# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**                                    Case No.:     1:17-CV-52

      Plaintiff,

v.                                                                              JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

      Defendants.

## PLAINTIFF SCOTT T. BALLOCK'S OPPOSITION TO JOINT MOTION TO DISMISS BY STATE TROOPER DEFENDANTS KIEF, GASKINS AND BERRY

      Frederick R. Juckniess, Esquire, *pro hac vice* pending and Charles J. Crooks, Esquire, sponsoring local counsel, having appeared this 6th day of July, 2017 hereby submit the following brief in opposition to the Trooper Defendants' motion to dismiss.

## MOTION TO EXCEED 25-PAGE LIMIT

      Pursuant to LR Civ P 7.02, counsel for the Plaintiff respectfully moves for leave to submit this 27-page opposition brief. Good cause to exceed 25 pages exists in the volume and detail of the factual allegations, the number of discrete arguments in the motion to dismiss and Plaintiff counsels' obligation to identify and argue controlling precedent that was omitted from the motion to dismiss.

                            /S/ *Charles J. Crooks*
                            Charles J. Crooks, Esq.
                            local sponsoring counsel

## MATERIAL FACTUAL ALLEGATIONS

Beginning in the fall of 2012, Plaintiff Scott T. Ballock and Defendant Ellen Ruth Costlow were engaged in acrimonious divorce proceedings, including alimony and child custody issues. The case was litigated in the Family Court of Monongalia County, West Virginia. (Am. Compl. ¶¶19-20). Defendant Costlow sought full custody of the couple's two minor children and lifetime support payments. (Am. Compl. ¶¶22-23).

Defendant Costlow presented a false narrative to the Family Court and others. (Am. Compl. 67, 70, 71). She falsely claimed that Plaintiff had brutally beat her in front of their children, but in fact she was never assaulted by Plaintiff. See (Am. Compl. 256, 257). To evaluate the extraordinary and suspicious nature of Costlow's claims, the Family Court judge ordered that a forensic psychiatrist nationally recognized in Battered Women's Syndrome conduct an independent investigation. (Am. Compl. 260-263). Defendant Costlow had numerous reasons to fear losing the custody of her children, including that her false claims of abuse would come to light. (Am. Compl. 85). Costlow also has serious mental health disorders which manifest, among other ways, in vindictiveness, deceitfulness, and a desire to harm others. (Am. Compl. 85). Costlow also feared being arrested for her theft of thousands of dollars' worth of U.S. government-issued property. (Am. Compl 78-79). Concerned about losing her children, Costlow admitted to others, both orally and in writing that it was her intention to have Plaintiff Ballock arrested so that he would lose his job. (Am. Compl. 93, 113, 114).

In the spring of 2013, Costlow's boyfriend, Kenny Ice, Jr., contacted Ballock. Ice, Jr., shared, among other things, to Ballock and witnesses, that Costlow was involved in a romantic relationship with trooper Chris Berry. (Am. Compl. 28, 29, 30, 59, 72, 73, 95, 97, 98, 99-106, 110-

1

112).  Ice, Jr. informed that at Costlow's request, Berry conducted surveillance of Ballock his parents to help Costlow in her custody battle. (Am. Compl. 26, 27)

As the final Family Court hearing approached, Defendant Costlow conspired with Defendants Michael Kief, Ronnie M. Gaskins, and Chris Berry (with whom she was having a romantic relationship), all troopers with the West Virginia State Police, to have Ballock wrongfully arrested. (Am. Compl. 32, 33, 46, 47).  On September 13, 2013, the day of the long-anticipated custody hearing, Defendants executed on their plan and staged a dramatic arrest of Ballock by Defendant Kief (Berry's immediate supervisor) at the Courthouse, directly in front of Family Court judge and personnel. (Am. Compl. 34, 35).

Ballock did not commit the non-violent misdemeanor offenses with which he was charged. (Am. Compl. 50, 51, 53-56).  Had the Defendants conducted an actual investigation or interviewed Ballock, they would have learned that Ballock was innocent. *See* (Am. Compl. 51-56).  The troopers' intention was not to learn the truth of a situation; rather, in coordination with Costlow, they abused their positions of authority within the legal system to achieve their ulterior motives - to harm Ballock and assist Costlow in the Family Court. (Am. Compl. 57-58).

The charges and prosecution were maintained and continued by Defendants, who eventually "dumped" the charges in the lap of the prosecutor.  Am. Compl. ¶115.  Eventually, Ballock was ultimately able to present his side of the story to the Monongalia County Prosecutor, who recognized the injustice and agreed to dismiss the charges. *See* Am. Comp. ¶¶ 53, 54.  The charges against Ballock were dismissed, with prejudice, on April 7, 2016.  The matter was expunged by the Monongalia County Circuit Court on July 13, 2016.  (Am. Compl. 55-56).

Ballock was fully exonerated from the assertions by Costlow by the report and testimony of the court-appointed psychiatrist, Dr. Christi Cooper-Lehki. (Am. Compl. 84, 271).  Based in

part on Doctor Christi Cooper-Lehki's findings, Ballock was awarded sole custody of the couple's minor children, and Costlow was denied even visitation with the children unless it occurred under the immediate and direct supervision of an independent third party who could protect the children from further harm by Costlow. (Am. Compl. 86, 87).   Dr. Cooper-Lehki's findings were so damning and shone such a bright light on Defendant Costlow's outrageous conduct, that Costlow fought to have them sealed. (Am. Compl. 266, 276).  Ballock was thus prevented from using the report to clear his name, fight the criminal charges, or challenge his punishment and investigation at the FBI.

Through the arrest and nearly three-year duration of the charges and prosecution, Ballock suffered serious harm to his personal reputation, his professional reputation as an FBI agent, associated economic losses, and severe emotional distress. See Am. Comp. Paras. 119, 120. An investigation into Ballock was initiated at work, and Ballock was prevented from promotions and transfers, and is currently threatened with termination.  The financial and emotional harms suffered by Ballock are alleged as a direct result of the concerted and coordinated wrongful conduct of the Defendants Costlow, Kief, Gaskins, and Berry. (Am. Compl. 32, 47, 91).

