## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**

               Plaintiff,                            Case No.: 1:17-CV-52

v.                                             JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS**,
**STATE TROOPER CHRIS BERRY**,

               Defendants.

### THIRD AMENDED COMPLAINT

Pursuant to the Court's order (ECF No.48), pages 27 – 31, the Plaintiff, Scott T. Ballock, hereby serves his third amended complaint. This amends the second amended complaint (ECF No. 45):

### INTRODUCTION

1. Defendant Ellen R. Costlow and officers with the West Virginia State Police (WVSP) abused the judicial process by arresting Scott T. Ballock in an attempt to assist Costlow in an ongoing Family Court dispute regarding alimony and child custody.

2. Scott T. Ballock was defamed, slandered, and suffered emotional and financial harm based on the actions of Costlow and WVSP troopers.

3. Costlow and WVSP troopers abused the legal system in order to achieve ulterior motives. They did not use the legal system as a tool to address a wrong; rather, they used the system as a sword to cause harm to plaintiff and assist Defendant Costlow.

4. This is a civil rights action raising federal and state law claims on behalf of Ballock, the victim of defendants' abuse of the judicial system.

1

5.  Specifically, this is an action brought by Scott T. Ballock to vindicate deprivations of his federal Constitutional rights and violations of West Virginia law.

## VENUE AND JURISDICTION

6.  This action arises under the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments of the United States Constitution and is

   brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

7.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, and on the supplemental jurisdiction of this Court to entertain related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

9.  This case is instituted in the United States District Court for the Northern District of West Virginia pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events occurred and in which Defendants maintain offices and/or reside.

## PARTIES

10. At all times relevant hereto, Plaintiff Scott T. Ballock was a resident of the State of West Virginia and a citizen of the United States of America.

11. At all times relevant hereto, Defendant Ellen Ruth Costlow was a resident of the State of West Virginia and a citizen of the United States of America.

12. At all times relevant hereto, Defendant Michael Kief was a resident of the State of West Virginia and a citizen of the United States and was acting under the color of state law in his capacity as a law enforcement officer with the West Virginia State Police, Morgantown Detachment.

13. This action is brought against Defendant Kief in his individual capacity and his official capacity.

14. At all times relevant hereto, Defendant Chris Berry was a resident of the State of West Virginia and a citizen of the United States and was acting under the color of state law in his capacity as a law enforcement officer with the West Virginia State Police, Morgantown Detachment.

15. This action is brought against Defendant Berry in his individual capacity and his official capacity.

16. At all times relevant hereto, Defendant Ronnie M. Gaskins was a resident of the State of West Virginia and a citizen of the United States and was acting under the color of state law in his capacity as a law enforcement officer with the West Virginia State Police, Morgantown Detachment.

17. This action is brought against Defendant Ronnie M. Gaskins in his individual capacity and his official capacity.

18. The claims will not cost West Virginia taxpayers and are therefore not subject to immunity. Pittsburgh Elevator v. West Virginia Board of Regents, 172 W.Va. 743, 310 S.E.2d 675 (1983).

19. Upon information and belief, West Virginia has a policy that covers it and its agents up to $1 million for the wrongful acts, and other acts alleged herein.

## ALLEGATIONS COMMON TO ALL COUNTS

20. Beginning in October 2012, Ellen Ruth Costlow and Scott T. Ballock were engaged in divorce proceedings in Monongalia County, West Virginia.

21. Ellen Ruth Costlow initiated the divorce proceedings after commencing a romantic relationship with Kenny Ray Ice, Jr., a man Costlow met via an online website.

22. Ballock and Costlow separated on September 14, 2012.

23. Costlow sought sole custody of Costlow's and Ballock's two minor children.

24. Costlow, a college-educated school teacher, also sought lifetime alimony payments from Ballock.

25. Costlow was alleged to be having an affair with WVSP trooper Chris Berry.

26. Ballock independently uncovered evidence which corroborates the allegation that trooper Berry was maintaining a romantic relationship with Costlow.

27. Ballock learned that at Costlow's request, trooper Berry was conducting surveillance of Ballock and Ballock's parents.

28. Trooper Berry, at Costlow's request, was also allegedly attempting to find a reason to arrest Ballock, in order to help Costlow in her Family Court battle.

29. On approximately August 13, 2013, Ballock's father, Tom Ballock, contacted Sgt. Mike Kief, Trooper Berry's supervisor, and informed him of the allegations against Berry.

30. Kief told Tom Ballock he would investigate the allegations.

31. A few days later, Plaintiff Scott T. Ballock also informed Kief of the allegations that trooper Berry was conducting surveillance of him and his parents, as well as having an affair with Costlow.

32. Kief angrily informed Ballock during this conversation that Berry had not engaged in any wrongdoing.

33. On information and belief, Berry, Kief, and Gaskins, in cooperation with Costlow, intentionally ignored policies, procedures, and the Constitutional rights of Ballock in planning and proceeding with an arrest of Ballock at the Family Court Judge's courtroom on the day of a hearing critical to Costlow and her desire to obtain custody of the children.

34. Together, defendants intended the place of arrest, time of arrest, and nature of the process to harm Ballock and benefit Costlow in the Family Court proceedings, and to damage and harm Ballock personally.

35. On September 13, 2013 – in an elaborate production on the day of the final custody hearing - Ballock was arrested by WVSP Sergeant Mike Kief directly outside the Family Court Judge's courtroom during a break in the proceedings.

36. Ballock was arrested in view of the Family Court personnel and, flanked by two WVSP troopers, taken from the Family Court waiting area to another floor in the municipal building and another Magistrate's courtroom.

37. Ballock was not free to leave.

38. Ballock was released on a PR bond by the Magistrate.

39. Ballock was charged with the misdemeanor offenses of Stalking-Harass/Credible Threat; and Stalking-Harass/Credible Threat.

40. As the basis for the charges, Costlow alleged that Ballock sent her unwanted email messages and text messages.

41. Ballock was not summoned for this misdemeanor, non-violent offense; a warrant was issued for his arrest.

42. Defendant Gaskins said Ballock was arrested at the Family Court hearing out of a concern for officer safety; as an FBI agent, Ballock carried a firearm.

43. This explanation was pretense and was knowingly false.

44. Ballock was later that same day instructed by Defendant Kief to report to WVSP's Morgantown Detachment for processing.

45. Counter to Gaskins' alleged concern for Ballock having a weapon, Ballock entered the WVSP Detachment that same day and was processed - all while wearing his sidearm.

46. Ballock was never interviewed by WVSP troopers.

47. WVSP troopers relied solely on information provided by Costlow.

48. On information and belief, the defendants knowingly violated policies and procedures, and Ballock's Constitutional rights, in relying on information that they knew was false, unsubstantiated, and intended to abuse the process and initiate a malicious prosecution.

