# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

OF WEST VIRGINIA

* * * * * * * *

SCOTT T. BALLOCK,          *

    Plaintiff          *   Case No.

    vs.          *   1:17-CV-52

ELLEN RUTH COSTLOW,          *

STATE TROOPER MICHAEL          *

KIEF, STATE TROOPER          *

RONNIE M. GASKINS,          *

STATE TROOPER CHRIS          *

BERRY,          *

    Defendants          *

* * * * * * * *

DEPOSITION OF

MICHAEL KIEF

May 28, 2019

Any reproduction of this transcript is prohibited without

authorization by the certifying agency.

51

1     Q.    Against Trooper Berry?

2     A.    Yes, sir.

3     Q.    All right.

4           Tell me about that.  When was it, first of all?

5     A.    It was my first contact with Tom Ballock,

6  Senior.  He had called in to the state police barracks to

7  let us know, or let me know --- he asked for a supervisor

8  --- to let me know that Chris Berry was having an affair

9  with his daughter-in-law or soon to be daughter-in-law.

10          That conversation was short.  There was a

11 couple of questions that I had that he answered.

12    Q.    What were those?

13    A.    I asked him what his relationship was to Ms.

14 Costlow.  He said he was the father-in-law.  I asked him

15 why he was making the complaint instead of her husband.

16 I don't remember how he responded to that, if he did.  I

17 asked him if he wanted to make a formal complaint, and he

18 declined to do so.

19    Q.    So you offered to facilitate the filing of a

20 formal complaint?

21    A.    Yes.

22    Q.    And your recollection is that Tom, Senior ---?

23    A.    He said he didn't want to do that.

24    Q.    Did he explain why?

52

1       A.   No, sir, he did not.

2       Q.   Is that the end of your contact with Tom,

3  Senior?

4       A.   Yes, sir.  I believe so.

5       Q.   When was that?

6       A.   That was --- I do not know that, sir, not

7  without looking at --- it was the first time that I knew

8  of Mr. Ballock and knew of the situation.

9       Q.   Okay.

10           So Ellen Ruth Costlow ---

11      A.   Yes, sir.

12      Q.   --- comes in the picture next.

13      A.   Trooper Berry did first, yes.

14      Q.   All right.

15           Trooper Berry.  Go ahead.  Tell me what you

16  remember.

17      A.   I called Trooper Berry, and told him about the

18  allegation.  He denied it.  I asked him to come in and

19  speak to me.  He did.  He --- he came in.  He did --- I

20  looked at his cell phone.  He let me see his cell phone,

21  and there wasn't anything on there that --- that gave me

22  concern or no --- no proving or disproving of a --- of a

23  relationship.

24      Q.   Were there any communications on Trooper

55

1       Christopher Berry had communicated directly with Ellen

2       Ruth Costlow using his cell phone?

3            A.   I don't remember that, sir.  I do not remember

4       if there was any communications between him and her on

5       there.  I remember that there wasn't anything --- there

6       wasn't anything proving an allegation on his cell phone.

7       I don't remember specific conversation between him and

8       her on the cell phone.  It's been so many years.  I --- I

9       don't remember that point.

10           Q.   When you say you examined his phone, what did

11      you look at, specifically as you can tell me?

12           A.   Text messages.

13           Q.   So you looked at text messages?

14           A.   Yes.

15           Q.   Did you look at the call history?

16           A.   Yes, sir.

17           Q.   All right.

18                Anything else?

19           A.   No, sir.  No, sir.

20           Q.   These cell phones, you can do all kinds of

21      things?

22           A.   Yes.  Yes.  Yes.

23           Q.   I use mine for email.

24           A.   Yes.

60

1    Berry?

2         A.    Yes, sir.

3         Q.    What did you do?

4         A.    Called Ms. Costlow.

5         Q.    All right.

6               How'd you --- how'd you know how to get in

7    touch with her?  Did Tom Ballock give you that

8    information, or ---?

9         A.    I don't remember how I found that out.  No,

10   sir, I don't remember that.

11        Q.    Didn't get it off Trooper Berry's phone, did

12   you?

13        A.    I doubt that, sir.  I don't remember how I got

14   her --- her phone information.

15        Q.    Okay.

16              Well, you can't say for sure that there wasn't

17   communication between Trooper Berry and Ellen Costlow, so

18   it's possible you did get it from his phone?

