# EXHIBIT 16

```
           IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT

                   OF WEST VIRGINIA

                  * * * * * * * *

SCOTT T. BALLOCK,                       *

     Plaintiff                          *    Case No.

     vs.                                *    1:17-CV-52

ELLEN RUTH COSTLOW                      *

STATE TROOPER MICHAEL KIEF,             *

STATE TROOPER RONNIE M. GASKINS,        *

STATE TROOPER CHRIS BERRY,              *

     Defendants                         *

                  * * * * * * * *

              TROOPER RONNIE M. GASKINS

                   May 29, 2019
```

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

26

1 enforcement action and --- and referring this lady back
2 to her lawyer and the Family Court?
3     A.    Did I consider that?
4     Q.    Did you consider it?
5     A.    No, I --- I considered --- consulted with the
6 Prosecuting Attorney's Office in Monongalia County.
7     Q.    Okay.
8     So at what stage of the investigation did you
9 go to see the Prosecutor?
10     A.    I don't remember exactly when.  It was a few
11 weeks, two or three week, maybe, after the initial
12 complaint.
13     Q.    Who'd you see?
14     A.    Assistant Prosecutor Cindy Scott.
15     Q.    Okay.
16     Well, just tell me what happened.  You went to
17 see her and what happened?
18     A.    I called her and requested to meet with her
19 about this case.  And I met with her in person at her
20 office and advised her of the allegations.
21     And I brought the disk that was provided to us.
22 And she did review some of the content on the --- the
23 disk.
24     Q.    Okay.

1   So you briefed her. And then she looked at
2   some of the communications.
3       What happened next?
4       A.   After looking over the --- there's was the
5   letter from Ballock's attorney and the --- the e-mails
6   and the content that followed.
7       When the letter was dated and sent to Scott,
8   she advised that there was enough probable cause for an
9   arrest and to obtain a warrant for one count of computer
10  harassment and one count of stalking.
11      Q.   Was there any discussion with Cindy Scott about
12  the fact that Scott Ballock was an active FBI agent?
13      A.   She was informed of that.
14      Q.   Did she make any comment on that?
15      A.   No.
16      Q.   What is stalking, under the West Virginia
17  Criminal Code?
18      A.   Without seeing the Code in front of me, it's
19  --- it focuses on repeated patterns of behavior, not just
20  one occasion, but multiple occasions of --- whether it's
21  established communication or contact with the person of
22  interest.
23      Q.   It's probably a decent time to look at another
24  document here.

62

1  A. He was higher ranked than me.
2  Q. Yeah, above your pay grade?
3  A. Right.
4  Q. Okay.
5     Well, and there were a couple of occasions that
6  Lieutenant Kief told us about yesterday in deposition,
7  where representatives from the FBI came to the barracks.
8     Were you present for either or both of those?
9  A. Both, I believe.
10 Q. Okay.
11    Let's just take them in order then.
12    The first one, what do you remember?
13 A. That was Special Agent John Hambrick.
14 Q. Yeah.
15 A. He's retired now. At the time he was in charge
16 of the Clarksburg Field Office. It's a branch of the
17 Pittsburgh Office.
18 Q. Right.
19    You knew him because from time to time the
20 State Police and the FBI interact.
21    Right?
22 A. I worked with him quite a bit when we were
23 working the Skylar Neese investigation.
24 Q. Okay.

63

1   A.   So he, I believe, was instructed by his
2   supervisors in Pittsburgh to meet with us to go over the
3   case, what we had.  And he was interested in seeing the
4   content that was on the disk.
5   Q.   Okay.
6   A.   We checked with Ms. Scott, if that would be
7   okay if he could look at that.  And she did not object.
8       Then he started going through the different
9   types of e-mails on the disk.
10  Q.   Did he make copies or take ---- take anything
11  with him?
12  A.   She --- she --- Ms. Scott was fine if he had a
13  copy of the disk.  So he did have a disk when he left.
14  Q.   All right.
15      Conversation, you know, what conversation did
16  you either have or bear witness to during the time that
17  Agent Hamrick was in the detachment looking at the
18  investigation file?
19  A.   I don't recall exactly what all was said.  I
20  don't think he was allowed to discuss with us what was
21  happening internally with the FBI, so ---.
22  Q.   Okay.
23  A.   But I don't recall exactly what all was said or
24  who said what.

```
                                                              66
 1    pages counted as one of the pages.  It says so, yeah,
 2    four pages including cover page.
 3              So the cover page is 402 and then the
 4    accompanying document is 403 through 405.  And I'll just
 5    proffer into the record that Troopers' 403 through 405
 6    would be a copy of the motion made by Marcia Ashdown on
 7    April 7, 2016 in Magistrate Court to dismiss charges with
 8    prejudice in both of the criminal cases brought against
 9    Scott Ballock.  There's also a two-page attachment to the
10    motion.
11              I think it's clear enough that this was
12    Sergeant Kief advising the FBI, through James Herman, as
13    to the fact that the criminal case against Scott Ballock
14    had been dropped.
15              Can you tell me if you were present in court
16    the day the Prosecutor dropped those charges?
17         A.   I was.
18         Q.   Okay.
19              Did you know that she was going to do that?
20         A.   Not until the day of.
21         Q.   Okay.
22              So in the days leading up to the hearing, I'm
23    advised that there were communications between the
24    Prosecutor's Office and Scott Ballock's attorney, Mike
```

