# EXHIBIT 21



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535-0001

April 10, 2017

PERSONAL

Mr. Scott T. Ballock
Federal Bureau of Investigation
Clarksburg, West Virginia

Dear Mr. Ballock:

I have completed my review of an administrative inquiry regarding the allegation that you harassed your then-wife by sending her unwelcome emails and texts despite her requests that you stop doing so, in violation of FBI Offense Code 4.8 (Other Misdemeanors). Based on a preponderance of the evidence, I conclude the allegation is substantiated. A preponderance of the evidence further establishes that you lacked candor under oath when you denied that you physically abused your wife, and when you asserted you ensured your emails and texts to her were "respectful and appropriate," in violation of FBI Offense Code 2.6 (Lack of Candor/Lying – Under Oath). Based on the circumstances of this case, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, I propose dismissing you from the rolls of the FBI.

## DISCUSSION

### I. Harassment

You and your ex-wife (Ex-Wife) separated in 2012, and your divorce became final in May 2014. As described below, on September 13, 2013, you were arrested at the Monongalia County courthouse on two misdemeanor counts of harassment and unwanted communications via computer. On April 7, 2016, the charges were dismissed pursuant to an agreement between you and the prosecuting attorney in which you agreed not to contact your Ex-Wife for any reason, subject to narrow exceptions for any future hospitalization or foreign travel of your children.

#### A. Ex-Wife's Allegations

According to her FD-302 (Serial 21), your Ex-Wife told FBI investigators during this disciplinary inquiry that she endured years of threats, intimidation, and abuse from you:

**CONFIDENTIAL**  PL 00013

Mr. Scott T. Ballock

> [EX-WIFE] continually referenced "threats" she received from SA BALLOCK. She described the "threats" to include how SA BALLOCK would ensure she does not get custody of their children if she left him. [EX-WIFE] advised that BALLOCK also threatened to plant drugs in her car and have her arrested if she ever tried to leave. She explained that SA BALLOCK tried to control her during their marriage and continually threatened to ruin her life if she left him. [EX-WIFE] described several incidents in which SA BALLOCK "threatened" to leave her. During arguments and altercations, [EX-WIFE] claimed that SA BALLOCK would place his "Glock" into his mouth. When she learned of an affair he was having, [EX-WIFE] claimed that SA BALLOCK put her in a headlock and threatened her life asking "Are you ready to die?" She claimed he also inserted his "Glock" into her vagina. [EX-WIFE] advised these incidents and arguments regularly occurred from approximately 2003 through the time of their divorce in May 2014.

Your Ex-Wife described how you both arranged for men found on the internet to come to your home and have sex with her while you videotaped the encounters. These liaisons often made your Ex-Wife fearful for her small children. She also stated you would become angry if you were not satisfied with the video:

> [EX-WIFE] confirmed that throughout their marriage she and SA BALLOCK arranged for men to come to their home and engage in sexual acts with her. The men were recruited from Craigslist. The encounters were videotaped and maintained by both [EX-WIFE] and SA BALLOCK. [EX-WIFE] advised that she often was fearful of the encounters because her children were sometimes present in the home. The children stayed in their bedroom upstairs. SA BALLOCK stood outside their door to ensure the children were not exposed to the encounter. [EX-WIFE] confirmed that the men were not "screened" in any way before they arrived. [EX-WIFE] advised that she would try to look up real names and phone numbers on Google if they provided that information. She confirmed that SA BALLOCK did not screen the men before the encounter.[1] She explained that SA BALLOCK would become angry if the video did not capture the "shot" correctly or [EX-WIFE] was not "loud" enough during the activity.

Your Ex-Wife stated that after years of threatening behavior, she separated from you, which resulted in a "strained" relationship not only with you, but also your father, who then posted nude pictures of her on various websites. Your Ex-Wife also described harassing emails and texts she received from you after the separation:

> In addition to the information placed on the websites, SA BALLOCK sent [EX-WIFE] several thousand emails and more than 10,000 texts she described as harassing. Additionally, [EX-WIFE] has over 45 audio recordings in her possession of conversations between she and BALLOCK which contain various

---

[1] I note that in contrast, your Ex-Wife told police the men were screened by you. This discrepancy does not affect the analysis of the allegations at issue.

2

Mr. Scott L. Ballock

threats.[2] SA BALLOCK obtained a cell phone she used and had a private company conduct a forensic examination of the phone. She claimed that SA BALLOCK engaged in these types of activities to control and harass her. He also followed her around. She contacted an attorney and subsequently the West Virginia State Police (WVSP) regarding the harassment. [EX-WIFE] advised that there was an accusation that she was having an affair with [a] WVSP Officer [ ] which she denies. [EX-WIFE] provided the emails and texts to the WVSP investigator who eventually contacted the prosecutor and filed charges. SA BALLOCK was arrested. After his arrest, SA BALLOCK stopped sending [EX-WIFE] texts and emails. [BALLOCK'S FATHER], however, continued to post pictures and derogatory information about [EX-WIFE] on more than 10 websites. According to [EX-WIFE], this was in violation of their divorce and criminal agreements. [EX-WIFE] acknowledged that she may pursue criminal/civil action against [BALLOCK'S FATHER].

In addition to apprising FBI investigators of this information during this inquiry, your Ex-Wife recounted many of these accusations to the WVSP during its criminal investigation of you, and they are set forth in the WVSP report discussed below.

