# EXHIBIT 24



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

March 05, 2019

PERSONAL

Mr. Scott T. Ballock
Federal Bureau of Investigation
Clarksburg, West Virginia

Dear Mr. Ballock:

This administrative inquiry was predicated on the allegation that you harassed EC, your then-wife, by sending her unwelcome emails and text messages despite her requests that you stop doing so, in violation of FBI Offense Code 4.8 (Other Misdemeanors). On April 10, 2017, the Office of Professional Responsibility (OPR) found the allegation was substantiated and also found you lacked candor under oath when you denied you physically abused your wife and when you asserted you ensured your emails and texts to her were "respectful and appropriate," in violation of FBI Offense Code 2.6 (Lack of Candor/Lying - Under Oath). OPR proposed dismissing you for the violations. On June 14, 2017, you submitted a written response to the proposal (117+ pages including exhibits and references). On September 14, 2017, you submitted a supplement to your written response (50 pages including exhibits). You waived your scheduled oral presentation.[1] On September 21, 2017, OPR issued a final letter finding the allegations were substantiated and dismissing you for your violation of both Offense Codes 4.8 and 2.6.

On September 28, 2017, you notified the Office of Disciplinary Appeals (ODA), Human Resources Branch (HRB), of your intent to appeal OPR's final decision. On October 3, 2017, you submitted a 25-page document in support of your appeal. By letter dated December 22, 2017, you submitted an additional 46 pages in support of your appeal. On January 19, 2018, ODA issued an electronic communication (Remand EC) remanding the case to the Inspection Division (INSD) to re-notice and conduct additional investigation and to OPR for re-adjudication thereafter. Pursuant to the Remand EC, INSD conducted the following investigation:

1. Obtained CCL's Custody Evaluation, which was previously attached to your written response to OPR's proposal letter; an Order, dated February 8, 2018, from the United

---

[1] No adverse inference was drawn based on the waiver.

Mr. Scott T. Ballock

> States District Court; and a transcript of CCL's testimony on September 13, 2013 in your child custody case.[2]

2.  Re-interviewed you with respect to a portion of EC's allegations of abuse and electronic communications between you and EC.

3.  Provided you with the opportunity to voluntarily take a polygraph examination concerning the truthfulness of the information contained in your signed sworn statement (SSS), which you declined.[3]

4.  Obtained additional documents you wished to submit for consideration.

On July 2, 2018, INSD referred the case to OPR for re-adjudication. Based on the Remand EC and INSD's additional investigation, OPR re-adjudicated the case. This re-adjudication will supersede OPR's prior adjudication and final letter, dated September 21, 2017.

On November 15, 2018, OPR proposed dismissing you from the rolls of the FBI based on its finding that you: (1) vaginally penetrated EC with a weapon and placed a weapon inside your mouth, in violation of FBI Offense Code 5.13 (Misuse of Weapon / Safety Violation); (2) engaged in unprofessional conduct off duty, in violation of FBI Offense Code 5.21 (Unprofessional Conduct - Off Duty); and (3) lacked candor under oath, in violation of FBI Offense Code 2.6 (Lack of Candor/Lying - Under Oath). As the deciding official in this matter, I have given full and impartial consideration to all documentation and evidence upon which your proposed dismissal was based, your written response, dated January 8, 2019, with attachments; audio files you submitted on January 18, 2019; and your Supplement to Written Response, dated February 12, 2019. Through email communications, dated January 8, 2019, from your attorney, you waived your opportunity to review a redacted copy of the administrative file and to make an oral presentation.[4] You requested your case be decided based on your written submissions. Based on a preponderance of the evidence, I conclude the allegations are substantiated. Based on the circumstances of this case, for the efficiency of the service, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, I am dismissing you from the rolls of the FBI.[5]

---

[2] In your written response dated January 8, 2019, you claim that "OPR refuses to hear from CCL." Although OPR does not interview witnesses, CCL's Custody Evaluation and testimony were carefully considered throughout this inquiry.

[3] I will refer to your first SSS, dated July 13, 2016, as SSS #1 and your second statement, dated April 17, 2018, as SSS #2.

[4] No adverse inference was drawn based on the waivers.

[5] This administrative inquiry was opened before January 1, 2017, and thus will be analyzed under the FBI's 2012 Offense Codes and Penalty Guidelines.

Mr. Scott T. Ballock

## DISCUSSION

### Background

You and EC were married in 1992, separated in September 2012, and divorced in May 2014. During the course of your marriage, you and EC repeatedly solicited strangers via the internet to come to your home to have sex with EC, and you videotaped some of these encounters. CCL determined the two of you had a "very pathological" relationship in which you engaged in "deviant sexual practices." You, unconvincingly, attribute this solely to EC.[6] It is clear from the administrative file, including voluminous materials provided by you, EC is a broken and troubled individual. She has engaged in a number of behaviors that are deeply concerning while possibly indicative of abuse she has suffered. You have vehemently attacked EC's integrity and argue her allegations should be entirely dismissed. The record does not support such a wholesale rejection of her claims. Equally disturbing evidence of your misconduct cannot be ignored despite your relentless attempts to distract from the focus of this inquiry, your own misconduct.

Your harassment of EC was skillful, intrusive, and pervasive. Although OPR previously addressed your harassment of EC under FBI Offense Code 4.8 (Other Misdemeanors) based on the emails and texts you sent after being instructed not to do so, the harassment and abuse you committed extended far beyond these written communications. Because the communications are but one aspect of the misconduct in which you engaged, this case is more appropriately adjudicated under Offense Code 5.21 (Unprofessional Conduct – Off Duty). In applying Offense Code 5.21, I will not consider your arrest by the State Police, which is the subject of ongoing litigation.[7] Rather, I will focus on your deeply concerning behavior and misconduct as supported by the evidence contained in the administrative file.

---

[6] The family court judge who presided over the child custody dispute stated: "In considering the parties' sexual behavior, the Court is not sanguine about the Father's role in that regard. At the very least, the Court finds the Father's apparent acquiescence in the Mother's sexual relations with other men to be a contributing factor." When asked whether the pathology of the relationship reflected on the judgment of both you and EC, CCL stated that it did.

I am deeply concerned by your knowledge of and complicity in the sexual abuse of a minor. CCL testified that EC indicated the first time you wanted her to have an extramarital relationship, it was with your 14-year-old cousin. CCL testified that you told her you did not initially know about the sexual relationship, but when you found out about it, you were "okay with it, [you] let them." According to CCL's testimony, you "actually took [your] children and [EC] was allowed to be alone with [the victim] . . . ." Your failure to report ongoing child abuse indicates you were an unsuitable candidate for FBI employment, who would not have been hired as an FBI Special Agent if this information was disclosed. In your written response dated January 8, 2019, you claimed you did not learn that EC "had engaged in sexual relations with [your] cousin until 16 years after the fact, when [your] cousin was 30-years old." You further stated you were "not ok with [EC's] behaviors and repeatedly attempted to stop them." This is inconsistent with CCL's testimony that you told her that you did not know about EC's sexual relationship with your cousin for "several years into it" and when you found out about it, you were "okay with it, [you] let them."

[7] On September 13, 2013, you were arrested on two misdemeanor counts of harassment and unwanted communications via computer. On April 7, 2016, the charges were dismissed pursuant to an agreement in which you: (1) acknowledged probable cause existed for the issuance of the warrants against you; (2) acknowledged communicating via email with EC after it was alleged a letter was sent to you asking you to stop such communications; (3) agreed to cease efforts to affect EC's personal reputation and to discourage any other person

Mr. Scott T. Ballock

## Scope of Harassment alleged by EC

When interviewed by FBI investigators, on May 18, 2016, EC described multiple forms of abuse committed by you, including:

- You threatened to ensure she would lose custody of the children if she left you.
- You continually threatened to ruin her life if she left you.
- You placed your "Glock" into your mouth during an argument.
- You inserted your "Glock" into her vagina.
- Your father posted nude photos and inflammatory claims against her online.
- You sent numerous harassing emails and text messages.
- You obtained a cell phone she used and had a private company conduct a forensic examination of the device.
- EC believed you used these activities to control and harass her.[8]
- You threatened to plant drugs in her car and to have her arrested if she ever tried to leave.
- You put her in a headlock and threatened her life asking, "Are you ready to die?"
- You followed her around.
- You stood outside the door to ensure the children were not exposed to sexual encounters between EC and other men, and you became angry if the video did not capture the "shot" correctly or if EC was not "loud" enough during the encounters.

## Penetration with Glock Handgun

When asked during the re-investigation whether you recalled testimony regarding your use of a handgun during sex with EC, you stated, "I do not recall stating I used my FBI issued Glock to penetrate [EC's] vagina during sex." You stated you recalled discussing with CCL your use of a handgun to penetrate EC's vagina at her "insistence." CCL testified that you

---

purporting to act on your behalf; (4) agreed to assist in removing any disparaging social media postings by taking reasonable steps within your control to remove the postings and links; and (5) agreed not to contact EC for any reason other than to notify her by email of your children's hospitalization or international travel.

[8] Notes of EC's May 12, 2016 interview with FBI investigators also indicate EC alleged you:
- Used the alias "[SM]" when you went to Location #1 (10/06) and you used it again to blackmail her during the divorce. I note you have not refuted that you used an online alias to communicate with EC. CCL testified that you created the account because "[you] felt like [you were] not able to keep tabs on [EC] and keep her safe and keep any kind of control on her . . . ."
- Used "FBI things," including a GPS to keep track of her.
- Made her believe you were watching her through the computer and through her cell phone.
- Would often bring things home from the Bureau and say they were from "Uncle Sugar."
- Threatened to harm her reputation.
- Said FBI employee SL had a sworn statement against EC. EC described SL and you as inseparable (to the extent others thought the two of you were married) and alleged that you used an alias "EM" with a picture of SL.
- When she began dating KI, you told her that you hired a private investigator and that KI was a drug dealer. EC believed that DP, your subordinate and a former police sergeant, followed her boyfriend.

Mr. Scott T. Ballock

admitted to her that you used your service weapon to penetrate EC. She further stated that you told her EC wanted you to do it, but EC stated the act was forceful. In SSS #2, you claimed you did not use your FBI-issued weapon and claimed "[t]his was not an instance of sexual or physical abuse," rather it was done "not only with [EC's] consent, but at her request and insistence." You described the incident as another one of your "attempts to appease" EC. You claimed that when you lived with EC, you locked your "FBI weapon" in a safe in your home but also kept a Glock 27 under your bed.[9] You believed EC may have "convinced" herself that her "desire" for "this kind of intimacy was indicative of [you] having abused her."

