# In The Matter Of:

*Scott Ballock v.*
*Ellen Ruth Costlow, et al*

---

*Scott Ballock*
*April 19, 2019*

---

*Sapphire Court Reporting LLC*
*204 Oak Drive*
*Clarksburg, WV 26301*
*304-476-7553*
*www.SapphireCR.com*

Original File Scott T. Ballock.txt
**Min-U-Script® with Word Index**

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


SCOTT BALLOCK,

     Plaintiff,

v.                                    CIVIL ACTION
                                      NO.:  1:17-CV-52
ELLEN RUTH COSTLOW,
STATE TROOPER MICHAEL KIEF,
STATE TROOPER RONNIE M.
GASKINS, AND STATE TROOPER
CHRIS BERRY,

     Defendants.


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


     The videotaped deposition of SCOTT T. BALLOCK
taken at the insistence of the Defendant herein,
pursuant to Notice as to time and place and pursuant to
the statutes of the West Virginia Rules of Civil
Procedure, before Donna Watkins Pizzino, Court Reporter
and Notary Public, at the offices of Steptoe & Johnson
PLLC, 1085 Van Voorhis Road, Morgantown, West Virginia,
on the 19th day of April, 2019, commencing at the hour
of 9:00 a.m.


Sapphire Court Reporting LLC
DONNA WATKINS PIZZINO, COURT REPORTER
204 Oak Drive - Clarksburg, WV 26301
304.476.7553
www.SapphireCR.com

2

1                          APPEARANCES

2

3        APPEARING FOR THE PLAINTIFF:

4                Charles J. Crooks, Esquire
                 Crooks Law Firm PLLC
5                244 Pleasant Street
                 Morgantown, West Virginia 26505
6

7        APPEARING FOR THE DEFENDANTS:
8
                 Mark G. Jeffries, Esquire
9                Steptoe & Johnson PLLC
                 400 White Oaks Boulevard
10               Bridgeport, West Virginia 26330

11               Monte L. Williams, Esquire
                 Steptoe & Johnson PLLC
12               Post Office Box 1616
                 Morgantown, West Virginia 26507
13
                 P. Todd Phillips, Esquire
14               Lyons Phillips Legal Group PLLC
                 141 Walnut Street
15               Morgantown, West Virginia 26505

16

17       ALSO PRESENT:

18               State Trooper Ronnie M. Gaskins
                 State Trooper Michael Kief
19               State Trooper Chris Berry

20

21

22

23

24

25

3

1                          EXAMINATION INDEX

2

3    Direct Examination by Mr. Jeffries              8

4    Cross-Examination by Mr. Phillips             230

5    Cross-Examination by Mr. Crooks               259

6    Redirect Examination by Mr. Jeffries          318

7    Cross-Examination by Mr. Phillips             326

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                        EXHIBIT INDEX

2

3    1    Timeline                                24

4    2    Emails, 11/7/2012                       25

5    3    Emails, 9/26/2012                       28

6    4    Emails, 9/30/2012                       30

7    5    Emails, 10/2/2012, 4:18 p.m.            30

8    6    Emails, 10/2/2012, 10:45 p.m.           31

9    7    Emails, 10/7/2012                       32

10   8    Emails, 10/9/2012                       38

11   9    Emails, 10/11/2012                      39

12   10   Emails, 10/15/2012                      42

13   11   Emails, 10/20/2012                      43

14   12   Emails, 10/21/2012                      44

15   13   Emails, 11/11/2012                      45

16   14   Emails, 11/15/2012                      46

17   15   Emails, 11/24/2012                      47

18   16   Emails, 12/7/2012                       48

19   17   Emails, 12/15/2012                      49

20   18   Emails, 12/16/2012                      52

21   19   Emails, 1/5/2013                        53

22   20   Emails, 1/6/2013                        58

23   21   Emails, 1/28/2013                       61

24   22   Emails, 2/9/2013                        62

25   23   Email of text messages, 9/16/2013       63

5

1              EXHIBIT INDEX (continued)

2

3    24    Emails, 8/28/2013                              66

4    25    Emails, 4/26/2013                              72

5    26    Emails, 5/3/2013                               74

6    27    Letter from Matthew Stout, 5/3/2013            75

7    28    Emails, 5/15/2013                              76

8    29    Emails, 9/6/2013                               80

9    30    Magistrate Court Motion, 4/7/2016             108

10   31    Interview of Kenny Ice, 5/21/2013             113

11   32    TB Phone conversation with Sgt. Kief         122

12   33    State Police Investigation Report            129

13   34    Scott Ballock Sworn Statement, 6/29/2016     156

14   35    Emails, 11/11/2012                           159

15   36    FBI Proposed Decision to Terminate           171

16   37    Letter from J. Cathryne Watson, 6/14/2017    174

17   38    Second Amended Complaint                     175

18   39    FBI Decision to Terminate                    188

19   40    Letter from J. Cathryne Watson, 10/3/2017    192

20   41    Scott Ballock Sworn Statement, 3/12/2018     198

21   42    Letter to Unit Chief Chen, 1/8/2019          202

22   43    Temporary Modification Order, 9/20/2013      205

23   44    Interrogatories                              207

24   45    Request for Production of Documents          216

25   46    WVU Medicine Records, 7/19/2012              217

6

1                      EXHIBIT INDEX (continued)

2

3    47    Phoenix Psychological and Counseling        218
           Assoc, Inc. Records
4
     48    WVU Medicine Records, 10/24/2012            220
5
     49    WVU Medicine Records, 10/15/2013            221
6
     50    Fremouw-Sigley Psychological Associates     223
7          Psychological Diagnostic Interview

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          THE VIDEOGRAPHER:   We are now on the

2    record.   Today is April 19th, 2019.   The time is

3    approximately 9:04.   My name is Jason Good, CDVS, legal

4    videographer, located at 534 Meridan Street, Morgantown,

5    West Virginia.   I am not affiliated with this case nor

6    do I have any financial interest in the outcome of this

7    action.

8          This video-recorded deposition of the

9    plaintiff, Scott T. Ballock is being taken at the

10   offices of Steptoe & Johnson PLLC located at 1085 Van

11   Voorhis Road, Suite 400, Morgantown, West Virginia.   The

12   caption of this case is Scott T. Ballock, Plaintiff v

13   Ellen Ruth Costlow, State Trooper Michael Kief, State

14   Trooper Ronnie M. Gaskins, and State Trooper Chris

15   Berry, Defendants, Civil Action Number 1:17-cv-52, filed

16   in the United States District Court Northern District of

17   West Virginia.

18          Notice of this deposition is given by the

19   defendants.   The court reporter is Donna Pizzino.   Will

20   all parties please state their appearances beginning

21   with the party noticing this proceeding.

22          MR. JEFFRIES:   Mark Jeffries and Monte

23   Williams for Defendants Troopers Michael Kief, Ronnie

24   Gaskins, and Chris Berry.

25          MR. PHILLIPS:   Todd Phillips for Defendant

8

1    Ellen Ruth Costlow.

2                    MR. CROOKS:  My name is Charles Crooks.

3    I'm a lawyer.  I'm here today on behalf of Scott

4    Ballock.

5                    THE VIDEOGRAPHER:  At this time will the

6    court reporter please administer the oath.

7                    (The oath was administered.)

8                    THE DEPONENT:  I do.

9                         SCOTT T. BALLOCK,

10   called as a witness by the Defendant, was first duly

11   sworn, as hereinafter certified, examined, and testified

12   as follows:

13                    DIRECT EXAMINATION

14   BY MR. JEFFRIES:

15       Q.   Mr. Ballock, would you state your full name for

16   the record?

17       A.   Yeah.  Scott Thomas Ballock, B as in boy

18   a-l-l-o-c-k.

19       Q.   We met briefly before we went on the record.

20   My name is Mark Jeffries.  As I just said, I represent

21   the state police defendants, and I'm here to take your

22   deposition today.  Have you ever given a deposition

23   before?

24       A.   No.

25       Q.   Okay.  Well, just as reminder, you just took

1    the oath so you're under oath the same as if you were on

2    a witness stand in court.  Do you understand that?

3         A.    Yes.

4         Q.    The court reporter is going to make a

5    transcript of everything that I ask and every answer

6    that you give, so it's important that you give verbal

7    answers.  It's common when people are talking face to

8    face to nod their head or shrug their shoulders.  You

9    need to try to avoid that so she can get a good record

10   because, of course, a shrug or nod doesn't translate.

11        A.    Understood.

12        Q.    I may remind you of that from time to time.  If

13   I do, I'm not trying to be difficult; I'm just trying to

14   make sure we get a good record.

15        A.    Sure.

16        Q.    Towards that same end of getting a good clean

17   transcript, it's important that you and I try very hard

18   not to talk over each other.  So please let me finish

19   the question before you give an answer, and I'll try to

20   do my best to let you finish your answer before I ask

21   another question.  Okay?

22        A.    Sure.

23        Q.    I'm going to presume that you understand my

24   questions, but if there's -- from time to time it

25   happens that a question isn't as clear as I would like

10

1    it to be.  If you don't understand a question just let

2    me know and I'll try to rephrase it and make it a little

3    more easy to understand.  Okay?

4        A.   I will.

5        Q.   We're probably going to be here all day.  We'll

6    take some breaks.  But if at any time you feel like you

7    need a break just say so and we'll be happy to go off

8    the record for a little bit.  The only thing that I ask

9    is that if I have a question pending you answer the

10   question before we break.  Okay?

11       A.   Understood.

12       Q.   Are you taking medication today?

13       A.   My regular medication for high blood pressure.

14       Q.   What is that?

15       A.   I'm on amlodipine, high blood pressure and

16   cholesterol medication.  I couldn't tell you the names

17   of them right now as we sit here.

18       Q.   Would any of those medicines influence you to

19   where you wouldn't be able to provide accurate truthful

20   testimony?

21       A.   No, not at all.

22       Q.   Without telling me any discussions that

23   occurred, am I correct that you met with Mr. Crooks

24   before the deposition to prepare?

25       A.   Yes.

11

1    Q.   Okay.  Did you review any documents?

2    A.   With Charles, yes.

3    Q.   What documents did you review?

4    A.   Judge Aloi's memorandum.

5    Q.   Anything else?

6    A.   I don't believe so.

7    Q.   When you say memorandum, is that the report and

8    recommendation that denied the motions to dismiss?

9    A.   Correct.

10   Q.   Could you speak up just a little --

11   A.   Oh, sorry.

12   Q.   -- having a little bit of trouble hearing you?

13   A.   Correct.  Sorry.

14   Q.   What's your current address, Mr. Ballock?

15   A.   315 North Odell Street, o-d-e-l-l, Brownsburg,

16   Indiana 46112.

17   Q.   How long have you lived there?

18   A.   Since December 2017.

19   Q.   Who lives there with you?

20   A.   Correction.  I've lived in Brownsburg since

21   December 2017.  We didn't move into the house until

22   June 2018.

23   Q.   Where did you live -- strike that.

24   A.   At an apartment complex in Brownsburg.

25   Q.   Who lives there at the house on Odell Street

12

1    with you?

2         A.    My children Tommy and Summer.

3         Q.    No one else?

4         A.    No one else.

5         Q.    You kind of anticipated my next question.

6    Before you moved into the house on Odell Street where

7    did you live?

8         A.    I don't recall the address.  It was an

9    apartment complex in Brownsburg.

10        Q.    Where did you live prior to that?

11        A.    51 Summit Overlook Drive.

12        Q.    That's the house you shared with Ellen Costlow

13   when you were married?

14        A.    Correct.

15        Q.    That's here in Morgantown?

16        A.    Correct.

17        Q.    What's the highest level of education you've

18   received?

19        A.    Master's degree.

20        Q.    In what subject?

21        A.    Criminal justice studies.

22        Q.    Where did you obtain that?

23        A.    Indiana University, Bloomington, Indiana.

24        Q.    So you have a bachelor's degree.  What's your

25   bachelor's in?

13

1      A.    General studies.

2      Q.    Where did you receive that?

3      A.    Indiana University, Bloomington, Indiana.

4      Q.    Any other degrees?

5      A.    No.

6      Q.    When did you obtain your bachelor's?

7      A.    1994 -- 1991.  1991.

8      Q.    When did you obtain your master's?

9      A.    1994.

10     Q.    When did you start working for the FBI?

11     A.    June 1st, 2003.

12     Q.    When you first started with the FBI, what was

13  your job title?

14     A.    Special agent.

15     Q.    What were your job duties as a special agent?

16     A.    They varied.  In my first assignment in

17  Indianapolis I was assigned to the violent crimes and

18  major offender squad, VCMO.  I investigated bank

19  robberies, fugitives, kidnappings.

20     Q.    And then your next assignment after

21  Indianapolis?

22     A.    I was transferred to Detroit division in 2006,

23  routine transfer for new agents.  I was assigned to the

24  Ann Arbor resident agency where I investigated all

25  violations with an emphasis on counter-terrorism and

14

1  counter-intelligence matters.

2      Q.   So, I want to make sure I understand.  You were

3  at the Ann Arbor resident agency, but that falls under

4  the Detroit field office?

5      A.   Correct.

6      Q.   So you didn't actually work physically at

7  Detroit; you were physically at Ann Arbor?

8      A.   My office was in Ann Arbor.

9      Q.   Okay.

10     A.   Yeah.

11     Q.   So, am I correct then that, basically, your job

12 duties as a special agent, speaking generally, were

13 investing crimes, apprehending suspects --

14     A.   Correct.

15     Q.   -- making arrests?

16     A.   Yes.

17     Q.   Anything else that I'm missing?  I mean, my

18 knowledge of the FBI comes from TV and movies.

19     A.   Developing informants, working with the CIA to

20 develop informants to work against terrorists overseas.

21     Q.   Where did you go after Ann Arbor?

22     A.   I was promoted to supervisory special agent at

23 CJIS in Clarksburg, West Virginia.  I started there in

24 August of 2011.

25     Q.   Was that your first supervisory position?

15

1    A.   Yes.

2    Q.   You said August 2011?

3    A.   Correct.

4    Q.   What was your chain of command there at CJIS?

5    So who was your supervisor?

6    A.   I had a unit -- when I left -- when I was last

7    there or throughout the whole time?

8    Q.   Let's just go when you --

9    A.   I've had a few.

10   Q.   Who was your first supervisor?

11   A.   Jeff Lindsey, L-i-n-d-s-e-y, and then Michael

12   Haas, H-a-a-s, and then Soo Barrow, S-o-o, Barrow,

13   B-a-r-r-o-w.

14   Q.   And am I correct that that's not a result of

15   you moving around.  That's the result of those

16   supervisor -- changes in the supervisor?

17   A.   It was a result of both of those things.

18   Q.   Okay.  All right.  So let's break that down

19   then.  When you first started at CJIS, what, I guess,

20   division or office did you work in?  It's a huge

21   facility.

22   A.   Yeah.  It's called N-DEx, the National Data

23   Exchange.  It's a program that the bureau developed to,

24   essentially, connect all criminal justice agencies'

25   databases so that when a law enforcement officer or an

16

1  analyst runs someone's name or license plate or an

2  address, they're not just searching their own databases

3  but all other databases throughout the country.

4      Q.   And Jeff Lindsey was your supervisor there?

5      A.   Correct.  And then when he left, Michael Haas

6  was my supervisor there.

7      Q.   Okay.  And then where did you work after N-DEx?

8      A.   The public access line.

9      Q.   Public access line?

10      A.   Yes.

11      Q.   What's that involve?

12      A.   When you call your local FBI office to report a

13  crime or to talk to an agent, you're not calling --

14  you're transferred to CJIS where trained analysts answer

15  the phones, interview you, take your information, and if

16  appropriate write up a report and send it to the field.

17      Q.   So anyone anywhere in the country looks up, you

18  know, your local FBI office and picks up the phone and

19  thinks they're calling, you know, the Ann Arbor office,

20  it's actually -- they're speaking to someone at CJIS?

21      A.   That's right, if they're calling to report

22  something.

23      Q.   I didn't know that.  Was Soo Barrow your

24  supervisor there?

25      A.   Yeah.  First Jeff -- actually, that's where

1    Jeff Lindsey went.  So, first him, and then Soo Barrow.

2    Yeah.

3         Q.    Did you work anywhere after that?

4         A.    No.

5         Q.    When were you and Ellen Costlow married?

6         A.    June of 1990 -- 1991?  1991.

7         Q.    Where were you married?

8         A.    Bloomington, Indiana.

9         Q.    Was that your first marriage?

10        A.    Yes.

11        Q.    Was it hers?

12        A.    Yes.

13        Q.    I believe you said you have two children;

14   correct?

15        A.    Yeah.

16        Q.    Summer and Tommy?

17        A.    Correct.

18        Q.    What are their ages?

19        A.    Summer is now 15.  She'll be 16 in three weeks,

20   less than three weeks.  And Tommy is 18.

21        Q.    Now, I understand from reviewing the file here

22   that at some point in your marriage Ellen began seeing

23   other men; is that correct?

24        A.    Correct.

25        Q.    When did that begin?

18

1      A.    When we were assigned to Indianapolis division.

2      Q.    Do you know what year?

3      A.    2003.

4      Q.    Were you aware that she was seeing other men?

5      A.    Yes.

6      Q.    How did she meet these men?

7      A.    Online and in person.

8      Q.    When you say online, how did she meet them

9   online?

10     A.    Craigslist.

11     Q.    Any other methods or websites she used?

12     A.    Yeah.  Yes, that's the website she used.  I

13  don't know of any others.

14     Q.    Okay.  All right.  I'm sorry I wasn't clear

15  there.

16           You said she met them online and in person.

17  Would she first make contact with them through

18  Craigslist?

19     A.    Uh-huh.

20     Q.    I need a verbal answer.

21     A.    Oh, I'm sorry.  You're right.  Yes.

22     Q.    And then she would arrange an in-person

23  meeting; is that correct?

24     A.    Yes.

25     Q.    Okay.  Did you ever post ads on Craigslist for

19

1    her?

2        A.    No.

3        Q.    Did you ever respond on her behalf to responses

4    that she had received from her Craigslist ads?

5        A.    No.

6        Q.    Did you screen the men that she was seeing?

7        A.    No.

8        Q.    Before she started posting these ads on

9    Craigslist, did she discuss this with you?

10       A.    After.

11       Q.    After?

12       A.    Uh-huh.

13       Q.    So she had been doing it for some time and then

14   you learned about it?

15       A.    Correct.

16       Q.    How did you learn that she was meeting men

17   through Craigslist?

18       A.    We had -- I had suspicions and confronted her

19   and she shared it with me.

20       Q.    How did you become suspicious?

21       A.    She just wasn't very good at covering her

22   tracks.  She was distant.

23       Q.    Anything else?

24       A.    No.

25       Q.    So she just kind of got distant and you thought

20

1    something was up?

2        A.    Yeah.

3        Q.    Did you ask her are you seeing other men or did

4    you just ask her, you know, generally, what's up, why

5    are you so distant or --

6        A.    I don't recall specifically, but probably are

7    you seeing other men.

8        Q.    Okay.  And then she confessed to you that she

9    was soliciting men through Craigslist?

10       A.    Yes.

11       Q.    And you, at that point, did not divorce her;

12   correct?

13       A.    Correct.

14       Q.    And she continued to see men on Craigslist or

15   through Craigslist after you confronted her; correct?

16       A.    Correct.

17       Q.    Did you record any of her encounters with these

18   other men on video?

19       A.    No.

20       Q.    Did anyone record the encounters?

21       A.    She did.

22       Q.    Anyone else?

23       A.    Not that -- not that I'm aware of.

24       Q.    Did you watch videos of your wife having sex

25   with other men?

21

1      A.   Yes.

2      Q.   How often?

3      A.   Not very often, just to confirm that it was

4   happening.

5      Q.   Did you ever have sexual relations with anyone

6   else while you and Ellen were married?

7      A.   No.

8      Q.   So, kind of the crux of this matter, what led

9   to us being here today was after you two -- the four of

10  you moved here to Morgantown, the transfer to CJIS,

11  Ellen began seeing a man called Kenny Ice; correct?

12     A.   Kenny Ice, Jr; correct.

13     Q.   When did you become aware that Ellen was seeing

14  Kenny Ice?  And I'll just refer to him as Kenny Ice, but

15  you're correct there's Kenny Ice Junior and Senior, and

16  she was seeing the junior.  So when did you become aware

17  that she was seeing Kenny Ice?

18     A.   In the summer of 2011.

19     Q.   How did you learn that?

20     A.   She told me about it.

21     Q.   Why did she tell you?

22     A.   Because she said if we couldn't get things

23  straightened out that she was going to leave me for him.

24     Q.   So I take it you two were having some marital

25  problems at that point?

22

1    A.    Yes.

2    Q.    What kind of marital problems?

3    A.    She has mental disorders, and she was very

4  moody and violent and difficult.  It was like walking on

5  egg shells around her.  She -- for her part, I didn't

6  give her the attention that she wanted.  All my

7  attention was focused on the children.  Instead of

8  having date nights, I would insist that whatever we did

9  recreationally or vacation-wise was with the children.

10  I neglected her emotional needs.

11    Q.    Okay.  Now, so you said that you first became

12  aware that she was seeing Kenny Ice in the summer of

13  2011?

14    A.    Yes.

15    Q.    And you guys didn't separate until September

16  2012; is that correct?

17    A.    So then I need to make a correction.  She met

18  him in the summer of 2012, about June.  You're correct.

19  We moved to West Virginia in 2011.  A year -- almost a

20  year later, in June 2012, is when she met Kenny

21  Ice, Jr., and we were separated, that's correct, in

22  September of 2012.

23    Q.    Now, if she had been seeing other men since

24  2003 -- so at this point it would have been nine years

25  -- why was it an issue when she began seeing Kenny Ice?

23

1    A.   It was always an issue.  I would ask her to

2    stop.  I would beg her to stop.  She would for a while.

3    And then she would resume.  When we moved here, we had

4    an agreement that it was going to be a fresh start and

5    she wouldn't engage in that behavior.

6    Q.   So, summer of 2012, she begins -- you learn

7    that she's seeing Kenny Ice.  Do you know when she

8    actually started seeing him?

9    A.   I believe it was June 2012.

10   Q.   So you learned about it almost about the same

11   time it began happening?

12   A.   No.  I learned a little bit later.

13   Q.   About when did you become aware that she began

14   seeing him?

15   A.   Maybe August of 2012.

16   Q.   Had you -- did the two of you separate at any

17   time during the marriage before 2012?

18   A.   Not for any length of time.  I would often

19   spend the night in my government car at the office to

20   escape the home.  That happened many times, but I never

21   moved out.

22   Q.   So just for, like, a night or so?

23   A.   Yeah.  If she was violent and throwing things

24   or making threats, I would leave and go sleep in the car

25   at the office, take a shower at the gym in the morning.

24

1     Q.   So, September 2012, you and Ellen separate?

2     A.   Uh-huh.

3     Q.   She -- am I correct that she stayed in the

4 house at 51 Summit Overlook?

5     A.   Yes.

6     Q.   And where did you live?

7     A.   I moved to an apartment in downtown Morgantown.

8     Q.   Do you know the address?

9     A.   I do not.

10    Q.   Who filed for divorce?

11    A.   She filed for divorce.

12    Q.   Do you know when that was?

13    A.   Around September 2012.

14    Q.   So shortly after you separated?

15    A.   Yes, very shortly.  Maybe October 2012, but

16 shortly.

17    Q.   Approximation is good enough.

18    A.   Okay.

19          (Deposition Exhibit No. 1 was marked for

20          identification.)

21    Q.   Mr. Ballock, I've handed you what's been marked

22 as Exhibit 1.

23    A.   Yes.

24    Q.   I'll represent to you that we got this from the

25 -- we requested and received the prosecuting attorney's

25

1  file in the criminal prosecution that underlies this

2  matter.

3      A.   Uh-huh.

4      Q.   Did you create this timeline?

5      A.   I did.

6      Q.   Do you know when you did?

7      A.   I don't.  I should have dated it.

8      Q.   Was it -- it was created for the criminal --

9      A.   Correct.  Yes.

10     Q.   -- at some time during the criminal action?

11     A.   Yes.

12     Q.   Okay.  We'll have a number of exhibits today,

13  but I'd ask you to kind of set this one aside because

14  we'll be coming back and referring to it from time to

15  time.  It's, frankly, a pretty comprehensive

16  chronological listing of what went on.

17          We'll move on to Exhibit 2.

18              (Deposition Exhibit No. 2 was marked for

19              identification.)

20     Q.   Mr. Ballock, take a look at the bottom of the

21  first page there.  You'll see an email from

22  ScottBallock@yahoo.com, November 7th, 2012, to

23  EllenBallock@yahoo.com.  Do you see where I am?

24     A.   Yes.

25     Q.   If you flip it over to the next page you'll see

26

1    that it appears that that email is in response to one

2    sent from Ellen Ballock on November 7th, 2012.  Do you

3    see that?

4        A.   Yes.

5        Q.   Okay.  Did you -- do you recall this email

6    exchange between you and Ellen?

7        A.   Not specifically.

8        Q.   Do you have any reason to believe that it's not

9    sent from you through your Yahoo account?

10       A.   No.

11       Q.   We've got thousands of emails, and I don't

12    believe that at any point in the criminal prosecution or

13    in the divorce that there was any question as to the

14    authenticity of them.  So to save us time, I'm not going

15    to ask you to verify each and every email.  But I will

16    ask that if you see one that you don't think you ever

17    sent, that you don't think is genuine, please let me

18    know.  Otherwise, I'll presume that today you don't

19    contest the authenticity of the email.  Okay?

20       A.   Okay.

21          MR. CROOKS:  That's agreeable.

22       Q.   So if you go to the second page at the top of

23    Ellen's email on November 7th, she said, "I've asked you

24    many times to leave me alone.  This is my last request.

25    Please refrain from sending harassing emails and texts

27

1    as well as any other means of communication."

2            And then your response on the first page says,

3    "My correspondence has been polite and respectful.

4    Calling it harassing does not make it so.  I am simply

5    providing you with information and recommendations for

6    the divorce process and the benefit of the children."

7    Did I read that correctly?

8        A.    Is that on the first page?

9        Q.    On the first page at the bottom in response to

10   Ellen saying --

11       A.    Oh, yes.

12       Q.    -- leave me alone --

13       A.    Okay.  Yes.

14       Q.    And you said, "My correspondence has been

15   polite and respectful."

16       A.    Yes.

17       Q.    "I am simply providing you with information and

18   recommendations for the divorce process and the benefit

19   of the children."

20       A.    That's correct.

21       Q.    Do you see that?

22       A.    Uh-huh.

23       Q.    And you told her that -- she had characterized

24   your communications as harassing.  She said, "Please

25   refrain from sending harassing emails and texts."  And

28

1    you said, "Calling it harassing does not make it so."

2    Kind of on the flip side, does your stating that the

3    communications are not harassing make it so?

4        A.    I'm sorry.  I don't understand the question.

5        Q.    Sure.  It may not have been the best one.

6              MR. CROOKS:  I think it's a legal

7    question.

8        Q.    You had told Ellen, "Calling it harassing does

9    not make it so," calling the correspondence harassing

10   does not make it so.  Does the reverse also apply,

11   simply because you said it wasn't doesn't mean that it's

12   not?

13       A.    I don't believe I was harassing her.

14       Q.    But is that just because you said it wasn't

15   harassing?

16       A.    Not because I said it, but because I don't

17   believe that it was harassing.

18       Q.    Okay.

19              (Deposition Exhibit No. 3 was marked for

20              identification.)

21       Q.    Okay.  I've handed you what's been marked as

22   Exhibit 3.

23       A.    Uh-huh.

24       Q.    This is an email.  The one that is at issue

25   here is at the bottom of the first page, sent from you

29

1    on September 26, 2012, the subject line, "Hatred

2    Exposed."  So this would have been -- do you recall the

3    exact date that the two of you separated?

4         A.    September 14th.

5         Q.    Okay.  This was sent September 26, so less than

6    two weeks later?

7         A.    Yes.

8         Q.    Was this about the divorce process or the

9    children?

10        A.    Everything was about the children.

11        Q.    So that's your position, that everything that

12   you spoke to her about was about the children?

13        A.    Everything that I did and all of my actions

14   were for the benefit of the children.

15        Q.    Okay.  Where in this email are the children

16   mentioned?

17        A.    The children aren't mentioned in this email.

18        Q.    And how is it for the benefit of the children

19   for you to say that her hatred was exposed?

20        A.    My attempts at writing her were to reconcile.

21   The things that I wrote were done in an attempt to

22   reconcile with her because I was concerned about the

23   children's future and the children's welfare.

24        Q.    And saying that her hatred was exposed, was

25   that polite and respectful?

30

1     A.    I don't think it was impolite or disrespectful.

2               (Deposition Exhibit No. 4 was marked for

3               identification.)

4     Q.    I'm handing you another email that's been

5  marked as Exhibit 4.  The one that I want to focus on is

6  on the top half of the page, September 30th, 2012 at

7  1:38 a.m., subject "Final Poem."  This one is short.

8  "Black boots, black coat, black heart, black soul."  Was

9  that about the divorce process?

10    A.    In general.

11    Q.    Was it about the children?

12    A.    It wasn't about the children.  Again, it was in

13 an attempt to reconcile on behalf of the children.

14    Q.    Is it your position that saying that Ellen had

15 a black heart and black soul was polite and respectful?

16    A.    I don't think it was impolite nor

17 disrespectful.

18    Q.    Do you believe that anyone who received that

19 poem could find it impolite or disrespectful?

20    A.    Under different circumstances, perhaps.

21              (Deposition Exhibit No. 5 was marked for

22              identification.)

23    Q.    I've handed you what's been marked as

24 Exhibit 5.  The second email from the top, sent from you

25 to Ellen, October 2nd, 2012, subject "Last Text."  "If

31

1    you want to avoid any potential embarrassment, don't

2    come down tonight with your date."  What was that about?

3        A.   I don't recall.

4        Q.   Was it about the divorce -- was this email

5    about the divorce process or the children?

6        A.   I don't recall what it was about.  I don't

7    recall the email.

8        Q.   You don't believe that you sent this email?

9        A.   Oh, I think there was a -- no.  I'm not saying

10   I didn't send it.  I don't recall what it was about.  I

11   don't recall why I didn't want her to come downtown.  I

12   don't know.

13                  (Deposition Exhibit No. 6 was marked for

14                  identification.)

15       Q.   I've handed you what's been marked as

16   Exhibit 6.  This is a longer email and we're just going

17   to focus on parts of it.

18       A.   Yes.

19       Q.   You see it's, at the top of the first page,

20   dated October 2nd, 2012, subject line "I'm sorry."

21       A.   Yes.

22       Q.   And about halfway down, I guess, you'll see you

23   write, "You will ultimately regret your decision to

24   leave, to drive south instead of downtown tonight."  Do

25   you see where I am?

32

1     A.   No, but I have no reason to doubt it.

2     Q.   Then a few lines below that, "I regret my

3  choices now.  You will regret yours later when one day

4  you wake up in Fairmont or some other crummy West

5  Virginia town, the kids at home with me, look around and

6  realize where you are and who you are with and that sex

7  cannot fill you in the ways you truly need and knowing

8  that I am fulfilling someone else in meaningful ways."

9     A.   Uh-huh.

10    Q.   Was this about the divorce process or the kids?

11    A.   Both.

12    Q.   When you said that you'll regret your choices

13  later when you wake up in Fairmont and the kids at home

14  with me, were you implying that you were going to get

15  custody of the children?

16    A.   Yes.

17             (Deposition Exhibit No. 7 was marked for

18             identification.)

19    Q.   I've handed you what's been marked as

20  Exhibit 7.  Just above the halfway point on the page,

21  there's an email, October 7th, 2012, from you to Ellen

22  subject line "Choices."  Do you see where I am?

23    A.   Yes.

24    Q.   Okay.  And then in the second paragraph of that

25  email, the second sentence, you say, "Ask anyone, save

33

1    for those you pay cash to and those who stick their dick

2    in you," if it's healthy to make -- "if it's healthy to

3    immediately begin dating and having sex."  Do you

4    believe that was polite and respectful?

5        A.    Under the circumstance, yes.

6        Q.    Then four lines on down you say, "Reverse the

7    roles and tell them it's me who is leaving the kids at

8    home to go have sex with a dirty troll."  Again, do you

9    believe that was polite and respectful?

10       A.    Under the circumstances, yes.

11       Q.    What were the circumstances that would make

12    that polite and respectful?

13       A.    Ellen -- where to begin?  Ellen was abusing and

14    harming my children in a variety of ways, so much so

15    that they're still suffering from it.  And that's the

16    way we spoke to each other in general anyway, so it's

17    not -- it wasn't something -- those weren't words that

18    we wouldn't normally use.

19       Q.    Even before your marital difficulties you spoke

20    to each other that way?

21       A.    Sure.

22       Q.    When you say she was harming the children --

23    I'm sorry.  I think the word you used was abusing the

24    children.

25       A.    Yes.

34

1     Q.   Physically abusing them?

2     A.   Yes, one of them.

3     Q.   Which one?

4     A.   Tommy.

5     Q.   How did she physically abuse him?

6     A.   She would put her forearm in his throat.   He

7  had long hair.  She would pull his hair.  She would

8  punch him, so much so that on one night he called 911

9  for help.  After the police left, Ellen told him -- and

10  he will testify to this -- that she said as long as I

11  don't leave bruises on you there's nothing they can do

12  to me.

13     Q.   You said harm them in many ways.  Would she --

14  besides physical abuse, how else would she harm them?

15     A.   Where to begin?  She -- I drove here last night

16  with my daughter Summer.  And she asked what this was

17  all about today.  And I asked her -- I told her what I

18  was being accused of and what she thought of that.  And

19  she was shocked because she said you're the most gentle

20  and peaceful guy that Tommy and I know, and quite the

21  opposite, mom is extremely violent and angry and

22  aggressive toward us.  Summer has taken it upon herself

23  in her new home to tell her pastor and others --

24     Q.   I'd like to -- I'm sorry, but I'd like to

25  interrupt you because we're kind of getting off track.

35

1     A.    I'm trying to describe to you --

2                 MR. CROOKS:   -- answer the question.

3     A.    I'm trying to describe to you how aware they

4     were of the physical and emotional abuses.

5           She's told her pastor and others that, should

6     mom show up at any of our events, you're to protect me.

7     She said to me -- she admitted to me last night that she

8     was directed by her mother to lie to the guardian ad

9     litem, to the psychiatrist, to the counselor, to me, and

10    to others about the things that she was experiencing and

11    her mom was exposing her to.  And she thanked me for

12    saving her.  She said I'm disgusted at how mom treated

13    me.

14    Q.    Okay.  You only barely got into answering my

15    question.  My question wasn't how are your kids taking

16    it or what were they aware of.  My question was what was

17    she doing.  And the only part of an answer I got there

18    was that she was directing Summer to lie to the --

19    A.    She was directing Summer to lie.  She was

20    taking Summer late at night to a bar in Fairmont, West

21    Virginia.  She was failing to get her to school.  She

22    was failing to tend to her needs.  She was exposing

23    Summer to violence between Kenny and her.

24          She was using narcotics in the home.  She

25    attempted suicide on a couple of different occasions in

36

1    the home.  She left Summer outside.  Summer, at one

2    time, was outside for several hours, couldn't get in the

3    house while her house -- while her mother and Kenny were

4    inside having sex, so much so that she finally had to

5    call police to get into the house to arouse her mother.

6            Summer says that her mom was so sleepy and/or

7    drugged up on Christmas morning that year that Summer

8    sat and cried opening her presents and saying, "Mommy,

9    please watch me open my present," but her mom wouldn't

10   wake up.  She --

11       Q.   Let me --

12       A.   She would yell --

13            MR. CROOKS:  I object to your interrupting

14   him.  He's answering your question.

15            MR. JEFFRIES:  Okay.

16       A.   She would yell at the children.

17            MR. JEFFRIES:  I believe I'm allowed to

18   ask the questions I want --

19            MR. CROOKS:  You're allowed to ask a

20   question, but you're not allowed to interrupt him --

21            MR. JEFFRIES:  Well he's not allowed to

22   drone on for hours.  When he's --

23            THE DEPONENT:  I've not been going on for

24   hours.

25            MR. CROOKS:  He's got a lot of information

37

1   for you in response to your question.

2                  THE COURT REPORTER:  One at a time.  One

3   at a time.

4                  THE DEPONENT:  I've not been going on for

5   hours.

6                  She would yell at the children.  She would

7   scream at the children.  She would hit the -- Tommy.

8   She didn't hit Summer.  Summer said she was so afraid of

9   her mother.  And I asked, "Why?  Are you afraid that

10  she's going to come after you next?"  And Summer said,

11  "No.  I'm afraid what she's going to do next to Tommy."

12  BY MR. JEFFRIES:

13      Q.   Had she done all this by October 7th, 2012,

14  when you sent this email?

15      A.   Yes.

16      Q.   So, Christmas, you mentioned that she had done

17  some things on Christmas.  That had occurred by

18  October 7th, 2012?

19      A.   Not that.

20      Q.   That's what I'm asking.  At the time that you

21  sent this email what had happened?

22      A.   Yes.

23      Q.   Okay.

24      A.   So all of these emails you need to read in the

25  context of what I was experiencing and what my children

38

1   were experiencing.

2                   (Deposition Exhibit No. 8 was marked for

3                   identification.)

4       Q.    All right.   Mr. Ballock, you've been handed

5   what's been marked as Exhibit 8.

6       A.    Yes.

7       Q.    I want to focus on the bottom half of the page,

8   the email October 9th, 2012, subject line "The End."   Do

9   you see where I am?

10      A.    Yes.

11      Q.    You tell Ellen, "This will be my last personal

12  correspondence with you.   All future communication to

13  include discussions about the division of assets and

14  custody/visitation arrangements will occur between our

15  attorneys."

16            I take it from that that you agreed that the

17  two of you could work out your differences through

18  communications between your attorneys; correct?

19      A.    I hoped.

20      Q.    Down at the very bottom of the page you say,

21  "Tell your counselor kudos for another fantastic

22  recommendation to explore the possibility of love with a

23  troll."   Do you believe that was polite and respectful?

24      A.    I don't believe it was impolite nor

25  disrespectful, again, under the circumstances and given

39

1    the way that Ellen and I communicated with each other

2    generally.

3                    (Deposition Exhibit No. 9 was marked for

4                    identification.)

5        Q.    All right, Mr. Ballock.  You've just been

6    handed Exhibit 9.  It's several pages long.

7        A.    Uh-huh.

8        Q.    You can count them if you like, but I'll

9    represent to you that I counted a total of 40 emails you

10   sent to Ellen this day between 7:30 a.m. and 9:42 p.m.

11   Do you have any reason to doubt that's how many emails

12   you sent?

13       A.    No reason to doubt it.

14       Q.    Okay.  If you go to the very back page, 50 --

15   down at the bottom you see page 594?

