Mr. Scott T. Bullock

FaceTime and as well as photos of herself she sent me during this time period.
On at least one occasion, she initiated contact with me posing as our son [ ].
I did initiate communications, but usually referencing our children. *None of my communications were threatening or harassing* (emphasis added).

You assert that your Ex-Wife is severely mentally unbalanced and that during your separation, she abused prescription drugs; attempted suicide; exposed her daughter to a known child molester; mistreated the children in other ways; and planned to destroy your reputation and get you fired from the FBI, not because she felt harassed, but simply to harm you and "gain lifetime alimony and full custody of the children." You assert the state Family Court judge who adjudicated your custody issues viewed the timing of your arrest for harassment as a strategic decision to gain advantage in the child custody case. In fact, the WVSP contacted the FBI before WVSP executed your arrest and planned your arrest on the day of the child custody hearing at the courthouse, to ensure you were not armed. You also cite the purported findings of a court-appointed psychiatrist, which appear to be under seal, that your Ex-Wife suffers from severe mental illness, and is vindictive and dangerous. You stated the psychiatrist concluded your Ex-Wife is an "unfit" and "abusive" mother, actively attempted to alienate the children from you, might be a sociopath, and "does not perceive reality correctly." You assert you were awarded full custody of the children, and your Ex-Wife's visitation rights have been revoked.

The Family Court Judge expressed significant concerns regarding your Ex-Wife's sexual behavior during the marriage and separation, but he also criticized your conduct as a "contributing factor" (9/20/13 Temporary Modification Order, at 3-4):

In considering the parties' sexual behavior, the Court is not sanguine about the Father's role in that regard. At the very least, the Court finds the Father's apparent acquiescence in the Mother's sexual relations with other men to be a contributing factor. The Mother alleges her behavior was coerced by the Father. The Court questions that. The Court notes many if not most of the Mother's encounters occurred outside the presence of the Father though most admittedly with his knowledge and apparent consent.

## C.  The Emails, Texts, and Other Communications

The record shows that beginning in September 2012, you sent your Ex-Wife hundreds of e-mails and text messages during your separation, including numerous communications intended to convince your Ex-Wife to reconcile with you, as well as emails criticizing your Ex-Wife's behavior.[4]

On September 29, 2012 (9:00am), your Ex-Wife accused you of texting her for seven hours the previous day. She said these texts were "over the top," and she asked you to stop. You agreed (9:01am), stating: "Yes. Let's start now. See you..."

---

[4] *See* Serial 1A2 (DVD containing emails and text messages). The DVD contains two files, one with 1,495 items and one with 1,843 items. The items consist of emails, text messages, and photos.

4

**CONFIDENTIAL**

**PL 00016**

Mr. Scott T Ballock

However, the next day, September 30 at 1:38am, you texted your Ex-Wife a derogatory message: "Black boots, Black coat, Black heart, Black soul "

On October 11, 2012, you emailed your Ex-Wife with the subject line "We broke our vows" and a photo of you standing alone at a church altar. Other emails contained in the file show close photos of you looking emotional, and perhaps crying.

On November 7, 2012, your Ex-Wife emailed you stating: "Scott, I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication." You responded the same day: "My correspondence has been polite and respectful. Calling it 'harassing' does not make it so. I am simply providing you with information and recommendations for the divorce process and the benefit of the children."

In a January 12, 2013 email from your Ex-Wife to her attorneys, she requested a protective order against your excessive communications. Your Ex-Wife stated that in addition to your emails and texts, she received phone calls from you at all hours of the day and night. The email emphasized: "I'm tired of Scott's harassment, his control over my life through nearly constant communication . . . and these late night blocked calls. It's all outrageous because they cut into my ability to get the sleep I need. The late night blocked calls are almost always silent on the caller's end, but from time to time Scott will forget to block his number and that is why I am convinced he's the one behind the calls tonight. PLUS, you've read from other emails that he sleeps with his phone next to him at night, so it's easy for him to call six times in a row at 3 am." Although there is no evidence in the file that your Ex-Wife's attorneys requested a protective order at that time, her January 12 email confirms the seriousness of her concerns.

By email dated April 26, 2013, your Ex-Wife again requested her attorneys to stop the harassing communications from you:

> I consider Scott's actions harassment at this point. Please help me put a stop to his incessant emails where he's sending me excerpts taken from [two accounts].[5] I have chosen to stop living a toxic marriage filled with physical, psychological, and sexual abuse. When Scott walked out Sept 14, I didn't let him come back home as I had in the past. I am seeking peace in my life from my abusive husband. I ask again for your help in stopping Scott's contact with me over this matter and any other matter unless it is of an emergent nature or deals strictly with decision-making with the children.

On May 1, 2013, your Ex-Wife sent you another email making clear your "harassing" texts and emails were unwelcome. She requested you to stop communicating with her unless it concerned the children, and she directed you to contact her attorneys about any other matter:

---

[5] These accounts were among those used by you and your Ex-Wife to invite men to have sex with her during your marriage while you videotaped the encounters

5

**CONFIDENTIAL**                                   **PL 00017**

Mr. Scott T. Ballock

Scott,

I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication. I specifically told you on April 29, 2013, to stop contacting me unless it is about the children and you need my input as a parent. If you have a question or concern about anything else, my attorneys can help you.

Your Ex-Wife's email included the names and phone numbers for her attorneys. The next day, May 2, you sent an email agreeing to limit communications:

I'm not trying to 'harass' you. I'm sorry you feel that way. I shared with you the email last night because it's so much like a TMLMTBGB play[6] and I hoped you would appreciate that.

I'm sorry I missed your calls last night. I tried returning them this morning.

I will, as you request, limit my conversations to discussion about the children. And I hope you will allow me to continue sending you regular updates about [our son].

Your Ex-Wife requested her attorneys to send you a letter demanding you cease all communications with her "not directly necessary for the care of [the] children." This request reinforces the seriousness of her concerns. *See* Serial 1A2. By letter dated May 3, 2013, your Ex-Wife's counsel advised you: "My client has informed me that you continue to send her harassing and threatening text messages and emails. Please be informed that you are to send to our office – and not Mrs. Ballock – all inquiries and/or communications not directly necessary for the care of your children. Any communications sent to Mrs. Ballock that we view as further harassment will be used in Court to substantiate her allegations of your continuing intentional infliction of emotional distress."[7]

Notwithstanding your Ex-Wife's May 1 instruction, on May 3 at 8:29am, you emailed her in an effort to reconcile. Although the email references your son, it does not concern decision-making regarding your children, but instead uses your son as leverage in your unwelcome attempts to reconcile:

Think about coming over tonight.

We could then leave the kids with Nana and spend the weekend talking, making up, finding the way forward. After my conversation with him last night, I know [our son] would like that very much. I think you would too.

---

[6] TMLMTBGB appears to be a reference to a play called "Too Much Light Makes the Baby Go Blind."

[7] The investigative file does not contain the lawyer's letter to you, but the police report quotes from the letter. You have insinuated you never received it, but even if true, the emails and texts from your Ex-Wife herself make clear further communications from you were unwelcome unless they concerned decisions regarding your children.

6

**CONFIDENTIAL**                                    **PL 00018**

Mr. Scott T. Ballock

Your Ex-Wife responded at 8:35am with an email regarding your daughter's birthday, and you replied at 9:00am with an effort to reconcile that raised the possibility of both of you losing custody of your children due to information about your Ex-Wife that you shared with your attorney:

> There will always be a hole. * * * It is there every day for them. They feel it. I feel it. I know you feel it. And that hole will be there for the rest of their lives. It's not too late, [Ex-Wife]. We can implode our lives (my attorney doesn't pull punches and after I shared with her what I need to disclose now to defend myself against your claims she said there is a very real risk we may both lose the children; imagine them being raised by a foster family in West Virginia) or we can find a way to peacefully co-exist. Or we can find the very best in us and live a fairy tale life. I know that after this awful experience we would never take any of it for granted again.

Later that same day, at 10:03am, you again sent an email offering to take your Ex-Wife to New York City in an effort to reconcile.

On May 7, you wrote your Ex-Wife another lengthy email advising that you are writing your thoughts down so your son "knows how much [you] loved [your Ex-Wife], how much [you] didn't want this, so he knows how much [you] tried . . . ."

On May 9 at 4:33 you wrote your Ex-Wife yet another lengthy email complaining, among other things, that the both of you have spent all of your savings on legal battles and your daughter is suffering due to your Ex-Wife's "self-centered choices":

> This is a mess and it's getting worse by the day with no end in sight. I do hope you realize all you're doing some day, the ugliness you have brought into all of our lives, the futures you have doomed us all to, through your self-centered choices.

On May 14, you wrote a lengthy email to your Ex-Wife blaming her and her "demons" for your plight, including tearing the family apart and the "resentment, anger, and sadness the children will feel for the rest of their lives." You again stressed your "attorneys pull no punches" and "[i]t is possible [you] may both lose custody of the children." The email concludes by emphasizing the children "are being hurt the most in all of this . . . ."

On May 15, you advised you might not be able to take the children on a planned vacation. When your Ex-Wife responded she could take them if you paid for it, you responded with a sarcastic email offering to pay for a vacation for your Ex-Wife and her boyfriend. Also on May 15, you sent an email stating: "I will not go through your attorneys for anything. Ever. As long as you have custody of [our daughter], I will make my requests directly to you. That is my privilege."

7

**CONFIDENTIAL**

**PL 00019**

Mr. Scott T. Ballock

On May 16 and again on May 17, you emailed your Ex-Wife inviting her to take an out-of-town trip with you to Old Town Alexandria. You stated you wanted to "apologize" and "make amends," but that your Ex-Wife is "so filled with hatred and rage and insists like treating [you] like an enemy." You advised you will keep the reservations "in case [your Ex-Wife] realize[s] what a mistake [she is] making . . . ." Again on May 17, you emailed your Ex-Wife the lengthy lyrics to a song about a failed marriage.

On May 25, you emailed your Ex-Wife to accuse her of creating a "false narrative" and asking her to "please call" if she is "fearful for [your] children's future," saying you both "owe it to [the children] to try to work this out and the first simple step is talking."

On May 28, you wrote your Ex-Wife accusing her of violating 18 U.S.C. 641 by stealing FBI property, including ammunition worth up to $2100 and several other items. You assert your accusation is based on statements made by your Ex-Wife's boyfriend. Regardless of the legitimacy of the accusation, your email clearly violated your Ex-Wife's instruction to stop communicating with her. You emphasize: "Theft of government property is a matter we will be addressing immediately."

On May 28, you criticized your Ex-Wife for giving a lamp that belonged to your son to a "fuck buddy," calling her actions "disgraceful":

For all that you have done, for all the hurt and suffering you have caused, I was struck by your selfish decision to give your own son's cherished bowling ball lamp to a fuck buddy. I will let you explain to [our son] why you thought it would be ok to give away one of his prized possessions. [Our son] is all about family memories and his little treasures. For you to dishonor him is disgraceful.

On May 29, you sent your Ex-Wife an email accusing her of secretly videotaping a mutual acquaintance while the acquaintance was showering and then showing the video to your Ex-Wife's boyfriend. You chastise your Ex-Wife for having a "sex addiction," asserting "[t]his keeps getting uglier and uglier." Even if true, the email again violates your Ex-Wife's instruction not to communicate with her about such matters. That same day, your Ex-Wife sent an email to her attorneys requesting them to bring harassment charges against you because your "constant threats, insults, and other abusive tactics are intolerable."

On June 19, you sent your Ex-Wife a particularly sharp email, asserting: "What are you and/or your idiot friends up to this time? Committing a felony by stealing from the FBI wasn't enough for you?"

The file contains more examples of communications from you to your Ex-Wife notwithstanding her instruction to limit communications to decisions involving the children.

8

**CONFIDENTIAL**                                           **PL 00020**

Mr. Scott T. Ballock

### D. The Criminal Investigation

On September 2, 2013, your Ex-Wife filed a formal complaint with the WVSP against you for "harassing communications by cell phones and electronic communications devices." Your Ex-Wife's attorney provided the police with a CD of approximately 3,000 e-mails and text messages. A WVSP Corporal stated he reviewed thousands of emails and text messages provided by your Ex-Wife's attorney and identified some as "harassment and stalking."[8]

FBI investigators interviewed the Corporal, who conducted the criminal investigation of you for harassment. According to the FD-302 (Serial 20), the Corporal concluded you engaged in harassment, stalking, and threatening behavior:

> Upon assignment of the complaint, Corporal [ ] received and reviewed a compact disc (CD) containing more than 3000 emails and texts between SA BALLOCK and [EX-WIFE]. The CD was provided to the WVSP by [EX-WIFE'S] attorney [ ].
>
> * * * *
>
> During the investigation, Corporal [ ] reviewed numerous texts and emails between SA BALLOCK and [EX-WIFE] that were identified as harassment and stalking. Some communications included threats. A written statement was obtained from [EX-WIFE] According to [EX-WIFE], she was seeking a divorce from SA BALLOCK. When she left her husband, SA BALLOCK began continually following her and sending her communications via text and email containing threats.
>
> According to reports from [EX-WIFE], SA BALLOCK placed ads on Craigslist for men to have sex with [EX-WIFE] at their home under [a fictitious] name [ ]. SA BALLOCK placed the ads and videotaped the sexual encounter. This type of activity originated when they lived in Indianapolis. [EX-WIFE] advised that safety was not a concern because SA BALLOCK "screened" the men before they arrived at the house.[9]
>
> Corporal [ ] took the complaint and evidence to Assistant Prosecutor [ ] who agreed to file misdemeanor charges of Stalking and Harassment against SA BALLOCK. As a result, SA BALLOCK was arrested after a Family Court Hearing where Corporal [ ] knew he would be unarmed. SA Ballock was arraigned, processed, and released after his arrest. As a condition of his bond, SA BALLOCK ceased email and text communication with [EX-WIFE].

---

[8] *See* the Corporal's FD-302, dated 04 14/2016 and Incident Report (Serial 1A5). The Corporal's Incident Report is incorporated into OPR's Report of Investigation in its entirety

[9] I note your Ex-Wife told FBI investigators that you did not screen the men

9

**CONFIDENTIAL**

**PL 00021**

Mr. Scott T. Ballock

After SA BALLOCK'S arrest, [BALLOCK'S FATHER] created various websites and posted nude photos of [EX-WIFE] and began to post statements and pictures alleging the West Virginia State Police falsely arrested his son. The postings occurred on the various websites [BALLOCK'S FATHER] created . . . .

The police report prepared by the Corporal concluded that a substantial number of emails appear to be pressuring your Ex-Wife to reconcile with you, and reflect "obsessive behavior in wanting the victim back." The report provides numerous examples of your "obsessive behavior" designed to persuade your Ex-Wife to reconcile.

You accused a WVSP Trooper of having a romantic relationship with your Ex-Wife, which allegedly motivated the Trooper to arrest you to assist your Ex-Wife with her alimony and custody claims. You stated you based this accusation on information provided to you by your Ex-Wife's boyfriend, and you asserted you intend to pursue a civil suit against WVSP. However, the file shows WVSP investigated the accusation of the affair and determined that it is untrue.

The local Monongalia County Assistant Prosecutor reviewed the evidence from the Corporal's investigation and agreed to file misdemeanor charges in the Magistrate Court of Monongalia County, West Virginia, against you for harassment and unwanted communications by computer, in violation of West Virginia Code §§ 61-2-9a and 61-3C-14a(a)(2). On September 13, 2013, you were arrested at the Monongalia County courthouse immediately following your child custody hearing on the two misdemeanor counts of harassment and unwanted communications by computer. On April 7, 2016, you entered into an agreement with the local prosecutor to dismiss the two misdemeanor charges in exchange for agreeing to, among other things, the fact that probable cause existed for your arrest. You were represented by counsel when you agreed to these terms.[10] In the agreement, you admitted, among other things, that probable cause existed to arrest you for harassing your Ex-Wife. The agreement, signed by you and your counsel, contains the following provisions:[11]

1. SCOTT BALLOCK acknowledges that probable cause existed for West Virginia State Police to file for the issuance of the warrants in this case pursuant to W.VA. Code 61-3C-14a and 61-2-9a.

* * *

3. SCOTT BALLOCK agrees to cease, and not to initiate or reinitiate, if applicable, efforts to affect [EX-WIFE'S] personal reputation, employment, professional status or workplace relationships, and he agrees to discourage any other person purporting to act on his behalf to similarly cease, or not to reinitiate any disparagement of [EX-WIFE] on social media or other platforms of public communications. SCOTT BALLOCK also agrees to assist in removing any

---

[10] *See* Serial 1A5, *Motion*.

[11] *See* FD-302, West Virginia State Police Corporal.

10

**CONFIDENTIAL**                                            **PL 00022**

Mr. Scott I. Ballock

remains of disparaging social media postings by taking reasonable steps within his control to remove these postings, links or other social media communications.

✦ ✦ ✦

6. SCOTT BALLOCK agrees not to contact [EX-WIFE] by any means or for any reason other than to notify her by email of hospitalization of either child, or regarding either child traveling outside of the country.

After your arrest, the FBI's Human Resources Division, in consultation with the Deputy Director and CHS, suspended your law enforcement duties until the resolution of your criminal proceeding.

## ANALYSIS

### A.   Harassment

According to FBI Offense Code 4.8, employees are prohibited from "[e]ngaging in an act, other than one which has been specifically delineated in another offense code, which is considered a misdemeanor in the jurisdiction in which the act occurred."

In addition, West Virginia Code § 61-3C-14a (Obscene, anonymous, harassing and threatening communications by computer, cell phones and electronic communication devices; penalty.) states: "It is unlawful for any person, with the intent to harass or abuse another person, to use a computer, mobile phone, personal digital assistant or other electronic communication device to: . . . (2) Make contact with a person after being requested by the person to desist from contacting them . . .  Any person who violates a provision of this section is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $500 or confined in jail not more than six months, or both fined and confined."[12]

The evidence shows that from September 2012 to May 2013, after having received numerous unwelcome electronic communications from you, your Ex-Wife demanded you desist from contacting her.  You refused to comply with your Ex-Wife's demand and continued to harass her via electronic communications.  After enduring several more months of your excessive electronic communications, as well as your blatant violation of your Ex-Wife's demand to stop harassing her via electronic communication, your Ex-Wife sought help from law enforcement.  A WVSP Corporal reviewed over 3,000 emails provided by the person to your Ex-Wife's attorney and determined the electronic communications to be "harassment and stalking" in nature.  A local prosecutor then reviewed the evidence against you and she determined there was enough evidence to charge you on two misdemeanor counts of harassment/stalking and unwanted communications by computer.  My independent review of the emails, summarized above, confirms they were unwelcome and constituted harassment.

---

[12] In addition to WVC § 61-3C-14a (Obscene, anonymous, harassing and threatening communications by computer, cell phones and electronic communication devices; penalty), you were arrested for violating WVC § 61-2-9a (Stalking and harassment). I believe WVC § 61-3C-14a is more applicable to the facts presented.

11

**CONFIDENTIAL**

PL 00023

Mr. Scott T. Ballock

You claim you have emails from your Ex-Wife showing she welcomed your texts and emails, but it is unclear whether any such communications post-date her May 2013 instruction to you to stop sending her unwanted texts and emails. You also state you have emails from your Ex-Wife concerning your children, but these would not be especially relevant given that your Ex-Wife made clear that communications about decisions involving the children were necessary, and not harassing or unwelcome.

Based on a preponderance of the evidence, I conclude that you violated West Virginia Code § 61-3C-14a, and thereby committed a misdemeanor, in violation of Offense Code 4.8.

**B.     Lack of Candor**

According to FBI Offense Code 2.6, an employee is prohibited from "[k]nowingly providing false information in a verbal or written statement made under oath. 'False information' includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

In your SSS provided during this disciplinary inquiry, you failed to be fully forthright in two respects: (1) when you denied you physically abused your Ex-Wife; and (2) when you asserted you ensured your emails and texts to your Ex-Wife were "respectful and appropriate."

**1.   Physical Abuse**

At various times, your Ex-Wife has accused you of physical abuse. In your SSS, you stated that your Ex-Wife's claim that you physically abused her is false (pp. 6-7). However, your own emails and texts to your Ex-Wife show you physically abused her. For example, on October 2, 2012, your Ex-Wife asserted you engaged in physical abuse, psychological abuse, and sexual abuse. You did not deny that you did so, but instead responded "I was wrong. I ask forgiveness":

**10/02/2012,** You to Ex-Wife (1:55 PM): "I was sitting in a meeting today and pictured you out on your date tonight, then I flashed to you in a wedding dress, smiling and kissing your new husband. I had to leave abruptly. I am lost without you. It feels like part of me has died. The best part."

Ex-Wife to You (2:55 PM): "I have pictured you going to see [your Mistress] instead of staying home with us so many times. [I] picture you in Chicago with her, I picture you looking up [another woman] to see what's up with her. And all of this you try to hide from me. I don't know how you got that these things would not cause long-lasting damage. *Shall I Move on to the physical abuse? The psychological abuse? How about the sexual abuse?*" (emphasis added).

You to Ex-Wife (3:20 PM): "You do not need to move on to anything else. *I was wrong. I ask forgiveness.* I ask to move forward with you. Because, despite your anger and hatred right now, there is part of you that lives in me. There were magical times and a closeness." (emphasis added).

12

**CONFIDENTIAL**

**PL 00024**

Mr. Scott F. Ballock

Your Ex-Wife then wrote to you that you threatened her life and she would need "a long time to heal." You did not deny that you threatened her life, but instead responded you understood what she was saying:

> Ex-Wife to You (3:37 PM): "Scott, There is too much history of hurtful actions. I changed the day you threatened my life. The next times you did it I became someone not like myself. I became a lonely, rejected, uncared for survivor. It's going to take me a long time to heal."

> You to Ex-Wife (3:42 PM): "Ok. Thank you. I understand. Too much history. I am moving on then. Tonight, without you. If you begin to think of me and wish to end your date and come over, call me and I will come back to town."

On October 8 your Ex-Wife asserted you repeatedly strangled her and touched her in a sexual manner against her will. You did not deny her assertions but instead stated you were sorry, you "messed up," and you know you drove her away:

> **10/08/2012,** Ex-Wife to You (5:31 PM): "What is wrong is you fondling me at your apartment and in the emergency room. What's wrong is expecting to the point of nearly demanding I hug you when we drop off or pick up the kids."

> You to Ex-Wife (5:34 PM): "Ok, I will stop again.[13] Please understand how difficult this is for me. To experience, to believe. It's unreal to me. It really is."

> Ex-Wife to You (5:36 PM): "*It was unreal the first time you strangled me.* It was unreal when you didn't spend my 37th birthday with me and the kids at a campground [made] sad because you wanted to see KC. It was unreal when you told me you didn't want to be married as everything was loaded onto a moving truck (twice). *Need I go on?*" (emphasis added).

> You to Ex-Wife (5:38 PM): "*You needn't.*" (emphasis added).

> You to Ex-Wife (10:45 PM): Subject: *I'm sorry*: "*I know how much I messed up.* But I'm sitting here in my cozy apartment, knowing where you are and what you're doing and I'm surprisingly at peace with it. Because I know I drove you away. Because I know I am responsible for tonight . . . . Thanks for being a good friend, babe. I only wish I would have recognized it earlier, appreciated you and how you tried, and followed your advice earlier. If I had, none of us would ever have to struggle. We could have lived a fantasy life, never having to worry about anything. But it took losing you for me to realize what I had. Sad and embarrassing." (emphasis added).

---

[13] I note that your reply, that you will stop "again," shows this was not the first time you sexually harassed your Ex-Wife through unwelcome fondling. Your response is an unequivocal admission.

13

**CONFIDENTIAL**

**PL 00025**

Mr. Scott F. Bullock

In short, although you stated under oath that the allegation you physically abused your Ex-Wife is "false," the evidence establishes you likely physically abused your Ex-Wife and threatened her life. This finding does not turn on a credibility assessment of your Ex-Wife, but instead on your own admissions, apologies, and acquiescence in your communications about the abuse.[14]

### 2.  The Nature of Your Emails and Texts

In your SSS (p. 2), you stated you ensured your emails and texts to your Ex-Wife after you separated were respectful and appropriate:

> During our separation and divorce, I specifically requested and engaged in 'written' forms of communication with [my Ex-Wife] to ensure our conversations were documented – precisely so that my communications with her could not be misconstrued or misrepresented. Specifically because we were in the middle of contentious divorce proceedings, I ensured that nothing I sent to [my Ex-Wife] could be construed as anything but appropriate and respectful.

As shown above, however, during your separation you sent your Ex-Wife emails and texts that were disrespectful, accusatory, sarcastic, and malicious. They included, among other things, derogatory references to your Ex-Wife and her "fuck buddy," highly charged accusations of criminal violations, and assertions your Ex-Wife's actions were severely harming your children. Given the allegations in this inquiry, you had a strong motive to mischaracterize your texts and emails, but it is clear those communications were not "appropriate and respectful."

Based on a preponderance of the evidence, I conclude that you violated Offense Code 2.6.

### PENALTY DETERMINATION

When proposing an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

The investigation establishes you violated FBI Offense Code 4.8 (Other Misdemeanors). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

---

[14] I note the record contains other evidence of physical abuse, including the following statements by your Ex-Wife: "Regarding physical abuse, alleged SSA Bullock had pushed her to the ground in front of the children injuring her knee in 2011;" "Alleged SSA Bullock had inserted his Glock into her vagina when they resided in Michigan (2007/2008);" and "Alleged SSA Bullock had thrown her onto the bed, put her in a headlock and asked her if she was ready to die (following a confrontation about an affair he was having (2007/2008)." Again, however, the strongest evidence comes not from your Ex-Wife, but from your own emails and texts.

14

**CONFIDENTIAL**                    **PL 00026**

Mr. Scott I. Ballock

The investigation further establishes you violated FBI Offense Code 2.6 (Lack of Candor/Lying - Under Oath). The standard penalty is dismissal. Offense Code 2.6 does not include a mitigated or aggravated range.

In mitigation, you have a positive service record and no prior disciplinary history, and your Division thinks well of you. You were under great stress during your separation and divorce.

Notwithstanding the relevant mitigating factors, I find that severe aggravation is appropriate. First, as a Supervisory Special Agent, you are held to a higher standard. The Bureau trusts its supervisors to represent the FBI professionally at all times, and to serve as an example for those they supervise. The FBI Offense Codes and Penalty Guidelines specifically cite "supervisory or high-grade status" as an aggravating factor.

Second, your arrest was reported by several local and national online media outlets, thereby harming the Bureau's reputation in the process. After your arrest, you accused a WVSP trooper of being sexually involved with your Ex-Wife. Your allegation was investigated by the WVSP and shown to be false. The FBI Offense Codes and Penalty Guidelines cite "actual or potential harm to the FBI's reputation" as an aggravating factor.

Third, you not only lied under oath, but you lied about extraordinarily serious prior misconduct, including physical abuse, sexual abuse, and death threats against your Ex-Wife.[15] By your unprofessional and criminal behavior, you have shown you do not possess the integrity, judgment, and self-control required to be an FBI Special Agent.[16]

Finally, the record shows that in late-May 2013, you ordered a Bureau contractor to perform a database search of your "estranged wife's boyfriend."[17] Although your database

_____

[15] By email dated July 29, 2015 to OPR and copied to the FBI's appellate authorities, the Director made clear: (1) he cares deeply about the issue of domestic violence; (2) OPR's penalties for domestic violence must "strongly promote both specific and general deterrence", and (3) he fully supports dismissal for domestic violence where appropriate. He also recognized victims frequently fail to seek relief because they fear additional abuse or the adverse financial consequences if the abuser goes to jail or loses employment.

[16] In addition to the above referenced examples of your abusive behavior, it is noted that during your five-year reinvestigation, the investigative file contained an example, provided to an investigator, regarding your violent temper. One interviewee, identified only as BICS 1-1, was "aware" of a "problem" with your "temper" and "heard about an incident where [you were] yelling loudly and throwing objects around because [you] could not get [your] garage door open." Moreover, in your Ex-Wife's statement, she told Bureau investigators that you had used an alias to frequent "men4men" listings on Craigslist while you and your Ex-Wife lived in Indiana. Your Ex-Wife also provided names and contact information of individuals that could support her accusations.

[17] This database is an FBI-developed repository of unclassified criminal justice records, available to the criminal justice community in a secure online environment. This national investigative information sharing system brings together federal, regional, state, local, and tribal criminal justice agency data, including: Incident and Case reports, Arrest Reports, Computer and Related Dispatch Calls, Traffic citations, Narratives, Photos, Booking and Incarceration data. Parole/Probation information. *CJIS Intranet Site*, accessed 12-12-2016.

In June 2013, the contractor reported the unauthorized search to his Bureau-employed friend, a Liaison Specialist. The contractor explained he performed the search because "[you] asked him to do it." After hearing this

15

Mr. Scott F. Ballock

misuse was treated as a performance issue and not investigated as misconduct, it demonstrates your willingness to flout Bureau rules for your personal advantage. The incident warrants consideration as an additional aggravator.

Based on the circumstances of this case, I propose dismissing you for your 4.8 and 2.6 offenses.[18]

## CONCLUSION

In sum, I propose dismissing you from the rolls of the FBI. The Assistant Director (AD) of the Office of Professional Responsibility (OPR) will make the final decision in this matter after consideration of your written and/or oral response(s), should you choose to submit either or both.

## PROCEDURAL PROTECTIONS

(1) This Statement of Proposed Action provides you thirty calendar days' advance written notice of the proposed action.

(2) You may contact and use an attorney to assist in the disciplinary matter, subject to limitations imposed by law and regulation regarding the disclosure of classified or sensitive information. The FBI will not be responsible for payment of any attorney's fee or other expense you incur in connection with an attorney's representation of your interests associated with a disciplinary matter or an appeal of a disciplinary sanction.

(3) You have ten calendar days from the date of receipt of this notice to make a written request to review the material which was relied upon by OPR's proposing official. Copies of such material will be redacted in accordance with civil discovery policy and procedures. These documents are the property of the FBI and will be made available for review for a reasonable amount of time by you and/or your attorney within the FBI office space and control. You may take notes, but you may not make copies.

(4) You and/or your attorney may provide a written response to the proposed action. Your written response may include affidavits or other documents of choice, and it may identify witnesses or documentary sources of exculpatory evidence.[19] Your written response must be

---

information, the Liaison Specialist reported the database misuse to her supervisor. On June 26, 2013, an EC was prepared memorializing your database misuse and sent to the FBI's Inspection Division. You did not have authorization to order the database search of your Ex-Wife's boyfriend. You ordered the search for a personal purpose.

[18] The penalty being imposed is a single, integrated penalty based on the totality of your misconduct. Even if you had not lied under oath, your 4.8 violation would warrant dismissal based on the cited aggravators.

[19] You are admonished not to discuss this matter with anyone other than the Inspection Division's Internal Investigations Section (IIS), OPR, the Human Resources Branch's Office of Disciplinary Appeals (ODA), the Security Division, the FBI's Employee Assistance Program, the FBI's Ombudsman, or an attorney who has signed the appropriate Nondisclosure Agreement. Neither you, your attorney, nor anyone acting on your behalf should contact any witness or potential witness about this inquiry without first obtaining approval from IIS (during the

16

**CONFIDENTIAL**                                                        **PL 00028**

Mr. Scott T. Ballock

submitted within ten calendar days after your receipt of the proposed action or after you have been provided access to the material described in (3) above, whichever occurs later. Due to mail delays associated with security procedures, you must send your response by facsimile to OPR, Adjudication Unit I, WB-410, at 202-436-7887 or 202-436-7455.

(5) In addition to, or in lieu of, submitting a written response, you may request an oral presentation which, at your election, will be made telephonically, in person, or by video teleconference to the Assistant Director of OPR. You must request an oral presentation, in writing, within ten calendar days after your receipt of the proposed action or after you have been provided access to the material described in (3) above, whichever occurs later. Upon receipt of your written request for an oral presentation, OPR will provide you at least fifteen days' notice of the presentation date. If you are submitting a written response in addition to making an oral presentation, the oral presentation will be scheduled for a date after the deadline date for OPR's receipt of your written response. During your presentation, you and/or your attorney may present oral testimony or evidence, including any information, affidavits, and other documentation deemed pertinent to your case. The testimony of witnesses is not allowed. Any travel and/or attorney costs incurred as part of your oral presentation are your responsibility. For WebTA, employees in duty status may treat a reasonable amount of file review time, and the time spent during the oral hearing, as part of their official duties and record it as regular hours. Employees in duty status may also treat up to one hour prior to the hearing and up to one hour after the hearing as part of their official duties if that time is actually spent preparing for the hearing or discussing the hearing with counsel. Employees in non-duty status are not entitled to use official time to review their file or attend their oral presentation.

(6) You will receive a written decision letter from the AD, OPR, after consideration of any oral and written responses to the proposed action, fully stating the reasons for the decision. This decision letter will be delivered to you as soon as practicable following completion of the disciplinary process described above.

## REFERRAL TO OTHER DIVISIONS

In accordance with established policy, the results of this administrative inquiry will be shared with other divisions, as appropriate. Thus, a copy of this communication is being provided to the Security Division as it may be relevant to your retention of a Top Secret security clearance. Information regarding this inquiry will also be provided to the Special Agent Mid-

---

investigative stage of the proceedings), OPR (during the adjudicatory stage of the proceedings), or ODA (during the appeal). This prohibition applies to persons from whom you would like to solicit a character reference. If you would like OPR to consider a character reference, provide the undersigned OPR Unit Chief with the person's name, position, and contact information. OPR will determine whether a character reference from the listed individuals would enhance the investigative record and, if so, OPR will solicit the character reference. Absent exceptionally compelling circumstances, OPR will not solicit a character reference from a subordinate on behalf of a supervisor. If you believe additional witnesses need to be interviewed or other additional evidence needs to be obtained, you may direct that request to IIS (during the investigative stage of the proceedings) or include the request in your written response to OPR (during the adjudicatory stage of the proceedings). In addition, you are admonished that any redacted materials or other FBI documents you review in connection with this inquiry are the property of the FBI, and you are prohibited from photocopying or removing such documents from FBI space. You may take notes concerning the content of such material, but those notes may be used only to facilitate your participation in this disciplinary inquiry and for no other purpose.

17

Mr. Scott L. Ballock

Level Management Selection Board and/or the Director for their consideration on any future promotion or other action requiring their recommendation.

Sincerely yours,

*Timothy J. Dowling*

Timothy J. Dowling, Chief
Adjudication Unit 1
Office of Professional Responsibility

Enclosures

18

**CONFIDENTIAL**                    **PL 00030**

# SWICK & SHAPIRO, P.C.
### ATTORNEYS AT LAW
1101 15TH STREET, N.W., SUITE 550
WASHINGTON, D.C. 20005

(202) 842-0300
FAX (202) 842-1418

June 14, 2017

**VIA FACSIMILE NO. (202) 436-7887**
Candice M. Will
Assistant Director
Office of Professional Responsibility
Federal Bureau of Investigation

**Re: SSA Scott T. Ballock**

Dear Assistant Director Will:

This letter responds to the proposal to dismiss SSA Scott T. Ballock.   For the following reasons, the proposal should be vacated.

**I.     SSA Ballock has never abused or threatened his ex-wife.**

The sole source of allegations that SSA Ballock has abused or threatened his ex-wife, Ellen Costlow is Ms. Costlow.   However, the record, including documentation supplemented herewith, demonstrates that Ms. Costlow's accusations are unworthy of credence for numerous reasons.

Attached hereto is the custody evaluation report prepared in late 2013 by forensic psychiatrist Dr. Christi Cooper-Lehki, the court-appointed forensic psychiatrist assigned to the Ballocks' family court proceeding in Monongalia County Family Court.[1]   Exhibit ("Exh.") 1.
Dr. Cooper-Lehki is a nationally-recognized expert mental health, and in Battered Women's Syndrome specifically.

---

[1]Dr. Cooper-Lehki stated on the last page of this report, "As I have already testified extensively in this matter on 13 September 2013 and expect to testify again at the final hearing, and my recommendations are unchanged, I am not writing an extensive history in this matter."   SSA Ballock sought permission to submit a more extensive and thorough report by Dr. Cooper-Lehki, and one can be obtained if it is deemed useful and appropriate.   However, the attached report, though not overly lengthy, is fairly thorough, and in it, Dr. Cooper-Lehki is unequivocal in her evaluation of Ms. Costlow.

EXHIBIT
37

**CONFIDENTIAL**                                                      PL 00274

The sources Dr. Lehki utilized to form her professional opinion and recommendation that SSA Ballock be awarded full custody of the two children are listed on the first and second pages of the report.   Dr. Cooper-Lehki interviewed Ms. Cosltlow for 13 hours, SSA Ballock for eight hours, and the children for two hours each.   She reviewed every single email and text message between SSA Ballock and Ms. Costlow.   She also spoke with Ms. Costlow's therapist, Laura Surovick, and reviewed her records on Ms. Costlow.   In addition, she interviewed the children's therapist.

Based on her extensive evaluations of all the family members, Dr. Cooper-Lehki determined to a reasonable medical certainty that Ms. Costlow's claims of being a victim of abuse were false, and that she suffers from disorders which are characterized by deceitfulness, a false sense of victimhood, and abusive behavior toward those close to her.   Dr. Cooper-Lehki's evaluation includes the following:

Ellen Ballock[2] meets DSM-5 criteria for Borderline Personality Disorder.   It is my opinion that Ellen Ballock's personality disorder has a serious negative impact on her ability to parent appropriately...

Concerning and suggestive of a poor prognosis is that [Ellen] has been in intensive individual counseling since September 2012 [with Laura Surovick] and more recently in joint counseling with Scott [with Terry Laurita Sigley] and has not shown improvement or the ability to put her children's interests ahead of her own...Concerning is her inability or unwillingness to present accurate and honest information to her counselors; she has largely focused on presenting herself as a victim.   Her identification as a victim prevents her from accepting responsibility for her own harmful or destructive actions.   Additionally, she puts forth significant effort in her pursuit of civil charges against Tom Ballock and Scott Ballock, and more recently in criminal charges against Scott Ballock...

Ellen Ballock suffers from borderline personality disorder, which is a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that begins by early adulthood and is present in a variety of contexts.   Criteria specific to her include 1) frantic efforts to avoid real or imagined abandonment; 2) a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation; 3) identity disturbance; 4) impulsivity in at least two areas that are self-damaging (such as spending, sex, substance abuse); 5) recurrent suicidal behavior, gestures, or threats; 6) affective instability due to a marked reactivity of mood (intense dysphoria, irritability, or anxiety usually lasting a few hours); 7) chronic feelings of emptiness; 8) inappropriate, intense anger or difficult anger; 8) transient, stress-related paranoid ideation.   Her symptoms of this personality disorder are evident in her interactions and relationships, well supported by past

---

[2] Ellen no longer uses the surname Ballock, but her maiden name, Costlow.

2

**CONFIDENTIAL**

**PL 00275**

emails and texts, and corroborated by the observations of others.   Symptoms / behaviors that further support the presence of this disorder include her manipulative behavior, inability to accept responsibility for her actions, gross misperceptions of situations and motives / actions of others, deceitfulness, dramatic and historic behaviors and presentations, somatic preoccupation, indecisiveness, and need for reassurance...

Ellen indicated that her therapist supported her delivering [videos, photos, and documented details of sexual relations to the wives of her lovers to prove to her boyfriend Kenny Ice she was willing to hurt them].   Laura Surovick declined to tell me whether or not this was true.   If she did support it, the concern about that therapeutic relationship is obvious.   If she did not, it is another example of Ellen's deceitfulness.   Extensive interviewing of Ellen's current boyfriend, Kenny Ice, strongly supports that she has Borderline Personality Disorder.

Ellen Ballock also has an Unspecified Paraphilic Disorder...She chooses to blame Scott Ballock for her sexual acts, insisting that he forced her, coerced her, and groomed her to perform sexual acts with other men and with dogs for his pleasure. After extensive investigation into this, including review of volumes of texts, emails videos, etc., and interviews of others (including her past sexual partners, both from recent years and from many years ago), I do not believe that Ellen Ballock was forced, coerced, or groomed into engaging in these behaviors.

Tommy has significant anger and resentment towards his mother; he believes that she was abusive to him and needs to take responsibility for her actions and apologize to him. Tommy's description of his mother's behaviors suggests that she was emotionally abusive and physically aggressive with him.   Both children were exposed to their mother's sudden mood changes and rages.   Ellen Ballock engaged in alienating behaviors; she tried to influence Summer's beliefs about her father.   For example, when Summer saw videos of Ellen involved in sexual acts with other men, Ellen told her that she had been forced to do that by Scott. Summer has been coached and instructed by her mother on what to say to Scott and to [the children's therapist] Diane Halbritter, in a manner that was favorable to Ellen.   There are many examples of Ellen's inappropriate and harmful parenting behaviors.   One important example was knowingly exposing Summer to a convicted sex offender and then instructing Summer to lie about the extent of that exposure.

*See* Exhibit 1 (Cooper-Lehki Report).

Dr. Cooper-Lehki performed extensive examinations of the Ballock family, and devoted the majority of this report to explaining her grave concerns about Ms. Costlow's fitness as a parent.   By contrast, she made no disparaging comments about SSA Ballock.   Nothing in her report even hints that SSA Ballock is anything less than totally honest, that he ever engaged in

3

**CONFIDENTIAL**

PL 00276

abusive behavior, physical, emotional or otherwise, that he is deceitful, or that he is at all impaired in his ability to parent appropriately and have healthy interpersonal relationships.  As such, she, the children's counselor, and the Guardian ad Litem recommended full custody of the children be awarded to SSA Ballock, and that Ms. Costlow not be permitted any unsupervised visits with them.

As she stated in her report, Dr. Cooper-Lehki gave extensive sworn testimony in this matter.  In court, she testified that Ms. Costlow was the single worst patient she had ever worked with because of her desire to harm others.  Dr. Cooper-Lehki volunteered that, while she had worked with violent criminals such as rapists and murders, testifying unfavorably about Ms. Costlow made her fear for herself and her own family because of Ms. Costlow's skill at manipulation and desire to cause harm.  In her September 13, 2013 testimony in family court, Dr. Cooper-Lehki testified that, contrary to Ms. Costlow's claims, Ms. Costlow was not a battered woman and there was no evidence of abuse against her.  Dr. Cooper-Lehki testified that neither of the children had ever witnessed any aggressive behavior by SSA Ballock toward Ms. Costlow.  However, both children had witnessed Ms. Cosltow's uncontrolled rage directed toward their minor son Tommy.  Dr. Cooper-Lehki also informed that it was not uncommon for someone with Ms. Costlow's mental disorder to "project" their own bad behavior onto others to help cope with guilt.  She also testified that Ms. Costlow may be a sociopath.  If asked, Dr. Cooper-Lehki can give more detailed testimony about the discrepancies she uncovered in Ms. Cosltow's narrative of her and SSA Ballock's relationship.

SSA Ballock was arrested on the day of the September 13, 2013 hearing.  The Court opined that Ms. Costlow's timing in bringing the harassment charges against him was a strategic move.  In the temporary modification order, the judge stated:

> The Court was somewhat dismayed at the arrest of the Father on the day of the hearing on September 13, 2013. While the Court in no way condones any potential criminal behavior on anyone's part, *the Court has to believe the timing of the arrest represented primarily a strategic decision to gain advantage in this case.* In that regard, the Court notes the Father's communications at issue occurred over several months with no apparent effort by the Mother to seek assistance from this Court or any other judicial body until the time of the hearing. This Court almost certainly would have been willing to enjoin such communications by the Father if the Mother had raised the issue at any time.

Exh. 2 (Temporary Modification Order) at 5 (emphasis added).

Furthermore, the AD of CJIS noted in his *Douglas* factors input, "Tellingly, as assessed and documented by an appointed forensic psychiatrist, Ellen Costlow's behavior was declared to be vicious, manipulative, vindictive, and dishonest."  As such, SSA Ballock was awarded full custody of the children and no alimony or unsupervised visits were awarded to Ms. Costlow. The AD of CJIS also appropriately noted that Ms. Costlow stands to benefit if she can successfully discredit SSA Ballock, by gaining a more favorable custody arrangement.

4

**CONFIDENTIAL**                                                                 **PL 00277**

We have attached hereto a copy of SSA Ballock's Amended Complaint in the United States District Court for the Northern District of West Virginia.  Exh. @.  The Amended Complaint lays out many of these and other issues more thoroughly.  Included in these other issues are SSA Ballock's allegations against the West Virginia State Police.

If asked, Dr. Cooper-Lehki can also provide testimony regarding the fact that spouses of individuals with Borderline Personality Disorder learn ways to communicate with and handle them so as to hopefully minimize destructive reactions.  This is the coping mechanism SSA Ballock learned to utilize with Ms. Costlow.  The proposal treats three text message exchanges in October 2012, after separation proceeding had begun, in which SSA Ballock did not explicitly deny having physically abused Ms. Costlow as credible evidence that he in fact did so.  This is an error.  SSA Ballock learned to try to deal with Ms. Costlow in a ways that would hopefully avoid outbursts or vindictive reactions by her.  This is what he did in the cited text messages.  These text messages do not nearly amount to preponderant evidence that SSA Ballock engaged in physical abuse of Ms. Costlow, especially given the totality of these circumstances.  SSA Ballock has never physically abused Ms. Costlow, and his denial of having done so in his signed sworn statement is absolutely true.

## II.   Communications during SSA Ballock's and Ms. Costlow's separation were not one-sided, and SSA Ballock did not have an intent to harass.

It has been portrayed that, starting in September 2012, when SSA Ballock and Ms. Costlow were beginning to separate, communications between them were essentially one-sided.  However, this was not the case, and Ms. Costlow continued to initiate contact with SSA Ballock up until the time of his arrest on September 13, 2013, and after.

- On September 24, 2012, at 3:50am, Ms. Costlow sent SSA Ballock a brief but affectionate email with the subject line "Poems," saying, "I like them, all.  I do." Exh. 4.

- There were also instances during this time period that Ms. Costlow telephoned SSA Ballock in the middle of the night.  Per Exh. 5, on October 16, 2012, Ms. Costlow called the family house phone repeatedly beginning at 1:00am. When she finally left a voice mail, she said the reason for the repeated calls was that their daughter was having a severe asthma attack.  However, their daughter advised SSA Ballock the next day she had not had an asthma attack.  It was evident that the true reason for the call was to verbally berate SSA Ballock in the middle of the night.

- The investigative file contains a November 8, 2012 self-reporting form submitted by SSA Ballock reporting two frivolous 911 calls Ms. Costlow made on November 5, 2012.
- On December 9, 2012, Ms. Costlow posed as their son and text messaged SSA Ballock, "Hi."  SSA Ballock, thinking he was corresponding with his son, asked if he was having a good day.  SSA Ballock received the response, "yes Iam [sic]."  SSA Ballock's son later received a text from his son saying, "the hi and yes I am were from mom."  He also

5

**CONFIDENTIAL**

PL 00278

wrote, "I hate it here." SSA Ballock asked his son about this, and his son told him Ms. Costlow had taken their son's phone before for the purpose of corresponding with SSA Ballock while pretending to be their son. SSA Ballock memorialized this event in a note to himself. *See* Exh. 6. SSA Ballock and his son subsequently agreed on some code words to use in text messages so SSA Ballock would know it was really his son and not Ms. Costlow.

- The proposal references a January 12, 2013 email from Ms. Costlow to her attorneys asking for a restraining order against SSA Ballock for excessive communications. However, as page 2 of Exhibit 7 references, Ms. Costlow telephoned SSA Ballock at 2:00am on January 31, 2013 for a reason she never explained ("You never did discuss with me the reason for your 2:00 am telephone call which you said was very important [in voice mail]. I'm guessing it actually wasn't. If it relates to the children, please let me know.").

- On June 1, 2013, Ms. Costlow initiated contacted SSA Ballock and asked him about the "good parts" of their marriage, to which he responded via email. Exh. 8.

- On July 2, 2013, Ms. Costlow initiated contact with SSA Ballock to tell him to give his mother and the children her love, which SSA Ballock considered disingenuous and pretextual as he had had difficulty getting her to communicate with him about meaningful issues relating to the children such as visitation. Exh. 9.

- On one occasion during this time period, Ms. Costlow entered SSA Ballock's apartment in the middle of the night.

- Less than a week after SSA Ballock's arrest on September 13, 2013, SSA Ballock and Ms. Costlow saw each other at a school function. At this event, Ms. Costlow initiated communication with SSA Ballock. She grabbed his hand, and led him around the event. This was witnessed by the other attendees at the event, including my SSA Ballock's parents. During this time, Ms. Costlow expressed to SSA Ballock dismay that the West Virginia State Police had arrested him.

That Ms. Costlow continued to initiate communication with SSA Ballock right up until his arrest, and continued to do so after, undermines any notion that SSA Ballock possessed the specific intent to harass her.

Moreover, the email and text communications which formed the purported basis the harassment and stalking charges against SSA Ballock were determined not to support such charges. SSA John Hambrick, who reviewed more than 60% of the communications, stated that, "none of the communications reviewed could be characterized as threatening...The communications could be characterized as a mixture of manipulative, desperate (as it relates to

6

**CONFIDENTIAL**                                              PL 00279

his marital relationship), and routine/normal." SSA Michael T. Smith stated,

> The underlying predication of unlawful harassment was not supported by the
> investigative results. SSA Ballock's extensive communications with his estranged
> spouse were intentional and consistently repetitive, but were not malicious or
> selfish. The investigation determined that SSA Ballock's communications were
> for the purposes of attempted reconciliation and notable concerns for the health
> and welfare of his two children.

SSA Ballock's Division stated, "AD CJIS believes SSA Ballock has been exonerated by the
investigation, specific to the stalking/harassment." It is further noted in the *Douglas* factors that
the criminal charges against SSA Ballock were dismissed with prejudice on April 7, 2016, and
the records were ordered expunged. The Division advised that "SSA Ballock was cooperative,
professional, and responsive during the investigation."

In addition, the rulings of West Virginia courts which have considered Code § 61-3C-14a,
which SSA Ballock is alleged to have violated, counsel against holding SSA Ballock liable. In
the *State v. Thorne*, it was determined the defendant possessed the specific intent to harass,
which is required of the statute, when he threatened to *fry one of his victims in oil*, he told his
victims they were "little piggies [who would] get it by way of *being barbecued or fried*," and the
victims in fact felt threatened by his statements. *State v. Thorne*, 175 W. Va. 452, 455-56
(1985); *see also State v. Calvert*, 2016 W. Va. LEXIS 457, at *12 (June 3, 2016) (specific intent
to harass is required element of the statute). In *State v. Calvert*, the defendant was charged
under § 61-3C-14a for saying the following:

> I will have no problem answering your husband, your son, your friend, and any
> Clarksburg police department officer with my Mossberg shotgun, and I vow to
> you today, I will raise heaven and earth to have your husband convicted for what
> he did to me. I reiterate, please come looking for me, you come to my house bitch,
> *I will open your chest with my 12 gauge*, that I promise you from the bottom of
> my heart.

*State v. Calvert*, 2016 W. Va. LEXIS 457, at *3 (June 3, 2016). In both these cases, the
offenders explicitly threatened physical violence. The record shows that nothing SSA Ballock
said to Ms. Costlow could fairly be characterized as threatening, let alone rise to a level that
would actually be prosecuted in West Virginia. None of SSA Ballcok's messages were
threatening. Furthermore, there is no evidence Ms. Costlow actually felt threatened at any time.
The prosecutor in SSA Ballock's criminal case told his criminal defense attorney that she
believed the State Troopers colluded with Ms. Costlow to have SSA Ballock arrested. She also
told SSA Ballock he would have a difficult time proving collusion, as the Troopers would likely
cover for one another. SSA Ballock plans to have his criminal attorney testify as a witness in his
aforementioned civil law suit in federal court.

7

**CONFIDENTIAL**

**III.    Previous communications show SSA Ballock's true character as loving and devoted to his family.**

We have included herewith examples of previous communications from SSA Ballock and Ms. Costlow which demonstrate a number of things worth consideration in this case.  Exh. 10 is a sampling of 2010 emails from Ms. Costlow to SSA Ballock's sister wherein Ms. Costlow spoke glowingly and superlatively about SSA Ballock as a husband, father, and person.  Ms. Costlow was counseling and comforting SSA Ballock's sister through some marital difficulties, and she described SSA Ballock representing the ideal in a spouse and father.  These emails from Ms. Costlow are in direct contradiction to the false narrative about SSA Ballock she later asserted when the couple began to separate.

We have also included as Exh. 11 a sampling of emails spanning 2008 to 2010 from SSA Ballock to his parents and sister reporting on the goings-on with his family.  These mostly recount what the children have been up to, and many of them include amusing and sweet anecdotes.  They show how involved SSA Ballock is as a father, as he often recounted full conversations with the children.  It is evident from these emails that SSA Ballock is a warm, loving, attentive, and involved parent.[3]

These emails demonstrate how important SSA Ballock's family is to him, and how much he cherished having a stable and happy family prior to the deterioration of his relationship with Ms. Costlow.  He of course continues to cherish and nurture his relationship with his children, but it would be nearly impossible to overstate what a loss it has been that his relationship to Ms. Costlow turned destructively toxic due to her mental illness.

These emails also demonstrate that it is completely outside of SSA Ballock's nature to be abusive or harassing, especially toward his family.[4]

---

[3]SSA Ballock kept a near-daily journal of his children's activities since the day his first child was born.  He wanted the children to know all about their childhood and he himself did not want to forget the stories. There are hundreds upon hundreds of these journal entries. SSA Ballock's practice was to write about his observations and email the journal entry to his then-wife, Ms. Costlow, for safekeeping.  Fortunately, SSA Ballock also sometimes sent a copy to his parents and sister.  SSA Ballock no longer has the entries he sent only to Ms. Costlow, because she has refused to provide them to him or his children.   SSA Ballock and his children now have only a handful.

[4]We have also included a statement from SSA Ballock's father, Thomas Ballock, explaining that it was he, not Scott, who published websites regarding Ms. Costlow in an attempt to mitigate the reputation damage she caused his son, Scott.  Exh. 12.

8

**CONFIDENTIAL**                                                                 **PL 00281**

**IV.    SSA Ballock did not lack candor in his description of his communications with Ms. Costlow.**

In the context of the highly contentious, stressful, painful, and financially disastrous end of SSA Ballock's relationship with his ex-wife, who had engaged in erratic, dangerous behavior and placed the couple's children in harm's way, SSA Ballock genuinely considered his communications with Ms. Costlow to be appropriate and respectful under the circumstances. It is true that on a few occasions over the course of approximately a year, communications were highly-charged, emotional, and/or incredibly unpleasant, but this was this was because Ms. Costlow had in fact engaged in behavior which warranted a strong response. Dr. Christi Cooper-Lehki commented that SSA Ballock was remarkably calm and low key in light of the harm being inflicted on him and his children. SSA Hambrick, who attended the arrest proceeding, stated SSA Ballock was composed and articulate. Insofar as there may be a difference of opinion as to whether, under the totality of the circumstances, SSA Ballock's communications were respectful and appropriate, we respectfully submit it is just that – a difference of opinion – not a basis for a lack of candor charge.

**V.    SSA Ballock is an excellent employee, and the FBI should retain him as a highly valuable asset.**

SSA Ballock is an excellent and dedicated asset to the FBI, and it would be to the organization's detriment to dismiss him. It is very evident from the record that SSA Ballock has the support of his Division, who described him as reliable, competent, well-regarded, and dedicated to his subordinates. SSA Ballock was rated at the Excellent level from 2012 to 2015, and he has earned two cash awards. He received an Assistant Director's Award in 2016. SSA Ballock's supervisor nominated him for a cash award this year, but it was denied due to this administrative inquiry.

We have attached hereto SSA Ballock's 2017 AES Leadership Report. Exh. 13. Of particular note, 100% of SSA Ballock's subordinates (26 of 26) reported they would work for SSA Ballock again. Exh. 13 at p. 7. The accompanying 2017 AES Leadership Narrative extols SSA Ballock for being helpful, caring, and supportive of his subordinates. Exh. 14. at 3. SSA Ballock should be permitted to continue serving the FBI as an outstanding employee and leader.

**CONFIDENTIAL**                                                    **PL 00282**

**Conclusion**

For the foregoing reasons, the proposal to dismiss SSA Scott Ballock should be vacated.

Sincerely,


J. Cathryne Watson

List of Exhibits:

| | |
|---|---|
| Exhibit 1: | Custody Evaluation by Forensic Psychiatrist Dr. Christi Cooper-Lehki |
| Exhibit 2: | Temporary Modification Order |
| Exhibit 3: | Amended Complaint in *Ballock v. Costlow, et al.* |
| Exhibit 4: | September 24, 2012 email from Ellen Costlow to Scott Ballock |
| Exhibit 5: | October 12, 2012 email from Ballock to Costlow |
| Exhibit 6: | December 9, 2012 Memo by Ballock |
| Exhibit 7: | January 31, 2012 email exchange between Costlow and Ballock |
| Exhibit 8: | June 1, 2013 email from Ballock to Costlow |
| Exhibit 9: | July 2, 2013 email from Ballock to Costlow |
| Exhibit 10: | Late 2010 email exchanges between Costlow and SSA Ballock's sister, Christy |
| Exhibit 11: | 2008-2010 emails from Ballock to family members about the children |
| Exhibit 12: | April 16, 2017 Statement of Thomas Ballock regarding websites published related to Ellen Costlow and the West Virginia State Police |
| Exhibit 13: | 2017 AES Leadership Report |
| Exhibit 14: | 2017 AES Leadership Narrative Comments |

10

**CONFIDENTIAL**                                                      **PL 00283**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SCOTT T. BALLOCK

      Plaintiff,

v.

ELLEN RUTH COSTLOW,
STATE TROOPER MICHAEL KIEF,
STATE TROOPER RONNIE M. GASKINS,
and
STATE TROOPER CHRIS BERRY,

      Defendants.

Case No.: 1:17-CV-52

JURY TRIAL REQUESTED

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Scott T. Ballock for his claim of violation of his Constitutional rights
and violations of West Virginia law, alleges as follows:

## INTRODUCTION

1. Defendant Ellen R. Costlow and officers with the West Virginia State Police (WVSP)
   abused the judicial process by arresting Scott T. Ballock in an attempt to assist Costlow
   in an ongoing Family Court dispute regarding alimony and child custody.

2. Scott T. Ballock was defamed, slandered, and suffered emotional and financial harm
   based on the actions of Costlow and WVSP troopers.

3. Costlow and WVSP troopers abused the legal system in order to achieve ulterior motives.
   They did not use the legal system as a tool to address a wrong; rather, they used the
   system as a sword to cause harm to plaintiff and assist Defendant Costlow.

4. This is a civil rights action raising federal and state law claims on behalf of
   Ballock, the victim of defendants' abuse of the judicial system.

5. Specifically, this is an action brought by Scott T. Ballock to vindicate deprivations of his
   federal Constitutional rights and violations of West Virginia law.



1

## VENUE AND JURISDICTION

6. This action arises under the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments of the United States Constitution and is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, and on the supplemental jurisdiction of this Court to entertain related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

8. This case is instituted in the United States District Court for the Northern District of West Virginia pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events occurred and in which Defendants maintain offices and/or reside.

## PARTIES

9. At all times relevant hereto, Plaintiff Scott T. Ballock was a resident of the State of West Virginia and a citizen of the United States of America.

10. At all times relevant hereto, Defendant Ellen Ruth Costlow was a resident of the State of West Virginia and a citizen of the United States of America.

11. At all times relevant hereto, Defendant Michael Kief was a resident of the State of West Virginia and a citizen of the United States and was acting under the color of state law in his capacity as a law enforcement officer with the West Virginia State Police, Morgantown Detachment.

12. This action is brought against Defendant Kief in his individual capacity and his official capacity.

13. At all times relevant hereto, Defendant Chris Berry was a resident of the State of West Virginia and a citizen of the United States and was acting under the color of state law in his capacity as a law enforcement officer with the West Virginia State Police, Morgantown Detachment.

14. This action is brought against Defendant Berry in his individual capacity and his official capacity.

15. At all times relevant hereto, Defendant Ronnie M. Gaskins was a resident of the State of West Virginia and a citizen of the United States and was acting under the color of state law in his capacity as a law enforcement officer with the West Virginia State Police, Morgantown Detachment.

16. This action is brought against Defendant Ronnie M. Gaskins in his individual capacity and his official capacity.

17. The claims will not cost West Virginia taxpayers and are therefore not subject to immunity. Pittsburgh Elevator v. West Virginia Board of Regents, 172 W.Va. 743, 310 S.E.2d 675 (1983).

18. Upon information and belief, West Virginia has a policy that covers it and its agents up to $1 million for the wrongful acts, and other acts alleged herein.

## ALLEGATIONS COMMON TO ALL COUNTS

19. Beginning in October 2012, Ellen Ruth Costlow and Scott T. Ballock were engaged in divorce proceedings in Monongalia County, West Virginia.

20. Ellen Ruth Costlow initiated the divorce proceedings after commencing a romantic relationship with Kenny Ray Ice, Jr., a man Costlow met via an online website.

21. Ballock and Costlow separated on September 14, 2012.

22. Costlow sought sole custody of Costlow's and Ballock's two minor children.

23. Costlow, a college-educated school teacher, also sought lifetime alimony payments from Ballock.

24. Costlow was alleged to be having an affair with WVSP trooper Chris Berry.

25. Ballock independently uncovered evidence which corroborates the allegation that trooper Berry was maintaining a romantic relationship with Costlow.

26. Ballock learned that at Costlow's request, trooper Berry was conducting surveillance of Ballock and Ballock's parents.

27. Trooper Berry, at Costlow's request, was also allegedly attempting to find a reason to arrest Ballock, in order to help Costlow in her Family Court battle.

28. On approximately August 13, 2013, Ballock's father, Tom Ballock, contacted Sgt. Mike Kief, Trooper Berry's supervisor, and informed him of the allegations against Berry.

29. Kief told Tom Ballock he would investigate the allegations.

30. A few days later, Plaintiff Scott T. Ballock also informed Kief of the allegations that trooper Berry was conducting surveillance of him and his parents, as well as having an affair with Costlow.

3

31. Kief angrily informed Ballock during this conversation that Berry had not engaged in any wrongdoing.

32. On information and belief, Berry, Kief, and Gaskins, in cooperation with Costlow, intentionally ignored policies, procedures, and the Constitutional rights of Ballock in planning and proceeding with an arrest of Ballock at the Family Court Judge's courtroom on the day of a hearing critical to Costlow and her desire to obtain custody of the children.

33. Together, defendants intended the place of arrest, time of arrest, and nature of the process to harm Ballock and benefit Costlow in the Family Court proceedings, and to damage and harm Ballock personally.

34. On September 13, 2013 – in an elaborate production on the day of the final custody hearing - Ballock was arrested by WVSP Sergeant Mike Kief directly outside the Family Court Judge's courtroom during a break in the proceedings.

35. Ballock was arrested in view of the Family Court personnel and, flanked by two WVSP troopers, taken from the Family Court waiting area to another floor in the municipal building and another Magistrate's courtroom.

36. Ballock was not free to leave.

37. Ballock was released on a PR bond by the Magistrate.

38. Ballock was charged with the misdemeanor offenses of Stalking-Harass/Credible Threat; and Stalking-Harass/Credible Threat.

39. As the basis for the charges, Costlow alleged that Ballock sent her unwanted email messages and text messages.

40. Ballock was not summoned for this misdemeanor, non-violent offense; a warrant was issued for his arrest.

41. Defendant Gaskins said Ballock was arrested at the Family Court hearing out of a concern for officer safety; as an FBI agent, Ballock carried a firearm.

42. This explanation was pretense and was knowingly false.

43. Ballock was later that same day instructed by Defendant Kief to report to WVSP's Morgantown Detachment for processing.

44. Counter to Gaskins' alleged concern for Ballock having a weapon, Ballock entered the WVSP Detachment that same day and was processed - all while wearing his sidearm.

45. Ballock was never interviewed by WVSP troopers.

4

Case 1:17-cv-00052-IMK-MJA   Document 116-5   Filed 07/08/19   Page 30 of 235   PageID #: 1847

Case 1:17-cv-00052-IMK-MJA   Document 45   Filed 10/13/17   Page 5 of 30   PageID #: 390

46. WVSP troopers relied solely on information provided by Costlow.

47. On information and belief, the defendants knowingly violated policies and procedures, and Ballock's Constitutional rights, in relying on information that they knew was false, unsubstantiated, and intended to abuse the process and initiate a malicious prosecution.

48. Through his attorney, Ballock formally volunteered to waive his Constitutional rights against self-incrimination and submit to an interview by WVSP.

49. WVSP troopers declined Ballock's repeated offers to be interviewed.

50. Ballock did not commit the misdemeanor offenses with which he was charged.

51. Had WVSP troopers conducted an actual investigation and interviewed Ballock, they would have learned that Ballock had not committed any crime.

52. The troopers' intention, however, was not to learn the truth; their intention was to harm Ballock and assist Costlow.

53. Through his attorney, Ballock provided evidence regarding his innocence to the Monongalia County Prosecutor.

54. Through his attorney, Ballock provided evidence to the Monongalia County Prosecutor which supported the claim that Ballock's arrest was an abuse of the judicial process.

55. The charges against Ballock were dismissed – with prejudice - by the Monongalia County Prosecutor on April 7, 2016.

56. With concurrence from the Monongalia County Prosecutor, the entire case against Ballock was expunged on July 13, 2016, and WVSP was ordered to destroy any and all records related to its investigation.

57. Costlow and officers with the WVSP had ulterior motives in arresting Ballock.

58. Costlow and officers with the WVSP abused the judicial process to achieve their ulterior motives.

59. On May 28, 2013, having had a falling out with Costlow after discovering Costlow's romantic relationship with trooper Berry, Kenny Ray Ice, Jr. contacted Ballock and offered to meet with Ballock to share information regarding Costlow's conduct.

60. Kenny Ray Ice, Jr. voluntarily provided his cell phone to Ballock so that Ballock could have the phone forensically examined and retrieve content and communications between Ice, Jr., and Costlow.

61. Kenny Ray, Ice., Jr. informed Ballock, among other things, that he and Costlow had stolen Ballock's FBI-issued property and given it away or sold it.

62. On May 28, 2013, Ballock sent Costlow an email message informing he had learned she was stealing and disposing of Ballock's government property.

63. On May 29, 2013, one day after the above-noted events, Costlow sent an email message to her attorneys, which read in part:

   A. "Amber and Matt, I need to file harassment charges against Scott today and I would appreciate your help in the matter. Scott's constant threats, insults, and other abusive tactics are intolerable. I'm losing sleep at night as I fear what Scott will do next, and I am afraid he's going to keep ramping things up until he threatens my life. But unlike times before, this time I fear he will be successful in taking my life. I have lived far too long in an abusive relationship to have any ability to heal from it while trying to cope with what Scott throws my way via texts and email. He's out of control trying to control and hurt me, and what he writes to me is nothing compared to what he's doing in secret. The writing is meant to distract me as he plots his next attack. The writing is meant to take my energy, frighten me, and keep me from living a productive life apart from him..."

64. Plaintiff never threatened, harmed, abused, or attacked Defendant Costlow.

65. Defendant Costlow created a false narrative which was ultimately thoroughly debunked by the court-appointed psychiatrist and the Family Court.

66. Costlow's divorce attorneys fired Costlow as a client.

67. On September 2, 2013, Ronnie M. Gaskins, WVSP, prepared an incident report (1210-43774), replete with inaccuracies and outright, salacious lies as related to him by Defendant Costlow.

68. As but one small example, Gaskins writes in his report that Ballock allegedly sent Costlow email messages on significant dates "including when her father passed away."

69. Costlow's father is still very much alive.

70. Costlow relayed false information to Gaskins for inclusion in his report to further push the false narrative she was attempting to sell to the Family Court and others.

71. Costlow intentionally and knowingly defamed Plaintiff with her false statements to others.

72. Though his employee, Chris Berry, was alleged to be having an affair with Costlow and at her request conducting surveillance of Ballock, Defendant Kief did not recuse himself or his agency from the investigation into Ballock.

6

73. Though his employee, Chris Berry, was alleged to be having an affair with Costlow and at her request conducting surveillance of Ballock, Defendant Kief or WVSP troopers never interviewed Tom Ballock or Scott Ballock about these allegations.

74. Instead, Kief participated directly in the investigation and prosecution of Ballock.

75. In her attempt to gain sole custody of the children and lifetime alimony payments, Costlow created and attempted to convey a false narrative in Family Court.

76. Costlow used WVSP troopers and the legal system in an attempt to bolster her false narrative.

77. As the custody hearing in Family Court approached, it was becoming apparent to Costlow that she was not faring well in her bid to gain sole custody of the children and lifetime alimony payments.

78. Costlow was also highly concerned about the discovery of her theft of government property.

79. Ballock said in a joint counseling session that she was so stressed about being arrested for her theft of U.S. government property, that she dressed well every morning and prepared the house for a visit from law enforcement who would, she was certain, arrest her.

80. The arrest of Ballock was Costlow's attempt to draw first blood against Ballock, and an attempt to stop Ballock from gaining custody of his children.

81. Ballock's arrest was an abuse of the judicial process, and Costlow defamed and slandered Ballock by providing officers with outrageous, slanderous, and false allegations.

82. On September 8, 2013, five days before the scheduled custody hearing, Costlow sent an email message to WVSP in which she demonstrated her true intent for filing charges against Ballock.

83. In the email, Costlow wrote, in part, "The custody hearing is this Friday at 8:30 am in Judge Minor's chambers. Custody of my daughter is what is at stake as it's been difficult for the Guardian ad Litem and the forensic psychiatrist to decipher which of us is telling the truth (me or Scott) and the lies he tells are bringing into question my fitness as a primary custodial parent..."

84. In actuality, the forensic psychiatrist had little difficulty in deciphering the truth and confirming that Costlow was spreading false information about Plaintiff.

85. Costlow was highly concerned, legitimately so, about losing custody of her children for various reasons, including but not limited to:

7

    A. Costlow was physically and emotionally abusive toward her children.

    B. After one violent episode with her then- 11-year old son, the Court issued a restraining order against Costlow.

    C. Costlow sexualized her then- 9-year old daughter.

    D. Costlow has long suffered from severe mental illnesses which manifest in her inability to tell the truth, maliciousness, vindictiveness, as well as criminal sexual behaviors.

    E. Costlow repeatedly left her minor children at home alone overnight.

    F. Costlow introduced and socialized her then- 9-year old daughter with a convicted and registered sex offender, Karl Vincent Taylor.

    G. Costlow regularly took her then- 9-year old daughter to a local drinking and gambling establishment known as a "Hot Spot."

    H. Costlow attempted suicide with her daughter in the home.

    I. Costlow was illegally abusing narcotics such as cocaine, as well as prescription pain medications such a Hydrocodone (Costlow referred to the Hydrocodone by its street name, "Bean"), and Adderall.

    J. The children's counselor believes Costlow coached her then- 9-year old daughter to lie and how to answer questions in counseling sessions.

    K. The children's counselor believes Costlow went so far as to send her then- 9-year old child into at least one counseling session with a recording device.

    L. The children's counselor believes Costlow actively and aggressively worked to alienate Ballock's minor children from him.

    M. In a recovered audio recording, Costlow can be heard interrogating her then- 9-year old daughter and coaching her what to say to her counselor immediately preceding a counseling session.

    N. Costlow and her Kenny Ray Ice, Jr., were regularly involved in physical altercations in front of Costlow's then- 9-year old daughter.

86. Ballock was awarded full custody of the children.

87. Costlow was permitted limited, supervised visitation with one of the minor children.

88. Costlow was denied alimony and was directed to pay child support to Ballock (though she has stopped paying this obligation).

89. WVSP troopers failed to learn any of the above-noted information during the course of their investigation.

90. In an order dated September 20, 2013, Judge Randall Minor, Family Court Judge, Monongalia County, West Virginia wrote in part: "The Court was somewhat dismayed at the arrest of the Father on the day of the hearing on September 13, 2013. While the Court in no way condones any potential criminal behavior on anyone's part, **the Court has to believe the timing of the arrest represented primarily a strategic decision to gain advantage in this case** (emphasis added). In that regard, the Court notes the Father's communications at issue occurred over several months with no apparent effort by the Mother to seek assistance from this Court or any other judicial body until the time of the hearing. This Court almost certainly would have been willing to enjoin such communications by the Father if the Mother had raised the issue at any time."

91. WVSP troopers knew that Costlow and Ballock were involved in ongoing proceedings in Family Court and that the Family Court was the appropriate venue for any concerns Costlow might have had.

92. Costlow and WVSP troopers, though, had ulterior motives in arresting Ballock.

93. In a text message Costlow sent to Kenny Ice, Jr. during this time period, Costlow wrote that she had "the upper hand with...ruining (Ballock's) career."

94. This message immediately preceded a message in which Costlow wrote she was going to file harassment charges against Ballock.

95. In a text message Costlow sent to Kenny Ice, Jr. on May 13, 2013, during the time period when she was alleged to have been working with trooper Berry in finding a way to have Plaintiff arrested, Costlow wrote, "I'm well protected. Things happened this evening that solidify protection. Like a gold suit if (sic) armor..."

96. On August 12, 2013, Defendant Costlow phoned 911 following yet another physical altercation with Kenny Ice, Jr.

97. Kenny Ice, Jr. would later inform that the fight with Costlow started because Ice learned Costlow was having an affair with WVSP trooper Chris Berry.

98. Ice, Jr. said he had observed on Costlow's cell phone inappropriate communications between Costlow and trooper Berry.

99. During the 911 call, Defendant Costlow specifically asked the 911 Dispatcher to speak with trooper Berry and provided trooper Berry's personal phone number to the dispatcher.

9

100. Defendant Costlow informed the 911 Dispatcher that trooper Berry had been to her house earlier in the day.

101. Though trooper Berry was at Defendant Costlow's home during the day, the 911 Dispatcher informed that Berry was scheduled to work the midnight night shift and Costlow indicated she was aware of that.

102. The 911 Dispatcher asked Defendant Costlow why trooper Berry had been to her home earlier in the day.

103. Defendant Costlow told the 911 Dispatcher that trooper Berry had been to her home earlier that day because he was investigating car break-ins in Defendant Costlow's neighborhood.

104. Car break-ins had occurred in Costlow's neighborhood, but they occurred several months prior and were investigated not by WVSP, but by the Monagalia County (WV) Sheriff's Department.

105. Following Costlow's 911 call, deputies with the Monongalia County Sheriff's Department responded to Defendant Costlow's residence for the domestic disturbance call.

106. Defendant Costlow told responding deputies that her fight with Kenny Ice, Jr. ensued after Ice saw text messages on Costlow's phone between Costlow and trooper Berry.

107. Deputies found Defendant Costlow suffered an injury to her lip and Ice had sustained a knife wound on his arm.

108. Defendant Costlow repeatedly asked Sheriff's Deputies to keep her name out of any police report.

109. Such a request by Costlow had earlier been honored by the West Virginia State Police, on March 6, 2013, when WVSP responded to a violent domestic disturbance call involving Costlow and Kenny Ice, Jr., and troopers agreed – at Costlow's request - to not write a report about the incident.

110. Defendant Costlow told Sheriff's Deputies a completely different story for trooper Berry being at her home earlier in the day.

111. Defendant Costlow told Sheriff's Deputies that trooper Berry had been at her home earlier in the day in order to investigate the theft of Costlow's laptop computer.

112. The theft of Costlow's laptop computer had occurred some three months earlier and was not investigated by WVSP, but by the Marion County (WV) Sheriff's Department.

10

113. On at least one occasion, Ballock's and Costlow's son overheard Costlow discussing with others her intention of getting Ballock fired from his job.

114. Ballock's and Costlow's son will testify that Costlow said her strategy to get Ballock fired from his job as an FBI special agent was to get Ballock's gun taken away from him.

115. During a court-mandated joint counseling session, Costlow admitted that she did, in fact, make these statements to others about trying to get Ballock's gun taken away from him and fired from his job.

116. Prior to Ballock's first court appearance before Magistrate Judge Hershel Mullins, Ballock's attorney explained to Mullins that the matter rightly belonged in Family Court and that WVSP troopers were inappropriately helping Costlow in her attempt to gain an advantage in Family Court.

113. Assistant Prosecutor Cindy Scott, Monongalia County (West Virginia) Prosecutor's Office, did not disagree.

114. Rather, Scott held up a West Virginia statute book, waved it before the Magistrate judge, and said (paraphrasing): "These are all the ways you can arrest someone in this state. If you want to find a reason to arrest someone, you can."

115. Assistant Prosecutor Cindy Scott told the Magistrate judge that WVSP troopers "dumped" the case in her lap.

116. The charges against Ballock were dismissed on April 7, 2016, and upon recommendation by the prosecutor, expunged on July 13. 2016, but not before great harm was done to Ballock and his rising career as an FBI agent.

117. In an attachment to the motion to dismiss criminal charges in Magistrate Court dated April 7, 2106, Defendant Costlow agreed that "she will not communicate any disparaging information or commentary to Scott Ballock's employer or place of employment..."

118. Defendant Costlow thereafter violated the agreements and communicated disparaging, outrageous lies to Plaintiff's employer.

119. Ballock has suffered negative repercussions at work, including being denied promotional and transfer opportunities, due to Defendants' abuse of the judicial system.

120. Since the filing of this action, specifically on Monday, September 25, 2017, as a direct consequence of the defendants' joint and several acts and omissions as alleged, Ballock was terminated as an employee of the FBI. The termination decision is subject to an appeal, but as of Monday, September 25, 2017, Ballock lost his base compensation as a GS 14, Step 6 Federal Employee, including the law enforcement authorized-overtime allowance, medical, vision and dental insurance, participation in the employee thrift plan including employer contributions, as well as his federal pension.

11

121. Plaintiff's professional and personal reputation have been harmed by Defendant Costlow's false statements.

122. Costlow has a long history of abusing the system:

    A. In February 2013, Costlow learned that Amy Fetty of Fairmont, West Virginia was providing Ballock with information which would be detrimental to Costlow's attempts to gain custody of her children (Fetty informed, among other items, that Costlow's boyfriend, Kenny Ray Ice, Jr. was a low-level drug dealer).

        (1) Costlow phoned Fetty nearly every day, attempting to dissuade her from talking to Ballock.

        (2) Costlow falsely told Fetty that Ballock was an FBI agent and he was attempting to build a case against her and have her arrested.

        (3) Ballock's divorce attorney asked Costlow's attorney to direct Costlow to stop tampering with Ballock's witness.

        (4) After several weeks of unsuccessful attempts at dissuading Fetty from speaking with Ballock, Costlow lodged a criminal complaint against Fetty in the Magistrate Court of Marion County.

        (5) Costlow alleged that Fetty was threatening to attack her. Fetty was arrested and charged with Assault.

        (6) The charges against Fetty were dismissed by the Magistrate Judge.

    B. On December 22, 2012, Costlow improperly committed her then- 11-year old son to Chestnut Ridge Hospital (a secure psychiatric ward) for the offense of misbehaving.

        (1) Costlow was frustrated by the child repeatedly asking to visit his father.

        (2) Prior to having the child improperly committed, Costlow phoned Ballock to express her frustration with the child.

        (3) Immediately prior to having the child improperly committed, Costlow told Ballock she was going to "solve this once and for all."

        (4) Immediately prior to having the child improperly committed, Costlow sent Ballock a text message which read, "I will get this solved with (child). I am very sad he is struggling so badly that he's a danger to himself."

12

(5) Against the Family Court's standard custodial orders, Costlow told hospital staff that they were not to notify Ballock of his son's commitment, and that if Ballock found out about the commitment, he was not permitted to visit.

(6) The minor child was confined at Chestnut Ridge's secure facility until the afternoon of December 25, 2012.

(7) The minor child, a gifted and talented student, varsity athlete, and all-around normal little boy, was ultimately deemed to have been improperly committed by Costlow and no follow up treatment was recommended by staff at Chestnut Ridge.

(8) The minor child shared with Dr. Cooper-Lehki that Costlow lied about his actions in order to have him committed.

C. In recovered communications between Costlow and Kenny Ray Ice, Jr., it was discovered that Costlow was threatening to have sex with other men then report to the hospital to falsely claim she had been raped by them.

D. In recovered communications between Costlow and Kenny Ray Ice, Jr., it was discovered that Costlow had threatened to plant drugs in Kenny Ray Ice, Jr.'s residence in order to get him arrested.

E. Costlow has on numerous occasions contacted police, generally involving domestic disputes with Kenny Ice, Jr.

F. Costlow has been deemed by police to be untruthful and manipulative with law enforcement during some of these encounters.

(1) During one encounter, police were summoned to the residence after Costlow had cut her boyfriend with a knife.

(2) Costlow's boyfriend, Kenny Ray Ice, Jr., had discovered evidence on Costlow's cell phone of her ongoing romantic relationship with trooper Berry.

(3) Noted in the police report, Costlow asked officers to keep her name out of the police report so as not to harm her Family Court case; police declined to do so.

(4) Costlow was repeatedly untruthful in Family Court and was once found in contempt.

G. Costlow once unilaterally postponed a scheduled Family Court hearing because, she said, she had suffered a stroke, become partially paralyzed, and lost sight in one eye following an elective surgery.

13

(1) Costlow later admitted that she misrepresented this claim to the court;
Costlow blamed her misrepresentation to the court on the drugs she was
administered following her elective surgery.

H. Costlow was alleged to have attempted to befriend the Family Court judge's wife in
an effort to influence Family Court proceedings.

123. Defendants Kief and Gaskins, who together conducted the WVSP investigation knew, or
had reason to know, from the recovered communications between Ballock and Costlow, that
Defendant Costlow had committed felony theft by misappropriating over $2,000 worth of her
estranged husband's government-issued equipment, including FBI ammunition, yet they pursued
no follow up action regarding this felony offense.

124. Defendants Kief and Gaskins, who together conducted the WVSP investigation knew, or
had reason to know, from the recovered communications between Ballock and Costlow, that
Defendant Costlow had engaged in illegal sexual conduct, yet they pursued no follow up action
regarding these felony offenses.

125. Defendants Kief and Gaskins, who together conducted the WVSP investigation knew, or
had reason to know, from the recovered communications between Ballock and Costlow, that
Defendant Costlow was illegally using controlled substances, including cocaine, Hydrocodone
(which Costlow referred to by its street name of "Bean"), and Adderall, yet they pursued no
follow up action regarding these felony offenses.

126. Defendants Kief and Gaskins, who together conducted the WVSP investigation knew, or
had reason to know, from the recovered communications between Ballock and Costlow that
Costlow was physically stalking and harassing the wives of multiple men with whom she had
illicit affairs yet they pursued no follow up action regarding these criminal actions.

127. Defendants Kief and Gaskins, who together conducted the WVSP investigation
knew, or had reason to know, from the recovered communications between Ballock and Costlow
that Costlow, while alleging she was receiving unwanted communications from Ballock, initiated
contact with Ballock during this same time period. In one text message the troopers possessed,
Costlow wrote to Ice, Jr., about Ballock, "Then later on help me mess with him (Ballock).
Please…By the way, the 'real Scott' line worked like a charm."

128. In an email message dated May 9, 2013, and possessed by the troopers, Ballock wrote to
Costlow, "Ellen, I received your barrage of text, email and phone messages from late last
night…"

129. In an email messaged dated July 2, 2013, and possessed by the troopers, Ballock wrote to
Costlow, in part, "(Ellen), Please don't send communications asking me to send the children or
my mom your love…"

130. Had Defendants Kief and Gaskins not had ulterior motives, and had they conducted an
actual investigation, they would have also learned the following:

14

131. By her own admission in recovered communications, Defendant Costlow is a skillful liar.

132. In recovered communications with Kenny Ray Ice, Jr., Costlow created and perpetuated a false story that she had once been violently raped and beaten by a stranger.

133. In recovered communications with Kenny Ray Ice, Jr., Costlow ultimately confessed that she had lied about being violently raped and beaten by a stranger.

134. Costlow used this false story, she wrote, to demonstrate what a skillful liar she is.

135. In recovered communications with Kenny Ray Ice, Jr., Costlow explains the techniques she uses in order to skillfully lie and fool others.

136. In these recovered communications with Kenny Ray Ice, Jr. regarding her skillful abilities to lie and fool others Costlow wrote, "I'm very smart. Sometimes too smart for my own good. Sometimes not smart enough for my own good. But the rough sex story is not true. Not at all. I made it up using parts of rough sex ideas I've seen."

137. In recovered communications with Kenny Ray Ice, Jr., Costlow threatened to irresponsibly call police on Ice for mundane matters.

138. Costlow wrote once, for example, "Switch phones dammit...If you don't switch phones I will call police...If you don't switch phones I will call police..."

139. On March 6, 2013, WVSP troopers responded to Costlow's home regarding a violent domestic dispute between Costlow and Kenny Ray Ice, Jr.

140. Costlow's minor child was present at the time of this incident.

141. The 911 dispatcher was informed by the caller that Ice, Jr. had weapons, and Costlow can be heard in the background of the 911 recording screaming, and throwing and breaking dishes.

142. WVSP troopers did not write a report regarding this violent domestic episode.

143. Ice, Jr. informed that WVSP troopers, at Costlow's request, did not write a report regarding this violent domestic episode because WVSP troopers did not want it to reflect negatively on Costlow's divorce and custody proceedings.

144. Defendant Kief informed Ballock that this failure of WVSP troopers to document its response to a violent domestic episode is not uncommon.

145. Defendants abused the judicial process, exercising powers they don't have, and ignoring duties they actually bear.

15

Case 1:17-cv-00052-IMK-MJA   Document 116-5   Filed 07/08/19   Page 41 of 235   PageID #:
1858
Case 1:17-cv-00052-IMK-MJA   Document 45   Filed 10/13/17   Page 16 of 30   PageID #: 401

146. As a direct and proximate result of Defendants' conduct, Mr. Ballock has suffered damages and losses entitling him to compensatory and special damages, in amounts to be determined at trial.

147. In addition to compensatory and special damages, Mr. Ballock is entitled to punitive damages against Defendants Kief, Berry, and Gaskins under 42 U.S.C. § 1983, in that the actions of the Defendants were taken maliciously, willfully, or with a reckless or wanton disregard of the Constitutional rights of Mr. Ballock.

148. This cause of action against the individual officers in their official capacity seeks to recover only to the extent they are covered by liability insurance and do not seek to cover tax payer payments.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Abuse of Process in violation of 42 U.S.C. § 1983
(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

149. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

150. 42 U.S.C. § 1983 provides that:

151. Every person who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress...

152. Plaintiff is a citizen of the United States and all of Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

153. Defendants Kief, Berry, and Gaskins, at all times relevant hereto, were acting under the color of state law in their capacity as West Virginia State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

154. Defendants Costlow, Gaskins, Kief, and Berry abused the judicial process by encouraging and causing the criminal charges and prosecution to be brought, not out of a belief that probable cause existed for their issuance, but rather for unconstitutional purposes and to attempt to punish Plaintiff and improperly assist Defendant in another judicial proceeding.

155. Defendants Gaskins, Kief, and Berry initiated and continued their efforts even after it was apparent that Plaintiff was innocent.

16

156. Any reasonable police officer knew or should have known of Plaintiff's rights at the time of the complained conduct.

157. All Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federal protected Constitutional rights.

158. The procurement and continuation of prosecution against Plaintiff was malicious, shocking, objectively unreasonable, and an abuse of the judicial process in light of the circumstances.

## SECOND CLAIM FOR RELIEF
### Malicious Prosecution in violation of 42 U.S.C. § 1983
(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

159. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

160. 42 U.S.C. § 1983 provides that:

161. "Every person who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress..."

162. Plaintiff is a citizen of the United States and all of Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

163. Defendants Kief, Berry, and Gaskins, at all times relevant hereto, were acting under the color of state law in their capacity as West Virginia State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

164. Defendants Costlow, Gaskins, Kief, and Berry encouraged and caused the criminal charges and prosecution to be brought, not out of a belief that probable cause existed for their issuance, but rather for unconstitutional purposes and to attempt to punish Plaintiff and assist Costlow.

165. Plaintiff's arrest was not supported by probable cause and the authorities continued his prosecution after it was apparent that he was innocent.

166. Plaintiff was seized pursuant to legal process that was not supported by probable cause and the criminal proceedings have terminated in his favor.

167. Any reasonable police officer knew or should have known of Plaintiff's rights at the time of the complained conduct.

168. All Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federal protected Constitutional rights.

169. The procurement of prosecution against Plaintiff was malicious, shocking, objectively unreasonable, and an abuse of the judicial process in light of the circumstances.

### THIRD CLAIM FOR RELIEF
### Violation of First Amendment Right to Seek Redress in the Courts
### in violation of 42 U.S.C. section 1983

170. Shortly after attempting to serve Defendants Kief, Gaskins, and Berry their copies of the original complaint, a uniformed representative with the West Virginia State Police appeared at the Clarksburg Resident Agency of the FBI to lodge a complaint with the Senior Supervisory Resident Agent about Plaintiff Ballock's filing of this civil suit.

171. During the meeting, on information and belief, the WVSP representative, on behalf of Defendants, sought to intimidate Ballock, sought to create problems for him with the FBI, sought to intimidate Ballock through this contact and his employer to withdraw the lawsuit, and sought to prevent Ballock from continuing to petition the Court for redress.

172. Defendants, in cooperation with the WVSP representative, were aware of Ballock's employment with the FBI, and each intended by these actions to wrongfully and intentionally damage that relationship with the object of pressuring Ballock to stop or withdraw his lawsuit.

173. Defendants further intended to use the appearance of law enforcement, and authority of the WVSP, to intimidate Ballock's employer into convincing Ballock to stop, or withdraw, his lawsuit.

174. These actions violated Ballock's Constitutional rights under the First Amendment to seek redress in the Courts for damage done to him and for violation of law.

### FOURTH CLAIM FOR RELIEF
### Abuse of Process under West Virginia State Law
(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

175. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

176. Defendants Kief, Berry, and Gaskins, at all times relevant hereto, were acting under the color of state law in their capacity as West Virginia State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

177. Defendants Costlow, Gaskins, Kief, and Berry abused the judicial process by encouraging and causing the criminal charges and prosecution to be brought, not out of a belief that probable

18

cause existed for their issuance, but rather for unconstitutional purposes and to attempt to punish Plaintiff and improperly assist Defendant in another judicial proceeding.

178. Defendants Gaskins, Kief, and Berry initiated and continued their efforts even after it was apparent that Plaintiff was innocent.

179. Any reasonable police officer knew or should have known of Plaintiff's rights at the time of the complained conduct.

180. All Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federal protected Constitutional rights.

181. The procurement and continuation of prosecution against Plaintiff was malicious, shocking, objectively unreasonable, and an abuse of the judicial process in light of the circumstances.

## FIFTH CLAIM FOR RELIEF
### Malicious Prosecution under West Virginia State Law
(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

182. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

183. Defendants Kief, Berry, and Gaskins, at all times relevant hereto, were acting under the color of state law in their capacity as West Virginia State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

184. Defendants Costlow, Gaskins, Kief, and Berry encouraged and caused the criminal charges and prosecution to be brought, not out of a belief that probable cause existed for their issuance, but rather for unconstitutional purposes and to attempt to punish Plaintiff and assist Costlow.

185. Plaintiff's arrest was not supported by probable cause and the authorities continued his prosecution after it was apparent that he was innocent.

186. Plaintiff was seized pursuant to legal process that was not supported by probable cause and the criminal proceedings have terminated in his favor.

187. Any reasonable police officer knew or should have known of Plaintiff's rights at the time of the complained conduct.

188. All Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federal protected Constitutional rights.

189. The procurement of prosecution against Plaintiff was malicious, shocking, objectively unreasonable, and an abuse of the judicial process in light of the circumstances.

## SIXTH CLAIM FOR RELIEF – Conspiracy
(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

190. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

191. The Defendants agreed, implicitly or explicitly, to commit the acts herein alleged.

192. The Defendants jointly operated to perpetuate the wrongful acts complained of herein.

193. The Defendants are jointly and severally liable for each of the wrongs.

## SEVENTH CLAIM FOR RELIEF
## Defamation in violation of 42 U.S.C. § 1983
(Plaintiff against Defendant Costlow, and Defendant Gaskins in his individual and official capacities)

194. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

195. Defendant Costlow's false written and verbal statements to police defamed Plaintiff and harmed his personal and professional reputation.

196. Indeed, her statements were intended to communicate that Plaintiff engaged in criminal behavior when he did not.

197. Defendant Costlow's written and verbal statements to police were knowingly false.

198. Defendant Costlow's written and verbal statements to police were statements of fact that are demonstrably false.

199. Defendant Costlow's written and verbal statements to police were made intentionally and with knowledge of their falsity.

200. When he prepared his official report, Defendant Gaskins knew, or should have known, that the statements provided to him by Costlow were false and defamatory.

201. Defendant Gaskins knew, or should have known, that Costlow's statements, regurgitated by Gaskins in his report, would cause harm, both personally and professionally, to Plaintiff.

202. As a direct and proximate cause of Defendants' intentional conduct, the plaintiff has suffered harm to his personal and professional reputation as a federal government employee (see e.g. ¶ 120), and other damages.

20

## EIGHTH CLAIM FOR RELIEF - Slander
(Plaintiff against Defendant Costlow, and Defendant Gaskins in his individual capacities and official capacities)

203. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

204. Defendant Costlow's false written and verbal statements to police defamed Plaintiff and harmed his personal and professional reputation.

205. Indeed, her statements were intended to communicate that Plaintiff engaged in criminal behavior when he did not.

206. Defendant Costlows's written and verbal statements to police were knowingly false.

207. Defendant Costlow's written and verbal statements to police were statements of fact that are demonstrably false.

208. Defendant Costlow's written and verbal statements to police were made intentionally and with knowledge of their falsity.

209. When he prepared his official report, Defendant Gaskins knew, or should have known, that the statements provided to him by Costlow were false and defamatory.

210. Defendant Gaskins knew, or should have known, that Costlow's statements, regurgitated by Gaskins in his report, would cause harm, both personally and professionally, to Plaintiff.

211. As a direct and proximate cause of Defendants' intentional conduct, the plaintiff has suffered harm to his personal and professional reputation as a federal government employee (see e.g. ¶ 120), and other damages.

## NINTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

212. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

213. Defendants, in their personal and official capacities, abused the judicial process in an effort to harm Plaintiff and unfairly benefit Defendant Costlow.

214. The conduct of all Defendants was so blatant and outrageous as to exceed all bounds of decency.

21

215. Defendants' actions inflicted severe emotional distress on Plaintiff and his children.

216. Defendants Kief, Gaskins, and Berry's decision to abuse the judicial process and encourage and support the prosecution of Plaintiff involved reckless disregard for basic community standards, shocked the conscience, and was outrageous.

217. Defendants conducted themselves with reckless disregard for inflicting emotional distress on Plaintiff and his children.

218. As a result of this breach, Plaintiff and his children have suffered actual emotional injuries or other damages and losses as described herein, (see e.g. ¶ 120), entitling Plaintiff to compensatory and special damages, in amounts to be determined at trial.

## TENTH CLAIM FOR RELIEF
### Tortious Interference with Contract (Employment)
(Plaintiff against Defendant Costlow, and Defendants Kief, Gaskins, and Berry in their individual and official capacities)

219. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

220. Shortly after attempting to serve Defendants Kief, Gaskins, and Berry their copies of the original complaint, a uniformed representative with the West Virginia State Police appeared at the Clarksburg Resident Agency of the FBI to lodge a complaint with the Senior Resident Agent about Plaintiff Ballock's filing of this civil suit.

221. Defendants, and each of them, were aware of Ballock's employment with the FBI and each intended, by these actions, to wrongfully and intentionally damage that relationship and cause harm to Ballock's employment relationship with the FBI.

222. Defendants had no justification or authority to cause these actions to take place, and such actions were likewise a violation of Ballock's Constitutional rights.

223. Plaintiff has suffered negative repercussions, and faces possible termination of his employment, (see e.g. ¶ 120), because of Defendant Costlow's outrageous defamatory statements.

## ELEVENTH CLAIM FOR RELIEF
### Tortious Interference with Contract (Employment)
(Plaintiff against Defendant Costlow)

224. Defendant Costlow was aware of Ballock's employment with the FBI and that her actions and conduct had caused an investigation of Ballock with his employer.

225. Defendant Costlow contacted the FBI and/or FBI investigators in or around May 2016.

226. Costlow intended to provide, and did provide, the FBI investigators with false information intended to harm Ballock, his employment, and his reputation.

227. Costlow further intended for Ballock to be terminated or suffer other damaging repercussions at his employment with the FBI.

228. Costlow's intentional lies and information were provided to the FBI without justification, and with the intent to cause harm to the contractual relationship between Ballock and his employer.

229. Costlow's conduct, including the lies she told to the FBI investigators, caused Ballock significant harm, prolonged the investigation, caused Ballock to spend substantial time and money, and damaged his relationship with the FBI and his future employment, and caused him to face possible termination due to Costlow's outrageous conduct, (see e.g. ¶ 120).

## TWELFTH CLAIM FOR RELIEF
### Defamation in violation of West Virginia State Law
(Plaintiff against Defendant Costlow)

230. Plaintiff hereby re-alleges and incorporates all paragraphs of this Complaint as if fully set forth herein.

231. Defendant Costlow contacted the FBI and/or FBI investigators in or around May 2016.

232. Costlow was aware that the investigators were seeking information regarding Ballock and whether the allegations, as alleged above, were true, false, or otherwise inaccurate.

233. Costlow repeated defamatory and disparaging statements about Ballock, made claims that he committed acts that he did not commit, and made other false claims concerning Ballock.

234. This includes, but is not limited to, the false and outrageous lies that Ballock threatened and physically abused Costlow.

235. Costlow knew that her statements about Ballock were false.

236. Furthermore, Costlow knew the statements would cause harm to Ballock and his employment with the FBI, and to his life.

237. Furthermore, the same lies and defamatory statements made by Costlow to the FBI investigators were thoroughly refuted by the court-appointed forensic psychiatrist, Dr. Christi Cooper-Lehki.

238. Dr. Christi Cooper-Lehki's report and testimony further proves and corroborates this claim and the facts above.

23

239. The false and defamatory statements made by Costlow did cause damage to Ballock and his relationship with his employer.

240. Ballock faces possible termination from his employment based upon Costlow's defamatory statements, (see e.g. ¶ 120).

241. Furthermore, the statements have cost Ballock damages in the amounts of costs, fees, and expenses related to proceedings caused by the defamatory statements of Costlow.

### THIRTEENTH CLAIM FOR RELIEF – Breach of Contract
(Plaintiff against Defendant Costlow)

242. In an attachment to the motion to dismiss criminal charges in Magistrate Court dated April 7, 2016, Defendant Costlow specifically agreed that "she will not communicate any disparaging information or commentary to Scott Ballock's employer or place of employment..."

243. Defendant Costlow violated the agreement shortly thereafter and told defamatory lies about Plaintiff to Plaintiff's employer.

244. The defamatory information Defendant Costlow provided to Plaintiff's employer has been thoroughly refuted by the court-appointed forensic psychiatrist, Dr. Christi Cooper-Lehki.

245. Plaintiff has suffered negative repercussions, and faces possible termination of his employment because of Defendant Costlow's outrageous defamatory statements, (see e.g. ¶ 120).

### FOURTEENTH CLAIM FOR RELIEF – Color of Law
(Plaintiff against Defendants Kief, Gaskins, and Berry)

246. Plaintiff was deprived of his Constitutional rights under color of state law and the actions of the West Virginia State Police and the Monongalia County (WV) Prosecutor.

247. The State denied the ability of Plaintiff to call the single most significant witness in the criminal case against him and to offer exculpatory evidence of Costlow's mental and emotional derangement which led to her false statements against Plaintiff.

248. The court-appointed forensic psychiatrist spent several months on her examination and said it was the most extensive effort she had ever undertaken.

249. At a hearing in Family Court on March 4, 2016, Plaintiff asked for the testimony and evaluation report of Dr. Christi Cooper-Lehki to be unsealed, as it was critical to his defense.

250. Cooper-Lehki's evaluation and testimony would have provided exculpatory and mitigating evidence, serving to detail Costlow's severe mental illnesses and, contrary to Costlow's assertions, outline evidence which confirms she was not a battered woman and nothing indicates she was ever abused by Plaintiff.

24

251. Assistant Prosecutor Gabrielle Mucciola of the Monongalia County (WV) Prosecutor's Office appeared at this hearing and, despite not knowing the full contents of the evaluation report and Dr. Cooper-Lehki's testimony (the information was under seal and Mucciola had not spoken with Cooper-Lehki) argued on behalf of Defendant Costlow that the information would not be of any benefit to Plaintiff's defense.

252. From the Family Court judge's order:

253. "It appears to this Court that the records in question would have minimal if any relevance to Mr. Ballock's criminal case. In reaching that conclusion, the Court found persuasive the arguments of the prosecuting attorney in the criminal case, Ms. Mucciola..."

254. The Family Court judge declined to unseal the evaluation report and Cooper-Lehki's testimony based upon the State's representations that it would not benefit Plaintiff and because, he said, its release would be highly embarrassing to Defendant Costlow.

255. In representing the interests of Defendant Costlow in Family Court and by denying Plaintiff access to critical defense information, the State violated Plaintiff's Constitutional rights.

256. The Plaintiff's defense was severely hindered by the actions of the State, whose appearance and arguments at a Family Court proceeding, in an effort to deny access to information critical to the defense, were outrageous, partial, and represented serious harm to the defendant, (see e.g. ¶ 120).

## REQUEST FOR DECLARATORY JUDGMENT

257. As part of a broader false narrative she provided in Family Court, Defendant Costlow falsely claimed to have been a battered woman.

258. Defendant Costlow falsely claimed, among other lies, that Plaintiff brutally beat her in front of her and Plaintiff's minor children.

259. Costlow was not a battered woman and was never physically assaulted by Plaintiff.

260. Even though Costlow tried to alienate and coach Plaintiff's young children during the custody proceedings, both children informed the court-appointed psychiatrist and their counselor that they have never witnessed Plaintiff harm Defendant Costlow.

261. Because of Costlow's false claims, the Family Court judge ordered that a forensic psychiatrist conduct a comprehensive custody evaluation, to include an assessment of Defendant Costlow's claims of being a battered spouse.

262. Defendant Costlow specifically requested the court appoint Dr. Christi Cooper-Lehki to conduct the evaluation because Cooper-Lehki is an expert in Battered Women's Syndrome.

25

262. The Court noted that it was appointing Dr. Cooper-Lehki because it wanted the very best evaluation and recommendation available.

263. Dr. Christi Cooper-Lehki is a psychiatrist at Chestnut Ridge Center and an Assistant Professor of Forensic, Child, and Adolescent Psychiatry at West Virginia University's School of Behavioral Medicine and Psychiatry.

264. Starkly contrasted with WVSP's "investigation" which consisted of interviewing Costlow only, Cooper-Lehki spent months conducting dozens of interviews, to include many hours of in-depth interviews with Costlow and Ballock.

265. Though WVSP troopers reviewed only limited correspondence provided to them by Costlow, Cooper-Lehki reviewed all correspondence between Costlow and Ballock.

266. At Costlow's request, the Family Court sealed Dr. Cooper-Lehki's findings.

267. At Costlow's request, the Family Court ordered that copies of the custody evaluation report are to be kept at Plaintiff's and Defendant Costlow's attorneys' offices and that neither Costlow nor Plaintiff are to be given a copy; review of the custody evaluation must be done at their respective attorney's office.

268. Costlow blatantly ignored the Family Court's order and secured for herself a copy of the custody evaluation report.

269. It is unknown how widely Costlow disseminated the custody evaluation report or with whom she has shared it.

270. The Family Court indicated that the records concerning Dr. Cooper-Lehki's findings may be unsealed at the request of another judicial body should the information be deemed relevant to court proceedings.

271. Dr. Cooper-Lehki's report and testimony are vitally relevant to the instant matter and directly support Plaintiff's allegations.

272. Defendants, who purposely avoided pursuing this matter in Family Court, should not be permitted to now hide behind the protective shield of Family Court.

273. The U.S. District Court, in making its own determination regarding the instant matter, should have access to these materials.

274. Additionally, Plaintiff's children, who were subjected to aggressive attempts by Defendant Costlow to alienate them from Plaintiff, deserve to know the truth should they ever inquire about this matter.

275. In the interests of justice, Plaintiff hereby requests a declaratory judgment unsealing the Family Court's custody evaluation report.

276. The report concerning Ellen Costlow was sealed at the request of Costlow in an attempt to prevent the facts and circumstances regarding her relationship with her children and her ex-husband, Ballock.

277. There is an ongoing and continuing dispute between Plaintiff and Costlow regarding the status of the report, having it unsealed, and having it disclosed.

278. The reasons submitted to the Court for protecting that information were not warranted, justified, or fair.

279. For example, Costlow intended to continue her campaign of false information with the intent to cause harm to Ballock, and, on information and belief, expected the sealing of the report to make such efforts more likely to succeed.

280. In addition, Costlow also intended to undertake actions to cause Ballock problems with his employer, and eventually provided false, defamatory and manufactured stories and information to his employer.

281. Costlow was able to do so only because, by having the report sealed, the true motives, intent and mental illness of Costlow would remain unpublished and unavailable for Ballock to use in order to disprove and discredit her falsehoods.

282. The report would not, and should not, have been sealed if all facts had been disclosed and the events which have taken place since the sealing were known at the time.

283. The sealing of the report likewise harmed Ballock, and unjustifiably protected Costlow, by concealing the truth of the circumstances regarding the divorce, the custody battle, the criminal charges wrongfully sought by Costlow, and other personal and legal issues.

284. Such harm continues through today, and will continue with the ongoing, unjustified and improvident sealing of the report.

285. Plaintiff Ballock is also unable to present the report to his children, and is thus prevented from presenting those children the truth regarding their family history, their relationship with their mother and their father, and the reasons and facts relating to and behind significant events in their lives.

286. This causes Ballock ongoing harm and emotional distress, and continues to harm his ability to raise his children in an environment of full truth and disclosure.

287. Defendant Costlow and her counsel have rejected repeated requests to unseal and provide copies of the report for Ballock to review and utilize in connection with ongoing proceedings at his place of employment (see e.g. ¶ 120), among other ongoing issues.

288. There is an ongoing dispute regarding whether or not the report should remain sealed or must be released.

27

289. Plaintiff Ballock seeks a declaratory judgment declaring his right to obtain an unsealed copy of the report for use in connection with his employer, his children, and all issues where Ellen Ruth Costlow is involved.

## JURY TRIAL DEMAND

290. Plaintiff demands a jury trial on all issues so triable.

## DAMAGES AND RELIEF

291. Plaintiff prays this Court enters judgment for the Plaintiff and against each of the Defendants and grant:

   A. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

   B. Economic losses on all claims allowed by law;

   C. Presumed damages for the harm to Plaintiff of rights that are difficult to quantify, including but not limited to violations of the right to be free from abuses of the judicial system;

   D. Special damages in an amount to be determined at trial;

   E. Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

   F. Costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

   G. Pre- and post-judgment interest at the lawful rate;

   H. Attorney fees as allowed by law and pursuant to 42 U.S.C. section 1983.

   I. Any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

   Respectfully submitted by Scott T. Ballock, by and through his counsel, this ___ day of

October, 2017.

/S/ Frederick R. Juckniess
Frederick R. Juckniess, Esquire
302 E. Liberty St., Suite 203
Ann Arbor, MI 48104

Phone (734) 707-1515

Rick@Juckniesslaw.com

*/S/ Charles J. Crooks*
Charles J. Crooks, Esquire
Crooks Law Firm PLLC
244 Pleasant Street
Morgantown, WV 26505

WV State Bar # 4633
Phone (304) 282-1039

Charles@crookslawfirm.org

29

Case 1:17-cv-00052-IMK-MJA   Document 116-5   Filed 07/08/19   Page 55 of 235   PageID #:
Case 1:17-cv-00052-IMK-MJA   Document 45-8   Filed 10/13/17   Page 30 of 30   PageID #: 415
1872

30

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**SCOTT T. BALLOCK,**

        Plaintiff,                       Case No.: 1:17-CV-52-IMK

v.                                      JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

        Defendants.

**PLAINTIFF'S IN-CAMERA SUBMISSION:**
**FBI DECISION TO TERMINATE EMPLOYMENT**

    The attached is a copy of the 20-page letter to Scott Ballock dated September 21, 2017 terminating Scott Ballock from employment with the FBI. This was received from Scott Ballock on Monday, August 21, 2018 and is part of the administrative proceedings concerning his termination.

    This was hand delivered to Judge Irene M. Keeley chambers on August 23, 2018.

Respectfully,

Charles J. Crooks / WV Bar # 4633
Crooks Law Firm PLLC
244 Pleasant Street
Morgantown, WV 26505
Cell: (304) 282-1039
Charles@CrooksLawFirm.org
*Local Counsel for Plaintiff, Scott Ballock*

*/S/ Frederick R. Juckniess*
Frederick R. Juckniess
Juckniess Law Firm PLC
302 E. Liberty St., Suite 203
Ann Arbor, MI 48104
Phone:  (734) 707-1515
Rick@juckniesslaw.com
*Lead Counsel for Scott Ballock*

EXHIBIT
39

**CONFIDENTIAL**                                 **PL 00031**



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

September 21, 2017

PERSONAL

Mr. Scott T. Ballock
Federal Bureau of Investigation
Clarksburg, West Virginia

Dear Mr. Ballock:

On April 10, 2017, the Office of Professional Responsibility (OPR) proposed dismissing you from the rolls of the FBI based on its finding that you: (1) harassed your then-wife by sending her unwelcome emails and texts despite her requests that you stop doing so, in violation of FBI Offense Code 4.8 (Other Misdemeanors); and (2) lacked candor under oath in your Signed Sworn Statement when you denied that you physically abused your wife, and when you asserted you ensured your emails and texts to her were "respectful and appropriate," in violation of FBI Offense Code 2.6 (Lack of Candor/Lying – Under Oath). As the deciding official in this matter, I have given full and impartial consideration to all documentation and evidence upon which your proposed dismissal was based, as well as your Written Response dated June 14, 2017 (117+ pages including exhibits and references), and your Supplement to Written Response dated September 14, 2017 (50 pages including exhibits).[1]  Based on a preponderance of the evidence, I conclude the allegations are substantiated.  Based on the circumstances of this case, for the efficiency of the service, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, I am dismissing you from the rolls of the FBI.

## FACTUAL BACKGROUND

At the outset, it is helpful to provide some context for the harassment and candor allegations at issue.  You and your Ex-Wife separated in 2012, and your divorce became final in May 2014.  The divorce was highly contentious and included a child custody dispute.

The investigative record contains evidence that during the course of your marriage, you and your wife repeatedly solicited strangers via the internet to come to your home to have sex with your wife, and that you videotaped some of these encounters.  One SSA who reviewed the emails and texts at issue concluded they reveal an "atypical marriage and corresponding sex life

---

[1] You waived your scheduled oral hearing.  No adverse inference has been drawn from this waiver.  It is noted simply for the sake of a complete procedural history.

**CONFIDENTIAL**

Mr. Scott T. Ballock

which if borne out to be true could provide embarrassing."[2] The "Custody Evaluation" (p. 4) attached to your Written Response as Exhibit 1 concluded that your Ex-Wife was not coerced to engage in these activities, but it discusses the texts, emails, and videos that confirm this activity took place. There is no evidence your Ex-Wife fabricated these activities or your role in them.

The allegations against you in this disciplinary inquiry do not directly concern these sexual activities, but the harassing communications at issue include insinuations that you intended to use this conduct against your wife in your child custody dispute. The SSA referenced above concluded you knew this conduct could prove "embarrassing" to your wife, and your emails suggested you intended "to leverage this embarrassment factor against [your] estranged wife in a custody battle." As discussed below, the Family Court Judge who presided in your child custody dispute stated: "In considering the parties' sexual behavior, the Court is not sanguine about the Father's role in that regard. At the very least, the Court finds the Father's apparent acquiescence in the Mother's sexual relations with other men to be a contributing factor." Again, it is important to emphasize that these sexual activities are not the subject of the misconduct allegations against you, but they provide context for understanding the harassment and candor allegations at issue.[3]

## I.  Harassment

On September 13, 2013, you were arrested at the Monongalia County courthouse on two misdemeanor counts of harassment and unwanted communications via computer. On April 7, 2016, the charges against you were dismissed pursuant to an agreement between you and the prosecuting attorney in which you: (1) acknowledged probable cause existed for your arrest; and (2) agreed not to contact your Ex-Wife for any reason, subject to narrow exceptions for any future hospitalization or foreign travel of your children.

### A.  Your Emails, Texts, and Other Communications

After you and your wife separated in September 2012, you sent her thousands of e-mails and text messages. These contacts included numerous communications intended to convince her to reconcile with you, as well as emails that were demeaning, insulting, or critical of her behavior. *See* 1A2 (DVD containing two files, one with 1,495 items and one with 1,843 items, consisting of emails, text messages, and photos).

Many of your communications were unwelcome. Your Ex-Wife viewed them as harassment, and she told you to stop sending them. For example, on September 29, 2012 (9:00am), your Ex-Wife accused you of texting her for seven hours the previous day. She complained these texts were "over the top," and she asked you to stop. You agreed (9:01am), stating: "Yes. Let's start now. See you..." However, the very next day, September 30 at

---

[2] Serial 1 (9/14/2013 email from the SSA to IIS attaching "Review prepared by SSA [name, division, phone number deleted], summarizing a review of an estimated 60% or more of the communications provided to the State Police by your estranged wife).

[3] Because you are not being disciplined for engaging in these activities, it is unnecessary to make findings regarding their frequency or your precise role in arranging, viewing, or videotaping these encounters.

2

**CONFIDENTIAL**                                    PL 00033

Mr. Scott T. Ballock

1:38am, you texted your Ex-Wife a derogatory message: "Black boots, Black coat, Black heart, Black soul."

On October 11, 2012, you emailed your Ex-Wife with the subject line "We broke our vows" and a photo of you standing alone at a church altar. Other emails contained in the file show close-up photos of you looking emotional, and perhaps crying.

On November 7, 2012, your Ex-Wife emailed you stating: "Scott, I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication." You responded the same day: "My correspondence has been polite and respectful. Calling it 'harassing' does not make it so. I am simply providing you with information and recommendations for the divorce process and the benefit of the children." As noted, however, the record shows that many of your communications went beyond "the divorce process and the benefit of the children."

In a January 12, 2013 email from your Ex-Wife to her attorneys, she requested a protective order against your excessive communications. She stated that in addition to your emails and texts, she received phone calls from you at all hours of the day and night. The email emphasized: "I'm tired of Scott's harassment, his control over my life through nearly constant communication . . . and these late night blocked calls. It's all outrageous because they cut into my ability to get the sleep I need. The late night blocked calls are almost always silent on the caller's end, but from time to time Scott will forget to block his number and that is why I am convinced he's the one behind the calls tonight. PLUS, you've read from other emails that he sleeps with his phone next to him at night, so it's easy for him to call six times in a row at 3 am." Although there is no evidence that your Ex-Wife's attorneys requested a protective order at that time, her January 12 email to her attorneys confirms the seriousness of her concerns.

By email dated April 26, 2013, your Ex-Wife again requested her attorneys to stop the harassing communications from you. This email references two internet accounts used by you and your Ex-Wife to invite men to have sex with her during your marriage while you videotaped the encounters.

> I consider Scott's actions harassment at this point. Please help me put a stop to his incessant emails where he's sending me excerpts taken from [the two internet accounts]. I have chosen to stop living a toxic marriage filled with physical, psychological, and sexual abuse. When Scott walked out Sept 14, I didn't let him come back home as I had in the past. I am seeking peace in my life from my abusive husband. I ask again for your help in stopping Scott's contact with me over this matter and any other matter unless it is of an emergen[cy] nature or deals strictly with decision-making with the children.

On May 1, 2013, your Ex-Wife sent you another email making clear your "harassing" texts and emails were unwelcome. She requested you to stop communicating with her unless it concerned the children, and she directed you to contact her attorneys about any other matter:

3

**CONFIDENTIAL**

PL 00034

Mr. Scott T. Ballock

Scott,

I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication. I specifically told you on April 29, 2013, to stop contacting me unless it is about the children and you need my input as a parent. If you have a question or concern about anything else, my attorneys can help you.

Your Ex-Wife's email included the names and phone numbers for her attorneys. The next day, May 2, you sent an email agreeing to limit communications:

I'm not trying to 'harass' you. I'm sorry you feel that way. I shared with you the email last night because it's so much like a TMLMTBGB play[4] and I hoped you would appreciate that.

I'm sorry I missed your calls last night. I tried returning them this morning.

I will, as you request, limit my conversations to discussion about the children. And I hope you will allow me to continue sending you regular updates about [our son].

Your Ex-Wife again requested her attorneys to send you a letter demanding that you cease all communications with her "not directly necessary for the care of [the] children." This request again reinforces the seriousness of her concerns. *See* 1A2. By letter dated May 3, 2013, your Ex-Wife's counsel advised you: "My client has informed me that you continue to send her harassing and threatening text messages and emails. Please be informed that you are to send to our office – and not Mrs. Ballock – all inquiries and/or communications not directly necessary for the care of your children. Any communications sent to Mrs. Ballock that we view as further harassment will be used in Court to substantiate her allegations of your continuing intentional infliction of emotional distress."[5]

Notwithstanding your Ex-Wife's repeated requests to you through May 1, as well as your repeated agreements to limit your communications to the care of the children, on May 3 at 8:29am, you emailed her in an effort to reconcile. Although the email references your son, it does not concern decision-making regarding your children, but instead uses your son as leverage in your unwelcome attempts to reconcile:

---

[4] TMLMTBGB appears to be a reference to a play called "Too Much Light Makes the Baby Go Blind."

[5] The investigative file does not contain the lawyer's letter to you, but the police report quotes from the letter. You have insinuated you never received it, but even if true, the emails and texts from your Ex-Wife herself make clear further communications from you were unwelcome unless they concerned decisions regarding your children.

4

**CONFIDENTIAL**                                          PL 00035

Mr. Scott T. Ballock

On May 15, you advised your Ex-Wife you might not be able to take the children on a planned vacation. When your Ex-Wife responded she could take them if you paid for it, you responded with a sarcastic email offering to pay for a vacation for your Ex-Wife and her boyfriend. Also on May 15, you sent an email stating: "I will not go through your attorneys for anything. Ever. As long as you have custody of [our daughter], I will make my requests directly to you. That is my privilege."

On May 16 and again on May 17, you emailed your Ex-Wife inviting her to take an out-of-town trip with you. You stated you wanted to "apologize" and "make amends," but that your Ex-Wife is "so filled with hatred and rage and insists like treating [you] like an enemy." You advised you will keep the reservations "in case [your Ex-Wife] realize[s] what a mistake [she is] making . . . ."

Again on May 17, you emailed your Ex-Wife the lengthy lyrics to a song about a failed marriage.

On May 25, you emailed your Ex-Wife to accuse her of creating a "false narrative" and asking her to "please call" if she is "fearful for [your] children's future," saying you both "owe it to [the children] to try to work this out and the first simple step is talking."

On May 28, you wrote your Ex-Wife accusing her of violating 18 U.S.C. 641 by stealing FBI property, including ammunition and other items. You assert your accusation is based on statements made by your Ex-Wife's ex-boyfriend.[6] Regardless of the legitimacy of the accusation, your email clearly violated your Ex-Wife's instruction to stop communicating with her. You emphasized: "Theft of government property is a matter we will be addressing immediately." Given the contentious nature of your divorce, and her repeated instructions to you not to contact her, the better course would have been for you to request that someone else in the FBI address the stolen property allegation. Your personal involvement in this matter, including your derogatory tone, undoubtedly exacerbated the pre-existing acrimony. If you had advised your chain of command of her repeated allegations of harassment and her repeated requests that you not contact her, the Division likely would have advised you not to become personally involved in addressing the stolen property allegation, and likely would have assigned someone else to the matter if necessary.

On May 28, in an especially hostile and acrimonious communication, you criticized your Ex-Wife for giving a lamp that belonged to your son to a "fuck buddy," calling her actions "disgraceful":

---

[6] The Division recently provided OPR your June 21, 2017 Security Incident Reporting System (SIRS) Active Incident Report (Serial 34), in which you assert that the ex-boyfriend advised you that: (1) your Ex-Wife gave him stolen FBI property; (2) the most expensive piece of FBI property he received was a megaphone; and (3) he was turning the property over to the local police.

6

CONFIDENTIAL

PL 00036

Mr. Scott T. Ballock

For all that you have done, for all the hurt and suffering you have caused, I was struck by your selfish decision to give your own son's cherished bowling ball lamp to a fuck buddy. I will let you explain to [our son] why you thought it would be ok to give away one of his prized possessions. [Our son] is all about family memories and his little treasures. For you to dishonor him is disgraceful.

Regardless of whether your allegation against her in this email is true, it plainly contravenes her repeated requests, and your repeated agreements, not to send her unwelcome emails and texts. This email was especially derogatory and demeaning, notwithstanding whether your underlying allegation was true.

On May 29, you sent your Ex-Wife an email accusing her of secretly videotaping a mutual acquaintance while the acquaintance was showering, and then showing the video to your Ex-Wife's boyfriend. You chastised your Ex-Wife for having a "sex addiction," asserting "[t]his keeps getting uglier and uglier." Even if true, the email again violates your Ex-Wife's instruction not to communicate with her about such matters. That same day, your Ex-Wife sent an email to her attorneys requesting them to bring harassment charges against you because your "constant threats, insults, and other abusive tactics are intolerable."

On June 19, you sent your Ex-Wife a particularly sharp email, asserting: "What are you and/or your idiot friends up to this time? Committing a felony by stealing from the FBI wasn't enough for you?"

The file contains more examples of unwelcome communications from you to your Ex-Wife despite her instruction to limit communications to decisions involving the children.

## B. The Criminal Investigation

On September 2, 2013, your Ex-Wife filed a formal complaint with the State Police against you for "harassing communications by cell phones and electronic communications devices." Her attorney provided the police a CD of approximately 3,000 e-mails and texts. A Corporal assigned to the matter stated he reviewed thousands of emails and text messages provided by your Ex-Wife's attorney and identified various communications as "harassment."[7]

FBI investigators interviewed the Corporal. According to the FD-302 (Serial 20), after his extensive review of your communications, the Corporal concluded you engaged in harassment, stalking, and threatening behavior:

During the investigation, Corporal [ ] reviewed numerous texts and emails between SA BALLOCK and [EX-WIFE] that were identified as harassment and stalking. Some communications included threats. A written statement was obtained from [EX-WIFE]. According to [EX-WIFE], she was seeking a divorce

---

[7] *See* the Corporal's FD-302, dated 04/14/2016 and Incident Report (Serial 1A5). The Corporal's Incident Report is incorporated into OPR's Report of Investigation in its entirety.

7

**CONFIDENTIAL**                                      PL 00037

Mr. Scott T. Ballock

from SA BALLOCK. When she left her husband, SA BALLOCK began continually following her and sending her communications via text and email containing threats.

According to reports from [EX-WIFE], SA BALLOCK placed ads on Craigslist for men to have sex with [EX-WIFE] at their home under [a fictitious] name [ ]. SA BALLOCK placed the ads and videotaped the sexual encounter. This type of activity originated when they lived in Indianapolis. [EX-WIFE] advised that safety was not a concern because SA BALLOCK "screened" the men before they arrived at the house.[8]

Corporal [ ] took the complaint and evidence to Assistant Prosecutor [ ] who agreed to file misdemeanor charges of Stalking and Harassment against SA BALLOCK. As a result, SA BALLOCK was arrested after a Family Court Hearing where Corporal [ ] knew he would be unarmed. SA Ballock was arraigned, processed, and released after his arrest. As a condition of his bond, SA BALLOCK ceased email and text communication with [EX-WIFE].

After SA BALLOCK'S arrest, [BALLOCK'S FATHER] created various websites and posted nude photos of [EX-WIFE] and began to post statements and pictures alleging the [] State Police falsely arrested his son. The postings occurred on the various websites [BALLOCK'S FATHER] created . . . .

The police report prepared by the Corporal concluded that a substantial number of emails appear to be pressuring your Ex-Wife to reconcile with you, and reflect "obsessive behavior in wanting the victim back." The report provides numerous examples of your "obsessive behavior" designed to persuade your Ex-Wife to reconcile.

The local Monongalia County Assistant Prosecutor reviewed the evidence from the Corporal's investigation and agreed to file misdemeanor charges in the Magistrate Court of Monongalia County, West Virginia, against you for harassment and unwanted communications by computer, in violation of West Virginia Code §§ 61-2-9a and 61-3C-14a(a)(2). In the Criminal Complaint signed by the Magistrate, the Corporal swore or affirmed to the Magistrate that you harassed your Ex-Wife via email and text notwithstanding repeated written communications to you by her and her attorney to stop contact.

As noted, on September 13, 2013, you were arrested at the Monongalia County courthouse immediately following your child custody hearing on the two misdemeanor counts of harassment and unwanted communications by computer.

More than two years later, on April 7, 2016, you entered into an agreement with the local prosecutor to dismiss the charges. You were represented by counsel when you agreed to the

---

[8] I note your Ex-Wife told FBI investigators that you did not screen the men. This discrepancy does not significantly affect the analysis.

**CONFIDENTIAL**

Mr. Scott T. Ballock

terms of the agreement.[9] In the agreement, you admitted, among other things, that probable cause existed to arrest you for harassing your Ex-Wife. The agreement, signed by you and your counsel, contains the following provisions:[10]

> 1. SCOTT BALLOCK acknowledges that probable cause existed for West Virginia State Police to file for the issuance of the warrants in this case pursuant to W.VA. Code 61-3C-14a and 61-2-9a.

\* \* \*

> 3. SCOTT BALLOCK agrees to cease, and not to initiate or reinitiate, if applicable, efforts to affect [EX-WIFE'S] personal reputation, employment, professional status or workplace relationships, and he agrees to discourage any other person purporting to act on his behalf to similarly cease, or not to reinitiate any disparagement of [EX-WIFE] on social media or other platforms of public communications. SCOTT BALLOCK also agrees to assist in removing any remains of disparaging social media postings by taking reasonable steps within his control to remove these postings, links or other social media communications.

\* \* \*

> 6. SCOTT BALLOCK agrees not to contact [EX-WIFE] by any means or for any reason other than to notify her by email of hospitalization of either child, or regarding either child traveling outside of the country.

You accused a State Trooper of having a romantic relationship with your Ex-Wife, which allegedly motivated the Trooper to arrest you in order to assist your Ex-Wife with her alimony and custody claims. You stated you based this accusation on information provided to you by your Ex-Wife's boyfriend, whom you elsewhere describe as a violent, low-level drug dealer. In other words, the purported source of this inflammatory allegation is a violent criminal whose veracity is obviously subject to serious question. The Trooper denied your allegation. The State Police investigated the accusation of the affair and determined it is untrue.

You also accuse the State Police and your wife of conspiring to have you arrested after a Family Court hearing as part of a plot to influence the outcome of that hearing. However, the record shows the State Police coordinated with the FBI regarding the arrest and advised the FBI it selected this time and location to ensure you would be unarmed to minimize the risk of violence. An internal FBI email dated September 13, 2013 states: "These are the representations of the [State Police] – as we discussed – they are concerned about the fact that he is [law enforcement] / the duress of the situation and the stress it will put him under / which is why they want to utilize the courtroom environment, away from work, unarmed, to effect the arrest" (1A5). These concerns were legitimate, as evidenced by an FBI email dated September 13, 2013 and a September 16, 2013 EC from your Assistant Director stating that pursuant to discussions

---

[9] *See* Serial 1A5, *Motion*.

[10] *See* FD-302, West Virginia State Police Corporal.

9

**CONFIDENTIAL**

PL 00039

Mr. Scott T. Ballock

with the FBI Deputy Director, your law enforcement privileges would be suspended. In its referral FC to the Inspection Division, CJIS observed that your arrest and related developments were of "notable concern" to CJIS and had been the subject of discussion and coordination with the FBI's Deputy Director and the AD, HRD.

Your Written Response (p.4.) notes the Family Court Judge expressed concern that your arrest was executed for "strategic" reasons related to the custody dispute. You fail to note, however, the judge was unaware that both the State police and the FBI had legitimate concerns regarding how you might react, and the State Police and the FBI coordinated on the arrest to ensure you would be unarmed. You are pursuing a civil suit against the State Police, and your Written Response includes a copy of your Amended Complaint against three State Troopers and your Ex-Wife. Although you have had an opportunity to review the file, which (along with OPR's proposal letter) shows the State Troopers coordinated with the FBI regarding the arrest, your filings in the civil suit fail to disclose the efforts by the State Police to coordinate the arrest with the FBI, and the legitimate concerns shared by the State Police and the FBI regarding the need to ensure you were unarmed when arrested to reduce the risk of violence.

## C. Your Ex-Wife's Allegations

According to her FD-302 (Serial 21), your Ex-Wife told FBI investigators during this disciplinary inquiry that she endured years of threats, intimidation, and abuse from you.[11] I am not making a specific finding regarding the veracity of each allegation she made, but the FD-302 provides relevant background and context.

Specifically, your Ex-Wife also described how you both arranged for men found on the internet to come to your home and have sex with her while you videotaped the encounters. These liaisons often made your Ex-Wife fearful for her small children. She also stated you would become angry if you were not satisfied with the video:

> [EX-WIFE] confirmed that throughout their marriage she and SA BALLOCK arranged for men to come to their home and engage in sexual acts with her. The men were recruited from Craigslist. The encounters were videotaped and maintained by both [EX-WIFE] and SA BALLOCK. [EX-WIFE] advised that she often was fearful of the encounters because her children were sometimes present in the home. The children stayed in their bedroom upstairs. SA BALLOCK stood outside their door to ensure the children were not exposed to the encounter. [EX-WIFE] confirmed that the men were not "screened" in any way before they arrived. [EX-WIFE] advised that she would try to look up real names and phone numbers on Google if they provided that information. She confirmed that SA BALLOCK did not screen the men before the encounter.[12] She explained that SA BALLOCK would become angry if the video did not

---

[11] The FD-302 references other serious allegations against you that need not be recited here.

[12] I note that in contrast, your Ex-Wife told police the men were screened by you. This discrepancy does not affect the analysis of the allegations at issue.

**CONFIDENTIAL**

PL 00040

Mr. Scott T. Ballock

capture the "shot" correctly or [EX-WIFE] was not "loud" enough during the activity.

Your Ex-Wife stated that after years of threatening behavior, she separated from you, which resulted in a "strained" relationship not only with you, but also your father, who then posted nude pictures of her on various websites. Your Ex-Wife also described harassing emails and texts she received from you after the separation:

> In addition to the information placed on the websites, SA BALLOCK sent [EX-WIFE] several thousand emails and more than 10,000 texts she described as harassing. Additionally, [EX-WIFE] has over 45 audio recordings in her possession of conversations between she and BALLOCK which contain various threats.[13] SA BALLOCK obtained a cell phone she used and had a private company conduct a forensic examination of the phone. She claimed that SA BALLOCK engaged in these types of activities to control and harass her. He also followed her around. She contacted an attorney and subsequently the West Virginia State Police regarding the harassment. [EX-WIFE] advised that there was an accusation that she was having an affair with [a State Police Officer] which she denies. [EX-WIFE] provided the emails and texts to the [State Police] investigator who eventually contacted the prosecutor and filed charges. SA BALLOCK was arrested. After his arrest, SA BALLOCK stopped sending [EX-WIFE] texts and emails. [BALLOCK'S FATHER], however, continued to post pictures and derogatory information about [EX-WIFE] on more than 10 websites. According to [EX-WIFE], this was in violation of their divorce and criminal agreements. [EX-WIFE] acknowledged that she may pursue criminal/civil action against [BALLOCK'S FATHER].

The FBI investigators specifically recommended review of the original notes located in the 1As. In addition to apprising FBI investigators of this information during this inquiry, your Ex-Wife recounted many of these accusations to the State Police during its criminal investigation of you, and they are set forth in the State Police report discussed above.

## D.  Your Response

You assert in your Signed Sworn Statement (SSS) (Serial 22) that your communications with your Ex-Wife were always "appropriate and respectful," and never "harassing":

> During our separation and divorce, I specifically requested and engaged in "written" forms of communication with [Ex-Wife] to ensure our conversations were documented - precisely so that my communications with her could not be misconstrued or misrepresented. Specifically because we were in the middle of contentious divorce proceedings, *I ensured that nothing I sent to [Ex-Wife] could be construed as anything but appropriate and respectful.* Most of these communications referenced issues or concerns with our minor children [ ]. I

---

[13] The file does not contain copies of these audio recordings.

‚ ‚

**CONFIDENTIAL**

Mr. Scott T. Ballock

received calls from [Ex-Wife] and I told her she needed to email or text me concerning the nature of her communication. I possess emails which demonstrate [Ex-Wife], despite her allegation that my communications were unwanted, actually wanted to communicate with me. [Ex-Wife] repeatedly initiated contact with me. Among other reasons, [Ex-Wife] contacted me to request that I help her secure employment with the FBI, to discuss issues with the children, and to discuss the possibility of reuniting and saving our marriage. I once woke in the middle of the night to [Ex-Wife] standing directly above me in my apartment; she had let herself in to talk to me. On another occasion, [Ex-Wife] called me in the early morning hours and asked that I meet her "at the mailbox" in front of her home to talk (I declined). I have printouts of her communications with me via FaceTime and as well as photos of herself she sent me during this time period. On at least one occasion, she initiated contact with me posing as our son [ ]. I did initiate communications, but usually referencing our children. *None of my communications were threatening or harassing.* (Emphasis added).

You assert that your Ex-Wife is mentally unbalanced and that during your separation, she abused prescription drugs; attempted suicide; exposed your daughter to a known child molester; mistreated the children in other ways; and planned to destroy your reputation and get you fired from the FBI in order to "gain lifetime alimony and full custody of the children."

You also cite the findings of a court-appointed psychiatrist that your Ex-Wife suffers from severe mental illness. You stated the psychiatrist concluded your Ex-Wife is an "unfit" and "abusive" mother, actively attempted to alienate the children from you, might be a sociopath, and "does not perceive reality correctly." You assert you were awarded full custody of the children, and your Ex-Wife's visitation rights have been revoked.

As noted, the Family Court Judge expressed significant concerns regarding your Ex-Wife's sexual behavior during the marriage and separation, but he also criticized your conduct as a "contributing factor" (9/20/13 Temporary Modification Order, at 3-4):

In considering the parties' sexual behavior, the Court is not sanguine about the Father's role in that regard. At the very least, the Court finds the Father's apparent acquiescence in the Mother's sexual relations with other men to be a contributing factor. The Mother alleges her behavior was coerced by the Father. The Court questions that. The Court notes many if not most of the Mother's encounters occurred outside the presence of the Father though most admittedly with his knowledge and apparent consent.

## ANALYSIS

### A.   Misdemeanor/Harassment

According to FBI Offense Code 4.8, employees are prohibited from "[e]ngaging in an act, other than one which has been specifically delineated in another offense code, which is considered a misdemeanor in the jurisdiction in which the act occurred."

12

**CONFIDENTIAL**

PL 00042

Mr. Scott T. Ballock

The West Virginia Code, Section 61-3C-14a (Obscene, anonymous, harassing and threatening communications by computer, cell phones and electronic communication devices; penalty.) states: "It is unlawful for any person, with the intent to harass or abuse another person, to use a computer, mobile phone, personal digital assistant or other electronic communication device to: . . . (2) Make contact with a person after being requested by the person to desist from contacting them . . . . Any person who violates a provision of this section is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $500 or confined in jail not more than six months, or both fined and confined."[14]

The evidence shows that, after having received numerous unwelcome electronic communications from you, your Ex-Wife repeatedly demanded that you stop contacting her unless necessary to address child-rearing issues. She repeatedly told you that your communications were unwelcome, with the narrow exception of communications about matters requiring her input regarding a parenting decision. You refused to comply with your Ex-Wife's repeated demands and continued to harass her via electronic communications. After enduring many more unwelcome communications, your Ex-Wife sought help from law enforcement. A State Police Corporal reviewed over 3,000 emails provided by your Ex-Wife's attorney and determined that many of the electronic communications were "harassment and stalking" in nature. A local prosecutor then reviewed the evidence and she determined there was enough evidence to charge you with two misdemeanor counts of harassment/stalking and unwanted communications by computer. My independent review of the emails, summarized above, confirms they were unwelcome and constituted harassment.

You claim you have emails from your Ex-Wife showing she welcomed your texts and emails, but you have provided no evidence that any such communications post-date her May 2013 instruction to you to stop sending her unwanted texts and emails. You also state you have emails from your Ex-Wife concerning your children, but these would not be especially probative given that your Ex-Wife made clear that communications about decisions involving the children were necessary, and not harassing or unwelcome. The very few communications you cite that occurred after May 2013 are relatively innocuous[15] and, more importantly, in no way rescind her instruction to you to stop your unwelcome, harassing communications.

You seem to take the position that an email is not harassment unless it threatens physical violence or is otherwise malicious on its face. In fact, multiple *unwelcome* emails constitute harassment where, as here, they contravene repeated instructions to stop sending them. The derogatory and insulting nature of many of your emails reflect an intent to harass or abuse.

The Division's *Douglas* Factors EC (pp. 8, 10) asserts the investigation "exonerates" you from the harassment allegations, but this conclusion is premised on the false assumption that

---

[14] In addition to WVC § 61-3C-14a (Obscene, anonymous, harassing and threatening communications by computer, cell phones and electronic communication devices; penalty), you were arrested for violating WVC § 61-2-9a (Stalking and harassment). I believe WVC § 61-3C-14a is more applicable to the facts presented.

[15] For example, you assert that on July 2, 2013, she told you to send her love to your mother and the children. Regarding certain purported communications, you provide no evidence whatsoever.

12

Mr. Scott T. Ballock

of this you try to hide from me. I don't know how you got that those things would not cause long-lasting damage. *Shall I move on to the physical abuse? The psychological abuse? How about the sexual abuse?*" (Emphasis added).

You to Ex-Wife (3:20 PM): "You do not need to move on to anything else. *I was wrong. I ask forgiveness.* I ask to move forward with you. Because, despite your anger and hatred right now, there is part of you that lives in me. There were magical times and a closeness." (Emphasis added).

Your Ex-Wife then wrote to you that you threatened her life and she would need "a long time to heal." You did not deny that you threatened her life, but instead responded you understood what she was saying:

Ex-Wife to You (3:37 PM): "Scott, There is too much history of hurtful actions. I changed the day you threatened my life. The next times you did it I became someone not like myself. I became a lonely, rejected, uncared for survivor. It's going to take me a long time to heal."

You to Ex-Wife (3:42 PM): "Ok. Thank you. I understand. Too much history. I am moving on then. Tonight, without you. If you begin to think of me and wish to end your date and come over, call me and I will come back to town."

Your Ex-wife's references to your having threatened her life were not an incidental comment, but instead her core message, as reflected in the assertion: "I changed the day you threatened my life." Your response -- "Ok. Thank you. I understand. Too much history." – is a clear acknowledgement that you did so.

On October 8, 2012, your Ex-Wife asserted you repeatedly strangled her and touched her in a sexual manner against her will. You did not deny her assertions but instead stated you were sorry, you "messed up," and you "drove [her] away":

**10/08/2012,** Ex-Wife to You (5:31 PM): "What is wrong is you fondling me at your apartment and in the emergency room. What's wrong is expecting to the point of nearly demanding I hug you when we drop off or pick up the kids."

You to Ex-Wife (5:34 PM): "Ok, I will stop again.[16] Please understand how difficult this is for me. To experience, to believe. It's unreal to me. It really is."

Ex-Wife to You (5:36 PM): "*It was unreal the first time you strangled me*. It was unreal when you didn't spend my 37th birthday with me and the kids at a campground [made] sad because you wanted to see KC. It was unreal when you told me you didn't want to be married as everything was loaded onto a moving truck (twice). *Need I go on?*" (Emphasis added).

---

[16] I note that your reply, that you will stop "again," shows this was not the first time you sexually harassed your Ex-Wife through unwelcome fondling. Your response is an unequivocal admission.

**CONFIDENTIAL**

**PL 00044**

Mr. Scott T. Ballock

You to Ex-Wife (5:38 PM): "*You needn't.*" (Emphasis added).

You to Ex-Wife (10:45 PM): Subject: *I'm sorry: "I know how much I messed up.*
But I'm sitting here in my cozy apartment, knowing where you are and what
you're doing and I'm surprisingly at peace with it. Because I know I drove you
away. Because I know I am responsible for tonight . . . . (Emphasis added).

In other words, in response to a clear and pointed assertion that you strangled your Ex-
wife, you did not question or deny it, but instead apologized that same day by saying:
"I'm sorry."; "I know how much I messed up."; and "I know I drove you away."

In short, although you stated under oath that the allegation you physically abused
your Ex-Wife is "false," the evidence establishes you likely physically abused your Ex-
Wife and threatened her life. This finding does not turn on a credibility assessment of
your Ex-Wife, but instead on your own admissions, apologies, and acquiescence in your
communications about the abuse.[17] You had a clear motive for lying in your SSS, given
the potential disciplinary consequences, and it is reasonable to assume you forgot that
you had admitted to the abuse in your communications with your Ex-Wife.

Your Written Response (p. 5) asserts your apologies and other communications were
simply a "coping mechanism" you adopted to minimize your Ex-Wife's "destructive reactions"
in view of her mental unbalance. This is demonstrably false. Your communications were filled
with attacks and insults that were in no way designed to assuage her. For example, you
described her by saying: "Black boots, Black coat, Black heart, Black soul." You told her "For
you to dishonor [your son] is disgraceful." You said she was "filled with hatred and rage" and
referred to "all the hurt and suffering [she] caused." You stressed "the ugliness you have
brought into all of our lives, the futures you have doomed us all to, through your self-centered
choices." You repeatedly stated you both could lose custody of the children, and you blamed her
"demons" for your plight, including tearing the family apart and the "resentment, anger, and
sadness the children will feel for the rest of their lives." And on and on. In view of these highly
derogatory and insulting communications, it is unpersuasive for you to explain your apologies as
part of an overall strategy to mollify her due to her mental instability.

## 2. The Nature of Your Emails and Texts

In your SSS (p. 2), you stated that after you separated from your Ex-Wife in September
2012, you ensured your emails and texts to her were respectful and appropriate:

During our separation and divorce, I specifically requested and engaged in
'written' forms of communication with [my Ex-Wife] to ensure our conversations
were documented – precisely so that my communications with her could not be
misconstrued or misrepresented. Specifically because we were in the middle of

---

[17] The record contains other evidence of physical abuse provided by your Ex-Wife to the police and FBI
investigators, but it is unnecessary to address that evidence because the strongest evidence comes not from your Ex-
Wife, but from your own emails and texts.

CONFIDENTIAL

PL 00045

Mr. Scott T. Ballock

contentious divorce proceedings, I ensured that nothing I sent to [my Ex-Wife] could be construed as anything but appropriate and respectful.

As shown above, however, during your separation you sent your Ex-Wife emails and texts that were disrespectful, sarcastic, and malicious. They included, among other things, derogatory references to your Ex-Wife and her "fuck buddy," highly charged accusations of criminal misconduct, and hostile characterizations of your Ex-Wife's actions. Your tone was often angry and acrimonious. Given the allegations in this inquiry, you had a strong motive to mischaracterize your texts and emails. Regardless whether any of your specific allegations against her were true, it is clear those communications were not "appropriate and respectful."

### 3. Your Written Response

The vast bulk of your Written Response is devoted to an attempt to show your Ex-Wife is mentally unbalanced and lacks credibility. The Written Response (p. 1) asserts she is the "sole source" of the allegations against you. This is incorrect. Nothing in my findings depends on her credibility. The findings in OPR's proposal letter and this final letter are based on independent record evidence, including your own communications, that in no way turn on her credibility. I am not "taking sides" in your contentious divorce, and in no way do I condone her behavior. The issue is not her behavior or whether her accusations are, as you put it, "unworthy of credence." Rather, the issue is whether you have engaged in misconduct. For the reasons set forth herein, the records shows you have.

Your written response (p. 9) also argues that others have described you as calm and low key, but these descriptions do not accurately describe your texts and emails to your Ex-Wife. The harassing nature of your communications does not involve a mere "difference of opinion" as you suggest, but is overwhelmingly shown by the communications themselves.

### 4. Conclusion

In sum, the record shows you failed to be fully forthright in your SSS regarding: (1) your physical abuse; and (2) the nature of your communications with your Ex-Wife. Based on a preponderance of the evidence, I conclude that you violated Offense Code 2.6.

## PENALTY DETERMINATION

When determining an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

### A. Harassment

The investigation establishes you violated FBI Offense Code 4.8 (Other Misdemeanors). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

17

**CONFIDENTIAL**

**PL 00046**

Mr. Scott T. Ballock

In mitigation, you have a positive service record and no prior disciplinary history, and your Division thinks well of you. You were under stress during your separation and divorce. The file also reflects other mitigators, which I have considered.

Notwithstanding the relevant mitigating factors, I find that severe aggravation is appropriate for several reasons. First, as a Supervisory Special Agent, you are held to a higher standard. The Bureau trusts its supervisors to represent the FBI professionally at all times, and to serve as an example for those they supervise. The FBI Offense Codes and Penalty Guidelines specifically cite "supervisory or high-grade status" as an aggravating factor.

Second, your arrest was reported by several local and national online media outlets, thereby harming the Bureau's reputation. The FBI Offense Codes and Penalty Guidelines cite "actual or potential harm to the FBI's reputation" as an aggravating factor.

Third, and most importantly, the harassment followed serious prior misconduct, including physical abuse and death threats against your Ex-Wife. By email dated July 29, 2015 to OPR and copied to the FBI's appellate authorities, the Director made clear: (1) he cares deeply about the issue of domestic violence; (2) OPR's penalties for domestic violence must "strongly promote both specific and general deterrence"; and (3) he fully supports dismissal for domestic violence where appropriate. He recognized victims frequently fail to seek relief because they fear additional abuse or the financial consequences if the abuser goes to jail or loses employment.

In sum, the record shows you do not possess the integrity, judgment, and self-control required to be an FBI Special Agent. Based on the circumstances of this case, I am dismissing you for your 4.8 offense.[18]

## B. Lack of Candor

The investigation further establishes you violated FBI Offense Code 2.6 (Lack of Candor/Lying – Under Oath). The standard penalty is dismissal. Offense Code 2.6 does not include a mitigated or aggravated range.

Based on the circumstances of this case, I am dismissing you for your 2.6 offense.

---

[18] The record contains evidence that in late-May 2013, you ordered a Bureau contractor to perform a database search of your estranged wife's boyfriend. The matter was handled as a performance issue. You dispute the allegation and contend the contractor misused the database to satisfy his own curiosity because he knew the boyfriend. You assert the contractor was your "subordinate" and you admonished him for misusing the database. Due to these conflicting accounts, I have not considered this incident in assessing a penalty.

18

**CONFIDENTIAL**

**PL 00047**

Mr. Scott T. Ballock

## CONCLUSION

In sum, a preponderance of the evidence substantiates that you violated Offense Codes 4.8 and 2.6. Your conduct, as set forth herein, represents a willful and intentional violation of Bureau rules and regulations. As a result, I am dismissing you from the rolls of the FBI. This action is necessary and warranted to promote the efficiency of the FBI.[19]

## APPEAL RIGHTS

If you wish to appeal, **within ten (10) calendar days following notification of OPR's *final* decision, you must forward a brief statement that you intend to appeal** to the Executive Assistant Director, Human Resources Branch, Federal Bureau of Investigation, J. Edgar Hoover Building, 935 Pennsylvania Avenue, Northwest, Washington, D.C. 20535-0001. You may also fax your notice of appeal to HRB's Office of Disciplinary Appeals at 202-324-9312. You will then be provided an opportunity to review the file and submit a brief based on a deadline set by HRB. Your division head must be notified at the time you file an appeal. If an appeal is filed for any action other than a dismissal, the OPR disciplinary penalty will be held in abeyance pending the appellate decision.

If you are appealing a suspension of fourteen (14) calendar days or less, the EAD, HRB, will decide the appeal. If you are appealing a suspension of more than fourteen (14) calendar days, demotion, or dismissal, the Disciplinary Review Board (DRB) will decide the appeal. The standard of review on appeal in examining OPR's factual findings and penalty is the substantial evidence standard of review. The penalty set by OPR cannot be increased on appeal by either the EAD, HRB, or the DRB. In the rare instance that the EAD, HRB, or the DRB identifies factors that require additional investigation and/or adjudication, the case will be remanded to the Inspection Division and/or OPR for additional action.

Should you wish to retain an attorney to assist you in your appeal, you must ensure that the enclosed forms are completed prior to disclosing any Bureau information to the attorney handling your appeal. If you and the attorney who will assist you have already completed and provided these disclosure forms to the Bureau in connection with this case, you do not have to re-submit them. You are referred to Corporate Policy Directive 0915D (Disciplinary Appeals Process) for additional details pertaining to appeals.

---

[19] You are admonished not to discuss this matter with anyone other than the Inspection Division's Internal Investigations Section (IIS), OPR, the Human Resources Branch's Office of Disciplinary Appeals (ODA), the Security Division, the FBI's Employee Assistance Program, the FBI's Ombudsman, or an attorney who has signed the appropriate Nondisclosure Agreement. Neither you, your attorney, nor anyone acting on your behalf should contact any witness or potential witness about this inquiry without first obtaining approval from IIS, OPR, or ODA. In addition, you are admonished that any redacted materials or other FBI documents you review in connection with this inquiry are the property of the FBI, and you are prohibited from photocopying or removing such documents from FBI space. You may take notes concerning the content of such material, but those notes may be used only to facilitate your participation in this disciplinary inquiry and for no other purpose.

19

**CONFIDENTIAL**                                               PL 00048

Mr. Scott T. Ballock

## REFERRAL TO OTHER DIVISIONS

In accordance with established policy, the results of this administrative inquiry will be shared with other divisions, as appropriate. Thus, a copy of this communication is being provided to the Security Division as it may be relevant to your retention of a Top Secret security clearance.

## NOTICE TO SEPARATED EMPLOYEE REGARDING
## FEDERAL EMPLOYEES HEALTH BENEFITS COVERAGE

Your Federal Employees Health Benefit (FEHB) coverage will automatically continue at no cost to you for 31 days after your separation. At that point, you may elect to enroll in OPM's Temporary Continuation of Coverage (TCC) in the Federal Employees Health Benefits program at your own expense. The website www.opm.gov contains additional information and rates for TCC.

Sincerely yours,

Candice M Will

Candice M. Will
Assistant Director
Office of Professional Responsibility

Enclosures

20

**CONFIDENTIAL**

PL 00049

**SWICK & SHAPIRO, P.C.**
ATTORNEYS AT LAW
1101 15ᵀᴴ STREET, N.W., SUITE 205
WASHINGTON, D.C. 20005

(202) 842-0300
FAX (202) 842-1418

October 3, 2017

**VIA EMAIL: Attn: Tracy Brown: tebrown@fbi.gov**
Bevereley Borgia
Unit Chief
Office of Disciplinary Appeals
Human Resources Branch
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535-0001

Re: <u>Scott T. Ballock</u>

Dear Unit Chief Borgia:

Attached hereto is the supplemental submission of Scott T. Ballock in support of his appeal of FBI OPR's decision to dismiss him from the Bureau's rolls. I submitted a request to review the investigative file and file a supplemental submission following that review on Mr. Ballock's behalf on September 28, 2017. However, rather than await the investigative file and a due date for his supplemental submission, Mr. Ballock requests that the attached submission be accepted in support of his appeal, and that his appeal be decided as soon as possible. As such, I do not anticipate a need to arrange to review Mr. Ballock's investigative file (which he and I both did when his case was with OPR), nor do I anticipate filing an additional submission on Mr. Ballock's behalf. If it is possible for Mr. Ballock's appeal to therefore be moved up on the DRB's calendar, that would be greatly appreciated.

Thank you.

Sincerely,

J. Cathryne Watson

EXHIBIT
40

**CONFIDENTIAL**                                                    **PL 00051**

October 3, 2017

**VIA EMAIL: Attn: Tracy Brown: tebrown@fbi.gov**
Disciplinary Review Board
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C.  20535-0001

Re:    **Scott T. Ballock**

Dear Disciplinary Review Board:

The following constitutes Scott T. Ballock's supplemental submission in support of his appeal of the FBI Office of Professional Responsibility's decision to remove him from the rolls of the FBI.  For the following reasons, that decision must be reversed.

OPR lawyers rely on lawyerly methods of investigation: narratives provided to them by others. Acknowledgment or denial of guilt or innocence. But lawyerly methods are not perfect and can be fallible. Numerous people have been exonerated of crimes, after having been imprisoned, because of faulty lawyering. Indeed, SSA Ballock was the victim of a false accusation and ultimately exonerated.[1]

Real life situations, particularly when reconstructed from the perspective of a person with an overriding desire to get someone fired, can be more nuanced and difficult to discern. For example, if you are told to stop abusing your wife, ask yourself how you would go about proving it is a falsehood, a fabrication. Would your first instinct be to utter a denial, or might you, instead, choose to ignore it as not worthy of debate? Should your ignoring the accusation be construed evidence of your guilt? The challenge is made even more difficult when the accuser has been formally diagnosed as mentally ill.

OPR wrongly rests its conclusions squarely on the allegations of Ellen Costlow, a vindictive ex-wife with an agenda, trying to sell a false narrative to harm her ex-husband, SSA Ballock. The allegations are especially reprehensible as it is impossible for a falsely accused person to prove a negative.

SSA Ballock's ex-wife is viewed by OPR as an honest, credible source when, in fact, she has been diagnosed as suffering from severe mental illnesses which manifest specifically in vindictive, malicious, manipulative, and deceitful behavior.

---

[1] On September 14, 2017, SSA Ballock, via counsel, submitted a supplemental submission of documents to OPR, and requested these documents and submission be incorporated into the record and taken into consideration.  In the event this submission has not been added to the record on appeal, that submission is attached hereto for consideration of SSA Ballock's appeal of OPR's decision to remove him.

**CONFIDENTIAL**                              **PL 00052**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 2

Despite Ellen's medically diagnosed mental derangement, OPR spends a significant amount of time dwelling on her unfounded and baseless allegations as though they are fact. OPR believes the ex-wife's mental illness is not a relevant issue for this inquiry, but clearly it is important to acknowledge the manifestations of her severe mental illness, or how Ellen behaves because of her mental illness.

Dr. Christi Cooper-Lehki (CCL), the court-appointed forensic psychiatrist, characterized Ellen as the single worst patient with whom she has ever worked – specifically because Ellen is so manipulative and deceitful and *actively seeks to harm others*. **CCL further testified that Ellen is intensely focused on trying to harm SSA Ballock.**

Dr. Christi Cooper-Lehki (CCL), the court-appointed forensic psychiatrist, is a nationally-recognized expert in Battered Women's Syndrome. CCL was appointed by the court precisely because of her expertise in these matters. CCL attested she found no evidence that Ellen was ever an abused woman.

CCL is a respected faculty member at West Virginia University's (WVU) School of Medicine and on the staff at WVU Hospital's psychiatric care facility. She has over 23 years of experience in Behavioral Medicine and Psychiatry and routinely works with criminal justice practitioners. Notably, Cooper-Lehki testified in court on behalf of an abused woman who shot and killed her husband as he lay in his hospital bed; CCL is no stranger to advocating for actual victims of domestic violence. OPR's expertise in domestic abuse and psychiatric matters is unknown.   Nothing in the record suggests OPR's expertise in domestic abuse is greater than CCL's; rather, the record reflects the opposite.

OPR based its conclusions on SSA Ballock's ex-wife's accusations and a review of limited, select materials.   In contrast, CCL conducted what she testified was the most exhaustive and comprehensive investigation she has ever performed as a forensic psychiatrist.

CCL spent hundreds of hours over the course of many months reviewing pertinent documents, and interviewing SSA Ballock, Ellen, the couple's children, their family members, friends, neighbors, teachers, acquaintances, and colleagues, both past and present.

CCL's inquiry spanned the lifetimes of her subjects. CCL had the benefit of observing the parties up close and personal over a meaningfully lengthy period of time. Because the children are still minors, CCL has continued her professional involvement in the case to the present day, over three years later.

SSA Ballock and his ex-wife were subjected to testing and hours-long interviews by CCL. CCL testified that she personally reviewed *every single* communication between SSA Ballock and Ellen, including those select few cited by OPR in its decision.

**CONFIDENTIAL**                                                                                   **PL 00053**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 3

CCL also personally listened to *every single* audio recording provided to her by Ellen (Ellen surreptitiously recorded all of her conversations with SSA Ballock from shortly before their initial separation).

CCL conducted in-depth interviews of SSA Ballock and Ellen following CCL's review of these materials. CCL also spoke with the children's counselor, as well as SSA Ballock's and Ellen's individual and joint counselors. CCL met and got to know well Ellen, SSA Ballock, and their children.

During the course of her investigation, CCL became intimately familiar with all parties. CCL had unfettered, unfiltered access to the parties and their histories, and was able to see the entire, overarching picture.

The court recognized the value of appointing a truly independent, unbiased, highly experienced professional. OPR, however, completely ignored the findings of the independent investigators in this matter, both INSD and CCL.

On September 13, 2013, CCL testified in Family Court as an expert witness.

CCL testified that, **contrary to Ellen's claims, Ellen was NOT a battered woman.** CCL, a recognized expert in the field of battered women, wholly disagrees with OPR's determination in this regard. OPR made no mention of CCL's findings in its decision. Failure to consider this relevant and determinative evidence was grave error on OPR's part, warranting reversal of its decision.

CCL testified that she found **NO EVIDENCE OF ANY ABUSE** directed toward Ellen by SSA Ballock. **Again, CCL's findings are at complete odds with OPR's, and conspicuously absent from OPR's report.**

Instead, CCL diagnosed Ellen as suffering from severe mental illnesses which manifest, among other ways, in her *inability to correctly perceive reality, and malicious, deceitful behaviors.*

**CCL believes that Ellen created a false narrative of abuse in order to harm SSA Ballock and advantage herself.**

CCL formally diagnosed Ellen as suffering from Borderline Personality Disorder, and Paraphelia, a strong desire to have sex with non-consenting beings, such as children and animals.

CCL testified that Ellen is **manipulative, vindictive, malicious, and a dangerous liar who works aggressively to hurt SSA Ballock and others whom she believes have wronged her.**

**CONFIDENTIAL**                                                          **PL 00054**

Scott T. Ballock – Supplemental Submission in Support of Appeal

Disciplinary Review Board
October 1, 2017
Page 4

**CCL did not view SSA Ballock's communications as threatening or harassing and was prepared to testify to this at SSA Ballock's misdemeanor trial.**

**CCL did not believe Ellen felt genuinely threatened or harassed by SSA Ballock's communications. Rather, CCL deemed Ellen's complaint to be another way to harm SSA Ballock.** CCL is expected to testify to these findings at SSA Ballock's upcoming civil trial.

CCL believes Ellen may be a sociopath. CCL said she did not administer a lie detector test to Ellen because she believes the test is unreliable on sociopaths who are so skilled at lying.

Though Ellen claimed that SSA Ballock routinely beat Ellen, including in front of their children, CCL, a skilled child forensic psychiatrist who interviewed the couple's children at length and worked closely with the children's counselor, testified **neither** child had **EVER** witnessed their father being aggressive toward their mother in any capacity. Ever. **Who better to be in a position to know of any violence committed against their mother than the children?** OPR completely ignored this evidence.

CCL testified that both children, however, shared with her and their counselor that they often witnessed Ellen's uncontrolled rage and violent outbursts, particularly directed toward the couple's minor son. Borderlines often engage in projection, the practice of defending themselves against their own negative behaviors by denying their existence in themselves while attributing them to others.

Based on these and other factors, CCL (as well as the children's counselor and the Guardian ad Litem) recommended that SSA Ballock be awarded full custody of the children. This recommendation was notable in that the State of West Virginia starts with the presumption that the mother should be awarded full custody of minor children and it is an extraordinarily heavy burden for fathers to overcome.

CCL, the children's counselor, and the Guardian ad Litem further recommended that Ellen be permitted visitation with the children *only* under the immediate and direct supervision of an independent monitor. CCL, the children's counselor, and the Guardian ad Litem all feared for the physical, mental, and emotional well being of the children should they be exposed to Ellen in even the briefest unsupervised setting.

From CCL's custody evaluation report, which was attached to SSA Ballock's Written Response to OPR's proposal for dismissal:

> Concerning is her [Ellen's] inability or *unwillingness to present accurate and honest information to her counselors; she has largely focused on presenting herself as a*

**CONFIDENTIAL**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 5

> *victim. Her identification as a victim prevents her from accepting responsibility for her own harmful or destructive actions.* Additionally, *she puts forth significant effort in her pursuit of civil charges against Tom Ballock and Scott Ballock, and more recently in criminal charges against Scott Ballock.*

If Ellen won't present accurate and honest information to a counselor, can it be believed she would present accurate and honest information to an investigator who might help her attain her goal--her ex-husband's job loss? For this reason, both the family court and the magistrate court ordered that Ellen not disparage SSA Ballock to his employer, two court orders which, not surprisingly, Ellen immediately violated.

Despite relying upon Ellen's false allegations for a substantial portion of its accusations, OPR did not undertake an effort to review CCL's testimony or to interview her. Indeed, OPR denied SSA Ballock's request to obtain a statement from her for submission written submission to the proposal for dismissal. OPR's refusal to allow SSA Ballock to include this in the record was unjustified, and can only be construed as prejudicial to SSA Ballock.

SSA Ballock offered to sign a release form and allow investigators to interview CCL. SSA Ballock also offered to provide OPR with a written statement from Dr. Christi Cooper-Lehki regarding these matters and her findings; OPR declined the offer.[2]

---

[2]An article on the topic of "BPD [Borderline Personality Disorder] Distortion Campaigns" can be viewed online at the following web address: https://angiemedia.com/2008/12/29/bpd-distortion-campaigns/#.WdKaA1tSyUk. From that article:

> One of the classic behaviors of a person suffering from Borderline Personality Disorder is the vilification campaign. The target is the person against whom the perpetrator Borderline conducts the vilification. The intent is to destroy the target's reputation and thereby destroy the target's relationships with family and friends, employers, co-workers, doctors, teachers, therapists, and others. The intent may even be to force the target to leave the community, put the target in prison, or even kill the target. As with so many things involving Borderlines and their typical inability to understand or respect boundaries, there really are no limits. They will use basically any means available to them to cause damage to their target, including denigration, endless disparaging remarks, fabrication, false accusations, and even teaching others (including their children!) to lie on their behalf as part of their vilification campaign...

**CONFIDENTIAL**                                        **PL 00056**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 6

---

What lies do BPs tell? Often they revolve around false claims of partner abuse, child abuse, perverse sexual behaviors, drug and substance abuse, mental illness, and criminal conduct. BPs tend to pick false accusations that are difficult to disprove. Although we supposedly live in a society in which people are "innocent until proven guilty", the reality is, that is not how people are treated. This is especially the case when accusations of sexual abuse, child abuse, and spousal abuse are involved. The victims of the distortion campaign often are treated as pariahs or even criminals, assumed to be guilty without any evidence whatsoever.

The perhaps surprising aspect of many of these defamatory statements is that they are not about the target at all. Often BPs are aware at some level that **they themselves** are doing these bad behaviors. So instead of taking responsibility for their own problems, they blame them on others. This behavior is known as "projection." (See Wikipedia: Psychological Projection)

For example, an emotionally and physically abusive BP female will falsely accuse her male partner of abuse. A typical example might be a distortion such as blaming him for an incident of physical abuse. She may tell others that her husband got mad at her, started yelling and screaming at her, and then slammed the door on her hand to break her finger. This might even be part of the truth. She'll get a lot of sympathy, people will think bad things about her husband, and she gains allies. That is, so long as nobody hears the full truth before they've been effectively brainwashed by her.

The full truth might be that she was very angry at her husband. She came at her husband with a knife while berating him loudly. (Reputable studies indicate that females use weapons to commit domestic violence more than males do.) She might have been drunk, or maybe was just irate. (Borderlines often have substance abuse problems and nearly always have trouble controlling their emotions — it is sometimes called "Emotional Intensity Disorder.") He may have then yelled "Stay away from me!", fled the room, and slammed the door behind him as he tried to get away. He was acting in self-defense trying to escape a bad situation the BP wife created. But she will reliably tell everybody that he screamed at her, slammed the door on her hand and broke her finger. She will portray it as a pattern of abuse by him, even though the real abuser is her. This is lying by partial truth and distortion. BPs excel at this. They are believed and seldom questioned because of their emotional intensity and conviction they exhibit while they repeat their lies.

**CONFIDENTIAL**                                    **PL 00057**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 7

**OPR's Charge:** Because SSA Ballock did not deny his ex-wife's limited-context statements sent via text message, he is obviously guilty.

**Answer:** False. Finding SSA Ballock guilty for not offering a denial to outlandish statements exhibits a propensity to confuse opinion with fact.

Trying to prove guilt by saying something *wasn't* said is flawed logic and is not reasonable proof of guilt. It's nothing more than an assumption and, in this case, a completely wrong assumption, with significantly more evidence supporting the opposite conclusion.

After more than 20-plus years of living with a mentally disturbed wife, SSA Ballock learned that it is useless to engage in argument (or denial) with Ellen because she only becomes more enraged. OPR summarily dismissed SAA Ballock's explanation. OPR's response demonstrates an ignorance of SSA Ballock's ex-wife's emotional dysfunction, how people learn to cope with Borderlines, and how mental health professionals advise others to deal with them.

SSA Ballock attended regular individual counseling sessions during and after this tumultuous time. Among other topics, the sessions focused on communication strategies, coping strategies, and addressing SSA Ballock's co-dependency issues.

Some of the strategies listed below are recommended by mental health professionals for persons dealing with loved ones diagnosed as Borderlines, or what are often defined as "High Conflict Personalities" (HCP). Traditional methods of communication are not effective, as a core component of BPD is affective instability, which generally manifests as unusually extreme emotional responses, irrational rage, unfounded feelings of victimization, and destructiveness.

See if you recognize SSA Ballock's employment of some of these strategies in the select few text messages OPR used to "prove" SSA Ballock beat his wife.

**The EAR Method**: when dealing with an angry, blaming Borderline individual, communicate first Empathy, Attention, and Respect.

**The JADE Technique:** when dealing with a Borderline who is making false accusations. AVOID justifying, admitting, deflecting, or explaining (JADE). Having a debate with a Borderline can actually have the counter-productive effect of reinforcing their biases, as they repetitively remember and state the facts from their own point of view. Thus, it is important to AVOID JADE... *DON'T* Justify, Argue, Defend, or Explain.

---

**CONFIDENTIAL**                                                      **PL 00058**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 8

Some other strategies provided by mental health professionals include:

**Stay calm:** Borderlines lack the awareness of how their own behavior contributes to an issue and are often inflexible and combative. While you will want to respond in kind (it's human nature), this will only escalate the situation. In fact, Borderlines will often try to upset you to validate their own feelings or opinions ("s/he is so emotional, I must be right!")

**Abandon logical arguments:** *Logic is useless on Borderlines.* Borderlines' power and sense of self come from feeling bad about themselves. Thus, arguing with them will never resolve the issue because the conflict stems from their personality, not the substance of the issue.

**Focus on the present/near future, not the past:** Borderlines do not learn from past behavior so focusing on what actually happened before is worthless. Likewise, focusing on the long-term has no resonance. Focus only on the present and near future when discussing how to move forward.

These strategies, pulled straight from the published literature, directly reflect techniques taught to, and often employed by, SSA Ballock.

**OPR's Charge:** Because SSA Ballock signed a document agreeing that probable cause existed for his arrest, he is guilty of the charges.

**Answer:** False. Probable cause does not equate to guilt. To suggest otherwise, as OPR did in this case, demonstrates a basic misunderstanding of the law. Behind the scenes, both police and prosecutors privately acknowledged to SSA Ballock's criminal attorney that they had erred in so quickly pursuing criminal charges against SSA Ballock. Having done so, however, they were reluctant to dismiss the charges for fear that SSA Ballock would pursue a civil lawsuit against them for malicious prosecution. They believed that SSA Ballock's agreement to this condition would preclude any civil lawsuit against the Troopers. Precisely because SSA Ballock recognizes that probable cause is not the same as guilt, he agreed to this stipulation. SSA Ballock never admitted guilt, nor would he ever do so in this case.

**OPR's Charge:** SSA Ballock physically abused his wife.

**Answer:** False, as supported by the court-appointed forensic psychiatrist who extensively examined SSA Ballock, his wife, and their children. Further confirmed by the Family Court judge who dismissed SSA Ballock's ex-wife's allegations of abuse. Further confirmed by the prosecutor who dismissed the case, the magistrate judge who granted the dismissal, and the circuit court judge who - with concurrence from the prosecutor - expunged the record. Most significantly, confirmed by the

**CONFIDENTIAL**                    **PL 00059**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 9

couple's two children who both shared with the professionals that their father is, and has always been, non-violent.

Despite Ellen's medically diagnosed mental derangement, OPR spends a significant amount of time dwelling on her unfounded and baseless allegations as though they are fact. Ellen, however, is a demonstrated and self-admitted liar.

On a recovered audio recording, Ellen tells her boyfriend that a story she had earlier shared with him about being brutally beaten and raped was, in fact, a lie. Ellen's lie about being violently raped had been so convincing that her boyfriend at first refused to believe it was actually a lie. Ellen let him believe the fake story for three days simply so she could demonstrate to him her superior skills at lying. Ellen said, "I'm clever. Damned clever." In recovered text messages, Ellen described to her boyfriend how she so convincingly tells lies - by sprinkling in bits of truth, weaving in actual events, and summoning emotions (such as tears). The rest of her text exchange, in her own words, dated May 10, 2013: "I'm very smart. Sometimes too smart for my own good. Sometimes not smart enough for my own good. But the rough sex story is not true. Not at all. I made it up using parts of rough sex ideas I've seen...I made it believable with emotion and a few details."

Ellen's boyfriend also shared that once, when he and Ellen were at odds, Ellen threatened to have sex with his friends and then falsely report to the hospital to say that she had been raped by them. Recovered text messages reveal Ellen's boyfriend warning his male friends about Ellen's threat to falsely accuse them of rape.

**OPR's Charge:** SSA Ballock violated the West Virginia Criminal Code 61-3C-14a and thereby committed a misdemeanor.

**Answer:** False. SSA Ballock was merely *accused* of this offense by a mentally-ill and vengeful woman on a mission to ruin his career, aided and abetted by the West Virginia State Police. SSA Ballock was never tried or convicted; he was merely *accused*. The charge that SSA Ballock violated the WV Criminal Code is false. An accusation and guilt are two different things. The prosecutor dropped the charge as soon as she heard SSA Ballock's side of the story, and a circuit court judge, with the prosecutor's support, approved the complete expungement of SSA Ballock's record. SSA

Ballock had a strong defense prepared and had every confidence he would have been found not guilty of the charge.

As noted elsewhere in this report, SSA Michael T. Smith, the INSD investigator, also determined there was no basis for the misdemeanor charge. As Smith wrote, **"The underlying predication of**

**CONFIDENTIAL**                                                          PL 00060

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 10

**unlawful harassment was not supported by the investigation's results."** (emphasis added) SSA Hambrick concurred with SSA Smith.

Lastly, SSA Ballock's criminal attorney believes the statute is unconstitutional as it requires no intent. SSA Ballock's attorney characterized the statute as a "gotcha" statute for police to use when they need to find a way to arrest someone.

**OPR's Charge:** You falsely accuse a WVSP Trooper of wrong-doing.

**Answer:** In the OPR report, there is a highly prejudicial attitude toward the WVSP, and an obvious dislike of SSA Ballock making accusations about its Troopers. A review of civil lawsuits against the WVSP shows they can hardly be relied upon for integrity and honesty. Their troopers' unethical actions have resulted in millions of dollars' worth of judgements or settlements. A 2003 report by the United States Commission on Civil Rights blasts the West Virginia State Police for its history of misconduct and brutality.[3]

The OPR report indicates WVSP investigated the allegation made by SSA Ballock against the Trooper "and determined it is untrue." SSA Ballock stands firm in his belief that his ex-wife and WVSP Troopers colluded to have him arrested so as to advantage Ellen in the divorce proceedings.

OPR did not obtain a copy of the WVSP investigative file, nor did it examine the results of any investigation into Trooper Berry. Instead, OPR simply took the word of a single trooper, a friend and colleague of the accused trooper no less, that the allegations were untrue. Why was no formal investigative report produced? SSA Ballock suspects that no report was produced because no report existed. WVSP has a Professional Standards unit whose mission is to investigate internal affairs and complaints. Was the allegation about Berry referred there? Or was the "investigation" simply a matter of Kief asking Berry if the allegation was true?

In preparation for his civil lawsuit, SSA Ballock submitted a FOIA request for information regarding any such investigation into Trooper Berry and received no response. SSA Ballock and the two attorneys who are now representing him on a contingency basis in his civil case strongly believe WVSP's misconduct will be borne out during the civil trial. OPR's reliance on the mere word of a lone WVSP Trooper is egregious error.

It strains credulity to believe that WVSP could have conducted an actual investigation into the matter without ever having interviewed the very persons who made the allegation in the first place (SSA

---

[3]This report can be viewed online at the following web address:
https://www.law.umaryland.edu/marshall/usccr/documents/cr122003006283.pdf

**CONFIDENTIAL**                                                      **PL 00061**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 11

Ballock and his father). OPR must know that it is standard procedure and, in fact, quite necessary, to ask the complainant for the details about her/his complaint in order to conduct a logical investigation. As is true in this case, a complainant often has much information and evidence to provide regarding the allegation. SSA Ballock is unaware of any FBI investigation in which the complainant was not asked what she/he knows about their allegation(s).

Additionally, Sergeant Kief angrily informed SSA Ballock only a few days after Kief first learned of the allegation against one of his Troopers that it was "untrue." This seems like an extraordinarily short amount of time to conduct a legitimate investigation into such a serious allegation against a Trooper, especially without the benefit of any information from the complainant. Unless, of course, your "investigation" consists merely of interviewing the accused, as happened here. In keeping with its investigative practice of obtaining only one side of the story, in its investigation into SSA Ballock, WVSP interviewed only the complainant.

OPR also failed to learn why the (now retired) local prosecutor dropped the misdemeanor charges against SSA Ballock. From the moment she was informed of the other side of the story (SSA Ballock's side), the lead prosecutor sought a way to end the criminal case against SSA Ballock.

The lead prosecutor told SSA Ballock's criminal attorney that she believed Ellen and the WVSP troopers did, in fact, collude to have SSA Ballock arrested. SSA Ballock's criminal attorney conveyed that the phrase she used was, "My boys have been misbehaving." The prosecutor told SSA Ballock's criminal attorney that it would be difficult to prove the collusion, however, because, she believed, the troopers would "cover for each other" and lie on the stand. SSA Ballock's criminal attorney has offered to serve as a witness and testify to his conversations with the lead prosecutor at SSA Ballock's federal civil trial.

For clarification purposes, the OPR report indicates SSA Ballock complained about Trooper Berry's affair with SSA Ballock's ex-wife after SSA Ballock's arrest. In fact, a cursory reading of the record will confirm that SSA Ballock's complaint/allegation was made many weeks before his arrest.

For unknown reasons, OPR questions SSA Ballock's use of information provided by "a violent criminal whose veracity is obviously subject to serious question." Obviously? OPR does not explain why it believes this person's veracity should be "subject to serious question." As veteran investigators well know, even violent criminals can provide valuable, accurate information. In fact, as was the case here, they are often in the very best position to know such things.

Here again, OPR does not know, or care to note for the record, the full story. SSA Ballock did not rely solely upon this individual's information. SSA Ballock independently uncovered evidence regarding this allegation. SSA Ballock also independently corroborated information provided by the individual, thus lending credibility to his claims. The individual voluntarily surrendered his iPhone

**CONFIDENTIAL**                                    PL 00062

Scott T. Ballock – Supplemental Submission in Support of Appeal

Disciplinary Review Board
October 1, 2017
Page 12

so that its contents could be downloaded and reviewed. The recovered communications independently corroborated most of what the individual attested to.

It is noteworthy that OPR, in supporting its rebuttal argument, questions the "obviously" questionable veracity of a witness, yet says elsewhere that the veracity of the primary accuser in this entire case against SSA Ballock - Ellen Costlow - is irrelevant.

It bears repeating that SSA Michael T. Smith, the INSD investigator, does not support OPR's findings or recommendations. Specifically, with regard to SSA Ballock's communications and the misdemeanor charge, Smith wrote:

> **The underlying predication of unlawful harassment was not supported by the investigation's results.**   SSA Ballock's extensive communications with his estranged spouse were intentional and consistently repetitive, but were not malicious or selfish. The investigation determined that SSA Ballock's communications were for the purposes of attempted reconciliation and notable concerns for the health and welfare of his two children.

(emphasis added.)

**OPR's Charge:** Your actions brought a large amount of unfavorable media coverage to the bureau.

**Answer:** This was not a public matter and need never have been one. Had Ellen brought the charge before the family court where it belonged, there would have been no publicity. It only became public because of the scheming machinations of a vindictive ex-spouse who wanted to cause SSA Ballock to lose his job. And, having been the spouse of a federal LEO for 20-plus years, Ellen knew enough about the FBI to know what that would require. When SSA Ballock and his wife would argue during their marriage, Ellen would occasionally end the argument by grabbing her neck and, in an exaggerated fashion, cry, "Oh look, you assaulted me. Now I'm going to have to call 911."

SSA Ballock's son told CCL and his counselor that he heard his mother speaking with others about her strategy for getting SSA Ballock fired - by getting his gun taken away from him. The couple's shared counselor will testify that Ellen admitted to this in a joint counseling session. In a recovered text message, Ellen wrote that she had "the upper hand in ruining (SSA Ballock's) career."

What little media coverage that did result is directly attributable to Ellen and WVSP. SSA Ballock did not cause, nor did he seek, the media coverage. SSA Ballock's reputation and career were significantly harmed by this event, and it is precisely why Ellen chose this course of action.

**CONFIDENTIAL**                                                                                    **PL 00063**

Scott T. Ballock – Supplemental Submission in Support of Appeal

Disciplinary Review Board
October 1, 2017
Page 13

Additionally, OPR's findings regarding media coverage is sharply at odds with both the truth, and INSD's findings. INSD investigator Smith wrote: **"There has been negligible reporting and no discernible impact on the reputation of the bureau."**

OPR does not say whether it views INSD's polar opposite findings regarding the media coverage merely a difference of opinion or a lack of candor.

For clarification purposes, two local television stations in Clarksburg, West Virginia (metropolitan area population: 68,761) and a local country radio station, K-Country 97, briefly mentioned SSA Ballock's arrest. The only reporting of the story which could be construed by OPR as "national" coverage, was done by a few fringe, or special-interest blogs, which can hardly be considered "major" news sources.

**OPR's Charge:** SSA Ballock lied about emails and texts to his ex-wife being "respectful and appropriate."

**Answer:** False. As explained in greater detail below, given the circumstances, the financial stress, the emotional stress, and the repeated attacks from his wife, SSA Ballock was, in fact, more respectful and his communications more appropriate than could be expected of anyone in such trying circumstances. SSA Ballock does not waver in his opinion that his communications were respectful and appropriate. In fact, considering the circumstances, SSA Ballock considers all of his communications more than appropriate. OPR may believe otherwise, but it would represent nothing more than a difference of opinion, not a lack of candor issue. SSA Ballock knew that investigators had full access to his communications. He was not trying to hide anything, but merely expressing his own opinion about them.

SSA Ballock's communications with his estranged wife did not occur under anything even remotely resembling normal circumstances. These communications - between estranged spouses involved in a contentious custody dispute - are, in fact, respectful and appropriate considering the great emotional and financial stress suffered by SSA Ballock. To wit:

**Financial stress:**
The Family Court judge called this divorce action the most expensive he had ever seen, and it essentially wiped out SSA Ballock's lifelong savings. Estimated costs totaled over $200,000, including:
  - The forensic psychiatrist's bill
  - The Guardian ad Litem's bill
  -Attorney fees

**CONFIDENTIAL**                                                              **PL 00064**

Scott T. Ballock – Supplemental Submission in Support of Appeal

Disciplinary Review Board
October 1, 2017
Page 14

Without SSA Ballock's knowledge, Ellen stole nearly all of the couple's savings, over $127,000, representing primarily savings for their children's future college education, from the family's bank account in violation of a court-ordered protective trust.

Ellen spent these family funds, in part, to purchase drugs, and to buy gifts for, and to financially support, her boyfriend.

Though all possessions in the marital home were subject to the court-ordered constructive trust, and Ellen was obligated to not dispose of anything, Ellen and her boyfriend admitted to stealing SSA Ballock's personal possessions as well as FBI-issued equipment, including ammunition which was kept in a basement safe. Ellen and her boyfriend gave away some of the FBI items, and sold other FBI items on E-Bay.

*SSA Ballock's communications should be viewed in the context of these extraordinarily stressful circumstances. Would any other person have acted as rationally and calmly given these same circumstances?*

**Concern for the children:**
The couple's son and daughter were both being seen by a mental health counselor and a court-appointed child forensic psychiatrist. Both the psychiatrist and the children's counselor determined that Ellen was coaching the couple's daughter, telling her what to say in counseling sessions and to others.

While in her custody, Ellen was unable to get the couple's daughter to school. School records reflect the child missed 16 days of school and was significantly tardy another 29 times.

Ellen was leaving the couple's children, then ages 9 and 11, at home alone and unattended overnight, in order to visit her boyfriend in another town.

Ellen was emotionally and physically abusive toward the couple's children. Both children shared their experiences and fears with the court-ordered psychiatrist and their counselor.
In order to punish him, Ellen had the couple's 11-year old son improperly involuntarily committed to a psychiatric care hospital over the Christmas holiday, on 12/22/2011. In violation of the court's standing orders, Ellen refused to allow the hospital's staff to notify SSA Ballock of the child's admission to the facility and so he spent his first 24 hours of confinement alone. The child was released from the facility late on Christmas Day and has refused to celebrate Christmas since this traumatic event.

**CONFIDENTIAL**

**PL 00065**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 15

The couple's son was incredibly distraught and distressed, particularly when in the custody of his mother. Once, when he was with her in her car, the child opened the door and "escaped" from the vehicle.

Both children shared with their counselor and the court-ordered psychiatrist that their mother was emotionally and verbally abusive, and regularly physically assaulted the couple's son. The couple's daughter said she was fearful of what Ellen would do next to the son.

On two separate occasions, while in the care of their mother, the couple's son called 911 after being physically assaulted by his mother. The child told his counselor that after the deputy left, his mother told him, "They can't do anything to me unless I leave marks."

The court-ordered psychiatrist and counselor determined that Ellen was sexualizing the couple's 9-year-old daughter.

At the same time she began sexualizing the couple's daughter, Ellen introduced and socialized the child with Karl Vincent Taylor, a convicted and registered sex offender who served time in federal prison for impregnating a 14-year old girl.

Ellen was routinely taking the couple's daughter to a local gaming/drinking establishment, to include late at night and on school nights.

*SSA Ballock's communications should be viewed in the context of these extraordinarily stressful circumstances. Would any other person have acted as rationally and calmly given the same circumstances?*

**Drugs:**
SSA Ballock's wife of 20+ years had broken up the family to begin dating a low-level drug dealer who was arrested and convicted for stealing a car and $10,000 cash from his employer.

In a recovered audio recording, Ellen is heard telling her boyfriend about being with him the first time she used cocaine. She also talked about using a bottle for a "chemical experiment" in what sounded like the production of backyard meth.

Ellen became addicted to and abused Adderall, Valium, and prescription pain medication Hydrocodone (which she referred to by its street name, "Bean").

*SSA Ballock's communications should be viewed in the context of these extraordinarily stressful circumstances. Would any other person have acted as rationally and calmly given the same circumstances?*

**CONFIDENTIAL**

PL 00066

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 16

**Alienation:**
The children's counselor and the court-appointed psychiatrist testified that Ellen was actively and aggressively attempting to alienate SSA Ballock's children from him. Ellen was aggressively attempting to turn the children against SSA Ballock.

Ellen was also, according to the court-ordered psychiatrist and the children's counselor, coaching the children how to lie to SSA Ballock and to their counselors.

*SSA Ballock's communications should be viewed in the context of these extraordinarily stressful circumstances. Would any other person have acted as rationally and calmly given the same circumstances?*

**Manifestation of Ellen's mental illness:**
During the course of her investigation, the court-appointed psychiatrist learned Ellen was physically stalking and harassing the wives of her former lovers. In one instance, Ellen sent a wife a videotape of her and the woman's husband having sex. Ellen sent the videotape to the woman's place of employment and included one of SSA Ballock's FBI business cards in the package.

While the couple's daughter was living with Ellen, there were repeated calls to 911 for violent domestic disturbances between Ellen and her boyfriend. In one incident, the responding deputy sheriff found Ellen with a swollen lip and her boyfriend with a knife cut on his arm.

In another instance, during the middle of the night, Ellen and her boyfriend were engaged in a physical altercation. Ellen yelled for the family dog to come rescue her. When the dog didn't rescue her, Ellen began screaming for the couple's then- 9-year old daughter to save her.

On more than one occasion, Ellen attempted suicide with the couple's daughter in the home.

*SSA Ballock's communications should be viewed in the context of these extraordinarily stressful circumstances. Would any other person have acted as rationally and calmly given the same circumstances?*

**Abuse of process:**
Ellen had her boyfriend's ex-girlfriend arrested and taken before a Magistrate judge because the ex-girlfriend was sharing with SSA Ballock information which would reflect negatively on Ellen in family court. Ellen told the ex-girlfriend, falsely, that SSA Ballock was an FBI agent who was trying to arrest her. When that didn't stop the ex-girlfriend from communicating with SSA Ballock, Ellen accused her of threatening Ellen, and she was arrested (the case against her was immediately dismissed). Ellen later apologized to the girlfriend, saying SSA Ballock had "forced" her hand.

**CONFIDENTIAL**                                    **PL 00067**

**Scott T. Ballock -- Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 17

Ellen undertook a meritless civil lawsuit against SSA Ballock and his father while the Family Court was in session. Ellen asked for the case to be dismissed once she had to answer questions about her false claims.

Ellen's misdemeanor criminal complaint should have been referred to Family Court, where matters are not public. But she wanted publicity and embarrassment for SSA Ballock.

The couple's child heard Ellen say that she was trying to get SSA Ballock's gun taken away from him so that he would lose his job. Ellen admitted to this in a joint counseling session.

Recovered text communications revealed Ellen was attempting to befriend the family court judge's wife so as to help her in the custody dispute.

Ellen was found in contempt of court by the Family Court Judge for violating a court order designed to protect the couple's daughter, less than a week after it was issued.

After the divorce was finalized, it came to light that Ellen had been involved in a minor fender bender and, with the assistance of a personal injury attorney, she recovered a financial award from the other driver's insurance company. Ellen failed to disclose this financial information to the court, as required for the purposes of dividing assets, in order to benefit herself financially.

SSA Ballock's communications should be viewed in the context of these extraordinarily stressful circumstances. Would any other person have acted as rationally and calmly given the same circumstances?

Considering all that SSA Ballock had to endure during this extraordinarily hostile divorce action (the Family Court judge referred to it in his orders as "scorched earth"), his actions and communications were, in fact, incredibly restrained. OPR cherry picked a few examples which it concluded were less than respectful and for this alleges SSA Ballock demonstrated a lack of candor warranting his dismissal. SSA Ballock made his statement regarding his communications knowing full well the actual communications were thoroughly reviewed by investigators, and does not waver from his opinion about them.

No less an authority than the court-appointed psychiatrist believed that SSA Ballock demonstrated extraordinary calm, restraint, and composure even though he and his children were being repeatedly attacked and harmed by a malicious individual out to ruin him.

Consider the totality of the extraordinarily demanding circumstances, the maliciousness and vindictiveness of Ellen Costlow (so stated by a forensic psychiatrist), the lack of corroboration of Ellen Costlow's allegations of abuse and the statements of people who knew both Ellen and SSA

**CONFIDENTIAL**                                                    PL 00068

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 18

Ballock. The only assertions of abuse originate with a mentally-ill vengeful ex-wife who has admitted her goal was to force SSA Ballock to lose his job.

During the course of the divorce proceedings, Ellen called 911 approximately a dozen times, mostly because of violent fights between her and her boyfriend. She is clearly not unfamiliar with or slow to call police for help. Not once during her 20+ year marriage to SSA Ballock, however, did she call 911.

Put yourself (or any normal person) in SSA Ballock's shoes during this nearly- two-year-long period of non-stop stress, life-changing turmoil, and continual hostility from a vengeful wife, suffering severe angst over the welfare of his children, and ask yourself if your actions and communications would have been as restrained as SSA Ballock's. In light of all the demands and pressures SSA Ballock faced, it is entirely unfair to characterize his communications as "abusive," nor can it rationally be believed that he lied when he called them, in his opinion, respectful and appropriate.

Again, even the INSD investigator believed "the underlying predication of unlawful harassment was not supported by the investigation's results..." OPR and INSD's findings regarding this issue are in polar opposition to each other. Do these polar opposite findings represent a mere difference of opinion or a lack of candor on one side or the other?

**OPR's Charge:** "You assert the state Family Court judge who adjudicated your custody issues viewed the timing of your arrest for harassment as a strategic decision to gain advantage in the child custody case. In fact, the WVSP contacted the FBI before WVSP executed your arrest...to ensure you were not armed."

**Answer:** Yes, in fact, the Family Court judge viewed the timing of SSA Ballock's arrest as a strategic decision to gain advantage in the child custody case. The judge wrote the following, which was not included in the OPR investigator's report:

> The Court was somewhat dismayed at the arrest of the Father on the day of the hearing on September 13, 2013. While the Court in no way condones any potential criminal behavior on anyone's part, **the Court has to believe the timing of the arrest represented primarily a strategic decision to gain advantage in this case. In that regard, the Court notes the Father's communications at issue occurred over several months with no apparent effort by the Mother to seek assistance from this Court or any other judicial body until the time of the hearing. This**

**CONFIDENTIAL**                                                                 **PL 00069**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 19

> Court almost certainly would have been willing to enjoin such communications by
> the Father if the Mother had raised the issue at any time.

(emphasis added.)

Additionally, what is the relevancy of the OPR author's comment that WVSP contacted the FBI? It
does not negate the judge's assertion that the timing of SSA Ballock's arrest appeared to be for a
strategic advantage in the custody dispute.  Nor does it negate the fact that the elaborate arrest
production by WVSP was conducted under false pretenses.

As for ensuring SSA Ballock was not armed, this was certainly merely pretense. SSA Ballock was
accused of a non-violent, misdemeanor charge, for which a summons would normally be issued.
WVSP's claim of concern for violence on the part of SSA Ballock was used to further Ellen's false
narrative before the family court, and is sharply undercut when one considers that SSA Ballock was
processed only a few hours later deep inside the Morgantown detachment - all while wearing his
fully loaded sidearm.

Even when he was arrested, SSA Ballock was described by all participants in only positive terms for
his professional, respectful demeanor.

**OPR's Charge:** SSA Ballock's ex-wife's sexual behavior is attributable to SSA Ballock.

**Answer:** False. SSA Ballock bears no responsibility for his wife's choices, decisions, or actions.
While the OPR report included a small portion of the Family Court judge's opinion, a great deal
more exculpatory commentary in the judge's opinion was omitted. Additionally, OPR neglected to
cite the forensic psychiatrist's findings that SSA Ballock was in no way responsible for his wife's
conduct.

Dr. CCL testified that she did not believe SSA Ballock was in any way responsible for his ex-wife's
sexual practices, partly because the ex-wife continued these same practices after the separation. OPR
failed to note the professional's findings.

**OPR's Charge:** You ordered a contractor to conduct a search of an FBI database system for his
benefit.

**Answer:** False. OPR wrongly uses this completely unfounded allegation to provide supporting
justification for its recommendation to dismiss SSA Ballock.

**CONFIDENTIAL**

**PL 00070**

Scott T. Ballock – Supplemental Submission in Support of Appeal

Disciplinary Review Board
October 1, 2017
Page 20

SSA Ballock never ordered anyone to do any such thing. It is not something SSA Ballock would ever do. SSA Ballock was completely unaware of the contractor's actions.

The subordinate who ran Kenny Ice in the National Data Exchange (N-DEx) system is David Pennypacker. SSA Ballock never directed, asked, suggested, or even hinted that Pennypacker should run a database check on Kenny Ice or anyone else.. Pennypacker did so to satisfy his own curiosity because he became aware of SSA Ballock's story and met Kenny Ice. When SSA Ballock learned Pennypacker had run Ice's name in N-DEx, he admonished him. SSA Ballock believes that if questioned, Pennypacker will confirm these events.

Though Pennypacker was aware of Kenny Ice he was not fully aware of the many other unsavory characters in whom SSA Ballock had a strong interest.

Pennypacker was not equally aware of Karl Vincent Taylor, the federally convicted and registered pedophile with whom SSA Ballock's estranged wife was socializing the couple's 9-year old daughter.

Pennypacker was not equally aware of Terry Satterfield, the operator of a local gaming and drinking establishment where SSA Ballock's estranged wife was taking the couple's daughter on school nights.

Pennypacker was not equally aware of Kenny Ice, Sr., or Conrad Ice, or Annie Ice, all Kenny Ice's family members, with whom SSA Ballock's wife and child were spending their time.

Pennypacker was not equally aware of Chris Berry, the trooper with whom SSA Ballock's estranged wife was alleged to be having an affair.

Naturally, SSA Ballock was highly interested in learning about these people and conducted open source searches into them on his home computer. SSA Ballock called pedophile Karl Vincent

Taylor's Federal probation officer to ask about Taylor. SSA Ballock then tracked down Taylor and interviewed him. SSA Ballock also interviewed Terry Satterfield and Kenny Ice, Sr.

Precisely because he is not one to improperly use his position as an FBI agent, during each and every one of those meetings SSA Ballock made certain to emphasize that he was simply a concerned father asking for information. It stands to reason that if SSA Ballock directed anyone to run Kenny Ice, SSA Ballock would have had them run these other people as well, *especially* the dangerous pedophile who was spending time with SSA Ballock's daughter. He didn't.

Additionally, Pennypacker ran Ice's name in the N-DEx database system in May or June 2013. That's because Pennypacker did not meet or become aware of Ice until then. SSA Ballock, however, had known of Ice since his wife ran off with him in September 2012 - a full nine months before

**CONFIDENTIAL**                                                    PL 00071

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 21

Pennypacker ran Ice's name in the N-DEx system. Should OPR check, it will see that neither SSA Ballock nor anyone else (presumably) ran Ice in the N-DEx system the entire nine (9) month time period (09/2012 to 05/2013) when SSA Ballock knew of Ice but before Pennypacker met Ice. Had SSA Ballock wanted to run Ice he had plenty of opportunity and time to do so, and Pennypacker was

SSA Ballock's colleague during this entire time period. But again, Pennypacker ran Ice because of his own curiosity after they met, not because SSA Ballock directed him to do so.

SSA Ballock's then-direct supervisor, Unit Chief Michael Haas, N-DEx, called SSA Ballock into his office in approximately October 2012, and informed him that agents/officers from three separate law enforcement agencies had contacted him about Kenny Ice. These law enforcement officers had learned of SSA Ballock's estranged wife's relationship with Kenny Ice and called his supervisor as a professional courtesy so that SSA Ballock could be warned of law enforcement's awareness of Kenny Ice, how dangerous he was, and how he might try to harm SSA Ballock. Haas suggested that SSA Ballock make sure he carried his firearm with him at all times as law enforcement suggested Ice might confront SSA Ballock at his home. Despite learning this disturbing information, neither SSA Ballock nor anyone else (presumably) ran Ice, through the N-DEx database system until Pennypacker ran him in May or June 2013.

**OPR's Charge:** SSA Ballock obtained a cell phone his ex-wife used and had a private company conduct a forensic examination of the phone.

**Answer:** False. The cell phone belonged to Kenny Ice, not SSA Ballock's ex-wife. Kenny Ice was the sole user of the cell phone. Kenny voluntarily offered his cell phone to permit a forensic review of its contents.

**OPR's Charge:** SSA Ballock's ex-wife sent an email to her attorneys requesting them to bring harassment charges against him.

**Answer:** Dr. Cooper-Lehki herself believes that Ellen did so, not because she felt threatened or harassed, but only to harm SSA Ballock.

OPR ignores the fact SSA Ballock's ex-wife's own attorneys refused to bring such charges before the Family Court, even though she requested they do so. Nor does OPR surmise or investigate why. After SSA Ballock's arrest, Ellen's newest attorney went out of his way to notify the Family Court, both verbally and in writing, that he was not even aware of the criminal investigation, and did not condone it. OPR also fails to note the timing of Ellen's seeking of charges - coming directly on the heels of learning that her boyfriend had provided SSA Ballock with highly damaging information

Scott T. Ballock – Supplemental Submission in Support of Appeal

Disciplinary Review Board
October 1, 2017
Page 22

about Ellen's activities, activities which were illegal and/or would greatly harm her efforts in family court.

OPR also neglects to note that Ellen's attorney dropped her as a client when she asked him to bring harassment charges against SSA Ballock. Ellen's attorney discontinued representing her when she got WVSP involved. The attorney's stated reason in his court filing: "The plaintiff and the undersigned have had a breakdown of communication that makes continued representation untenable."

**OPR's Charge:** A county assistant prosecutor agreed to file misdemeanor charges.

**Answer:** OPR fails to note in its report the assistant prosecutor's comments to a Magistrate Judge before the initial hearing. After SSA Ballock's attorney told the Magistrate Judge that the matter rightly belonged in Family Court and that his ex-wife was improperly using the judicial system to help her win a custody battle, the assistant prosecutor did not disagree. Instead, the assistant prosecutor held up a statute book, and told the Magistrate Judge (paraphrased), "These are all the ways you can arrest someone. If you want to arrest someone, you can find a reason." The assistant prosecutor then told the judge that WVSP had "dumped" the case in her lap. The judge looked at the assistant prosecutor and asked, "And now you're dumping it in my lap?" The assistant prosecutor responded by simply shrugging her shoulders. The assistant prosecutor's comments indicate this was nothing more than a rubber stamp process, with the assistant prosecutor relying entirely on the WVSP charge and conducting no other independent investigation.

The assistant prosecutor told SSA Ballock's attorney off the record that she did not want to prosecute SSA Ballock, but that Ellen refused to allow her to drop the charges "dumped" on her by WVSP. The assistant prosecutor told SSA Ballock's attorney that she actually attempted to convince Ellen to agree to drop the charges, but Ellen refused and threatened to file a formal complaint against the assistant prosecutor should she unilaterally drop the charges. SSA Ballock's attorney informed that the assistant prosecutor, who was planning on running for Circuit Court Judge in an upcoming election (she did), greatly feared a complaint by a "domestic violence victim" might appear to voters that she is weak on domestic violence issues. Interestingly, the assistant prosecutor believed that Ellen was surreptitiously recording their conversations to potentially use them against her.

Lastly, the charges were ultimately dismissed and expunged by a Circuit Court Judge upon the recommendation of the prosecutor's office.

**OPR's Charge:** OPR writes, "Your Ex-Wife stated that after years of threatening behavior, she separated from you, resulting in a 'strained' relationship not only with you, but your father also, who then posted nude pictures of her on various websites."

**CONFIDENTIAL**                                                    **PL 00073**

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 23

**Answer:** Again, OPR says it does not rely on the word of SSA Ballock's ex-wife for its decision to terminate SSA Ballock, but its report is littered with her (false) accusations, and used to support OPR's decision.

Regarding years of threatening behavior, see letter dated November 10, 2010, in which Ellen volunteers glowing praise of SSA Ballock. They are not the writings of an abused woman.

Ellen experienced absolutely no threatening behavior during the marriage. None. Her accusations against SSA Ballock are especially galling when one knows what her life was actually like. Ellen enjoyed a privileged life as a stay-at-home mother, whose husband arranged for regular maid service at their house so that Ellen could spend her time focused on the children and herself. Ellen controlled the family finances, spent her days as she pleased, vacationed several times a year, and wanted for nothing. When he arrived home each night, SSA Ballock took over the household duties as well as the care of the children because Ellen struggled with major depression. SSA Ballock admits that he contributed significantly to the failure of the marriage by neglecting Ellen's emotional needs and focusing essentially all of his attention on his career and his children. However, he was never threatening or abusive - to anyone.

Ellen's frivolous lawsuit against SSA Ballock and his father was filed on April 23, 2013, shortly preceding Ellen's initiation of harassment charges against SSA Ballock. Recovered text messages from Ellen revealed her goal for filing the lawsuit was to keep information which was embarrassing and damaging to her out of family court. Again, Ellen's ulterior motives were to help her in the custody dispute. When SSA Ballock's father filed a counterclaim and Ellen was forced to provide evidence and actually answer questions about her false accusations in formal court-required interrogatories, she refused, and her attorney made the request that the parties agree to dismiss the lawsuits - with prejudice.

*Douglas* **Factors:**
In what appears to be a perfunctory, boilerplate statement, OPR notes that it considered the *Douglas* Factors when coming to its decision. An honest review of the record, however, would seem to indicate OPR hasn't genuinely considered the *Douglas* Factors or given them their proper weight in this case. In a brief, three sentence paragraph, OPR writes, "In mitigation, you have a positive service record and no prior disciplinary history, and your Division thinks well of you. You were under stress during your separation and divorce. This file also reflects other mitigators, which I have considered."

OPR does not do justice when it fails to acknowledge the extreme levels of stress and extraordinarily difficult circumstances in which SSA Ballock found himself. Nor does the OPR report accurately reflect SSA Ballock's dedicated history of service and positive standing within the organization.

**Scott T. Ballock – Supplemental Submission in Support of Appeal**

Disciplinary Review Board
October 1, 2017
Page 24

As to the possibility of rehabilitation, OPR writes that rehabilitation is not possible. OPR does not elaborate as to why it believes rehabilitation is not possible. In yet another instance of polar opposite findings, INSD Investigator Smith believes that rehabilitation is not even required in this case. As to this specific *Douglas* Factor, Smith wrote: "N/A...exonerated by the investigation."

Since SSA Ballock's arrest over four years ago, he has led an exemplary life, excelling at his job, and serving as the sole caretaker, provider, and role model for his two thriving children. The misdemeanor arrest is the lone blemish on SSA Ballock's 49 years of life (he doesn't have even a speeding or parking ticket to his name).

SSA Ballock also, as recommended by the court-appointed psychiatrist, successfully completed a counseling program in which he addressed co-dependency issues. Rehabilitation is not impossible, as suggested by OPR; it is unnecessary.

<div align="center">

**Conclusion**

</div>

OPR notes in its summation that the director has taken a strong stance against domestic violence. *This incident does not involve domestic violence.*

SSA Ballock could not be more supportive of the director's position regarding domestic violence. SSA Ballock has worked for 23 years to bring justice to victims, including victims of domestic violence. In SSA Ballock's college masters program, his major area of study was "Peacemaking Criminology." He is universally described as a gentle, kind, mild mannered, soft spoken man. SSA Ballock serves as a strong role model for his daughter, and encourages her strength and independence. SSA Ballock drove his daughter to Washington DC for the Women's March specifically so she will never doubt that she is valuable and powerful. CCL's exhaustive investigation revealed SSA Ballock is the exact opposite of OPR's wildly inaccurate description of him.

Like the director, like most everyone in his profession, SSA Ballock views domestic violence as reprehensible. Equally reprehensible are false allegations of abuse, as these actions not only hurt the wrongly accused but also diminish the claims of the those who are truly victims. By giving credence to these false allegations of domestic violence, OPR unfairly and unjustly harms SSA Ballock and his innocent children.

It is telling that while she tried to find more, the court-appointed psychiatrist could find only one person on the entire earth who has ever accused SSA Ballock of being violent: an angry, vindictive, mentally disturbed ex-wife attempting to sell a false narrative in an attempt to cause harm and be awarded full custody of her children and lifetime alimony payments.

**CONFIDENTIAL**

Scott T. Ballock – Supplemental Submission in Support of Appeal

Disciplinary Review Board
October 1, 2017
Page 25

OPR is at stark odds with everyone else who has reviewed this matter. OPR's recommendation goes against the INSD investigator's findings and recommendation, against the findings of the field agents who actually met SSA Ballock and conducted the interviews, against the recommendation of the CJIS Division AD who worked with SSA Ballock and knew his story, against the court-appointed forensic psychiatrist's detailed and independently-supported findings, against the family court which exonerated SSA Ballock of the false abuse allegations, against the magistrate court which dismissed the misdemeanor case, against the prosecutor's office which not only initiated the dismissal, but concurred with the recommendation for complete expungement of the record, against the circuit court which expunged the record, and perhaps most poignantly, against SSA Ballock's unbiased, honest children who shared with the professionals that, in contrast to the false claims made against him, they have never seen their father behave violently and that, in fact, they have hardly ever heard him raise his voice in anger. Those children are now needlessly suffering even greater harm, ripped from their home and lives, because of OPR's decision.

Respectfully submitted,

_/s/ Scott T. Ballock_
Scott T. Ballock

Enclosure:     September 14, 2017 Supplemental Submission and Documentation to OPR

**CONFIDENTIAL**                                          **PL 00076**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SCOTT T. BALLOCK,

        Plaintiff,

v.

ELLEN RUTH COSTLOW,
STATE TROOPER MICHAEL KIEF,
STATE TROOPER RONNIE M. GASKINS,
and
STATE TROOPER CHRIS BERRY,

        Defendants.

Case No.: 1:17-CV-52-IMK

JURY TRIAL REQUESTED

### PLAINTIFF'S IN-CAMERA SUBMISSION: SCOTT BALLOCK'S SWORN STATEMENT GIVEN MARCH 12, 2018

The attached is a copy of the 15-page sworn statement dated March 12, 2018, given by

Scott Ballock as part of the administrative proceedings concerning his termination from the FBI.

This was received from Scott Ballock on Monday, August 21, 2018.

This was hand delivered to Judge Irene M. Keeley chambers on August 23, 2018.

Respectfully,

Charles J. Crooks / WV Bar # 4633
Crooks law Firm PLLC
244 Pleasant Street
Morgantown, WV 26505
Cell: (304) 282-1039
Charles@CrooksLawFirm.org
*Local Counsel for Plaintiff, Scott Ballock*

/S/ *Frederick R. Juckniess*
Frederick R. Juckniess
Juckniess Law Firm PLC
302 E. Liberty St., Suite 203
Ann Arbor, MI 48104
Phone: (734) 707-1515
Rick@juckniesslaw.com
*Lead Counsel for Scott Ballock*



EXHIBIT
41

**CONFIDENTIAL**

PL 00128

03/12/2018
Indianapolis, Indiana

I, Scott T. Ballock, having been duly sworn by Supervisory Special Agent (SSA) Jared J Garth, hereby make the following supplemental statement to SSA Jared J Garth and Assistant Special Agent-in-Charge (ASAC) Anthony Russo, whom I know to be SSAs of the Federal Bureau of Investigation (FBI), assigned to the Inspection Division and Indianapolis Division, respectively. My attorney in support of this matter, J. Cathryne Watson of the law firm Swick & Shapiro, P.C. in Washington D.C. participated in today's interview. In addition, my attorney Rick Juckniess, of the Juckniess Law firm in Ann Arbor Michigan, participated in today's interview by speaker phone. Mr. Juckniess represents me in a civil lawsuit I filed against members of the West Virginia State Police (WVSP) in the Federal District Court for the Northern District of West Virginia (Docket 17-CV-52).

I entered on duty (EOD) on 6/1/2003, as a Special Agent. My first assignment was to the Indianapolis Field Office. After approximately three years, I rotated to the Detroit Field Office, Ann Arbor RA. In August 2011, I transferred from the Detroit Field Office to the Criminal Justice Information Services (CJIS) Division where I served as a Supervisory Special Agent.

I understand this internal investigation was initiated on 09/26/2013. It was originally initiated after my arrest on 09/13/2013 by the WVSP and charged with the following misdemeanor counts: 1) Stalking-Harass/Credible Threat; and 2) Stalking-Harass/Credible Threat (4.8, Other Misdemeanors).

**Page 1 of 15**

**CONFIDENTIAL**                     **PL 00129**

**03/12/2018**
**Indianapolis, Indiana**

After my arrest, CJIS management altered the scope of my official duties. They also had me surrender by FBI firearm.

I understand the Inspection Division concluded its investigation on or about 08/29/2016 and transferred the results of the investigation to the FBI Office of Professional Responsibility (OPR).

On or about 04/10/2017, OPR proposed dismissing me from the rolls of the FBI based in its finding that I: (1) harassed by former spouse Ellen Costlow by sending her unwelcomed emails and text messages in violation of FBI Offense Code 4.8 (Other Misdemeanors), and (2) OPR's supplemental finding that beyond a preponderance of the evidence, I lacked candor under oath in my Signed, Sworn, Statement (SSS) dated 07/13/2016 because I denied ever having physically abused Ellen Costlow. This was adjudicated to be a violation of FBI Offense Code 2.6 (Lack of Candor/Lying- Under Oath).

On or about 09/21/2017, the Assistant Director of OPR issued a letter dismissing me from the rolls of the FBI. On 09/26/2017, I was walked out of CJIS.

I understand today's interview is a result of the decision made on 01/19/2018 by the FBI's Office of Disciplinary Appeals (ODA) to remand my case to the Inspection Division for additional investigation. I also understand the focus on this second interview is OPR's post hoc determination that I lacked candor under oath. I have been advised that the purpose of this interview is not to discuss the initial predication for the

**Page 2 of 15**

**CONFIDENTIAL**                    **PL 00130**

03/12/2018
Indianapolis, Indiana

internal investigation, which was the reason for my arrest on September 13, 2013.

I have been further advised of my rights and responsibilities in connection with this inquiry. **Should I refuse to answer or fail to reply fully and truthfully during this interview, I can expect to remain dismissed from the rolls of the FBI.**

SSA Garth began the interview by asking me to outline the history of my relationship with my former spouse, Ellen Costlow. I met Ellen Costlow in approximately September 1986. This was during my first week as a freshman in college at Indiana University. Ellen was a sophomore at Indiana University. I was eighteen (18) years old. She was nineteen (19). We started dating and in 1992, we married.

Ellen and I began our marriage with the mutual understanding neither of us wanted to have children. For me that changed after my sister had children. Although Ellen was reluctant to have children, she acquiesced to my plea to raise a family. We had two children, Tommy (now age 17) and Summer (now age 14). They currently reside with me in Indianapolis. In December 2017, my children and I moved to Indianapolis, and I started a job as a manager for the Kroger grocery company.

In 2001, our son Tommy was born. I believe shortly after his birth, our marriage began to deteriorate. Nevertheless, I tried to preserve our marriage.

**Page 3 of 15**

**CONFIDENTIAL**                                    **PL 00131**

03/12/2018
**Indianapolis, Indiana**

Shortly after my transfer from Ann Arbor, MI to CJIS in West Virginia, Ellen met an individual named Kenny Ice.   I believe it was in the summer of 2012 that she met Ice through the Craigslist dating site, "Women Seeking Men," or "Casual Encounters," or something to this effect.   In an ongoing attempt to hold our marriage together, I did not object to having an open marriage wherein Ellen dated other men.   Yet, after she met Kenny Ice, my relationship with Ellen deteriorated rapidly. Notwithstanding my efforts to preserve our marriage, on September 14, 2012, Ellen ordered me to leave our home in Morgantown, West Virginia. I complied with her demand.

SSA Garth shared with me and my attorney Cathryne Watson, the text and e-mail messages Ellen Costlow provided the FBI Internal Investigations Section in May 2016.  From the data shared with me, it appears these electronic communications were transmitted during a period of approximately six (6) months between September 13, 2012 and February 24, 2013.  I acknowledge during this time, I missed Ellen and desperately wanted to reconcile with her.  At the time, I did not want our marriage to end.

SSA Garth asked me about specific e-mails during this time frame, which former FBI OPR Unit Chief Timothy J. Dowling cited in his 04/10/2017 letter.  In this letter former UC Dowling proposed dismissing me from the FBI for the added charge of lack of candor.  In particular, SSA Garth asked me about the e-mails Ellen and I exchanged on or about 09/29/2012, 10/02/2012, and 10/08/2012.  In these specific exchanges, Ellen alleged I

**Page 4 of 15**

**CONFIDENTIAL**                                    **PL 00132**

committed sexual, physical, and psychological abuse. She claimed I touched her against her will, strangled her, and placed a gun to her head. I deny having done any of these things. Her allegations are completely false.

I had compelling reasons why, during this time frame, I did not contemporaneously respond to Ellen's e-mails with a denial. Ellen has been formally diagnosed with Borderline Personality Disorder. I learned from counselors that had I immediately denied her aggressive and false accusations, doing so would have escalated our conflict. I knew from the history of our relationship, denials to Ellen would routinely lead to escalations; she would feed off of our fight. During this same time period, while talking with her on the phone, Ellen would routinely and forcefully demand that I admit to abusing her. I always refused because I never abused Ellen. When I refused to admit to abusing Ellen, she would hang up the phone. Ellen would tell me that if I wanted to talk to her, which I desperately did, I would say aloud that I abused her. I never did even though it meant getting hung up on. I later learned that Ellen had been surreptitiously recording our phone conversations. I believe she hoped to use them in our divorce proceedings. Court-appointed forensic psychiatrist Dr. Christi Cooper-Lehki reviewed these phone conversations, as well as the text messages cited by OPR, and still stated that there is no evidence that Ellen was abused.

Prior to this interview, the FBI did not ask me about these text messages. Had they, they would have learned that when I

CONFIDENTIAL

wrote I would "stop again" I was referring to asking Ellen for a hug, not sexually abusing her. I never abused Ellen, sexually, physically, or psychologically.

When I wrote "You do not need to move on to anything else. I was wrong. I ask for forgiveness," I was not admitting to any abuse. I was purposely vague and did not admit to abuse. I simply said generally that I was wrong, hoping this would satisfy her need to blame me for her problems so we could move on in our discussion. Both she and I knew her accusations were false and I didn't want her to continue with that line of false attack. I also didn't want her anger and rage to escalate. Then and now I admit to contributing to the decline of our marriage, but not by abusing her, there was never any abuse, and so it was fair of me to say I was wrong and sorry. It was not an admission.

Similarly, when I wrote "You needn't [go on]" it was because I lived a lifetime of Ellen going on and on and on and on and on, about how I was to blame for her problems, about how she believed everyone else was to blame for her issues, and I didn't need or want to hear her meritless complaints yet again. Because her accusations were ridiculous and false, she didn't need to go on. This was not an admission of guilt. Again, I never physically abused Ellen, nor did I abuse her sexually or psychologically.

When I wrote, "I understand. Too much history" I was not admitting to physically abusing Ellen. I was simply saying that

**CONFIDENTIAL**

PL 00134

03/12/2018
Indianapolis, Indiana

I understood there was too much history between us. But that
history never included any physical abuse on my part.

I have never once admitted to Ellen's false accusations.
That's because they never happened. I was deflecting and de-
escalating, techniques both taught to me and learned from a
lifetime of having to communicate with an angry Borderline.

Prior to our separation, I attended individual counseling.
During the summer of 2012, my counselor, Kathie Gieselmanat
Phoenix Psychological and Counseling Associates, 4579 Buckhannon
Pike, #101, Mt. Claire, WV, telephone number 304-622-6404
provided me with various techniques for communicating with
Ellen. This included a system having the acronym JADE. This
stands for the notion that when dealing with a Borderline who is
making false accusations, one should never Justify, Argue,
Defend, or Explain in an effort to resolve conflict.  I used
this approach during our telephone, email, and text message
exchanges in the months following our separation.  My choice not
to contemporaneously deny Ellen's false accusations was an
attempt to abide by our marriage counselor's recommended
strategy and to avoid escalating an argument with Ellen. I have
provided email messages in which I adamantly denied Ellen's
false accusations.  **Exhibit 3**

About nine (9) months after I separated from Ellen, Kenny
Ice contacted me by telephone. Kenny Ice's telephone number is
304-288-8296. I believe he resides with Ellen at 55 Panola,
Fairmont, WV.  Ice first contacted me in May 2013. I agreed to
meet with him in person.  He shared with me all sorts of

**Page 7 of 15**

**CONFIDENTIAL**                              **PL 00135**

horrific details about Ellen. Most concerning was Ice's claim
that Ellen had been socializing our 9-year old daughter with a
convicted and registered child molester. Kenny also informed
that he and Ellen routinely fought in front of my daughter, that
Ellen was leaving our children at home unattended overnight,
that Ellen was abusing narcotics, and that Ellen had attempted
suicide with our daughter ·in the house. I believe I met Kenny
Ice on six different occasions between May and August 2013. We
also spoke on the phone on a few occasions.

I am including this information in my statement because I
believe it corroborates my assertions regarding Ellen's behavior
and lack of credibility she exhibited during the months after
our separation.  Because I had information that Ice was a low-
level drug dealer and I was not certain of his motives for
contacting me, I undertook actions to independently corroborate
his statements. Ice voluntarily surrendered his personal cell
phone to me so that I could hire a private company to
forensically examine it. The company was able to retrieve
several months' worth of information. Recovered text messages
and email messages between Ice and Ellen, as well as photos and
videos of Ellen that Ice surreptitiously recorded, corroborated
most of the information he told me. To prevent Ellen from saying
Kenny's testimony was coerced, I hired a private investigator to
interview Kenny separately from me. Despite this, and despite
the fact that Kenny reached out to me, Ellen still said that I
threatened to arrest Kenny if he didn't say these things. I have
provided copies of both interviews for OPR, as well as my notes

Page 8 of 15

**CONFIDENTIAL**                                    **PL 00136**

from speaking with Ice's father, Kenny Ray Ice, Sr.  I've also
included notes I took after conversations with Ice.  These are
**Exhibit 4.**

SSA Garth advised me the Internal Investigations Section
obtained a transcript of Dr. Christi Cooper-Lehki's testimony on
September 13, 2013 before the Monongalia County, West Virginia
family court.  I understand the Honorable Randal Minor released
a copy of the transcript to the FBI in support of this internal
investigation, and the court imposed a strict protective order
precluding me from obtaining a copy. I have also not been
permitted to review the transcript.

I was present for Dr. Christi Cooper-Lehki's testimony on
September 13, 2012 in Judge Minor's courtroom.  This was the
same day the West Virginia State Police (WVSP) executed a
warrant for my arrest.  During that family court hearing, the
court advised those present in the courtroom that the WVSP
intended to execute the warrant at the conclusion of the day's
hearing.  I was therefore somewhat distracted by my impending
arrest, which was a total surprise, at the time.  Nevertheless,
I do believe that I recall much of Dr. Christi Cooper-Lehki's
testimony, which the court relied on in part, to award me sole
custody of our children.

SSA Garth referred to my original signed, sworn, statement
(SSS) dated 07/13/2016.  In that SSS, I stated Dr. Cooper-Lehki
testified that Ellen was not abused and that she was not a
battered woman.  I agree a more accurate characterization of Dr.
Cooper-Lehki's testimony is that, in response to the court's

**CONFIDENTIAL**

inquiry, she found no evidence that I physically abused Ellen Costlow. Dr. Cooper-Lehki did not provide all of her significant findings about Ellen to the Family Court, and I encourage OPR to contact her to learn why Cooper-Lehki does not believe Ellen was an abused woman. Again, there exists absolutely no evidence that Ellen was physically abused, but lots of evidence that she is a manipulative liar intent on hurting me.

SSA Garth asked me whether I recall testimony regarding my use of a handgun during sex with Ellen Costlow. I do not recall stating I used my FBI issued Glock to penetrate Ellen's vagina during sex. I do recall discussing with Dr. Cooper-Lehki that I did, at Ellen's insistence, use a handgun to penetrate Ellen's vagina during sex. I did not, however, use my FBI issued weapon. This was not an instance of sexual or physical abuse. This was done not only with Ellen's consent, but at her request and insistence. This illustrates another one of my attempts to appease Ellen. Nevertheless, I believe it is possible Ellen may have convinced herself that her desire for this kind of intimacy was indicative of my having abused her.

When we lived together, I locked my FBI weapon in a safe we maintained in our home. I did own a personal weapon, which was a Glock 27. I kept this weapon under my bed. And I still own it. On one occasion, I recall Ellen asking me to use the weapon in order to arouse her. The weapon was not loaded with ammunition. Ellen had been diagnosed with a sex disorder. Although I recall I initially tried to persuade her not to use

**CONFIDENTIAL**

**PL 00138**

the weapon in this manner, I ultimately complied with her
request in my ongoing effort to appease and satisfy her.

I recall having a discussion with Dr. Cooper-Lehki sometime
after she testified on September 13, 2013.  Approximately nine
(9) months after the September 13, 2013 hearing, the court
awarded me full custody of our two children. Prior to the
court's decision, Dr. Cooper-Lehki had expected to testify a
second time. Yet, the court did not require her to do so.

During our conversation Dr. Cooper-Lehki described how sick
Ellen had become. Dr. Cooper-Lehki told me she had worked with
many violent individuals during the course of her career, but
Ellen was the worst patient she had ever met and attempted to
treat, specifically because Ellen was so malicious and
manipulative. Dr. Cooper-Lehki told me Ellen never showed any
remorse for her actions, constantly tried to manipulate people,
and purposely hurt people. Dr. Cooper-Lehki told me she believes
Ellen may be a sociopath.

Over the course of several years, Ellen met with four or
five different counselors. She switched counselors so often
because none could ever "fix" her. Ellen struggled with many
demons. She suffered from major depression, could not maintain
personal relationships, and had difficulty even functioning most
days.  She began counseling when we lived in Ann Arbor.
Michigan. Finally, she met a counselor in Morgantown, West
Virginia who told Ellen something she wanted to hear.  The
counselor persuaded her to believe that she felt threatened and
trapped by me...  I recall the day Ellen had that counseling

**Page 11 of 15**

**CONFIDENTIAL**                                   **PL 00139**

session.  She came home and was giddy.  She happily announced to me that she was an abused woman.  She said something like, "I finally have an answer." Ellen believed she finally had the answer for all of her problems, and it was me.

I believe she had the goal of seeing me fired from my job as a Special Agent with the FBI because she wanted to hurt me. I believe she wanted to see the FBI take my weapon away. My son Tommy heard Ellen say that she was going to get my gun taken away from me so that I would be fired. In a court-ordered joint counseling session with counselor Terry Laurita-Sigley, Ellen admitted to making this statement in front of my son. In a recovered text message, Ellen wrote to Kenny that she has the upper hand in ruining my career.

Both of my children feared Ellen because she would have frequent violent outbursts.  When the Monongalia Family Court awarded me full custody of our children, it also ordered Ellen's visits be supervised.  As a consequence, my son Tommy has not seen his mother in almost five (5) years, and my daughter Summer in almost three (3) years. Indeed, Ellen violated two separate court orders in speaking with the FBI. That is how motivated she is in trying to hurt me. This mentally disordered person believes I, not she, am responsible for the loss of her

CONFIDENTIAL

children, as well as every other problem she has, and she wants to punish me for it.

SSA Garth asked me about the e-mails and texts messages I referenced at the bottom of page two (2) of my July 13, 2016 SSS. In my SSS, I stated, "I possess e-mails which demonstrate Ellen, despite her allegation that my communications were unwanted, actually wanted to commute with me. These e-mails are now attached to this current SSS as **Exhibit 1.**

In my July 13, 2016 SSS, I also referenced electronic communications Kenny Ice provided to me. I recall I offered to include them in support of my July 13, 2016 SSS, but the interviewing agents did not want to accept a copy of them. I recall they said that if they needed them, they would ask for them at a later date. These electronic communications are now attached to this current SSS as **Exhibit 2.**

SSA Garth asked me one more time to clarify whether I was ever physically abusive toward my former wife Ellen Costlow. I was not. I was never physically abusive toward Ellen. Never. The fact that I did not immediately respond to the claims she made in e-mails to me in late September and early October 2012 is not a basis to conclude I lacked candor in my July 13, 2016 SSS.

I understand ODA has offered me the opportunity to take a voluntarily polygraph examination concerning the truthfulness of the information contained in this signed, sworn, statement, and

**Page 13 of 15**

**CONFIDENTIAL**                    **PL 00141**

in particular, on the question of whether I ever physically abused Ellen Costlow.  I also have been advised and understand that should I chose not to take a polygraph, no negative inference may be drawn from that personal decision.  Upon advice of counsel, I am declining to take a polygraph examination.

I have no other pertinent information regarding the aforementioned allegations.  I have been advised that I should submit any additional information of which I may become aware, regarding this inquiry, to the Internal Investigations Section (IIS)/Inspection Division (INSD) or to the Office of Professional Responsibility (OPR).

I have been given the opportunity to review this statement and make any changes prior to signing it.

I was instructed on 03/12/2018 not to discuss this matter with anyone other than the person(s) conducting this interview, representatives from IIS/INSD, OPR, the FBI Ombudsman, and/or an FBI Employee Assistance Program (EAP) Counselor.  I have been told that should I decide to discuss this matter with anyone else, I must first obtain authorization from the interviewer(s).

CONFIDENTIAL

**03/12/2018**
**Indianapolis, Indiana**

      I have read this statement, consisting of this and fourteen (14) other pages and it is true and correct.


                              _____
                               Scott T. Ballock


      Sworn to and subscribed before me on the _____ day of April, 2018, in Indianapolis, Indiana.


                                _____
                               SSA Anthony Russo


Witness:


_____
SSA Meredith A. Burke

**Page 15 of 15**

**CONFIDENTIAL**

**PL 00143**

January 8, 2019

**Via Electronic Mail: PChen@fbi.gov**
Pei Ling Chen
Unit Chief
Adjudication Unit 1
Office of Professional Responsibility
Federal Bureau of Investigation

**Re: <u>SSA Scott T. Ballock</u>**

Dear Unit Chief Chen:

Attached to this email are supporting materials.   They are:

      1.    Text File Summarizing Supporting Materials
      2.    August 12, 2013 Audio Recording
      3.    Example of Costlow Changing Text Sender
      4.    Confession Audio Recording
      5.    Monongalia County Sheriff's Office Summary of
           Phone Call from Kenny Ice

OPR's conclusions are based on allegations made by Scott Ballock's ex-wife, Ellen Costlow. Ellen has been diagnosed as severely mentally ill. Her allegations are false.

Ballock never abused Ellen, physically or emotionally. Ballock did not engage in the behaviors Ellen alleges.

Ellen is mentally ill and motivated by an intense desire to harm Ballock. Ellen created a false narrative in an attempt to secure the best possible outcome in a divorce and custody battle, to blame Ballock for her behaviors, and to harm Ballock.

Ballock again refers OPR to Dr. Christi Cooper-Lehki (CCL), the court-appointed forensic psychiatrist who conducted a months-long investigation into Ellen's allegations. As a forensic psychiatrist, Dr. Cooper-Lehki is highly trained and experienced in dealing with cunning mentally disordered offenders, where others (including misguided OPR attorneys) are not.

Dr. Cooper-Lehki is so accomplished in this field that she teaches the subject matter at West Virginia University's School of Medicine. She works with mentally disordered persons on a daily basis in both a psychiatric hospital setting and with the legal community in the field. She has been deemed an expert witness by the court. In its report, OPR misrepresents, mischaracterizes, and simply dismisses Dr. Cooper-Lehki's findings without ever speaking to her directly.

1



**CONFIDENTIAL**

**PL 00174**

Ballock once again requests the FBI interview Dr. Cooper-Lehki to learn first-hand her findings and conclusions and to answer its questions.

Dr. Cooper-Lehki is the one person who is most intimately familiar with all parties and the circumstances of this matter. Per the Family Court's directive, Dr. Cooper-Lehki oversaw and coordinated all aspects of the custody evaluation, working closely with the children's counselor, the Guardian ad Litem, and others.

Dr. Cooper-Lehki is an unbiased and highly regarded mental health professional. OPR's refusal to hear directly from Cooper-Lehki represents egregious error. OPR's second guessing of Dr. Cooper-Lehki's findings is unwarranted and baseless.

Dr. Cooper-Lehki's months-long investigation was the most extensive and comprehensive she has ever conducted. CCL interviewed dozens of people, read every exchange between Ballock and Ellen, and listened to every recording. She repeatedly interviewed Ballock and Costlow and questioned them at length.

Dr. Cooper-Lehki used her more than two decades worth of education, training, and direct experience to reach her conclusions with what she described as a high degree of medical certainty. OPR's findings are directly at odds with CCL's (as well as with the agents who conducted the initial investigation for this administrative inquiry).

**CCL shared only a very small portion of her findings in Family Court.** Likewise, she provided only a very small portion of her findings in her written evaluation. CCL spoke with Ballock and his attorneys on more than one occasion in person and via telephone, and provided additional information regarding Ellen and her mental disorders. CCL shared the following:

CCL, a noted expert in Battered Women's Syndrome, testified that she found **no evidence of any abuse directed toward Ellen. None. CCL believes Ellen's accusations against Ballock were fabricated, concocted to cause him harm.**

Ellen may have been able to dupe OPR into believing she was a victim, but she was not able to fool a forensic psychiatrist who routinely works with actual victims of abuse, as well as mentally disordered individuals who lie about being victims. CCL, who worked in concert with other mental health professionals on this case, believes that Ellen is exceptionally skilled at deceiving others. OPR was deceived.

OPR lacks CCL's mental health expertise, education, training, and experience dealing with the mentally ill. OPR possesses only a small fraction of CCL's knowledge and understanding of the circumstances surrounding this matter. OPR did not interview CCL. OPR did not interview the dozens of persons CCL interviewed. OPR did not review CCL's extensive work product. OPR did not review the volumes of material collected by CCL. OPR refuses to hear from CCL. Yet OPR somehow dismisses CCL's finding that **there exists no evidence of abuse.**

**CCL diagnosed Ellen as suffering from severe mental illnesses.** And yet this is whose story OPR chooses to believe.

CCL believes Ellen **may be a sociopath.** Sociopathy is a relatively rare personality disorder that manifests itself in such traits as dishonesty, charm, manipulation, narcissism, and a lack of both remorse and impulse control. And yet this is whose story OPR chooses to believe.

2

**CONFIDENTIAL**                                                           **PL 00175**

CCL was asked to characterize the extent of Ellen's mental illness. CCL volunteered that as a forensic psychiatrist she has worked with the worst offenders among us, including murderers and rapists. CCL said that **Ellen is the most dangerous patient with whom she has ever worked,** in part because of Ellen's intense desire to cause others harm, as well as her superior skills at lying, manipulating, and deceiving others. And yet this is whose story OPR chooses to believe.

CCL said Ellen **does not perceive reality correctly.** And yet this is whose story OPR chooses to believe.

CCL said Ellen suffered from **paranoid thoughts.** And yet this is whose story OPR chooses to believe.

CCL believes Ellen is extremely **manipulative, vindictive,** and **malicious.** And yet this is whose story OPR chooses to believe.

**CCL believes that Ellen is so devious and malicious, that she (CCL) was afraid for her and her own family's safety** after having given Ellen an unfavorable diagnosis.

CCL believes **Ellen is highly skilled at deception and has difficulty telling the truth.** CCL said administering a lie detector test to Ellen would be worthless. CCL believed Ellen's extraordinary skills at lying, and convincing herself of her own fiction, would result in no different physiological responses were Ellen to tell a lie during any such test. And yet this is whose story OPR chooses to believe.

CCL believes Ellen is highly focused on, and **works aggressively, to hurt Ballock.** And yet this is whose story OPR chooses to believe.

CCL did not believe that Ellen felt harassed or threatened by Ballock. Rather, CCL believed Ellen seized on an opportunity to harm Ballock.

CCL was dismayed at what she described as the Family Court's unwarranted gender bias afforded Ellen and the court's attempts to shape and curb CCL's testimony. CCL told Ballock and Ballock's attorney that if the roles were reversed and CCL had made about Ballock the findings she made about Ellen, Ballock would never see his children again.

Again, CCL, the foremost authority with regard to this matter, an independent court-appointed mental health expert who specializes in Battered Women's Syndrome, testified that she found **no evidence of any abuse against Ellen. None. Instead, she believes Ellen created a false narrative in order to harm Ballock.** Yet, somehow, OPR believes it knows better and dismisses her findings.

From the very beginning of this internal administrative inquiry, Ballock has offered for CCL to be interviewed. He even offered to provide a written statement from CCL. OPR's refusals to hear from CCL make no sense, unless OPR has a predetermined outcome it is trying to achieve. OPR has been conducting this administrative inquiry for over a year and a half. Surely Dr. Cooper-Lehki isn't that difficult to reach.

Ballock provided OPR with the transcript of a recovered audio recording in which Ellen admitted she completely made up a story that she had been violently raped. In the recording Ellen talks about how she sprinkles her falsehoods with bits of truth in order to make them believable. In this example, Ellen says she recalled the pain she felt from having a wisdom tooth

3

**CONFIDENTIAL**

extracted in order to describe what she said it felt like to be hit by her make believe attacker. In other recovered messages, Ellen brags about how skillfully she lies and convinces others that she is a victim. Yet this is whose story OPR chooses to believe.

Ballock provided OPR with a recovered text message which corroborates Kenny Ice's allegation that Ellen threatened to have sex with Kenny's friends, bruise herself with a hairbrush, and then report to the hospital to falsely claim she had been raped. In this same text message exchange, Kenny alerts his friends that Ellen has threatened to plant drugs in his home and call the police on him. And yet this is whose story OPR chooses to believe.

In recovered text messages, Ellen shares with Kenny Ice how she is able to send fake text messages to herself or others and make them appear as though they were sent by someone else. And yet this is whose story OPR chooses to believe.

Ellen told CCL that Ballock once killed a man. Ballock has obviously never killed anyone. And yet this is whose story OPR chooses to believe.

Ellen falsely told CCL that Ballock is a "cutter," a person who cuts his own skin to make himself feel better. CCL physically inspected Ballock's body and confirmed this was also untrue. And yet this is whose story OPR chooses to believe.

Ellen, already suffering from severe mental illnesses, was abusing both prescription and illegal narcotics. And yet this is whose story OPR chooses to believe.

Because of her outrageous and harmful conduct, Ellen has not seen her own children in over five years, save for one unauthorized occasion. Devious and manipulative Ellen tracked down her daughter in a public setting, against the Family Court's order. In September 2017, Ellen followed her daughter to an ice cream parlor in Fairmont, West Virginia. In violation of the court's orders, Ellen pulled her daughter away from her friends to meet privately with her. Ellen grilled the child about her father. Ellen told the daughter that her father is dangerous. Ellen told the daughter that she (the daughter) was in danger because of her father. Ellen warned her daughter that her father would hurt her. Ellen told her daughter that a WVSP Trooper was secretly watching over her to ensure her father didn't harm her. Ellen directed the child not to tell her father about this meeting (but the child did). Just as CCL and the child's counselor had feared, Ellen resumed her lies and manipulation and attempts to alienate the children from their father the very first chance she had. Ellen violates a court order, tracked down her daughter, and attempted to scare and deceive the child in order to harm Ballock. And yet this is whose story OPR chooses to believe.

Ellen lied to the Family Court on several occasions and was found in contempt of court. Once, Ellen told the court that she did not attend a scheduled final hearing because she had suffered a stroke and half of her body had become paralyzed during an elective surgery. Questioned by the court, Ellen ultimately admitted that she had not, in fact, been paralyzed. Ellen blamed her lies to the court on her medicine. And yet this is whose story OPR chooses to believe.

While residing in Ann Arbor, Michigan from 2006 to 2011, Ellen saw at least two different counselors. Ellen told neither about any of the abuse she now claims to have suffered. Ellen said she stopped seeing her counselors when they began to question her stories and accused her of lying. CCL was unable to talk to Ellen's former counselors because Ellen initially lied and said she had not previously received counseling. When confronted with evidence to the contrary,

4

**CONFIDENTIAL**

Ellen refused to provide CCL with her counselors' names. And yet this is whose story OPR chooses to believe.

Had OPR spoken with CCL, it would have learned that Ellen has a history of telling outrageous lies in order to harm others. In December, 2012, Ellen had her then 11-year old son improperly committed to a psychiatric facility over Christmas. Ellen falsely told the hospital's admitting personnel that her son was physically violent toward her and attacked her with a hatchet. Notice a pattern?

Mental health professionals interviewed both the boy and his sister, both of whom were present at the time Ellen claimed she was physically assaulted. Both children said Ellen made up the story; the boy never assaulted or even threatened to assault his mother. Ballock's son, a healthy and normal little boy, was ultimately released from the psychiatric facility with no recommended follow up treatment. The facility's mental health professionals believe Ellen lied about her son being violent toward her in order to have him improperly committed (CCL interviewed these professionals as well).

Ellen knew then the power of falsely claiming to be the victim of physical abuse, and the difficulty in disproving it. If Ellen will lie about her own son and cause him to experience the trauma of being improperly committed to a secure psychiatric facility over the Christmas holiday, could there be any doubt she would make false accusations against her estranged husband with whom she was engaged in a bitter custody and divorce battle? The mental health experts were appalled at Ellen's deceitful manipulation of the system in this manner. And yet this is whose story OPR chooses to believe.

Ballock suspects Ellen made these false accusations against the child in order to discredit him. Ballock's son had described to CCL and his counselor conduct by his mother which both CCL and the counselor deemed to constitute physical and emotional abuse. Ballock's daughter told CCL that she had witnessed Ellen's abuse of her brother, and was afraid for him. The daughter said she was frightened for her brother because she didn't know how Ellen was going to hurt him the next time she lashed out. Ballock's son once called 911 after Ellen attacked him and forearmed him in the throat. Ballock's son says his mother told him that as long as she didn't leave marks on his body, there was nothing the police could do.

Ballock's son also told CCL that he overheard Ellen say that she was trying to get Ballock fired from his job. Ballock's son said Ellen told her friend that if she could get Ballock to lose his gun, he would lose his job.

In a court-ordered joint counseling session, Ellen at first denied making this statement overheard by her son. When the counselor asked Ellen why a young child would lie about such a thing, Ellen admitted she did, in fact, make the statement, but said she didn't really mean it (CCL interviewed this counselor as well). It is not a coincidence that Ellen's false accusations against Ballock center around his handgun.

It was not necessary for Ellen to discredit her nine-year old daughter. Because her daughter was younger, compliant, and wanted to please her mother, Ellen simply coached the daughter what to say. CCL determines that Ellen coached the girl what to say to both her father and to the professionals. Ellen didn't just coach her daughter what to say to her father and to the custody evaluators, she taught her *how* to say it. Ellen coached the girl and made her rehearse what Ellen

5

**CONFIDENTIAL**                                                                                    **PL 00178**

wanted her to say to her dad and to the custody evaluators, including CCL and her counselor (CCL worked closely with the children's counselor and discussed these matters often and in much detail). Ellen made the child rehearse her lines (Ellen's lines) until Ellen was satisfied with the child's delivery. Ellen coached a nine-year old girl, her own daughter, what to say to the authorities in order to deceive them. And yet this is whose story OPR chooses to believe.

Ballock's then nine-year old daughter attended regular private counseling sessions with MSW Diane Halbritter during (and after) the divorce. Halbritter informed that Ellen once sent Summer into a counseling session with a hidden recording device. Ellen wanted to ensure the child was saying the lines Ellen had coached her to say. Ellen was so concerned about securing the best outcome in the custody and divorce dispute that she violated her daughter's trust and bond with a counselor who was assigned to help the child deal with the divorce of her parents and the breakup of her family. And yet this is whose story OPR chooses to believe.

Ellen coached Ballock's daughter to lie about her and Ellen's friendship with convicted child molester Karl Vincent Taylor. The child initially kept the secret but ultimately admitted that Ellen warned her if she ever disclosed their friendship with the child molester, both she and Ellen would get in trouble. And yet this is whose story OPR chooses to believe.

CCL and counselor Halbritter both testified that Ellen was attempting to alienate the children from Ballock. Ellen's efforts were so aggressive, outrageous, and harmful to the children that CCL, the children's counselor, and the Guardian ad Litem all recommended Ellen be permitted visitation with the children only under the immediate supervision of another, independent adult. It was recommended that Ellen not even be permitted to accompany her daughter unattended to the bathroom for fear she would use that brief moment to resume her efforts at alienating the child from Ballock and telling the child harmful lies about her father.

Because she was deemed by the court-appointed psychiatrist to be mentally ill, untruthful, and aggressively attempting to harm Ballock and get him fired from his job, Ellen was prohibited by two separate courts from providing disparaging information to Ballock's employer. The Family Court ordered Ellen not to have any contact with Ballock's employer. The Magistrate Court ordered Ellen not to provide disparaging information about Ballock to his employer. Email correspondence between Ellen and a WVSP Trooper obtained during the discovery phase of Ballock's civil suit revealed that Costlow, with the encouragement and support of a trooper friend who led the misdemeanor investigation into Ballock, knowingly, willingly, and eagerly violated both court orders. Costlow violated the magistrate's court order within a week of its issuance. Ellen was, as CCL had said, eager to ruin Ballock.

In its administrative inquiry, OPR did not bother to ask Ellen about any of the above information which casts a serious shadow over her story. Instead, OPR simply took Ellen at her word and characterized her as a victim.

**Websites**

As for Ballock's father's websites, Ballock has never had any connection to, or control over, them. None whatsoever. When Ballock hired Forensicon to download the contents of Kenny Ice's cellphone, the results were provided to Ballock on a thumb drive. Ballock did not own a personal computer or printer. Ballock gave the thumb drive to his father and asked that he download and print the materials for him. It was then that Ballock's father gained access to the

6

PL 00179

materials provided by Kenny Ice. Because Ballock was busy working full-time and raising his two young children, his father (retired) helped out by serving as Ballock's "filing clerk" and viewed many of the court-related documents possessed by Ballock. Contrary to OPR's contention, Ballock did not knowingly provide materials to his father for the website.

The following May help to remove doubt about Ballock's disassociation with his father's website. Following Ballock's arrest, the local prosecutor informed Ballock that she would drop the criminal charges against Ballock provided Ballock's father take down his website (the prosecutor said this was one of Ellen's demands). All Ballock had to do was convince his father to take down the website, and the criminal charges against him would be dismissed. Ballock was informed of this proposal by his attorney, Michael Benninger. Benninger met with Ballock and Ballock's father at Benninger's office. Benninger shared the prosecutor's proposed offer of dismissal. Ballock's father refused to take down his website. Even though it would have meant the criminal charges against his son (Ballock) would have been dismissed, and even though Ballock asked him to take down the site, Ballock's father refused. Clearly, Ballock had no control over the websites which bother OPR. OPR is welcome to discuss this matter with attorney Benninger or Ballock's father.

**Ballock's Cousin**

Had OPR conducted a thorough investigation and interviewed CCL, perhaps it would have not made the false and slanderous claim that Ballock had knowledgeable of, and complicity in, the sexual abuse of a minor. Ballock did not learn that Ellen had engaged in sexual relations with Ballock's cousin until 16 years after the fact, when Ballock's cousin was 30-years old; Ballock was not ok with Ellen's behaviors and repeatedly attempted to stop them. CCL interviewed Ballock's cousin who confirmed he did not disclose his story to Ballock until he was 30-years old. CCL also learned that Ellen's deviant sexual behaviors continued well after her separation from Ballock. CCL investigated the matter thoroughly, and does not believe that Ballock is responsible for Ellen's sexual behaviors. Instead, CCL diagnosed Ellen as suffering from severe mental disorders, including Paraphelia. CCL told the court that there is not an actual diagnosis for "Sex Addict" in the Diagnostic and Statistical Manual of Mental Disorders (DSM), but if there were, Ellen would be diagnosed as one. As for Ballock, CCL said that he had co-dependency and anxiety issues, but nothing of any major concern. OPR continues to make very serious (and false) and slanderous accusations against Ballock while knowing only a small portion of the story.

**Text Messages**

OPR fails to acknowledge that although Ellen asked Ballock to stop writing her, Ellen herself would contact Ballock by phone after she made these requests. Ellen even once let herself into Ballock's apartment and appeared at Ballock's bedside in the middle of the night to berate him. Ballock did not call or attempt to visit Ellen in person. Ellen could have pushed a button on her iPhone which would have blocked Ballock's text messages. She could have done the same with regard to his email messages. Or she could have simply deleted them without opening them. She didn't. Instead she wrote and phoned Ballock occasionally.

OPR believes that Ballock's "non-denial" to a few of Ellen's email and text messages in which Ellen mentions abuse is an admission of guilt. Again, OPR would benefit from speaking with the mental health professionals. OPR would learn the ways in which the spouses of Borderlines

7

**CONFIDENTIAL**

learn to speak to them in order to avoid the escalation of conflict. In an email dated 09/29/2010, Ellen wrote to Ballock's sister, praising Ballock for his calm demeanor and communication style. Ellen knew first-hand that Ballock communicated with her in a manner which de-escalated arguments before they became worse. Ellen wrote, "You both (Ballock and his sister) find it easier to de-escalate a problematic situation through conversation, hearing sides and talking it out, and other thoughtful (albeit time consuming) ways."

Ballock's communication techniques with Ellen were borne of a lifetime of coping with an aggressive Borderline. His techniques were actually approved of, reinforced, and refined by his counselor. He was taught by his counselor to never justify, argue, defend, or explain when being wrongly accused of something by his mentally ill wife; Borderlines thrive on conflict and to do any of those things only causes them to escalate and become even more enraged. Ballock never once admitted to abusing Ellen because he never has.

### Unauthorized Investigation

A year and a half after initiating this internal inquiry, after OPR learned its original reasons for firing Ballock were unfounded, OPR now accuses Ballock of conducting an "unauthorized investigation." OPR is grasping at straws to justify its original decision to terminate Ballock.

OPR cites FBI Offense Code 5.9 which prohibits employees "without authorization from engaging in an ongoing social, romantic, or intimate relationship or association with a person the employee knew, or should have known, is involved in criminal activities." OPR writes, "Your ongoing social interactions with a known criminal were inappropriate."

Ballock did not conduct an unauthorized investigation. Nor did Ballock have "ongoing social interactions with a known criminal." Not once has Ballock ever had a social interaction with Kenny Ice. No reasonable person would define Ballock's interactions with Kenny Ice as social in nature. Ballock talked to Kenny Ice because he volunteered to share information about Ballock's estranged wife's dangerous behaviors and Ballock's children. That was the extent of Ballock's interactions. There was never any social, romantic, or intimate relationship. For OPR to suggest otherwise is both disingenuous and ludicrous.

Although not required to do so (because it was not an investigation), Ballock informed his Unit Chief of his planned meetings with Kenny Ice and others. The Unit Chief expressed absolutely no concern with Ballock's meetings with Kenny Ice or others. In fact, the Unit Chief provided Ballock with helpful advice in advance of his meetings. The Unit Chief's only admonishment to Ballock was that he inform the people with whom he spoke that he was talking to them as nothing more than a concerned parent; Ballock always did so.

On or about September 16, 2013, Ballock met with the Assistant Director of the CJIS Division, the Division's Deputy Assistant Director, and a Section Chief. In that meeting, held in the AD's office, Ballock shared his story, to include his meetings with Kenny Ice and others. None of the assembled senior executives that day - or any day thereafter - expressed any concern whatsoever regarding Ballock's meetings with others. To the contrary, Ballock was offered assistance in the form of an escort/witness should he need someone to accompany him to future meetings. If OPR genuinely believes Ballock conducted an investigation, it would be extremely difficult to characterize it as unauthorized.

8

**CONFIDENTIAL**

But here again, by erroneously claiming Ballock conducted an unauthorized investigation, OPR's interpretation of events is seriously flawed and demonstrates the lengths to which OPR will go to justify its original wrongful termination of Ballock.

Ballock makes no apologies for accepting information offered to him, for protecting his children, and for defending himself against false accusations. Ballock did not abuse his position in obtaining this information and doubts any other concerned parent would have done any differently.

OPR's efforts to find justification for its original decision are comical. OPR cites a neighbor (who provided other demonstrably false information) who claims he witnessed Ballock become angry once. Because it refused to meet with Dr. Cooper-Lehki, OPR did not get to hear that Ballock's children told CCL and their counselor that their father was never violent or aggressive and that they rarely ever heard him even raise his voice. Ballock's young children, despite Ellen's efforts to coach them otherwise, both told CCL that their mother was violent and angry and abusive, and that their father was the peacemaker, soft spoken, understanding, loving and kind. OPR also ignored Ballock's colleagues and close family friends who cited his peaceful and calm demeanor even in difficult circumstances. Finally, OPR did not get to hear CCL describe Ballock as extraordinary level and calm, especially given the circumstances in which he was placed.

Ballock admits that he did send his daughter photos he took of himself in FBI space, an administrative office space where nearly everyone possessed a smart phone and this practice was not uncommon. To save OPR time as it continues to seek justification for its original decision, Ballock also admits to occasionally driving his government vehicle above the posted speed limit and not wearing his seatbelt at all times.

**Misuse of Database**

Perhaps a timeline might help OPR better understand that Ballock did not ask David Pennypacker to run Kenny Ice in N-DEx:

09/2012 -

Ballock learns his wife has left him for Kenny Ice. Ballock learns Kenny Ice is living in Ballock's home with Ballock's estranged wife and Ballock's children. Ballock does not run Kenny Ice. Pennypacker, who has not yet met Kenny Ice, does not run Kenny Ice.

10/2012 -

Ballock's supervisor informs him that three separate law enforcement agencies have contacted him so that he can warn Ballock about Ice. Ballock is told that Kenny Ice, the man living in his home and with his children, is a dangerous, low-level drug dealer. Ballock does not run Kenny Ice. Pennypacker, who has not yet met Kenny Ice, does not run Kenny Ice.

10/2012 to 05/2013 (8 full months) -

Ballock daily fears for the safety and welfare of his children, in part, because of Kenny Ice's presence in their lives. Ballock does not run Kenny Ice. Pennypacker, who has not yet met Kenny Ice, does not run Kenny Ice.

05/15/2013 -

9

**CONFIDENTIAL**                                    **PL 00182**

Kenny Ice contacts Ballock via text. Ice has broken up with Ellen and has highly concerning information regarding Ballock's children he is willing to share. Ballock does not run Kenny Ice. Pennypacker, who has not yet met Kenny Ice, does not run Kenny Ice.

05/19/2013 -

Ballock receives first phone call from Kenny Ice. Kenny provides alarming information, including that Ballock's daughter is being socialized with a convicted and registered child molester, Karl Vincent Taylor. Ballock does not run Kenny Ice. Ballock does not run Karl Vincent Taylor. Pennypacker, who has not yet met Kenny Ice or Karl Vincent Taylor, does not run Kenny Ice or Karl Vincent Taylor.

05/21/2013 -

For his own safety, Ballock takes a colleague, friend, and former LEO, David Pennypacker, to meet with Kenny Ice. Ice confirms that Ballock's 9-year old daughter is being socialized with a convicted and registered child molester, Karl Vincent Taylor. Ballock does not run Kenny Ice. Ballock does not run Karl Vincent Taylor.

05/2018 (date unknown) - David Pennypacker runs Kenny Ice in the N-DEx system. Pennypacker's job at N-DEx requires him to routinely test the system's capabilities so that he may train local law enforcement how to navigate the system. Pennypacker tells Ballock he ran Ice out of curiosity one day when he was running names through the system ahead of another training event. Ballock admonished Pennypacker.

Does OPR really believe that Ballock waited some eight months to ask his colleague and friend Pennypacker to run Kenny Ice? Why wouldn't Ballock have asked Pennypacker to run Ice in September or October 2012 - or any time thereafter - when Ballock was certainly most curious about him? In the fall of 2012, Ballock had been told by his supervisor that local law enforcement suggested Ballock should make sure he was always armed because Kenny Ice was the type of person who might appear at his home unannounced seeking a confrontation. If Ballock was ever going to run Kenny Ice, it surely would have been then. But Ballock did not run Ice. Ballock never ran Ice. Nor did Ballock ask his friend and colleague to run Ice during all that time.

If Ballock asked Pennypacker to run Ice in May 2013, why didn't he also ask Pennypacker to run convicted child molester Karl Vincent Taylor? Surely Ballock would have liked to have learned information about the convicted child molester who was spending time with Ballock's nine-year old daughter. Ballock didn't run either Ice or Taylor because he knew it was not permitted. OPR's reasoning is severely flawed.


**Lack of Candor or Difference of Opinion?**

OPR continues to argue that Ballock lacked candor by the way he described his written communications with Ellen. Ballock did not lack candor. Ballock's two young children were being abused and traumatized, exposed to violence, and being socialized with a convicted child molester, among many other abuses.

10

**CONFIDENTIAL**

PL 00183

Ballock will forever believe his communications were not inappropriate. OPR's difference of opinion as to whether they were appropriate and/or respectful does not amount to a lack of candor on Ballock's part. Ballock had no intent to deceive with his characterization of the correspondence.

If OPR believes a difference of opinion equates to a lack of candor then either OPR or the agents who originally conducted this investigation are guilty of a lack candor because OPR's findings starkly contradict those of the agents who met with and interviewed Ballock and Ellen. Lack of candor or difference of opinion? It apparently depends on what OPR is trying to accomplish.

**Ellen and Sean Matthews**

While the Ballocks were assigned to the Indianapolis Division, from 2003 to 2006, Ellen engaged in extramarital affairs. Ballock attempted to stop Ellen's behavior but was unsuccessful; Ellen told Ballock that if he did not allow her to live her own separate life the way she wanted, she would break up the family. Ballock was eventually successful in persuading Ellen to stop (or so he believed).

In approximately 2008, while residing in Ann Arbor, Michigan, Ballock learned that Ellen was soliciting men on Craigslist. Ballock, using the pseudonym Sean Matthews, created an online alias and placed an ad on Craigslist. Ellen responded. Ballock, as Sean Matthews, engaged in online conversations with Ellen. Dr. Cooper-Lehki reviewed and possesses these communications. OPR has not reviewed them.

In September, 2012, while the Ballocks were residing in Morgantown, WV,  Ellen left Ballock when she began a relationship with Kenny Ice. Ellen met Ice online in June 2012. Ellen told the Family Court and WVSP, however, that she divorced Ballock because Ballock forced her to have sex with other men and was physically abusive. Ellen said Ballock would beat her if she refused to have sex with other men. As is her practice, Ellen falsely blamed someone else (Ballock) for her own behaviors. Ellen was understandably worried that her behaviors would reflect poorly on her in the divorce and custody dispute. Her go-to solution: blame Ballock for her conduct.

Ellen also falsely told the Family Court and CCL that Ballock was an abusive and uninvolved father who didn't even love his children. Ellen told the Family Court and CCL (and later, the WVSP) that Ballock routinely beat her, including in front of the children. Ellen used the term "monster" to describe Ballock.

Ellen's own words, provided below, serve to disprove these despicable lies about Ballock. They further demonstrate Ellen's efforts to write a completely false narrative about Ballock and to demonize him (a common practice among Borderlines). The vast differences between Ellen's words to someone she considered a trusted online sounding board (Sean Matthews) and her later words to those people who held the power to help her harm Ballock (The Family Court, WVSP, and OPR), illustrate why Ellen's ugly allegations about him are not to be believed.

OPR ended Ballock's career based in large part on a few messages in which Ballock failed to deny wildly false allegations of a mentally disordered individual. Below Ballock provides but a sampling of thousands of messages composed by Ellen which strongly disprove her false claims of victimization. Again, the forensic psychiatrist's findings were based on an exhaustive,

11

**CONFIDENTIAL**                                                    **PL 00184**

months-long, comprehensive investigation and a trove of these sorts of relevant, clarifying and supporting materials; OPR's was not.

Because Ellen's emails so clearly disprove her false allegations against Ballock, Ellen first told the professionals that she did not write them; Ellen said Ballock must have written them. When that lie didn't work, Ellen admitted that, yes, she did write the emails but she actually knew it was Ballock she was writing and her words were chosen solely to please him. When this lie didn't work, Ellen told the professionals that, yes, she did write the emails but they were simply her attempts at creative writing. Creative writing? Forced to have sex with other men or be beaten? A victim? Ellen's own words prove otherwise.

**In Ellen's own words:**

*I am hiding in the shadow of myself and in all actuality I am a horrible person. I don't fit the full description, but I am close enough. It's strange to read about myself. I read about all the things I hide and why, the reasons why I have a difficult time being "good", the justifications I come up with for the "bad" behavior, how I twist the world around me to suit my needs, why I expect special treatment or why I live my life as if some rules shouldn't apply to me, why I don't handle criticism well, why my relationships with others are fragile, my self-absorbed mentality/personality and what may eventually result from it, and so on...Eons ago my "type" whose brains were hard wired to be detail oriented, highly cautious, unwavering, and self-absorbed were the survivors. Now we are socially unacceptable beings in our society.*

*I am realistically fearful that I am eventually going to ruin my life and those of my kids and husband through my actions.*

*My ability to keep lies and pile them on top of one another in order to keep them has come from my upbringing. It was a way of survival for me since I was so different from what my parents wanted in a daughter.*

*It boggles my mind how much (husband) loves me and how tolerant he is of me. I'm not all that amazing, but one could think that based on all he's put up with and is willing to give...he loves me enough to come home from work and bathe the kids and put away dishes and other kinds of things that most men would never think of doing.*

*I am lonely in my marriage. (Husband) is a great provider financially. He adores the kids and is kind to me as people should be to each other. But I'm still alone. It used to not be this way.*

*Welcome back to my fucked up world. Nothing is normal with me. Isn't it interesting how a pretty person can get away with so much more than others? I got by on my looks for decades and now I have to figure out how to be pretty on the inside if I want to get along in this world for the remainder of my years.*

*I love my kids and (husband) so much that I don't want to do much of anything anymore to lose them. They are the ones who love me for who I am and will remain by my side no matter how gray and wrinkly I turn, no matter if I end up in a wheelchair or sick with cancer. They see the good in me even when I don't. Goodness knows that (husband) has had many opportunities to leave me and dozens of justified reasons to do so and he has remained here with me loving me and tolerating my behaviors. Someday he will reach his limit with me. I don't want that someday to come.*

12

**CONFIDENTIAL**

PL 00185

*I sit here and justify why I write you every day. I sit here and hide in the shadow of myself. I sit here knowing full well that what I'm doing would end my marriage and harm my children's lives as a result. I sit here and wonder WHY I take that risk everyday throughout the day. After reading a bit last night, now I know. The problem I'm having now is doing something about it...making the conscience decision to be the wife my (husband) wants me to be...and thinking of others instead of myself. So I sit here and continue to hide in the shadow of myself and tell myself that maybe tomorrow I'll stop. Maybe tomorrow won't be too late. Just one more day won't hurt will it? I need to play this thing out in my mind and focus on the reality of how my choices are perceived by others and how much hurt those who love me and count on me most would feel for the rest of their lives as a result of my narcissistic behaviors.*

*The liar and cheater in me has come and gone throughout my life. The last time I had a big problem I was 18. It took a year for my parents to understand that they cannot control me no matter how hard they tried. I had to do it myself and I did it. My problems began again when I was 36. It's been four years of off and on lying and it is taking a toll on me. Yes, the liar and cheater may always be there, but I don't have to succumb to it. I kept it at bay for 17 years. Maybe in another 17 years (let's see...I'll be 58 by then) I'll be too old to want to jeopardize everything I have for a rush of sexual excitement.*

*I am not feeling very confident today. Some days are like that especially after I read about what a narcissistic person I am in one of my books. What I learned last night is that my brain hasn't evolved much from the reptilian and mammalian era. Remember, I don't believe Jesus Christ put us here in human form. I believe wholeheartedly in evolution...this book was bonking me on the head - really hard.*

*Yes, I'm still me and that's what sometimes scares me. I think I'm on my way to destroying my family and losing everything I have because of who I am.*

*This isn't about (husband) or my kids. This is me out of control and losing perspective. This is simply me being selfish. This is me getting older and realizing that if I'm going to have any fun with other men I'd better do it now. Given how I've aged in the past 7 years, I may not look like I do now in another 7. Maybe by then my hormones will be less raging. I don't know. I've always been like this.*

*I'm not feeling guilty. I'm feeling reckless.*

*I must be inflicted with some sort of psychosis that hits people in their late thirties, early forties. As happy as things have been, last night I was unable to push out thoughts of suicide and I broke down and cried in front of my husband. I'm such a weakling that I couldn't hold it together for the few hours that he was home and now he's worried about me. I am such a loser I can't even begin to tell you..it'd take too long. He wouldn't go to bed last night until I had promised I wouldn't do anything stupid. He didn't leave for work this morning until I promised him again. He just called to check up on me and make sure I'm going to be OK for the next hour or so while he's with someone and out of reach. I'm racked with guilt to be worrying my husband like this.*

*I still don't understand why I lash out. Immaturity? Habit? The way I was raised? Pure stupidity?*

13

**CONFIDENTIAL**

PL 00186

*It scares me to know I might be sick. I don't want to go down this path. There is no obvious reason for me to be in this state of mind. My children love me and they are growing up healthy and happy. My husband loves me more than I ever thought...I have so much to live for.*

*(Husband) knows me and cares about me. Whether I get old and gray or grow sick and lame, he'll still love me...why am I playing with fire risking hurting my precious children and husband? Because I am who I am, which means I'm highly sexual and stupid.*

*So I'll sit here and watch my lovely daughter play with her dolls and I'll think...and I'll go to my son's school and watch him play, in awe of his physical talents and I'll think some more...and I'll tell myself I'm making horrible decisions and am on the verge of destroying so many lives for entirely selfish reasons and I should be strong enough to stop...then I'll return to my usual ways...because I have my head in my ass and lie to myself and believe that today is not the day that I'll get caught. It will be another day, but not today, so I'll have some fun right now for myself. I have an addiction, don't know what to call it exactly, but it's there. I scare myself. I don't want to deny who I am, but my behavior is going to ruin my marriage and my kids if I don't find it within myself to stop.*

*There is an angel on one shoulder that tells me to do the right thing no matter what I think I may be missing out on in life because if I get caught doing the wrong thing I won't have any sort of a life (at least not as I know it now and right now it's really good —better than most—and I shouldn't screw it up). The angel tells me to stop thinking only of myself or I'm going to regret it.*

*There is a devil on the other shoulder telling me that if I don't enjoy life now it will pass me by and I'll miss out on something exciting. That little devil tells me that since I already have the lying capabilities and know how to sneak around I should not worry about getting caught...I'm a little scared of myself and need to pull back.*

*Dear voice of reason and sanity, I'm glad I have you.*

*I find myself feeling stuck in my life right now, which is a good life - an incredibly good life - but I like having more space to roam and more options to choose from. I think my husband feels the same way, but he is more mature and stable and makes better choices.*

*I push the envelope of safety in my marriage all too often. I push it hardest when (husband) and I are getting along very well; when I love him most. It doesn't make sense to me.*

*I scare myself with the naughty things I'm capable of doing. I am amazed at what a dog (cougar or whatever) I've turned into. It's bad, really bad.*

*Almost all men are dogs and would cheat on me so, no I don't have some perfect life imagined that I want to live out. Aren't I living out a nearly perfect one as it is?*

*Secret: I'm very, very, very, very close to going back on Adderall. If I do, I'm not telling (husband) (at least not at first). Low doses of it snap me out of my funks and help me concentrate. Higher doses of it make me mean and impulsive.*

*Your bad, bad, very bad, insanely crazy, self-sabotaging, self-centered, inappropriately selfish, overly sensitive Labby is here today. I'm definitely going through a mid-life crisis. I'm not going to go into detail, but it's intense and it's hell and I wish it to be over. Can you hear the anvils falling? I know which path my life should go, but it scares me to death so I look to other ways I can spend the next 20 years of my life and try those paths on for size. Any way I look at it, it's all*

14

**CONFIDENTIAL**                                                        PL 00187

scary. Reality bites! I don't aim to cause anyone to fret over how I feel and what's going on with me, but yes, I have it bad. Maybe others keep their feelings inside, but I've not heard other women my age having any of the ideas circling in their head that I have. I don't share this stuff with anyone but you and (husband) (and therapists from time to time) so maybe others are silent about it too. I struggle to understand why I feel this way when I am living a great (spoiled) life. If I could, today I'd take something to make my mind calm and my thoughts tranquil. Maybe I need to bottle up my feelings, the deep down ones, and put on a mask of contentment and finish out my life going down the path that works - the same one everyone else who's 40 with two young kids and a loving husband goes down.

When I think back on my past with my husband with an open mind all of our problems are a result of selfish behaviors that were hurtful, so hurtful, that the memories and feelings are tied up in anger. And almost all of it is my fault. I was the one who changed and started being way too controlling and emotional and petty...eventually pushing away my husband. Then when I got hurt (a direct result of my non-loving actions) I turned angry and began to live life by putting myself first. That was a very bad choice and although some great things happened those were only for me. Those same bad choices have brought my family nothing but heartache and misery. I've lost the trust that was once so strong between my husband and I...The way my husband still loves me in spite of myself totally boggles my mind.

My ability to keep lies and pile them on top of one another in order to keep them has come from my upbringing. It was a way of survival for me since I was so different, far from what my parents wanted in a daughter...At times I think I'm better at it than most people, but there are days, like yesterday, that I slip up over and over and over. It depends on if I'm lying to hide something about myself or if I'm trying to keep a short term fun secret. Yesterday I kept saying to my daughter, "When Nana gets here tomorrow..." and then catching myself because it's supposed to be a surprise that Nana is visiting.

It's getting more difficult to get away with lying because my lie detector is getting better and better with his skills of reading me. He's really good with questioning and reading me, but I'm better at hiding and lying. Unfortunately, the gap is narrowing. Today he caught me off guard but by the time he realized it I had gotten my physical gestures under control.

I should probably seek therapy again - or start paying you for your time. Seriously though, I don't see the world as most women do and I don't believe in a god so most therapists don't know what to do about me. They hardly ever admit it, but I can tell I frustrate the hell out of them.

I've been thinking a lot about my situation. I'm getting somewhere with my husband now that he thinks I'm no longer involved with anyone. It's when he knows I'm carrying on with others that he has little patience for me.

All I can think about is dick, dick, dick...I need some strange...I better quit writing while my hubby is home. It's too risky...

Secrets can make everything that much hotter.

I have a great life and I do believe that good guys are hard to find. All the ones I've kissed pale in comparison to (husband) and the way he loves me and always will.

So why am I online and cruising Craigslist? Because I was missing my mom and the fact that when she died, my dad didn't step up to the plate and continue with close family relations. He

15

sucks. I want him to be here with me and my family, not there with his "other family" that isn't even related to me. Am I jealous? You betcha! And I'm sad and angry and frustrated too.

No one can hold a candle to (husband). I knew that long ago when I was in college (when I was living much more closely with other guys) and lost sight of that fact somewhere along the way. I hope I never lose sight of that again.

(Son) is grounded from the school bus for throwing his homework and other things out the bus window. It's a great punishment for a kid who loves riding the bus with his friends. It's great except for one thing: guess who forgot to pick him up from school? Yep. Dumb blond mommy. I ate lunch with (husband) today and went to the grocery store afterward. (Daughter) had a bad stomach ache in the store and we spent forever in the bathroom. When we got home I had a bad stomach ache. I was lying on the couch recovering when (husband) called to tell me the school had called and he told T to ride the bus home. Most women would be in hot water for forgetting something like that. Not I. (Husband) knows I'd forget my head if it weren't attached. He'll tease me tonight for sure. I'm looking forward to it actually. He cracks me up the way he teases.

I've said this more than once: most guys are assholes. I can't believe my luck finding a genuinely nice guy for a husband.

I have to show more respect to (husband) and I'm not. I haven't. Am I capable of it? I sure do take the freedom I'm given and run with it full-tilt. I'm a danger to myself. It's really scary.

Every day I ask myself if I think I can leave my kids behind. Every day the answer is no...but I keep asking.

I can't believe that I fall so quickly and so deeply into these states of depression. It's like an abyss this time...deep and dark. Yesterday I slept most of the day away. I couldn't help it. I am trying really hard to feel happy and when it's beyond my control I fake it which takes an inordinate amount of energy. It's the weirdest feeling in the world to be elated one day and have to pretend to be happy the next.

I know I should stop playing with fire, but it's difficult. On the one hand I should stop for (husband) and the kids sake because a broken home would keep my kids from reaching their potential. On the other hand (husband) knows what makes me tick and he knew it before he married me.

Yes, I'm still me and that's what sometimes scares me. I think I'm on my way to destroying my family and losing everything I have because I am who I am.

When I consider divorcing (husband) it is only to save him and the kids from so much hurt. But I love them and can't picture a better overall life without them...I watch other men with their wives and their kids and they are nothing exceptional; some are downright dumb, some gawk at other women in front of their wife and kids, some are hotheads, etc...

So why am I continuing on behind his (husband's) back pretending I'll never get caught? It's nearly certain that someday I'll get caught. No matter how good I am at keeping secrets and lying others will be involved and things will happen beyond my control.

What I want I cannot have. What I want brings potential ill effects to those around me...what I want could negatively impact (husband's) life and all the hard work he's put forth for the betterment of our family. The next best thing to what I want is what I've got: the security given

16

**CONFIDENTIAL**

*by (husband) that allows me to live under one roof with my children. What I've got is something more than most people have: loving husband, cute kids, house, car, food on the table, the ability to stay home, money in the bank, the ability to stay home...I should stop screwing around, but doing so is easier said than done. I owe (husband) much more respect than I've shown him in this small city (and in Indy)...I don't know what to do with all my pent up sexual energy, but I'm going to have to learn to do something to stifle my lustful desires...if I keep on the way I have been, I am bound to screw up...in several years repressing my urges will become easier. I'll have grown older and my body will be changing.*

*Honest to fucking goodness I am somehow incapable of making a permanent change in my behavior for the better, without slipping back into the asshole that is me. I am clever and smart in both good ways and very bad ways which is a big reason why it's so difficult for my therapists to see through to the real me. I don't let people in. The way I was raised was fucked up and it hurts to think about it let alone share about it enough for someone to help me correct my behavior.*

*I trust no one. It takes several sessions with a therapist for me to open up even just a little bit and even after a year, I'm highly guarded...I have a lot to hide.*

*Girls are especially difficult for me to trust. We are the more clever of the species you know. We don't say what we think to our friends as much as what we think they would like to hear. You can never know what a girl is really thinking unless you get her to let her guard down, and in my case I don't let mine down. And we craft our questions and storytelling to gain insight into what makes our friends tick and to learn about them and so on and so forth.*

*I need strange cock so badly that it hurts. How does my hubby do it? How does he go without strange for so long? I guess that's the difference between a normal person and an addict.*

*I hate that he feels like he's walking on eggshells even when everything is going well. Will he ever trust me as his best friend and wife again? He has a wall built around him as a result of my behavior - attacks and dishonesty - and I don't know how to break it down. I don't know how to break down the wall I have built around me too. And therapy is entirely overrated.*

*I'm really good at lying, which is something I am not proud of, but it's how I survived growing up in such a strict household so I've had years of practice.*

*I'm getting that (dog paw) tattoo soon. I had another conversation with (husband) about it last night. He says he's just trying to save me from myself (it's a recurring theme with me, isn't it) and keep me from doing something I'll regret.*

*I don't know why it's so difficult for me to keep my anger in check. I don't know why I so easily spin out of control. And why the heck can I not respond to all-hell-breaking-loose without losing it? I snap. My knee-jerk reactions suck.*

*I didn't stop to count to 10 last night. I didn't go into the other room and do something else to dissipate the way I was feeling. I escalated things. Then I fought back when my buttons were pushed. My husband was relaxing watching the Bears, screwing around on the computer, talking to his sister, and then.........I spoiled it. Everything was fine by about 8:00, but the 6:15 - 8:00 p.m. time was awful. I wish I could take it back and replace it with anything, even sheer boredom.*

*My life is good. My life is very good. I know that...I'm intense.*

17

**CONFIDENTIAL**                                        **PL 00190**

*I should look at the past as a gift once given and the future as something I should work hard to earn and keep. I'm certainly not doing a very good job of doing everything I can to increase the chances my kids are raised in a home with both parents...Am I being stupid risking what I've got going in life?*

*The world doesn't revolve or stop for me, though I've been living my life as it does...He wants me to himself and 100% committed to our family.*

*I am the one who brings out the meanness or any other knee-jerk bad qualities my husband has displayed. It's not in his nature to be that way. You've seen what his mom is like; so kind and gentle and loving. He's a lot like her. He's the best person that has ever entered my life. I haven't even come close to making his life better and pleasant in return for him making mine so great...don't you think I should worship the ground he walks on? I do.*

*First I said I was sorry and then I handed (husband) the ticket today when I stopped by to see him at work this afternoon. He laughed and asked me if I have something against using parking meters correctly :) Then he kissed me and asked me to try harder. Sometimes I am a ditzy blond and today was one of those days.*

*I lie to myself more than anyone else and I'm damn good at it. That's the problem. I'm good at something that is destructive. Where has it gotten me? Into trouble. What has it earned me? Nothing. I have lost the trust my husband once had for me. Who has it helped? No one. Absolutely no one...I imagine he feels humiliated and taken for granted. He has probably felt emasculated and worthless by my unloving and selfish actions. All he wanted to do was make me happy; to give me the moon and the stars. What did I do with it? I snatched it right up and asked for more without showing appreciation and respect for the lengths he went to for me. What an ungrateful, uncaring, self-centered bitch I was. I have behaved so badly. ...I don't deserve any of what I have. Mostly I don't deserve my husband.*

*My life would really suck if my husband left. Once upon a time and quite often he'd say "if you get fat I'll leave you." Well, I'm fat and he's still here. When I asked him about it yesterday he said, "When you were skinny you were a bitch. Now you're nice. That's all that matters is that you're nice. I'm keepin' ya." I don't feel right lying to him anymore.*

*I used to be so much fun. I have always been intense, but no so mean and crabby.*

*Docs are difficult to deal with sometimes. I have two good ones and two that I don't think I can stick with much longer. It's my opinion from experience that not all docs are created equal, even if they are a specialist and well respected within their field...Plus, I ask lots of questions and assert myself which doesn't always mesh well with men with large egos. I'm intense you know.*

*Let me repeat myself a little. My husband is not a loser. He never was and never will be. I am the loser for not treating him right. The more I read about the proper caring of a husband and a marriage, the more amazed I am that he's still here with me and still wants me. He is a fabulous husband who possesses all the qualities some women would give everything up for. Why have I been so blind? If he's cranky it's because he's either tired or hungry or an asshole has entered his life and created a stir. Don't we all get cranky for those same reasons? And he's a loving and doting father who wants to provide all he can for our family to the point that he sacrifices his own desires. He chooses to do for us first. He chooses to be as physically and emotionally strong and financially secure as he can be. For example, there is no motorcycle parked in our garage*

18

*because he doesn't want one right now. No matter how many times I've said, "Just do it. It'll make you so happy to have a motorcycle" and almost get him to agree to it, he will turn to me with a list of the reasons why he isn't going to do it. When I tell him life is short and to live it, he repeats his list and tells me those are the things he's living for. He says having a motorcycle would be fun, but won't satisfy what he really wants. Know what's on that list? Saving our money for college so our kids won't have to worry about it like he did, saving our money so the kids can have a car when they're old enough to drive, staying alive (he's wrecked on one before - he knows the dangers) so he can see the kids grow up, staying safe so I don't have to care for an invalid or become the breadwinner, saving our money for family trips that build wonderful memories, and saving our money so we can fly his mom here to visit. Then the list changes to things like wanting to take me for a ride but not wanting to leave the kids orphaned if something bad were to happen, not being able to talk as we ride (he loves to talk to me when we travel or are apart from the kids and home), and not wanting to miss out on what's going on at home while he's out riding around. He can't stand anything that takes his time away from our family, especially the kids. He doesn't want to do for himself until he feels like everyone else's needs have been met and even then he doesn't want to be away on his own. I understand his feelings, but I still think he should get one because he deserves it for working so hard for all of us. But what I think doesn't really matter. I have to respect his list of reasons and love him for being the way he is. Those qualities in him are what attracted me to him in the first place.*

*I'm going to assume that you are beginning to see that I've had a defensive wall built around me since I was a very young girl. It's as if it's made of impervious steel. I've not lived very much of my life without it. It's my protection (security blanket) so I'm fearful of living without it. Please don't tell a soul, but I think I was much better behaved as a person when I was still sucking my thumb. I don't know why, but I do know I don't want to start again. Also when I take psychological evaluations I end up scoring in the same category as an alcoholic. Then what happens is my therapists don't believe fully in the test results because I rarely drink and so they dismiss it. I still look at it as a flaw that needs correction.*

OPR may wish to note that none of Ellen's embarrassing messages ever appeared on Ballock's father's website because Ballock had nothing to do with the website and Ballock's father never had access to these messages.

**Ellen's Sexual Practices**

Dr. Christi Cooper-Lehki diagnosed Ellen as suffering from severe mental illnesses which manifest in several ways, including abnormal and deviant sexual behaviors. CCL had no such concerns regarding Ballock.

As is her practice, Ellen blamed Ballock for her sexual behaviors. Ellen didn't admit to having affairs with other men; she said Ballock *forced* her to have sex with other men. For added emphasis, Ellen told authorities that if she refused to have sex with other men, Ballock would beat her.

CCL, who even interviewed men with whom Ellen had affairs, found no evidence to support Ellen's claims. CCL says that Ballock is not responsible for Ellen's sexual behaviors. CCL pointed out that Ellen continued her deviant sexual practices well after her separation from Ballock. Kenny Ice, having known Ellen for less than a year, independently corroborated her perversions.

19

The following messages, from Ellen to Sean Matthews, provide insight into Ellen's mind, and the absurdity of her claims that Ballock was responsible for her sexual conduct. They demonstrate that, despite what she says now, Ellen was never an abused woman who was forced to do anything. Rather, Ellen was a woman who struggled with many demons. Ballock participated in only legal, consensual relations with Ellen. She was never a victim.

Ballock makes no apologies for communicating with Ellen in this manner, as it was the only way he could learn the extent of his wife's behaviors and to help monitor, moderate, and protect against the dangerous activities of his children's mother. Ellen shared via these communications things she would never share with Ballock.

Though Ellen saw counselors and took prescription medications, she would not stop engaging in dangerous behaviors. Ballock was desperate to get Ellen to stop and preserve his family.

Ballock consulted a divorce attorney who informed that great deference was given to mothers in divorce cases. The divorce attorney informed Ballock that unless he could show that his children had been seriously physically abused (suffered broken bones or cigarette burns at the hands of their mother), Ellen would gain custody of the children and Ballock would see them every other weekend and for a few hours every Wednesday night. Ballock is a devoted father and was unwilling to be separated from his children. Instead, he tried to moderate his wife's behaviors and convince her to seek treatment.

The following email messages (a fraction of the total) written by Ellen depict a hyper-sexual lifestyle which has long been recognized as an addiction by Ellen. Ballock shares them for no other reason than to disavow anyone of the notion that he ever forced Ellen to do anything against her will or that he ever abused her. Ellen was not a victim.

Though Ellen shares her deepest secrets in these messages, including her disappointments with her husband, not once did Ellen ever say she was abused in any way. To the contrary, Ellen expresses her ongoing struggle with wanting to leave a husband who treated her so well.

Ellen's own words will hopefully allow for a better understanding of Ballock's many concerns about Ellen. Ballock was understandably extremely concerned when Ellen chose to expose Ballock's young children to another unhealthy individual she met on Craigslist (Kenny Ice), as well as to a convicted child molester (Karl Vincent Taylor).

CCL possesses Ellen's communications, none of which OPR reviewed because it refused to speak to CCL. Again, OPR's conclusions are based on extremely limited knowledge as well as an ignorance of mentally disordered persons and their capabilities to create havoc. CCL's diagnoses and recommendations were made after a thorough and exhaustive investigation; OPR's were not.

When reading Ellen's words, recall the recovered audio recording in which Ellen explains how she expertly crafts false stories of being victimized and makes them so believable...by sprinkling her falsehoods with bits of truth. Below is Ellen's truth, some of which she called upon when concocting falsehoods to harm Ballock.

**In Ellen's own words:**

> *I'm soooooooo horny because I'm me. I am wired this way.*
>
> *I live for sex. It's always on my mind.*

20

**CONFIDENTIAL**

**PL 00193**

*It is difficult to control myself all of the time. The more times I can deliberately set up a situation where I don't have to concentrate on keeping my hands and mouth to myself, the better. Restraint takes a lot of energy and will-power. Some days it can be a little mentally exhausting.*

*I need a good gang bang fucking. I need to be covered in cum and piss and get to the point that I am raw and sore and can't take any more. Problem is that I need something like that on a regular basis, say once every month or so.*

**I've grinded on lots of hands, knees/quads, chins, hard cocks, and a gear shifter.   I've had all kinds of kitchen utensils, veggies, dildos, vibrators, handles of hairbrushes, a glock, a narrow glass bottle, fingers, tongues, and of course hard cocks inside of me.   I need to experiment more.**

**It's spring and I am celebrating in my own way with porn, writing you a lot, jilling, and fucking every night...near the edge of being a little over zealous. When I awoke at 4:00 a.m. in excruciating pain I knew I had gotten what I deserved; I have a bruised urethra. Yes, I hurt like you can't believe when I pee and it's from rubbing myself into a tizzy and using my vibrator more than once a day and hard finger fucking and a royal pounding three days in a row. Plus (husband) has been lasting a lot longer than usual so the pounding is really a pounding. It's awesome, but my poor little puss hurts inside and out.**

*I am coming to find out that I like really rough sex.   Wonder what that says about me?*

**I'm going to the doctor for my little bruise problem..."how did this happen?..." "Rough sex." I say it with a straight face in a very matter of fact way and watch for the doc's reaction. Today I'll see a male doc which is even more fun. I think the words "rough sex" are listed several times in my chart. I don't know if I'll be up for sex tonight. My body says yes, my body says no. Hopefully the doc can help.**

*The yellow squash must have caused some damage because sex hurt tonight as it has ever since we went nuts with the veggies. But sex only hurt tonight until I got into the right position. Then it was great.*

*All I can think about is dick, dick, dick...I need some strange.*

*I didn't get my dad on tape. I was so excited at the thought of taping him and disappointed when it didn't happen.*

*I love, love love taboo. There are some things I like that I can't look up on the computer or even dare to write about, but they appear in the news every so often. If I ever meet you I'll tell you to your face.*

*From a young age I have lusted after all kinds of dick. While growing up and watching National Geographic specials I used to wonder what it"d be like for me in a tribe where the men wear only a loin cloth. I'd watch intently hoping to catch a glimpse of some native dick :)*

*I'm still me with an out of control sex-drive and craving for dogs, but I have to learn to temper my selfishness and stop hurting my husband by being disrespectful.   He wants me as his own little whore to call on when he needs it.   If he's all I get to have for the rest of my life, then that will be enough for me.   I think I've got that better than most women too.*

21

**CONFIDENTIAL**

**PL 00194**

*I used to make strong moves without thinking things through.   He found out about each guy at different times and each time he would plead, "Don't screw around with anyone (else) from my work," and every time I'd do it again. I hate telling you how out of control I was.*

*Cheater. Me.   Some days I'm more comfortable with it than others.*

*(Husband) is watching women's softball.   Funny the tame things he likes.*

*Good morning sunshine. I was frustrated all evening as (husband) was both a computer hog and not in the mood for sex.*

*The big dog is out doing something for work so the little dog is playing around.   If you ever read a letter from me that ends abruptly or is all out of order, then know that I had to stop writing unexpectedly.   I almost got caught writing you yesterday so I'm going to have to be more careful.*

*I only look like a grown up.   You know I'm far from acting like one.*

*(Husband) is head and shoulders (mmmmmmmm.......shoulders...) above all of these guys.   They're just new dick with new vibes and different scents and ways of making me cum.   But I get lost in the moment unless he's around to keep me grounded.*

*I could get attached to Tarzan and what we could do together very easily.   Why am I this way?   Crazy hormones.*

*Your worries should be subsided a bit after witnessing the choice I made to stay with (husband).   It was an attractive offer though, don't you think?   I know he'd do exactly as he said as far as taking care of me, but I couldn't do it.   I can't leave behind 22 years of knowing him and loving him.   I love him differently than others; it's a fierce sort of love that is difficult to describe.   I was actually surprised by my response to his offer.   We have too much of a history for me to move him out of our house and into an apartment just so I can sow my wild oats.   There are too many memories and life experiences we've shared.   I will be trying very hard not to push the envelope of danger anymore.   My nine lives are up and I must behave.*

*The trouble with teaching high school is that I may end up in trouble.   Can't do it.*

*I have a bad case of penis envy.   I caught it when I was 8 years old and it's never gone away.*

*I feel frustrated that I have such a high sex drive and no one to help me relieve the intense build-up. I don't know exactly how to explain it because it's a physical feeling that links itself to states of being like euphoria as well as emotions such as love or anger. This must be what it's like to be a 15 year-old boy with raging hormones. My body physically aches for attention...I don't eve want to go there right now. See why I'm happy about the lessening of sensitivity in my nipples. Sheesh, I can't believe I'm writing all of this to you.*

*I hope I don't end up in the elevator at the Y because I promised (husband) I wouldn't mess around there anymore.   I have to keep that promise.   Please remember, I need to stay a married woman.*

*I think my anger over a few nonsense things that happened with one of my docs has scared away the roadrunner for now. Anger does that to me - takes me out of a depression funk - but it results in other complications. Maybe anger is how I control things I cannot control. Yes, that's probably it. I'm such a dysfunctional loser-girl.*

22

**CONFIDENTIAL**

PL 00195

*Daddy!   My dad won't ever try anything with me for fear of going straight to Hell.   He'll never know I was willing....*

*It's difficult not to soothe myself with sex with someone new. Sex - mmmmmmmmmmmmm- my drug of choice. And I have a craving that won't go away: I want to fuck someone who hasn't gotten any in a long time and really needs it. It's so fulfilling to do that for a guy.*

*Today I'm going to order a few "how to be a better wife" books so I can learn how to be golden to my hubby.   Maybe I should buy ones that say "how to stop whining" or "how to keep from going ape-shit nut-so."*

*See why I love K9 sex?  Dogs are fun and love everything they're getting.   They pant and nearly smile with excitement.   Most men are borderline pigs or jackasses.*

*The spy cam is set up in the downstairs bathroom so I can get a video of my daddy's dick.   I can't wait.   And the hairdryer is tucked away in my bathroom so he'll have to ask me for it as he did before when he got a good look at me in my bra.   I bet he wants to reach out and grab my tits.   I'd let him.*

*When I talk to my husband about each of us having a secret, he distances himself from me.   He wants to know everything about me and doesn't want my one secret to lead to another and so on.   He's smart to think that way.*

*I'm a night owl for sure, but screwing around with others is out.   I keep hinting around about all kinds of fun things, but right now my husband would prefer me to be plain vanilla.   Blah!*

*My husband and I had a long conversation last Saturday morning.   It went well because we were both in a good mood.   There was a lot of laughing and teasing.   The only thing that sucks is that I'm still on restriction and may be for the rest of my life.   He doesn't trust me at all when it comes to my sexual nature.*

*Here's the summary: I am not to be writing anyone, having phone sex with anyone, and definitely not screwing around with anyone including girls.   If I can't live without those things, then I am supposed to leave.   Things are to be kept at a fantasy level and shared only with my husband.   He's afraid if I am writing someone or having phone sex that it will lead to fucking them.   The whole mess that goes with that is something he doesn't want to have to deal with again.   He says it's easier if we don't include anyone else in our lives except through fantasies.   He says he doesn't want to risk losing me.   His words:   "Isn't it enough for you to have me and fantasize about others?   If it's not, then I understand.   But you'll have to leave me if that's what you want because it's not what I want.   You're going to have to choose."*

*Even though no one else would understand...you are good for me.*

*In regards to the Bunny Ranch, I've asked if I can go work a few months out of the year in NV. Lots of women earn enough money in a few months to be set for the year and then return to their home life and raise their kids. My hubby said I could do whatever I want, but I'd have to divorce him to do that job...that's a divorce threat that isn't going to change. If I run away, that's where you can find me.*

*Bunnies. It's right up my alley. I dislike the word whore too. Bunny is much better. I see nothing wrong with it either and never have, but hardly anyone else feels that way. It's strange to be so different from most other people.*

23

**CONFIDENTIAL**

**PL 00196**

*My son is 7 and a half and will start second grade in the fall, my daughter is five and will begin Kindergarten. I don't know when this parenting thing ends...I expect thirteen years and a few months from now (daughter) will be entering college. I think that's too long to wait to work at the bunny ranch, don't you?*

*I sometimes question whether I have what it takes to get myself worked through it.   My dad's and his wife's visit pushed me close to the edge.   I cried myself to sleep last night.   It took longer than usual and I feel awful today as you can imagine.   The serious stuff that goes through my mind is leaving everywhere for good.   Basically, I think a lot of people would be better off without me if not now, then in the future.   It's something I've struggled with for a few years now and it's only getting worse.   I hate myself on so many levels and this one - thinking of ending everything - is what I hate most about myself.   I usually mask my feelings with sex.   Pathetic, I suppose.*

*Fucking my dad or uncle won't get me fired from an elementary school.   I can't share the other stuff until you give me a sincere promise that you're not sharing anything we write with anyone else and that you are very, very careful to sign out of our account...I'm sorry, it's difficult to take such a risk without knowing you on a personal level.*

*I like to talk to young boys and watch their eyes flit from my tits to my face.   I know they want to reach out and touch them.*

*Dear voice of reason and sanity. I'm glad I have you.*

*Because I don't live with a dog, he's never been a dog, I forget that about men. I'm not going to leave my good catch.   I got really, really lucky didn't I?   In fact I'm extremely lucky he hasn't thrown my ass to the curb on dozens of occasions.   Maybe he stays because I give really good head.   :)*

*I haven't figured out how to do it right (check out) without someone I don't want finding me or hurting myself and turning into a vegetable or something.*

*There wasn't any eye candy at the Y.   Today I ran the track with a bunch of people who were walking around it slowly.   I had fun feeling like I was fast (I'm definitely not) as I passed them over and over.   I like to do sit-ups and push-ups upstairs above the chaos going on in the gymnasium and the hustle and bustle down below in the streets of the city.   Sometimes I get really close to the widow that faces Ashley look down and fantasize about jumping.   I know I've exercised hard enough when my face is red and I no longer feel like jumping.*

*The gorgeous dog next door has an awesome dick and a humongous knot.   I molested him this afternoon.   I got a phone call from my neighbors (who own Captain) and they were away from home and needed me to enter their house through that open back door and grab an address from their calendar.   That put me in the house alone with the lucky boy.   I was careful to go into the bathroom with him in the event they have some kind of spy camera set up in the kitchen.   It appears they leave their back door open quite often when they're away and Irwin is constantly talking about spy cameras.*

*I've parked my wrecked motorcycle of a sex life and I won't be getting back on for a ride ever again.   It's different this time.   I'm stopping because I want to, not because I need to or because (husband) has asked me to.   If you'd have heard the strange things Bily was saying*

24

*and the scary tone to his voice, you'd be in the same frame of mind as I.  My experiences with Craigslist and with J are enough to both keep me happy and keep me grounded.  I'm glad my last experience was a wild one.   I had sex with Rob, Bily and Tess, CB, and (husband) all in one day and that's good enough for me to end on.   Weird guy Rob followed by a sexy threesome followed by roughness followed by the familiar.*

*(Husband) was pretty uncomfortable with the whole idea of me fucking other men last night.   What happened is T had a friend over to play and when that friend's dad came to the door the mood of things around here changed.   T's friend's dad was drop dead gorgeous.  (Husband) was home and saw how he (John) looked at me before John saw him.  John is divorced and raising his son all by himself.   He lives around the corner on Harley Drive.  (Husband) and John stared at each other for what seemed like an eternity.   I wasn't quite sure what was going and got a little nervous when (husband) said he looked familiar to him.  John said the same thing.  (OMG, is this a bad guy in our living room? is what I was thinking by the way husband was intently staring).   They finally figured out that they see each other at the Y.   Whew! After John left and while the kids were busy playing with their new pet guinea pig, (husband) got all strict and bossy with me.   He deserves to be that way, I'm just setting the mood for you.   He told me that fooling around with other men will get me divorced and left with nothing.   Then he went on to explain that if I fuck around with any neighbors (he must have seen how I was looking at John) or anyone who he even remotely works with him, he'll leave me instantly; there will be no begging for forgiveness because I should know I'm playing with fire in this small city.*

*As I was following (husband) out of Qdoba, I walked behind Harlan and ran my fingers along his muscles from shoulder to shoulder.  (Husband) was ahead of me so he didn't see.   My hand was low enough that Harlan's crew members didn't see either.  I don't know if Harlan turned to look or not as I just kept walking and didn't look back.  I don't have the hots for Harlan as much as I used the situation to be bad for my own selfish needs.   That's also what adds to the "badness" of it.*

*I did have a problem with Vicodin at one time (for about two months) and when I stopped, I substituted more sex for the high until I got back to a more normal level of existence.   Normal for me is quite abnormal for everyone else though.   :)*

*I'm joining (husband) for lunch today.   Probably Great Wraps, but maybe the Prickly Pear.  (Husband) has begun wearing cologne to work.   I like that.   Maybe he's got some girl he's working on on the side.   I can't believe he denies himself things he can have in life.   No motorcycle and no gf.   I don't get it.*

*Oh Boy! There are a bunch of men fixing the roof of my neighbor's house (two houses down).   I can't tell if they're good looking or not, but men at work (physical labor) turn me on.   Right now they're very busy so I'm not going to bother them.   Maybe later I'll go for a walk to see what's going on.   Maybe I should offer them a warm, sweet treat.  I was thinking of me, but they'd probably go for chocolate chips cookies too. Maybe some pie :)*

*I think about what life would be like at the Bunny Ranch often.   What holds me back is (husband) telling me he'd never stay married to me if I did it--and the thought of how devastating it be to the kids to no longer have me in their lives.  I fantasize about the Bunny Ranch more than about men here in AA.*

25

**CONFIDENTIAL**                                           **PL 00198**

*I feel as gray on the inside as the weather.   Why is having an affair so goddamn difficult?  Stupid question.  It's because I'm dealing with someone I don't really know and we owe each other pretty much nothing.*

*I'm very lucky to have (husband).   I see that when I am with other men, even when all I'm doing is flirting. I am even more lucky to have you by my side.   Thank you for letting me share every thought that crosses my mixed up mind.*

*Yes, it's a difficult balance to enjoy life the way I want to and remain true and faithful to my family.*

*...you have done more for me than any other psychologist ever has.   I have paid a lot of money (maybe wasted is a better choice of words) to those who have PhDs or MDs and haven't gotten any better.   With you I feel I'm getting somewhere with myself.*

*Everything in moderation?   OK, I'll give it a try.*

*It seems I'm battling demons left and right in my life.*

*Right now I have to go walk the dog across the street, then go to story time, then hit the Y.   I'll be home this afternoon and I'll write you about my fantasy ideas for the Bunny Ranch.   I wonder if the girl who liked dogs (did you see her big dog?) sucks and fucks him too.      That's where my head is today...thinking about the videos I've seen of girls getting their dogs off.*

*I lie to myself a lot.   It makes life more convenient I think.   As a whole, we lie to ourselves more than we lie to others.   Obviously I know when I'm lying to others, but I also know when I'm lying to myself.   Most of the time I choose to ignore the realization that I'm lying to myself.   It's a problem....You help keep me honest.*

*Mastain's Little Fuck Toy, was another nickname I had for a while.   Remember that?   He was too scared of (husband) to pursue me unless (husband) was out of the state.   That's where (husband) was the day Ryan came over and came.*

*(Husband) will have had a good day at work.   He's justifiably frustrated and it makes him edgy and tired.   I wish he'd used sex like I do to take the edge off of the rigor of life.   He wouldn't even talk about a motorcycle this morning....hrumpff....*

*Super glue. That's what I use to keep my pants on in my neighborhood.  ;)*

*I'm off and on queasy from surgery and in agony from the pain.   I slept with frozen corn and frozen peas under my back last night.   This morning I switched to mixed vegetables.   The cold packs just weren't cutting it so I phoned in for major pain killers.   Now I'm taking vicodin and all I want to do is suck dick.   Curious side-effect don't you think?*

*Oh, crap.  Sean, please help me.  I'm spiraling out of control.   I know why, but it's too deep and boring to want to share right now.  All I want to do is soothe myself with thoughts of doing everything kinky under the sun with a willing guy like Tarzan.*

*I've been me my whole life, not a lot different from when I was a little girl.*

*I'll have to smell the guys who exercise during lunchtime today.*

*His job is the same reason I can't go work at the Bunny Ranch for a few months out of the year.   I'm glad he has a job, don't get me wrong, but it gets in the way of me being me*

26

**CONFIDENTIAL**

PL 00199

*sometimes.   He gets tons of perks and I get, um.... lots more rules to live by than I used to have to follow.   Maybe that's a good thing for me.   Hmmm.   I don't know.*

*"Aren't you afraid of divorce?"   Yes, always.*

*Craigslist should be called Candy Land.   :)*

*You and (husband) are both worried about me getting arrested in AA.   Both of you warned me to keep myself out of someone else's car and mouth to myself during my lunch break today.   You both know how I'm wired. Fortunately for you guys, there were absolutely no good looking men (or women) in my class.   It was full of dogs and pigs.   No one was the least bit impressive.   I learned a lot about first aid, administering CPR as a layman and how to use an AED.*

*The bunny ranch was a topic of conversation last night and again this afternoon.   I am begging (husband) to let me go.   He must be using his work as an excuse for me not to go, because he has said nothing about it for a while.   Instead he says he doesn't want to be left at home alone with the kids.   Then he says I can go if I want to separate from him first because he doesn't want to be married to a whore.   I couldn't help it, but tears came to my eyes when he said that and I got whiny and said that I didn't want to be a teacher and work my ass off for such little pay....I wanted to earn what he earns if not more.   He lightened up with his strictness and told me to just keep staying home because he likes it best that way anyway.   That is not the answer I'm looking for.   I feel like I'm banging my head against a brick wall.*

*I am sorry to be driving myself crazy with thoughts of checking out or thoughts of leaving for the Bunny Ranch.   You are absolutely right as you've told me too many times to count to stop thinking of those things (things that I really cannot and, thus, will not end up doing).   I will now stop.   I have yet to figure out what I'm going to to redirect myself when I have those thoughts.   Playing the piano used to help, but I haven't played in years.   Who cares if I'm not good at it right away (or ever) if it helps, right?*

*When there is someone who is as freaky as I to spend time with I do. And I do all of these things at the expense of my family.*

*You do calm me down and center me.   I'm missing that self-monitoring part of myself.*

*I've got to stop all of this. You're right.   I'm on a path to self-destruction and I need to stop.   I have a great life.   I don't get everything I want, but I get more than most. Even corresponding with you will land me in a messy divorce.   I am going to miss you something awful, but I should do the right thing.   Maybe I do have mental problems or maybe I'm just a spoiled girl.   We'll leave it at that.*

*I'm afraid to visit any porn sites right now.   I can't locate Norton on my computer and don't know if (husband) is monitoring my actions on this laptop or not.   I think he's too busy right now.   He has all kinds of connections but isn't one to ask favors of others either.*

*I think about running away and starting a new, more fun life as a bunny many times a day baby.   I can tell when I'm getting out of control and today is one of those days.   I am so tempted to just haul off and do it.   I am feeling extremely impulsive. OK...1,2,3...work!   (bleck)*

27

**CONFIDENTIAL**                                                      **PL 00200**

*He knows who I am and what I'm all about.   He asked why I do it and I answered that it's a sex addiction and has nothing to do with him.   He knows that's pretty much it.*

*The rules I have to follow are as follows: Do not let any of his colleagues find out about any of this past, present, or future. Do not do something stupid that gets me arrested. Do not do anything around the kids.*

*I'm very lucky to have (husband). I see that when I am with other men, even when all I'm going is flirting.*

*Secret. After having kids and before getting a boob job, I could lick my own nipples.   Now my boobs are too tight.   I miss it a little.*

*Time of day. Hmmm.   I'll have to think about your question about my mood changing throughout the day.   I'll think right here, right now.   Most likely my mood change is based on how my morning has started, what kind of mood my family is in when they wake, and what kinds of stress happens as the day rolls on.   When things get really stressful I either toughen up and plow through it or I retreat (to here and Craigslist) and soothe myself.   Recently I've been retreating.   Some days, after exercising or if the weather is bright and sunny, I'm in a silly sort of mood.   Days like today are definitely not mood boosting, but have a calming effect on me.   I don't know.   I wear my emotions on my sleeve and express most everything I'm thinking to you.*

*I won a game of corn hole, which (husband) thought I'd never do, and the standing bet wager was that if I ever won he's supposed to bring home a girl to share.  (Husband) said no and took back the wager.  Oh well.*

*Besides babysitting, my first "real" job was at an ice cream stand called The Milky Way.   It was configured like the DQ in Dexter.   We had the best custard in all of central Indiana and people would come from all over just for a taste.   The girls who worked there were the cheerleaders and pom pom girls.   Everyone had a ponytail or a pretty face or both and a great body to match.   Our uniforms were white pants, white polo shirt, and a red and blue apron.   Our white pants showed the guys everything they wanted to see as we bent over to scoop their ice cream treat.   Unlike Stucci's, our freezer was in a position where we had to turn our back to the customer and reach down to dip.   Being a shorty pants I sometimes had to stand on my toes before bending over to scoop if the gallon container was nearing the end.   Being the bad girl I am I always made sure to wear my skimpy, silky white, bikini undies with tiny red and purple hearts.   They looked cute (probably sexy too) through my white pants.   You'd have visited me everyday at work had you known me then.   The owner was smart to hire us all or our bf and wanna be bf would hang out and spend loads of money just to talk to us.  OK--that was a loooooooong time ago, but what a great memory to visit.*

*What would you think of me if I left my kids and husband behind? Would you call me an idiot, a loser, out of my freaking mind, selfish, or brave?*

*It's a boring story about how I got here.   Suffice to say I read a few books about the human psyche and evolution.   I'm not very highly evolved, which is actually a very good thing, and that's why I am the way I am sexually and otherwise. Who I am and what I do has nothing to do with (husband).   I'm not fucking around behind (husband's) back because he doesn't*

28

**CONFIDENTIAL**                    PL 00201

satisfy me or because I don't love him, but doing it in secret makes what I'm doing incredibly intense.

And no, I don't feel the least bit guilty about any of this.

My PT is smart and confident. She has lots of personality qualities I find attractive. She's easy to be around. If she ever makes me cum, she'll know it because my muscles will involuntarily contract and she'll feel it with her fingers/hands or see it with her eyes. I'll say "thank you" if it happens.

Yes, I'd love to fuck him and yes, (husband) took him right off my plate. I have to show more respect to (husband) and I'm not. I haven't. Am I capable of it?

I sure do take the freedom I'm giving and run with it full-tilt. I'm a danger to myself. It's really scary.

Do you ever feel like taking people down a few notches just for the hell of it?

I like to talk to young boys and watch their eyes flit from my tits to my face. I know they want to reach out and touch them.

I think I told you that part of the reason I have packed on the pounds is that I no longer take Adderall XR (amphetamine based medicine for attention deficit disorder). That stuff was great for killing my appetite. I'm tempted to go back on it, but then I remember how agitated it made me feel and I shouldn't do it for the benefit of everyone around me.

The trouble with teaching high school is that I may end up in trouble. Can't do it.

Dear voice of reason and sanity, I'm glad I have you.

(Daughter) and I ate lunch with (husband) and went to the mall for a few things. I hate being bombarded with free stuff from the people who work in the kiosks area. I am nice about turning them down, but I really just want to punch them in the head.

If you do settle down, just remember you don't ever ever ever get to do what you really want once you have kids.

Keep on me. I'll cave and do the right thing about the Adderall. I wouldn't have told you about all of this if I didn't think you could help me. So far your words are making a difference.

I should start going at lunchtime for a quick run on the treadmill so I can check out the guys who exercise over their lunch hour. I know there are some pretty bored-with-their-wives guys at that time.

I'm looking for a cute or handsome guy to weave a tangled web around next. So far I've seen none. I meant it when I asked where all the good looking guys have gone? Where are they?

I carried a black backpack as I was out and about the city with the kids. The straps framed my tits nicely and lots of guys enjoyed looking.

I'm hanging in there. Do you ever feel like I do? Sometimes I think life is one big joke and no one is really ever truly happy (at least not for very long) and we live in denial of our feelings and problems doing our best to muddle through day after day, year after year....I'm really down. I hate when I get like this. My head is full of dark clouds and I've been ready for bed

29

**CONFIDENTIAL**

**PL 00202**

*since 3:30.  I'm going to make dinner and IF I have any energy I'll go to the Y otherwise I'm going to try to go to bed early.*

*Turn to page 120 in the August issue of Playboy to see my new mermaid fantasy. Yes, I have fantasies about unreal things too.  Do you?*

*The night before last (husband) wanted to read himself to sleep, but I wouldn't let him.  I wanted sex.  Last night he asked to take a break.  I can't believe I wear him out to the point that he has to practically beg for me to keep to myself.  He won't keep me waiting long I know.  I just find it amusing when he pleads for me to let him just go to bed is all.  Tonight I think I'll grab his dick during the concert and keep him hard then blow him on the car ride home.*

*When Captain gets out of his biting stage I'm going to let him lick me again.  SBHP liked to bite, but not as hard as Captain.  Captain is a good little, bad little dog.  So am I.*

*Secret. After having kids and before getting a boob job, I could lick my own nipples.  Now my boobs are too tight.  I miss it a little.*

*I am feeling great today.  I have nothing to complain about or contemplate.  I wrote Chris and Charlie.  I wonder if I'm going to spin out of control.  That's probably what you're going to have to watch me for....getting a little over zealous.  I am not in love with J (so far) but I may fall in love with his dick.*

*Yes, I'd do almost anyone who lined up if I wouldn't get into trouble for it.  I think sex is THAT fun and as different as dicks are so is the method guys use to fuck.*

*Dudes and dogs. Dogs are better because they don't talk back.   :)*

*If I just keep my eyes to myself and head down and my legs closed I'll have no problem, right?   Then I won't have to worry about cars and getting caught.*

*Since the age of 8 I've known the excitement of almost getting caught.  It's an amazingly strong sensation.*

*Jeen said thank you for the photos, but didn't say anything about them specifically.  He is usually unappreciative so it's no big deal.  He said something about them not being of my face and safe for him to open when Michelle is home.  I told him in no uncertain terms that he should never ever do such a stupid thing.  Who knows what goes through his head.  Maybe he gets off on almost getting caught...many of us do.*

*Sometimes I wish I could disconnect my head and give myself a break.*

*I'm sorry I can't watch Homeclips anymore because it gets me too excited.  Honest to goodness I can't handle it.  I also don't handle myself well when I write you.  I get myself all worked up and want more and more, but I can't have more and more if I want to remain married to (husband) and live under the same roof as my kids.  I must control myself by whatever means it takes to keep from ruining my fantastic life.*

*I'm super busy today.  That's good for keeping me out of trouble.*

*Sean, you brought up something I don't like to talk about but am going to address:  I am not going to have this kind of power over men as I age.  That's a big part of my problem.  For*

30

**CONFIDENTIAL**                                    PL 00203

*example I like the feeling of being watched as I exercise.   In ten years I'll be lucky to grab anyone's attention other than a blind man.   ;)*

*Maybe I should try Prozac.   Maybe it will act like a chastity belt in some fashion.*

*I'm still thinking about giving up everything.   I think it's the only way I can do right by (husband). I'm back on Wellbutrin.   I went to the doc today and told her a few scenarios about my recent emotional outbursts.   She thinks it'd be a good idea for me to resume taking meds to help with seratonin levels so I can be more emotionally balanced. Wellbutrin doesn't affect my ability to have an orgasm and I was afraid to try something like Prozac, though that's what she offered me first.   Do you think I should try the Prozac instead?   I can always get a script for it tomorrow.   I am afraid to take something new and suffer the side effects is all.*

*Today I turned off my imagination and saw life as I used to.   I'm rather boring that way, but I think it's better for me.   All of this that I do behind (husband's) back is no longer worth the risk.*

*Thank you again for keeping me safe with you here. Thank you for letting me by myself. I love you.*

*It's quite possible that my inhaling all of the spray paint fumes (which is nothing I'm doing on purpose) is killing off my good judgment brain cells and making me high at the same time which makes me extremely horny.*

*I used to have a problem with Lortab too.   It resulted from having a lot on hand after back to back root canals and a few minor surgeries.   I didn't have any trouble stopping that drug, although I missed the overall mellowness I felt.*

*Please don't worry.   I'm careful not to get started on addictive meds now that I know what I usually do with them.*

*My sexual nature is also more toward becoming an addiction issue.*

*It's tough to share my secret thoughts sometimes.   Thanks for not judging me.*

*You keep me grounded sexually (and you try very hard to keep me grounded otherwise).   I can rev things up and keep them in fantasy terms by sharing my every thought with you and there's no fear of judgment.   Other men are not a threat to our relationship so there is no fear you'll hold my ideas against me. You're fantastic at talking me down from the ledge when I begin to blur the lines between fantasy and reality.   Most of all you understand my weaknesses and my strengths.*

*I don't feel lost anymore, rather I feel a little stuck but stuck a good spot with very few things that bug me anymore.   I wonder what that says about me?   ...being OK with feeling stuck I mean.   Am I maturing or am I growing tired and settling down or am I bi-polar and transitioning from the depression state to the manic state?   Maybe all of this doesn't mean a thing.   It could just be that life is what it is and over-analyzing myself only leads to falling anvils.*

*Am I really all that different from most girls?   I think not, I'm just more open and honest--or it could be that I'm more stupid.*

31

**CONFIDENTIAL**

PL 00204

*My husband and I had a long conversation last Saturday morning.   It went well because we were both in a good mood.   There was a lot of laughing and teasing.   The only thing that sucks is that I'm still on restriction and may be for the rest of my life.   He doesn't trust me at all when it comes to my sexual nature.*

*I really should heed your advice and return to the good wife I once was, the one my husband deserves.*

*I know how good of a life I have, but I also know how great it once was.   It's difficult to be with the same person and have things be less than what they used to be.   I keep waiting to get back to that point, but it isn't happening.   I should stop expecting that it ever will.   I'm not the person my husband wants and needs me to be now that we're older and have kids.   I find it upsetting to have to shut the door on parts of who I am if I want to stay married and live under the same roof as my family.   I should be bigger than that.*

*Since happy pills don't work and corresponding with you isn't the answer to my problem (because my problem lies within me), I'll have to try something else.   I should probably start with giving in and accepting that this is the life I chose.   I should be so much more pleased with it than I am.   Next, I should grow up and act like all the other women who are 40 (I hate being 40 and growing old).   Life as I once knew it is over and the last few years have been wasted on arguments and such driving my hubby crazy over trying to find happiness.*

*Thank you for being a voice of reason.   I should be a better person and wake mine up and use it now.*

*I know I'm wrong most of the time.   I also know I'm loony.   It's a strange word, but a good description for a strange person like me.*

*I owe you a big thank you for guiding me in the right direction.   I'm guessing you figured I was smart enough to get myself turned around and keep my family living happily together, and were hoping that eventually I'd rise to the occasion.   I'm sorry it has taken me so long to come around.   Of course that means, in all sincerity, that I must stop writing you.   I have to fully commit to my family no matter what of my petty needs are or are not being fully met.   If I am a more loving and a better wife, then I will eventually gain the love, trust, and support that I need.   It may not come to me right away, but I have to give and give and live my life right first.   I can't continue living my life the way I have been without destroying myself, my husband, and my kids.   I made a choice to get married and have two kids.   They deserve all of my love and focus.   (Geez, I sound like I've found God.   I haven't.   I'm still an atheist and always will be.).*

*I'm such a jerk.   I feel like a loser, yes a loser, which makes me even more determined to immediately stop my selfish behaviors and truly focus on making my home a loving, warm place for my family.*

*I've done wrong and caused a lot of hurt.   I have to grow up and overcome how I was raised.   I'm no longer a child in my parent's home.   I have to move beyond the rotten memories and hang onto the good ones.   When I look at the family I'm in now with an open mind and heart I see that I have it really, really good.   In fact I have it much better than most women.   I have always had a good life with my husband.   If I'm devoted to him and being my best, then it will continue to be that way and can only get better.*

32

**CONFIDENTIAL**                                                     **PL 00205**

*I find myself feeling stuck in my life right now, which is a good life- an incredibly good life - but I like having more space to roam and more options to choose from.   I think my husband feels the same way, but he is more mature and stable and makes better choices.*

*I wish my husband would let me go to work at the Bunny Ranch and earn enough money to move us out of here and relieve him of the financial stress he feels as the sole breadwinner.   He's so much more fun when he's not stressed.   It's strange to be married to him and have him with me every night but still miss him.*

*To escape my heavy thoughts, throughout the day I make plans to run away with you to NV and start fresh.   I think about how I could be more of who I am with you.   Would you want to live on the mountain where there are 4 seasons or down in the valley?   I was surprised you mentioned living in the NV sunshine the other day.   I thought you didn't like Vegas and the desert when you were there.   If CA weren't so outrageously expensive I'd live there in the southern part where the weather is nearly perfect.   About the time I get to the CA part, my heartstrings snap me back into reality and I realize that deep down I can't leave my husband and kids because I love them too much.   It would crush them all if I ran away.   It would ruin my kids.   They deserve better.   So I tell myself over and over to be happy with what I've got, love the ones I'm with, respect my husband, life is not all about me, and (again) be happy with what I've got.*

*Why am I so different?*

*I really shouldn't be writing.   Too risky.*

*I think you'd like my nipples.   They used to reach to my mouth, but no longer.   I loved sucking on them (well, it was more like licking) because it felt soooo good.*

*In a few minutes I will have an hour free.   I am sooooo tempted to ask Charlie where he works so I can stop by his work to meet him and "drop off my resume" which means blow him.*

*I'm going to exercise tonight (8:00?) and every evening for a little while.   I promised (husband) and I promised myself (and didn't I promise you?) that I'd not ruin the Y for my family and that's what I'm on my way to doing with J.   I fear I have appeared to be J's gf on some level in front of others.   I'm pretty sure others have seen him break my space and look me over.   Maybe those who've seen are giving me the benefit of the doubt and assuming we are good friends.   Probably not though.*

*I need to rise above my selfish self and do what's being asked of me even though I don't like it one bit.   I have been asked over and over and over to stop writing you or anyone else.   I am supposed to be a one man woman and behave as a 40 year-old wife and mother of two is supposed to behave.   I'm supposed to be sexy-naughty behind closed doors; nowhere else and with no one else.   You know the rules...and that I've been breaking them for a very long time...and that one day I'd probably give in and start following them or end up divorced.*

*Tonight I will ask him to help me figure out how to satisfy that side of me.   The "coming to him for advice and guidance" is a good start, much better that what I tried last night.   Last when I brought up the prospect of corresponding with Jeen again he said in a very exasperated way, "I thought we were beyond that and we were in agreement that you weren't going to do any of that stuff anymore."   I'm afraid tonight he's going to say "Aren't I enough?"*

33

**CONFIDENTIAL**                                                  PL 00206

*and it'll kill me to hear him say that because that's not what this is about and I'll feel like a heel and a spoiled brat and then the worst will happen.................................*

*I'll look up and see that sneaky road runner trying to push that big, black anvil off the cliff and onto my stupid head.   Bonk!*

*When I put myself in (husband's) shoes I see myself as a big piece of shit.   I see myself as a spoiled brat.   He's giving me all he can.   I ruined things for myself and am not allowed to fuck around with others now.   Even if I'd done everything according to his wishes I still don't think he'd share me with someone new now.   I mean not only do I fall in love with others, but others fall in love with me.   He doesn't want to lose me like that.   So why am I continuing on behind his back pretending I'll never get caught?   It's nearly certain that I'll someday get caught.   No matter how good I am at keeping secrets and lying others will be involved and things will happen beyond my control.*

*It's difficult to keep myself out of trouble when I get like this.   Today I wanted to fuck the True Green lawn guy.   Why? Because he had all the right body parts to do it and he was breathing.   I seem to be in some kind of heat.   Please help me be safe...talk me down when I get too out of control.   OK?*

*Besides you I find myself thinking about how I'm going to keep myself out of guys pants once both kids are in school full-time.   I need to get a physical labor job where I'm too busy and tired to screw around with men I meet.   Or I need to be a nanny for little kids so I have no time to screw around.*

*I'm a little scared of myself and need to pull back.   Keep reeling me in.*

*My daughter cracks me up throughout the day. I won't bother you with the details, just suffice to say when she grows up she's going to be one hot, sexy thing. I can safely say that because I'm her mommy.*

*The back of my shoulder is where dogs rest their chins (do dogs have chins?) and between my legs is where I love to be licked so it's a toss up as to where to get a tat. I have no problem bearing any body part for the procedure as long as a guy is doing it. I really don't want a girl to brand me. I think a guy will be more careful to do a good job. Girls have an "it's good enough and you're a bitch if you don't like my work" attitude. Can you tell I've crossed a few girls? I think you're right about other guys figuring out the meaning of it. That doesn't matter to me so much as trying to figure out what to say to my kids about it. My daughter is so curious about my body and asks if hers is going to look like mine when she grows up. She is hoping for big boobs most of all. Apparently she's seen her friend's mom naked and wasn't impressed with smaller boobs. Anyway she'd notice the tattoo right away and go tell all the neighbors. How would I explain that one? I like to keep the perv in me a secret you know.*

*I have known my brother for 31 years, but we only lived in the same home for 8.  If he and I were the last two people on earth I could definitely have fun fucking him without any weird feelings.  In reality, he's too religious to go there though.   He fits in my family, unlike me - the black sheep who doesn't believe in organized religion or Jesus Christ.   I find it hot to do (and*

34

**CONFIDENTIAL**                                      **PL 00207**

*think about) sex acts that would be looked upon by my family as "horrid and unclean" like ass fucking, blowing a stranger, fucking my brother, fucking a black guy, getting naked for my dad and sucking his hard dick, fucking my uncle, fucking 3 guys in one day, etc.... Things that they'd say I'd be sent to Hell for.   Yeah, those things get me off.*

*In reality I can't do my dad.   The religious thing is too heavy and I don't want to be written out of the will. My uncle is a different story.   He has a sex addiction that has cost him three wives (maybe four, I can't remember right now) and several jobs.   The only problem is that he's hasn't aged well and if he's like my dad and the other brothers, he'll need some Viagra to get things going.   He's also had a heart attack and open-heart surgery this past year......   I don't want to be the one who accidentally kills him and there's potential for that.   The thought of that makes me giggle, but it'd be horrible if it really happened.*

*Want to know what I think about me?   I am making bad choices and should tone things waaaaaay dooooowwwwwn. Today I need to repeat to myself over and over:   Slow down, way down.   Breathe and think.*

*When I take a good, hard look at myself I still feel pathetic.   I could be doing things differently in my life.   I bet lots of people feel that way too.   That doesn't make it OK, I'm just saying....*

*At least I'm not the only person on the face of this planet who wants more sex and craves the thrill of new experiences.*

*I like how fatherly and friendly James is.   There is some odd kind of comfort I feel when he talks about church and all of the blessing that have been bestowed upon his family (doesn't that sound churchy?).   I'm glad for him that he's such a strong believer, never one to "question the lord," and is comfortable enough with it to talk freely.   I'll never reveal that I'm an atheist.   I'm comfortable with what I believe, but not comfortable with other's reactions to it. There is something so wrong about lusting after a religious man that it motivates me.   There is something so wrong about sitting on my bf lap in the women's restroom of a church showing my tits to him for the first time and feeling him suck on my nipples that makes me wet thinking about it.   I am so happy that a church was the first place that happened.*

*Yes, I'm receiving physical therapy to help with my pain. Today she fingered me - part of therapy - and it felt soooo good. I kept those comments to myself though.*

*Secret: when I was in my twenties I taught first grade. At the time it was difficult for me to keep from staring at and wondering abut the taller, more developed 12 year-old sixth grade boys (In Indiana, elementary schools are K - 6th grade, notK - Ruth like here). And they liked staring at my tits as you can imagine. I had some hot dreams about some of them.*

*And I'm not the only girl who's fucked a dog.   Now that's something I'm not ever going to be denied.   I should thank my lucky stars.*

*I don't have a plan of what to do or say in the event that (husband) walks into the house while I am downstairs fucking.   I'd hope that would never happen--that I'd have all my bases covered and not take chances where that could even happen.   I'd definitely open the back door, point in the direction of the woods and tell the guy to run...if we have enough time.   No telling what (husband) would really do in that circumstance, but you know what he has*

35

strapped to his ankle everyday right?  I wouldn't want to take any chances.  And no one else needs to take the heat for what's happening but me.  The reason I'm fucking other men is because of me and only me.  It's not because of (husband), it's not because of you, it's because I crave sex and dick.

When Chris calls me "young lady" it reminds me of my uncle that I have always been sexually curious about.  It makes my knees week.  I feel like a bad girl just about to be punished with a big, thick cock ramming and some spanking to go along with it.

Do I need an intervention?

I wanted very much to sneak into the blond stranger's room at our hotel.  I couldn't do it for a bunch of reasons, but mostly because (husband) gets up too often to pee in the middle of the night and when we were in the hotel room he made sure to squeeze my foot on his way back to his bed.  Oh yeah, I forgot to tell you that I chose the bed by the door and let (husband) sleep by himself in the other bed by putting (son) on the floor and keeping (daughter) with me.  Now that I think about it, maybe (husband) would squeeze my foot just to make sure I was still in the room.  Hmmmm.

Hold my feet to the fire.  Tell me what a stupid girl I am to let my sex drive take over my better judgment.  Tell me what losers other men are and how good I have it.  Tell me that I'll eventually get caught and lose everything---everything.

I love (husband).  I love my kids.  I love sex and lots and lots of it.

...I know for certain now I'd be able to lick you clean after you take a dump.  J wasn't perfectly clean when I got to his asshole and I had a few choices that circled in my head:  get up and grab a baby wipe and clean him off real quick or wipe him off with my fingers or lick it up and keep going.  Guess what I chose?  Yes I did.  It smells strong from the bacteria, but it tastes a lot like food.

I will try to write again later.  The 4 boys are tearing up the house and the now 3 girls are needing my guidance.  Seven kids in the house is too much. Having kids is not at all what I thought it'd be.  It's such a bummer and so damn expensive, not to mention emotionally taxing.  Do you think your parents felt the same way about you? Want to know what you're missing out on by not having kids?  Whining, crying, back-talk, insults, trips to the ER...just to name a few.  Have I told you lately how brilliant I think you are? $180 for a new bedroom window. $150 for a new passenger side rear car door handle. And who knows what for the front step to be re-sanded and re-stained. FUCK! My son is lucky he's cute. I re-evaluate my feelings every day.

Body image is also taking a toll on me.  Add that to the meds I'm on and the books I've been reading and I have to stop and ask myself "who the hell do I think I am?"  I'm certainly not the 26 year-old hottie I once was.  I'm not even the 36 year-old MILF I once was.

I am not used to weighing 125 and in my mind's eye I don't see myself as heavier.  It's not until I get a look at myself in the mirror that I realize "those days are gone."  My body isn't the same after having kids and since stopping Adderall I have gained this weight that won't come off.  I don't like the way I look, but I'm not one to starve myself so I keep exercising. Otherwise I am healthy, but it's frustrating.  It's also humbling to carry around this extra weight.  H

36

**CONFIDENTIAL**                                                 PL 00209

*doesn't care about my weight.   He still thinks I'm pretty.   He prefers me nicer and plumper than mean and skinnier.   My kids would probably vote that way too.*

*(Husband) isn't going away at the end of July as I'd thought.   Darn. He'll be going to Chicago for work in August (17th - 22nd).   He mentioned going a few days earlier than his assignment just to get away by himself.   I hope he really does take time for himself, but I doubt he'll follow through.   I don't want to encourage him too much so he doesn't think I want him out of here, but in reality I do want a few extra days without him.   I want to have J over a lot while he's away.   Maybe that's when J and Mike can double team me.   Mmmmmmmmmmm.   I'm really looking forward to that.*

*My hard work led to great sex last night.   Whoo-hoo!   I know, I'm silly; a nymphomaniac in the raw.*

*If looking at motorcycles on-line were against the law, (husband) would be facing the death penalty.   He wants one soooooo badly. I bet he thinks more about motorcycles than girls and maybe more than yummy food (which is usually what's on his mind). He can't seem to bring himself to the point of commiting to buy one.   He's getting closer though.   Last night he showed me one with a sidecar so he could take the kids for rides.   He's such a great dad/family man like that but it gets in the way of him seeing that he needs his own outlets away from all of us so he can continue to be a happy husband and dad.   I want his life to include something more than work and a family.   Doesn't he see that he deserves to have a "toy" of his own?*

*It took every ounce of self-control I have to keep from stopping by Harlan's place and knocking on the door this morning. I think I've made him out to be something more than he is - well, I know I have because that's how my mind works - and I want to see what it feels like to have such a strong, cut body fuck me.   Is that bad?   Yes?   I know.   I seriously can't help it though.   He's only 27.   Can you imagine how powerful he'd be in bed?   I need to kiss him sometime.   That will tell me if we're going to click.   It's true (at least for me) the every guy I've found to be a good kisser has also been a great fuck.*

*He knows I like rough see and am more raw so why does he hold back?   I keep thinking he's got it in him to be more fun.*

*My watch ticks like this: dick, dick, dick, dick.*

*I saw him (Harlan) at the Y the other day and guess what.....his dick didn't fall into my mouth.   Whew!*

*I am suffering from depression again.   This didn't happen when we lived in Vegas.   I have to think that it's partially related to the lack of sunshine in MI.*

*You know, if I off myself (husband) and the kids will have plenty of money to move anywhere they'd like.   I can't help letting those thoughts circle my head when I get like this.   The only way I can see providing for my family is to let them have insurance money.   As of right now I work as a sub for practically nothing and it sucks so much energy from me and I have very little left to meet the needs of my family. There are parts of my life I love and parts of it I despise.*

37

**CONFIDENTIAL**                    **PL 00210**

*What I'd like to write (to Tarzan): I'd look best in a thong of your favorite color.   I'd have you take them off of me and sit at the edge of your desk as you sit back in your chair and enjoy them.   I'd get off without having to touch myself; just watching and listening to you would be enough.   If you wanted seconds I'd lean back while you lean in to taste my sweet, silky pussy.   I'd ask to taste you since you'd tasted me.   I'd ride you first though because I'd like the taste of my juices in combination with your fresh, hot cum. Oh, crap.   Sean, please help me.   I'm spiraling out of control.   I know why, but it's too deep and boring to want to share right now.   All I want to do is soothe myself with thoughts of doing everything kinky under the sun with a willing guy like Tarzan.*

*Why Jane cannot go for coffee with Tarzan: We'd meet for coffee (I drink tea) and my foot would be in his crotch as soon as he'd be seated.   Then I'd ask him for some of his piss in a cup to enjoy alongside my tea.   We'd end up back at my place doing all of the naughty things he/we can think of that his wife would never do for him, not in a million years.   We'd like it probably too much and have to meet again and again. This is exactly why Jane cannot go out for coffee with Tarzan.*

*Did you see I e-mail another virgin needing help listing?   Virgins are interesting.   The look on their face as they enter inside me is unbelievable.*

*I like keeping secrets very much and I ache inside that I don't feel like I can do that anymore.   I feel that if I keep anything more than the little secret about the Busch's guy writing on CL for me that I'll end up divorced/wrecking my family.   (Husband) spelled it pretty clearly after things went haywire with Bily and Tess.*

*I'll get help when the thoughts of suicide happen after my mom's mom dies, which may not be for several years.   I am safe until then...I think.*

*I finally figured out that once my mom's mom passes and I inherit the money that was to go to my mom (about 9 - 12 months later), I will be able to check out.   My insurance policies will leave $600,000 to my family (it won't matter that I committed suicide) and my other inheritance due to me when my dad passes will go to my kids even if I'm not alive. (Husband) will be able to find another girl more suited to his needs and tastes; he will be so much happier.   Kids are resilient; they will adapt and soldier on.   Plus, they're cute so anyone will love them.   Their college will be paid for and there will be enough money left over that they will have everything they need to start their own lives. I'm sorry to end things this way. Bye.*

*I haven't had time to cruise the luscious dick pics on Craigslist.*

*I forgot until now that Vicodin makes me crave sucking dick even more than usual.*

*Yes, there are always men I'm interested in.   There was a table full of them at Qdoba yesterday.   I had their attention, but chose to ignore them to see if I could actually do it and I did.   That's why I was proud of myself.   Aren't I pathetic?   The answer is a resounding "yes, Labby, most of the time you're pathetic thinking you will be able to calm down your ramped up sex drive and be more "normal."   In all honesty it was very, very difficult not to look at them.   I wanted to give them a glance and see what reaction I'd get.   It's fun to play around with men like that--only problem is that AA is too small for me to be myself as often as I'd like.*

38

**CONFIDENTIAL**

PL 00211

*In another town (not here because AA is too small) I could definitely say to some stranger "Can I suck your dick" and then just start sucking him off or just start sucking off someone without even saying a single word.  I'd just give him a knowing look and then get started.   I think about the latter ALL of the time.   I seriously crave dick that much.   Am I right that all guys (even if they're gay) like to have their dick sucked until they cum?*

*I hope I don't end up in the elevator at the Y because I promised (husband) I wouldn't mess around there anymore.   I have to keep that promise.   Please remember, I need to stay a married woman.*

*Have you read about the recent rise in the number of suicides for women in their 40s and 50s.   Interesting to know I'm not alone in my feelings after all.*

*Have I told you lately that I think you're brilliant for deciding not to have children?   And if you haven't, go get a vasectomy to make your decision permanent.*

*I've stopped projecting favorable qualities onto other men and I am finding that most are unattractive goobers, bumbling idiots, or immature sleaze-balls.   Right now the only man I want to be near is (husband).   I'm glad he's going to be home tomorrow through next Tuesday.*

*I will work a lot harder to keep my family together.   They're all I've got in this crazy world full of mixed up people.I'm not leaving, I'm just saying that I'm accepting my place in this world as a somewhat boring 40-something wife and mommy.  I have it good, really good.  I see that now, clear as a bell, and am lucky I'm still attached to those who love me most and always will.*

*I have fallen....for a girl.   A delicious, sweet, soft, beautiful, openly sexual, confident, free-spirited girl.*

*And this is what Tess wrote to me :) :) Thank you for opening up your home and body to me, a complete stranger. I had a wonderful time playing with you, and hope I get to see you soon after you get back from Chicago :)*

*Holy fucking shit!   Remember when I said Bily doesn't scare me anymore?  I take that back.  All of that scares me so bad that it puts a damper on my idea of Craigslist.  Of course what was I thinking?...everyone on Craigslist is a freak in some way and I'm bound to run into lots of them if I answer their ad(s).   I'm lucky I never got into more of a sticky, stomach churning situation than I'm in already.*

*Asian virgin...It's the eyes I can't get past.  Eyes are one of my favorite body parts and Asian eyes are not appealing to me. Ok, I'm going to be really shallow here, but I'm afraid he's going to smell like an egg roll too.  All of my Asian friends smell funky like that.*

*I'm telling you my thoughts about yesterday.   It can all be summed up this way:   There was an intense connection between two sex freaks.*

*I'm on the brink of losing my mind.   I need someone to come over here and fuck me silly.   No game playing, no role playing, no dress up, just wild, passionate sex.*

*It's amazing I'm allowed to do any of what I'm doing.   I'm lucky and spoiled.*

39

**CONFIDENTIAL**                                         **PL 00212**

*Have I told you recently that I'm still interested in going to the rehab/hospital to find guys who need a little help?  Do you have any ideas how I could seriously go about doing that?*

*I want to have someone over for hot sex tonight.  I'm no longer on my period and am so horny I am having trouble seeing straight.  J is in town.  He said he'd be up for a late night booty call, but waking him is difficult to do. Last night I woke (husband) in the middle of the night/morning (4am) for sex.  He wasn't interested.  He wanted me to sleep with him, but only in realistic terms not sexy terms.  I scratched his back for awhile then went back upstairs and slept alone.  I should have jilled.  Instead I cried a little bit over feeling sexually frustrated by (husband).  I woke with an intense migraine as a result. It's gone now.  I talked to (husband) about his turning me down this morning.  He keeps saying he's old and fat and just not interested in sex like I am.  I told him it makes me feel rejected even though he says it's not because of me it's because of him.  I wanted to ask if I could have someone over tonight, but the timing didn't feel right.  I'm not sure what to do about next week.  I have a list a mile long of things (husband) wants me to do before we depart for Chicago.  He's determined to keep me busy and out of trouble.  It doesn't help my schedule any that our son isn't adjusting to school very well.  (Husband) and I agreed that I should go to school to help out in the classroom as much as possible to keep an eye on him.  So now I'm tied up until at least noon every day.  I have doctor appointments for both kids on Tuesday and Thursday afternoon.  (Husband) is going to take Friday off so that day is out too.  I should probably put everyone on the back burner and hope no one walks away. It's sad that I could have J, the artist, Harlan, Dev, and Chris Knight all next week and I probably won't be able to due to my other life's obligations. Today seems like another day in paradise to any onlookers, but it feels like hell to me right now.*

*John was there.  He talked to me about his upcoming vacation plans with his wife and complained about his 10 year-old daughter being so needy.  I think all people who are brave enough to be honest regret having kids.*

*I have none (plans) for the week.   I should play the role of wife and mother and let the whore side of me rest while my body does its thing.*

*I had a problem with Adderall (amphetamine based med) for a while...The Adderall is still in the house and I haven't touched it and don't plan to, but I can't seem to dump it out.  Does that mean I still have a problem or that I'm weak? I think it means both.*

*SBHP was not only a marine, but a firefighter. I met him when he was in Indy for a convention. Did I ever tell you that (husband) told my dad about what happened with SBHOP and I got a few lectures from Dad about the dangers of having sex with other men?*

*I'm going to have to back off of watching homeclips and other sexy, hot fun stuff. It's killing me on the inside. My body physically hurts when I don't get any release. My vibrators and dildos only do so much for me. There is no one forceful on the other end, no other body scents, no other smiling or laughing, etc...  Sex with someone else is so much better than doing it alone.*

*My hubby had a conversation with me last night about his waning sex drive.  We had fun screwing around two nights ago, but when I asked for some dildo fun last night, he said no. He wanted to go to bed right away after our tv watching ended. I was disappointed and couldn't help showing it, which almost started an argument.  I'd spent yesterday at the Y exercising*

40

**CONFIDENTIAL**                    PL 00213

and the more I sweat, the more I smelled like the hot sex we'd had the night before. I had been thinking about him all day long and kept telling him about it and how I was craving him because I could smell him on me. I wasn't expecting him to say no and to feel like a jerk for even asking and for being disappointed.   We had a great night, so why is it so difficult for him to want to fuck me with a dildo? Is it really his sex drive? Honestly I don't think either of us (you and me) understand what it feels like to not crave sex all day long so neither of us can correctly answer that question. I really don't mean to whine, but I know I am. I'm just typing this out to see how stupid I am acting over being told no to sex. I still feel like a 15 year old boy, wanting more than I can find or have. It sucks.

My husband is concerned that someone else is going to know things about me that he doesn't. He wants to know me entirely.   I understand, but it's difficult to remain open with him when who I am frustrates him to the point of being disappointed in me and in himself. What should I do? For instance, it's easier to keep secrets than to tell him that I am so interested in sex that I want to share myself with a girl and have found one who is interested. He knows I want a girlfriend, but doesn't know that I think about it so much and am pursuing it.   I usually try to talk to him when we're messing around and he's hard. I can keep his attention better that way and he's feeling good and is more likely to say yes to things.   But then he cums. How do I open up and tell him the parts of me I've been hiding without hurting him or causing an argument? How do I do it so he accepts me for who I am and isn't threatened by it?   And how do I open up and not be rejected to the point of divorce?

I could leave and go work at the Bunny Ranch. I have no problem holding my own with men sexually and performing all kinds of feel-good tricks all day long. I'd love it. But I'm choosing my family who I love more.   I have a husband who wants me and two loving children who need me.

After reading _The Proper Care and Feeding of Husbands_ I can say that the difference between me and most women is that I still crave sex and lots of it. Some days that's what drives my every action. I'd never ever think of withholding sex because I'm mad at my husband. Unbelievable. Are they nuts?   After reading the few other messages in that book (the overriding message was have sex with your husband and fix him yummy meals, the underlying messages were ) I see that I am not nuts, but was driving him and everyone around me (including you) absolutely nuts with my self-centered behaviors.   That's how losers behave; thinking life is all about and for them when it's not, taking and taking and not giving back.

I've fucked up things so many times--almost every time. Remember who he is dealing with. I was a liar and a cheat (because I wanted what I wanted and didn't want to follow his rules) until I met you and you straightened me out (thank you) and now I'm just a liar. Liar, liar.....pants on fire. Sorry, I couldn't resist.   I'm giggling as I write this because it's so absurd to think about sometimes.

My PT wasn't attractive, but she wasn't a dog either. She is about 48, best guess, and very open-minded and physically free/comfortable with her body and mine. No hang-ups.   I imagine she gets overly modest girls/women in her room all too often who are difficult to work with and freak out over what needs to be done. The fingering felt sooooo good and it's designed to help with some of my physical problems.   She massaged around my belly, then

41

**CONFIDENTIAL**

PL 00214

*around my groin muscles, then all around my labia (up and down, round and round) before plunging her fingers inside me. Ten blissful minutes... I nearly came. :)*

*I was a shit this afternoon. Raising kids is tougher than I ever imagined. It's a moment by moment job with no predictability and I'm not cut out for a job like that.   I really stink at it. No, really really stink at it.*

*Something is really wrong with me.   Anvils came out of nowhere and fell on my head this morning. Everyone in my home is super happy and enjoying life, the weather is sunny and pleasant, and I am bluesy with dark thoughts darting in and out of my mind.*

*I watched a good movie last night and had sex twice, yes, twice yesterday and woke up feeling like this.   There's got to be some stupid chemical imbalance in my head. Maybe I'm having an adverse reaction to the medicine the doc prescribed. Either way I hope this funk passes soon.*

*I can't believe that I fall so quickly and so deeply into these states of depression. It's like an abyss this time...deep and dark. Yesterday I slept most of the day away.   I couldn't help it. I am trying really hard to feel happy and when it's beyond my control I fake it which takes an inordinate amount of energy. It's the weirdest feeling in the world to be elated one day and have to pretend to be happy the next.*

*The benefit of hooking up with a stranger is that I know he's into me on the surface.   I wouldn't want to be too soft or too short or have some quality that rubs a guy the wrong way but he fucks me just because I'm breathing and have tits and a pussy. I like to be used as a object, but I like to be a pleasing object.*

*Two guys (or more) getting each other off is about the most exciting thing I have ever seen on video. Girls and dogs are the second most exciting followed by black guys with a little, lily white blond. Anal sex really gets me wet too. The rest I'd have to tell you to your face.*

*Yes, I have trouble keeping my pants on with Dave, my daughter's friend's dad. The very first day we moved in (husband) pointed to Dave (he was painting the house across the street) and said, "There's your next 'Jeen.'" Then (husband) went over the rules for AA and our neighborhood reiterating why nothing could ever happen between me and another guy here.*

*Taboo. Mine are mainly dog love and guy on guy things I've seen. When those thoughts enter my mind, which is often, I get distracted. It's a good kind of distraction. It happens a lot at the Y and when I am running, doing the stair-climber or on the elliptical. Other times my mind wanders there too, like when I jill.*

*I think the age of legal consent should be lowered.*

*He put a few offers on the table and I'm supposed to make a choice and stick with it. It's difficult to have to make such a decision when I think only in terms of myself.   It's much easier when I focus on the impact my decision would have on my family.  Offer one:  Find someone who is more of a sex maverick like me and have him support me in whatever ways I need (emotionally and financially) until I start my life with someone else. He says he'll remain my best friend. Offer two:   Give up everything involving other men and stay with him*

42

**CONFIDENTIAL**

PL 00215

exclusively. He made sure to emphasize that even writing someone else on the internet would be a violation of that choice and will land me in an ugly divorce.

Helping out old men at the retirement/health center or those who've lost a spouse is something I've always thought about. In my fantasy life, you'd take me to see your friend's dads who have lost their wives so I could meet their needs as only a woman can. You know...take a batch of cookies and offer up my pie :)

I don't know what made me into the creature that desires pleasuring those who haven't gotten any in a long time, but that's part of who I am.

I kissed the handyman and he squeezed my tits and nipples with his strong hands. He saw me completely naked before I hopped into the shower. Nothing more happened because my daughter was in the house on a different floor -- too dangerous.

Men who love to play golf are boring. Boys who like to fuck their gf on the ninth hold fairway are fun :) I worked at our country club as a teen (lifeguard and concession stand) and the men would enjoy looking at me in my short shorts or my bathing suit as they passed from the back nine to the front nine. I found most of them to be either dorky or full of themselves. I was a tease to the ones who were full of themselves. Want me? Can't have me. Want to see what's under my swimsuit? Let me jump into the pool and get wet so when I get out I'll be cold and my nipples will be begging to be sucked. But wait...don't you go to Rotary on Fridays with my dad? I was bad.

The only thing I see wrong about what my uncle did is he failed to heed the warning his employers gave him the first time he got caught. Yes, he's lost two jobs for looking up porn while at work.   You'd think he'd have learned by now. He's 61, newly divorced for the third time, and starting a new job mid-January. When life gets too difficult for him he goes running home (actually it's to a retirement home) to the loving arms of his 90 year-old mother (protector of all evil and soother of all wounds). I think that's pathetic. I want his dick and what it can do for me, not him. I'm blunt; I know.

I share more of my thoughts with you on certain subjects than I do with anyone else.   I don't filter them all that much so you get the bulk of the raw/unrefined stuff.   Many times I think through writing you or write to get something out of my head for a while.

The Adderall is still in the house and I haven't touched it and don't plan to, but I can't seem to dump it out. Does that mean that I still have a problem or that I'm weak? I think it means both.

I'm ready for an orgy or a train or a gang bang. Oh yeah :) but I'm a 40 year old married woman with a jealous hubby...so it's probably not going to happen.

I have no problem having free-spirited sex outside. Lucky for me I never got caught naked and fucking on the golf course fairway and green of my home town. My parents would've sent me away to a convent...but it'd have only be a matter of time before I figured out how to have sex there too.

I like to have sex in places when you're not supposed to, like in a church or up against the wall of the high school gymnasium in the middle of winter while a basketball game is being played or in the parking lot of a brew pub. I'm bad...and dangerous.

43

**CONFIDENTIAL**                                                                          **PL 00216**

*Why is my head in my ass most of the time and the rest of the time my head feels like this: ;aslkdjfa;oeipour? Seriously.*

*I hope this sort of thing doesn't get passed on genetically. I'd hate to know that I brought kids into this world who will suffer like I do.*

*I hate being a fuddy-duddy. I like to flirt. I like to have fun. Is there any hope for me at all?*

*My hormones are raging which is seriously dangerous for me. There are a ton of cuties (guys and girls) who exercise at the Y between 4:30 and 6 p.m. I had to sit against the wall that surrounds the basketball courts to avoid taking in too many manly scents. Then my friend's husband stopped by to talk and commented that the men's locker room was especially rank tonight. Rank is not a word I'd use to describe it, but just to be safe I didn't go anywhere near it.*

*I need to rise above my selfish self and do what's being asked of me even though I don't like it one bit. I have been asked over and over and over to stop writing you or anyone else. I am supposed to be a one man woman and behave as a 40 year-old wife and mother of two is supposed to behave. I'm supposed to be sexy-naughty behind closed doors; nowhere else and with no one else. You know the rules...and that I've been breaking them for a very long time.*

*Tonight I will ask (husband) to help me figure out how to satisfy that side of me. The "coming to him for advice and guidance" is a good start, much better than what I tried last night. Last night when I brought up the prospect of corresponding with Jeen again he said in a very exasperated way, "I thought we were beyond that and we were in agreement that you weren't going to do any of that stuff anymore." I'm afraid tonight he's going to say "Aren't I enough?" And it'll kill me to hear him say that because that's not what this is about and I'll feel like a heel and a spoiled brat and then the worst will happen...I'll look up and see that sneaky road runner trying to push that big, black anvil off the cliff an onto my stupid head. Bonk!*

*I need to be a better wife and figure out a way to control myself better than I have been...What I've got is really great and I shouldn't do anything to ruin it.*

**Ellen has never been a victim of anything other than her own demons. Contrary to what she hoped to convince others, Ballock is not one of them.**

**Ballock is guilty only of desperately trying to protect his children, preserve his family, and help save his wife from harming herself and others.**

Sincerely,

*Scott Ballock*
Scott Ballock

Enclosure:
1. Text File Summarizing Supporting Materials
2. August 12, 2013 Audio Recording
3. Example of Costlow Changing Text Sender
4. Confession Audio Recording
5. Monongalia County Sheriff's Office Summary of Phone Call from Kenny Ice

44

**CONFIDENTIAL**                                **PL 00217**

IN THE FAMILY COURT OF Monongalia COUNTY, WEST VIRGINIA

IN RE THE MARRIAGE/CHILDREN OF:

PETITIONER:                        and        RESPONDENT:

Ellen Ballock                                 Scott Ballock

EXHIBIT
43

CIVIL ACTION NUMBER:        12-D-529 (Minor)

## TEMPORARY MODIFICATION ORDER

This matter came on for hearing on September 13, 2013 pursuant to the Father's Emergency Motion to Modify Order Pendente Lite. Petitioner Ellen Ballock and Respondent Scott Ballock appeared for the hearing. Petitioner's counsel, Kevin T. Tipton, and Respondent's counsel, Delby Pool, also appeared for the hearing.

WHEREUPON, based upon the Findings of Fact and Conclusions of Law indicated below and/or stated upon the record, this Court ADJUDGES and ORDERS as follows:

1.   **JURISDICTION AND VENUE**

    a.   This Court has subject matter jurisdiction, personal jurisdiction over the parties, and venue.

2.   **MINOR CHILDREN**

    a.   The parties are the parents of the following minor children:

        i.   Thomas Scott Ballock, DOB January 22, 2001, SSN XXX-XX-9456.

        ii.   Summer Scott Ballock, DOB May 1, 2003, SSN XXX-XX-8253.

3.   **CUSTODIAL RESPONSIBILITY & DECISION-MAKING**

    a.   Custodial responsibility and decision-making for the parties' children has been governed by the Court's previous orders entered January 11, 2013, April 25, 2013 and June 11, 2013.

    b.   Under the current order and parenting plan, the Father is designated as the parent with primary custodial responsibility of Thomas, while the Mother is designated as the parent with primary custodial responsibility of Summer.

    c.   Per the original temporary order, the parties were to alternate custodial responsibility on weekends with the children to be together with the Father one weekend and the Mother the next weekend. However, the Mother has had only very limited contact with Thomas since January 2013. In late December 2012 there was an incident that resulted in the Mother placing Thomas in Chestnut Ridge Hospital for evaluation. Since then, Thomas has been resistant to spending much if any time with the Mother.

Page 1 of 7
**CONFIDENTIAL**

d.    Both children have been in counseling with Diane Halbritter since early in these proceedings. It was Ms. Halbritter's recommendation Thomas not be forced to spend time with the Mother, and an order to that effect was entered by the Court on April 25, 2013.

e.    In his Motion the Father seeks to be designated the primary custodial parent for both children.

f.    After considerable thought and consideration of the evidence presented at the September 13, 2013 hearing, the Court has entered a modified temporary parenting plan dated September 20, 2013 that will govern the parties till further Order of the Court.

g.    In entering the modified temporary parenting plan the Court considered the entire record herein, including the following:

    i.    The Court has given significant weight to the recommendations of the Guardian Ad Litem (GAL) and the custody evaluator. It is apparent to the Court both have spent many hours in carrying out their duties in this matter, that their investigations have been comprehensive, and that their findings and conclusions are entitled to great deference. Both appeared to feel quite strongly the Father should be designated as the children's primary custodian pending a final decision in this case.

    ii.    Though she did not testify at the hearing on September 13, it is the Court's impression based upon the testimony of the custody evaluator and GAL that Diane Halbritter also has reservations about the appropriateness of the Mother having primary custody of either child at this time.

    iii.    Despite the apparent advice of her attorney, the Mother has insisted on maintaining an on again/off again relationship with Kenneth Ice that has been volatile and which may very well have interfered with her caretaking of Summer. At the very least, that relationship appears to have resulted in Summer being exposed to arguments between the Mother and Mr. Ice, as well as to a registered sex offender, Karl Taylor, who apparently is an acquaintance of Mr. Ice. It also seems more likely than not the Mother's preoccupation with the relationship has caused her to neglect to some extent her responsibilities to the child. The Court questions whether the Mother has any real desire to end the relationship with Mr. Ice or to otherwise avoid exposing Summer to the fallout from the relationship.

    iv.    The Court is concerned regarding the Mother's emotional state over the past several

**CONFIDENTIAL**

PL 00290

months. It appears the Mother has had suicidal thoughts during this period and may have taken an overdose of pills on at least one occasion.

v.   The Court is concerned Summer has missed considerable school while in the Mother's care since September 2012. While in fairness, it appears both children also missed considerable school in the preceding school year while the parties were together, it also appears that getting the children to and from school during that time was the responsibility of the Mother who was a stay-at-home mom.

vi.  There were significant concerns raised by the custody evaluator regarding the Mother's sexual behavior both during the marriage and quite likely since the parties' separation. In that regard, it is undisputed the Mother has had multiple partners solicited through Craigslist and perhaps other social media throughout the marriage. It also appears the Mother spends an inordinate amount of time on the internet pursuing her sexual interests.

vii. It appears the Mother's preoccupation with sex and past actions have caused emotional harm to both parties. The custody evaluator believes the Mother's sexual behavior represents an obsession or other personality disorder on the Mother's part which impacts to some extent her caretaking of the children. At the very least, it is undisputed that the Mother's behavior resulted in Summer's exposure to a video of the Mother having sex with a stranger. That incident and other alleged statements by the Mother regarding Summer's future sexual behavior raises some concern on the Court's part whether the Mother has the ability to be an appropriate role model for her children, and particularly a young girl.

viii. In considering the parties' sexual behavior, the Court is not sanguine about the Father's role in that regard. At the very least, the Court finds the Father's apparent acquiescence in the Mother's sexual relations with other men to be a contributing factor. The Mother alleges her behavior was coerced by the Father. The Court questions that. The Court notes many if not most of the Mother's encounters occurred outside the presence of the Father though most admittedly with his knowledge and apparent consent. The Court also notes the Mother took no obvious steps throughout the marriage to end the extramarital encounters or to seek judicial intervention to stop the alleged coercion or other alleged

**CONFIDENTIAL**

**PL 00291**

abuse on the Father's part.  Though it is true the Mother eventually made the decision to leave the Father, it appears that primarily stemmed from her relationship with Mr. Ice.  If anything, it appears the Father's past acquiescence had more to do with his apparent obsession with the Mother than any real sexual gratification on his part.  Ultimately, the Court is inclined to agree with the custody evaluator that the parties' behavior has been driven by the Mother to a significantly greater extent than the Father.

    ix.    The Court has considered the testimony of the Mother's counselor, Laura Surowick-Snyder; however, her conclusions have been discounted to some extent by the Court since they appear almost exclusively based upon the Mother's reports.  In reaching that conclusion, the Court could not help but contrast the limited sources of Ms. Surowick-Snyder's information with the extensive efforts of the custody evaluator to seek corroboration of the parties' allegations from other sources.  For example, there was the Mother's allegation regarding an affair by the Father.  On closer inspection, as testified to by the custody evaluator, it appears more likely than not the affair never occurred.

    h.    In considering how the Mother would interact with the children, and particularly Summer, over the next few months until the final hearing, the Court has sought to balance the interest of the Mother in having meaningful access against the recommendation of the custody evaluator that such access be limited to a few hours of supervised visitation each week.  Ultimately the Court has concluded the Mother should continue to have unsupervised overnight visits with Summer.  In reaching that conclusion, the Court notes the following:

    i.    The Mother has been the primary caretaker for both children for most of their lives.

    ii.    While the custody evaluator and GAL raised significant concerns about the Mother, no one has suggested the Mother poses a risk of physical harm to the child.

    iii.    The primary concern raised with regard to the recommendation of only supervised visits dealt with the fear the Mother might retaliate by seeking to undermine the child's relationship with the Father and perhaps her therapist.  However, it appears to the Court there are less restrictive ways to address that concern.  Moreover, there has been little evidence of attempts to alienate the child, and indeed the child appears to have maintained a loving relationship with the Father throughout these proceedings.

**CONFIDENTIAL**

PL 00292

      iv.    Everyone agrees Summer wishes to remain in her Mother's care.  The Court is concerned it might be traumatic for the child to go from living with her Mother most of the time to having almost no contact or only interacting in a very restricted setting.

    i.    In considering custodial responsibility, the Court cannot help but be concerned regarding the high level of conflict in this case and the parties' apparent willingness to adopt a "scorched earth" approach to the litigation.  The Court was somewhat dismayed at the arrest of the Father on the day of the hearing on September 13, 2013.  While the Court in no way condones any potential criminal behavior on anyone's part, the Court has to believe the timing of the arrest represented primarily a strategic decision to gain advantage in this case.  In that regard, the Court notes the Father's communications at issue occurred over several months with no apparent effort by the Mother to seek assistance from this Court or any other judicial body until the time of the hearing.  This Court almost certainly would have been willing to enjoin such communications by the Father if the Mother had raised the issue at any time.

    j.    Similarly, the Court takes a jaundiced view of the Father's attempt to have the Mother referred as a sexual predator or other sexual offender based upon actions occurring many years ago.  In that regard, the Court notes the Father had knowledge of the incident at the time, he chose to stay with the Mother, he later started a family with the Mother, he allowed her to be the primary caretaker of the parties children, and he apparently never raised the issue in any regard until this litigation.

    k.    The Court cautions the parties that if they continue in their efforts to ruin the other's lives for purely strategic reasons, the Court will almost certainly hold that against them in making a final decision regarding custodial responsibility and perhaps a claim for spousal support.

4.    **CHILD SUPPORT**

    a.    Under the Court's current Order, entered January 11, 2013, the Father has a child support obligation to the Mother in the amount of $1200 per month.

    b.    Per the modified parenting plan, primary custodial responsibility for Summer has changed from the Mother to the Father.

    c.    Based upon the foregoing finding, the Father's child support obligation will be reduced to $0 per month effective October 1, 2013.

    d.    The Mother has no employment income at this time, and the Court does not believe any purpose

**CONFIDENTIAL**

PL 00293

would be served by Ordering her to pay child support at this time.

5.    **INCOME TAX FILINGS**

    a.    Because custodial responsibility for the children has been split between the parties for most of 2013, and in an effort to maximize funds available to the parties and the children, the Court directs the parties to cooperate to file a joint tax return for Tax Year 2013. Any refund obtained may be equally split between the parties if they agree. Otherwise, the refund should be deposited in the Father's attorney's client trust account. The parties are reserved all claims regarding how the Court might account for the refund with respect to the parties' divorce.

6.    **EQUITABLE DISTRIBUTION**

    a.    It appears more likely than not the former marital home ultimately will be sold. The Wife probably cannot afford to keep the home and buy out the Husband's share in the home. The Husband may very well choose to relocate to another state if he can do so with the children. Given that, the Court is inclined to believe it most fair to the parties to simply sell the home, determine thereby the true value of the home, and then split any proceeds equally between the parties.

    b.    Based upon the foregoing, the Court directs the parties to contract with a realtor in the next 30 days to sell the home unless they reach some other agreement within that time.

    c.    The parties will cooperate as necessary to facilitate the sale of the home.

    d.    Pending the sale of the home, the Wife will remain in possession of the home and the Husband will maintain the mortgage payments, the property taxes, and homeowner's insurance as previously Ordered.

    e.    The parties are reserved all claims regarding how the Court might account for the Husband's payments related to the home.

7.    **SPOUSAL SUPPORT**

    a.    This is a long-term marriage, and there is a significant disparity between the parties' financial circumstances.

    b.    It does not appear the Wife has made any effort to seek employment over the past several months. Regardless, it is unlikely the Wife will be able to find employment immediately or to otherwise significantly better her financial circumstances in the next few months.

**CONFIDENTIAL**

**PL 00294**

  c.  The Court believes the Husband has the financial ability to pay spousal support to the Wife.

  d.  Effective October 1, 2013, the Husband will have a temporary spousal support obligation to the Wife of $900 per month.

8. **PREVIOUS ORDER OR ORDERS**

  a.  Except as otherwise provided herein, the Court's previous Order or Orders governing the parties remain in full force and effect.

9. **ATTACHMENTS TO THIS ORDER**

  a.  The provisions of this Order are supplemented by the following documents, attached hereto and incorporated herein unless inconsistent with specific provisions contained in this Order:

    i.  Parenting Plan dated September 20, 2013.

10. **COPIES TO ALL INTERESTED PARTIES**

  a.  Upon the entry of this Order, the Clerk of this Court shall mail a certified copy of the same to:

    i.  Petitioner's counsel, Kevin T. Tipton, at 316 Merchant Street, Suite 100, Fairmont, WV 26554.

    ii.  Respondent's counsel, Delby Pool, at 230 Court Street, Clarksburg, WV 26301.

    iii.  GAL Teresa Lyons, at 141 Walnut Street, Morgantown, WV 26505.

Date:  September 20, 2013

Family Judge Randal Minor

**CONFIDENTIAL**

PL 00295

Sep. 20. 2013 12:13PM                                                    No. 6233   P. 9/14

IN THE FAMILY COURT OF Monongalia COUNTY, WEST VIRGINIA

IN RE THE CHILDREN OF:

| | | | |
|---|---|---|---|
| Petitioner: | Ellen Ballock | Respondent: | Scott Ballock |
| Civil Action Number: | 12-D-529 | Date: | September 20, 2013 |

### TEMPORARY MODIFIED PARENTING PLAN

A parenting plan provides a framework for how decisions affecting children will be made, where children will live, and how children will interact with parents and other family members. Once approved and adopted by a family court judge, a parenting plan becomes a binding court order which must be obeyed. While the parties always may agree to deviate from the parenting plan as circumstances may warrant, absent agreement by both parties, the terms of the parenting plan control.

This parenting plan was prepared by the ☐ Father ☐ Mother ☐ Parties Jointly ☑ Court  ☐ Other: _____

This parenting plan applies to the following minor children:

| NAME | DATE OF BIRTH | SOCIAL SECURITY NUMBER | PRIMARY RESIDENTIAL CUSTODIAN* |
|---|---|---|---|
| Thomas Scott Ballock | January 22, 2001 | XXX-XX-9456 | Father |
| Summer Scott Ballock | May 1, 2003 | XXX-XX-8253 | Father |

* The primary residential custodian is defined as the person with whom a child will physically resided for at least 6 months (ie. half or more of the time) out of the calendar year. The child will reside with the primary residential custodian except as otherwise provided by this parenting plan.

### DECISION-MAKING AND ACCESS TO INFORMATION

► Both parties shall have full access to each child's educational, medical and juvenile court records. Both parties shall have the right to be informed of and participate in all educational, medical and juvenile court activities and decisions involving a child.

► The party with whom a child is residing on any given day makes all day-to-day decisions about the care and control of the child.

► Either party may make emergency decisions affecting the health or safety of a child at any time, regardless of the party with whom the child is residing at that time. A party will take all reasonable steps to inform the other party of any emergency as soon as possible.

► With respect to major decisions involving a child, including decisions related to education, medical, dental, eye and other health care, religious matters, child care, the child's employment, motor vehicle use, school and after school activities, and sports (check boxes and complete as applicable):

☐ The parties will consult and share in the making of all major decisions involving a child.

☐ All major decisions will be made by the ☐ Father ☐ Mother
☐    Other _____

☐ The parties will consult and share in the making of all major decisions involving a child with the exception of the following (check box and indicate who will make the decision):

☐ Education _____
☐ Medical _____
☐ Religious _____
☐ Child Care _____
☐ Employment _____
☐ Vehicle _____
☐ School Activities _____
☐ Sports _____
☐ Other _____

1 of 6

**CONFIDENTIAL**

**PL 00296**

Sep. 20. 2013 12:13PM                                              No. 6233   P. 10/14

## RESIDENTIAL SCHEDULES

- This section provides how a child listed above will spend time with each party. The primary custodial parent will have custodial responsibility of the children except as otherwise provided by this parenting plan.

- The parties may always agree to some other schedule than provided herein; however, in case of any conflict between the parties the schedule provided herein will control.

- The Holiday and Other Special Days Schedule will control over the Summer Vacation and Weekly Residential schedules. The Summer Vacation Schedule will control over the Weekly Residential Schedule.

- <u>Weekly Residential Schedule</u>: The Weekly Residential Schedule provides the basic day to day schedule where a child will reside, except as otherwise provided by the Summer or Holiday Schedules.

  □ The Weekly Residential Schedule will be as indicated on Attachment A: Residential Schedule.

  ☒ None of the schedules provided with Attachment A are appropriate in this case and the following schedule will apply:

  > The Mother will have custodial responsibility of Summer every weekend of the month except the weekend beginning the 3rd Friday of the month from Friday immediately after school or 6:00 PM if there is no school until Sunday at 6:00 PM.
  >
  > The Mother may spend time with Thomas at such times and upon such terms as deemed appropriate by Thomas' counselor, and the Father will cooperate in that regard. At the very least, it is contemplated by the Court the Mother will have at least two hours each week to spend with Thomas to work towards repairing the relationship between the Mother and child. This in no way precludes the time from being expanded should the counselor deem that appropriate.

- <u>Summer Residential Schedule</u>: The Summer Residential Schedule provides an opportunity for a party to spend an extended period of time with a child or children during the summer months when children typically are out of school. Parties may use extended periods for vacations or trips with the child. To the extent there are periods of time during the Summer months not covered by the options below or if none of the options provided below are checked, then the Weekly Residential Schedule will continue to apply (check the box and complete as appropriate):

  □ The parties will continue the regular weekly residential schedule during the Summer unchanged.

  □ During the Summer _____ will have custodial responsibility the first Friday immediately following the last day of the school year and every other week thereafter from Friday at 6:00 PM until the following Friday at 6:00 PM. This alternating weekly summer schedule will terminate the last Friday before school starts and the parties will revert back to the regular weekly schedule at that time.

  □ The parties will continue the regular weekly residential schedule during the Summer, except that the parties will cooperate to arrange time for each party to have an extended period of no more than ____.___ continuous days of custodial

responsibility during the Summer. Unless the parties agree otherwise, the period of extended custodial will commence at the beginning of the requesting party's normal period of weekend custodial responsibility. Each party will notify the other by no later than May 1 of when he or she proposes to exercise his or her extended period custodial responsibility during the Summer. In case of conflict between the parties with respect to when they propose to exercise their right to an extended period of custodial responsibility during the Summer, the Mother's wishes will control in even numbered years, and the Father's wishes will control in odd numbered years.

  □ None of the summer residential schedules provided above are appropriate for the children and the following summer schedule will apply

  > [blank]

- <u>Holidays and Other Special Days Schedule</u>: The Holiday and Other Special Days Schedule provides how a child will spend time with his or her parents on holidays and other special days like the child's or the party's birthday (check the box and complete as appropriate):

  ☒ The Holiday Schedule for Summer will be as indicated on Attachment B: Holiday Schedule. The parties will cooperate to allow the Mother to spend at least some time with Thomas on Holidays subject to the recommendations of his counselor.

  □ The parties will spend holidays with the children as described below:

  > [blank]

## TRANSPORTATION AND EXCHANGES

- The party having custodial responsibility of a child immediately prior to or immediately after any school day or after school activity of the child will be responsible for arranging transportation for the child between the party's home and the school or activity. Such arrangements will be at the responsible party's discretion, and may include letting the child ride a school bus between the school and the party's home if that is an available option.

- Otherwise, transportation and exchanges of a child will occur as follows (check the box and complete as appropriate):

  ☒ Transportation is a shared responsibility. The party receiving a child at the beginning of a period of custodial responsibility will do so at the other party's residence.

  □ Transportation is a shared responsibility. The parties will meet and exchange a child at:

  > [blank]

  □ The _____ will be solely responsible for providing all transportation for a child to and from the parties' homes.

- A party who expects to be late in picking up or dropping off a child must provide as much advance notice to the other party as reasonably possible. Parties will always extend a 30 minute grace period to a party who is late in picking up or dropping off a child. A party who incurs childcare or other costs as a result of the other

2 of 6

**CONFIDENTIAL**

PL 00297

party being late in picking up or dropping a child off will be reimbursed for such costs by the late party.

▸ A party will return all clothes and other belongings a child had when he or she arrived for a period of custodial responsibility to the other party at the conclusion of the period of custodial responsibility.

## TELEPHONE CONTACT

▸ The party with whom a child is not residing needs to make special efforts to stay in touch with the child. The party with whom a child is residing needs to encourage the child to stay in touch with the other party.

▸ A child may call the party with whom the child is not residing at any reasonable time and as often as the child wishes.

▸ A party with whom a child is not residing may call the child at any reasonable time. If the parties are unable to agree on what would be a reasonable time for the other party to call a child, then no calls are to be made to the child between the hours of 8:00 PM and 8:00 AM. If the parties are unable to agree on what would constitute a reasonable number of successfully completed calls to a child in a 24 hour period, then no more than one (1) call may be made from a party to a child in a 24 hour period.

▸ A party may call the other party at any reasonable time to discuss a child. If the parties are unable to agree on what would be a reasonable time for one party to call the other party, then no calls are to be made to the other party between the hours of 8:00 PM and 8:00 AM. If the parties are unable to agree on what would constitute a reasonable number of successfully completed calls by one party to the other party in a 24 hour period, then no more than one (1) call may be made from a party to the other party in a 24 hour period.

▸ Neither party may use phone calls to repeatedly harass, threaten or otherwise abuse the other party, or to unreasonably interfere with the other party's exercise of custodial responsibility.

▸ No party may knowingly refuse to answer or return, or permit a third party to refuse to answer or return, a phone call from the other party to the child or to the party in reference to a child. A party who is made aware the other party is trying to reach a child by phone, will take all reasonable steps to ensure the child returns the phone call as soon as reasonably possible.

▸ Long distance calls from the child to a party with whom the child is not residing will be paid for by the party with whom the child is residing at the time of the call.

▸ Long distance calls from the party with whom a child is not residing to the child will be paid for by the party making the call.

## COMMUNICATION

▸ Separated parties need to regularly communicate with each other to provide the best possible care for a minor child of the parties and to reduce the stress of the parties' separation on the child.

▸ A party will never speak poorly or allow anyone else to speak poorly of the other party in the child's presence.

▸ A party will never discuss litigation between the parties or the parties' financial matters in the child's presence.

## CHILDREN'S ACTIVITIES

▸ A party will not schedule activities for a child during the other party's scheduled parenting time, unless the party with the parenting time agrees in advance.

▸ The parties will cooperate to the extent reasonably possible to enable a child to participate in school, sports, and other scheduled activities so long as such activities do not unduly interfere with a party's exercise of custodial responsibility.

▸ The parties will take all reasonable steps to ensure that both parties have timely advance notice of a child's school, sports, and other scheduled activities.

## CHANGES IN CUSTODIAL ARRANGEMENTS

▸ If one party requests a non-emergency change in custodial arrangements, the party receiving the request will decide whether to permit the change.

▸ If a change in custodial arrangements is required because of an emergency, the party with custodial responsibility at the time of the emergency does not require advance agreement of the other party to make the change but must notify the other party of the emergency as soon as possible.

▸ A party receiving a request for a change will never use a request for a change as a bargaining chip, or as a way to punish the party making the request.

▸ A party making a request for a non-emergency change will make the request as soon as reasonably possible. A party receiving a request for a change will respond to the request as soon as reasonably possible.

▸ A party making a change without request and agreement as provided herein will be responsible for any additional child care or other costs caused by the change.

## SETTLING DISAGREEMENTS

▸ The parties will make all reasonable efforts to resolve disagreements with respect to their child or children informally.

▸ In the event the parties are unable to resolve a dispute informally, either party may file an appropriate motion with the Court seeking resolution of the dispute.

▸ In the event the Court finds that either party has acted unreasonably in addressing any dispute between the parties, including the filing of frivolous litigation, the Court may award the other party his or her costs associated with resolving the dispute, including reasonable attorney fees.

## RELOCATION OF EITHER PARTY

▸ A party who has custodial responsibility under a parenting plan or court order who intends to change his or her residence for more than ninety days must give a minimum of sixty (60) days advance notice, or the most notice practicable under the circumstances, to the other party. Notice shall include the relocation date, the address of the intended new residence, the specific reasons for the proposed relocation, a proposal for how custodial responsibility should be modified in light of the intended move, and information for the other party as to how he or she may respond to the proposed relocation or modification of custodial responsibility.

## DUTY TO INFORM THE OTHER PARTY OF RESIDENCE, MAILING ADDRESS, AND PHONE NUMBERS

3 of 6

CONFIDENTIAL

PL 00298

- The parties will always let each other know their current residence addresses, mailing addresses, home, work, cell, and emergency telephone numbers, and will notify each other within 24 hours of any changes in these matters. But this requirement does not apply in cases in which a family court has allowed the withholding of identifying information.

- This duty to inform shall continue until there is no child of the parties under the age of eighteen (18) years.

- Service of any future filing or notice of hearing in this action shall be considered legally sufficient if timely made to the last address provided by the served party to the serving party.

## ENFORCEMENT OF PARENTING PLANS

- Once the Family Court accepts and adopts a parenting plan proposed by the parties jointly or individually by one party, the plan becomes a court order. While parties may always agree to alternative arrangements, absent such agreement by both parties, the parties must obey all terms and conditions of the parenting plan. A party has no right to violate a parenting plan even if the other party has violated the plan previously.

- If, upon a party's complaint, the Court finds the other party intentionally and without good cause violated a provision of the court-ordered parenting plan, it shall enforce the remedy specified in the plan or, if no remedies are specified or they are clearly inadequate, it shall find the plan has been violated and order an appropriate remedy.

- If a party interferes with the other party's right to exercise custodial responsibility for a child, the Court can order make-up time to compensate for time missed with the child.

- If a party misses planned time with a child or causes the other party to miss time with a child, the Court can award monetary compensation for the missed time, and/or award child care costs and other expenses in connection with the missed time.

- If a party violates the parenting plan, the Court can modify the plan in favor of the party who did not violate the plan. The Court can change custodial responsibility to favor the non-violating party, or the Court can grant exclusive custodial responsibility to the non-violating party.

- The Court can order a party violating the plan to submit to counseling.

- The Court can order a party violating the plan to pay a civil penalty up to $100.00 for a first violation, up to 500.00 for a second violation, or up to $1000.00 for a third or subsequent violation.

- The Court can order a party violating the parenting plan to pay the other party's court costs, attorney's fees, and any other expenses that the party incurred to enforce the parenting plan.

## CONTEMPT

- The failure by one party to perform any obligation imposed herein or by the attached order may give rise to the contempt powers of the Family Court and to such other powers as available to the Court, including the entry of judgment and the imposition of interest at up to the legal rate from the breach of any obligation, and the assessment of reasonable attorney's fees related to the enforcement of such obligation.

## ADDITIONAL TERMS AND CONDITIONS

The following additional terms and conditions should apply to this parenting plan:

The parties will cooperate to continue the children's counseling with Diane Halbritter until the counselor deems the same no longer necessary. The parties will adhere to the recommendations of Ms. Halbritter in all regards and neither party will do anything to undermine the children's counseling with Ms. Halbritter.

The parties will cooperate to begin family counseling as soon as possible with Terri Laurita-Sigley or some other appropriate counselor if she is unavailable. It is contemplated this will primarily be designed as joint counseling for the parties, but the children may be involved as deemed appropriate by the counselor in the counselor's sole discretion. The parties will execute any authorizations required to allow the family counselor to collaborate with the parties' and the children's individual counselors. The parties will adhere to all recommendations of the family counselor.

The Mother will not expose the children to Kenny Ice during her periods of custodial responsibility or otherwise.

No one will access the internet in the Mother's home during the Mother's periods of custodial responsibility.

Neither party will do anything to prevent the children from contacting the other party while in his or her custodial care.

Neither party will denigrate the other party in any respect in the presence of the children or permit any third party to do so. The children's counselor will report any such comments or other efforts to undermine the children's relationship with the other party to the GAL and the Court if she has any suspicion that the same has occurred from this point forward.

The paternal grandfather's ability to interact with the children is conditioned upon his removal of any website or related content that references Ellen Ballock by name or this litigation in any fashion whatsoever, including within the website address, within 96 hours of entry of the Court's modified temporary order. Neither party shall take any steps to reference anyone involved in this litigation or the litigation otherwise in a website address or otherwise discuss the other on the web, including on any social media. To the extent possible, the parties will remove any reference to the other party or this litigation from all social media.

**CONFIDENTIAL**

**PL 00299**

Ellen Ballock _____     Date _____

Scott Ballock _____     Date _____

State of West Virginia

County of _____

    This Parenting Plan was affirmed before me by one or both parents as evidenced by the foregoing signature(s) on

_____

_____
Notary Public

My commission expires _____

```
For the Court's Use:

_____ Accepted as Proposed

_____ Accepted as Modified

_____ Not Accepted
```

DATE:    September 20, 2013

_____
Family Judge Randal Minor

5 of 6

**CONFIDENTIAL**           PL 00300

PLEASE SIGN BELOW BEFORE A NOTARY PUBLIC.

**CONFIDENTIAL**          **PL 00301**

Sep. 20. 2013 12:14PM                                                        No. 6233   P. 14/14

## PARENTING PLAN ATTACHMENT B:   HOLIDAY SCHEDULE (Summer only)

The following provisions will govern how the parties spend time with the children during holidays (check the box and complete as appropriate):

### CHILD'S BIRTHDAY

[✓] The parties will cooperate to arrange time for each party to celebrate a CHILD'S BIRTHDAY with the child. If the parties cannot agree otherwise, the party not scheduled to have custodial responsibility on the child's birthday will have custodial responsibility on the child's birthday from 5:00 PM until 8:00 PM.

### PARENT'S BIRTHDAY

[✓] The parties will cooperate to arrange time for a parent to celebrate the PARENT'S BIRTHDAY with the children. If the parties cannot agree otherwise, a parent not scheduled to have custodial responsibility on his or her birthday will have custodial responsibility on his or her birthday from 5:00 PM until 8:00 PM.

### MOTHER'S DAY

[✓] The Mother will have custodial responsibility on MOTHER'S DAY from 9:00 AM until 6:00 PM.

[ ] The Mother will have custodial responsibility the MOTHER'S DAY WEEKEND from Friday at 6:00 until Sunday at 6:00 PM.

### FATHER'S DAY

[✓] The Father will have custodial responsibility on FATHER'S DAY from 9:00 AM until 6:00 PM.

[ ] The Father will have custodial responsibility the FATHER'S DAY WEEKEND from Friday at 6:00 PM until Sunday at 6:00 PM.

### THREE DAY HOLIDAY WEEKENDS

[ ] During THREE DAY HOLIDAY WEEKENDS if a party is scheduled to have custodial responsibility on a three day holiday weekend, then that weekend of custodial responsibility will be extended until Monday at 6:00 PM.

### EASTER HOLIDAY

[✓] During the EASTER WEEKEND in even numbered years, the Mother will have custodial responsibility from Saturday at 6:00 PM until Sunday at 6:00 PM. In odd numbered years, the Father will have custodial responsibility per that schedule.

[ ] During the EASTER WEEKEND in even numbered years, the Mother will have custodial responsibility Easter Weekend from Friday at 6:00 PM until Sunday at 6:00 PM. In odd numbered years, the Father will have custodial responsibility per that schedule.

### SPRING BREAK

[ ] If a child receives a School Spring Break, the Mother will have custodial responsibility in even numbered years from the last day of school at 6:00 PM until the last day before school resumes at 6:00 PM. In odd numbered years, the Father will have custodial responsibility per that schedule.

### FOURTH OF JULY HOLIDAY

[✓] During the FOURTH OF JULY HOLIDAY in even numbered years, the Father will have custodial responsibility on July 4 from 9:00 AM until 10:00 PM. In odd numbered years, the Mother will have custodial responsibility per that schedule.

### HALLOWEEN

[✓] During HALLOWEEN if the parents' respective residential municipalities schedule trick or treating on different days, then each parent will have custodial responsibility from 1 hour before to 1 hour after the time period set aside for trick or treating by the parent's municipality. In the event the parents reside in the same municipality or the parents are otherwise unable to both take the child or children trick or treating on Halloween, the Father will have the opportunity, pursuant to the foregoing schedule, to take the child or children trick or treating in even years and the Mother will have that opportunity in odd years.

### THANKSGIVING HOLIDAY

[ ] During the THANKSGIVING HOLIDAY in even numbered years, the Mother will have custodial responsibility from the last day of school at 6:00 PM until the Wednesday before Thanksgiving at 6:00 PM, while the Father will have custodial responsibility from the Wednesday before Thanksgiving at 6:00 PM until the day before school resumes at 6:00 PM. In odd numbered years, that schedule will be reversed between the parties.

[ ] During the THANKSGIVING HOLIDAY in even numbered years, the Father will have custodial responsibility from the last day of school at 6:00 PM until the last day before school resumes at 6:00 PM. In odd numbered years, the Mother will have custodial responsibility per that schedule.

[✓] During the THANKSGIVING HOLIDAY in even numbered years, the Father will have custodial responsibility from the day before Thanksgiving at 6:00 PM until Thanksgiving day at 4:00 PM; and the Mother will have custodial responsibility from Thanksgiving day at 4:00 PM until the next day at 6:00 PM. In odd numbered years, that schedule will be reversed between the parties.

### CHRISTMAS HOLIDAY

[ ] During the CHRISTMAS HOLIDAY in even numbered years, the Mother will have custodial responsibility from the last day of school at 6:00 PM until Christmas Day at 2:00 PM, while the Father will have custodial responsibility from Christmas Day at 2:00 PM until the last day before school resumes at 6:00 PM. In odd numbered years, that schedule will be reversed between the parties.

[ ] During the CHRISTMAS HOLIDAY in even numbered years, the Mother will have custodial responsibility from the last day of school at 6:00 PM until the last day before school resumes at 6:00 PM. In odd numbered years, the Father will have custodial responsibility per that schedule.

[✓] During the CHRISTMAS HOLIDAY in even numbered years, the Mother will have custodial responsibility from the day before Christmas at 6:00 PM until Christmas day at 2:00 PM; and the Father will have custodial responsibility from Christmas day at 2:00 PM until the next day at 6:00 PM. In odd numbered years, that schedule will be reversed between the parties.

### NONSPECIFIC SHARED HOLIDAYS/BIRTHDAYS

[ ] The parties will cooperate to allow the children to spend roughly equal time with each party on holidays and birthdays.

6 of 6

**CONFIDENTIAL**                                                        **PL 00302**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA

SCOTT T. BALLOCK,

       Plaintiff,

v.

                                  **CIVIL ACTION NO.: 1:17-CV-5**

ELLEN RUTH COSTLOW,
STATE TROOPER MICHAEL
KIEF, STATE TROOPER
RONNIE M. GASKINS, AND
STATE TROOPER CHRIS
BERRY,

       Defendants.

## PLAINTIFF'S FIRST SUPPLEMENTAL ANSWERS TO TROOPER DEFENDANTS' FIRST INTERROGATORIES

Plaintiff, Scott T. Ballock, through his counsel, objects to the entire Trooper defendants' First Set of Interrogatories because they include multiple interrogatories that are compound and constitute more than a single interrogatory. As such, Defendants have exceeded the number of interrogatories allowed under the Federal Rules of Civil Procedure Rule 33.

Without waiving the foregoing objections, the Plaintiff, Scott T. Ballock (Ballock), supplements his answers as follows:

### INTERROGATORY NO. 1:

Please state the total amount you are owed in damages, including a detailed explanation of all the factors you used in your calculation of damages.

### SUPPLEMENTAL ANSWER NO. 1:

All damages amounts below continue to accrue and are subject to supplementation:

**Lost income due to termination of employment with FBI:**



1

October 2017 to December 2017: $36,973. Based on annual salary of $147,890 (GS 14, step 6 for 2017). A copy of the 2018 GS Salary Schedule is being produced. Total 2017 lost income: $36,973.

January 2018 to August 2018: $100,243. Based on annual salary of $150,364 (GS 14, step 6 for 2018).

September 2018 to December 2018: $51,553. Based on annual salary of $154,659 (GS 14, step 7 schedule for 2018). Ballock would automatically receive this step increase and increase in salary in August 2018 based on his years of service. Total 2018 lost income: $151,796.

January 2019 to December 2019: $154,659. Based on GS 14, step 7 schedule for 2018. Does not reflect expected potential increase to the GS salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock.Total 2019 lost income: $154,659.

January 2020 to December 2020: $154,659. Based on GS 14, step 7 schedule for 2018. Does not reflect expected increase to the GS salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock. Total 2020 lost income: $154,659.

January 2021 to August 2021: $103,106. Based on a salary of $154,659 (GS 14, step 7 schedule for 2018). Does not reflect expected increase to the GS salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock.

September 2021 to December 2021: $52,985. Based on a salary of $158,955 (GS 14, step 8 schedule for 2018). Ballock would automatically receive this step

2

increase in August 2021 based on his years of service. Does not reflect expected increase to the GS salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock. Total 2021 lost income: $156,586.

January 2022 to December 2022: $158,955. Based on a salary of $158,955 (GS 14, step 8 schedule for 2018). Does not reflect expected increase to the salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock. Total 2022 lost income: $158,955.

January 2023 to December 2023: $158,955. Based on a salary of $158,955 (GS 14, step 8 schedule for 2018). Does not reflect expected increase to the salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock. Total 2023 lost income: $158,955.

January 2024 to August 2024: $105,970. Based on a salary of $158,955 (GS 14, step 8 schedule for 2018). Does not reflect expected increase to the salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock.

September 2024 to December 2024: $54,417. Based on a salary of $163,251 (GS 14, step 9 schedule for 2018). Ballock would automatically receive this step increase in August 2024 based on his years of service. Does not reflect expected increase to the salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock. Total 2024 total lost income: $160,387.

3

January 2025 to September 2025: $122,438. Based on a salary of $163,251 (GS 14, step 9 schedule for 2018). Does not reflect expected increase to the salary schedule. Also does not reflect any increase in salary for promotion. Also does not reflect income from holiday pay, typically more than $2,000 a year for Ballock. Total 2025 lost income: $122,438.

Total lost income due to termination of FBI employment: More than $1,255,438. This total will be supplemented with additional information including amounts referenced above which are not included or estimated as yet.

**Lost Pension Income:**

- Calculation of FBI Pension:
- 1.7% of high-3 average pay multiplied by 20 years of service
- plus 1% of high-3 average pay multiplied by any years of service above 20.

Ballock's pension calculation as of 09/26/2017:

- 23 years federal service.
- Average three high: $148,000
- 1.7% of $148,000 X 20 years of service: $50,320
- Plus 1% of $148,000 X 3 years of service: $4,440
- Total pension: $54,760/year

Ballock's expected pension calculation as of September 30, 2025 (mandatory retirement date at age 57): 31 years of federal service.

Average three high: $159,432 (assuming no adjustments to the salary schedule and no promotions).

- 1.7% of $159,432 X 20 years of service: $54,206
- Plus 1% of 159,432 X 11 years of service: $17,538
- Total pension: $71,744/year

4

- Difference of $16,984/year.

- Average male life expectancy in U.S.: 79 years.

- 22 years X $16,984: $373,648 in lost pension.

**Lost TSP Income:**

The first 3% of employee TSP contributions is matched dollar-for-dollar by the government; the next 2% is matched at 50 cents on the dollar. Thus, the government contributes an amount equal to 4% of the employee's contribution to his TSP account.

Ballock contributed $1,000 a month to his TSP account. He would have, therefore, contributed another $96,000 to his TSP before his retirement in 2025.

The government matching contribution amounted to $40 a month. $40 x 96 months: $3,840.

Total lost TSP income: $99,840.

Total lost income from inability to earn accrued interest on $99,840 using 7 percent return over 96 months: $55,910.

Losses resulting from need to list home for sale to find employment, fees, and moving expenses: $75,000-$100,000.

Total lost income (conservative estimate) due to termination of FBI employment: $1,809,806.

Loss of chosen profession and ability to continue as FBI agent: $1,000,000.

Physical damage and emotional distress damages as determined by a jury, but estimated at present of $2,000,000. As a result of the conduct of the defendants, and the events and consequences caused by that conduct, Ballock has suffered severe emotional distress which has resulted in:

a. Multiple years of debilitating distress due to fear and anxiety regarding the investigation related to the false charges;

b. Pain, suffering and humiliation associated with the unjust and wrongful termination of his employment and his career as an FBI agent as a result of the conduct of defendants;

c. Suffering from humiliation and embarrassment due to false claims of criminal conduct, including false assertions of abuse and threatening conduct toward his then-wife;

d. Emotional trauma caused by having to raise his children during the events caused by Defendants;

e. Anxiety and suffering caused by the need to find new employment and to provide for his children;

f. Resulting depression, anxiety and loss of sleep;

g. Necessary visits to medical professionals who have prescribed multiple medications to address the emotional trauma and distress suffered by Ballock.

Attorneys' fees and costs, currently estimated at more than $150,000.

**INTERROGATORY NO. 2:**

With respect to each and every person whom you or your counsel knows to have knowledge of any relevant fact or allegation pertaining to this lawsuit, please state the person's name, last known address (including street number, city, state and zip code) telephone number and current employer.

**SUPPLEMENTAL ANSWER NO.2:**

Plaintiff objects to the request to the extent it seeks to pose an interrogatory directly to counsel as that violates attorney work product and attorney-client privilege and is overbroad. It likewise asks Ballock to speculate as to who "counsel knows" to have any kind of

6

"knowledge" and is thus overbroad, vague, and improper.  Plaintiff further objects to the interrogatory as compound.  Subject to these objections, Plaintiff responds:

**Dr. Christi Cooper-Lehki.** Chestnut Ridge Center, 930 Chestnut Ridge Rd. Morgantown, WV  Phone: 855-WVU-CARE

Medical Specialties:

- Forensic Psychiatry

- Child and Adolescent Behavioral Medicine and Psychiatry

- Behavioral Medicine and Psychiatry

- Psychiatry

Board Certifications

- American Board of Psychiatry and Neurology - Psychiatry

- American Board of Psychiatry and Neurology - Child and Adolescent Psychiatry

- American Board of Psychiatry and Neurology - Forensic Psychiatry

   Special Training

- 2005 - Forensic Psychiatry  Fellowship - West Virginia University

- 2001 - Child and Adolescent Psychiatry  Fellowship - Wayne State University

- 1999 - Psychiatry  Residency - Wayne State University

Education

- 1994 - WV School of Osteopathic Medicine - DO

   Dr. Cooper-Lehki was appointed by the Family Court to conduct a custody evaluation for Ballock and Costlow. Costlow, who was seeking sole custody of the couple's children and lifetime alimony payments, specifically requested Dr. Cooper-Lehki conduct the evaluation. Costlow falsely claimed in Family Court that she was the victim of domestic violence, and Dr. Cooper-Lehki is an expert in Battered Women's Syndrome.

Dr. Cooper-Lehki will be asked to testify as to her findings regarding Costlow's false claims, as well as her professional assessments of Costlow and Ballock. Dr. Cooper-Lehki formally diagnosed Costlow with Borderline Personality Disorder and Paraphilia.

Dr. Cooper-Lehki reviewed all of the correspondence between Ballock and Costlow and will be asked to testify as to her professional impressions regarding Ballock's expressions of intent and how those impressions impacted her conclusions.

Dr. Cooper-Lehki will be asked to testify about her report and findings regarding Costlow's obsessive desire and aggressive efforts to harm Ballock, Costlow's history of manipulating situations and others for her benefit, and Costlow's inability to correctly perceive reality. In this respect, Dr. Cooper-Lehki will be asked to testify as to lies told by Costlow that Dr. Cooper-Lehki uncovered as well as Dr. Cooper-Lehki's interview of Kenny Ice concerning his observations and interactions with Costlow.

Dr. Cooper-Lehki will be asked to testify as to the Ballock children's observations regarding both Ballock and Costlow. Dr. Cooper-Lehki is expected to testify that neither child reported ever witnessing any violent or aggressive behavior by Ballock, but both independently reported witnessing violent outbursts and abusive behaviors by Costlow, including physical violence directed toward Tommy Ballock.

**Diane Halbritter, MSW**, 235 High Street, Morgantown, WV 26505. Ms. Halbritter was the children's counselor. She will be asked to testify as to the children's observations regarding both Ballock and Costlow. Ms. Halbritter is expected to testify that neither child reported ever witnessing any violent or aggressive behavior by Ballock, but both independently reported witnessing violent behaviors by Costlow, including physical violence directed toward Tommy Ballock. Ms. Halbritter will be asked to testify about Costlow's aggressive efforts to alienate the children from Ballock, and Costlow coaching her then-nine-year old daughter to lie to Ms. Halbritter.

8

**Terry Laurita-Sigley, Clinical Psychologist,** 1224 Pineview Drive, Morgantown, WV 26505 (304) 598-2300. Terry Laurita-Sigley served as the counselor who moderated Family Court-ordered joint counseling sessions between Ballock and Costlow. Ms. Laurita-Sigley will be asked to testify about Costlow's admission in a counseling session that she told others she was trying to get Ballock's gun taken away from him so that he would be fired from his job. Ms. Laurita-Sigley will be asked to testify about lies told by Costlow which Laurita-Sigley uncovered in sessions.

**Kathie Gieselman,** Marriage and Family Therapist, MA, LMFT, LPCC, Twin Cities Therapy and Counseling Associates, 5851 Duluth St., Suite 306, Golden Valley, Minnesota, 55422, (952) 314-3975. Ms. Gieselman has knowledge and information regarding Costlow's demands of Ballock, abuse of Ballock, and that the claims and accusations by Costlow against Ballock are false. She may also have information relevant to the question of damages and emotional distress. Scott Ballock began counseling with Gieselman shortly before Costlow separated from Ballock. Ms. Gieselman has knowledge regarding the harm to Ballock and circumstances surrounding the divorce as well as damage to his career and family life. She also has knowledge regarding Costlow's conduct and attempts to sabotage Ballock's career and damage him. Gieselman also has knowledge regarding Ballock's conduct and the lack of any abusive behavior, and that Costlow was mentally ill and that she was violent, verbally and physically abusive, and a danger to the children and family.

**Michael Benninger, Attorney,** 154 Pleasant Street, Morgantown, WV 26505, (304) 241-1856. Mr. Benninger served as Ballock's defense attorney for his misdemeanor criminal case. He will be asked to testify about his conversations with Assistant Prosecutor Cindy Scott and Prosecutor Marsha Ashdown, including Ellen Costlow's agreements in both Family Court and Magistrate Court to not provide any derogatory information about Ballock to Ballock's employer.

9

**Cindy Scott** West Virginia University, (304) 293-5600. Cindy Scott was the Assistant Prosecutor who presided over Ballock's misdemeanor criminal case. Ms. Scott will be asked to testify about her comment to the Magistrate Judge that the WVSP "dumped" the case in her lap, and for clarification of her comment to the Magistrate Judge that if a police officer wants to find a reason to arrest someone, they can easily do so. Ms. Scott will also be asked about her reasoning behind her demand that Tom Ballock, a party unrelated to the criminal case against Scott Ballock, take down a website in exchange for her dropping criminal charges against Scott Ballock.

**Kenny Ice, Jr.** 55 Panola, Fairmont, WV (304) 288-8296. In the spring of 2013, Kenny Ice, Jr. contacted Ballock and asked to meet so he could share information regarding Costlow. Over the course of several weeks, Ice provided Ballock with information regarding Costlow. Kenny Ice, Jr. informed Ballock about Costlow's sexual relationship with WVSP Trooper Chris Berry. He informed Ballock that Costlow was working with police to try to find a way to have Ballock arrested so as to hurt Ballock and help Costlow in Family Court. Ice, Jr. will be asked about his meetings with Ballock. Ice will be asked about how and when he began his relationship with Costlow. Ice will be asked about his interactions with, and observations of, Costlow.

**Dave Pennypacker.** 1000 Custer Hollow Drive, Clarksburg, WV (575) 308-1411. Dave Pennypacker, a retired Sergeant with the Norfolk (VA) Police Department, accompanied Ballock when Ballock interviewed Kenny Ice, Jr. Pennypacker will be asked to testify as to whether Kenny Ice, Jr. freely provided information to Ballock, and as to his professional assessment of Ice, Jr.'s candor during these meetings. He also has knowledge concerning Ballock, his character and conduct, and concerning damages.

**Kenny Ice, Sr.,** Address unknown, (681) 753-1260. Kenny Ice, Sr. has knowledge regarding Costlow's conduct and statements, as well as physical and psychological abuse by

10

Costlow. He offered to meet with Ballock to share his observations about Costlow. Ice, Sr. will be asked to testify about his observations of Costlow, including lies she has told about being physically assaulted by Kenny Ice, Sr. He will also be asked to testify about Costlow's giving him FBI property which Costlow stole from Ballock. Most recently, Ice, Sr. appeared unannounced at Ballock's residence in the summer of 2017 and again in October 2017 and shared that Costlow had willfully violated the Family Court order that she not have unsupervised visits with her daughter. Ice, Sr. will be asked to testify about these events.

**Amy Fetty,** Address unknown. Ms. Fetty will be asked to testify about her arrest at the request of Costlow. Ms. Fetty will be asked to testify about her interactions with Costlow.

**Amanda Berry,** (Defendant' wife). Amanda Berry will be asked to testify as to extramarital affairs perpetrated by her husband, WVSP Trooper Chris Berry, his illicit relationship with Costlow.

**Christine Pluscht,** 2613 Loon Lake Drive Denton, TX 76203 (940) 395-5040. Ms. Pluscht is Ballock's sister and was for years Costlow's closest friend and confidant. She will be asked to testify as to her interactions with, and observations of Costlow. Costlow shared with Pluscht the most intimate details of her life, including reasons why she contemplated divorce. Pluscht will testify about these conversations, none of which ever included allegations of abuse by Plaintiff Ballock.

**Kelli Grindo,** 248 Lockwood, Morgantown, WV 26508, FBI employee (724) 993-0769. Ms. Grindo will be asked to testify as to her observations regarding the damaging impact Ballock's arrest had on him.

**Steve Secor,** Special Agent, FBI 8825 Nelson B. Klein Pkwy, Indianapolis, IN 46250 (317) 775-1343. Special Agent Secor will be asked to testify about his knowledge concerning Costlow's threats to falsely claim she had been abused in order to get Ballock fired from his job.

11

**John Large,** Special Agent, FBI, Clarksburg Resident Agency, Suite 310, Derek W. Hotsinpiller Federal Building, Clarksburg, WV 26301. 304-624-6200. Special Agent Large will be asked to testify regarding being approached by a representative of the WVSP regarding Ballock's filing of a civil suit against three troopers. Special Agent Large will also be asked to testify about being contacted by a representative with the West Virginia State Police regarding Ballock.

**Teresa Lyons,** 141 Walnut Street, Morgantown, WV 26505, (304) 296-0123. Teresa Lyons was appointed by the Family Court to serve as the Guardian ad Litem for Ballock's and Costlow's children. Ms. Lyons will be asked to testify as to her findings, as well as her interactions with Ballock, Costlow, and WVSP Trooper Mike Kief who discussed Ballock's arrest with Lyons prior to the event. Ms. Lyons is currently a law partner with Costlow's counsel in this action. Ballock's counsel has identified this as a potential conflict.

**Dr. Toni B. Goodykoontz,** 930 Chestnut Ridge Rd., Morgantown, WV 26506, 304-293-5323. Dr. Goodykoontz evaluated Tommy Ballock after Costlow had Tommy improperly committed against his will to a secure mental health facility over the Christmas holiday in 2011. Dr. Goodykoontz will be asked to testify about her evaluation of Tommy, whether his commitment by Costlow was clinically justified and why she recommended no follow up treatment for Tommy following his discharge. Dr. Goodykoontz will also be asked about her interactions with and observations of Costlow in the context of these events.

**Deputy Brandon Snider,** Monongalia County Sheriff's Office, 116 Walnut Street, Morgantown, WV 26505. 304-291-7260. Deputy Snider responded to the violent domestic incident between Costlow and Kenny Ice, Jr. on August 12, 2013. He will be asked to testify about this event, including Costlow's conduct, Costlow's statements regarding Trooper Berry, and why Costlow said she wanted him to keep her and Kenny Ice's name out of his police report.

12

**Laura Surovick** 720 Downs Avenue, Morgantown, WV 26505 304-296-9298. Ms. Surovick was Costlow's counselor. She has knowledge about Costlow's conduct, will be asked about her interactions with Costlow, as well as Costlow's decision to commit her 11-year old son to a mental health treatment facility without reason or basis and with improper motive.

**Summer Ballock & Tommy Ballock,** Contact through counsel. Plaintiff's children have knowledge regarding the conduct of Costlow, the falsity of her allegations against Plaintiff, Costlow's intent to get Ballock fired and to harm his reputation and to impair his ability to work betraying to have his sidearm taken away, admissions by Costlow concerning false statements and intent to harm Ballock, Costlow physical abuse and violent episodes, Costlow statements and admissions concerning physical abuse, Costlow efforts to coach these witnesses into lying for the benefit and to serve the purposes of Costlow, Costlow violations of family court orders, exposing the children to danger and requiring them to lie about such episodes, Costlow's relationships including with WV State Troopers, and damages and emotional distress of Plaintiff.

Tommy Ballock can also testify he heard Ellen Costlow admit and tell others that she was attempting to get Ballock's gun taken away from him so that Ballock would be fired from his job. He will testify that he never witnessed Ballock engage in any violent behavior, but that he regularly witnessed Ellen's violent outbursts, including physical assaults against him.

**Sue Lucas** 200 East Liberty St., Ann Arbor, MI, 48104  (734) 431-0648. Sue Lucas has knowledge regarding Ballock's career, damages suffered by Ballock, admissions of Costlow regarding Ballock and her accusations, Ballock's conduct and observations regarding Costlow behavior, Ballock emotional distress, and related evidence.

**Soo Barrow,** 1000 Custer Hollow Drive, Clarksburg, WV 26306 (304) 625-2000. SSA Barrow was supervisor for Scott Ballock and has knowledge regarding his tenure at the

FBI, as well as events that took place shortly after he filed the civil suit. Specifically, SSA Barrow has knowledge regarding the fact that a West Virginia State Trooper had appeared unannounced at the Clarksburg Resident Agency to lodge a complaint about Ballock and his filing of a civil lawsuit.

**SSA Ed Ryan,**1000 Custer Hollow Drive, Clarksburg, WV 26306 (304) 625-2000. SSA Ed Ryan was a colleague of Ballock's at the FBI and has knowledge regarding his tenure at the FBI as well as events that took place after he filed the civil suit. Specifically, SSA Ryan has knowledge of the fact that a WVSP Trooper appeared unannounced at the Clarksburg Resident Agency to lodge a complaint about Ballock and his filing a civil lawsuit. He also has knowledge of, and informed Ballock that, the WVSP representative's conduct including his meeting with Sr. Resident Agent John Large.

Ballock also incorporates the answers to interrogatories 3, 4, 8 and 9.

**INTERROGATORY NO 3:**

With respect to each person whom you or your counsel expect to call as an expert witness at the trial of this case, please provide the following information: name, address, employer, and telephone numbers of each such person, specific statement of the subject matter upon which each such person is expected to testify; specific statement of the substance of the facts and opinions to which each such person is expected to testify; a summary of the ground for each opinion; a list of all data or information considered by the witness in forming his or her opinions, whether or not acquired or developed in anticipation of litigation or for trial; any exhibits to be used as a summary or support for the opinions of any such expert; a listing of the qualifications of the witness including a list of all publications authored by the witness within the preceding; the compensation to be paid for the study and testimony; a listing of any other cases in which the witness has testified as an expert at trial or by deposition in the preceding four (4) years.

14

**SUPPLEMENTAL ANSWER NO. 3:**

Ballock objects to the Interrogatory to the extent it is premature, and states that Ballock will provide information concerning expert witnesses as required under the scheduling order and Federal Rules of Civil Procedure.

Subject to those objections, Ballock states that each of the following individuals would qualify and may testify as an expert witness at trial. Ballock will supplement this interrogatory at the time that expert identification and reports are due and produced:

- Dr. Christi Cooper-Lehki
- Dr. Toni Goodykoontz
- Diane Halbritter
- Terry Laurita-Sigley
- Kathie Giesleman

**INTERROGATORY NO. 4:**

With respect to each and every person whom you or your attorney reasonably expect to call as a witness at the trial of this case please state the person's name, last known address (including street, street number city, state and zip code), telephone number, current employer and the subject of the person's testimony.

**SUPPLEMENTAL ANSWER NO. 4:**

Ballock objects to the interrogatory as compound, as overbroad as seeking irrelevant information by asking for "current employer" and seeking knowledge of "your attorney." Subject to these objections, Plaintiff responds:

**Dr. Christi Cooper-Lehki.** Chestnut Ridge Center, 930 Chestnut Ridge Rd. Morgantown, WV Phone: 855-WVU-CARE

Medical Specialties:

- Forensic Psychiatry

15

- Child and Adolescent Behavioral Medicine and Psychiatry

- Behavioral Medicine and Psychiatry

- Psychiatry

    Board Certifications

- American Board of Psychiatry and Neurology - Psychiatry

- American Board of Psychiatry and Neurology - Child and Adolescent Psychiatry

- American Board of Psychiatry and Neurology - Forensic Psychiatry

    Special Training

- 2005 - Forensic Psychiatry Fellowship - West Virginia University

- 2001 - Child and Adolescent Psychiatry Fellowship - Wayne State University

- 1999 - Psychiatry Residency - Wayne State University

    Education

- 1994 - WV School of Osteopathic Medicine - DO

Dr. Cooper-Lehki was appointed by the Family Court to conduct a custody evaluation for Ballock and Costlow. Costlow, who was seeking sole custody of the couple's children and lifetime alimony payments, specifically requested Cooper-Lehki conduct the evaluation. Costlow falsely claimed in Family Court that she was the victim of domestic violence, and Cooper-Lehki is an expert in Battered Women's Syndrome.

Dr. Cooper-Lehki will be asked to testify as to her findings regarding Costlow's false claims, as well as her professional diagnoses of Costlow and Ballock. Cooper-Lehki formally diagnosed Costlow with Borderline Personality Disorder and Paraphilia. Cooper-Lehki reviewed all of the correspondence between Ballock and Costlow and will be asked to testify as to her professional opinion regarding Ballock's intent. Cooper-Lehki will be asked to testify about her report and findings regarding Costlow's obsessive desire and aggressive efforts to harm Ballock, Costlow's history of manipulating situations and others for her

16

benefit, and Costlow's inability to correctly perceive reality. Cooper-Lehki will be asked to testify as to lies told by Costlow that Cooper-Lehki uncovered. Cooper-Lehki interviewed Kenny Ice at length and will be asked to testify as to Ice's observations regarding Costlow. Cooper-Lehki will be asked to testify as to the Ballock children's observations regarding both Ballock and Costlow. Cooper-Lehki is expected to testify that neither child reported ever witnessing any violent or aggressive behavior by Ballock, but both independently reported witnessing violent outbursts and abusive behaviors by Costlow, including physical violence directed toward Tommy Ballock.

**Diane Halbritter, MSW,** 235 High Street, Morgantown, WV 26505. Ms. Halbritter was the children's counselor. Ms. Halbritter will be asked to testify as to the children's reported observations and interactions with both Ballock and Costlow. She is expected to testify that neither child reported ever witnessing any violent or aggressive behavior by Ballock, but both independently reported witnessing violent behaviors by Costlow, including physical violence directed toward Tommy Ballock. Ms. Halbritter will be asked to testify about Costlow's aggressive efforts to alienate the children from Ballock, and Costlow coaching her then-nine-year old daughter to lie to Ms. Halbritter.

**Terry Laurita-Sigley, Clinical Psychologist,** 1224 Pineview Drive, Morgantown, WV 26505 (304) 598-2300. Terry Laurita-Sigley served as the counselor who moderated Family Court-ordered joint counseling sessions between Ballock and Costlow. Laurita-Sigley will be asked to testify about Costlow's admission in a counseling session that she told others she was trying to get Ballock's gun taken away from him so that he would be fired from his job. Laurita-Sigley will be asked to testify about lies told by Costlow which Laurita-Sigley uncovered in sessions.

**Kathie Gieselman,** Marriage and Family Therapist, MA, LMFT, LPCC, Twin Cities Therapy and Counseling Associates, 5851 Duluth St., Suite 306, Golden Valley, Minnesota,

17

55422, (952) 314-3975.  Ms. Gieselman has knowledge and information regarding Costlow's demands of Ballock, abuse of Ballock, and that the claims and accusations by Costlow against Ballock are false. Ms. Gieselman may also have information relevant to the question of damages and emotional distress.  Scott Ballock began counseling with Gieselman shortly before Costlow separated from Ballock. Ms. Gieselman has knowledge regarding the harm to Ballock and circumstances surrounding the divorce as well as damage to his career and family life.  She also has knowledge regarding Costlow's conduct and attempts to sabotage Ballock's career and damage him. Ms. Gieselman also has knowledge regarding Ballock's conduct and the lack of any abusive behavior, and that Costlow was mentally ill and that she was violent, verbally and physically abusive, and a danger to the children and family.

**Michael Benninger, Attorney,** 154 Pleasant Street, Morgantown, WV 26505, (304) 241-1856. Mr. Benninger served as Ballock's defense attorney for his misdemeanor criminal case. Mr. Benninger will be asked to testify about his conversations with Assistant Prosecutor, Cindy Scott and Prosecutor Marsha Ashdown. Mr. Benninger will also be asked to testify about Ellen Costlow's voluntary agreements in both Family Court and Magistrate Court to not provide any derogatory information about Ballock to Ballock's employer.

**Cindy Scott** West Virginia University, (304) 293-5600. Cindy Scott was the Assistant Prosecutor who presided over Ballock's misdemeanor criminal case. Scott will be asked to testify about her comment to the Magistrate Judge that the WVSP "dumped" the case in her lap, and for clarification of her comment to the Magistrate Judge that if a police officer wants to find a reason to arrest someone, they can easily do so. Scott will also be asked about her reasoning behind her demand that Tom Ballock, a party unrelated to the criminal case against Scott Ballock, take down a website in exchange for her dropping criminal charges against Scott Ballock.

18

**Kenny Ice, Jr.** 55 Panola, Fairmont, WV (304) 288-8296. In the spring of 2013, Kenny Ice, Jr. contacted Ballock and asked to meet so he could share information regarding Costlow. Over the course of several weeks, Ice provided Ballock with highly derogatory information regarding Costlow. Ice, Jr. informed Ballock about Costlow's sexual relationship with WVSP Trooper Chris Berry. Ice, Jr. informed Ballock that Costlow was working with police to try to find a way to have Ballock arrested so as to hurt Ballock and help Costlow in Family Court. Ice, Jr. will be asked about his meetings with Ballock. Ice will be asked about how and when he began his relationship with Costlow. Ice will be asked about his interactions with, and observations of, Costlow.

**Dave Pennypacker.** (575) 308-1411. Dave Pennypacker, a retired Sergeant with the Norfolk (VA) Police Department, accompanied Ballock when Ballock interviewed Kenny Ice, Jr. Pennypacker will be asked to testify as to whether Kenny Ice, Jr. freely provided information to Ballock, and as to his professional assessment of Ice, Jr.'s candor during these meetings.   He also has knowledge concerning Ballock, his character and conduct, and concerning damages.

**Kenny Ice, Sr.,** (681) 753-1260. Kenny Ice, Sr. has knowledge regarding Costlow's conduct and statements, as well as physical and psychological abuse by Costlow.  offered to meet with Ballock to share his observations about Costlow. Ice, Sr. Will be asked to testify about his observations of Costlow, including lies she has told about being physically assaulted by Kenny Ice, Sr. Ice, Sr. Ice, Sr. will also be asked to testify about Costlow's giving him FBI property which Costlow stole from Ballock. Most recently, Ice, Sr. appeared unannounced at Ballock's residence in the summer of 2017 and again in October 2017 and shared that Costlow had willfully violated the Family Court order that she not have unsupervised visits with her daughter. Ice, Sr. will be asked to testify about these events.

19

**Amy Fetty.** Ms. Fetty will be asked to testify about her arrest at the request of Costlow. Ms. Fetty will be asked to testify about her interactions with Costlow.

**Amanda Berry.** Amanda Berry will be asked to testify as to any extramarital affairs by her husband, WVSP Trooper Chris Berry. Amanda Berry will be asked about the nature of Chris Berry's relationship with Costlow.

**Christine Pluscht,** 2613 Loon Lake Drive Denton, TX 76203 (940) 395-5040. Pluscht is Ballock's sister and was for years Costlow's closest friend and confidant. Pluscht will be asked to testify as to her interactions with, and observations of, Costlow. Costlow shared with Pluscht the most intimate details of her life, including reasons why she contemplated divorce. Ms. Pluscht will testify about these conversations, none of which ever included allegations of abuse.

**Kelli Grindo** 248 Lockwood, Morgantown, WV 26508, FBI employee (724) 993-0769. Ms. Grindo will be asked to testify as to her observations regarding the impact his arrest has had on Ballock and regarding damages.

**Steve Secor** Special Agent, FBI (317) 775-1343. Special Agent Secor will be asked to testify about his knowledge concerning Costlow's made threats to falsely claim she had been abused in order to get Ballock fired from his job.

**John Large** Special Agent, FBI, Clarksburg Resident Agency, Suite 310, Derek W. Hotsinpiller Federal Building, Clarksburg, WV 26301. 304-624-6200. Special Agent Large will be asked to testify regarding being approached by a representative of the WVSP regarding Ballock's filing of a civil suit against three troopers. Special Agent Large will be asked to testify about being contacted by a representative with the West Virginia State Police regarding Ballock.

**Teresa Lyons,** 141 Walnut Street, Morgantown, WV 26505, 304-296-0123. Teresa Lyons was appointed by the Family Court to serve as the Guardian ad Litem for Ballock's and

Costlow's children. Ms. Lyons will be asked to testify as to her inquiries and findings, as well as her interactions with Ballock, Costlow, and WVSP Trooper Mike Kief who discussed Ballock's arrest with Lyons prior to the event.

**Dr. Toni B. Goodykoontz,** 930 Chestnut Ridge Rd., Morgantown, WV 26506, 304-293-5323. Dr. Goodykoontz evaluated Tommy Ballock after Costlow had Tommy improperly committed to a secure mental health facility over the Christmas holiday in 2011. Goodykoontz will be asked to testify about her evaluation of Tommy, whether his commitment by Costlow was proper, and why she recommended no follow up treatment for Tommy following his discharge. Goodykoontz will also be asked about her interactions with and observations of Costlow.

**Deputy Brandon Snider,** Monongalia County Sheriff's Office, 116 Walnut Street, Morgantown, WV 26505. 304-291-7260. Deputy Brandon Snider responded to the violent domestic incident between Costlow and Kenny Ice, Jr. on 08/12/2013. Deputy Snider will be asked about this event, including Costlow's conduct, Costlow's statements regarding Trooper Berry, and why Costlow said she wanted him to keep her and Kenny Ice's name out of his police report.

**Laura Surovick** 720 Downs Avenue, Morgantown, WV 26505 304-296-9298. Surovick was Costlow's counselor. Surovick has knowledge about Costlow's conduct, will be asked about her interactions with Costlow, as well as Costlow's decision to commit her 11-year old son to a mental health treatment facility without reason or basis and with improper motive.

**Summer Ballock & Tommy Ballock,** contact through counsel. Plaintiff's children have knowledge regarding the conduct of Costlow, the falsity of her allegations against Plaintiff, Costlow's intent to get Ballock fired and to harm his reputation and to impair his ability to work betraying to have his sidearm taken away, admissions by Costlow concerning

21

false statements and intent to harm Ballock, Costlow physical abuse and violent episodes, Costlow statements and admissions concerning physical abuse, Costlow efforts to coach these witnesses into lying for the benefit and to serve the purposes of Costlow, Costlow violations of family court orders, exposing the children to danger and requiring them to lie about such episodes, Costlow's relationships including with WV State Troopers, and damages and emotional distress of Plaintiff.

Tommy Ballock heard Ellen Costlow admit and tell others that she was attempting to get Ballock's gun taken away from him so that Ballock would be fired from his job. Tommy will testify that he never witnessed Ballock engage in any violent behavior, but that he regularly witnessed Ellen's violent outbursts, including physical assaults against him.

**Sue Lucas** Ann Arbor, MI, 7344310648. Sue Lucas has knowledge regarding Ballock's career, damages to Ballock, admissions of Costlow regarding Ballock and her accusations, Ballock's conduct and observations regarding Costlow behavior, Ballock emotional distress, and related evidence.

**Soo Barrow,** 1000 Custer Hollow Drive, Clarksburg, WV 26306 (304) 625-2000. SSA Soo Barrow was supervisor for Scott Ballock and has knowledge regarding his tenure at the FBI, as well as events that took place shortly after he filed the civil suit. Specifically, Barrow has knowledge regarding the fact that a West Virginia State Trooper had appeared unannounced at the Clarksburg Resident Agency to lodge a complaint about Ballock and his filing of a civil lawsuit.

**SSA Ed Ryan,**1000 Custer Hollow Drive, Clarksburg, WV 26306 (304) 625-2000. SSA Ed Ryan was a colleague of Ballock's at the FBI and has knowledge regarding his tenure at the FBI as well events that took place after he filed the civil suit. Specifically, Ryan has knowledge of the fact that a WVSP Trooper appeared unannounced at the Clarksburg Resident Agency to lodge a complaint about Ballock and his filing a civil lawsuit. He also

22

has knowledge of, and informed Ballock that, the WVSP representative's conduct including his meeting with Sr. Resident Agent John Large.

Ballock also incorporates the answers to interrogatories 3, 8 and 9.

**INTERROGATORY NO. 5:**

If you have any notes, minutes, tape recordings or other recordings relating to the matters alleged in the Third Amended Complaint, please describe the documents or tapes and specify who presently has custody of them.

**SUPPLEMENTAL ANSWER NO. 5:**

Recordings will be provided pursuant to 33(d).

**INTERROGATORY NO. 6:**

Have you or has anyone on your behalf obtained any written or recorded statements (overtly or covertly) from any employee, farmer employee or agent of the West Virginia State Police concerning the subject matter of this proceeding and, if so, please state the name of each such person from whom the statement has been obtained; the date of each such statement the manner in which each such statement was taken; and the name and last known address (including street, street number, city, state and zip code) of every custodian of each such statement.

**SUPPLEMENTAL ANSWER NO. 6:**

Ballock objects to this interrogatory as compound.  Subject to this objection, Ballock answers no.

**INTERROGATORY NO.7:**

Please identify any evidence which you intend to introduce at trial pursuant to Rule 404( b) of the Federal Rules of Evidence.

23

**SUPPLEMENTAL ANSWER NO. 7:**

It has not yet been determined what Rule 404 (b) evidence will be presented at trial. Ballock also objects to the extent that no depositions or full document discovery has been had from defendants. Subject to these objections, Ballock responds that the information produced in his document productions as well as the information produced by Defendants will be used. Third-party discovery has been delayed but Ballock expects additional productions to yield information that will be provided and used at trial.

**INTERROGATORY NO.8:**

Identify  each  physician, psychologist, co-counselor, or healthcare provider who has treated or examined you as a result of the incidents described in the Third Amended Complaint. For each such person, state:  a.  Name and address;  b. Nature of treatment or examination;  c.  Date of each treatment or examination.

**SUPPLEMENTAL ANSWER NO. 8:**

Ballock objects to the interrogatory as compound and composing at least four interrogatories.  Ballock also objects to requesting each date of treatment or examination as overbroad, unduly burdensome and not relevant.  Subject to these objections, Ballock responds.

As a result of the incidents described in the Third Amended Complaint, Scott T. Ballock was treated by Fremouw-Sigley Associates and Cheat Lake Physicians.

**Dr. Edward Baker,** Fremouw-Sigley Associates, 1224 Pineview Drive, B, Morgantown, WV 26505, telephone number 304-598-2300.  Sessions were held in late 2012 and early 2013.  Sessions were held for several months beginning in January 2013.  Joint sessions were also held pursuant to court mandate with Terry Lauretta Sigley in late 2012 or early 2013.

24

Ballock received treatment throughout the winter and spring of 2013-2014 for conditions and issues caused by the incidents described in the Third Amended Complaint including insomnia, depression, anxiety, and related health effects from these conditions.

Ballock received treatment throughout the winter and spring of 2013-2014.

**Emily Obertance,** Nurse Practitioner, Cheat Lake Physicians, 608 Cheat Road, Morgantown, WV 26508, telephone number 304-594-1313.

Ballock received treatment for conditions and issues caused by the incidents described in the Third Amended Complaint including insomnia, depression, anxiety, and related health effects from these conditions.

Ballock received treatment between 2012 through 2017.

## INTERROGATORY NO. 9:

Please identify each and every psychologist, psychiatrist, physician, cleric, or other person with whom you have counseled or treated concerning his psychological or emotional condition within the last 10 years, including the dates of counseling or treatment.

## SUPPLEMENTAL ANSWER NO. 9:

Ballock objects to the request as overbroad in seeking 10 years of psychologist or psychiatrist records. Ballock further objects to the request as overbroad in seeking any "cleric" or "other person" with whom he has "counseled" because Ballock's communications with any religious leaders would not be relevant and would be privileged. Likewise, the request asks for any "other person" which would encompass anyone with whom Ballock discussed his case, including his attorneys. Subject to these objections, Ballock received formal treatment concerning his psychological or emotional condition since the events alleged in the Third Amended Complaint as follows:

Dr. Edward Baker.

25

Kathie Gieselman.

Ballock confirms that no "cleric" was consulted.

Ballock also incorporates the responses to Interrogatories Nos. 2 and 4.

**INTERROGATORY NO. 10:**

Please list all medicine purchased or used by you since January 1, 2012, which you believe was needed because of the events described in the Third Amended Complaint, including the name of the medicine, the dosage prescribed, who prescribed or recommended the medicine, the inclusive dates during which you took the medicine the frequency with which you took it, and the pharmacy where the prescriptions were filled.

**SUPPLEMENTAL ANSWER NO. 10:**

**BALLOCK DESIGNATES THIS RESPONSE AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER.**

Ballock objects to the request as compound.  Subject to these objections, Plaintiff responds that medicines were required to combat symptoms including depression, anxiety, and nervous tics brought on by the events outlined in the Third Amended Complaint, Ballock has been prescribed and has taken Wellbutrin, Paxil, Propranolol, and Lorazepam. These medicines were prescribed by **Emily Obertance**, Nurse Practitioner, Cheat Lake Physicians, Morgantown, WV.  Each was taken daily, with Lorazepam taken at various stages. Ballock also has needed to take.  Ballock has also needed to take OTC sleep aids as result of anxiety and insomnia including ZZZQuil. Prescriptions were filled at CVS in Morgantown WV.

**INTERROGATORY NO.11:**

If you have ever been a party to any other legal actions (civil or criminal), or administrative proceedings either as a defendant or as a plaintiff other than the underlying divorce and custody proceedings involving Defendant Costlow, and the criminal charge in

26

the West Virginia Magistrate Court referred to in the Third Amended Complaint please state the date and place of such action was filed including the name of the court, the names of the parties involved, the court file number of each such action and the names of the attorneys representing each party and a description of the nature of each action and the results of such action.

### SUPPLEMENTAL ANSWER NO. 11:

Ballock objects to the interrogatories compound, and as constituting multiple interrogatories. Ballock also objects to the request as overbroad in that it implies that every action involving Ballock is relevant. Subject to these objections, Ballock states:

Ellen R. Costlow filed a civil action against Thomas Y. Ballock and Scott T. Ballock, Civil Action No. 13-C-313, on April 23, 2013 in Monongalia County (WV) Circuit Court. Costlow sued for Defamation, Civil Conspiracy, Invasion of Privacy, Intentional or Reckless Infliction of Emotional Distress, and Assistance or Encouragement of defamation based on a website about Ellen Costlow published and maintained solely by Thomas Y. Ballock.

Thomas Y. Ballock filed a counterclaim against Costlow, Civil Action No. 13-C-944, on December 2, 2013. Thomas Y. Ballock sued Costlow for Defamation and Intentional or Reckless Infliction of Emotional Distress.

Thomas Y. Ballock represented himself pro se. Scott T. Ballock was represented by attorney Michael J. Benninger. Ellen Costlow was represented by attorney Matthew Stout. Costlow failed to respond to Thomas Y. Ballock's request for discovery, and as initiated by Costlow, all parties agreed to a dismissal of the case, with prejudice, on February 14, 2014. During the pendency of the criminal prosecution of Scott T. Ballock, Monongalia County Assistant Prosecutor Cindy Scott offered to drop the misdemeanor criminal charges against Scott T. Ballock on the condition that Thomas Y. Ballock take down his website. Assistant Prosecutor Cindy Scott informed attorney Benninger that Ellen R. Costlow would not agree

27

to allow the prosecutor's office to dismiss the criminal misdemeanor charges against Ballock unless the website was taken down. Thomas Y. Ballock refused, and Assistant Prosecutor Cindy Scott continued to pursue the criminal charges against Scott T. Ballock.

Complaint filed 06/18/2009, Northern District of Indiana, federal court case no.: 2:09-cv-00173-TLS-APR. Ralph Lacotta (plaintiff) civil action against Patricia Ballock, defendant (Scott Ballock's mother) also naming Scott Ballock as a defendant. The matter involved Lacotta's assigning power of attorney and guardianship to Patricia Ballock because of concern about his loss of mental faculties. The case was dismissed by mutual agreement on 04/25/10.

### INTERROGATORY NO. 12:

Please identify all facts and witnesses that support your contention that Trooper Berry was alleged to be having an affair with Defendant Costlow, as set forth in Paragraph 25 of the Third Amended Complaint.

### SUPPLEMENTAL ANSWER NO. 12:

Scott T. Ballock was informed by Kenny Ice, Jr. of Trooper Chris Berry's sexual relationship with Ellen R. Costlow. Ice provided various information on multiple occasions, both by telephone and in person, including the content of text messages and other communications between Costlow and Berry.

The allegation of a sexual relationship was also included in an incident report prepared by the Monongalia County (WV) Sheriff's Department regarding a domestic dispute call on 08/12/2013.

Further evidence came from an audio recording of a 911 call on 08/12/2013 as compared to an incident report prepared by the Monongalia County Sheriff's Department regarding a domestic dispute on 08/12/2013.

Email correspondence between Berry and Costlow likewise provides circumstantial evidence supporting an affair.

Costlow further made statements to Ballock and others indicating that such an affair was taking place, and that she was "golden" and "untouchable" as a result.

The conduct of Berry is likewise evidence of an affair given the knowingly unjustified actions taken on behalf of Costlow at her request. Likewise, the willingness of the WVSP to do as Costlow requested is evidence that she more likely than not was involved in a sexual relationship with Berry and that it was the reason for cooperation, as well as a decision not to write a domestic disturbance report involving Costlow and Ice, in violation of policy requiring a report and arrest at the scene of a violent domestic disturbance where a minor child is present.

Ballock further states that Costlow has failed to produce documents and, as such, this answer cannot be supplemented with that additional evidence.

**INTERROGATORY NO. 13**:

Please identify all facts and witnesses that support your allegation that Trooper Berry conducted surveillance of Plaintiff and his parents at Defendant Costlow's request as set forth in Paragraph 27 of the Third Amended Complaint.

**SUPPLEMENTAL ANSWER NO. 13**:

Scott T. Ballock was informed by Kenny Ice, Jr. that Trooper Berry was, at Costlow's request, conducting surveillance of Ballock and Ballock's parents. Ice informed that Berry told Costlow he was able to easily conduct the surveillance because he lived near Ballock. Ballock then lived at 102 New Castle Drive, Morgantown, WV. Witnesses will include Ballock, Ice, Costlow, Berry, Kief, Gaskins and Tom Ballock.

**INTERROGATORY NO. 14**:

Please identify by name, address, telephone number, email or web site who or what

29

entity "forensically examined" and retrieved content from Kenny Ray Ice Jr.'s cell phone as set forth in Paragraph 61 of the Third Amended Complaint.

**SUPPLEMENTAL ANSWER NO. 14:**

Forensicon, 309 W. Washington Street, Suite 1300, Chicago, IL 60606, telephone number 312-427-5668.

**INTERROGATORY NO. 15:**

Please identify the name of the uniformed representative with the West Virginia State Police who allegedly appeared at the FBI's Clarksburg Resident Agency to lodge a complaint about Plaintiff's filing of this suit with the Senior Resident Agent, as well as the name of the Senior Resident Agent with whom the complaint was allegedly made and the date this complaint was allegedly made, as set forth lo Paragraph 225 of the Third Amended Complaint.

**SUPPLEMENTAL ANSWER NO. 15:**

Ballock objects to the interrogatory as compound and as comprising at least three separate interrogatories. Ballock responds to each interrogatory as follows:

1. Ballock does not know the identity of the uniformed representative of the West Virginia State Police who appeared at the FBI's Clarksburg (WV) Resident Agency to lodge a complaint about Ballock's filing of a civil suit.

2. Ballock was approached by his supervisor, SSA Soo Barrow, shortly after he filed the civil suit and told that a West Virginia State Trooper had appeared unannounced at the Clarksburg Resident Agency to lodge a complaint about Ballock and his filing of a civil lawsuit. SSA Ed Ryan, a colleague of Ballock's at the FBI, later told Ballock that the WVSP representative had met with Sr. Resident Agent John Large. Ballock did inquire further about this incident.

3.  The exact date is not known, other than it was shortly after the filing of the original Complaint.

**INTERROGATORY NO. 16:**

With respect to each job you have held since September 25, 2017, state the name and address of the employer, the name of your immcdit1t.e supervisor, your job classification and job description, the amount and manner of compensation for your services, and the reason(s) for leaving each such position of employment, where applicable.

**SUPPLEMENTAL ANSWER NO. 16:**

Plaintiff objects to this request as compound.  Subject to this objection, Plaintiff states:

Following his September 26, 2017 termination by the FBI, Ballock secured employment with Kroger in Indianapolis, Indiana. Ballock is employed as an Operations Manager and is responsible for the daily operations of a Kroger grocery store located at 2420 Lebanon Street, Lebanon, Indiana. Ballock's yearly compensation for this job is $54,000 plus a potential $5,000 bonus beginning in 2018. Ballock began employment with Kroger on December 04, 2017. Ballock participated in the Kroger management training program from December 04, 2017 to March 09, 2018. During this time his immediate supervisor was Matt Mueller. Upon graduation from the training program and his assignment to the Lebanon, Indiana store, Ballock's immediate supervisor was Mark Fowler.

**INTERROGATORY NO. 17:**

For each employer to which you  made inquiry or application for employment after September 25, 2017. state the name and address of each such employer; the date each such inquiry or application was made; the nature of each inquiry (whether by written application, oral inquiry, etc.); the name of each person at each such potential employer to  which you

31

made application or inquiry; the reason given to you by each such employer, if given for its decision not to employ you; whether each such employer had advertised that there was a job opening; the source of your information that the employer had a job opening; and for any employment offers made which were not accepted, the date the offer was made; the date that each such job would have commenced, the salary or hourly rate of pay offered; the nature of the job offered; the hours of employment and the job title for each such offer of employment and the reason you refused or failed to accept each such offer of employment.

### SUPPLEMENTAL ANSWER NO. 17:

Plaintiff objects to this interrogatory as unduly burdensome and irrelevant in seeking every application or "inquiry" made by ballock regardless of the nature of the "inquiry." Ballock further states that every application or investigation concerning employment is not relevant, and is over broad and unduly burdensome. It is likewise over broad and unduly burdensome in seeking every advertisement reviewed by Ballock and every source of information regarding job openings, which lacks any relevance and is not likely to lead to the discovery of any relevant information.

Ballock also objects to this interrogatory as compound. Subject to these objections, Ballock provides the following response:

Ballock began a job search on September 26, 2017. Ballock applied to dozens of advertised and unadvertised job openings in several different states, including for various investigator positions. Ballock was not informed by any potential employer why he was not offered an interview or a job. Besides Kroger, Ballock's only other interview was with Amazon; Ballock was not offered this position.

On November 15, 2017, Ballock was formally offered a management position with Kroger in Indianapolis, Indiana. A copy of Ballock's job offer letter is being produced.

Ballock began the formal Kroger management training program on December 04, 2017 and graduated from the program on March 09, 2018.

These supplemental interrogatory answers were served on Monday, August 6, 2018.

**AS TO OBJECTIONS:**

*/s/ Charles J. Crooks*

Charles J. Crooks
Crooks Law Firm PLLC
244 Pleasant Street
Morgantown, WV 26505
Charles@CrooksLawFirm.org

WV Bar # 4633

and

Frederick R. Juckniess
Juckniess Law Firm PLC
302 E. Liberty St., Suite 203
Ann Arbor, MI 48104
Phone: (734) 707-1515
Rick@juckniesslaw.com

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**                              Case No.:      1:17-CV-52

          Plaintiff,

v.                                                                   JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

          Defendants.

## CERTIFICATE OF SERVICE

    I, Charles J. Crooks, Esq., local counsel for the Plaintiff, Scott T. Ballock, hereby

certify that on the 6th day of August, 2018, I filed the certificate of service for the foregoing

"**PLAINTIFF'S FIRST SUPPLEMENTAL ANSWERS TO TROOPER**

**DEFENDANTS' FIRST INTERROGATORIES**" with the Clerk of the Court using the

CM/ECF system, and the full document to the following by U.S. Mail:

P. Todd Phillips
Lyons Phillips Legal Group PLLC
141 Walnut Street
Morgantown, WV 26505
toddphillips.law@gmail.com
**Counsel for Defendant,**
**Ellen Ruth Costlow**

| | |
|---|---|
| Mark G. Jeffries (WV Bar No. 11618) | Monté L. Williams (WV Bar No. 9526) |
| Steptoe & Johnson PLLC | Steptoe & Johnson PLLC |
| 400 White Oaks Blvd. | P.O. Box 1616 |
| Bridgeport, WV 26330-4500 | Morgantown, WV 26507-1616 |
| Mark.jeffries@steptoe-johnson.com | (304) 598-8000 |
| **Co-counsel for Defendants State** | Monte.williams@steptoe-johnson.com |
| **Trooper** | **Co-counsel for Defendants State** |
| **Michael Kief, State Trooper Ronnie M.** | **Trooper** |
| **Gaskins and State Trooper Chris Berry** | **Michael Kief, State Trooper Ronnie M.** |
| | **Gaskins and State Trooper Chris Berry** |

and

34

/s/ Charles J. Crooks

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SCOTT T. BALLOCK                          Case No.: 1:17-CV-52
                                          Honorable Irene M. Keeley
        Plaintiff,

v.                                        JURY TRIAL REQUESTED

ELLEN RUTH COSTLOW,
STATE TROOPER MICHAEL KIEF,
STATE TROOPER RONNIE M. GASKINS,
and
STATE TROOPER CHRIS BERRY,

        Defendants.

---

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF



1

REQUEST NO. 1:     Please produce any and all documents, photographs, recordings and other tangible things which relate in any way whatsoever to the allegations made by you in the Third Amended Complaint.

RESPONSE: Plaintiff will produce responsive documents.

REQUEST NO. 2:     Please produce all notes, calendars, diaries, personal correspondence and other documents (not protected by the attorney-client privilege) that you maintained or prepared that document, support, or relate to the claims and causes of action alleged by you in the Third Amended Complaint.

RESPONSE: Plaintiff objects to the extent the request calls for materials protected by the work product doctrine. Subject to this objection, Plaintiff will produce responsive documents.

REQUEST NO. 3:     Please produce any and all documents or tangible things that you reasonably expect to proffer as exhibits at the trial of this case.

RESPONSE: Plaintiff will produce responsive documents to the extent identified for introduction at trial.

REQUEST NO. 4:     Please produce any and all documents or tangible things that you reasonably expect to use for demonstrative purposes at the trial of this case.

RESPONSE: Plaintiff will produce responsive documents to the extent identified for introduction at trial.

REQUEST NO. 5:     Please produce any and all documents and things that you have provided or plan to provide to an expert witness whose opinion you intend to introduce into evidence at the trial of this case.

RESPONSE: Plaintiff will produce responsive documents as required under the Federal Rules

2

of Civil Procedure Rule 26.

REQUEST NO.6:   Please produce all statements, signed or unsigned, including affidavits and all transcripts of recorded statements and/or interviews, of any person or witness, relating to,   referring to, or describing any of the events, damages, or injuries alleged in the Third Amended Complaint.

RESPONSE: Plaintiff objects to this request as vague and failing to adequately identify what documents it seeks, and to the extent that it calls for attorney-client or work product privileged information. Subject to these objections, Plaintiff will produce responsive documents to the extent they can be identified.

REQUEST NO. 7:        Please produce a copy of any and all statements you, or anyone acting on your behalf, have made, either in writing or orally other than your attorney, concerning the facts of this matter.

RESPONSE: Plaintiff objects to this request as vague and failing to adequately identify what documents it seeks, and to the extent that it calls for information covered by the work product doctrine. Subject to these objections, Plaintiff will produce responsive documents to the extent they can be identified.

REQUEST NO. 8: Please produce a copy of all documents, records, reports, correspondence, images, x-rays, MRIs, CT scans, invoices, writings of any kind, and recordings of any kind that relate to medical care, treatment, consultations, and evaluations that you received as a result of the incidents described in the Third Amended Complaint. This request encompasses but is not limited to documents, records, images and invoices that reflect medical treatment, or evaluations provided to you as well as medications prescribed to you by health care providers, physicians, nurses, chiropractors, therapists or emergency medical technicians. Alternatively, please return a fully executed original of the medical records

3

release attached as Exhbiit 1 so that the State Police Defendants can obtain a copy of all documents and materials covered under the release.

**RESPONSE:** Plaintiff will provide a medical records release with all production subject to the protective order and appropriately limited.

**REQUEST NO. 9:**   Please  produce  copies of  any and all  bills, invoices, statements, records and other papers indicative of any expense you contend is recoverable in this action.

**RESPONSE:** Plaintiff objects to this request as overbroad and vague in seeking any "papers" or "records" that are "indicative" of expenses.  Subject to this objection, Plaintiff will produce responsive documents concerning expenses.

**REQUEST NO. 10:** Please produce a copy of all documents, records, reports, correspondence, notes, invoices, writings of any kind, and recordings of any kind that relate to mental health care, treatment, counseling, and evaluations that you have received at any time within the last ten years  This request encompasses but is not limited to documents, records, and invoices that reflect psychological, psychiatric or emotional care, treatment, counseling or evaluations provided to you, as well as medications that you have been prescribed. Alternatively, please return a fully executed original of the medical and mental health records releases attached as Exhibits 1, 2 and 3 so that the State Police Defendants may obtain a copy of all documents and materials covered under the releases.

**RRSPONSE:** Plaintiff will provide a medical records release with all production subject to the protective order and appropriately limited.

**REQUEST NO. 11:** Please provide complete prescription records  from  any and all pharmacies of any kind from which you have obtained prescription medications for the last 10 years.  In the alternative please execute the attached medical records release attached as Ehixbit 1 so that the State Police Defendants may obtain those records.

**RESPONSE:** Plaintiff will provide a medical records release with all production subject to the

4

protective order and appropriately limited.

REQUEST NO. 12:  Please  provide a  copy of any and all correspondence,

forms, letters, memos, e-mails or any other documents or tangible things which you have sent to

or received from Medicare, Medicade, or any other government agency relating to treatment for injuries

that are the subject of this case.

RESPONSE:  Plaintiff will produce responsive documents, if any.

RROUEST NO. 13:  Please produce all the evidence that allegedly corroborates

your contention that Trooper Berry was having a romantic relationship with Ms. Costlow as set

forth in Paragraph 26 of the Third Amended Complaint.

RESPONSE:  Plaintiff will produce responsive documents.

REQUEST NO. 14:  Please  produce  all  documents that support your allegation that

Trooper Berry was conducting surveillance of you and your parents, as set forth in Paragraph

31 of the Third Amended Complaint.

RESPONSE:  Plaintiff will produce responsive documents.

RE QUE ST NO. 15:  Please produce  all documents reflecting information  retrieved

from Kenny  Ray  Ice, Jr.'s cell  phone,  as  set  forth  in  Paragraph  61 of the Third Amended

Complaint.

RESPONSE:  Plaintiff objects to the request as overbroad and vague in seeking anything

"reflecting information" which would include pleadings in this case as well as privileged and work

product communications.  Plaintiff will produce the information retrieved from Ice's cell phone.

REQUEST NO. 16: Please produce complete copies of all emails and text

5

messages referred to or quoted in the Third Amended Complaint

RESPONSE: Plaintiff will produce responsive documents.


REQUEST NO. 17:   Please produce a complete, unedited copy of the "recovered audio recording " referred to in Paragraph 86 of the Third Amended Complaint.

RESPONSE: Plaintiff will produce responsive documents.


REQUEST NO. 18: Please produce all documents relating any "negative repercussions, you suffered at your employment, including but not limited to all documents that refer to or relate to your termination from employment on September 25, 2017, as set forth in Paragraphs 124-125 of the Third Amended Complaint.

RESPONSE: Plaintiff objects to the request as overbroad and vague, as well as duplicative of the requests already sent to the FBI. Plaintiff will work with counsel for Defendants to identify and produce responsive documents, if any, to the extent not already produced.


REQUEST NO. 19: Please produce all "recovered communications between Ballock and Costlow" referred to in Paragraphs 128-132 of the Third Amended Complaint.

RESPONSE: Plaintiff will produce responsive documents.


REQUEST NO. 20: Please produce a copy of the 911 recording referred to in paragraph 146 of the Third Amended Complaint.

RESPONSE: Plaintiff will produce responsive documents.


REQUEST NO. 21: Please produce all documents that support your allegation that the State Police Defendants conspired with Ms. Costlow to arrest you in order to assist her during the Family Court proceedings between you and Ms.Costlow.

6

RESPONSE : Plaintiff will produce responsive documents.

REQUEST NO. 22: Please produce all documents that support your claim that the State Police Defendants tortuously interfered with your employment as set forth in Count Ten of the Third Amended Complaint.

RESPONSE: Plaintiff will produce responsive documents.

REQUEST NO. 23: Please produce a copy of any and all communications, Including but not limited to letters, e-mails and text messages between you or your attorneys and Tom Ballock, which are related to or mention any of the State Police Defendants or are related to any of the allegations in the Third Amended Complaint.

RESPONSE: Plaintiff objects to the request as vague and overbroad in seeking communications between attorneys and Tom Ballock, and seeking any and all communications with Tom Ballock without limitation other than "related to" or "mention any" of the Defendants.

REQUEST NO. 24: Please produce a copy of any and all documents, photographs, audiotapes, and videotapes identified, reviewed, referenced, or relied upon by you in formulating answers to "Defendants State Trooper Michael Kief, State Trooper, Ronnie M. Gaskins and State Trooper Chris Berry's First Set of Interrogatories to Plaintiff that have not been previously identified in response to these Requests for Production.

RESPONSE: Plaintiff will produce responsive documents.

REQUEST NO. 25: Please produce a copy of all documents that you have collected or maintained that you contend can prove or substantiate the allegations in the Third Amended Complaint and that have not otherwise been produced in response to these document requests.

RESPONSE: Plaintiff objects to the request as vague, overbroad and unclear. Subject to this objection, Plaintiff incorporates its responses and objections to all the requests herein.

7

REQUEST NO. 26: Please produce your federal and state income tax returns for calendar years 2012, 2013, 2014, 2015, and 2016, as well as your 2017 federal and state Income tax returns when they are prepared.

RESPONSE: Plaintiff objects to the request to the extent it seeks confidential information, and is overbroad. Nevertheless, Plaintiff will produce these tax returns as "confidential" subject to the protective order.

REQUEST NO.27: Please produce any and all documents reflecting any fringe benefits that you received in 2012, 2013, 2014, 2015, 2016, and 2017.

RESPONSE: Plaintiff objects to the request as vague, and states he has produced information relating to income as well as tax returns.

REQUEST NO. 28 Please produce all documents which reflect your income thus far for 2018.

RESPONSE: Plaintiff objects to the request as overbroad and vague. Subject to the objection, Plaintiff will produce documents that show income.

REQUEST NO. 29: Please produce any and all documents related to your search for and/or attainment of employment from September 25, 2017 to present.

RESPONSE: Plaintiff objects to the request as overbroad and vague, and seeking information that is not relevant, in asking for anything related to the "search for" employment. Subject to these objections, Plaintiff has produced documents regarding his employment.

REQUEST NO. 30: Please produce any documents relating to any employment you have held since September 25, 2017, including copies of any employment contracts, offer letters, pay stubs, documents reflecting employee benefits that you are receiving and any employee

8

handbooks.

RESPONSE: Plaintiff objects to the request as overbroad and vague in seeking "any documents" that are "relating" to any employment, including "employee handbooks." The request likewise seeks irrelevant information and will not lead to the discovery of relevant information. Subject to these objections, Ballock has produced information regarding his current employment.

REQUEST NO.31: Please produce any documents, including email, text or other social media messages, photographs or recordings in your possession, custody or control related to the State Police Defendants in any way.

RESPONSE: Plaintiff objects to the request as overbroad and vague, including because everything about Scott Ballock's life has been impacted by the conduct of Defendants. Plaintiff likewise objects to the request as duplicative of the requests above. Subject to this objection, Plaintiff will produce the documents requested as specified in responses to 1-30 and certain documents relating to the State Police Defendants will be produced.

May 21, 2018:

/s _____
Frederick R. Juckniess
Juckniess Law Firm PLC
302 E. Liberty St., Suite 203
Ann Arbor, MI 48104
Phone:  734) 707-1515
Rick@juckniesslaw.com

9

Official Copy

 WVU Medicine

WVU Hospitals and University Health Associates

1 STADIUM DRIVE
MORGANTOWN WV 26505
FACESHEET

BALLOCK,SCOTT
MRN: E1704718
DOB: 9/3/1968, Sex: M
Enc. Date: 07/19/12

## Patient Information

| | | | | | | | SSN: | 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 |
|---|---|---|---|---|---|---|---|---|
| Name: | BALLOCK,SCOTT | | | | | | | |
| Baby band #: | | | Alias: | BALLO CK,SC OTT T | | | Religion: | UNKNOWN |
| DOB: | 09/03/68 | Age: 49y | Sex: | M | Marital : | Divorc ed | Ethnic group: | Non-Hispanic |
| Address: | 51 SUMMIT OVERLOOK DRIVE | | | | | | | |
| City: | MORGANTOWN | State: WV | Zip: | 26508 | Phone : | 304-381-2342 | | |

## Guarantor Information

| | | | | | SSN: | 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 |
|---|---|---|---|---|---|---|
| Name: | BALLOCK,SCOTT | | | | | |
| Address: | 51 SUMMIT OVERLOOK DRIVE | | | | | |
| City: | MORGANTOWN | State: WV | Zip: 26508 | Phone: | | 734-660-4240 |
| Employer: | | | | | | |
| Address: | 320 WEST PIKE STREET | | | | | |
| City: | CLARKSBURG | State: WV | Zip: 26301 | Phone: | | 304-624-6200 |
| Guar DOB: | 09/03/68 | | | | | |

## Emergency Contact Information

| | | | | Relationship: | Mother |
|---|---|---|---|---|---|
| Name: | BALLOCK,PATTY | | | | |
| Address: | 102 NEW CASTLE DR | | | | |
| City: | MORGANTOWN | State: WV | Zip: 26508 | Phone: | 999-999-9999 |
| | | | | Business phone: | 999-999-9999 |

## Insurance Information

| | | | Phone: | 800-543-7822 |
|---|---|---|---|---|
| BLUE CROSS BLUE SHIELD/FEDERAL BLUE CROSS | | | | |
| Subscriber: | Ballock, Scott | | Subscriber#: | R57879410 |
| Group#: | 105 | | Precert#: | |

## Admission Information

| Unit/Room/Bed: | // | | Service: | |
|---|---|---|---|---|
| Admitting provider: | | | Phone: | |
| Attending provider: | Pallie, Erika. MD | | Phone: | 304-284-0025 |
| PCP: | Pallie, Erika. MD | | Phone: | 304-284-0025 |
| Admission dx: | | | Patient class: | OUTPATIENT |
| Admission type: | EL | | | |

## Admission Information - Hospital Account/Patient Record

| Arrival Date/Time: | 07/19/2012 10:37 AM | Admit Date/Time: | 07/19/2012 10:37 AM | IP Adm. Date/Time: | |
|---|---|---|---|---|---|
| Admission Type: | Elective | Point of Origin: | Clinic Or Physician Referral | Admit Category: | |
| Means of Arrival: | | Primary Service: | | Secondary Service: | |
| Transfer Source: | | Service Area: | WVU | Unit: | |
| Admit Provider: | Pallie, Erika. MD | Attending Provider: | Pallie, Erika. MD | Referring Provider: | |

EXHIBIT
46

## Admission Diagnoses / Reasons for Visit (ICD-9-CM)

| Code | Description | Comments |
|---|---|---|
| 272.4 | OTHER AND UNSPECIFIED HYPERLIPIDEMIA | |

Printed on 8/29/2018 11:52 AM

CONFIDENTIAL

Troopers 00898

Official Copy

**WVU** Medicine
WVU Hospitals and University Health Associates

1 STADIUM DRIVE
MORGANTOWN WV 26505
LMR REPORT

BALLOCK,SCOTT
MRN: E1704718
DOB: 9/3/1968, Sex: M
Enc. Date: 07/19/12

## Admission Diagnoses / Reasons for Visit (ICD-9-CM) (continued)

### Final Diagnoses (ICD-9-CM)

| Code | Description | POA | CC | HAC | Affects DRG |
|---|---|---|---|---|---|
| 272.4 [Principal] | OTHER AND UNSPECIFIED HYPERLIPIDEMIA | | | | |
| 401.9 | UNSPECIFIED ESSENTIAL HYPERTENSION | | | | |
| 270.4 | Disturbances of sulphur-bearing amino-acid metabolism | | | | |
| 302.75 | PREMATURE EJACULATION | | | | |
| 477.9 | ALLERGIC RHINITIS, CAUSE UNSPECIFIED | | | | |

### Discharge Information - Patient Record Only

| Discharge Date/Time | Discharge Disposition | Discharge Destination | Discharge Provider | Unit |
|---|---|---|---|---|
| None | None | None | None | Family Medicine, Cheat Lake |

### Allergies as of 7/19/2012

Reviewed On: **7/19/2012** By: **Pallie, Erika**

No Known Allergies

### Current Immunizations

Reviewed on 9/13/2016

| Name | Date |
|---|---|
| **Tetanus Toxoid/Diphtheria Toxoid/Acellular Pertussis Vaccine, Adsorbed (Tdap)** | 9/13/2016 |

### Home Medication Documentation Review Audit (Reverse Chronological Order)

Reviewed by Johnson, Crystal Dawn, LPN (LICENSED PRACTICAL NURSE) on 7/19/12 at 1047

| Medication | Order | Taking? | Sig | Documenting Provider | Status | Last Dose |
|---|---|---|---|---|---|---|
| amlodipine (NORVASC) 10 mg Oral Tablet | 58931 464 | Yes | take 10 mg by mouth Once a day. | Provider, Historical | Active | Taking |
| aspirin 81 mg Oral Tablet, Chewable | 58931 473 | Yes | take 81 mg by mouth Once a day. | Provider, Historical | Active | Taking |
| buPROPion (WELLBUTRIN SR) 150 mg Oral Tablet Sustained Release | 58931 469 | Yes | take 150 mg by mouth Twice daily. | Provider, Historical | Active | Taking |
| Cholecalciferol, Vitamin D3, (VITAMIN D-3) 5,000 unit Oral Tablet | 58931 474 | Yes | take  by mouth. | Provider, Historical | Active | Taking |
| coenzyme Q10 30 mg Oral Capsule | 58931 472 | Yes | take 200 mg by mouth Daily with Dinner. | Provider, Historical | Active | Taking |
| Fexofenadine (ALLEGRA) 30 mg Oral Tablet | 58931 471 | Yes | take 30 mg by mouth Twice daily. | Provider, Historical | Active | Taking |
| folic acid (FOLVITE) 1 mg Oral Tablet | 58931 468 | Yes | take 4 mg by mouth Once a day. | Provider, Historical | Active | Taking |
| hydrochlorothiazide (HYDRODIURIL) 25 mg Oral Tablet | 58931 466 | Yes | take 25 mg by mouth Once a day. | Provider, Historical | Active | Taking |
| lisinopril (PRINIVIL) 40 mg Oral Tablet | 58931 465 | Yes | take 40 mg by mouth Once a day. | Provider, Historical | Active | Taking |

**CONFIDENTIAL**

**Troopers 00899**

Official Copy
**WVU**Medicine
WVU Hospitals and University Health Associates

1 STADIUM DRIVE
MORGANTOWN WV 26505
LMR REPORT

BALLOCK,SCOTT
MRN: E1704718
DOB: 9/3/1968, Sex: M
Enc. Date: 07/19/12

## Home Medication Documentation Review Audit (Reverse Chronological Order) (continued)

| omega-3 fatty acid (LOVAZA) 1 gram Oral Capsule | 58931 470 | Yes | take 2 g by mouth Twice daily. | Provider, Historical | Active | Taking |
| rosuvastatin (CRESTOR) 20 mg Oral Tablet | 58931 467 | Yes | take 20 mg by mouth QPM. | Provider, Historical | Active | Taking |

## ED Course

### ED Arrival Information
Patient not seen in ED

### ED Disposition
None

## H&P Summary Notes

### H&P by Pallie, Erika at 07/19/12 1324

| Author: Pallie, Erika | Service: (none) | Author Type: Physician |
| Filed: 07/19/12 1330 | Encounter Date: 7/19/2012 | Status: Signed |
| Editor: Pallie, Erika | | |

HPI:
43-year-old married Caucasian gentleman brought in today by his wife. Has several issues that he is mostly here for establishment. Has had recent onset of headaches. He mostly feels them in his right side of his head sometimes on top of his head. They're accompanied by sensitivity to light and sound and some nausea. He's had 3 episodes in the past 6 months. He does admit to being stressed out he has neck pain. Has not been to a chiropractor had massage therapy. His wife gives him naproxen with Sudafed and caffeine in it seems to help but he thinks lying down in a dark room helps more than anything. Has no prodrome and no residual symptoms after his headaches are resolved.

Patient is a life long history of facial Ticks which reportedly run in the family both and his grandmother and himself his cousins. He had once been prescribed Klonopin but he couldn't tolerate it made him feel like a zombie. Now taking Wellbutrin and that seems to keep it under control.

He does have hereditary hyperlipidemia. Last year he was changed to Crestor. He did have elevated LFTs on Lipitor. He is followed by a cardiologist in Ann Arbor Michigan. Doctor's name is Dr. Dodds who is a family friend. He is also on folic acid for homocystine anemia.

Patient complains of premature ejaculation and would like to see a urologist for this. This is increasingly problematic for him.

**Past Medical History**
Diagnosis                                    Date
• HTN
• Hyperlipidemia
• Atypical tic disorder                      7/19/2012

**Past Surgical History**

Official Copy
**WVU**Medicine   1 STADIUM DRIVE
WVU Hospitals and University Health Associates   MORGANTOWN WV 26505
LMR REPORT

BALLOCK,SCOTT
MRN: E1704718
DOB: 9/3/1968, Sex: M
Enc. Date: 07/19/12

## H&P Summary Notes (continued)

### H&P by Pallie, Erika at 07/19/12 1324 (continued)

| Procedure | Date |
|---|---|
| • Hx adenoidectomy | |
| • Hx other | |
| *U tripple P sinus surg* | |

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| • Healthy | Mother | |
| • Coronary Artery Disease | Father | |
| • Hypertension | Father | |
| • High Cholesterol | Father | |
| • Tics/Tourette's | Paternal Grandmother | |

**History**

Social History
• Marital Status:        Married
    Spouse Name:      Ellen
    Number of Children:  N/A
• Years of Education:    N/A

Occupational History
•                        Fbi

Social History Main Topics
• Smoking status:        Never Smoker
• Smokeless tobacco:     Not on file
• Alcohol Use:           No
• Drug Use:              Not on file
• Sexually Active:       Yes -- Female partner(s)

Other Topics              Concern
• Seat Belt              Yes
• Sunscreen Used         Yes
• Right Hand Dominant    Yes

Social History Narrative
• No narrative on file
patient has lived in Ann Arbor Michigan, Indiana, Chicago, Las Vegas, Washington DC, most recently moved here from Ann Arbor Michigan. He travels a lot.

No outpatient prescriptions prior to visit.
No Known Allergies

Review of Systems -
Denies vision changes tinnitus earaches sore throat upper respiratory symptoms. Has been having horrible environmental

Official Copy

**WVU**Medicine
WVU Hospitals and University Health Associates

1 STADIUM DRIVE
MORGANTOWN WV 26505
LMR REPORT

BALLOCK,SCOTT
MRN: E1704718
DOB: 9/3/1968, Sex: M
Enc. Date: 07/19/12

## H&P Summary Notes (continued)

### H&P by Pallie, Erika at 07/19/12 1324 (continued)

allergies and is taking Allegra recently. Problems with sinus congestion runny nose. No chest pain palpitation shortness of breath. No orthopnea no edema. No abdominal pain. No nausea vomiting diarrhea dysuria. No blood per rectum. No urinary frequency urgency polydipsia or polyuria. No trouble achieving erection and just maintaining it. No seizures.

OBJECTIVE:
BP 136/78 | Temp 36.9 °C (98.5 °F) | Ht 1.88 m (6' 2") | Wt 103 kg (227 lb 1.2 oz) | BMI 29.15 kg/m2
General no acute distress very pleasant gentleman. EOMI PERRLA. Fundi within normal limits. Tympanic membranes are clear. Nares is nonerythematous. Neck supple no JVD bruits similar lymphadenopathy. He does have reproducible tenderness in the right paraspinal also on his right trapezius. Heart is regular. No murmurs. Lungs are clear. No wheezes rhonchus or rales. Abdomen soft nontender normal bowel sounds no organomegaly rebound guarding bruits or masses. Strength is no clubbing cyanosis or edema good range of motion. Skin is warm and dry. Cranial nerves are intact. Reflexes are intact and symmetrical. No motor or sensory deficits.

Assessment plan:
1. Dyslipidemia (272.4)                     LIPID PANEL, ALT (SGPT)
2. HTN (hypertension) (401.9)               COMPREHENSIVE METABOLIC PNL, FASTING,
                                            THYROID STIMULATING HORMONE (SENSITIVE
                                            TSH)
3. Homocysteinemia (270.4)                  folic acid (FOLVITE) 1 mg Oral Tablet,
                                            HOMOCYSTEINE, TOTAL, PLASMA
4. Premature ejaculation (302.75)           paroxetine (PAXIL) 10 mg Oral Tablet, OUTSIDE
                                            CONSULT/REFERRAL PROVIDER(AMB)
5. Environmental allergies (477.9)          Fexofenadine (ALLEGRA) 30 mg Oral Tablet,
                                            fluticasone (FLONASE) 50 mcg/actuation Nasal Spray,
                                            Suspension

We'll continue current medication her current doses. Check fasting blood work.

Erika Pallie, M.D.
Assistant Professor
WVU Cheat Lake Physicians

"Electronically signed by Pallie, Erika at 07/19/12 1330"

---

**CONFIDENTIAL**

**DSM IV Diagnosis and Treatment Plan:**

**Scott Ballock**          **July 23, 2012**

Axis I:        296.32         Major Depressive Disorder, Recurrent, Moderate

               300.02         Generalized Anxiety Disorder

Axis II:                      Deferred

Axis III:                     none reported

Axis IV:                      Relationship disturbance

Axis V:                       Current GAF: 66

Patient's strengths/limitations in achieving goals/objectives:

Scott presents with above average intelligence. He has a support system that includes friends and a good income. He is willing to learn techniques for working out difficulties in the marriage and shares easily in session. He is limited by exhaustion in the current situation and is seriously concerned with the welfare of his marriage.

TREATMENT PLAN

Goals:                                          Estimated time frame for resolution:
  1)  Process grief over unresolved childhood neglect
  2)  Improve communication with spouse
  3)  Gain understanding about anxiety and depression

Ref to DR. for medication eval?

Interventions (relate to above goals)
1)      Learn more about the grief process and help to express frustrations.
2)      Learn techniques to defuse the tension between partners
3)      Learn strategies to deal with high anxiety and fears

Does patient understand proposed treatment plan?
Yes    No   If "no," please explain:

Signature _____          7/23/12
Kathie Gieselman _____     Date _____

EXHIBIT
47

**Troopers 00885**

# Phoenix Psychological and Counseling Assoc, Inc.

Patient Name: _____Scott Ballock_____   Date: _____8/06/2012_____

Appointment: __X_ routine ____emergency ___ late cancel ___ no show

CPT code: ___ 90801 _X__ 90806 ___ 90812 ___90814 ___90808

DX: _X__ unchanged ____ changed _____

Psychosocial and Environmental stressors addressed:

___ primary support          _X__ self-care issues          ____abuse

_X_ social environment     ___ economic stressors     ___substance issues

___school/work issues     ___health issues          ___ OTHER_____

___housing               ___Fx of origin          ___OTHER_____

Functioning: ___X__ unchanged ____higher ___lower

Risk: __SI ___non-compliant __X_none

Medications: _X_N/A ___unchanged ___changed _____

Affect: _X__sad ___restricted ___flat ___blunted ___angry ___ inappropriate ___ normal

Mood: _X_depressed ___anxious ___angry ___labile ___guarded ___euphoric ___ expansive ___ irritable

___sleep disturbance ___delusions ___poor insight/judgment ____normal

Interventions: _X__Adlerian _X__ problem solve ___role play _X___psycho/social edu ___CBT ____EMDR

Other: _____

Response: ___ resistant _X__ interested ____ responsive ____ confused ___angry ____other

Scott arrived on time for his individual sessions at my office. He relates more information about his life and his anxiety about current stressors. There is huge stressor around his life and marriage. His description of his wife indicates that she is displaying very erratic behavior. He reports that she has some significant trauma in her childhood and that her father also exhibited similar erratic behavior. She does things to entice him to react to her – such as screaming, spending large amounts of money, and physical confrontation. He admits that he stays in the marriage for their two children and we discuss the ramifications of that decision. He appreciates a place to talk openly about the situation. I challenge him to recognize that his anxiety may not decrease as long as he is in this relationship – and it seems that the relationship is worsening. We will meet in one week.

Signature: _____ Kathie Gieselman _____

Kathie Gieselman, LPCC, MFT

**Troopers 00886**

# Phoenix Psychological and Counseling Assoc, Inc.

Patient Name: _____Scott Ballock_____  Date: ____8/14/2012_____

Appointment: _X__ routine ___emergency ___ late cancel ___ no show

CPT code: ___ 90801 _X__ 90806 ___ 90812 ___90814 ___90808

DX: _X__ unchanged ____ changed _____

Psychosocial and Environmental stressors addressed:

___ primary support      _X__ self-care issues        _____abuse
_X_ social environment   ___ economic stressors      _____substance issues
___school/work issues    ___health issues            ___ OTHER_____
___housing               ___Fx of origin             ___OTHER_____

Functioning: ___X__ unchanged ____higher ___lower

Risk: ___SI ___non-compliant _X__none

Medications: _X_N/A ___unchanged ___changed _____

Affect: ___sad ___restricted _X_flat ___blunted ___angry ___ inappropriate ___ normal

Mood: _X__depressed ___anxious ___angry ___labile ___guarded ___euphoric ___ expansive ___ irritable
___sleep disturbance ___delusions ___poor insight/judgment ____ normal

Interventions: _X_Adlerian _X_ problem solve ___role play _X_psycho/social edu ___ CBT ___ EMDR

Other: _____

Response: ___ resistant _X_interested ____ responsive ____ confused ____angry ____ other

Scott arrived on time for his individual sessions at my office. He presents with high anxiety and the topic is in regard to the stressors around his life and marriage. He shows some movement and states that he is seeking some help with how to deal with the situation. He describes his wife as "is in a manic phase right now" and I encouraged him to talk with her about how "they" could improve their situation as a couple – avoiding the blame game. Asking her what might help her to de-escalate when she ramps up in her anger and depressive states. He is firm that he is committed to the relationship, but only for the kids sake. He tells me that he would leave, but he "worries about the kids if I was not there to deflect the anger" from them when her moods escalate. I highly suggest medication and suggested that he not react to her pushing – he can state that "I am sorry that you feel that way" when she is attempting to pick a fight in an effort to diffuse and not defend. Having some words to use and a plan of action reduce his anxiety and he goes home with the goal of trying to make things calmer at home. I sent home a reading from the book *Solo Partner*. We will meet in three weeks due to scheduling difficulties.

Signature: _Kathie Gieselman_____ 8/14/12

Kathie Gieselman, LPCC, MFT

Troopers 00887

# Phoenix Psychological and Counseling Assoc, Inc.

Patient Name: _____Scott Ballock_____  Date: ____9/04/2012_____

Appointment: __X_ routine ___emergency ___ late cancel ____ no show

CPT code: ___ 90801 __X_ 90806 ___ 90812 ___90814 ___90808

DX: ____ unchanged ____ changed _____

Psychosocial and Environmental stressors addressed:

___ primary support        _X__ self-care issues              ___abuse
_X_ social environment     ___ economic stressors       ___substance issues
___school/work issues      ___health issues             ___ OTHER _____
___housing                 ___Fx of origin              ___OTHER_____

Functioning: ___X__ unchanged ____higher ___lower

Risk: ___ SI ___non-compliant _X__none

Medications: _X_N/A ___unchanged ___changed _____

Affect: _X__sad ___restricted ___flat ___blunted ___angry ___ inappropriate ___ normal

Mood: ___depressed __X_anxious ___angry ___labile ___guarded ___euphoric ___ expansive ___ irritable
___sleep disturbance ___delusions ___poor insight/judgment ____ normal

Interventions: ___Adlerian _X__ problem solve ___role play __X_psycho/social edu ___ CBT ___ EMDR

Other:_____

Response: ___ resistant _X__interested ____ responsive ____ confused ____angry ____ other

Scott arrived on time for his individual sessions at my office. He reports that his wife
agreed to seek counseling help her during her manic phase. Yesterday, she saw a woman
from Morgantown who will try EMDR with her. Scott reports that his wife believes that this
counselor will be able to help her. We discuss the process of EMDR and I directed him to
research about results with the technique. We talk about his relationship with the children.
He reports that his wife "is smart" and has "threatened several things" that could potentially
cost him his job at the FBI. This writer encouraged him to seek protection, possibly
document incidents and/or to validate his predicament by having others accompany him to
witness events. We discussed this situation and the impact on his children. We will meet in
one week.

Signature: _____s/Kathie Gieselman_____          Date: 9/4/2012
Kathie Gieselman, LPCC, MFT

**Troopers 00888**

# Phoenix Psychological and Counseling Assoc, Inc.

Patient Name: _____ Scott Ballock_____  Date: ____10/03/2012____

Appointment: ___ routine ___emergency ___ late cancel ___ no show

CPT code: ___ 90801 ___ 90806 ___ 90812 ___90814 ___90808

DX: ____ unchanged ____ changed _____

Psychosocial and Environmental stressors addressed:

___ primary support        ____ self-care issues        ____abuse
___ social environment     ____ economic stressors      ____substance issues
___school/work issues      ____health issues            ___ OTHER _____
___housing                 ____Fx of origin             ___OTHER_____

Functioning: _____ unchanged _____higher ___lower

Risk: ___SI ___non-compliant ___none

Medications: __N/A __unchanged ___changed _____

Affect: ___ sad ___restricted ___flat ___blunted ___angry ___ inappropriate ___ normal

Mood: ___depressed ___anxious ___angry ___labile ___guarded ___euphoric ___ expansive ___ irritable
___sleep disturbance ___delusions ___poor insight/judgment ____ normal

Interventions: ___Adlerian ___ problem solve ___role play ____psycho/social edu ___ CBT ___EMDR

Other: _____

Response: ___ resistant ___interested ____ responsive ____ confused ___angry ____ other

Scott arrived on time for his individual sessions at my office. He has asked for an
emergency session and I put him in today. He is visually upset and he reports that his wife
'threw him out' of the house and this time he "left and stayed away." She has filed for
divorce and he is meeting with an attorney on Friday. He is upset and cries throughout the
session. She is accusing him of years of abuse and she is acting out by dating other men. He
is devastated and cries the most when he talks about the effects on his children. He is
worried about his kids being traumatized by this situation. I do my best to normalize his
feelings and calm his fears. I suggest that he use his support system to lean on.   He will call
tomorrow to set up more appointments.

Signature: _____ Kathie Gieselman _____ 6/3/13

Kathie Gieselman, LFCC, MFT

**Troopers 00889**

Official Copy

**WVU**Medicine   1 STADIUM DRIVE
MORGANTOWN WV 26505
WVU Hospitals and University Health Associates   LMR REPORT

BALLOCK,SCOTT
MRN: E1704718
DOB: 9/3/1968, Sex: M
Enc. Date: 10/24/12

**Home Medication Documentation Review Audit (Reverse Chronological Order) (continued)**

## ED Course

### ED Arrival Information
Patient not seen in ED

### ED Disposition
None

## Progress Note

### Progress Notes by Pallie, Erika at 10/24/12 1919

| | | |
|---|---|---|
| Author: Pallie, Erika | Service: (none) | Author Type: Physician |
| Filed: 10/24/12 1923 | Encounter Date: 10/24/2012 | Status: Signed |
| Editor: Pallie, Erika | | |

**Patient Active Problem List**
Diagnoses
- Migraine
- Dyslipidemia
- HTN (hypertension)
- Homocysteinemia
- Atypical tic disorder
- Environmental allergies

SUBJECTIVE:
Mr. Ballock is here today for a followup visit. He reports he is not sleeping well. He is stressed out. His wife has left him. He is in counseling he needs something for his nerves. I had given him Paxil to help with anxiety and to help premature ejaculation. At work but he stopped taking it and he needs refills. Taking his medication as prescribed otherwise. Not drinking alcohol nonsuicidal non-homicidal. Able to work. Fasting blood sugar was 117. He does exercise 7 days a week but he eats a lot of sweets

**Lab Results**

| Component | Value | Date |
|---|---|---|
| CHOLESTEROL | 151 | 8/17/2012 |
| HDLCHOL | 41 | 8/17/2012 |
| LDLCHOL | 76 | 8/17/2012 |
| TRIG | 169* | 8/17/2012 |



EXHIBIT
48

| Comprehensive Metabolic Profile | | | | | |
|---|---|---|---|---|---|
| **Lab Results** | | | **Lab Results** | | |
| Component | Value | Date/Time | Component | Value | Date/Time |
| SODIUM | 139 | 8/17/2012 7:40 AM | CALCIU M | 9.7 | 8/17/2012 7:40 AM |
| POTASS IUM | 4.9 | 8/17/2012 7:40 AM | TOTALP ROTEIN | 7.3 | 8/17/2012 7:40 AM |
| CHLORI DE | 103 | 8/17/2012 7:40 AM | AST | 35 | 8/17/2012 7:40 AM |

**CONFIDENTIAL**

**Troopers 00926**

Official Copy
**WVU**Medicine
WVU Hospitals and University Health Associates

1 STADIUM DRIVE
MORGANTOWN WV 26505
LMR REPORT

BALLOCK,SCOTT
MRN: E1704718
DOB: 9/3/1968, Sex: M
Enc. Date: 10/24/12

## Progress Note (continued)
### Progress Notes by Pallie, Erika at 10/24/12 1919 (continued)

| | | | | | |
|---|---|---|---|---|---|
| CO2 | 27 | 8/17/2012 7:40 AM | ALT | 16 | 8/17/2012 7:40 AM |
| ANIONG AP | 9 | 8/17/2012 7:40 AM | | | |
| BUN | 14 | 8/17/2012 7:40 AM | | | |
| CREATININE | 1.01 | 8/17/2012 7:40 AM | | | |

**Lab Results**

| Component | Value | Date |
|---|---|---|
| TSH | 1.081 | 8/17/2012 |

Review of Systems -
Denies chest pain palpitation shortness of breath. Denies headaches dizziness earaches or sore throat. Denies abdominal pain nausea vomiting diarrhea and dysuria.

OBJECTIVE:
BP 130/78 | Temp 37.2 °C (98.9 °F) | Ht 1.88 m (6' 2") | Wt 98.6 kg (217 lb 6 oz) | BMI 27.91 kg/m2
General no acute distress. HEENT EOMI PERRLA. Tympanic membranes are clear. Pharynx is nonerythematous. Heart rate is regular. Lungs are clear. Abdomen is soft nontender normal bowel sounds. Extremities no clubbing cyanosis or edema. Skin is dry. Cranial nerves intact and reflexes are intact and symmetrical.

Assessment and plan:
1. **Premature ejaculation (302.75)**          paroxetine (PAXIL) 20 mg Oral Tablet
2. HTN (hypertension) (401.9)          lisinopril (PRINIVIL) 40 mg Oral Tablet, amLODIPine (NORVASC) 10 mg Oral Tablet, hydrochlorothiazide (HYDRODIURIL) 25 mg Oral Tablet
3. Dyslipidemia (272.4)          rosuvastatin (CRESTOR) 20 mg Oral Tablet, omega-3 fatty acid (LOVAZA) 1 gram Oral Capsule
4. Anxiety (300.00)          LORazepam (ATIVAN) 1 mg Oral Tablet
5. Elevated blood sugar (790.29)          BASIC METABOLIC PNL, FASTING, INSULIN, FREE, SERUM, HGA1C (HEMOGLOBIN A1C WITH EST AVG GLUCOSE)

Counseled to avoid sweets avoid soda. Repeat fasting blood sugar with insulin A1c, if elevated Center nutritional consult. Refill other medications.

Patient is advised that if Paxil with her region doesn't do the trick for him he will probably need to see a psychiatrist.

Erika Pallie, M.D.
Assistant Professor
WVU Cheat Lake Physicians

Official Copy

**WVU**Medicine

WVU Hospitals and University Health Associates

1 STADIUM DRIVE
MORGANTOWN WV 26505
LMR REPORT

BALLOCK,SCOTT
MRN: E1704718
DOB: 9/3/1968, Sex: M
Enc. Date: 10/15/13

## Progress Note (continued)

**Progress Notes signed by Long, Mary Ann at 10/16/13 1606  (continued)**

MEDICAL RECORD NUMBER:  014633606
DATE OF BIRTH:          09/03/1968

DATE OF SERVICE:        10/15/2013

CHIEF COMPLAINT: Needs refills.

SUBJECTIVE: The patient is a 45-year-old male with past medical history significant for hypertension, hyperlipidemia, depression and anxiety who presents to clinic for the above reason. He was previously followed by Dr. Pallie. He reports that he has actually been out of his medication for several months and has not been taking any of them. He notes that his anxiety issues have been under worse control since he has been off the Paxil and Wellbutrin. He feels that he needs to go back on those medications. He has undergone a very difficult divorce and there is a lot of discord between him and his ex-wife. He is currently caring for his 2 children. He has full custody and also works full time at the FBI. He does report some difficulty sleeping at night secondary to all the stress and anxiety. He had been prescribed lorazepam in the past which helped. Again, he stopped taking that several months ago. He was also on several blood pressure medications including Prinivil, hydrochlorothiazide, and Norvasc. Again, stopped all his medications. He does not check his blood pressure at home so is not sure how it has been running. No complaints of any chest pain or shortness of breath. Also notes that he has not been working out as much as he would like and knows that he feels better and sleeps better when he does work out. He does try to follow appropriate sleep hygiene measures. No other acute issues or concerns today. He is a nonsmoker.

OBJECTIVE: Vitals are stable. Blood pressure 118/82, pulse 81, afebrile. He is alert and oriented, very pleasant, well-appearing male in no acute distress. HEENT: NC/AT, TMs are clear bilaterally. Pupils equal, round, reactive to light with no conjunctival injection. Oropharynx is pink and moist. Neck is supple with no thyromegaly, no carotid bruits, no lymphadenopathy. Heart is regular rate and rhythm without murmur noted. Lungs are clear to auscultation bilaterally without crackles or wheezes. Extremities: Without edema.

ASSESSMENT AND PLAN:
1. Hypertension. Blood pressure is actually fairly good today. We will just start him back on his Norvasc 10 mg daily. He was instructed to start monitoring his blood pressures at home and if these are increased above 140s systolic or over 90's diastolics or decreased significantly, he is to notify me. We will also get blood work including BMP.
2. History of hyperlipidemia. Prescription given for Crestor and Lovaza. He is also to get labs--lipid panel, AST, ALT.
3. Anxiety. I did renew his Paxil and Wellbutrin. I also gave him a prescription for lorazepam to use as needed 0.5 mg daily, #30 with 3 refills. Advised to use this sparingly and only if needed. He is aware of the addictive nature of this medication and knows to avoid it with alcohol.
4. Insomnia. Again, due to anxiety and stress. Can use lorazepam just as needed. We also discussed using melatonin on a regular basis to help improve his sleep architecture. Continue to follow with appropriate sleep hygiene measures. Could consider low dose Trazodone in the future if this remains an issue. He is to follow up in 3 months to reevaluate his blood pressure, sooner if any issues.


Mary Ann Long, MD
Assistant Professor
WVU Cheat Lake Physicians

ML/lkk/2513575; D: 10/15/2013 19:02:16; T: 10/16/2013 12:07:21



EXHIBIT

49

EXHIBIT
50

## FREMOUW-SIGLEY PSYCHOLOGICAL ASSOCIATES
### Psychological Diagnostic Interview

Name: _Scott Bullock_ _____ Referred by: _____ Loc: Mgtv Ft ___ Other ___

DOB: _____ Age: _____ (M/F) Intake Date: _10/22/13_ Time In: _6_ Time Out: _7_

Brought by: _self_

Presenting Problem(s): _under court order to resolve conflicts w/ estranged wife to_
_↓ harm to children_
Purpose: Eval need for Tx/Rec: _____

HxPP (length and type of symptoms, reason for therapy now): _Since separating from wife he_
_has been teary, more emotionally, once w/ille, overdose to avoid on last trying_
_to use his brush, arguing more, passive self destructive life_
Prior episodes: _—_
Fam Hx: similar problem: _—_
Abuse Hx: _____
Fam psych illness or substance abuse: _____

**Medical Hx:**
    Illnesses: _____ Allergies: _____
    Surgeries: _____
    Rx Meds: _____
    Non Rx Meds & herbs: _____

**Psychiatric Tx:**
    Hospitalizations: _____ Foster Care/Shelters: _____
    Out-pt Tx: _____
    Psych meds-current: _____
    Psych meds-previous: _____

| Risk Assessment | Prior Thoughts | Prior Attempts | Current Thoughts | Current Plans | Current Means | Current Control | Overall Risk 0-3 |
|---|---|---|---|---|---|---|---|
| Suicide | | | | | | | |
| Self Injury | | | | | | | |
| Runaway | | | | | | | |
| Homicide | | | | | | | |
| Child Abuse | | | | | | | |

| Substance Use | N/A | Past Use | Current Use/ Frequency | Amount | Impairment 0-3 |
|---|---|---|---|---|---|
| Ethol | | | | | |
| THC | | | | | |
| Pills | | | | | |

**Troopers 01159**

**Soc Hx:** Born where: _____ # Siblings: _____ Current Living: _____
Mom: _____ Dad: _____
Fx Problems: _____
School: _____ Year: _____ Grades: _____ Clubs: _____
Problems: _____

Single: _____ Married: ✓ # of times: _1_ Divorced: _____
Separated: _____ Children: _12 - 5m  10 da 11_ Current Relationship: _____
Legal Problems: _was recently arrested for possession certif over part of_
Military service: _____ Vocational: _FBI_
Spiritual beliefs: _____ Trauma: _crying baby only cried once_

**MSE:** Appearance: Ht: _tall over 6 foot_ Wt: _slim_ Dress: _business casual_
Speech: _relevant_ Cog Process 3X _✓_ DS _✓_ (100-3) _____ Memory _WNL_
Mood _depress, angry, stimulus_ Affect _broad & appropriate_ Judgment _ltd._
Emotional: Depression _____ Anger _____ Anxiety _____
Cognitive Content: SI/HI: _____ Del/Hal: _____ Insight: _fair_
Biological: Sleep: _____ Appetite: _____ Energy: _ave_ Cry _often_

**Measures:** CBCL / BDI/MAYSE: _____

**DX:** Axis I: _309.0 adj. D/o = Depressed mood_
Axis II: _____
Axis III: _____
Axis IV: Primary Support (Legal, Educational, Specify): _____
Axis V: GAF, Current _60_

**Summary:** _____

**Risk:** Self: Low Med High  Others: Low Med High  Run: Low Med High

**Prognosis:** Poor _____ Guarded _✓_ Good _____
**Rationale:** _vivid thinking, wants to blame her, he's bright but neurocog...del._

**Referrals:** Med Eval: Yes / No   Psych Tx: Yes / No   Psych Eval: Yes / No

**Recommendations:** _____ Individual _____ Group _✓_ Family Therapy

**Symptoms to be targeted in therapy:** (Circle All) depression, anxiety, relationship problems, behavioral disturbances, sexual offending, abuse history with emotional or behavior disturbance, substance abuse, other _____

Date: _6/24/13_ Name: _Jung L. Sigley, MA_ Licensed Psychologist # _61_
Diagnostic Interview 7.10.12

**Troopers 01160**

## PROGRESS NOTES

**PATIENT NAME:** Scott Ballock DX: 309.0
Date: 11/5/13 Start: 8 Stop: 9 CPT Code: 90847 Loc: Mgtn office/Fmt office / Other:
Reason for Encounter: depressed [illegible]
Pertinent Med / Social Interval History:
Type Session: Ind/Fam/Marital/ Grp Therapy Type: Cog-Beh/ Fam Sys/RET/Insight oriented/Supportive
Mental Status Exam: Psychotic Processing Concerns: Y / N If yes, list:

Assessment of current functioning: Says he's "OK" - [illegible] Oriented 4 x
Topics Discussed: Ellen shared her thinking re: buying a car for [illegible] & phone [illegible] shared his concern re: the no contact [illegible] Discussed [illegible] divorce [illegible] [illegible]
Client Response to Tx: [illegible]
Tx. Plan Change/homework:
Present in session: S + Ellen Frequency/Intensity: 1 wk/ 2 wk / 3wk/
Risk (0, 1, 2, 3) Suicide/ Homicide 0 Child 0 Drug/ Ethol 0 Runaway

***Provider/Psychologist Signature:** TLS MA Lic. # 611 Date: 11/5/13
11/6/13 Rec'd call from Ellen - she has [illegible] appt. [illegible] TLS MA
11/10/13 Rec'd [illegible] call from T. [illegible] - no [illegible] TLS MA

Date: 11/22/13 Start: 8 Stop: 9 CPT Code: 90837 Loc: Mgtn office/Fmt office / Other:
Reason for Encounter: depressed - poor comm - c wife - conflict [illegible]
Pertinent Med / Social Interval History: S
Type Session: Ind/Fam/Marital/ Grp Therapy Type: Cog-Beh/ Fam Sys/RET/Insight oriented/Supportive
Mental Status Exam: Psychotic Processing Concerns: Y N If yes, list:

Assessment of current functioning: Says he's ok but [illegible] Mom [illegible] on independent [illegible] Oriented 4 x
Topics Discussed: Mom (Ellen's) [illegible]
Client Response to Tx: Was calm + quiet [illegible]
Tx: Plan Change/homework:
Present in session: c Ellen + S Frequency/Intensity: 1 wk/2 wk/ 3wk/
Risk (0, 1, 2, 3) Suicide/ Homicide Child Drug/ Ethol Runaway

***Provider/Psychologist Signature:** TLS, MA Lic. # 611 Date: 11/22/13

*William Fremouw (WF); Terry Laurita Sigley(TLS); Ed Baker (EB); Traci Berry-Harris (TBH); T.Anne Hawkins (TAH); Jennifer Guriel Myers (JGM)

10/25/2018 12:15PM FAX 3045982307 FREMOUW-SIGLEY 0005/0006

## PROGRESS NOTES

PATIENT NAME: _Scott Bullock_                        DX: _309.0_

Date: _4/22/12_ Start: _9_ Stop: _9:30_ CPT Code: _90834_ 3 ? Loc: Main office / Fmt office / Other: _____

Reason for Encounter: _adj dis - depressed mood_

Pertinent Med / Social Interval History: _____

Type Session: Ind / Fam / Marital / Grp       Therapy Type: Cog-Beh / Fam Sys / RET / Insight oriented / Supportive

Mental Status Exam: Psychotic Processing Concerns: Y / N̄ If yes, list: _____

Assessment of current functioning: _He's hopeful the legal chgs will be dropped or_                                Oriented   Y   x

_dropped today - feels defeated a lot of the time for lack of progress._

Topics Discussed: _his ability to persevere through all this - discuss_

_the way truth become manipulated by power, opens_

_½ truths & the twisted past - need to see chgs in their entirety_

Client Response to Tx: _Was surprised at this by only 5mt - will_

_not doc himself need service by me by his choice_

_to push forward in spite of his silence - trying to reconcile_

_the others his resistance._

Tx. Plan Change/homework: _____

Present in session: _ind_                           Frequency/Intensity: 1 wk / 2 wk / 3 wk

Risk (0, 1, 2, 3): Suicide / Homicide _0_  Child _0_  Drug / Ethol _0_  Runaway _0_

**\*Provider/Psychologist Signature:** _RD, M.A._      Lic. # _611_      Date: _4/22/12_

---

Date: _12/4/12_ Start: _4_ Stop: _5_ CPT Code: _90834_ Loc: Main office / Fmt office / Other: _____

Reason for Encounter: _adj dis. depressed mood_

Pertinent Med / Social Interval History: _____

Type Session: Ind / Fam / Marital / Grp       Therapy Type: Cog-Beh / Fam Sys / RET / Insight oriented / Supportive

Mental Status Exam: Psychotic Processing Concerns: Y / N̄ If yes, list: _____

Assessment of current functioning: _Employed - doing OK - had a good holiday - Travelled_      Oriented   Y   x

_+ had fun w/ fam._

Topics Discussed: _the fdr. law has now the custody dispute - peace situation_

_that show little to no real agreement re: the issues - lack of support_

_re: edu - keeping them from up dates - use of drugs, depress. the kids_

Client Response to Tx: _He was more motivated than we've seen him -_

_he acknowledge when challenged that his boundaries can_

_+ have created hostile environment. He also acknowledged_

_that he has no proof that daughter was ever self medicating_

Tx. Plan Change/homework: _____ _monitored mt be able to get on_

Present in session: _ind + fam_                     Frequency/Intensity: 1 wk / 2 wk / 3 wk

Risk (0, 1, 2, 3): Suicide / Homicide _0_  Child _0_  Drug / Ethol _0_  Runaway _0_

2/18/14 - Spoke to Lanie re: thee, Ellen TB, MA

**\*Provider/Psychologist Signature:** _RD, MA_     Lic. # _611_     Date: _12/4/12_

12/03/13 - CbC - Ellen having preg. for surgery. RS req. MA - not RS due. to manage medical conditions - WCP to RS

5/29/14 - Lm for Dean Hollbritter re: no involvement at this time. TB, MA

2/24/09 Spoke briefly w/ bobby & Scott who said Ellen has petitioned court for us no more   family thee, MA

\*William Fremouw (WF); Terry Laurita Sigley (TLS); Ed Baker (EB); Traci Berry-Harris (TBH); T.Anne Hawkins (TAH); Jennifer Guriel Myers (JGM)