IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

OF WEST VIRGINIA

* * * * * * * *

SCOTT T. BALLOCK,              *

    Plaintiff           *   Case No.

    vs.                 *   1:17-CV-52

ELLEN RUTH COSTLOW,      *

STATE TROOPER MICHAEL    *

KIEF, STATE TROOPER      *

RONNIE M. GASKINS,       *

STATE TROOPER CHRIS      *

BERRY,                   *

    Defendants          *

* * * * * * * *

DEPOSITION OF

MICHAEL KIEF

May 28, 2019

Any reproduction of this transcript is prohibited without

authorization by the certifying agency.

2

1                              DEPOSITION

2                                 OF

3     MICHAEL KIEF, taken on behalf of the Plaintiff herein,

4     pursuant to the Rules of Civil Procedure, taken before

5     me, the undersigned, Guy Starrett, a Court Reporter and

6     Notary Public in and for the State of West Virginia, at

7     the offices of Steptoe and Johnson, PLLC, 1085 Van

8     Voorhis Road, Suite 400, Morgantown, West Virginia, on

9     Tuesday, May 28, 2019 beginning at 1:11 p.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                        A P P E A R A N C E S

2

3     CHARLES J. CROOKS, ESQUIRE

4     Crooks Law Firm PLLC

5     244 Pleasant Street

6     Morgantown, WV  26505

7          COUNSEL FOR PLAINTIFF

8

9     MARK JEFFRIES, ESQUIRE

10    Steptoe and Johnson, PLLC

11    400 White Oaks Boulevard

12    Bridgeport, WV  26330

13         COUNSEL FOR DEFENDANTS STATE TROOPER MICHAEL KIEF/

14         STATE TROOPER RONNIE M. GASKINS/STATE TROOPER CHRIS

15         BERRY

16

17    P. TODD PHILLIPS, ESQUIRE

18    Lyons Phillips Legal Group, PLLC

19    141 Walnut Street

20    Morgantown, WV  26505

21         COUNSEL FOR DEFENDANT ELLEN RUTH COSTLOW

22

23

24

4

1                          I N D E X

2

3   WITNESS: MICHAEL KIEF

4   EXAMINATION

5      By Attorney Crooks                        7 - 248

6      By Attorney Phillips              248 - 263

7      By Attorney Jeffries             264 - 267

8   DISCUSSION AMONG PARTIES                         267

9   CERTIFICATE                                     268

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1                           <u>EXHIBIT PAGE</u>

2

3                                                          PAGE

4       <u>NUMBER</u>        <u>DESCRIPTION</u>                       <u>IDENTIFIED</u>

5       Exhibit 1   Policies and Procedures            79

6       Exhibit 2   Call Summary Report                79

7       Exhibit 3   8/22/13 Email                      98

8       Exhibit 4   Memo from Captain

9                   Merrill                            98

10      Exhibit 5   Complaint Report                  137

11      Exhibit 6   Domestic Violence Report          169

12      Exhibit 7   FBI Documents                     190

13      Exhibit 8   Warrant for Arrest

14                  - Harassment                      205

15      Exhibit 9   Warrant for Arrest

16                  - Unwanted Communication          205

17      Exhibit 10  Motion to Dismiss

18                  Charges                           213

19      Exhibit 11  Investigation Report              235

20

21

22

23

24

6

1                           OBJECTION PAGE

2

3     ATTORNEY                                    PAGE

4     Jeffries                 17, 74, 94, 104, 130, 144, 148,

5                              152, 186, 192, 208, 212, 230

6     Phillips                              230

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
25

7

1                 S T I P U L A T I O N

2    ----------------------------------------------------------

3    (It is hereby stipulated and agreed by and between counsel

4    for the respective parties that reading, signing, sealing,

5    certification and filing are not waived.)

6    ----------------------------------------------------------

7                   P R O C E E D I N G S

8    ----------------------------------------------------------

9                    MICHAEL KIEF,

10   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

11   HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

12   FOLLOWS:

13                       ---

14                   EXAMINATION

15                       ---

16   BY ATTORNEY CROOKS:

17        Q.   Okay.

18             Let's start real easy.  Full name and date of

19   birth.

20        A.   Lieutenant Michael Kief.

21        Q.   Okay.

22        A.   Date of birth is 11/25/1968.

23        Q.   What's your middle name?

24        A.   Andrew.

8

1       Q.    You wouldn't happen to be Junior or ---

2       A.    No, sir.

3       Q.    --- Michael Andrew Keith, III or anything of

4  that sort?

5       A.    No, sir.

6       Q.    Okay.

7       A.    There's about five of us, but no juniors or

8  seniors.

9       Q.    Okay.

10            Where were you born and raised?

11      A.    Martinsburg.

12      Q.    Martinsburg.

13            How long's it been since you lived in Berkeley

14  County?

15      A.    Nineteen (19) --- well, I went to college in

16  '87, so back for summer.  So probably '91, '92 somewhere.

17      Q.    The college, where was that?

18      A.    Fairmont State.

19      Q.    Fairmont State.

20      A.    And Marshall University.

21      Q.    Did you graduate any programs at Fairmont?

22      A.    Board of Regents.  That was a four year.

23      Q.    What degree did you obtain at Marshall?

24      A.    Police Science.

9

1        Q.    Police science.

2        A.    Two-year degree.

3        Q.    Okay.

4              Police science --- well, let me back up to the

5   program at Fairmont State.  Sounds like that Board of

6   Regents program was a --- a liberal arts education?

7        A.    What happened was I --- my major was

8   architectural engineering.

9        Q.    Okay.

10        A.    And then I went to the academy.  Out of the

11  academy, I was stationed over in Romney.  So I still had

12  a couple hours to finish for my degree.  So I went back,

13  and --- and just finished under the Board of Regents

14  Degree.

15        Q.    Okay.

16        A.    Because they changed the catalogue.  If you're

17  out for two years, you can't go back in under the same

18  major.  You have to take different classes.

19        Q.    Yeah.

20              Okay.

21              I appreciate that.  And I'm sure I'll

22  understand this in its sequence here in just a couple

23  minutes.  What year did you attend the police academy?

24        A.    1994.  September of '94 to April of 1995.

10

| | | |
|---|---|---|
| 1 | Q. | I presume that was at the Institute facility? |
| 2 | A. | Yes, sir. |
| 3 | Q. | Okay. |
| 4 | | My mother graduated there. |
| 5 | A. | Your mother? |
| 6 | Q. | My mother.  She was a deputy. |
| 7 | A. | Okay. |
| 8 | Q. | In Wood County. |
| 9 | A. | Basic class.  Nice. |
| 10 | Q. | And she graduated their program back in the |
| 11 | '70s, so ---. |

12       A.    Lots changed since then.

13       Q.    You were --- you were playing basketball in

14    Junior High probably.

15       A.    Probably so.  Well, actually no.  I was ---.

16       Q.    When was ---- you was born in '68?

17       A.    Yeah.  I would've been 12.

18       Q.    Yeah.

19       A.    So yeah.

20       Q.    Okay then.

21            I'm a little bit familiar with their program.

22    But I'm sure it changed a lot from the time my mother

23    went through to --- until you attended.  So I'll ask you

24    a couple questions about that, too.

11

1          Okay.

2          So you graduated from Martinsburg High School?

3    A.    Yes, sir.

4    Q.    Okay.

5          And that would've been what year?

6    A.    1987.

7    Q.    So you graduated in 1987 from Martinsburg High

8    School.  You then went to Fairmont State?

9    A.    Correct.

10   Q.    Started a program in architectural --- I'm

11   sorry.

12   A.    Engineering.

13   Q.    Engineering, yeah.

14   A.    Uh-huh (yes).

15   Q.    I knew it wasn't design.  Engineering.  Did you

16   ever get a degree in architectural engineering?

17   A.    No.

18   Q.    You started your program in architectural

19   engineering at Fairmont, and that was in 1987.  You

20   graduated, I presume, in '91?

21   A.    No.  My parents got a divorce.  I can't

22   remember what --- what year they got a divorce.  I

23   couldn't attend college anymore.  I had to go get a job.

24   And then I worked at Elder Beerman up in Morgantown here.

12

1      I became a manager there, and from there, I went to the

2    state police academy.

3          Q.    Okay.  All right.  Okay.

4                So you had to quit college after --- do you

5    remember how many years of school you had in?

6          A.    I think I had three and a half, four years in.

7          Q.    You were close.

8          A.    I was getting close, yes.  Yes, sir.

9          Q.    Okay.

10               I guess I have --- my curiosity.  Not that it's

11   all that relevant I guess to the case, but I'm just

12   curious.  Why didn't you go back and finish up your

13   architectural engineering program?  Why'd you switch to

14   police work?

15         A.    I also wanted to be a trooper.  My parents did

16   not want me to be a trooper.  I did the drafting, home

17   design in high school.  When they got divorced, I pretty

18   much told them both to hell with you.  I'm going to go do

19   what I want to do.

20         Q.    Okay.

21               So you were emancipated by the divorce?

22         A.    Pretty much.

23         Q.    I got you.  Well, good for you.  Glad you

24   pursued your own passion there.

13

1          Okay.

2          So when you went to the police academy, you

3   hired in at the state police.  And they told you, you

4   know, before you do any, you know, police work for us,

5   you have to go to the academy for six months.  Is that

6   pretty much the deal that explained to you?

7       A.   Yes, sir.  That's how cadets do it, yes.  State

8   police do it.

9       Q.   That's the way I remember it when my mother

10  went through.  The state police guys kind of had a

11  different track that they were on.

12      A.   Right.  We have a longer course.

13      Q.   Yeah.  Different from municipal and county

14  people?

15      A.   Yes.  Yes, sir.

16      Q.   I guess it was still that way when you went

17  through.

18          All right.

19          So at the police academy, as a cadet, your

20  courses of study, can you just give me --- just rattle

21  off as many as you can readily bring to memory?

22      A.   Accident investigation, criminal investigation.

23   Where --- where the Marshall University comes in, they

24  sent instructors over to the academy to teach us deviant

14

1    behavior, some math course.

2         Q.    Deviant behavior.  You mean, like, criminal

3    psychology?

4         A.    Pretty much.  Yes, sir.

5         Q.    Okay.

6               Did you ever learn what a borderline

7    personality diagnosis means?

8         A.    I know about it.

9         Q.    You --- you do know something about that?

10        A.    I've read about it, but I don't know too much

11   about it, sir.  Not ---

12        Q.    Okay.

13        A.    --- clinically.

14        Q.    Okay.

15              Well, that's fine.  What you have read about

16   borderline personality, was it in connection with this

17   litigation?

18        A.    No, sir.  No, sir.

19        Q.    Was it in connection with Ellen Ruth Costlow by

20   any chance?

21        A.    No, sir.

22        Q.    Okay.

23              So it was something --- perhaps another case

24   you were walking?

15

1       A.    I was also taught at Pierpont Community

2   College.

3       Q.    Oh, okay.

4             So you were doing background research for your

5   teaching?

6       A.    Sure.

7       Q.    Sorry.  Maybe I misunderstood you.  I thought I

8   heard you say that you did some teaching at Pierpont?

9       A.    Yes, sir.

10      Q.    And I took it you to mean that you read about

11  borderline personality in preparation for your teaching

12  work there?

13      A.    Oh, no.  No, sir.

14      Q.    That was my mistake then.

15      A.    No, sir.

16      Q.    I misunderstood what you were telling.

17      A.    No, sir.

18      Q.    Okay.

19            Well, at any rate, I --- I interrupted you with

20  some questions.  And I appreciate you tolerating that.  I

21  asked you before to identify best you could from memory

22  the courses that you took when you were at the academy.

23            So you said criminal investigation, ---

24      A.    Accident ---.

16

1      Q.    --- traffic accidents, deviant behavior.

2      A.    That was through Marshall.  Of course, we did

3  the qualificat --- firearms, driving skills, things like

4  that.

5      Q.    Okay.

6            Criminal investigation, that makes a lot of

7  sense.  I'm going to guess that there are probably a

8  variety of individual classes that were given in respect

9  to the topic of criminal investigation.  I mean, that

10  could really take in some ---

11      A.    Some.

12      Q.    --- territory.

13      A.    Uh-huh (yes).

14      Q.    I mean, that's the --- the guts of police work

15  after all, is investigating crimes and --- and you're not

16  always going to show up in the midst of a fracas and ---

17  and restore peace.  A lot of times you're --- you're

18  coming along after the fact, and you have to investigate

19            True?

20      A.    Yes, sir.

21      Q.    Okay.

22            So criminal investigation.  Did you have

23  classes that were specific to domestic disturbances?

24      A.    Not that I can recall, sir.

17

1      Q.    I've heard it said and I'm sure you have as

2  well ---.   Now I have the opportunity to ask somebody

3  who's in the line of duty this question.   Is it true that

4  first responders, particularly police officers, regard

5  domestic dispatches as some of the least pleasant and

6  perhaps most dangerous calls that you can be assigned?

7                    ATTORNEY JEFFRIES:   Objection.   Calls for

8  speculation.

9  BY ATTORNEY CROOKS:

10     Q.    I'm just asking for your take on that.

11     A.    It can --- it can be that way, yes, sir, when

12 emotions are involved ---

13     Q.    Okay.

14     A.    --- between two people.

15     Q.    Does your blood run cold when somebody says we

16 got a domestic dispute?

17     A.    No.

18     Q.    We need you to ---

19     A.    No, sir.   Not at all.

20     Q.    --- respond to it?

21     A.    Not at all.   It's dealing with people.   However

22 their emotional state is when we get there, it's, you

23 know, up to us to calm them down and take care of the

24 situation.

18

1    Q.   So when you are dispatched on a domestic call,

2    what sort of expectations are you entertaining as you're

3    in route there?

4    A.   I have learned not to do that.

5    Q.   Okay.

6    A.   Everything's different.  What you expect is not

7    what you're going to get.  Whether it be a small call

8    that escalates to something larger, or a major that

9    escalates or --- or deescalates to something that doesn't

10   have anything to do with it.  It's just --- I don't

11   really speculate when I go to a call.  I've learned that,

12   just take care of it when you get there.

13   Q.   So running through this list of classes you

14   took at the academy, traffic accidents, criminal

15   investigation, deviant behaviors taught by adjuncts from

16   the Marshall University, firearms issues, driving skills.

17   How about investigation techniques as they relate to

18   interview setting, how to interview people?

19   A.   We would have troopers come in and talk to us

20   about investigative skills.  As far as interview

21   processes, there wasn't a specific class on that.  No,

22   sir.

23   Q.   You finished at the academy in April 1995?

24   A.   Yes, sir.

19

1      Q.    Did you receive any awards or distinctions upon

2  graduation?

3      A.    No, sir.

4      Q.    Do they hand out awards or distinctions to any

5  of the cadets?

6      A.    I think they recognize the top person in the

7  --- in the class.  But other than that, no, sir.

8      Q.    Did you have your marksman badge or anything of

9  that nature as a product of your training at the academy?

10      A.    I had a shooting badge, yes, sir.

11      Q.    Did you earn that because of your training at

12  the academy?

13      A.    Yes, sir.

14      Q.    Anything else in that block?

15      A.    Sorry?

16      Q.    Anything else of that type?

17      A.    Skills?

18      Q.    Yeah.  I mean, we've mentioned your shooting

19  badge.  I mean, is there anything else?

20      A.    Right.  Everything was pretty much pass or

21  fail.

22      Q.    Uh-huh (yes).

23            Okay.

24            So after you graduated the academy in April

20

1   1995, they posted you somewhere.  Where did --- where'd

2   you go?

3        A.    Romney.  Hampshire County.

4        Q.    How long were you there?

5        A.    1995 to 2002.

6        Q.    You're a Lieutenant now.

7        A.    Yes, sir.

8        Q.    What was your rank at the time you posted in

9   Romney?

10       A.    Trooper to Senior Trooper.

11       Q.    Aside from serving honorably over a period of

12  time, anything else you had to do to achieve promotion

13  from the rank of Trooper to Senior Trooper?

14       A.    No, sir.

15       Q.    Okay.

16             What was your second posting?

17       A.    Came to Morgantown.

18       Q.    So that would've been --- what time --- what

19  part of 2002?

20       A.    I believe it was around April.  I believe.  I

21  know it was in the spring.

22       Q.    Have you been posted in Morgantown ever since

23  April of 2002?

24       A.    No, sir.

21

1      Q.     How many other postings have you had since

2  2002?

3      A.     From Morgantown, I was promoted to Sergeant in

4  Moundsville.

5      Q.     So you got a promotion to Sergeant and

6  transferred to Marshall County?

7      A.     Yes, sir.

8      Q.     How long were you in Marshall County?

9      A.     Approximately three years.

10      Q.     Did you --- strike that.

11          Were you promoted during the time that you were

12  posted in Marshall County?  That is to say beyond

13  Sergeant?

14      A.     No, sir.  I was transferred back to Morgantown

15  as a Sergeant.

16      Q.     So that would've been your fourth posting.

17          Am I ---

18      A.     Correct.

19          Back to Morgantown.

20      Q.     --- hearing ---?

21      A.     Yes, sir.

22      Q.     So you were reposted to Morgantown in about

23  2005?

24      A.     That's about right.  Yes, sir.

22

1      Q.    You have any more specific recollection as to

2  time of year?

3      A.    No, sir.  I do not.

4      Q.    Were you promoted from Sergeant to Lieutenant

5  during the time you were serving your fourth post here in

6  Morgantown?

7      A.    No, sir.  From Morgantown, I went to Wheeling

8  as a First Sergeant.

9      Q.    So your fifth posting to Ohio County?

10     A.    Yes, sir.  That was in September of, I believe,

11  '15.  I think so.  It was '15.  I think it was September,

12  '15.

13     Q.    I want to make sure I have this understood

14  accurately.  You were a First Sergeant while you were

15  serving in Wheeling?

16     A.    Yes, sir.  Sergeants are --- Sergeant's

17  Assistant Detachment Commander --- Detachment Commander

18  pertain to the county.  First Sergeant is a district.

19  It's usually three counties.  Supervise three counties.

20     Q.    Okay.

21     A.    The Sergeants are underneath them.

22     Q.    You anticipated me beautifully.  That was what

23  I was going to ask you to do is explain the difference

24  between being a Sergeant and First Sergeant.

23

```
 1            So your promotion to First Sergeant was
 2   coincident with your transfer to Wheeling?
 3        A.   Yes, sir.
 4        Q.   Am I understanding that right?
 5        A.   Yeah, yeah.  Yes, sir.  Yes.
 6        Q.   Now, when you were supervising three counties,
 7   what --- what did that entail?
 8        A.   It basically entailed supervising the three
 9   Sergeants that I had, one in each county, and making sure
10   those Detachments ran correctly.
11        Q.   What county Sergeants were you supervising?
12        A.   Ohio County, Brook County and Hancock County.
13        Q.   How long were you in the Wheeling post?
14        A.   Approximately three years and some change.  I
15   was promoted to Lieutenant in February of this year.
16        Q.   Of 2019?
17        A.   Yes, sir.
18        Q.   Could ---?
19        A.   Yes.  Uh-huh (yes).  Yep.  Yes, sir.  Two years
20   and some --- three years and some change.  Three years,
21   six months.  Something like that.
22        Q.   So February, 2019 promoted to ---
23        A.   First Lieutenant.
24        Q.   --- First Lieutenant?
```

24

1      A.    Yes, sir.

2      Q.    How many grades of Lieutenant are there?

3      A.    Two on the books.  We just use one.

4      Q.    Okay.

5      A.    There is a Second Lieutenant promotion on the

6  books, but we don't use it.

7      Q.    Okay.

8            So you were promoted to First Lieutenant in

9  February 2019 and transferred coincidentally to

10  Morgantown?

11      A.    Elkins.

12      Q.    I'm sorry.  To Elkins.

13            So it sounds like the --- the longest period

14  that you were in any one posting was Morgantown between

15  2005 and 2015?

16      A.    Yes, sir.

17      Q.    During that time, you were a Sergeant?

18      A.    Yes, sir.

19      Q.    As Sergeant, you were answerable to a First

20  Sergeant?

21      A.    I was --- I was an Assistant Detachment

22  Commander and Detachment Commander during that time.  As

23  I was an Assistant Detachment Commander, I would answer

24  to the Detachment Commander and the First Sergeant.

25

1      Q.    Okay.

2            Who was your Detachment Commander?  I'm going

3      to --- I'm going to do it this way.  Ten years' time

4      span.  You guys get shifted around.

5      A.    Right.

6      Q.    So I'm going to guess that you had different

7      Detachment Commanders ---

8      A.    Yes, sir.

9      Q.    --- during that ten period of years.

10     A.    Yes.  Uh-huh (yes).

11     Q.    All right.

12           Let me focus my question then during the time

13     period that I think most pertinent to why we're together

14     here.

15     A.    Sure.

16     Q.    Let's look at, say, 2012, 2013, '14, '15.

17     A.    Correct.

18           Okay.

19     Q.    Until you're transferred.

20     A.    Yes, sir.

21     Q.    So let's says 2012 through '15, how many

22     different Detachment Commanders did you have during that

23     time?

24     A.    In 2015, right before I went to Wheeling, I was

26

1    the Detachment Commander.  I had that for --- it was over

2    a year.  I can't remember how --- how long that was.

3    Before that, if I'm working backwards?

4         Q.    Sure.

5         A.    Lieutenant Kennedy was the Detachment Commander

6    right before me.

7               Hold on.

8         Q.    Okay.

9               How long ---

10        A.    Hold on a second.

11        Q.    --- was Lieutenant Kennedy your Detachment

12   Commander?

13        A.    Hold on one second.

14        Q.    Sure.

15        A.    Yeah.  That's correct.  Yes, sir.

16              I --- I can't say that, sir.  I don't know.

17   It's ---.

18        Q.    Too long ago?

19        A.    It was --- yeah.  Too --- yeah.  People come

20   and go as you said.  Yes, sir.

21        Q.    That's policy, isn't it?  To some degree you

22   guys are moved around, you know, by design?

23        A.    No, sir.  Not now.  No.  The reason I was

24   stagnant in --- in Morgan --- in Morgantown for that long

27

1    is because my kids were here.

2        Q.   Okay.

3        A.   Didn't want to go anywhere.  Didn't test.  I

4    didn't do anything because my kids were here.

5        Q.   All right.

6        A.   And they were growing up.  So I was happy, you

7    know, just staying put without promotions.

8        Q.   Okay.

9             I think I follow that.  Let me return to my

10   question, though.  As a matter of policy, is it

11   desirable, from the perspective of the state police, that

12   --- that their troopers serve different parts of the

13   state over the course of their stay?

14       A.   No, sir.  No, sir.

15       Q.   All right.

16       A.   It's changed.

17       Q.   State police would be satisfied to have you

18   stay in one spot?

19       A.   If that's what you would like, yes.  If you

20   didn't test for promotion --- there's a guy here in

21   Morgantown that's been here 20-some years.

22       Q.   Okay.

23       A.   But he's never really wanted to go anywhere

24   else.

28

1      Q.    I see.

2            Okay.

3            Now, has it always been the policy to leave it

4      up to the individual troopers as to whether they stay or

5      not?

6      A.    Since I've been.  I --- I understand before

7      they would transfer them, but since I've been in, it's

8      pretty much been that way.  Yes, sir.

9      Q.    All right.

10           Maybe that's where I got off the track.  It

11     used to be the policy, and then it ceased to be?

12     A.    Right.  Right.  It's common to get promoted

13     with --- I mean, I'm sorry --- transferred with a

14     promotion.  If that spot's open.

15     Q.    Okay.

16           So February, 2019 you were promoted to First

17     Lieutenant, transferred to Elkins Town.  How long were

18     you in Elkins?

19     A.    My current duty station's in Elkins.

20     Q.    So you're still working there?

21     A.    Yes, sir.

22     Q.    As a First Lieutenant posted to Elkins, do you

23     supervise --- do you supervise troopers in multiple

24     counties?

29

1      A.    No, sir.

2      Q.    Okay.

3            Describe for me what the nature of your

4      position is as First Lieutenant.

5      A.    I'm part of the Professional Standards Unit.

6      Q.    Professional Standards Unit?

7      A.    Yes, sir.

8      Q.    On TV, they would call that office of internal

9      affairs.

10           Right?

11     A.    Pretty much.  Yes, sir.

12     Q.    Okay.

13           So if police officers, or troopers --- pardon

14     me --- are accused of misconduct, ---

15     A.    Yes, sir.

16     Q.    --- you would be involved in investigating that

17     misconduct?

18     A.    Yes.  There's other Lieutenants also that

19     they're under PSU.  It would be one of us that would go

20     in and investigate that.

21     Q.    How many Lieutenants are in PSU?

22     A.    There's at least one per troop.  We have six

23     --- we'll have eight troops. But we'll have First

24     Lieutenants in charge of PSU in six of those troops.  I'm

30

1    sorry.  Turnpike, seven.

2        Q.    So there are seven troops?

3        A.    There's eight troops.

4        Q.    Okay.

5        A.    Counting BCI.

6        Q.    Okay.

7        A.    BCI would not have their --- would not have

8    PSU.

9        Q.    BCI?

10       A.    Bureau of Criminal Investigations.

11       Q.    So have you ever worked in Bureau of Criminal

12   Investigations?

13       A.    No, sir.

14       Q.    No experience in that one?

15       A.    No, sir.

16       Q.    Okay.

17             So you started doing professional standards

18   unit work in February of this year, 2019?

19       A.    Yes, sir.

20       Q.    Do you like it?

21       A.    That's a broad question.

22       Q.    I suppose so.

23       A.    I don't like the area.  I do not like --- it's

24   a beautiful area.

31

1     Q.   Elkins is beautiful.

2     A.   Yes, it is.  And I spend a lot of time out in

3  the field.

4     Q.   Very rural.

5     A.   Yes.  Very beautiful though.  It's --- I

6  inspect Detachments, and you know, I just don't know a

7  lot of the guys over there because I've never been over

8  there before.

9     Q.   Okay.

10      All right.

11      So the nature of the work that you do in the

12  Professional Standards Unit, it includes investigating

13  wrongdoing allegations on the part of troopers.  What

14  else does it take in?  Is that all you do?

15     A.   No, sir.  No, sir.  We --- we have to inspect

16  Detachments, inspect facilities, inspect troopers.

17     Q.   When you say you inspect troopers, what do you

18  mean by that?

19     A.   If we go and do an Detachment inspection, part

20  of that inspection is to make sure that their weapons are

21  --- are in good shape.  Their laptops, any personnel

22  equipment they've been issued, it's inspected.

23     Q.   Do you go through personnel files and judge

24  whether the trooper is up to date on all of their

32

1    training and certifications?

2         A.   No, sir.  That's up to the academy.

3         Q.   The academy does that.

4         A.   Uh-huh (yes).

5         Q.   On an ongoing basis?

6         A.   We go once a year to in service, we call it.

7         Q.   Okay.

8         A.   And in that in service, we get enough hours to

9    recertify us from year to year.

10        Q.   Okay.

11             I think I understand you.

12             How long is the in service that's done on an

13   annual basis?

14        A.   It's usually Tuesday morning through Thursday

15   evening.

16        Q.   Is it same time every year?

17        A.   They start in February of each year, and it

18   goes to the end of May.  It depends on which week you go.

19    They schedule you during that time period.

20        Q.   I think I understand you.

21             So tell me about that in service training.

22   What does it entail?

23        A.   We have different classes depending on what the

24   academy is teaching that year.  We have defensive tactics

33

1    updates, we requalify with our weapons, we have a

2    physical and see the department doctor.

3        Q.    State police are usually pretty fit specimens

4    by my observation.

5        A.    Yes.  We try.  But at least we get a physical

6    year.

7        Q.    Okay.

8             Well, I mean, if --- if you got severely obese,

9    that would be a problem for you, wouldn't it?

10       A.    Yes, sir.

11       Q.    You might not even pass your physical

12   standards?

13       A.    The physical standards is only for promotions.

14       Q.    Oh, is it?

15       A.    Yes, sir.

16       Q.    Okay.

17       A.    There's --- yes.

18       Q.    Okay.

19             I just presumed that they expected you guys to

20   stay fit and trim.

21       A.    I think there's case law out there preventing

22   that for some reason.  Not that I get into all that.

23       Q.    I think you might be right about that.

24       A.    Yes, sir.

34

1      Q.    I'm a little surprised, but okay.

2            So how many investigations of trooper

3      misconduct have you been involved in so far?

4      A.    One.

5      Q.    One.  That wouldn't happen to concern either of

6      the other two trooper Defendants in this litigation,

7      would it?

8      A.    No, sir.  No, sir.

9      Q.    Okay.

10     A.    No, sir.  And let me qualify that's not the

11     only job I have in the state police.

12     Q.    Yeah.  I --- I presume that you had other

13     duties?

14     A.    Yes, sir.

15     Q.    Right.

16     A.    Yes, sir.

17     Q.    How many state troopers are there right now?

18     A.    There's over 600.  I don't know the number.

19     Q.    Yeah, I'm not holding you to a precise number.

20     A.    It changes ---

21     Q.    I'm just trying to get a reliable ---.

22     A.    --- from day to day.

23           Yes, sir.

24     Q.    I'm just trying to get a reliable ballpark

35

1    figure.

2         A.    It changes from day to day.

3         Q.    Over 600?

4         A.    Yes, sir.

5         Q.    So there are over 800 troopers spread among

6    eight troops?

7         A.    Six hundred (600).

8         Q.    What'd I say?

9         A.    Eight hundred (800).

10        Q.    Oh, I'm sorry.

11              There are over 600 troopers spread among eight

12   troops?

13        A.    And headquarters.

14        Q.    And headquarters.  The one case of alleged

15   misconduct that you have investigated, is it concluded?

16        A.    Yes, sir.

17        Q.    How long did it take to conduct that?

18        A.    About a week.

19        Q.    So you --- based on what you've been told, and

20   how you've been trained in conducting these inquiries, is

21   that fairly standard turnaround time?

22        A.    It depends on the investigation.

23        Q.    Depends on what the nature of the allegation

24   is?

36

1      A.     This is a very straightforward allegation.

2      Q.     Do you know if any professional standards unit

3   inquiries have been conducts either in regard to your

4   performance or the performance of Chris Berry or Ronnie

5   Gaskins in connection with this matter?

6      A.     No, sir.  I do not know that.

7      Q.     When I say this matter, I mean the issues that

8   are joined in the pleadings of this civil action.

9      A.     No, sir.  I know there is a complaint filed,

10  but I do not believe the professional standards unit

11  conducted an investigation.

12     Q.     Okay.

13            Why not?

14     A.     The letter I received from --- they have to

15  notify us.  And plus, they notify us when the --- when

16  the investigation is over with.  I believe the letter

17  that I got pertained to, I believe --- and this is from

18  my recollection.  If --- when the court case was over, if

19  an investigation is still warranted or wanted, they would

20  do an investigation after the court case was --- was

21  done.

22     Q.     When did you receive that letter?

23     A.     Oh, my gosh.  That's --- I would say a couple

24  years ago.  But it could've been much longer than that.  I

37

1    don't remember.

2         Q.    Do you know who filed the complaint?

3         A.    That was Mr. Ballock, Senior.

4         Q.    That would be Tom ---

5         A.    Yes, sir.

6         Q.    --- Ballock?

7         A.    Uh-huh (yes).

8         Q.    Do you have any memory as to when Mr. Tom

9    Ballock, Senior filed his complaint ---

10        A.    No, sir.

11        Q.    --- with the Professional Standards Unit?

12        A.    No, sir.

13        Q.    Were you shown a copy of his complaint?

14        A.    I --- I believe the letter I received was the

15   response that was given to him.  The letter that was

16   written to him was also ---.

