IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

OF WEST VIRGINIA

* * * * * * * *

SCOTT T. BALLOCK,                          *

    Plaintiff                          *   Case No.

    vs.                                *   1:17-CV-52

ELLEN RUTH COSTLOW                         *

STATE TROOPER MICHAEL KIEF,                *

STATE TROOPER RONNIE M. GASKINS,   *

STATE TROOPER CHRIS BERRY,                 *

    Defendants                         *

* * * * * * * *

DEPOSITION OF

TROOPER CHRIS BERRY

May 29, 2019

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

2

1                          DEPOSITION

2                             OF

3       TROOPER CHRIS BERRY, taken on behalf of the Plaintiff

4       herein, pursuant to the Rules of Civil Procedure, taken

5       before me, the undersigned, Guy Starrett, a Court

6       Reporter and Notary Public in and for the State of West

7       Virginia, at Steptoe & Johnson, PLLC, 1085 Van Voorhis

8       Road, Suite 400, Morgantown, West Virginia, on Wednesday,

9       May 29, 2019, beginning at 4:19 p.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

```
 1                    A P P E A R A N C E S

 2

 3    CHARLES J. CROOKS, ESQUIRE

 4    Crooks Law Firm, PLLC

 5    244 Pleasant Street

 6    Morgantown, WV  26505

 7        COUNSEL FOR PLAINTIFF

 8

 9    MARK G. JEFFRIES, ESQUIRE

10    Steptoe & Johnson, PLLC

11    400 White Oaks Boulevard

12    Bridgeport, WV  26330

13        COUNSEL FOR DEFENDANTS, STATE TROOPER KIEF, STATE

14        TROOPER RONNIE M. GASKINS, STATE TROOPER CHRIS BERRY

15

16    TODD PHILLIPS, ESQUIRE

17    Lyons Phillips Legal Group, PLLC

18    141 Walnut Street

19    Morgantown, WV  26505

20        COUNSEL FOR DEFENDANT, ELLEN RUTH COSTLOW

21

22

23

24
```

4

1                          I N D E X

2

3     WITNESS: CHRIS BERRY

4     EXAMINATION

5        By Attorney Crooks                          7 - 35

6     EXAMINATION

7        By Attorney Jeffries                       35 - 39

8     RE-EXAMINATION

9        By Attorney Crooks                         39 - 43

10    DISCUSSION AMONG PARTIES                       43 - 44

11    CERTIFICATE                                         45

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1                    <u>EXHIBIT PAGE</u>

2

3                                              PAGE

4    <u>NUMBER</u>   <u>DESCRIPTION</u>                     <u>IDENTIFIED</u>

5                          NONE OFFERED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

6

1                                OBJECTION PAGE

2

3       ATTORNEY                                          PAGE

4                                 NONE MADE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

7

S T I P U L A T I O N

----------------------------------------------------------

(It is hereby stipulated and agreed by and between counsel

for the respective parties that reading, signing, sealing,

certification and filing are not waived.)

----------------------------------------------------------

P R O C E E D I N G S

----------------------------------------------------------

                TROOPER CHRIS BERRY,

CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

FOLLOWS:

                       ---

                   EXAMINATION

                       ---

BY ATTORNEY CROOKS:

     Q.    Good afternoon.

     A.    Good afternoon.

     Q.    Your name is Christopher Berry?

     A.    Yes, sir.

     Q.    Okay, thank you.

           Middle name?

     A.    John.

     Q.    Christopher John Berry.

8

1          All right.  What's your date of birth, please?

2     A.   1984.

3     Q.   And where were you born?

4     A.   Morgantown, West Virginia.

5     Q.   Graduate Morgantown High or ---?

6     A.   Morgantown High.

7     Q.   What year was that?

8     A.   2003.

9     Q.   After you graduated high school, did you go

10    straight into college?

11    A.   Yes, sir.

12    Q.   Where?

13    A.   First year was at WU, in Journalism.  Then

14    second year I transferred down to Fairmont State for

15    Criminal Justice.

16    Q.   Did you graduate from that program?

17    A.   No, I'm actually 40 credits away to going to

18    State Police -.

19    Q.   Okay.

20         So help me, then, what year was it that you

21    joined the State Police?

22    A.   2008.

23    Q.   You were already a student at Fairmont and you

24    were studying Criminal Justice.  So is it fair to suggest

9

1    that State Police work with the sort of thing you wanted

2    to do anyways, so you may as well sign up now?

3         A.   Yeah.  State Police was my main direction.

4         Q.   Okay.

5              Did you go to the academy?

6         A.   Yes, sir.

7         Q.   This same year?

8         A.   Yes, sir.

9         Q.   Okay.

10             What months were you there?

11        A.   It was August 2008 to February 2009.

12        Q.   So after you graduated the academy in February

13   2009, where did you post first?