Though she agreed not to do so, Defendant Costlow has repeated false and defamatory information to Ballock's employer – falsities that would be revealed by disclosure of the sealed report. (Am. Compl. 117, 118, 119, 120).  As a result, in addition to Ballock's other causes of action, he seeks an order to unseal the report regarding Costlow.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), courts must construe the complaint in the light most favorable to the plaintiff, reading the allegations comprehensively, accepting the asserted facts as true. *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (7th Cir. 1993).  The complaint need

only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Tobey v.* Jones, 706 F.3d 379, 387 (4th Cir. 2013) (*quoting Bell Atlantic Corp. v. Twombly*, 550 US. 544, 555, 127 S.Ct. 1955 (2007)). A motion to dismiss under 12(b)(6) "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Id.* (*quoting Republican Party of North Carolina v.* Martin, 980 F.2d 943, 952 (4th Cir. 1992).

The complaint in this case was prepared by *pro se* plaintiff Scott Ballock. Complaints filed by *pro se* plaintiffs are to be liberally construed – more liberally than those drafted by counsel. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "However inartfully pleaded by a *pro se* plaintiff, allegations are sufficient to call for an opportunity to offer supporting evidence unless it is beyond doubt that the plaintiff can prove no set of facts entitling him to relief." *Thompson v. Echols*, Civ. No. 99-6304, 1999 WL 717280 (4th Cir.) (*citing Cruz v. Beto*, 405 U.S. 319 (1972)).

## I.   PLAINTIFF HAS ALLEGED A MALICIOUS PROSECUTION CLAIM, AND HAS NOT ADMITTED PROBABLE CAUSE IN HIS COMPLAINT OR THE AGREEMENT RAISED BY DEFENDANTS AS AN AFFIRMATIVE DEFENSE.

Plaintiff has adequately alleged a malicious prosecution claim under both federal and state law. Defendants have a single argument to dismiss, relying on enforcement of a fugitive document identified as Exhibit A as a bar to the Plaintiff's claims. The argument fails first because the document cannot be considered and has not been properly submitted, and cannot be used to contradict Ballock's allegation that the proffered cause was based on false information and malicious intent. More importantly, when enforceable, such agreements are known as release-dismissal agreements requiring a complete factual record before defendants can carry their burden to show it can be enforced. Whether the agreement is an enforceable bar to the Plaintiff's claim is a question that cannot be resolved at the 12(b)(6) stage.

### A.   Exhibit A is a Fugitive Document That May Not Be Properly Considered on the Motion to Dismiss.

4

The exhibit A submitted by defendants may not be considered at the 12(b)(6) stage. The Defendants failed to authenticate the document or demonstrate its admissibility. No declaration establishes that it is properly considered by the court, that it is unaltered or was retrieved from a credible source. Furthermore, defendants make no effort to request or justify that the court take judicial notice of the document.

The principal case cited by defendants demonstrates how they have failed to properly submit and present extrinsic evidence. In *Zak v. Chesea Therapeutics Int'l*, 780 F.3d 597 (4th Cir. 2015), the court reversed a 12(b)(6) dismissal after the lower court improperly considered extrinsic evidence. Unlike this case, the *Zak* defendants made a request for the court to take judicial notice, yet it was still reversible error. *Id.* at 604.

Further, the *Zak* decision makes clear the principles that prevent consideration of the exhibit as suggested by defendants. Under Federal Rule of Evidence 201, courts "at any stage of a proceeding may "judicially notice a fact that is not subject to reasonable dispute" provided that it meets the requirements that the fact itself is "generally known within the court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Defendants make no effort to request judicial notice or make the required showing that the document or its contents meet either of these tests.

In *Zak*, the complaint had identified public filings submitted to the SEC, but it did not otherwise refer to the contents of the SEC filings that court relied upon. As such, the contents were not "explicitly referenced in or an integral part of the plaintiff's complaint." *Id.* at 607. Similarly, Ballock alleged that Defendant Costlow agreed "she will not communicate any disparaging information or commentary to Scott Ballock's employer or place of employment" and refers to the attachment to the defendants' prior motion to dismiss.

5

Respectfully, this Court may not properly consider the defendant's Exhibit A because defendants failed to authenticate the document, failed to request judicial notice or establish that notice could be taken under Federal Rule of Evidence 201, and because the document does not fall within the narrow exception to excluding extrinsic evidence at the 12(b)(6) stage.

**B.** **Even If Considered, Exhibit A Cannot Establish that Defendants Acted with Probable Cause and Not with False Assertions and Improper Motives.**

Had the defendants requested judicial notice, and attempted the required showing (which they could not) the document could not be considered under the "narrow exception" detailed in *Zak*. There are limits on how such evidence may be proffered and used. First, the court "must construe such facts in the light most favorable to the plaintiffs." Second, how and whether a fact properly is considered "depends on the manner in which a court uses the information." Here, Defendants seek to improperly use Exhibit A to contradict Ballock's allegation that the cause proffered by the trooper Defendants was false and that it was all being done as part of a civil conspiracy to misuse the legal system to harm Plaintiff and benefit Costlow.

It is improper for the Court to use judicial notice to use extrinsic evidence to establish facts that contradict the allegations of the complaint. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 558 (4th Cir. 2013); *Zak*, 780 F.3d at 607. In *Clatterbuck*, the plaintiff challenged a city ordinance as violating the First Amendment, and defendants sought to dismiss seeking judicial notice of the legislative record. Though the record evidence showed a content-neutral purpose by the City in enacting the challenged ordinance, the Fourth Circuit reversed the lower court for relying on that evidence at the 12(b)(6) stage. *Clatterbuck* reiterated that, at the Rule 12(b)(6) stage, "the court's task is to test the legal feasibility of the complaint without weighing the evidence that might be offered to support of contradict it." *Id.* at 558.

Similarly, the *Zak* decision reversed the trial court, finding its reliance on extrinsic documents to be error because, even if judicial notice had been appropriate, the district court "incorrectly construed the information" in the SEC documents. *Id.* at 607. The lower court had failed to consider the information in the light most favorable to plaintiffs, accepting that the SEC documents showed that none of the plaintiffs sold stock during the class period. Though this was the conclusion pressed by defendants, the Court found that the fact could not be found explicitly on the face of the filing, particularly construed in the plaintiffs' favor. As a result, the information could not properly be relied upon to establish that fact. *Id.* at 607.

Viewed in a light most favorable to Ballock, the fugitive Exhibit A does not negate the defendants' fraudulent and willful violation of Ballock's constitutional rights against unlawful seizure by asserting false evidence and conspiring with Costlow in having Ballock arrested at the courthouse during a custody hearing.