49. Through his attorney, Ballock formally volunteered to waive his Constitutional rights against self-incrimination and submit to an interview by WVSP.

50. WVSP troopers declined Ballock's repeated offers to be interviewed.

51. Ballock did not commit the misdemeanor offenses with which he was charged.

52. Had WVSP troopers conducted an actual investigation and interviewed Ballock, they would have learned that Ballock had not committed any crime.

53. The troopers' intention, however, was not to learn the truth; their intention was to harm Ballock and assist Costlow.

54. Through his attorney, Ballock provided evidence regarding his innocence to the Monongalia County Prosecutor.

55. Through his attorney, Ballock provided evidence to the Monongalia County Prosecutor which supported the claim that Ballock's arrest was an abuse of the judicial process.

56. The charges against Ballock were dismissed – with prejudice - by the Monongalia County Prosecutor on April 7, 2016.

57. With concurrence from the Monongalia County Prosecutor, the entire case against Ballock was expunged on July 13, 2016, and WVSP was ordered to destroy any and all records related to its investigation.

58. Costlow and officers with the WVSP had ulterior motives in arresting Ballock.

59. Costlow and officers with the WVSP abused the judicial process to achieve their ulterior motives.

60. On May 28, 2013, having had a falling out with Costlow after discovering Costlow's romantic relationship with trooper Berry, Kenny Ray Ice, Jr. contacted Ballock and offered to meet with Ballock to share information regarding Costlow's conduct.

61. Kenny Ray Ice, Jr. voluntarily provided his cell phone to Ballock so that Ballock could have the phone forensically examined and retrieve content and communications between Ice, Jr., and Costlow.

62. Kenny Ray, Ice., Jr. informed Ballock, among other things, that he and Costlow had stolen Ballock's FBI-issued property and given it away or sold it.

63. On May 28, 2013, Ballock sent Costlow an email message informing he had learned she was stealing and disposing of Ballock's government property.

64. On May 29, 2013, one day after the above-noted events, Costlow sent an email message to her attorneys, which read in part:

   a. "Amber and Matt, I need to file harassment charges against Scott today and I would appreciate your help in the matter. Scott's constant threats, insults, and other abusive tactics are intolerable. I'm losing sleep at night as I fear what Scott will do next, and I am afraid he's going to keep ramping things up until he threatens my life. But unlike times before, this time I fear he will be successful in taking my life. I have lived far too long in an abusive relationship to have any ability to heal from it while trying to cope with what Scott throws my way via texts and email. He's out of control trying to control and hurt me, and what he writes to me is nothing compared to what he's doing in secret. The writing is meant to distract me as he plots his next attack. The writing is meant

7

to take my energy, frighten me, and keep me from living a productive life apart from him…"

65. Plaintiff never threatened, harmed, abused, or attacked Defendant Costlow.

66. Defendant Costlow created a false narrative which was ultimately thoroughly debunked by the court-appointed psychiatrist and the Family Court.

67. Costlow's divorce attorneys fired Costlow as a client.

68. On September 2, 2013, Ronnie M. Gaskins, WVSP, prepared an incident report (1210-43774), replete with inaccuracies and outright, salacious lies as related to him by Defendant Costlow.

69. As but one small example, Gaskins writes in his report that Ballock allegedly sent Costlow email messages on significant dates "including when her father passed away."

70. Costlow's father is still very much alive.

71. Costlow relayed false information to Gaskins for inclusion in his report to further push the false narrative she was attempting to sell to the Family Court and others.

72. Costlow intentionally and knowingly defamed Plaintiff with her false statements to others.

73. Though his employee, Chris Berry, was alleged to be having an affair with Costlow and at her request conducting surveillance of Ballock, Defendant Kief did not recuse himself or his agency from the investigation into Ballock.

74. Though his employee, Chris Berry, was alleged to be having an affair with Costlow and at her request conducting surveillance of Ballock, Defendant Kief or WVSP troopers never interviewed Tom Ballock or Scott Ballock about these allegations.

75. Instead, Kief participated directly in the investigation and prosecution of Ballock.

76. In her attempt to gain sole custody of the children and lifetime alimony payments, Costlow created and attempted to convey a false narrative in Family Court.

77. Costlow used WVSP troopers and the legal system in an attempt to bolster her false narrative.

8

78. As the custody hearing in Family Court approached, it was becoming apparent to Costlow that she was not faring well in her bid to gain sole custody of the children and lifetime alimony payments.

79. Costlow was also highly concerned about the discovery of her theft of government property.

80. Ballock said in a joint counseling session that she was so stressed about being arrested for her theft of U.S. government property, that she dressed well every morning and prepared the house for a visit from law enforcement who would, she was certain, arrest her.

81. The arrest of Ballock was Costlow's attempt to draw first blood against Ballock, and an attempt to stop Ballock from gaining custody of his children.

82. Ballock's arrest was an abuse of the judicial process, and Costlow defamed and slandered Ballock by providing officers with outrageous, slanderous, and false allegations.

83. On September 8, 2013, five days before the scheduled custody hearing, Costlow sent an email message to WVSP in which she demonstrated her true intent for filing charges against Ballock.

84. In the email, Costlow wrote, in part, "The custody hearing is this Friday at 8:30 am in Judge Minor's chambers. Custody of my daughter is what is at stake as it's been difficult for the Guardian ad Litem and the forensic psychiatrist to decipher which of us is telling the truth (me or Scott) and the lies he tells are bringing into question my fitness as a primary custodial parent…"

85. In actuality, the forensic psychiatrist had little difficulty in deciphering the truth and confirming that Costlow was spreading false information about Plaintiff.

86. Costlow was highly concerned, legitimately so, about losing custody of her children for various reasons, including but not limited to:

a.  Costlow was physically and emotionally abusive toward her children.

b.  After one violent episode with her then- 11-year old son, the Court issued a restraining order against Costlow.

c.  Costlow sexualized her then- 9-year old daughter.

d.  Costlow has long suffered from severe mental illnesses which manifest in her inability to tell the truth, maliciousness, vindictiveness, as well as criminal sexual behaviors.

e.  Costlow repeatedly left her minor children at home alone overnight.

f.  Costlow introduced and socialized her then- 9-year old daughter with a convicted and registered sex offender, Karl Vincent Taylor.

g.  Costlow regularly took her then- 9-year old daughter to a local drinking and gambling establishment known as a "Hot Spot."

h.  Costlow attempted suicide with her daughter in the home.

i.  Costlow was illegally abusing narcotics such as cocaine, as well as prescription pain medications such a Hydrocodone (Costlow referred to the Hydrocodone by its street name, "Bean"), and Adderall.

j.  The children's counselor believes Costlow coached her then- 9-year old daughter to lie and how to answer questions in counseling sessions.

k.  The children's counselor believes Costlow went so far as to send her then- 9-year old child into at least one counseling session with a recording device.

l.  The children's counselor believes Costlow actively and aggressively worked to alienate Ballock's minor children from him.