19        A.    Again, I don't know, sir.

20        Q.    All right.

21              So tell me about this.  Did you go to see her?

22   Did she come to see you?  Did you just talk over the

23   phone?  How did this go down?

24        A.    I --- I called her on the phone, had a

61

1    conversation with her on the phone.

2         Q.   Okay.

3              Walk me through what you remember about that.

4         A.   I told her why I was calling.  She --- she got

5    upset and denied any affair with Trooper Berry.  And she

6    made the comment --- a comment about --- and I don't know

7    exactly word for word, but she made the comment she was

8    being harassed.

9         Q.   By whom?

10        A.   I don't believe she even said that, sir.  I

11   don't remember the whole gist of the conversation.  Being

12   wronged, though.

13             She asked if she could come into the state

14   police barracks to talk to me.  I said, well, sure if you

15   have a complaint you would like to make or --- or talk to

16   me, that's fine.  So she came in.

17        Q.   Have you told me everything you can recall

18   about your first telephone discussion with her?

19        A.   No, sir.  That's about the --- the vague ---

20   the vague memory I have of it.

21        Q.   Did you make notes of your conversation with

22   Tom Ballock, Senior, your discussion with Trooper Berry,

23   and your phone call with Ellen Ruth Costlow?

24        A.   I believe I jotted a few things down talking to

66

1    know, your best, honest recollection and testimony about

2    all this stuff.  And it's not --- you know, it's not a

3    contest or ---

4         A.    Sure.

5         Q.    --- anything of that nature.

6               All right.

7               So Ellen Ruth Costlow comes in to see you the

8    evening of the same day that you called her?

9         A.    I believe it was the same evening.

10        Q.    To the best of your memory?

11        A.    Yes, sir.

12        Q.    Tell me what you remember.  What was your

13   impression when --- when she came in to see you?

14        A.    She --- she came to the state police barracks.

15   She sat down, and she --- well, I had a conversation

16   about her and Trooper Berry, which she denied having an

17   affair with Trooper Berry.

18              She then went on to say she was in the middle

19   of a divorce or in --- in the process of divorce and that

20   her soon to be ex-husband would not stop contacting her,

21   that she was being harassed daily with emails and text

22   messages.

23        Q.    You say Ellen Ruth Costlow denied having a

24   romantic relationship with Christ Berry.  Did she deny

97

1      Q.    Okay.

2            When you told her she would have to sign a

3    paper saying that he was harassing her ---?

4      A.    I don't if I told her she had to sign a paper.

5    We don't ---

6      Q.    Okay.

7      A.    --- do that.

8      Q.    Okay.

9            Well, yeah.  Rather than me do it that way, let

10   me just put it this way.  You explained to her what the

11   process of making a criminal complaint against Scott

12   would consist of?

13     A.    Correct.

14     Q.    So ultimately, there --- there was an

15   investigation opened?

16     A.    Yes, sir.

17     Q.    And based on the documents that have been

18   produced in discovery, it --- it appears to me that you

19   were probably the trooper who got the ball rolling.  You

20   --- you're the one who officially got the investigation

21   started.

22           Am I right?

23     A.    I kicked it upstairs to, well, the first

24   sergeant, which went to the captain.

106

1   Gaskins of the Morgantown Detachment.

2        Q.   Okay.

3             And who's it from?

4        A.   Captain Merrill.

5        Q.   Okay.

6             And what was Captain Merrill instructing

7   Corporal --- then Corporal Gaskins?

8        A.   To open up an investigation.

9        Q.   So the fair implication here is that Exhibit 4

10  occurred because it was instigated by Exhibit 3?  In

11  other words, you asked Captain Merrill for authority and

12  he granted it.  And he personally directed Corporal

13  Gaskins to open the investigation?

14       A.   Correct.

15       Q.   All right.

16            And the reason this echelon of authority at the

17  state police was directly involved here is because there

18  was an FBI agent at issue.

19            True?

20       A.   Yes, sir.

21       Q.   Did you make any contact with the FBI in the

22  course of your investigating?

23       A.   During the course of the whole ---?

24       Q.   Prior to the time that my client was arrested

107

1   on September 13th, 2013, did you contact the FBI?

2       A.   I --- I do not know, sir.   I cannot remember

3   who contacted the FBI.