67

1  Benninger.
2      Did the --- anybody at the Prosecutor's Office
3  brief either you or Sergeant Kief about what they were
4  talking about?
5      A.   No, I --- I was just --- assumption we were
6  preparing for trial.  But they didn't tell me exactly
7  what was communicated between Marcia and Mr. Benninger.
8      Q.   Okay.
9           So you went to court on April 7, 2016
10 anticipating that you were going to testify?
11     A.   Correct.
12     Q.   You had reviewed your report and everything you
13 had done and were prepared to be the witness?
14     A.   Correct.
15     Q.   All right.
16          Only to find out that they had a deal and that
17 they were going to drop the case.
18     A.   Yes.
19     Q.   How'd you feel about that?
20     A.   I would've rather it gone to trial.
21     Q.   Okay.
22          By the time the hearing occurred on April 7,
23 2016, Tom Ballock had been posting things on his website
24 for some long period of time.

113

1   practical because there were just too many
2   communications.
3           There were more than 3,000 of them.  That's
4   what I understood you to tell me.
5       A.   The content spoke for itself, correct.
6       Q.   Okay.
7           You felt that the --- just reading it on your
8   own gave you the --- the comfort and satisfaction that
9   this was, in fact, harassment and criminal conduct under
10  the Code, did not need to follow the rules and talk to
11  the suspect?
12      A.   It wouldn't work that way.  But that's why I
13  reached out to Mrs. Scott and presented to her what I did
14  have at that point.  And then we had the conversation
15  about the search warrant to seize his phones and
16  computers.
17      Q.   All right.
18      A.   But --- and I agreed with her honest decision,
19  she reviewed the content on the disk and --- not all of
20  them, of course.
21          And she was comfortable with --- that there was
22  probable cause for his arrest.
23      Q.   Okay.
24          Did you direct the Assistant Prosecuting

114

1  Attorney Scott to any particular e-mails?  Did you select
2  any that you thought were most indicative for her to
3  examine or do you just give her the disk and say, you
4  know, here I'm going to leave this you, you can look at
5  as much of it as you think you need to?
6      A.   She put the disk in.  She started going through
7  it herself.
8      Q.   Okay.
9      A.   And I pointed out some of the other e-mails,
10 too, that were on the disk, but --- but she was at her
11 own leisure going through some of the content.
12     Q.   Uh-huh (yes).
13          In your report, as we've already addressed, you
14 did print off some of the e-mails and attached them.  So
15 you know, you wouldn't go down through the stack of stuff
16 that was produced from the investigation and see which
17 ones those were, but did you --- did you show those to
18 APA Scott?
19     A.   I don't believe I showed them all to her, but
20 that she --- but I did address a few of them to her.
21     Q.   Uh-huh (yes).
22          Was it your view that if there was even one
23 e-mail from among the more than 3,000 that could be
24 fairly interpreted as threatening, then that's all you

1  going to be in Family Court. And that's when the plan
2  was laid to execute on these arrest warrants.
3           Fair?
4       A.  I believe she informed at the time Sergeant
5  Kief about that coming hearing. So I believe I found out
6  from him.
7       Q.  I'm looking at the content of paragraph --- the
8  fifth paragraph on page five of your report.
9           Due to officer safety reasons, the arrest
10 warrants were served at the Monongalia County Magistrate
11 Court. The accused is a federal law-enforcement officer
12 and carries an issued firearm.
13          Okay.
14          So I see what's recorded here.
15          Okay?
16          I can read it.
17          When you say, due to officer safety reasons,
18 was there something specific about Scott that left you
19 and Sergeant Kief concerned about your safety, or was it
20 just the general fact that Scott was law enforcement and
21 he carried a weapon?
22      A.  He was a concern how his --- and me looking at
23 the e-mails, and I wasn't sure of his mental state. So
24 there was concerns of how he would respond, knowing he