### B. Your Response

You assert in your Signed Sworn Statement (SSS) (Serial 22) that your communications with your Ex-Wife were always "appropriate and respectful," and never "harassing":

> During our separation and divorce, I specifically requested and engaged in "written" forms of communication with [Ex-Wife] to ensure our conversations were documented - precisely so that my communications with her could not be misconstrued or misrepresented. Specifically because we were in the middle of contentious divorce proceedings, *I ensured that nothing I sent to [Ex-Wife] could be construed as anything but appropriate and respectful*. Most of these communications referenced issues or concerns with our minor children [ ] I received calls from [Ex-Wife] and I told her she needed to email or text me concerning the nature of her communication. I possess emails which demonstrate [Ex-Wife], despite her allegation that my communications were unwanted, actually wanted to communicate with me.[3] [Ex-Wife] repeatedly initiated contact with me. Among other reasons, [Ex-Wife] contacted me to request that I help her secure employment with the FBI, to discuss issues with the children, and to discuss the possibility of reuniting and saving our marriage. I once woke in the middle of the night to [Ex-Wife] standing directly above me in my apartment; she had let herself in to talk to me. On another occasion, [Ex-Wife] called me in the early morning hours and asked that I meet her "at the mailbox" in front of her home to talk (I declined). I have printouts of her communications with me via

---

[2] The file does not contain copies of these audio recordings.

[3] The file does not contain copies of any such emails. You will have an opportunity to provide them with your written response to this proposal letter.

3

Mr. Scott T. Ballock

> FaceTime and as well as photos of herself she sent me during this time period. On at least one occasion, she initiated contact with me posing as our son [ ]. I did initiate communications, but usually referencing our children. *None of my communications were threatening or harassing* (emphasis added)

You assert that your Ex-Wife is severely mentally unbalanced and that during your separation, she abused prescription drugs; attempted suicide; exposed her daughter to a known child molester; mistreated the children in other ways; and planned to destroy your reputation and get you fired from the FBI, not because she felt harassed, but simply to harm you and "gain lifetime alimony and full custody of the children." You assert the state Family Court judge who adjudicated your custody issues viewed the timing of your arrest for harassment as a strategic decision to gain advantage in the child custody case. In fact, the WVSP contacted the FBI before WVSP executed your arrest and planned your arrest on the day of the child custody hearing at the courthouse, to ensure you were not armed. You also cite the purported findings of a court-appointed psychiatrist, which appear to be under seal, that your Ex-Wife suffers from severe mental illness, and is vindictive and dangerous. You stated the psychiatrist concluded your Ex-Wife is an "unfit" and "abusive" mother, actively attempted to alienate the children from you, might be a sociopath, and "does not perceive reality correctly." You assert you were awarded full custody of the children, and your Ex-Wife's visitation rights have been revoked.

The Family Court Judge expressed significant concerns regarding your Ex-Wife's sexual behavior during the marriage and separation, but he also criticized your conduct as a "contributing factor" (9/20/13 Temporary Modification Order, at 3-4):

> In considering the parties' sexual behavior, the Court is not sanguine about the Father's role in that regard. At the very least, the Court finds the Father's apparent acquiescence in the Mother's sexual relations with other men to be a contributing factor. The Mother alleges her behavior was coerced by the Father. The Court questions that. The Court notes many if not most of the Mother's encounters occurred outside the presence of the Father though most admittedly with his knowledge and apparent consent.

### C. The Emails, Texts, and Other Communications

The record shows that beginning in September 2012, you sent your Ex-Wife hundreds of e-mails and text messages during your separation, including numerous communications intended to convince your Ex-Wife to reconcile with you, as well as emails criticizing your Ex-Wife's behavior.[4]

On September 29, 2012 (9:00am), your Ex-Wife accused you of texting her for seven hours the previous day. She said these texts were "over the top," and she asked you to stop. You agreed (9:01am), stating: "Yes. Let's start now. See you..."

---

[4] See Serial 1A2 (DVD containing emails and text messages). The DVD contains two files, one with 1,495 items and one with 1,843 items. The items consist of emails, text messages, and photos.

4

Mr. Scott T. Ballock

However, the next day, September 30 at 1.38am, you texted your Ex-Wife a derogatory message: "Black boots, Black coat, Black heart, Black soul."

On October 11, 2012, you emailed your Ex-Wife with the subject line "We broke our vows" and a photo of you standing alone at a church altar. Other emails contained in the file show close photos of you looking emotional, and perhaps crying.

On November 7, 2012, your Ex-Wife emailed you stating: "Scott, I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication." You responded the same day: "My correspondence has been polite and respectful. Calling it 'harassing' does not make it so. I am simply providing you with information and recommendations for the divorce process and the benefit of the children."

In a January 12, 2013 email from your Ex-Wife to her attorneys, she requested a protective order against your excessive communications. Your Ex-Wife stated that in addition to your emails and texts, she received phone calls from you at all hours of the day and night. The email emphasized: "I'm tired of Scott's harassment, his control over my life through nearly constant communication . . . and these late night blocked calls. It's all outrageous because they cut into my ability to get the sleep I need. The late night blocked calls are almost always silent on the caller's end, but from time to time Scott will forget to block his number and that is why I am convinced he's the one behind the calls tonight. PLUS, you've read from other emails that he sleeps with his phone next to him at night, so it's easy for him to call six times in a row at 3 am." Although there is no evidence in the file that your Ex-Wife's attorneys requested a protective order at that time, her January 12 email confirms the seriousness of her concerns.