**Hospitalization Following Penetration with Wine Bottle**

During testimony before the family court, CCL discussed an incident in which you penetrated EC vaginally and/or anally with a large wine bottle to the extent she had to be taken to the emergency room. When questioned about the incident, CCL stated she talked with you about "the wine bottle" but she "[did not] remember the details." The court stated, "It does kind of have, seem to me, an abusive element to it. I mean I suppose it's possible we're having consensual sex and things went a little too far, but that seems more abusive from his end than hers." CCL replied, "If [EC] asked him to do it?" To which the court replied, "Well, I'm sure she didn't ask to be penetrated to the point where she had to go to the Emergency Room."

**Threatening Suicide by Placing Glock in Mouth**

EC told FBI investigators she felt threatened when she tried to leave and you placed your gun in your mouth. CCL testified EC also disclosed to her that you put your gun in your mouth and threatened to kill yourself. When asked whether she saw an issue with you placing a loaded service weapon in your mouth, CCL admitted she did see that as an issue. She stated you had pathology and "need[] help," and she then proceeded to refocus the inquiry on EC's suicide attempts.[10] During her testimony, CCL estimated your suicide threat took place in the early 2000s. EC reported the incident took place in 2005.

**Defamatory Internet Postings**

After you and EC separated, your father, TB, created multiple public websites to which he posted nude photos of EC, including what was described as a "screen grab" of a video taken while EC was having sex, and derogatory information about her, her therapist, and her boyfriend, KI.[11] The websites also highlighted your position as an FBI Special Agent, your progression to a

---

[9] You described the Glock 27 as your "personal weapon." I note the Glock 27 is a smaller gun than the Glock 22, which was previously issued by the Bureau to agents as a duty weapon. The Glock 27 was frequently purchased by agents for use as an approved, personally owned weapon (POW).

[10] According to CCL's Custody Evaluation, she determined you meet the criteria for an Unspecified Anxiety Disorder #1 and have features of Disorder #2. CCL stated you were in counseling and would likely benefit from psychotropic medication treatment.

[11] The websites, include: Ashleeleeson.com, Ellencostlow.com and .org, Tomballock.com and .org, Easyasl23.com, WestVirginiastatepolice.us, and Scottballock.org.

Mr. Scott T. Ballock

Supervisory Special Agent (SSA), and disclosed that you were assigned to CJIS.[12]  In your Written Response dated June 14, 2017, you attributed creation of the websites to your father and submitted a statement from him indicating the same.  You, however, directly contributed to the sites by providing the content to be used against EC.  For example, the sites quote from and provide links to a "sworn statement" you drafted after a multi-session interview of KI.  The sites also contained EC's text messages and cellphone screen shots you obtained from KI.[13]  When questioned about how your father obtained the information to post online, CCL testified that she did not "recall specifics" but admitted "it came from [you]."  She further claimed she "didn't see much of the content" but "whatever it [was, it was] inappropriate, grossly inappropriate."

**Harassing Communications**

        After you and EC separated in September 2012, you sent her numerous communications intended to convince her to reconcile with you as well as emails that were demeaning, insulting, and critical of her behavior.  Many of the communications were unwelcome, and EC viewed them as harassment.  On multiple occasions EC told you to stop sending them.  For example, on September 29, 2012 at 9:00 a.m., EC accused you of texting her for seven hours the previous day.  She complained these texts were "over the top," and she asked you to stop.  At 9:01 a.m., you agreed and stated, "Yes.  Let's start now."  However, the very next day, September 30, 2012 at 1:38 a.m., you emailed EC a derogatory message: "Black boots, Black coat, Black heart, Black soul."  On October 11, 2012, you emailed EC with the subject line "We broke our vows" and a photo of you standing alone at a church altar.[14]  Other emails included close-up photographs of you appearing emotional and possibly crying.

        On November 7, 2012, EC emailed you stating: "I have asked you many times to leave me alone.  This is my last request.  Please refrain from sending harassing emails and texts, as well as any other means of communication."  You responded the same day, "My correspondence has been polite and respectful.  Calling it 'harassing' does not make it so.  I am simply providing you with information and recommendations for the divorce process and the benefit of the

---

[12] One included an image of a man dressed in an FBI raid jacket.

[13] I note at least one site contained a private email from EC to your sister, which you submitted to OPR as part of this administrative inquiry.  In your written response dated January 8, 2019, you do not deny that you provided your father with material that he placed on the websites.  You instead argue that after you hired a company to conduct a forensic examination of the device you obtained from KI, the company provided you the extracted contents of the device on a "thumb drive."  You claim that you did not own a computer or printer, so you "gave the thumb drive to [your] father and asked that he download and print the materials for [you]."  You also stated your father served as your "filing clerk" and accordingly viewed many court-related documents.  You did not address the inclusion of the statement you prepared for KI after your multi-session interview of him.

[14] I note you violated FBI policy when you emailed your daughter multiple photos taken in your FBI workspace.  In your written response dated January 8, 2019, you admitted you took and sent photos of yourself in FBI space.  You suggested you worked in "an administrative office space where nearly everyone possessed a smart phone and this practice was not uncommon."  You continued, "To save OPR time as it continues to seek justification for its original decision, [you] also admit[] to occasionally driving [your] government vehicle above the posted speed limit and not wearing your seatbelt at all times."  Your cavalier attitude toward Bureau policy and operational security is concerning.

Mr. Scott T. Ballock

children." As noted, however, the record shows that many of your communications went beyond "the divorce process and the benefit of the children."

By email dated January 12, 2013, EC requested her attorneys obtain a protective order against your excessive communications. EC stated that she had received hundreds of emails and texts as well as phone calls from you at all hours of the day and night. She further explained that you had "gone out of [your] way to contact [KI's] friends and ex-girlfriends. [You] call[ed] and text[ed] [KI's] phone, including one of [hers she was] letting [KI] use, all hours of the day but especially when it [was your] time to have both children in [your] custodial care and [she was] alone." The email emphasized,

> I'm tired of [Ballock's] harassment, his control over my life through nearly constant communication . . . and these late night blocked calls. It's all outrageous because they cut into my ability to get the sleep I need. The late night blocked calls are almost always silent on the caller's end, but from time to time [Ballock] will forget to block his number and that is why I am convinced he's the one behind the calls tonight. PLUS, you've read from other emails that he sleeps with his phone next to him at night, so it's easy for him to call six times in a row at 3 am.

By email dated April 26, 2013, EC again requested her attorneys' assistance in stopping your harassing communications:

> I consider [Ballock's] actions harassment at this point. Please help me put a stop to his incessant emails where he's sending me excerpts taken from the Ashlee Leeson account and a21ab (aalab.training) account.[15] I have chosen to stop living a toxic marriage filled with physical, psychological, and sexual abuse. When [Ballock] walked out Sept 14, I didn't let him come back home as I had in the past. I am seeking peace in my life from my abusive husband. I ask again for your help in stopping [Ballock's] contact with me over this matter and any other matter unless it is of an emergent nature or deals strictly with decision-making with the children.

On May 1, 2013, EC sent you another email making clear your texts and emails were unwelcome harassment. She requested you stop communicating with her unless it concerned the children, and she directed you to contact her attorneys about any other matter:

> I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication. I specifically told you on April 29, 2013, to stop contacting me unless it is about the children and you need my input as a parent. If you have a question or concern about anything else, my attorneys can help you.

---

[15] These accounts were among those used by you and EC to invite men to have sex with EC, while you videotaped the encounters, during your marriage.

Mr. Scott T. Ballock

EC's email included her attorneys' names and contact information. The next day, May 2, 2013,
you sent an email agreeing to limit your communications:

> I'm not trying to 'harass' you. I'm sorry you feel that way. I shared with you the
> email last night because it's so much like a TMLMTBGB play and I hoped you
> would appreciate that.[16]

> I'm sorry I missed your calls last night. I tried returning them this morning.

> I will, as you request, limit my conversations to discussion about the children.

EC requested her attorneys send you a letter demanding you cease all communications with her
"not directly necessary for the care of [the] children." This request reinforces the seriousness of
her concerns. By letter dated May 3, 2013, EC's counsel advised you:

> My client has informed me that you continue to send her harassing and
> threatening text messages and emails. Please be informed that you are to send to
> our office – and not [EC] – all inquiries and/or communications not directly
> necessary for the care of your children. Any communications sent to [EC] that we
> view as further harassment will be used in Court to substantiate her allegations of
> your continuing intentional infliction of emotional distress.[17]

Notwithstanding EC's May 1 instruction, on May 3, 2013 at 8:29 a.m., you emailed EC
in an effort to reconcile. Although the email references your son, it does not concern decision-
making regarding the children and instead uses your son as leverage in your unwelcome attempts
to reconcile. You wrote:

> Think about coming over tonight.

> We could then leave the kids with Nana and spend the weekend talking, making
> up, finding the way forward. After my conversation with him last night, I know
> [Son] would like that very much. I think you would too.

EC responded at 8:35 a.m. with an email regarding your daughter's birthday, and you replied at
9:00 a.m., again attempting to reconcile and raising the possibility of you both losing custody of
the children due to information about EC that you shared with your attorney:

> There will always be a hole. . . . It is there every day for them. They feel it. I feel
> it. I know you feel it. And that hole will be there for the rest of their lives. It's
> not too late, [EC]. We can implode our lives (my attorney doesn't pull punches
> and after I shared with her what I need to disclose now to defend myself against

---

[16] TMLMTBGB appears to be a reference to a play.

[17] The investigative file does not contain the lawyer's letter to you, but the police report quotes from the letter. You
have insinuated you never received it, but even if true, the emails and texts from EC herself make clear further
communications from you were unwelcome unless they concerned decisions regarding the children.

Mr. Scott T. Ballock

> your claims she said there is a very real risk we may both lose the children; imagine them being raised by a foster family in [Location #2]) or we can find a way to peacefully co-exist.  Or we can find the very best in us and live a fairy tale life.  I know that after this awful experience we would never take any of it for granted again.

Just an hour later, you sent an additional email offering to take EC to Location #3.