16       A.    Yes.

17       Q.    At the very top at 8:08 p.m., on October 11th,

18   2012, you sent her an email and said, "You have

19   convinced me that you have moved way beyond" -- it says

20   pint.  I believe that's supposed to be point -- "of any

21   possible reconciliation."  Do you see that?

22       A.    Okay.

23       Q.    Do you agree that it's supposed to be point

24   instead of pint?

25       A.    Yes.

40

1        Q.    Typographical.   If, as of October 11th, 2012,

2    you were convinced that the two of you were beyond the

3    point of any possible reconciliation why did you

4    continue to send her additional emails and texts seeking

5    to reconcile?

6        A.    Because what you've not provided are her emails

7    to me or her text messages to me or the phone calls to

8    me or the unannounced appearances at my residence in

9    between these -- all of these emails.

10       Q.    Okay.   Go to page 588.   Just for context, that

11   email we just discussed was sent at 8:08 p.m.

12       A.    Uh-huh.

13       Q.    Go to page 588, there on the bottom quarter at

14   8:12 p.m., four minutes later, Ellen writes you, "Stop.

15   It will all get figured out in the end.   Leave me alone

16   now."   Do you see where I am?

17       A.    I do.

18       Q.    Okay.   And your response was two minutes later

19   at 8:14 p.m., to say among other things, "We can work on

20   our relationship."

21       A.    Okay.

22       Q.    Six minutes ago you had said that the two of

23   you were beyond the point of any possible

24   reconciliation, but at this point you're seeking to

25   reconcile.   Why is that?

1      A.    It was a very difficult time.  I was trying to

2  figure out my emotions.  On one -- some part of me

3  wanted to divorce her.  And some part of me didn't want

4  to divorce her.

5      Q.    Okay.  You just said that I wasn't aware of the

6  context of the texts, emails, and phone calls and

7  personal visits she was making.  Did she make any

8  between 8:08 p.m., when you said we're beyond the point

9  of any possible reconciliation and 8:14 p.m., when you

10  said we can work on our relationship?

11      A.    I don't know.

12      Q.    Okay.  Let's go to page 586.  Midway down the

13  page at 8:15 p.m., Ellen writes, "I asked what you

14  needed me to place in the garage.  One simple email

15  would have sufficed, Scott."  Do you see that?

16      A.    I'm seeing it on yours.  Yes.

17      Q.    Do you see it on yours?  I want you to be able

18  to follow along.  It's just beyond the halfway point,

19  the bottom half of the page.

20      A.    Okay.  Yes.

21      Q.    Okay.  And then your response was, "I gave you

22  one email.  Then you questioned about the Bose, so I

23  explained."  In context, there is some discussion here

24  about what personal property you want her to leave and

25  whether you or she should get the Bose radio.  But then

42

1    you go on to send her another 18 emails after this one.

2        A.    Okay.

3        Q.    Do you not believe that that is harassment,

4    especially after she had told you to please stop and

5    leave me alone?

6        A.    I don't believe it's harassment.

7                    (Deposition Exhibit No. 10 was marked for

8                    identification.)

9        Q.    You've been handed Exhibit 10.  This is an

10   October 15th, 2012 email.  This one is from Ellen to

11   you.  And there at the very bottom of page 567 -- do you

12   see where I am?

13       A.    Yes.

14       Q.    She says, "Scott, you abused me, had an affair,

15   neglected me emotionally, et cetera, for years on end."

16   And then she goes on at the top of page 568.  "As you

17   beg for me to come back you also wrote horrible, nasty

18   things about me."

19                And then she continues at the end of this

20   paragraph, "To continue to write me all day and into the

21   wee hours of the morning (hundreds of texts and emails a

22   day) when I have asked you to stop is not love."

23                Would you agree with me that Ellen is making it

24   clear here that she did not find your emails polite and

25   respectful?

43

1  A. She doesn't say that.

2  Q. And you don't think that when she said, "You

3 also wrote horrible, nasty things about me," she took

4 that to be polite and respectful?

5  A. I don't know.  You'll have to ask Ellen.

6  Q. Okay.  Would you agree that she's also making

7 it clear that she doesn't -- that she considers you

8 sending her hundreds of texts and emails a day when

9 she's asked you to stop to be harassment?

10  A. That was what she said in this email.  I can't

11 tell you what she then said to me afterwards because,

12 between the emails, I would receive phone calls and

13 visits and text messages from Ellen to include things

14 like I love the poems you wrote, to include things like

15 just give me until September and we'll see where we are,

16 to include things like this is really hard.

17     (Deposition Exhibit No. 11 was marked for

18      identification.)

19  Q. You've been handed Exhibit 11.  What we're

20 looking at here is, again, just a little more than

21 halfway down the page, October 20th, 2012, at 7:06 p.m.

22 Do you see where I am?

23  A. Yes.

24  Q. You sent an email in response to something she

25 had said.  You said, "You are not street smart and are

44

1   easily manipulated, especially when cock is involved."

2   Do you believe that was polite and respectful?

3       A.   I don't believe it was impolite nor

4   disrespectful considering the way we normally spoke with

5   each other and considering the circumstances.

6                   (Deposition Exhibit No. 12 was marked for

7                   identification.)

8       Q.   Exhibit 12 is an email the next day,

9   October 21st, 2012.  A little over halfway down the page

10  at 2:35 a.m.  Do you see where I am?

11      A.   Yes.

12      Q.   And you tell her, "You are something else.  I

13  provide for you, protect you, say loving things to you,

14  and you say okay.  Kinny bangs you" -- and it's spelled

15  K-i-n-n-y.

16      A.   Yes.

17      Q.   "Kinny bangs you and you tell him you love

18  him."  Was this about the divorce process or the kids?

19      A.   Again, all of my messages were done in an

20  attempt to reconcile or to help her see what she was

21  doing and, ultimately, for the benefit of the kids.

22  Yes.

23      Q.   And why did you spell Kenny with lower case K

24  and an I instead of an uppercase K and an E?

25      A.   Because he pronounces his name kinny.

45

1    Q.    So is that taking a dig at him?

2    A.    Yeah.

3    Q.    Was this email polite and respectful?

4    A.    I don't believe it was impolite nor

5    disrespectful given the circumstances, given the way

6    Ellen and I normally spoke with each other.   I do

7    believe it was impolite and disrespectful to Kenny.

8              (Deposition Exhibit No. 13 was marked for

9              identification.)

10   Q.    Exhibit 13.   Towards the bottom of the page is

11   an email from you 11/11/2012 at 11:11 a.m., subject line

12   "Sunday."  Do you see that?  Actually, a little below

13   that, November 11th, 2012 at 11:08 a.m., Ellen Ballock

14   writes -- do you see where I am?

15   A.    Yes.

16   Q.    She told you to stop, and your response was,

17   "Do you think anymore?"  Why didn't you stop emailing

18   her when she asked you to?

19   A.    Please point out...

20   Q.    Almost to the bottom, November 11th, 2012,

21   11:08 a.m., Ellen writes one word, "Stop."  Do you see

22   that?

23   A.    Yes.

24   Q.    Your response is just above it, three minutes

25   later, at 11:11 a.m., "Do you think anymore?"

46

1         And my question is she tells you at 11:08 to

2    stop and you email her again three minutes later.  Why

3    didn't you stop when she asked you to?

4         A.   What were we discussing here?  Were we

5    discussing plans with the children?

6         Q.   You had said, "Plans have changed.  Very short

7    and curt answers.  No cooperation."

8         A.   So I'm thinking that we were discussing plans

9    with the children.  Often I -- my emails were to discuss

10   plans with the children.  And she would tell me during

11   those conversations even to stop, which was difficult

12   when I needed to have her cooperation with regard to the

13   transfer of the children or vacation plans or school

14   plans or extracurricular activities.

15        Q.   So is that why you didn't stop when she told

16   you to?

17        A.   I'd have to see the full context of this.  But,

18   again, between these she would call me or she would

19   visit me.

20              (Deposition Exhibit No. 14 was marked for

21                  identification.)

22        Q.   Exhibit 14, just above the top half of the page

23   is an email from Ellen to you, November 15th, 2012, at

24   9:35 p.m.  Do you see where I am?

25        A.   Yes.

47

1      Q.   And she writes, "You fantasize like a child

2    that I will want you at some point in time and you will

3    be able to turn me down saying it's too late.   That will

4    never happen.   I have no interest in you.   Not now, not

5    in a year, not in a decade, not for the remainder of

6    your life."

7          Now, even though you had stated on October 11th

8    that you recognized that she was way beyond the point of

9    any possible reconciliation, when you received this

10   email, was there any doubt in your mind that she was not

11   interested in reconciliation?

12     A.   Yes, there was doubt in my mind.

13               (Deposition Exhibit No. 15 was marked for

14               identification.)

15     Q.   Exhibit 15, focusing on an email here at the

16   bottom, November 22nd, 2012.   It goes on, "How could you

17   be so cruel as to let me write these poems," so on and

18   so forth.   And then at the end you write, "Pure evil.   I

19   will never forgive you."

20          Was this about the divorce process or the kids?

21     A.   Both.

22     Q.   Do you believe it was polite and respectful?

23     A.   I don't believe it was impolite nor

24   disrespectful given the nature of the circumstances nor

25   the way we normally spoke with each other.

48

1          (Deposition Exhibit No. 16 was marked for

2              identification.)

3     Q.    Exhibit 16.  At the very top is an email sent

4  from webmaster@moc.freep.com, and then in brackets is

5  your Yahoo account, December 7th, 2012, subject "Two

6  years later, Morenci mom holds out hope that three boys

7  are still alive."

8     A.    Yeah.

9     Q.    It looks to me that this was -- you were

10  forward -- on the newspaper online and forwarded an

11  article to Ellen; is that correct?

12     A.    Correct.

13     Q.    What was this about?

14     A.    That was a case I investigated in Michigan

15  where three boys were taken from their mother.

16     Q.    Who took them?

17     A.    We believed their father, and we believe he

18  killed them.

19     Q.    Why did you send this to her?

20     A.    Because Ellen did a very wonderful thing that I

21  thought.  One of my assignments was to, because of my

22  personality, was to be the liaison with the victim

23  mother and to be with her all day and to keep her

24  updated on things that we found, if we needed a hair

25  sample or a brush sample to get it from her.

49

1        She was very poor, and her bible was old.  And

2   Ellen went out and bought a really expensive, nice bible

3   and gave it to the pastor to give to her.

4        Q.   Okay.

5             (Deposition Exhibit No. 17 was marked for

6             identification.)

7        Q.   Exhibit 17 is an email.  At the bottom of the

8   first page, December 15th, 2012, subject line "And as if

9   on cue."  Do you see that?

10       A.   Yeah.

11       Q.   About midway through the first paragraph

12  discussing your daughter Summer you say, "She

13  volunteered that kinny" -- again, spelled with a lower

14  case K and an I.

15       A.   Uh-huh.

16       Q.   -- "that kinny doesn't speak right, is gross,

17  and can never replace me.  (How awful for you to expose

18  her to him."  Do you believe that was polite and

19  respectful?

20       A.   I don't believe it was disrespectful nor

21  impolite given the nature of the circumstances, given

22  the fact that Kenny was a bad influence, given the fact

23  that I was concerned for my children's welfare and

24  safety.

25       Q.   Okay.

50

1      A.    I had three -- my supervisor approached me one

2    day.  And he said that he had three different law

3    enforcement agents approach him and tell him that Kenny

4    Ice, Jr., was violent and a low-level drug dealer and

5    that I should be careful and make sure that I carry my

6    weapon with me at all times because he was one who would

7    confront me.  So that's the information I had in the

8    back of my mind when I knew Ellen was exposing my

9    children to him.

10     Q.    Did your supervisor tell you that Kenny didn't

11   speak right and was gross?

12     A.    No.  I knew that and my children knew that.

13     Q.    Okay.  Let's go to the second page of this

14   email.

15     A.    Yeah.

16     Q.    The third full paragraph from the top.

17     A.    Uh-huh.

18     Q.    It starts off, "I don't care why you say you

19   left."  Do you see the paragraph I'm at?

20     A.    Yeah.

21     Q.    About midway down you write, "We both were bad

22   to each other."

23     A.    Yes.

24     Q.    What did you do that was bad?

25     A.    Like I said before, I neglected her.  I

51

1    neglected her emotions.  I put all my energy into work

2    and the children.  I didn't take her on dates.  I was

3    bad to her in that respect.

4        Q.    Okay.  Then the next sentence after that says,

5    "As is yours, my counselor is appalled at some of the

6    things I share."  Which counselor were you referring to?

7        A.    I forget her name.  She's on the list.  It's a

8    very unique last name.

9        Q.    Kathie Gieselman?

10       A.    That's it.

11       Q.    What did you tell your counselor that she was

12   appalled about?

13       A.    Ellen's behaviors toward the children.

14       Q.    None of yours?

15       A.    No.

16       Q.    Go down to the next paragraph.  "When your

17   daughter gets pregnant in the backseat of a corvette by

18   some ill-spoken Fairmont hillbilly or when your troubled

19   son kills himself because of the inner turmoil he feels,

20   I will be there to remind you that you chose this path."

21           Do you believe that was polite and respectful?

22       A.    I do not believe it was impolite nor

23   disrespectful given the nature of the circumstances nor

24   the way we spoke with each other.  And those were

25   legitimate concerns that I had.

52

1    Q.   Did you --

2    A.   My children have, in fact, suffered greatly.

3    Q.   Did you and your wife frequently talk about

4    your troubled son killing himself?

5    A.   No.  We talked about our troubled son.

6    Q.   Then if you'll go down to the very last

7    sentence of this email.  "But I will never stop

8    reminding you of the terrible, life-altering mistake you

9    have made."

10          Was that about the divorce process or the

11   children?

12   A.   Both.

13              (Deposition Exhibit No. 18 was marked for

14              identification.)

15              MR. CROOKS:  Before you start asking

16   questions about our 18th exhibit, I want to take a short

17   break.

18              MR. JEFFRIES:  Okay.  Sounds good.

19              THE VIDEOGRAPHER:  The time is 10:06.  We

20   are off the record.

21              (There was a short break in the

22              proceedings.)

23              THE VIDEOGRAPHER:  We are back on the

24   record.  The time is 10:22.

25   BY MR. JEFFRIES:

53

1      Q.    Mr. Ballock, before the break you were handed

2   what's been marked as Exhibit 18.  I want to focus on

3   the last email down there at the bottom, Sunday,

4   December 16th, 2012, subject "Beautiful family."  Do you

5   see where I am?

6      A.    Yes.

7      Q.    Okay.  I will represent to you that this is one

8   of 45 emails that you sent to Ellen on December 16th,

9   2012.  That is the December right after you two

10  separated.  Most of the 45 emails were journal entries,

11  it appeared, of past Christmases.

12     A.    Okay.

13     Q.    I don't expect you to, you know, take my word

14  for it.  But, presuming that you did send 45 emails

15  about past Christmases, why did you send so many emails

16  about past Christmases?

17     A.    I don't recall that, but it makes -- I don't

18  doubt it and it makes sense because I was trying to get

19  Ellen to reconnect.

20     Q.    In this email that we have here at the bottom

21  you said, "I'm not a monster.  I made lots of mistakes

22  and did bad things."  What bad things did you do?

23     A.    I neglected Ellen.

24                  (Deposition Exhibit No. 19 was marked for

25                   identification.)

54

1    Q.   All right, Mr. Ballock.   Exhibit 19, a little

2  over, maybe, two-thirds of the way down the page you see

3  on January 5th, 2013, at 2:22 p.m. Ellen sent an email

4  to you.   Do you see where I am?   January 5th at 2:22.

5    A.   Yes.

6    Q.   Ellen writes is that why you had KC over all

7  the time?   Who is KC?

8    A.   Kimberley Compliment, a friend of ours.

9    Q.   Do you know what Ellen was referring to there

10  about having Kimberlee over all the time?

11    A.   Yeah.   Ellen mistakenly believed that Kimberlee

12  and I had an affair.   And because she believe that, she

13  pulled a knife on Kimberlee and attacked her with it.

14    Q.   You did not have an affair with Ms. Compliment?

15    A.   I did not.   Ms. Compliment was a married woman

16  and I was very close friends with both her and her

17  husband.

18    Q.   And she goes on, "Is that why you offered to

19  have McKenzie live with us while you paid for her?"   Who

20  is McKenzie?

21    A.   Did she write -- was that her?

22    Q.   Yes.   That's Ellen writing to you, "Is that why

23  you offered to have McKenzie live with us?"

24    A.   I have no -- honest to goodness have no idea

25  who McKenzie is.

55

1    Q.   Your response to this email from Ellen was,
2  "Please stop arguing with me.  I'm not dredging up the
3  past with you.  Your transgressions or mine."  What were
4  your transgressions?
5    A.   I was a bad husband.  I didn't take Ellen on
6  dates.  I neglected her.  I put the kids over her.  At
7  night, I played with the kids instead of spending time
8  with her.
9    Q.   At the very top of the page, January 5th, 2013,
10 at 3:00 p.m., the third paragraph down you write, "I can
11 show you four years' worth of your email correspondence
12 with another man."
13   A.   Yes.
14   Q.   Who was the other man?
15   A.   Oh.  The other man was me.
16   Q.   Why were you another man?
17   A.   Because I suspected Ellen was engaged in online
18 affairs again, I posted an ad online on Craigslist
19 posing as another man.  And, sure enough, she answered
20 and we began an online correspondence.  She told this
21 man named Sean Matthews -- was my alias -- things that
22 she would never tell me.  And that's how I learned a lot
23 about what was going on with my wife.
24   Q.   Okay.  So she thought that you were Sean
25 Matthews?

56

1      A.    No.  She had no idea I was Sean Matthews.

2      Q.    Okay.  But she thought there was a man named

3  Sean Matthews that she was responding to?

4      A.    Yes.

5      Q.    And did not know it was you?

6      A.    Correct.

7      Q.    And did I hear you say that this went on for

8  years?

9      A.    Yes.

10      Q.    This was a Craigslist ad; right?

11      A.    Yes.

12      Q.    Where she would find men to hook up with?

13      A.    Correct.

14      Q.    She talked to this Sean Matthews for years?

15      A.    Probably two, two-and-a-half years, yes.

16      Q.    And never met him?

17      A.    Never met him.

18      Q.    Did she ever ask to meet him?

19      A.    Yes.

20      Q.    What would you say?

21      A.    I would say I don't want to meet you.  I want

22  it to be an online relationship where we can discuss our

23  feelings and emotions and help each other out.  I must

24  admit that was the most difficult part was avoiding the

25  meeting.

57

1    Q.   Okay.  And then when you talk about the four

2  years of email correspondence with Sean Matthews, you go

3  on to say, "Correspondence that shows your extreme

4  sexual side, talking about sex with dogs, horses, your

5  dad, your brother, your stepbrother, and eventually your

6  son's friends."  So you weren't just talking about your

7  feelings and emotions?

8    A.   No.  No.  Clearly.  She would -- again, she

9  would share with me things that -- with Sean Matthews

10  that she wouldn't share with me.  That's how I was able

11  to monitor her and keep track of her and help her.  She

12  was very suicidal and she would share with him her

13  thoughts about suicide that she wouldn't share with me

14  often.  And so that would -- on those days, I would stay

15  home and take care of her.  And, yes, I used it as a way

16  to learn about the extent of her cheating.

17    Q.   And so, how did you, as Sean Matthews, get her

18  to talk about her extreme sexual side?

19    A.   Oh, Ellen's very open about her sexuality.

20    Q.   Did you, as Sean Mathews, prompt her to talk

21  about her sex?

22    A.   Yes.

23    Q.   You would ask her to discuss fantasies and

24  things like that?

25    A.   Yes.

58

1     Q.   Did she ever find out that it was you?

2     A.   She never did.

3     Q.   Did you ever confront her and say, Ellen, I'm

4  Sean Matthews and these things that you're saying have

5  me worried?

6     A.   No.

7     Q.   Did you believe that the things she was telling

8  you, as Sean Matthews, were dangerous to your children?

9     A.   Yes.

10    Q.   But you still never confronted her?

11    A.   Correct.

12    Q.   Did you ever contact Child Protective Services

13 or whatever the equivalent agency is in the other states

14 where you were living?

15    A.   I did not.

16    Q.   Why, in this email here on January 5th, 2013,

17 did you mention I can show you four years' worth of

18 email correspondence talking about your extreme sexual

19 side?  Were you threatening her?

20    A.   No.

21    Q.   Why did you mention it?

22    A.   Because she would say that she did not have a

23 sex problem.

24                    (Deposition Exhibit No. 20 was marked for

25                     identification.)

59

1      Q.   Exhibit 20 is a series of emails.   If you go to
2   the last page, page 138, January 5th, 2013 at 3:03 p.m.,
3   Ellen wrote to you, among other things, "Stop harassing
4   me."  Do you see that at the very bottom?   The very
5   bottom of page 138.
6      A.   Yes.  Yes.
7      Q.   She writes at 3:03, "Stop harassing me."   And
8   I'll represent to you that if you will count between
9   that email and the end of January 5th, 2013, you sent
10  her another 16 emails.  Why?
11     A.   Why did I send the emails?
12     Q.   Yes, after she told you to "stop harassing me"
13  at 3:03?
14     A.   Again, because I was hoping to help Ellen to
15  reconnect because I wanted -- I didn't want our family
16  to dissolve.  And Ellen uses -- throws around the term
17  harassment -- has our whole marriage.  If I ask her to
18  put the silverware in -- the dishes in the dishwasher
19  without rinsing them off first -- to rinse them off
20  first, she would call that harassment.  Kenny Ice
21  relayed to me that she would say the same things to him.
22     Q.   But nevertheless, she told you to "stop
23  harassing me."  I mean, you're a law enforcement
24  officer, FBI agent.  Did you think it was still okay to
25  continue to send her 16 more emails?

60

1    A.   Yes.

2    Q.   About halfway down the page you'll see at

3  3:12 p.m., you tell her on the third paragraph of this

4  email at 3:12, "I want to apologize to you for all the

5  hurt I've caused."  Again, what were you referring to

6  there?

7    A.   The hurt that I've caused Ellen is that I was

8  disengaged.

9    Q.   Let's go to the previous page.  Of course, you

10 understand the way these work --

11   A.   They go up.

12   Q.   Yeah.  They go up.  So let's go to page 137.

13   A.   Yeah.

14   Q.   About midway down the page here is an email

15 from you to Ellen at 3:43 p.m., subject line "Sins."  Do

16 you see that?

17   A.   Yes.

18   Q.   You say, "Truth is we have both done awful

19 things to each other.  We have both sinned against each

20 other."  What awful things did you do to Ellen?

21   A.   I ignored her needs.  I was a disengaged,

22 emotionally unattached husband.

23   Q.   That's it?

24   A.   That's the worst I have ever done.  I treated

25 Ellen like a princess.  She was spoiled.  She lived a

61

1  fabulous life.  I never harmed her physically.

2      Q.   Let's turn to the next page, 136.  Down at the

3  bottom at 4:45 p.m., you sent her an email, subject

4  "NYC."  Do you see that?

5      A.   Yes.

6      Q.   You tell her, "I made hotel reservations for

7  New York," after you had told her in October that the

8  two of you were way beyond the point of any possible

9  reconciliation and she had explicitly told you in

10 November that she had no interest in reconciliation, not

11 for the remainder of your life.  Why did you book a

12 hotel in New York and invite her to come with you to

13 discuss reconciliation?

14     A.   Because she vacillated as well and because that

15 was one place she asked me to take her.

16     Q.   When did she ask you to take her to New York?

17     A.   For years.

18             (Deposition Exhibit No. 21 was marked for

19             identification.)

20     Q.   Okay.  Exhibit 21, at the very bottom of the

21 first page is an email from you to Ellen on

22 January 28th, 2013, at 9:58 p.m.  Do you see where I am?

23     A.   Yes.

24     Q.   You tell her, "You are an embarrassment."  And

25 then you go on to say, "People are universally horrified

62

1    by your actions.  Horrified."

2         A.    Yes.

3         Q.    Do you believe that was polite and respectful?

4         A.    I don't believe it was impolite or

5    disrespectful given the circumstances, given the way we

6    spoke to each other, given the things that she was

7    doing.

8                    (Deposition Exhibit No. 22 was marked for

9                     identification.)

10        Q.    Exhibit 22, at the top of the page is an email

11   you sent Ellen on February 9th, 2013, subject line

12   "Attorney fees."  It says, "Please keep separate any and

13   all attorney expenses related to our divorce and any

14   that may arise as a result of criminal prosecutions

15   and/or lawsuit filed against you and kinny for malicious

16   prosecution, abuse of process, defamation, et cetera."

17   And then in parentheses, "You can't go around falsely

18   telling people among other lies that they are being

19   investigated by the FBI."

20        A.    Yes.

21        Q.    You were threatening her with this very lawsuit

22   in this email, weren't you?

23        A.    I wasn't threatening.  I was telling her that I

24   was considering it.

25        Q.    What's the difference?

63

1    A.   It's not a threat.  I have the right to do it.

2    She stole FBI property and gave it away and sold it on

3    Craigslist.  She told others falsely who were speaking

4    to me about her and Kenny that the only reason I was

5    speaking to them was because I was trying to find a way

6    to arrest them.  And she was spreading lies about me.

7              (Deposition Exhibit No. 23 was marked for

8              identification.)

9    Q.   Mr. Ballock, Exhibit 23 is a series of text

10   messages between you and Ellen.  The ones I want to talk

11   about start a little over halfway down the first page on

12   May 17th, 2013, beginning at 8:24 a.m.  And I'll

13   represent to you that I counted these up and you sent

14   Ellen 61 text messages between 8:24 a.m. and 8:48 p.m.

15             At 12:02 p.m., on the second page, you text

16   Ellen, "Please call back to continue the conversation."

17   And she sent a one-word response, "No."  At 12:05, you

18   texted her, "Please call back.  Please hear me out.

19   This has the potential to get so much worse."

20             What did you mean by this has the potential to

21   get so much worse?

22   A.   The -- what has happened.  The children have

23   suffered.  We've lost hundreds of thousands of dollars.

24   She had to go back to work.  When I said those things

25   about regrets and about things getting worse, I was not

64

1   implying or suggesting that any harm would come to her

2   from me but that things would get worse and, in fact,

3   they did.  They got very worse.

4       Q.   About halfway down this page at 12:08 p.m., she

5   sent you a text, "I need you to stop texting me now."

6   At that point, you had sent her 23 texts.  So at 12:08

7   she says, "I need you to stop texting me now," and in

8   response you texted her 12 more times in the next 12

9   minutes.  Why?

10       A.   I notice that this was two days after she

11   kicked me out of the house.  I was very emotional and

12   very upset.  Divorce is a very stressful thing.  My

13   child, my son, latched himself on to me when she kicked

14   me out of the house.  He climbed into the backseat and

15   refused to get out so I couldn't leave.

16          It was a very emotional time, very difficult

17   time.  Anybody who has been through a divorce can

18   relate.  And when you hear the rest of what I had to

19   deal with from Ellen, it will make more sense.

20       Q.   Does the fact that you were going through a

21   difficult time excuse unlawful behavior?

22       A.   It was not unlawful behavior.

23       Q.   Generally speaking, does the fact that a person

24   is going through a difficult time excuse unlawful

25   behavior?

65

1    A.    No.

2        Q.    So you sent her 12 more texts over the next 12

3    minutes.  And then at the bottom of the page, about four

4    lines up at 12:20, she again says, "Please stop texting

5    me."  And if you follow along, you'll see that you

6    responded by sending three more texts over the next two

7    minutes.

8            Then again, going to the third page, at 12:22

9    and 12:23, she again texts, "Stop texting me please."

10   At 12:23, "Please leave me alone now."  You then sent 23

11   more texts.  So between the time that she first asked

12   you to stop texting her at 12:02 and the end of the day,

13   you sent a total of 38 text messages after she asked you

14   to stop.  Why?

15       A.    Because I was emotionally distraught.

16       Q.    You would agree with me that you made contact

17   with her using a cell phone after she asked you to stop?

18       A.    Yes.

19       Q.    At 1:45, about midway down the third page, one

20   of the texts you sent her after she'd asked you

21   repeatedly to stop was, "But I see it spiraling out of

22   control.  I see the cliff fast approaching for us all

23   and I want to save us."

24       A.    Can you repeat that?

25       Q.    Sure.  1:45 p.m., about halfway down the page.

66

1    You said, "And my requests to heal have not been only of

2    late.  But I see it spiraling out of control.  I see the

3    cliff fast approaching for us all and I want to save

4    us."  What did you mean by it spiraling out of control

5    and the cliff fast approaching for us all?

6        A.    The dissolving of our family.

7        Q.    I mean, this was in May of 2013.  You two had

8    been separated for eight months.  You were in the

9    process of getting a divorce.  Hadn't that already

10   occurred?

11       A.    And in -- what's that?

12       Q.    At this point, you had been separated for eight

13   months and were in the process of getting a divorce.

14   Hadn't the dissolving of your family already occurred?

15       A.    Not in my mind.  And in between, again, she

16   would say things like -- the one I remember specifically

17   was give me until December -- September, let's see where

18   we are in September.

19       Q.    Can you point to me anywhere in this series of

20   text messages where she said that?

21       A.    No.  That was a face-to-face conversation.

22              (Deposition Exhibit No. 24 was marked for

23              identification.)

24       Q.    Mr. Ballock, Exhibit 24, at the top of the page

25   you'll see an email from westcoasttwiggs@yahoo.com to

67

1    davedew13@gmail.com.

2        A.    Yes.

3        Q.    Is westcoasttwiggs, is that you?

4        A.    Yes.

5        Q.    And is davedew13 Kenny Ice?

6        A.    Kenny Ice, Jr.

7        Q.    Correct.  If you go on down it says, "Begin

8    forwarded message."  It appears to me that you were

9    forwarding to Kenny an earlier email from

10   aalab.training@yahoo.com that was sent October 20th,

11   2012, to westcoasttwiggs@yahoo.com.  Do you see that?

12       A.    Yes.

13       Q.    What was the aalab.training@yahoo.com email?

14       A.    That is an email address -- Ellen's email

15   address under which she communicated with Sean Matthews.

16       Q.    Okay.  So, this was sent October 20th, 2012.

17   At that point, was she still communicating with Sean

18   Matthews?

19       A.    That was sent -- that was sent from the aalab

20   account to westcoasttwiggs' account; right?  Do you see

21   that.

22       Q.    Yes.

23       A.    Yes.  No, she was not.

24       Q.    Okay.  So how did an email from her yahoo

25   account, aalab.training, get sent to you on

68

1   October 20th, 2012, a month after you separated?

2       A.   I sent it to myself.

3       Q.   How did you get access to her email account?

4       A.   It was our shared email account, I should say.

5   She created it.  It was our shared email account.

6       Q.   What do you mean it was shared?

7       A.   That's how she -- that's how she communicated

8   with Sean Matthews, back and forth on that account.

9       Q.   Okay.  So you forwarded this to yourself on

10  October 20th after you separated?

11      A.   To save it.

12      Q.   Going back up to the top of the page on

13  July 13th, 2013.  You forwarded this email to Kenny Ice.

14  And just put it in context.  I don't think we need to

15  read it into the record, but if you go through these

16  pages and the emails that were forwarded talking about

17  some of her sexual activities.  On the first page she's

18  talking about Gary.  Who is Gary?

19      A.   That is her stepbrother.

20      Q.   And you tell Kenny, "When this is all over I

21  plan to share these with her family so they can protect

22  themselves and hopefully pressure her to get help."

23  Were you threatening to blackmail her with these?

24      A.   No.  It wasn't a threat.  I wanted -- and all

25  throughout our marriage -- wanted her to get help.  She

69

1    saw numerous counselors, took different medications, and

2    I couldn't get her to stop her dangerous sexual

3    behaviors.  And I had hoped to enlist the help of her

4    family.  Kenny and I were having discussions at that

5    time about how to help her, how to get her to stop

6    because he saw it as well.

7        Q.   When were these emails originally sent from

8    Ellen to Sean Matthews?

9        A.   It would have been before 2011.

10       Q.   So, if you were concerned then, why didn't you

11   share them with her family at the time?

12      A.   Because I thought I could do it and because I

13   didn't want to embarrass her and because she promised to

14   get help.  She promised to stay on her meds.  I did, in

15   fact, reach out to her father via telephone on one

16   occasion and shared with him my concerns.

17         She -- the other reason I was going to do that

18   was to protect them from that one of Ellen's fantasies

19   that she wrote to Sean Matthews actually -- one of her

20   fantasies was that her dad would find himself in the

21   hospital and that that's when he would finally be able

22   to have sex with her without his permission.  So I

23   wanted to protect him.

24      Q.   But you wanted to wait until the divorce was

25   over to protect him?

70

1    A.   No.  Again, I reached out to him before.

2    Q.   And told him that his daughter was having

3    fantasies about having sex with him?

4    A.   No.  At that time I told him that she was out

5    of control sexually, having sex in public places, that

6    sort of thing.

7    Q.   Okay.  When I asked you just a little bit ago

8    why you didn't bring these to her family's attention at

9    the time back in before 2011 when they were originally

10   sent you said you thought you could do it and you wanted

11   to help her.

12   A.   And I was able to.  I was able to moderate her

13   behaviors.  I was able to monitor.  I was able to

14   persuade her to continue with counseling or get back

15   into counseling.  I was able to persuade her to take her

16   medicines.  And when she left, that's when I became

17   incredibly concerned for my children's welfare and for

18   hers, quite frankly.

19   Q.   Did you call CPS about your children's welfare?

20   A.   No.

21   Q.   So by July 13th, 2013, when you were forwarding

22   this to Kenny Ice, did you still believe you could take

23   care of it?

24   A.   No.

25   Q.   So if you were concerned about her family and

71

1   their need to protect themselves, why were you going to

2   wait until this was all over?  First, let me back --

3        A.   I didn't say that I was going to wait until --

4        Q.   I'm sorry.  I'd like to clarify my question if

5   I could.  When you say this is all over, what were you

6   referring to?

7        A.   I don't know.  I don't know.  I guess the

8   divorce.  I don't know.

9        Q.   So -- and now the original question I asked.

10  Why would you wait until the divorce was all over to

11  protect them?

12       A.   Because I -- I don't know why.  I don't know

13  why.

14       Q.   Let's go back to --

15       A.   I guess because I still had hope.

16       Q.   Let's go to the fourth page here.  Down at the

17  bottom there's an email from westcoasttwiggs to

18  davedew13, that is from you to Kenny.

19       A.   Yeah.

20       Q.   Dated July 21st, 2013?

21       A.   Uh-huh.

22       Q.   "She will not be able to become a nurse when

23  the licensing board learns about her problem with sex

24  and violence and abusing prescription drugs."  Were you

25  going to inform the nursing board if she tried to get a

72

1    job as a nurse?

2         A.    Yes.

3                    (Deposition Exhibit No. 25 was marked for

4                    identification.)

5         Q.    Mr. Ballock, I've handed you what's been marked

6    as Exhibit 25.  Just for clarification, you see at the

7    top the email address is written over "Expunged."

8         A.    Okay.

9         Q.    So I'll represent to you that I couldn't find

10   this elsewhere in our file, but I got it from the state

11   police investigation which, per your request was

12   expunged so they whited out your name.  But I'll

13   represent to you that I believe this to be, where it

14   says "Expunged," to say from ScottBallock@yahoo.com.  Do

15   you recall sending this email dated April 26th, 2013?

16        A.    I don't recall it, but I have no reason to

17   believe it wasn't me.

18        Q.    Okay.  So let's go to the next page.  It looks

19   like what you did was forward her a photograph.  And I

20   understand the photograph to be a screenshot that you'll

21   see down at the bottom right-hand corner Troopers 36.

22   Do you see where that is?

23        A.    Yes.

24        Q.    So this is a screenshot of an email from Ashlee

25   Leeson to Chris Elliss of an email dated June 9th, 2012.

73

1   Do you see that?

2       A.   Yes.

3       Q.   Who is Ashlee Leeson?

4       A.   That was her online alias that she used to meet

5   men.

6       Q.   How did you get access to that email?

7       A.   I have no idea how I would have gotten access

8   to that email.

9       Q.   You said earlier --

10      A.   Maybe -- maybe -- Scott gave it to me.  I don't

11   know.

12      Q.   Scott?

13      A.   Scott is Chris Elliss.  I investigated and

14   learned that Chris Elliss was actually a guy by the name

15   of Scott Kirby.  He used that alias, so he may have

16   given this to me.  I don't remember.

17      Q.   You testified earlier this morning that you

18   watched some of the videos of Ellen having sex with

19   other men?

20      A.   Yes.

21      Q.   How did you get those videos?

22      A.   I found them.

23      Q.   Where did you find them?

24      A.   She had them hidden.

25      Q.   Where did she have them hidden?

74

1      A.    In a cabinet in the living room that we don't

2  use.

3      Q.    Did she know you were watching them?

4      A.    No.

5      Q.    Did she ever become aware you were watching

6  them?

7      A.    Yeah.

8      Q.    When did she become aware?

9      A.    I don't remember when exactly.

10      Q.    Was it before or after the two of you

11  separated?

12      A.    Oh, before.

13            (Deposition Exhibit No. 26 was marked for

14             identification.)

15      Q.    Mr. Ballock, I've handed you Exhibit 26.  This

16  is an email from you to Ellen dated May 3rd, 2013.  If

17  you go to the third paragraph of that email, about

18  halfway through the paragraph, again, you're pleading

19  with her to reconcile and you state, "We can implode our

20  lives."  And then in parentheses, "My attorney doesn't

21  pull punches.  And after I shared with her what I need

22  to disclose now to defend myself against your claims she

23  said there is a very real risk we may both lose the

24  children."

25            What did you share with your attorney that made

75

1    her fear you could lose custody of your children?

2         A.   Ellen's sexual behaviors.

3         Q.   How could that cause you to lose custody?   You

4    said that you may both lose custody?

5         A.   Because I didn't go to CPS.   I didn't think

6    that Ellen's sexual behaviors with other men was a

7    threat to the children.

8                   (Deposition Exhibit No. 27 was marked for

9                   identification.)

10        Q.   Mr. Ballock, I've handed you Exhibit 27.

11   Again, this came from the state police file so your name

12   has been expunged, but I believe you've seen this letter

13   before, haven't you?

14        A.   Yes.

15        Q.   Did you receive this letter -- just for the

16   record let me put it in context for the record.   This

17   Exhibit 27 is a letter dated May 3rd, 2013, from Ellen's

18   divorce attorney Matthew Stout to you directing you to

19   send all inquiries or communications not directly

20   necessary for the care of the children through the

21   attorney's office.   Did you receive this letter from

22   Mr. Stout?

23        A.   I did not, the same way I did not receive the

24   letter sent to me from Judge Aloi's office.   I didn't

25   receive this.   I wish I had.