17        Q.    Copied to you?

18        A.    Yes, sir.

19        Q.    Okay.

20              Was the complaint proceeding just you

21   individually, or against you, Trooper Gaskins and Trooper

22   Berry altogether?

23        A.    I believe it was individually.

24        Q.    Okay.

38

1           How about the other two troopers?  Were ---?

2    A.   I don't know anything about that, sir.

3    Q.   You don't know?

4    A.   No, sir.

5    Q.   I guess another biographical topic I wanted to

6  cover has to do with your family situation.  You

7  mentioned you --- you raised some kids already?

8    A.   Yes, sir.

9    Q.   Are you currently married?

10   A.   No, sir.

11   Q.   No?

12   A.   No, sir.

13   Q.   Okay.

14        Are you divorced, or did your wife pass away?

15   A.   Divorced.

16   Q.   How long has that been?

17   A.   I believe that was 2005.

18   Q.   No remarriages?

19   A.   No, sir.

20   Q.   Were you just married the one time?

21   A.   Yes, sir.

22   Q.   How many kids do you have?

23   A.   Two.

24   Q.   I'm not going to depose them, but I would ask

1   you a couple questions ---

2        A.    Sure.

3        Q.    --- in that direction.  First of all, boy,

4   girl?

5        A.    Both.  One each.

6        Q.    Okay.

7              Which one's older?

8        A.    My daughter.

9        Q.    How old is she?

10       A.    She will be --- let me see.  1995.  She'll be

11   24 this year.

12       Q.    She was born in 1995?

13       A.    Yes, sir.

14       Q.    Same year as my son.

15             And so your son, what year was he born?

16       A.    1998.  He'll be 21 this year.

17       Q.    Is he going to the academy?

18       A.    He wants to be a police officer, but he wants

19   to finish college first.

20       Q.    Okay.

21             How about your daughter?  She in school?

22       A.    She --- she went through a beautician school.

23       Q.    Okay.

24       A.    Yes.

40

1     Q.   How about the training you got at the academy -

2   -- specifically I want to ask about what, at least in my

3   line of work, lawyers would refer to as professional

4   conduct, perhaps ethics.

5     A.   Yes, sir.

6     Q.   Did you receive any training in that?

7     A.   I believe we had a class in ethics.

8     Q.   Tell me what kind of material was discussed in

9   that.

10    A.   I really don't remember, sir.

11    Q.   Is there a Code of Ethics for state police

12  officers?

13    A.   Sorry?

14    Q.   Do you have a Code of Ethics that you adhere to

15  in the state police?

16    A.   You mean spelled out Code of Ethics?  What we

17  can do and what we can't do?

18    Q.   Sure.

19    A.   Sure thing.

20    Q.   Lawyers do it, so I'm --- I'm asking whether

21  state police do it, too.

22    A.   No, sir.

23    Q.   Lawyers have a set rules we have to go by.

24    A.   Nothing spelled out.  We do have some core

41

1    values.  But as far as ethical, I mean, we've been told

2    what we can do and what we can't do.  But as far as it

3    being spelled out, I don't know where --- where I can

4    find that.

5       Q.   So there's no Code of Ethics, there's no set of

6    rules of professional or --- or proper conduct?  Whether

7    the word --- I don't want to overstate the question by

8    using the word professional.  There are no rules of

9    conduct for state police officers?

10      A.   Of course, we have --- I don't understand your

11   --- are you trying to pin me down to a specific ---

12   something in writing that we have or ---?

13      Q.   Sure.  I mean, you work in the professional

14   standards unit.

15      A.   Yes, sir.

16      Q.   How do you judge the propriety of conduct on

17   the part of troopers if there is no Code of Ethics or

18   codified set of rules for conduct?

19      A.   State code, of course.  What we can't do.  We

20   can't break a law or do anything against state code.  As

21   far as ethical violations, that would be referred to an

22   investigation and a determination if the officer's

23   conduct was becoming or not becoming.

24      Q.   Would the professional standards unit make that

42

1    investigation?

2        A.   Yes, sir.

3        Q.   If a state police officer, trooper, had a

4    romantic relationship --- and by that, I mean a

5    relationship that included sexual relations --- with a

6    member of the public, would it be considered unethical

7    for that trooper to investigate a complaint filed by that

8    person?

9        A.   I don't understand your question.

10       Q.   Sure.

11       A.   Is it unethical for a trooper to have a sexual

12    relation with another person or ---?

13       Q.   I presume it's not unethical for troopers to

14    have sexual relationships.  My question has to do with

15    the propriety of a state trooper having a sexual

16    relationship with a member of the public, and then acting

17    in an official capacity to investigate a complaint made

18    by the person with whom they have a sexual relationship.

19    Would that be considered appropriate conduct on the part

20    of the state trooper?

21       A.   I --- I guess it would be --- it would be

22    determined by what that investigation was.  There's all

23    different forms of investigations.  I don't know.  It's

24    kind of a broad question.

43

1      Q.   Do you know if Christopher Berry, Trooper

2   Christopher Berry, ever had a sexual relationship with

3   Ellen Ruth Costlow?

4      A.   I do not know that.  No, sir.

5      Q.   If Christopher Berry had a personal

6   relationship with Ellen Ruth Costlow, and she wanted to

7   file a complaint against her estranged husband at the

8   time, my client, ---

9      A.   Right.

10      Q.   --- Scott Ballock, ---

11      A.   Yes, sir.

12      Q.   --- would it have been appropriate for Chris

13   Berry to participate in any way in the investigation of

14   that complaint?

15      A.   If a trooper was having a sexual relationship

16   with a person, and for him to be personally involved with

17   making a complaint against her ex-husband or --- or a

18   family member would be improper.

19      Q.   Why?

20      A.   He wouldn't be a non-biased person.

21      Q.   Why would that be a problem?

22      A.   Because he would have emotional connection with

23   the person he's making a complaint about.

24      Q.   That would explain his impartiality, wouldn't

44

1    it?

2         A.    Impartiality to ---?

3         Q.    His lack of impartiality when he received that.

4    If a trooper is having a sexual relationship with a

5    member of the public, that by itself is not a problem?

6         A.    No, sir.  Unless it's on duty.

7         Q.    Unless it's during ---

8         A.    Right.

9         Q.    --- work hours.

10              Okay.

11              I understand that.  I don't know if my

12   information is that precise.

13              The point that I'm touching on currently here

14   has to do with if a trooper --- in this case we're

15   talking about Christopher Berry ---

16        A.    Yes, sir.

17        Q.    --- having a sexual relationship with a member

18   of the public.  And we're talking about Ellen Ruth

19   Costlow?

20        A.    Yes, sir.

21        Q.    And she wanted to make a criminal complaint

22   against her then estranged husband, Scott Ballock, ---

23        A.    Yes, sir.

24        Q.    --- my client, ---

45

1      A.   Yes, sir.

2      Q.   --- it would be inappropriate for Christopher

3  Berry to either participate directly or to try and

4  influence his colleagues at the state police in the

5  investigation of the complaint that Ellen Ruth Costlow

6  might have made against my client?

7      A.   Yes, sir.

8      Q.   One of the reasons ---.

9      A.   I'm not avoiding your question.  I'm just

10  trying to make sure we --- we're clear.

11      Q.   I appreciate that.

12      A.   Okay.

13      Q.   I appreciate your careful attention to my

14  questions because these are lawyerly questions.  There's

15  a lot of stuff in it, and I can tell you're paying close

16  attention.

17      A.   Okay.

18      Q.   I appreciate it.

19           Thank you.

20           I'll try to be clearer with you.  I don't --- I

21  don't have any problem with your asking for

22  clarification.  I want to make sure we understand one

23  another.

24      A.   Yes, sir.

46

1      Q.   If Christopher Berry was having a romantic

2 relationship with Ellen Costlow, and he participated or

3 tried to influence a state police investigation into a

4 complaint initiated by Ellen Costlow against my client,

5 Scott Ballock, during the course of their divorce, that

6 would be inappropriate because under such circumstances,

7 Chris Berry would lack impartiality?

8      A.   Correct.

9      Q.   Okay.

10          Help me understand what the policy position of

11 the state police was during the period that you were

12 working in the Morgantown Detachment from 2012 through

13 2015 with specific regard to the handling of complaints

14 in the context of domestic disputes that were pending in

15 family court.

16          All right?

17      A.   Okay.

18      Q.   There's a lot in that question.

19      A.   There is.

20      Q.   But I --- my sense is that you followed it.

21      A.   Yes, sir.

22      Q.   Okay.

23          There's a term that you here used sometimes

24 called lawfare.

47

1        A.    Never heard of it.

2                  COURT REPORTER:  Sorry I didn't---.

3                  ATTORNEY CROOKS:  Lawfare.  Lawfare.

4    L-A-W-F-A-R-E.

5                  COURT REPORTER:  Okay.

6                  Thank you.

7    BY ATTORNEY CROOKS:

8        Q.    Yeah.  It's kind of --- it'd kind of a

9    modification of the word warfare.

10       A.    Okay.

11       Q.    And instead of, you know, overt violence, it's

12   the use of the court system to try and disadvantage or

13   hurt another person.

14       A.    Okay.

15       Q.    Say making a criminal complaint, not so much

16   because the subject of the complaint was guilty of

17   anything criminal, but to try and gain an advantage or to

18   hurt that person.

19       A.    Okay.

20       Q.    Okay.

21             People who are going through divorces sometimes

22   are motivated by a lot of hurt and anger.

23       A.    Sure.

24       Q.    If the opportunity comes along in the course of

48

1   divorce litigation, they'll inflict emotional pain on the

2   person from whom they're getting divorced.

3        A.   Yes, sir.

4        Q.   You're familiar with that.  I know you got

5   divorced.

6        A.   Yes, sir.

7        Q.   So --- and I don't --- I don't necessarily want

8   to put your divorce upon on the examining table here.

9   But at least, you know, I know because you've been

10  through the process of divorce that it's a kind of a sad

11  thing at the very least.

12       A.   Sadder and unpleasant.

13       Q.   Sad and unpleasant.

14       A.   Yes, sir.

15       Q.   Yeah.  You're ending a relationship ---

16       A.   Yes, sir.

17       Q.   --- with somebody that, you know, you married

18  at one point.  And --- and in your case, and my case, I'm

19  divorced also, children were involved.

20       A.   Yes, sir.

21       Q.   So --- well, in the case of Scott and Ellen,

22  there were two children involved.  Are you aware of that?

23       A.   Yes, sir.

24       Q.   And a boy, Tommy, and a daughter, Summer.  Were

49

1       --- did you know the names of those kids?

2            A.    I probably read them someplace, sir.

3            Q.    Okay.

4                  During the period of time when you were working

5       in the Morgantown Detachment, 2012 through 2015, there

6       were times when Ellen Ruth Costlow contacted members of

7       the detachment to initiate criminal complaints my client.

8       Are you aware of that?

9            A.    About what, sir?  What --- what's --- is there

10      a specific?

11           Q.    It does get rather specific, but I'm just

12      asking generally at the moment.  Are you aware that Ellen

13      Ruth Costlow initiated at least one criminal complaint

14      against my client, Scott Ballock, during the time that

15      you were working in Morgantown Detachment?

16           A.    Did she initiate and seek that out?

17           Q.    Yes.

18           A.    No.

19           Q.    All right.

20                 So I'm acting on the point of clarification

21      that you just ---

22           A.    Sure.

23           Q.    --- offered back to me.  What is it about that

24      point of clarity that prompted you to say you weren't

50

1   aware of that?

2       A.   I --- I'm sorry.  I'm misconstruing your

3   question.  She did not initiate ---.

4       Q.   I may have confused you without intending to.

5   You worked in the Morgantown Detachment ---

6       A.   Yes, sir.

7       Q.   --- of the state police between 2012 and 2015?

8       A.   Yes, sir.

9       Q.   You were a sergeant?

10      A.   Yes, sir.

11      Q.   And my question has to do with some of the

12   merits that we're litigating in this civil action.

13      A.   Sure.  Yes, sir.

14      Q.   Okay.

15         I'm asking you do you remember, generally, that

16   Ellen Ruth Costlow initiated at least one criminal

17   complaint against my client, Scott Ballock, during that

18   time.

19      A.   That was not her intent when she came into the

20   state police detachment.

21      Q.   Okay.

22        What was her intent, as far as you were able to

23   discern?

24      A.   A complaint against Trooper Berry.

51

1     Q.   Against Trooper Berry?

2     A.   Yes, sir.

3     Q.   All right.

4     Tell me about that.  When was it, first of all?

5     A.   It was my first contact with Tom Ballock,

6  Senior.  He had called in to the state police barracks to

7  let us know, or let me know --- he asked for a supervisor

8  --- to let me know that Chris Berry was having an affair

9  with his daughter-in-law or soon to be daughter-in-law.

10    That conversation was short.  There was a

11  couple of questions that I had that he answered.

12     Q.   What were those?

13     A.   I asked him what his relationship was to Ms.

14  Costlow.  He said he was the father-in-law.  I asked him

15  why he was making the complaint instead of her husband.

16  I don't remember how he responded to that, if he did.  I

17  asked him if he wanted to make a formal complaint, and he

18  declined to do so.

19     Q.   So you offered to facilitate the filing of a

20  formal complaint?

21     A.   Yes.

22     Q.   And your recollection is that Tom, Senior ---?

23     A.   He said he didn't want to do that.

24     Q.   Did he explain why?

52

1      A.    No, sir, he did not.

2      Q.    Is that the end of your contact with Tom,

3   Senior?

4      A.    Yes, sir.  I believe so.

5      Q.    When was that?

6      A.    That was --- I do not know that, sir, not

7   without looking at --- it was the first time that I knew

8   of Mr. Ballock and knew of the situation.

9      Q.    Okay.

10          So Ellen Ruth Costlow ---

11     A.    Yes, sir.

12     Q.    --- comes in the picture next.

13     A.    Trooper Berry did first, yes.

14     Q.    All right.

15          Trooper Berry.  Go ahead.  Tell me what you

16   remember.

17     A.    I called Trooper Berry, and told him about the

18   allegation.  He denied it.  I asked him to come in and

19   speak to me.  He did.  He --- he came in.  He did --- I

20   looked at his cell phone.  He let me see his cell phone,

21   and there wasn't anything on there that --- that gave me

22   concern or no --- no proving or disproving of a --- of a

23   relationship.

24     Q.    Were there any communications on Trooper

53

1    Berry's cell phone ---?

2         A.   I don't remember that.  I'm sorry.  Go ahead.

3         Q.   You're cooperating with me, and I appreciate

4    it, but we're --- we're kind of getting comfortable with

5    each other so you're kind of anticipating my question and

6    overrunning it a little bit.  That's not disrespectful.

7    It's just how it works with humans.  So let me, without

8    being rude to you, suggest that you need to let me finish

9    the question.

10        A.   Absolutely.

11        Q.   Okay.

12             That way the transcript will --- will read a

13   lot better.

14        A.   Got you.

15        Q.   You examined Christopher Berry's cell phone as

16   part of your inquiry into, this informal complaint we'll

17   call it, ---

18        A.   Right.

19        Q.   --- that Tom Ballock, Senior had phoned in to

20   you?

21        A.   Correct.

22        Q.   All right.

23             In those days, there in Morgantown Detachment,

24   were troopers using an official West Virginia State

54

1    Police phone, and then maintaining a --- a separate

2    personal phone?

3         A.   No, sir.

4         Q.   Okay.  All right.

5              So if a state police trooper like Christopher

6    Berry had to conduct state police business on the

7    telephone as opposed to over the radio, he would just use

8    his own personal phone?

9         A.   Yes, sir.

10        Q.   Okay.

11             Likewise, if Trooper Berry wanted to use his

12   cell phone for his own personal, private own business,

13   it'd be that same phone?

14        A.   True.  Yes, sir.

15        Q.   Okay.

16             So you weren't --- you weren't trying to, you

17   know, examine some official phone versus ---

18        A.   No, sir.

19        Q.   --- his personal phone?

20        A.   No, sir.

21        Q.   All right.

22             That's all.  That's the only point I'm trying

23   to make clear here.  Sources of evidence, you know.

24             So you looked at his phone.  Did you find that

55

1  Christopher Berry had communicated directly with Ellen

2  Ruth Costlow using his cell phone?

3      A.   I don't remember that, sir.  I do not remember

4  if there was any communications between him and her on

5  there.  I remember that there wasn't anything --- there

6  wasn't anything proving an allegation on his cell phone.

7  I don't remember specific conversation between him and

8  her on the cell phone.  It's been so many years.  I --- I

9  don't remember that point.

10      Q.   When you say you examined his phone, what did

11  you look at, specifically as you can tell me?

12      A.   Text messages.

13      Q.   So you looked at text messages?

14      A.   Yes.

15      Q.   Did you look at the call history?

16      A.   Yes, sir.

17      Q.   All right.

18          Anything else?

19      A.   No, sir.  No, sir.

20      Q.   These cell phones, you can do all kinds of

21  things?

22      A.   Yes.  Yes.  Yes.

23      Q.   I use mine for email.

24      A.   Yes.

56

 1      Q.   Did you look at Christopher Berry's email
 2 account?
 3      A.   No, sir.  I did not.
 4      Q.   Okay.
 5      A.   He was letting me look at his cell phone, his
 6 personal cell phone so ---.
 7      Q.   Well, you had legitimate reason to do so.
 8           Right?
 9      A.   Right.
10      Q.   All right.
11           You were the sergeant for the detachment?
12      A.   One of the sergeants, yes, sir.
13      Q.   Okay.
14           I take it was within your scope of
15 responsibilities as a sergeant in the detachment to make
16 the inquiry of Christopher Berry that you made?
17      A.   Yes, sir.
18      Q.   Okay.
19           Did you consider this to be an investigation
20 that would be reported to the ---?
21      A.   Professional Standards Unit?
22      Q.   Professional Standards Unit, yeah.
23      A.   Depending on what I found.
24      Q.   Explain that answer to me with a little more

57

1    detail.

2         A.    If he was conducting a relationship or --- or

3    activities on duty that --- that weren't --- if he was

4    doing something extracurricular on duty, then that would

5    be a problem.

6         Q.    Okay.

7               Was Chris Berry married at that time?

8         A.    I do not know his married status.

9         Q.    Okay.

10              I think we've already established that there's

11   nothing, per se, inappropriate about state police

12   officers, troopers, having personal relationships with

13   civilians?

14        A.    Correct.

15        Q.    That in and of itself is perfectly fine?

16        A.    Yes, sir.

17        Q.    Likewise, if Chris Berry was having a

18   relationship with Ellen Ruth Costlow at that time,

19   whenever it was that Tom Ballock called and

20   complained, ---

21        A.    Yes, sir.

22        Q.    --- that was not necessarily a problem to your

23   way of thinking unless it was taking up company time?

24        A.    Correct.

58

1       Q.   After looking Trooper Berry's cell phone, you

2   were satisfied that there was --- there was nothing that

3   you could see in the text app or the call history to

4   suggest that he was, in fact, having a relationship with

5   Ellen Ruth Costlow.  Is that ---

6       A.   Correct.

7       Q.   --- to the best of your memory?

8       A.   Yes, sir.

9       Q.   But you're not able to recall whether there

10  might've been evidence of direct communication between

11  Chris Berry and Ellen Ruth Costlow on his cell phone?

12      A.   Correct.

13      Q.   There may be very --- there may very well have

14  been communication between Chris Berry and Ellen Ruth

15  Costlow on Chris Berry's cell phone?

16      A.   Yes, sir.  That point, I cannot remember.

17      Q.   Okay.

18               ATTORNEY JEFFRIES:  Are we at a breaking

19  point, Charles?  Break wanted.

20               What time is it?

21               COURT REPORTER:  2:10, and we can go off

22  the record.

23                          ---

24  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

59

1                          ---

2              <u>ATTORNEY CROOKS:</u>  We can go back on the

3    record.

4    <u>BY ATTORNEY CROOKS:</u>

5         Q.    Okay.

6              Just before we took our short break, we were

7    talking about a timeframe that we'll probably be able to

8    pin down more precisely by reference to the voluminous

9    document productions that have been made.

10             But doing the best we can from memory, it

11   sounds like you --- you heard from Tom Ballock, Senior by

12   his way of calling --- asking for the person in charge at

13   the barracks.  Got you.  He complained about Chris Berry.

14             And then you got in touch with Trooper Berry,

15   talked to him.  He denied the relationship with Ellen

16   Ruth Costlow.  You looked at his cell phone.  Can't

17   remember exactly what you found, but you're confident

18   that you certainly didn't find anything that prompted you

19   to act further on that particular inquiry.

20             Have I summed all that up correctly?

21        A.    Correct.  Yes, sir.

22        Q.    Okay.

23             Did you do anything else at that point to

24   investigate Tom Ballock, Senior's complaint about Trooper

60

1   Berry?

2          A.    Yes, sir.

3          Q.    What did you do?

4          A.    Called Ms. Costlow.

5          Q.    All right.

6                How'd you --- how'd you know how to get in

7    touch with her?  Did Tom Ballock give you that

8    information, or ---?

9          A.    I don't remember how I found that out.  No,

10   sir, I don't remember that.

11         Q.    Didn't get it off Trooper Berry's phone, did

12   you?

13         A.    I doubt that, sir.  I don't remember how I got

14   her --- her phone information.

15         Q.    Okay.

16               Well, you can't say for sure that there wasn't

17   communication between Trooper Berry and Ellen Costlow, so

18   it's possible you did get it from his phone?

19         A.    Again, I don't know, sir.

20         Q.    All right.

21               So tell me about this.  Did you go to see her?

22   Did she come to see you?  Did you just talk over the

23   phone?  How did this go down?

24         A.    I --- I called her on the phone, had a

61

1    conversation with her on the phone.

2        Q.   Okay.

3             Walk me through what you remember about that.

4        A.   I told her why I was calling.  She --- she got

5    upset and denied any affair with Trooper Berry.  And she

6    made the comment --- a comment about --- and I don't know

7    exactly word for word, but she made the comment she was

8    being harassed.

9        Q.   By whom?

10       A.   I don't believe she even said that, sir.  I

11   don't remember the whole gist of the conversation.  Being

12   wronged, though.

13            She asked if she could come into the state

14   police barracks to talk to me.  I said, well, sure if you

15   have a complaint you would like to make or --- or talk to

16   me, that's fine.  So she came in.

17       Q.   Have you told me everything you can recall

18   about your first telephone discussion with her?

19       A.   No, sir.  That's about the --- the vague ---

20   the vague memory I have of it.

21       Q.   Did you make notes of your conversation with

22   Tom Ballock, Senior, your discussion with Trooper Berry,

23   and your phone call with Ellen Ruth Costlow?

24       A.   I believe I jotted a few things down talking to

62

```
 1    Mr. Ballock.  I don't remember if I jotted anything down
 2    talking to Trooper Berry or Ms. Costlow.  I don't
 3    remember that.
 4         Q.   Okay.
 5              I don't know enough about internal policy and
 6    procedure at the state police at the time this happened
 7    to have an anticipation, but --- so I'll just ask you.
 8    Did you open any kind of a file?  Did you keep anything
 9    on these inquiries that you were making by way of, say, a
10    computer file?
11         A.   No, sir.
12         Q.   Okay.
13              Would it be fair to say that prior to Ellen
14    Ruth Costlow coming in to see you, to that point, you did
15    not see enough information to warrant getting in touch
16    with the PSU about Mr. Ballock's complaint?
17         A.   Correct.
18         Q.   After all, Tom Ballock was offered the
19    opportunity to file a formal complaint.  You offered to
20    facilitate it.
21         A.   Yes, sir.
22         Q.   True?
23         A.   Yes, sir.
24         Q.   Okay.
```

63

1          I take it then the next thing that happened in

2     the story is Ellen Ruth Costlow came in to see you?

3          A.    Correct.

4          Q.    Okay.

5          When was it?  Was it straight away, was it the

6     same day?

7          A.    I almost believe it was that night.  Yes, sir.

8          Q.    Same day?

9          A.    I believe so.  I believe so.  Yes.  I believe

10    it was that night.  I can't 100 percent say that, but I

11    believe it was that night.

12         Q.    I'm going to suggest that this probably was all

13    taking place during the calendar year 2013.  Am I helping

14    you there?  Anything about the work you've done on this

15    matter, maybe documents you reviewed in preparation?

16         A.    Not 100-percent sure, sir.  Don't --- I don't

17    remember ---

18         Q.    Okay.

19         A.    --- without looking at the ---.

20         Q.    Let me ask you that question since it's come up

21    in my thinking.  What have you done in order to get ready

22    in this deposition today?  You reviewed anything?

23         A.    I met with Mr. Jeffries and reviewed some

24    emails.

64

1     Q.    Okay.

2           So you did look at some documentation?

3     A.    Yes, sir.

4     Q.    Okay.

5           The emails that you reviewed, ---

6     A.    Uh-huh (yes).

7     Q.    --- were they part of the production that I

8  have here in front of me dated March 21, 2018, it looks

9  like?

10          ATTORNEY CROOKS:  Maybe you go the page

11  count memorized, Mark.  Do you?

12  BY ATTORNEY CROOKS:

13    Q.    It looks to me like it's --- well, I've got 882

14  pages of documents that Mark produced to me on March 21,

15  2018.  And I will represent to you I've been through this

16  recently, and there's a lot of emails in here.

17    A.    Yes, sir.

18    Q.    Would --- would those be some of the same

19  emails that you reviewed?

20    A.    Yes, sir.

21    Q.    Do you remember looking through a stack like

22  this?

23    A.    I --- we referenced certain emails, sir.

24    Q.    All right.

65

1         Mark is right there.  He probably had something

2   flagged that he wanted to talk to you about.

3         Right?

4         Now, I --- I really don't want to take the time

5   to go page by page down through 880-some pages of

6   documents that have been produced.  And I'm sure you

7   appreciate that.

8    A.   Yes, sir.

9    Q.   You wouldn't want to spend the time with me to

10  do that, either.  I've done it before.  So that's why I'm

11  doing so much of this in reliance on the review that

12  you've made, and your recollection of this events.

13        Right?

14   A.   Yes, sir.

15   Q.   However, we do have these documents here.

16   A.   Yes, sir.

17   Q.   And if you want to --- if you want to brace

18  your memory by having --- taking a moment or two to kind

19  of look down through this, I'm happy to do that for you.

20   A.   Okay.

21   Q.   All right?

22   A.   Yes, sir.

23   Q.   So I don't want to give you the wrong idea

24  about how this process works.  I --- I'm looking for, you

66

1    know, your best, honest recollection and testimony about

2    all this stuff.  And it's not --- you know, it's not a

3    contest or ---

4         A.    Sure.

5         Q.    --- anything of that nature.

6               All right.

7               So Ellen Ruth Costlow comes in to see you the

8    evening of the same day that you called her?

9         A.    I believe it was the same evening.

10        Q.    To the best of your memory?

11        A.    Yes, sir.

12        Q.    Tell me what you remember.  What was your

13   impression when --- when she came in to see you?

14        A.    She --- she came to the state police barracks.

15   She sat down, and she --- well, I had a conversation

16   about her and Trooper Berry, which she denied having an

17   affair with Trooper Berry.

18               She then went on to say she was in the middle

19   of a divorce or in --- in the process of divorce and that

20   her soon to be ex-husband would not stop contacting her,

21   that she was being harassed daily with emails and text

22   messages.

23        Q.    You say Ellen Ruth Costlow denied having a

24   romantic relationship with Christ Berry.  Did she deny

67

1    knowing Trooper Berry?

2         A.    No.  No, she --- I don't believe she did deny

3    knowing Trooper Berry.

4         Q.    Okay.

5              Tell me what you remember in that direction.

6         A.    I really don't remember a lot.  I remember

7    something to the effect that Trooper Berry was up in her

8    neighborhood conducting some sort of investigation.  But

9    I don't know the specifics of the --- I don't remember

10   the specifics of the investigation or why he was up in

11   that neighborhood doing that.

12        Q.    We do have some documentation on that.  In

13   fact, I can show you documentation --- and this is from

14   2013 ---

15        A.    Uh-huh (yes).

16        Q.    --- when the 911 call was placed.

17        A.    Okay.

18        Q.    And the 911 call resulted in some state police

19   responding to the Costlow residence.  Maybe you reviewed

20   some of that evidence in preparation for the deposition

21   today?  No --- no bells going off?

22        A.    No bells going off, sir.  I know --- I know the

23   state police at least went up there at least once, but

24   I ---.

68

1      Q.    Let me see if this might job your memory a
2  little.
3      A.    Okay.
4      Q.    And again, we can take the time necessary to
5  get into some of these documents.
6      A.    Sure.
7      Q.    And I am going to show you some documents in
8  the course of this, but you know, you're a
9  straightforward, attentive witness, and you have an
10 impressive memory.  So we're covering a lot of ground
11 without the time necessary for a lot of document work.
12 So I'm going to take advantage of that.
13          There came a time when my client, Scott
14 Ballock, called and talked to you and he asked about the
15 fact that state police went to his estranged wife's
16 residence.  And he questioned you as to why there was no
17 report of that police activity.
18     A.    Yes, sir.
19     Q.    And you were a bit --- affronted, I believe
20 would be a fair way to put it, by his questioning you
21 along that line.
22     A.    I think that's a mischaracterization.
23     Q.    Okay.
24          Well, let me just ask you personally, do you

69

1   remember having a conversation with Scott?

2        A.   I remember having a conversation with Scott.

3        Q.   You do remember that?

4        A.   Yes.

5        Q.   Okay.

6             Good.  So tell me about his conversation that

7   you had with Scott Ballock.

8        A.   From what I remember about the conversation, he

9   called in and asked about an incident that happened at

10  his house.  And I believe he wanted a report, if I

11  remember correctly.

12       Q.   Uh-huh (yes).

13       A.   And ---.

14       Q.   I believe he did.

15       A.   Okay.

16       Q.   Yeah.

17       A.   And I explained how to get that report.  Well,

18  he --- he asked me if there was a report filed.  I

19  checked.  There was not a report filed.  So he questioned

20  me on why there wasn't a report filed.

21       Q.   Okay.

22            You presumably went on your computer system,

23  called up a database in some fashion or whatever, and

24  were able to determine that there was no report on file?

70

1      A.    The CI log did not show a report on file.

2      Q.    What log?

3      A.    Criminal Investigation log.

4      Q.    Okay.

5            So you told Scott Ballock that there was no

6   report prepared?

7      A.    Correct.

8      Q.    What else do you remember about the

9   conversation?

10     A.    I believe he asked me why there wasn't a report

11  filed.  And I explained to him, you know, based upon the

12  investigating officers or the responding officers'

13  observations, and you know, it's up to them to --- to

14  initiate a report if they feel that it needs to be

15  initiated.  But, you know, if they --- if, you know, a

16  trooper goes on a call, and there's no substance to that

17  call, then a report probably isn't going to be filed.

18     Q.    Okay.

19           What do you remember about the substance of the

20  call, that is to say --- I realize as I listen to my own

21  questioning that that's probably a confusing way to

22  phrase it.  Scott Ballock called you, told you that state

23  police had been to his residence, and his estranged wife

24  was currently living there.

71

1           And he wanted a copy of the report.  You looked

2    in the Criminal Investigation log on your computer and

3    told him there was no report.  And he wanted to know why.

4    You told him that the trooper who responded must have

5    judged it unworthy of a report.

6           Is that ---?

7    A.    Correct.  Yes, sir.

8    Q.    Okay.

9           Do you know anything about what happened when

10   that --- who that trooper was, or what he found?

11   A.    From what I remember, it was a verbal

12   altercation at his house or his --- that residence.

13   Q.    All right.

14         They were estranged.  Do you --- do you guys in

15   the state police use that word, estranged?

16   A.    We can.

17   Q.    When --- when someone is married to another

18   person, but by order of the family court, usually,

19   they're not living together.