14        A.   Martinsburg.

15        Q.   How long were you there?

16        A.   Until 2012.

17        Q.   Your second post?

18        A.   Fairmont.  Which was only for approximately two

19   months.

20        Q.   Third?

21        A.   Morgantown.

22        Q.   Have you been in Morgantown ever since?

23        A.   Just recently went back down Fairmont, back in

24   April.

10

1     Q.    So you came to Morgantown in 2013?

2     A.    '12.

3     Q.    '12.

4     A.    Yes, sir.

5     Q.    Do you know Ellen Ruth Costlow?

6     A.    Yes.

7     Q.    When did you first make the acquaintance of

8  Ellen Ruth Costlow?

9     A.    I do not remember the exact date, but it was

10  around 2013 summertime.  Maybe early spring.

11          I can't remember the exact date.

12     Q.    At that time, she went by the name Ellen Ruth

13  Ballock?

14     A.    Yes.

15     Q.    Okay.

16          Tell me what you remember about your first

17  meeting with Ellen Ruth Ballock.

18     A.    That day, whatever that date was, I was driving

19  through certain subdivisions, because we had a string of

20  vehicle break-ins.  I remember it was a white vehicle,

21  possibly a Nissan, was the suspect vehicle.  But we had a

22  rash string of break-ins going on.

23          And it all led back to this vehicle.  And any

24  time I'm in neighborhoods or anything and I see people

11

1    out in their driveways or yards, I stop to talk to them.

2    Ellen was one of them.

3         Q.   The address of the Ballock residence was 51

4    Summit Overlook Drive.

5         A.   Okay.

6         Q.   Which I understand is part of the Thistledown

7    Development.

8         A.   Yes, sir.

9         Q.   Okay.

10             So we're talking about the neighborhood that

11   overlooks the Interstate 79 near the Goshen Road exit.

12        A.   Yes, sir.

13        Q.   Okay.

14             So your first opportunity to meet Ellen Ballock

15   was late spring, early summer of 2013.  You were cruising

16   the neighborhood and looking for a suspect vehicle.

17             You saw Ellen outside, stopped and spoke to

18   her?

19        A.   Yes, sir.

20        Q.   Okay.

21             Tell me, what did you discuss?

22        A.   Just pretty much advised her of the situation

23   while I was there.  And if she ever saw any suspected

24   vehicles driving through the neighborhood.  I advised her

12

1    of the suspect vehicle, but we didn't have a plate number

2    for it.

3            And that if she would happen to see this

4    vehicle or suspect vehicle that matches the description I

5    gave her, to --- if she could get a plate, please let us

6    know.

7        Q.    Sure.

8            Did she have any information for you?

9        A.    No.  She said she'd keep an eye out of it,

10   though, like anybody else would.  I advised her to tell

11   her neighbors just heads up, everything.

12       Q.    Okay.

13           Can you tell me what the next occasion was

14   whenever you next saw or communicated with Ellen Ballock?

15       A.    Next time I saw her was referencing a --- well,

16   it was over a laptop that had to deal with her ex-

17   boyfriend.

18       Q.    Stolen laptop, and the suspect was her ex-

19   boyfriend?

20       A.    She referred to him as an ex-boyfriend.

21       Q.    Are we talking about Kenny Ice?

22       A.    Yes, sir, Kenny Ice.

23       Q.    That'd be easier.

24       A.    Yeah.  But it wasn't actually --- she didn't

13

1   report it stolen.  She actually reported it as like it

2   was destroyed by him.  Now, maybe he stole and destroyed

3   it.

4           That's where she's getting the stolen part, but

5   it was more for it being destroyed.

6       Q.   Okay.

7           Did you prepare and file any documentation with

8   the State Police to give evidence or memorialize your

9   contact with Ellen Ballock about this laptop issue?

10      A.   No.

11      Q.   Okay.

12          Why is that?

13      A.   Come to find out the property was destroyed and

14  all this --- well, whatever is stolen and destroyed or

15  both, it all occurred in Marion County.

16      Q.   You're a State Police officer.  So you got

17  jurisdiction in Marion County, too.

18          Right?

19      A.   Yes, sir.  We have the whole state, but where

20  we're stationed Morgantown, we just only deal with

21  Monongalia County crimes.

22      Q.   Okay.

23      A.   I advised her if she wanted to make a report

24  she had to go down to the Fairmont and file a report with

14

1    the Fairmont State Police.

2         Q.   Okay.

3              My next question --- I'll go ahead and ask my

4    next question was going to be, could you have notified

5    the Fairmont detachment that this was a matter that was

6    going to be coming their way?

7         A.   No, I wouldn't have.  I just told if she wanted

8    to file it, she needed to run down there and file it with

9    the,

10        Q.   Okay.

11        A.   Because we all have different shifts.  I could

12   tell a Trooper who's working that night, but that doesn't

13   mean she's going to be down there that night.

14        Q.   Okay.

15             So it's kind of a logistical issue that

16   motivated you to handle it the way you did?  You just

17   told her, look you know the smart thing for you to do

18   would be go down to the detachment in Fairmont?