Examination of the fugitive Exhibit A shows that Ballock did not agree to release these defendants for constitutional violations, including malicious prosecution, or otherwise agree that he will not seek to remedy the violation of his constitutional rights. Instead, paragraph 1 of Exhibit A states only that "Scott Ballock acknowledges that probable cause existed for West Virginia State Police to file for the issuance of the warrants in this case pursuant to W.Va. Code 61-3C-14a and 61-2-9a." Even if one were to assume that this agreement is itself enforceable, it does not say what defendants claim it says, nor establish the absence of a legal requirement for malicious prosecution.

Defendants neither address nor acknowledge any of the allegations of the amended complaint regarding the deliberate use of false and manufactured evidence, failure to interview or investigate, participation in a scheme to cause Ballock harm and advantage Costlow in a custody proceeding, and other misconduct directed at causing the seizure of Ballock. As such, defendants

7

cannot challenge the adequacy of those allegations, and their challenge is limited to using a fugitive document, Exhibit A, to summarily bar those allegations. Such a use of a fugitive document would be error as shown in *Clatterbuck* and *Zak, supra*. This Court must not weigh fugitive evidence and find facts necessary to an affirmative defense.

### C.     The Defendants' Fugitive Exhibit A Does Not Constitute a Release-Dismissal Agreement and Cannot Be Summarily Enforced as Such.

If Exhibit A could be properly considered at the 12(b)(6) stage, Defendants still could not carry their burden to show that Exhibit A is a valid and enforceable release of any malicious prosecution claim. Defendants repeatedly argue that Exhibit A acts as a complete bar and release. Yet, they failed to cite a single case stating that this agreement could be so summarily enforced at the 12(b)(6) claim to bar Plaintiffs' §1983 claims. Instead, the Defendants proposed that this Court make an entirely new area of law that allows prosecutors in this state and elsewhere to achieve a release by disguising it as an agreement regarding the legal conclusion of probable cause.

Under Supreme Court and Fourth Circuit authority, agreements that achieve the result Defendants are requesting are known as release-dismissal agreements. As discussed in detail below, such agreements are not presumed enforceable – quite the opposite. Instead, each such agreement must be examined on a case-by-case basis to determine whether the public interest in enforcing the agreement outweighs any harm, and must be *proven* by a defendant asserting it to be valid and enforceable. *Town of Newton v. Rumery*, 480 U.S. 386 (1987).

Defendants failed to identify the binding test set forth by the Supreme Court and adopted by the Fourth Circuit, nor did they attempt to show that their fugitive document meets the multi-factor test. Such an effort would be inappropriate at this 12(b)(6) stage anyway. Worse, they unfairly and unjustifiably suggest their fugitive document acts as a release-dismissal agreement,

but evidently should escape *any* scrutiny because it does not contain an actual release.  Defendants cannot completely sidestep this area of law, and enforce an ambiguous and indefinite document as an affirmative defense at the 12(b)(6) stage as if it were a true release-dismissal agreement.  They apparently expect the court to create new law that will allow prosecutors to obtain the benefits of a release-dismissal agreement without the trouble of following Supreme Court precedent – do not ask for a release, just get an agreement like Ballock's that "probable cause existed" and it automatically bars later §1983 claims.

1. **Release Dismissal Agreements Require Defendants to Prove Validity and Enforceability in Light of Multiple Factors Inappropriate at the 12(b)(6) Stage.**

Release-dismissal agreements have been scrutinized and in some cases held to be *per se* unenforceable by the courts, until the Supreme Court addressed the strict standards on which such agreements may be relied.  The standards that apply to express releases of officials from suit in exchange for dismissal -- standards which defendants fail to even address -- make clear that a far less explicit and ambiguous document like Exhibit A cannot become more definitive and effective than the much-questioned and often invalid release-dismissal agreement.

In *Rumery*, the defendant Bernard Rumery threatened a witness to his friend's aggravated assault, and was arrested for the felony of witness tampering.  Rumery and his defense counsel threatened to sue if the charges were not dismissed.  *Id.* at 389-90.  The prosecutor concluded that the prosecution should be dismissed so that the threatened witness would not be subjected to trauma in having to testify against Rumery.  Rumery's counsel then drafted an agreement "in which Rumery agreed to release any claims he might have against the town, its officials, or [the threatened witness] if [the prosecutor] agreed to dismiss the criminal charges."  *Id.* at 390.  After three days and meetings with his counsel, Rumery signed the release-dismissal agreement.

Months after signing the agreement, Rumery filed an action under § 1983. Defendants moved to dismiss based on the release-dismissal agreement. The lower court dismissed the claim. On appeal, the First Circuit reversed the dismissal and adopted a *per se* rule invalidating release-dismissal agreements, explaining:

> It is difficult to envision how release agreements, negotiated in exchange for a decision not to prosecute, serve the public interest. Enforcement of such covenants would tempt prosecutors to trump up charges in reaction to a defendant's civil rights claim, suppress evidence of police misconduct, and leave unremedied deprivations of constitutional rights.

*Id.* at 391 (*quoting* 778 F.2d 66, 69 (1985)). Likewise, other courts and scholars have come out strongly against the enforcement of such agreements except in very limited circumstances.

Reviewing the First Circuit's decision, the Supreme Court began its analysis of the release-dismissal by explaining the rule that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Id.* at 392. Although the Court found that a *per se* rule would be unnecessary, it held that the enforceability of such agreements "may infringe important interests of the criminal defendant" and thus required scrutiny before enforcement. *Id.* at 394.

Examining the factual background and circumstances of the agreement, the Court found that there was an independent, legitimate reason for the prosecutor to make the agreement -- the threatened witness would be "spared the public scrutiny and embarrassment she would have endured" if she had to testify. All parties agreed that this was the reason the prosecutor sought the release, and thus supported "an independent legitimate reason ... directly related to his prosecutorial responsibilities." *Id.* at 398. The decision noted Rumery's counsel drafted the agreement, Rumery had three days to meet with counsel, and that evaluation of the record facts

showed "enforcement of this agreement would not adversely affect the relevant public interests." *Id.* at 398.

Justice O'Connor clarified that these findings were based on "ample evidence in the record concerning the circumstances of the execution of this agreement" and "[c]lose examination of all the factors in this case." *Id* at 402-03. Accordingly, the concurrence clarifies that the burden of proof is on the defendants asserting the agreement. She explained:

> The defendants in a 1983 suit may establish that a particular release executed in exchange for the dismissal of criminal charges was voluntarily made, not the product of prosecutors overreaching, and in the public interest. But they must *prove that this is so;*"

*Id.* at 401 (emphasis in original). In considering whether the agreement was knowing and voluntary, O'Connor identified a set of factors to be considered in determining whether a release-dismissal agreement may be enforced:

> (1) the knowledge and experience of the criminal defendant;
> (2) the nature of the criminal charges;
> (3) the existence of a legitimate criminal justice objective for obtaining the release;
> (4) whether the defendant was counseled; and
> (5) whether the agreement was executed under judicial supervision.