10

m.  In a recovered audio recording, Costlow can be heard interrogating her then- 9-year old daughter and coaching her what to say to her counselor immediately preceding a counseling session.

n.  Costlow and her Kenny Ray Ice, Jr., were regularly involved in physical altercations in front of Costlow's then- 9-year old daughter.

87. Ballock was awarded full custody of the children.

88. Costlow was permitted limited, supervised visitation with one of the minor children.

89. Costlow was denied alimony and was directed to pay child support to Ballock (though she has stopped paying this obligation).

90. WVSP troopers failed to learn any of the above-noted information during the course of their investigation.

91. In an order dated September 20, 2013, Judge Randall Minor, Family Court Judge, Monongalia County, West Virginia wrote in part: "The Court was somewhat dismayed at the arrest of the Father on the day of the hearing on September 13, 2013. While the Court in no way condones any potential criminal behavior on anyone's part, **the Court has to believe the timing of the arrest represented primarily a strategic decision to gain advantage in this case** (emphasis added). In that regard, the Court notes the Father's communications at issue occurred over several months with no apparent effort by the Mother to seek assistance from this Court or any other judicial body until the time of the hearing. This Court almost certainly would have been willing to enjoin such communications by the Father if the Mother had raised the issue at any time."

92. WVSP troopers knew that Costlow and Ballock were involved in ongoing proceedings in Family Court and that the Family Court was the appropriate venue for any concerns Costlow might have had.

93. Costlow and WVSP troopers, though, had ulterior motives in arresting Ballock.

94. In a text message Costlow sent to Kenny Ice, Jr. during this time period, Costlow wrote that she had "the upper hand with...ruining (Ballock's) career."

95. This message immediately preceded a message in which Costlow wrote she was going to file harassment charges against Ballock.

96. In a text message Costlow sent to Kenny Ice, Jr. on May 13, 2013, during the time period when she was alleged to have been working with trooper Berry in finding a way to have Plaintiff arrested, Costlow wrote, "I'm well protected. Things happened this evening that solidify protection. Like a gold suit if (sic) armor..."

97. On August 12, 2013, Defendant Costlow phoned 911 following yet another physical altercation with Kenny Ice, Jr.

98. Kenny Ice, Jr. would later inform that the fight with Costlow started because Ice learned Costlow was having an affair with WVSP trooper Chris Berry.

99. Ice, Jr. said he had observed on Costlow's cell phone inappropriate communications between Costlow and trooper Berry.

100.   During the 911 call, Defendant Costlow specifically asked the 911 Dispatcher to speak with trooper Berry and provided trooper Berry's personal phone number to the dispatcher.

101. Defendant Costlow informed the 911 Dispatcher that trooper Berry had been to her house earlier in the day.

102. Though trooper Berry was at Defendant Costlow's home during the day, the 911 Dispatcher informed that Berry was scheduled to work the midnight night shift and Costlow indicated she was aware of that.

103. The 911 Dispatcher asked Defendant Costlow why trooper Berry had been to her home earlier in the day.

104. Defendant Costlow told the 911 Dispatcher that trooper Berry had been to her home earlier that day because he was investigating car break-ins in Defendant Costlow's neighborhood.

105. Car break-ins had occurred in Costlow's neighborhood, but they occurred several months prior and were investigated not by WVSP, but by the Monogalia County (WV) Sheriff's Department.

106. Following Costlow's 911 call, deputies with the Monongalia County Sheriff's Department responded to Defendant Costlow's residence for the domestic disturbance call.

107. Defendant Costlow told responding deputies that her fight with Kenny Ice, Jr. ensued after Ice saw text messages on Costlow's phone between Costlow and trooper Berry.

108. Deputies found Defendant Costlow suffered an injury to her lip and Ice had sustained a knife wound on his arm.

109. Defendant Costlow repeatedly asked Sheriff's Deputies to keep her name out of any police report.

110. Such a request by Costlow had earlier been honored by the West Virginia State Police, on March 6, 2013, when WVSP responded to a violent domestic disturbance call involving Costlow and Kenny Ice, Jr., and troopers agreed – at Costlow's request - to not write a report about the incident.

111. Defendant Costlow told Sheriff's Deputies a completely different story for trooper Berry being at her home earlier in the day.

112. Defendant Costlow told Sheriff's Deputies that trooper Berry had been at her home earlier in the day in order to investigate the theft of Costlow's laptop computer.

113. The theft of Costlow's laptop computer had occurred some three months earlier and was not investigated by WVSP, but by the Marion County (WV) Sheriff's Department.

114. On at least one occasion, Ballock's and Costlow's son overheard Costlow discussing with others her intention of getting Ballock fired from his job.

115. Ballock's and Costlow's son will testify that Costlow said her strategy to get Ballock fired from his job as an FBI special agent was to get Ballock's gun taken away from him.

116. During a court-mandated joint counseling session, Costlow admitted that she did, in fact, make these statements to others about trying to get Ballock's gun taken away from him and fired from his job.

117. Prior to Ballock's first court appearance before Magistrate Judge Hershel Mullins, Ballock's attorney explained to Mullins that the matter rightly belonged in Family Court and that WVSP troopers were inappropriately helping Costlow in her attempt to gain an advantage in Family Court.

118. Assistant Prosecutor Cindy Scott, Monongalia County (West Virginia) Prosecutor's Office, did not disagree.

119. Rather, Scott held up a West Virginia statute book, waved it before the Magistrate judge, and said (paraphrasing): "These are all the ways you can arrest someone in this state. If you want to find a reason to arrest someone, you can."

120. Assistant Prosecutor Cindy Scott told the Magistrate judge that WVSP troopers "dumped" the case in her lap.

121. The charges against Ballock were dismissed on April 7, 2016, and upon recommendation by the prosecutor, expunged on July 13. 2016, but not before great harm was done to Ballock and his rising career as an FBI agent.

122. In an attachment to the motion to dismiss criminal charges in Magistrate Court dated April 7, 2106, Defendant Costlow agreed that "she will not communicate any disparaging information or commentary to Scott Ballock's employer or place of employment..."

123. Defendant Costlow thereafter violated the agreements and communicated disparaging, outrageous lies to Plaintiff's employer.

124. Ballock has suffered negative repercussions at work, including being denied promotional and transfer opportunities, due to Defendants' abuse of the judicial system.