4       Q.   All right.

5            I take it by your answer that you're satisfied

6   that there was somebody at the state police who contacted

7   the FBI about Scott Ballock prior to his arrest on

8   September 13, 2013?

9       A.   Correct.

10      Q.   What was the point of that contact?

11      A.   Twofold, to let the agency that he was hired

12  under know that there was a criminal investigation being

13  conducted, and two, professional courtesy.

14      Q.   Did you direct someone to make that contact?

15      A.   I do not remember that, sir.

16      Q.   Would corporal Gaskins have had the authority

17  to contact the FBI for the two purposes that you just

18  identified?

19      A.   Yes, sir.

20      Q.   Okay.

21           Who was in charge of the investigation,

22  Corporal Gaskins?

23      A.   He was the investigating officer, sir.

24      Q.   Okay.

120

1    Ballock?  Why --- why you couldn't just let him know,

2    look, you know, we got these warrants for you.  You want

3    to come and report voluntarily?  Why didn't you do that?

4        A.    Because of some of the tones of the emails,

5    some of the threatening manners of the emails.  We did

6    not feel like that was going to be a --- an outcome to

7    this that we wanted to see.

8        Q.    I don't --- I don't follow you.

9        A.    Some of the --- the tones of the emails were

10   quite worrisome to us.  Letting him know that there was

11   warrants on an investigation and he was going to be

12   arrested, we didn't know if he was going to have any

13   conversations with his ex-wife about it, or whatever.

14         And we knew part of his bail agreement was to

15   have no conversations with Ms. Costlow.  We weren't going

16   to give him an option of --- of having any conversations

17   with Ms. Costlow about the arrest.

18       Q.    Okay.

19         Was the FBI told that the state police was

20   worried that Scott might act out in violence?

21       A.    I don't know what the FBI's thought was on

22   that.

23       Q.    Not my question.  Was the FBI told by West

24   Virginia State Police that they felt it was going to be

121

1 necessary to catch him on the hop, and arrest Scott

2 Ballock in front of the magistrate --- or the family

3 court judge in order to deny him the opportunity of

4 acting out violently?

5  A. We had the discussion with the FBI about some

6 of the emails being worrisome, about tone and in a

7 threatening manner.

8  Q. Did West Virginia State Police ask the

9 permission of the FBI to arrest one of their agents?

10  A. Ask permission, sir?

11  Q. Yeah, as opposed to working with the FBI to

12 arrange for something less traumatic than an arrest with

13 handcuffs in front of the family court Judge?

14  A. I don't believe there was handcuffs, sir.

15  Q. Okay.

16  A. They didn't do that.

17  Q. But back to the point of my question, was there

18 any effort made by the West Virginia State Police to work

19 with the FBI to arrange for Scott to, you know, surrender

20 to the magistrate for arraignment rather than have to

21 take him into custody and arrest him?

22  A. No, sir.  That wasn't offered.

23  Q. Why not?

24  A. That wasn't offered by the FBI.

153

1      A.    I believe I knew that, Yes, sir.   I --- I

2 remember something about that.

3      Q.    Okay.

4            How'd you find out about that?

5      A.    I can't remember that, sir.   I don't ---.

6      Q.    Ellen Costlow?

7      A.    It could've been her, or it could be through

8 Cindy Scott, or --- or Corporal Gaskins at the time.

9      Q.    What was --- what was your reaction when you

10 learned that Scott was denied the permission to use Dr.

11 Christi Cooper-Lehki's report in his own defense ---

12      A.    I would ---.

13      Q.    --- against the charges that Ellen Costlow

14 initiated against him?

15      A.    I --- I believe I was happy for her because she

16 --- she acted happy that she had finally won something,

17 that she had finally thought that she garnered some ---

18 she won a court case or opinion or whatever.   She --- she

19 --- actually, was one of the few times I saw, you know,

20 her be not excited about something, but not happy about

21 something, but she --- a positive content to her.

22      Q.    Do you remember using language to the effect

23 that Scott must have had his tail between his legs as he

24 left court at the end of that hearing?

154

1    A.   Again, I probably did say that.  Or I did say

2  that.  But that was just in regard for --- to embellish

3  her to --- she finally won one, and I was just, you know,

4  happy about just garnering her ---.

5    Q.   Do you think that that was consistent with your

6  obligation under policy and procedure to maintain

7  impartiality with respect to a matter that wasn't even

8  part of your official duties?

9    A.   Impartiality concerning ---?

10   Q.   Yeah.  I mean, you weren't investigating

11  anything in connection with the family court case?