157

1  was going to be arrested.
2     Q.   What did Ellen tell you to expect?
3     A.   I don't know.  I think --- I don't think she
4  even elaborated on that.  Or if she did, I don't
5  remember.
6     Q.   Okay.
7          So she wasn't sitting there with you and
8  Sergeant Kief saying, you watch out for this guy?
9     A.   I --- I don't remember her saying anything like
10 that.  Like I can't recall, at least.
11    Q.   Was she telling you that she was afraid of
12 Scott?
13    A.   That he might hurt her?  In that sense?  Is
14 that what you're talking about?
15    Q.   Yeah.
16    A.   Don't recall.
17    Q.   Okay.
18         So you don't recall Ellen ever saying, you
19 know, I'm afraid of Scott, I'm afraid what he might do to
20 me, he might hurt me?
21    A.   I don't think she ever conveyed that like there
22 would be a physical harm.  I don't think so.
23    Q.   Well, she never told you that he acted out in
24 violence against her.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

201

1   A.   Correct.
2   Q.   And we established that he said he wouldn't.
3        Right?
4   A.   Correct.
5   Q.   And in fact, he seemed to indicate that nothing
6   would make him stop.
7   A.   It didn't like he was going to.
8   Q.   Yeah. And I sort of --- I couldn't --- don't
9   remember if anything in the follow-up questions from Mr.
10  Ballock's attorney ---. I can't remember if Trooper
11  Berry was mentioned in that.
12       But I remember going on break, I was struck at
13  least up until then I --- I don't think you -- do you
14  recall mentioning Trooper Berry in any of your testimony
15  today?
16  A.   No, just --- just the alleged affair.
17  Q.   Okay.
18       Because --- because I believe the complaint
19  puts you and Trooper Berry and Lieutenant Kief all
20  together in investigating Mr. Ballock, arresting him,
21  continuing the prosecution after.
22       As far as the investigation, arrest,
23  prosecution, did Trooper Berry play any role at all?
24  A.   No.

                                                                214

1                    Just a few follow-ups.
2                              ---
3                         RE-EXAMINATION
4                              ---
5    BY ATTORNEY JEFFREIES:
6         Q.    You will recall earlier today you answered some
7    questions of Mr. Crooks discussing a meeting you had with
8    FBI Agent John Hambrick, where you gave him the disks of
9    all the e-mails and text messages sent by Mr. Scott and
10   Ellen Costlow.
11             Do you recall that testimony?
12        A.    Yes.
13        Q.    Do you recall when that meeting with John
14   Hambrick occurred?
15             I'm not asking you to give a specific date,
16   but, do you know ---?
17        A.    I believe it was post arrest, because we
18   checked with Ms. Scott, that that was okay to release
19   that, considering it was pending adjudication.
20        Q.    So --- and so what I was kind of getting at ---
21   you believe it's after he had been arrested?
22        A.    I believe it was post arrest.
23        Q.    Okay.
24             Do you recall approximately how long after his

```
                                                              215

 1    arrest?  Like do you think it's a matter of a week or two
 2    weeks or months?
 3              I mean, this case went on for almost two years.
 4         A.   I think it was fairly quick, because he had to
 5    respond to his supervisor in Pittsburgh.
 6         Q.   So fairly soon after the arrest?
 7         A.   I believe it was soon.  Perhaps a matter of
 8    days.
 9         Q.   You also discussed some --- in other cases,
10    especially, when there's a child-custody dispute, one
11    parent will call the State Police, lodge a complaint.
12    Kind of gain a little leverage in the child-custody
13    dispute.
14              And --- and you said that in most instances
15    generally what you'll do is refer the complaint to Child
16    Protective Services.
17              Do you recall that testimony?
18         A.   I do.
19         Q.   Why would you refer them to Child Protective
20    Services for making a complaint?
21         A.   If there's allegations of the child visits may
22    be around paraphernalia, drugs, we would contact CPS.
23    They could do home visits, speak with the parents.
24              If --- if we get information that the child can
```