By email dated April 26, 2013, your Ex-Wife again requested her attorneys to stop the harassing communications from you:

> I consider Scott's actions harassment at this point. Please help me put a stop to his incessant emails where he's sending me excerpts taken from [two accounts].[5] I have chosen to stop living a toxic marriage filled with physical, psychological, and sexual abuse. When Scott walked out Sept 14, I didn't let him come back home as I had in the past. I am seeking peace in my life from my abusive husband. I ask again for your help in stopping Scott's contact with me over this matter and any other matter unless it is of an emergent nature or deals strictly with decision-making with the children.

On May 1, 2013, your Ex-Wife sent you another email making clear your "harassing" texts and emails were unwelcome. She requested you to stop communicating with her unless it concerned the children, and she directed you to contact her attorneys about any other matter:

---

[5] These accounts were among those used by you and your Ex-Wife to invite men to have sex with her during your marriage while you videotaped the encounters.

5

CONFIDENTIAL

PL 00017

Mr. Scott T. Ballock

> Scott,
>
> I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication. I specifically told you on April 29, 2013, to stop contacting me unless it is about the children and you need my input as a parent. If you have a question or concern about anything else, my attorneys can help you.

Your Ex-Wife's email included the names and phone numbers for her attorneys. The next day, May 2, you sent an email agreeing to limit communications:

> I'm not trying to 'harass' you. I'm sorry you feel that way. I shared with you the email last night because it's so much like a TMLMTBGB play[6] and I hoped you would appreciate that.
>
> I'm sorry I missed your calls last night. I tried returning them this morning.
>
> I will, as you request, limit my conversations to discussion about the children. And I hope you will allow me to continue sending you regular updates about [our son].

Your Ex-Wife requested her attorneys to send you a letter demanding you cease all communications with her "not directly necessary for the care of [the] children." This request reinforces the seriousness of her concerns. *See* Serial 1A2. By letter dated May 3, 2013, your Ex-Wife's counsel advised you: "My client has informed me that you continue to send her harassing and threatening text messages and emails. Please be informed that you are to send to our office – and not Mrs. Ballock – all inquiries and/or communications not directly necessary for the care of your children. Any communications sent to Mrs. Ballock that we view as further harassment will be used in Court to substantiate her allegations of your continuing intentional infliction of emotional distress."[7]

Notwithstanding your Ex-Wife's May 1 instruction, on May 3 at 8:29am, you emailed her in an effort to reconcile. Although the email references your son, it does not concern decision-making regarding your children, but instead uses your son as leverage in your unwelcome attempts to reconcile:

> Think about coming over tonight.
>
> We could then leave the kids with Nana and spend the weekend talking, making up, finding the way forward. After my conversation with him last night, I know [our son] would like that very much. I think you would too.

---

[6] TMLMTBGB appears to be a reference to a play called "Too Much Light Makes the Baby Go Blind."

[7] The investigative file does not contain the lawyer's letter to you, but the police report quotes from the letter. You have insinuated you never received it, but even if true, the emails and texts from your Ex-Wife herself make clear further communications from you were unwelcome unless they concerned decisions regarding your children.

6

CONFIDENTIAL PL 00018

Mr. Scott T. Ballock

Your Ex-Wife responded at 8:35am with an email regarding your daughter's birthday, and you replied at 9:00am with an effort to reconcile that raised the possibility of both of you losing custody of your children due to information about your Ex-Wife that you shared with your attorney:

> There will always be a hole. * * * It is there every day for them. They feel it. I feel it. I know you feel it. And that hole will be there for the rest of their lives. It's not too late, [Ex-Wife]. We can implode our lives (my attorney doesn't pull punches and after I shared with her what I need to disclose now to defend myself against your claims she said there is a very real risk we may both lose the children; imagine them being raised by a foster family in West Virginia) or we can find a way to peacefully co-exist. Or we can find the very best in us and live a fairy tale life. I know that after this awful experience we would never take any of it for granted again.

Later that same day, at 10:03am, you again sent an email offering to take your Ex-Wife to New York City in an effort to reconcile.

On May 7, you wrote your Ex-Wife another lengthy email advising that you are writing your thoughts down so your son "knows how much [you] loved [your Ex-Wife], how much [you] didn't want this, so he knows how much [you] tried . . . ."

On May 9 at 4:33 you wrote your Ex-Wife yet another lengthy email complaining, among other things, that the both of you have spent all of your savings on legal battles and your daughter is suffering due to your Ex-Wife's "self-centered choices":

> This is a mess and it's getting worse by the day with no end in sight. I do hope you realize all you're doing some day, the ugliness you have brought into all of our lives, the futures you have doomed us all to, through your self-centered choices.

On May 14, you wrote a lengthy email to your Ex-Wife blaming her and her "demons" for your plight, including tearing the family apart and the "resentment, anger, and sadness the children will feel for the rest of their lives." You again stressed your "attorneys pull no punches" and "[i]t is possible [you] may both lose custody of the children." The email concludes by emphasizing the children "are being hurt the most in all of this . . . ."