On May 7, 2013, you wrote EC another lengthy email advising that you were writing your thoughts down so your son would know how much you loved EC.  You wrote:

> I wanted morning noon and nightfall with you.  I wanted your tears, your smiles, your kisses . . . the smell of your hair, the taste of your skin, the touch of your breath on my face.  I wanted to see you in the final hour of my life[,] to lie in your arms as I took my last breath.

> I missed you so much that I hurt from it.  I imagined seeing you again.  That you'd come to me.  That I'd run into you on the street.  That I'd look up, and you'd be there, and you'd be *well* . . . and I'd tell you that I love you. . . . I wanted to provide you and them with security, comfort, and a fairy tale future . . . . They say the sweetness of reunion is the joy of heaven.

On May 9, 2013, you wrote EC yet another lengthy email complaining, among other things, the two of you had spent all of your and EC's savings on legal battles and your daughter was suffering due to EC's "self-centered choices":

> This is a mess and it's getting worse by the day with no end in sight.  I do hope you realize all you're doing some day, the ugliness you have brought into all of our lives, the futures you have doomed us all to, through your self-centered choices.

On May 14, 2013, you sent EC multiple emails including a lengthy message in which you stated that it was "tragic" where the two of you found yourselves and that the two of you "were to have been" "[r]enewing [your] vows in front of the children at [] Chapel next month . . . ."  After a lengthy description of the way your lives should have been, you stated, "I don't think you knew how bad it would be when you left me . . . Sadly, your demons got the best of you and led you astray."  You again stressed your "attorneys pull no punches" and "[i]t [was] possible [the two of you] may both lose custody of the children."  You continued, "And it won't end there.  Because of the tone you have set and the behaviors in which you have engaged, the ugliness may never end."  Later that day at 5:13 p.m., you wrote you wanted to make an offer to EC again "one more time."  You explained, "Before the divorce is finalized, the bureau will move our family at no expense to us. . . . Please give it some serious thought.  My boss will support us and help us get out of here.  This opportunity will not exist once the divorce is finalized."

Mr. Scott T. Ballock

On May 15, 2013, you sent an email stating, "I will not go through your attorneys for anything. Ever. As long as you have custody of [our daughter], I will make my requests directly to you. That is my privilege."

On May 16, 2013, you sent EC three separate emails requesting she take an out-of-town trip with you to Location #4. You suggested, "We could meet in [Location #4], walk the cobblestone streets and talk." In a second email, you stated, "I want to make amends for the past, not argue about it." In a third email, you urged, "You have nothing to lose by meeting me in [Location #4]. Nothing to lose and everything to gain . . . Worst thing that could possibly happen is you get sick from eating too much popcorn at the IMAX theater. Please take a leap of faith. I will catch you . . . like I did the first time we were in [Location #5]." The next morning, May 17, 2013, you texted EC, "Meet me in [Location #4] this weekend. Start the healing process before it's too late. It will be a good weekend. Walk and talk, dinner, and movie." That afternoon, you emailed again, stating you wanted to "apologize" and "make amends," but that EC was "so filled with hatred and rage and insist[ed] [on] treating [you] like an enemy." You advised you would keep the reservations "in case [EC] realize[d] what a mistake [she was] making" and how "ugly" it could still become. You also emailed EC the lengthy lyrics to a song about a failed marriage.

On May 25, 2013, you sent EC an email message indicating the two of you should have been at a family camp that weekend. You attached a photo from the camp and stated, "I know you are committed to the false narrative you have written, and you may have even convinced yourself of it after having repeated it so often." After accusing EC of creating a "false narrative," you asked her to call if she was ever "lying in bed alone, as disappointed as [you were] with the dramatic turn [your] lives [had] taken, fearful for [the] children's future . . . ."

On May 28, 2013, you wrote to EC accusing her of violating 18 U.S.C. 641 by stealing FBI property, including ammunition and other items. You stated your accusation was based on statements made by KI and emphasized, "Theft of government property is a matter we will be addressing immediately."[18] Your email clearly violated EC's instruction to stop communicating with her. Given the contentious nature of your divorce, and EC's repeated instructions not to contact her, the better course would have been for you to request that someone else in the FBI address the stolen property allegation. Your personal involvement in this matter, including your derogatory tone, undoubtedly exacerbated the pre-existing acrimony. If you had advised your chain of command of EC's repeated allegations of harassment and her repeated requests that you not contact her, the Division likely would have advised you not to become personally involved in addressing the stolen property allegation and would have assigned someone else to the matter if necessary.

In an especially hostile and acrimonious communication, dated May 28, 2013, you criticized EC for giving a lamp that belonged to your son to a "fuck buddy," calling her actions "disgraceful." You wrote:

---

[18] On June 21, 2013, you submitted a System Active Incident Report in which you asserted that KI advised: (1) EC gave him stolen FBI property; (2) the most expensive piece of FBI property he received was a megaphone; and (3) he was turning the property over to the local police.

10

Mr. Scott T. Ballock

> For all that you have done, for all the hurt and suffering you have caused, I was
> struck by your selfish decision to give your own son's cherished bowling ball
> lamp to a fuck buddy. I will let you explain to [Son] why you thought it would be
> ok to give away one of his prized possessions. [Son] is all about family memories
> and his little treasures. For you to dishonor him is disgraceful.

Again, your communication plainly contravened EC's repeated requests, and your repeated
agreements, not to send her unwelcome emails and texts. This email was especially derogatory
and demeaning, irrespective of whether the underlying allegation was true.

On May 29, 2013, you sent EC an email indicating, "By Bureau policy, I reported today
the theft, conveyance and disposal of my FBI-issued property." Later that night, you sent EC
another email accusing her of secretly videotaping a mutual acquaintance while the acquaintance
was showering and then showing the video to KI. You chastised EC for having a "sex
addiction," asserting "[t]his keeps getting uglier and uglier. Every day I learn something new
and disturbing about you. Just when I think it can't get any worse, it does. I am almost afraid to
view the results of the forensic examination of [KI's cellphone]." You concluded, "I hope some
day you acknowledge your demons and find the help you need to genuinely and honestly address
them." That same day, EC sent an email to her attorneys requesting they bring harassment
charges against you because your "constant threats, insults, and other abusive tactics [were]
intolerable."

On May 31, 2013, EC expressed concern as to what would "befall" her if she did not
accept your invitation to travel to Location #4 with you. You replied, "Nothing will befall you.
You will just have passed up another opportunity . . . like all the others." You continued by
trying to convince her to go:

> We could walk the cobblestone streets and talk. Or sit by the [River]. Eat a good
> dinner. Go to a movie and not sit in the front row. . . . My only other suggestion
> is to travel to [Location #3] so you can see TMLMTBGB and, hopefully,
> remember your true self.

On June 1, 2013, you emailed EC a 17-paragraph exposition of your relationship with
her. You wrote, "Your voice made me melt. Your beautiful smile was etched in my mind. Your
scent was home . . . I thought of you all day long, every day. You were the first thing on my
mind in the morning, the last thing on my mind when I go to bed, and you live in my dreams."
You further stated, "Though I have lived 44 years on this earth, I had never seen anything more
beautiful than the sight of you standing at my dorm room door in your sun dress. Nothing." You
continued, "I always knew we would be partners for life, that you were my soul mate. I now
believe that it was fate, that God sent you to me, that it wasn't a choice." You concluded, "You
promised to take care of me in my old age . . . to hold my hand and comfort me when I die. You
were me and I was you."

On June 18, 2013, you sent an email to EC while camping with the children. You
included a short description of the children's activities, but then referred to your review of EC's
private communications. You wrote, "Of course, as I read in your text messages, I'm not as

11

Mr. Scott T. Ballock

good of a father as your childless boyfriend of a couple months . . . ." You further stated your daughter would need "life-long counseling" and "[i]t took only a few months for [EC] to really mess her up (and reading the messages and hearing the recording, it was obvious how [she] did it)." On June 19, 2013, you sent EC a particularly sharp email asking, "What are you and/or your idiot friends up to this time? Committing a felony by stealing from the FBI wasn't enough for you?" The file contains additional examples of communications from you to EC notwithstanding her instruction to limit communications to decisions involving the children.

**Additional Abuse**

Your emails and texts to EC suggest further physical abuse. For example, on October 2, 2012, EC asserted you engaged in physical abuse, psychological abuse, and sexual abuse. You did not deny that you did so, but instead responded "I was wrong. I ask forgiveness":

<u>10/02/2012</u>

You (1:55 p.m.): I was sitting in a meeting today and pictured you out on your date tonight, then I flashed to you in a wedding dress, smiling and kissing your new husband. I had to leave abruptly. I am lost without you. It feels like part of me has died. The best part.

EC (2:55 p.m.): I have pictured you going to see [KL] instead of staying home with us so many times. [I] picture you in [Location #6] with her. I picture you looking up [MC] to see what's up with her. And all of this you try to hide from me. I don't know how you got that those things would not cause long-lasting damage. Shall I Move on to the physical abuse? The psychological abuse? How about the sexual abuse?

You (3:20 p.m.): You do not need to move on to anything else. I was wrong. I ask forgiveness. I ask to move forward with you. Because, despite your anger and hatred right now, there is part of you that lives in me. There were magical times and a closeness.

EC then wrote to you that you threatened her life and she would need "a long time to heal." You did not deny that you threatened her life, but instead responded you understood what she was saying:

EC (3:37 p.m.): There is too much history of hurtful actions. I changed the day you threatened my life. The next times you did it I became someone not like myself. I became a lonely, rejected, uncared for survivor. It's going to take me a long time to heal.

You (3:42 p.m.): Ok. Thank you. I understand. Too much history. I am moving on then. Tonight, without you. If you begin to think of me and wish to end your date and come over, call me and I will come back to town.

Mr. Scott T. Ballock

On October 8, 2012, you sent EC in excess of 60 email messages. At 5:11 p.m., you wrote:

> You have a tough exterior, but I know you have a soft, creamy inside. Love resides there. It's the part I fell in love with. You get to it through your smile. It's where I need to be again. You just have to let me in. Like you did back in 1986. It was so soft and gooey in there that I got stuck and haven't been able to climb out for 26 years. But it's ok, because there is no other place like it on earth. When I die, if there is a heaven, it will be there.

In an exchange later that evening, EC was upset that you had touched her against her will and she referenced the first time you strangled her. You did not deny her assertions but instead stated you were sorry, you "messed up," and you knew you drove her away:

**10/08/2012**

EC (5:31 p.m.): What is wrong is you fondling me at your apartment and in the emergency room. What's wrong is expecting to the point of nearly demanding I hug you when we drop off or pick up the kids.