76

1     Q.   Which letter from Judge Aloi's office?

2     A.   I don't know what it was, but he mentioned in

3 his ruling, I believe, that something he sent to me came

4 returned as undeliverable.

5     Q.   You don't recall what it was?

6     A.   No, I don't recall what it was.

7     Q.   Was this when you were pro se?

8     A.   Yes.

9            (Deposition Exhibit No. 28 was marked for

10            identification.)

11     Q.   Mr. Ballock, Exhibit 28 is an email exchange

12 between you and Ellen on May 15th, 2013.  At the bottom

13 of the first page you'll see in response to a request

14 from you to take Summer to Disney World, she had stated,

15 "Email should be fine enough for communicating, but your

16 one-day deadlines and requests for me to respond only if

17 I object lead me to believe you may need to go through

18 my attorney's office in the future."

19        Then you respond on the fourth paragraph of

20 your response, "I will not go through your attorneys for

21 anything ever."

22     A.   Uh-huh.

23     Q.   At this point, this was May 15th, 2013, Ellen

24 has repeatedly told you, as we've discussed this

25 morning, to stop harassing her, to stop emailing her,

77

1  and now to direct communications through her attorney's

2  office, but you would not honor her request; correct?

3      A.   Correct.

4      Q.   Why not?

5      A.   For one thing, Ellen was racing through our

6  money.  She, at one point, showed up at a family court

7  hearing with three attorneys in tow, which I was paying

8  for.  And I found it very difficult to have to talk to a

9  third party rather than talking to Ellen about simple

10 plans for drop-offs or vacations and have to pay

11 outrageous sums of money just to do that.

12     Q.   Do you recall us discussing earlier this

13 morning another email that you had sent to Ellen saying

14 don't communicate with me anymore, go through the

15 attorneys for everything including arranging pickup and

16 visiting children?

17     A.   Yeah.

18     Q.   At that time, you thought that was reasonable

19 option?

20     A.   Yeah.

21     Q.   But here you didn't.  What was the difference?

22     A.   We were getting drained financially.

23     Q.   So because you were being drained financially

24 you didn't have to honor her request to go through her

25 attorneys?

78

1    A.   I didn't want to.  If she wanted to talk to me

2    she should be able to talk to me about simple matters

3    like drop-offs.

4        Q.   On the second paragraph of your response here

5    you said, "You haven't wanted to talk to me for eight

6    months now."  Now you've testified repeatedly that she

7    would communicate with you and say she was interested in

8    reconciliation, but here you're saying that she had not

9    wanted to talk to you for eight months now.  Which is

10   it?

11       A.   She didn't want to sit down and talk about

12   reconciliation.  It was always just short, brief

13   conversations.  It was her showing up to yell at me.  I

14   wanted to have a sit-down conversation with her, and she

15   wouldn't do that with me.

16       Q.   And you wouldn't honor her request to not talk

17   about reconciliation?

18       A.   I kept asking her.

19       Q.   You go on in this second paragraph, "It is

20   going to be a very long and ugly eight years for all of

21   us."  Now, where did the figure eight years come from?

22       A.   For how long we would have to be in

23   communication with each other because of the children

24   until Summer turned 18.

25       Q.   Were you threatening her by saying it's going

79

1  to be a very long and ugly eight years?

2     A.   No.  Quite honestly, I was referring to her

3  behaviors.

4     Q.   On the bottom of this -- of your response you

5  tell Ellen, "It is your privilege to continue to ignore

6  me, even if it negatively impacts the children just as

7  it was your privilege to break up the family for a man

8  you met on Craigslist and ruin our young children's

9  lives.  It is your privilege to lie about me and try to

10  hurt me.  It has always been about you and your

11  privileges.  For 26 years it is about you and your

12  privileges.  It is also your privilege to pay your

13  attorneys with your own money.  I will not waste my

14  hard-earned money in that manner.  When you actually

15  work for your money you will finally understand the

16  value of it."

17          Do you believe that was polite and respectful?

18     A.   I do not believe that was impolite nor

19  disrespectful given the circumstances, given our

20  history, not at all.

21     Q.   Okay.

22              (Deposition Exhibit No. 29 was marked for

23              identification.)

24              MR. WILLIAMS:  Excuse me.  We can go off

25  the record just for a brief moment.

80

1              THE VIDEOGRAPHER:   The time is 11:00.   We

2    are off the record.

3              (There was a short break in the

4              proceedings.)

5              THE VIDEOGRAPHER:   We are back on the

6    record.   The time is 11:01.

7              (Deposition Exhibit No. 29 was marked for

8              identification.)

9         Q.   Mr. Ballock, during the break you were handed

10   what's been marked as Exhibit 29.   I believe you

11   testified about this earlier.   I'd like to ask about it.

12        This is a May 28th, 2013, email from you to

13   Ellen, subject "Theft of government property."   In this

14   email, just to kind of sum it up, you accuse Ellen of

15   removing joint funds and assets and stealing some

16   government-issued property.   Would that be a fair

17   characterization?

18        A.   Yes.

19        Q.   Why didn't you address this issue between your

20   attorneys and hers?

21        A.   Between my attorneys and hers?

22        Q.   Yes.   Particularly, the removal of joint funds

23   and assets.

24        A.   I did.

25        Q.   But you also went directly to her as well?

81

1    A.    Yes.

2    Q.    You accused Ellen of stealing government

3  property and you say, "Theft of government property is a

4  matter we will be addressing immediately."  And then you

5  copy 18 U.S.C. Section 641?

6    A.    Yes.

7    Q.    You were threatening her with criminal charges,

8  weren't you?

9    A.    No.   I was telling her what she was at risk of.

10 I did not want to see my children's mother -- I didn't

11 want my children to see their mother going to jail.

12   Q.    Okay.  Given this contentious, bitter divorce

13 that you've described and your accusations that she

14 repeatedly lies, why didn't you just report the theft of

15 FBI property to the FBI and let them deal with it?

16   A.    I did report it to the FBI immediately.

17   Q.    But also went directly to Ellen?

18   A.    Yes.

19   Q.    Isn't it true though that the property you're

20 describing here is stuff that you had left at the house

21 when you moved out?

22   A.    Yes, under lock and key.  In fact, one of your

23 colleagues who was previously the criminal division AUSA

24 for Pittsburgh wanted to prosecute Ellen for this.

25   Q.    Who was that?

82

1    A.   I forget her name.  She was the criminal

2   division chief in the AUSA's office up in Pittsburgh.

3   She's now with you.  She said she couldn't represent me

4   on this matter because you guys represent West Virginia

5   State Police.  If you said her name, I would know it.

6   Morgan -- Shawn Morgan.  Shawn Morgan wanted to

7   prosecute it.

8       Q.   So you had left this property at the house, as

9   you say under lock and key?

10     A.   Yeah.  It was under a constructive trust.

11   She'd been directed not to remove or dispose of any

12   household items.

13     Q.   Did you ever try to -- before May 28th, 2013,

14   ever try to get the FBI property out of the house?

15     A.   No.  I had what I needed at my apartment.  And

16   I assumed that because some of it was under lock and key

17   and because it was FBI property, she wouldn't mess with

18   it.  I left a lot of my other possessions there as well.

19   I was in a small apartment and only took a few things.

20     Q.   Do you recall an incident on November 5th,

21   2012, when you were at the house and Ellen called the

22   police?

23     A.   Yes.

24     Q.   Were you trying to get property then?

25     A.   I was trying -- what was I trying to get?  I

83

1   was trying to get suits.  I was trying to get suits.

2          MR. CROOKS:  What was the date you

3   referenced, Mark?

4          MR. JEFFRIES:  November 5th, 2012.

5      A.   Actually, I wasn't trying to get suits.

6   Actually, she called me and said come to the house.

7   Tommy wants -- is misbehaving and he's asking to see

8   you.  And so I think it would be best for him to go with

9   you tonight.

10          So I went to the house and I stood at the front

11  door, even though the house was still in my name and I

12  was still making payments and I had every right to be

13  there, I stood outside the front door.  And it was a

14  cold evening.  And so -- and she said since you're here,

15  why don't you take your suits and I'll go get them.

16          And when she did, I stepped inside -- one step

17  inside the front door because it was cold outside,

18  because the kids were coming up to see me, because the

19  dog was there.  And she came around the corner and

20  flipped her lid.  She went nuts.  "What are you doing in

21  my house?  Get the fuck out of my house."  And then she

22  called the police.

23      Q.   So you were not there to pick up the FBI

24  property on November 5th, 2012?

25      A.   No, I saw no reason to.  I assumed it was safe.

84

1       Q.   If you'll refer to Exhibit 1, that's the

2   timeline that you prepared.

3       A.   Yeah.

4       Q.   I told you we were going to come back to it.

5   If you'll look on the entry for 5/26/2013.  It's on

6   page 9.

7       A.   Yes.

8       Q.   The second paragraph of this entry says, "Per

9   his employer's request, Scott asks Ellen via text

10  message to return what remains of the FBI property."

11  Who told you to contact Ellen about returning the FBI

12  property?

13      A.   I can't remember her name, but she was an

14  employee of the security division, the division to which

15  I reported the theft.

16              MR. JEFFRIES:  We've been going another

17  hour.  Do you want to take a break, Charles?

18              MR. CROOKS:  What time is it?

19              MR. JEFFRIES:  I'm at a good stopping

20  point here.  It's 11:07.

21              MR. CROOKS:  Do you want to take a break

22  for lunch or what are you thinking?

23              MR. JEFFRIES:  Let's go off the record.

24              THE VIDEOGRAPHER:  The time is 11:07.  We

25  are off the record.

85

1              (There was a short break in the

2              proceedings.)

3              THE VIDEOGRAPHER:   We are back on the

4    record.   The time is 11:26.

5    BY MR. JEFFRIES:

6        Q.   Mr. Ballock, I understand that you were

7    arrested on September 13th, 2013, during a break in the

8    family court proceedings in the divorce?

9        A.   I was.

10       Q.   Had Judge Minor informed you that you were

11   going to be arrested --

12       A.   He did.

13       Q.   -- earlier in the proceeding?

14       A.   At the start of the proceedings.

15       Q.   So about what time were you arrested?

16       A.   Late morning.

17       Q.   Before lunchtime, would you say?

18       A.   Yeah, around lunchtime.

19       Q.   Was it a regularly scheduled break in the

20   hearing in family court?

21       A.   Yes.

22       Q.   Who arrested you?

23       A.   Mike Kief.

24       Q.   Anyone else?

25       A.   I was told that there were other troopers

86

1  there, but I didn't notice them.

2      Q.   You didn't see any other troopers?

3      A.   Yeah.  I didn't notice them.

4      Q.   Who told you there were other troopers there?

5      A.   Delby Pool, my attorney.

6      Q.   Okay.  So you were arrested.  Were you put in

7  handcuffs?

8      A.   No.

9      Q.   Am I correct that you were taken up from family

10  court to the magistrate court for arraignment?

11      A.   Correct.

12      Q.   Then what happened?

13      A.   The magistrate released me on a PR bond.

14      Q.   And you went back to the family court hearing?

15      A.   Yes.

16      Q.   How long did this total process take from the

17  time that you left the family court until the time you

18  came back?

19      A.   15 or 20 minutes.  It was brief.

20      Q.   When you were in the magistrate court getting

21  arraigned was there anyone else there?

22      A.   My attorney, Mike Benninger.

23      Q.   I thought you just said that Delby Pool was

24  your attorney?

25      A.   Yeah, but I called Benninger to let him know

87

1   what was going on, so he was with me -- was he with me

2   at the magistrate hearing?

3        Q.   I don't know.  I wasn't there.

4        A.   I had attorney representation.  Delby is not a

5   criminal attorney.  My memory is fuzzy on that fact.  I

6   think Benninger was there.  I don't recall.  But I had

7   attorney representation.

8        Q.   Was there anyone not involved in the case

9   present there in the magistrate hallway or not in the

10  courtroom but there outside the courtroom?

11       A.   There were other people in the hallway.

12       Q.   Did you know any of them?

13       A.   Not that I remember.  I was pretty focused on

14  what was going on.

15       Q.   Now, in Paragraph 33 of the current version of

16  the complaint you allege that my clients intentionally

17  ignored policies, procedures, and the constitutional

18  rights of Ballock by arresting you at family court on

19  the day of the hearing.  What policies and procedures do

20  you believe they violated?

21       A.   I believe that they purposely arrested me at

22  family court to influence the family court's decision.

23  Judge Minor, in fact, said that in his ruling, that this

24  was clearly done in an attempt to influence his

25  decision.

88

1     Q.    But --

2     A.    I was -- it was a nonviolent misdemeanor for

3     which I was never interviewed.  I have no history of

4     violence.  Normally, a summons would be issued for that

5     sort of thing, but they had to make a show at family

6     court.

7     Q.    Okay.  I appreciate all that, but my question

8     was what policies or procedures do you believe they

9     violated by arresting you at family court on the day of

10    the hearing?

11    A.    By not issuing a summons instead of arresting

12    me.

13    Q.    Do you believe that there's a state police

14    policy or procedure that requires that they issue a

15    summons?

16    A.    Yes.

17    Q.    You don't know the number or name of the

18    policy?

19    A.    No.

20    Q.    What constitutional rights did they violate by

21    arresting you at family court on the day of the hearing?

22    A.    I hadn't committed any crime.

23    Q.    So which constitutional right would that be?

24    A.    I can't answer that.  I don't...

25    Q.    In Paragraph 48 of the third amended complaint,

89

1    you allege my clients knowingly violated policies and

2    procedures and your constitutional rights in relying on

3    information they knew was false, unsubstantiated, and

4    intended to abuse the process and initiate a malicious

5    prosecution.  Again, my question is what policies and

6    procedures did they violate by relying on the

7    information that they received from Ms. Costlow?

8        A.   Their policy manual states that they should

9    interview everybody that they can including the suspect,

10   and they didn't.  Their policy manual requires that they

11   document everything, and they didn't.  Their policy

12   manual requires that they take special care and

13   consideration when investigating someone like a

14   politician or another law enforcement officer, and they

15   didn't.

16       Q.   Anything else that they violated in their

17   policies and procedures?

18       A.   Not that I can think of off the top of my head.

19       Q.   What constitutional rights did they violate by

20   relying on information that was provided to them by

21   Ms. Costlow?

22       A.   I can't say.

23            MR. CROOKS:  What was the paragraph of the

24   complaint to which you referred there in your question?

25            MR. JEFFRIES:  Paragraph 48.

90

1               MR. CROOKS:  Thank you.

2    BY MR. JEFFRIES:

3       Q.   You allege that the information they had was

4    unsubstantiated, but Ellen's allegations were

5    substantiated, weren't they, by the emails and text

6    messages she provided; correct?

7       A.   No.  Ellen also told them that I was physically

8    violent towards her.  That's unsubstantiated.

9               MR. JEFFRIES:  Let's go off the record for

10   a second.

11              THE VIDEOGRAPHER:  The time is 11:33.  We

12   are off the record.

13              (There was a short break in the

14              proceedings.)

15              THE VIDEOGRAPHER:  We are back on the

16   record.  The time is 11:35.

17   BY MR. JEFFRIES:

18      Q.   Mr. Ballock, I apologize for the interruption.

19   To kind of get us back on track I had asked there's an

20   allegation in the complaint that my clients relied on

21   information that they knew was unsubstantiated and I

22   asked what information was unsubstantiated when

23   Ms. Costlow had provided emails and texts.  And the

24   answer that you were giving was that they -- she also

25   mentioned physical abuse.  Is there anything else that

91

1    was unsubstantiated?

2        A.    Well, because they didn't speak to me, because

3    they didn't interview me, even though I offered to be

4    interviewed, they didn't get to hear that between all of

5    these correspondences that she would reach out to me.

6        Q.    You said that you believe they violated the

7    policy manual which requires them to interview everyone,

8    including the suspect.  Do you know the number or the

9    name of the policy that you're --

10       A.    I don't.  It's in the policy manual that you

11   provided us during discovery.

12       Q.    What information did Ellen provide to the state

13   police that was false?

14       A.    That I was abusive.

15       Q.    Anything else?

16       A.    I would have to refresh my memory by looking at

17   it.

18       Q.    That's all you can recall right now off the top

19   of your head?

20       A.    Correct.

21       Q.    Why do you think that Corporal Gaskins and

22   Sergeant Kief knew that this information was false?

23       A.    Because I believe that for some reason they had

24   a personal vested interest in assisting Ellen.

25       Q.    Why do you believe that?

92

1    A.   Because of email correspondence between Kief

2 and Ellen and because of some circumstantial evidence

3 against Berry and because Kenny Ice told me that --

4 Kenny Ice, Jr., told me that Berry was having a sexual

5 relationship with Ellen.

6    Q.   I'll go to the allegations about Trooper Berry

7 and Kenny Ice later, but what email or emails between

8 Sergeant Kief or now Lieutenant Kief and Ellen led you

9 to believe that the troopers had a vested interest in

10 assisting her?

11    A.   For one, before my misdemeanor trial, I

12 approached the family court and asked for the unsealing

13 of Christi Cooper-Lehki's report and testimony for use

14 in my defense.  Gabrielle Mucciola, I believe her name

15 is, assistant prosecutor showed up and represented Ellen

16 at that hearing and argued against its release.

17         The judge ultimately decided that he wasn't

18 going to release it based upon her comments and because

19 he thought it would be too embarrassing to Ellen.  In

20 emails between Kief and Ellen, Kief writes Ellen

21 something to the effect of -- 'cause Ellen, obviously,

22 had shared with him this information.  And Kief writes

23 to Ellen, "Wow.  That's fantastic.  That's great.  I bet

24 Scott was humiliated and walked out of the courtroom

25 with his tail between his legs."  So Kief, who is

93

1   supposed to be an unbiased law enforcement officer who

2   represents citizens as a whole, not just one person, was

3   taking sides with the complainant and very

4   unprofessionally and improperly communicating with her

5   on his official government account about how happy he

6   was that I was humiliated and how happy he was that

7   potentially exculpatory evidence was going to be kept

8   out of my case.

9       Q.   Just so I'm clear.   In the email from Kief to

10  Ellen he was describing the hearing where Gabe Mucciola

11  argues against releasing the Cooper-Lehki report?

12      A.   Yeah.   That was what he was referring to, I bet

13  Scott walked out of that courtroom with his tail between

14  his legs.   That's great news.   I bet he was humiliated.

15      Q.   That was Ellen saying those --

16      A.   No.   That was your Sergeant Kief saying those

17  statements, a law enforcement officer saying those

18  statements.

19      Q.   But you testified earlier --

20      A.   So he wasn't just -- so he wasn't just

21  concerned about the law or justice prevailing.   He was

22  concerned and happy that someone was being humiliated

23  and that someone would not be able to use exculpatory

24  information to their benefit.

25      Q.   Where did you get that email?   Was that

94

1    produced in discovery?

2         A.    From you.  From you.  You surely read it.

3         Q.    Anything else that you -- leads you to believe

4    that the troopers had a vested interest in assisting

5    Ellen?

6         A.    Yes.  Well, at the dismissal at which Sergeant

7    Kief at the time was there, Judge Mullins said that

8    Ellen shall not provide any disparaging information to

9    my employer.  That was a condition.  Ellen shall not

10   provide any disparaging information to my employer.

11   That was also a condition of divorce court.

12        Judge Minor said you shall not have any contact

13   with Scott's employer.  Any contact.  So now, two

14   different judges have told Ellen you shall not interfere

15   with Scott's employment.

16        One week after that dismissal at which Sergeant

17   Kief attended and I have reason to believe probably

18   helped craft that wording, Sergeant Kief contacted Ellen

19   and invited her -- the FBI at the time was going to

20   investigate me due to the internal administrative

21   inquiry.  And Sergeant Kief knew that Ellen wasn't

22   allowed to talk to the FBI.  He knew it.  He was there.

23   He heard the judge's instructions.  He's a law

24   enforcement officer.  And he wrote -- he contacted Ellen

25   and said the FBI is coming to talk to me, hey, let's get

95

1   around that, you tell me what you want me to tell the

2   FBI.

3           Ostensibly, the investigation -- the FBI's

4   investigation -- that was a week later.  Ostensibly, the

5   FBI's investigation was to have been about these emails.

6   That's it.  But Sergeant Kief told Ellen let's broaden

7   the scope, let me know if you know any way that he has

8   abused his power.

9           So Sergeant Kief is messing with my job.  He

10  wants me fired.  He doesn't want to administer justice.

11  He doesn't want to just do what's right.  He doesn't

12  want to be a neutral and impartial law enforcement

13  officer.  He wants to screw me, and I don't know why.

14      Q.   I'd like to break down what you just said a

15  little bit.  You said that you have reason to believe

16  that Sergeant Kief helped craft the language in the

17  dismissal agreement that your wife shall not provide

18  disparaging information to your employer; is that

19  correct?

20      A.   I wouldn't be surprised if he did.  He was part

21  of that is my understanding.  But he was -- in any

22  event, he was at the hearing where that was agreed upon.

23  He was sitting with Ellen.

24      Q.   All right.  You testified you have reason to

25  believe that he helped craft it.  Why do you have reason

96

1     to believe that?

2          A.    My attorney.

3          Q.    What did your attorney tell you?

4          A.    That he worked with the prosecutor's office who

5     was working with the state police in crafting that

6     agreement.

7          Q.    And your attorney being Mike Benninger?

8          A.    Yeah.  My attorney was Mike Benninger.

9          Q.    So Mike told you that Sergeant Kief worked with

10    the prosecuting attorney to craft this language?

11         A.    Yes.

12         Q.    Okay.

13         A.    He somehow had very close relations with the

14    prosecutor's office.  And he shared with me things that

15    were going on.  He said that --

16         Q.    Let me interrupt just for a second.

17         A.    I'm finishing that question.

18         Q.    I'm not clear.  You said he had close relations

19    with the prosecutor's office --

20         A.    Yes.

21         Q.    You're talking --

22         A.    Benninger.  I'm sorry.  Benninger.

23         Q.    Okay.  Go ahead and finish.

24         A.    So he knew a lot that was going on.  So,

25    another reason that I believe he -- that I believe he

97

1    was being unprofessional is, again, this dismissal

2    agreement.  One of the conditions is that I was supposed

3    to encourage my father to take down his website.

4          The email correspondence between Kief and Ellen

5    which you provided me during discovery shows that Kief

6    was actively trying to arrest me for violating that

7    agreement.  He -- Ellen was encouraging him to.  She was

8    asking him where he was in his investigation.  She was

9    giving him investigative advice.  She was asking him if

10   he was keeping records, things of that nature.  So he

11   clearly knew about the conditions because he was trying

12   to bust me for one of them, but he was helping Ellen

13   violate it.

14         Mike Benninger also told me -- he called me one

15   day and he said, hey, make sure -- I know you -- I know

16   you have nothing to do with your father's website, but

17   you better make sure you don't because Kief is upset

18   that he didn't get you.  He's coming after you.  West

19   Virginia State Police have employed a forensic --

20   computer forensics expert.  They are going -- the are

21   going gangbuster for you.  He wants to get you.  And I

22   was unfazed and unconcerned because I had no connection

23   to my father's website.

24         Mike Kief -- and I've never heard of this in

25   law enforcement.  Mike Kief reached out to someone at a

98

1   school board and someone -- a school principal on

2   Ellen's behalf to be a character reference for her.   I

3   have never heard of a law enforcement officer doing that

4   for a complainant.   It's highly unprofessional and

5   smacks me of improper relationship between Kief and

6   Ellen.

7          Chris Berry was allegedly having a sexual

8   relationship with Ellen.   I wouldn't be surprised if

9   Mike Kief was having a sexual relationship with Ellen or

10  had.   I don't know why he was taking sides in an

11  investigation.

12     Q.   You said you wouldn't be surprised if

13  Lieutenant Kief was having sex with Ellen.   Do you have

14  any evidence that he was?

15     A.   I don't.

16     Q.   Did I understand you correctly that emails that

17  you saw indicated that Sergeant Kief was actively trying

18  to have you arrested for your father violating the terms

19  of the agreement by posting the website?

20     A.   That he was investigating it, yes, in the

21  emails you provided me.   And we are still coming up with

22  search terms so that we can search additional emails.   I

23  don't believe that we've received -- it's my belief that

24  we haven't received everything.

25     Q.   Why do you believe that?

99

1    A.   Because in one of the emails Ellen says to

2    Kief, call or write me any time.  And it just appears

3    they have a very close relationship, an unprofessionally

4    close relationship between a trooper and complainant.

5    And it's just my belief.

6    Q.   Okay.  Just because you believe that the

7    relationship is too close?

8    A.   Yes.

9    Q.   No physical evidence?  You haven't seen any

10   emails like from Ellen's side that would lead you to

11   believe --

12   A.   No.

13   Q.   You said that the scope of the FBI

14   investigation was originally just about the emails that

15   you sent Ellen and that Sergeant Kief tried to expand it

16   to any way that you had abused your power.  Do you have

17   any reason to believe that Sergeant Kief knew what the

18   scope of the FBI investigation was?

19   A.   I suspect as is protocol that the agent would

20   have told Kief why he was interviewing him for me.

21   Q.   But you don't know that for certain?

22   A.   No.   There is also a -- there was an event

23   where a West Virginia State Trooper, after I filed my

24   criminal complaint approached an FBI agent in Clarksburg

25   and told the FBI agent that he was upset about the

100

1    lawsuit and that it was going to hurt relations between

2    the FBI and state troopers.  And I wouldn't be surprised

3    -- I don't have any information to believe that he

4    wasn't sent there by Kief.

5        Q.    We'll get to that allegation in a little bit.

6    I'll let you tell your story there.

7        A.    Okay.

8        Q.    You filed the original complaint in this matter

9    and the first amended complaint pro se; correct?

10       A.    Correct.

11       Q.    Did you draft them yourself?

12       A.    I did.

13       Q.    Did anyone assist you?

14       A.    No.

15       Q.    Now, after you were arraigned at magistrate

16   court, you said that you returned back to family court

17   to continue the hearing there; correct?

18       A.    Yes.

19       Q.    Okay.  Going back to the day of your arrest.

20   Sorry.  We got kind of diverted there for a bit.

21       A.    Yes.

22       Q.    After family court was over you reported to the

23   Morgantown state police detachment for processing;

24   correct?

25       A.    Right.  Which is interesting because they said

101

1    that the reason that they did it -- made the arrest at

2    family court was because they were afraid I was armed

3    and might hurt somebody.  But I walked into that

4    detachment with my firearm and had it on me the whole

5    time.  They weren't concerned about that.  That was just

6    pretense.

7        Q.   Was Sergeant Kief there when you were

8    processed?

9        A.   I don't know.

10       Q.   Did you see him?

11       A.   I did not.

12       Q.   How about Corporal Gaskins?  Was he there?

13       A.   I didn't know what Corporal Gaskins looked like

14   at the time.

15       Q.   Did you identify yourself as an FBI agent when

16   you came into the detachment?

17       A.   I didn't have to.  They knew who I was.  They

18   were expecting me.

19       Q.   Who was?

20       A.   This kid named Schlobeim (ph).

21       Q.   Named what?

22       A.   It was a kid named Schlobeim, a trooper.

23       Q.   Schlobeim?

24       A.   Yeah.

25       Q.   You wouldn't happen to know how to spell that,

102

1   would you?

2        A.   S-c-h-l-o-b maybe e-i-m or e-a-h-m, Schlobeim.

3        Q.   Had you worked with him before?

4        A.   Never met him in my life.

5        Q.   But he knew who you were?

6        A.   Oh, yeah.  They were very professional and

7   very, very good.

8        Q.   Was your gun visible?

9        A.   No.

10       Q.   Let's go back to your timeline for a second.

11   Go to --

12       A.   But had they been concerned about the gun as

13   they would be an offender or any other citizen, they

14   would have patted me down.  They weren't concerned about

15   that.  It was all pretense.

16       Q.   Do you believe that they pat down every citizen

17   that comes into the state police detachment?

18       A.   No, but I believe they would pat down citizens

19   who they previously said they were afraid would use

20   their gun on them.

21       Q.   On page 12 of your timeline --

22       A.   Yeah.

23       Q.   The very bottom, your entry for September 2nd,

24   2013.

25       A.   Yeah.

103

1    Q.   It says at the very end of this page and

2  continuing on to the next one, "Scott offers to waive

3  his constitutional right against self-incrimination and

4  be interviewed by the prosecutor's office and West

5  Virginia State Police.  Both declined the offer.  When

6  did you learn that you were under investigation?

7    A.   Can you direct me?

8    Q.   Sure.

9    A.   Page --

10    Q.   Bottom of page 12, the very end of it.

11    A.   My bottom of page 12 -- oh.  My bottom begins

12  with September 2nd, Corporal Gaskins.

13    Q.   Right.  And at the very last -- end of that

14  sentence, Scott offers to waive his constitutional

15  rights.  Do you see where I am now?

16    A.   Yeah.

17    Q.   Okay.  When did you learn that you were under

18  investigation?

19    A.   The day I was arrested.

20    Q.   So you did not know on September 2nd, 2013 that

21  you were -- you obviously couldn't, if you didn't know

22  you were under investigation, could not have offered on

23  September 2nd?

24    A.   No, so that's an error.  That's a good catch.

25    Q.   When did you offer to waive your Fifth

104

1   Amendment rights and give a statement?

2        A.    Immediately.  I told my attorney I want to talk

3   to them.  They need to hear my side of the story.

4        Q.    On the day of the arrest?

5        A.    Yeah.

6        Q.    Did your attorney advise you to give a

7   statement or to exercise your right?

8        A.    No.  He said I will reach out to prosecutors

9   and West Virginia State Police.

10       Q.    Now, on the day of the arrest, you -- if I

11  recall correctly, you're not sure who your attorney was

12  at that time, whether it was Mike or --

13       A.    My memory is vague.  That was a pretty

14  traumatic experience.  I -- there was another agent

15  there not representing me but just to see what was --

16  just to be there for my safety.

17       Q.    So there was another agent there at magistrate

18  court?

19       A.    Yeah.

20       Q.    Who was that.

21       A.    Not in magistrate court, but when Kief met me.

22  I don't recall his name.

23       Q.    At family court?

24       A.    Yeah.

25       Q.    When you came out?

105

1    A.   Yeah.  I'm sorry.  I -- maybe I wasn't

2  represented.  I don't know the sequence of events.

3  Again, it was a traumatic experience.  I don't recall.

4  I may not have even had an attorney by my side.  I don't

5  know.

6    Q.   Okay.  Fair enough.  I mean, we're talking

7  about events coming up on six years ago.  You know, I

8  should have covered this at the beginning of the

9  deposition.  If you don't know or you don't recall, I

10  want the best of your recollection, but I don't want you

11  to just make things up.

12    A.   Okay.

13    Q.   Let's move on in your timeline to the bottom of

14  page 14.

15    A.   Yeah.

16    Q.   9/16/13, "Scott loses his badge, gun, and law

17  enforcement powers due to the arrest.  Scott is

18  reassigned and loses out on promotional and transfer

19  opportunities."

20    A.   Yes.

21    Q.   So I'll represent to you that I went back and

22  checked my calendar.  September 13th, 2013, was a

23  Friday.  So the 16th would have been the following

24  Monday.  Does that sound right to you that it was the

25  next workday after the arrest?

106

1      A.    Yes.

2      Q.    Where were you reassigned to?

3      A.    The public access line.  They said we need to

4  take you out of the -- out of this high-profile

5  position.

6      Q.    Did this result in a change in your GS rating

7  or your pay scale?

8      A.    No.

9      Q.    No loss of pay?

10     A.    No loss of pay.

11     Q.    What promotional opportunities did you lose out

12  on?

13     A.    I was -- I had already taken the test and

14  passed the test to be promoted to a GS-15, a unit chief.

15  I had -- I was intent on applying for promotions.

16  People -- but I was -- because of the arrest, because of

17  the pending investigation by the FBI, I wasn't allowed

18  to put in for anything.

19          I was trying to get transferred as well.  And,

20  again, everything was put on hold and I was denied

21  transfer opportunities.

22     Q.    What transfer opportunities did you miss out

23  on?

24     A.    We have something called a -- what's it called

25  -- an OP list, an Office of Preference list.  You tell

107

1    the bureau where you want to go and, once during your

2    career, they will send you where you want to go.  And

3    it's based on seniority.  I wanted to get out of West

4    Virginia and go back home.  And I was not allowed to,

5    even though I was at the top of the list.

6        Q.   Do you know if any -- when you say go back

7    home, where were you wanting --

8        A.   Indianapolis area.

9        Q.   Do you know if any openings occurred at the

10   Indianapolis area that you would have been eligible for

11   --

12       A.   Several.

13       Q.   -- during this time?

14       A.   Several.

15       Q.   What positions were they?

16       A.   There was a counter-intelligence position in

17   West Lafayette and there was -- there were other just

18   general assignments in Indianapolis.

19       Q.   Were they for unit chief positions?

20       A.   No.   I was -- I was trying to get out of West

21   Virginia, and whether that was through promotion to

22   headquarters or through -- I was willing to step down to

23   go back home.

24       Q.   You say you had passed the test to be promoted

25   to unit chief.  Did any unit chief openings come open

108

1    while you were --

2         A.    Yes.

3         Q.    -- while the criminal charges were pending?

4         A.    Yes.  And a person who had much less seniority

5    than me and came to CJIS a year after I did got the

6    position because I wasn't allowed to apply for it.  I

7    was highly qualified for it, and I believe would have

8    gotten the position.  There were several other positions

9    at headquarters that I could have gotten as well.

10                    (Deposition Exhibit No. 30 was marked for

11                     identification.)

12        Q.    Mr. Ballock, I've handed you -- the reporter

13   has handed you what's been marked as Exhibit 30.  This

14   is the dismissal order from the criminal charges in

15   magistrate court as well as the attachment agreement.

16        A.    Yeah.

17        Q.    Go to page -- first, let me go to the second

18   page.  That will be the first page of the attachment.

19   Down there at the bottom lower left-hand corner, is that

20   your initials, STB?

21        A.    Correct.

22        Q.    Then on the last page, is that your signature

23   there?

24        A.    Yes.

25        Q.    And below that, your counsel signed it as well;

109

1    correct?

2         A.    Yes.

3         Q.    Without going into any details about the actual

4    discussion that occurred, is it fair to say that you

5    discussed this agreement with your counsel before you

6    signed it?

7         A.    Yes.

8         Q.    Looking on the second page, the first paragraph

9    of the agreement.  "Scott Ballock acknowledges that

10   probable cause existed for West Virginia State Police to

11   file for the issuance of the warrants in this case

12   pursuant to West Virginia Code Section 61-3C-14a and

13   Section 61-2-9a."  Did Corporal Gaskins have probable

14   cause to charge you with those violations?

15        A.    I don't believe he did.

16        Q.    You signed at the bottom of this agreeing that

17   he did.  Did you submit a false statement to the

18   magistrate court?

19        A.    In that regard, yes.

20        Q.    Now, as an FBI agent investigating crimes, you

21   understood what probable cause meant; correct?

22        A.    Yes.  It's a very low standard.

23        Q.    And when you would investigate cases, you would

24   gather the evidence and present it to a U.S. Attorney;

25   correct?

110

1      A.    Yes.

2      Q.    If the attorney told you this isn't enough, we

3  need more evidence, you would go back and get additional

4  evidence, wouldn't you?

5      A.    Yes.

6      Q.    Conversely, if the U.S. Attorney told you we're

7  good to go, we're going to move forward with these

8  charges, did you second-guess the U.S. Attorney and say,

9  hold on, I better go get more evidence?

10     A.    No.

11     Q.    Over your 14 years as an FBI agent, did you

12 ever investigate a case where the suspect got acquitted?

13     A.    Yes.

14     Q.    Did that mean you didn't have probable cause to

15 charge the suspect in the first place?

16     A.    No.

17     Q.    Did you ever have charges against a suspect in

18 a case where you had investigated, ever have charges

19 dismissed?

20     A.    No.

21     Q.    Did you ever have a situation where a suspect

22 in a case that you had investigated would be charged

23 with multiple counts and, as part of a plea deal, the

24 government would agree to dismiss certain counts in

25 order to get a guilty plea for another count?

1    A.    Yes.

2    Q.    Did that mean that you didn't have probable

3 cause to charge the suspect with the charges that were

4 dismissed?

5    A.    No.

6    Q.    You would agree with me that just because a

7 suspect ends up not pleading guilty or being found

8 guilty, that does not mean that there was not probably

9 cause?

10    A.    Correct.

11    Q.    And you just testified that you submitted a

12 false signed statement to the magistrate court saying

13 that there was probable cause to charge you when you did

14 not believe there was.  Why did you do that?

15    A.    I did that because my attorney advised me to.

16 I did that because I wanted to protect my children.  I

17 was concerned about this reflecting poorly on me.  I did

18 it because Benninger told me that Marcia Ashdown had

19 already agreed to expunge the case as soon as possible,

20 which we did 60 days later.

21         I did it because he said Marcia Ashdown

22 insisted on this statement because, even though she

23 believed -- and her words were, "My boys have been

24 behaving badly."  Even though Marcia Ashdown told

25 Benninger that she believed they conspired with Ellen to

112

1    get me that she didn't want to see her boys face a civil

2    suit, and she believed that this would preclude me from

3    filing a civil suit.

4        Q.    Any other reasons why you knowingly submitted a

5    false statement to the magistrate?

6        A.    No.  Everybody knew that probable cause didn't

7    exist.  Marcia did.  My attorney did.  I believe Ellen

8    did.

9        Q.    And you would agree with me that the magistrate

10   found probable cause and issued a warrant for your

11   arrest; correct?

12       A.    Yeah.  Sure.  That's pretty easy.

13       Q.    Let's refer back to your timeline for a minute.

14   Page 8 on your entry for May 21st, 2013, "Kenny Ice

15   interviews begin."

16       A.    Yes.

17       Q.    That's the day you first spoke to Kenny Ice?

18       A.    I think so.

19       Q.    It says here in your timeline that Mr. Ice

20   revealed that Ellen was having a sexual affair with West

21   Virginia State Police Trooper Chris Berry, that Ellen

22   and Berry were working to have you arrested so that you

23   would lose your job and so that Ellen would win custody

24   of the children and lifetime alimony payments.

25       A.    Yes.

113

1    Q.   And that Trooper Berry, at Ellen's request, was

2  conducting surveillance of you and your parents?

3    A.   Yes.

4    Q.   He told you all this at this meeting on

5  May 21st, 2013?

6    A.   I don't know if this was aggregated when I made

7  the timeline, or if he told me that on the 21st.

8    Q.   So you don't know if that's when he told you?

9    A.   Yeah.

10            MR. CROOKS:   I'm sorry.   What page were

11  you referring?

12            MR JEFFRIES:   Page 8, entry for 5/21/13.

13            (Deposition Exhibit No. 31 was marked for

14            identification.)