20   A.    Correct.

21   Q.    Then they are said to be estranged.

22   A.    Yes, sir.

23   Q.    That's the way we sue that word in the law.

24   You guys use it that way, too?

72

1          A.    We can.  Yes, sir.

2          Q.    Okay.  All right.

3                So it is accurate to say that his wife lived

4     there, but he did not because they were going through a

5     divorce at the time.  And that squares with your best

6     memory of what you learned about all of this ---

7          A.    Yes, sir.

8          Q.    --- at the time?

9                Who was the state police trooper who went to

10    the house?

11         A.    I can't remember that, sir.  I don't remember

12    that.

13         Q.    All right.

14         A.    I'd hate to speculate.

15         Q.    All right.

16               Did you make any effort to find out at the time

17    who the trooper was?

18         A.    I can't remember, sir.

19         Q.    You don't' remember if you tried to find out?

20         A.    No, sir.  I can't remember that.

21         Q.    How was Scott Ballock in his attitude and ---

22         A.    I remember ---.

23         Q.    --- in the course of this conversation?

24         A.    I believe his discourse came from when I told

73

1    him there wasn't a police report filed.  And he

2    continually questioned me upon that.  And I really didn't

3    have another answer for him except for the fact that it

4    was what it was, a verbal altercation that the

5    investigating --- or the responding officer didn't feel

6    like a report needed to be filed.

7        Q.   Okay.

8        A.   But he kept pressing upon that issue.

9        Q.   Was there any policy or practice in effect at

10   the state police at the time of this response to the

11   Ballock residence in Thistledown as to whether a report

12   should be filed if a child, minor child, was present?

13       A.   No, sir.

14       Q.   If Summer Ballock, a minor child at the time,

15   was present at the Ballock residence when her mother and

16   Kenny Ice, Junior were having an argument, and the state

17   police came to the house about it, there'd be no

18   expectation on the part of the state police that the

19   trooper should formalize what they did, what they found,

20   what they did, in order to safeguard the interests of

21   that minor child?

22       A.   It depended on thee escalation of the --- of

23   the incident.

24       Q.   Okay.

74

1        So I mean, we don't know who the trooper was,

2  but it wasn't you.

3        A.    It was not me.

4        Q.    So but --- but you are supervisory.  You're a

5  lieutenant, and you supervisor troopers, so you're in a

6  position to know.  If a trooper went to the residence,

7  there was no violence going on at the time, and upon

8  inquiring, it seemed that violence was not likely, then

9  it would be an acceptable policy and procedure for the

10  trooper to, you know, tell the people at the residence,

11  look, you know, if I have to come back here, it's going

12  to be a problem?  And then go back, get in the car, you

13  know, let the station know that everything's ---

14  everything's okay, and that, you know, you're back onto

15  the next thing.

16        A.    If ---.

17            ATTORNEY JEFFRIES:  Object to the form.

18  I'm not sure if there was a question, and if there was,

19  I'm not sure what it was.

20  BY ATTORNEY CROOKS:

21        Q.    That would be --- that would be an acceptable

22  approach to take on the part of whoever that trooper was?

23        A.    If there wasn't anything going on.  If there's

24  no criminal offense, yes, sir.

75

1      Q.    When you show up, and there's physical violence

2  in flagrante right there in front of you, you know, then

3  that's a different story altogether.  But if it's just a

4  verbal argument, and everybody's cool, then a trooper

5  doesn't have to fill out a report even if there was a

6  minor child present?

7      A.    Correct.

8      Q.    What do you know about Chris Berry

9  investigating in the Thistledown neighborhood?

10     A.    Just from general recollection, there was

11  something about car break-ins.

12     Q.    Okay.

13     A.    But that's about all I know.  I don't know if

14  he was following up on something.  I have no --- that was

15  --- that's my general recollection.

16     Q.    Ellen Costlow told you that she knew Chris

17  Berry, and it was because he'd been in the neighborhood

18  investigating car break-ins.

19          True?

20     A.    That I do not remember.  I don't remember that

21  --- that specific with her.

22     Q.    Okay.

23          So you may have garnered your information about

24  Chris Berry's investigative activity in the Thistledown

76

1    neighborhood from some source other than Ellen Costlow?

2        A.    From Chris or --- yeah.  I don't remember that,

3    sir.

4        Q.    Okay.

5             If Chris Berry was investigating car break-ins

6    in the Thistledown neighborhood, would that be something

7    that he would be obliged by the policy and procedure of

8    the state policy to document?

9        A.    Sir?

10       Q.    If Chris Berry was in the Thistledown

11   neighborhood investigating reports of car break-ins,

12   would that be the sort of investigative effort that would

13   --- you'd expect to be written?  Put in writing?  Kept on

14   file?

15       A.    There would be --- that would be on his daily

16   activity sheet, his general activity of what happened

17   during that day.

18       Q.    What if he went up and did that investigation

19   on his own time?  Would there be ---?

20       A.    On his own time?

21       Q.    Would there be any record of it?

22       A.    I --- I'm not too sure I know the question,

23   sir.

24       Q.    All right.

77

1          Kind of an odd question, isn't it?  I'm

2    suggesting that a state trooper would go up to

3    Thistledown neighborhood on his own time, off the clock,

4    and conduct an investigation to car break-ins in the

5    neighborhood.  That --- that would sound very irregular,

6    wouldn't it?

7          A.    In uniform or ---?

8          Q.    I don't know if he was wearing his uniform at

9    the time.

10         A.    I --- it would be very unlikely some trooper

11   would be investigating a crime on their off-duty hours.

12         Q.    That would be very irregular, wouldn't it?

13         A.    Yes, sir.  It would be irregular.

14         Q.    In your review of the discovery in this case,

15   have you seen the Monongalia County sheriff's report

16   indicating that deputies went to the Ballock household in

17   Thistledown neighborhood in 2013 in response to an

18   argument between Ellen Costlow and Kenny Ice, Junior?

19         A.    In preparations for this case, sir?

20         Q.    At any point during the course of this case.

21         A.    I might have seen it during the investigation,

22   but I don't have any ---.

23         Q.    You have a general memory of ---

24         A.    I remember ---.

78

1      Q.    --- being aware of it?

2      A.    Yes.  I have a general memory of being aware

3  --- general recollection of --- of yes, that, yes.

4      Q.    In that report --- and again, we can take the

5  time to pull it up here, but in that report, I looked at

6  it as recently as last evening.  That's why I'm recalling

7  it.  It says in there that Ellen Costlow begged the

8  deputies not to prepare a report because she was involved

9  in a divorce case.  She --- she didn't want --- she

10  didn't want the fact that there --- the police had to be

11  called to her residence to be documented as such that it

12  could wind up being used in the divorce case.

13          Does that stimulate memory of what you

14  reviewed?

15      A.    No, sir, that does not.

16      Q.    How about the mention of Trooper Berry in

17  the ---?

18               ATTORNEY JEFFRIES:  Can we go ahead and

19  pull out the report ---

20               ATTORNEY CROOKS:  Sure.

21               ATTORNEY JEFFRIES:  --- if you want to

22  talk about it, Charles?

23               ATTORNEY CROOKS:  Sure.  It'll take me

24  just a moment.

79

1              ATTORNEY JEFFRIES:  You print any extra

2      copies, by chance?

3              ATTORNEY CROOKS:  I did, at least on

4      anything that I thought was likely to come up anyhow.

5                  Let's do this.  Let's mark that as Kief 1.

6                              ---

7                  (Whereupon, Deposition Exhibit 1, Policies

8                  and Procedures, was marked for

9                  identification.)

10                             ---

11             ATTORNEY CROOKS:  Here's a copy for you,

12     Todd.

13             ATTORNEY PHILLIPS:  Thank you.

14             ATTORNEY CROOKS:  Here's one for you.  I

15     just came to that as I was looking for the --- the other

16     one.

17                 All right.

18                 This will be Kief 2.

19                             ---

20                 (Whereupon, Deposition Exhibit 2, Call

21                 Summary Report, was marked for

22                 identification.)

23                             ---

24             ATTORNEY CROOKS:  Could you hand one of

80

1    this to Mark for me?  That way I don't throw it at you.

2                    ATTORNEY JEFFRIES:  Thank you.

3                    ATTORNEY CROOKS:  Yeah.  It's probably a

4    good suggestion that you make, Mark.  It's time we start

5    looking at some of these documents.

6                    ATTORNEY JEFFRIES:  I'll just represent to

7    you, we did not go into extensive document review in

8    preparation.

9                    ATTORNEY CROOKS:  Yeah, I understand.

10   Neither did we.  It's funny how the longer these things

11   go on, the more time we got to live with these documents.

12   The case kind of comes to life.

13                   Okay.

14                   Gentlemen, indulge me just for a second to

15   proffer for our record what we've done just now.

16   BY ATTORNEY CROOKS:

17      Q.   The record should show that we have done a

18   couple of things.  One is we've marked a document as Kief

19   1.  That document bears some identification numbers

20   beginning with Troopers 844, ending with Troopers 868.

21   These were produced to us March 21, 2018 by your Counsel,

22   Lieutenant.

23      I have gone through this and take it to be

24   responsive to our discovery requests in this case.  We

81

1    asked for policies, procedures, that would apply during

2    the time of the events that we're talking about in this

3    litigation.  And this is what we were given.

4         A.   Sure.

5         Q.   Okay.

6         And I take it that looking at Kief Number 1,

7    you can affirm for me that these, in fact, were

8    statements of policy and procedure that applied at the

9    time of, let's say, 2013, 2014, when investigation was

10   conducted on the part of the state police barracks in

11   Morgantown concerning a complaint made by Ellen Ruth

12   Costlow against her estranged husband, my client, Scott

13   Ballock?

14        A.   Correct.

15        Q.   Okay.

16        Would you expect that there should be other

17   polices and procedure documents included here?

18        A.   Well, ---.

19        Q.   Does this --- does it look this would be

20   everything you'd know to give us too?

21        A.   Not that I know of, sir.  That --- yes.

22        Q.   Okay.

23        You don't know of anything?

24        A.   No, I do not know of anything.

82

```
 1        Q.    All right.

 2              Did you participate in trying to obtain this

 3    information so that it could be produced, or was

 4    something your lawyer did without help from you?

 5        A.    I don't remember supplying this.

 6        Q.    Okay.  All right.

 7              Have you reviewed the content of Kief Number 1

 8    in preparation for your deposition today?

 9        A.    No, sir.

10        Q.    Or did you just look at emails?

11        A.    I'm sorry?

12        Q.    I said did you review the content of Kief

13    Number 1 in preparation for today, or did you just look

14    at emails?

15        A.    I did not review this document, sir.  No.

16        Q.    Kief Number 2 has also been marked.  That

17    document bears a Monongalia County Sheriff's Office.

18    There's an address for the office, and there's a subtitle

19    Call Summary Report.

20              You with me?

21        A.    Yes, sir.

22        Q.    Okay.

23              This is the document that I was referring to

24    unaided by documentation when your Counsel suggested
```

83

1    maybe it'd be a good time to start marking and discussing

2    actual documents.

3         A.   Yes, sir.

4         Q.   You've seen documents like this before from the

5    county sheriff's office?

6         A.   Just a few, sir.

7         Q.   Okay.

8              A Call Summary Report, is this something the

9    deputy who responds to the scene prepares?  Is that the

10   way you understand it?

11        A.   That's what it says, sir.  Yes, sir.

12        Q.   Okay.

13             So you can see there's a narrative prepared by

14   Deputy Branden Snider?

15        A.   Yes, sir.

16        Q.   And this narrative was approved by Mansell

17   Floyd Jones.  You see that on the first page?

18        A.   Yes, sir.

19        Q.   Says time cleared, August 12, 2013, 4:59.  What

20   do you take that to mean?

21        A.   Time cleared, I'm not ---.

22        Q.   Time arrived, time cleared.

23        A.   I see that, yes.

24        Q.   Maybe those two things should be read together.

84

1      A.    I got you.

2            Okay.

3      Q.    I take that to mean that's when they arrived on

4      scene, and that's when they left scene.

5      A.    That's what I would take it as, yes, sir.

6      Uh-huh (yes).

7      Q.    Okay.

8            I'm only a lawyer, but ---

9      A.    Yeah.

10     Q.    --- I'm kind of a quick study.  I'm a little

11     bit intuitive, too.

12           It says call type domestic dispute.  You with

13     me there?

14     A.    Yes, sir.

15     Q.    Okay.

16           Now the location of this call was 51 Summit

17     Overlook Drive, Morgantown.  That's out in Thistledown

18     neighborhood where the Ballocks lived?

19     A.    Correct.

20     Q.    Now at the time that this happened, August 12,

21     2013, the record will show that Ellen Ruth Costlow was

22     awarded the right to live in the family residence.  I'll

23     just proffer that to you.  Do you have any reason to

24     doubt or dispute that?

1      A.    No, sir.

2      Q.    Maybe your lawyer will even stipulate the

3   accuracy of that.  Save us a little time.

4                  ATTORNEY CROOKS:  You okay with that,

5   Mark?

6                  ATTORNEY JEFFRIES:  I have no knowledge,

7   but I mean, do you want to represent it, we can go on an

8   assumption.

9                  ATTORNEY CROOKS:  Okay.

10  BY ATTORNEY CROOKS:

11     Q.    I won't mislead you on that.

12           Now, there's a lot to this Call Summary Report.

13  I mean, the narrative goes on for --- well, we'll say a

14  third of the first page, the entire second page, the

15  entire third page, maybe a fifth of the fourth page.

16           I would also add that there was a second person

17  who contributed to this narrative.  Maybe that accounts

18  for some of the length.  There's a Lieutenant Jones,

19  beginning on the second page.

20     A.    I see that.

21     Q.    Yeah.  About three fourths of the way down, it

22  says Lieutenant Jones' narrative?

23     A.    Uh-huh (yes).

24     Q.    Okay.

86

1              I take that to be Mansell Floyd Jones.

2              Do you know those --- those folks?  Do you know

3    Mansell Jones?

4         A.   I just know Lieutenant Jones in passing.  I do

5    not know ---.

6         Q.   Don't know Snider?

7         A.   No, sir.

8         Q.   Okay.

9         A.   I might have met him sometime, but I don't'

10   remember.  Yeah.

11        Q.   Well, you know, we've --- we've been taking a

12   few minutes here, and I haven't exactly left you in

13   silence to study this, but you have had a chance to kind

14   of look it over.  Do you remember seeing this before?

15        A.   If I saw it, it would've been in the

16   investigation stage of --- of all this.  I --- I'm

17   reading this with a vague memory of it.  But I don't know

18   if I read it or somebody told me about it.  I don't

19   remember that.

20        Q.   All right.  Okay.

21             Well, one of the reasons I'm taking up your

22   time with this is because one of your troopers comes for

23   mention in this report.  Do you see that?

24        A.   On which part, sir?

87

1      Q.    Okay.

2      A.    Where are you at?  Where are you at?

3      Q.    I just --- I just saw that you were reviewing

4    it, and I just thought perhaps you had read mention of

5    Trooper Berry.

6      A.    I --- I see that here, yes.

7      Q.    Okay.

8            Your --- your looking at it where?  On the ---?

9      A.    First page.

10     Q.    First page?

11     A.    Uh-huh (yes).

12     Q.    Because it gets mentioned more than once.

13     A.    Yes, sir.  That's why I asked.

14     Q.    Uh-huh (yes).  Fair --- fair enough.

15           So on the first page, Mrs. Ballock, which

16   that's going to be Ellen Ruth Costlow.  You --- you

17   understand that, right?

18     A.    Yes, sir.

19     Q.    Okay.

20           She was told by the deputy that, you know, if

21   he, Trooper Berry, was already investigating the incident

22   --- and by incident, there's some back reference here to

23   Ellen Costlow saying that a piece of personal property

24   had been stolen.  You see that?

88

1        A.    Yeah.

2        Q.    Maybe --- maybe I just should give you a few

3    minutes to --- to review this.

4        A.    Probably.

5        Q.    You know, I think that might be a much more

6    efficient approach here.  I --- I hate to just sit around

7    in silence, but ---.

8                 COURT REPORTER:  We can go off the record,

9    if you want.

10                ATTORNEY JEFFRIES:  Yeah.  We can go off

11   the record for a second.

12                COURT REPORTER:  Will do.

13                            ---

14   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

15                            ---

16                ATTORNEY CROOKS:  All right.

17                Let's go back on the record.

18                We've taken a short break, and during that

19   time, we took the opportunity to review this Kief Exhibit

20   Number 2, which is pretty much four full pages of

21   information.

22   BY ATTORNEY CROOKS:

23        Q.    Now that I've left you alone long enough to

24   actually read it, let me repeat a question I asked

89

1    earlier.  Do you have memory of seeing this before?

2         A.    Sir, I believe I have a vague recollection of

3    seeing this before.

4         Q.    Okay.

5              You have seen it.  You just can't tell me when?

6         A.    Correct.  Yes, sir.

7         Q.    All right.

8              Now, what we have here is a narrative by two

9    police officers.  They're --- they're deputies in the

10   sheriff's office.  You know one of them.  They're ---

11   they're describing the course of their response to

12   Ballock residence.  And we see in both narratives that

13   Ellen Costlow was texting Trooper Berry.  You can see the

14   first reference to that at the top of page two, Deputy

15   Snider's narrative?

16        A.    Uh-huh (yes).

17        Q.    Mrs. Ballock stated she was texting Trooper

18   Berry about meeting him earlier in the day to speak with

19   him about the computer.  That's the computer she said had

20   been stolen?

21        A.    Correct.

22        Q.    Okay.

23              And apparently, it was about that time,

24   according to her account, that Kenny Ice showed up and

90

1    they argued.

2            Then over on the third page in the third full

3    paragraph, Mansell Jones, Lieutenant Mansell Jones,

4    reports that Ellen Costlow told him that West Virginia

5    State Police Trooper Berry had been at her home that day

6    or the day before in reference to a missing laptop that

7    she said Kenny Ice had stolen.  And that Ballock said ---

8    when he said Ballock, he's referring to Ellen Costlow,

9    said that Kenny Ice accused her of sleeping with Berry.

10            This is consistent with the way Deputy Snider

11   wrote it up.  You see back on page two, top paragraph.

12   Mrs. Ballock stated at some point Mr. Ice looked at her

13   text message and saw she was texting Trooper Berry.  And

14   he got angry, and accused her of sleeping with him.

15            So if --- if Trooper Berry, all right, was

16   having a relationship that included sexual relations with

17   Ellen Costlow, then he should not have been at her

18   residence on official business investigating the theft of

19   a laptop computer.

20            Would you agree?

21       A.   I agree.

22       Q.   Yeah.  And why would that be inappropriate

23   conduct on his part?

24       A.   Why would it be inappropriate conduct on his

91

1    part?  If you're having a relationship with a person, you

2    don't take a complaint from that person.  You leave that

3    up to another police officer.

4        Q.    Why?

5        A.    Impartiality.

6        Q.    All right.

7              The theft of a laptop computer, would that be

8    the sort of thing that a state police trooper would

9    ordinarily investigate?

10       A.    We investigate any crime, sir.

11       Q.    Okay.

12             So the nature of the complaint doesn't tell us

13   anything about ---

14       A.    No, sir.

15       Q.    --- his being present?

16             Do you recall talking with Trooper Berry about

17   being present at Ellen Costlow's residence?

18       A.    No, sir.  I do not.

19       Q.    Okay.

20             You did have a conversation with Trooper Berry

21   and asked him in that conversation if he had a personal

22   relationship that included sex with Ellen Costlow?

23       A.    Correct.

24       Q.    We're covered that.  Tell me, now that you've

92

1     reviewed this Kief Exhibit 2, which is a report of an

2     incident that happened August 12, 2013, would --- does

3     that help you remember when you had this conversation

4     with Trooper Berry and asked him if he was having sex

5     with Ellen Costlow?

6          A.   It was around that time, sir.

7          Q.   It was about that same time?

8          A.   Around it, yes, sir.

9          Q.   Okay.

10              Would this incident of August 12, 2013 that is

11    the subject of Kief Exhibit 2 have occurred after the

12    state police responded to the Ballock residence, but

13    rendered no report about it?

14         A.   I don't know that, sir.

15         Q.   Okay.

16              Can you search your memory and tell me if

17    having reviewed this Kief Exhibit Number 2 refreshes your

18    recollection as to whether your discussion on the

19    telephone with my client, Scott Ballock, about the state

20    police going to his estranged wife's residence.  Did that

21    telephone conversation precede this incident of August

22    12th?

23         A.   I --- I don't know that, sir.

24         Q.   Okay.

93

1          So you participated in the --- before I get

2     into that, let me --- let me have a second here.

3          I see mentioned in the narratives rendered by

4     Deputy Snider as well as Lieutenant Jones that both

5     officers were asked by Ellen Costlow not to mention their

6     names in any reports on this.

7          A.   Yeah.  I saw that in Deputy Snider's, but I

8     don't know if I saw that in Lieutenant Jones'.

9               Yes, sir.  I see that now.

10         Q.   So both officers record that they had been

11    asked by Ellen Costlow, look, you know, I don't --- I

12    don't want my name used in any police reports about this?

13         A.   According to this document, yes, sir.

14         Q.   Yet they did so?

15         A.   Yes.

16         Q.   Why do you --- I mean, do you have memory,

17    maybe in your own personal experience as a trooper

18    responding to domestic calls, people making that kind of

19    request?  Look, I'm involved in a divorce.  Would you

20    please leave my name out of your report?

21         A.   I can't remember anything off the top of my

22    head, sir.

23         Q.   Nobody ever asked you to do something like

24    that?

94

1      A.   I can't remember anything off the top of my

2  head, sir.

3      Q.   Okay.

4           So you regard such as request from Ms. Costlow

5  as being little on the unusual side, wouldn't you?

6      A.   Unusual, yes, sir.

7      Q.   You saw mention in here that Mr. Ice had the

8  opportunity to refer charges against Ellen Costlow and

9  declined?

10     A.   Correct.

11     Q.   In fact, she cut him with a knife according to

12  this narrative.

13          Right?

14     A.   He said she cut her (sic).  She says he cut

15  himself yes.

16     Q.   There was a cut on his arm, and there was a

17  bloody knife found downstairs.

18          Right?

19     A.   Yes.

20     Q.   That's --- that's fairly solid evidence to

21  indicate that she assaulted him with a knife and cut him?

22          ATTORNEY JEFFRIES:  I'm going to object to

23  the form.

24  BY ATTORNEY CROOKS:

95

1      Q.    There would be enough there that these deputies

2   were warranted to advise Mr. Ice that he could make a

3   complaint against her?

4      A.    Yes.  Based upon his statement, yes, sir.

5      Q.    The fact that Mr. Ice was not supposed to be

6   present at the residence, do you --- do you make note of

7   that reference in this --- in these narratives also?

8      A.    I saw --- I read that, yes, sir.

9      Q.    Okay.

10          Now, these deputies went to Cindy Scott, the

11   assistant prosecuting attorney, according to page two of

12   Deputy Snider's narrative.  He says that he spoke with

13   Cindy Scott on August 20, which was about eight days

14   after the incident.  And according to Deputy Snider's

15   narrative, Mrs. Scott felt that there was insufficient

16   evidence to identify the primary aggressor and charge

17   anyone at this time.  So she closed it.

18          That sort of thing happens from time to time in

19   these domestic cases, doesn't it?

20      A.    Yes, sir.

21      Q.    Okay.

22          Now, at some point after, you received a phone

23   call from Tom Ballock, Senior complaining about Chris

24   Berry.  And then you inquired of Berry, as you explained

96

1    in the deposition already.

2          Ellen Costlow came in to see you.  She told you

3    at that time that she wanted to bring a complaint against

4    her estranged husband, didn't she?

5          A.   No, sir.

6          Q.   Okay.

7               She did not?

8          A.   No, sir.

9          Q.   What did --- what was her intention?  Did she

10   say?

11         A.   Her intention was to talk to me about the ---

12   the affair, and she stated she was being harassed by her

13   soon to be ex-husband.

14         Q.   Okay.

15              There came a time when Ellen Costlow did

16   communicate with you to tell you that she wanted to make

17   a complaint against Scott?

18         A.   After she knew she could.

19         Q.   Did you --- were you the one who educated her

20   as to the option of making a criminal complaint against

21   Scott?

22         A.   Yes, like criminal investigation.  Yeah,

23   opening up a criminal investigation.  Criminal complaint,

24   Yes, sir.

97

1          Q.    Okay.

2                When you told her she would have to sign a

3     paper saying that he was harassing her ---?

4          A.    I don't if I told her she had to sign a paper.

5     We don't ---

6          Q.    Okay.

7          A.    --- do that.

8          Q.    Okay.

9                Well, yeah.  Rather than me do it that way, let

10    me just put it this way.  You explained to her what the

11    process of making a criminal complaint against Scott

12    would consist of?

13         A.    Correct.

14         Q.    So ultimately, there --- there was an

15    investigation opened?

16         A.    Yes, sir.

17         Q.    And based on the documents that have been

18    produced in discovery, it --- it appears to me that you

19    were probably the trooper who got the ball rolling.  You

20    --- you're the one who officially got the investigation

21    started.

22                Am I right?

23         A.    I kicked it upstairs to, well, the first

24    sergeant, which went to the captain.

98

1          Q.    Okay.

2          A.    Yes.

3                    ATTORNEY CROOKS:  Let's mark this Number

4    3.

5                              ---

6                    (Whereupon, Deposition Exhibit 3, 8/22/13

7                    Email, was marked for identification.

8                              ---

9                    ATTORNEY CROOKS:  And I don't know that I

10   have extra copies of this, so I'll indulge the time

11   necessary for your lawyer and Mr. Phillips both.  I'll

12   let you start if you want, Mark.

13                   ATTORNEY PHILLIPS:  If you don't mind,

14   I'll just look over his shoulder.

15                   ATTORNEY CROOKS:  Sure.

16                   And let me go ahead and ask the reporter

17   to mark the next one in sequence that I'm going to ask.

18                              ---

19                   (Whereupon, Deposition Exhibit 4, Memo

20                   from Captain Merrill, was marked for

21                   identification.)

22                              ---

23                   ATTORNEY CROOKS:  Thank you.

24                   I'll let the three of you fellows look at

99

1    those documents real quick while I excuse myself for just

2    a moment.  I'll be right back.  Hopefully, both of us

3    will use our time wisely.

4                          ---

5    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

6                          ---

7                COURT REPORTER:  Back on the record.

8                ATTORNEY JEFFRIES:  He's got them.

9                ATTORNEY CROOKS:  Yeah.  I --- I got them

10   here just so I can ask a couple questions.

11               We're back on the record after a short

12   break.

13   BY ATTORNEY CROOKS:

14       Q.   We've identified Kief Exhibit 3 and Kief

15   Exhibit 4.  And I believe these documents will more or

16   less prove up the answer you've already given, which is

17   that you kicked it upstairs, I think you said was the ---

18   what you did.  You asked your superior for permission to

19   open an investigation.

20               So let me show you Exhibit Number 3.  Can you

21   tell us what that is?

22       A.   That's an email to my captain, James Merrill,

23   at the time.

24       Q.   Okay.

100

1          Why were you emailing your Captain?

2     A.   Anytime another police officer or public

3 official or whoever --- we have to get permission to

4 investigate them from Charleston, more or less.

5     Q.   Why is that?

6     A.   I guess they don't want us opening

7 investigations on other police officers or public

8 officials without them knowing it.

9     Q.   Okay.

10         Have you ever known a time when you sent an

11 email of this kind, and the response was no you have no

12 authority to open an investigation into this individual?

13    A.   No, sir.

14    Q.   Can you think of any other time when you ever

15 had to write an email like this and ask for permission to

16 investigate another police officer?

17    A.   No, sir.

18    Q.   At the time of Kief Exhibit Number 3, which was

19 August 20, 2013, I think, --- am I right?

20    A.   Yes, sir.

21    Q.   Okay.

22              ATTORNEY JEFFRIES:  Correction.  August

23 22nd.

24              THE WITNESS:  I'm sorry, 22nd, yes.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

101

1    BY ATTORNEY CROOKS:

2         Q.    Okay.

3         A.    Yes.

4         Q.    Thank you.

5              Kief Exhibit Number 3 is your email of August

6    23 to your captain.  It looks like there's a second page

7    to that, and I don't have it.  Do you have any memory of

8    this document now that we've looked at it as much as we

9    have?  You remember doing this?

10        A.    I remember sending an email.  I ---.

11        Q.    Okay.

12        A.    Yeah.  Yeah.  Yeah, just ---.

13        Q.    Best of your recollection, this was the first

14   time you'd ever sent an email of this kind to the captain

15   asking for permission to open an investigation because it

16   concerned a high profile person or a member of the law

17   enforcement community.

18             True?

19        A.    True.

20        Q.    Okay.

21             I believe --- make a point a point of it to

22   suggest that that might be one of the reasons you have of

23   --- of doing this.  You never had to do it before.

24             Did you have any conversations with the captain

102

1    on the telephone?

2         A.   Yes, sir.

3         Q.   Okay.

4              Tell me what you remember.

5         A.   I --- I just called him and explained the

6    merits of what was going on with the whole thing.  And he

7    said, well, email --- put it in writing.  Give me ---

8    give me an email about what --- opening an investigation.

9         Q.   Okay.

10             Now, the reason you did this email to Captain

11   Merrill was because Ellen Costlow had come to see you,

12   and she offered to give you a collection of emails from

13   her attorney, Matt Stout?

14        A.   Correct.

15        Q.   Did you have those emails, and did you review

16   them before you asked for permission from Captain

17   Merrill?

18        A.   No, sir.

19        Q.   Okay.

20             So you were simply seeking permission to take

21   advantage of the offer that Ellen Costlow had made to you

22   that she would provide this evidence?

23        A.   Correct.

24        Q.   Okay.

103

1          And can you tell me if you had any conversation

2     with Captain Merrill to the effect that there has been

3     some allegations made that there was a sexual

4     relationship between the Complainant, Ellen Costlow, and

5     one of your troopers, Chris Berry?

6          A.   I can't remember that, sir.

7          Q.   Don't you think that's the sort of thing you

8     --- would be on your mind as you were talking to your

9     captain?

10         A.   Again, I can't remember the --- the specifics

11    of the conversation.  I don't know if I gave that to him

12    or not.  I don't know.

13         Q.   Did your captain ask you, look, why do you ---

14    why do you want to get involved in investigating a case

15    that's in front of the family court judge?  Why don't you

16    just send her to the family court judge?

17         A.   Because we were investigating a criminal

18    complaint, not a civil complaint.

19         Q.   You understand that the family court judge

20    would have authority to order restrictions on

21    communication between parties who are divorced?

22         A.   Yeah.

23         Q.   You've been through a divorce yourself.

24              Right?

104

1      A.   Right.  We never came to that.

2      Q.   That was never necessary in your case, but ---

3      A.   No, sir.

4      Q.   --- I don't surprise you at all to tell you

5  that a family court judge has that authority?

6      A.   It wouldn't surprise me, sir.

7      Q.   Did it occur to you that you might refer her to

8  the family court judge rather than open a criminal

9  investigation?

10      A.   No, sir.

11      Q.   After all, she had cut Kenny Ice in a domestic

12  dispute, and there was no reason to make an arrest or

13  open an investigation into --- into that.  And the state

14  police had responded to her residence on at least one

15  occasion and didn't even deem it necessary to make a

16  report.

17                ATTORNEY JEFFRIES:  Objection, suspects.

18  BY ATTORNEY CROOKS:

19      Q.   In light of --- in light of what we know about

20  the broad discretion that the state police has, I mean,

21  you were under no obligation to open up an investigation

22  into this complaint that Ellen Costlow was making, were

23  you?

24      A.   My obligation is to the victim.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

105

1       Q.    So you felt obliged to Ellen Costlow?

2       A.    If there was a criminal infraction, yes.

3       Q.    At what point in time did you come to the

4   conclusion that there was enough evidence to seek the

5   criminal warrant for the arrest of Scott Ballock?

6       A.    It wasn't mine.  I had nothing to do with that,

7   sir.