19        A.   Yes, sir.

20        Q.   Okay.

21             Now, when you contacted her --- strike that.

22             When you spoke with Ellen Ballock about this

23   laptop issue, ---

24        A.   Yes, sir.

15

1     Q.    --- can you tell me, was this at the end of a

2  shift, at the beginning of a shift?

3          What shift were you working?

4     A.    It was an evening shift and I was working that

5  night.

6     Q.    Okay.

7     A.    So --- but our shifts are sporadic.  We're

8  either dayshift or evening.  It's throughout the week

9  wherever we are and less restricted midnight shifts.

10     Q.    Just making a note.  And I was trying to listen

11  to you at the same time.

12     A.    If you're midnight shift, you're straight

13  midnight shift.  But if you're not on midnight shift,

14  let's say your first three days of working you're evening

15  your last few days are dayshift.

16          That kind of gives you --- what the Sergeants

17  do for that is to give you a longer weekend.  In contrast

18  that's so you're coming in late on your Monday, but

19  leaving early on your Sunday.

20     Q.    Okay.

21          I think I follow that.  Very civilized.

22     A.    Yes, sir.

23     Q.    Yeah, you have good Sergeants.

24          Are you married?

16

1          A.    Yes, sir.

2          Q.    How long?

3          A.    Ten years.

4          Q.    Kids?

5          A.    Nope.

6          Q.    So did you provide your cellphone number to

7     Ellen Ruth Ballock?

8          A.    Yes, sir.

9          Q.    You did?

10         A.    Uh-huh (yes).

11         Q.    Okay.

12               Why'd you do that?

13         A.    I've always handed my cellphone number out to

14    people.  It's one thing we'd done back in Charlestown as

15    State Police, when I was over in the Martinsburg,

16    Charlestown area.

17         Q.    The cellphone number that you gave to Ellen

18    Ruth Ballock, was that a State Police phone or was that

19    your personal phone?

20         A.    Personal phone.

21         Q.    Okay.

22               Just to be clear about this.  You guys don't

23    have West Virginia State Police issued telephones?

24         A.    They can't afford that, no.

17

1      Q.    Okay.

2            So when did you give her your cellphone?  Was

3      it the first time you saw her when you were looking for

4      that suspect vehicle or ---?

5      A.    Yes, sir.

6      Q.    Okay.

7            Was there ever an arrest made in that break-in

8      case?

9      A.    Yeah.  Actually there was.  We did find them.

10     We charged then with over --- I know it was over 150

11     counts of vehicle arson.

12     Q.    The white Nissan, was that accurate?

13     A.    Yes, sir.

14     Q.    Okay.

15     A.    Actually, he got rid of the Nissan and then

16     went to a Silver Honda or something.  I can't remember

17     what it was.

18           I know that it was a silver car that he

19     transitioned to, when he dealt with a couple new buddies

20     that were stealing for drugs.

21     Q.    The break-ins that happened, what kind of

22     timespan did that cover?

23     A.    Months.  I mean, I can't give exact dates, but

24     it was --- what they always did was stiff developments.

18

1   They would park somewhere in the development and just

2   walk from house to house, driveway to driveway checking

3   car doors.

4        Q.   Was the Ballock residence included among the

5   victims of the break-ins?

6        A.   If it was, I didn't investigate it.  But like I

7   said, I was just going there --- going through

8   neighborhood to neighborhood.

9        Q.   Okay.

10            Tom Ballock, do you know what name?

11       A.   Didn't know it until all this came out.

12       Q.   Okay.

13            All this came out meaning?

14       A.   The lawsuit and all.

15       Q.   Okay.

16            Okay.  So you're talking about this litigation

17   that brings us together?

18       A.   Yes, sir.

19       Q.   Okay.

20            I don't think you were here yesterday when

21   Lieutenant Kief sat for a deposition?

22       A.   No, sir.

23       Q.   You were here today for --- Sergeant party.

24   You were here today for Sergeant Gaskins' deposition,

19

1    though?

2         A.    Yes, sir.

3         Q.    Okay.

4               So you heard me question him about a telephone

5    call that Tom Ballock placed to the barracks.  And he

6    spoke with, then Sergeant Kief, now Lieutenant Kief?

7         A.    Yes, sir.

8         Q.    Okay.

9               That's what I want to talk with you about.

10        A.    Okay.

11        Q.    Tom Ballock seemed convinced that there was an

12   affair going on between Ellen Ballock, now Ellen Costlow,

13   and you.

14        A.    Yes, sir.

15        Q.    Well, first of all, let me just put the

16   question to you directly.

17               Have you ever had a sexual relationship with

18   Ellen Ballock?

19        A.    No, sir.

20        Q.    Okay.

21               Ellen Ballock would be Ellen Costlow now.

22        A.    Yes, sir.

23        Q.    All right.

24               So we know who we're talking about.  And so

20

1    your answer to that in unequivocally, no.