*Id.* at 401-402.[1] The Fourth Circuit has adopted these factors, and noted that defendants "must *prove*" the validity and enforceability of the asserted release-dismissal agreement. *Rodriguez v.*

---

[1] It is important to note that four justices -- Stevens, Brennan, Marshall and Blackmun -- dissented from the *Rumery* opinion, finding that the agreement was not proven enforceable and should not be enforced. As they observed "[e]ven an intelligent and informed, but completely innocent, person accused of crime should not be required to choose between a threatened indictment and trial, with their attendant publicity and omnipresent possibility of wrongful conviction, and surrendering the right to a civil remedy against individuals who have violated his or her constitutional rights." *Id.* at 403. The dissent explains that no release-dismissal agreement could be so easily determined to be deliberate, informed and voluntary:

> Whatever the true value of a 1983 claim may be, a defendant who is required to give up such a claim in exchange for dismissal of a criminal charge is being forced to pay a price that is unrelated to his possible wrongdoing as reflected in that charge.

*Id.* at 411. As a result, the dissent concluded that even though Rumery's decision was deliberate, informed and voluntary, those findings do not address two additional distinct principles against enforcement: "[t]he prosecutor's offer to drop the charges if the defendant accedes to the agreement is inherently coercive; moreover, the agreement exacts a price unrelated to the character of the defendant's own conduct." *Id.*

*Smithfield Packing Co., Inc.,* 338 F.3d 348, 353-54 (4th Cir. 2003); *see also, Poling v. Ferguson,* 878 F.Supp. 880, 881 (N.D. West Virginia 1995) ("The burden of proving the enforceability of a release-dismissal agreement is upon the party asserting it as a defense to a § 1983 claim.")

The *Rodriguez* decision was, however, at the summary judgment stage where the language, circumstances, and facts underlying the *Rumery* factors could be examined on a developed record. Similarly, the *Poling* decision was rendered under Rule 56, not Rule 12(b)(6). In fact, defendant cites no case in support of a 12(b)(6) dismissal because it appears there is no decision in West Virginia or the Fourth Circuit granting a 12(b)(6) motion to dismiss based on a release-dismissal agreement. Rather, consistent with *Rumery*, each of these decisions applied the factors based on facts developed by defendants who bore their affirmative burden to enforce such agreements, based on factual records and Rule 56 analysis.

The defendants have failed to even identify the required factors to assert this agreement as an affirmative defense. They cannot timely attempt the required showing on a developed factual record at this stage. Dismissal is unwarranted and unavailable based on fugitive Exhibit A.

## 2. Exhibit A on Its Face Cannot Support a Finding of Voluntary and Deliberate Relinquishment of All Ballock's Rights to Pursue a § 1983 Claim Against These Defendants.

While there is not an adequate factual record, a cursory examination of the fugitive Exhibit A reveals that it could not been enforced as a voluntary and deliberate release of Ballock's constitutional rights and right to sue under §1983. Though it would have been little or no additional burden to add explicit language to Exhibit A, the prosecutor did not say anything about releasing these defendants, about waiving any right to sue, or explicitly surrendering any rights. Compare Exhibit A to the release-dismissal agreement examined in *Rodriguez, supra*. There, the release-dismissal agreement considered at the summary judgment stage was explicit:

> I hereby fully release and forever discharge the Bladen County Sheriff's Department, including but not limited to Sheriff Steve Bunn [and several named sheriff's deputies] ... from all existing claims which I may have against [them] for alleged conduct that occurred on or about August 22, 1997....
>
> I will not initiate any lawsuit, complaint or legal claim against any of the Releasees in any federal, state or any other court or other tribunal for any conduct that occurred on or about August 22, 1997.

*Id.* at 352. In considering whether the agreement was a bar to the §1983 claims, the court looked to the *Rumery* factors to see if it enforceable, deliberate and voluntary. The Court concluded that the agreement could be enforced in light of the facts adduced at summary judgment including, among other reasons, the record facts that "plaintiffs conceived, initiated, and proposed the arrangement" and drafted the document, and it was not presented by a prosecutor "who knew that civil liability might arise from the underlying events." *Id.* at 353-54. There was no question as to the intended meaning of the terms, as there is in this case.

The Defendants have not and cannot show that language of the agreement supports an enforceable and voluntary release-dismissal agreement. This, along with the failure to even proffer, much less establish, all the other factors in support of enforcement, they cannot properly use their fugitive Exhibit A to achieve Rule 12 dismissal.

**D.     Defendants' Argument for Estoppel Does Not Explain or Support What is Estopped or The Type of Estoppel They Ask the Court to Apply.**

Although defendants do not cite any cases – release dismissal agreement cases or otherwise – to support their argument about fugitive Exhibit A they do mention one defensive doctrine in passing. They state that because of Exhibit A, Ballock "is estopped from arguing that his arrest was not supported by probable cause." Dkt. 16 at 8-9. Defendants provide no citation to support this argument. The Court must reject this throw-away argument – one cannot even tell if the defendants think collateral estoppel, equitable estoppel or judicial estoppel applies, how it would meet the test for any or avoid the exceptions. Indeed, the argument as to what Ballock is supposedly

estopped from saying does not even match the language of Exhibit A. His arrest was not supported by probable cause. He plainly alleges that the individual defendants knew that he should not be arrested, and that they had improper and ulterior motives for doing so.  No case law or cogent theory has been offered to support dismissal under Rule 12(b)(6).

## II.   PLAINTIFF'S § 1983 CLAIM BASED ON THE WVSP TROOPERS SEEKING TO INTIMIDATE PLAINTIFF AND MOTIVATE THE FBI TO COERCE PLAINTIFF TO DROP HIS SUIT SHOULD NOT BE DISMISSED AND WARRANTS AT LEAST INJUNCTIVE RELIEF

It fits the pattern of behavior by the Defendants that they would send uniformed West Virginia State Troopers to the FBI headquarters the day after Plaintiff attempted service of his initial complaint.  By using the office and uniforms of the WVSP to both intimidate Plaintiff, prevent him from proceeding, and to cause him further harm and damage to his relationship with his employer at the FBI, Defendants have violated Ballock's First Amendment Rights. Furthermore, he was right to raise it in his *pro se* complaint to reserve the right to seek injunctive relief during the pendency of this matter and to prevent further conduct intended to intimidate, harass and damage his employment status.