125. Since the filing of this action, specifically on Monday, September 25, 2017, as a direct consequence of the defendants' joint and several acts and omissions as alleged, Ballock was terminated as an employee of the FBI. The termination decision is subject to an appeal, but as of Monday, September 25, 2017, Ballock lost his base compensation as a GS 14, Step 6 Federal Employee, including the law enforcement authorized-overtime allowance, medical, vision and dental insurance, participation in the employee thrift plan including employer contributions, as well as his federal pension.

126. Plaintiff's professional and personal reputation have been harmed by Defendant Costlow's false statements.

127. Costlow has a long history of abusing the system:

  a.  In February 2013, Costlow learned that Amy Fetty of Fairmont, West Virginia was providing Ballock with information which would be detrimental to Costlow's attempts to

gain custody of her children (Fetty informed, among other items, that Costlow's boyfriend, Kenny Ray Ice, Jr. was a low-level drug dealer).

(1) Costlow phoned Fetty nearly every day, attempting to dissuade her from talking to Ballock.

(2) Costlow falsely told Fetty that Ballock was an FBI agent and he was attempting to build a case against her and have her arrested.

(3) Ballock's divorce attorney asked Costlow's attorney to direct Costlow to stop tampering with Ballock's witness.

(4) After several weeks of unsuccessful attempts at dissuading Fetty from speaking with Ballock, Costlow lodged a criminal complaint against Fetty in the Magistrate Court of Marion County.

(5) Costlow alleged that Fetty was threatening to attack her. Fetty was arrested and charged with Assault.

(6) The charges against Fetty were dismissed by the Magistrate Judge.

b. On December 22, 2012, Costlow improperly committed her then- 11-year old son to Chestnut Ridge Hospital (a secure psychiatric ward) for the offense of misbehaving.

(1) Costlow was frustrated by the child repeatedly asking to visit his father.

(2) Prior to having the child improperly committed, Costlow phoned Ballock to express her frustration with the child.

(3) Immediately prior to having the child improperly committed, Costlow told Ballock she was going to "solve this once and for all."

(4) Immediately prior to having the child improperly committed, Costlow sent Ballock a text message which read, "I will get this solved with (child). I am very sad he is struggling so badly that he's a danger to himself."

(5) Against the Family Court's standard custodial orders, Costlow told hospital staff that they were not to notify Ballock of his son's commitment, and that if Ballock found out about the commitment, he was not permitted to visit.

(6) The minor child was confined at Chestnut Ridge's secure facility until the afternoon of December 25, 2012.

(7) The minor child, a gifted and talented student, varsity athlete, and all-around normal little boy, was ultimately deemed to have been improperly committed by Costlow and no follow up treatment was recommended by staff at Chestnut Ridge.

(8) The minor child shared with Dr. Cooper-Lehki that Costlow lied about his actions in order to have him committed.

c. In recovered communications between Costlow and Kenny Ray Ice, Jr., it was discovered that Costlow was threatening to have sex with other men then report to the hospital to falsely claim she had been raped by them.

d. In recovered communications between Costlow and Kenny Ray Ice, Jr., it was discovered that Costlow had threatened to plant drugs in Kenny Ray Ice, Jr.'s residence in order to get him arrested.

e. Costlow has on numerous occasions contacted police, generally involving domestic disputes with Kenny Ice, Jr.

f. Costlow has been deemed by police to be untruthful and manipulative with law enforcement during some of these encounters.

(1) During one encounter, police were summoned to the residence after Costlow had cut her boyfriend with a knife.

(2) Costlow's boyfriend, Kenny Ray Ice, Jr., had discovered evidence on Costlow's cell phone of her ongoing romantic relationship with trooper Berry.

(3) Noted in the police report, Costlow asked officers to keep her name out of the police report so as not to harm her Family Court case; police declined to do so.

(4) Costlow was repeatedly untruthful in Family Court and was once found in contempt.

g. Costlow once unilaterally postponed a scheduled Family Court hearing because, she said, she had suffered a stroke, become partially paralyzed, and lost sight in one eye following an elective surgery.

(1) Costlow later admitted that she misrepresented this claim to the court; Costlow blamed her misrepresentation to the court on the drugs she was administered following her elective surgery.

h. Costlow was alleged to have attempted to befriend the Family Court judge's wife in an effort to influence Family Court proceedings.

128. Defendants Kief and Gaskins, who together conducted the WVSP investigation knew, or had reason to know, from the recovered communications between Ballock and Costlow, that Defendant Costlow had committed felony theft by misappropriating over $2,000 worth of her estranged husband's government-issued equipment, including FBI ammunition, yet they pursued no follow up action regarding this felony offense.

129. Defendants Kief and Gaskins, who together conducted the WVSP investigation knew, or had reason to know, from the recovered communications between Ballock and Costlow, that Defendant

Costlow had engaged in illegal sexual conduct, yet they pursued no follow up action regarding these felony offenses.

130. Defendants Kief and Gaskins, who together conducted the WVSP investigation knew, or had reason to know, from the recovered communications between Ballock and Costlow, that Defendant Costlow was illegally using controlled substances, including cocaine, Hydrocodone (which Costlow referred to by its street name of "Bean"), and Adderall, yet they pursued no follow up action regarding these felony offenses.

131. Defendants Kief and Gaskins, who together conducted the WVSP investigation knew, or had reason to know, from the recovered communications between Ballock and Costlow that Costlow was physically stalking and harassing the wives of multiple men with whom she had illicit affairs yet they pursued no follow up action regarding these criminal actions.

132. Defendants Kief and Gaskins, who together conducted the WVSP investigation        knew, or had reason to know, from the recovered communications between Ballock and Costlow that Costlow, while alleging she was receiving unwanted communications from Ballock, initiated contact with Ballock during this same time period. In one text message the troopers possessed, Costlow wrote to Ice, Jr., about Ballock, "Then later on help me mess with him (Ballock). Please…By the way, the 'real Scott' line worked like a charm."

133. In an email message dated May 9, 2013, and possessed by the troopers, Ballock wrote to Costlow, "Ellen, I received your barrage of text, email and phone messages from late last night…"

134. In an email messaged dated July 2, 2013, and possessed by the troopers, Ballock wrote to Costlow, in part, "(Ellen), Please don't send communications asking me to send the children or my mom your love…"

135. Had Defendants Kief and Gaskins not had ulterior motives, and had they conducted an actual investigation, they would have also learned the following:

136. By her own admission in recovered communications, Defendant Costlow is a skillful liar.

137. In recovered communications with Kenny Ray Ice, Jr., Costlow created and perpetuated a false story that she had once been violently raped and beaten by a stranger.

138. In recovered communications with Kenny Ray Ice, Jr., Costlow ultimately confessed that she had lied about being violently raped and beaten by a stranger.