12   A.   Correct.

13   Q.   You were participating to some degree in the

14  criminal case against Scott.  And Scott was trying to get

15  evidence to defend himself against those charges, and you

16  were pretty happy that he failed in that effort, weren't

17  you?

18   A.   My disdain for Scott and his dad had come with

19  harassments and emails.  Not --- harassments and

20  websites.

21   Q.   Okay.

22       So you do harbor ill feeling toward my client?

23   A.   For --- yes, sir.  I do.

24   Q.   Likewise, you harbor a feeling toward Scott's

155

1   father?

2        A.    Correct.

3        Q.    And that ill feeling is borne of things that

4   Scott's father was posting on the website about the case

5   against his son, including references to you personally?

6        A.    Correct.

7        Q.    Just want to make sure I understand.

8              Now, you were interviewed by the FBI.

9        A.    There was a meeting with the FBI, sir.

10       Q.    Okay.

11             You had a meeting?

12       A.    Yes, sir.

13       Q.    All right.

14             Well, I ---

15       A.    An interview.

16       Q.    --- appreciate your sense of caution in

17   answering my question, but the fact is, you had a

18   communication, face-to-face communication with somebody

19   form the FBI?

20       A.    Correct.

21       Q.    Okay.

22             When was that?

23       A.    Which one?

24       Q.    Well, okay.  Maybe that's a more appropriate

156

1    question.  How many different times?

2        A.    I remember two specifically.

3        Q.    Okay.

4        A.    Once when the FBI came to review the emails and

5    text messages.

6        Q.    Okay.

7              Those would be the emails and text messages

8    that the state police obtained from Matt Stout, one of

9    the lawyers represented Ellen Ruth Costlow?

10       A.    Correct.

11       Q.    Okay.

12             Did you have any other emails other than the

13   ones you obtained from Mr. Stout?

14       A.    I don't know that, sir.  I can't remember if I

15   did or not.  If we did ---.

16       Q.    Well, Ellen Costlow shared a lot of stuff with

17   you, right?

18       A.    I can't --- I remember the disc --- yes.  Yes,

19   sir.  Yes, sir.  Yes.  Yes, sir.

20       Q.    So, you know, your collection of evidence came

21   from the magnetic disc that Mr. Stout provided as well as

22   a series of emails forwarded to you by Ellen Costlow?

23       A.    I don't know if they forwarded to us or if she

24   had them printed out.  I can't remember that.

161

```
 1        A.    Correct.  Right.

 2        Q.    How did you take that?  Were you surprised?

 3        A.    No, sir.  I wouldn't say I was surprised if it

 4   was --- I wasn't surprised or --- it was --- I don't know

 5   how they operate.  So that was --- I don't know their

 6   thoughts behind that.  I don't know.

 7        Q.    This was an internal FBI matter, and you had no

 8   information or expectation as to what his answer to that

 9   question was going to be?

10        A.    Correct.  Yes, sir.  Yes, sir.  I don't know.

11        Q.    Was --- was your disdain for Scott Ballock such

12   by that point that you were disappointed to hear that he

13   would keep his job unless he got convicted of these cases

14   that you were investigating against him?

15        A.    No, sir.  I'm not even so sure if the website

16   were up at that time.  This was pretty early in the

17   investigation.

18        Q.    There was a second time that you communicated

19   with the FBI?

20        A.    Yes, sir.

21        Q.    Okay.

22              Tell me about that.

23        A.    After the investigation was over with, after

24   the court was over with, they contacted and wanted to
```

162

1    have a meeting.

2         Q.    Okay.

3               Was it Hamrick again?

4         A.    I didn't --- no.  I believe he was retired by

5    that time.

6         Q.    Okay.

7               Who was it?

8         A.    It was another John.  I'm sure I'll remember

9    his name here shortly.

10        Q.    Large?

11        A.    No.  It's --- could've been.  Could've been

12   John Large.  Could've been.  There was another --- I

13   can't remember.

14        Q.    Okay.  All right.

15              So just one or two people?  Do you know?

16        A.    I can't remember that, sir.

17        Q.    Where did the interaction take place?

18        A.    I believe it was up in the state police

19   barracks up in the conference room.

20        Q.    Same place where Hamrick was shown

21   investigative material?

22        A.    No.  We were down in the sergeants' room at

23   that point.

24        Q.    Okay.

167

1      A.    I don't remember if there was more than one,

2  sir.