On May 15, you advised you might not be able to take the children on a planned vacation. When your Ex-Wife responded she could take them if you paid for it, you responded with a sarcastic email offering to pay for a vacation for your Ex-Wife and her boyfriend. Also on May 15, you sent an email stating: "I will not go through your attorneys for anything. Ever. As long as you have custody of [our daughter], I will make my requests directly to you. That is my privilege."

7

**CONFIDENTIAL**     **PL 00019**

Mr. Scott T. Ballock

On May 16 and again on May 17, you emailed your Ex-Wife inviting her to take an out-of-town trip with you to Old Town Alexandria. You stated you wanted to "apologize" and "make amends," but that your Ex-Wife is "so filled with hatred and rage and insists like treating [you] like an enemy." You advised you will keep the reservations "in case [your Ex-Wife] realize[s] what a mistake [she is] making . . . ." Again on May 17, you emailed your Ex-Wife the lengthy lyrics to a song about a failed marriage.

On May 25, you emailed your Ex-Wife to accuse her of creating a "false narrative" and asking her to "please call" if she is "fearful for [your] children's future," saying you both "owe it to [the children] to try to work this out and the first simple step is talking."

On May 28, you wrote your Ex-Wife accusing her of violating 18 U.S.C. 641 by stealing FBI property, including ammunition worth up to $2100 and several other items. You assert your accusation is based on statements made by your Ex-Wife's boyfriend. Regardless of the legitimacy of the accusation, your email clearly violated your Ex-Wife's instruction to stop communicating with her. You emphasize: "Theft of government property is a matter we will be addressing immediately."

On May 28, you criticized your Ex-Wife for giving a lamp that belonged to your son to a "fuck buddy," calling her actions "disgraceful":

> For all that you have done, for all the hurt and suffering you have caused, I was struck by your selfish decision to give your own son's cherished bowling ball lamp to a fuck buddy. I will let you explain to [our son] why you thought it would be ok to give away one of his prized possessions. [Our son] is all about family memories and his little treasures. For you to dishonor him is disgraceful.

On May 29, you sent your Ex-Wife an email accusing her of secretly videotaping a mutual acquaintance while the acquaintance was showering and then showing the video to your Ex-Wife's boyfriend. You chastise your Ex-Wife for having a "sex addiction," asserting "[t]his keeps getting uglier and uglier." Even if true, the email again violates your Ex-Wife's instruction not to communicate with her about such matters. That same day, your Ex-Wife sent an email to her attorneys requesting them to bring harassment charges against you because your "constant threats, insults, and other abusive tactics are intolerable."

On June 19, you sent your Ex-Wife a particularly sharp email, asserting: "What are you and/or your idiot friends up to this time? Committing a felony by stealing from the FBI wasn't enough for you?"

The file contains more examples of communications from you to your Ex-Wife notwithstanding her instruction to limit communications to decisions involving the children.

CONFIDENTIAL          PL 00020

Mr. Scott T. Ballock

### D. The Criminal Investigation

On September 2, 2013, your Ex-Wife filed a formal complaint with the WVSP against you for "harassing communications by cell phones and electronic communications devices." Your Ex-Wife's attorney provided the police with a CD of approximately 3,000 e-mails and text messages. A WVSP Corporal stated he reviewed thousands of emails and text messages provided by your Ex-Wife's attorney and identified some as "harassment and stalking."[8]

FBI investigators interviewed the Corporal, who conducted the criminal investigation of you for harassment. According to the FD-302 (Serial 20), the Corporal concluded you engaged in harassment, stalking, and threatening behavior:

> Upon assignment of the complaint, Corporal [ ] received and reviewed a compact disc (CD) containing more than 3000 emails and texts between SA BALLOCK and [EX-WIFE]. The CD was provided to the WVSP by [EX-WIFE'S] attorney [ ].
>
> * * * *
>
> During the investigation, Corporal [ ] reviewed numerous texts and emails between SA BALLOCK and [EX-WIFE] that were identified as harassment and stalking. Some communications included threats. A written statement was obtained from [EX-WIFE]. According to [EX-WIFE], she was seeking a divorce from SA BALLOCK. When she left her husband, SA BALLOCK began continually following her and sending her communications via text and email containing threats.
>
> According to reports from [EX-WIFE], SA BALLOCK placed ads on Craigslist for men to have sex with [EX-WIFE] at their home under [a fictitious] name [ ]. SA BALLOCK placed the ads and videotaped the sexual encounter. This type of activity originated when they lived in Indianapolis. [EX-WIFE] advised that safety was not a concern because SA BALLOCK "screened" the men before they arrived at the house.[9]
>
> Corporal [ ] took the complaint and evidence to Assistant Prosecutor [ ] who agreed to file misdemeanor charges of Stalking and Harassment against SA BALLOCK. As a result, SA BALLOCK was arrested after a Family Court Hearing where Corporal [ ] knew he would be unarmed. SA Ballock was arraigned, processed, and released after his arrest. As a condition of his bond, SA BALLOCK ceased email and text communication with [EX-WIFE].

---

[8] See the Corporal's FD-302, dated 04/14/2016 and Incident Report (Serial 1A5). The Corporal's Incident Report is incorporated into OPR's Report of Investigation in its entirety.

[9] I note your Ex-Wife told FBI investigators that you did not screen the men.