You (5:33 p.m.): I still think of you as my loving wife when I see you. I was trying to make you laugh in the ER. I see you and I want to hold you. I don't see red. I see my love.

EC (5:33 p.m.): My body is not for you to touch. I have boundaries.

You (5:34 p.m.): Ok, I will stop again. Please understand how difficult this is for me. To experience, to believe. It's unreal to me. It really is.

You (5:34 p.m.): I understand. Goodbye.

You (5:36 p.m.): I hold out this false hope that the next text or phone call I receive is you saying you miss me. I still dream of you visiting me. . . . I have so much love for you that it's hard to understand that you are empty. Please forgive me.

EC (5:36 p.m.): It was unreal the first time you strangled me. It was unreal when you didn't spend my 37th birthday with me and the kids at a campground [made] sad because you wanted to see KC. It was unreal when you told me you didn't want to be married as everything was loaded onto a moving truck (twice). Need I go on?

You (5:38 p.m.): You needn't.

13

Mr. Scott T. Ballock

At 5:50 p.m., you sent an additional message to EC:

> Because you will want me back. Your heart will be broken again. You will
> struggle. You will soften. You will remember what it was that made you love
> me. You will want to hug me, hold my hand. But please don't tell me that you
> do. Please always keep this cold, distant exterior. I don't want to ever know that
> we could have been us again.

Then at 10:45 p.m., you sent EC an email with the Subject: I'm sorry. You stated:

> I know how much I messed up. But I'm sitting here in my cozy apartment,
> knowing where you are and what you're doing and I'm surprisingly at peace with
> it. Because I know I drove you away. Because I know I am responsible for
> tonight . . . . Thanks for being a good friend, babe. I only wish I would have
> recognized it earlier, appreciated you and how you tried, and followed your
> advice earlier. If I had, none of us would ever have to struggle. We could have
> lived a fantasy life, never having to worry about anything. But it took losing you
> for me to realize what I had. Sad and embarrassing.

**Unauthorized Investigation**

You have relied heavily, in your divorce proceedings and this administrative action, on
your own unauthorized investigative efforts and interviews you conducted of EC's boyfriend
(KI), KI's ex-girlfriend (AF), and KI's father (KI Senior), among others. You described KI as a
"known drug dealer" (SSS #1) and a "low-level drug dealer" (SSS #2), yet you stated under oath
that you began to have "regular contact" with him (SSS #1).[19] On April 17, 2018, through your
attorney, you submitted additional documents to INSD, including your explanation of some of
"the FBI's investigative techniques," which you employed. You stated:

> Although the FBI relies heavily on informants for many of its most successful
> prosecutions, OPR doubts the veracity of . . . [KI] solely because he was thought

---

[19] FBI Offense Code 5.9 prohibits employees, "[w]ithout authorization, [from] engaging in an ongoing social, romantic, or intimate relationship or association with a person the employee knew, or should have known, is involved in criminal activities. Social relationships or associations involve any contact beyond that reasonably necessary for the completion of an investigative mission or beyond that which is authorized." You were not engaged in an authorized investigation into KI's criminal activities, and your ongoing social interactions with a known criminal were inappropriate. In your January 8, 2019 written response, you argue that your interaction with KI was not social, romantic, or intimate. I note you were working together with KI for a shared purpose and your interactions were repeated, ongoing, and unrelated to an investigative mission. You reference a September 16, 2013 meeting between you, the CJIS AD, the Deputy Assistant Director, and a Section Chief. The meeting took place after months of your interactions with KI and after the Division received information indicating a database had been misused to access information about KI. You stated that during the discussion with your management you "shared your story, to include [your] meetings with [KI] and others." You suggest that because, according to you, these individuals did not express concern regarding your investigative efforts, "it would be extremely difficult to characterize [them] as unauthorized." I do not agree and note these individuals were not provided with the administrative record before me.

Mr. Scott T. Ballock

to be a low level drug dealer. The OPR report authors may be unfamiliar with the FBI's investigative techniques.

[You] did not simply accept . . . [KI's] words as fact. As investigators do, [you] assessed [KI's] credibility, repeatedly tested him, and sought corroboration for the information he provided, including interviewing others.

In SSS #2, you claimed KI first contacted you in May 2013 and you "agreed" to meet with KI in person. By this time, you had previously contacted and interviewed KI's ex-girlfriend. In your September 14, 2017 Supplement to your Written Response, you stated you met with and interviewed KI's girlfriend, AF, in January 2013 to learn more about KI. According to you, AF told you that KI was a "violent, low-level drug dealer." On January 28, 2013, AF emailed KI regarding contact from you. The communication indicates that KI "warned" AF about you, stated you had been "bothering" him, and he expressed concern regarding your ability to hack him. AF claimed you wanted your kids and not EC. AF advised, "If you are so worried about being hacked maybe you should cut all ties with [EC]. [Ballock] hates you."[20]

In SSS #1, you stated you corroborated information about EC through your "own investigation" and documented the conversations "302 style." You discussed your interviews of KI and stated you would provide "302 style" documentation "upon request."[21] In a Timeline submitted by you in support of your Written Response, you stated KI contacted you on May 12, 2013, after KI had a falling out with EC.[22] According to the document, KI was "not comfortable" meeting with you. You indicated your interviews of KI began on Tuesday, May 21, 2014, and were witnessed by "[DP], (retired) Sergeant, [Location #7] Police Department." On May 30, 2013, you submitted an FD-1078 Self Reporting Form regarding the loss of FBI property. You stated you met with KI on May 21, 2013, for nearly six hours, and you continued regular contact with him. You further reported that on Tuesday, May 28, 2013, you and DP, "a friend and retired police officer," met with KI at his place of employment at which time KI returned four empty boxes of ammunition and a roll of FBI evidence tape.[23] You did not disclose on the FD-1078 that DP was an FBI contractor nor that he was your subordinate. You

---

[20] Just a few weeks earlier, you emailed EC, "All you had to do was so [sic], 'No.' You don't have to needlessly attack and ramp things up. I have as much ammunition as you do, more actually, but don't intend to use it. I have never contacted [AF] in my life. I have no idea who she is or how to contact her. And I wouldn't contact her."

[21] Exhibit 4 of SSS #2 includes a copy of the statement you prepared for KI, which was initialed paragraph by paragraph by KI and signed by KI, you, and DP on May 22, 2013; an additional statement prepared for KI by BKV (the private investigator you hired), which was signed by KI and BKV on June 7, 2013; and your notes of your conversations with KI on May 19, 2013 and May 22, 2013.

[22] The Timeline conflicts with an FD-1078 submitted by you on May 30, 2013, wherein you claimed KI contacted you on May 19, 2013. On April 17, 2018, through your attorney, you also submitted what you claimed was a memorialization of a call with AF and KI on May 19, 2013.

[23] According to your FD-1078, KI indicated he had 40 to 50 boxes of ammunition. I note the amount of ammunition you had amassed from the Bureau that was in your personal residence was excessive.

Mr. Scott T. Ballock

stated you also met with KI and his father on May 29, 2013, to obtain additional empty boxes of ammunition.  You made clear, "I am willing to testify in any criminal proceeding."

In addition to conducting multiple interviews, you hired a private investigator and obtained a cellphone used by KI to communicate with EC.  According to you, the investigator, BKV, re-interviewed KI and prepared an additional statement for KI in case the statement you prepared was challenged as "coerced."[24]  You claimed that KI voluntarily surrendered the cellphone on May 28, 2013.[25]  You recently explained:

> [Company], an independent company which has been used by the FBI for similar proposes, was able to retrieve thousands of text messages and email messages sent between [KI] and [EC] over the course of nearly a year.  Also recovered were hundreds of photos, videos, and audio recording of [EC] surreptitiously recorded by [KI].

According to you, EC sent multiple text messages to KI stating she would call the police if KI did not switch phones.  You stated that on May 29, 2013, "one day after . . . [KI] provide[d] his cell phone for review," EC wrote to her divorce attorneys, stating she needed to file harassment charges against you.  She wrote, "I have lived far too long in an abusive relationship to have any ability to heal from it while trying to cope with what [Ballock] throws my way via texts and email . . . and what he writes to me is nothing compared to what he's doing in secret."  That same day you interviewed KI Senior to obtain additional information against EC.

**Misuse of Database[26]**

By electronic communication dated June 26, 2013, CJIS reported to INSD that Database team member BC reported misuse of the Database to her immediate supervisor, SSA JG.  The allegation was subsequently communicated to Chief Security Officer (CSO) and your supervisor, Unit Chief (UC).  On June 26, 2013, CSO discussed the allegation with BC.  BC indicated that approximately one month earlier, she was having lunch with DP, a Database contractor whom

---

[24] The statement begins, "I have previously met [EC's] husband, Scott Ballock.  I am aware he is an FBI Agent but he has in no way used his position to threaten or intimidate me and he has offered me nothing or promised me anything in exchange for providing this information."  Although the document indicates KI had "no reason to lie and [would] provide the truth," it also includes the following statement: "I don't want to testify in court.  I just don't like court. . . . If compelled to testify, I will simply say I bumped my head and forgot everything.  I do not like court . . . I will not set foot in a courtroom.  I ain't goin to court.  I don't like court."

[25] The "surrender" was witnessed by RF.  I note RF is listed as an employee of the Database Program at CJIS.  On May 28, 2013, RF signed, as a witness, a document in which KI agreed to permit a complete search of a cellphone that he claimed to "own and possess, control, and/or have access to."  The document began, "I, [KI], have been asked by Scott T. Ballock to permit a complete search of the cellular telephone . . . ."  It appears from your and EC's communications that EC purchased the phone.

[26] Database is an FBI-developed repository of unclassified criminal justice records, available to the criminal justice community in a secure online environment. Database, the national investigative information sharing system, brings together federal, regional, state, local, and tribal criminal justice agency data, including: Incident and Case reports, Arrest Reports, Computer and Related Dispatch Calls, Traffic citations, Narratives, Photos, Booking and Incarceration data, and Parole/Probation information.