15    Q.   Mr. Ballock, I've handed you Exhibit 31.   At

16  the top it says, "Interview of Kenny Ice by Scott

17  Ballock."

18    A.   Yes.

19    Q.   We received this from you in discovery.   Am I

20  correct that you prepared this document?

21    A.   Yes.

22    Q.   And am I correct that the initials on the left

23  are by Kenny Ice?

24    A.   Yes.

25    Q.   Those are his handwriting; correct?

114

1       A.    Correct.

2       Q.    I take it then that you had typed this up and

3   brought it with you when you met -- well, no.

4       A.    That's right.

5       Q.    After you met Kenny Ice on May 21st, 2013, you

6   had another meeting with him?

7       A.    We had several.

8       Q.    And brought this and he read over it and

9   initialed it?

10      A.    Yes.

11      Q.    Take a moment to look through here.  Would you

12  agree with me that there was absolutely no mention of

13  Chris Berry in this document?

14      A.    I would agree with that.

15      Q.    Why not?

16      A.    Again, as I've said before, I'm not certain if

17  I was aggregating everything when I made this timeline.

18  He didn't tell me that during this interview.  He would

19  -- he parsed information.  He would repeatedly call me,

20  ask me to meet or talk to me on the phone.  And I didn't

21  document everything that he told me.

22           My efforts were at documenting those things

23  that I thought would help me protect the children in the

24  family court hearings.  When he told me that he was

25  having an affair with -- she was having an affair with

1  Berry and that he was going to arrest me, I was

2  unconcerned because I didn't think I was doing anything

3  wrong.

4      I didn't document it.  I didn't document a lot

5  of things that he told me.  I had a busy life.  I was a

6  single parent.  I was raising my two children.  I work.

7  I didn't document everything he told me.

8      Q.   As I understand it, you allege that there were

9  some text messages between Trooper Berry and Ellen; is

10 that correct?

11     A.   According to Kenny Ice, Jr.

12     Q.   Did you see the text messages?

13     A.   I did not.  Kenny Ice, Jr. said they were of a

14 personal nature, highly inappropriate messages between a

15 law enforcement officer and Ellen, someone that was

16 already in a relationship with him.

17     There was one message along the lines of what

18 should I bring over for lunch.  This caused a fight --

19 or maybe what should I get for lunch.  I don't know

20 which one sent it.  It caused a fight between Ellen and

21 Kenny which resulted in deputies being called out to the

22 house.

23     Q.   But you did not actually see those text

24 messages?

25     A.   I did not.  They were sent at a time when Berry

116

1    was apparently off duty.

2        Q.    Okay.  And so what exactly did Mr. Ice tell you

3    about Trooper Berry and Ellen?

4        A.    That they were having a relationship.

5        Q.    Sexual relationship?

6        A.    Sexual relationship, yes, and that it was clear

7    from the email -- from the text messages.

8        Q.    It was clear to him?

9        A.    Yeah, clear to him.

10       Q.    When did he say this affair began or this

11   relationship began?

12       A.    I didn't -- I don't think I asked that and I

13   don't know he told me.

14       Q.    How long did the relationship last?

15       A.    I don't know the answer to that.

16       Q.    How did Trooper Berry and Ellen meet?

17       A.    I don't know the answer to that.

18       Q.    Where would they meet to have sex?

19       A.    I don't have the answer to that.

20       Q.    Kenny Ice didn't provide you with any of this

21   information?

22       A.    No.

23       Q.    What I can't understand, Mr. Ballock, Ellen had

24   been seeing other men with your knowledge since

25   approximately 2003.  So, at this point, for ten years.

117

1  The two of you were separated and in the process of
2  getting a divorce.  She was dating Kenny Ice, had been
3  dating him for a year at this point.  If she was having
4  an affair with Trooper Berry, why would you care?
5       A.    I didn't care.  I couldn't care less.  The
6  reason he told me was because it's what started a fight.
7       Q.    Between him and --
8       A.    Between them.  I cared only in that he also
9  said they were trying to find a way to arrest me.
10      Q.    What specifically did he tell you about that?
11      A.    Just that they were trying to find a way to
12  arrest me.
13      Q.    Did he tell you why he believed that?
14      A.    So that I would lose my job.
15      Q.    But, I mean, why did he believe that they were
16  trying to find a way to arrest you?
17      A.    I don't know.  He was -- he was coy in a lot of
18  things.  He, again, would parse out information,
19  increasingly damaging information.  In fact, he once
20  told me I have one thing that I'm not even telling you
21  that would send Ellen to jail and she'd never see her
22  kids again, but I'm waiting to see how you treat me
23  through all this.
24      Q.    That's what Kenny Ice told you?
25      A.    Yeah.

118

Q.   Now, in Paragraph 26 of your complaint it says that "Ballock independently uncovered evidence which corroborates the allegation that Trooper Berry was maintaining a romantic relationship with Costlow."  What evidence did you uncover?

A.   That night, Ellen and Kenny got into a physical altercation and Ellen called 911.  Ellen asked specifically of the 911 operator to speak with Chris Berry.  She said that she had Chris Berry's personal cell number.  She told the 911 operator that Chris Berry had been to her house earlier in the day.

The 911 operator asked why Chris Berry had been to her house earlier in the day and Ellen told the 911 operator that he had been there investigating car break-ins in the neighborhood.  The 911 operator told Ellen that Berry was working a midnight shift.  And, of course, remember, Berry had been to the house earlier in the day investigating, I guess, magnanimously on his time off, car break-ins.

Well, I learned from Kevin Tipton, Ellen's former attorney who lived across the street, they had a -- I learned from Kevin Tipton that the West Virginia State Police had not investigated car break-ins in the neighborhood, which makes sense.  I don't think that -- I don't know, but in my experience, I've not worked with

119

1   state troopers who investigate car break-ins.  Maybe

2   they do.  But, in any event, it wasn't investigated by

3   the West Virginia State Police, according to Kevin

4   Tipton.  He lived in the neighborhood, lived across the

5   street from us, actually.  So he was fully aware of the

6   investigation.

7        The investigation into the neighborhood car

8   break-ins was conducted by the local sheriff's

9   department, which is appropriate.  It makes sense.  And

10  he also reminded me that Ellen's car wasn't one that had

11  been broken into and that the investigation had occurred

12  three months previous.  But Berry was there conducting

13  an investigation with Ellen into car break-ins.

14       Q.   How do you know Berry was there that day?

15       A.   Because that's what Ellen said to the -- Ellen

16  said Berry was here earlier today investigating car

17  break-ins.

18       Q.   Okay.  Hasn't it been your position throughout

19  the divorce proceedings, the criminal prosecution, the

20  administrative investigation by the FBI, and, in fact,

21  in this case that Ellen Costlow suffers severe mental

22  illness, is a compulsive liar --

23       A.   Yes.

24       Q.   -- and is not to be believed?

25       A.   Yes.

120

1     Q.   Why do you believe her when she says Chris

2  Berry was there that day?

3     A.   Well, because the same reason I believe Kenny

4  Ice.  I don't just take people at their word.  I

5  corroborate the information.  When Kenny Ice told me

6  that Ellen was exposing my daughter, my nine-year-old

7  daughter to a convicted sex -- child molester, I went

8  and interviewed the child molester.  I interviewed the

9  child molester's probation officer.

10      I also know that Ellen -- and it's in the text

11  messages that we've provided you -- says that she's so

12  good at lying because she sprinkles the truth in with

13  her lies.  So the reason that I believe it's true is

14  because Kenny saw the text messages between Chris Berry

15  and Ellen, combined with the fact that Ellen told the

16  911 operator that Berry had been there earlier in the

17  day, combined with the fact that during discovery Chris

18  Berry admitted that he was there investigating car

19  break-ins.  But, of course, he doesn't have any notes,

20  he didn't write a report, he only interviewed Ellen.

21     Q.   He said that he was there August 12th, 2013?

22     A.   No.  No.

23     Q.   So you have no independent corroboration that

24  he was there that day?

25     A.   I do not.  But it sure stinks to high heavens.

121

1        Interestingly, the deputies asked Ellen why

2  Kenny and she were fighting, and Ellen told the deputies

3  that they were fighting because Kenny had accused her --

4  had seen messages and accused her of having a sexual

5  relationship with Chris.  And they asked, well, why was

6  Chris Berry here earlier in the day.  And she told them

7  a different story.  She told them that he was there

8  investigating her -- theft of her laptop, which occurred

9  in Fairmont, West Virginia, and was appropriately

10  investigated by the local authorities there three months

11  prior.

12        And, again, I don't know what West Virginia

13  State Police do, but in my experience I've never known

14  West Virginia -- or state troopers to have jurisdiction

15  over and concerns about the theft of a stolen laptop.

16  But her story changed.

17    Q.   So the inconsistency of her story makes it more

18  credible?

19    A.   The inconsistency of her story shows me that

20  she was under stress and she got caught in her lie.  I

21  don't --

22    Q.   The lie could be that Chris Berry was never

23  there at all, couldn't it?

24    A.   Yes.

25        (Deposition Exhibit No. 32 was marked for

122

1              identification.)

2      Q.   Mr. Ballock, this was produced by you in

3  discovery.

4              MR. CROOKS:   Exhibit 32?

5              MR. JEFFRIES:   32, yes.   Sorry.

6      Q.   It says at the top, "TB phone conversation with

7  Sergeant Kief," and discusses a telephone conversation

8  between your father Tom Berry (sic) and Sergeant Kief.

9  Would you agree that's a fair characterization of it?

10     A.   Between my father Tom Ballock --

11     Q.   I'm sorry.   Tom Ballock.

12     A.   -- and Sergeant Kief; correct.

13     Q.   Are these your father's notes of the phone

14  conversation?

15     A.   No.   That was his recollection of the phone

16  conversation to me.

17     Q.   Did you type this or did he?

18     A.   I did.

19     Q.   When were these notes made?

20     A.   I don't remember.   Well after it occurred

21  because we had problems coming up with the date.   That

22  was our best estimate.

23     Q.   So, well after this conversation occurred, your

24  father relayed to you his recollection of the --

25     A.   He relayed to me his conversation with Kief

123

1    immediately after it happened.  But then I wanted to

2    write this up some time later and said remember that,

3    tell me again what happened.

4        Q.    Okay.  Why did your father contact Sergeant

5    Kief about allegations that his

6    soon-to-be-ex-daughter-in-law was seeing a state

7    trooper?

8        A.    My dad said that he did that to protect Trooper

9    Berry, actually, because Ellen had sexual relations with

10   men and would then go tell their wives about the

11   relationship.  And he said that he was trying to help

12   Berry avoid the same fate.

13       Q.    Now, there's no mention in here that your

14   father asked Sergeant Kief to file a formal complaint

15   against Trooper Berry, is there?

16       A.    No.

17       Q.    Did your father tell you that he asked Sergeant

18   Kief to file -- that he wanted to file a formal

19   complaint against Trooper Berry?

20       A.    I don't think he did.  I think, again, I think

21   he was calling just to give a heads-up.

22       Q.    Let's go back to your timeline.

23             MR. WILLIAMS:  Take a break?

24             MR. JEFFRIES:  Let me finish this up.

25       Q.    Let's go to page 12.  Are you there?

124

1       A.      Yeah.

2       Q.      Okay.  Your entry for August 15th, 2013,

3   indicates that you then contacted Sergeant Kief to

4   confirm that the state police failed to document its

5   response to a violent domestic incident between Ellen

6   and Kenny Ice on March 6th, 2013?

7       A.      Yes.

8       Q.      And that Sergeant Kief told you it was none of

9   your business, yelled at you --

10      A.      Yes.

11      Q.      -- and then angrily tells you that Trooper

12  Berry did not engage in a sexual relationship with

13  Ellen.  So the purpose of your call wasn't to discuss

14  this allegation that Trooper Berry was allegedly seeing

15  Ellen but to ask about this domestic violence incident

16  on March 6th; correct?

17      A.      Correct.

18      Q.      What did you tell Sergeant Kief?

19      A.      I asked him why there wasn't any documentation

20  made when his troopers responded to a domestic violence

21  -- a very violent domestic violence episode, why they

22  wouldn't make a record of that, is that common

23  procedure.  At first, I called to see if they did

24  because I wanted to obtain a copy of it.  He said that

25  they didn't and that it was not uncommon for them to not

125

1    write up such a report.

2        Q.   So this was August.  This domestic violence

3    call occurred in March, five months earlier.  Why were

4    you just now contacting the state police about it?

5        A.   Again, Kenny Ice parsed out information.  And

6    as you'll see, 8/15, we're getting closer to the custody

7    hearing.  Maybe it just came to my -- you know, maybe I

8    just thought then that I needed to get that.

9        Q.   Did Trooper Berry respond to this call on

10   March 6th?

11       A.   I don't know.

12       Q.   How did Trooper Berry's name come up if you

13   were just calling to talk about this report?

14       A.   Because I knew that my dad had previously

15   called Trooper Kief about Trooper Berry.

16       Q.   And so why did it come up?

17       A.   I don't know.  I don't know if I brought it up

18   or if Kief brought it up.  I don't remember how it came

19   out.

20       Q.   You testified earlier that you really didn't

21   care if Trooper Berry was seeing Ellen?

22       A.   No.

23       Q.   Did you ask Sergeant Kief if you could file a

24   formal complaint against Trooper Berry?

25       A.   No.

126

1     Q.   Did Sergeant Kief speak to Trooper Berry about

2   these allegations of Trooper Berry's involvement with

3   Ellen?

4     A.   I have no idea.

5     Q.   Did Sergeant Kief speak to Ellen about the

6   allegations that she was seeing one of his troopers?

7     A.   I have no idea.

8     Q.   Paragraph --

9     A.   But I will say that in discovery, we asked for

10  that information and the only thing that you could

11  provide was one single page of scribbles by Sergeant

12  Kief, no investigative reports, no notes, no nothing.

13     Q.   It's true, I mean, you've testified that

14  neither you nor your father asked Sergeant Kief to open

15  up a formal complaint?

16     A.   Right.  But it's standard practice in law

17  enforcement agencies, if such an egregious violation is

18  alleged against one of your troopers, you take notes,

19  you conduct an actual investigation.  You don't -- I was

20  surprised.  I was shocked at the extent of his

21  quote/unquote investigation was his handwritten

22  scribbles.

23     Q.   Okay.  In Paragraph 74 of your complaint, you

24  allege that Sergeant Kief never interviewed you or your

25  father?

127

1    A.    Right.

2    Q.    But didn't you and your father both relay your

3  concerns to Sergeant Kief?

4    A.    Relaying my concerns is not him interviewing.

5    Q.    But you did relay your concerns; correct?

6    A.    Yes.

7    Q.    Was there information that you were holding

8  back for a later interview?

9    A.    No.  He did ask me about it.  He just said he

10 didn't do it.

11   Q.    What information could -- I mean, why would he

12 need to speak to you again if you and your father both

13 relayed what information you knew?

14   A.    All this information that I've already shared,

15 that Ellen does that sort of thing, that she has sex

16 with people to manipulate things, that Kenny Ice said

17 that he saw the text messages.  And then that would

18 allow Sergeant Kief to check his text messages.

19         Ellen's inconsistent stories to the operator.

20 Ellen's telling the operator that Berry had been there

21 earlier in the day.  All sorts of things.

22   Q.    And you didn't tell -- you didn't share those

23 with Sergeant Kief when you first raised the issue of

24 Trooper Berry?

25   A.    No, because that was not the purpose of my

128

1    call.  The purpose of my call was simply to ask why

2    wasn't there any documentation by the West Virginia

3    State Police who responded to a violent domestic

4    incident at which my daughter was present.  And he said

5    that's not uncommon.

6        Q.   But you did speak, even though the purpose of

7    your call was to ask about this report or lack of a

8    report, you did speak about the allegation that Trooper

9    Berry was seeing your --

10       A.   I don't know that we spoke about it.  I think

11   it was just a very quick -- I already talked to him, he

12   didn't do it.

13       Q.   And you didn't, at that point, say --

14       A.   Let me give you more --

15       Q.   I've got text messages, I've got this --

16       A.   No.

17       Q.   -- I've got that.

18       A.   No.

19       Q.   All right.

20       A.   Again, because that wasn't the purpose of my

21   call.  That wasn't my primary concern.

22               MR. JEFFRIES:  Okay.  Let's go ahead and

23   take a break.  I know at least some lunch is here.

24               THE VIDEOGRAPHER:  The time is 12:24.  We

25   are off the record.

129

1          (There was a short break in the

2          proceedings.)

3          THE VIDEOGRAPHER:  We are back on the

4     record.  The time is 12:57.

5     BY MR. JEFFRIES:

6     Q.   MR Ballock, in Paragraph 68 of your complaint

7     you allege that Corporal Gaskins prepared an incident

8     report that was -- and I'm quoting from the complaint

9     here -- "Replete with inaccuracies and outright

10    salacious lies."

11         So I'll hand you what's going to be marked as

12    Exhibit 33.  This is the incident report you were

13    referring to in the complaint; correct?

14    A.   Correct.

15          (Deposition Exhibit No. 33 was marked for

16          identification.)

17    Q.   Can you identify for me any inaccuracy or

18    outright salacious lies in the report?

19          MR. CROOKS:  Mark, what paragraph?

20          MR. JEFFRIES:  Paragraph 16 of the

21    complaint.

22    Q.   Okay?

23    A.   Excuse me.

24    Q.   You're on the second page?

25    A.   Yes.  The last paragraph, I do not believe my

130

1    behavior was obsessive, I don't know Ronnie Gaskins'

2    background in psychiatry to make that statement.  The

3    next point --

4        Q.    Let me address that.  Now, you would agree with

5    me that the incident report does not show that -- does

6    not state that you are obsessive or exhibiting obsessive

7    behavior; correct?  It says the accused appears to show

8    obsessive behavior; correct?

9        A.    That's a statement.

10       Q.    Would you agree that that's a statement of

11   opinion?

12       A.    Yes.

13       Q.    Okay.  Go on to the next one.

14       A.    I'd like to point out just -- it's not an

15   inaccuracy, but I'd like to point out that the close-up

16   pictures of the accused crying, that was sent to her

17   after she sent me one like that.  And I believe Charles

18   provided that to you.

19       Q.    You're on page 3 now?

20       A.    Page 3, second paragraph.  "One email in

21   particular from westcoasttwiggs to victim's email

22   account and Kenny Ice's email account."  I don't believe

23   I ever sent it to Ellen.  I believe I sent it only to

24   Kenny Ice.

25       Q.    Would you characterize that as an inaccuracy or

131

1   an outright and salacious lie?

2       A.   Inaccuracy.  Page 4, the victim advised the

3   reason the accused wanted her to come back into his life

4   was so she could fulfill his fantasy.

5       Q.   Which paragraph are you on?

6       A.   The first paragraph.

7       Q.   Okay.  I see it, about four lines down?

8       A.   That's a salacious lie.

9       Q.   So it's your position that Ms. Costlow did not

10  tell Corporal Gaskins that the reason you wanted her

11  back was to -- so that you could fulfill -- so that she

12  could fulfill your fantasy?

13      A.   No.  That statement is a lie.

14      Q.   But you have no reason to doubt that she

15  advised Corporal Gaskins of that, would you?

16      A.   No.

17      Q.   Okay.

18      A.   The victim advised the accused would record men

19  having sex with her and he would get off on watching the

20  videos.  That's a lie.

21      Q.   Again, do you have any reason to believe that

22  she did not tell Corporal Gaskins that?

23      A.   No.

24              MR. CROOKS:  What was the page and

25  paragraph referenced?

132

1        THE DEPONENT:  Page 4, Paragraph 1.

2        A.    The victim advised that the camera would not

3   function properly or the battery was going low, the

4   accused would "hyperventilate," in quotes.  That's a

5   lie?

6        Q.    So Ms. Costlow did not tell Corporal Gaskins

7   that?

8        A.    I don't have any reason to believe that.

9        Q.    You don't believe that she told him that?

10       A.    No.  I didn't say that.  I don't have any

11  reason to believe that she didn't tell him.

12       Q.    Okay.  All right.  Sorry.  Go ahead.

13       A.    The victim advised the accused had a file on

14  every male subject that responded to the Craigslist.

15  That's a lie.

16       Q.    And, again, is it the fact that she told

17  Corporal Gaskins that a lie or is what she is saying a

18  lie?

19       A.    What she is saying is a lie.

20       Q.    But you have no reason to believe that Corporal

21  Gaskins was lying when he said that she advised him of

22  that?

23       A.    Correct.  I just don't understand why Corporal

24  Gaskins wouldn't talk to me.  I have copies of the

25  videos on my iPad and DVDs were --

133

1      Q.     Which --

2      A.     Second paragraph, page 4.  Sorry.  That's a

3   lie.

4      Q.     And, again, kind of with the standard line of

5   questioning here.  It says, "the victim advised."  Do

6   you believe that Ellen did not advise Corporal Gaskins

7   of that?

8      A.     I have no reason to believe that.  Victim

9   advised, to your point, "the accused would make fun" --

10  so this one isn't the victim advised.  "The accused

11  would make fun of Brett Twiggs and Brett Twiggs had an

12  email account."  I'm sure Gaskins, if he had to write it

13  again, would write the victim advised.

14     Q.     You believe that she told him that?

15     A.     Sure.

16     Q.     Okay?

17     A.     The victim advised the emails -- making

18  reference to sexual acts with animals were excerpts of

19  her and the erotic fictional writing.  Same.

20            The accused got off on the erotic fictional

21  writing.  I have no reason to believe that Ellen didn't

22  tell him that.  And if he had to write it over again, he

23  would write the victim said.

24            The victim advised -- blah, blah, blah -- when

25  her father passed away.  Her father is still very much

134

1    alive.  So that's just an inaccuracy.

2            Due to officer safety reason -- oh, sorry.

3    Page 5, fifth paragraph.  Due to officer safety reasons,

4    the arrest warrants were served at the Monongalia County

5    Magistrate Court.  The accused is a federal law

6    enforcement officer and carries an issued firearm.  I

7    have serious doubts that due to officer safety reasons

8    that's why they served it on me at and in front of the

9    family court judge.  Again, I walked into their

10   detachment fully armed.

11       Q.  But the rest is true, you would agree?  I mean,

12   they were served on you at the Mon County Magistrate

13   Court?

14       A.  Yes.

15       Q.  You were a federal law enforcement officer, and

16   you did carry an issued firearm; correct?

17       A.  Yes.

18       Q.  Okay.

19       A.  Page 6, second paragraph, third line from the

20   bottom.  The accused got into an argument and the

21   accused pushed her down and fell onto the ground and

22   hurt her knee.  The victim advised her children were

23   present when this argument occurred.  Again, lies.

24       Q.  But again, it says, "the victim advised."  Do

25   you believe that Ellen did not tell Corporal Gaskins

135

1  that?

2      A.   No.   But had he come and talked to me or the

3  children he would know that -- and my innocent children,

4  9 and 11, had no reason to lie -- that that didn't

5  happen, nor did the next paragraph, screaming in her

6  ear.   But, again, yes, he wrote, "The victim advised."

7          Next paragraph, the accused told her that is --

8  that's just a typing error -- that is -- I guess he

9  meant to say a suicidal person is the most dangerous.

10 That's a lie that I did any of that.   But, again, I have

11 no reason to believe that if he had to write it over

12 again he would write the victim advised.

13         Two more paragraphs down, second from the

14 bottom.   I never put her in a headlock and asked her if

15 she was ready to die.   But, again, he wrote, "The victim

16 advised," like you said.

17         Next page, 7, top paragraph.   The victim

18 advised Scott Kirby is one of the individuals that I set

19 her up with through Craigslist.   That's a lie.   But,

20 yes, he said the victim advised.

21         Second paragraph, the victim alleged that her

22 boyfriend Kenny Ice took her cellular phone and handed

23 it over to the accused.   It was not her cellular phone.

24 It was Kenny's cellular phone.   But, again, he wrote,

25 "The victim alleged."   But, again, this is why you

136

1  interview more than just the complainant.  Everyone

2  knows that.

3       This is a good one.  The third paragraph, the

4  victim went on displaying that the accused would cut his

5  toenails short, to the point where they would bleed and

6  make a comment it was a relief.  She accused me of being

7  a cutter.  She told the -- I have no idea how she came

8  up with that.  That was pretty fantastical.  She told

9  the psychiatrist that I was a cutter and therefore I was

10 dangerous.

11      I was going through, obviously, the most

12 difficult time of my life, and she, in response to that,

13 had me roll up my pant legs and my sleeves to see that I

14 have no scars.  I'm not a cutter.  I don't know why she

15 -- she would have said those things.

16      Well, I do know why.  She was trying to make me

17 out to be a monster.  It fit within her narrative.

18 That's a lie.  But, again, as you say, he wrote, "The

19 victim."

20      Q.   So --

21      A.   But, again, that's why you talk to other

22 people.  You don't just talk to just the complainant

23 unless you're trying to accomplish an objective.

24      Q.   You would agree with me then that nearly

25 everything that you've characterized as a lie was

1   related to -- it even explicitly says in the report that

2   Ellen told Corporal Gaskins that.

3       A.   Correct.

4       Q.   Would you agree that on the two or three

5   occasions you pointed out where he did not actually say

6   -- you know, preface the statement with "the victim

7   advised," would you agree that if you read in context

8   he's just relaying what she told him?

9       A.   Yeah.

10      Q.   In Paragraph 216 of your complaint it says

11  "When he prepared the report, Gaskins knew or should

12  have known that the statements provided to him by

13  Costlow were false."  I'd like to break that down.  Why

14  do you think Corporal Gaskins actually knew the

15  statements were false?

16      A.   Because I believe that they worked in concert

17  with Ellen to affect my arrest at family court to

18  advantage Ellen and disadvantage me based upon all the

19  other evidence.  And, at minimum, he should have known

20  because he should have interviewed more than the

21  complainant, especially in a divorce case.  Everyone

22  knows that that's where false allegations are routinely

23  made.  It's unbelievable.

24      Q.   I don't want to interrupt you.  Are you done?

25      A.   I'm done.

138

1     Q.   Okay.  That was my next question.  Why do you

2   think he should have known the statements were false and

3   you believe he should have interviewed more people than

4   just Ms. Costlow?

5     A.   You hear divorce -- you hear divorce,

6   immediately your antennae go up.

7     Q.   Would you agree that that's the same -- in

8   terms of not just divorce but a non-married couple

9   that's in a fight?

10     A.   Yes, but going through a divorce raises it to

11   another level with regard to false allegations.

12     Q.   So Kenny Ice and Ellen were going through a

13   fight, separation back in May of 2013 when he approached

14   you.  Did you contact Corporal Berry or Trooper Berry to

15   find out about the allegations against him?

16     A.   To -- I'm sorry.  Ask that again.

17     Q.   Kenny Ice informed you that he believed Ellen

18   and Trooper Berry were intimately involved?

19     A.   Yes.

20     Q.   They were fighting at the time; correct?

21     A.   Correct.

22     Q.   That's why Kenny came to you; correct?

23     A.   Correct.

24     Q.   Did you go to Trooper Berry to corroborate her

25   story?

139

1     A.    I did not.

2     Q.    You stated in the complaint, specifically in

3  Paragraphs 139 and 140, that Ellen is a, quote,

4  "skillful liar."  Why should Corporal Gaskins have known

5  that her statements were false especially when she had

6  your own emails to back a lot of them up?

7     A.    Because had he done his job properly and

8  professionally, he would have -- and had he not been

9  trying to serve another objective, he would have

10 interviewed more than the complainant.

11    Q.    So you just believe he didn't conduct an

12 adequate investigation?

13    A.    On purpose.

14    Q.    Who was this report provided to?

15    A.    Which report?

16    Q.    The incident report?

17    A.    Who was it provided to?

18    Q.    Yes.

19    A.    I don't understand the question.  They created

20 it for their --

21    Q.    Do you know who read this report?

22    A.    Who read it?

23    Q.    Yes.

24    A.    I have no idea who all read it.

25    Q.    Do you know if it was provided to anyone

140

1   outside of the criminal proceedings?

2       A.   I don't know.  But I wouldn't be surprised if

3   Christi Cooper-Lehki received it as part of her

4   investigation.  I don't know.

5       Q.   Between the time that you were arrested in

6   September 2013 and the time that the charges against you

7   were dismissed in April 2016, you didn't have any

8   contact with Sergeant Kief, did you?

9       A.   No.

10      Q.   During that same timeframe, did you have any

11  contact with Sergeant Gaskins?

12      A.   No.

13      Q.   During that same timeframe between your arrest

14  and the dismissal of the charges, did you have any

15  contact with Trooper Berry?

16      A.   No.

17      Q.   Did any of the troopers, my clients, ever offer

18  to drop the criminal charges against you?

19      A.   Your clients?

20      Q.   Yes.

21      A.   No.

22      Q.   Did Ellen ever offer to drop the charges

23  against you?

24      A.   Through the assistant prosecutor.

25      Q.   Which assistant prosecutor?

141

1       A.   Cindy Scott.  Cindy Scott, at my initial

2   hearing, before it began, Benninger and Scott approached

3   the bench and Benninger explained to the judge what this

4   was all about in reality and it belonged in family

5   court.  Cindy Scott held up a West Virginia statute book

6   and said these are all the ways you can arrest someone

7   in West Virginia, if you want to find a way to arrest

8   someone, you can.  The West Virginia State Police dumped

9   this in my lap.  The judge looked at her and said and

10  now you're dumping it in my lap.  And she shrugged.

11       My attorney told me that Cindy Scott did not

12  want to pursue these charges against me but that Ellen

13  was threatening her that if she didn't she would make a

14  big stink about it.  He said -- and this was before she

15  announced.  He said that Cindy Scott was going to run to

16  be a judge, and she didn't want the victim of a domestic

17  to be able to say that she didn't take care of her.  So

18  she was threatening Cindy Scott.

19       And, in fact, Cindy Scott believed that Ellen

20  once surreptitiously recorded a conversation with her.

21  So, again, Cindy Scott didn't want to prosecute me

22  according to Mike Benninger.  But she said Ellen is

23  forcing me to.

24       And Cindy Scott, though, worked with Ellen and

25  offered to dismiss the case if -- on the condition that

142

1    my father remove a website that he had created which had

2    Ellen on it.  Benninger --

3        Q.    Which one?

4        A.    I don't know what it is.  Benninger called my

5    dad into his office and me, told us of Cindy Scott's

6    proposal.  And my dad refused, so Benninger threw him

7    out of the office.

8        Q.    You don't know the name of the website that

9    Cindy Scott wanted removed?

10       A.    No.

11       Q.    So Ellen continued to prosecute the case until

12   it was eventually dismissed?

13       A.    Yes.

14       Q.    Was Trooper Berry involved in your criminal

15   prosecution at all?

16       A.    I don't know.

17       Q.    Did he ever appear at any of the hearings

18   related to the criminal charges?

19       A.    Not that I'm aware.

20       Q.    How did my clients, Lieutenant Kief, Sergeant

21   Gaskins, and Trooper Berry, how did they abuse the

22   criminal process?

23       A.    By working with Ellen to have me arrested at

24   family court to advantage her and disadvantage me.

25       Q.    And --

143

1    A.   By forming an inappropriately close

2  relationship with a complainant, by violating and

3  inviting someone else, Ellen, to violate a judge's

4  order, and by giving her suggestions as to how to

5  violate it, by --

6    Q.   Let me pause you there.  When you're talking

7  about violation of the order, that's what you testified

8  to earlier about talking to the FBI?

9    A.   Uh-huh.

10    Q.   And that was after the charges had been

11  dismissed; correct?

12    A.   Correct.  But he's still a part of the criminal

13  justice system and he's abusing his position to try and

14  get me fired, clearly, because it was more to him.

15    Q.   Any other ways that they abused the criminal

16  process?

17    A.   By not following their policy manual in

18  conducting the investigation.

19    Q.   In Paragraph 183 of the current complaint you

20  allege that the state police defendants continued their

21  efforts even after it was apparent the plaintiff was

22  innocent.  How did they continue their efforts?

23    A.   By all of those -- what I just said.  By all of

24  those actions.

25    Q.   Essentially continuing the prosecution?

144

1    A.   Uh-huh.  They had or should have had Christi
2  Cooper-Lehki's report.
3        I want to take a moment here to clarify
4  something.  I provided Christi Cooper-Lehki's report to
5  the FBI as part of my internal inquiry.  Todd Phillips,
6  in one of his message -- writings, made a point that I
7  did that in violation of the court's order.  But I want
8  to let you know how that happened.
9    Q.   Actually, Mr. Ballock, I was going to ask you
10  specifically about that later on.
11    A.   Okay.
12    Q.   If you'll just bear with me, we'll get there
13  soon.
14    A.   Okay.
15    Q.   What do you believe is the reason that
16  Lieutenant Kief and Sergeant Gaskins initiated a
17  criminal investigation against you?
18    A.   I don't know how they came into contact.  I
19  believe it's -- I believe it's because of Chris Berry's
20  relationship with Ellen primarily, so...
21    Q.   So you believe that Trooper Berry contacted his
22  superior, at that time, Sergeant Kief, and said I'm
23  having an affair with this lady, we want to get her
24  estranged husband in trouble, help us out, and Sergeant
25  Kief said, yeah, let's do that?

145

1    A.    No.

2    Q.    How do you believe this came about then?

3    A.    I believe that Sergeant Kief, when an

4 allegation was made against one of his troopers, he

5 circled the wagons and worked with Berry and Ellen to

6 figure out a way to hurt me.

7    Q.    What evidence do you have to support that

8 belief?

9    A.    An email message, for one, that Ellen sent to

10 Gaskins maybe five days before the custody hearing in

11 which she said the custody hearing is this coming

12 Friday.  I have no understanding why it would be

13 important for their investigation to know why the

14 custody hearing was coming up because -- ask the

15 question again.

16    Q.    What evidence do you have to support your

17 belief that the whole reason they initiated a criminal

18 investigation and brought charges against you was

19 because of Berry's relationship with Ellen?

20    A.    Because of the sequencing of events.

21    Q.    Can you explain that to me?

22    A.    Chris Berry has a relationship with her, we let

23 Kief know about it, very shortly thereafter they began

24 an investigation, violate all of their policies, and

25 have me arrested at a family court hearing when that was

146

1    completely unnecessary.

2         Q.    Any other evidence?

3         A.    Not that I can think of right now.

4         Q.    Do you have any evidence that -- strike that.

5               What outrageous acts did Sergeant Kief commit?

6         A.    I've explained some of them.  Shall I explain

7    them again?

8         Q.    Yes.  If you could -- I mean, if you've already

9    referred to them, just point me back to earlier

10   testimony.  But what specifically did he do that you

11   believe is outrageous?

12        A.    Specifically he invited Ellen to circumvent the

13   judge's order.  And, through him, provide the FBI with

14   disparaging information.  He thought he was being pretty

15   clever there.

16              He obviously wanted harm to come to me because

17   he gave Ellen suggested topics to include, has Scott

18   ever abused his position of authority which was well

19   outside of the scope of the bureau's internal

20   investigation into me seven days after the order was

21   issued at which Kief was sitting next to Ellen.  The

22   email where he says that's great news that the

23   exculpatory information is being denied Scott.  He

24   didn't use the term exculpatory information, but that's

25   what it was.  Great news.

147

1        The fact that he's even communicating with a

2   complainant about those sorts of things.  But then he

3   says that's -- I bet Scott was really embarrassed --

4   again, I'm paraphrasing -- and he walked out of court

5   with his tail between his legs.  The fact that he then

6   tried to work to get me again for violating the judge's

7   order.

8        Q.   Anything else that --

9        A.   He served as a personal reference for Ellen to

10  get a job as a school teacher and called the school

11  board of one district and the school principal of

12  another district.

13       Q.   How did that harm you?

14       A.   How did that harm me?

15       Q.   Yes.

16       A.   I didn't -- think that that was the question.

17  I thought you were asking how his acts were outrageous.

18       Q.   It was, but when you brought it up, how did him

19  providing a reference to Ellen to the school board harm

20  you?

21       A.   That did not -- well, it harmed me in that I

22  imagine he defamed me when he spoke to them, and I'm

23  curious to know about any communications that he had

24  with them.  We'll be asking that.

25            I'm sure he defamed me like he defamed my

148

1    father in the emails when he was talking about how my

2    father was crazy to Gabrielle Mucciola.  I don't know

3    that -- maybe Kief has a psychiatrist degree --

4    psychiatry degree.  Maybe he just chooses to be a police

5    officer instead and he knows about insanity.  But he

6    defamed my father.  He made -- he served as a character

7    reference to Ellen to a school board acting in his

8    capacity as a West Virginia State Police officer when he

9    knew or should have known that Ellen has a sexual

10   attraction to young children and Ellen was diagnosed as

11   a paraphiliac.  That's a really absurd thing to do --

12       Q.    Now --

13       A.    -- to recommend --

14       Q.    Why should he have known that she had that

15   diagnosis?

16       A.    Because there's one email from Ellen to Kief

17   where she's talking about her diagnosis actually.  I

18   can't imagine that the West Virginia State Police wanted

19   one of its troopers to be a character reference for

20   somebody who has had sex with a minor and has been

21   deemed by a psychiatrist to have sexual attraction to

22   young children.

23       Q.    Is it your position that Sergeant Kief had read

24   the report from Dr. Cooper-Lehki?

25       A.    I don't know.  I have no proof of that.  He

149

1   should have.

2       Q.    Is there anywhere outside of that report that

3   would let him know that she had this diagnosis?

4       A.    Had he talked to me.

5       Q.    Is there anything besides the Cooper-Lehki

6   report that would have let him know that Ellen had this

7   diagnosis?

8       A.    Had he talked to the guardian ad litem, had he

9   talked to her counselor, had he talked to anybody else

10  besides Ellen.  But, of course, if you already know what

11  you want, you already have your objective, you already

12  have the side that you are trying to help, you're not

13  going to talk to other people.  Why would you want any

14  contradictory information?

15      Q.    Anything else that Lieutenant Kief did that you

16  would characterize as outrageous?

17      A.    If he had anything to do with the trooper

18  approaching the FBI agent after I filed my complaint --

19  if he had anything to do with that or knowledge of it,

20  that would have been outrageous.  Him -- no, that's

21  enough.

22      Q.    Okay.  Going back to this character reference

23  to the school board.  You stated, I believe, what you

24  testified was you're sure Sergeant Kief defamed you to

25  the school board?

150

1  A. I'm not sure.  Well, okay.  Let me say I'm sure

2 in that I know he was out to do me harm.  I know he's an

3 unprofessional trooper, and so it wouldn't surprise me

4 and I have suspicions and concerns that he would have

5 defamed me.

6  Q. You have suspicions and concerns, but no

7 evidence; correct?

8  A. Correct, not until we finish discovery.

9  Q. What outrageous acts did Sergeant Gaskins

10 commit?