8       Q.    Okay.

9             Were you consulted on it?

10      A.    I was being updated on the progress of the

11  investigation.

12      Q.    All right.

13            According to Exhibit 3, Captain Merrill wanted

14  to be kept in the loop.  He wanted email reports on this.

15  Did you keep him advised?

16      A.    That was --- that is not --- that email is not

17  --- I'm sorry.  The memo is not sent to me, sir.

18      Q.    Pardon me.  I --- I'm misspeaking it.  I

19  apologize.  I'm just trying to move along her, and I'm

20  getting a little ahead of myself.

21      A.    That's all right.

22      Q.    Let me show you Exhibit Number 4.  What is

23  that?

24      A.    That is a Troop 1 Memorandum to Corporal

106

1    Gaskins of the Morgantown Detachment.

2         Q.    Okay.

3               And who's it from?

4         A.    Captain Merrill.

5         Q.    Okay.

6               And what was Captain Merrill instructing

7    Corporal --- then Corporal Gaskins?

8         A.    To open up an investigation.

9         Q.    So the fair implication here is that Exhibit 4

10   occurred because it was instigated by Exhibit 3?  In

11   other words, you asked Captain Merrill for authority and

12   he granted it.  And he personally directed Corporal

13   Gaskins to open the investigation?

14        A.    Correct.

15        Q.    All right.

16              And the reason this echelon of authority at the

17   state police was directly involved here is because there

18   was an FBI agent at issue.

19              True?

20        A.    Yes, sir.

21        Q.    Did you make any contact with the FBI in the

22   course of your investigating?

23        A.    During the course of the whole ---?

24        Q.    Prior to the time that my client was arrested

107

1    on September 13th, 2013, did you contact the FBI?

2         A.    I --- I do not know, sir.  I cannot remember

3    who contacted the FBI.

4         Q.    All right.

5              I take it by your answer that you're satisfied

6    that there was somebody at the state police who contacted

7    the FBI about Scott Ballock prior to his arrest on

8    September 13, 2013?

9         A.    Correct.

10        Q.    What was the point of that contact?

11        A.    Twofold, to let the agency that he was hired

12   under know that there was a criminal investigation being

13   conducted, and two, professional courtesy.

14        Q.    Did you direct someone to make that contact?

15        A.    I do not remember that, sir.

16        Q.    Would corporal Gaskins have had the authority

17   to contact the FBI for the two purposes that you just

18   identified?

19        A.    Yes, sir.

20        Q.    Okay.

21              Who was in charge of the investigation,

22   Corporal Gaskins?

23        A.    He was the investigating officer, sir.

24        Q.    Okay.

108

1          All right.  I appreciate your answering me.

2   Does that mean he was in charge of it?

3          A.    Yes, sir.

4          Q.    Okay.

5          The reason I'm asking you is Captain Merrill

6   wanted to be kept advised.  He wanted to know what was

7   happing with all of this.

8          Right?

9          A.    Yes, sir.

10         Q.    And presumably, based on what you told me up to

11  this point, Captain Merrill wanted to be kept in the loop

12  because the person under investigation here was a Federal

13  Bureau of Investigation agent?

14         A.    Correct.

15         Q.    Do you know if Corporal Gaskins, in fact, kept

16  Captain Merrill advised by email?  Were you copied on his

17  emails?

18         A.    I don't remember.  I don't know that, sir.  I

19  don't remember being copied on emails.

20         Q.    Okay.

21         Captain Merrill in Exhibit number, what is it,

22  4?

23         A.    Yes, sir.

24         Q.    Did he copy you?

109

1       A.    On?

2       Q.    Did he copy you on his email to --- or his memo

3   to Corporal Gaskins?

4       A.    I don't remember that, sir.

5       Q.    Does it say?

6       A.    No, sir.

7       Q.    Well, I only have the one copy, and I'm not

8   looking at it so ---.

9       A.    No, sir.  It does not.

10      Q.    No matter how many times I've been down through

11  this stack, and I've tried to memorize everything, but I

12  guess I'm getting too old to be able to do that.

13          So you have a memory as to whether you were

14  kept advised of the investigation into Ellen Costlow's

15  complaint against Scott Ballock prior to Scott's arrest

16  on September 13, 2013.

17      A.    I didn't say that, sir.

18      Q.    I'm asking.

19      A.    Yes, sir.  But you made a statement, and I'm

20  --- that's not correct.

21      Q.    Sounded like a statement, but it was intended

22  to be a question.  Let me put it a little more clearly

23  for you.  Were you kept advised of the investigation into

24  Ellen Costlow's criminal complaints against Scott Ballock

110

1    prior to the day of his arrest?

2         A.    Yes, sir.

3         Q.    How were you kept advised?

4         A.    I was Corporal Gaskins' supervisor.  So he

5    would, you know, periodically talk to me about what's

6    going with the cases, his investigation.

7         Q.    Okay.

8               What sort of things would he tell you?

9         A.    Just an update on the investigation, what was

10   going on, what he found.

11        Q.    Okay.

12              Based on those periodic briefings, what did you

13   understand to be the course of the investigation?  How

14   did it go down?  How did --- how was it done?  Was it

15   done in compliance of the protocols laid out in Kief

16   Exhibit Number 1?

17        A.    I --- I do not know that, sir.

18        Q.    Would it have been your responsibility to see

19   to it that Corporal Gaskins complied with the

20   requirements laid out in Kief Exhibit Number 1?

21        A.    Explain that.

22        Q.    You're his supervisor?

23        A.    I am his --- was his supervisor, yes, sir.

24        Q.    He was doing an investigation under your

111

1    supervision.

2        A.    Yes.

3        Q.    And the captain was being kept in the loop on

4    how the investigation proceeded?

5        A.    Correct.

6        Q.    Did you, in fact, make a point to see to it

7    that the policies and procedures laid out in Kief Exhibit

8    Number 1 were followed in the investigation of Ruth Ellen

9    --- Ellen Ruth Costlow's criminal complaint against Scott

10   Ballock?

11       A.    It's my opinion that Corporal Gaskins was

12   following all criminal --- the procedures, yes, sir.

13       Q.    Do you know if Captain Merrill was told that

14   the decision had been made to seek an arrest warrant for

15   Scott Ballock?

16       A.    That's something ---.

17       Q.    Before he was --- let me --- let me restate the

18   question.  It's been two years.  I can almost read the

19   transcript.  Let me articulate the question.

20            Do you know if Captain Merrill was told

21   beforehand that the decision had been made to obtain an

22   arrest warrant for Scott Ballock?

23       A.    That would've been done, sir.

24       Q.    Why?

112

```
 1       A.   Because before we arrested any police officer
 2  or any official, we would've told that to our superiors.
 3       Q.   Do you know if Captain Merrill provided express
 4  authority to proceed?
 5       A.   I do not know that, sir.
 6       Q.   Do you know if Captain Merrill ever had any
 7  contact with the FBI?
 8       A.   I do not know that, sir.
 9       Q.   Now, there was an FBI agent present at the
10  family court proceeding on September 13, 2013 when my
11  client Scott Ballock was arrested.
12            Are you aware of that?
13       A.   Repeat the question, sir.
14       Q.   Sure.  The day my client was arrested ---
15       A.   Yes, sir.
16       Q.   --- in family court on the count, there was a
17  representative from the FBI present?
18       A.   Correct.  Yes, sir.
19       Q.   You know that?
20       A.   Yes, sir.
21       Q.   And in fact, one of the reasons you know that
22  is because the state police advised the FBI that we're
23  going to execute an arrest warrant for one of your agents
24  at the family court proceeding?
```

113

1    A.    Correct.

2    Q.    Were you the one who notified the FBI of that

3    fact for the representative to be there?

4    A.    I do not remember that, sir.

5    Q.    And who actually the arrest warrant?

6    A.    I was there.  There was another trooper there

7    when we went upstairs to the magistrate's office to get

8    --- to have Mr. Ballock arraigned.  I don't remember

9    whose signature is on the arrest warrant.

10    Q.    I think it was yours.

11    A.    Okay.

12          I --- I can't remember that, sir.

13    Q.    I can show it to you here if we need to.

14          So did you interview Scott Ballock before you

15    arrested him?

16    A.    No, sir.

17    Q.    Did you reach out to make contact with Scott

18    Ballock prior to making the decision to arrest him to let

19    him know that you were investigating his communications

20    with his wife?

21    A.    I didn't make that decision, sir.

22    Q.    Who did?

23    A.    That'd be the investigating officer and the

24    prosecuting attorney.

114

1      Q.    So that would be Corporal Gaskins who made that

2  decision?

3      A.    And the prosecuting attorney, sir.

4      Q.    Who was that?

5      A.    Cindy Scott.

6      Q.    Cindy Scott.  Did you have any conversations

7  with Cindy Scott in the course of the investigation?

8      A.    Not that I can remember, sir.

9      Q.    So your input was not solicited by Corporal

10  Gaskins prior to proceeding with getting permission from

11  Captain Merrill to arrest Scott Ballock?

12      A.    Captain Merrill wouldn't have given permission.

13  He would've known that we were arresting him.  The

14  permission would've came from the prosecuting attorney's

15  office.

16      Q.    Okay.

17           So the prosecutor, according to your

18  understanding, authorized the obtaining of an arrest

19  warrant for Scott Ballock?

20      A.    Correct.

21      Q.    Was there ever any discussion, either between

22  you and Cindy Scott or you and Corporal Gaskins, about

23  talking to Scott Ballock to try and get his side of this?

24      A.    Not that I remember, sir.

115

1      Q.    I know there were a lot of emails.  My client

2   was deposed about many of them.  You have looked at them.

3   I guess you have even looked at some of those emails

4   before your deposition here today.

5           True?

6      A.    Correct.

7      Q.    Okay.

8           Those emails, do you know how many of them were

9   instigated by Ellen Ruth Costlow?

10     A.    Emails to?

11     Q.    Her.

12     A.    Emails from me to her?

13     Q.    No.

14     A.    I'm sorry.

15     Q.    That's all right.

16          In my client's deposition, he was asked about a

17   great many texts and emails that he sent to Ellen Ruth

18   Costlow.

19          In fact, these were the same emails that the

20   state police obtained from Matt Stout, one of the lawyers

21   representing Ellen Ruth Costlow in the divorce.

22          Right?

23     A.    Okay.

24     Q.    Am I --- am I on the bean so far with you here?

116

1        A.   Yes, sir.

2        Q.   Okay.

3             Are you aware, by the way, that the day after

4    Matt Stout provided the disc of emails to the state

5    police that his firm withdrew as counsel for Ellen Ruth

6    Costlow?

7        A.   No, sir.

8        Q.   Do you know how many different lawyers have

9    represented Ellen Ruth Costlow?

10       A.   No, sir.  I don't.

11       Q.   As you were going through the emails that were

12   provided to you, were you counseling with Corporal

13   Gaskins on all these, what they meant, whether they

14   reached the level of criminal conduct under the West

15   Virginia Code?

16       A.   As I was going through the emails, sir?

17       Q.   Yeah.  Did you go through the emails as part of

18   the investigation, or did you just turf all that out to

19   Corporal Gaskins?

20       A.   Corporal Gaskins was the investigating officer.

21   He would speak to me about certain emails.

22       Q.   I --- I know he did.  And that's why ---

23       A.   Yes.

24       Q.   --- I'm asking you this ---

117

1    A.    I'm just trying to be clear on this.

2    Q.    Well, I appreciate that.  And I believe you.

3    You're very attentive and forthright with us.  I

4    appreciate that.

5          I know that Corporal Gaskins was the

6    investigating officer.

7    A.    Yes, sir.

8    Q.    I know that he had the lead on going through

9    these emails, and I also know that he kept you advised,

10   and the two of you talked ---

11   A.    Correct.

12   Q.    --- at different times.  And I guess I may have

13   worded my question poorly, but the point of it is, you

14   know, were you helping him to assess these emails to

15   determine whether they constituted criminal conduct under

16   the West Virginia Code?

17   A.    Yes, sir.  I'll agree to that.

18   Q.    Okay.

19         And did you harbor an opinion on that issue?

20   A.    If they broke State Code?

21   Q.    Uh-huh (yes).

22   A.    Yes, sir.

23   Q.    What was your opinion?

24   A.    Yes, they did.

118

1        Q.    Okay.

2             What, in particular, left you satisfied that

3    those emails constitute criminal conduct under the Code?

4        A.    Without going through the emails and pointing

5    them out ---.

6        Q.    There are a lot of them.

7        A.    There are --- there are a ton of them.  That's

8    one of the harassment of the --- of the amount of emails

9    and text messages, the victim being bombarded with text

10   messages and emails.

11       Q.    Were you aware, in fact, I believe there's

12   documentation to this effect in this case to the affect

13   that the family court Judge had ordered that

14   communications be restricted to matters of child custody?

15       A.    No, sir.  I did not know that.

16       Q.    Do you recall Judge Minor, the family court

17   judge, commenting at the time of Scott Ballock's arrest

18   that he couldn't help but feel this was being staged for

19   his benefit?

20       A.    I did not speak with Judge Minor, sir.

21       Q.    Wasn't my question.

22       A.    Repeat your question.

23       Q.    Do you recall hearing Judge Minor, the family

24   court Judge on the Ballock and Costlow divorce,

119

1      commenting at the time of the arrest that he could not

2      help but feel that this was being staged for his benefit?

3          A.    I remember Judge Minor having some discourse

4      with how it was done until it was explained to him.

5          Q.    Okay.

6                What do you remember about that?

7          A.    That --- I believe it was one of the

8      prosecutors explained to him what was going on

9      afterwards.

10         Q.    All right.

11               During the course of that colloquy between

12     Judge Minor and Cindy Scott, do you recall hearing Judge

13     Minor comment to the effect that he couldn't help but

14     believe that this was all being staged for his benefit?

15         A.    I remember him having some discourse with it,

16     sir.  I don't --- I don't remember any specific verbiage

17     on that.

18         Q.    Do you understand that the topic that Judge

19     Minor was addressing in court that day was custody of the

20     children?

21         A.    No, I did not know that, sir.

22         Q.    Let me ask you this.  Did you have any

23     discussion with Cindy Scott as to why it was even

24     necessary to go through the formality of arresting Scott

120

1    Ballock?  Why --- why you couldn't just let him know,

2    look, you know, we got these warrants for you.  You want

3    to come and report voluntarily?  Why didn't you do that?

4         A.    Because of some of the tones of the emails,

5    some of the threatening manners of the emails.  We did

6    not feel like that was going to be a --- an outcome to

7    this that we wanted to see.

8         Q.    I don't --- I don't follow you.

9         A.    Some of the --- the tones of the emails were

10   quite worrisome to us.  Letting him know that there was

11   warrants on an investigation and he was going to be

12   arrested, we didn't know if he was going to have any

13   conversations with his ex-wife about it, or whatever.

14          And we knew part of his bail agreement was to

15   have no conversations with Ms. Costlow.  We weren't going

16   to give him an option of --- of having any conversations

17   with Ms. Costlow about the arrest.

18        Q.    Okay.

19          Was the FBI told that the state police was

20   worried that Scott might act out in violence?

21        A.    I don't know what the FBI's thought was on

22   that.

23        Q.    Not my question.  Was the FBI told by West

24   Virginia State Police that they felt it was going to be

121

1  necessary to catch him on the hop, and arrest Scott

2  Ballock in front of the magistrate --- or the family

3  court judge in order to deny him the opportunity of

4  acting out violently?

5      A.   We had the discussion with the FBI about some

6  of the emails being worrisome, about tone and in a

7  threatening manner.

8      Q.   Did West Virginia State Police ask the

9  permission of the FBI to arrest one of their agents?

10      A.   Ask permission, sir?

11      Q.   Yeah, as opposed to working with the FBI to

12  arrange for something less traumatic than an arrest with

13  handcuffs in front of the family court Judge?

14      A.   I don't believe there was handcuffs, sir.

15      Q.   Okay.

16      A.   They didn't do that.

17      Q.   But back to the point of my question, was there

18  any effort made by the West Virginia State Police to work

19  with the FBI to arrange for Scott to, you know, surrender

20  to the magistrate for arraignment rather than have to

21  take him into custody and arrest him?

22      A.   No, sir.  That wasn't offered.

23      Q.   Why not?

24      A.   That wasn't offered by the FBI.

122

1    Q.    Why wasn't it suggested by the state police?

2    A.    I don't know that, sir.  I --- I have no clue

3    about that, sir.

4    Q.    Isn't it true, in fact, the reason that was

5    never offered or suggested or discussed with the FBI was

6    in am effort to try and prejudice Scott Ballock in the

7    eyes of his employer, the FBI, and to prejudice him in

8    the eyes of the family court Judge, Judge Minor?

9    A.    No, sir, not at all.  That was not the intent.

10   Q.    Would you agree that that was certainly the

11   effect?

12   A.    No, sir.

13   Q.    You don't --- you don't think that there was

14   any prejudice to Scott Ballock in the eyes of his

15   employer, the FBI, to ---?

16   A.    If there was ---.

17   Q.    Rather than the state police contact them, and

18   say that they were worried that he might be violent, he

19   was going to have to be taken into custody?

20   A.    If we had any prejudice against Mr. Ballock

21   about his employer, we would have went to his place of

22   work and placed him under handcuffs and taken him out of

23   his workplace.

24   Q.    What did you understand the purpose of the

123

1    presence of the FBI representative to be in court the

2    date that you arrested Scott Ballock?

3         A.    They wanted to be present, sir.  I don't know

4    what their purpose was.

5         Q.    They didn't explain?

6         A.    No, sir.  Not that I can remember.

7         Q.    Okay.

8               Did Scott Ballock put up any resistance to

9    being arrested?

10        A.    No, sir.

11        Q.    How did he handle the whole thing?

12        A.    I don't remember him, but I just --- he was

13   quite calm about it, I believe.  I don't think he said a

14   word, if I remember correctly.

15        Q.    So in fact, the concern about him possibly

16   being, you know, violent or even loud and obnoxious about

17   it, those worries and fears were not born out, were they?

18        A.    Of being obnoxious about it, sir?

19        Q.    Yeah.  I mean, he didn't raise his voice ---

20        A.    No, sir.  He did not raise his voice at all.

21        Q.    --- or say how dare you or ---?

22        A.    No, sir.

23        Q.    Nothing to that effect?

24        A.    No, sir.

124

1      Q.    Is it true that, following his arrest, Scott

2  Ballock, more than once, offered to the state police to

3  waive his rights against self-incrimination and to be

4  interviewed by the state police?

5      A.    That would've went to Corporal Gaskins, sir.  I

6  don't know that.

7      Q.    He conferred with you about the investigation?

8      A.    He did.

9      Q.    Okay.

10          Did he tell you that Scott Ballock had offered

11  more than once ---?

12      A.    Not that I can remember, sir.

13      Q.    Is right now the first time you're aware that

14  Scott Ballock had offered to do that?

15      A.    I can't remember when I became aware of that,

16  sir.  I do not remember that.

17      Q.    I take it then just now is not the first time

18  you were made aware of that?

19      A.    No.  I was here at the deposition with Mr.

20  Ballock.

21      Q.    Okay.

22      A.    And he --- I'm sorry.  I'm sorry.  I did know

23  that, through the websites.

24      Q.    The websites?  You're referring to Scott's

125

1   father's ---

2        A.   Yes, sir.

3        Q.   --- website?

4             Okay.

5             Did the West Virginia State Police refuse to

6   interview Scott Ballock?

7        A.   Not that I know of, sir.

8        Q.   Well, he offered to be interviewed, and he was

9   never interviewed.

10       A.   Okay.

11       Q.   So why was he never interviewed?

12       A.   I don't know that, sir.

13       Q.   If the state police refused to interview Scott

14  Ballock, would that have been a violation of the policies

15  and procedures set out in Kief Exhibit Number 1?

16       A.   I do not believe so, sir.  No.

17       Q.   Why not?

18       A.   That would be a conversation topic between the

19  investigating officer and the prosecuting attorney.

20       Q.   What I'm hearing you saying is that it would

21  have been up to Corporal Gaskins and Cindy Scott to

22  decide whether to accept Scott's offer to sit for an

23  interview about the communications he had with his

24  estranged wife?

126

1     A.   I would proffer if Corporal Gaskins or the

2   prosecuting attorney, Cindy Scott, didn't feel like they

3   had enough evidence, they would have interviewed Mr.

4   Ballock.

5     Q.   According to the policies and ---.

6          ATTORNEY JEFFRIES:  Can we take a break?

7   He needs to make a call.

8          ATTORNEY CROOKS:  Pardon?

9          ATTORNEY JEFFRIES:  I believe Lieutenant

10  Kief needs to make a call.

11         ATTORNEY CROOKS:  Yes, sir.

12         Okay.

13         I didn't know that.  Sorry.

14         THE WITNESS:  That's all right.

15              ---

16  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

17              ---

18         ATTORNEY CROOKS:  Back on the record.

19  BY ATTORNEY CROOKS:

20    Q.   When the state police investigate criminal

21  complaints, if the opportunity to question the suspect,

22  the accused, Defendant, is available, it's very unusual

23  for the state police to pass up that opportunity, isn't

24  it?

127

1    A.   I don't know if I would call lit unusual.  It's

2   certainly up to the investigating officer.  It depends on

3   the case.

4    Q.   All right.

5         And if --- can you recall your personal

6   experience in the cases that you've worked.  You've been

7   at this a long time.  Can you recall having a Defendant

8   say, look, you know, I'll tell you what happened?  And

9   you just passed that opportunity, said it's okay, don't

10   need it.

11    A.   Off the top of my head, no, sir.  I cannot

12   remember.  No.  No, I cannot say that I've had that

13   happen to me.

14    Q.   Do you know whether, in fact, Corporal Gaskins

15   and Cindy Scott collaborated and came to a decision on

16   whether to question Scott Ballock?

17    A.   No, sir.  I do not.

18    Q.   You'd have to ask Corporal Gaskins that?

19    A.   Yes, sir.

20    Q.   Now, he's sergeant.

21         Right?

22    A.   Yes, he is.

23    Q.   You're the lieutenant, but you're in Elkins, so

24   Gaskins no longer reports to you?

128

1       A.    Correct.  Yes, sir.

2       Q.    Maybe he does?

3       A.    On certain other aspects of state police, yes,

4    sir.

5       Q.    Okay.

6             Maybe something to do with your what --- what

7    --- doesn't matter what my speculation might be.  On what

8    aspect of police business does ---

9       A.    I'm ---.

10      Q.    --- Sergeant Gaskins report to you?

11      A.    I'm the crime scene team coordinator for the

12   state police statewide.  Sergeant Gaskins is the crime

13   scene team leader of Troop 1, so he does report to me in

14   that capacity.

15      Q.    So if you're investigating a murder scene?

16      A.    Sergeant Gaskins is the team leader in this

17   area.

18      Q.    So he'd get --- he'd be the one to jump out of

19   bed and go --- go to a crime scene ---

20      A.    Yes.

21      Q.    --- and start coordinating?

22      A.    Yes, sir.

23      Q.    Okay.

24            I think I understand.

129

1        So in the course of the investigation of Ellen

2    Costlow's complaint against Scott Ballock, do you know if

3    the history between Ellen and Scott was given fair

4    treatment by Corporal Gaskins and Cindy Scott?  Do you

5    have any opinion on that?

6        A.    I'm not so sure I understand the question.

7        Q.    You were kept advised by then Corporal Gaskins

8    as he moved through the process of investigating Ellen

9    Costlow's criminal complaint against Scott Ballock, her

10   estranged husband?

11       A.    Yes, sir.

12       Q.    Okay.

13             And that's what you told me?

14       A.    Yes, sir.

15       Q.    Corporal Gaskins wasn't just conferring with

16   you.  He was collaborating with the assistant prosecutor,

17   Cindy Scott.  That's what you told me also?

18       A.    Yes, sir.

19       Q.    Likewise, at the direction of Captain Merrill,

20   you at least understood that then Corporal Gaskins was

21   supposed to be keeping Captain Merrill advised of the

22   progress of the investigation?

23       A.    Correct.

24       Q.    So based on the ongoing process of briefing

130

```
 1    you, can you tell me, did Scott Ballock get fair

 2    treatment?  Were his interests given adequate and fair

 3    treatment, consideration, particularly in view of the

 4    fact that policy of the West Virginia State Police is to

 5    take special care when they're investigating another

 6    member of the law enforcement community.

 7                    ATTORNEY JEFFRIES:  Objection,

 8    mischaracterizes the evidence.

 9    BY ATTORNEY CROOKS:

10        Q.    I mean, you told us that there's a policy

11    specifically addressing the investigation of other

12    members of the law enforcement community.

13        A.    Yes, sir.

14        Q.    That's why you had to get in touch with Captain

15    Merrill?

16        A.    Yes, sir.

17        Q.    Okay.

18              So in light of all that, was Scott Ballock

19    given fair consideration, and --- and fair treatment by

20    the West Virginia State Police in the way they

21    investigated and went about handling this complaint that

22    a woman in a divorce proceeding was making against her

23    estranged husband?

24        A.    Yes, sir.
```

131

1    Q.   You don't feel that it was unfair to Scott to

2    turn him down when he offered to come in, and --- and

3    tell his side of the --- of the case?

4    A.   Again, sir, I did not know that.

5    Q.   Are you aware that --- well, how long --- let

6    me ask you the question.  How long after Scott was

7    arrested did it take before the charges against Scott

8    were resolved?

9    A.   That was a couple years, I believe, sir.

10   Q.   Actually, it was pretty close to three years.

11   A.   I was going to say that, but I didn't --- I

12   knew it was over a couple.

13   Q.   All right.

14   A.   Yes, sir.

15   Q.   Why'd it take that long?

16   A.   The --- the magistrate that was assigned the

17   case, Magistrate Mullins, had some medical issues and he

18   was not doing his magisterial duties.  And instead of

19   transferring that to another magistrate, it was kept in

20   front of Magistrate Mullins.

21   Q.   Are you aware that ultimately the prosecuting

22   attorney dropped the charges against Scott Ballock?

23   A.   Yes, sir.

24   Q.   Did you agree with that?

132

1      A.   No, sir.

2      Q.   Why not?

3      A.   We felt like we had enough to --- to go forward

4  with the trial.

5      Q.   Is that fairly typical?  I mean, it's not the

6  first time the prosecutors have disappointed the

7  investigating officers, is it?

8      A.   No, sir.

9      Q.   I mean, that sort of thing happens ---

10     A.   It does.

11     Q.   --- in the courthouse quite frequently.

12  Prosecutors exercise their discretion, and cut deals, and

13  drop charges, and the investigating officers are

14  disappointed.

15          True?

16     A.   Correct.

17     Q.   Now, in this case, during the course of the

18  investigation, Scott's father, Tom, was posting a lot of

19  things on the Internet, including things that were

20  unflattering about the West Virginia State Police.

21          True?

22     A.   True.

23     Q.   In fact, this is reflected by --- I don't know.

24  I don't have a page count, but a lot of material was

133

1   included in the --- the stuff I received from your lawyer

2   in March of last year in response to our discovery

3   request.

4           So it looks to me like the state police

5   included consideration of Tom Ballock's website in its

6   investigation.

7       A.   No, sir.

8       Q.   Is that true?

9       A.   No, sir.

10      Q.   All right.

11          Well, during the pendency of the criminal

12   charges against Scott Ballock after he was arrested, you

13   knew that Tom Ballock was posting things on the Internet,

14   kind of blogging or chronicling the case against his son.

15   You were aware of that.

16          Right?

17      A.   Yes, sir.

18      Q.   All right.

19          You also knew that Ellen Ruth Costlow had filed

20   a lawsuit against Tom Ballock in connection with that

21   activity?

22      A.   I don't know if I knew that, sir.  I knew at

23   one point, but I couldn't tell you when I knew that she

24   had filed a lawsuit.  I --- I don't know that.

1    Q.    Okay.

2          So did you ever try to provide any assistance

3    to Ellen Ruth Costlow in the course of her litigation

4    against Tom Ballock?

5    A.    No, sir.

6    Q.    Okay.

7          Why would you have all the emails that Tom

8    Ballock had sent to Ellen's father, Judd, why would those

9    be included in the files that were produced to us in

10   Discovery in this case?

11   A.    She was asking why --- why Scott could be

12   arrested for harassment and not his father, Tom.  Hey,

13   look at this.  This is what he's doing now.  This is what

14   he's posting now.

15   Q.    What'd you tell her?

16   A.    That that decision's not made --- that's not

17   made by me.  There's a fine line between what he puts on

18   the Internet and how he's harassing her.  Just because

19   it's on the Internet doesn't mean it's harassing.

20   Q.    The implication of your answer suggests to me

21   that you felt that there could have been criminal charges

22   made against Tom Ballock?

23   A.    I don't know that.  Again, with the --- with --

24   - I don't know that.  I don't know that.  Could there

135

1    have been?  I --- I'm sure there could've been, but

2    that's a gray area as far as I'm concerned with the

3    Internet and First Amendment rights and everything.  I

4    --- I don't know that.

5        Q.   A lot of the emails that were produced to us by

6    your Counsel were emails from Tom Ballock addressed to

7    Ellen Costlow's father, Judd.

8        A.   I remember a few.

9        Q.   Okay.

10       A.   If ---.

11       Q.   I said a lot, but I don't know.  They were

12   lengthy.  Maybe --- maybe there weren't so many as just

13   that each of them were so long.

14            But did you feel that those emails constituted

15   harassment under the West Virginia Criminal Code?

16       A.   I don't believe I did, sir, no.

17       Q.   Okay.

18            So it sounds like Ellen Costlow came to you.  I

19   believe this is what you told me.  You tell me if I'm

20   getting this right.  She came to you and wanted to know,

21   hey, why can't I bring a criminal charge against Tom

22   Ballock because of what he's putting on the Internet, and

23   what he's writing to my father?

24       A.   Yes, sir.  Correct.

136

1      Q.    Okay.

2            So did you just tell her, look, you need ---

3      you need to go talk to Corporal Gaskins and Cindy Scott?

4      A.    Well, it depends on where she lived at the time

5      who would have venue over that.

6      Q.    Okay.

7            How do you mean?  What are you thinking of?

8      A.    If she lived in Marion County, then she would

9      have to go report that to Marion County police agency.

10     Q.    She did move Marion County at some point.

11     A.    At one point in time, yes, sir.

12     Q.    And in fact, she moved in with Kenny Ice,

13     Junior?

14     A.    Yeah.  I --- I have recollection of that, yes,

15     sir.

16     Q.    Okay.

17           Kenny Ice, Junior, do you know anything about

18     him?

19     A.    No, sir.  I do not.

20     Q.    Do you know if you ever investigated him, or if

21     anybody in --- in your barracks have ever investigated

22     his activities?

23     A.    I have never investigated him.  I do not know

24     if anybody in the barracks have ever investigated him.

137

1       Q.    All right

2             Give me one second here.

3                   ATTORNEY CROOKS:   What are we up to now?

4                   COURT REPORTER:   Five.

5                   ATTORNEY CROOKS:   You good?

6    BY ATTORNEY CROOKS:

7       Q.    Have you had a fair opportunity to review that

8    exhibit, Lieutenant?

9       A.    Yes, sir.

10      Q.    What is it?

11      A.    It is our WVSP number 193.  State police

12   complaint form.  Report.

13                        ---

14            (Whereupon, Deposition Exhibit 5,

15            Complaint Report, was marked for

16            identification.)

17                        ---

18   BY ATTORNEY CROOKS:

19      Q.    This is required by policy and procedures.

20            True?

21            Use of this form?

22      A.    Yes, sir.

23      Q.    Specifically, I'm referring to the criminal

24   investigative polices and procedures manual that's been

138

1    produced to us in discovery and marked as Kief Exhibit

2    Number 1 in todays' deposition.

3        A.    Okay.

4        Q.    Am I right?

5        A.    Yes, sir.

6        Q.    All right.

7              Take a look at page 853 of Deposition Exhibit

8    Number 1 for a second, would you?

9        A.    I'm sorry.  Got one.

10       Q.    I'm looking at 3.02.  Proper conduct of a

11   criminal investigation includes, but is not necessarily

12   limited to.