2       A.   Yes, sir.

3       Q.   All right.

4            Now, I have not interviewed Tom Ballock about

5    his suspicion, but I know that there was a point in time

6    when the Monongalia County Sheriffs' Department went to

7    that Ballock residence, there in the Thistledown ---

8       A.   Yes.

9       Q.   --- Thistledown neighborhood.

10           And the reason they were called there was

11   because of a domestic dispute that was going on between

12   Ellen Ballock and Kenny Ice.

13      A.   Yes, sir.

14      Q.   Okay.

15           Matter of fact we marked as an exhibit a

16   document that helps memorialize that whole thing.  Let's

17   just take a look at it.

18           You've got the official stack of exhibits

19   there.  I'm looking at Exhibit 2.

20      A.   Got it.

21      Q.   Okay.

22           Have you ever seen this before?

23      A.   A Sheriffs' Department report, I've seen them

24   before.  But no, I have not seen this specific one.

21

1          Q.    Yeah, okay.

2               That was my --- actually my question was, have

3     you ever seen this one before?  I thought maybe you

4     might've reviewed it in anticipation of giving your

5     deposition.

6          A.    No, sir.

7          Q.    Okay.

8               Let me just give you kind of a chance to look

9     through that.  Because I don't know if it's going to be

10    very productive and fair to sit here and ask you

11    questions about something you haven't heard of.

12                              ---

13    (WHEREUPON, WITNESS REVIEWS DOCUMENT.)

14                              ---

15                   THE WITNESS:  Okay.

16    BY ATTORNEY CROOKS:

17         Q.    You've only had the chance to read this since I

18    showed it to you a couple minutes ago.  So in fairness to

19    you, I'll direct you a little bit here to the part of the

20    document that is of interest to me.  I think the first

21    place I want to go is the second full paragraph of Deputy

22    Snyder's narrative.

23               More specifically, I'm looking at the top of

24    page two.  See reference there to Mrs. Ballock stated she

22

1    was texting Trooper Berry.

2         A.    Yes, sir.

3         Q.    About meeting him earlier in the day, to speak

4    with him about the computer.

5         A.    Yes, sir.

6         Q.    Okay.

7               So personally, Trooper Berry, that's you?

8         A.    Yes, sir.

9         Q.    There's no other Trooper Berrys, are there?

10        A.    No.

11        Q.    Okay.

12              And reference to the computer would be the

13   computer issue that you had talked with her about, where

14   you discovered that the event, if it happened, happened

15   in Marion County.

16              So you referred her there?

17        A.    Yes.

18        Q.    Okay.

19              So first thing I want to do it utilize this

20   document to suggest that your encounter with Ms. Ballock

21   was earlier the same day of this report, August 12, 2013.

22              And the reason I make that suggestion is

23   because Deputy Snyder writes here that he was told by

24   Mrs. Ballock that she was texting you about meeting with

23

1   her earlier in the day.

2       A.    Uh-huh (yes).

3       Q.    So I interpret that to mean the same day,

4   August 12th.

5           Are you okay with what this is suggesting?

6   Does this sound like it's plausible, that August 12 was

7   the day you encountered her about the laptop issue?

8       A.    That probably would be right, yes.

9       Q.    Okay.

10          I mean, let me put it to you this way.  You're

11  a busy guy.  You do a lot of stuff, I know.

12          So maybe the better way to do it is to say, do

13  you have any reason to doubt that it was August 12, 2013

14  when you dealt with Ellen Ballock about this computer

15  issue?

16      A.    Yeah, because it was only one time only when I

17  dealt with her about the laptop, so this would have to be

18  the day.

19      Q.    Sure.  Right.

20          And Deputy Snyder, I mean, do you know him?

21      A.    Yes, sir.

22      Q.    I mean, he's careful.  He's reliable so he's

23  going to write this down carefully and probably get it

24  right.

24

1      A.    Uh-huh (yes).

2      Q.    Okay.

3            Okay.  So it would appear, then, that she,

4      Ellen, texted you, wanting to meet with you about the ---

5      apparently about the computer.

6            This narrative suggests that Kenny Ice came

7      home unexpectedly, got a look at the text messaging and

8      it set him off.  And he accused her of having an affair

9      with you.

10     A.    That's what it states.

11     Q.    Yeah.

12           I don't suppose all these years later you would

13     have any way to retrieve whatever messaging passed

14     between you and Ellen Ballock on August 12, 2013, would

15     you?

16     A.    No, sir.  I'd be lucky to retrieve text

17     messages from old phones.  That was two years ago.

18     Q.    You've changed phones ever since?

19     A.    Oh, yeah.  These Apple phones it's every two

20     years they go bad.