While the FBI representative to whom the trooper appeared did not recognize him, it may have been one of the three defendants, or someone sent at defendants' behest, discovery will tell. Either inference is warranted and far more likely than not. Plaintiff adequately alleges that Plaintiffs "intended to use the appearance of law enforcement, and authority of the WVSP, to intimidate Ballock's employer into convincing Ballock to stop, or withdraw, his lawsuit." (Am. Cmpt. 172)

Although Ballock may not yet have the full facts to flesh out the causal connection between these actions and his reputational and career damages, there are sufficient facts alleged that this

pattern and practice of Defendants to misuse their office to damage Plaintiff warrants at least injunctive relief under 28 U.S.C. §1983.

### III. PLAINTIFF HAS ADEQUATELY ALLEGED A CLAIM FOR TORTIOUS INTERFERENCE BASED ON THE ATTEMPT TO INTIMIDATE PLAINTIFF AND END HIS ACTION BY COMPLAINING TO HIS EMPLOYER.

Defendants acknowledge, *arguendo*, that sending West Virginia State Troopers, in uniform, to Plaintiffs' employer to lodge a complaint on behalf of the troopers and seek to discuss Ballock's case with the "Senior Supervisory Resident Agent" was wrongful. However, they assert, without explanation or reference to the allegations, that Ballock failed to allege there was an intentional act of interference. Next, they assert there is no allegation of damage to his employment. Both assertions lack merit or explanation, and fail to comprehensively read the *pro se* complaint in a light most favorable to Ballock.

Again, Ballock alleges that the timing and appearance of the uniformed representative were connected to the attempts to serve the defendants, as well as the fact that it was Defendants who were aware of his employment with the FBI. (Am. Cmpt. 219-21). Moreover, as noted above, it is more likely than not that the uniformed representative was either one of the defendants, or acted at Defendants' direction. Indeed, that is the only reasonable conclusion. Notably, Defendants fail to offer any possible legitimate purpose for a uniformed West Virginia trooper to seek to lodge a complaint and to speak with the Senior Resident Agent about Ballock's filing. (Am. Cmpt. 219).

Ballock has likewise alleged damages sufficient to survive Rule 12 dismissal. The damage to his employment relationship as comprehensively alleged in the complaint demonstrates harm to his relationship, including concerning promotion and advancement, denial of promotion and transfer opportunities, and an ongoing investigation that may result in termination. (Am. Cmpt. 116, 199, 223, 238-240). Each of these allegations must be viewed in light of the pattern of

15

conduct, and admissions by Costlow, that together these defendants sought to damage him.  (See e.g. Am. Cmpt. 93).

Plaintiff supports these allegations by identifying and alleging facts regarding the "investigation of Ballock with his employer."  (Am. Cmpt. 223)  That investigation has been "prolonged" and may still result in his termination.  (Am. Cmpt. 228, 238-240).  As Ballock also alleges, even Costlow acknowledged that through her conduct she had obtained "the upper hand with . . . ruining (Ballock's) career."  (Am. Cmpt. 93).   Nevertheless, the status of being investigated, the denial of regular promotion and transfer opportunities, and that the investigation may result in termination are sufficiently alleged, and support the required altered status to support this claim.  This improper and unlawful conduct by Defendants has been sufficiently alleged, along with damage to Plaintiff, to preclude dismissal at the 12(b)(6) stage.

IV.   **THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' OTHR CLAIMS.**

Defendants argue that the remaining claims against them should be dismissed on statute of limitations grounds.  This argument should be rejected for at least three reasons.

First, Defendants fail to credit the allegations that show that Defendants' actions continued at least through the dismissal of the criminal complaint, and continued thereafter.  By impermissibly reading the allegations in isolation and in a light most favorable to themselves, Defendants assert that "[t]he last date identified in the Amended Complaint that any Defendant is alleged to have committed an act or omission that resulted in damage to Mr. Ballock is September 13, 2013, the date Sgt. Kief is alleged to have arrested Mr. Ballock."  (Dkt. 16 at 13).  To the contrary, Plaintiff alleges the cooperation and continued participation of Defendants through the time of dismissal, April 7, 2016.  It was Defendants who both "initiated and continued their efforts even after it was apparent that Plaintiff was innocent."  Plaintiff alleges throughout the

"continuation of prosecution" by Defendants, which included that the Defendants "'dumped' the case in [the prosecutor's] lap." (See e,g, Am. Cmpt. ¶¶ 157, 180).

Viewed comprehensively, the amended complaint describes an ongoing pattern and practice to harm Plaintiff, including through the date of filing the complaint, when Defendants either went or sent a uniformed trooper in an improper attempt to intimidate Plaintiff and damage his relationship with his employer.  As a result, the ongoing conduct is not time barred, and is alleged to last at least through April 7, 2016, and further alleged to continue through the filing of the complaint in May 2017.  Second, concerning the Section 1983 claims, even if Plaintiff's allegations of continuing conduct were somehow not credited, his cause of action against defendants would be still dependent on the outcome of the criminal proceedings when the initial arrest was pursuant to a warrant, and thus did not accrue until after termination of the prosecution. Where a complaint for violation of §1983 is made based in part on an unconstitutional arrest pursuant to a warrant, then the statute of limitations on such claims does not run until after termination of the prosecution. *See Brooks v. City of Winston-Salem,* 85 F3d 178, 183 (4th Cir. 1996).  The *Brooks* decision reversed dismissal on statute of limitation grounds, finding that the claims were not time barred where the complaint alleged that the arrest warrant "was not supported by probable cause or that the officer continued the prosecution after he knew or should have known that Brooks was innocent." *Id.*  Similarly, Ballock could not have successfully brought any of his §1983 claims without termination of the proceedings because a conviction would have prevented any such claims.  Accordingly, his claims did not accrue until the favorable termination. *Id.*

**V.      DEFENDANTS FAIL TO ADDRESS THE ABUSE OF PROCESS ALLEGATIONS, AND THUS CANNOT DEMONSTRATE THAT THE FEDERAL OR STATE LAW CLAIMS FAIL ON THE PLEADINGS.**

Plaintiff has alleged a detailed history and course of events that resulted in the misuse of process intended to harm Plaintiff, and benefit defendants and the then-lover of one of the defendants. The issuance of the warrant on false information was then improperly used not just to arrest Ballock, but to do so at a time and place chosen by Defendants in collusion with Costlow -- at the courthouse, at the same time as family court proceedings involving Plaintiff, with the intent to cause Ballock harm in those proceedings and to damage his reputation and ability to live and work in the community. Defendants' motion not only ignores these facts, Defendants make no effort to consider any allegations in a light most favorable to Ballock as required at the 12(b)(6) stage.