139. Costlow used this false story, she wrote, to demonstrate what a skillful liar she is.

140. In recovered communications with Kenny Ray Ice, Jr., Costlow explains the techniques she uses in order to skillfully lie and fool others.

141. In these recovered communications with Kenny Ray Ice, Jr. regarding her skillful abilities to lie and fool others Costlow wrote, "I'm very smart. Sometimes too smart for my own good. Sometimes not smart enough for my own good. But the rough sex story is not true. Not at all. I made it up using parts of rough sex ideas I've seen."

142. In recovered communications with Kenny Ray Ice, Jr., Costlow threatened to irresponsibly call police on Ice for mundane matters.

143. Costlow wrote once, for example, "Switch phones dammit...If you don't switch phones I will call police...If you don't switch phones I will call police..."

144. On March 6, 2013, WVSP troopers responded to Costlow's home regarding a violent domestic dispute between Costlow and Kenny Ray Ice, Jr.

145. Costlow's minor child was present at the time of this incident.

146. The 911 dispatcher was informed by the caller that Ice, Jr. had weapons, and Costlow can be heard in the background of the 911 recording screaming, and throwing and breaking dishes.

147. WVSP troopers did not write a report regarding this violent domestic episode.

148. Ice, Jr. informed that WVSP troopers, at Costlow's request, did not write a report regarding this violent domestic episode because WVSP troopers did not want it to reflect negatively on Costlow's divorce and custody proceedings.

149. Defendant Kief informed Ballock that this failure of WVSP troopers to document its response to a violent domestic episode is not uncommon.

150. Defendants abused the judicial process, exercising powers they don't have, and ignoring duties they actually bear.

151. As a direct and proximate result of Defendants' conduct, Mr. Ballock has suffered damages and losses entitling him to compensatory and special damages, in amounts to be determined at trial.

152. In addition to compensatory and special damages, Mr. Ballock is entitled to punitive damages against Defendants Kief, Berry, and Gaskins under 42 U.S.C. § 1983, in that the actions of the Defendants were taken maliciously, willfully, or with a reckless or wanton disregard of the Constitutional rights of Mr. Ballock.

153. This cause of action against the individual officers in their official capacity seeks to recover only to the extent they are covered by liability insurance and do not seek to cover tax payer payments.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Abuse of Process in violation of 42 U.S.C. § 1983

(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

154. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

155. 42 U.S.C. § 1983 provides that:

156. Every person who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

157. Plaintiff is a citizen of the United States and all of Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

158. Defendants Kief, Berry, and Gaskins, at all times relevant hereto, were acting under the color of state law in their capacity as West Virginia State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

159. Defendants Costlow, Gaskins, Kief, and Berry abused the judicial process by encouraging and causing the criminal charges and prosecution to be brought, not out of a belief that probable cause existed for their issuance, but rather for unconstitutional purposes and to attempt to punish Plaintiff and improperly assist Defendant in another judicial proceeding.

160. Defendants Gaskins, Kief, and Berry initiated and continued their efforts even after it was apparent that Plaintiff was innocent.

161. Any reasonable police officer knew or should have known of Plaintiff's rights at the time of the complained conduct.

162. All Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federal protected Constitutional rights.

163. The procurement and continuation of prosecution against Plaintiff was malicious, shocking, objectively unreasonable, and an abuse of the judicial process in light of the circumstances.

## SECOND CLAIM FOR RELIEF

### Malicious Prosecution in violation of 42 U.S.C. § 1983

(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

164. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

165. 42 U.S.C. § 1983 provides that:

166. "Every person who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…"

167. Plaintiff is a citizen of the United States and all of Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

168. Defendants Kief, Berry, and Gaskins, at all times relevant hereto, were acting under the color of state law in their capacity as West Virginia State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

169. Defendants Costlow, Gaskins, Kief, and Berry encouraged and caused the criminal charges and prosecution to be brought, not out of a belief that probable cause existed for their issuance, but rather for unconstitutional purposes and to attempt to punish Plaintiff and assist Costlow.

170. Plaintiff's arrest was not supported by probable cause and the authorities continued his prosecution after it was apparent that he was innocent.

23

171. Plaintiff was seized pursuant to legal process that was not supported by probable cause and the criminal proceedings have terminated in his favor.

172. Any reasonable police officer knew or should have known of Plaintiff's rights at the time of the complained conduct.

173. All Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federal protected Constitutional rights.

174. The procurement of prosecution against Plaintiff was malicious, shocking, objectively unreasonable, and an abuse of the judicial process in light of the circumstances.

### THIRD CLAIM FOR RELIEF

**Violation of First Amendment Right to Seek Redress in the Courts
in violation of 42 U.S.C. section 1983**

175. Shortly after attempting to serve Defendants Kief, Gaskins, and Berry their copies of the original complaint, a uniformed representative with the West Virginia State Police appeared at the Clarksburg Resident Agency of the FBI to lodge a complaint with the Senior Supervisory Resident Agent about Plaintiff Ballock's filing of this civil suit.

176. During the meeting, on information and belief, the WVSP representative, on behalf of Defendants, sought to intimidate Ballock, sought to create problems for him with the FBI, sought to intimidate Ballock through this contact and his employer to withdraw the lawsuit, and sought to prevent Ballock from continuing to petition the Court for redress.

177. Defendants, in cooperation with the WVSP representative, were aware of Ballock's employment with the FBI, and each intended by these actions to wrongfully and intentionally damage that relationship with the object of pressuring Ballock to stop or withdraw his lawsuit.

178. Defendants further intended to use the appearance of law enforcement, and authority of the WVSP, to intimidate Ballock's employer into convincing Ballock to stop, or withdraw, his lawsuit.

24

179. These actions violated Ballock's Constitutional rights under the First Amendment to seek redress in the Courts for damage done to him and for violation of law.

## FOURTH CLAIM FOR RELIEF

### Abuse of Process under West Virginia State Law

(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

180. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

181. Defendants Kief, Berry, and Gaskins, at all times relevant hereto, were acting under the color of state law in their capacity as West Virginia State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

182. Defendants Costlow, Gaskins, Kief, and Berry abused the judicial process by encouraging and causing the criminal charges and prosecution to be brought, not out of a belief that probable cause existed for their issuance, but rather for unconstitutional purposes and to attempt to punish Plaintiff and improperly assist Defendant in another judicial proceeding.

183. Defendants Gaskins, Kief, and Berry initiated and continued their efforts even after it was apparent that Plaintiff was innocent.

184. Any reasonable police officer knew or should have known of Plaintiff's rights at the time of the complained conduct.

185. All Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federal protected Constitutional rights.

186. The procurement and continuation of prosecution against Plaintiff was malicious, shocking, objectively unreasonable, and an abuse of the judicial process in light of the circumstances.