3      Q.    When was this one substantive telephone

4  discussion with the FBI that you can recall?

5      A.    After Mr. Ballock showed up at the state police

6  barracks.

7      Q.    Okay.

8            This would be after Scott Ballock came to the

9  police barracks in an effort to try and serve the summons

10  and complaint that was filed in this civil action?

11      A.    He wasn't there to serve us, sir.

12      Q.    What was he there for?

13      A.    He was there to give us the information because

14  it was going to be on the news the next day.

15      Q.    And you know that because you talked to him?

16      A.    I knew that because I was on the phone with the

17  Secretary at that point.

18      Q.    You had no direct communication with Scott that

19  day?

20      A.    No.  He was there when I was on the phone with

21  the Secretary.

22      Q.    All right.

23            You --- let's say, by that time you were ---

24  you were in an office ---

168

1    A.    Yeah.

2    Q.    --- meeting?

3    A.    Yes, sir.

4    Q.    Are you aware that the family court ordered

5  Ellen Costlow not to have any communication with the FBI

6  about Scott?

7    A.    No, sir.  I do not know that.

8    Q.    She never told you that there was an order

9  entered?

10   A.    I can't remember, sir.  I don't --- I can't

11 remember if that fact came up.

12   Q.    Did you ever tell Ellen that you were going to

13 meet with the FBI, and that you would --- you wanted to

14 know what she would like you to tell them?

15   A.    I remember a conversation with Ellen.  I didn't

16 know why the FBI was coming.  And there was so much that

17 happened with this case, and so many scenarios, and so

18 many incidents.  That was basically to jog my memory if

19 I'm --- if I'm not remembering something huge or correct

20 --- incorrect or something that was --- was pretty

21 relevant.

22   Q.    So you did ask Ellen Costlow to tell you if she

23 had any suggestions for what she wanted you to tell the

24 FBI?

169

1          A.    Just to jog my memory, yes, sir.

2                    ATTORNEY CROOKS:   Let's take a short

3    break.  I want to look over some of my stuff here, and

4    assess and I owe you the forecast here.

5                              ---

6    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

7                              ---

8                    ATTORNEY JEFFRIES:   We can go on the

9    record here.

10                   Lieutenant, a document marked Exhibit 6

11   has been examined by everybody, and you have it in front

12   of you now.

13                             ---

14                   (Whereupon, Deposition Exhibit 6, Domestic

15                   Violence Report, was marked for

16                   identification.)

17                             ---

18   BY ATTORNEY CROOKS:

19        Q.    Can you identify that?

20        A.    That's a domestic violence, what we normally

21   call a 195, given to --- excuse me, victims or alleged

22   victims of domestic violence.  It just tells them how to

23   obtain a domestic violence protective order, go to a

24   shelter if they feel abused or threatened.

196

1     next morning.  I don't know that.

2          Q.    Okay.

3                You may not have had an opportunity to call

4     until the next day.  But apparently you --- you made it a

5     priority to get in touch with the FBI to tell them that

6     Scott had stopped by the Morgantown barracks with that

7     paperwork?

8          A.    Correct.

9          Q.    And I guess one of my questions is, you know,

10    why did you deem it necessary to contact the FBI about

11    this?

12         A.    On two previous occasions, I had seen Mr.

13    Ballock out in public.  On both of those incidences, I

14    felt that he was trying to intimidate me on both

15    instances.

16         Q.    Okay.

17         A.    And this was another instance of trying to

18    intimidate us, or me.  He was there for no apparent

19    reason.  He wasn't there to serve us.  He just wanted us

20    to have the information.  He wasn't there in a legal ---

21    his official capacity.  He was just there to --- I don't

22    want to say intimidate us.

23         Q.    Well, too late.  You already did.  But to ---.

24         A.    Right.  So this was in an effort to try to ---

203

1      Q.    So when you arrested Scott, you didn't handcuff

2   him?

3      A.    No, sir.  I didn't --- no.  I didn't --- no.

4   No.  We did not handcuff him.

5      Q.    I guess I just --- all this time, I presumed

6   that you did.  I thought you guys always did that.

7      A.    No.  No, sir.  We were in the same building as

8   the magistrate court.  We just took him upstairs and got

9   him arraigned.

10      Q.    Okay.

11            Did you relieve him of his weapon?

12      A.    No, sir.  That was one of the reasons why we

13   did it at the magistrate's office or at --- in that

14   building.  We knew he would not have his weapon on him.