9

CONFIDENTIAL     PL 00021

Mr. Scott T. Ballock

After SA BALLOCK'S arrest, [BALLOCK'S FATHER] created various websites and posted nude photos of [EX-WIFE] and began to post statements and pictures alleging the West Virginia State Police falsely arrested his son. The postings occurred on the various websites [BALLOCK'S FATHER] created . . . .

The police report prepared by the Corporal concluded that a substantial number of emails appear to be pressuring your Ex-Wife to reconcile with you, and reflect "obsessive behavior in wanting the victim back." The report provides numerous examples of your "obsessive behavior" designed to persuade your Ex-Wife to reconcile.

You accused a WVSP Trooper of having a romantic relationship with your Ex-Wife, which allegedly motivated the Trooper to arrest you to assist your Ex-Wife with her alimony and custody claims. You stated you based this accusation on information provided to you by your Ex-Wife's boyfriend, and you asserted you intend to pursue a civil suit against WVSP. However, the file shows WVSP investigated the accusation of the affair and determined that it is untrue.

The local Monongalia County Assistant Prosecutor reviewed the evidence from the Corporal's investigation and agreed to file misdemeanor charges in the Magistrate Court of Monongalia County, West Virginia, against you for harassment and unwanted communications by computer, in violation of West Virginia Code §§ 61-2-9a and 61-3C-14a(a)(2). On September 13, 2013, you were arrested at the Monongalia County courthouse immediately following your child custody hearing on the two misdemeanor counts of harassment and unwanted communications by computer. On April 7, 2016, you entered into an agreement with the local prosecutor to dismiss the two misdemeanor charges in exchange for agreeing to, among other things, the fact that probable cause existed for your arrest. You were represented by counsel when you agreed to these terms.[10] In the agreement, you admitted, among other things, that probable cause existed to arrest you for harassing your Ex-Wife. The agreement, signed by you and your counsel, contains the following provisions:[11]

1. SCOTT BALLOCK acknowledges that probable cause existed for West Virginia State Police to file for the issuance of the warrants in this case pursuant to W.VA. Code 61-3C-14a and 61-2-9a.

* * *

3. SCOTT BALLOCK agrees to cease, and not to initiate or reinitiate, if applicable, efforts to affect [EX-WIFE'S] personal reputation, employment, professional status or workplace relationships, and he agrees to discourage any other person purporting to act on his behalf to similarly cease, or not to reinitiate any disparagement of [EX-WIFE] on social media or other platforms of public communications. SCOTT BALLOCK also agrees to assist in removing any

---

[10] See Serial 1A5, Motion.

[11] See FD-302, West Virginia State Police Corporal.

10

Mr. Scott L. Ballock

> remains of disparaging social media postings by taking reasonable steps within his control to remove these postings, links or other social media communications.
>
> * * *
>
> 6. SCOTT BALLOCK agrees not to contact [EX-WIFE] by any means or for any reason other than to notify her by email of hospitalization of either child, or regarding either child traveling outside of the country.

After your arrest, the FBI's Human Resources Division, in consultation with the Deputy Director and CJIS, suspended your law enforcement duties until the resolution of your criminal proceeding.

## ANALYSIS

### A. Harassment

According to FBI Offense Code 4.8, employees are prohibited from "[e]ngaging in an act, other than one which has been specifically delineated in another offense code, which is considered a misdemeanor in the jurisdiction in which the act occurred."

In addition, West Virginia Code § 61-3C-14a (Obscene, anonymous, harassing and threatening communications by computer, cell phones and electronic communication devices; penalty ) states: "It is unlawful for any person, with the intent to harass or abuse another person, to use a computer, mobile phone, personal digital assistant or other electronic communication device to: . . . (2) Make contact with a person after being requested by the person to desist from contacting them . . . Any person who violates a provision of this section is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $500 or confined in jail not more than six months, or both fined and confined."[12]

The evidence shows that from September 2012 to May 2013, after having received numerous unwelcome electronic communications from you, your Ex-Wife demanded you desist from contacting her. You refused to comply with your Ex-Wife's demand and continued to harass her via electronic communications. After enduring several more months of your excessive electronic communications, as well as your blatant violation of your Ex-Wife's demand to stop harassing her via electronic communication, your Ex-Wife sought help from law enforcement. A WVSP Corporal reviewed over 3,000 emails provided by your Ex-Wife's attorney and determined the electronic communications to be "harassment and stalking" in nature. A local prosecutor then reviewed the evidence against you and she determined there was enough evidence to charge you on two misdemeanor counts of harassment/stalking and unwanted communications by computer. My independent review of the emails, summarized above, confirms they were unwelcome and constituted harassment.

---

[12] In addition to WVC § 61-3C-14a (Obscene, anonymous, harassing and threatening communications by computer, cell phones and electronic communication devices; penalty), you were arrested for violating WVC § 61-2-9a (Stalking and harassment). I believe WVC § 61-3C-14a is more applicable to the facts presented.

11

Mr. Scott T. Ballock

You claim you have emails from your Ex-Wife showing she welcomed your texts and emails, but it is unclear whether any such communications post-date her May 2013 instruction to you to stop sending her unwanted texts and emails. You also state you have emails from your Ex-Wife concerning your children, but these would not be especially relevant given that your Ex-Wife made clear that communications about decisions involving the children were necessary, and not harassing or unwelcome.