Mr. Scott T. Ballock

she described as her "good friend," when he disclosed that you asked him to run a Database check on EC's boyfriend. According to BC, she told DP he could "get in trouble for that." To which DP explained he ran the search based on your request. DP was your subordinate at the time. The matter was referred to INSD. INSD did not open an administrative inquiry but recommended CJIS "strongly counsel" you that any additional similar behavior would result in an inquiry.[27]

In your Supplemental Written Response dated September 14, 2017, you claimed you did not direct DP to run the search; rather, DP ran the search to "satisfy his own curiosity because he became aware of [your] story and met [KI]."[28]  You did not disclose that DP "became aware of [your] story," by taking part in your investigative efforts, including witnessing the signing of the nine-page statement you prepared after interviewing KI for approximately six hours the day prior.  You stated you admonished DP, who was your subordinate, when you learned of the search.  Based on your submission, OPR did not consider this incident in assessing your penalty in the September 21, 2017 final letter dismissing you from the Bureau.

**Your Denials of Harassment and Abuse**

In SSS #1, you asserted that your communications with EC were always "appropriate and respectful" and never "harassing."  You further claimed you "specifically requested and engaged in 'written' forms of communication with [EC] to ensure [your] conversations were documented" and you "ensured that nothing [you] sent to [EC] could be construed as anything but appropriate and respectful."  You suggested "most" of your communications "referenced issues or concerns with [your] minor children" and that "[n]one of [your] communications were threatening or harassing."  You further claimed to possess emails that demonstrated EC, "despite her allegation that [your] communications were unwanted, actually wanted to communicate with [you]."[29]  In SSS #2, you "acknowledged" that during the period of communications EC provided the FBI, you "desperately wanted to reconcile with her."  In SSS #2, you asserted you had "compelling reasons" for not responding with denials when EC sent emails referencing abuse.  You claimed your responses were a technique to deal with a "Borderline who is making false accusations" by not justifying, arguing, defending, or explaining.  You also addressed particular portions of the communications and reiterated that you were "deflecting and deescalating, techniques both taught to [you] and learned from a lifetime of having to communicate with an angry Borderline."

---

[27] CSO and UC completed a "cursory audit" of DP's search activities and indicated that they found "[n]o compelling or noteworthy information."

[28] In your Supplemental Submission in Support of Appeal, you listed the names of "many other unsavory characters in whom you had a strong interest" but of whom DP was unaware.  The names included KI's family members and employer, among others.  You stated, "Precisely because [you are] not one to improperly use [your] position as an FBI agent, during each and every one of those meetings [you] made certain to emphasize that [you were] simply a concerned father asking for information."  In your written response dated January 8, 2019, you again suggested there were other individuals you would have asked DP to search if you had requested he search KI.  You also provided a timeline to suggest you had reason to run KI months before DP misused the database.

[29] These documents were submitted by you and attached to SSS #2 as Exhibit #1.  The documents do not provide convincing evidence that your ongoing communications were desired or welcomed by EC.

17

Mr. Scott T. Ballock

You provided three email messages in which you described yourself as adamantly denying EC's accusations. The communications were attached to SSS #2 as Exhibit 3. In the first dated, February 15, 2013, you wrote, "You have lost your way. You had it so good. You have ruined so much. Stop telling others lies about me. I never abused you. I never forced you to have sex with others. I never beat you for not doing so. . . . You have major psychological issues . . . It may not surprise you to learn [KL] saved correspondence between you and her which highlights your wild sex life. I possess many more." You continue, "You have always been the type of person who, in an empty room, spills something on herself and frantically looks around asking, 'Who did this to me.'" You conclude the email by requesting EC "take [your] hand and walk like friends through this life." In the second email, dated May 25, 2013, you wrote the two of you should have been at a family camp that weekend, included a photo from the camp, and stated, "I know you are committed to the false narrative you have written, and you may have even convinced yourself of it after having repeated it so often." The third message, dated November 12, 2012, included the subject line, "As usual, your perspective is warped. That will change when you are on your own." You began the email, "You have legitimate issues with me, but you are out of line with regard to many things." You then provided an extensive listing of trips, material items, and purchases you made for EC.[30]  You further stated:

> As with most things, you wrongly make yourself out to be a victim and are entirely unfair in your characterizations of events. I can just see your counselor shaking her head at your version of this sad sad story, just another example of an abused woman. You have no idea how privileged you are and how spoiled you sound. I challenge you to share this tale of woe with anyone – anyone – and hear their response. In fact, I will run it by a few people and ask for their opinion. I can't wait for you to see how the rest of the world lives . . . .

In SSS #2, you denied committing sexual, physical, and psychological abuse; touching EC against her will; strangling her; and placing a gun to her head. You stated EC's allegations were "completely false" and "there exists absolutely no evidence that [EC] was physically abused, but lots of evidence that she is a manipulative liar intent on hurting [you]." You stated you believed EC had the goal of seeing you fired from your job and wanted to see the FBI take away your weapon.[31] Although you stated you "did not object to having an open marriage," you did not address your use of aliases to contact men online to have sex with EC nor your role in recording the encounters. In SSS #1, you alleged CCL testified that EC "was not abused and that she was not a battered woman." In SSS #2, you stated, "I agree a more accurate characterization of [CCL's] testimony is that, in response to the court's inquiry, she found no evidence that I physically abused [EC]."

---

[30] In the email, you stated, "Yes, I often took advantage of Uncle Sam paying the $3,000 weekly bill . . . . We still spent a good deal of our own money on those trips . . . ." I note EC told FBI investigators that you would often bring things home from the Bureau and say they were from "Uncle Sugar."

[31] You further alleged that your son heard EC say that she was going to get your gun taken away from you so that you would be fired and that EC admitted, during a court-ordered joint counseling session, to making this statement in front of your son. You also stated that EC sent a text message to her boyfriend, which indicated she had the "upper hand" in ruining your career.

Mr. Scott T. Ballock

CCL testified that she "searched" to find anything that suggested EC had Battered Woman Syndrome and while she could not find anything, she believed EC was in "pathological relationships." When the court questioned whether there were any objective tests for Battered Woman Syndrome, CCL replied "Not really, it's a clinical kind of presentation." When asked what sorts of threats EC alleged, CCL testified, "I'm sure I have it written down. Well, the most concerning of course was that there was threats of physical violence, and then he would take the kids away from her, divorce her, spend all their money on a divorce, expose her publicly." CCL testified that EC stated "[You] had once choked her, and on one occasion, held a gun to [EC's] head." When pressed further, CCL admitted EC reported that you put a gun in your own mouth and threatened to kill yourself. She also testified that a person had been interviewed who saw bruises on EC's neck. CCL stated the witness "said that one time [EC] had some bruises on her neck" and implied they were from you. CCL did not personally interview the witness and seemed unconcerned with the information reported. In addition, CCL stated she was unable to retrieve EC's past therapy records and admitted she did not speak with all the witnesses EC suggested she speak with. CCL claimed she spoke with numbers comparable to those she contacted on your behalf, but her testimony suggests otherwise. When asked about a Child Protective Services report, which appeared to be favorable to EC, CCL discounted the report entirely. Regarding the report's authors, she testified, "They are experts, but I don't necessarily find what they do credible because I work with them all the time." She further stated her belief that the report "just wasn't useful."

While the presiding judge did not directly challenge CCL's assertions, he repeatedly questioned why the issues were framed as "mom's problem, but not dad's problem." The court described you as having "pimped mom out" and stated, "I am sensitive to I guess the issue that somehow this is terrible for mom, but not so bad for dad, because I mean quite frankly it seems that probably both parties would have to have personality disorders and pretty extreme mental health issues to allow this kind of dysfunctional hurtful relationship circumstance to go on." CCL testified she believed you have a sexual disorder and "may have a voyeuristic pattern." The court further opined, "And, frankly, this seems very two-sided to me. Now we can say who is more at fault or who had the bigger issues, but neither party has really given me cause to believe that these children will have happy healthy lives with either of them."

**Written Responses**

Your written responses dated January 8, 2019 and February 12, 2019 focus almost exclusively on attacking EC's character and credibility. Referring to EC, you stated more than 20 times "this is whose story OPR chooses to believe." Your misconduct is the basis of my findings, and you have offered little substantive information with regard to your own actions. You are silent as to evidence indicating you vaginally penetrated EC with a handgun, placed a loaded weapon in your mouth, and penetrated EC with a wine bottle to the extent that she required emergency medical care. You provided more than 30 pages of alleged email communications from EC to an email account you maintained under the alias SM, but you did not provide your corresponding communications. You also provided 20 pages of email communications, which you described as "recovered correspondence," between EC and SK. Finally, you submitted copies of two surreptitiously recorded conversations between EC and KI and an LP Call Summary Report resulting from an argument between them. The materials you

19

Mr. Scott T. Ballock

submitted further evidence the disturbing extent of your intrusion into EC's life and complete invasion of her privacy.

## ANALYSIS

**A.      Misuse of Weapon/Safety Violation**

According to Offense Code 5.13 (Misuse of Weapon/Safety Violation), employees are prohibited from "[h]andling, displaying, operating, controlling, carrying, storing, or otherwise treating a weapon, explosive, or incendiary device in a manner inconsistent with the use and safety protocols and procedures established by the FBI and federal regulatory agencies."

Section 2.7 of the FBI's Firearms Policy Guide (0888PG, 06/22/2017) (Firearms Policy) requires FBI SAs to "[b]e responsible for the appropriate use, security, and maintenance of all firearms and related equipment under their control." *See also* Manual of Investigative Operations & Guidelines Part 2 (MIOGP2) § 12-1.2 (same). Firearms Policy Section 4.1.1 states, "SAs must avoid any unnecessary display of firearms outside of FBI space and must avoid any unnecessary handling of firearms." *See also* MIOGP2 § 12-2.2(11)-(12) (same). Finally, the FBI's well-established, Cardinal Safety Rules require: "(1) Treat all firearms as if they are loaded. (2) Keep your finger off the trigger unless you intend to press it. (3) Never point a firearm at anyone unless you are justified." Firearms Policy § 4.3.1; *see also* MIOGP2 § 12-10.3 (same).

In SSS #2, you admitted you vaginally penetrated EC with a handgun. This use of your firearm was fundamentally at odds with the most basic safety expectations of an FBI Special Agent. Your placement of a loaded weapon in your mouth was a similarly egregious violation of FBI safety protocol and procedures. Based on a preponderance of the evidence, including your admission, I conclude the allegation that you violated Offense Code 5.13 is substantiated.