11  A. Sergeant Gaskins violated his agency's policies

12 by not interviewing everyone he could, even when I

13 offered to waive my rights and to be interviewed.  I

14 believe it was Sergeant Gaskins -- Sergeant Kief -- it's

15 interesting that Sergeant Kief had anything to do with

16 it at all when he assigned Gaskins to conduct the

17 investigation.

18  But then he was interviewing Ellen for an hour

19 and somehow the tape recorder didn't work, and so

20 Gaskins, instead of asking Kief -- well, first of all,

21 instead of memorializing the interview -- first of all,

22 Kief did not memorialize the interview after he learned

23 that the tape recorder didn't work.  Instead, Gaskins

24 went to Ellen and said why don't you give me a written

25 statement about what occurred in that interview with

151

1   Kief where the tape recorder didn't work.

2       Q.    Anything else that Sergeant Gaskins did that

3   was outrageous?

4       A.    No.

5       Q.    What outrageous acts did Berry commit?

6       A.    I believe that he had a sexual relationship

7   with Ellen.  I believe that he lied when he said he was

8   there conducting investigations into car break-ins in

9   the neighborhood.  If he, in fact, was there

10  investigating car break-ins that had occurred three

11  months earlier, which didn't affect Ellen, he didn't

12  take notes, he didn't write a report.

13      Q.    When did he say he was investigating car

14  break-ins?  I recall Ellen saying that he was there to

15  investigate car break-ins, but --

16      A.    Your response to us in discovery.

17      Q.    Our response.

18      A.    Berry said, yes, he was there investigating car

19  break-ins that happened three months earlier and were

20  investigated by another agency and for which he took no

21  notes of someone whose car was not broken into off --

22  off the clock.

23      Q.    What else -- what other outrageous acts did

24  Trooper Berry commit?

25      A.    That's all.

152

1      Q.   I'd like to refer back to your timeline again
2  if we can.
3      A.   Yes.
4      Q.   Page 14.
5      A.   Yes.
6      Q.   So the Monday after you were arrested it says,
7  "Scott loses his badge, gun, and law enforcement powers
8  due to his arrest."  Kind of -- and was reassigned.
9  Kind of explain to me how that came about.  You come
10 into work on Monday morning, and just kind of expand on
11 what you have here in the timeline.
12     A.   Yeah.  At CJIS, one of the assistant directors
13 is assigned to CJIS, and I was called up to the
14 assistant director's office where there were a couple of
15 other senior executives.  And they asked me what
16 happened, and I explained the situation.  And they said
17 I hope you can understand that until we get this
18 resolved we're going to have to take your badge and gun
19 away and reassign you.
20          I was in a position where I was traveling
21 across the country meeting with chiefs of police, with
22 law makers, with high-profile people.  And, of course,
23 you can't have an FBI agent who's been arrested do that
24 anymore, so they reassigned me.
25     Q.   So did you turn in your gun and badge right

153

1    there in the office?

2        A.    Actually, they drove me to my home to get my

3    gun.

4        Q.    You didn't carry your gun to work with you?

5        A.    I didn't.  Let me clarify.  I may have had my

6    personal weapon on me, but not the bureau weapon.

7        Q.    Okay.  When they drove you to your home to pick

8    up your gun, did you make any attempt to get all the

9    other bureau property that you had there?

10       A.    This was while I was -- had moved out of the

11   house.

12       Q.    Oh, you're right.  I'm sorry.

13       A.    Let me clarify.  One other outrageous thing

14   that Chris Berry did, I believe he did.  Kenny Ice, Jr.,

15   told me that Chris Berry was conducting surveillance of

16   me and my parents on behalf of Ellen and at Ellen's

17   request.  Of course, I didn't care because I wasn't

18   doing anything.

19             And he said Chris lived a couple or three miles

20   around the corner from me.  And that's how he was able

21   to do it so often and so easily.

22       Q.    Did you ever see Chris Berry conducting

23   surveillance --

24       A.    No, but I wasn't looking for surveillance.

25       Q.    You were trained in counter-surveillance --

154

1      A.    Yeah, but I don't look for it unless I'm

2  meeting with a source.  Day-to-day activities here, it

3  was an office-type job.  I don't look for

4  counter-surveillance.

5      Q.    Okay.  So, going back to the --

6      A.    I mean, I don't engage in counter-surveillance.

7      Q.    Going back to the loss of your badge and gun,

8  who was the assistant director that you saw that day?

9      A.    Dave Cuthbertson.

10     Q.    Can you spell that last name?

11     A.    C-u-h -- C-u-t-h-b-e-r-t-s-o-n, perhaps.

12  Cuthbertson.

13     Q.    You said assistant director.  I imagine -- and

14  correct me if I'm wrong, but I imagine there's probably

15  numerous assistant directors over each section; is that

16  correct?

17     A.    Correct.

18     Q.    So he was assistant director of what?

19     A.    CJIS.

20     Q.    The whole facility?

21     A.    Yes.

22     Q.    Okay.  You said there were a couple other

23  senior executives.  Do you know who they were?

24     A.    I forget their names.

25     Q.    So they took you home to get your gun and they

155

1    brought you back to CJIS?

2        A.    Yes.

3        Q.    And you went back to work?

4        A.    Yeah.

5        Q.    Did they inform you at that time that they

6    would be conducting an investigation?

7        A.    No, because it wasn't them who conducted the

8    investigation.  The protocol is for OPR to conduct an

9    investigation.

10       Q.    Did they inform you at that time that OPR would

11   be conducting an investigation?

12       A.    I don't know that they informed me of that, but

13   it was understood.

14       Q.    Okay.  Now I understand that about a week and a

15   half later, on September 26th, 2013, the FBI began its

16   internal investigation?

17       A.    No.

18       Q.    No?

19       A.    The FBI delayed its internal investigation

20   until the resolution of the misdemeanor criminal charge.

21   I invited them to and I asked them to, but their policy

22   is to not begin until...

23       Q.    Regardless of when the FBI investigation began,

24   were you informed they were conducting an internal

25   investigation?

156

1    A.    Yes.

2    Q.    Who informed you?

3    A.    It may have been via letter.  I don't know

4  precisely who informed me.

5    Q.    That leads to my next question.  After the

6  charges were dismissed in the Mon County Magistrate

7  Court in April of 2016, what then happened at the FBI?

8    A.    Then two agents came out to interview me.  This

9  may have been the first time I was official and formally

10  notified of the investigation.  Although, I knew it was

11  coming.  And interviewed me about what happened.

12    Q.    Were you still -- I take it you weren't put

13  back into your old position?

14    A.    Correct.

15    Q.    You weren't given your gun or badge?

16    A.    Correct.

17    Q.    That kind of leads to my next exhibit.

18          (Deposition Exhibit No. NO 34 was marked

19          for identification.)

20    Q.    Mr. Ballock, Exhibit 34 is your signed sworn

21  statement that you gave to the FBI on June 29th, 2016.

22    A.    Yeah.

23    Q.    This is what you were just referring to?

24    A.    Yeah.

25    Q.    Actually, I do have a question.  At the top

157

1   right-hand corner of each page in the header it says,

2   "6/29/16."  Do you see that?

3       A.   Uh-huh.

4       Q.   But if you go to the back page, it says, "Sworn

5   to and subscribed before me on the 13th day of July,

6   2016."  I'm not sure that makes any difference, but do

7   you know whether it was June or July?

8       A.   So, the agent wrote this and then he came out

9   to me and had me sign it later.

10      Q.   So the interview occurred June 29th, and then

11  you signed it July 13th; is that correct?

12      A.   Yes.

13      Q.   Okay.  So on page 1 of the statement in the

14  first paragraph it says you were sworn by Supervisory

15  Special Agent James L. Herman and making a statement to

16  him and Supervisory Special Agent Lawrence W. Quigley.

17  Who is James Herman?

18      A.   He's an agent out of the Clarksburg -- was an

19  agent out of the Clarksburg RA.

20      Q.   It says that he's assigned to inspection

21  division.  Was that his normal job, or was that a

22  special assignment?

23      A.   Special assignment.

24      Q.   Okay.  So he's normally at the Clarksburg

25  agency and then I guess the FBI said we want you to do

158

1   an investigation.  Would that be accurate?

2      A.   Yeah.

3      Q.   Who is Lawrence Quigley?

4      A.   Another agent who I'd never met before.

5      Q.   Do you know where he normally worked?

6      A.   I don't.

7      Q.   Let's go to page 2.  On the first full -- well,

8   the only full paragraph about two-thirds of the way down

9   you state, "I ensured that nothing I sent to Ellen could

10  be construed as anything but appropriate and

11  respectful."  I thought that was kind of an interesting

12  phrase.  You didn't say that everything was appropriate

13  and respectful.  You said that you ensured that it

14  couldn't be construed any other way.  Did you

15  intentionally draft your emails and texts to her so that

16  you could plausibly deny they were intended to harass

17  her?

18     A.   No.  I wasn't thinking about that.

19     Q.   Do you still believe that nothing that you sent

20  her could be reasonably construed by a reasonable person

21  as anything but appropriate and respectful?

22     A.   Someone who is not familiar with the

23  circumstances and everything that happened and the way

24  we talked to each other normally.

25     Q.   Let's go to page 3, there at the top -- very

159

1    top of the page, discussing reasons that Ellen would

2    contact you.  You said, "Among other reasons, Ellen

3    contacts me to request that I help her secure employment

4    with the FBI."  When did she ask you to help her secure

5    employment with the FBI?

6        A.    That would have been in the fall of 2013 -- no

7    -- 2012.

8        Q.    Shortly after the two of you separated?

9        A.    Yeah, sometime after.

10                  (Deposition Exhibit No. 35 was marked for

11                  identification.)

12       Q.    Mr. Ballock, Exhibit 35 is an email, about

13   midway down the page, from you to Ellen, November 11th,

14   2012, subject "Employment."  Do you see that?

15       A.    Yes.

16       Q.    You state to Ellen, "When you begin looking for

17   work I hope you will look to me and my mom to help you

18   secure a good paying job.  The bureau and mom's

19   employers are both good viable options."  Am I correct

20   then that you offered to help her find employment with

21   the FBI; correct?

22       A.    Yes.

23       Q.    Going back to --

24       A.    Well, I offered after she asked, but, yes.

25       Q.    Going back to Exhibit 34, the sworn statement,

160

1   still on page 3.  You also say that she "contacted you
2   to discuss the possibility of reuniting and saving your
3   marriage."  When did she contact you to discuss
4   reuniting?
5       A.   That would have been wintertime.
6       Q.   Was this before or after the October 11th email
7   when you told her that you were convinced that she was
8   way beyond the point of any possible reconciliation?
9       A.   Oh, it was after.
10      Q.   Was it before or after the November 15th email
11  you discussed this morning where she told you that
12  reconciliation will never happen in your lifetime?
13      A.   It was after.
14      Q.   Do you have copies of any of these
15  communications?
16      A.   No.  These communications also were in person.
17      Q.   Let's go back to the timeline.  Page 1 of your
18  timeline.
19      A.   Uh-huh.
20      Q.   You discuss these communications.  You say
21  between September 2012 to September 2013, "Despite her
22  allegations of harassment, Ellen regularly initiates
23  telephone contact with Scott."  Did she ever contact you
24  any other way besides phone?
25      A.   She showed up in person.

161

1       Q.   Then below that you discuss emails which

2   corroborate some of the communications initiated by

3   Ellen?

4       A.   Yeah.

5       Q.   Okay.  So the first one -- a portion of an

6   email message sent from you to her where you tell her,

7   "You never discussed with me the reason for your

8   2:00 a.m. telephone call."  She never did send you an

9   email discussing the reason for it, did she?

10      A.   No.

11      Q.   Going to the next page, a portion of an email

12   from you to Guardian ad litem Teresa Lyons where you

13   tell Ms. Lyons that on April 22nd, 2013, you received a

14   cryptic two-sentence text message from Ellen saying she

15   had taken herself to the emergency room but that Summer

16   was safe.  Do you have a copy of that text message?

17      A.   No.

18      Q.   Going on down, you discuss a portion of an

19   email message from you to Ellen on May 9th, 2013, where

20   you said, "Ellen, I received your barrage of text,

21   email, and phone messages from late last night."  Do you

22   have the text or email messages that she sent that

23   night?

24      A.   I probably do if it's an email message.  Text

25   messages, I wouldn't have.  Email messages, I probably

162

1    have.

2        Q.   Is it fair to say that if you have those email

3    messages, they've been produced?

4        A.   I can't say for certain.

5        Q.   Can you go back and check --

6        A.   Yes, of course.

7        Q.   -- and if they haven't been produced,

8    supplement your production?

9        A.   May I write on these?  Are these mine?

10       Q.   That will go with the record, but we'll trust

11   Charles to follow up on that.

12            MR. CROOKS:  You're looking for email or

13   texts --

14       A.   Email dated 5/9/2013 at 7:15 a.m.

15       Q.   Well, no.  We have that.  I've seen that email.

16       A.   Oh, you have.

17       Q.   I'm talking, in that email, you reference that

18   she sent a barrage of text and email messages late last

19   night.

20       A.   You want those?

21       Q.   Yes.

22       A.   Okay.

23            MR. CROOKS:  So we're talking May 8?

24       A.   Yeah.

25       Q.   Or maybe early in the morning, right after

163

1    midnight.

2                    MR. CROOKS:   Yeah.   I got you.

3         Q.   The next one down, a portion of an email

4    message from Scott to Ellen, from you to her on June 1st

5    where you say, "Ellen, you asked me today about the good

6    parts of our marriage."  Did she ask you by email or

7    text or --

8         A.   No.   She called me to say I want you to tell me

9    the ways in which our marriage was good.

10        Q.   Lastly, you cite an email message from you to

11   her on July 2nd, 2013, "Ellen, please don't send

12   communications asking me to send the children or my mom

13   your love."  Looking through all of these, what I see is

14   emails that you sent saying that she contacted you, but

15   you -- unless you can produce these emails on this

16   second one, the barrage of texts and email messages from

17   late May 8th, early May 9th, would you agree that you

18   don't have any documentation of any of these --

19        A.   I'll have to check.   But I know I didn't

20   capture because I didn't know I'd be sitting here -- I

21   didn't capture text messages.

22        Q.   How about the communication asking you to send

23   the children or your mom her love, was that by phone or

24   was that email, text?

25        A.   Telephone.

164

1      Q.   Let's go back to your signed sworn statement

2  for a minute.

3      A.   I believe telephone.

4      Q.   Okay.

5      A.   My sworn statement?

6      Q.   Yeah.  Page 7, please.

7                MR. PHILLIPS:   Page 7?

8                MR. JEFFRIES:   Page 7.

9      Q.   At the very fop of the page you talk about

10  Dr. Cooper-Lehki's testimony and you said, "Contrary to

11  Ellen's claims, Dr. Cooper-Lehki testified that Ellen

12  was not abused and that she was not a battered woman."

13  Now you were never charged with physically abusing

14  Ellen, were you?

15     A.   No, but that was the underlying theme, the

16  false narrative that she created to enhance everything.

17     Q.   What did Cooper-Lehki actually say in her

18  testimony?

19     A.   I would have to have her testimony in front of

20  me.

21     Q.   You don't recall?

22     A.   No.

23     Q.   Let's go to page 8.  At the bottom, just before

24  the last paragraph you state, "I possess documentation

25  which lends credence to and corroborates these

165

1    allegations."  And to put it in context, you're talking

2    about the allegations that Trooper Berry was seeing

3    Ellen.  "I possess documentation which lends credence to

4    and corroborates these allegation in which I intend to

5    use in a civil suit against the West Virginia State

6    Police."  What documentation were you referring to?

7         A.    The 911 call Ellen made, the deputy's report in

8    which she mentions why she was seeing Chris Berry on his

9    time off earlier that day, the information from Kenny

10   Ice, Jr.

11        Q.    You don't have any documentation of information

12   from Kenny Ice, do you?

13        A.    He didn't have documentation.

14        Q.    But what you state here is documentation, so

15   that's why I'm asking.

16        A.    Yeah.  Let me clarify that how this worked is

17   they interview me.  They go back.  I don't write this.

18        Q.    Right.

19        A.    They write it up and then they bring it back to

20   me and they say, you know, how is this.  And I read it

21   and I'm looking at it for the overall content.  And if I

22   had to go back and edit this more clearly, which I don't

23   think I edited it except for some grammatical stuff, I

24   would have worded that differently.

25        Q.    Okay.  But as it stands, that's your initials

166

1   in the upper left-hand corner?

2       A.    Yeah.

3       Q.    And your initials on the lower right-hand

4   corner?

5       A.    Yeah.

6       Q.    Indicating you reviewed the entire page?

7       A.    Yeah.

8       Q.    Okay.  Is there any documentation corroborating

9   the allegations against Trooper Berry that we have not

10  discussed today?

11      A.    No.  I'm not holding anything back.

12      Q.    Okay.  Let's move on to page 9.  Well,

13  actually, let's go to the bottom of page 8 to put things

14  in context.  You talk about the dismissal agreement that

15  we just looked at earlier today.  And one condition was

16  that you agreed that the state police had probable cause

17  for your arrest.  And you state, "This was insisted upon

18  by the prosecutor so I would not be able to initiate a

19  lawsuit against the West Virginia State Police for

20  malicious prosecution."  You understood then that the

21  dismissal agreement was intended to preclude the

22  malicious prosecution count; correct?

23      A.    Say it again.

24      Q.    You understood that this dismissal agreement,

25  Exhibit 30 that we discussed earlier today, was designed

167

1    -- was intended to preclude a malicious prosecution

2    count against the troopers?

3        A.    Yes.   I understood that was Marcia's reason for

4    including it.

5        Q.    So why are there malicious prosecution counts

6    under both state law and 42 U.S.C. Section 1983 and the

7    complaint in this matter?

8        A.    Because, although that was her intent, I still

9    believe that they violated that law.   If the judge

10   disagrees with me, so be it.

11       Q.    In Paragraph 225 of your complaint --

12       A.    Yes.

13       Q.    -- you allege shortly -- and you've alluded to

14   this earlier today, but this is your chance to talk

15   about it.

16       A.    Yeah.

17       Q.    "Shortly after attempting to serve the state

18   police defendants a uniformed representative with the

19   state police appeared at the Clarksburg Resident Agency

20   of the FBI to lodge a complaint with the Senior Resident

21   Agent about your filing of the civil action."   I'd like

22   to discuss that for a little bit.   How did you attempt

23   -- it says after attempting to serve my clients.   How

24   did you attempt to serve the troopers?

25       A.    I went to the Morgantown detachment, asked for

168

1    them.

2        Q.    Attempted to serve them personally?

3        A.    Yes.   I didn't know what the rules were for

4    service.

5        Q.    When you filed the original complaint pro se,

6    you received a copy of the notice of general guidelines

7    for proceeding pro se?

8        A.    Uh-huh.

9        Q.    Did you read them?

10       A.    Yes.

11       Q.    So you were informed that, even though you were

12   proceeding pro se, you were bound by the Federal Rules

13   of Civil Procedure.

14       A.    Yes.

15       Q.    Were you aware that Rule 4 provides that as a

16   party to the action you are not permitted to conduct

17   service?

18       A.    No.   I only attended law school for three

19   weeks.

20       Q.    So who was the uniformed representative who

21   appeared at the resident agency?

22       A.    I don't know.   I wish you guys would tell me.

23       Q.    To make sure that I'm clear, the resident

24   agency is a different physical location and different --

25   I guess within the organization chart, it's a completely

169

1    different entity from CJIS; correct?

2        A.    Correct.  CJIS is considered a headquarters

3    division.  That's -- those are -- the RA, they're field

4    agents.

5        Q.    So the RA is in downtown Clarksburg?

6        A.    I believe so.

7        Q.    It's not at CJIS?

8        A.    It's not at CJIS.

9        Q.    And you didn't work at the resident agency?

10       A.    I did not.

11       Q.    Was the senior supervisory resident agent of

12   the resident agency in your chain of command?

13       A.    No.

14       Q.    He didn't supervise you?

15       A.    No.

16       Q.    He didn't participate in your evaluations or

17   anything like that?

18       A.    No.

19       Q.    Who was the senior supervisory agent at the

20   Clarksburg Resident Agency at that time?

21       A.    I don't know who it was.  The person who told

22   me that it happened did not mention a name.  And because

23   I didn't want to -- I didn't want any appearance of

24   impropriety, I didn't ask any questions of her when she

25   told me this information.

170

1     Q.   Who told you?

2     A.   Sue Barrow, my immediate supervisor.  And even

3 though my good friend and deskmate was friends with all

4 those guys, I didn't ask him about it either.

5     Q.   You said he was friends with all those guys,

6 what guys?

7     A.   All the guys at the Clarksburg RA.

8     Q.   When did you learn that this supposed trooper

9 uniformed representative showed up?

10    A.   Gosh.  I don't remember when I learned that.

11    Q.   Can you give me an approximation?  So the

12 complaint was filed in April of 2017.  The first amended

13 complaint, if I'm correct, was filed about a month later

14 in May 2017.

15    A.   It had to have been around that time.

16    Q.   April/May 2017?

17    A.   Yeah.

18    Q.   That's when you learned about it?  Not when it

19 happened, that's when you learned about it?

20    A.   When it happened and I learned about it, I

21 think.

22    Q.   What did -- so they told you it was probably

23 April/May 2017?

24    A.   Well, they didn't tell me when it happened.

25 They just said it happened.

171

1        Q.    Okay.

2                    MR. JEFFRIES:  All right.  I am informed

3    that we need to change disks, so let's take a break.

4                    THE VIDEOGRAPHER:  The time is 1400.  We

5    are off the record.

6                         (There was a short break in the

7                         proceedings.)

8                    THE VIDEOGRAPHER:  We are back on the

9    record.  The time is 1411.

10                        (Deposition Exhibit No. 36 was marked for

11                        identification.)

12   BY MR. JEFFRIES:

13       Q.    Mr. Ballock, you have been handed Exhibit 36

14   which is the April 10th, 2017, letter you received from

15   Timothy Dowling at the Office of Professional

16   Responsibility --

17       A.    Yes.

18       Q.    -- informing you of the FBI's proposal to

19   terminate your employment.

20       A.    Yes.

21       Q.    I'd like to turn to page 2 of this letter.

22                   MR. CROOKS:  This is 36?

23                   MR. JEFFRIES:  Yes.

24       Q.    The first full paragraph there on page 2.  It

25   says, "Your ex-wife described how you both arranged for

172

1    men found on the Internet to come to your home and have

2    sex with her while you videotaped the encounters"; is

3    that true?

4        A.    It's not true.

5        Q.    Okay.  Let's go to page 4.  About midway

6    through that first full paragraph there Mr. Dowling

7    states, discussing your arrest at family court.  "In

8    fact, the West Virginia State Police contacted the FBI

9    before West Virginia State Police executed your arrest

10   and planned your arrest on the day of the child custody

11   hearing at the courthouse to ensure you were not armed."

12          Were you aware prior to receiving this letter

13   that the state police had contacted the FBI to

14   coordinate your arrest?

15       A.    No.

16       Q.    Let's go to page 15, please.

17              THE VIDEOGRAPHER:  I need you to adjust

18   your mic a little.  If you could put it above that

19   button right here.

20              THE DEPONENT:  Yeah.

21              THE VIDEOGRAPHER:  Not that high.  That's

22   okay.  Just right -- right here.

23              THE DEPONENT:  Sorry.

24              THE VIDEOGRAPHER:  That's okay.  There you

25   go.  Perfect.

173

1    BY MR. JEFFRIES:

2        Q.    Page 15?

3        A.    Yeah.

4        Q.    Note 16 there at the bottom towards the end of

5    the note.   It says, "Moreover, in your ex-wife's

6    statement she told bureau investigators that you had

7    used an alias to frequent men-for-men listings on

8    Craigslist while you and your ex-wife lived in Indiana";

9    is that true?

10       A.    Yes.

11       Q.    Why did you frequent the men-for-men listings?

12       A.    Wait.   I was commenting about the alias.   Say

13   it again.

14       Q.    In your ex-wife's statement she told bureau

15   investigators that you had used an alias to frequent

16   men-for-men listings on Craigslist when you and your

17   ex-wife lived in Indiana.

18       A.    Show me this.   Where?

19       Q.    It's the second-to-last sentence of Note 16.

20       A.    Yes.   That's not true.

21       Q.    So you did not?

22       A.    No.

23       Q.    Now, I take it you've reviewed this letter

24   before today?

25       A.    I've read it.   I've not reviewed it since I

174

1    received it.  But just like Gaskins' report, this is all

2    she said.

3        Q.   Understood.  Can you show me anywhere in this

4    letter where a contact by the state police with the

5    Clarksburg Resident Agency is mentioned?

6        A.   I'd have to read it, but I take your word that

7    it's not.

8        Q.   On the very last page, page 18, after

9    Mr. Dowling's signature box it says there were

10   enclosures.  And I understand from your discovery

11   responses that you never received the enclosures?

12       A.   No.  I'm allowed to look at them at the office.

13   I'm put in a room in security division, given the letter

14   and all the investigative documents, and I'm allowed to

15   look at them, I'm allowed to take notes, but I've got to

16   leave it all there.

17       Q.   So the enclosures were the investigative

18   documents; is that correct?

19       A.   Yeah.  I don't have any.  You could ask for

20   them.

21                   (Deposition Exhibit No. 37 was marked for

22                    identification.)

23       Q.   Mr. Ballock, Exhibit 37 is your written

24   submission that you made to the Office of Professional

25   Responsibility on June 14th, 2017.  So, just to make

175

1    sure I understand the process, you get the letter in

2    April proposing your discharge, then you have a chance

3    to defend yourself, basically?

4        A.    Yes.

5        Q.    And then, at some point later, they actually

6    either adopt or don't adopt the recommendation; is that

7    correct?

8        A.    Right.

9        Q.    Okay.  So this was in the interim after you

10   received the notification or the proposal but before you

11   were actually terminated; correct?

12       A.    Correct.

13       Q.    Okay.  On the first page here it says on the

14   bottom paragraph, "Attached hereto is the custody

15   evaluation report prepared in late 2013 by forensic

16   psychiatrist Dr. Christi Cooper-Lehki."  And you

17   testified earlier a little bit about this, that you had

18   submitted her report to the FBI.

19       A.    Yes.

20                   (Deposition Exhibit No. 38 was marked for

21                   identification.)

22       Q.    All right, Mr. Ballock.  You have been handed

23   what's been marked as Exhibit 38.  This is the Second

24   Amended Complaint in this action, so not the current

25   version of the complaint.  If you look at the top on the

176

1   header --

2       A.   Yeah.

3       Q.   -- you'll see the civil action number, the

4   docket number, and that this was filed on October 13th,

5   2017; do you see that?

6       A.   Yes.

7       Q.   Okay.  So this was filed after your written

8   submission of June 14th, 2017; do you understand that?

9       A.   Yes.

10      Q.   Let's go to Paragraph 267.  Back up a page,

11  please, to page 25 of the Second Amended Complaint.

12  Now, in your Second Amend Complaint as in your original

13  complaint, the First Amended Complaint, you have a

14  request for a declaratory judgment asking the Court to

15  unseal Dr. Cooper-Lehki's report for you to use with the

16  -- in connection with the disciplinary proceedings with

17  the FBI, but you had already had a copy of the report

18  and had already submitted it to the FBI at the time this

19  was filed.  Why did you include this request for

20  declaratory judgment?

21      A.   I had already submitted it to the FBI?

22      Q.   Well, this is dated October 2017 and, according

23  to your submission in June 2017, you had submitted the

24  report to the FBI three months -- four months earlier.

25      A.   Yeah.  I wanted more than just the report.  I

177

1    wanted her testimony -- transcript of her testimony.

2        Q.   Well, in your request for declaratory judgment,

3    you never asked for the transcript of her testimony.

4        A.   What did I ask for.

5        Q.   The report.

6        A.   The report.

7        Q.   Let's go to Paragraph 267.

8        A.   Yes.

9        Q.   "At Costlow's request, the family court ordered

10   the copies of the custody evaluation report are to be

11   kept at Plaintiff and Defendant Costlow's attorneys'

12   office and that neither Costlow nor Plaintiff are to be

13   given an copy." How did you get a copy of the report?

14       A.   Yeah.  So, Costlow requested that nobody ever

15   be able to see this and the judge said I will give each

16   of your attorneys a copy and if you want to read it you

17   have to go to the attorney's office, you can read it

18   there, but you can't leave with a copy.  Attorney, you

19   understand?  Attorney, you understand?  You guys all

20   understand?  We all understand.

21            My attorney said do you want to come in and

22   read it.  And I said, no, just tell me generally what it

23   says and if it's beneficial.

24            We had a family court hearing.  Ellen was found

25   in contempt for something unrelated.  And at the end of

178

1    the family court hearing, the judge gave me the

2    materials that Ellen had submitted to the judge in

3    support of her argument.  When I got home -- I didn't

4    even look at them.  When I got home I put them on the

5    countertop.  And I was looking at them and, low and

6    behold, there's the report from Christi Cooper-Lehki.

7            Ellen had broken the seal and gotten a copy

8    from her attorney and provided it to the judge.  I have

9    no idea how far and wide it's been disseminated, but

10   Ellen broke the seal.  And my -- I told my attorney

11   about this.  And I said I want to submit it to the FBI

12   because I think it might be helpful, but, you know, what

13   do you think.

14           And he said submit it.  The most important

15   thing is to get your job back so go ahead and submit it.

16   So, upon advice of counsel, I submitted the copy that I

17   had not obtained but I had been given voluntarily by

18   Judge Minor.  I imagine he didn't even read to see what

19   was in that stack of materials he gave me, that Ellen

20   had violated the court order and her attorney had

21   violated the court order by giving her a copy and

22   walking out of the office with it.

23       Q.   When was this family court hearing where you

24   came upon the --

25       A.   I don't know the date.

179

1    Q.    Was it before or after the divorce was final?

2    A.    It must have been before.

3    Q.    Who was your attorney at that time?

4    A.    Delby Pool.

5    Q.    And she said go ahead and submit it?

6    A.    Oh, sorry.   No.   Delby Pool was my divorce

7 attorney.   Rick Junkness (ph) and Charles Crooks were my

8 attorneys at that time.

9    Q.    Did you get authorization from the family court

10 to get a copy of the -- to release a copy of the report?

11   A.    No.

12   Q.    Go to Paragraph 281 of the complaint.   In

13 Paragraph 281 you allege, "Costlow was able to do so."

14 By, doing so, referring back to the previous paragraph,

15 "to undertake actions to cause you problems with your

16 employer and provide false, defamatory, and manufactured

17 stories."

18        You -- in Paragraph 281 you say, "Costlow was

19 able to do so only because, by having the report sealed,

20 the true motives, intent, and mental illness of Costlow

21 would remain unpublished and unavailable for Ballock to

22 use in order to disprove and discredit her falsehoods."

23 That's not true, is it?

24   A.    What do you mean?

25   Q.    Well you alleged here that the report was

180

1    unavailable for you to use with your employer, but you

2    had used it four months earlier; correct?

3        A.    She wanted it sealed so that it could not be

4    used by me as exculpatory evidence in the misdemeanor

5    case.

6        Q.    But that wasn't true.   It was available for you

7    to use?

8        A.    No, it wasn't.

9        Q.    How did you submit it to the FBI?

10       A.    I just explained how I submitted it to the FBI.

11   That occurred after the judge denied its use in the

12   misdemeanor case.

13       Q.    Right.   And in your Second Amended Complaint

14   you're not talking about the misdemeanor case because it

15   had already been dismissed a year earlier.   You're

16   talking about using it in connection with the FBI's

17   administrative investigation.

18            Paragraph 280, you talk about she undertook

19   actions to cause you problems with your employer and

20   provide false, defamatory, and manufactured stories to

21   your employer.   And then you say in 281, she was only

22   able to do so because the report would remain

23   unpublished and unavailable for you to use.   But you had

24   used it four months earlier; correct?

25       A.    Yes, but I hadn't used it initially when the

181

1   agents came to interview me.

2        Q.   In Paragraph 283, you allege that "The sealing

3   of the report likewise harmed Ballock and protected

4   Costlow by concealing the truth of the circumstances

5   regarding the divorce, the custody battle, the criminal

6   charges wrongfully sought by Costlow, and other personal

7   legal issues."  That's not true either, is it?

8        A.   No.  It's true.  I wasn't allowed to use it at

9   my misdemeanor trial.

10       Q.   Mr. Ballock, this is not concerned with your

11  misdemeanor trial.  At this point, the misdemeanor trial

12  has already been dismissed.  This is in connection with

13  this litigation.  You're requesting the United States

14  District Court to order the unsealing of that report for

15  you to use in connection with your employer and in

16  connection with this litigation.

17       A.   I see.  I see what you're saying.

18       Q.   Paragraph 283 is not true; correct?

19       A.   I had permission to -- by my attorneys to give

20  it to the FBI.  I did not have permission to give it to

21  -- to submit it and use it for this matter.  They

22  thought it would be wise to get that permission from the

23  judge.

24       Q.   Well, you had actually, initially filed for

25  declaratory judgment in the initial complaint, in the

182

1  First Amended Complaint when you were pro se.

2     A.   Uh-huh.

3     Q.   Why did you file for a declaratory judgment in

4  those actions before?  That couldn't have been based

5  upon advice of counsel because you were unrepresented at

6  that time; correct?

7     A.   Right.

8     Q.   So why did you request a declaratory judgment

9  unsealing the report then?

10    A.   Oh.  Oh, I see what you're saying.  Because I

11 wanted permission to use it.

12    Q.   Well, you had already used it without

13 permission.

14    A.   Yes, and that was without permission.  I wanted

15 permission to use it.

16    Q.   When you allege in Paragraph 283 that the

17 sealing of the report harmed you, that's not true, is

18 it, because you were able to use it despite it being

19 sealed?

20    A.   I was not able to provide it, and I did not

21 feel comfortable providing to the original agents who

22 conducted the investigation.

23    Q.   When you say original agents, who are you

24 referring to?

25    A.   The two agents who came out to interview me.

183

1     Q.   In Paragraph 285 you allege that you were

2  unable to present the report to your children.   That

3  also was not true, was it?

4     A.   No, it's true.

5     Q.   You had it available; correct?

6     A.   Yeah.

7     Q.   You had, obviously, shared it without the

8  family court's approval; correct?

9     A.   Correct.

10    Q.   Why couldn't you share it with your children?

11    A.   Because, while I was okay giving it to my

12  employer, I was not okay giving it to the children.

13    Q.   Have you shared the report or any of its

14  contents with your children?

15    A.   No.

16    Q.   Even though Judge Aloi did grant this

17  declaratory judgment?

18    A.   Yes.   I've not shared it.

19    Q.   The next page, Paragraph 289.   "Plaintiff

20  Ballock seeks a declaratory judgment declaring his right

21  to obtain an unsealed copy of the report for use in

22  connection with his employer."  Why were you seeking a

23  declaratory judgment to get a copy of the report for use

24  with your employer when you had already provided it to

25  the FBI?

184

1      A.   Because I wanted it sanctioned by the judge.

2      Q.   And you never mentioned anywhere in here that

3  you actually had already provided it to you employer?

4      A.   Correct?

5      Q.   Do you believe that was being candid with the

6  Court?

7      A.   I don't -- I don't think it was a lack of

8  candor, no.

9      Q.   Was it your belief that if the Court granted

10  this declaratory judgment that Dr. Cooper-Lehki's report

11  would be publicly accessible?

12      A.   No.

13      Q.   Did your father believe that if the Court

14  granted this declaratory judgment the report would be in

15  the public domain --

16      A.   I don't know what my father believed.

17      Q.   He never discussed it with you?

18      A.   No.

19      Q.   Do you have a copy of the transcript of

20  Dr. Cooper-Lehki's testimony in the family court

21  hearings?

22      A.   I don't.

23      Q.   Let's go back to your June 14th, 2017, written

24  statement.  Let's go to page 6.

25                MR. CROOKS:  I'm sorry.  I didn't --

185

1    you're referring back to what?

2                    MR. JEFFRIES:  To the June 14th statement,

3    page 6.

4                    MR. CROOKS:  What's the exhibit number on

5    that.

6                    MR. JEFFRIES:  37.

7                    MR. CROOKS:  37.  Okay.

8    BY MR. JEFFRIES:

9        Q.    Are you on page 6, sir?

10       A.    Yeah.

11       Q.    There at the bottom -- bottom paragraph, second

12   sentence, "Senior Supervisory Agent John Hamrick, who

13   reviewed more than 60 percent of the communications" --

14   who is John Hamrick?

15       A.    He was the guy who showed up at my arrest on

16   behalf of the agency, and he was the SSRA at Clarksburg.

17       Q.    What was his involvement in your investigation?

18       A.    I don't know specifically.  He would have

19   reviewed the work of the agents.

20       Q.    The investigating agents?

21       A.    Yeah.

22       Q.    When you say the agents, would that be the two

23   that you gave the sworn statement to in April?

24       A.    Yes.

25       Q.    Let's go to page 9 of your statement here.

186

1    Again, you have alluded to this before, but in the top

2    paragraph there it talks about Agent Hamrick attended

3    the arrest proceeding.  So he was there at family court

4    when you came out?

5         A.   Uh-huh.

6         Q.   Verbal answer.

7         A.   Yes.  Sorry.  Yes.

8         Q.   Did he accompany you to magistrate court?

9         A.   I don't know.

10        Q.   He was just there on behalf of the agency to

11   observe?

12        A.   Yes.

13        Q.   There on the -- just under Item 5, under the

14   bold heading it says, Special Agent -- "Senior

15   Supervisory Agent Ballock was rated at the excellent

16   level from 2012 to 2015."  So this would include after

17   your arrest in 2013 and while the charges were pending

18   in 2014 and '15?

19        A.   Yes.

20        Q.   I'm sorry?

21        A.   Yes.

22        Q.   And it goes on to say, "and he has earned two

23   cash awards."  What is the basis for a cash award?

24        A.    It varies, doing a special assignment, going

25   above and beyond, getting -- starting new projects.

1     Q.   So it says you earned two cash awards, when did

2     you earn them?

3     A.   I don't know.

4     Q.   Did you earn them while the charges were

5     pending?

6     A.   Yes.

7     Q.   I'm sorry?

8     A.   Yes, I believe so.

9     Q.   And then it says that you received an Assistant

10    Director's award in 2016.

11    A.   Yes.

12    Q.   What is an Assistant Director's award?

13    A.   They have an award ceremony every year at which

14    they pass out awards for different achievements and

15    accomplishments.  I believe this was for my work with

16    N-DEx.  I don't even recall.

17    Q.   So you received it in 2016, despite the fact

18    that the criminal charges were still pending at that

19    time?

20    A.   Were they?

21    Q.   Up until April.

22    A.   Yeah, unless I got it after that -- after

23    April.  I just don't remember.

24    Q.   It says that your supervisor nominates you for

25    cash award this year, which would have been 2017 when

188

1   this letter was written, but it was denied due to this

2   administrative inquiry.