13              ATTORNEY JEFFRIES:  Charles, I believe

14   you're on page 851.

15              ATTORNEY CROOKS:  Am I?

16              All right.

17   BY ATTORNEY CROOKS:

18       Q.    I apologize.  Didn't mean to mislead you.

19   Thank you for the ---.

20       A.    All right sir.

21       Q.    Thank you for bracing me on that.  Let me take

22   a fresh line of questioning.  We've looking at page 851

23   of Kief Exhibit Number 1.  I'm looking specifically at

24   3.02.  Proper conduct of a criminal investigation

139

1   includes, but is not necessarily limited to --- are you

2   with me so far?

3       A.   Yes, sir.  Uh-huh (yes).

4       Q.   I'm going to skip past some stuff that doesn't

5   pertain, and focus on parts that I believe do for

6   purposes of my question.

7       A.   Uh-huh (yes).

8       Q.   Sub-part (c) says locating and interviewing all

9   persons who have or who are thought to have any

10  information concerning the crime under investigation?

11      A.   Yes, sir.

12      Q.   Well, all persons who have information would

13  certainly include the person who's accused of sending the

14  harassing emails and texts ---

15      A.   Yes, sir.

16      Q.   --- wouldn't it?

17      A.   Uh-huh (yes).

18      Q.   So that means to say this policy and procedure

19  called for interviewing Scott Ballock.

20      A.   Okay.

21      Q.   True?

22      A.   As it --- as it is written, yes, sir.

23      Q.   So if Scott Ballock was offering to come in and

24  --- and sit for an interview by the state police and/or

140

1    the prosecutor's office, and they turned him down, then

2    they would have been operating in contradiction to this

3    directive in state police policy and procedure?

4         A.   Yes, sir.

5         Q.   Sub-paragraph (f) says that proper conduct of a

6    criminal investigation also includes, but is not

7    necessarily limited to, locating and questioning those

8    persons suspected of having committed the crime.  I mean,

9    that's --- that's saying explicitly that Scott Ballock

10   should've been interviewed if the opportunity presented

11   itself, isn't it?

12        A.   Yes, sir.

13        Q.   And so if the state police and the person,

14   Corporal Gaskins, whether acting of his own accord or

15   under the direction of Cindy Scott, turned Scott down

16   when he volunteered to come in and give a statement, that

17   wouldn't be fair treatment to Scott, would it?

18        A.   I don't know if I would characterize it as

19   that, sir.  These are guidelines that we go by, not --- I

20   mean, it's policy and procedure.  But the --- we have a

21   lot of leeway about how we conduct a criminal

22   investigation.  It's certainly not something that they

23   would be written up or anything like that.

24        Q.   A lot of the communications that were at issue

141

1    in the criminal charge for which Scott was arrested,

2    which was later withdrawn by the prosecuting attorney's

3    office, had to do with interactions that Ellen and Kenny

4    Ice, Junior were having.  You've looked at those emails

5    enough to --- to know that I'm right about that?

6              Correct?

7              Kenny Ice comes up a lot.

8        A.   I'm thinking that's a --- yes.  Kenny Ice comes

9    up a lot, yes, sir.

10       Q.   And so he would've been somebody who had

11   information concerning the crime under investigation.

12             True?

13       A.   He would have knowledge of it, yes, sir.

14       Q.   Do you know if Kenny Ice was contacted and

15   interviewed by Corporal Gaskins as part of the ---?

16       A.   I do not know that, sir.  I don't believe he

17   was.

18       Q.   In fact, a lot of the claims hat Ellen Costlow

19   made against Scott and many of the subjects addressed by

20   Scott Ballock in his texts and emails to Ellen could've

21   been either corroborated or refuted by Kenny Ice if ---

22   if all the mentions of Kenny Ice are to be taken as

23   credible in those emails.

24             True?

142

1          He was in a position --- Kenny Ice, Junior was

2     in a position to either corroborate or refute a lot of

3     what Ellen Ruth Costlow was complaining of against my

4     client, Scott Ballock, in her criminal case that was

5     being investigated by the state police?

6          A.   It depends on what time during that

7     investigation that was.

8          Q.   What difference would the timing have?  Kenny

9     Ice, Junior was identified repeatedly in those texts and

10    emails.

11         A.   Right.  He was also identified as working with

12    Scott during some of this, and ---.

13         Q.   He did go to Scott Ballock.  You --- you were

14    aware of that, too, didn't you?

15         A.   I remember something about that, yes.

16         Q.   What do you think of that?

17         A.   I do not know about that, sir.  That --- that

18    is --- I have no clue.

19         Q.   What would've, you know, what --- I mean, you

20    were part of the investigative team.  You were

21    collaborating with Corporal Gaskins.  Did the two of you

22    have any conversation as to what in the world would Kenny

23    Ice, Junior want to go talking, probably, with Scott

24    Ballock and even go so far as to provide him his cell

143

1    phone?

2         A.    Yeah.

3         Q.    Why would he do that?

4         A.    I don't know that, sir.  Don't know that.

5         Q.    Don't you think it would've been appropriate to

6    get in touch with Kenny Ice, Junior and ask him?

7         A.    I don't think so, sir.  No, sir.

8         Q.    If Kenny Ice Junior was telling Scott Ballock,

9    look, you know, Ellen Costlow is lying about you.  And

10   she's trying to hurt you with this criminal complaint,

11   and the cops are helping her trying to hurt you.  They're

12   trying to get you fired from the FBI.  Don't you think

13   that would've been information that the state police

14   should've at least taken into account and reported to the

15   prosecutor?

16        A.    I don't know where Corporal Gaskins --- it's my

17   thought was on interviewing Kenny Ice.  I would consider

18   him as an unreliable witness.

19        Q.    You would?

20        A.    Yes, sir.

21        Q.    Why?

22        A.    Because he had a romantic relationship with Ms.

23   Costlow.

24        Q.    You regarded her as credible, didn't you?

144

1      A.    What's that got to do with anything?

2      Q.    Why would his romantic relationship with her

3   disqualify him as a credible witness?

4      A.    Because he was also doing something with Scott

5   on the other hand.

6      Q.    Yeah, but you had no understanding as to what

7   his motive was.

8      A.    I didn't understand what his motive was.  I

9   wasn't --- I wasn't conducting the investigation.

10      Q.    Depending on what his motive was, he might've

11   been a credible witness.

12      A.    Yeah, I don't --- I don't know that, sir.

13   That's ---.

14      Q.    You wouldn't know unless you asked him, would

15   you?

16      A.    Again, I don't know if I would've interviewed

17   him, sir.  I don't know.

18      Q.    In fact, that might've been one of the reasons

19   that the prosecutor gave up on their case against my

20   client and ---

21      A.    I don't believe so.

22      Q.    --- withdrew their motion, isn't it?

23      A.    No, sir.

24                 ATTORNEY JEFFRIES:  Objection.  Calls for

1    speculation.

2    BY ATTORNEY CROOKS:

3        Q.    Are you aware that the criminal charges that

4    --- for which you obtained arrest warrants and executed

5    were not only withdrawn by the prosecutor, but they were

6    expunged by the Circuit Court?

7        A.    I did not obtain criminal charges against

8    Scott.

9        Q.    Were you --- you signed off on the executed

10   warrants, didn't you?

11       A.    Correct.

12       Q.    Maybe I misspoke there.

13       A.    Yes.

14       Q.    You --- you didn't personally obtain those

15   warrants?

16       A.    No, sir.

17       Q.    That would've been Corporal Gaskins?

18       A.    Right.

19       Q.    You executed the arrest warrants?

20       A.    Correct.

21       Q.    I'm sorry.  I apologize.

22       A.    That's all right.

23       Q.    I didn't mean that.  I don't want ---

24       A.    There's two different things.

146

1      Q.    ---- I don't want to --- yeah.  I don't want to

2  misrepresent what ---.

3      A.    Yeah.  There's two different things there.

4      Q.    Yeah.  Your --- just another case of your

5  careful attention to my questions.  Thank you.

6            You interviewed Ellen Costlow at the detachment

7  in Morgantown the night before you executed the warrants

8  and arrested Scott?

9      A.    I interviewed her, sir?

10     Q.    Yeah.

11     A.    Okay.

12           I don't remember that.

13     Q.    You don't remember doing that?

14     A.    No, sir.

15     Q.    You don't remember having a discussion with her

16 saying look, you know, we got these warrants.  I'm going

17 to execute them tomorrow.  What time is your hearing?

18 What time do I need to be there?  How did you know?

19     A.    I don't believe Ms. Costlow knew we were going

20 to serve those warrants on him that day.  It's my

21 recollection we did not tell her.

22     Q.    You did not tell her?

23     A.    Correct.

24     Q.    Okay.

147

```
 1        A.    We knew that there was a hearing the next day.
 2        Q.    How did you know that?
 3        A.    I can't remember how we found out the
 4   conversation of how we knew that there was going to be a
 5   court hearing the next day.
 6        Q.    Did you assign Corporal Gaskins, or was that
 7   Captain Merrill?
 8        A.    We discussed having Corporal Gaskins do the
 9   investigation.
10        Q.    Did you ever interview Ellen Costlow without
11   Corporal Gaskins being present?
12        A.    The first time I met Ms. Costlow, the night
13   --- the first night of her asking about the affair.  I
14   don't remember having another interview with her.  I
15   can't --- I can't recall, sir.  I do not know.
16        Q.    Did you ever make any recordings of interviews
17   that you conducted with Ellen Costlow?
18        A.    I don't remember any, sir, no.
19        Q.    Have you ever done that sort of thing in the
20   course of criminal investigations?
21        A.    Sure.
22        Q.    How about criminal investigations where another
23   member of law enforcement is at issue?  Don't you think
24   making a recording of interviews with the complaining
```

148

1    witness would help in keeping Captain Merrill advised?

2        A.   I don't know if I've interviewed a complaining

3    victim, sir.  I don't know if I've ever done that before.

4    I've done suspects, but not victims.

5        Q.   If Scott Ballock had been interviewed as he

6    offered, and he waived his Fifth Amendment privilege,

7    answered questions, he could have potentially put the

8    rope around his own neck and admitted to criminal

9    activity.

10            True?

11       A.   He could have, yes, sir.

12       Q.   Wouldn't that have been a good reason to

13   interview him?  Doesn't that argue that he would be a

14   credible witness worthy of interviewing in the course of

15   the investigation?

16               ATTORNEY JEFFRIES:  Objection.  Scott is

17   not with us.

18   BY ATTORNEY CROOKS:

19       Q.   If the man is willing to risk his career, and

20   --- and go on to jail to answer questions, doesn't that

21   argue in favor of bringing him and interviewing him?

22       A.   Corporal Gaskins did not feel like he needed to

23   interview Mr. Ballock for a reason.  I do not know that

24   reason.

149

1   Q.   Did you ever indicate that you had tried to

2   tape record an interview with Ellen Costlow, but that the

3   recording machine malfunctioned?

4   A.   I remember that on a website someplace.  I

5   don't recall what that circumstance was.  But I remember

6   reading that on one of his websites.  But I don't recall

7   the circumstances.

8   Q.   You received quite a few emails directly from

9   Ellen Costlow during the course of this investigation.

10  True?

11  A.   True.

12  Q.   And that was even after Corporal Gaskins had

13  been appointed as the investigating officer?

14  A.   True.

15  Q.   Did you ever tell Ellen Costlow, look, I'm not

16  the chief investigating officer on this?  You should be

17  communicating with Corporal Gaskins?

18  A.   No, sir.

19  Q.   Why not?

20  A.   Couple different things.

21  Q.   Why would you have back channel communication

22  with the complainant when somebody else is investigating?

23  A.   They're really --- Ms. Costlow was --- her

24  emails are, basically, somebody that wants somebody to

150

1    listen to her and asking questions.  Corporal Gaskins was

2    doing the investigation.  I kind of fielded emails from

3    her, and I believe she also sent Corporal Gaskins emails

4    also.  But it was both of us that she sent emails to.

5        Q.    Do you recall telling Ellen Costlow in one of

6    your emails that the assistant prosecutor just didn't

7    understand Tom Ballock's mental illness?

8        A.    Yes, sir.

9        Q.    What was that about?

10       A.    After reading and getting exploited on the

11   Internet, personally, by Tom, it's just not normal.

12   There's --- there's something wrong.  There's --- you

13   know, I'm no expert on mental illness or anything like

14   that, but I know normal.  That's not normal.

15       Q.    So you're saying that you personally were

16   mistreated by Tom Ballock on his website?

17       A.    Correct.

18       Q.    Did you ever have any communication with him,

19   and tell him, look, you need to stop posting this

20   information?

21       A.    I believe the state police did.

22       Q.    Who in the state police?

23       A.    I don't know that.  He was sent some letter

24   regarding that.

151

1      Q.   Do --- strike that.

2           Are you aware that Tom Ballock gave an

3    interview to the FBI about his website?

4      A.   No, I do not.

5      Q.   Was there ever any criminal charge made against

6    Tom Ballock in connection with his website and the things

7    he put on there?

8      A.   No, sir

9      Q.   Are you aware that Ellen Costlow dropped her

10   civil lawsuit against Tom Ballock ---

11     A.   No, sir.

12     Q.   --- in connection with the website that he

13   maintained?

14     A.   No, sir.

15     Q.   Did you have any conversations with anybody at

16   the prosecutor's office about Tom Ballock and the things

17   he was putting on the Internet on his website?  You said

18   that they didn't understand his mental illness, so I'm

19   trying to find out what the basis for your opinion is.

20     A.    I can't remember specifically who I spoke with,

21   but we were going through the whole harassment, not

22   harassment, intimidation, retaliation conversation.

23     Q.   You're aware that the local forensics

24   psychiatrist, Dr. Christi Cooper-Lehki, performed an

152

1    investigation and reported to the family court judge

2    concerning her opinion on child custody?

3        A.   I know of a report authored by that person.

4    What that report is regarding to, I have no clue.

5        Q.   Okay.

6             And how do you know about that report?

7        A.   It's come up in several conversations through,

8    I think, Mr. Ballock's deposition.  He --- he referred to

9    that.  I knew there was a report.  I knew it was in civil

10   court.  That's all I knew of it though.

11       Q.   You were aware that Scott Ballock tried to get

12   the family court to unseal that report so that he could

13   use it in his defense in the criminal case?

14       A.   I believe she told me that, yes.

15       Q.   Who told you that?

16       A.   I believe Ms. Costlow told me that.

17       Q.   Okay.

18            Are you aware that the assistant prosecutor,

19   Cindy Scott, went to the family court hearing and argued

20   against allowing Scott to use that report?

21       A.   I believe so.

22            ATTORNEY JEFFRIES:  Objection,

23   mischaracterizes the evidence.

24   BY ATTORNEY CROOKS:

153

1      A.    I believe I knew that, Yes, sir.  I --- I

2   remember something about that.

3      Q.    Okay.

4            How'd you find out about that?

5      A.    I can't remember that, sir.  I don't ---.

6      Q.    Ellen Costlow?

7      A.    It could've been her, or it could be through

8   Cindy Scott, or --- or Corporal Gaskins at the time.

9      Q.    What was --- what was your reaction when you

10  learned that Scott was denied the permission to use Dr.

11  Christi Cooper-Lehki's report in his own defense ---

12     A.    I would ---.

13     Q.    --- against the charges that Ellen Costlow

14  initiated against him?

15     A.    I --- I believe I was happy for her because she

16  --- she acted happy that she had finally won something,

17  that she had finally thought that she garnered some ---

18  she won a court case or opinion or whatever.  She --- she

19  --- actually, was one of the few times I saw, you know,

20  her be not excited about something, but not happy about

21  something, but she --- a positive content to her.

22     Q.    Do you remember using language to the effect

23  that Scott must have had his tail between his legs as he

24  left court at the end of that hearing?

154

1      A.    Again, I probably did say that.  Or I did say

2    that.  But that was just in regard for --- to embellish

3    her to --- she finally won one, and I was just, you know,

4    happy about just garnering her ---.

5      Q.    Do you think that that was consistent with your

6    obligation under policy and procedure to maintain

7    impartiality with respect to a matter that wasn't even

8    part of your official duties?

9      A.    Impartiality concerning ---?

10     Q.    Yeah.  I mean, you weren't investigating

11   anything in connection with the family court case?

12     A.    Correct.

13     Q.    You were participating to some degree in the

14   criminal case against Scott.  And Scott was trying to get

15   evidence to defend himself against those charges, and you

16   were pretty happy that he failed in that effort, weren't

17   you?

18     A.    My disdain for Scott and his dad had come with

19   harassments and emails.  Not --- harassments and

20   websites.

21     Q.    Okay.

22           So you do harbor ill feeling toward my client?

23     A.    For --- yes, sir.  I do.

24     Q.    Likewise, you harbor a feeling toward Scott's

155

1   father?

2       A.    Correct.

3       Q.    And that ill feeling is borne of things that

4   Scott's father was posting on the website about the case

5   against his son, including references to you personally?

6       A.    Correct.

7       Q.    Just want to make sure I understand.

8             Now, you were interviewed by the FBI.

9       A.    There was a meeting with the FBI, sir.

10      Q.    Okay.

11            You had a meeting?

12      A.    Yes, sir.

13      Q.    All right.

14            Well, I ---

15      A.    An interview.

16      Q.    --- appreciate your sense of caution in

17  answering my question, but the fact is, you had a

18  communication, face-to-face communication with somebody

19  form the FBI?

20      A.    Correct.

21      Q.    Okay.

22            When was that?

23      A.    Which one?

24      Q.    Well, okay.  Maybe that's a more appropriate

156

1    question.  How many different times?

2        A.    I remember two specifically.

3        Q.    Okay.

4        A.    Once when the FBI came to review the emails and

5    text messages.

6        Q.    Okay.

7              Those would be the emails and text messages

8    that the state police obtained from Matt Stout, one of

9    the lawyers represented Ellen Ruth Costlow?

10       A.    Correct.

11       Q.    Okay.

12             Did you have any other emails other than the

13   ones you obtained from Mr. Stout?

14       A.    I don't know that, sir.  I can't remember if I

15   did or not.  If we did ---.

16       Q.    Well, Ellen Costlow shared a lot of stuff with

17   you, right?

18       A.    I can't --- I remember the disc --- yes.  Yes,

19   sir.  Yes, sir.  Yes.  Yes, sir.

20       Q.    So, you know, your collection of evidence came

21   from the magnetic disc that Mr. Stout provided as well as

22   a series of emails forwarded to you by Ellen Costlow?

23       A.    I don't know if they forwarded to us or if she

24   had them printed out.  I can't remember that.

157

1      Q.    Well, ---

2      A.    I can't ---.

3      Q.    --- I don't know that the difference ---

4      A.    True.

5      Q.    --- comes to that much.  But those are the two

6  sources that you were operating with?

7      A.    Yes, sir.

8      Q.    So when the FBI came, that's what you shared

9  with them?

10     A.    They looked at the --- the content of the ---

11  of the text and emails.

12     Q.    Did they talk to you about the investigation?

13     A.    No, not really, sir.

14     Q.    Did they ask you any questions?

15     A.    Not that I can recall.  I --- I remember him

16  coming and looking at the discs, and having the emails.

17  But I --- as far as talking to us about what happened or

18  what was going on, or with the case, no.  The only thing

19  we knew that they --- they told us was if, unless Mr.

20  Ballock was found guilty in court, that he would keep his

21  job.

22     Q.    Okay.

23           How many people were present there from the

24  FBI?

158

1      A.   I believe just one.

2      Q.   Just one?

3      A.   That ---.

4      Q.   Do you remember the name?

5      A.   I believe it was John Hamrick.

6      Q.   John Hamrick?

7      A.   Yes, sir.

8      Q.   Okay.

9           I know that name.

10          So Mr. Hamrick --- well, strike that.

11          Agent Hamrick told you that, you know, unless

12   Scott was found guilty in the criminal case, he would

13   keep his job?

14     A.   Sure.

15     Q.   All right.

16          That statement was apropos of what?  Did ---

17   did you ask him?

18     A.   I don't know how that conversation came about.

19   It's been a long time ago.  I'm sure we don't know the

20   relationship between state charges and the federal

21   government, and how that worked.  I don't know how that

22   conversation came about, sir.

23     Q.   Was anybody from your state police headquarters

24   present when Agent Hamrick was present the first time to

159

1    look at the emails?

2         A.   No, sir.  I believe it was just --- no, sir.

3    Uh-uh (no).  No.

4         Q.   Are you the person in the highest authority

5    from the West Virginia State Police present when Agent

6    Hamrick came and looked at the evidence that was part of

7    the state police investigation into Scott Ballock's

8    communications with Ellen Costlow?

9         A.   I believe so, sir.

10        Q.   Okay.

11             Was anyone from the Monongalia County

12   prosecuting attorney's office present at that time?

13        A.   Not that I can remember.

14        Q.   So the members of the West Virginia State

15   Police present when Agent Hamrick came would've been you

16   and Corporal Gaskins?

17        A.   Yes, sir.

18        Q.   Anyone else?

19        A.   I don't believe so, sir.

20        Q.   Did you provide copies of any investigative

21   product to Agent Hamrick?

22        A.   I believe he took a copy of the disc.

23        Q.   All right.

24             So a copy of the disc was turned over?

160

1      A.   I believe so.  Yes, sir.

2      Q.   Okay.

3           Well, we've established that there was also

4  some other email that you'd receive in either printed-off

5  form or via email from Ellen Costlow.  How about that

6  stuff?  Was any of that given to Agent Hamrick?

7      A.   I would believe it would have been, sir.  I

8  don't specifically remember that, but I believe it would

9  have been.

10     Q.   Okay.

11          Was Agent Hamrick at all interested in the

12 website that Tom Ballock was ---

13     A.   I can't remember that, sir.

14     Q.   --- operating?

15          Okay.

16          You don't think --- you don't remember?

17     A.   I don't remember that, sir.  I don't.

18     Q.   Do you remember having any discussion with him

19 about it?

20     A.   No, sir.  I do not remember.

21     Q.   So you don't remember what it was that prompted

22 Agent Hamrick to tell you that, look, you know, unless

23 Scott gets convicted of this, he's not going to lose his

24 job?

161

1      A.    Correct.  Right.

2      Q.    How did you take that?  Were you surprised?

3      A.    No, sir.  I wouldn't say I was surprised if it

4    was --- I wasn't surprised or --- it was --- I don't know

5    how they operate.  So that was --- I don't know their

6    thoughts behind that.  I don't know.

7      Q.    This was an internal FBI matter, and you had no

8    information or expectation as to what his answer to that

9    question was going to be?

10     A.    Correct.  Yes, sir.  Yes, sir.  I don't know.

11     Q.    Was --- was your disdain for Scott Ballock such

12   by that point that you were disappointed to hear that he

13   would keep his job unless he got convicted of these cases

14   that you were investigating against him?

15     A.    No, sir.  I'm not even so sure if the website

16   were up at that time.  This was pretty early in the

17   investigation.

18     Q.    There was a second time that you communicated

19   with the FBI?

20     A.    Yes, sir.

21     Q.    Okay.

22           Tell me about that.

23     A.    After the investigation was over with, after

24   the court was over with, they contacted and wanted to

162

1    have a meeting.

2         Q.   Okay.

3              Was it Hamrick again?

4         A.   I didn't --- no.  I believe he was retired by

5    that time.

6         Q.   Okay.

7              Who was it?

8         A.   It was another John.  I'm sure I'll remember

9    his name here shortly.

10        Q.   Large?

11        A.   No.  It's --- could've been.  Could've been

12   John Large.  Could've been.  There was another --- I

13   can't remember.

14        Q.   Okay.  All right.

15             So just one or two people?  Do you know?

16        A.   I can't remember that, sir.

17        Q.   Where did the interaction take place?

18        A.   I believe it was up in the state police

19   barracks up in the conference room.

20        Q.   Same place where Hamrick was shown

21   investigative material?

22        A.   No.  We were down in the sergeants' room at

23   that point.

24        Q.   Okay.

163

1          A.    I remember being in that room, yes, sir.

2          Q.    Okay.

3                So you met upstairs in the conference room with

4     an FBI agent on the second occasion.  This was after the

5     prosecutor had withdrawn the charges against my client?

6          A.    Yes, sir.

7          Q.    You've already told me that you were

8     disappointed that the prosecutor dropped the charges

9     against Scott.  Did you ask the FBI agent who you met

10    with in the conference room what was going to happen with

11    Scott's job?

12         A.    No, sir.

13         Q.    You were already satisfied after talking to

14    Hamrick on the first occasion that he was probably going

15    to keep his job?

16         A.    That's what we were told, sir.

17         Q.    So what --- what did you tell the agent in the

18    conference room meeting?

19         A.    He had questions on some of the stuff that we

20    uncovered during the investigation or that Corporal

21    Gaskins uncovered during the investigation.

22         Q.    Like what?

23         A.    Certain instances, what had happened during

24    different times of their going through emails.  I can't

164

1    remember specifically what the --- what the content was,

2    but he asked us questions of --- I believe the ammunition

3    came up in that conversation, about what we found as far

4    as details about what Ms. Costlow had said, certain

5    things to that nature.

6         Q.   Were you surprised that the FBI was still

7    asking questions?  After all, Hamrick told you that if he

8    didn't get convicted, he wasn't going to lose his job.

9         A.   I don't know if it was a surprise.  It was just

10   we didn't know what they wanted in the meeting.

11        Q.   Okay.

12             Well, certainly, by the time of your second

13   meeting with the FBI, after the criminal case against

14   Scott had been dropped, Tom Ballock had been posting

15   things on the Internet for quite some time?

16        A.   Correct.

17        Q.   I take it then that your disdain for my client

18   and his father was running pretty high, particularly

19   after the criminal case had been dropped against him.

20             True?

21        A.   I had disdain for --- for both of them, yes.

22        Q.   And seeing the criminal case withdrawn probably

23   made it somewhat worse?

24        A.   I don't think that's --- I've had those ---

165

1    after 25 years, if the prosecutor wants to do something

2    then, you know, we --- there's not a lot we can say about

3    it.

4         Q.    Were you encouraged that perhaps there might

5    yet be some risk for Scott's employment with the FBI?

6    After all, you were having this second meeting with the

7    FBI, and they were asking a lot of questions.

8         A.    Yeah.  I didn't know what the meeting was

9    about, sir.  I really didn't.  They were asking questions

10   about, you know, things that, again, found in the

11   investigation.

12        Q.    Did you ask them why are you here?  What --- I

13   thought this was all over?

14        A.    I don't think we came out specifically and

15   asked them.  I mean, that's --- it's a meeting they ---

16   they asked for.  And it's been my experience with ---

17   with the FBI that they'll tell you about as much as you

18   want to know --- they'll tell you about as much as they

19   want you to know.  I'm sorry.

20        Q.    Okay.

21        A.    My bad.  You looked at me kind of strange, and

22   I was like --- yeah.

23        Q.    There's a --- I would assume.

24        A.    As much as they want you to know.

166

1      Q.   Yes.  Right.  Understood.

2           Okay.

3           So these two discussions with FBI agents, were

4      those the only contacts that you had personally with the

5      FBI?

6      A.   You mean on the phone, or in person, or ---?

7      Q.   Well, let's go with in person first.

8      A.   I believe so, sir.

9      Q.   There was any face-to-face contacts ---?

10     A.   I can remember --- yes.  Yes, sir.

11     Q.   Did you have telephone contact in addition to

12     that?

13     A.   Yes, sir.

14     Q.   Were they anything more than just arrangements

15     to, you know, meet with them?

16     A.   Yes, sir.

17     Q.   They were?

18     A.   Yes, sir.

19     Q.   They were substantive discussions?

20     A.   Yes, sir.

21     Q.   How many were there?

22     A.   I can remember one.

23     Q.   You remember one, but do you --- do you know if

24     there was more than one?

167

1      A.    I don't remember if there was more than one,
2   sir.
3      Q.    When was this one substantive telephone
4   discussion with the FBI that you can recall?
5      A.    After Mr. Ballock showed up at the state police
6   barracks.
7      Q.    Okay.
8            This would be after Scott Ballock came to the
9   police barracks in an effort to try and serve the summons
10  and complaint that was filed in this civil action?
11     A.    He wasn't there to serve us, sir.
12     Q.    What was he there for?
13     A.    He was there to give us the information because
14  it was going to be on the news the next day.
15     Q.    And you know that because you talked to him?
16     A.    I knew that because I was on the phone with the
17  Secretary at that point.
18     Q.    You had no direct communication with Scott that
19  day?
20     A.    No.  He was there when I was on the phone with
21  the Secretary.
22     Q.    All right.
23            You --- let's say, by that time you were ---
24  you were in an office ---

168

1        A.    Yeah.

2        Q.    --- meeting?

3        A.    Yes, sir.

4        Q.    Are you aware that the family court ordered

5   Ellen Costlow not to have any communication with the FBI

6   about Scott?

7        A.    No, sir.  I do not know that.

8        Q.    She never told you that there was an order

9   entered?

10        A.    I can't remember, sir.  I don't --- I can't

11   remember if that fact came up.

12        Q.    Did you ever tell Ellen that you were going to

13   meet with the FBI, and that you would --- you wanted to

14   know what she would like you to tell them?

15        A.    I remember a conversation with Ellen.  I didn't

16   know why the FBI was coming.  And there was so much that

17   happened with this case, and so many scenarios, and so

18   many incidents.  That was basically to jog my memory if

19   I'm --- if I'm not remembering something huge or correct

20   --- incorrect or something that was --- was pretty

21   relevant.

22        Q.    So you did ask Ellen Costlow to tell you if she

23   had any suggestions for what she wanted you to tell the

24   FBI?

169

1      A.   Just to jog my memory, yes, sir.

2                ATTORNEY CROOKS:  Let's take a short

3   break.  I want to look over some of my stuff here, and

4   assess and I owe you the forecast here.

5                          ---

6   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

7                          ---

8                ATTORNEY JEFFRIES:  We can go on the

9   record here.

10               Lieutenant, a document marked Exhibit 6

11  has been examined by everybody, and you have it in front

12  of you now.

13                          ---

14               (Whereupon, Deposition Exhibit 6, Domestic

15               Violence Report, was marked for

16               identification.)

17                          ---

18  BY ATTORNEY CROOKS:

19      Q.   Can you identify that?

20      A.   That's a domestic violence, what we normally

21  call a 195, given to --- excuse me, victims or alleged

22  victims of domestic violence.  It just tells them how to

23  obtain a domestic violence protective order, go to a

24  shelter if they feel abused or threatened.

170

1      Q.    Sure.

2      A.    It just gives them information how to seek

3    assistance.

4      Q.    I think I understand that.  That particular

5    document, there are some signatures.  Can you identify

6    them or at least one signature?

7      A.    I --- I do not.  I can't read that signature,

8    sir.

9      Q.    Okay.

10     A.    I don't know who that is.

11     Q.    I believe it's Ellen Costlow's signature.

12     A.    I would say that because she's marked as the

13   victim, so I would say she would sign that she received

14   this report --- this form, but I can't read her

15   signature.

16     Q.    Just so our record is clear enough here,

17   Exhibit 6 is a form that West Virginia State Police

18   routinely provide to people who need it in connection

19   with domestic violence.  This particular one identifies

20   Ellen Ruth Costlow.

21     A.    Ellen Ballock.  I'm sorry.

22     Q.    She went by Ellen Ballock prior to the

23   completion of the divorce.  I didn't mean to confuse

24   things on that.

171

1          All right.

2          So anyway, Ellen Ballock is identified on the

3    form, and then there's a signature at the bottom which

4    I'll represent to you is her signature.  What else has

5    been completed on that form?