21     Q.    Right.

22           But when you change phones, not that I'm any

23     expert on this subject.  But I'll tell you what I think I

24     know.  I know when I do it, what they do is they pull the

25

1    SIM card out of the old one and they put it in the new

2    one.  Which to my way of thinking tells me that there is

3    some data that carries forward to the new phone, ---

4         A.    Uh-huh (yes).

5         Q.    --- because of that SIM card.

6         A.    Not text messages, though.

7         Q.    Well, that was going to be my question to you.

8              Do you know enough about this to tell me if you

9    think that would also carry forward text messaging?

10        A.    The only reason why I could tell you it's

11   definitely not text messages is because every time I've

12   always got a new phone, I've lost all my text messages.

13             I even lost pictures.  I've lost --- on this

14   brand new phone, this iPhone X, I lost half my contacts.

15   And I had to regain them.  But text messages, yeah, you

16   always lose text messages.

17             So it's one of those things where you got to

18   bite the bullet and --- because there's not only --- I'm

19   not talking about Ellen Ballock, but, you know, text

20   messages with other people and stuff that might have

21   dates or certain things on there that I always keep as a

22   planner or guide that, you know, I could always go back

23   and scroll through.  And double-check myself, but ---.

24        Q.    I do that, too.

26

1           Yeah, sure.

2           So it sounds like the evidence of your text

3    exchange with Ellen Ballock, from August 12, 2013, at

4    least so far as your side of that communication, is lost

5    to history.

6       A.   Yes, sir.

7       Q.   Okay.  All right.

8           So this instant of domestic discord that

9    resulted in the Deputy Sheriff having to go to the

10   Ballock residence, you didn't know anything about that

11   until I showed you this document?

12      A.   I don't know if he contacted about everything

13   that was going on.

14      Q.   Okay.

15      A.   But he might've brought this up or something.

16   I can't remember, but I remember hearing something about

17   this.  But at the same time it really wasn't my business

18   or, you know, ---

19      Q.   Right.

20      A.   One of those things where, you know, it's

21   typical any time domestics you'll --- we can go to the

22   house a hundred times in a month for domestics.

23      Q.   Uh-huh (yes).

24      A.   It's one of those things I didn't care about,

27

 1   so ---.

 2        Q.    Okay.

 3             You have a memory of being contacted by the

 4   then Sergeant Kief?

 5        A.    Uh-huh (yes).  Yes, sir.

 6        Q.    And during that contact, he --- what did he

 7   have to say about all this?  Just tell me what you

 8   remember about that discussion.

 9        A.    I remember vaguely.  But that was when I found

10   out about this whole affair thing.

11        Q.    Okay.

12        A.    And I just laughed about it, because I was

13   like, you kidding me?  And when I saw him the next time,

14   he actually saw Ellen, too, but he looked, because he's

15   like, about the text messages.

16             And I showed him my phone and he --- I showed

17   him the text messages.  I said, where on there does it

18   say we're having an affair?

19             And it showed all the stuff, so ---.  That had

20   nothing to do with anything of an affair.

21        Q.    So your discussion with Sergeant Kief was

22   person to person?

23        A.    First it was a phone call.  But next time when

24   I came into the detachment, we spoke more about it.  The

28

1    phone call was just more when --- what's going on?

2    What's this all about?

3         And you know, he told me he said, well, there's

4    mention you have an affair.  And I just --- I laughed

5    about it, because I couldn't figure out where that came

6    from.

7         But now after seeing this report, I can see ---

8    and after hearing all the testimonies I can see why now.

9    Q.    Do you know Kenny Ice?

10   A.    Never met him.

11   Q.    Okay.

12        So you talked with Sergeant Kief on the phone.

13   You followed up with an in-person discussion, during

14   which you showed him your phone.

15        Does that cover everything that ever passed

16   between you and Sergeant Kief concerning Ellen Ballock?

17   A.    Yes, sir.  It was all done --- it was like a

18   couple days after it, because I was on days off when he

19   contacted me.

20   Q.    Uh-huh (yes).  Okay.

21        So have you, to your knowledge, had any

22   communication with Ellen Ballock, now Ellen Costlow, of

23   any kind?

24   A.    After this case?

29

1      Q.    Well, let me be a little precise about this,

2  okay?

3      A.    Okay.

4      Q.    We know --- we've established here, using this

5  Exhibit Number 2, that it was August 12, 2013 that you

6  interacted with her about the laptop issue.

7      A.    Yes, sir.

8      Q.    Okay.

9            And we know that a few days after you

10 interacted with Sergeant Kief.  And he asked you about

11 whether you were having an affair.

12           And you denied it.

13     A.    Yes, sir.

14     Q.    Okay.

15           So then my question becomes, you know, have you

16 had any more interaction with Ellen Costlow until this

17 lawsuit got filed?

18     A.    No.

19     Q.    Okay.

20           Since this lawsuit got filed, have you had any

21 communication with her?

22     A.    No.

23     Q.    Okay.

24           You sat through the deposition of Sergeant

30

1    Gaskins earlier today.  And you probably know a lot more

2    now about the investigation you did than you did before

3    today?