Initially, Defendants question whether a cause of action exists under §1983 for abuse of process. Abuse of process, where the process relates to criminal proceedings, has long been recognized as supporting a § 1983 claim. *See Cook v. Sheldon*, 41 F.3d 73, 79-80 (2d Cir. 1994); *Rose v. Bartle*, 871 F.2d 331, 350 N.17 (3d Cir. 1989); *Jennings v. Shuman*, 567 F.2d 1213, 1218-19 (3d Cir. 1977). Though the Fourth Circuit has apparently neither rejected nor adopted a cause of action, the facts here as in *Jennings* warrant the holding that "by definition" the abuse of process constitute a constitutional rights violation. Defendants have likewise failed to demonstrate that the abuse of process count pursuant to § 1983 must be dismissed.

Defendants' motion claims that they were unable to identify any factual allegations relating to "improper use" of a regularly issued process. *Dkt.* 16 at p. 16. They then claim that the amended complaint "only alleges that the State Police Defendants caused an arrest warrant to issue." *Id.* Defendants do not even acknowledge or address any factual allegations about the circumstances of the arrest or the continued damage caused by the ongoing proceedings and prosecution with Defendants knew should not have even started.

18

Plaintiff is entitled to have all facts accepted as true and viewed in the light most favorable to the plaintiff. *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011) (affirming denial of dismissal of § 1983 claims when facts and "all inferences" were taken in plaintiffs' favor). Ballock alleges that Defendants cooperated with Costlow (with whom Defendant Berry was having an affair) to damage Ballock and benefit Costlow including in her custody and alimony battle with Ballock, continued their investigation and continuation of the prosecution to harm and disadvantage Ballock, and abused the criminal process in doing so. Am Cmpt. at 1-3, 22-25, 32-36,45-54, 57-58, 76-84, 90-95, 114-116, 123-26, 153-54, 157, 176 and 180.

Defendants are simply wrong to argue that he "only alleges" that defendants "caused an arrest warrant to issue." Among the allegations, which must be construed in a light most favorable to Plaintiff, are the following facts:

- ". . .Berry, Kief, and Gaskins, in cooperation with Costlow, intentionally ignored policies, procedures and the constitutional rights of Ballock in planning on proceeding with an arrest of Ballock at the Family Court Judge's courtroom on the day of a hearing critical to Costlow and her desire to obtain custody of the children. (Para. 32)
- Together, defendants intended the place of arrest, time of arrest, and nature of the process to harm Ballock and benefit Costlow in the Family Court proceedings, and to damage and harm Ballock personally." (para. 33)
- On September 13, 2013 -- in an elaborate production on the day of the final custody hearing -- Ballock was arrested by WVSP Seargent Mike Kief directly outside the Family Court Judge's courtroom during a break in the proceedings. (para. 34)
- Ballock was arrested in view of the Family Court personnel and, flanked by two WVSP troopers, taken from the Family Court waiting area to another flooring the municipal building and another Magistrate's courtroom. (Para. 35)
- [Defendants] knew that Costlow and Ballock were involved in ongoing proceedings in Family Court and that the Family Court was the appropriate venue for any concerns Costlow might have had." (Para 91)
- In an order dated September 20, 2013, Judge Rangall Minor, Family Court Judge, Monongalia County, West Virginia wrote in part: "The Court was somewhat dismayed at the arrest of the Father on the day of the hearing on September 13, 2013. While the Court in no way condones any potential criminal behavior on anyone's part, **the Court has to believe the timing of the arrest represented primarily a strategic decision to gain advantage in this case** (emphasis added.) In that regard, the Court notes the father's communications at issue occurred over several months with no apparent effort by the Mother to seek assistance from this Court or any other judicial body until the time of the

hearing. This court almost certainly would have been willing to enjoin such communications by the Father if the Mother had raised the issue at any time." (para 90)

- Costlow admitted on multiple occasions that she intended by these actions to get Ballock fired from his job and to cause him harm. (113-114)
- "Assistant Prosecutor Cindy Scott told the Magistrate judge that WVSP troopers 'dumped' the case in her lap." (para 115)

The allegations taken as true establish that after the warrant improvidently issued, Defendants planned and executed an arrest which was staged to cause Ballock the greatest harm and benefit Costlow. Defendants also continued the wrongful investigation and prosecution of Ballock, all of which are alleged as part of the conspiracy to abuse the process. This included Defendants ongoing conduct, ignoring procedures, and participation in the continuation of the prosecution. (Am. Compl. 45-54 153-157, 176-180).

Ballock alleges that the arrest was on September 20, 2013, but that the Defendants' conduct continuing and supporting the prosecution, withholding the exculpatory truth and refusing to conduct a proper investigation or follow procedure, through the years when Defendants 'dumped' the case in her lap." (Am. Compl. 115) The process continued for almost three years, through April 7, 2016, when the claims were finally dismissed with prejudice. (Am. Cmpt. 55). Ballock's factual allegations establish conduct beyond seeking a warrant which support his abuse of process claims, and Defendants fail to even acknowledge those allegations, let alone examine all reasonable inferences. Accordingly, his claims for abuse of process must not be dismissed.

## VI.   DEFENDANTS' ARGUMENT TO DISMISS THE § 1983 DEFAMATION CLAIM FAILS BECAUSE IT MISCONSTRUES AND FAILS TO ADDRESS FACTS ALLEGED BY PLAINTIFF

Defendants argue that the § 1983 claim based on defamation cannot survive without an allegation of an "altered or extinguished" status. Dkt. 16 at 17-18 (citing *Shirvinski v. U.S. Coast*

*Guard*, 673 F.3d 308, 314-15 (4th Cir. 2012).[2]  Defendants again fail to properly acknowledge the allegations.  Ballock has alleged that his status has changed by a pending investigation and his employment status is the subject of a review that may result in his termination.  (Am. Compl. 116, 119, 223, 228, 238-40).

As noted above, the report and the attendant damage was of a continuing nature, stretching from the time of the report, through dismissal of the charges, and continuing through today while Ballock's employment is under review and threat of termination, all of which is adequately alleged by Ballock at the 12(b)(6) stage.  He alleges that he faces termination after the current review precipitated by the report and the related prosecution is complete.  The threat of termination, investigation, and denials of promotion are sufficient to support the claims.