**FIFTH CLAIM FOR RELIEF**

**Malicious Prosecution under West Virginia State Law**

(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

187. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

188. Defendants Kief, Berry, and Gaskins, at all times relevant hereto, were acting under the color of state law in their capacity as West Virginia State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

189. Defendants Costlow, Gaskins, Kief, and Berry encouraged and caused the criminal charges and prosecution to be brought, not out of a belief that probable cause existed for their issuance, but rather for unconstitutional purposes and to attempt to punish Plaintiff and assist Costlow.

190. Plaintiff's arrest was not supported by probable cause and the authorities continued his prosecution after it was apparent that he was innocent.

191. Plaintiff was seized pursuant to legal process that was not supported by probable cause and the criminal proceedings have terminated in his favor.

192. Any reasonable police officer knew or should have known of Plaintiff's rights at the time of the complained conduct.

193. All Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federal protected Constitutional rights.

194. The procurement of prosecution against Plaintiff was malicious, shocking, objectively unreasonable, and an abuse of the judicial process in light of the circumstances.

## SIXTH CLAIM FOR RELIEF – Conspiracy

(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

195. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

196. The Defendants agreed, implicitly or explicitly, to commit the acts herein alleged.

197. The Defendants jointly operated to perpetuate the wrongful acts complained of herein.

198. The Defendants are jointly and severally liable for each of the wrongs.

## SEVENTH CLAIM FOR RELIEF

### Defamation in violation of 42 U.S.C. § 1983

(Plaintiff against Defendant Costlow, and Defendant Gaskins in his individual and official capacities)

199. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

200. Defendant Costlow's false written and verbal statements to police defamed Plaintiff and harmed his personal and professional reputation.

201. Indeed, her statements were intended to communicate that Plaintiff engaged in criminal behavior when he did not.

202. Defendant Costlow's written and verbal statements to police were knowingly false.

203. Defendant Costlow's written and verbal statements to police were statements of fact that are demonstrably false.

204. Defendant Costlow's written and verbal statements to police were made intentionally and with knowledge of their falsity.

205. When he prepared his official report, Defendant Gaskins knew, or should have known, that the statements provided to him by Costlow were false and defamatory.

206. Defendant Gaskins knew, or should have known, that Costlow's statements, regurgitated by Gaskins in his report, would cause harm, both personally and professionally, to Plaintiff.

207. As a direct and proximate cause of Defendants' intentional conduct, the plaintiff has suffered harm to his personal and professional reputation as a federal government employee (see e.g. ¶ 120), and other damages.

### EIGHTH CLAIM FOR RELIEF - Slander

(Plaintiff against Defendant Costlow, and Defendant Gaskins in his individual capacities and official capacities)

208. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

209. Defendant Costlow's false written and verbal statements to police defamed Plaintiff and harmed his personal and professional reputation.

210. Indeed, her statements were intended to communicate that Plaintiff engaged in criminal behavior when he did not.

211. Defendant Costlows's written and verbal statements to police were knowingly false.

212. Defendant Costlow's written and verbal statements to police were statements of fact that are demonstrably false.

213. Defendant Costlow's written and verbal statements to police were made intentionally and with knowledge of their falsity.

214. When he prepared his official report, Defendant Gaskins knew, or should have known, that the statements provided to him by Costlow were false and defamatory.

215. Defendant Gaskins knew, or should have known, that Costlow's statements, regurgitated by Gaskins in his report, would cause harm, both personally and professionally, to Plaintiff.

216. As a direct and proximate cause of Defendants' intentional conduct, the plaintiff has suffered harm to his personal and professional reputation as a federal government employee (see e.g. ¶ 120), and other damages.

**NINTH CLAIM FOR RELIEF**

**Intentional Infliction of Emotional Distress**

(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

217. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

218. Defendants, in their personal and official capacities, abused the judicial process in an effort to harm Plaintiff and unfairly benefit Defendant Costlow.

219. The conduct of all Defendants was so blatant and outrageous as to exceed all bounds of decency.

220. Defendants' actions inflicted severe emotional distress on Plaintiff and his children.

221. Defendants Kief, Gaskins, and Berry's decision to abuse the judicial process and encourage and support the prosecution of Plaintiff involved reckless disregard for basic community standards, shocked the conscience, and was outrageous.

222. Defendants conducted themselves with reckless disregard for inflicting emotional distress on Plaintiff and his children.

223. As a result of the conduct of the defendants, and the events and consequences caused by that conduct, Ballock has suffered severe emotional distress which has resulted in:

a. Multiple years of debilitating distress due to fear and anxiety regarding the investigation related to the false charges;

b. Pain, suffering and humiliation associated with the unjust and wrongful termination of his employment and his career as an FBI agent as a result of the conduct of defendants;

c. Suffering from humiliation and embarrassment due to false claims of criminal conduct, including false assertions of abuse and threatening conduct toward his then-wife;

d. Emotional trauma caused by having to raise his children during the events caused by Defendants;

e. Anxiety and suffering caused by the need to find new employment and to provide for his children;

f. Resulting depression and anxiety

g. Loss of sleep, resulting in the need for medication;

h. Necessary visits to medical professionals who have prescribed medications to address the emotional trauma, depression and distress suffered by Ballock, including suicidal thoughts;

i. Anxiety and emotion-driven effects on Ballock's weight;

j. Development of involuntary tics and physical effects from the constant stress.

## TENTH CLAIM FOR RELIEF

### Tortious Interference with Contract (Employment)

(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

224. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

225. Shortly after attempting to serve Defendants Kief, Gaskins, and Berry their copies of the original complaint, a uniformed representative with the West Virginia State Police appeared at the Clarksburg Resident Agency of the FBI to lodge a complaint with the Senior Resident Agent about Plaintiff Ballock's filing of this civil suit.

226. Defendants, and each of them, were aware of Ballock's employment with the FBI and each intended, by these actions, to wrongfully and intentionally damage that relationship and cause harm to Ballock's employment relationship with the FBI.

227. Defendants had no justification or authority to cause these actions to take place, and such actions were likewise a violation of Ballock's Constitutional rights.

228. Plaintiff has suffered negative repercussions, and faces possible termination of his employment, (see e.g. ¶ 120), because of Defendant Costlow's outrageous defamatory statements.

### ELEVENTH CLAIM FOR RELIEF

### Tortious Interference with Contract (Employment)

(Plaintiff against Defendant Costlow)

229. Defendant Costlow was aware of Ballock's employment with the FBI and that her actions and conduct had caused an investigation of Ballock with his employer.

230. Defendant Costlow contacted the FBI and/or FBI investigators in or around May 2016.

231. Costlow intended to provide, and did provide, the FBI investigators with false information intended to harm Ballock, his employment, and his reputation.