15      Q.    He didn't have his weapon on him in family

16   court?

17      A.    You can't have your weapon on you in the family

18   courts.  They don't care who they are.  They disarm you.

19   They would disarm anybody.

20      Q.    Okay.

21            Well, you're helping me because, my

22   understanding, this is kind of, I'll admit this and be

23   naïve on this point.  I see a little bit of a conflict

24   between his obligation as a federal agent to always have

210

1    going in for a trial.  We just stayed for the hearing.  I

2    don't remember if Marcia asked us to stay.  I don't

3    remember that.

4         Q.   Was Scott there?

5         A.   Of course he was.

6         Q.   And Mike Benninger?

7         A.   Yes, sir.

8         Q.   Marcia Ashdown was there?

9         A.   Yes.  Yes, sir.

10        Q.   A little unusual for the --- they elected the

11   head prosecutor to come to the magistrate's court, isn't

12   it?

13        A.   I've had the main prosecutor in magistrate

14   court before.

15        Q.   Not unheard of, but it's unusual, isn't it?

16        A.   Yes.  It is unusual, yes.

17        Q.   And it's --- it's kind of an indicator that

18   something significant is --- is going on.  Don't you

19   agree?  You took it that way?

20        A.   No, she wanted to handle it.

21        Q.   Right.  She wanted to personally see to it that

22   things got handled the way she thought they should.

23             Did Marcia Ashdown ever tell you before she

24   submitted this motion to dismiss the charges that ---

211

1    that she was going to do it?

2         A.   We found out that morning, sir.

3         Q.   That morning?  Who told you?

4         A.   Marcia Ashdown.

5         Q.   She did.  So she told you.  She didn't really

6    solicit your input on it?

7         A.   No, sir, not at all.

8         Q.   Did you know that she had been talking with

9    Mike Benninger about terms and conditions for dropping

10   the charges against Scott Ballock?

11        A.   No, sir.

12        Q.   Were you kind of thunderstruck by all this?

13   Did it surprise you?

14        A.   It surprised us, yes.

15        Q.   Surprised us.  You're speaking in the plural.

16   Were --- was Gaskins with you?

17        A.   Correct.

18        Q.   Anybody else?

19        A.   Not that I know of, sir.

20        Q.   Ellen Costlow was present?

21        A.   Later.

22        Q.   Later?  She wasn't at the --- the hearing ---?

23        A.   She wasn't at mine and Corporal Gaskins and

24   Marcia Ashdown's meeting before the hearing.  Well, at

257

1      Q.   Okay.

2         Did you ever discuss the investigation with

3  Trooper Berry?

4      A.   No, sir.

5      Q.   To your knowledge, did anyone?

6      A.   Not that I know of, sir.

7      Q.   All right.

8         Yeah.  To your knowledge, did he play any role

9  whatsoever in the investigation?

10     A.   Not that I know of, sir.

11     Q.   Okay.

12        And --- and I was a little confused with the

13  communications with the FBI.  Is it your understanding

14  that --- that state police spoke with the FBI to where

15  some decision was made about --- about where Mr. Ballock

16  should be arrested?

17     A.   We conferred with the FBI about how he was

18  going to be arrested.

19     Q.   Okay.

20        And who represented the state police in that

21  discussion?

22     A.   I cannot remember that, sir.  I don't know if I

23  spoke to the FBI or Corporal Gaskins.  I can't recall.

24     Q.   Okay.

258

1          And so the --- the arrest in family court, well

2    that was done, I guess, obviously.  But now, with the

3    FBI, they had an agent there?

4          A.    Yes, sir.

5          Q.    And it's fair to say they approved the arrest

6    occurring in that matter?  Manner.  At that --- at that

7    place, at that time?

8          A.    They didn't say anything to the contrary.

9          Q.    Okay.

10          And you --- and you thought it was --- well I

11   guess the arrest in family court had the advantage that

12   he wouldn't be --- Mr. Ballock wouldn't be armed.

13          Right?

14          A.    Correct.

15          Q.    And --- and it would be less --- less

16   embarrassing for him than being arrested at work?

17          A.    Work or home or work.

18          Q.    And possibly in front of his kids?

19          A.    Absolutely.

20          Q.    You wanted to avoid that?

21          A.    Yes, sir.

22          Q.    And so then you said that Ms. Costlow

23   originally was upset that an agreement had been --- her

24   initial reaction to the agreement that when --- the