Based on a preponderance of the evidence, I conclude that you violated West Virginia Code § 61-3C-14a, and thereby committed a misdemeanor, in violation of Offense Code 4.8.

### B.    Lack of Candor

According to FBI Offense Code 2.6, an employee is prohibited from "[k]nowingly providing false information in a verbal or written statement made under oath. 'False information' includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

In your SSS provided during this disciplinary inquiry, you failed to be fully forthright in two respects: (1) when you denied you physically abused your Ex-Wife; and (2) when you asserted you ensured your emails and texts to your Ex-Wife were "respectful and appropriate."

#### 1. Physical Abuse

At various times, your Ex-Wife has accused you of physical abuse. In your SSS, you stated that your Ex-Wife's claim that you physically abused her is false (pp. 6-7). However, your own emails and texts to your Ex-Wife show you physically abused her. For example, on October 2, 2012, your Ex-Wife asserted you engaged in physical abuse, psychological abuse, and sexual abuse. You did not deny that you did so, but instead responded "I was wrong. I ask forgiveness":

> 10/02/2012, You to Ex-Wife (1:55 PM): "I was sitting in a meeting today and pictured you out on your date tonight, then I flashed to you in a wedding dress, smiling and kissing your new husband. I had to leave abruptly. I am lost without you. It feels like part of me has died. The best part."
>
> Ex-Wife to You (2:55 PM): "I have pictured you going to see [your Mistress] instead of staying home with us so many times. [I] picture you in Chicago with her. I picture you looking up [another woman] to see what's up with her. And all of this you try to hide from me. I don't know how you got that those things would not cause long-lasting damage. *Shall I Move on to the physical abuse? The psychological abuse? How about the sexual abuse?*" (emphasis added).
>
> You to Ex-Wife (3:20 PM): "You do not need to move on to anything else. *I was wrong. I ask forgiveness.* I ask to move forward with you. Because, despite your anger and hatred right now, there is part of you that lives in me. There were magical times and a closeness." (emphasis added).

12

CONFIDENTIAL

PL 00024

Mr. Scott T. Ballock

Your Ex-Wife then wrote to you that you threatened her life and she would need "a long time to heal." You did not deny that you threatened her life, but instead responded you understood what she was saying:

> Ex-Wife to You (3:37 PM): "Scott, There is too much history of hurtful actions. I changed the day you threatened my life. The next times you did it I became someone not like myself. I became a lonely, rejected, uncared for survivor. It's going to take me a long time to heal."
>
> You to Ex-Wife (3:42 PM): "Ok. Thank you. I understand. Too much history. I am moving on then. Tonight, without you. If you begin to think of me and wish to end your date and come over, call me and I will come back to town."

On October 8 your Ex-Wife asserted you repeatedly strangled her and touched her in a sexual manner against her will. You did not deny her assertions but instead stated you were sorry, you "messed up," and you know you drove her away:

> 10/08/2012, Ex-Wife to You (5:31 PM): "What is wrong is you fondling me at your apartment and in the emergency room. What's wrong is expecting to the point of nearly demanding I hug you when we drop off or pick up the kids."
>
> You to Ex-Wife (5:34 PM): "Ok. I will stop again.[13] Please understand how difficult this is for me. To experience, to believe. It's unreal to me. It really is."
>
> Ex-Wife to You (5:36 PM): "*It was unreal the first time you strangled me.* It was unreal when you didn't spend my 37th birthday with me and the kids at a campground [made] sad because you wanted to see KC. It was unreal when you told me you didn't want to be married as everything was loaded onto a moving truck (twice). *Need I go on?*" (emphasis added).
>
> You to Ex-Wife (5:38 PM): "*You needn't.*" (emphasis added).
>
> You to Ex-Wife (10:45 PM); Subject: *I'm sorry*: "*I know how much I messed up.* But I'm sitting here in my cozy apartment, knowing where you are and what you're doing and I'm surprisingly at peace with it. Because I know I drove you away. Because I know I am responsible for tonight . . . . Thanks for being a good friend, babe. I only wish I would have recognized it earlier, appreciated you and how you tried, and followed your advice earlier. If I had, none of us would ever have to struggle. We could have lived a fantasy life, never having to worry about anything. But it took losing you for me to realize what I had. Sad and embarrassing." (emphasis added).

---

[13] I note that your reply, that you will stop "again," shows this was not the first time you sexually harassed your Ex-Wife through unwelcome fondling. Your response is an unequivocal admission.

13

CONFIDENTIAL                                                    PL 00025

Mr. Scott F. Ballock

In short, although you stated under oath that the allegation you physically abused your Ex-Wife is "false," the evidence establishes you likely physically abused your Ex-Wife and threatened her life. This finding does not turn on a credibility assessment of your Ex-Wife, but instead on your own admissions, apologies, and acquiescence in your communications about the abuse.[14]

### 2. The Nature of Your Emails and Texts

In your SSS (p. 2), you stated you ensured your emails and texts to your Ex-Wife after you separated were respectful and appropriate:

> During our separation and divorce, I specifically requested and engaged in 'written' forms of communication with [my Ex-Wife] to ensure our conversations were documented – precisely so that my communications with her could not be misconstrued or misrepresented. Specifically because we were in the middle of contentious divorce proceedings, I ensured that nothing I sent to [my Ex-Wife] could be construed as anything but appropriate and respectful.