**B.      Unprofessional Conduct – Off Duty**

According to FBI Offense Code 5.21, employees are prohibited from "[e]ngaging in conduct, while off duty, which dishonors, disgraces, or discredits the FBI; seriously calls into question the judgment or character of the employee; or compromises the standing of the employee among his peers or his community."

You had a pathological relationship with EC in which you engaged in abusive and harassing behaviors that called into question both your judgment and character. In addition to the abusive acts discussed above, you also penetrated her with a large wine bottle to the extent that she had to receive emergency medical treatment.

You directly contributed to multiple public websites that posted highly derogatory information about EC. The sites provided extremely personal information and displayed nude photos of EC, including a "screen grab" of a video taken while she was having sex. The websites described your position as an FBI Special Agent, your progression to SSA, and disclosed that you were assigned to CJIS. While you maintain the sites were created by your

Mr. Scott T. Ballock

father, it is clear from both the material posted on the sites and the testimony of CCL that you
contributed a substantial amount of content to be posted, including the "sworn statement" you
drafted after conducting a six-hour interview of KI as well as EC's private communications that
you obtained through a forensic examination of a cellphone you obtained from KI.

You abused your position as an FBI Special Agent and the extreme power differential
between you and the "low-level" criminals you interviewed to gain information against EC. You
admitted to employing FBI investigative techniques while establishing regular contact with a
known criminal. You contracted with Company, a company which according to you is used by
the FBI, to image a cellphone EC purchased. You admitted the process recovered "hundreds of
photos, videos, and audio recordings of [EC] surreptitiously recorded by [KI]." In addition to
your own investigative efforts, you obtained the assistance of two FBI colleagues, at least one of
whom was your subordinate at the time. The individuals you interviewed were aware of your
position as an FBI Special Agent and were likely aware of the positions of the employees you
brought with you. In contravention of the Bureau's mission, your extensive interaction with KI
created an appearance of corruption, which could damage future criminal actions against an
individual whom you knew to be a drug dealer.

In addition to acts of physical, sexual, and psychological abuse, your harassment of EC
was skillful and far reaching. You stated that on May 29, 2013, "one day after . . . [KI]
provide[d] his cell phone for review," EC wrote to her divorce attorneys, stating she needed to
file harassment charges against you. She wrote, "I have lived far too long in an abusive
relationship to have any ability to heal from it while trying to cope with what [Ballock] throws
my way via texts and email . . . and what he writes to me is nothing compared to what he's doing
in secret." Your texts and emails demonstrated your repeated disregard for her requests that you
limit your communications to her. When interviewed by FBI investigators, EC alleged you
threatened to ensure she would lose custody of the children if she left you, threatened to ruin her
life if she left you, placed your "Glock" into your mouth during an argument, inserted your
"Glock" into her vagina, sent numerous emails and texts she felt were harassing, obtained a cell
phone she used and had a private company conduct a forensic examination of the device, and
your father posted nude photos and inflammatory claims against her online. These claims are
supported by the evidence collected in this administrative inquiry.[32]

You disregarded your obligation as an FBI Special Agent to protect the reputation of the
Bureau at all times and instead engaged in a number of behaviors that seriously called into
question your judgment and character. Your actions have dishonored and disgraced the FBI and
have compromised your standing in the community. Based on a preponderance of the evidence,
I conclude the allegation that you violated Offense Code 5.21 is substantiated.

---

[32] In addition to the above referenced examples of your abusive behavior, it is noted that during your five-year
reinvestigation, the investigative file contained an example, provided to an investigator, regarding your violent
temper. One interviewee, identified only as Interviewee Number, was "aware" of a "problem" with your "temper"
and "heard about an incident where [you were] yelling loudly and throwing objects around because [you] could not
get [your] garage door open."

Mr. Scott T. Ballock

### C.   Lack of Candor/Lying – Under Oath

According to FBI Offense Code 2.6, an employee is prohibited from "[k]nowingly providing false information in a verbal or written statement made under oath. 'False information' includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

#### 1.   Abuse

In SSS #2, you falsely denied ever sexually, physically, or psychologically abusing EC. You committed psychological abuse when you inserted your loaded weapon into your mouth and threatened to kill yourself if EC left you. But your psychological abuse of EC extended far beyond this single act. Despite EC's numerous requests that you stop, you sent her unrelenting communications, which fluctuated between harsh condemnation and extensive idealized descriptions of EC and your life together. You left no area of her life untouched as you threatened her with disparaging, highly personal information you gathered through your investigative efforts. You obtained EC's private communications and surreptitious recordings by convincing a "low level criminal" to cooperate with your efforts. You used this information against EC and provided the content to your father to post on multiple public websites, extending your abuse of EC to the public domain.

You committed physical and sexual abuse when you penetrated EC with a large wine bottle to the extent that she required emergency medical care. Although you defend your actions as consensual, the physical result belies such a characterization. You also inserted your Glock into EC's vagina, an act she described as forceful but you again maintain was consensual. As discussed above, your emails and text messages indicate you committed additional acts of physical abuse. Although you categorically denied committing any form of abuse, a preponderance of the evidence showed you committed multiple forms of abuse over a significant period of time.

#### 2.   Nature of Emails and Text Messages

In SSS #1, you stated you ensured your emails and text messages to EC after the two of you had separated were "respectful and appropriate" and that "none of [your] communications were threatening or harassing." As shown above, however, your communications were far from appropriate and respectful. The sheer quantity alone was disrespectful of EC's numerous requests that you limit your communications to her. Your lengthy and idealized descriptions of EC, your life together, and your feelings toward her were neither respectful nor appropriate in the context of the acrimonious separation, particularly when interspersed with communications in which you demeaned and attacked her. You sent EC emails and texts that were disrespectful, accusatory, sarcastic, and malicious. They included, among other things, derogatory references to EC and her "fuck buddy," intimidating accusations of criminal violations, and frequent criticism of her character. You continue to mischaracterize your texts and emails, but the communications themselves were not "appropriate and respectful." Based on a preponderance of the evidence, I conclude the allegation that you violated Offense Code 2.6 is substantiated.

22

Mr. Scott T. Ballock

## PENALTY DETERMINATION

When determining an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

### A.   Misuse of Weapon / Safety Violation

The investigation establishes you violated Offense Code 5.13 (Misuse of Weapon / Safety Violation). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

I have considered all mitigating factors supported by the record, including, but not limited to, your 14 years of Bureau service and positive performance record. Your Division maintained confidence in your performance and noted you were "reliable and competent" and you were "dedicated to [your] subordinates and well regarded by them." You experienced significant stress as a result of your separation and divorce. Notwithstanding all relevant mitigating factors, I find that severe aggravation is appropriate. As an SSA, you were held to a higher standard. You were expected to represent the FBI professionally at all times and to serve as an example for your subordinates, which you failed to do. The FBI's Offense Codes and Penalty Guidelines cite "supervisory or high-grade status" as an aggravating factor for all offenses. In addition, your misconduct was discussed during court proceedings and with multiple individuals, which necessarily damaged the Bureau's reputation. Finally, your actions were intentional, posed an extremely high safety risk, and were used to intimidate and threaten EC. Each of these is specifically set forth as an aggravating factor under Penalty Guideline 5.13. You disregarded your responsibility as a federal law enforcement officer and abused the authority with which you were entrusted. Based on the circumstances in this case, I am dismissing you for your 5.13 offense.

### B.   Unprofessional Conduct – Off Duty

The investigation establishes you violated FBI Offense Code 5.21 (Unprofessional Conduct – Off Duty). The standard penalty is a five-day suspension. Mitigating factors warrant an oral reprimand to a three-day suspension, and aggravating factors warrant a seven-day suspension to dismissal.

I have considered all mitigating factors supported by the record, including, but not limited to, those discussed above. Notwithstanding all relevant mitigating factors, I find that severe aggravation is appropriate. As an SSA, you were held to a higher standard. You were expected to represent the FBI professionally at all times and to serve as an example for your subordinates, which you failed to do. Your misconduct was discussed during court proceedings and with multiple individuals, which necessarily damaged the Bureau's reputation. You contributed exceedingly private and inappropriate material to be posted on public websites that named you, described your progression within the Bureau, provided photographs of you, and even named your Division, further damaging the Bureau's reputation. Your mistreatment, abuse,

23

Mr. Scott T. Ballock

and harassment of EC was in direct contravention of the FBI's Core Values, including respect for the dignity of those we protect, compassion, and uncompromising personal integrity. Your lack of character was further evidenced by your use of multiple FBI employees, including a subordinate, to advance your personal interests. Your extensive unprofessional conduct was disgraceful and demonstrated a depravity of character that is fundamentally incompatible with your continued service as an FBI Special Agent. Based on the circumstances in this case, I am dismissing you for your 5.21 offense.[33]

## C.    Lack of Candor/Lying Under Oath

The investigation further establishes you violated FBI Offense Code 2.6 (Lack of Candor/Lying – Under Oath). The standard penalty is dismissal. Offense Code 2.6 does not include a mitigated or aggravated range.

I have considered all mitigating factors supported by the record, including, but not limited to, those discussed above. In aggravation, as an SSA, you were held to a higher standard. You were expected to represent the FBI professionally at all times and to serve as an example for your subordinates, which you failed to do. Your lack of candor was repeated and involved extraordinarily serious misconduct, including psychological, physical, and sexual abuse. You have shown you do not possess the integrity, judgment, and self-control required to be an FBI Special Agent. Based on the circumstances in this case, I am dismissing you for your 2.6 offense.

## CONCLUSION

In sum, a preponderance of the evidence substantiates that you violated Offense Codes 5.13, 5.21, and 2.6. Violations of Offense Codes 5.13, 5.21, and 2.6 each warrant dismissal. Your conduct, as set forth herein, represents a willful and intentional violation of Bureau rules and regulations. As a result, I am dismissing you from the rolls of the FBI. This action is necessary and warranted to promote the efficiency of the FBI.[34]

---

[33] By email dated July 29, 2015 to OPR and copied to the FBI's appellate authorities, Director made clear: (1) he cares deeply about the issue of domestic violence; (2) OPR's penalties for domestic violence must "strongly promote both specific and general deterrence"; and (3) he fully supports dismissal for domestic violence where appropriate. He also recognized victims frequently fail to seek relief because they fear additional abuse or adverse financial consequences.