3       A.    Yeah.

4       Q.    How do you know that was the reason you didn't

5   receive a cash award?

6       A.    Because after the cash awards were handed out

7   she came up to me and she said I put you in for a cash

8   award for your exemplary work, but they denied it

9   because of the inquiry, I'm so sorry.

10      Q.    When you say she, Sue Barrow?

11      A.    Sue Barrow.

12      Q.    But, again, the reason for you not receiving it

13  was the FBI's administrative inquiry not the criminal

14  investigation that had already been dismissed a year

15  earlier?

16      A.    Right.

17              (Deposition Exhibit No. 39 was marked for

18              identification.)

19      Q.    Mr. Ballock, Exhibit 39 is the September 21st,

20  2017, letter from Assistant Director Candice Will

21  adopting the proposal that you be discharged from

22  employment.  Again, can you show me anywhere in here

23  where a visit by anyone from the state police to the

24  Clarksburg Resident Agency is listed as a factor in the

25  FBI's decision?

189

1    A.    No.

2    Q.    Let's go to page 10 of this letter, just above

3    the heading Your Ex-Wife's Allegations, just above that.

4    A.    Uh-huh.

5    Q.    Assistant Director Will says, "Although you

6    have had an opportunity to review the file which along

7    with the OPR's proposal letter shows the state troopers

8    coordinated with the FBI regarding the arrest, your

9    filings in the civil suit" -- meaning this action here

10   -- "failed to disclose the efforts by the state police

11   to coordinate the arrest with the FBI and the legitimate

12   concerns shared by the state police and the FBI

13   regarding the need to ensure you were unarmed when

14   arrested to reduce the risk of violence."

15         Why did you omit that fairly important fact

16   from the complaints in this matter?

17   A.    What important fact?

18   Q.    That the state police had coordinated with the

19   FBI to arrest you at the family court proceedings and

20   that the FBI shared the state police's concerns.

21   A.    I don't know that the FBI shared the state

22   police's concerns.

23   Q.    You were told in the proposal letter that they

24   did, weren't you?

25   A.    I was also told in the proposal letter that the

190

1   West Virginia State Police said that they investigated

2   the allegations against Chris Berry and found them to be

3   untrue when they were able to provide no confirmation

4   that they conducted an investigation.

5       Q.   Do you have any reason to doubt that the state

6   police coordinated with the FBI as you were told in the

7   proposal letter?

8       A.   No, I have reason to doubt that.

9       Q.   So why wasn't that fact included in the

10  complaints in this matter?

11      A.   Because that has nothing to do with them

12  falsely stating that their concern was that I would have

13  a gun on me, and that was demonstrated by the fact that

14  I walked into the detachment with my firearm.   It was

15  all pretense.

16      Q.   Let's go over to page 13.   Actually, let's go

17  to -- I don't know how to say it.   You skipped between

18  page 13 -- you'll see the next page is page 15.   Page 14

19  is missing.   Why didn't you produce that?

20      A.   I didn't not produce it for any reason.   I

21  didn't know it was not produced.

22      Q.   Did your attorney ask you to produce it?

23      A.   My attorney asked me to produce this document,

24  which I produced.   I didn't know page 14 was missing.

25      Q.   Go on to page 19.

191

1        MR. CROOKS:   I don't think we have

2   page 14.

3        MR. JEFFRIES:   What's that?

4        MR. CROOKS:   I said I don't think we have

5   page 14.

6   BY MR. JEFFRIES:

7        Q.   Mr. Ballock, do you have page 14?

8        A.   I don't know.  I'll have to look.

9        Q.   Would you do that for me --

10       A.   Of course.

11       Q.   -- and supplement production?  Let's go to

12   page 19 and the note at the bottom, Note 19.  You are

13   admonished not to discuss this matter with anyone other

14   than certain agencies within the FBI or an attorney who

15   has signed the appropriate nondisclosure agreement.

16       But in both the Second Amended Complaint and

17   the Third Amended Complaint, the current complaint, you

18   did discuss that you were discharged, that is you

19   discussed this matter.  Did you get authorization from

20   the FBI to discuss the discharge decision in your

21   pleadings?

22       A.   No.  My attorney's advice and my Washington,

23   D.C., attorney's advice was it's important for them to

24   have that information and, what are they going to do,

25   fire you.

192

1          (Deposition Exhibit No. 40 was marked for

2          identification.)

3      Q.   Mr. Ballock, Exhibit 40 is the October 3rd,

4  2017 submission by the attorneys to the FBI's Office of

5  Disciplinary Appeals.

6      A.   Yes.

7      Q.   I'd like to go to page 7, which is

8  Bates-numbered PL 58 there in the lower right-hand

9  corner.  That might be an easier way to find it.

10     A.   Thank you.

11     Q.   On page 7 going to page 8 you discuss some

12  strategies used by -- recommended by mental health

13  professionals to deal with people with borderline

14  personality disorder including the EAR and the JADE

15  techniques.

16     A.   Uh-huh.

17     Q.   Where did you learn these techniques?

18     A.   In counseling.

19     Q.   With whom?

20     A.   A woman whose name I forgot and you said to me.

21     Q.   Kathie Gieselman?

22     A.   Gieselman, yeah.

23     Q.   When was that?

24     A.   That was before and after the separation, so

25  summer of 2012 into the fall of 2012, maybe.

193

1      Q.   Why would Ms. Gieselman discuss strategies for

2  dealing with someone with borderline personality

3  disorder when Ellen wasn't diagnosed until 2013?

4      A.   She wasn't diagnosed, you're right, but based

5  upon what I told her about Ellen and our relationship

6  and her behaviors, that was her guess as to what was

7  going on.  She said she was at least a high conflict

8  personality and these sorts of methods were helpful.

9      Q.   Okay.  Let's turn the page to page 8, the

10  second full paragraph from the bottom, second sentence

11  -- I guess third sentence.  You say, "Behind the scenes,

12  both police and prosecutors privately acknowledged to

13  your criminal attorney that they had erred in so quickly

14  pursuing criminal charges against you."  Which police

15  officers told your attorney that?

16      A.   I don't know.

17      Q.   You were told that by Mike Benninger?

18      A.   Mike Benninger.

19      Q.   And he didn't tell you names?

20      A.   No.

21      Q.   Let's go to page 10, PL 61.  The third

22  paragraph from the bottom, third-to-last sentence, "West

23  Virginia State Police Professional Standards Unit whose

24  mission is to investigate internal affairs and

25  complaints."  Did you contact Professional Standards

194

1    regarding your allegations against Trooper Berry?

2         A.   I did not.  I assumed that Kief would have done

3    so.

4         Q.   In the next paragraph down you state, "In

5    preparation for a civil lawsuit, Special Agent Ballock

6    submitted a FOIA request for information regarding any

7    such information into Trooper Berry and received no

8    response."  We asked about this in our second set of

9    requests for production --

10        A.   Yes.

11        Q.   -- and we were told that you never submitted

12   any request?

13        A.   Because I don't recall when I did it or how I

14   did it, and I don't have information about.

15        Q.   Well, did you or did you not submit a FOIA

16   request?

17        A.   I think I did, but I don't have a copy of it.

18   I didn't get anything back.

19        Q.   So your answer -- your response to our request

20   for production that you never submitted one is not

21   correct?

22        A.   No, I think I did.  I'm fuzzy on that, but I

23   think I did.

24        Q.   Okay.  At the bottom of page 10, going over to

25   the next page, "It strains credulity to believe that the

195

1   West Virginia State Police could have conducted an

2   actual investigation into the matter without ever having

3   interviewed the very persons who made the allegation

4   regarding Trooper Berry in the first place," meaning you

5   and your father.  That's not true, is it?

6       A.   No.  They didn't talk to us.

7       Q.   Sergeant Kief spoke to both you and your father

8   about these allegations, didn't he?

9       A.   Sergeant Kief listened to my father.  Sergeant

10  Kief made a comment that there was no truth to it, but

11  he didn't investigate.  He didn't ask questions.  He

12  didn't ask for evidence.  He didn't investigate.

13      Q.   All right.  Let's go on to the bottom of

14  page 11, talking about Kenny Ice.  I mean, I think I

15  know the answer here, but I just want to confirm it.

16      A.   Which PL number?

17      Q.   PL 62?

18      A.   Thank you.

19      Q.   Again, you're referring to the information

20  about Trooper Berry supposedly having an affair with

21  Ellen.  It says you "did not rely solely upon this

22  individual's information," meaning Kenny Ice, "but you

23  independently uncovered evidence regarding this

24  allegation."  Again, you were referring to the --

25      A.   Yeah, nothing that I'm withholding.

196

1    Q.   -- call reports?

2    A.   Yeah.  Nothing that I'm withholding.

3    Q.   You go on after another sentence, "The

4 individual," Kenny Ice, "voluntarily surrendered his

5 iPhone so that its contents could be downloaded and

6 reviewed.  The recovered communications independently

7 corroborate most of what the individual attested to."

8 Would you agree with me that there's no mention of

9 Trooper Berry in the recovered communications from Kenny

10 Ice's cell phone?

11    A.   Yes.

12    Q.   Would you agree that there are no pictures of

13 Trooper Berry in the phone?

14    A.   Yes.

15    Q.   Would you agree there are no videos of Trooper

16 Berry in the phone?

17    A.   Yes.  Let me say that the forensic company

18 which did the examination said that it was only able to

19 retrieve some of the deleted materials.  They could not

20 attest that everything that had been on there was still

21 on there or that they recovered.  They did their best.

22    Q.   Let's go to page PL 64.

23    A.   Yes.

24    Q.   At the top paragraph you state that the

25 Inspection's Division, Investigator Smith wrote that

197

1    there has been negligible reporting of your arrest.

2        A.    Yes.

3        Q.    Do you agree with that?

4        A.    Yes.

5        Q.    Let's go to page PL 76, the last page.   I

6    notice that this written submission is signed by you,

7    while the previous ones were signed by your attorneys at

8    Swick and Shapiro.   And also, the written submission

9    itself is not on Swick and Shapiro letterhead, although

10   the cover letter is from Swick and Shapiro.   Did you

11   draft this yourself?

12       A.    Yes, and Swick and Shapiro submitted it.

13               MR. JEFFRIES:   Does anybody want to take a

14   break or are we good to press on?   Are you good,

15   Mr. Ballock?

16               THE DEPONENT:   I'm good.   Yeah.

17               MR. CROOKS:   Actually, I'm going to take

18   you up on the offer of a short break because I need to

19   make a phone call.

20               MR. JEFFRIES:   Okay.

21               THE VIDEOGRAPHER:   The time is 1446.   We

22   are off the record.

23               (There was a short break in the

24               proceedings.)

25               THE VIDEOGRAPHER:   We are back on the

198

1    record.  The time is 1500.

2                 (Deposition Exhibit No. 41 was marked for

3                 identification.)

4    BY MR. JEFFRIES:

5       Q.   Mr. Ballock, you have been handed during the

6    break Exhibit 41, which is your March 12th, 2018, sworn

7    statement to the FBI.  I'd like to direct your attention

8    to page 4, Bates-numbered PL 132.  In the top paragraph

9    there you say, "In an ongoing attempt to hold our

10   marriage together I did not object to having an open

11   marriage wherein Ellen dated other men."  I mean, you

12   did more than merely not object, didn't you?

13      A.   No, I did not object to it.

14      Q.   You didn't enjoy seeing her with other men?

15      A.   No.

16      Q.   You didn't watch videos of her seeing other men

17   for your pleasure?

18      A.   Not for my pleasure, no.

19      Q.   Go to the next page.  The first full paragraph,

20   third sentence you said, "I learned from counselors

21   that, had I immediately denied her aggressive and false

22   accusations, doing so would have escalated our

23   conflict."  Which counselors told you that?

24      A.   Gisel --

25      Q.   Gieselman, Kathie Gieselman?

199

1  A. Yeah.

2  Q. Anyone else?

3  A. No.  I better write that name down.

4  Q. Let's skip over two pages to page 7, PL 135.

5 The second full paragraph you say, "Prior to our

6 separation, I attended individual counseling during the

7 summer of 2012 with Kathie Gieselman," and learned

8 "various techniques for communicating with Ellen

9 including JADE."  So you learned JADE from Kathie

10 Gieselman; is that correct?

11  A. Correct.

12  Q. At the bottom of the same paragraph you say

13 that your "choice not to contemporaneously deny Ellen's

14 false accusations was an attempt to abide by your

15 marriage counselor's recommended strategy to avoid

16 escalating an argument with Ellen."  Which counselor was

17 that referring to?

18  A. Gieselman.

19  Q. Now Kathie wasn't your marriage counselor, was

20 she?

21  A. No.  She was to be our marriage counselor.

22 Ellen wanted me to go first to individual counseling

23 sessions and then said after you're there for a while

24 then I'll come in.

25  Q. So you went to see Kathie Gieselman at Ellen's

200

1   request?

2       A.   Yes.   And she sent me with a list of things

3   that she wanted me to talk about.   And they were all my

4   faults and things that weren't true.   And she said I

5   want you to talk to her about these things.

6            And what I learned later -- what I surmised is

7   that she was -- because she was planning the divorce,

8   was that she was hoping that it would get on record with

9   Gieselman that I had engaged in wrongdoing.

10           And then when I would come home from the

11  counseling sessions, much as she did with our daughter,

12  she would demand to know what we talked about.   Kathie

13  told me, no, you don't tell her what we talk about.   And

14  that would send her into an eruption.

15      Q.   So, in this statement where you say that the

16  choice not to deny her false accusations was based upon

17  marriage counselor's strategy that's an error --

18      A.   Yeah.   And, again --

19      Q.   -- individual counselor?

20      A.   Yeah.   And, again, I didn't write this.   The

21  agent wrote it.

22      Q.   Understood.   They typed it up and had you

23  review it and sign.

24      A.   Yeah.   And I may not have caught marriage.

25      Q.   Okay.   And on -- let's go to page 9, PL 137.

201

1    At the bottom of this page you talk about Special Agent

2    Garth referred to the original signed sworn statement

3    from back in 2016 where you stated that Dr. Cooper-Lehki

4    testified that Ellen was not abused.  And you say, "I

5    agree a more accurate characterization of

6    Dr. Cooper-Lehki's testimony is that, in response to the

7    Court's inquiry, she found no evidence that I physically

8    abused Ellen Costlow."  Why did you change your --

9        A.    I didn't.  He -- he thought that that was a

10   more accurate characterization of Dr. Cooper-Lehki's

11   testimony.  I didn't go back and review it.  But,

12   because he said that was a more accurate

13   characterization, I said fine.

14       Q.    Okay.  On the next paragraph down you discuss

15   an incident when you used your Glock 27 and inserted it

16   into Ellen during sex.  When did this happen?

17       A.    When we were in Ann Arbor, so prior to 2011.

18       Q.    When did you move to Ann Arbor?

19       A.    2006.

20       Q.    So between 2006 and 2011?

21       A.    Yes.

22       Q.    At the bottom of page, continuing to talk about

23   the incident with the gun.  The second line from the

24   bottom you say, "Ellen had been diagnosed with a sex

25   disorder."  What disorder was she diagnosed with?

202

1      A.    She had been diagnosed with the sex disorder of

2   paraphilia.

3      Q.    Who diagnosed her with that?

4      A.    Christi Cooper-Lehki.

5      Q.    Okay.  Now, you're telling me that this

6   incident with the gun occurred between 2006 and 2011,

7   but Ellen wasn't diagnosed by Dr. Cooper-Lehki until

8   2013.

9      A.    Yeah.  And, again, I didn't write this.

10     Q.    So just another error in the --

11     A.    Yeah.  This was -- if you want to obtain the

12  original, ask the FBI for it.  There were so many things

13  that I -- I was embarrassed by how poorly written it

14  was.  So this is one that I didn't catch either.  I

15  marked it up a lot.

16                (Deposition Exhibit No. 42 was marked for

17                identification.)

18     Q.    Exhibit 42 is your submission to the Office of

19  Professional Responsibility, January 8th of this year,

20  January 8th of 2019.

21     A.    Yes.

22     Q.    And, again, I notice no Swick and Shapiro

23  letterhead and on the last page it's signed by you.  So,

24  you drafted this yourself?

25     A.    Yes.

203

1    Q.    Are you still represented by Swick and Shapiro

2    in the administrative proceedings?

3    A.    I am.  Katie Watson is her name.

4    Q.    Why are you drafting things yourself instead of

5    your attorney?  Any particular reason?

6    A.    No reason.  I know the story better.

7    Q.    Let's go to page 6 of this submission?

8    A.    PL?

9    Q.    PL 179.  I think we've discussed this, but I'd

10   just like to clarify.  The third paragraph from the

11   bottom, about midway through you say, "Email

12   correspondence between Ellen and the West Virginia State

13   Police trooper obtained during the discovery phase of

14   Ballock's civil suit revealed that Costlow, with the

15   encouragement and support of a trooper friend who led

16   the misdemeanor investigation into Ballock, knowingly,

17   willingly, and eagerly violated both court orders."

18   What were you referring to there?

19   A.    Where -- I told you where Kief said the FBI's

20   coming to see me, what do you want me to tell them.

21   Q.    Okay.  That's what I thought, but I wanted to

22   be clear.

23   A.    Yeah.

24   Q.    So you've already testified as to that

25   reference?

1    A.    Yeah.

2    Q.    Which court orders were you referring?  You

3    said both court orders.  Which --

4    A.    Magistrate Mullins' court order and the divorce

5    court order in which Judge Minor admonished her not to

6    have any contact with the FBI.

7    Q.    Was she told not to contact the FBI or not to

8    initiate contact with the FBI?

9    A.    Much more specific.  She was told not to have

10   any contact.

11   Q.    So, is it your position that even if the FBI

12   contacted her and said we'd like to interview you, she

13   had to tell them no?

14   A.    Of course.  That was the intent.  That was the

15   understanding.  That was the agreement.  No contact

16   means no contact.

17   Q.    Let's go to the next page, PL 180.

18   A.    Yeah.

19   Q.    There under Ballock's Cousin.  "Had OPR

20   conducted a thorough investigation and interviewed CCL,"

21   meaning Christi Cooper-Lehki, "perhaps it would have not

22   made the false and slanderous claim that Ballock had

23   knowledge of and complicity in the sexual abuse of a

24   minor.  Ballock did not learn that Ellen had engaged in

25   sexual relations with Ballock's cousin until 16 years

205

1 after the fact."  What were you referring to there?

2  A. I was referring to the time that Ellen had sex

3 with a cousin of mine who was 14 years old when she was

4 in college.  And Jeff told me about it when he was 30

5 years old.

6  Q. So he was 14 at the time she had sex with him?

7  A. Yeah.

8  Q. How old was Ellen at the time?

9  A. She was in college.  Again, she has a sexual

10 interest in young children.  Christi Cooper-Lehki

11 determined that Ellen sexualized our young daughter, our

12 third-grade daughter.

13     (Deposition Exhibit No. 43 was marked for

14     identification.)

15  Q. Exhibit 43 is the family court order dated

16 September 20th, 2013, following the September 13th, 2013

17 hearing at which you were arrested.

18  A. Okay.

19  Q. Let's go to Paragraph 3j, which is on PL 293.

20  A. Okay.

21  Q. "The Court takes a jaundiced view of the

22 father's attempt to have the mother referred as a sexual

23 predator or other sexual offender based upon actions

24 occurring many years ago."  Was Judge Minor referring to

25 this same incident with your cousin?

206

1    A.    Yes.

2    Q.    "In that regard, the Court notes the father had

3    knowledge of the incident at the time, he chose to stay

4    with the mother, he later started a family with the

5    mother, and he allowed her to be the primary caretaker

6    of the parties' children, and he apparently never raised

7    the issue in any regard until this litigation."

8          You would agree with me that there's a court

9    finding that you knew of the incident between Ellen and

10   your cousin at the time it occurred; correct?

11   A.    I would agree with you that that's what the

12   Court said, but the Court was wrong, as it was in a lot

13   of other instances.

14         Christi Cooper-Lehki actually called Jeff and

15   interviewed him.  And he shared with her that he didn't

16   tell me until he was 30.  So I don't know why the Court

17   would have said that.

18   Q.    What is the current status of your appeal of

19   your discharge from employment?

20   A.    My case is now going before the Disciplinary

21   Review Board or DRB.  It's comprised of agents and

22   support personnel, five -- five people, who will review

23   all the materials and either agree with or deny OPRs

24   decision.

25   Q.    Any idea when you can expect a decision on

207

1  that?

2     A.   No.  They come from all over the United States

3  and so it's a coordination effort.

4            MR. JEFFRIES:  We are almost done, or I'm

5  almost done, Mr. Ballock.

6            (Deposition Exhibit No. 44 was marked for

7            identification.)

8            MR. CROOKS:  This is 44.

9            MR. JEFFRIES:  Yes, sir.

10          MR. CROOKS:  I want to make sure I haven't

11  lost the sequence.

12  BY MR. JEFFRIES:

13     Q.   Mr. Ballock, Exhibit 44 are your supplemental

14  answers to our first set of interrogatories.  Do you

15  recall seeing these interrogatories?

16     A.   Yeah.

17     Q.   Interrogatory Number 1 asks you to calculate

18  your damages.  If you'll turn to page 2 and going on to

19  page 3, basically, from 2019 on, in calculating the

20  damages, there's a blurb each time that says does not

21  reflect income for holiday pay, typically more than

22  $2,000 a year for Ballock.  How is holiday pay

23  determined?

24     A.   If an agent works on a holiday he receives

25  holiday pay, an increased level of pay.  It's quite

208

1   significant.

2       Q.    Is it time and half or is it something

3   different?

4       A.    No, it's not -- we're not paid hourly.  It's --

5   I don't know how they calculate it, but it's quite

6   generous.

7       Q.    Did you get holiday pay every year?

8       A.    Oh, yeah.

9       Q.    What was the least amount you recall receiving?

10      A.    $2,000.

11      Q.    What was the most you recall receiving?

12      A.    Probably $4,000.

13      Q.    Go to page 5, if you will.  You're still

14  discussing the economic losses that you're claiming.

15  About a third of the way from the bottom you discuss

16  "Losses resulting from need to list home for sale to

17  find employment, fees, and moving expenses."  You had

18  moved out of the house at 51 Summit Overlook in

19  September 2012, the year before you were arrested;

20  correct?

21      A.    In December -- wait, wait.  Yes, but then I

22  went back to the home after the divorce.  Does that make

23  sense?

24      Q.    So were you awarded the home in the division of

25  the assets?

209

1      A.    Yes.   I bought her out.

2      Q.    You bought Ellen out.   Let's go to the next

3  page.   At the top of the page you discuss emotional

4  distress damages.   It says that you've had fear and

5  anxiety regarding the investigation related to the false

6  charges.   Correct that you were diagnosed with an

7  anxiety disorder before your arrest; right?

8      A.    Yeah.

9      Q.    And didn't you report to Cheat Lake Physicians

10 in 2014 and 2015 when the charges were pending that you

11 were not suffering from any distress?

12     A.    I may have.

13     Q.    On Item G there you discuss necessary visits to

14 medical professionals who have prescribed multiple

15 medications to address the emotional trauma and distress

16 suffered by Ballock.

17     A.    Uh-huh.

18     Q.    What medications have you been prescribed as a

19 result of the arrest?

20     A.    Wellbutrin -- I'm really bad with the names of

21 medicines -- Lexapro, clonazepam.   If there are more

22 I'll tell you.

23     Q.    Okay.   Moving on to Interrogatory Number 2 it

24 asks you to list each and every person who you know to

25 have knowledge of any relevant fact.   And then if you'll

210

1    skip on over to page 10 in your answer to this

2    interrogatory you identify Cindy Scott.  You said,

3    "Ms. Scott will also be asked about her reasoning behind

4    her demand that Tom Ballock, a party unrelated to the

5    criminal case against you, take down a website in

6    exchange for her dropping the criminal case against

7    you."  When did she make that demand?

8        A.    Sometime when the case was pending she made

9    that demand.

10       Q.    You can't recall what year?

11       A.    No.  She made that demand -- I spoke about it

12   earlier -- to Benninger.

13       Q.    Just verbally to Mike?  She didn't send him a

14   letter or email or anything?

15       A.    I don't know about that.  But he said, here's

16   the deal, they'll drop the case if you do this because

17   that's what Ellen is insisting.

18       Q.    And I believe you testified earlier you don't

19   know which website she was wanting him to take down?

20       A.    No.

21       Q.    Going to page 13.  We're still on

22   Interrogatory 2 asking about people who have knowledge

23   of any relevant fact.  You identify your children.

24       A.    Yes.

25       Q.    Among the topics you say they have knowledge of

211

1   is "Costlow's relationship including with the West

2   Virginia State Troopers."  What knowledge do they have

3   of their mother's relationship with my clients?

4        A.    I don't know about your clients specifically.

5   In September 2017, Kenny Ice, Sr., arrived at my house

6   unannounced on his motorcycle to come talk to me.  And

7   one of the things that he told me was that, in violation

8   of the family court order, Ellen had stalked down my

9   daughter who was with her friends in Fairmont at a place

10  called the Pokey Dot having ice cream.  She stalked her

11  there, pulled her away from her friends and grilled her

12  about what was going on with me, asking if I was going

13  to get fired, telling her she had nothing to do with my

14  firing, telling her that I am a dangerous man, that she

15  is in very great danger, Daddy's going to hurt you,

16  you're 14 now, you can make a decision to come live with

17  me, all you need to do is go tell somebody, if you

18  don't, Daddy's going to hurt you over and over again.

19              During the course of that conversation she also

20  told Summer, but my West Virginia friends are watching

21  out for you -- well, West Virginia State Trooper friends

22  are watching out for you, they're watching over you,

23  they'll protect you.  So I don't know what that means,

24  and I don't know if it's these guys or somebody else

25  who's watching over me.

212

1    Q.   Could it be that Ellen was lying about that?

2    A.   Sure.

3    Q.   Go to page 28.

4    A.   I also have that -- I believe I have that --

5    'cause then Ellen engaged in some text conversations

6    with Summer saying those same sorts of things, and

7    Summer captured those text messages.  I think I have

8    those.

9    Q.   Have you produced those?

10   A.   No, because I just now thought of it, but I

11   will look for it.

12   Q.   Okay.  Page 28, you'll see Interrogatory 12

13   asking to identify all facts and witnesses that support

14   your contention that Trooper Berry was having an affair

15   with Ellen.  If you go on to the next page --

16   A.   Yes.

17   Q.   At the top of the next page you say, "Email

18   correspondence between Berry and Costlow likewise

19   provide circumstantial evidence supporting an affair."

20   What email correspondence between Trooper Berry and

21   Ellen were you referring to?

22   A.   Is that my response?

23   Q.   That is your response.

24   A.   I don't have any email correspondence between

25   Berry and Costlow.

213

1      Q.    Skip down to the third paragraph.  You say,
2  "The conduct of Berry is likewise evidence of an affair
3  given the knowingly unjustified actions taken on behalf
4  of Costlow at her request."  What actions of Berry were
5  you referring to?  What conduct?
6      A.    Where he was, according to Kenny, surveilling
7  me and my parents.  I was living at -- on New Castle
8  Lane at the time.
9      Q.    That was where you moved to after you moved out
10  of the house at 51 Summit Overlook?
11      A.    That was my second destination, yes.
12      Q.    Where did you move to first?
13      A.    To an apartment in downtown Morgantown.
14      Q.    But you don't recall where?
15      A.    No.  I mean, I know where it is, but I couldn't
16  tell you the address off the top of my head.
17      Q.    Anything else besides the alleged surveillance?
18      A.    Let me go back to it.
19            MR. CROOKS:  Could you repeat that
20  question?
21      Q.    Anything else besides the alleged surveillance
22  by Trooper Berry.
23      A.    The statements that she made to the deputies
24  who arrived on the scene giving the conflicting
25  information.

214

1    Q.   Well, I think you might discuss that down here

2    later.  But I'm asking specifically about conduct of

3    Berry, things he did.

4    A.   No.  Oh, I see what you're saying.  Sorry.  No.

5    Q.   Then you go on, "Likewise, the willingness of

6    the West Virginia State Police to do as Costlow

7    requested is evidence that she more likely than not was

8    involved in a sexual relationship with Berry."  What did

9    they do that she requested?

10    A.   I believe that she had an involvement in the

11    timing of the arrest and the place of the arrest.  Like

12    I said earlier, she was essentially Kief's supervisor

13    during his investigation into me after the -- well, but

14    that was after -- after the dismissal.

15    Q.   And then you discuss a decision not to write a

16    "domestic disturbance report involving Costlow and Ice

17    in violation of policy requiring a report and arrest at

18    the scene of a violent domestic disturbance where a

19    minor child is present."  I'd like to break that down

20    just a little bit.

21    A.   Uh-huh.

22    Q.   Are you referring to that March 6th, 2012

23    domestic violence call --

24    A.   Yes.

25    Q.   -- that you asked Sergeant Kief about?

215

1    A.    Yes.

2    Q.    What policy did they violate?

3    A.    I can't cite it to you right now.

4    Q.    Then how do you know that they violated one?

5    A.    Because -- I would have to re-read the policy

6    where I got that from.

7    Q.    Now, you've produced the 911 call record of

8    that incident.

9    A.    Have I?

10   Q.    Yes.

11   A.    Okay.

12   Q.    Was there any violence reflected in the 911

13   call record?

14   A.    There was window smashing.   There was a gun

15   involved.   I don't remember -- was that when Kenny was

16   stabbed or was that the other time?   I just recall that

17   it was a violent episode.   And Kenny told me that it was

18   violent as well.

19   Q.    And you don't know if Trooper Berry was

20   allegedly involved with Ellen at that time?

21   A.    No, I have no idea.

22   Q.    Okay.   Moving on down, Interrogatory 13 asks

23   you to identify all facts and witnesses that support

24   your allegation that Trooper Berry conducted

25   surveillance of you and your parents.   And in your

216

1   answer you identify some evidence and some possible
2   witnesses.  Among the witnesses, you list Tom Ballock.
3   What does your dad know about the surveillance that was
4   allegedly being conducted?
5       A.   Like I said, he was alleged to have conducted
6   surveillance of both me and my father.  My father,
7   looking back on it, thought that he was being
8   surveilled, but he can't say for sure if it was Berry.
9               (Deposition Exhibit No. 45 was marked for
10                   identification.)
11      Q.   All right, Mr. Ballock.  We're up to
12  Exhibit 45.  These are your responses to our requests
13  for production.  I'd like to take you over to page 6.
14  Request Number 18 is for all documents relating to any
15  "negative repercussions you suffered at your employment
16  including but not limited to all documents that refer to
17  or relate to your termination from employment."
18              And the response was, other than an objection
19  on vagueness, "Plaintiff will work with counsel for
20  defendants to identify and produce responsive documents,
21  if any, to the extent not already produced."  Now, you
22  already had all these documents from the FBI at this
23  time, didn't you?
24      A.   When was this?
25      Q.   This was May -- signed May 21st, 2018.

217

1     A.    Yes, I would have.

2     Q.    Why didn't you produce them?

3     A.    Because there was a lot of discussion about

4  whether I could or whether I should because I was

5  admonished by the OPR not to share it with anybody.

6     Q.    Why didn't you put in your response that I have

7  documents but I can't produce them because of a

8  confidentiality agreement with the FBI?

9     A.    I don't know.  Rick wrote this.

10              (Deposition Exhibit No. 46 was marked for

11              identification.)

12    Q.    Exhibit 46 is a record from -- if you look in

13  the upper right-hand corner, you'll see the encounter

14  date July 19th, 2012, when you went to see Erika Pallie

15  at Cheat Lake Physicians?

16    A.    Yes.

17    Q.    Go to page 900, under HPI, which I'll represent

18  to you I believe stands for History of Present Illness.

19  In the second paragraph, Dr. Pallie notes the patient

20  has a lifelong history of facial ticks which reportedly

21  run in the family; is that correct?

22    A.    Yes.

23    Q.    She goes on to state that he had once been

24  prescribed Klonopin; is that correct?

25    A.    Correct.

218

1    Q.    What were you prescribed Klonopin for?

2    A.    The ticks.

3    Q.    And then she goes on and states, "Now taking

4    Wellbutrin."  So you were taking a --

5    A.    Antidepressant.

6    Q.    In July of 2012?

7    A.    Yeah.

8              (Deposition Exhibit No. 47 was marked for

9              identification.)

10   Q.    Mr. Ballock, Exhibit 47 is, I'll represent to

11   you, the entirety of the records that we received from

12   Kathie Gieselman.  And I'm a little confused, and maybe

13   you can help me out.  We got these from Twin Cities

14   Therapy in Minnesota.  Was she in Minnesota when you

15   were seeing her?

16   A.    No.  She transferred there.

17   Q.    Where was she when you saw her?

18   A.    In a little town south of Clarksburg.  I don't

19   recall.

20   Q.    Let's go to page 888.

21   A.    Page?

22   Q.    888.

23   A.    888.

24   Q.    This is a record from September 4th, 2012.  Do

25   you see that in the upper right-hand corner?

219

1    A.    Yes.

2    Q.    Down in the narrative it says, "He reports that

3   his wife 'is smart,'" end quote, "and has 'threatened

4   several things,'" end quote, "that could potentially

5   cost him his job at FBI."  What had she threatened you

6   with -- let me back up.  This was before you separated,

7   September 4th, 2012; correct?

8    A.    Yes.

9    Q.    What did Ellen threaten you with at that point?

10    A.    Oh, Ellen -- Ellen was always making threats

11   like that.  Whenever we would have a discussion or --

12   sorry, discussion -- an argument and she would start to

13   feel like she was losing, her standard go-to was to do

14   this, oh, my neck, oh, my neck, you just hit me in the

15   neck, I'm going to have to call 911 and tell them that

16   you abused me and then you're going to lose your job.

17   And that's when I would go sleep in my car.

18    Q.    That's what you were referring to --

19    A.    That's one of the things I was referring to.

20    Q.    What else were you referring to?

21    A.    All sorts of activities like that.  She just

22   wanted me -- she threatened me with my job.  I spoke

23   with Agent Steve Secore (ph) when we were in

24   Indianapolis as partners at that time about how Ellen,

25   when we would fight, would threaten to go to the FBI and

220

1  tell them false things so that I would lose my job.

2  That's her pattern.

3      Q.    You said Steve Secore was when you were in

4  Indianapolis?

5      A.    Indianapolis.

6      Q.    Let's go to the next page, 889.  This was a

7  visit on October 3rd, 2012.  In the very last sentence

8  Ms. Gieselman notes, "He will call," meaning you, "will

9  call tomorrow to set up more appointments."  Did you

10  ever call to set up any more appointments?

11      A.    I don't remember.  She ultimately left and went

12  to Minnesota.

13      Q.    Is that why you quit seeing her?

14      A.    Perhaps.  Again, I wanted to do marriage

15  counseling and that was the intent.  And Ellen had said

16  she wasn't going to.

17      Q.    Do you recall seeing Kathie after October 3rd,

18  2012?

19      A.    No.

20      Q.    This was the only session you had with her

21  after the separation?

22      A.    Probably.

23              (Deposition Exhibit No. 48 was marked for

24              identification.)

25      Q.    Exhibit 48, if you'll look in the upper

221

1    right-hand corner, is a visit at Cheat Lake Physicians

2    on October 24th, 2012.  Do you see that?

3        A.    Yeah.

4        Q.    Again, with Dr. Erika Pallie.  And in the

5    subjective component she notes in the second line, "I

6    have given him Paxil to help with his anxiety."  Is that

7    correct that you had received Paxil --

8        A.    Yes.

9        Q.    -- at least as of October 2012?

10       A.    Yes.

11       Q.    For anxiety?

12       A.    Yes.

13             (Deposition Exhibit No. 49 was marked for

14             identification.)

15       Q.    Exhibit 49 is another progress note from Cheat

16   Lake Physicians dated October 15th, 2013.  Just to kind

17   of put things in perspective this would have been a

18   month after you were arrested, approximately.

19       A.    Okay.

20       Q.    Under the subjective paragraph it discusses you

21   have undergone a very difficult divorce and there's a

22   lot of discord between him and his ex-wife.  "He is

23   currently caring for his two children.  He has full

24   custody and also works full-time at the FBI."  It

25   discusses difficulty sleeping due to stress and anxiety,

222

1    has been prescribed lorazepam in the past which helped.

2    And then, at the very bottom of this paragraph, "No

3    other acute issues or concerns today."

4            So it discusses your divorce, caring for the

5    children, working full-time, no mention of the arrest.

6    Is that correct that you didn't discuss the arrest with

7    your doctor then?

8        A.   Correct.

9        Q.   And it's also correct that you were prescribed

10   lorazepam -- if you go down to Assessment Plan Number 3,

11   Anxiety, it says, that they renewed your Paxil and

12   Wellbutrin and gave you a prescription for lorazepam.

13   So you were prescribed lorazepam for anxiety in October

14   2013?

15       A.   Yeah.

16       Q.   Are you still taking it?

17       A.   No.

18       Q.   When did you quit taking it?

19       A.   I couldn't tell you, but it made me feel like a

20   zombie.

21       Q.   Was it before or after the charges were

22   dismissed?

23       A.   I don't know.  I have so many medications, I

24   don't know.

25       Q.   How about the Paxil?  Do you still take it?

223

1     A.   No.

2     Q.   When did you quit taking it?

3     A.   We replaced that with Lexapro, and that would

4  have been last year, I guess.

5     Q.   So Lexapro is another antidepressant?

6     A.   Yes.

7     Q.   You believe that was in 2018?

8     A.   Yes.

9     Q.   How about the Wellbutrin?  Do you still take

10  it?

11     A.   Yes.  It's been increased.

12           (Deposition Exhibit No. 50 was marked for

13           identification.)

14     Q.   Exhibit 50, Mr. Ballock, is the records from

15  Fremouw-Sigley Psychological Associates.  And, I'll be

16  honest with you, they're very difficult to read.  I will

17  translate as best I can.  And if you think it says

18  something different, you let me know.

19           Initially, going to Fremouw-Sigley, this was

20  court-ordered joint counseling; is that correct?

21     A.   Correct.

22     Q.   Was Ellen at all the sessions?

23     A.   No.  She stopped going.

24     Q.   Up until she quit going altogether, did she

25  miss any sessions?

224

1      A.    No.

2      Q.    Let's go to page 1161.  Upper left-hand corner,

3   date November 5th, 2013.  Assessment of current

4   functioning, patient name is you.

5      A.    Okay.

6      Q.    It says, "He's okay.  Denied any current" -- it

7   looks like stressors to me.  Do you think that that was

8   correct, that you were okay in November 2013?

9      A.    On that day I was.

10      Q.    Now, below that is a progress note for

11   November 22nd, 2013.  Under type of session they've

12   circled family.