6         A.   Completed, sir?  The suspect's --- suspect name

7    is circled as Scott ballock, and then it has the date of

8    September 5th, 2013, and the time is 10:40 hours.

9         Q.   September 5th, 2013?

10        A.   I think it's the 5th.  I think it's --- I think

11   that's what it says, sir.  September 5th, 2013.  I

12   believe that's what it says.

13        Q.   So that'd be a little more than a week before

14   you arrested Scott Ballock?

15        A.   Correct.

16        Q.   So would it be a fair surmise that you showed

17   this form to Ellen Costlow a little more than a week

18   before you arrested her husband, and suggested that she

19   might enlarge upon her complaint against Scott by

20   including allegations of physical abuse?

21        A.   No, sir.  I --- I don't believe I've seen this.

22   That's not my handwriting at the top of the form.

23        Q.   Okay.

24          Who is it at the state police who writes in

172

1    that fashion?  Can you identify it from past ---?

2        A.    I believe it's Corporal Gaskins.  I'm not 100

3    percent sure, but that --- that's not my handwriting.

4        Q.    Did Ellen Costlow, or Ellen Ballock at the

5    time, ever tell you that Scott physically assaulted her

6    in any form?

7        A.    Sure.

8        Q.    She told you this?

9        A.    That she's been abused, sir.  Yeah.

10       Q.    Okay.

11             So why didn't you initiate one of these forms

12   with her?

13       A.    She wasn't making a complaint.  She just was

14   offering it into part of the investigation that she's

15   been assaulted.

16       Q.    She did?

17       A.    Specifically with --- with his weapon.

18       Q.    Okay.

19             Did you tell her that that could well form the

20   basis for a separate criminal complaint?

21       A.    No, sir.

22       Q.    Why not?

23       A.    It was sexual in nature.  I didn't --- we

24   didn't know the circumstances of such.

173

1      Q.    Why didn't you ask her?

2      A.    Well, we asked her if it was wanted, and she

3  said no.

4      Q.    So it was nonconsensual sex, too?

5      A.    Well, ---.

6      Q.    Rape is, I believe, what civilians call it.

7      A.    I --- I don't know that, sir.  She said it was

8  unwanted, but ---.

9      Q.    You didn't believe her?

10      A.    It's not that I didn't believe her, sir.  Not

11  at all.  It was a sexual activity she mentioned.  She

12  didn't really give a lot of details about it.

13      Q.    Well, I mean, she was a cooperative

14  complainant. She --- she volunteered this information to

15  you.  What held you back from questioning her in greater

16  depth and proceeding with a case for sexual assault

17  against Scott Ballock?

18      A.    I really don't remember if we offered that to

19  her, or if she wanted to make a complaint or not.  I

20  don't remember that.

21      Q.    Is that sort of thing written down anyplace

22  that you could retrieve it, and look at it, and refresh

23  your memory of why that would ---?

24      A.    I don't know that, sir.  I do not --- I do not

174

1    know that, sir.

2        Q.    Would information of that kind ordinarily be

3    noteworthy, essentially, to be written down in the course

4    of a criminal investigation?

5        A.    I don't know if --- what kind of credence we

6    gave it at the time.  I don't --- I don't know that.

7        Q.    You didn't find it credible?

8        A.    I don't --- I can't remember what context it

9    was given, so I really can't answer your question about

10   that.

11       Q.    Have you ever read the report written by Dr.

12   Christi Cooper-Lehki?

13       A.    No, sir.

14       Q.    You sound pretty confident.

15       A.    Oh, yeah.

16       Q.    Were you interested to read it?

17       A.    No, sir.

18       Q.    Did it occur to you that it might shed relevant

19   evidence on the investigation that carried on for close

20   on three years against my client?

21       A.    No, sir.

22       Q.    Have you ever talked with the forensic

23   psychiatrist, Dr. Christi Cooper-Lehki?

24       A.    No, sir.

175

Q.   Let me ask you, have you interviewed anybody other than Ellen Ruth Costlow about her criminal case against my client Scott Ballock?

A.   I don't believe, sir, not that I can remember. Interview?  I don't believe so, sir.

Q.   Interview is used in the context of your policies and procedures which are marked as Kief Exhibit Number 1.

A.   Not that I can remember, sir.

Q.   In light of the fact that there's a discrete policy that speaks to investigations affecting public figures as well as other members of law enforcement, don't you think it would've been a good idea to interview somebody other than just Ellen Costlow, someone you didn't even believe to be a credible complainant about sexual assault?

A.   I never said she wasn't credible, sir.

Q.   Well, you took no action on her telling you that she'd been sexually assaulted by Scott Ballock.

A.   Again, I don't --- I do not remember what context that was in.  I don't remember that.

Q.   What context could possibly explain it other than you just didn't believe her?

A.   It was abnormal, yes, but again, I can't answer

176

1    your question.

2         Q.   Why not?

3         A.   Again, I don't know what the context of it.  I

4    can't remember the context of the conversation.

5         Q.   You mean to say you can't remember if this was

6    consensual sex that went too far, or I mean ---?

7         A.   I would --- I would say that.  Yes, sir.  Yes,

8    sir.  I don't know.  I don't know that.

9         Q.   Do you remember ever having any conversations

10   with Corporal Gaskins about whether a separate

11   investigation on domestic violence, sexual assault,

12   should be opened?

13        A.   No, sir.  I do not remember a conversation.

14        Q.   Okay.

15             Do you know if Corporal Gaskins followed the

16   instructions he received from Captain ---

17        A.   Merrill?

18        Q.   --- Merrill, thank you, and provided routine

19   regular updates on the investigation?

20        A.   I don't know that, sir.

21        Q.   Would it have been part of your responsibility

22   as Corporal Gaskins immediate supervisor to see to it

23   that he complied with Captain Merrill's directive?

24        A.   I wouldn't have checked up on that, sir.  No,

177

1    sir, unless the Captain spoke to me directly about that

2    issue.

3        Q.    Did Captain Merrill ever pick up the phone and

4    call you and say, look, I don't want to put it in

5    writing, but you can tell Gaskins he can stop --- he can

6    stop reporting to me about this investigation?

7        A.    Not that I remember, sir.

8        Q.    In the course of this investigation, were you

9    harboring any concern that perhaps a lawsuit of the kind

10   that brings us together here today might be the result of

11   this criminal case?

12       A.    I'm sorry, sir?

13       Q.    In the course of your investigation into my

14   client, Scott Ballock, did you harbor any concern that

15   you might get sued by Scott Ballock if the case didn't

16   stick?

17       A.    I don't know if it was a concern.  It was ---

18   it was a thought that we might get sued.

19       Q.    Okay.

20             When did that thought come into your discussion

21   between you and the prosecutor's office?

22       A.    I don't believe we ever discussed --- hold on a

23   second.  It was --- Mr. Ballock's attorney had brought up

24   that issue.

178

1      Q.    Explaining that he ---?

2      A.    He had -- he had brought it up to, I believe,

3   Cindy Scott, that Scott was --- there was some sort of

4   discussion about him filing a civil suit against the

5   state police.  That was through --- Mr. Bittinger,

6   Binninger?

7      Q.    You're close, Benninger.  It's all right.  My

8   client ---.

9      A.    Yeah.  That was the conversation between him

10  and Cindy Scott, which ---.

11     Q.    She shared that with you?

12     A.    Correct, yes.

13     Q.    She came back and said Mike Benninger says

14  Scott Ballock is going to sue you when this was all over?

15     A.    I don't know if she said that directly.  She

16  just --- the next time we saw her, she made a comment

17  that that was --- that was the topic that was brought up.

18     Q.    Okay.

19           So what did --- what was your response to that?

20  What we going to do about it?

21     A.    No, sir.  There's no ---.

22     Q.    You didn't ask her what can we do about it?

23     A.    I've been sued before.

24     Q.    Okay.

179

1      A.   It was a nonissue for me.

2      Q.   What did you get sued for?

3      A.   I can't remember what the suit was about, sir.

4  It was one of those things where it was filed, and it was

5  not timely submitted, so it was thrown out.  I can't

6  remember.

7      Q.   Use of force case, maybe?

8      A.   No, sir.  No, sir, not at all.

9      Q.   Okay.

10          I just started there because that's the most

11  common sort of thing that ---

12     A.   I understand.

13     Q.   --- police officers get sued for.

14          I know you got accused of threatening to shoot

15  a man's dog one time.

16     A.   I think so, yes, sir.

17     Q.   You remember that?

18     A.   I did remember that, yes.

19     Q.   In fact, ---

20     A.   It could've been over there.

21     Q.   --- Criminal Affairs came to see you about ---.

22     A.   Could've been over that case.  I don't remember

23  specifically, but it could've been over that case.

24     Q.   You never shot anybody's dog, did you?

180

1       A.    No, sir.  No, sir.

2       Q.    You never threatened to shoot a dog, did you?

3       A.    No, sir.  At all, no.

4       Q.    You didn't strike me as the kind of guy that

5   would do that.

6             All right.

7             So the motion to drop the criminal case against

8   Scott Ballock, there was a document attached to it.  Were

9   you aware of that?

10      A.    Document attached to ---?

11      Q.    The motion.  The prosecutor filed a motion ---.

12      A.    There was only one motion.

13      Q.    There's a document attached to it ---

14      A.    Okay.

15      Q.    --- on my end, but ---.

16      A.    I --- the court.  I got you.  Okay.  Yes, sir.

17      Q.    All right.

18            There was a number of things mentioned in

19   there.  One of them had to do with probable cause for the

20   arrest.

21      A.    Correct.

22      Q.    Do you have any memory of that?

23      A.    I --- I remember something about that, sir.

24   Yes, sir.

181

1      Q.   Do you remember talking with the prosecutor's

2  office about why the prosecutor would want to have Scott

3  sign off on something like that?

4      A.   No, sir.

5      Q.   Did it perhaps come into the discussion that

6  you had with Cindy Scott about the potential for being

7  sued after the case --- the criminal case was dismissed?

8      A.   No, sir.

9      Q.   You ever heard the term malicious prosecution?

10     A.   I've heard the term, yes.

11     Q.   Do you know what it means?

12     A.   Not definition-wise, no, sir.

13     Q.   Do you know what the term abuse of process

14 means?

15     A.   Not by definition, sir.  No.

16     Q.   Do you know what the term defamation means?

17     A.   Again, sir, ---.

18     Q.   When you went to the police academy, they ever

19 bring any prosecutors in there to talk about legal

20 liability for police officers, what you could be sued

21 for?

22     A.    Not specifically.  We had certain domestics and

23 all that good stuff about the --- being civil liability

24 for things to that nature.  But I don't remember specific

182

1    class on any of that, no, sir.

2         Q.    Being told about domestics?  What do you mean?

3         A.    There was a certain --- if we conduct ourselves

4    in a certain manner, we can be held accountable for it.

5         Q.    Okay.

6               Can you be any more specific?

7         A.    Going above and --- I can't remember, sir.  I

8    really --- I can't remember what the specifics of that is

9    without reviewing it.  There's something in the domestic

10   part.

11        Q.    You ever receive training on, say, racial

12   profiling?

13        A.    I think during one in service we did receive a

14   class of racial profiling, so yes.

15        Q.    All right.

16              Well, is there --- is there an in house

17   attorney for the state police?

18        A.    Yes, sir.

19        Q.    Do they employ a lawyer?

20        A.    Yes, sir.

21        Q.    Who is it?

22        A.    I don't know who that is right now, sir.

23        Q.    Was the in-house attorney for the state police

24   ever consulted in the course of the Ballock

183

1    investigation?

2         A.    Not --- I do not know that, sir.

3         Q.    So he or she may have been?

4         A.    They were aware of the websites.

5         Q.    Did Ellen Ballock ever tell you during the

6    course of the investigation of her estranged and,

7    ultimately, her ex-husband, Scott Ballock, that she hoped

8    and wanted him to lose his job at the FBI?

9         A.    Not that I can remember, sir.

10        Q.    Is just now the first time that it ever

11   occurred to you that she may have been motivated to try

12   and cost Scott his job at the FBI?

13        A.    We cautioned her against that.

14        Q.    Why?

15        A.    Well, when --- when you file a complaint, you

16   know, in the --- in the first --- filing a complaint with

17   certain parts --- you know, being a law enforcement

18   officer, we did tell her at the beginning, you know, he

19   could possibly, you know, with all this, you may --- if

20   it went --- you could --- he could maybe lose his job.

21             We threw that possibility out to her.  But if

22   that's something, you know, and to lose his --- to lose

23   his job.  But what with --- but we throw that out to ---

24   to a lot of people concerning complaints.

184

1    Q.    So you caution complainants before they step

2 off and actually make a complaint somebody that there

3 could be consequences to all of this that, maybe, you

4 haven't thought about?

5    A.    Correct.

6    Q.    All right.

7          Well, when you explained this to Ellen Ballock,

8 what did she say?

9    A.    I don't believe --- I don't remember what she

10 said.  That was six odd years ago.

11    Q.    You sure she didn't rub her hands together and

12 smile, and say ---

13    A.    No.

14    Q.    ---- oh, that's --- that would be fantastic.

15    A.    No.  She didn't do that.

16    Q.    Did you read her as the sort of person who was

17 angry at her estranged husband?

18    A.    No.  She was scared.

19    Q.    She was scared.  What was it that she feared?

20    A.    She was pretty much --- she didn't like being

21 bombarded every day with emails and texts.

22    Q.    Yeah.  A lot of those emails and texts, at

23 least in late 2012, were to the effect that he wanted to

24 reconcile with her, weren't they?

185

1        A.    Correct.

2        Q.    I mean, ---

3        A.    That I remember.

4        Q.    --- that was a dominant theme of his

5   communications of late 2012.  Wouldn't you agree?

6        A.    Yes, sir.  I would agree to that.

7        Q.    Sure.  Come as any surprise to you that a man

8   going through a divorce, despite it all, would want to

9   reconcile with his wife?  That didn't come as any

10  surprise to you, did it?

11       A.    No, sir.

12       Q.    And you felt that Scott's instant effort to try

13  and reconcile with Ellen constituted criminal harassment?

14       A.    When she said to stop, but he wouldn't stop,

15  yes.

16       Q.    Are you aware that in this litigation that

17  Scott Ballock contends that just about all this

18  communication was ongoing between the two of them?  She

19  might have said in email, text, stop, but then she would

20  call him.  Did you know that?  She would call him on ---

21  what do you call it?  Where you call, and can see each

22  other?  Face --- Facetime?  That kind of a thing?

23       A.    During his deposition, I did hear him say that,

24  yes.

186

1     Q.   He took some --- he hit the button and did some

2   screen captures during some of those calls.  Are you

3   aware of that?

4     A.   No, sir.

5     Q.   If you had taken him up on the offer and

6   interviewed him during the course of your investigation

7   prior to arresting him, and he told you this, and showed

8   you evidence to the effect that she had initiated contact

9   with him, and that she had sent emails to him and texts

10  to him.  Would --- would that have tempered your

11  recommendation to proceed with the arrest warrants?

12                ATTORNEY JEFFRIES:  Objection,

13  mischaracterizes the evidence.

14                THE WITNESS:  I don't know that, sir.

15  BY ATTORNEY CROOKS:

16    Q.   You're trained in investigation, and you're a

17  supervisory member of the state police.  So don't you

18  think that common sense and a sense of fair play

19  obligated you guys, even Corporal Gaskins, to try and

20  hear Scott's side of this to see if maybe --- maybe this

21  was a matter that should've simply been left in the

22  family court rather than taken to criminal court?

23    A.   No, sir.

24    Q.   The expungement that was rendered in regard to

187

1    the criminal case, what did you understand that to mean?

2        A.    That's a broad question, sir.  I -- expungement

3    of --- the expungement order?  Is that what you're

4    talking about?

5        Q.    Uh-huh (yes).

6        A.    That the --- that the --- his arrest record

7    would be expunged.  The report is expunged to redact his

8    name in any manner.  Files removed with his name on it,

9    just like if, you know, all the proceedings were, I

10   guess, sealed.  But everything --- within our office,

11   everything was redacted.

12       Q.    Did you get any advice from the prosecutor's

13   office as to what expungement obligated the state police

14   to do?

15       A.    No, sir.

16       Q.    How did you know to go through this massive

17   file that you produced through your attorneys and --- and

18   redact out Scott's name everywhere is showed up?

19       A.    All expungements go through our legal down in

20   Charleston.

21       Q.    Okay.

22             So this is where the in-house attorney for the

23   state police got involved?

24       A.    They --- all expungements come through --- they

188

1    were --- they're sent down to Charleston, and then

2    they're sent back up.

3         Q.   Okay.

4              Were you personally involved in any of ht

5    redacting work that was done?

6         A.   No, sir.

7         Q.   That's not your ---

8         A.   No, sir.

9         Q.   --- job description?

10        A.   No, sir.

11        Q.   Okay.

12             Did the corporate attorney for the state police

13   or anybody at the prosecutor's office explain to you that

14   expungement has the legal effect of meaning that it's as

15   if it never happened?

16        A.   Correct.

17             I did know that.  I don't know --- corporate

18   attorney, I don't know what that means.

19        Q.   When I say corporate attorney, I'm thinking of

20   the in-house counsel.

21        A.   Oh, yes, sir.  Yes, sir.

22        Q.   That was probably just a slip of the tongue on

23   my part.  I should've referred to him as the in-house

24   counsel.

189

1          Do you know if Trooper Christopher Berry ever

2    conducted any surveillance of Scott Ballock?

3          A.   I do not know that, sir.

4          Q.   Was any surveillance performed as a part of the

5    investigation into the case against my client, Scott

6    Ballock?

7          A.   No, sir.

8          Q.   Do you know if Trooper Chris Berry ever

9    performed any surveillance on Scott's parents?

10         A.   Not that I know of, sir.

11         Q.   If Trooper Berry ever performed any

12   surveillance on his own time, off the company clock,

13   would that have been appropriate according to policy and

14   procedure of the state police?

15         A.   I don't know of an instance where that would be

16   proper.

17         Q.   In fact, state police probably have a standing

18   policy against moonlighting, don't they?

19         A.   They want to know if we have a second job.  It

20   actually has to be approved.

21         Q.   It has to be approved?

22         A.   Yes, sir.

23         Q.   So if one of the troopers wanted to do some

24   surveillance to try to help somebody out, even if off the

190

1    clock, they'd have to get permission?

2        A.    Not if they work for a company.  Of course,

3    that --- you're kind of broad on it.

4        Q.    Let's --- let's leave that out.

5        A.    Okay.

6        Q.    Let's just focus on a situation like we have in

7    this case.

8        A.    Uh-huh (yes).

9        Q.    If Chris Berry took it upon himself to do any

10   surveillance work on behalf of Ballock, Ellen Costlow, if

11   he did that without telling superiors of the state

12   police, that would be wrong, wouldn't it?

13       A.    There would be a problem, sir.

14       Q.    There would be a problem.

15                 COURT REPORTER:  Seven?

16                 ATTORNEY CROOKS:  Uh-huh (yes).

17                              ---

18                 (Whereupon, Deposition Exhibit 7, FBI

19                 Documents, has been marked for

20                 identification.

21                              ---

22                 ATTORNEY CROOKS:  Are you my reporter

23   tomorrow?

24                 COURT REPORTER:  Yeah.

191

1          ATTORNEY CROOKS:  Okay.

2          Could you hang onto all these exhibits,

3     and bring them back?

4          COURT REPORTER:  Sure.

5          ATTORNEY CROOKS:  And then we'll just use?

6          COURT REPORTER:  Uh-huh (yes), yep.

7          Something that I need to hold onto mine

8     too.

9          ATTORNEY CROOKS:  What's that?

10         COURT REPORTER:  I said I need to hold

11    onto mine too.

12         ATTORNEY CROOKS:  Well, you --- you follow

13    your own --- you take your own Counsel on that, but I

14    would suggest that might be a good idea.

15         Okay.

16    BY ATTORNEY CROOKS:

17    Q.   So Kief Deposition Exhibit 7 has been marked

18    and provided to you.

19    A.   Yes, sir.

20    Q.   It's further identified by control numbers

21    Troopers 878 through Troopers 882.  That control sequence

22    indicates that this is part of the collection produced in

23    Discovery by your Counsel in response to our formal

24    requests.

192

1              ATTORNEY JEFFRIES:  Charles, before you

2     get started on that, ---

3              ATTORNEY CROOKS:  Yeah.

4              ATTORNEY JEFFRIES:  --- I'm just going to

5     lodge an objection to --- a warning to take this out of

6     context because most of page 880 has been redacted by the

7     FBI so you don't know context of what's there.

8              ATTORNEY CROOKS:  Well, fair enough.

9     Let's address that.

10             The record should reflect that this

11    exhibit, Kief Exhibit 7, presents itself as a document

12    produced by the civil litigation unit of the Department

13    of Justice Federal Bureau of Investigation in response to

14    a request that had been made by the law firm representing

15    the trooper Defendants in this case.

16             More specifically, I would proffer for the

17    record that pages 879 and 880 are the subject of Mark's

18    objection.  Page 879 explains what are called deletion

19    codes.  It appears to be from an alphabetized list of

20    deletion codes that this department routinely uses on

21    documents they produce.

22             ATTORNEY JEFFRIES:  It appears they do

23    this quite often.

24             ATTORNEY CROOKS:  Yes.

193

1              Specifically, deletion codes K, L, M and S

2    are detailed of page 879, and they did that apparently

3    because they were asserting those reasons for redacting

4    pretty much the entirety of 880.

5              At the bottom of page 880, after the

6    redaction, there appears to be some email.  It appears to

7    be the beginning of an email, actually, from agent John

8    D. Large, FBI, sent April 10, 2017.  Directed to Raymond

9    P. Duda, D-U-D-A, of the FBI.  And the subject of the

10   email is WVSP, which I interpret as West Virginia State

11   Police, Call to Clarksburg, RA, Resident Agent.

12              Okay.

13              So Mark is protecting the record in

14   respect to the wholesale redaction that appears on page

15   880.  I don't know --- I don't know quite what to say

16   about your objection, Mark.  I probably would wind up

17   joining it.  I wish --- you know, I wish the government

18   that serves the people of this country could be more open

19   and transparent of the people of this country.  But I

20   won't elaborate any further on that.

21              ATTORNEY JEFFRIES:  Well, I just wanted to

22   get on the record I object to this document, but go

23   ahead.  Ask about whatever you do have.

24              ATTORNEY CROOKS:  Sure.

194

BY ATTORNEY CROOKS:

    Q.    Lieutenant, you know, we're working with the best production that your lawyer could manage from the FBI on this.  And it appears there's an email from Agent Large to Agent Duda.

          You can read it for yourself.  The entirety of it appears on page 881.  If you haven't had the chance, I'll give it to you now.

    A.    I'm familiar with it, sir.

    Q.    You're familiar with this?

    A.    Uh-huh (yes).

    Q.    You've seen this before?

    A.    Uh-huh (yes).

    Q.    Is this one of the emails you reviewed in preposition for deposition today?

    A.    I don't believe so.

    Q.    No?  Okay.

          But you've seen it?

    A.    Yes, sir.

    Q.    Starts out per discussion, so apparently Agent Large and Agent Duda must have had a discussion, probably by telephone --- it could've been in person --- about the West Virginia State Police First Sergeant Michael Kief, that's you, from the Wheeling detachment, reporting to

195

1  the FBI about Scott Ballock coming to the Morgantown

2  barracks on April 7.

3          Scott's appearance at the barracks on that date

4  was mentioned earlier in third session today.

5      A.   Correct.

6      Q.   And I don't want to go back through all that.

7  But it would appear that you reported to Agent Large, the

8  resident agent in Clarksburg, about Scott's appearance at

9  the barracks?

10     A.   Uh-huh (yes).

11     Q.   Is that a fair capture of what --- of what

12 we're seeing reported here?

13     A.   Yes, sir.

14     Q.   So as part of this exhibit, Agent Large

15 reported to Agent Duda that you presumed that Scott was

16 trying to provide some information in anticipation of

17 what turned out to be this civil litigation that brings

18 us here together today?

19     A.   Correct.

20     Q.   So it was your understanding as of whatever

21 date you got in touch with the FBI --- and I'm going to

22 ask you that next,  I mean, was it --- was it the same

23 day?  Did you call the Resident Agent the same day?

24     A.    I --- I don't know if I did.  Or it was the

196

1    next morning.  I don't know that.

2         Q.   Okay.

3              You may not have had an opportunity to call

4    until the next day.  But apparently you --- you made it a

5    priority to get in touch with the FBI to tell them that

6    Scott had stopped by the Morgantown barracks with that

7    paperwork?

8         A.   Correct.

9         Q.   And I guess one of my questions is, you know,

10   why did you deem it necessary to contact the FBI about

11   this?

12        A.   On two previous occasions, I had seen Mr.

13   Ballock out in public.  On both of those incidences, I

14   felt that he was trying to intimidate me on both

15   instances.

16        Q.   Okay.

17        A.   And this was another instance of trying to

18   intimidate us, or me.  He was there for no apparent

19   reason.  He wasn't there to serve us.  He just wanted us

20   to have the information.  He wasn't there in a legal ---

21   his official capacity.  He was just there to --- I don't

22   want to say intimidate us.

23        Q.   Well, too late.  You already did.  But to ---.

24        A.   Right.  So this was in an effort to try to ---

197

1    I didn't know about the fourth instance.  I didn't want

2    to be around him.  I didn't want to --- him to approach

3    me.  I didn't want him at the office to --- for something

4    to happen.  I didn't --- I didn't want another

5    confrontation with him.

6        Q.    Okay.

7              Well, I don't know anything about what you just

8    referenced.  These, I think, you said a couple of

9    occasions ---

10       A.    Yes, sir.

11       Q.    --- that you had just happened across Scott ---

12       A.    Correct.

13       Q.    --- out in public, I guess?

14       A.    Yes, sir.

15       Q.    Maybe a grocery store or something.  I don't

16   know.  Was that where it was?

17       A.    Once a grocery store, yes.

18       Q.    Grocery store.  Where was the other case?

19       A.    Sheetz.

20       Q.    Sheetz, okay.

21             So you bumped into each other?

22       A.    We didn't bump into each other.  We were in the

23   same vicinity.

24       Q.    Just you saw each other?

198

1      A.    Right.

2      Q.    Okay.

3            And you both knew that you saw each other?

4      A.    Absolutely.  Right.

5      Q.    Any exchange of communication?

6      A.    I don't believe so.  He --- he walked towards

7      me twice, and I just got that ---.

8      Q.    Walked toward you --- what do you mean, as if

9      --- as if to approach you in conversation?

10     A.    I don't know if to approach me in conversation,

11     or he just wanted me to know he was there.  I don't know.

12     Q.    All right.

13     A.    I don't know.

14     Q.    Okay.

15     A.    So this is in reference to him showing up at

16     the office to give us information that was going to be on

17     the news the next day.

18     Q.    Okay.

19           Well, these two prior occasions, can you give

20     me any better feel for when they happened?

21     A.    I can't remember, sir.

22     Q.    They would've been before the criminal case

23     against him was dismissed and expunged or after?

24     A.    They would --- you know, I don't know that,

199

1    sir.  I can't remember.  I don't remember that.

2        Q.    Did --- we know that you and Scott did have a

3    telephone conversation at least once when he was trying

4    to get a copy of a police report, and you told him that

5    there was no police report down.  By the way, I tracked

6    that date down.  March the 6th, 2013 was the date that

7    the state police went to the Ballock residence in this

8    event if it helps you.

9        A.    Okay.

10       Q.    If it helps you or not, but ---.

11       A.    Same general time.

12       Q.    Well, at least it tells you that that instance,

13   presuming that I'm accurate in my interpretation.  I'm

14   pretty confident that I am.  It happened before the

15   instance where --- that we discussed where the county

16   sheriff deputies went to the Ballock residence August the

17   12th.  Then it was about, what, September --- when was it

18   that Ellen Costlow came in and --- and gave you the

19   information necessary to get those warrants?

20       A.    You mean the disc?  The first ---?

21       Q.    Yeah, all that stuff.

22       A.    I --- I don't remember that, sir.  I don't

23   remember that.  I'm sure there are notes someplace.

24       Q.    So your purpose then in contacting the FBI as

200

1    documented to the extent that it is by Kief Deposition

2    Exhibit 7 was simply to, you know, tell the FBI that,

3    hey, you know, one of your agents is --- has, you know,

4    come to the barracks.  And I've looked, and apparently he

5    filed a lawsuit April the 6th, the day before he came to

6    the barracks.

7         A.    I don't care if he filed a lawsuit.  That's

8    not ---.

9         Q.    What did you mention then?  You mentioned it

10   apparently.  Kief advised that he searched pending court

11   matters ---.

12        A.    I didn't know what information he wanted to

13   give us.  That's why I searched to see what's going on

14   here.

15        Q.    Okay.

16        A.    Then I found the lawsuit.  And I was like,

17   okay.  That makes sense.

18        Q.    Okay.

19              I follow that.

20              So what could --- what did you want the FBI to

21   do?

22        A.    He wasn't there for anything specific purpose

23   except to thumb his nose at us.  I'm going to do this.

24   And he was arrogant enough to think it was going to be on

201

1   the news the next day.  So after the websites, after his

2   general displeasure with --- with me, and what's

3   discussed about me on the websites, we probably don't

4   need to be in the same general vicinity of each other.  I

5   didn't want Corporal Gaskins or Trooper Berry to, you

6   know, say anything or do anything.

7       Q.   You're a well-spoken, polite person that --- I

8   think you're meaning that you're saying after readings

9   what's been said about you on Tom Ballock's website, you

10  don't know if you can keep your temper intact if --- if

11  you're around Scott or his father.  Is that what you're

12  telling me?

13      A.   We didn't need to be in the general vicinity of

14  each other.  I don't know his purpose of going there to

15  give us that information.  I --- I don't know that.

16      Q.   Fair to say, you're not afraid of Scott, are

17  you?

18      A.   I can take care of any situation that's

19  presented in front of me.

20      Q.   I'll bet you can.  You're an impressive

21  physical specimen.

22           But it almost sounds to me like your concerned

23  that if Scott's spoiling for a fight, you're going to

24  find it difficult to deny it to him if the opportunity

202

1    comes around?

2        A.    I would never get into a physical confrontation

3    unless provoked.

4        Q.    Okay.

5        A.    Now, with that said ---.

6        Q.    It wouldn't take much to provoke you?

7        A.    I didn't say that either.

8        Q.    Okay.

9              What are you --- well, I'll let you say it.  Go

10   ahead.

11       A.    We just didn't need to be in the general

12   vicinity of each other with his attitude towards me

13   that's on the Internet for everybody to see, and my

14   displeasure for him.  We just --- it's just not a good

15   combination to have two people that don't like each other

16   in the same vicinity.

17       Q.    All right.  All right.

18             I think I understand.

19             Have you read the complaint that Scott filed in

20   this case?  Actually, there've been three amendments to

21   it.

22       A.    I probably haven't read the whole thing, sir.

23   I'm sure I reviewed it, but I never --- I haven't read

24   the whole thing, no, sir.

203

1      Q.    So when you arrested Scott, you didn't handcuff

2   him?

3      A.    No, sir.  I didn't --- no.  I didn't --- no.

4   No.  We did not handcuff him.

5      Q.    I guess I just --- all this time, I presumed

6   that you did.  I thought you guys always did that.

7      A.    No.  No, sir.  We were in the same building as

8   the magistrate court.  We just took him upstairs and got

9   him arraigned.

10     Q.    Okay.

11           Did you relieve him of his weapon?

12     A.    No, sir.  That was one of the reasons why we

13  did it at the magistrate's office or at --- in that

14  building.  We knew he would not have his weapon on him.

15     Q.    He didn't have his weapon on him in family

16  court?

17     A.    You can't have your weapon on you in the family

18  courts.  They don't care who they are.  They disarm you.