4         A.   Yes, sir.

5         Q.   All right.

6              Can you tell me if you were ever consulted for

7    information or in any other fashion by then Corporal

8    Gaskins, in the course of his investigation?

9         A.   No, sir.

10        Q.   Okay.

11             Do you happen to know Scott Ballock, by any

12   chance?

13        A.   No, sir.  First time I actually ever saw or met

14   him was his deposition.

15        Q.   Okay.

16             You know, just from the other depositions in

17   this case, that the West Virginia State Police and the

18   FBI, they collaborate on cases?

19        A.   Yes, sir.

20        Q.   Okay.

21             So comes my question, maybe you knew him from a

22   professional context or something?

23        A.   No, I have never met him.  I've actually never

24   even ---.

31

1          Like I said, the first --- I actually thought

2     it was Tom Ballock at first, was him.  I didn't know it

3     was the father until later.

4          Q.    Uh-huh (yes).

5          And Tom is the father.  Scott is my client.

6          A.    Yeah.  Because that's when I found out the

7     whole website ---.

8          Q.    Okay.

9          It was Kenny Ice who suggested that Ellen and

10    you had a relationship.

11         Can you identify anything for me other than

12    this episode on August 12, 2013, that Kenny Ice might be

13    relying on to make that suggestion?

14         A.    I have no idea.  Because I had never met him.

15         Q.    Just bear with me for a minute.

16         In fact, if you wanted to take a short break, I

17    got a couple things I want to look at here.  But I'm

18    really very nearly done.

19         A.    Okay.

20                        ---

21    (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

22                        ---

23    BY ATTORNEY CROOKS:

24         Q.    I wanted to clear up at least a confusion that

32

1    I have on the timeline that respects your interaction

2    with Ellen Ballock about the break-ins versus your

3    interaction with her about the laptop.

4         A.    Okay.

5         Q.    It's my impression that the first interaction

6    was about the break-ins.

7         A.    Yes.

8         Q.    And that just was happenstance as far as you

9    were cruising the neighborhood and she happened to be

10   outside.

11        A.    Yes.

12        Q.    Okay.

13              And you kind of --- do we have any way to know

14   when that happened?

15        A.    The ---?

16        Q.    Interaction about the break-ins.

17        A.    Like I said, I can't ---

18        Q.    There may not be any way to pin it down.

19        A.    Yeah, I remember --- like I said, I can't

20   guarantee --- tell you it was warm.  So that's why I want

21   to say spring, summer, you know, between then.

22              Exact date and time, I don't know.

23        Q.    But you're sure you gave her one of your cards.

24   And that's how she knew to text you about the laptop?

33

1       A.   Well, yeah.  I mean, she had my cellphone

2  number that day.

3       Q.   Okay.

4            Because according to the Mon County Sheriffs'

5  Department, you know, this fracas on August 12, 2013

6  between Ellen and Kenny Ice had to do with him coming

7  home unexpectedly and discovering that she was texting

8  you?

9       A.   Yes, sir.

10      Q.   Okay.

11           Let's see.  Let me look at something here.  You

12  still have that exhibit that the Sheriffs' Department

13  prepared.

14           Right?

15      A.   Yes, sir.

16      Q.   What's the number on it?

17      A.   Exhibit 2.

18      Q.   Okay.  There's my copy.

19                ATTORNEY CROOKS:  Just give me a minute.

20                          ---

21  (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

22                          ---

23  BY ATTORNEY CROOKS:

24      Q.   Have you made any effort, per chance, to try

Sargent's Court Reporting Service, Inc.
1-800-727-4349

34

1    and retrieve the text traffic between you and Ellen

2    Ballock?  Maybe even at the direction of your counsel, by

3    getting in touch with the telephone provider for us?

4        A.   The only thing it would've showed, then, phone

5    numbers probably.  But during this time when this all

6    came out and they asked me, that was years ago.  So I

7    mean, we wouldn't be able to see messages.

8        Q.   Okay.

9        A.   But that's even a long shot, if we'd even get

10   the full draft of text messages sent back between her and

11   I.  And that's going through a list of lots of people I

12   text, ---

13       Q.   Right.

14       A.   --- because it's just about date and times.

15       Q.   Okay.

16            I follow everything you just said, but pardon

17   me to insist on the point of the question, which is, did

18   you try to do it?

19       A.   No, I did not.  I asked them and we just --- we

20   just didn't.

21       Q.   Okay.

22            Have you ever conducted any surveillance of

23   Scott Ballock?

24       A.   No.

35

1      Q.    Have you ever conducted any surveillance of Tom

2    Ballock?

3      A.    No.

4                ATTORNEY CROOKS:   I think those are all

5    the questions I need to ask you today.