Ballock alleges the damage and required altered status, repeatedly that "great harm was done to Ballock and his rising career as an FBI agent." (Am. Compl. 116).  Rather than enjoy the standard status allowing promotion and advancement, Ballock suffered by "being denied promotional and transfer opportunities" and that that he "faces possible termination of his employment." (Am Compl. 119).

He supports these allegations by identifying and alleging facts regarding the "investigation of Ballock with his employer." (Am. Compl. 223)  That investigation has been "prolonged" and may still result in his termination. (Am. Compl. 228, 238-240).  As Ballock also alleges, even Costlow acknowledged that she had obtained "the upper hand with . . . ruining (Ballock's) career." (Am. Compl. 93)  The investigation, the denial of regular promotion and transfer opportunities, and potential termination are sufficiently alleged, and support the required altered status to support this claim.

---

[2] Defendants again fail to provide legal support for their argument, given that *Shirinksi* is a summary judgment decision, not at the 12(b)(6) stage.

**VII. DEFENDANTS' ARGUMENT THAT INSUFFICIENT FACTS ARE ALLEGED TO SUPPORT DEFAMATION UNDER FEDERAL OR STATE LAW FAIL.**

By once again citing and relying on only selected portions of the amended complaint, Defendants construct a false narrative regarding what facts are alleged. Defendants make three arguments: there were no defamatory statements by Defendant Gaskins, that any statements were not communicated, and that Gaskins' communicated statements were privileged. These arguments all fail.

Defendants first argue that "Ballock does not allege any facts" to show that Defendant Gaskins "made defamatory statements about [Ballock]." (Dkt. 16 at 19). They cite only one paragraph of the amended complaint -- paragraph 67. In this paragraph, Plaintiff alleges:

> On September 2, 2013, Ronnie M. Gaskins, WVSP, prepared an incident report (1210-43774), replete with inaccuracies and outright, salacious lies as related to him by Defendant Costlow. (Am. Cmpt. 67)

Defendants then assert that dismissal is warranted because this paragraph does not specify defamatory statements. Defendants fail to acknowledge or even give a fair reading to the rest of the allegations. For example, Ballock alleges that he "never threatened, harmed, abused, or attacked" Costlow, but alleges the defamatory facts that were relayed by Costlow including that he threatened, abused and attacked Costlow. (Am. Cmpt. 63-64). These lies were among those incorporated by Gaskins.

Furthermore, Defendants ignore the significance of the defamatory assertion by Gaskins included in his report that Ballock sent Costlow emails on "significant dates 'including when her father passed away." (Am. Cmpt. 68) Defendants fail to acknowledge that these statements by Gaskins are likewise defamatory because the asserted emails themselves constituted a crime and formed the basis for the prosecution, investigation of Ballock and damage to his employment

22

status. Falsely accusing someone of a criminal offense is the very first category of defamation *per se*. *Restatement (Second) of Torts Sec. 570 (2013)*.

Defendants' second argument is a single sentence, asserting that "Ballock does not allege that Trooper Gaskins communicated the contents of the incident report to anyone." This is an exceedingly narrow reading that turns the 12(b)(6) standard on its head by reading the allegations in a light most favorable to Gaskins. The amended complaint puts together a story of intentional and malicious misconduct by these defendants, which includes the preparation of the report by Gaskins. The report's role in the continued prosecution is a matter of fact and legal procedure -- reports are submitted and reviewed, and made part of the record. The very allegation and identification by number of the report itself demonstrates that the report was communicated. Likewise, the ongoing investigation and prosecution from 2013 through 2016 would continue to utilize and repeat the defamatory statements, including when Ballock explicitly alleges that the prosecutor acknowledged "that WVSP troopers 'dumped' the case in her lap." (Am. Cmpt. 115). The reasonable conclusion is that "the case" included the defamatory report. Accordingly, with all allegations taken in a light most favorable to Plaintiff, Gaskins is alleged to have communicated the defamatory statements.

Finally, Defendants ask the Court to assume that "communication to an incident report would be a normal part of his duties as a State Trooper" and that, therefore, the report is privileged. This would require disregarding the allegations of the complaint regarding the conspiracy between Costlow and the defendants including Gaskins, which alleges facts concerning how and why the conduct of Gaskins was not pursuant to his normal duties but was instead wrongful and in violation of constitution, policies and procedures. Defendants next point the Court to a summary judgment opinion under Connecticut state law regarding commitment proceedings,

which does not support the argument that Gaskin's police report is absolutely privileged and warrants dismissal under 12(b)(6). Rather, at summary judgment, the Connecticut court analyzed whether the written statements were entitled to immunity as "communications uttered or published in the course of judicial proceedings." *Hopkins v. O'Connor*, 925 A.2d 1030, 1037 (Conn. 2007). Examination of that case cited by Defendants demonstrates its inapplicability and the misstatement by Defendants of its holding.

In *Hopkins*, the police officer's statements were made in a § 17a-503 proceeding, which vests the Probate Court with jurisdiction. The Court observed that "[i]n light of the fact that a police officer's actions under 17a-503 result in a person being detained in a psychiatric hospital for evaluation to determine whether further detention and ultimately commitment are proper, it is clear that statements made in the course of such actions are the first step in the 'distinct possibility' of a judicial proceeding" in the probate court on commitment. That analysis, combined with on the evaluation of evidence and affidavit testimony from the officer, resulted in summary judgment on the applicability of a judicial proceeding privilege attaching to the allegedly defamatory statements. Here, no such evidence exists regarding a statutory scheme.

## VIII.   DEFENDANTS WRONGLY ARGUE THAT, AT THE PLEADING STAGE, THE OUTRAGEOUS CONDUCT ALLEGED IS NOT SUFFICIENTLY OUTRAGEOUS AND THAT THE EMOTIONAL DISTRESS WAS INSUFFICIENTLY SEVERE.

Defendants again cherry pick two paragraphs of the amended complaint (212 and 215), rather than reading comprehensively, in order to argue that there was no outrageous conduct by Defendants supporting intentional infliction of emotional distress ("IIED"). Again, they utterly ignore all factual allegations on which the count is made. (*See* para. 211).