232. Costlow further intended for Ballock to be terminated or suffer other damaging repercussions at his employment with the FBI.

233. Costlow's intentional lies and information were provided to the FBI without justification, and with the intent to cause harm to the contractual relationship between Ballock and his employer.

234. Costlow's conduct, including the lies she told to the FBI investigators, caused Ballock significant harm, prolonged the investigation, caused Ballock to spend substantial time and money, and damaged his relationship with the FBI and his future employment, and caused him to face possible termination due to Costlow's outrageous conduct, (see e.g. ¶ 120).

## TWELFTH CLAIM FOR RELIEF

### Defamation in violation of West Virginia State Law

(Plaintiff against Defendant Costlow)

235. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

236. Defendant Costlow contacted the FBI and/or FBI investigators in or around May 2016.

237. Costlow was aware that the investigators were seeking information regarding Ballock and whether the allegations, as alleged above, were true, false, or otherwise inaccurate.

238. Costlow repeated defamatory and disparaging statements about Ballock, made claims that he committed acts that he did not commit, and made other false claims concerning Ballock.

239. This includes, but is not limited to, the false and outrageous lies that Ballock threatened and physically abused Costlow.

240. Costlow knew that her statements about Ballock were false.

241. Furthermore, Costlow knew the statements would cause harm to Ballock and his employment with the FBI, and to his life.

242. Furthermore, the same lies and defamatory statements made by Costlow to the FBI investigators were thoroughly refuted by the court-appointed forensic psychiatrist, Dr. Christi Cooper-Lehki.

243. Dr. Christi Cooper-Lehki's report and testimony further proves and corroborates this claim and the facts above.

244. The false and defamatory statements made by Costlow did cause damage to Ballock and his relationship with his employer.

245. Ballock faces possible termination from his employment based upon Costlow's defamatory statements, (see e.g. ¶ 120).

246. Furthermore, the statements have cost Ballock damages in the amounts of costs, fees, and expenses related to proceedings caused by the defamatory statements of Costlow.

### THIRTEENTH CLAIM FOR RELIEF – Breach of Contract

(Plaintiff against Defendant Costlow)

247. In an attachment to the motion to dismiss criminal charges in Magistrate Court dated April 7,

248, Defendant Costlow specifically agreed that "she will not communicate any disparaging information or commentary to Scott Ballock's employer or place of employment..."

249. Defendant Costlow violated the agreement shortly thereafter and told defamatory lies about Plaintiff to Plaintiff's employer.

250. The defamatory information Defendant Costlow provided to Plaintiff's employer has been thoroughly refuted by the court-appointed forensic psychiatrist, Dr. Christi Cooper-Lehki.

251. Plaintiff has suffered negative repercussions, and faces possible termination of his employment because of Defendant Costlow's outrageous defamatory statements, (see e.g. ¶ 120).

## FOURTEENTH CLAIM FOR RELIEF – Color of Law

### (Plaintiff against Defendants Kief, Gaskins, and Berry)

252. Plaintiff was deprived of his Constitutional rights under color of state law and the actions of the West Virginia State Police and the Monongalia County (WV) Prosecutor.

253. The State denied the ability of Plaintiff to call the single most significant witness in the criminal case against him and to offer exculpatory evidence of Costlow's mental and emotional derangement which led to her false statements against Plaintiff.

254. The court-appointed forensic psychiatrist spent several months on her examination and said it was the most extensive effort she had ever undertaken.

255. At a hearing in Family Court on March 4, 2016, Plaintiff asked for the testimony and evaluation report of Dr. Christi Cooper-Lehki to be unsealed, as it was critical to his defense.

256. Cooper-Lehki's evaluation and testimony would have provided exculpatory and mitigating evidence, serving to detail Costlow's severe mental illnesses and, contrary to Costlow's assertions, outline evidence which confirms she was not a battered woman and nothing indicates she was ever abused by Plaintiff.

257. Assistant Prosecutor Gabrielle Mucciola of the Monongalia County (WV) Prosecutor's Office appeared at this hearing and, despite not knowing the full contents of the evaluation report and Dr. Cooper-Lehki's testimony (the information was under seal and Mucciola had not spoken with Cooper-Lehki) argued on behalf of Defendant Costlow that the information would not be of any benefit to Plaintiff's defense.

258. From the Family Court judge's order:

259. "It appears to this Court that the records in question would have minimal if any relevance to Mr. Ballock's criminal case. In reaching that conclusion, the Court found persuasive the arguments of the prosecuting attorney in the criminal case, Ms. Mucciola..."

260. The Family Court judge declined to unseal the evaluation report and Cooper-Lehki's testimony based upon the State's representations that it would not benefit Plaintiff and because, he said, its release would be highly embarrassing to Defendant Costlow.

261. In representing the interests of Defendant Costlow in Family Court and by denying Plaintiff access to critical defense information, the State violated Plaintiff's Constitutional rights.

262. The Plaintiff's defense was severely hindered by the actions of the State, whose appearance and arguments at a Family Court proceeding, in an effort to deny access to information critical to the defense, were outrageous, partial, and represented serious harm to the defendant, (see e.g. ¶ 120).

## REQUEST FOR DECLARATORY JUDGMENT

263. As part of a broader false narrative she provided in Family Court, Defendant Costlow falsely claimed to have been a battered woman.

264. Defendant Costlow falsely claimed, among other lies, that Plaintiff brutally beat her in front of her and Plaintiff's minor children.

265. Costlow was not a battered woman and was never physically assaulted by Plaintiff.

266. Even though Costlow tried to alienate and coach Plaintiff's young children during the custody proceedings, both children informed the court-appointed psychiatrist and their counselor that they have never witnessed Plaintiff harm Defendant Costlow.

267. Because of Costlow's false claims, the Family Court judge ordered that a forensic psychiatrist conduct a comprehensive custody evaluation, to include an assessment of Defendant Costlow's claims of being a battered spouse.

268. Defendant Costlow specifically requested the court appoint Dr. Christi Cooper-Lehki to conduct the evaluation because Cooper-Lehki is an expert in Battered Women's Syndrome.

269. The Court noted that it was appointing Dr. Cooper-Lehki because it wanted the very best evaluation and recommendation available.

270. Dr. Christi Cooper-Lehki is a psychiatrist at Chestnut Ridge Center and an Assistant Professor of Forensic, Child, and Adolescent Psychiatry at West Virginia University's School of Behavioral Medicine and Psychiatry.

271. Starkly contrasted with WVSP's "investigation" which consisted of interviewing Costlow only, Cooper-Lehki spent months conducting dozens of interviews, to include many hours of in-depth interviews with Costlow and Ballock.