As shown above, however, during your separation you sent your Ex-Wife emails and texts that were disrespectful, accusatory, sarcastic, and malicious. They included, among other things, derogatory references to your Ex-Wife and her "fuck buddy," highly charged accusations of criminal violations, and assertions your Ex-Wife's actions were severely harming your children. Given the allegations in this inquiry, you had a strong motive to mischaracterize your texts and emails, but it is clear those communications were not "appropriate and respectful."

Based on a preponderance of the evidence, I conclude that you violated Offense Code 2.6.

## PENALTY DETERMINATION

When proposing an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

The investigation establishes you violated FBI Offense Code 4.8 (Other Misdemeanors). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

---

[14] I note the record contains other evidence of physical abuse, including the following statements by your Ex-Wife: "Regarding physical abuse, alleged SSA Ballock had pushed her to the ground in front of the children injuring her knee in 2011;" "Alleged SSA Ballock had inserted his Glock into her vagina when they resided in Michigan (2007/2008);" and "Alleged SSA Ballock had thrown her onto the bed, put her in a headlock and asked her if she was ready to die (following a confrontation about an affair he was having (2007/2008)." Again, however, the strongest evidence comes not from your Ex-Wife, but from your own emails and texts.

14

CONFIDENTIAL

PL 00026

Mr. Scott T. Ballock

The investigation further establishes you violated FBI Offense Code 2.6 (Lack of Candor/Lying - Under Oath). The standard penalty is dismissal. Offense Code 2.6 does not include a mitigated or aggravated range.

In mitigation, you have a positive service record and no prior disciplinary history, and your Division thinks well of you. You were under great stress during your separation and divorce.

Notwithstanding the relevant mitigating factors, I find that severe aggravation is appropriate. First, as a Supervisory Special Agent, you are held to a higher standard. The Bureau trusts its supervisors to represent the FBI professionally at all times, and to serve as an example for those they supervise. The FBI Offense Codes and Penalty Guidelines specifically cite "supervisory or high-grade status" as an aggravating factor.

Second, your arrest was reported by several local and national online media outlets, thereby harming the Bureau's reputation in the process. After your arrest, you accused a WVSP trooper of being sexually involved with your Ex-Wife. Your allegation was investigated by the WVSP and shown to be false. The FBI Offense Codes and Penalty Guidelines cite "actual or potential harm to the FBI's reputation" as an aggravating factor.

Third, you not only lied under oath, but you lied about extraordinarily serious prior misconduct, including physical abuse, sexual abuse, and death threats against your Ex-Wife.[15] By your unprofessional and criminal behavior, you have shown you do not possess the integrity, judgment, and self-control required to be an FBI Special Agent.[16]

Finally, the record shows that in late-May 2013, you ordered a Bureau contractor to perform a database search of your "estranged wife's boyfriend."[17] Although your database

---

[15] By email dated July 29, 2015 to OPR and copied to the FBI's appellate authorities, the Director made clear: (1) he cares deeply about the issue of domestic violence, (2) OPR's penalties for domestic violence must "strongly promote both specific and general deterrence", and (3) he fully supports dismissal for domestic violence where appropriate. He also recognized victims frequently fail to seek relief because they fear additional abuse or the adverse financial consequences if the abuser goes to jail or loses employment.

[16] In addition to the above referenced examples of your abusive behavior, it is noted that during your five-year reinvestigation, the investigative file contained an example, provided to an investigator, regarding your violent temper. One interviewee, identified only as BICS T-1, was "aware" of a "problem" with your "temper" and "heard about an incident where [you were] yelling loudly and throwing objects around because [you] could not get [your] garage door open." Moreover, in your Ex-Wife's statement, she told Bureau investigators that you had used an alias to frequent "men4men" listings on Craigslist while you and your Ex-Wife lived in Indiana. Your Ex-Wife also provided names and contact information of individuals that could support her accusations.

[17] This database is an FBI-developed repository of unclassified criminal justice records, available to the criminal justice community in a secure online environment. This national investigative information sharing system brings together federal, regional, state, local, and tribal criminal justice agency data, including: Incident and Case reports, Arrest Reports, Computer and Related Dispatch Calls, Traffic citations, Narratives, Photos, Booking and Incarceration data, Parole/Probation information. (*CJIS Intranet Site*, accessed 12/12/2016.

In June 2013, the contractor reported the unauthorized search to his Bureau-employed friend, a Liaison Specialist. The contractor explained he performed the search because "[you] asked him to do it." After hearing this

15

Mr. Scott T. Ballock

misuse was treated as a performance issue and not investigated as misconduct, it demonstrates your willingness to flout Bureau rules for your personal advantage. The incident warrants consideration as an additional aggravator.

Based on the circumstances of this case, I propose dismissing you for your 4.8 and 2.6 offenses.[18]

## CONCLUSION

In sum, I propose dismissing you from the rolls of the FBI. The Assistant Director (AD) of the Office of Professional Responsibility (OPR) will make the final decision in this matter after consideration of your written and/or oral response(s), should you choose to submit either or both.

## PROCEDURAL PROTECTIONS

(1) This Statement of Proposed Action provides you thirty calendar days' advance written notice of the proposed action.