[34] You are admonished not to discuss this matter with anyone other than the Inspection Division's Office of Internal Affairs (OIA), OPR, the Human Resources Branch's Office of Disciplinary Appeals (ODA), the Security Division, the FBI's Employee Assistance Program, the FBI's Ombudsman, or an attorney who has signed the appropriate Nondisclosure Agreement. Neither you, your attorney, nor anyone acting on your behalf should contact any witness or potential witness about this inquiry without first obtaining approval from OIA, OPR, or ODA. In addition, you are admonished that any redacted materials or other FBI documents you review in connection with this inquiry are the property of the FBI, and you are prohibited from photocopying or removing such documents from FBI space. You may take notes concerning the content of such material, but those notes may be used only to facilitate your participation in this disciplinary inquiry and for no other purpose.

Mr. Scott T. Ballock

## APPEAL RIGHTS

If you wish to appeal, **within ten (10) calendar days following notification of OPR's *final* decision, you must forward a brief statement that you intend to appeal** to the Executive Assistant Director, Human Resources Branch, Federal Bureau of Investigation, J. Edgar Hoover Building, 935 Pennsylvania Avenue, Northwest, Washington, D.C. 20535-0001. You may also email your notice of appeal to HRB's Office of Disciplinary Appeals via HQ_DIV00_Appeals@fbi.sgov.gov (FBINet) or HQ_DIV00_Appeals@fbi.gov (UNet). You will then be provided an opportunity to review the file and submit a brief based on a deadline set by HRB. Your division head must be notified at the time you file an appeal. If an appeal is filed for any action other than a dismissal, the OPR disciplinary penalty will be held in abeyance pending the appellate decision.

If you are appealing a suspension of fourteen (14) calendar days or less, the EAD, HRB, will decide the appeal. If you are appealing a suspension of more than fourteen (14) calendar days, demotion, or dismissal, the Disciplinary Review Board (DRB) will decide the appeal. The standard of review on appeal in examining OPR's factual findings and penalty is the substantial evidence standard of review. The penalty set by OPR cannot be increased on appeal by either the EAD, HRB, or the DRB. In the rare instance that the EAD, HRB, or the DRB identifies factors that require additional investigation and/or adjudication, the case will be remanded to the Inspection Division and/or OPR for additional action.

Should you wish to retain an attorney to assist you in your appeal, you must ensure that the enclosed forms are completed prior to disclosing any Bureau information to the attorney handling your appeal. If you and the attorney who will assist you have already completed and provided these disclosure forms to the Bureau in connection with this case, you do not have to re-submit them. You are referred to Corporate Policy Directive 0915D (Disciplinary Appeals Process) for additional details pertaining to appeals.

## REFERRAL TO OTHER DIVISIONS

In accordance with established policy, the results of this administrative inquiry will be shared with other divisions, as appropriate. Thus, a copy of this communication is being provided to the Security Division as it may be relevant to your retention of a Top Secret security clearance.

## NOTICE TO SEPARATED EMPLOYEE REGARDING
## FEDERAL EMPLOYEES HEALTH BENEFITS COVERAGE

Your Federal Employees Health Benefit (FEHB) coverage will automatically continue at no cost to you for 31 days after your separation.

Under authority of 5 U.S.C. § 8905a and 5 C.F.R. § 890.1112, the Benefits Unit, Human Resources Division, has determined that this separation is for "gross misconduct" as defined by 5 C.F.R. § 890.1102. As a result, the Bureau intends to deny you Temporary Continuation of Coverage eligibility. This means your FEHB coverage will end 31 days after your separation

and you would not be allowed to enroll for continued Federal Employees Health Benefits coverage.  You may appeal this determination to the Personnel Officer, HRD, FBI Headquarters, Room 10903, and a final decision on this matter will be issued in writing.  An appeal must be filed within ten calendar days following notification of your separation from the Bureau.

Sincerely yours,

Nancy McNamara
Acting Assistant Director
Office of Professional Responsibility

Enclosures

IIS-1 (2015-03-26)



# THE FBI'S DISCIPLINARY PROCESS
## EXPLANATION OF PROCEDURES

You have been notified that an allegation of misconduct or criminal activity has been made against you, and have been advised of the nature of the issue(s) that will be addressed during the investigation. You will, absent compelling reasons to the contrary, be notified if any significant change in the issue(s) being addressed during this investigation occurs. This does not apply to investigation into possible false statements or lack of candor/cooperation.

## ALLEGATION OF CRIMINAL ACTIVITY

If the allegation involves criminal activity for which the Department of Justice (DOJ) has not declined prosecution, a criminal investigation will be conducted and you will be afforded all legal and constitutional rights.

## ALLEGATION OF MISCONDUCT OR CRIMINAL ACTIVITY THAT HAS BEEN DECLINED

If the allegation is of misconduct or criminal activity for which DOJ has declined prosecution, an administrative inquiry will be conducted, and the following rules will apply to you:

You are required to be fully cooperative and candid during the course of this investigation, and failure to furnish full and candid cooperation may, by itself, constitute grounds for disciplinary action.

You will be interviewed in this matter, and your participation in the interview is mandatory. The date, time and location will be set by the investigator conducting the interview.

You are directed to identify, during your interview or as soon as possible thereafter, any testimony, documents or other evidence which you believe are exculpatory or favorable, so the Internal Investigations Section (IIS), Inspection Division, can conduct appropriate investigation. Pertinent written documentation or other related material presented by you or your attorney will be made a part of the IIS file, and will be considered by OPR in adjudicating the matter.

## REPRESENTATION BY AN ATTORNEY

You may consult with and be accompanied by counsel during the course of the investigation and adjudication of this inquiry.

You may designate in writing one attorney to be present when you are interviewed, provided that person is a private attorney licensed to practice and authorized to represent you. This should not be taken as a legal or constitutional right, and the opportunity to have an attorney present during your administrative interview is conditioned upon observance of the rules set forth below.

The FBI is not obligated to provide you with an attorney. The decision to retain an attorney is yours, and the FBI cannot and will not pay the expenses you incur by retaining an attorney. You are not allowed to be represented by the Chief Division Counsel (CDC), the Associate Division Counsel, or any person employed in any capacity by the FBI or the U.S. Department of Justice.

## RESTRICTIONS ON CERTAIN COMMUNICATIONS WITH ATTORNEYS

As an employee, you are obligated to protect classified, law enforcement sensitive and Privacy Act information during the course of any communication with your attorney regarding a disciplinary investigation or adjudication. A separate form is attached informing you of policies concerning Disclosure of Information to Attorneys. If you decide to discuss the allegations against you with an attorney, you must sign and return the attached forms to your Division Head or his/her designee in advance of making any such disclosures. An attorney will not be permitted to be present at your interview if you have not returned the form designating that attorney within a reasonable time prior to the interview. IIS will conclude that you have elected not to seek representation by an attorney unless this form is returned with your original signature for inclusion in the file.

## RULES GOVERNING YOUR ATTORNEY'S INVOLVEMENT IN THE PROCESS

To ensure equal treatment and to avoid needless controversy, all employees will be treated the same in the disciplinary process, whether or not represented by an attorney. For example, although you may retain an attorney, neither the investigator conducting the administrative inquiry nor the Office of Professional Responsibility (OPR) is obligated to communicate with you through your attorney. Any attempt by you to avoid direct communication with the investigator, or to otherwise not comply with IIS directives, may be considered insubordination and/or failure to cooperate in an administrative inquiry, which may result in your dismissal for failure to obey a lawful order.

Absent compelling reasons to the contrary, you will be given reasonable advance notice of the interview date, time and location to ensure you have an opportunity to have counsel present. Requests for reasonable postponement of the interview may be granted at the discretion of the investigator.

One attorney designated by you in writing may be present for the interview, and you may consult with him/her before answering questions, to an extent that does not obstruct the interview process. Because the purpose of the interview is to establish pertinent facts and not to engage in legal disputes or discussions, the investigator is not required to respond to legal arguments, objections or requests. Your attorney's legal communications should be submitted in writing to IIS during the investigative stage or OPR during the adjudicative stage as soon as possible to permit them to be serialized into the file and taken into account by OPR in its adjudication of the matter.

Your attorney will not be permitted to improperly interject him/herself in the interview process by arguing, answering on your behalf, ordering you not to answer questions, or otherwise interfering with or unreasonably delaying the administrative interview. Should your attorney persist in such conduct after being warned that his/her actions are unacceptable, the attorney will be asked to leave the interview, and you must remain and be fully cooperative, candid and forthright, or be subject to the penalties for insubordination and failure to cooperate.

You will be sworn in prior to the interview. IIS will decide how the interview should be recorded or memorialized. Absent special circumstances, a signed, sworn statement (SSS) will be the normal method of recordation, and no other recordation will be permitted. After the interview, a draft SSS will be prepared by the investigator and a reasonable time will be provided for you and your attorney, if you desire, to review the draft. The draft SSS may only be reviewed in the presence of the IIS investigator or a designee. No exception, e.g. providing a draft SSS for your attorney to review at his/her leisure, will be made. Once any necessary corrections have been made to the draft, a final SSS will be prepared. Should you refuse to sign the final SSS, the investigator will submit the document to the file with an FD-302 explaining that the information contained in the unsigned statement represents your oral statement as recorded by the investigator and reciting the reasons provided by you for your refusal to sign.

2

In investigations involving classified and/or sensitive information or techniques, where, in the view of the FBI, disclosure of such information or techniques to a party outside the FBI would compromise investigations, prosecutions or national security interests, your opportunity to have an attorney present for your interview by investigators and other entitlements may be limited or even denied in exceptional circumstances. A decision to limit or deny a request to have an attorney present will be made only by the Assistant Director, Inspection Division, in consultation with the General Counsel or a designated Deputy General Counsel.

## REFERRAL OF THE INVESTIGATION TO OPR FOR ADJUDICATION

Once the investigation is complete, IIS will refer the file to OPR for adjudication. Should OPR issue an oral reprimand, letter of censure, or suspension of less than 15 days, you will receive written notification from OPR fully advising you of your rights going forward. Should OPR propose a suspension of more than 14 days, demotion, or removal, you will receive written notification from OPR of your rights going forward, including the following procedural protections for non-probationary employees:

(1) This Statement of Proposed Action provides you thirty calendar days' advance written notice of the proposed action.