13      A.    Okay.

14      Q.    And then down under Present in Session it says,

15   "With Ellen."  So this was a joint session.

16      A.    Okay.

17      Q.    Now I'd like to refer you back to your

18   timeline, if I can find my copy.  Here we go.  If you

19   look on your timeline for November 22nd, 2013 --

20      A.    Go ahead.

21      Q.    It discusses -- I'll give you a minute to find

22   it.

23      A.    Got it.

24      Q.    It's page 15.

25      A.    Yes.

225

1     Q.   At the very bottom it discusses 11/22/13, you

2  and Ellen attended the second joint counseling session.

3  And if you go over to the next page you discuss that

4  during the session, although it's not reflected in the

5  progress notes, you state that during this session Ellen

6  said that everyday during the summer of 2013 she dressed

7  nicely and had the house clean anticipating that FBI

8  agents would be arresting her for stealing FBI-issued

9  property.

10          Is there anything unreasonable about her

11  preparing to be arrested, given that you had threatened

12  several times in May 2013 to have her charged with a

13  felony count?

14     A.   I never threatened her.  I told her that this

15  is what she had done and she needs to not do that.  So I

16  take umbrage with that characterization.  I did not

17  threaten her.

18     Q.   Telling her that she violated the law, citing

19  the law, telling her it's a serious offense and that it

20  will be dealt with immediately is not threatening in

21  your mind?

22     A.   No.  She committed the crime.

23     Q.   Okay.  All right.  Since leaving the FBI.  You

24  got a job at Kroger in December 2017, I believe?

25     A.   Yes.

226

1      Q.    Are you still working there?

2      A.    Yes.

3      Q.    What is your position?

4      A.    Operations manager.

5      Q.    What is your current salary?

6      A.    $55,000.

7      Q.    I understand from your discovery responses

8  you're eligible for a bonus?

9      A.    Correct.

10      Q.    What determines that eligibility?

11      A.    Factors beyond my control, sales, customer

12  feedback, EBITA.

13      Q.    What's that?

14      A.    Earnings before interest, taxes, and

15  amortization.  It's a calculation.  The amount of shrink

16  that the store suffers, retention rates.  A whole lot of

17  factors go into deciding the bonus, all things that the

18  company wants us to accomplish.

19      Q.    Did you receive a bonus for 2018?

20      A.    I did.

21      Q.    How much?

22      A.    It was 49 percent of $5,000.  We were given a

23  49 percent bonus, so whatever that comes out to.

24      Q.    Just under $2,500 by my math.

25      A.    Okay.

227

1  Q. Do you have benefits through Kroger?

2  A. Yes, insurance.

3  Q. Do you have health insurance?

4  A. I do.

5  Q. How much do you pay for your premium?

6  A. I'd have to look.

7  Q. How much does your employer pay?

8  A. I'd have to look.

9  Q. What about dental insurance?

10  A. I do.

11  Q. Do you know how much either you or employer pay

12 for the premium?

13  A. I don't.

14  Q. Vision insurance?

15  A. I do.

16  Q. Do you know the premiums?

17  A. I don't.

18  Q. How about vacation?

19  A. Three weeks a year of vacation.

20  Q. How about any pension or a 401k plan?

21  A. No pension.  I have the ability to contribute

22 to a 401k, but I don't.

23  Q. Why don't you?

24  A. Because I don't have enough income to meet my

25 monthly expenses.

228

1     Q.    Does your employer contribute to the 401k?

2     A.    Only matching.

3     Q.    So zero for now?

4     A.    Yeah.

5     Q.    Do you receive child support?

6     A.    Yes.

7     Q.    How much?

8     A.    $508 a month, maybe.

9     Q.    Have you looked for other employment since

10    getting your job at Kroger?

11    A.    Yes.

12    Q.    Where have you looked?

13    A.    Various places all around in Indianapolis.

14    Q.    Have you been offered any jobs?

15    A.    No.

16    Q.    What were your attorney fees from the divorce?

17    A.    Oh, gosh tens of thousands.  I don't know the

18    exact number.

19    Q.    Less than $100,000?

20    A.    Probably.

21    Q.    Would you say it was more than $50,000?

22    A.    Could have been.

23    Q.    Do you have any idea?

24    A.    I don't.

25    Q.    Okay.  So it could be anywhere between $10,000

229

1   and $99,000?

2        A.   Sure.

3        Q.   Are your attorney fees from the divorce paid

4   off?

5        A.   Yes.

6        Q.   How about your attorney fees from the criminal

7   prosecution?

8        A.   I've paid Charles some amount to get me through

9   the dismissal phase.  He's now --

10                  MR. CROOKS:  He's talking about the

11   criminal case.

12       A.   Oh, criminal case.  I want to say $5,000.

13       Q.   And then, what are your attorney fees thus far

14   in this action?

15       A.   Rick represented me for nothing.  He's a friend

16   of the family.  Charles I've paid -- I paid money to get

17   me through the dismissal phase.  And now he's

18   representing me on a contingency basis.

19       Q.   How much did you pay to get through the

20   dismissal phase?

21       A.   I don't know.

22       Q.   Okay.

23       A.   I can get you that.

24                  MR. JEFFRIES:  That's all that I've got,

25   Mr. Ballock.  I'm going to turn you over to --

230

1          THE DEPONENT:  Can we take a bathroom

2   break?

3          MR. JEFFRIES:  Actually, let me -- before

4   I hand you over.  Let me take a break, consult, and

5   there may be another follow-up question or two.

6          THE VIDEOGRAPHER:  The time is 1545.  We

7   are off the record.

8          (There was a short break in the

9          proceedings.)

10          THE VIDEOGRAPHER:  We are back on the

11   record.  The time is 1558.

12          MR. JEFFRIES:  Mr. Ballock, I have no

13   further questions.  I'll let Mr. Phillips ask you some.

14          MR. PHILLIPS:  Okay.  We met, Mr. Ballock.

15   I'm Todd Phillips.  I represent Ellen in this matter.

16          Can you hear me okay?

17          (The videographer nods.)

18               CROSS-EXAMINATION

19   BY MR. PHILLIPS:

20      Q.   Okay.  Let's start first, I believe you

21   testified early on and several times in questions from

22   Mr. Jeffries that most everything you did was for the

23   benefit of your children, including emails you sent to

24   Ellen?

25      A.   Yes.

231

1     Q.   Okay.  Did you emotionally neglect Ellen for

2 the benefit of your children?

3     A.   No.  No, I didn't.

4     Q.   Okay.

5     A.   I emotionally neglected her partly because I

6 spent so much time with the children.

7     Q.   Okay.  All things considered, the emotional

8 neglect was not a benefit to the children?

9     A.   All things considered, the emotional neglect

10 was a bad thing for Ellen, me, our marriage, and

11 ultimately for the children.  Sure.

12     Q.   Okay.

13     A.   My point is that I never physically harmed

14 Ellen.  I've never physically harmed anyone.

15     Q.   Okay.  That wasn't the question.  So I guess

16 it's fair to say all things you did not benefit the

17 children; is that accurate?

18     A.   Sure.  Staying out late for work did not

19 benefit the children.  There are lots of things that

20 I've done that haven't benefited the children.

21     Q.   Go back to Exhibit 3.  Let me find it.  I

22 believe it's in here.  You state that you're ashamed of

23 your past.

24     A.   Okay.

25     Q.   And that what -- I want to ask about that.

232

1    What were you ashamed of?

2        A.    What we have been talking about.  I'm ashamed

3    that I forgot about Ellen.

4        Q.    Okay.  And going to the Sean Matthews persona

5    or alter ego.  Did you -- did you spell that S-e-a-n?

6        A.    Yes, I think so.  Yes.

7        Q.    Okay.  When did -- approximately, when did you

8    start going online as Sean Matthews?

9        A.    Probably about 2007.

10       Q.    Okay.  And that lasted until?

11       A.    Until we left Ann Arbor in 2011.

12       Q.    Okay.  And you used that identity on

13   Craigslist?

14       A.    Yes.

15       Q.    And what other -- any other sites?

16       A.    No.

17       Q.    And you spoke with -- spoke with Ellen.  Did

18   you exchange communications with anyone else as Sean

19   Matthews?

20       A.    No.

21       Q.    Have you ever used the Sean Matthews identity

22   in anything else?

23       A.    Yes.  Actually, that was my undercover alias

24   for the bureau.

25       Q.    Okay.  And the communications you would have

233

1    with -- were you using Sean Matthews with any

2    bureau-related matters between 2007 to 2011?

3        A.   I really never had to use that.   No.

4        Q.   Not during that time period?

5        A.   Huh-uh.

6        Q.   Had you used it before 2007 with the bureau --

7        A.   No.   I only had it while I was in Ann Arbor,

8    but never did actually ever have to pull it out or use

9    it.

10       Q.   Okay.   I'm a little -- maybe you can explain

11   that to me.   How did you have this identity and not use

12   it?

13       A.   I had it in the event that I needed to use it,

14   in case I needed to use it for whatever reason, but I

15   never did.   There was never an occasion in which I was

16   required or needed to present that identification or any

17   such thing.

18       Q.   Okay.   For identification, did you have any

19   forms of ID identifying you as Sean Matthews?

20       A.   Yes, I had a driver's license and a credit card

21   in the name of Sean Matthews.

22       Q.   Okay.   And then the --

23       A.   So, when creating the Craigslist account, I

24   just naturally went to that.

25       Q.   Uh-huh.   Okay.   And during this time that you

234

1  pretended to be Sean Matthews did you send Ellen any

2  communications on FBI --

3      A.   Oh, god, no.

4      Q.   No?  Didn't use FBI computer or cell phone?

5      A.   No way.

6      Q.   Okay.  Any communications while you were --

7  during working hours?

8      A.   No way.

9      Q.   Okay.  I believe in reference to questions you

10  were asked about Exhibit 20, I believe -- I believe -- I

11  think in response to questions there you, again,

12  indicated as you have several times about not being --

13  not providing emotionally for Ellen, and you said that

14  Ellen lived a fabulous life, that --

15      A.   A spoiled life.

16      Q.   Okay.  Spoiled.  That's -- so you were

17  referring to material provisions?

18      A.   She couldn't get out of bed in the morning so I

19  would drive the children to work -- to work, to school

20  -- then come back to get my bureau car to go to work.

21  When I came home I would stop at a cafe to buy dinner

22  pre-made.  I would do the dishes.  I would play with the

23  kids.  I read them nighttime stories.  I bathed them.  I

24  put them to bed.

25          Even though she had no job and nothing to do

235

1    all day, I hired her a housekeeper because she couldn't

2    find the energy to keep house.  I took her on vacations

3    throughout the year, both on the government -- when I

4    would travel for government and otherwise.

5          I bought her material things.  We lived in a

6    4,800 square foot -- 4,600 square foot house here in

7    West Virginia because she insisted on it.  She -- the

8    kids and I made her breakfast in bed every Saturday

9    morning.  I can share some pictures with you of that.

10   She was spoiled.

11   Q.   Okay.  So that -- so that's what you meant by a

12   fabulous life?

13   A.   She spent her days however she wanted to.   I

14   gave her the credit card, and I said to her all -- my

15   only expectation is that you don't spend more money than

16   we have coming in.

17   Q.   All right.  But you acknowledge you didn't

18   provide emotionally, you didn't provide sexually either?

19   A.   That's true.

20   Q.   Yeah.  Okay.

21   A.   Yeah, my energies were -- and I regret it.  My

22   energies were focused on my career and the children.

23   Ellen never wanted to have children.  And when my sister

24   had children, I said I want one of those and so we're

25   either going to have to separate or you're going to have

236

1    to give me a child.  And it was a very bad decision

2    because she resented those children.

3         Q.    But you had difficulty performing sexually?

4         A.    Yes.

5         Q.    And that's -- I saw, I believe it was in

6    Exhibit 45, that you were prescribed Paxil to help with

7    that?

8         A.    Yes.

9         Q.    And watching the videos could help you?

10        A.    No.

11        Q.    No?

12        A.    Not at all.  It wasn't a matter of getting

13   erect.  My issue was premature ejaculation.  And that's

14   one reason Ellen told me why she was fooling around on

15   me and leaving me.

16        Q.    Exhibit 48, you were prescribed Paxil for

17   sexual dysfunction.  Okay.  That was October 24th of

18   2012.  How long before that date were you prescribed

19   Paxil for premature ejaculation?

20        A.    I think that was then.

21        Q.    That was the first time?

22        A.    Yeah.  She -- she was there at the doctor's

23   appointment with Erika Pallie.

24        Q.    Okay.

25        A.    And we talked about it with her.  And it was

1   her -- at her suggestion and request that we bring it up

2   with Erika.

3       Q.   Okay.  It says the -- the report by Dr. Pallie

4   said she had given you Paxil to help with anxiety and to

5   help premature ejaculation.  That worked, but he stopped

6   taking it and he needs refills, so it seems to indicate

7   that was before October of 2012.

8       A.   Perhaps.

9       Q.   And --

10      A.   Perhaps.

11      Q.   I guess you did stop taking it then or at some

12  point?

13      A.   Yes.  Yes.  I didn't like the side effects.

14      Q.   Okay.  Then I believe in talking about your

15  financial situation, in responding to Exhibit 23, you

16  noted a loss of hundreds of thousands of dollars and

17  this was causing problems in your marriage.  How many

18  hundreds of thousands?

19      A.   Can you please...

20      Q.   That was not referenced in the -- let me take a

21  look at -- it was in reference to questions related to

22  Exhibit 23.

23      A.   What did I say?

24      Q.   You stated that -- well, that -- I believe it

25  was in reference to you had said that things were tough

238

1    so you had -- with the impending dissolution of the

2    marriage and that -- I believe Mr. Jeffries had asked

3    you, you know, just because things are tough that

4    doesn't excuse criminal behavior and you agreed.  And

5    some of things that you listed as making your life

6    difficult at the time, one of those was financially you

7    said that --

8        A.   Yes.

9        Q.   -- during the marriage, you and Ellen had lost

10   hundreds of thousands of dollars at that point.  And I'm

11   just wanting to know how many hundred?

12       A.   Oh, gosh.  I don't know.  The guardian ad litem

13   cost us tens of thousands of dollars.  Christi

14   Cooper-Lehki's bill was around $50,000.  Ellen, for

15   whatever reason, decided she needed three attorneys to

16   handle her divorce.  They were all three getting paid by

17   me.  You name it.

18       Q.   Okay.

19       A.   We had $127,000 set aside for the children's

20   education.  And when she kicked me out of the house, she

21   went to the bank -- it was in a joint account, and

22   removed it all.  And then, later, when the judge asked

23   her where it went, she couldn't explain it, but she had

24   spent all of it except $30,000.  She was buying gifts

25   for Kenny and -- expensive gifts.  And she was using

239

1   narcotics.  So I don't know where all the money went.

2   Kenny said they liked to go to strip clubs together a

3   lot.  I don't know, but my children's college education

4   fund was wiped out by her.

5       Q.   Okay.  That kind of explains it.  You had a lot

6   of money depleted, a lot of money-related -- it was an

7   expensive divorce for --

8       A.   Yes, even though she has a master's degree and

9   could have found a job for two years during the pendency

10  if the divorce, she sat at home and did nothing,

11  couldn't get our daughter to school.  And I was paying

12  the mortgage and giving her $2,000 a month cash, paying

13  for our children's private schooling.  And she did

14  nothing.  I went through a lot, a lot of money.

15           She -- right before she separated from me -- I

16  don't think it's a coincidence.  Right before she

17  separated from me, she went out and she bought a $60,000

18  SUV and paid cash for it.  She went through our money.

19  It was a very traumatic, very stressful time.

20      Q.   You mentioned about her not getting work.  I

21  mean, you threatened to sabotage work efforts.

22      A.   I threatened to sabotage work efforts?

23      Q.   In Exhibit 24, you indicated that you'd go to

24  the licensing board to prevent any attempt of her

25  becoming a nurse.

240

1      A.   Oh, yeah.   She has a -- she has a sexual

2   problem, paraphilia.   She has a desire to have sex with

3   unconsenting beings, and she has expressed fantasies

4   about molesting incapacitated patients in her writings

5   to Sean Matthews.   And I wasn't about to let her do

6   that.   Although I tried to get her a job at the FBI

7   because it would have been nice for her to work.

8      Q.   Did you ever contact an employer, prospective

9   employer, or licensing board?

10      A.   No.

11      Q.   Did your father or anyone else --

12      A.   Not that --

13      Q.   -- in your close family do that to your

14   knowledge?

15      A.   Not that I'm aware of.

16      Q.   Okay.   Do you think that's possible that's

17   something that your father would do?

18      A.   I wouldn't put it past him.   My father and I

19   have a strained and different relationship, so I don't

20   know what he's doing.

21      Q.   Okay.   Let me talk about -- go back to when you

22   were arraigned in magistrate court after being arrested,

23   and Mike Benninger might have been with you or another

24   attorney.

25      A.   Maybe.

241

1     Q.   Probably not Delby Pool because she's a family

2  court attorney; is that right?

3     A.   Maybe she went up with me because she was at

4  least an attorney.  I just don't remember who was in

5  that room.  I couldn't tell you.

6     Q.   Okay.  I believe you said the -- I believe you

7  testified the whole procedure from being arrested, let

8  out of family court, going to magistrate court, and then

9  back to family court only took 15 to 20 minutes?

10     A.   Yeah.  That's my best guess.

11     Q.   Yeah.  And you weren't aware of an impending

12  arrest at the time of the September 13th, 2012 hearing?

13     A.   No.  It was a shock to me.

14     Q.   Okay.

15     A.   And when it happened, Ellen looked over and

16  gave me a great big smile.

17     Q.   Did you -- but had you been in touch with --

18  retained Mr. Benninger prior to that time or another

19  attorney?

20     A.   Yes.

21     Q.   Okay.  What had he been retained for?

22     A.   My father -- the website you're talking about,

23  he created a website and Ellen filed suit against him.

24  And she named me as well, even though I had nothing to

25  do with it.  And so, I retained Benninger.

242

1      Q.   Okay.

2      A.   Ellen, when asked to provide discovery

3   materials initiated a settlement.  And the settlement

4   was we just all go our separate ways, nothing happens,

5   nothing changes.  But she didn't want to answer

6   questions in deposition.

7      Q.   Okay.  So he was your civil attorney?

8      A.   Yes.

9      Q.   I believe you testified at the time you were

10  eager to get out of the Clarksburg area.  You were

11  looking for a transfer with the FBI?

12     A.   Yes.

13     Q.   That's what you hoped for.  And was it to --

14  was that to go, I guess, to Indianapolis, somewhere near

15  there was your first choice?

16     A.   Yes.

17     Q.   Were you wanting to go other places?

18     A.   I was willing to go other places.  Indianapolis

19  was my first choice.  I was willing to go to

20  headquarters in D.C. as well.

21     Q.   Were you -- were you wanting to get out of West

22  Virginia even if it wouldn't be Indianapolis or

23  Virginia/D.C. area or something like that?

24     A.   No.  There were only certain places I was

25  interested in going, Indianapolis, Ann Arbor.  I would

243

1   go to Chicago.  I would have gone to Columbus, Ohio.

2   There were different places we were looking at.

3         We were only supposed to be here a year when we

4   moved.  It was a program that the bureau offered.  They

5   can't get people to come here so they give you an offer.

6   They say come here for a year, you'll be a supervisor,

7   and then you can go back to the field and you'll keep

8   your supervisor pay for the rest of your career.  We

9   were only supposed to be here for a year.

10      Q.   Okay.  I'll refer you to Exhibit 17 on the --

11      A.   Yes.

12      Q.   -- second page, third paragraph down -- second

13  full paragraph where you seemed to want to get out of

14  the area.  You state at the bottom -- it's the last

15  three sentences.  I've sent you the articles.  You know

16  the research and statistics.  And aren't the kids who

17  are stuck among hillbilly and in poor schools in West

18  Virginia.  Those aren't our kids, kids who were taught

19  the importance of family, memories, and traditions from

20  the day they were -- day they were born.

21      A.   That's right.

22      Q.   It sounds like you don't like area --

23      A.   Nor did Ellen.

24      Q.   -- good schools and wanted to get out?

25      A.   Nor did Ellen.  When we moved here, she

244

1    investigated the schools and she was appalled.  So she

2    made us enroll the children in Morgantown Learning

3    Academy, a private school.

4           She hated it as much as I did being here, only

5    because it lacks family and lifelong friends and

6    education, an emphasis on education, cultural

7    activities.  We were into the theater, concerts, those

8    sorts of things, outdoor cafes, things that we just

9    didn't find here.

10          And, in fact, it came to be true because when I

11   moved my children to Indianapolis, after we arrived, the

12   counselor called me and said your children are two years

13   behind where they should be.

14      Q.    Okay.

15      A.    So our fears were founded.

16      Q.    Okay.  So it's fair to say the area -- you

17   didn't think it was educated enough, sophisticated

18   enough for your kids?

19      A.    Not educated enough nor sophisticated enough,

20   but there are plenty of educated people here and there's

21   lots to do and I have some of my best friends are from

22   here.  My fiance is from here.

23          I loved a lot of things about this, but the

24   things that were important to me focus a strong

25   commitment to education, public libraries, cultural

245

1   events, those were lacking.  We've lived all over the
2   United States, and they're lacking here.
3       Q.   Okay.
4       A.   My son was in an AP English here.  He was a
5   straight A student in Morgantown High School.  And then
6   we went to West Virginia -- or Indianapolis and they
7   said that they're two years behind where they need to
8   be.  I talked to my son about it, and he said it's
9   completely different.  I said give me some examples.  He
10  said, in English class, we read the classics and then we
11  write papers about them and we have discussions about
12  them.  And in AP English class at Morgantown High
13  School, instead of reading Romeo and Juliet, we watched
14  two different movies about Romeo and Juliet and were
15  quizzed on the movies.
16      Q.   Okay.  Okay.  I have some questions about
17  Exhibit 30.  It's the dismissal order with attachments.
18  Okay.  First, you said -- the first paragraph where you
19  acknowledged probable cause, that was about a false
20  statement you made?
21      A.   I signed the agreement, but I did not believe
22  probable cause existed.  You're right.
23      Q.   Okay.  You --
24      A.   Nor did Marcia Ashdown, nor did my attorney,
25  and I don't believe Ellen did as well.  It was just at

246

1    Marcia Ashdown's insistence.  She told Benninger so that

2    she could protect, quote, her boys.  She said she was

3    getting ready to retire and that's not the note she

4    wanted to leave on, where her boys would be sued.

5         Q.   Do you think they -- do you think all four of

6    you signed falsely not believing that there was probable

7    cause?

8         A.   I can't speak to anybody else.

9         Q.   Actually -- okay.  I'll correct that.  You're

10   the -- I guess you're the only one acknowledging there's

11   probable cause in this attachment, this agreement.

12                   MR. CROOKS:  Object to the form of that

13   question.

14        Q.   Okay.  Paragraph 1 states, "Scott Ballock

15   acknowledges that probable cause existed for the West

16   Virginia State Police to file the issuance of the

17   warrants in this case pursuant to West Virginia Code

18   61-3C-14a and 61-2-9a."  Okay.

19              The -- there's nothing in there saying that

20   Ms. Costlow or Mr. Benninger or Ms. Ashdown acknowledge

21   probable cause.

22        A.   Correct.

23        Q.   It was just you.

24        A.   Correct.

25        Q.   Okay.  I believe you stated that you made the

247

1    false statement with your attorney's approval or --

2        A.    Upon my attorney's advice.

3        Q.    Advice.  Okay.  And that you lied to the Court

4    to benefit your kids; right?

5        A.    I signed the statement to benefit my kids.

6        Q.    A statement you knew was false?

7        A.    A statement I didn't agree with.

8        Q.    Okay.  And then the -- I'll go to the next

9    paragraph.  It states you acknowledge communicating via

10   email with Ellen Costlow after it is alleged that a

11   letter was sent to him asking him to stop such

12   communications to Ellen Costlow.

13        A.    That's factually correct.

14        Q.    Okay.

15        A.    I did not receive the letter, but it was sent

16   to me.

17        Q.    But, as we've gone over, you received any

18   number of emails or texts saying stop, don't call me,

19   something indicating that she didn't want you to contact

20   her?

21        A.    Correct, interspersed with her contacting me.

22        Q.    Contacting you in ways that we have no record

23   of?

24        A.    In some instances we have records of, yes.  I

25   didn't think this would have been an issue.  Otherwise,

248

1    I would have recorded it.

2         Q.    And you weren't -- you weren't charged with

3    anything violent; right?  The basis of the criminal

4    charges in the second paragraph is that you contacted

5    her after she told you not to?

6         A.    Correct.

7         Q.    And you acknowledge making all the contacts and

8    the emails that were -- at least you're not --

9         A.    I'm not denying.

10        Q.    You're not disputing the record of emails and

11   the text messages?

12        A.    I am not disputing that.

13        Q.    Okay.  And you called the Cooper-Lehki report

14   exculpatory evidence?

15        A.    I did.

16        Q.    The Cooper-Lehki report doesn't change the fact

17   that you made the -- that you sent the texts and emails

18   to Ellen and doesn't change the fact that she asked you

19   not to; correct?

20        A.    Correct.

21             MR. PHILLIPS:  Okay.  I was just told we

22   have to switch the tape soon.  I was looking for

23   something that would -- that you can answer quickly.

24   BY MR. PHILLIPS:

25        Q.    Okay.  You -- I guess you stated that you

249

1  believe Lieutenant Kief abused the judicial process from

2  -- by giving information that came from Ms. Costlow to

3  the FBI; is that accurate?

4      A.  He at least solicited it.  I don't know what he

5  gave them.

6      Q.  Okay.  Oh, I thought that -- I thought your

7  claim with abuse of process was that he got around the

8  order forbidding Ellen to communicate with the FBI?

9      A.  Correct.

10     Q.  But if he didn't communicate with -- if

11  Lieutenant Kief didn't pass this on to the FBI then that

12  order was not circumvented.

13     A.  He attempted to circumvent it.  He would have

14  attempted to circumvent it.  I don't have any reason to

15  believe that he elicited and solicited information from

16  Ellen, derogatory information and then didn't pass it

17  on.

18     Q.  Okay.  So now you're saying you don't know if

19  he talked to the FBI?

20     A.  I know he talked to the FBI.  I don't know the

21  full extent of what he told them.

22     Q.  Okay.  You don't know if it was -- you don't

23  know if it's information he got from Ellen after your

24  criminal case was dismissed?

25     A.  No.

250

1    Q.   Okay.  Because that's the order you were

2  talking about him circumventing; correct?

3    A.   Whether it was obtained before or after the

4  dismissal, the order was she shall not provide any

5  disparaging information.  And Kief was soliciting from

6  Ellen disparaging information about me.

7    Q.   But, if information was known long before the

8  -- long before the case was dismissed, then Ellen

9  wouldn't be violating the order.

10   A.   That's not true.  The order didn't say she

11  shall not provide certain disparaging information.  The

12  order was you shall not provide any disparaging

13  information to the FBI.  And Kief asked her to provide

14  disparaging information about me so that he could

15  provide it to the FBI circumventing the judge's order.

16   Q.   Right.

17   A.   The order was very clear, you shall not provide

18  any disparaging information, not unless... There was no

19  unless or but or...

20   Q.   But if you're saying that Kief gave this

21  information to the FBI, he could have known it long

22  before there was ever an order preventing Ellen from

23  sharing anything.

24   A.   Then I don't know why I would have had to ask

25  her for that disparaging information.

1       Q.    When did he ask her for that information?

2       A.    I don't know when.  But in her response, she

3  says rhetorically -- and I'm sure she did this to set

4  herself up for a defense to look to say --

5             MR. PHILLIPS:  We need to take a break.

6             THE VIDEOGRAPHER:  The time is 1639.  We

7  are off the record.

8             (There was a short break in the

9             proceedings.)

10            THE VIDEOGRAPHER:  We are back on the

11 record.  The time is 1643.

12 BY MR. PHILLIPS:

13      Q.    Okay, Mr. Ballock.  I want to go to the

14 questions about the Cooper-Lehki report.  First off, it

15 was a custody evaluation --

16      A.    Yes.

17      Q.    -- right?  Ellen Costlow was never a patient of

18 hers for purposes of diagnosis or anything like that.

19 It wasn't --

20      A.    Correct.  Ellen, in an attempt to get full

21 custody of the children and lifetime alimony payments,

22 rather than tell the Court that the reason our marriage

23 was breaking up was because she met Kenny Ice online and

24 wanted to live with him, she told the Court that I beat

25 her to include in front of her -- in front of the

252

1   children, that I was physically violent to her, that she

2   suffered from battered woman syndrome.

3           So the Court said let's see if that's true.

4   I'm going to appoint the foremost expert in battered

5   woman syndrome, Christi Cooper-Lehki.  And she conducted

6   what she described as the most exhaustive investigation

7   she's ever done.

8       Q.    And you gave that full report to the FBI in

9   June 2017?

10      A.    Yes.

11      Q.    And you say that you obtained that report on

12  some motion or some paper filed with the family court by

13  Ms. Costlow; right?

14      A.    I think the motion was filed by me.  But, in

15  response, she submitted paperwork and included in that

16  paperwork was the report that she was not allowed to

17  have in her possession.

18      Q.    Was it the full report or excerpts of the

19  report?

20      A.    It was the full report.

21      Q.    Okay.  I believe you said that you received

22  from Judge Minor the full report attached to an order;

23  is that --

24      A.    No.  We were leaving the courtroom that day

25  after everything had been resolved and he said, oh, I --

253

1   something to the effect of I forgot to give you these,

2   these are the attachments that she submitted.  And I

3   grabbed them on my way out and put them in my backpack

4   and left.

5        Q.   Okay.  You're saying under oath that the full

6   report was attached to a motion?

7        A.   The full report was given by Ellen to Judge

8   Minor, and she was using it for some reason.  I don't

9   know why.  And then she gave me copies, I guess, of what

10  she gave him.  Included in that, was the report.

11       Q.   Okay.  Okay.  You're testifying you received

12  the full report directly from Judge Minor approximately

13  when?

14       A.   I don't know when that was.

15       Q.   Okay.  Just a couple of questions following up

16  on Mr. Jeffries' examination about your contact with

17  Lieutenant Kief about the allegation that Ms. Costlow

18  and Trooper Berry were involved in a relationship.

19            First, you said in the summer of 2012, you were

20  not concerned about -- you thought there might be a

21  relationship but it didn't bother you; right?

22       A.   Correct.

23       Q.   But you -- but you mentioned this to Lieutenant

24  Kief and you were concerned that there was no

25  investigation?

254

1     A.   No.  No investigation into Berry?  No.

2     Q.   Yeah.

3     A.   No.

4     Q.   Did that concern --

5     A.   No.  We were approaching -- we were two weeks

6 away from the final custody hearing.  I was looking

7 through the materials that I had, and I was reminded

8 that there was a violent episode at Ellen's house

9 between her and Kenny Ice at which the West Virginia

10 State Police responded.  And I was concerned that my

11 daughter was there during that violent episode, and I

12 wanted the details.

13     Q.   Yeah.

14     A.   So I -- and I found out that they didn't have a

15 report.

16     Q.   Okay.

17     A.   So the purpose of my call to Kief was to ask is

18 that true, is there not a report.  And he said that's

19 true, there's not a report, in so many words.

20     And I asked him is that common practice.  And

21 he said -- he confirmed that, that that's not uncommon.

22     Q.   Okay.

23     A.   And he got angry with me and he said what

24 business is it of yours anyway.  I said, well, it's my

25 house, my daughter was there.  Your daughter wasn't

255

1    there.  And my daughter will testify that she was there.

2          And then there was -- then I may have brought

3    it up, or he may -- I don't know.  But then there was a

4    back and forth about Kief (sic).  And he said something

5    like I looked into it, there's nothing there.  I don't

6    know.  But I got off the phone relatively quickly

7    because it was apparent that he didn't like me, he

8    didn't want anything to do with me.

9          Q.   But you don't know what -- do you allege that

10   there was any -- are you alleging that the state police

11   did anything wrong by not investigating or not doing an

12   adequate investigation of any relationship between

13   Ms. Costlow and --

14         A.   That's my suspicion.  That's my suspicion

15   because, as you'll see when the deputies arrived at her

16   house on another violent altercation and Kenny was

17   stabbed, she did the same thing.  Not the same thing, I

18   should say, because I don't know what she did there.

19   She begged the deputies to keep her name out of the

20   report and keep Kenny's name out of the report because

21   it would reflect poorly on her in the divorce

22   proceedings.

23         It would not surprise me and my suspicion is

24   that she did the same with the West Virginia State

25   Police.  Perhaps that's when she met Berry.  I don't

256

1    know.  I don't know.  But I found it odd, given all the

2    other circumstances, that police responded to the scene

3    of a violent incident where glass was broken, where a

4    gun was involved, where a young child was, and -- not

5    that any arrests weren't made, but that there was no

6    documentation of it whatsoever.  It's as though it never

7    happened.  And the policy manual for the West Virginia

8    State Police says that they're supposed to document

9    their interactions.

10        Q.   Okay.  I just want to make clear though you're

11   not alleging that should have been an investigation of

12   any relationship between Costlow and Berry?

13        A.   Oh, no.  I think there should have been.

14        Q.   Based --

15        A.   Based upon --

16        Q.   Based upon -- if I can --

17        A.   The allegations by Kenny Ice.

18        Q.   Okay.  And --

19        A.   And then Berry's unusual statement and the

20   contradictory reasons that Ellen gave for his being

21   there earlier in the day on his time off, that she had

22   his personal cell phone number, that sort of thing, that

23   she called and asked for him when she called 911.

24            So, no, I think -- I think that they did not

25   fully and adequately, if at all, investigate that

257

1  allegation about Berry's affair.

2      Q.   This was, well --

3      A.   It's a pretty serious allegation.

4      Q.   I remember from your --

5      A.   It's a pretty serious allegation to not have

6  any record of the results of your investigation, your

7  interviews, or anything like that except one page of

8  scribbled notes.

9      Q.   Well, but I think the basis was you talking to

10 Lieutenant Kief.  And your information was something

11 Kenny Ice had said about a text that you didn't get to

12 look at?  Is that --

13     A.   Kief and I did not have that conversation.  No.

14     Q.   Oh.  So he didn't -- so Kief didn't even have

15 that information?

16     A.   No.

17     Q.   So --

18     A.   But he would have had he talked to somebody

19 else.  But, of course, if you have a predetermined

20 notion of how the investigation is going to come out,

21 you don't talk to other people who might provide

22 contradictory information.

23     Q.   I'm just confused as why you think they should

24 do an investigation when you, yourself didn't think it

25 was a big deal?

258

1    A.    I don't care if Berry's having sex with Ellen.

2  I didn't give a shit.  What I cared about was that a law

3  enforcement officer was engaging in such unprofessional

4  behavior.  And my father's concern for reaching out to

5  him was because Ellen has a history -- a documented

6  history -- Christi Cooper-Lehki confirmed that Ellen has

7  a history of having affairs with other men and then

8  going to the wives and sharing with them that -- those

9  affairs, to include videotapes and pictures and

10  communications.  And he wanted, he said, to save Chris

11  Berry that fate.

12    Q.    Did your father know Mr. Berry?

13    A.    No.

14    Q.    Okay.

15    A.    I don't even know if he knew his name at that

16  point.

17              MR. PHILLIPS:  No further questions.

18              MR. CROOKS:  Okay.  Let me just make a

19  quick note here.

20              Is my microphone active?  Can you hear me?

21              THE VIDEOGRAPHER:  Correct.

22              MR. CROOKS:  All right.

23              THE DEPONENT:  Let me say one more thing.

24  During one of the times Ellen visited me in person, she

25  liked to use the phrase I'm untouchable, I'm golden.

1    And she said that she had friends in law enforcement now

2    as though it were a threat.  I wanted to get that out

3    there as well.

4                    CROSS-EXAMINATION

5    BY MR. CROOKS:

6        Q.    Scott, I want to ask you some questions today.

7    This is going to be apropos a lot of different topics

8    that were addressed to you by the other two attorneys

9    here today.  So we're going to move around topic to

10   topic maybe even --

11       A.    Okay.

12       Q.    -- maybe even come back from time to time to

13   different topics.  But it's not going to be near so long

14   as the time that it took to respond to all the questions

15   you've answered so far today.

16            Firstly, my memory and my note here says that

17   you and Ellen were married in June of 1991; is that

18   accurate?

19       A.    Correct.

20       Q.    Okay.  How did you meet her?

21       A.    My very first week of college, showed up at

22   college, and we met that first week.

23       Q.    Where was that?

24       A.    Indiana University in Bloomington, Indiana.  I

25   was the coach of the intermural football team and I was

260

1    trying to recruit girls to play on the team.  And I

2    asked her if she wanted -- it was mid -- it was not

3    midnight.  It was dark.  It was late.  I asked her,

4    "Would you like to play football?"  And she said, "Now?"

5    And that's how we met.

6        Q.   Okay.  Did you date a long time before you

7    married?

8        A.   Five years -- six year -- five -- five years.

9        Q.   Okay.  So your first contact with her then goes

10   back to about 1986 --

11       A.   Yes.

12       Q.   -- if I understand this accurately?

13       A.   Yes.  I was 17.

14       Q.   You were 17 when?  When you first met her?

15       A.   When we met.

16       Q.   Okay.  All right.  So, is Ellen the same age as

17   you?

18       A.   She's a year older.

19       Q.   Okay.  During that five years that the two of

20   you were together before you married, do you know

21   whether she was monogamous with you?

22       A.   No.  She cheated on me then.

23       Q.   Okay.  So this sexual adventure -- her appetite

24   for sexual adventure was something that showed itself

25   right from the start of your relationship?

261

1     A.   Yes, fairly early on.  Yes.

2     Q.   Okay.  Well, let me ask you, did that cause you

3 any conflicted feelings about staying in the

4 relationship?

5     A.   Sure.

6     Q.   Did you talk to her about that?

7     A.   Yes.

8     Q.   You obviously went on to become married.  Did

9 you have any agreement as to whether your marriage was

10 going to be a monogamous one or an open marriage?

11    A.   Yes.  It was to be monogamous.

12    Q.   Was it, in fact, monogamous for any period of

13 time, to the best of you -- of your knowledge?

14    A.   Yes.

15    Q.   How long?

16    A.   I thought it was all the way up until she had

17 children.  But, then again, I told you Jeff told me when

18 he was 30 about the incident between he and Ellen when

19 she was in college.

20    Q.   Okay.  This is a cousin of yours?

21    A.   Yes.

22    Q.   He was 14 at the time that Ellen seduced him?

23    A.   Yes.

24    Q.   Did you talk to her about that?

25    A.   Yes.

262

1     Q.    Did she admit it?

2     A.    Yes.

3     Q.    Okay.  Well, was this the first time that you

4  had ever heard of any such behavior on her part?