19  They would disarm anybody.

20     Q.    Okay.

21           Well, you're helping me because, my

22  understanding, this is kind of, I'll admit this and be

23  naïve on this point.  I see a little bit of a conflict

24  between his obligation as a federal agent to always have

204

1    his weapon on him and security expectations of the --- of

2    the county court system which says you're not bringing

3    any weapons in here.

4        A.    True.

5        Q.    So I didn't quite know what the --- who, you

6    know, who had the upper hand in that conflict of law.

7        A.    There are certain courts in this state that

8    would disarm us when going into.

9        Q.    Is that right?  So if you --- if you go to, I

10   mean, our case is in federal district court.  You go to

11   federal district court for a hearing, you know, the

12   marshals are going to have you leave your weapon.

13       A.    I wouldn't take my weapon in, though.

14       Q.    You wouldn't take it in?

15       A.    Correct.

16             I wouldn't want them to handle my weapon,

17   actually.

18       Q.    I think I follow you there.

19             ATTORNEY CROOKS:  Let's go ahead and mark

20   that.  Just go ahead and hand it --- put it, yeah.

21   There.  Let your lawyer see it, and let's give Todd a

22   moment to look at it.  It's just a copy of one of the

23   warrants for arrest.

24                              ---

205

1                    (Whereupon, Deposition Exhibit 8, Warrant

2                    for Arrest - Harassment, was marked for

3                    identification.)

4                    (Whereupon, Deposition Exhibit 9, Warrant

5                    for Arrest - Unwanted Communications, was

6                    marked for identification.)

7                                  ---

8              ATTORNEY CROOKS:  Identify your signature

9    there as having been the officer who executed these

10   warrants.

11             What are we up to now?

12             COURT REPORTER:  That was 8 and 9.

13             ATTORNEY CROOKS:  8 and 9.

14   BY ATTORNEY CROOKS:

15        Q.   Lieutenant, have you looked at Exhibits 8 and 9

16   enough to tell me if those are ---

17        A.   There's two separate --- okay.  I got you.

18        Q.   --- accurate copies of the warrants that were

19   issued for Scott Ballock's arrest?

20        A.   Yes, sir.

21        Q.   And are they two separate warrants?

22        A.   I believe so, sir.  Yes, sir.

23        Q.   One's for harassment?

24        A.   Yes, sir.

206

1      Q.    The other is for stalking?

2      A.    One is for stalking harassment, and then one is

3  for unwanted communications via computer.

4      Q.    Okay.

5            So stalking harassment --- actually, this is

6  more a harassment than stalking.

7            Right?

8      A.    Correct.

9      Q.    Yeah.  I mean, you guys --- you guys weren't

10  contending that Scott was actually stalking her?

11     A.    Not that I believed, sir.  No.

12     Q.    Following her, walking around in the grocery

13  store behind her ---

14     A.    No, sir.  No, sir.

15     Q.    --- or anything like that?

16           And do you recognize your signature on Exhibits

17  8 and 9?

18     A.    Yes, sir.

19     Q.    Does that indicate that you, in fact, signed

20  off as having executed those warrants?

21     A.    Correct.

22     Q.    And I do think we covered this, but just to be

23  sure.  This process of harassment, to your knowledge,

24  Scott didn't know it was going to happen, did he?

207

1      A.    No, he did not.

2      Q.    All right.

3            And his reaction to it was calm and civil?

4      A.    I --- yeah.  I don't remember anything out of

5  the ordinary.  Yes, sir.

6      Q.    Did he say anything rude to you?

7      A.    I don't believe so.

8      Q.    Did he ever once raise his voice?

9      A.    Don't believe so.

10     Q.    You didn't handcuff him.  Did you --- did you

11  talk with him about that?  You know, I'm not going to put

12  handcuffs on you?

13     A.    I don't think we talked about it.  I explained

14  the warrants to him, and that we would be going upstairs

15  to see to the magistrate, which knew we were coming.

16     Q.    Okay.

17           So you were instructing him more than inviting

18  him to go with you upstairs to see the magistrate?

19     A.    Yes, sir.  He was under arrest at that point.

20     Q.    He was under arrest.  So you --- you did read

21  him his rights?

22     A.    No, sir.

23     Q.    No?  You did take him upstairs to the

24  magistrate?

208

1      A.   Yes, sir.

2      Q.   I trust somebody read him his rights up there.

3      A.   I'm sure the magistrate advised him of his

4  rights.

5      Q.   So that whole process of due process went

6  without a hitch?

7      A.   At the magistrate's office, sir?  Is that what

8  --- Yes, sir.  I don't remember anything out of the

9  ordinary.

10     Q.   Could --- could all this have been accomplished

11  by the issuance of a summons?

12     A.   It --- I guess it could have.  The summons is

13  --- is a way of doing it, but that's not our --- I don't

14  think in 25 years I've ever gotten a summons.

15     Q.   Well, this was something of a special case in

16  that the West Virginia State Police has a specific policy

17  where public figures and other members of law enforcement

18  community are the subject of investigation or arrest, at

19  least one of the objects of that special policy is to try

20  and deescalate and --- and minimize the amount of

21  spectacle around the investigation and arrest, if it

22  should happen.

23          Right?

24          ATTORNEY JEFFRIES:  Objection,

1   mischaracterizes the evidence.

2   BY ATTORNEY CROOKS:

3        Q.    Am I misstating any of that?

4        A.    A spectacle, I don't believe we ---.

5        Q.    Well, spectacle.  I mean, like, why the hell

6   would this --- wasn't there a little element of spectacle

7   about this?  I mean, they just finished a hearing in

8   front of the family court, and there you are to arrest

9   Scott in front of the court.

10       A.    I don't believe this was a spectacle.  If we

11  wanted to make a spectacle out of it, we could've done it

12  a couple different ways.

13       Q.    I'll grant you that.  It could've been made

14  worse.

15       A.    Absolutely.  Yes, sir.

16       Q.    Yeah.  It could've been more aggravating.

17            Were you present when the hearing was held on

18  April 7, 2016 when Marcia Ashdown submitted her motion to

19  dismiss both of the charges against Scott?

20       A.    I was at the hearing, yes, sir.

21       Q.    Okay.

22            Was there a particular reason that you were at

23  the hearing?

24       A.    We had showed up at the --- we thought we were

210

1    going in for a trial.  We just stayed for the hearing.  I

2    don't remember if Marcia asked us to stay.  I don't

3    remember that.

4         Q.   Was Scott there?

5         A.   Of course he was.

6         Q.   And Mike Benninger?

7         A.   Yes, sir.

8         Q.   Marcia Ashdown was there?

9         A.   Yes.  Yes, sir.

10        Q.   A little unusual for the --- they elected the

11   head prosecutor to come to the magistrate's court, isn't

12   it?

13        A.   I've had the main prosecutor in magistrate

14   court before.

15        Q.   Not unheard of, but it's unusual, isn't it?

16        A.   Yes.  It is unusual, yes.

17        Q.   And it's --- it's kind of an indicator that

18   something significant is --- is going on.  Don't you

19   agree?  You took it that way?

20        A.   No, she wanted to handle it.

21        Q.   Right.  She wanted to personally see to it that

22   things got handled the way she thought they should.

23             Did Marcia Ashdown ever tell you before she

24   submitted this motion to dismiss the charges that ---

211

1    that she was going to do it?

2         A.    We found out that morning, sir.

3         Q.    That morning?  Who told you?

4         A.    Marcia Ashdown.

5         Q.    She did.  So she told you.  She didn't really

6    solicit your input on it?

7         A.    No, sir, not at all.

8         Q.    Did you know that she had been talking with

9    Mike Benninger about terms and conditions for dropping

10   the charges against Scott Ballock?

11        A.    No, sir.

12        Q.    Were you kind of thunderstruck by all this?

13   Did it surprise you?

14        A.    It surprised us, yes.

15        Q.    Surprised us.  You're speaking in the plural.

16   Were --- was Gaskins with you?

17        A.    Correct.

18        Q.    Anybody else?

19        A.    Not that I know of, sir.

20        Q.    Ellen Costlow was present?

21        A.    Later.

22        Q.    Later?  She wasn't at the --- the hearing ---?

23        A.    She wasn't at mine and Corporal Gaskins and

24   Marcia Ashdown's meeting before the hearing.  Well, at

212

1    that time.  She did come in the meeting.

2        Q.   She did come in.  Because she had to sign off,

3    didn't she?

4        A.   I don't know if she signed off in court or

5    signed off in --- at --- I don't --- I don't recall that.

6        Q.   Okay.

7             Well, tell me what --- tell me the conversation

8    that you had with Marcia Ashdown.

9        A.   She brought us in, and she ---.

10            ATTORNEY JEFFRIES:  I'm going to object on

11   attorney-client privilege.  I'm going to instruct the

12   witness not to answer.

13            ATTORNEY CROOKS:  Okay.

14            I --- I don't see how there'd be an

15   attorney-client privilege between the prosecutor and the

16   state police.  She doesn't represent them.

17            ATTORNEY JEFFRIES:  No, but she represents

18   the government.  Either attorney-client privilege or work

19   product doctrine.  I can't swear to it, Charles, but I'm

20   thinking that I've researched it, and there's a --- a

21   recognized attorney-client privilege or work product

22   doctrine for discussions between a prosecuting attorney

23   and law enforcement.

24   BY ATTORNEY CROOKS:

213

1      Q.    Ellen Costlow was present for at least part of

2   the meeting.

3           Right?

4      A.    Correct.

5      Q.    What was discussed while Ellen Costlow was

6   present?

7      A.    The --- what do I want to call it, the court

8   document that Marcia Ashdown drew up.

9      Q.    Let's go ahead and address that.  We got a

10  document marked --- what is this now?  Ten?

11     A.    Yes, sir.

12     Q.    That should be a copy of the motion that Marcia

13  Ashdown filed as well as the attachment to it that bears

14  some signatures and states some terms.

15                         ---

16             (Whereupon, Deposition Exhibit 10, Motion

17             to Dismiss Charges, was marked for

18             identification.)

19                         ---

20             THE WITNESS:  Yes, sir.

21  BY ATTORNEY CROOKS:

22     Q.    Is that the same document that Marcia Ashdown,

23  Corporal Gaskins, you and Ellen Costlow discussed before

24  going into the courtroom with Magistrate Mullins?

Sargent's Court Reporting Service, Inc.
1-800-727-4349

214

1      A.    Correct.

2      Q.    Did --- did Marcia have a copy for you?

3      A.    I don't believe she did.

4      Q.    So did --- with Ellen Costlow present, there

5 certainly was no privilege attaching.  What did she

6 explain when Ellen was sitting there?

7      A.    She explained the --- the motion to dismiss to

8 Ms. Costlow.

9      Q.    What did Ellen Costlow have to say?

10      A.    She didn't like it.

11      Q.    She did not like it.  What'd she say to

12 indicate ---?

13      A.    I can't remember her specific words, but she

14 was --- she was not --- she was not happy with --- she

15 didn't agree with the dismissal.

16      Q.    Okay.

17            So she signed it under protest.

18      A.    No, sir.  I did not say that.

19      Q.    Okay.

20            Well, I'm --- I'm asking.

21      A.    After it was discussed with Ms. Costlow and the

22 prosecutor, she seemed fine with it.  She came to terms

23 with it after Ms. Ashdown explained ---

24      Q.    What --- I'm sorry.  I didn't mean to cut you

215

1    off now.  You go ahead.

2          A.    --- what it entailed, what it meant.

3          Q.    All right.

4                Well, what do you remember Marcia Ashdown

5    explain to Ellen Costlow that resolved --- appeared to

6    resolve Ellen Costlow's objection to what was about to

7    happen?

8          A.    That it would put an end to the criminal

9    proceedings, and this had an element of --- it would

10   benefit everybody involved.

11         Q.    How is it going to benefit Ellen Costlow?

12         A.    That she would --- I believe in here it says

13   --- hold on just one second.  Number six.  Scott Ballock

14   agrees not to contact Ellen Costlow by any means for any

15   reason other than for her --- either child or the

16   children.

17         Q.    During the course of the investigation of the

18   case against Scott Ballock, one that ultimately got

19   dismissed there in April 2017, from the time he was

20   arrested on September 13, 2013, until the day that motion

21   right there was tendered and accepted by Magistrate

22   Mullins, there were no further complaints from Ellen

23   Costlow that Scott Ballock was still contacting here and

24   harassing her, were there?

Sargent's Court Reporting Service, Inc.
1-800-727-4349

216

1      A.   There was a condition of his bond not to

2  contact her.

3      Q.   Okay.

4           That's somewhat responsive, but I'm going to

5  stand by my question.

6      A.   Yes, sir.  No, I'm sorry.  Yes.  I'm sorry.

7  Yeah, no.  She did not have another complaint.

8      Q.   Okay.

9           Yeah, I mean that --- I'll take your point.  I

10  mean, Scott could've been hailed before the court and

11  threatened with confinement if ---

12      A.   Correct.

13      Q.   --- he defied the court.  But fact is, he

14  didn't defy the court?

15      A.   Correct.

16      Q.   Okay.

17           So Marcia explained that the threat of jail

18  didn't hang over Scott anymore, but he did agree that he

19  wouldn't contact her?

20      A.   Correct.

21      Q.   As far as you know, he's honored that, hasn't

22  he?

23      A.   As far as I know, yes, sir.

24      Q.   Yeah.  So what else, if anything, did Ellen

217

1    Costlow get out of this?

2        A.   I --- I don't know that, sir.

3        Q.   Okay.

4            So if --- if, really, the relief that Ellen

5    Costlow was after back in September of 2013 was to just

6    have Scott, once and for all, without any exceptions,

7    stop contacting her, whether it was to try and reconcile,

8    or whether it was to try to shame her, or whatever it is.

9            If what --- that's what she was really wanting,

10   don't you think that due process and a sense of fairness

11   argue for the state police contacting Scott and saying,

12   look, we're ready to execute on a warrant for your arrest

13   if you contact her any further?  Rather than moving ahead

14   with a three-year prosecution that ended in a withdrawal

15   of the charges?

16       A.   No, sir.  No, sir.  There was a document in

17   those emails, text messages that he said he didn't care

18   who contacted him about not contacting her, that he would

19   do it anyway.

20       Q.   Okay.

21           Well, that was between him and her, but ---

22       A.   Correct.

23       Q.   --- once --- once the long arm of law got in

24   touch with him and said, look here.  This --- this could

218

1   get --- this could have some negative consequences for

2   you, and you should stop and consider that.  And don't

3   you think that would've been a measure that should have

4   been attempted prior to launching into this criminal case

5   that ultimately ended with a whimper rather than a bang?

6       A.   No, sir.  I do not.

7       Q.   No?

8       A.   No.

9       Q.   Why?

10      A.   Because of the tone of --- some of the tones of

11  the emails and texts, the length of the websites.

12      Q.   Say again.

13      A.   Websites.

14      Q.   I didn't catch what you said just before that.

15      A.   The length of websites to --- to --- against us

16  and against Ms. Costlow.

17      Q.   Okay.

18           So what I hear you saying is that prior to the

19  time you arrested Scott, there was already stuff being

20  posted on the Internet that told you that Scott needed to

21  be prosecuted?

22      A.   No, sir.  No, I did not say that.  I did not

23  say that.

24      Q.   Then I misunderstood your answer.

219

```
 1        A.    No.  It was just, of course, Mr. Ballock,
 2   Senior had the websites.
 3        Q.    When did you first learn of those websites?
 4        A.    I don't know, sir.  I don't know that.  I don't
 5   know that.
 6        Q.    Okay.
 7              So the websites really didn't have anything to
 8   do with your discretionary judgment as to whether
 9   something short of arrest and criminal prosecution was
10   necessary to get Scott Ballock to cease and desist any
11   further communication with Ellen?
12        A.    No, sir.
13        Q.    Did you answer?  I'm sorry.
14        A.    I said no, sir.  If I --- yeah.
15        Q.    Gabriella Mucciola, M-U-C-C-I-O-L-A.  Did I
16   pronounce that accurately?
17        A.    Mucciola (corrects pronunciation).
18        Q.    Mucciola, sorry.  My Italian is not what it
19   should be.
20              She's an assistant prosecutor at the Monongalia
21   County prosecutor's office?
22        A.    Correct.
23        Q.    Are you aware that she came to family court and
24   sat with Ellen Costlow and argued on Ms. Costlow's behalf
```

220

1    that Scott should not be permitted to use the custody

2    evaluation and psychiatric report prepared by Dr. Christi

3    Cooper-Lehki in the course of his criminal defense?

4                    ATTORNEY PHILLIPS:  And I'll object to it.

5    I think that's a mischaracterization.  She couldn't argue

6    on behalf of Ms. Costlow.  It may ---.

7                    ATTORNEY CROOKS:  She --- she already knew

8    her position.  Whether it was requested or not, she

9    argued against the release of the report.

10                    THE WITNESS:  I know she went to family

11   court, but I don't why she was in family court.  I don't

12   --- I do not know that.

13   BY ATTORNEY CROOKS:

14       Q.    Did you ever work with Gabriella Mucciola in

15   connection with this case against Scott Ballock?

16       A.    She was assigned the case after Ms. Scott had

17   left.  No.  I do not remember working with her --- with

18   her on this case.

19       Q.    Okay.

20            So it was your understanding that they took

21   over from Cindy Scott after she left?

22       A.    Correct.

23       Q.    You're friends with Gabriella Mucciola, am I

24   right?

221

1      A.    No, sir.

2      Q.    No?

3      A.    No, sir.  I don't --- I mean, I don't ---.

4      Q.    You're not?

5      A.    Ms. Mucciola?

6      Q.    Uh-huh (yes).

7      A.    No, sir.  I know of her.  She's in the

8  prosecuting office, but I'm not friends with her.  I

9  mean, ---.

10     Q.    She's married with a state trooper, isn't she?

11     A.    Ex-state trooper.

12     Q.    Ex-state trooper?

13     A.    Yes, sir.

14     Q.    I'm sorry.

15           What --- what's his name?

16     A.    Mike Mucciola.

17     Q.    Mike.  So what did he do?  Did he quit?

18     A.    Went to work for WVU, I believe.

19     Q.    Were you friends with him?

20     A.    He was one of my troopers on Detachemnt.

21     Q.    Okay.

22           Well, all right.  I --- I take it you're a

23  professional person so you're not necessarily friends

24  with everybody you work with.

222

 1          Right?

 2      A.    Correct.  Yes, sir.

 3      Q.    Particularly if you have to supervise them.  I

 4  got you.  I guess that's why I presumed that you were

 5  friends with --- with Gabe because she's married to

 6  somebody that you work with, and ---.

 7      A.    I --- I don't know when that wedding came

 8  about.  It might've been after he left.  I didn't attend

 9  the wedding if that's it.

10      Q.    You weren't invited?

11      A.    I was not invited.

12      Q.    You're good.  You're good.

13          One second.  I think I'm getting very close

14  here to the end of the deposition.  I just want to make

15  sure I got --- one of the hardest things lawyers ever

16  have to do is say no further questions.

17          Do you think Scott Ballock deserves to lose his

18  job as an FBI agent?

19      A.    I did not have any --- that doesn't matter to

20  me whatsoever, sir.

21      Q.    You don't trust yourself to be in his presence

22  for fear that you might put him in a headlock or

23  something?

24      A.    I never said that, sir.

223

1      Q.    Right?

2      A.    Never said that.

3      Q.    You just said --- well, you were very polite

4   about how you said it.

5      A.    I just don't think it's very good idea for us

6   to be in the same vicinity.

7      Q.    All right.

8            Let --- let me boil you down on that a little

9   bit if you don't mind me ---

10     A.    Sure.

11     Q.    --- doing that.  What do you mean by that?

12  What --- what are you afraid is going to happen?

13     A.    I'm not afraid of anything that's going to

14  happen.  You put two people who don't like each other in

15  a close vicinity of somebody, you know, says something or

16  you know, if they're being misconstrued in the wrong way.

17  And --- and we don't want any misconceptions or --- or

18  misunderstandings.

19     Q.    So the two of you being in the same place at

20  the same time has the potential to be a volatile

21  situation?  Could --- unintended provocation could easily

22  happen is what ---.

23     A.    Unintentional misunderstandings.

24     Q.    Yeah.

1      A.    Yes, sir.

2      Q.    You're saying a lot with your nonverbal

3  language that I'm just trying to get into the record.

4  That's just ---.

5      A.    No, sir.  It's --- it's --- it is what it is.

6  You know.

7      Q.    You're very effective in your nonverbal

8  language, but I just --- I need to get it into the

9  record.  That's all.  I understand you.

10           Are you aware that Tom Ballock took those

11  websites down?

12     A.    I believe I am.  Yes.  Either --- yes.  I am

13  aware that he took those websites down.  For now.

14     Q.    Did the --- the state police, the internal

15  affairs --- and I know I'm forgetting the proper name, so

16  help me.

17     A.    Professional Standards Unit.

18     Q.    Professional Standards Unit.  Did they ever

19  have any communication with you about things that Tom

20  Ballock was saying on his website?  Did it ever cause you

21  to be interviewed, or were you suffering embarrassment at

22  work?

23     A.    No, sir.  No --- embarrassment at work?  There

24  were certain nicknames I got.

225

1        Q.    What for?

2        A.    From the websites.  I don't know if it was

3    embarrassment or not.  I didn't like them.

4        Q.    I understand you.

5        A.    But yeah.

6        Q.    There was something else I --- I wanted to ask

7    you about.  Ellen Costlow works as a schoolteacher?

8        A.    Yes, sir.

9        Q.    Marion County?

10       A.    Uh-huh (yes).

11       Q.    Did you serve as a character reference on her

12   behalf to the school?

13       A.    Not a character --- I don't know what she would

14   --- you can take it for what you characterize it as.  I

15   was contacted by the school board.

16       Q.    School board contacted you?

17       A.    I --- I can't remember if they contacted me or

18   I called them back.  I can't remember how that --- that

19   went.  I don't know how that went, sir.

20       Q.    Okay.

21       A.    They wanted to speak to me.

22       Q.    They wanted to talk to you?

23       A.    Correct.

24             They wanted --- yes, yes.

226

1      Q.   You didn't --- you didn't initiate

2   communications with the board?

3      A.   No, sir, I did not.

4      Q.   Fair.  Okay.

5           What were the circumstances?  Help me.  When

6   was it, and what was it about?

7      A.   I don't remember when it was.  They ---.

8      Q.   Well, let me see if I can help you remember.

9   Would it have been during pendency of the criminal

10  charges against Scott Ballock?

11     A.   I don't know.  I can't ---.

12     Q.   That doesn't help you?

13     A.   Yeah.  Does not help me at all, sir.

14     Q.   Okay.

15     A.   It does not.

16     Q.   Well, I'm sorry.  You go ahead.  Tell me what

17  you can remember.

18     A.   They had some questions about, I believe, some

19  letters they were receiving.

20     Q.   From who?

21     A.   I --- I believe they were from Tom Ballock.

22     Q.   Okay.

23     A.   In regard to Ms. Costlow.

24     Q.   Okay.

227

1        A.    And they had --- they had referenced websites,

2    what was on the computer about Ms. Costlow.  And wanted

3    to know, basically, what is this?  This is not normal.

4    This is not something we encounter every day.  And they

5    wanted to --- they wanted me to verify that --- that

6    there was a criminal investigation about harassment, and

7    which I'm sure Ms. Costlow told them.  And that she was

8    being harassed, and --- and that her ex-husband had been

9    charged in that.

10       Q.    Would this recollection that you just shared

11   cause you to think that the school board reached out to

12   you during the pendency of those criminal charges before

13   they were dismissed and expunged?

14       A.    I don't remember that, sir.  I don't remember

15   what timeline that was.

16       Q.    If they had gotten in touch with you after the

17   charges had been dismissed and expunged, you would not

18   have been at liberty to --- to talk about any charges

19   against Scott because of the expungement.

20            True?

21       A.    True.  I, again, I don't remember when that

22   was, sir.

23       Q.    I'm just --- I'm trying to help narrow it down.

24       A.    I understand.

228

1    Q.   Yeah.  I mean, you obviously were at liberty to

2   tell them things about this.  So I'm presuming,

3   surmising, that it was, therefore, prior to the

4   expungement order.

5    A.   I don't know that.  I can't remember that, sir.

6    Q.   Okay.

7    A.   I don't know.

8    Q.   All right.

9         I've tested you enough along that line, I

10   guess.  But you told them that, yes, there were two

11   charges pending, and that you were aware of it.  And

12   that, what, that they shouldn't believe what they read on

13   the Internet ---?

14    A.   I never said that.

15    Q.   Okay.

16         Well, then, tell me what you said.

17    A.   They thought it was abnormal what --- what

18   they'd seen on the websites, and what they'd seen on the

19   computer about Ms. Costlow.  And ---.

20    Q.   There are some pretty unflattering things on

21   that website.

22    A.   True, yes.  And they received information,

23   letters about Ms. Costlow, which, of course, they never

24   have seen anything like this before.  So they were kind

229

1    of, like ---.

2        Q.   You mean, like, parents were writing in

3    saying ---?

4        A.   I don't --- no.  I don't believe parents were

5    writing in.  I did not say that.

6        Q.   All right.

7             I thought maybe a parent had ---

8        A.   No.  I believe it was --- I believe it was ---.

9        Q.   --- seen Tom Ballock's website.

10       A.   I don't know that.  I don't know that.  I think

11   this was specifically about Tom writing letters.

12       Q.   So did you tell the school board that Tom

13   Ballock was a mentally ill person?

14       A.   I don't believe I said that, no, sir.

15       Q.   All right.

16            Well, I know that we --- earlier in the

17   session, you put in writing you didn't think the

18   assistant prosecuting attorney, Cindy Scott, appreciated

19   Tom Ballock's mental illness.

20       A.   Correct.

21       Q.   Okay.

22            Ergo, you know, you had an opinion on that, and

23   I'm wondering if you shared it with the school board.

24       A.   I don't remember the specific conversation.  If

230

 1    I --- I'm sure I didn't unflatterly say anything about

 2    Mr. Ballock.  They wanted to know facts and circumstances

 3    of --- of a criminal charge because they had never seen

 4    anything like this before.

 5        Q.    They were confused.

 6                ATTORNEY JEFFRIES:  I want to place an

 7    objection to this continuing line of questions.  Mr. Tom

 8    Ballock isn't a party to this case.  There's no

 9    allegations concerning ---.

10    BY ATTORNEY CROOKS:

11        Q.    Well that website also makes reference to what

12    Tom Ballock characterize, shall we say, as a scandalous

13    and unfounded criminal case against his son, right?  And

14    this is Ellen's ex-husband or estranged husband depending

15    on when --- when this inquiry was made, right?

16        A.    From what I gathered from the --- the Board of

17    Education, it had nothing to do with what --- it was ---

18    they didn't tell me what was in the letters.  They made

19    reference to unflattering remarks about Ms. Costlow.  And

20    the whole thing, again, was very abnormal to them.  And

21    they wanted a clarification on the whole subject.

22        Q.    Okay.

23                And imagine, I'm trying to understand what

24    you're sharing here.

231

1       A.    Uh-huh (yes).

2       Q.    Was this the school principal or the school

3  board chairman?  Or who was it that called you?

4       A.    I --- I'll believe it was the vice-principal or

5  the principal.  I can't remember which one.

6       Q.    Okay.

7             Somebody on the school board?

8       A.    I believe so.  No, no, no.  I take that back.

9  No, it was not.  It was not.  It was either the assistant

10  superintendent or the superintendent.

11       Q.    Okay.

12       A.    Of Marion County.

13       Q.    That helps me.

14       A.    Yes, sir.

15       Q.    And so did you tell them that, look, you know,

16  I'm investigating Ellen Costlow's estranged husband?

17       A.    No, sir.  I --- I told them that he had been

18  charged.

19       Q.    He had been charged?

20       A.    Yes, sir.

21       Q.    Okay.

22       A.    They had ---.

23       Q.    So they're probably saying who is this guy, Tom

24  Ballock, and why does he say all these things about her,

232

1   and are they true?

2       A.    They knew who he was.

3       Q.    So they knew who he was.  So what was their

4   confusion?  What did they --- what were they confused

5   about?

6       A.    They --- they had just never seen anything like

7   this to the --- to the point of trying to get somebody

8   --- to try to harm somebody or harass somebody or try to

9   get them to lose their job or --- or whatever.  They've

10  never seen anything of this degree before.  It was very

11  unusual, and of course, they saw the websites and

12  everything.

13      Q.    Sure.  How'd you leave it with this assistant

14  superintendent?

15      A.    Sir?

16      Q.    Did you say assistant superintendent, or ---?

17      A.    I can't remember which one it was.  I don't

18  understand how ---.

19      Q.    I mean, was it just the one call, and that was

20  it or ---?

21      A.    I believe it was just one call, sir.  I don't

22  remember having another phone call with them.  There was

23  another phone call made, but not by that --- not by

24  Marion County.

233

1     Q.   Who was it?

2     A.   The state superintendent --- the State Board of

3  Education.

4     Q.   State Board of Education?

5     A.   Yes, sir.

6     Q.   Okay.

7          They were subsequent to the county board?

8     A.   No, sir.   There was --- they received letters

9  also, and called and wanted to know what was going on.

10  Again, they --- they'd never seen anything like this

11  before.   I guess they were receiving letters also.

12     Q.   Okay.

13          Well, what did you tell the State Board of

14  Education?

15     A.   That --- that her soon to be ex-husband or

16  ex-husband had been charged with --- with criminal

17  offense.

18     Q.   Okay.

19          So that these charges were pending, and that

20  was basically all you could tell them?

21     A.   Pretty much, sir.   Yes.

22     Q.   I mean, you could kind of suss that out from

23  the website, that there were charges pending.   But I

24  mean, you couldn't --- you didn't add anything beyond

234

1    that?

2        A.    Not that I can remember, sir.

3        Q.    Did they seem satisfy that you gave them all

4    the information you could?

5        A.    I can't remember if they seemed satisfied or

6    dissatisfied, sir.  I don't --- I don't' remember that.

7        Q.    I'm just trying to get a feel for --- you know,

8    are these people saying what --- you know, you got to

9    know more than that.  And you're saying, well, that's all

10   I can tell you?

11       A.    Well ---.

12       Q.    Is that the flow of the conversation?  I'm

13   telling you what I can tell you.

14       A.    I don't remember the substance of the

15   conversation, sir.  I know, you know, I told there was a

16   criminal charge.  And, again, the whole thing was

17   abnormal to them.  Not normal.

18       Q.    Okay.

19                    ATTORNEY JEFFRIES:  You have much more,

20   Charles?

21                    ATTORNEY CROOKS:  That's exactly what I'm

22   asking myself.  I'll tell you what.  I'll be satisfied to

23   pass the witness, and listen, and --- and finish looking

24   at my document here.  As long as we don't come back

235

1    around, and meet the argument that, you know, I already

2    passed the witness and I can't ask, you know.

3                    ATTORNEY PHILLIPS:   No.  But I'd like to

4    take a break, please.

5                    ATTORNEY CROOKS:   Okay.

6                            ---

7    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

8                            ---

9                    ATTORNEY CROOKS:   Kief Deposition Exhibit

10   11 has been marked.

11                           ---

12                   (Whereupon Deposition Exhibit 11,

13                   Investigation Report, was marked for

14                   identification.)

15                           ---

16   BY ATTORNEY CROOKS:

17       Q.    You've got a copy.

18             This looks like Corporal Gaskins' investigation

19   report.  Is that what it is, signed by Corporal R.M.

20   Gaskins?

21       A.    Yes, sir.

22       Q.    Okay.

23             I couldn't find a date on this anywhere.

24       A.    It was probably attached to the one named ---.

236

1    That's why.  It was probably attached to that.

2        Q.   Okay.

3             Is that routine?

4        A.   Yes, sir.

5        Q.   Okay.

6             That would explain --- I just thought ---

7    although there wouldn't be any reason why this couldn't

8    be dated.