6                THE WITNESS:   Okay, sir.

7                ATTORNEY CROOKS:   Thank you.

8                THE WITNESS:   Thank you.

9                ATTORNEY CROOKS:   Pass the witness.

10               ATTORNEY PHILLIPS:   Nothing, no questions.

11               ATTORNEY JEFFRIES: Just a couple.

12                            ---

13                         EXAMINATION

14                            ---

15   BY ATTORNEY JEFFRIES:

16     Q.    I'd like to refer back to Exhibit 2, the Mon

17   County Call Center Report.

18               In response to the questions from Mr. Crooks,

19   you agreed that you would likely exchange text messages

20   with Ms. Costlow on August 12, 2013, because she refers

21   him --- or Deputy Sheriff refers to in his narrative that

22   she said that she texted you that day.

23               Do you recall texting her on August 12, 2013,

24   specifically that day?

36

1      A.   Once again, like I said, I wouldn't know if I

2  did or not.  I can't --- just because it says in the

3  report and gives me a date, I can't prove that's still

4  the exact same date.

5      Q.   And can you go to page three of the report?

6           Actually if you'll just kind of refer back into

7  page two.  It starts and then it changes narrative and

8  then carries over to page three.

9      A.   Yes, sir.

10     Q.   Third full paragraph down, she, meaning Ms.

11  Costlow, said West Virginia State Police Trooper Berry

12  had been at her home that day or the day before,

13  referenced a missing laptop that she states has been

14  stolen.

15          Had you been at her home?

16     A.   I had been at her home.  But like I said, you

17  know what I mean right there, she's saying that day or

18  the day before.  So that's --- that I can't prove, if it

19  was the 12th or 11th or if it was even a couple days

20  before.  So ---.

21     Q.   So earlier talking about the initial meeting

22  with her about the car break-in, you said that you knew

23  it was hot.

24          So you're saying spring or summer.  When you

37

1    discuss the laptop with Ms. Ballock, was it hot?  Was it

2    fall, summer?

3         A.    It was still summertime.

4         Q.    So it could've been August.

5         A.    Could've been.

6         Q.    But it also could've been July.  It could've

7    been August 1st?

8         A.    Yes, sir.

9         Q.    You don't have any reason to doubt that it was

10   August 12th.  But she said that you also don't have any

11   reason to necessarily believe that's true.

12             Would that be correct?

13        A.    Correct.

14        Q.    Now, Mr. Crooks asked you about any other

15   communications with Ms. Costlow, other than --- let me

16   back up.  Strike that.

17             And the other thing, you know that

18   communication about the laptop occurred in the summer,

19   when it was hot?

20        A.    Yes, sir.

21        Q.    And you know that it was after you had spoken

22   about the car break-ins?

23        A.    Yes.

24        Q.    So you can at least pin it down to that area.

38

1           Moving on.  Mr. Crooks asked you about any

2    other communications with Ms. Costlow after this

3    August 12, 2013 domestic violence call.  And you said you

4    had not had any.

5           Had you had any other communications with Ms.

6    Costlow, other than we got the car break-in investigation

7    and the laptop complaint?  Have you had any other

8    communications with Ms. Costlow?

9        A.   Yes, sir.  There was one other time.

10       Q.   What was the other time?

11       A.   It was in between the break-ins and this the

12   laptop issue.  It was in reference to her contacting me

13   via text message, reference over her children and threats

14   made by her husband, husband's family.

15          It was just a brief text message and I advised

16   her, like I'd advise anybody to ---.  She can get a

17   protective order, if she needs to, or take it to the

18   family court judge for child custody issues.

19       Q.   So this would've been summer of 2013 as well?

20       A.   Yes, sir.  She was just looking for advice on

21   what to do.

22       Q.   Did she make any allegations to anything that

23   you construed as a criminal violation?

24       A.   She mentioned about, you know, the family --- I

39

1    can't remember if it was the family or just the husband

2    or who knows.  I can't remember who.  I remember it was

3    something to do with the husband or some family making

4    threats about the kids or child --- or the custody

5    issues.

6         Q.   And this was via text message, not in person?

7         A.   No.  Yeah, just all via text message.

8         Q.   Was --- were these text messages the ones that

9    you showed Lieutenant Kief whenever you met with him?

10        A.   Yes, sir.

11             ATTORNEY JEFFRIES:  I have no further

12   questions.

13                          ---

14                    RE-EXAMINATION

15                          ---

16   BY ATTORNEY CROOKS:

17        Q.   Do you know if it would've been practical to

18   print off the text messages that you showed to Sergeant

19   Kief?

20        A.   No.

21        Q.   At the time, I mean.

22        A.   Oh, I understand what you're saying.  No.  I

23   mean, like I said, at the same time, though, I just

24   laughed about them.  Because I didn't know it was going

40

1    to blow up into this.

2           You know I was being accused.  And like I said,

3    there was no formal complaint made on me that was to the

4    point of starting an investigation on me.

5    Q.   Uh-huh (yes).

6    A.   Now, if there would've been for like a PSU

7    investigation, then, yeah, they do print it off.