State Trooper Berry actively slept with Ballock's wife Costlow, personally and through his fellow defendants surveilled and harassed Ballock and his children, developed a plan with

Ballock's wife and his fellow troopers to arrest Ballock at family court during a custody proceeding, caused an investigation that damaged and continues to damage Ballock and may result in termination, and encouraged and supported the prosecution of plaintiff for three years during which Ballock and his children were faced with destructive and damaging false assertions knowingly spread by Costlow, her boyfriend, and his trooper friends.   That conduct is outrageous, goes beyond all possible bounds of decency.

The Defendants argue that it is of no moment that Ballock had to raise and watch his children deal with the results of this abuse.   Ballock's allegations regarding the damage suffered are sufficient at the pleading stage.   Moreover, viewed in a light most favorable to Ballock, his alleged emotional distress at having to deal with the lengthy, sordid history of Costlow and the troopers who assisted her, should be sufficient to avoid dismissal at the 12(b)(6) stage.   Defendants will have the opportunity at summary judgment to assert, based on the evidence, that Ballock's emotional suffering was inadequate.

## VI.   DEFENDANTS OFFER NO BASIS TO DISMISS THE CONSPIRACY CLAIM.

Still ignoring allegations, Defendants fail to properly consider the amended complaint when stating without support or citation that "Ballock alleges no facts to make plausible a claim that Defendants acted in concert" to commit the acts alleged in the earlier counts.   As shown, Plaintiff has alleged that Defendants acted in concert with Costlow to obtain a warrant on false information, design and plan an arrest for maximum detrimental effect, carry out that arrest, detail Ballock, maintain and support the prosecution of Ballock through 2016, including "dumping" the case in the lap of the prosecutor. (Am. Compl. 115).   Plaintiff has alleged motivation, including the romantic affair with Defendant Berry, and his coordination with the other defendants. *See supra* at p.5.   Plaintiff has also alleged supporting facts, including that each defendant acted against

procedures and protocols, acted without reason or justification, and participated in a scheme to knowingly and intentionally harm Ballock at Costlow's behest. (*See, e.g.*, Am. Compl, 32-36, 57-58, 76-84).

## CONCLUSION

The pleadings were written *pro se*. Some 300 paragraphs effectively and sufficiently allege the facts of a simple but outrageous story. The Defendant troopers and Plaintiff's then-wife conspired to arrest and prosecute Ballock during family court proceedings to advantage Costlow and harm Ballock. Defendant Barry was having an affair with Costlow and so agreed to use false information to stage the arrest at the courthouse, and support the prosecution of Ballock for nearly three years, until the criminal proceedings terminated in Ballock's favor in April 2016. This conspiracy of wrongful conduct continued through April 2016, and even after the filing of this lawsuit when state troopers were sent to complain to Ballock's employer – the FBI – about this litigation. In addition to the vindictive and unconstitutional efforts of the defendants on Costlow's behalf, Costlow manufactured stories of abuse by Ballock – lies that were found by a court-appointed psychiatrist to be utter fabrications of a disturbed individual. The psychiatrists' report was sealed by the family court, preventing Ballock from presenting those findings in the criminal proceedings and in defense of his reputation and career as an FBI agent.

The wrongful arrest and lengthy prosecution, while baseless, was nonetheless scandalous. Ballock's employment relationship suffered, including cancelled promotions and beneficial transfers, and the threat of termination. The FBI is investigating Ballock because of the malicious prosecution – Ballock is appealing a recommendation of dismissal.

Ballock filed his civil action within one year of the termination of the criminal proceedings – a prerequisite to his malicious prosecution claim and for effective adjudication of all his claims

related to the conspiracy of action that caused his damages. The Defendants' motion to dismiss myopically parses the pleadings, when the Court must comprehensively interpret the facts in a light most favorable to Ballock. The motion refuses to acknowledge the additional consideration that must be given to a *pro se* pleading. The only effort at a substantive argument – that Ballock's claims are barred by a release-dismissal agreement they attach as Exhibit A without certification or request for judicial notice – utterly fails to acknowledge the applicable law. The Defendants must bear the affirmative burden of proving this fugitive document is enforceable based on several factors – factors for which there is no evidentiary support at the Rule 12(b)(6) stage, a burden they will not be able to carry once the merits are developed.

The Plaintiff has alleged outrageous conduct in the defendants' conspiracy to abuse their authority within the justice system to stage a courthouse arrest and baseless prosecution to benefit Costlow and her lover, Trooper Berry, causing continuous harm to Ballock and his two children. Ballock's claims must not be dismissed. The motion must be denied.

Respectfully submitted by Scott T. Ballock, by and through his counsel, this 6th day of July, 2017.

/S/ Frederick R. Juckniess
Frederick R. Juckniess, Esquire
302 E. Liberty St., Suite 203
Ann Arbor, MI 48104

Phone (734) 707-1515

Rick@Juckniesslaw.com

/S/ Charles J. Crooks
Charles J. Crooks, Esquire
Crooks Law Firm PLLC
244 Pleasant Street
Morgantown, WV 26505

WV State Bar # 4633
Phone (304) 282-1039

Charles@crookslawfirm.org

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**SCOTT T. BALLOCK**                          Case No.:      1:17-CV-52

      Plaintiff,

v.                                            JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

      Defendants.

## CERTIFICATE OF SERVICE

      I, Charles J. Crooks, Esq., local counsel for the Plaintiff, Scott T. Ballock, hereby certify

that on the 6th day of July, 2017, I filed the foregoing "PLAINTIFF SCOTT T. BALLOCK'S

OPPOSITION TO JOINT MOTION TO DISMISS BY STATE TROOPER DEFENDANTS

KIEF, GASKINS AND BERRY" with the Clerk of the Court using the CM/ECF system, which

will send notification of the filing to the following:

P. Todd Phillips, Esq.                    Mark G. Jeffries (WV Bar No. 11618)
P. Todd Phillips & Associates             Steptoe & Johnson PLLC
235 High Street                           400 White Oaks Blvd.
Suite 322                                 Bridgeport, WV 26330-4500
Morgantown, WV 26505                      Mark.jeffries@steptoe-johnson.com
**Counsel for Defendant,**
**Ellen Ruth Costlow**                    Monté L. Williams (WV Bar No. 9526)
                                          Steptoe & Johnson PLLC
                                          P.O. Box 1616
And                                       Morgantown, WV 26507-1616
                                          (304) 598-8000
                                          Monte.williams@steptoe-johnson.com
                                          **Co-counsel for Defendants State Trooper**
                                          **Michael Kief, State Trooper Ronnie M.**
                                          **Gaskins and State Trooper Chris Berry**

*/S/ Charles J. Crooks, Esq.*

1