272. Though WVSP troopers reviewed only limited correspondence provided to them by Costlow, Cooper-Lehki reviewed all correspondence between Costlow and Ballock.

273. At Costlow's request, the Family Court sealed Dr. Cooper-Lehki's findings.

274. At Costlow's request, the Family Court ordered that copies of the custody evaluation report are to be kept at Plaintiff's and Defendant Costlow's attorneys' offices and that neither Costlow nor Plaintiff are to be given a copy; review of the custody evaluation must be done at their respective attorney's office.

275. Costlow blatantly ignored the Family Court's order and secured for herself a copy of the custody evaluation report.

276. It is unknown how widely Costlow disseminated the custody evaluation report or with whom she has shared it.

277. The Family Court indicated that the records concerning Dr. Cooper-Lehki's findings may be unsealed at the request of another judicial body should the information be deemed relevant to court proceedings.

278. Dr. Cooper-Lehki's report and testimony are vitally relevant to the instant matter and directly support Plaintiff's allegations.

279. Defendants, who purposely avoided pursuing this matter in Family Court, should not be permitted to now hide behind the protective shield of Family Court.

280. The U.S. District Court, in making its own determination regarding the instant matter, should have access to these materials.

281. Additionally, Plaintiff's children, who were subjected to aggressive attempts by Defendant Costlow to alienate them from Plaintiff, deserve to know the truth should they ever inquire about this matter.

282. In the interests of justice, Plaintiff hereby requests a declaratory judgment unsealing the Family Court's custody evaluation report.

283. The report concerning Ellen Costlow was sealed at the request of Costlow in an attempt to prevent the facts and circumstances regarding her relationship with her children and her ex-husband, Ballock.

284. There is an ongoing and continuing dispute between Plaintiff and Costlow regarding the status of the report, having it unsealed, and having it disclosed.

285. The reasons submitted to the Court for protecting that information were not warranted, justified, or fair.

286. For example, Costlow intended to continue her campaign of false information with the intent to cause harm to Ballock, and, on information and belief, expected the sealing of the report to make such efforts more likely to succeed.

287. In addition, Costlow also intended to undertake actions to cause Ballock problems with his employer, and eventually provided false, defamatory and manufactured stories and information to his employer.

288. Costlow was able to do so only because, by having the report sealed, the true motives, intent and mental illness of Costlow would remain unpublished and unavailable for Ballock to use in order to disprove and discredit her falsehoods.

289. The report would not, and should not, have been sealed if all facts had been disclosed and the events which have taken place since the sealing were known at the time.

290. The sealing of the report likewise harmed Ballock, and unjustifiably protected Costlow, by concealing the truth of the circumstances regarding the divorce, the custody battle, the criminal charges wrongfully sought by Costlow, and other personal and legal issues.

291. Such harm continues through today, and will continue with the ongoing, unjustified and improvident sealing of the report.

292. Plaintiff Ballock is also unable to present the report to his children, and is thus prevented from presenting those children the truth regarding their family history, their relationship with their mother and their father, and the reasons and facts relating to and behind significant events in their lives.

293. This causes Ballock ongoing harm and emotional distress, and continues to harm his ability to raise his children in an environment of full truth and disclosure.

294. Defendant Costlow and her counsel have rejected repeated requests to unseal and provide copies of the report for Ballock to review and utilize in connection with ongoing proceedings at his place of employment (see e.g. ¶ 120), among other ongoing issues.

295. There is an ongoing dispute regarding whether or not the report should remain sealed or must be released.

296. Plaintiff Ballock seeks a declaratory judgment declaring his right to obtain an unsealed copy of the report for use in connection with his employer, his children, and all issues where Ellen Ruth Costlow is involved.

## JURY TRIAL DEMAND

297. Plaintiff demands a jury trial on all issues so triable.

## DAMAGES AND RELIEF

298. Plaintiff prays this Court enters judgment for the Plaintiff and against each of the Defendants and grant:

    a.  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

    b.  Economic losses on all claims allowed by law;

    c.  Presumed damages for the harm to Plaintiff of rights that are difficult to quantify, including but not limited to violations of the right to be free from abuses of the judicial system;

    d.  Special damages in an amount to be determined at trial;

    e.  Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

f.   Costs associated with this action under 42 U.S.C. § 1988, including expert witness fees,

   on all claims allowed by law;

g.   Pre- and post-judgment interest at the lawful rate;

h.   Attorney fees as allowed by law and pursuant to 42 U.S.C. section 1983.

i.   Any further relief that this Court deems just and proper, and any other appropriate relief

   at law and equity.

Respectfully submitted by Scott T. Ballock, by and through his counsel, this 20th day of

December, 2017.

*/S/ Frederick R. Juckniess*
Frederick R. Juckniess, Esquire
302 E. Liberty St., Suite 203
Ann Arbor, MI 48104

Phone (734) 707-1515

Rick@Juckniesslaw.com

*/S/ Charles J. Crooks*
Charles J. Crooks, Esquire
Crooks Law Firm PLLC
244 Pleasant Street
Morgantown, WV 26505

WV State Bar # 4633

Phone (304) 282-1039

Charles@crookslawfirm.org

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**                                    Case No.:      1:17-CV-52

      Plaintiff,

v.                                                                       JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW**,
**STATE TROOPER MICHAEL KIEF**,
**STATE TROOPER RONNIE M. GASKINS**,
**STATE TROOPER CHRIS BERRY**,

      Defendants.

## CERTIFICATE OF SERVICE

I, Charles J. Crooks, Esq., local counsel for the Plaintiff, Scott T. Ballock, hereby certify

that on the 20th day of December, 2017, I filed the foregoing "**THIRD AMENDED**

**COMPLAINT**" with the Clerk of the Court using the CM/ECF system, which will send

notification of the filing to the following:

P. Todd Phillips, Esq.                              Mark G. Jeffries (WV Bar No. 11618)
P. Todd Phillips & Associates                    Steptoe & Johnson PLLC
235 High Street                                         400 White Oaks Blvd.
Suite 322                                                 Bridgeport, WV 26330-4500
Morgantown, WV 26505                            Mark.jeffries@steptoe-johnson.com
ToddPhillips.law@gmail.com

**Counsel for Defendant,**                          Monté L. Williams (WV Bar No. 9526)
**Ellen Ruth Costlow**                              Steptoe & Johnson PLLC
                                                              P.O. Box 1616
And                                                          Morgantown, WV 26507-1616
                                                              (304) 598-8000
                                                              Monte.williams@steptoe-johnson.com

                                                              **Co-counsel for Defendants State Trooper**
                                                              **Michael Kief, State Trooper Ronnie M.**
                                                              **Gaskins and State Trooper Chris Berry**

*/S/ Charles J. Crooks, Esq.*

41