(2) You may contact and use an attorney to assist in the disciplinary matter, subject to limitations imposed by law and regulation regarding the disclosure of classified or sensitive information. The FBI will not be responsible for payment of any attorney's fee or other expense you incur in connection with an attorney's representation of your interests associated with a disciplinary matter or an appeal of a disciplinary sanction.

(3) You have ten calendar days from the date of receipt of this notice to make a written request to review the material which was relied upon by OPR's proposing official. Copies of such material will be redacted in accordance with civil discovery policy and procedures. These documents are the property of the FBI and will be made available for review for a reasonable amount of time by you and/or your attorney within the FBI office space and control. You may take notes, but you may not make copies.

(4) You and/or your attorney may provide a written response to the proposed action. Your written response may include affidavits or other documents of choice, and it may identify witnesses or documentary sources of exculpatory evidence.[19] Your written response must be

---

information, the Liaison Specialist reported the database misuse to her supervisor. On June 26, 2013, an EC was prepared memorializing your database misuse and sent to the FBI's Inspection Division. You did not have authorization to order the database search of your Ex-Wife's boyfriend. You ordered the search for a personal purpose.

[18] The penalty being imposed is a single, integrated penalty based on the totality of your misconduct. Even if you had not lied under oath, your 4.8 violation would warrant dismissal based on the cited aggravators.

[19] You are admonished not to discuss this matter with anyone other than the Inspection Division's Internal Investigations Section (IIS), OPR, the Human Resources Branch's Office of Disciplinary Appeals (ODA), the Security Division, the FBI's Employee Assistance Program, the FBI's Ombudsman, or an attorney who has signed the appropriate Nondisclosure Agreement. Neither you, your attorney, nor anyone acting on your behalf should contact any witness or potential witness about this inquiry without first obtaining approval from IIS (during the

16

CONFIDENTIAL

PL 00028

Mr. Scott T. Ballock

submitted within ten calendar days after your receipt of the proposed action or after you have been provided access to the material described in (3) above, whichever occurs later. Due to mail delays associated with security procedures, you must send your response by facsimile to OPR, Adjudication Unit 1, WB-410, at 202-436-7887 or 202-436-7455.

(5) In addition to, or in lieu of, submitting a written response, you may request an oral presentation which, at your election, will be made telephonically, in person, or by video teleconference to the Assistant Director of OPR. You must request an oral presentation, in writing, within ten calendar days after your receipt of the proposed action or after you have been provided access to the material described in (3) above, whichever occurs later. Upon receipt of your written request for an oral presentation, OPR will provide you at least fifteen days' notice of the presentation date. If you are submitting a written response in addition to making an oral presentation, the oral presentation will be scheduled for a date after the deadline date for OPR's receipt of your written response. During your presentation, you and/or your attorney may present oral testimony or evidence, including any information, affidavits, and other documentation deemed pertinent to your case. The testimony of witnesses is not allowed. Any travel and/or attorney costs incurred as part of your oral presentation are your responsibility. For WebTA, employees in duty status may treat a reasonable amount of file review time, and the time spent during the oral hearing, as part of their official duties and record it as regular hours. Employees in duty status may also treat up to one hour prior to the hearing and up to one hour after the hearing as part of their official duties if that time is actually spent preparing for the hearing or discussing the hearing with counsel. Employees in non-duty status are not entitled to use official time to review their file or attend their oral presentation.

(6) You will receive a written decision letter from the AD, OPR, after consideration of any oral and written responses to the proposed action, fully stating the reasons for the decision. This decision letter will be delivered to you as soon as practicable following completion of the disciplinary process described above.

## REFERRAL TO OTHER DIVISIONS

In accordance with established policy, the results of this administrative inquiry will be shared with other divisions, as appropriate. Thus, a copy of this communication is being provided to the Security Division as it may be relevant to your retention of a Top Secret security clearance. Information regarding this inquiry will also be provided to the Special Agent Mid-

---

investigative stage of the proceedings), OPR (during the adjudicatory stage of the proceedings), or ODA (during the appeal). This prohibition applies to persons from whom you would like to solicit a character reference. If you would like OPR to consider a character reference, provide the undersigned OPR Unit Chief with the person's name, position, and contact information. OPR will determine whether a character reference from the listed individuals would enhance the investigative record and, if so, OPR will solicit the character reference. Absent exceptionally compelling circumstances, OPR will not solicit a character reference from a subordinate on behalf of a supervisor. If you believe additional witnesses need to be interviewed or other additional evidence needs to be obtained, you may direct that request to IIS (during the investigative stage of the proceedings) or include the request in your written response to OPR (during the adjudicatory stage of the proceedings). In addition, you are admonished that any redacted materials or other FBI documents you review in connection with this inquiry are the property of the FBI, and you are prohibited from photocopying or removing such documents from FBI space. You may take notes concerning the content of such material, but those notes may be used only to facilitate your participation in this disciplinary inquiry and for no other purpose.

17

CONFIDENTIAL

PL 00029

Mr. Scott L. Ballock

Level Management Selection Board and/or the Director for their consideration on any future promotion or other action requiring their recommendation.

Sincerely yours,

*Timothy J Dowling*

Timothy J. Dowling, Chief
Adjudication Unit I
Office of Professional Responsibility

Enclosures

18

**CONFIDENTIAL**

PL 00030