(2) You may contact and use an attorney to assist in the disciplinary matter, subject to limitations imposed by law and regulation regarding the disclosure of classified or sensitive information. The FBI will not be responsible for payment of any attorney's fee or other expense you incur in connection with an attorney's representation of your interests associated with a disciplinary matter or an appeal of a disciplinary sanction.

(3) You have ten calendar days from the date of receipt of this notice to make a written request to review the material which was relied upon by OPR's proposing official. Copies of such material will be redacted in accordance with civil discovery policy and procedures. These documents are the property of the FBI and will be made available for review for a reasonable amount of time by you and/or your attorney within the FBI office space and control. You may take notes, but you may not make copies.

(4) You and/or your attorney may provide a written response to the proposed action. Your written response may include affidavits or other documents of choice, and it may identify witnesses or documentary sources of exculpatory evidence. Your written response must be submitted within ten calendar days after your receipt of the proposed action or after you have been provided access to the material described in (3) above, whichever occurs later. Due to mail delays associated with security procedures, you must send your response by facsimile to OPR, Adjudication Unit [I or II], Room PA-444, at 202-436-7455 or 202-436-7887.

(5) In addition to, or in lieu of, submitting a written response, you may request an oral presentation which, at your election, will be made telephonically, in person, or by video teleconference to the Assistant Director of OPR. You must request an oral presentation, in writing, within ten calendar days after your receipt of the proposed action or after you have been provided access to the material described in (3) above, whichever occurs later. Upon receipt of your written request for an oral presentation, OPR will provide you at least fifteen days' notice of the presentation date. If you are submitting a written response in addition to making an oral presentation, the oral presentation will be scheduled for a date after the deadline for OPR's receipt of your written response. During your presentation, you and/or your attorney may present oral testimony or evidence, including any information, affidavits, and other documentation deemed pertinent to your case. The testimony of witnesses is not allowed. Any travel and/or attorney costs incurred as part of your oral presentation are your responsibility. For WebTA, you may treat a reasonable amount of file review time, and the time spent during the oral hearing, as part of your official duties and record it as regular hours. You

3

may also treat up to one hour prior to the hearing and up to one hour after the hearing as part of your official duties if that time is actually spent preparing for the hearing or discussing the hearing with counsel.

(6) You will receive a written decision letter from OPR's Assistant Director, after consideration of any oral and written responses to the proposed action, fully stating the reasons for the decision. This decision letter will be delivered to you as soon as practicable following completion of the disciplinary process described above.

APPEAL

Should the disciplinary process result in an oral reprimand or letter of censure, you may not appeal the decision.

Should the disciplinary process result in suspension without pay for fourteen days or less, you may appeal that sanction to the Human Resources Division (HRD) in writing. The appeal will be decided by either the Assistant Director (AD) or Deputy Assistant Director (DAD) of HRD. Should the AD, HRD, and the DAD, HRD, need to be recused, the AD, HRD, will select another AD to fulfill his or her responsibilities.

Should the disciplinary process result in a suspension without pay for more than fourteen calendar days, demotion or dismissal, you may appeal that sanction to the HRD in writing, stating your grounds. The HRD will convene a Disciplinary Review Board (DRB) consisting of five voting members selected by the Associate Deputy Director's (ADD) Office to ensure a broad cross-section of the FBI. The voting members are composed as follows: two Senior Executive Service (SES) members and two mid-level managers. Of these four employees, two are selected from a pool of eligible Supervisory Special Agents (SSAs), and the remaining two from the Professional Staff ranks. At least one of the four voting members is chosen from a pool of eligible employees assigned to the field. In addition, the AD, HRD, serves as permanent Chairperson of the DRB and the tie-breaking voting member when necessary. Along with the aforementioned voting members, the DRB shall consist of the following non-voting members: one mid-level management observer, one observer from the Office of Equal Employment Opportunity Affairs (OEEOA), and one observer from the Office of General Counsel (OGC). Utilizing the substantial evidence standard of review, the DRB will review the reasonableness of OPR's underlying findings of misconduct and the assessed penalty. You will be notified in writing of the DRB's findings and decision.

These procedural protections are granted only to those employees who have completed their probationary period. The FBI's disciplinary appeals process is more fully explained in FBI Corporate Policy Directive 0235D, Disciplinary Appeals Process.

An employee must file written notice of his or her intent to appeal to the Appellate Unit, HRD, within ten days from the date of receipt of the final letter from OPR.

IIS-2 (2015-03-26)



# FBI DISCIPLINARY PROCESS:
# DISCLOSURE OF INFORMATION TO ATTORNEYS

The FBI recognizes that, for you to receive effective assistance of counsel during an administrative inquiry, it may be necessary for you to disclose to your attorney information or materials derived from FBI files or obtained by virtue of your employment with the Bureau. Because much FBI information is by its nature very sensitive, the FBI and its employees have an obligation to protect that information from unauthorized disclosure to persons outside the FBI, even to attorneys representing FBI employees.

You are therefore reminded that, during the course of this process, you continue to be bound by federal laws and regulations prohibiting the unauthorized disclosure of FBI information and by the terms of the agreement you signed when you became an FBI employee in which you agreed never to divulge, publish, reveal or otherwise disclose any information or material from or relating to FBI files or any other information acquired by virtue of your official employment, duties, or status, without the written permission of the Director.

The following is a list of the types of FBI information you may not disclose to your attorney without prior authorization and the procedures you should use to obtain the necessary authorization to release the information to your attorney.

1.  Classified information, whether marked or unmarked, whether written or oral, that is classified pursuant to the provisions of the Executive Order 13526.

2.  Information protected from disclosure by the Privacy Act, which includes information in FBI files retrievable by an individual's name or other identifying data, including information pertaining to other FBI employees.

3.  Information that reveals sensitive law enforcement, intelligence, or counterintelligence techniques, sources or methods; or that reveals the sensitive, confidential or proprietary techniques, sources, or methods of other agencies or government entities.

4.  Information that would reveal grand jury material protected from disclosure by Rule 6(e) of the Federal Rules of Criminal Procedure.

5.  Information that would reveal the identity of a confidential source or informant.

6.  Information that relates to any sensitive operational details or the substantive merits of any ongoing or open investigation, inquest, probe, prosecution, appeal or case.

7.  Information consisting of the proprietary information of another entity, including trade secrets.

8.  Information pertaining to wiretaps or intercepts protected or regulated by Title III (18 U.S.C. §§ 2510-2520).

9.  Information pertaining to currency transaction reports regulated or protected by 31 U.S.C. §§ 5311-5319.

10. Tax return information regulated or protected by 26 U.S.C. § 6103.

11. Information, the disclosure of which is prohibited by any other Federal statute or regulation.

12. Information, the disclosure of which would divulge opinions, recommendations, and advice generated in the decision-making process of the federal government.

If you believe that your attorney will require access to classified information to assist you in this matter, you must first contact the Internal Investigations Section for guidance in securing the appropriate security clearance for your attorney. Classified information may not be disclosed either orally or in documentary form unless and until your attorney has received a security clearance from the Department of Justice. If your attorney has an appropriate security clearance, he or she will be permitted to review classified documents only in FBI workspace so as to ensure that classified documents are not compromised. All oral communications with your attorney regarding classified information must take place in person in FBI workspace with appropriate safeguards.

If you believe that your attorney will require access to any information other than classified information that is derived from FBI files or obtained by virtue of your employment, you must request from the Internal Investigations Section in writing, authority to disclose such information, whether you are seeking to disclose the information orally or in document form. Your request should specify the nature of the information and its location in FBI files, if known, and should state the reason why you believe it is necessary to disclose the information. The decision on whether disclosure will be authorized will be based upon the nature of the information requested and your need for it. If the Internal Investigations Section consents to the disclosure, your attorney will be required first to sign the attached agreement not to disclose the information further.

You should sign this form and submit it to the Division Head or his/her designee for transmittal to Internal Investigations Section/Inspection Division, Room 3041, FBIHQ. The division will retain a copy for its records.

I have read the above information regarding the restrictions on disclosing FBI information to my attorney. I understand that I am bound by the restrictions set forth in this notice.

_____          _____
        *Employee's Signature*                          *Date*

_____          **263-HQ-**_____
        *Printed Name*                            *File Number (from bottom of Notification Form)*

_____
_____
_____
_____

*Name, Address and Telephone Number of Attorney*

IIS-3 (2015-03-26)



# NONDISCLOSURE AGREEMENT

I, _____, an attorney licensed to practice in the state of
              (Name of Attorney)

_____, as consideration for being granted access to certain FBI-related
      (State)

information in connection with my legal representation of Federal Bureau of Investigation (FBI) employee,

_____, as to Administrative Inquiry
      (Name of Employee)

263-HQ-_____, agree as follows:
(File Number from Notification Form)

    I will not disclose orally, in writing, or by any other means, to any party other than the Director, FBI; Internal
Investigations Section/Inspection Division, FBI; the Office of Professional Responsibility (OPR), FBI; the Office of the General
Counsel, FBI; the United States Attorney General; the Office of the Inspector General, Department of Justice (DOJ); OPR, DOJ; or
otherwise as required by law, court order, or subpoena (and then under seal to the extent permitted by law) - **without the prior
written authorization of the FBI** - any information or material derived from or relating to FBI files or any other FBI-related
information acquired by virtue of my legal representation of this matter.

    I may, however, disclose such information to members and employees of my law firm or office pursuant to my legal
responsibilities in this matter, but only based upon a need to know and provided that all persons who receive this information first
shall be shown a copy of this nondisclosure agreement and, in a written and signed Certificate such as that annexed hereto, state that
he or she has read this nondisclosure agreement and agrees to be bound by the terms thereof. I agree to retain such certificates until
the conclusion of this matter and shall make such certificates available to the FBI upon request.

    I further agree that all documents released by the FBI in this matter remain the property of the FBI and that, upon the
conclusion of this matter or at the FBI's earlier request, I will return all such documents and any copies of them to the FBI.

    **I acknowledge that the unauthorized disclosure of the aforementioned information would violate this agreement,
might additionally violate federal law, regulations or policy, and could form the basis for legal action.**

_____        _____
(Signature of Attorney)                              (Date)



# CERTIFICATE

I, _____, acknowledge that I have reviewed the
(Printed Name)

Nondisclosure Agreement between the Federal Bureau of Investigation and _____,
(Name of Primary Attorney)

executed on _____, and agree to be bound by the terms thereof.
(Date of Agreement)


_____          _____
(Signature)                                              (Today's Date)