5     A.    Yes.

6     Q.    Did you have children together by that time?

7     A.    Yes.

8     Q.    I'm sorry.  I don't have this timeline mastered

9  to the point of being able to say it myself here.  Your

10  son is the older child?

11     A.    Yes.

12     Q.    That's Tom.  What year was he born?

13     A.    2001.

14     Q.    All right.  You call him Tommy?

15     A.    Tommy.

16     Q.    Because your dad is Tom?

17     A.    Correct.  And Tommy likes Tommy.

18     Q.    Okay.  So Tommy was born in 2001, and his

19  sister Summer was born what year?

20     A.    2003.

21     Q.    My note indicates that you were aware of your

22  wife at the time, Ruth Ellen Costlow, seeing other men

23  for sex outside of your marriage as early as 2003.  Is

24  that square with your memory of things?

25     A.    Yes.

263

1   Q.   So that would have been the same year that
2   Summer was born?

3   A.   Yes.

4   Q.   How did you first learn that this was
5   happening?

6   A.   I don't remember specifics about how I learned.

7   Q.   There was some discussion today about
8   Craigslist.  I think everybody knows what that is.  Did
9   that have anything to do with your discovery of her
10  sexual liaisons outside of your marriage?

11  A.   Well, when she would admit to me and I would
12  ask her how are you meeting these people, she told me
13  via Craigslist.

14  Q.   Okay.  The issue of her infidelity, did you
15  seek to address that through any couples counseling at
16  the time?

17  A.   No.

18  Q.   Why not?

19  A.   We thought we could work through it together.

20  Q.   Were you working at the FBI at that point?

21  A.   Yes.

22  Q.   How long had you been with the FBI by 2003?

23  A.   I'd just started in 2003.

24  Q.   Okay.

25  A.   June 1st.

264

1    Q.   I'm not sure this is clear yet.  How soon after

2    you finished your education did you begin your career at

3    the FBI?

4    A.   After my master's degree program I went to

5    Chicago where I was a U.S. probation and parole officer

6    for the district court.  I was there for two years

7    before I was transferred to Las Vegas.  And then in --

8    Q.   What year are we talking about, Scott?

9    A.   So, probation in Chicago from 2 -- from 1994 to

10   1996.  Probation in --

11   Q.   So you were married at that point?

12   A.   Yeah.

13   Q.   You took Ellen with you and you lived in

14   Chicago for two years; is that true?

15   A.   Yes.  And then she said I can't live here

16   anymore, being three hours away from my parents is too

17   close, we need to move.  So I put in for a transfer and

18   we moved to Las Vegas.

19   Q.   She was complaining that Chicago was too close

20   to her family?

21   A.   Yes.  She doesn't -- she was always conflicted

22   with her parents.

23   Q.   I see.  All right.  So you moved to Vegas and

24   your job there was what?

25   A.   U.S. probation officer for the district of

265

1  Nevada.

2      Q.   So it's more of the same kind of work you were

3  doing in Chicago?

4      A.   Yeah.

5      Q.   All right.  Did you transfer because your

6  supervisors sent you there, or did you ask for it, the

7  transfer?

8      A.   No.  Ellen asked me to get a transfer as far

9  away from Chicago as we could.  And so I applied to

10  several different places.  And I inter -- I was able to

11  interview in Las Vegas and they accepted my transfer.

12      Q.   Okay.  Ellen was a student in the same college

13  as you when the two of you met if I understand what

14  you're telling me.

15      A.   Yes.

16      Q.   What kind of program was she in?

17      A.   She was in the teaching school, the School of

18  Education.

19      Q.   Did she get her degree, do you know?

20      A.   She did.

21      Q.   Was it a bachelor's?

22      A.   Yes.

23      Q.   Did she ever get any degrees beyond bachelor?

24      A.   She was working toward her master's.  I think

25  she might have about 32 credit hours towards her

266

1  master's.

2     Q.   Okay.  So as matters stand today then, she is

3  somewhat short of her master's degree?

4     A.   I have no idea where she stands.  I mean, she

5  may have gone back to finish that.  I don't know.

6     Q.   I see.  Well maybe that wasn't an appropriate

7  way to pose the question.  The last you knew, Ellen was

8  a few hours short of getting her master's degree in

9  education --

10     A.   Yes.

11     Q.   Is that a fair statement?

12     A.   Yes.

13     Q.   Okay.  How many different men would you say you

14  discovered Ellen having relations with outside of your

15  marriage?

16     A.   Just a few.

17     Q.   Okay.

18     A.   That was my discovery.  Via the online

19  communication with her she admitted to many more.

20     Q.   Oh, I see.  Well, can you give me a grand

21  total?  I mean, how many different men are we talking

22  about that you ultimately learned about, regardless of

23  how you learned about it?

24     A.   About 45.

25     Q.   What did that do to your feelings for this

267

1    woman?

2        A.    I had separated myself emotionally from her.

3    We lived in separate bedrooms.  My entire world was the

4    children and Ellen.  I had consulted a divorce attorney

5    who told me that divorce laws were so favorable to women

6    that the pendulum had swung back toward being in favor

7    of women that unless there were cigarette burns and

8    broken bones I was going to get to see -- Ellen was

9    going to get custody of the children and I would get to

10   see my children on every other weekend and every

11   Wednesday night, and I wasn't willing to do that.

12       Q.    Where were you living at the time that you got

13   this advice from a lawyer?

14       A.    Ann Arbor.

15       Q.    So this was under Michigan law that you were --

16       A.    Yeah.  So I tolerated a lot.

17       Q.    Okay.  So, Ann Arbor -- so, just so we're clear

18   about this, this would have been 2003, when you first

19   began learning of this or some other subsequent time?

20       A.    2006.

21       Q.    All right.  So three years into your knowledge

22   of her activity outside of your marriage?

23       A.    Yes.

24       Q.    Okay.  Well, prior to your discovery of her

25   sexual liaisons outside your marriage in 2003, did you

268

1  have an affectionate relationship with your wife that

2  included sex?

3      A.   Yes.

4      Q.   I mean, you had two children?

5      A.   Yeah.

6      Q.   So this distance that came between the two of

7  you, this emotional distance that you've admitted to

8  repeatedly today, would it be fair to say that was a

9  consequence of your learning that she had sex adventures

10  outside your marriage?

11      A.   That's fair.  Also, I know everybody says it,

12  but I was just obsessed with my children.  And, like I

13  said, she would say can we please go on a date Friday

14  night.  And my response was always we only have so many

15  years with the kids and I want to spend my time with

16  them.

17      Q.   Well, I mean, we're here in deposition and

18  you're under oath so let me ask you the question.  Was

19  there also an element of resentment on your part toward

20  your wife over the sexual activities she was having

21  outside your marriage?

22      A.   Yes and contempt.

23      Q.   So, in 2012, all right -- let's come up a

24  little closer to the current time -- my notes indicate

25  that the best that you could figure it out Kenny Ice

269

1   began having a relationship with your then wife, Ellen

2   Costlow -- I guess she went by Ellen Ballock at the

3   time?

4       A.   Yeah.

5       Q.   Okay.   That Ellen Ballock began having a

6   relationship with Kenny Ice, Jr., as of about June 2012;

7   is that accurate?

8       A.   According to Kenny, yes.

9       Q.   According to Kenny.   When was it that you found

10  out about him?

11      A.   Before September 14th and after June, sometime

12  in the late summer.

13      Q.   All right.   What were the circumstances?   I

14  mean, how did it happen that you learned about Kenny Ice

15  Jr., and his relationship with your wife?

16      A.   She shared it with me.   And she said, if you

17  don't get your act together and pay attention to me, I'm

18  going to leave you.

19      Q.   What did she mean -- what did you take her to

20  mean when she said get your act together?   What did she

21  want from you?

22      A.   She wanted my focus and attention to be on her.

23  She would often say who do you love more, the kids or

24  me.   And I would always say I can't answer that, that's

25  a silly question.   And she would demand to know.   Who do

270

1  you love more, the kids or me?  I would never answer it.

2  And one day I was fed up with being asked that and I

3  told her the truth is, if a bus was barreling down the

4  street and going to hit the kids or you, I'd push them

5  out of the way if I could only push two out of the way.

6  And she screamed and went into hysterics and said you

7  should love me more, you chose me.

8           She was violent toward Tommy, I believe,

9  because she was taking her anger out on me toward him

10  because he's very much like me.

11      Q.   Did you ever witness Ellen Ballock commit acts

12  of violence against your children?

13      A.   None that I would consider egregious, smacking

14  him with a wooden spoon.  But I would often have to come

15  home from work in the middle of the day because Tommy

16  would be in the closet calling me and saying come home

17  and help me, mom's attacking me.  I would have to go

18  home and mediate those fights and those disputes.  It

19  increased to an unacceptable level after the separation.

20      Q.   Okay.  Did your son Tommy ever tell you that

21  his mother tried to choke him by putting her forearm

22  across his throat?

23      A.   Yes.

24      Q.   Was this -- when was this?

25      A.   This was after I left the house and the

271

1    children were still there with her.  She was engaging in

2    all sorts of unacceptable, concerning behaviors.  Summer

3    wasn't going to school -- to the private school we were

4    sending her to because Ellen couldn't get up and take

5    her to school.

6          Tommy told me that -- he slept in a bedroom

7    that was above the garage so he would hear the garage

8    door go up in the middle of the night and look out and

9    see her big white SUV driving away.  And then he'd go

10   downstairs to look for her or a babysitter and find no

11   one.  So she was leaving them at home alone.

12         He told me that they would fight and when he

13   would walk away from her she would -- he had long hair.

14   He never got it cut from the time he was a kid.  He

15   looked great.  He had this long flowing hair.  People

16   thought he was a girl.  And when he would walk away from

17   her she would grab him by the hair and yank him back.

18   And it upset him so much that when he came to live with

19   me -- again, he was 11 and he had had long hair his

20   whole life.  He said I can't have this hair anymore.

21      Q.   Okay.  How about Summer, your daughter.  Did

22   she ever report physical acts of violence perpetrated by

23   her mother?

24      A.   No.

25      Q.   When you said earlier that Ellen had sexualized

272

1   your daughter what did you mean by that?

2       A.   That's a term that I learned from Christi

3   Cooper-Lehki.   Ellen started dressing Summer up like a

4   whore.   She was eight, and she was putting make-up --

5   just a whole bunch of make-up on her face, making her

6   wear inappropriate clothes.   She offered Kenny Ice --

7   according to Kenny, she offered if he wanted to see

8   naked pictures of Summer.

9       Q.   Did she ever do that?

10      A.   No.   Kenny said -- Kenny's quote was, "Hell no.

11  I ain't no pervert."   She introduced Summer and

12  socialized him (sic) with a child molester, Carl Vincent

13  Taylor.   Then, when I finally got Summer to tell me the

14  truth about it, she said the reason I lied to you is

15  because Mommy said if anybody ever found out we would

16  both get in trouble.   She said to me in the car the

17  other night that she lied to the court investigators

18  about Carl Vincent Taylor.

19      Q.   Okay.   Did Summer ever say whether her mother

20  ever took naked pictures of her?

21      A.   No.

22      Q.   The subject of video and your wife having sex

23  with other men, what did you discover in that respect?

24      A.   Just that she had been taking the videos of

25  them.

273

1  Q. How did she do it?

2  A. I don't know.

3  Q. I mean, how could she have sex and take video

4 at the same time?

5  A. I don't know.  Set it up somewhere.  I don't

6 know.  She --

7  Q. Let me ask you another question before you go

8 on with that.  Were you ever involved in any of that?

9  A. No.

10  Q. Some people do that sort of thing, I guess.

11 And I think there may be a suggestion from somewhere in

12 this case that you not only knew about it but

13 participated in it.

14  A. Yeah.  That's what she says.

15  Q. Uh-huh.

16  A. But that's -- that's her M.O.  If something

17 reflects poorly on her, blame someone else.  And what's

18 she doing?  She's blaming me.

19  Q. Right.

20  A. She -- in fact, that behavior continued after

21 our separation because Kenny Ice told Christi

22 Cooper-Lehki, and I guess Ellen confirmed it, that Ellen

23 begged Kenny to have sex with another girl while Ellen

24 hid and videotaped it and masturbated while he did that.

25 So her behaviors continued after our separation.

274

1      Q.    In discovery of this case there's been some

2   video that was apparently recorded on a cell phone

3   camera.   And it appears to show Ellen having sex with a

4   man in a truck.   Do you know what I'm talking about?

5      A.    Yes.   Scott Kirby.

6      Q.    Was that Scott Kirby?

7      A.    Yeah.

8      Q.    How did that video come into your possession?

9      A.    When I learned that Ellen had stolen and sold

10  or given away a lot of the FBI property, the security

11  division said tell her she needs to give what she has

12  back to us.   So she gave me back a thumb drive -- a

13  bureau thumb drive that was -- said Classified on it.

14  It was in my Go bag.

15     Q.    What's a Go bag?

16     A.    A bag you keep in the event of being called out

17  quickly.

18     Q.    All right.

19     A.    And the thumb drive was in there.   So we looked

20  at it to see if she placed anything on it, and that's

21  what she put on there.   And, I imagine, in an attempt to

22  get me in trouble somehow.

23     Q.    All right.

24     A.    And it was time-stamped -- I remember I left it

25  at the home.   It was time-stamped that it was

1  transferred onto that device long after I had left the
2  home.
3      Q.   All right.  The other recordings of Ellen
4  having sex with men, how did you come across those?
5      A.   I searched for them in the house.
6      Q.   Why were you searching for such a thing?
7      A.   I was searching for anything, clues about her
8  infidelities.
9      Q.   At what point in time are we talking?
10     A.   In Ann Arbor.
11     Q.   When you were living in Ann Arbor.  So, help
12  me, Scott.  When was that?
13     A.   Between 2006 and 2011.
14     Q.   Okay.  What was going on that prompted you to
15  make a search of the house to see what you could find in
16  connection with her activity outside your marriage?
17     A.   I always had a nagging feeling.  I always never
18  fully trusted her.
19     Q.   Did that have anything to do with your sex life
20  with Ellen?
21     A.   Sure.
22     Q.   Did you have -- I mean, when was the last time
23  you had what you would characterize as a normal, healthy
24  sexual relationship with your wife, Ellen Ballock?
25     A.   Before we had children.

1    Q.   Did you entertain the notion that, perhaps,

2    having kids might settle her down and make her happy and

3    result in a normal, happy life?

4    A.   No.  She was adamant that she didn't want

5    children.  She did not -- did not -- did not want

6    children.  And she was upset when I told her that I want

7    to have children so, if that means we have to separate,

8    then so be it.  So she reluctantly had children.

9    Q.   Okay.  What did you understand Kenny Ice, Jr.'s

10   motivation to be to come to you and tell you what he

11   knew about not only his own relationship with Ellen but

12   her other activities that you've talked about today and

13   identified elsewhere in discovery of this case?

14   A.   Kenny and Ellen had been fighting and they had

15   broken up.  And he said to me that she -- he had

16   witnessed a lot of terrible things going on with the

17   children and he wanted to share that information with

18   me.  His biggest concern was Summer's socialization with

19   the child molester.

20   Q.   Okay.  Did this have anything to do with the

21   two of you separating in September of 2012?

22   A.   Did what have anything?

23   Q.   What you learned from Kenny Ice, Jr., or were

24   you already separated at that point?

25   A.   We were separated effective September 14th,

277

1   2012.  Kenny had a relationship with her from June all

2   the way until he contacted me.

3       Q.   I understand.

4       A.   And when he contacted me --

5       Q.   You'd already separated or --

6       A.   Oh, yeah.  I moved out of the house on

7   September 14th.

8       Q.   That's all I'm trying to pin down.

9       A.   I'm sorry.

10      Q.   That's all right.

11      A.   Yeah.

12      Q.   It's been a long day.

13      A.   I moved out of the house on September 14th and

14  Kenny moved in.

15      Q.   Okay.  All right.  So we're clear then, Kenny

16  came to you and shared all this information after you

17  had moved out and he moved in?

18      A.   Came out of the blue.  I had -- I was shocked.

19  I got a text message from Kenny Ice.

20      Q.   Okay.  Did you ask him for that iPhone he gave

21  you?

22      A.   He -- when he was telling me all of his

23  stories, he would say and I took pictures of it or I

24  would audio-record her screaming and yelling, I've got

25  text messages.  And he volunteered.  He said if you can

278

1    get that off of there, you can borrow my phone.

2         Q.   Okay.

3         A.   So he volunteered.

4         Q.   What did you do in that direction?

5         A.   I accepted his offer, and I found a company out

6    of Chicago called Forensicon that, for $1,500, extracted

7    videos, pictures, text messages, email messages.  They

8    said they did their best to extract -- recover deleted

9    items as well.

10        Q.   Is that all the material that was turned over

11   to --

12        A.   Yeah.

13        Q.   -- Mark so he could put it on that file-sharing

14   site?

15        A.   Yes.

16        Q.   Is there any of that stuff that was held back?

17        A.   No.

18        Q.   All the texts and emails that Mark reviewed

19   with you during his examination, Deposition Exhibit 2

20   through -- well, the biggest part of 50 deposition

21   exhibits --

22        A.   Yeah.

23        Q.   Where were you emotionally in your

24   relationship, emotionally with Ellen at the point when

25   you were writing these texts and emails?  How did you

279

1  feel about this relationship?  Did you want it over?

2  Did you want to save it?  Did you blow hot and cold?

3      A.   I blew hot and cold.

4      Q.   All right.  Did Ellen have any hand in your

5  change of mind from time to time on that topic?

6      A.   Yes, because she would give me hope that it

7  might work out.

8      Q.   In the time that you have known Ellen, going

9  all the way back to when you first met in college, would

10  it be fair to say she can be a seductive person when she

11  wants to be?

12     A.   She is -- yes.  She has feminine wiles.

13     Q.   Okay.  You're being polite and civilized I

14  think.  Why don't you be a little more explicit in what

15  you're saying?  What do you mean?

16     A.   She's very attractive.  She's very well-spoken

17  and educated.  She's very manipulative and she uses her

18  looks and her sex -- sexuality to get what she wants out

19  of people.

20     Q.   Has she ever used those influences on you?

21     A.   Sure.

22     Q.   Would it be true to say that she used those

23  capacities on you during the time that these emails and

24  texts that were the subject of the charges for stalking

25  and harassment took place?

280

1      A.   The main reason I tried to hold it together --
2   I didn't want to see my kids subjected to her crazy, to
3   the violence.  And I didn't want to see my kids --
4   there's so many things that happened, and it was just --
5   it was occurring with such regularity, fights at the
6   home between her and Kenny, her not taking Summer to
7   school.
8           The reality is that, even if it meant going
9   back to a -- to a distant relationship where we still
10  lived separate lives, essentially, I wanted that.  I
11  wanted to be able to be there for the kids to protect
12  them and to raise them.  I didn't want to see them every
13  other weekend and only on Wednesdays.
14     Q.   The divorce is final now, isn't it?
15     A.   Yes.
16     Q.   Were you awarded custody of your children?
17     A.   I have full custody of the children.
18     Q.   Did that come as any surprise to you when it
19  happened that way?
20     A.   No.  I warned her that that was going to
21  happen.  I knew that -- I knew in my heart that the
22  psychiatrist was going to get to the bottom of things.
23     Q.   Was the psychiatrist Dr. Christi Cooper-Lehki
24  -- was her involvement in the case the turning point in
25  your anticipation for how the child custody matter was

281

1 going to get resolved?  Is that where you began to have

2 some hope that you would prevail on that issue?

3   A. Yes, because instead of Ellen getting to turn

4 on the waterworks and be a cute little girl in front of

5 the judge and share her false narrative, I knew that

6 somebody was going to actually look into things.

7   Q. And yet -- well, I caught myself about to

8 misstate something.

9    By the time Dr. Cooper-Lehki became involved

10 had all these texts and emails happened yet, the ones

11 that you --

12   A. Oh, the vast majority of them, yes.  The texts

13 and emails declined significantly right before -- right

14 before the September 13th.  They were voluminous before

15 then.  And, yes, she said that she reviewed every text,

16 every email, every recorded conversation that Ellen

17 provided her because, unbeknownst to me, Ellen was

18 recording some of our conversations.

19   Q. You mean some of your telephone conversations?

20   A. Yes.

21   Q. Okay.  How did you come to find out about her

22 recording it?

23   A. Through Cooper-Lehki.

24   Q. Dr. Cooper-Lehki got involved when, Scott?

25   A. Spring of -- early spring of 2013.

282

1    Q.   Okay.  In all these emails and texts between

2    you and Ellen that were reviewed today, would it be fair

3    to say that they all predated the appointment of

4    Dr. Cooper-Lehki to look into this?

5    A.   No.  No.

6    Q.   No?

7    A.   Most of them, the vast majority of them.

8    Q.   Okay.  Well, I think I may follow your -- take

9    your meaning there.  Deposition Exhibit Number 23

10   appears to be some texting that happened in September of

11   2013.  That would have been well after Dr. Cooper-Lehki

12   was involved; true?

13   A.   Yeah.  That was after my arrest.  September?

14   Q.   I'm just looking at the date on -- let's see.

15   My apologies.  This is a text messages in Deposition

16   Exhibit Number 23 between Ellen and Ronnie M. Gaskins at

17   his state police account.

18   A.   Yeah.  No.  I stopped all communication with

19   Ellen after September 13th.  But one week later, there

20   was an event at my children's private school at which

21   Ellen came up to me and grabbed my hand and walked me

22   around to show me the artwork of the kids and gave my

23   mom a hug and a big kiss and told her I love you.

24        So a week after I was arrested and she feigned

25   surprise about the arrest.  She was like, I had no idea

283

1    they were going to do that, I am so sorry that happened

2    to you, I want you to know I had nothing to do with

3    that.

4         Q.   Okay.  Did you take her as truthful?

5         A.   No.

6         Q.   You knew she was lying?

7         A.   Of course.

8         Q.   Kimberley Compliment.

9         A.   Yes.

10        Q.   Her name came up today.

11        A.   Yes.

12        Q.   Am I right in understanding she was a

13   colleague?

14        A.   No.  She was just a friend of ours in

15   Indianapolis.

16        Q.   Oh, I see.  All right.  Did you ever have a

17   romantic relationship with Kimberlee Compliment?

18        A.   No.  And she told Dr. Cooper-Lehki as much.

19   She was married to professional hockey player Remi

20   Royer.  And Remi and I were very good friends.

21        Q.   Okay.  Well, I mean, you were a -- you were a

22   lonely man in your marriage.  Did you have relationships

23   with other women outside of your marriage?

24        A.   I did not.  I was consumed by work and my

25   children.

284

1      Q.    Has Ellen accused you of having affairs?

2      A.    Yes.  She accused me of having an affair with

3   Kimberley.  And she was so convinced that it happened

4   that she attacked Kimberley with a knife.  The same

5   thing she did to Kenny Ice.

6      Q.    When did that happen?  I didn't hear you put a

7   date on that.

8      A.    I wouldn't have a date.  It would have been

9   between 2003 and 2006 is all I can tell you, when we

10   were stationed in Indianapolis.

11      Q.    Okay.  All right.  This --

12      A.    Oh.  She was so -- she was so insistent that I

13   was having an affair -- she was afraid of it because,

14   you know, I was gone a lot, I had an undercover alias, I

15   had an excuse to be out of the house -- that one time

16   she took my government phone while I was sleeping and

17   went through it and called two girls whose names were in

18   there and said something to the effect of this is

19   Scott's friend, we want to get together for dinner with

20   you.  And these two girls freaked out and rightly so

21   because they were two girls that we had put in

22   protective custody and I was assigned to look over them.

23   So Ellen really screwed that up.

24      Q.    Did that cause you any trouble within the

25   bureau?

285

1    A.   For a little bit.

2    Q.   Okay.  I mean, did it --

3    A.   No.

4    Q.   Was it a black mark on your record?

5    A.   No.  It was okay, but I mean she...

6    Q.   Okay.  Let's talk for a second about late 2012,

7  we'll say the final quarter -- the fourth quarter of

8  2012.

9    A.   Okay.

10   Q.   What was going on between you and Ellen when

11  she would say give me until December and we'll see where

12  we are?  Put that into context for me.

13   A.   Give me until September, give me a year.  We

14  separated in September.  Maybe this will work out.  What

15  was going on?

16   Q.   Okay.  I thought it was December, but it's

17  September.

18   A.   Yeah.

19   Q.   What was she -- was she talking about September

20  of 2012 or --

21   A.   2013.

22   Q.   She's saying let's wait a year and see what

23  happens?

24   A.   Yeah.

25   Q.   So she wanted to be separate and apart for a

286

1  year and then consider whether to go ahead with the

2  divorce or to reconcile; is that a fair characterization

3  of where things stood?

4       A.   At least on one occasion she expressed that.

5       Q.   Okay.  I mean, have you got her in writing

6  somewhere on that because these folks want to see

7  everything in writing?

8       A.   I know, and I don't.  I don't.

9       Q.   Okay.

10      A.   And that was face to face.

11      Q.   Okay.  Were you willing to act on that request?

12      A.   It excited me.

13      Q.   Why do you use the word excited?

14      A.   It gave me hope.

15      Q.   Okay.  Were you still anxious and worried that

16  you could lose custody of your children to Ellen at that

17  point?

18      A.   Yes.

19      Q.   Was that your motivation for seeking

20  reconciliation?

21      A.   My primary motive, yes.

22      Q.   The arrest that happened, I guess it was Friday

23  the 13th --

24      A.   Uh-huh.

25      Q.   -- 2013, in September.  Were you aware that

287

1    this was going to happen, that you were going to be

2    arrested?

3        A.    No.

4        Q.    It sounds like the FBI was aware.

5        A.    Yes.

6        Q.    It sounds like there was an FBI agent present

7    to, I guess, just observe what happened?

8        A.    Yes.

9        Q.    Did you know that this person was an FBI agent

10   when they were present in the room?

11       A.    I had never met him, but he introduced himself

12   -- introduced himself as an FBI agent.

13       Q.    Really.  All right.  So you didn't know this

14   person prior to that?

15       A.    Correct.

16       Q.    And he said I'm an FBI agent.  So I'm going to

17   guess you probably said, okay, nice to meet you, but why

18   are you here?

19       A.    I didn't even have to ask that.  He very

20   quickly volunteered I'm here to make sure everything

21   goes okay for you.

22       Q.    What did you take him to mean by that?

23       A.    Just that he was there to observe and make sure

24   that -- be able to witness anything that happened.

25       Q.    Okay.  So, at the point that you met this agent

288

1   -- I'm sorry.  I've forgotten the name.  I can't -- I

2   know I wrote down what I thought I heard, but I --

3       A.   I think it was John Hamrick.

4       Q.   John Hamrick?  Okay.

5       A.   Again, I had never met him, and I haven't met

6   him since.

7       Q.   All right.  He didn't tell you they're going to

8   arrest you today, did he?

9       A.   No.  He didn't need to.  The judge had told me

10  that before the start of the custody hearing.

11      Q.   See, this is what I'm trying to get to, Scott.

12      A.   Oh, sorry.

13      Q.   That's all right.  But I want to try to be as

14  accurate as we can be about this.  At some point, you

15  were tipped off, and apparently it was the judge who

16  told you I guess there's going to be some state police

17  here today, they -- they're going to arrest you?

18      A.   Yes.

19      Q.   Okay.

20      A.   So then I had to go through the whole morning

21  hearing waiting to be arrested.

22      Q.   Did the judge tell you what the charges were

23  going to be?

24      A.   No, I don't believe so.

25      Q.   Okay.  Maybe I'm wrong to presume that you

289

1   would have some questions upon hearing that.  I mean,
2   didn't you ask the judge, Judge, what's it about, I
3   don't understand, what are they charging me with.
4        A.   No, I didn't ask.
5        Q.   You didn't?
6        A.   Huh-uh.
7        Q.   Okay.  Your lawyer was there with you, your
8   divorce lawyer; right?
9        A.   Uh-huh.
10       Q.   Did you ask her or tell her or was she aware?
11       A.   I don't believe she was aware.
12       Q.   Okay.  Who was Ellen's lawyer at that point?
13       A.   Kevin Tipton.
14       Q.   Kevin Tipton, your neighbor?
15       A.   Yeah.
16       Q.   Okay.  Did you ask Kevin, Kevin, what's going
17   on?
18       A.   No.  I was on this side with Delby.  He was
19   over there with Ellen.
20       Q.   All right.  So you just went through the
21   business of the divorce case knowing that you were going
22   to be arrested for something --
23       A.   Yeah.
24       Q.   -- later in the day?
25       A.   Correct.

290

1     Q.   And you knew that there was a fellow agent from

2 the bureau there to watch it all happen?

3     A.   I didn't know that until I walked out to be

4 arrested.

5     Q.   So did somebody say, well, it's time for you to

6 be arrested now, could you step out of the courtroom so

7 we can do it?

8     A.   No.  The judge, right before lunch, said let's

9 take a break and, you know, Scott, you've got some

10 business to attend to with the state police.  And so I

11 went out there.  Kief was in a conference room.  Hamrick

12 was in the conference room.  I shook Kief's hand.  He

13 handed me the paperwork, told me a little bit about what

14 was happening, told me to go to the detachment after I

15 was -- after the family court hearing was over that

16 evening to be processed.  And then they took me upstairs

17 where I went before the magistrate.

18     Q.   Okay, and the magistrate, was that Holepit?

19 Who was it that arraigned you?

20     A.   It was a female.  It was Holepit, yes.  That

21 was her name.  Sandy?

22     Q.   Sandy Holepit.

23     A.   Yeah.

24     Q.   All right.  So it was a personal recognizance

25 bond?

1    A.    Yes.

2    Q.    In other words, on your honor and as a citizen

3  and an agent of the FBI you swear you'll honor your

4  commitment to show up?

5    A.    Yeah, that sort of thing.

6    Q.    All right.  So did you have your weapon on you

7  at this point?

8    A.    No.  You can't take your weapon with you into

9  family court.

10    Q.    Okay.  Even if you're a federal officer?

11    A.    Even if you're a federal officer.  We can't

12  take our weapons into Disney World either.

13    Q.    Of course not.  Okay.  So, if -- I mean, did

14  you leave your -- check your weapon downstairs with

15  security or where was your weapon?

16    A.    I must have checked it with security.  Yeah.

17    Q.    Okay.  So --

18    A.    Or maybe I kept it in the safe in my trunk.  I

19  don't remember.

20    Q.    Okay.  So Kief was the one who performed the

21  arrest and gave you the paperwork that advised you of

22  the charges; is that fair?

23    A.    Yes.

24    Q.    Were there any other troopers present at that

25  point?

292

1    A.   No.  I was pretty narrowly focused on Kief.  I

2  don't know.  I was told that there were others.  I don't

3  remember seeing them.

4    Q.   Okay.

5    A.   I --

6    Q.   Was that your first notice that day?  Was that

7  your first notice that Ellen had gone to police and

8  complained about your communications with her?

9    A.   Yes.

10    Q.   Okay.  Did she ever tell you or threaten you,

11  either in personal conversations, that is face-to-face,

12  over the telephone, or maybe in texts or emails that we

13  just don't have for whatever reason, you know, if you

14  don't stop this I'm going to go to -- let's start with

15  judge -- I'm going to go to Judge Minor about this?

16    A.   No.  And she should have.  In fact, Judge

17  Minor, in his ruling, said that had Ellen gone to him

18  and given him her concerns he would have most certainly

19  enjoined my communication.

20    Q.   Okay.

21    A.   But --

22    Q.   To your knowledge, did she ever go to the judge

23  about this?

24    A.   She -- no.  She never did.  No, because she

25  wanted to harm me.  She wanted me to lose my job.  There

293

1   are numerous instances where she has said or done things

2   to indicate that she wanted me to lose my job.

3       Q.   Excuse me.

4       A.   Family court proceedings are private.  And, had

5   she gone to the family court judge, I wouldn't have lost

6   my job.  Having -- making a big scene at family court

7   with the West Virginia State Police and having me

8   arrested, she knew that would potentially cost me my

9   job.

10      Q.   Uh-huh.

11      A.   Tommy overheard her saying that she was trying

12  to get me to lose my job.

13      Q.   Ever seen any written communications initiated

14  by Ellen to that effect?

15      A.   There's one text message where she writes that

16  she has the upper hand over my career.

17      Q.   Explain the context of what you saw.

18      A.   That's the thing, a lot of this text -- the

19  format that we received the text messages and email

20  messages back from Forensicon, it's not very good with

21  order and context.  She was talking to Kenny Ice,

22  talking about the proceedings, family court, and she had

23  I have -- wait.  It said -- I wish I could remember the

24  exact quote -- that she had the upper hand over my

25  career.

294

1    Q.   To whom was she communicating?

2    A.   Kenny Ice, Jr.

3    Q.   You said earlier today, according to my note

4  anyway, you can correct me if I've got it wrong, that

5  you offered to be interviewed but the troopers declined

6  that offer?

7    A.   Yes.

8    Q.   When did that offer happen?

9    A.   I don't know when it happened.  But from the

10  very first time I spoke with Benninger and repeatedly, I

11  said I want to talk to them, let them talk to me.  And

12  he said I'll take care of that, I'll make the offer.

13    Q.   Was this before or after your arrest?

14    A.   After my arrest.

15    Q.   Had to be, because you didn't know this was

16  coming until you got arrested; am I right?

17    A.   Right.

18    Q.   See.  That was a trick question.  I was trying

19  to trip you up there.

20    A.   I wondered why you asked that.

21    Q.   Okay.  So this criminal case, it was pending

22  for three years?

23    A.   Yeah.  Judge Mullins had some sort of medical

24  issue and he was out for a long time.

25    Q.   Were you anxious to get that over with?

295

1      A.    Yes.

2      Q.    Did you tell your lawyer, man, let's get this

3  assigned to a different magistrate or something, you

4  know, I want to get this over?

5      A.    I didn't know that was an option.  I didn't

6  offer it.  He didn't offer it.  I don't know.

7      Q.    Okay.  So you told Mike, your lawyer, that you

8  wanted to sit down with the other side and explain this

9  to them.  Do you have any understanding as to why that

10 never came about?

11     A.    No.

12     Q.    All right.  Do you know if Mike reached out to

13 them to offer that?

14     A.    He told me he did.

15     Q.    Okay.

16     A.    He told me he also called the prosecutor's

17 office and asked for a sit-down.

18     Q.    You testified that about a week after there was

19 an order -- I'm not real clear on whether it was

20 Magistrate Mullins or Family Judge Minor, but apparently

21 there was an order saying that -- well, perhaps it was

22 the family judge -- directed that Ellen should not share

23 any disparaging information with the FBI.  And then it

24 was a week later -- are you with me now?

25     A.    Yeah.

296

1    Q.   Are you oriented to the subject I'm --

2    A.   I'm sorry.

3    Q.   -- trying to address?

4    A.   Yes.

5    Q.   Okay.  How did you -- how did you learn that

6    Trooper Kief was collaborating with Ellen to try and

7    circumvent Judge Minor's order and disparage you to the

8    FBI?  How did you learn about that?

9    A.   Through the emails that we were provided by

10   defense during discovery.

11   Q.   Okay.  Was this prior to the time the motion

12   was granted and Judge -- Magistrate Mullins dismissed

13   both criminal charges against you?

14   A.   My knowledge?

15   Q.   Well, that's a fair question on your part

16   because it could be a couple different things, couldn't

17   it.

18        This order from the family judge saying that

19   Ellen should not communicate any disparaging information

20   to the FBI about you, first of all, what prompted the

21   judge to issue that directive?  Were you going to him

22   with a motion saying, Judge, we're worried, you know,

23   that she's going to try and hurt my career?

24   A.   Yes.  There was discussions between Benninger

25   and Marcia about what would be in the agreement.

297

1    Q.    So the --

2    A.    And I knew that Ellen was trying to ruin my

3    career.

4    Q.    How did you know that?

5    A.    Because I read about it in text message,

6    because Kenny Ice told me, because my son overheard it,

7    because she admitted to it in a joint counseling

8    session, because she has threatened to do it numerous

9    times before, because I knew it would advantage her,

10   because she's vindicative and malicious, all of those

11   reasons.

12   Q.    All right.  So my surmise then is that your

13   lawyer in the family court case -- who would that have

14   been?  Delby?

15   A.    Delby Pool.

16   Q.    Delby Pool listened to your concerns, took it

17   to family judge, and he heard it and then issued his

18   directive.  Is that how it all came down?

19   A.    No.  We negotiated it.  Ellen and I, through

20   our attorneys, negotiated what the settlement terms

21   would be.

22   Q.    Settlement of the divorce or this dismissal of

23   the --

24   A.    No.  No.  Settlement of the divorce.  We're now

25   talking about the divorce; right?

298

1     Q.   I'm trying to, yes.

2     A.   Yes.  Settlement of the divorce.  And we said

3  that one of the conditions that we want is for Ellen to

4  agree to have no contact with the FBI.  And on the

5  written piece of paper -- and Judge Minor ordered that.

6  On the written piece of paper which Ellen signed, no is

7  capitalized, both the N and the O, and it's underlined,

8  no contact with the FBI.

9     Q.   Okay.  And this is after you had already been

10  arrested and charged and the criminal charges had been

11  pending for quite some time; true?

12     A.   Yes.

13     Q.   They had not yet been resolved?

14     A.   Correct.

15     Q.   So subsequent to Judge Minor issuing his

16  directive, the motion -- it's been called a dismissal

17  agreement in deposition today, but the caption on

18  Deposition Exhibit 30 says Motion.  Do you see where it

19  says that?

20     A.   Yes.  It was a motion presented by the

21  prosecutor.

22     Q.   In fact, I don't see the words dismissal

23  agreement anywhere on this document, did you?

24     A.   No.  It was not a plea agreement.  It was not

25  -- there's no agreement.  It was a motion.

299

1    Q.    What you initialed and signed is listed as

2  Attachment to Motion to Dismiss with Prejudice.

3    A.    Yes.

4    Q.    The words dismissal agreement, I couldn't find

5  those used anywhere in this attachment to the motion.

6          MR. JEFFRIES:   Look in your response to

7  our motion to dismiss.

8          MR. CROOKS:   I'm looking at the exhibit.

9  I'm looking at the exhibit, not your characterization in

10  this case.

11    Q.    So let me ask you some questions that pertain

12  to this motion that was submitted to Magistrate Mullins

13  and entered.   So was it your understanding that unless

14  you initialled and signed off on this attachment to the

15  motion that the prosecutor wasn't going to agree to

16  dismiss the charges against you?

17    A.    That's right.   She didn't need to put that in

18  there.   She didn't need to put any of that in there.

19  She could have just dismissed the case.   But she told

20  Benninger she was trying to protect her boys and she

21  insisted on that.

22    Q.    Okay.   Did you have any -- we already waived

23  attorney/client privilege with respect to this -- the

24  entry of this motion and the attachment to it.   Did you

25  talk with your lawyer, Mike Benninger, as to whether the