9             Right?

10       A.   No, sir.

11       Q.   Take a look at the last page.  Page eight.  It

12   says this investigation is an initial and complete,

13   cleared by arrest?

14       A.   Yes, sir.

15       Q.   What does that mean?

16       A.   Initial is --- we have two types of

17   investigations, initial investigations and supplemental

18   investigations.  A supplemental investigation would be

19   something that's been completed after the initial

20   investigation is over with, something else to add to the

21   --- to the report.

22       Q.   Okay.

23       A.   Initial is --- this was taken initially

24   and ---.

237

1     Q.   First report?

2     A.   First report.  Yes, sir.

3     Q.   Okay.

4     A.   And the investigation is complete, and it was

5  cleared by the arresting of the ---.

6     Q.   And it's initial and complete, meaning the

7  investigation is done?

8     A.   Until other circumstances might open themselves

9  up ---

10    Q.   Okay.

11    A.   --- to further investigation.

12    Q.   And you're saying that this would've been

13  attached to one of the other exhibits?

14    A.   I believe.  It'd be --- Yes, sir.

15    Q.   Exhibit Number ---?

16    A.   Exhibit Number 5.

17    Q.   And the title of five is?

18    A.   West Virginia State Police Complaint Report.

19    Q.   Date of that?

20    A.   Yes, sir.

21    Q.   What is the date of Exhibit 5?

22    A.   I'm sorry?

23    Q.   You're saying that Exhibit 11 ---

24    A.   Right.

238

1      Q.    --- it had been an attachment to Exhibit 5.

2      A.    If I'm reading it correctly.  Yes, sir.

3      Q.    Okay.

4            Well I'm moving right along with you on this,

5      but my question now is what's the date on Exhibit 5?

6      A.    The --- the turned-in date?

7      Q.    I guess.

8      A.    It would be September the 18th, 2013.

9      Q.    Okay.  Okay.

10           Cleared by arrest.  Cleared by arrest.  What's

11     that mean?

12     A.    We have different ways of classifying reports.

13     One would be the investigation's pending.  Two would be

14     cleared, or cleared by arrest, or prosecution denied,

15     something to that effect.  Juvenile, no custody.  Turned

16     over to another agency, or something like that.  Just the

17     way they classify the report.  Or the investigation, I'm

18     sorry.

19     Q.    Going from this report, it looks like --- it

20     looks like you participated in several aspects of, shall

21     we say, the investigation.  There's a reference I want to

22     find.  I guess I'm over on page five.

23           It looks like Corporal Gaskins went to

24     Magistrate Holepit on Thursday, September 12, at 11:30

239

1    hours and obtained two arrest warrants, which we've

2    already discussed in the session today.

3            Next paragraph says at approximately 18:15

4    hours, presumably the same day.

5            Right?

6    A.    All right.

7    Q.    You read it that way?

8    A.    Sure.

9    Q.    Okay.

10           So we're talking Thursday, September 12th, 2013

11   at approximately 18:15 hours, military.  That would be

12   6:15 p.m. civilian time.  Sergeant M.A. Kief, that's you,

13   scheduled an interview with the victim at the Morgantown

14   detachment.

15   A.    That's incorrect, sir.

16   Q.    Didn't happen?

17   A.    Well, that should've been the beginning --- in

18   the beginning of the report.  I think he's got --- I

19   don't know.  I don't --- I don't know what that is.

20   Q.    He appears to be rather deliberate about how

21   he's doing this.  Could it be that your recollection ---

22   A.    No, sir.  I wouldn't have got ---.

23   Q.    --- failed you?

24   A.    No, sir, not at all.  I would not --- got the

240

1      disk containing the emails and text messages and

2      photographs after the criminal complaint had been filed.

3      That would have been done at the beginning of the

4      investigation.  I believe there's --- I can't say

5      for ---.

6          Q.   Okay.

7          A.   I think that paragraph was --- was ---

8          Q.   Well, that ---.

9          A.   --- inserted someplace it's not supposed to.

10         Q.   There's reference to this paragraph to Sergeant

11     M.A. Kief recorded the interview, but due to technical

12     difficulties, did not record.

13         A.   I don't know what that is about, sir.  I don't

14     remember that at all.  But I believe that --- that

15     paragraph was put in where it's not supposed to be.  Or

16     it's a duplicate paragraph.  I don't know.

17         Q.   Well, take a look at the first page, second

18     paragraph.

19         A.   Uh-huh (yes).

20         Q.   Sergeant M.A. Kief provided the undersigned

21     officer--- that would be Corporal Gaskins --- with the

22     Magnavox DVD-R on Wednesday, August 28th, 2013 at

23     approximately 2:30 in the afternoon.

24         A.   Again, sir, I --- I don't --- I do not know

241

1    what that paragraph is in there.  I don't know.  I would

2    think that getting permission from the attorney --- at

3    that point, we had all that stuff.

4         Q.   Okay.

5              It says at the bottom of the second paragraph

6    that there's a letter attached, but there were not

7    attachments to this document when I got it.  Could this

8    Exhibit 11 have just been part of kind of a package of

9    documents?

10        A.   I don't --- I don't know that, sir.  I don't

11   --- I don't know that.  I didn't create ---.

12        Q.   All right.

13             Maybe I'll just sort that out with Corporal

14   Gaskins.

15             ATTORNEY JEFFRIES:  Charles, where did you

16   get this document?  This isn't --- doesn't have our Bates

17   number on it.

18             ATTORNEY CROOKS:  No, it doesn't.  But I

19   do think it came from --- honestly, I'm not sure --- I

20   mean, if you guys didn't give it to us, I don't know how

21   we got it.

22             ATTORNEY JEFFRIES:  That's not the ---

23   this isn't the copy that they had in their investigation

24   file because Scott's name isn't redacted.  In the copy

Sargent's Court Reporting Service, Inc.
1-800-727-4349

242

1  that we had of their investigation file, his name's

2  redacted.  I think is from somewhere else.

3              ATTORNEY CROOKS:  Good point.

4              All right.

5              Well, honestly, I don't know.

6              ATTORNEY JEFFRIES:  This is a print off.

7              ATTORNEY CROOKS:  I don't know.  I don't

8  --- I don't think this was part of the FBI production

9  because it still would've borne your control series.

10             ATTORNEY JEFFRIES:  Yeah.  I think this

11 either came from the prosecuting attorney's office or

12 from the magistrate court seeing how the name is not

13 redacted, and it doesn't have the ---

14             ATTORNEY CROOKS:  Okay.

15             ATTORNEY JEFFRIES:  --- Bates numbering on

16 it.  For what it's worth ---.

17             ATTORNEY CROOKS:  Well, just to give you

18 some comfort on this point, I'm not --- I'm not really

19 trying to mount some argument that you guys are violating

20 the expungement order.

21             ATTORNEY JEFFRIES:  Well, just, I think

22 that the ---

23             ATTORNEY CROOKS:  I mean, if that's what

24 you're worried about.

243

1          ATTORNEY JEFFRIES:  --- attached letter.

2     I --- I can represent it in --- in our file.  The one

3     that the state police, the May 3rd, 2013 letter from

4     Matthew Stout to --- to your client is in with this.

5          ATTORNEY CROOKS:  Well, that was what I

6     was trying to really get figured out.  You may be right.

7     BY ATTORNEY CROOKS:

8       Q.    Maybe this came from the --- would this have

9     been turned in?  Lieutenant, would this report have been

10    turned in to the --- the magistrate's court?  Or

11    produced, perhaps, as --- as Discovery ---

12      A.    It wouldn't have been ---.

13      Q.    --- in the criminal case?

14          ATTORNEY JEFFRIES:  Could be that.

15          ATTORNEY PHILLIPS:  Yeah.  I'm sure it

16    would've been in the criminal case.

17          ATTORNEY CROOKS:  Mike Benninger would

18    have asked for it.

19          ATTORNEY JEFFRIES:  Yeah.  And would have

20    got it.

21          ATTORNEY CROOKS:  He would've got it.  So

22    now I --- if you were concerned that I was going to argue

23    that you guys were violating the expungement order, don't

24    worry about that.  I won't.

244

1            ATTORNEY JEFFRIES:  No.  I was just trying

2     to clarify what the attached letter was.

3            ATTORNEY CROOKS:  Okay.

4            Yeah.  Well, that was the issue I was

5     trying to sort was ---.

6            ATTORNEY JEFFRIES:  In our copy, the ---

7     the letter is with this.  It's in your closed file.

8            ATTORNEY CROOKS:  Well, that was the

9     question I just asked Lieutenant Kief is, you know.  You

10    read this, and it's like, well, it should just be, like

11    --- like he's already said, Exhibit 5 should be on top of

12    this, and there should be a letter from the lawyer

13    attached to the back of it.  I don't know if we went

14    through patiently and looked at every page.  We probably,

15    maybe, missed it.  See attached emails is referenced on

16    page.

17            So I'm trying to guess, and --- that this

18    is part of a package of stuff in the original police

19    file, although the police file would, no doubt, be

20    redacted.

21            So all right.  I guess --- I guess I'm

22    ultimately not too panicked about it because I think we,

23    from my point, used these referenced attached elsewise

24    anyway.  I don't think I'm --- I don't think I'm being

245

1    denied it.

2    BY ATTORNEY CROOKS:

3        Q.   So would you have reviewed this report before

4    Gaskins put his name at the end of it?

5        A.   I don't know who signed off on that report,

6    sir.

7        Q.   Corporal Gaskins.

8        A.   Well, I know that.  As far as supervising,

9    there's four sergeants at the Morgantown Detachment.  I

10   don't know who would've signed off on the --- on the

11   actual report.  I don't know if I did.  I --- I don't

12   know that.

13       Q.   Fair enough.  But let me explain to you why I'm

14   asking.

15       A.   Sure.

16       Q.   Because the only signature I see is Corporal

17   Gaskins'.

18       A.   True, yes.

19       Q.   I mean, I don't see a countersignature ---

20       A.   Correct.

21       Q.   --- of any supervisor.

22            Do you know if this was sent to Captain

23   Merrill?

24       A.   I don't know that, sir.

246

1      Q.    Captain Merrill just sort of drops out of the

2    picture as far as I can make it out from the documents

3    that I've seen in this case.  What can you tell me to

4    help me understand where he went?  I mean, he started out

5    I want to know what's going on.  You --- you copy me on

6    this, and ---.

7      A.    What I ---.

8      Q.    That enough?

9      A.    What probably happened, sir, is Captain Merrill

10   is --- he was a figure at the Morgantown Detachment.  He

11   worked out of Shinnston, but he lived in Mon County.  He

12   was frequently at the --- the detachment here in

13   Morgantown.

14     Q.    Okay.

15     A.    I would say they had discussions about the case

16   where Captain Merrill wanted to be updated.  He just

17   asked Corporal Gaskins when he saw him at the detachment.

18     Q.    Uh-huh (yes).

19     A.    That's not uncommon for the Captain to stop

20   into the detachment, and speak to the troopers.  And hey

21   what's going on?

22     Q.    I hear you.

23     A.    Yeah.  So I would say that's what happened, but

24   I can't be 100 percent.

247

1      Q.    He did specify, though, he wanted emails.

2      A.    Sure.  Sure.  That's the end of all the memos

3  like that, that they want to be updated ---

4      Q.    Okay.

5      A.    --- by email.  It's been my experience that if

6  they speak to us about the topic, or --- or the

7  investigation, that satisfies them.  They just want to

8  know what's going on with it, to --- to be updated.  So

9  if they speak to us, they're satisfied with that also.

10     Q.    Okay.

11          Well, so what I hear you saying is that it

12  could be that he wasn't copied this report, and maybe he

13  wasn't sent emailed copies of any updates, that maybe he

14  was satisfied with what he heard when he stopped in ---

15     A.    Correct.

16     Q.    --- and let it go at that.

17     A.    Yes, sir.

18     Q.    Okay.

19          After this --- you said when you went to court

20  of April 7, 2016 and the case got withdrawn or dismissed

21  that you didn't anticipate that, and that you were

22  disappointed.  Did you go back to barracks, and --- and

23  call Captain Merrill and tell him what happened?

24     A.    I'm sure he found out some --- I don't remember

248

1   if I called him, or --- somebody called him, I'm sure, to

2   let him know what the disposition was.

3       Q.   I'm equally sure.  I'm just trying to find out

4   who it was that called him.

5       A.   I --- I don't know that, sir.  I don't know

6   that.

7       Q.   Some days there's hell to tell the Captain, and

8   I'm wondering if you were the one to do it.

9       A.   I don't remember that, sir.

10      Q.   Okay.

11          I think that's all the questions I'm going to

12  ask you right now.  Give the other --- others a chance.

13                          ---

14                      EXAMINATION

15                          ---

16  BY ATTORNEY PHILLIPS:

17      Q.   Okay.

18          Lieutenant Kief, I'm --- go back to your first

19  meeting with Ellen back and testified at the beginning of

20  your deposition.  So I'll just make --- make sure I have

21  the sequence in order here.

22          You called Ellen after Tom Ballock called ---

23  called you complaining about an alleged affair between

24  Ellen and Trooper Berry?

249

1      A.   Correct.

2      Q.   Okay.

3           And --- and you told Ellen what --- what Tom

4      had called about.

5           Correct?

6      A.   Correct.

7      Q.   Yeah.  I had --- and then Ellen said she was

8      being harassed by Scott?

9      A.   Yes.

10     Q.   Okay.

11          Did she also say she was being harassed by Tom?

12     A.   I can't remember that.

13     Q.   Okay.

14          And she said he was --- she was being harassed

15     by a volume of unwanted emails and texts?

16     A.   Correct.

17     Q.   And you said that she could come in and talk to

18     you about that?

19     A.   Right.

20     Q.   Okay.

21          And so did she tell you that Scott Ballock was

22     an FBI agent at that time, if you recall?

23     A.   I'm sure she did.

24     Q.   Okay.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

250

1           So then she came in later that --- later that

2     evening.

3           Tight?

4      A.    Yes, sir.

5      Q.    And --- and your testimony kind of cut off

6     there when being asked questions by Mr. Crooks.  What was

7     --- when you met in person, what was discussed?  Did

8     Ellen just give you more details about the harassing

9     emails and texts?

10     A.    Ms. Costlow was emotional.  She had ---.

11          ATTORNEY CROOKS:  She was --- I didn't

12    hear you.

13          THE WITNESS:  Emotional.  I'm sorry.

14          ATTORNEY CROOKS:  Okay.

15          THE WITNESS:  She said that she's being

16    bombarded with text messages, emails.  And that there was

17    no letup, that she was constantly being harassed.

18    BY ATTORNEY PHILLIPS:

19     Q.    Okay.

20     A.    And that her attorney had the context of these

21    emails and text messages.

22     Q.    Okay.

23          Did she --- did she show you any of the --- any

24    sampling o the emails or texts at that time?

251

1      A.    Not that night, sir.  Not --- not that I

2  believe.

3      Q.    Okay.  Okay.

4            And so that was about the extent of your first

5  --- that first meeting?

6      A.    Yes, sir.

7      Q.    Okay.

8            And prior to disclosing this to you when you

9  called after Tom Ballock's call, to your knowledge, Ms.

10 Costlow had never called the --- called the state police

11 to complain about receiving unwanted texts and emails

12 from --- from Scott Ballock?

13     A.    She wouldn't have complained.

14     Q.    Yeah.  She --- okay.  She hadn't --- she hadn't

15 --- to your knowledge, she hadn't tried to initiate any

16 investigation until you happened to call her?

17     A.    She didn't know it was a violation of law for

18 him to do that.

19     Q.    Really?

20     A.    Yes.

21     Q.    Okay.

22            So --- so fair to say, she wasn't, you know,

23 she ---would you say she just disclosed this to you

24 because she was afraid?

252

1      A.   Yes.

2      Q.   Not seeking any kind of any resolve, any remedy

3  for this?

4      A.   No, sir.

5      Q.   Okay.

6           Is it your understanding that she --- she

7  trusted you, and ---?

8      A.   She was --- this was going on in her life, and

9  she didn't know how to stop it.

10     Q.   Okay.

11          So was the --- what was the next step then?

12 Did --- then at some point, was the next step a DVD

13 cop9iled by her attorney delivered to you, or ---?

14     A.   There was --- yes, the CD, and she got that

15 information.  Or I can't --- I can't remember how that

16 was given to us.

17     Q.   Okay.

18     A.   Whether we got it from Matthew Stout or how we

19 got that.  I can't remember that.

20     Q.   Okay.

21          And at what point did --- at what point did you

22 talk to Captain Merrill?  Was it after --- after you

23 received the DVD?

24     A.   I don't know that, sir.  I don't know if it was

253

1    before or after we received the DVD.  Well before we

2    started the investigation, before we looked at anything,

3    we would have to get permission from --- from the

4    Captain.  Well, Charles through the Captain.

5         Q.   Before you looked at the DVD ---?

6         A.   I'm sure we did, yes.

7         Q.   Okay.  Okay.

8              So you did --- did that.  And then were you the

9    first person to view the DVD?

10        A.   I don't believe I viewed the DVD, sir.  I

11   believe it was Corporal Gaskins ---

12        Q.   Okay.

13        A.   --- that, yes.

14        Q.   Okay.

15        A.   I might be a little bit off on my times.

16        Q.   Yeah.

17        A.   It's been a long time ago, but ---.

18        Q.   And Corporal Gaskins reported what he found to

19   you?

20        A.   He would during his investigation.

21        Q.   Okay.

22             And so did you --- did you view the texts and

23   --- and emails also?

24        A.   Some of them.

254

1       Q.    Okay.

2             Just not in as --- not as thoroughly as

3    Corporal Gaskins?

4       A.    Correct.

5       Q.    Okay.

6             And the text and emails, you've described that

7    as --- as Ms. Costlow being bombarded.  They're --- they

8    --- they don't stop, I guess you're saying?

9       A.    Correct.

10      Q.    And are the content of some of them, some of

11   them demeaning in a way?

12      A.    Yes, sir.  I would say that, Yes, sir.

13      Q.    Yeah.  Some of them abusive?

14      A.    Demeaning, maybe threatening in manner.

15      Q.    Uh-huh (yes).  You think Ms. Costlow is

16   justified in being afraid by the --- the number and the

17   content of the emails?

18      A.    Yes, sir.

19      Q.    And from your --- in your review, did --- did

20   the volume and the content --- well, let me go back.  And

21   also, at many points in this --- in the emails from back

22   and forth between Mr. Ballock and Ms. Costlow, Ms.

23   Costlow tells him to stop?

24      A.    Correct.

255

1      Q.    That was in the she doesn't want these, she

2  doesn't want to receive any --- any more communication?

3      A.    Correct.

4      Q.    And he does not stop?

5      A.    Correct.

6      Q.    All right.

7           And you found the --- the volume of the emails,

8  the content, and the fact that she --- that he refused to

9  stop when asked is --- constitutes a criminal offense?

10     A.    Correct.

11     Q.    Okay.

12          And then, the kind of chain of this, you ---

13  and Corporal Gaskins also found probable cause that Scott

14  Ballock had committed two criminal offenses by virtue by

15  sending these emails and texts?

16     A.    Corporal Gaskins and the prosecuting attorney

17  thought there was enough evidence to do that.  The

18  magistrate found probable cause.

19     Q.    Okay.

20     A.    And administered the arrest warrants.

21     Q.    Yeah.

22          Okay.

23          And then --- and then a couple, three years

24  later, Scott Ballock also signed the paper saying that

256

1    there was probable cause for the charges?

2        A.    Correct.

3        Q.    Okay.

4              And I guess --- and when Ms. Costlow first came

5    to you, was she afraid for her safety?

6        A.    Seemed to be, yes, sir.

7        Q.    Yeah.  Was she still afraid at times during ---

8    while the criminal proceedings were going on?

9        A.    Yes, sir.

10       Q.    Were you afraid for her safety at any time?

11       A.    I found some of the emails and texts to be

12   concerning.

13       Q.    Uh-huh (yes).  Think she has any reason to be

14   afraid today?

15       A.    I don't know that.

16       Q.    And you discussed the --- was --- was any other

17   trooper working on the case with Corporal Gaskins?

18       A.    No, sir.

19       Q.    Okay.

20             And did you --- did you formally discuss the

21   case with anyone else with the state police besides

22   Gaskins and --- and Merrill?

23       A.    If the Captain had asked questions about it,

24   I'm sure I answered his questions.

257

1      Q.    Okay.

2            Did you ever discuss the investigation with

3    Trooper Berry?

4      A.    No, sir.

5      Q.    To your knowledge, did anyone?

6      A.    Not that I know of, sir.

7      Q.    All right.

8            Yeah.  To your knowledge, did he play any role

9    whatsoever in the investigation?

10     A.    Not that I know of, sir.

11     Q.    Okay.

12           And --- and I was a little confused with the

13   communications with the FBI.  Is it your understanding

14   that --- that state police spoke with the FBI to where

15   some decision was made about --- about where Mr. Ballock

16   should be arrested?

17     A.    We conferred with the FBI about how he was

18   going to be arrested.

19     Q.    Okay.

20           And who represented the state police in that

21   discussion?

22     A.    I cannot remember that, sir.  I don't know if I

23   spoke to the FBI or Corporal Gaskins.  I can't recall.

24     Q.    Okay.

258

1          And so the --- the arrest in family court, well

2     that was done, I guess, obviously.  But now, with the

3     FBI, they had an agent there?

4          A.   Yes, sir.

5          Q.   And it's fair to say they approved the arrest

6     occurring in that matter?  Manner.  At that --- at that

7     place, at that time?

8          A.   They didn't say anything to the contrary.

9          Q.   Okay.

10          And you --- and you thought it was --- well I

11     guess the arrest in family court had the advantage that

12     he wouldn't be --- Mr. Ballock wouldn't be armed.

13          Right?

14          A.   Correct.

15          Q.   And --- and it would be less --- less

16     embarrassing for him than being arrested at work?

17          A.   Work or home or work.

18          Q.   And possibly in front of his kids?

19          A.   Absolutely.

20          Q.   You wanted to avoid that?

21          A.   Yes, sir.

22          Q.   And so then you said that Ms. Costlow

23     originally was upset that an agreement had been --- her

24     initial reaction to the agreement that when --- the

259

1    dismissal, the charges against Mr. Ballock, her initial

2    reaction was she was kind of upset?  She didn't like it?

3            Am I correct?

4        A.    Correct.

5        Q.    But then after talking with Marcia Ashdown, she

6    --- she had a different reaction to the agreement?

7        A.    I think she came to terms with it.

8        Q.    Okay.

9            And you said that, I guess, your impression

10   that she liked the benefit of being protected against

11   future contact ---

12       A.    Correct.

13       Q.    --- from Scott.  And also, did you get a sense

14   that she was just relieved to have it over with?

15       A.    Yes.  Absolutely, yes.

16       Q.    And she liked the idea that --- was it your

17   impression that she thought by agreeing to this that Mr.

18   Ballock could keep his job?

19       A.    I believe so, sir.

20       Q.    Yeah.  And she had expressed to you, at least

21   once, that she wanted Scott to keep his job?

22       A.    Yes, sir.

23       Q.    And thought, you know, well-paying job, it'd be

24   good, you know, to support their children?

260

1  A. Correct.

2   She just wanted the harassment to stop.

3  Q. Yeah.

4  A. For the texting.

5  Q. And I guess you didn't mention it, but in

6 reviewing the --- the texts and emails from, which you

7 and others of the state police and the prosecutor's

8 office concluded crimes were being committed.  Can you

9 tell me what --- what role Scott Ballock's position as an

10 FBI agent played in that?  Did that kind of --- did that

11 make it more threatening, in your opinion, more --- more

12 abusive, harder to ---?

13  A. The only thing I can think of in that respect

14 was that Mr. Ballock would threatened Mrs. Ballock with

15 the --- Ms. Costlow --- with the FBI.

16  Q. Uh-huh (yes).

17  A. That she would be arrested or --- or something

18 like that.

19  Q. Yeah.

20   Okay.

21   You don't think, in general, repeated, unwanted

22 emails coming from a law enforcement officer can have

23 even more harassing and intimidating effect?

24  A. I don't know with her.  I don't know.  That

261

1   never really, you know.  She --- she was afraid of him,

2   and she --- she would --- she always said that she was

3   afraid of his job because he would threaten her with his

4   job.

5        Q.    Right.

6              Okay.

7              But I take it --- okay.  I see it didn't.  His

8   position as an FBI officer really didn't ---?

9        A.    In ---?

10       Q.    Yeah.  Come into --- it's just --- you just ---

11  just saw the texts, that his --- his occupation didn't

12  really matter.

13       A.    That was a violation of law regardless of if he

14  was an FBI agent or not.

15       Q.    Yeah.

16             Okay.

17             And --- let's back up.  A point I wanted to

18  make with the --- the investigation was based upon the

19  emails and texts, correct?  They --- there's talk about

20  whether or not witnesses were interviewed, that the

21  emails and texts spoke for themselves?  Basically, the

22  investigation.

23       A.    Correct.

24       Q.    Were there --- if --- if Kenny Ice were

262

1    interviewed, that wouldn't change what the texts and

2    emails said?

3         A.   Not that I can think of, sir.

4         Q.   Or if anyone else was interviewed.  And the ---

5    I guess, whether material in the email was true or not

6    was irrelevant in your analysis, wasn't it?  It was just

7    they were --- they were unwanted.  They kept coming.

8         A.   Yes, sir.

9         Q.   Volume, thousands of them after Ms. Costlow

10   said don't contact me?

11        A.   Correct.

12        Q.   And then we discussed some had even more

13   inappropriate or threatening nature?

14        A.   Correct.

15        Q.   And I guess the entire set of texts and emails

16   that Mr. Crooks referred to as 800 and some pages

17   earlier, those were all turned over to the prosecutor's

18   office?

19        A.   Correct.  Yes, sir.

20        Q.   And in your understanding, Mr. Ballock has

21   never disputed that he wrote all those texts and emails?

22        A.   No, sir.

23        Q.   Okay.

24             In fact, he hasn't disputed it in this case?

263

1     A.    Correct.

2     Q.    Okay.

3           And I guess --- and I guess --- do you --- do

4     you know on the criminal case, there's testimony ---

5     testimony about it dragging on because of Magistrate

6     Mullins' illness.  Is it your impression that Scott was

7     in agreement with waiting until Magistrate Mullins

8     recuperated rather than having it transferred to another

9     magistrate?

10    A.    Yes, sir.  It was our belief that --- the

11    information that we got, they were waiting on Magistrate

12    Mullins to come back from his medical leave.

13    Q.    Okay.

14          And that was ---?

15    A.    We had the same questions.

16    Q.    Okay.

17          Mainly --- and that was the position of --- of

18    Scott and his attorney?

19    A.    Yes, sir.

20    Q.    Okay.  Okay.

21          I have nothing --- nothing further for now.

22                ATTORNEY JEFFRIES:  Just a few follow ups.

23          If you go back to Exhibit 2, okay, this is

24    the Monongalia County Call Summary Report of Ms. Ellen's

264

1    call there at Ms. Costlow's house on August 12th, 2013.

2                    ATTORNEY CROOKS:  What was the exhibit

3    number on that?

4                    ATTORNEY JEFFRIES:  Two.

5                    ATTORNEY CROOKS:  Thank you.

6                              ---

7                          EXAMINATION

8                              ---

9    BY ATTORNEY JEFFRIES:

10        Q.   You don't routinely, at state police, receive

11   call summary reports from the sheriff's departments in

12   various counties, do you?

13        A.   No, sir.

14        Q.   Okay.

15             And I believe you testified that you had seen

16   this at some point, but you couldn't recall when.  Do you

17   have any reason to believe that you had seen this report

18   at the time that Ms. Costlow contacted you about filing a

19   complaint against Mr. Ballock?

20        A.   No, sir.

21        Q.   And am I correct that different law enforcement

22   agencies have different policies on what's put in the

23   report or when it has to be filed?

24        A.   Correct.

265

1      Q.    So the Monongalia County's police is not the

2  same as the state polices'?

3      A.    Correct.

4      Q.    You testified earlier in response to some

5  questions form Mr. Crooks that you harbor ill feelings

6  against Scott Ballock and his father.  Do you recall that

7  testimony?

8      A.    Yes, sir.

9      Q.    Did you harbor ay ill feelings towards Scott

10  Ballock at the time that Ms. Costlow first contacted you?

11      A.    No, sir.

12      Q.    When did you start to --- to develop ill

13  feelings towards the Ballocks?

14      A.    When my --- their focus became to harass me on

15  the Internet.

16      Q.    And that was after the --- Mr. Ballock was

17  arrested?

18      A.    Yes, sir.  I believe so.

19      Q.    And how did they harass you on the Internet?

20      A.    Just putting certain things on the Internet

21  about my personal life, my pictures, calling me names,

22  slandering the investigation, slandering my role in the

23  investigation, pretty much stating that I had an affair

24  with Ms. Costlow, pretty much putting it out there that I

266

1      was a pretty --- I wasn't a very good police officer.

2          Q.    And so they were posting their --- I guess Tom

3      Ballock was posting stuff on the Internet about the

4      criminal investigations.  So I take it from that that the

5      websites didn't come up until after Mr. Ballock was

6      arrested?

7          A.    I believe so, yes.

8          Q.    You talked about after the charges were

9      dismissed, and the charges against Mr. Ballock were

10     dismissed.  You had some contact with the FBI.  Who

11     initiated that contact?

12         A.    After the charges were dismissed?

13         Q.    That's correct.

14         A.    That would be the FBI.

15         Q.    They contacted you and said they wanted to

16     talk?

17         A.    Correct.  Yes.

18         Q.    When you're conducting an investigation, do you

19     routinely contact the suspect and --- and give them a

20     warning that you're preparing to file charges, and that

21     if they don't stop the behavior, you will fire charges?

22         A.    No, sir.

23         Q.    That's not the rule of the police to issue

24     warnings, is it?

267

1       A.    No.   No, sir.

2                   ATTORNEY JEFFRIES:   That's all I got.

3                   ATTORNEY CROOKS:   Thank you, Lieutenant.

4    Appreciate your time and careful attention to all my

5    questions.

6                   ATTORNEY JEFFRIES:   Lieutenant Kief, you

7    have the right to review your deposition transcript or

8    you can waive the right, and just accept it as it is.  Do

9    you want to read or do you want to waive?

10                  THE WITNESS:   Can we discuss that?

11                  ATTORNEY CROOKS:   Just have him waive.

12                  ATTORNEY JEFFRIES:   He'll read.   Let's

13   just --- he'll read.

14                  ATTORNEY CROOKS:   All right.

15                        *  *  *  *  *  *  *  *

16                  DEPOSITION CONCLUDED AT 7:23 P.M.

17                        *  *  *  *  *  *  *  *

18

19

20

21

22

23

24

268

1    STATE OF WEST VIRGINIA   )

2

3                            CERTIFICATE

4          I, Guy Starrett, a Notary Public in and for the

5    State of West Virginia, do hereby certify:

6          That the witness whose testimony appears in the

7    foregoing deposition, was duly sworn by me on said date,

8    and that the transcribed deposition of said witness is a

9    true record of the testimony given by said witness;

10          That the proceeding is herein recorded fully and

11   accurately;

12          That I am neither attorney nor counsel for, nor

13   related to any of the parties to the action in which these

14   depositions were taken, and further that I am not a

15   relative of any attorney or counsel employed by the

16   parties hereto, or financially interested in this action.

17

18          I certify that the attached transcript meets the

19   requirements set forth within article twenty-seven,

20   chapter forty-seven of the West Virginia Code.

21

22          OFFICIAL SEAL
            STATE OF WEST VIRGINIA
            NOTARY PUBLIC
            GUY STARRETT
23          The Peoples Bldg., Suite 617
            179 Summers St.                     Court Reporter
            Charleston, WV 25301
24          My commission expires July 17, 2023