8    Q.   Okay.

9           Yeah.  I mean, have you ever had a PSU

10   investigation on your behavior?

11   A.   Yes, sir.  Well, it was over --- this was back

12   in Martinsburg.  And then I had one here in Morgantown,

13   so ---.

14          But not in reference to this case.

15   Q.   Not in reference to the Ballocks?

16   A.   No.

17   Q.   Okay.

18          The other investigations, what generally did

19   that have to do with?

20   A.   The other --- well, the one in Martinsburg had

21   to deal with a crime scene issue that was over family.

22   And wasn't even I was in trouble over it, I was just one

23   of the officers that was there.

24   Q.   You're a witness?

41

1      A.    Yeah, a witness into it.  So that's why I had

2  to be investigated about it, just to cover all the

3  Troopers' tracks that were on that scene.

4      Q.    So your conduct was not in question the first

5  time?

6      A.    No, uh-uh (no).

7      Q.    Okay.

8            What about the --- down here?

9      A.    The second one was, I was --- well, there was a

10  little head butting going on between me and a Sergeant.

11  And I was going to leave the State Police to another sip.

12            And they said I applied for it, which I didn't,

13  but it was put in the paper that I was applying for a job

14  at West --- at the Westover Police Department.  Which

15  technically State Police policy is you're not supposed to

16  have a second job that's in law enforcement.

17            But I asked if I can, you know, join that

18  police department.  And they said yes.  And they went to

19  the City Council and the Council approved hiring me, but

20  I never put an application in.

21      Q.    Oh, okay.  I think I follow that.

22      A.    Uh-huh (yes).

23      Q.    Okay.

24      A.    It's actually a felony offense in the State

42

1    Police.

2         Q.    No kidding.

3         A.    Uh-huh (yes).

4         Q.    So what was the resolution of the whole thing?

5         A.    It got washed out.

6         Q.    So you weren't disciplined over it?

7         A.    I was disciplined by Captain Merrell for one

8    day.  But it was like a 24-hour ---.

9         Q.    Well, I mean, you're still with the State

10   Police.

11        A.    Oh, yeah.  Yes, sir.

12        Q.    Okay.

13              So this other instance that Mark asked you

14   about. he did a pretty thorough job there.  Your best

15   recollection is that the only evidence that there ever

16   would've been on that would've been your text messages,

17   which are now too old to retrieve?

18        A.    Yes, sir.

19        Q.    Okay.

20              That was strictly a text exchange?  You didn't

21   go by the residence?

22        A.    No, sir.

23        Q.    Likewise, she didn't come by the barracks to

24   meet you?

43

1    A.   No, sir.

2    Q.   Actually it's not barracks, is it?

3       It's detachment.

4    A.   You can call it ---.

5    Q.   I've heard more barracks being used.

6    A.   People call them barracks, too.

7    Q.   Technically, barracks that's where soldiers

8  sleep.

9       Right?

10    A.   We still go by military ---.

11    Q.   Okay.

12       And you guys don't sleep at the detachment, do

13  you?

14    A.   Oh, no, there is some guys who travel and will

15  stay.  We do have sleeping ---.

16    Q.   Do people cot in the back?

17    A.   Yeah.  Yeah, we actually have sleeping cores in

18  every detachment.

19    Q.   Okay.  All right.

20       I was kind of jesting there, but I suppose it

21  makes sense.  You have the facility to do that.

22       ATTORNEY CROOKS:  All right.

23       I think those are all the questions I need to

24  ask for now.

44

1          THE WITNESS:  Okay.  Thank you.

2          ATTORNEY JEFFRIES:  We'll read.

3                 *  *  *  *  *  *  *  *

4            DEPOSITION CONCLUDED AT 5:15 P.M.

5                 *  *  *  *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

45

1    STATE OF WEST VIRGINIA  )

2

3                          CERTIFICATE

4          I, Guy Starrett, a Notary Public in and for the

5    State of West Virginia, do hereby certify:

6          That the witness whose testimony appears in the

7    foregoing deposition, was duly sworn by me on said date,

8    and that the transcribed deposition of said witness is a

9    true record of the testimony given by said witness;

10         That the proceeding is herein recorded fully and

11   accurately;

12         That I am neither attorney nor counsel for, nor

13   related to any of the parties to the action in which these

14   depositions were taken, and further that I am not a

15   relative of any attorney or counsel employed by the

16   parties hereto, or financially interested in this action.

17

18         I certify that the attached transcript meets the

19   requirements set forth within article twenty-seven,

20   chapter forty-seven of the West Virginia Code.

21

22         OFFICIAL SEAL
           STATE OF WEST VIRGINIA
           NOTARY PUBLIC
           GUY STARRETT
23         The Peoples Bldg., Suite 617            _____
           179 Summers St.                         Court Reporter
           Charleston, WV 25301
24         My commission expires July 17, 2023