IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

OF WEST VIRGINIA

* * * * * * * *

SCOTT T. BALLOCK,                    *

    Plaintiff                       *   Case No.

    vs.                             *   1:17-CV-52

ELLEN RUTH COSTLOW                   *

STATE TROOPER MICHAEL KIEF,          *

STATE TROOPER RONNIE M. GASKINS,     *

STATE TROOPER CHRIS BERRY,           *

    Defendants                      *

* * * * * * * *

TROOPER RONNIE M. GASKINS

May 29, 2019

Any reproduction of this transcript is prohibited without

authorization by the certifying agency.

2

1                        DEPOSITION

2                            OF

3   TROOPER RONNIE M. GASKINS, taken on behalf of the

4   Plaintiff herein, pursuant to the Rules of Civil

5   Procedure, taken before me, the undersigned, Guy

6   Starrett, a Court Reporter and Notary Public in and for

7   the State of West Virginia, at Steptoe & Johnson, PLLC,

8   1085 Van Voorhis Road, Suite 400, Morgantown, West

9   Virginia, on Wednesday, May 29, 2019, beginning at

10  9:13 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                        A P P E A R A N C E S

2

3    CHARLES J. CROOKS, ESQUIRE

4    Crooks Law Firm, PLLC

5    244 Pleasant Street

6    Morgantown, WV  26505

7        COUNSEL FOR PLAINTIFF

8

9    MARK G. JEFFRIES, ESQUIRE

10   Steptoe & Johnson, PLLC

11   400 White Oaks Boulevard

12   Bridgeport, WV  26330

13       COUNSEL FOR DEFENDANTS, STATE TROOPER KIEF, STATE

14       TROOPER RONNIE M. GASKINS, STATE TROOPER CHRIS BERRY

15

16   TODD PHILLIPS, ESQUIRE

17   Lyons Phillips Legal Group, PLLC

18   141 Walnut Street

19   Morgantown, WV  26505

20       COUNSEL FOR DEFENDANT, ELLEN RUTH COSTLOW

21

22

23

24

4

1                        I N D E X

2

3    WITNESS: TROOPER RONNIE M. GASKINS

4    EXAMINATION

5        By Attorney Crooks                      7 - 189

6    EXAMINATION

7        By Attorney Phillips              189 - 213

8    RE-EXAMINATION

9        By Attorney Jeffries             214 - 219

10   CERTIFICATE                                     220

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1                          EXHIBIT PAGE

2

3                                                        PAGE

4    NUMBER          DESCRIPTION                    IDENTIFIED

5    Kief:

6    Exhibit 1    Policies and Procedures           --

7    Exhibit 2    Call Summary Report               --

8    Exhibit 3    8/22/13 E-mail                    --

9    Exhibit 4    Memo from Captain Merrill         --

10   Exhibit 5    Complaint Report                  --

11   Exhibit 6    Domestic Violence Report          --

12   Exhibit 7    FBI Documents                     --

13   Exhibit 8    Warrant for Arrest -

14                Harassment                        --

15   Exhibit 9    Warrant for Arrest -

16                Unwanted Communications           --

17   Exhibit 10   Motion to Dismiss Charges

18   Exhibit 11   Investigation Report              --

19

20

21

22

23

24          EXHIBITS NOT ATTACHED/FOR KIEF DEPOSITION

6

1                                OBJECTION PAGE

2

3       ATTORNEY                                        PAGE

4       Jeffries              35, 69, 74, 81, 82, 85, 86

5       Phillips                                         99

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

7

1                   S T I P U L A T I O N

2   ----------------------------------------------------------

3   (It is hereby stipulated and agreed by and between counsel

4   for the respective parties that reading, signing, sealing,

5   certification and filing are not waived.)

6   ----------------------------------------------------------

7                   P R O C E E D I N G S

8   ----------------------------------------------------------

9               TROOPER RONNIE M. GASKINS,

10  CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

11  HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

12  FOLLOWS:

13                        ---

14                    EXAMINATION

15                        ---

16  BY ATTORNEY CROOKS:

17      Q.    Good morning.

18            Let's start with your full name, please?

19      A.    It's Ronnie Michael Gaskins.

20      Q.    Date of birth?

21      A.    November 20th, 1979.

22      Q.    Born and raised where?

23      A.    Clarksburg, Harrison County.

24      Q.    What high school did you graduate?

8

1    A.   I went to Notre Dame High School, a private

2    school.

3    Q.   So without waiting for me to do the math, what

4    year did you graduate?

5    A.   1998.

6    Q.   College?

7    A.   Fairmont State, graduated in 2003.

8    Q.   Degree in?

9    A.   Criminal Justice.

10   Q.   Any honors or distinctions in your graduating?

11   A.   You mean like a ---?

12   Q.   Top of your class or ---?

13   A.   Summa cum laude.

14   Q.   Okay.

15        After you graduated from Fairmont State in

16   2003, did you sign up with the State Police?

17   A.   Graduated in May of 2003 and I got my

18   acceptance letter at the State Police Academy August of

19   that same year.

20   Q.   So you did six months at the West Virginia

21   Police Academy in Institute, West Virginia, starting

22   August of 2003?

23   A.   Well, I was sworn in September of 2003 and then

24   graduated April of 2004.

9

1     Q.   So you've been working as a Trooper since April

2  2004.

3          How many different places would you say you've

4  been posted in that time?

5     A.   My first duty post was Buckhannon, in Upshur

6  County.  And I was there approximately there six months.

7  And then I got transferred to Weston, Lewis County for

8  --- I was there from approximately 2004 to 2008.

9          And then in 2008 I got transferred to

10  Morgantown, Monongalia County.  And then when I got

11  promoted May of 2017, I was transferred to Wheeling, Ohio

12  County.  And then I got back to Bridgeport, Harrison

13  County, I think it was March of 2018.

14     Q.   I take it, then, you've been working out of the

15  Bridgeport detachment since March of 2018?

16     A.   That's correct.

17     Q.   You mentioned in the course of that history

18  your promotion, but I failed to catch it in my notes

19  here.

20          When were you promoted?

21     A.   May of 2017.

22     Q.   So that promotion was from Corporal to

23  Sergeant?

24     A.   That's correct.

10

1      Q.    When did you become Corporal?

2      A.    It was a 369 deal, so I would have got Corporal

3  my ninth year.  So I think that was 2012, 2013-ish,

4  somewhere around there.

5      Q.    Okay.

6            Well, a lot of the events at issue in this case

7  occur in the year 2013.  A lot of them are dated

8  September and after.

9            And by that time I know you were referred to in

10 writing as Corporal.  So certainly by September of 2013

11 you were a Corporal.

12     A.    Right.

13     Q.    Now, I understand that there are a couple of

14 different grades of Sergeant in the State Police?

15     A.    You generally have like a --- on detachment-

16 wise you have like and Assistant Detachment Commander and

17 then you can have a Detachment Commander.

18     Q.    Okay.

19           And what role do you occupy?

20     A.    I'm Assistant.

21     Q.    Okay.

22           There's a Captain Merrill mentioned in some

23 documentation in this case.

24           Is he still with the State Police?

Sargent's Court Reporting Service, Inc.
1-800-727-4349

11

1       A.    No, he's retired.

2       Q.    Retired.

3             Do you know when that was?  You don't have to

4    be exact on that, but ---.

5       A.    It was approximately 2014.  Approximately, I

6    can't be for sure on that.

7       Q.    So Captain Merrill would've retired, then,

8    during the pendency of the case against my client?

9       A.    Probably.  I can't remember exactly when he had

10   retired, but ---

11      Q.    Okay.

12      A.    --- it sounds right.

13      Q.    Yeah, trusting that your recollection's

14   accurate in that regard.

15      A.    Yeah.

16      Q.    I understand.

17      A.    Uh-huh (yes).

18      Q.    You're doing the best you can to remember

19   somebody else's retirement.

20            You were assigned by Captain Merrill to be the

21   investigating officer in connection with Ellen Ruth

22   Costlow's complaint against her then estranged husband,

23   my client, Scott Ballock.

24      A.    I believe Sergeant Kief at the time was the one

1    that actually assigned it to me.

2         Q.    Okay.

3         A.    And then Captain Merrill authorized the

4    investigation.

5         Q.    Can you give me a rundown on what sort of work

6    you've done in preparation for your deposition today?

7               Did you look at any documents?

8         A.    No, I've met with my attorneys.

9         Q.    Okay.

10              So you've just talked with the lawyers and let

11   it go at that?

12              How long's it been since you've looked at any

13   of the work product that made up the investigation into

14   the charges against my client?

15        A.    You talking about like reports or ---?

16        Q.    Reports, the e-mails that were at issue in the

17   charges.

18        A.    I haven't read any of those e-mails in a while.

19        Q.    Okay.

20              So I'm just trying to get a sense for, you

21   know, how long it's been, how fresh your memory on any of

22   that stuff may be.

23              Could it be that you haven't looked at it since

24   back in the day when you were doing the investigation?

13

1      A.    It's been a while.

2      Q.    Okay.

3            All right.  We took a deposition yesterday with

4      Lieutenant Kief and I presume you know that.

5      A.    Correct.

6      Q.    Okay.

7            There were 11 exhibits identified marked for

8      use.  And we had a copy, I think, marked --- made for

9      everybody.

10           And so let me just do this.  Let me hand you

11     what are the originals of those exhibits.

12           You can see Exhibit Number 1 is a collection of

13     documents that had been produced by your counsel in this

14     case, in response to our requests.

15           You can be sure that it was produced by your

16     lawyers by following the series of numbers that appear at

17     the bottom right-hand corner.

18           It starts with Troopers' 824 and runs ad

19     seriatim to 868.

20     A.    Yes.

21     Q.    Okay.

22           It's been explained to me that these are

23     policies and procedures of the West Virginia State Police

24     that would have been in effect at the time that you

14

1   performed your investigation that is at issue in this

2   case.

3       A.    Correct.

4       Q.    Now, if you need to take a moment to look at

5   any of this exhibit or any of these other exhibits, as we

6   discuss them, you know, you're entitled to do that.

7           I'm not going to try and rush you through this

8   and have you answer questions about something that you

9   aren't sure on, because I'm not giving you time to look

10  at it.  So be at your ease about that.

11          It's my understanding that there was a policy

12  or procedure, I don't know which, in effect at the time

13  you did your investigation at issue in this case that

14  pertained specifically to high profile people or to

15  members of the law-enforcement community.

16      A.    Is there a particular page you're referring to

17  about that?

18      Q.    No, not at the moment.  I'm speaking generally.

19          I was told this yesterday in deposition, that

20  there was a policy or procedure that required a certain

21  amount of consultation with upper echelon at the State

22  Police, for instance.

23          That's why Captain Merrill had to authorize the

24  investigation.

15

1          Does that square with your understanding and
2     memory of the events?
3          A.   I don't know if a special policy and procedure
4     --- I'm not aware of anything like that.  It was more of
5     a --- it involved a law-enforcement officer.  So I think
6     more of a professional courtesy to let everyone know what
7     was happening.
8          Q.   Okay.
9               Yeah, at the time you were assigned to conduct
10    the investigation into Ellen Costlow's complaint against
11    her estranged husband, my client, Scott Ballock, was that
12    your first notice of the whole matter or had you been
13    consulted or involved in some fashion already at that
14    point?
15         A.   You mean if I was aware of --- can you rephrase
16    that?
17              I'm not entirely sure where you're going
18    with ---.
19         Q.   It was kind of a wordy question.
20              You were assigned, in August of 2013, to be the
21    investigating officer into Ellen Costlow's complaint
22    against Scott Ballock?
23         A.   That sounds right.
24         Q.   Okay.

16

1            And we've got documents to that, so it's

2    not ---.

3            But my question is, did you have any knowledge

4    of that matter prior to then Sergeant Kief assigning you?

5        A.    Knowledge that ---?

6        Q.    I mean, had you met Ellen Costlow, when she

7    came to the barracks to talk with Sergeant Kief?  Had you

8    talked with Sergeant Kief about the fact that she had a

9    complaint to make?

10       A.    He did brief me regarding the allegations that

11   Ellen Costlow made against her husband.

12       Q.    Uh-huh (yes).  Okay.

13            So what did he do?

14       A.    He just briefed me on the allegations involving

15   the harassment.  She had an attorney, who --- I think it

16   was she had authorized her attorney at the time, I don't

17   remember who it was, to give us a disk, that had content

18   --- e-mails and text messages.

19            And then once we got that, then we would start

20   the investigation.

21       Q.    Okay.

22            All right.  Matt Stout, I think, is the lawyer

23   name you were trying to remember.

24            Does that sound right to you?

17

1      A.    Sounds right.

2      Q.    Did you have any meetings or telephone or in-

3   person discussion with Matt Stout about his client's ---?

4      A.    I never talked to Matt Stout.

5      Q.    Okay.

6            You just received the --- the magnetic disk

7   with the data on it.

8      A.    And the letter.  Correct.

9            ATTORNEY CROOKS:  And the letter.  Okay.

10   All right, then.

11            Hold on just one second.  Off the record.

12                          ---

13   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

14                          ---

15   BY ATTORNEY CROOKS:

16      Q.    I'm not necessarily just going to run through

17   all of these exhibits in the order that they were marked,

18   so ---.

19      A.    Sure.

20      Q.    So that's why I'm taking a second here.

21            Take a look at Exhibit Number 3, please.

22            Exhibit 3 is an e-mail from Michael Kief to

23   Captain Merrill.

24      A.    Okay.

18

1       Q.    And you were copied on it.

2       A.    Okay.

3       Q.    It's dated August 22, 2013.  And it says it is

4   a request to open an investigation into Scott Thomas

5   Ballock, Supervisory Special Agent FBI, CJIS.

6             Would this be the communication that you

7   referenced a few minutes ago about Sergeant Kief seeking

8   authority from Captain Merrill, who opened the

9   investigation?

10      A.    Let me glance over this real quick.

11      Q.    Sure.

12                          ---

13  (WHEREUPON, WITNESS REVIEWS DOCUMENT.)

14                          ---

15            THE WITNESS:  Yeah, I think --- it looks

16  like he's just briefing the Captain on --- on the early

17  stages of the complaint.

18  BY ATTORNEY CROOKS:

19      Q.    Okay.

20            Now, Exhibit 4 kind of goes along with Exhibit

21  3.

22            I'll let you look at it.

23                          ---

24  (WHEREUPON, WITNESS REVIEWS DOCUMENT.)

19

1                            ---

2                 THE WITNESS:  Okay.

3    BY ATTORNEY CROOKS:

4        Q.    So I take it this Exhibit 4 is Captain Merrill

5    advising you that he was authorizing you and assigning

6    you --- or at least affirming Sergeant Kief's assignment

7    of you as the investigating officer for the Ballock

8    investigation?

9        A.    Yes.

10       Q.    Okay.

11             In bold type Exhibit 4 says, you are to report

12   your findings to Troop 1 headquarters by written

13   memorandum no later than October 22, 2013.

14             Do you have any idea what drove that particular

15   date?

16       A.    I have no idea.

17       Q.    Okay.

18             And it's roughly 60 days.  So it could be

19   nothing more than just Captain Merrill saying, you know,

20   I want to know something within 60 days.

21             Correct?

22       A.    Yeah, it's possible.

23       Q.    Okay.

24             It says that you were also to notify Captain

20

1    Merrill regularly via e-mail of the progress of the

2    investigation as it unfolds.

3            So you know, let's stick with that for a

4    second.  You were assigned as of that date.  You had

5    already received the e-mails and text from Ellen's

6    lawyer.

7            What did you do next at that point?

8        A.   Once I received the disk, is that what you're

9    asking?

10       Q.   Yeah, once --- once all of this was in place.

11   You had the --- you had the communications that were at

12   issue.

13           Right?

14           I mean, the charge was unwelcome communications

15   via computer and harassing e-mails.

16           Right?

17       A.   Uh-huh (yes).

18       Q.   So you had the written communications that are

19   --- that were going to be at issue.  You had talked with

20   Sergeant Kief.

21           By August 22, you were assigned by --- well,

22   actually you'd already been assigned by the Sergeant and

23   the Captain affirmed it on August 22.

24           So okay, you're the --- you're the lead

21

1    investigating officer.  Had you talked to Ellen Costlow

2    by that point?

3         A.    I don't remember the exact date, but she was

4    called in early on in the investigation for a statement.

5         Q.    Okay.

6               All right.  She was called in.

7               The way you put that kind of made me think that

8    maybe somebody other than you called her in.

9         A.    I don't recall.  I believe I reached out to

10   her.  Or it could have been Sergeant Kief, I don't

11   remember.

12        Q.    Okay.

13               What residual role did Sergeant Kief have in

14   the investigation, any?  Or was this just assigned to you

15   solely?

16        A.    You mean like a hands-on ---?

17        Q.    Yeah.

18        A.    No, I was the primary investigator.  But he was

19   my immediate supervisor, so I would keep him up-to-date

20   on what was happening.

21        Q.    Okay.

22               Did you comply with Captain Merrill's directive

23   and keep him advised in e-mail format?

24        A.    I don't remember if I was e-mailing him as I

22

1   should.  I do know that he would --- he was very active

2   with the guys in Morgantown.

3           So he would often show up at our office and he

4   would talk to us about our cases.  So he could have been

5   apprised verbally.

6           But I can't --- I don't remember communicating

7   with him as much on e-mail.  I had a lot of interaction

8   with him directly.

9       Q.   Did Captain Merrill, to your recollection,

10  maintain an abiding interest in what was going on with

11  this investigation?

12      A.   He wanted to keep posted on what was going on,

13  because he --- we had a good working relationship with

14  the FBI.  So I think he wanted --- wanted to be kept up-

15  to-date as the case progressed.

16      Q.   Was there any discussion among you, Sergeant

17  Kief and Captain Merrill as to whether the FBI should be

18  contacted, let them know we're investigating one of your

19  agents?

20      A.   I don't remember having that kind of

21  conversation.  I don't know if Sergeant Kief and Captain

22  Merrill did.

23          Because I don't --- I don't believe I reached

24  out to the FBI.  I believe it was Sergeant Kief.

23

1          So I don't know if he was directed to do that

2    or if that was something he self-initiated.  I don't

3    know.

4          Q.    Okay.

5          What do you know about Sergeant Kief's contact

6    with the FBI, in that respect?

7          A.    I just know that he reached out to him.  And I

8    --- I don't believe I heard any conversations he had with

9    him like on the phone or anything, but --- that he

10   informed the --- I think it was the Clarksburg field

11   office that there was an investigation involving an agent

12   at the CG center.

13         Q.    And you know this because Sergeant Kief told

14   you that he reached out to the FBI?

15         A.    Yes.

16         Q.    Now, what did --- what was your understanding

17   at that point with respect to the relationship between

18   Ellen Costlow --- actually at that point her name was

19   Ellen Ballock ---?  She had yet to be divorced.  I'm

20   probably going to struggle with that, honestly.

21         It won't be any effort on my part to confuse

22   you, I'll just --- I probably will struggle with that.

23         But her name is Ellen Costlow now.

24         A.    Uh-huh (yes).

24

1        Q.    And that's the name she sails under now.  And

2   that's the name that is on the lawsuit.  So that's the

3   name that's stuck in my head.

4             But what was your understanding as of the

5   commencement of your investigation concerning the

6   relationship between Ellen Ballock and her husband,

7   Scott?

8             Where did matters stand between them?  What was

9   going on?

10       A.    The only thing I knew is they were in the

11  process of going through a divorce.

12       Q.    Okay.

13            So you --- you knew that you were investigating

14  communications between an estranged husband and his wife

15  that occurred in the midst of a divorce.

16            Did you have any concern about whether this was

17  fit subject matter for a criminal investigation?  That

18  maybe it was something that was better left to the Family

19  Court system, perhaps?

20       A.    No, because as Sergeant Kief cited, the West

21  Virginia Code 61.29(a), harassment, both with the e-mails

22  and the text messages that was investigated as a computer

23  harassment/Criminal Code violation.  So it was separate

24  from what they were doing in court for the divorce

25

1   proceedings.

2       Q.   So I take it, then, there was never any

3   discussion between you and Sergeant Kief or perhaps

4   Captain Merrill, when he was stopping in to check on

5   things, that, you know, in view of the fact that this is

6   an FBI agent, particularly, maybe we're better off if we,

7   you know, recommend Ms. Costlow --- or Ms. Ballock have

8   her lawyer go see the Family Court Judge about this.

9   Nothing to that effect?

10      A.   I don't believe so.

11      Q.   Okay.

12          I mean, you followed the point of my question

13  here.  The Captain wanted to know what you were doing

14  about this investigation.

15          And the way I'm understanding your testimony,

16  he wanted to know, because there was an FBI agent at

17  issue here.  And you know, the Captain didn't want to

18  spoil or do anything that would spoil the cordial

19  relations between the State Police and the FBI.

20          So my question then becomes, as you go through

21  all of these e-mails and you see that it's --- it's all,

22  you know, related to their domestic situation, I want to

23  know, I mean, was there any thought given ---

24  consideration given to simply taking a pass on a criminal

26

1    enforcement action and --- and referring this lady back

2    to her lawyer and the Family Court?

3         A.   Did I consider that?

4         Q.   Did you consider it?

5         A.   No, I --- I considered --- consulted with the

6    Prosecuting Attorney's Office in Monongalia County.

7         Q.   Okay.

8         So at what stage of the investigation did you

9    go to see the Prosecutor?

10        A.   I don't remember exactly when.  It was a few

11   weeks, two or three week, maybe, after the initial

12   complaint.

13        Q.   Who'd you see?

14        A.   Assistant Prosecutor Cindy Scott.

15        Q.   Okay.

16        Well, just tell me what happened.  You went to

17   see her and what happened?

18        A.   I called her and requested to meet with her

19   about this case.  And I met with her in person at her

20   office and advised her of the allegations.

21        And I brought the disk that was provided to us.

22   And she did review some of the content on the --- the

23   disk.

24        Q.   Okay.

27

1          So you briefed her.  And then she looked at

2     some of the communications.

3          What happened next?

4     A.    After looking over the --- there's was the

5     letter from Ballock's attorney and the --- the e-mails

6     and the content that followed.

7          When the letter was dated and sent to Scott,

8     she advised that there was enough probable cause for an

9     arrest and to obtain a warrant for one count of computer

10    harassment and one count of stalking.

11    Q.    Was there any discussion with Cindy Scott about

12    the fact that Scott Ballock was an active FBI agent?

13    A.    She was informed of that.

14    Q.    Did she make any comment on that?

15    A.    No.

16    Q.    What is stalking, under the West Virginia

17    Criminal Code?

18    A.    Without seeing the Code in front of me, it's

19    --- it focuses on repeated patterns of behavior, not just

20    one occasion, but multiple occasions of --- whether it's

21    established communication or contact with the person of

22    interest.

23    Q.    It's probably a decent time to look at another

24    document here.

28

1              Take a look, if you will, at Exhibit 8 and

2    Exhibit 9.

3              I'll represent to you, Sergeant, that these

4    documents were generated in the course of the criminal

5    case that was ultimately dismissed and expunged.

6              Exhibit 8 is where we'll start.  Is this the

7    warrant for the stalking charge that you just said you

8    discussed with Cindy Scott?

9         A.   Yeah, it's the stalking and harassment.

10        Q.   Okay.

11             How about Exhibit 9?

12             What's the charge there?

13        A.   This is the harassing communications by

14   cellphones and electronic communication devices.

15        Q.   Okay.

16             So these warrants were consistent with the

17   advice that you obtained from Cindy Scott about two to

18   three weeks into your investigation?

19        A.   These were the charges discussed.

20        Q.   Uh-huh (yes).

21             And returning from Cindy Scott --- had you

22   interviewed Ellen Costlow?

23        A.   She was interviewed once before the charges

24   were filed, I believe.  But we had to call her in again,

29

1   because there was a taped statement and the recorder

2   didn't record or didn't work.

3          And what we had on the recorder wasn't

4   captured, so she was called in again at least two times,

5   to my knowledge.

6      Q.   Okay.

7          In Lieutenant's Kief's deposition yesterday, I

8   learned that he had a meeting in the barracks with the

9   Complainant, Ellen Ballock, Ellen Costlow now.

10          And I understood from what he told me that it

11   was just the two of them.  You were not part of that.

12          So I want to ask you about that.  Do you recall

13   being a part of the first interview with the Complainant?

14      A.   I just recall meeting with her in person at

15   least two times.

16      Q.   Okay.

17      A.   I don't know about Sergeant Kief and Ellen, if

18   they were ---.

19      Q.   Okay.

20          Was Sergeant Kief part of either of the two

21   occasions when you interviewed Ellen Ballock?

22      A.   He was the first time, because it was his

23   digital recorder that was used.  I can't --- I'm not for

24   sure about the second time.

30

1       Q.   So during the two occasions that you had to

2  interview Ellen Ballock, what were you trying to find

3  out?

4       A.   To see --- just to get her statement in regards

5  to how the electronic device --- or how the e-mails were

6  harassing to her.  How did they make her feel?  Just

7  those general things.

8       Q.   Did you record the first time you interviewed

9  Ellen Ballock?

10      A.   On a --- it was an audio recorder the first

11 time.

12      Q.   Okay.

13           Was that the one that belonged to Sergeant

14 Kief?

15      A.   Correct.

16      Q.   And that was the one that malfunctioned?

17      A.   Correct.

18      Q.   Okay.

19           Did you keep any handwritten notes as a backup

20 to the recording that you thought was being made?

21      A.   Probably the --- I can't say for sure, but ---

22 did I mention in my report where the victim advised it

23 was --- I believe it was from that first meeting with

24 her.

31

 1          So there was stuff that she said verbally that
 2    I put in my report, as it pertained to the victim ---.
 3          Q.    All right.
 4                This production that we received from your
 5    lawyer in the civil ligation, have you reviewed it at any
 6    point?
 7          A.    Which exhibit are you referring to?
 8          Q.    It's not an exhibit.  It's a folder of paper
 9    I've got laying on the table there.  It's the one of ---
10    well, actually this Exhibit Number 1 is --- it comprises
11    the last of the many pages of the production.
12                So I can tell you that the total size of the
13    production was 868 pages.
14                Let me ask you this.  Were you a part of the
15    effort to try and marshal all of this material and get it
16    produced?
17          A.    What do you mean marshal all of the material?
18          Q.    Marshal it, to gather it together, to look for
19    it and find it, turn it over to the lawyers, so it can be
20    produced.
21          A.    I'm not sure I follow you.
22          Q.    Okay.
23                868 pages of West Virginia State Police
24    material, including your investigation, were produced to

32

1    us in discovery of this case.  And I'll just proffer that

2    to you.

3              My question is, did you help in pulling all of

4    that material together, so it could be produced for

5    investigation?

6        A.    I couldn't get direct access to the report

7    because --- well, there's a copy of a report that was on

8    detachment.  But there was an expungement order, so it

9    has names and everything was scratched out in the report.

10       Q.    Uh-huh (yes).

11       A.    And the disk, I believe, had been destroyed

12   because of the expungement.  So that content I would have

13   provided over to my attorneys, what we had on detachment,

14   in the expunged version of the report.

15       Q.    Uh-huh (yes).

16             Are you saying attachment or detachment?

17       A.    Or like the --- I had a bunch of e-mails also

18   printed off from the disk that was contained within the

19   report.  But his name's scratched out on a lot of that

20   stuff because of the expungement orders.

21       Q.    Right.

22       A.    If that makes sense.

23       Q.    It does make sense, yeah.

24             I'm aware, obviously, that there was an

33

1    expungement order entered in respect to the criminal case

2    that was initiated and then ultimately dropped against my

3    client.

4         The expungement of those records, that is to

5    say going through and scratching out as you say Scott

6    Ballock's name, that was somebody else in the State

7    Police that did that.

8         That wasn't you?

9    A.    No.

10   Q.    Okay.

11        And you've got other stuff to do besides

12   expunging old investigation files.

13        Right?

14   A.    Plenty of other things.

15   Q.    Plenty, yeah.

16        Okay.

17        So it sounds like you were a part of the

18   effort, then, to pull together what could be --- what

19   could be gathered together and produced to us in this

20   case.

21        True?

22   A.    The expunged part of the report.

23   Q.    Uh-huh (yes).

24   A.    Correct.

34

1  Q. Okay.

2   What about, for instance, these exhibits that

3 we talked about earlier?

4   I've got all of my exhibits jumbled up here, so

5 --- the exhibits that we discussed --- I'm specifically

6 referring to the communication from Sergeant Kief to

7 Captain Merrill and then Captain Merrill to you.

8  A. Exhibit 3 and 4, is what you're referring to?

9  Q. I believe so.

10   I don't what I've done with them.  But that's

11 what I'm trying to refer to, yes.

12  A. This would have been a --- yeah, this Troop One

13 memorandum with the attached e-mail would have --- was cc

14 copied to me.  So these were the --- I believe the first

15 documents I had on this case.

16  Q. Right.

17   You'll notice that Exhibits 3 and 4 --- I found

18 my copies --- they don't have the control sequence

19 showing at the bottom right hand like the other 858 pages

20 that were produced in discovery in this case.

21   That tells me that these were not produced to

22 us by your counsel.  So since you were involved in trying

23 to pull together the responsive information, I need to

24 know, first of all, did you go into the system and try to

35

1    find all of the old e-mails that related to the

2    investigation, so those could be produced?

3            Let me rephrase this question, because e-mails

4    is a term that gets used a lot in discussing the merits

5    of this case.  Because you were investigating e-mails.

6    So let me be a little more precise in the way I state my

7    question.

8            You were involved --- we know that you were

9    involved in trying to pull together documentation

10   responsive to discovery requests in the civil litigation

11   that brings us together today.

12           My question then has to do with internal State

13   Police e-mail communications, Exhibits 3 and 4 being

14   examples.

15           Did you go into the communications system for

16   the State Police, the internal e-mail system, and try to

17   pull down all of the internal communications that related

18   to the investigation that you conducted into the

19   complaint that Ellen Ballock had against my client, Scott

20   Ballock?

21                ATTORNEY JEFFRIES:  Let me lodge an

22   objection.  You're mischaracterizing the production.

23                ATTORNEY CROOKS:  Well, maybe I am and

24   maybe he can answer to that.  Maybe he can straighten me

36

1    out.

2                    ATTORNEY JEFFRIES:   I'm not sure that he

3    was the one who compiled the documents with the Bates

4    numbering on them.

5                    But you're implying that these documents

6    were not produced by the State Police.

7                    ATTORNEY CROOKS:   I don't believe that

8    they were part of the production you gave us.

9                    ATTORNEY JEFFRIES:   These particular

10   documents were not, but they were --- copies of these

11   documents were among the documents we produced.  And you

12   should have copies of these same documents with the

13   Trooper's Bates number on them.

14                   ATTORNEY CROOKS:   Okay.  All right.  Fair

15   enough.

16                   That very well could be.  868 pages --- I

17   may have --- you know, maybe two pages got stuck together

18   and I went past them and missed them.

19                   ATTORNEY JEFFRIES:   Well, I think the

20   problem is they're coming from separate sources.  But if

21   it doesn't have the Trooper's Bates number, you didn't

22   get it from us.

23                   ATTORNEY CROOKS:   Sure.

24                   ATTORNEY JEFFRIES:   But I can represent to

37

1   you and --- I can find these exact same documents were

2   produced by us and there should be a copy in --- that you

3   have with the Trooper's Bates number on it.  So ---.

4                    ATTORNEY CROOKS:  Okay.  Fair enough.  I

5   appreciate your help on that.

6                    Thank you --- you're helping me.

7   BY ATTORNEY CROOKS:

8        Q.   Okay.

9             So you've listened, obviously, to what your

10  lawyer has proffered back to me.  We're obviously the two

11  of us trying to sort out a question I have in respect to

12  the internal communications at the State Police

13  concerning your investigation.

14            And so I'm going to take the benefit of your

15  lawyer's proffer to me and accept it gratefully.  But I'm

16  also going to stand by my question and going to ask, were

17  you personally --- maybe you weren't.

18            Were you personally involved in trying to

19  retrieve internal e-mail communications from the State

20  Police computer system related to your investigation?

21       A.   Are you referring to e-mails between --- who

22  exactly?

23       Q.   Well, I would offer to you these Exhibits 3 and

24  4 as examples.  These were e-mails that got the

38

1    investigation established.  And they call for even more

2    e-mail communication.

3        A.   These Exhibits 3 and 4, I believe, are also

4    attached into the report.

5        Q.   Okay.

6        A.   If you're just --- if you're referring to 3 and

7    4, I would take them off and attach it to the report.

8        Q.   Okay.  Right.

9             Yeah, maybe that's the --- maybe that's the

10   thing I want to do next, is just have a look at your

11   report.  That is also an exhibit.

12             ATTORNEY JEFFRIES:  Before you start

13   questioning him on this, just for the record, this was

14   --- we had this discussion yesterday during Lieutenant

15   Kief's deposition.

16             A copy of the report that you've marked as

17   an exhibit is not the one that we produced.

18             ATTORNEY CROOKS:  Correct.

19             Maybe that's what --- maybe that's what

20   we'll do is just take a short break.

21             I've got the production here and I think

22   that maybe what we'll do ---.  But I'll tell you before

23   we actually pull the trigger on that, let me refer you to

24   Exhibit 11.

39

1    BY ATTORNEY CROOKS:

2        Q.    Does that appear to be a copy of the report

3    that you prepared on this investigation?

4        A.    Yes, it is.

5        Q.    As you can see, it's marked Exhibit 11 of Kief,

6    so we discussed it yesterday.

7              Take a look at the last sentence of the report

8    please, page eight.

9        A.    Okay.

10       Q.    The last sentence is fairly short.  I'll just

11   read it.  This investigation is an initial and complete

12   cleared by arrest.

13             When that sentence declares that this

14   investigation is an initial, what's it communicating?

15             What's that mean?

16       A.    If you --- can you pull out Exhibit 5?

17       Q.    All right.

18       A.    This is an old report format.  We don't use

19   this format anymore.

20       Q.    Okay.

21       A.    On the top left corner you're going to see

22   initial or supplemental.  So initial is ---

23       Q.    I see.

24       A.    --- the initial complaint and if there's any

40

1  follow-up information that goes to the case, then it

2  would be marked supplemental.

3      Q.   Okay.

4           So Exhibit 11 was attached to Exhibit 5?

5      A.   Correct.

6      Q.   Okay.

7           And also attached probably would have been at

8  least some of the e-mail communications at issue?

9      A.   That's correct.  If you go on page --- this is

10 the last page on Exhibit 5 in the narrative, it's not a

11 very big box.  So I put see attached, action taken.

12     Q.   All right.

13     A.   And Exhibit 11 is that attached action taken.

14     Q.   Okay.

15          Were there ever any supplemental reports?

16     A.   No.

17          ATTORNEY CROOKS:  Let's go off the record

18 for a moment.

19                    ---

20 (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

21 (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                    ---

23          ATTORNEY CROOKS:  Okay.  I'm ready.

24 BY ATTORNEY CROOKS:

41

1       Q.   During our break your Counsel and I conferred

2   on the document production that he made.  And we were

3   able to identify the e-mail communications that are

4   Exhibits 3 and 4.

5            We were able to identify those same documents

6   in the production that he made on your behalf, as he

7   proffered to.  I wasn't surprised.

8            But the exercise confirmed what I understood to

9   be the case, which is that I didn't see any follow on

10  internal e-mail communication from the State Police.  And

11  I guess that's the point that I want to tie off here.

12           And I know you told me that you spoke directly

13  face to face with Captain Merrill, because he was in and

14  out of the detachment on a regular basis.  And maybe

15  that's the answer.

16           But I want to make sure that I understand this.

17           Right?

18           And that our record has been as complete as I

19  can make it on this point.  Are there any other

20  communications --- e-mail communications, between you and

21  Captain Merrill on this investigation, other than what we

22  see as Exhibits 3 and 4 of this deposition proceeding,

23  which I will state show up as Troopers' 23, 24 and 25 in

24  the document production that Mark Jeffries made to me

42

1    back in March of last year?

2             Are there any other internal e-mail

3    communications involving you and Captain Merrill?

4        A.   No.

5        Q.   Are there any other internal e-mail

6    communications between you and Sergeant Kief?

7        A.   No.

8        Q.   Okay.

9             So two e-mails, then, the ones that I just

10   identified specifically in the record a moment ago,

11   that's the sum total of all of the internal e-mail

12   communication that occurred as part of or about your

13   investigation into Ellen Ballock's complaint against her

14   estranged husband?

15       A.   Correct.

16       Q.   Okay.

17            The --- Exhibit 11, ---

18       A.   Uh-huh (yes).

19       Q.   --- that's been identified already as your

20   report.  And it is part of the production that your

21   lawyer made.

22            The first page of your report, which we're

23   using as Exhibit 11, begins at Troopers' page eight of

24   the --- of the document production.  And that's just, for

43

1    the benefit of the record, more than any direction to

2    you, I'm just making sure that anybody reading this

3    transcript understands.

4         A.    Uh-huh (yes).

5         Q.    Okay.

6              Now, the documents that were produced by your

7    counsel, consistent with what you've testified, have been

8    expunged.  So I'm going to stick with using the

9    unredacted, unexpunged ---

10        A.    Okay.

11        Q.    --- version that's Exhibit 11 here.

12             Your report starts out at the very beginning of

13   the first paragraph with a date and time, September 2,

14   2013, at approximately 0800 hours, which civilian time is

15   of course is 8:00 a.m.

16             So the start of your day, I presume, ---

17        A.    Correct.

18        Q.    --- you were assigned an investigation of

19   harassment between Ellen Ballock and her estranged

20   husband, Scott Ballock.

21             Yet we know that according to the --- the only

22   two internal e-mail documents that exist concerning this

23   matter that you were previously assigned, what, about ten

24   days before.

44

1          Am I right?

2          Yeah, August 22.  Pardon me, August 23 is the

3    date of Captain Merrill's e-mail to you, Exhibit 4.

4          So I guess I'm --- I'm a little puzzled as to

5    why the report starts out stating that you were assigned

6    on September 2, when you had already ---.

7          In fact, it looks like --- I think the record

8    will show that the --- in fact, this report shows that

9    you obtained the disk from Ellen's lawyer containing all

10   of that e-mail material earlier in the month of August.

11      A.   I think that was --- I can't recall exactly why

12   that --- on that particular date.  That might have been

13   the date that I officially had it logged for a case

14   number.

15      Q.   Okay.

16          So that would be the incident number we see at

17   the top of the document?

18      A.   Correct.

19      Q.   Okay.

20      A.   I probably didn't want to take anything out of

21   sequence with the CI log, so that's probably why that

22   date's listed that way.

23      Q.   Okay.

24          Can you tell me if there was any particular

45

1    reason that Sergeant Kief wanted you to conduct this

2    investigation?  Did you have experience, perhaps, with

3    these sorts of offenses?

4        A.    He has assigned the investigations prior to

5    this.  So obviously I can't speak for him, but I would

6    just assume he --- he was comfortable and confident in

7    assigning cases to me.

8        Q.    Okay.

9            All right.  You'd never let him down in the

10   past ---

11       A.    Not to my knowledge.

12       Q.    --- is what I'm hearing you say.

13           Okay.

14           Well, this --- this report has a lot of

15   detailed information in it.  And there's really no point

16   in going through it line by line with you.  But there are

17   a few things along the way that --- exhibit me --- that I

18   did want to address.

19           You mention in your report, the first page,

20   second paragraph, that Ellen Ballock's divorce attorney,

21   who we know to have been Matt Stout at the time, wrote a

22   letter.  And that letter, of course, was attached to your

23   report --- to Scott Ballock saying, you know, stop

24   sending direct communications to my client.

46

1          Did you talk with Matt Stout to ask him why he

2     didn't carry through on what he said in his letter and

3     take the matter to the Family Court?

4          A.   I never had any conversations with Matthew

5     Stout.  I believe Sergeant Kief had interacted with him.

6          Q.   Okay.

7               All right.  I understand.

8               Honestly, Sergeant, that was why I asked you

9     earlier about Sergeant Kief's residual role in the

10    investigation.  Because it looks like you're --- you're

11    kind of handing off or deferring to Sergeant Kief in this

12    and maybe even other respects of the investigation.  But

13    you were the assigned officer.

14              So I'm trying to understand, you know, how you

15    were handling this assignment.

16              All right?

17              I just want to be forthright with you about the

18    point of my questions here.

19              When you're assigned as the investigating

20    officer, what does that mean?

21         A.   You're going to do the primary investigation.

22    You're going to prepare the report, meet with the

23    Prosecuting Attorney.  It can be different things.

24         Q.   Okay.

47

1          It doesn't necessarily mean that you have to do

2     every single thing yourself.

3          Right?

4          Is kind of what I hear you saying.

5     A.   It's not uncommon for other members to help

6     others on cases.

7     Q.   Okay.

8          Fair enough.  I'm accepting of that.

9          But when it gets down to ultimate

10    responsibility or seeing to it that the investigation is

11    sufficiently thorough, right, would it be fair to say

12    that it's the investigating officer's responsibility,

13    your responsibility in this case, to assure that the

14    investigation is sufficiently thorough?

15    A.   The primary investigator has to document the

16    information, make sure that the content is there.  And

17    then once the investigating officer finalizes the report,

18    then that's forwarded through channels to the supervisor

19    for approval.

20    Q.   Okay.

21         I appreciate that answer, but I'm not sure it

22    directly responds to the point of the question.

23         When you say at the last sentence of this

24    report that the investigation is complete, I take that to

48

1    simply mean that you intend on no further investigation

2    at that point, unless something should arise that would

3    warrant, you know, reopening the investigation.

4            Would it be fair to say that as of the date of

5    this report, which we know it was attached to Exhibit 5

6    --- so that should give us a date.

7            Right?

8            September 2, 2013, perhaps.

9    A.   That's when it was logged.

10   Q.   What's when it was logged.

11           Okay.

12           Well, help me with this.  That's another thing

13   that kind of threw me a little bit.  Your report doesn't

14   have a date on it anywhere.  I couldn't find one.

15           I mean, there are dates recited in the course

16   of the investigation.  In fact, it's impressive.

17           I mean, many cases you specify with military

18   precision the time of events.  But the date of this

19   report is --- I can't find it.

20   A.   That reported on --- would have been the date

21   that it was logged.  I know it's confusing if you're

22   looking at it from the outside.

23   Q.   That's one of the reasons we do depositions, so

24   we can understand and have an accurate understanding.

49

1          So what is the date of this investigation

2   report?

3          When did you finish it?

4       A.   Well ---.

5       Q.   Help me understand this.  You're saying ---

6   you're saying in the last sentence that I'm done.  But

7   I'm done as of what date?

8       A.   If you go to Exhibit 5, the last page.  I

9   signed and dated it, it looks like September 18th, 2013,

10  if that's the right date.  It's cut off a little bit.

11         And then ---.

12      Q.   Oh, okay.

13         At that the bottom.

14      A.   And at the very top of the front page on

15  Exhibit 5, I can't read the date, but that looks like

16  it's Sergeant Kief's initials and date that he approved

17  it.

18      Q.   Where are you now?

19      A.   If you go back to the front page on the

20  top, ---

21      Q.   Yes, sir.

22      A.   --- that looks like Sergeant Kief's

23  handwriting, where he approved the report.

24      Q.   You're referring now to Exhibit 5?

50

1     A.    Exhibit 5.

2     Q.    Yeah.

3     A.    So I would have turned it in September the

4    18th.  And I can't read the date that that --- that would

5    have been the date he approved the report.  And then it

6    would go on to the secretary, who would enter the

7    information into the computer system for like CRS

8    reporting.  And then that would go to the Prosecutor's

9    Office.

10              ATTORNEY CROOKS:  Okay.

11              Let's take a moment --- and, Mark, I don't

12    have multiple copies of your production.  It's just too

13    much material.

14    BY ATTORNEY CROOKS:

15     Q.    Let's take a look at the production that your

16    lawyer made, the redacted production.

17     A.    Okay.

18     Q.    And if my copy's the only we've got, then we'll

19    just make due the best we can.

20              But Exhibit 5, that you and I are referring to

21    and using, appears to be Trooper's 5.  Yeah, 5, 6, 7 ---

22    5, 6 and 7.

23              All right.

24              Let me just hand you my copy of the production

51

1      that your lawyer made.

2          A.    Are you asking the date?

3          Q.    Yeah.

4          A.    The top, it looks like September 18, 2013.

5                    ATTORNEY CROOKS:  Okay.

6                    So the record is clear here, we're

7      referring now to the document production that Defense

8      Counsel for the Troopers made in this case in March of

9      last year.

10                   ATTORNEY JEFFRIES:  Thank you.

11                   ATTORNEY CROOKS:  And more specifically

12     we're looking at Trooper's 5 through 7.  And the witness

13     has verified that it's a copy --- it's the produced,

14     redacted copy of Exhibit 5, Deposition Exhibit 5.

15     BY ATTORNEY CROOKS:

16         Q.    And based on your review here, it looks like

17     you completed this report on September 18, 2013.

18               Have I got that right?

19         A.    Right.

20         Q.    Okay.

21               Now, we know that the arrest was September 13.

22         A.    Correct.

23         Q.    So your report, then, was finished five days

24     after the arrest?

52

1      A.    That's when it was turned in, correct.

2      Q.    Okay.

3            And to the best of your memory, recollection

4   and belief, this was the end of your reporting on the

5   investigation?

6      A.    Correct.

7      Q.    Unless of course you had a conversation with

8   Captain Merrill or a conversation with Sergeant Kief or a

9   conversation with somebody at the Prosecutor's Office.

10           I want to be fair to you about that.

11     A.    If there was anything that would warrant

12  further investigation, it would have been supplemental.

13     Q.    Okay.

14           So any conversations that you might have had

15  with say Sergeant Kief or Captain Merrill or Assistant

16  Prosecuting Attorney Scott would have just be in

17  furtherance of resolving the charges that resulted in the

18  arrest of my client?

19           They wouldn't necessarily have constituted

20  further investigation.

21           True?

22     A.    Just pertaining core adjudication, ---

23     Q.    Right.

24     A.    --- things like that.

53

1          Q.    Right.

2                Working the case through the system?

3          A.    Right.

4          Q.    Okay.

5                That's my point that I'm trying to establish

6     while we're on the record here.

7                You were done investigating as of September 18,

8     2013?

9          A.    Correct.

10         Q.    Okay.

11               Now, we know from the 868 pages of production

12    that we have from your Counsel ---.

13               ATTORNEY CROOKS:  And I'll hand that back

14    to you.  I'm just trying to keep it all --- keep it all

15    together.

16    BY ATTORNEY CROOKS:

17         Q.    --- that there was a lot of material produced

18    to us, 868 pages worth.  I mean, there's stuff in here

19    that includes communications between my client and his

20    estranged wife, things that were screen-captured off of

21    the internet, things that --- many things that postdated

22    the signoff on your report of September 18, 2013.

23               For instance, website content that Tom Ballock

24    put up.  Tom Ballock, that's a name familiar to you, I

Sargent's Court Reporting Service, Inc.
1-800-727-4349

54

1    trust.

2        A.    Right.

3        Q.    Okay.

4              All right.  Did you ever talk to Tom Ballock?

5        A.    No.

6        Q.    You never met the man, never talked to him?

7        A.    I've seen him in court.

8        Q.    Okay.

9        A.    But I've never talked to him.

10       Q.    Okay.

11             When did you first even hear about Tom Ballock

12   and his website?

13       A.    I think I heard it from --- at the time

14   Sergeant Kief.

15       Q.    Sergeant Kief told you?

16       A.    About the Cowboykief website and all that.

17       Q.    Okay.

18             Let's take another look into the production

19   that your lawyer gave me in March of last year.  I land

20   on Trooper's 387 here.

21             There's an e-mail from Ellen Ballock addressed

22   to Sergeant Michael Kief, Ronnie M. Gaskins.  And it's

23   dated June 11, 2014.

24             So this is, you know --- what is that?  That's

55

1    like eight or nine months after you closed your report.

2        A.    Uh-huh (yes).

3        Q.    She writes an e-mail to the both of you

4    gentlemen, saying, Tom --- referring to Tom Ballock,

5    Scott's father --- is putting both my names on the

6    internet and linking them to the Ashlee Leeson pseudonym

7    because he will want anyone who Googles me a Costlow or

8    Ballock to be linked directly to a nude pic or video of

9    me once he launches those onto the web.

10         How can I get him stopped before he puts naked

11    photos of me on the internet?  He's trying to do it and

12    say Kenny is doing or possible frame another person.  I

13    know that will not be the case.  It will be Tom who does

14    it, just like it wasn't Kenny harassing me with

15    misspelled anonymous e-mails.  It was Tom posing as

16    Kenny, when Tom quit posing as Kenny and just sent

17    anonymous e-mail himself.

18         Sergeant, you know, what is it --- what's the

19    point of this?  Your investigation was done eight months

20    prior.  Ellen Ballock was still ---.  As of --- as of

21    June 2014, she was still a litigant in Family Court.

22         She, in fact, had a civil case filed against

23    Tom Ballock.

24         You're aware of that?

56

1      A.   I wasn't sure if I was aware of that at the

2  time, ---

3      Q.   Okay.

4      A.   --- like a civil suit.

5      Q.   Yeah, sued him.

6      A.   Oh, I believe so.

7      Q.   Okay.

8      A.   I remember.

9      Q.   All right.  Yeah.

10     A.   I think I might have heard that.

11     Q.   Yeah, sometimes it's difficult to remember the

12  precise sequence of events.  But you knew --- at some

13  point you realized and appreciated the fact that she sued

14  Tom Ballock about this website he was maintaining.

15         I mean, why is she writing to you and Sergeant

16  Kief in June of 2014, some eight months plus after you

17  closed your investigation?  What are you guys --- are you

18  inviting her to continue reporting to you on all this ---

19  all this stuff?

20     A.   I don't know why she was e-mailing me.  I

21  honestly had no interest in communicating with her at

22  that point.

23     Q.   Okay.

24         Did you ever e-mail her or --- or call her or

57

1    talk to her personally and explain to her, look, you

2    know, my part in this is done, you know?

3        A.   I don't remember in what capacity, but I would

4    refer her to Cindy Scott.  Because at that point it was

5    in the hands of adjudication.

6             So I had no interest in maintaining a dialogue

7    with her.

8        Q.   Okay.

9             So after September 18, 2013, anything in this

10   production that was made last year postdating

11   September 18, 2013, as far as you were concerned, was ---

12   had nothing to do with you.

13            You weren't looking at it.  You weren't

14   investigating it.  You weren't taking any action on it.

15   It may as well have never been sent to you.

16            Fair?

17       A.   I had no interest in looking into it anymore.

18   Now, if Ms. Scott felt there should have been a follow-up

19   to this, I would've done a supplemental.  But at that

20   point I was done actively looking into it.

21       Q.   Okay.

22            I'm unaware of any evidence in this production

23   to suggest that Cindy Scott or anybody else at the

24   Prosecutor's Office suggested or directed that additional

58

1    investigation work be done after your report of

2    September 18, 2013.

3              Were you?

4    A.    No, she never --- she never addressed anything

5    like that to me.

6    Q.    Okay.

7              What was Cindy Scott's attitude about this

8    ongoing drama of Ellen Ballock sending all of this

9    handwringing material in here to the State Police about

10   Tom Ballock?

11             What did Cindy Scott say about it?

12   A.    I never had any in-depth conversations or

13   anything like that with her about all these e-mails that

14   were continuing.

15             The only time I had interactions with Ms. Scott

16   is if there was an upcoming court date or I had other

17   cases to talk to her about.  I had really no interest in

18   pursuing all of this any further.

19   Q.    Sure.

20             I'm following what you're saying.  But also

21   you're a smart guy, I can tell.  So I think you

22   understand why I'm pursuing some of these lines of

23   questioning.  She continues to send this stuff to you.

24             Right?

1           Did you even look at it when it came in?

2      A.   I would often just delete it ---

3      Q.   Is that right?

4      A.   --- or forward it to Sergeant Kief.  I had no

5  interest in reading them.

6      Q.   Okay.

7           So Sergeant Kief, did you have a conversation

8  with him, perhaps, about, you know, look it's been ---

9  you know, it's been eight months since I wrote my report

10  on this ---?  Now, can't we tell her that the

11  investigation's closed and that we're going to --- you

12  know, we're going to appear in court and testify on the

13  charges.  But past that, you know, we're done.

14           I mean, look at all the stuff she's sending in

15  here.

16           Did you have any conversation to that effect?

17      A.   It might have been something to the effect

18  she's still sending me stuff.  I don't know why, because

19  she needs to call Cindy Scott, that type of statement I

20  might have made.

21      Q.   What did Sergeant Kief say?  He was your

22  superior.

23      A.   He didn't really have any --- much to say.  I

24  mean, I don't remember exactly, but I think he just

60

1    acknowledged what I told him.

2         Q.    Uh-huh (yes).  Uh-huh (yes).

3              Are you aware that Ellen Ballock was trying to

4    get work as a teacher in Marion County?

5         A.    I had heard about it.

6         Q.    Okay.

7              Are you aware that Sergeant Kief spoke with

8    representatives from the County School Board and the

9    State Board of Education about Ellen's employment?

10        A.    I believe it might have come up in conversation

11   at one time.

12        Q.    Okay.

13             What were you told?

14        A.    Something to the effect Tom was sending some

15   sort of correspondence to the School Board.  But I --- I

16   didn't care as to what it said or ---.

17        Q.    Okay.

18             I think I know the answer to this next

19   question.  Did you ever conduct any investigation into

20   the activities of Tom Ballock specifically as regards to

21   the maintenance of his website?

22        A.    No.

23        Q.    How about Tom Ballock and his communications

24   with the School Board?  Did you ever do any investigation

61

1    into that?

2        A.   No.

3        Q.   Okay.

4             Would it be fair to say that after you wrote

5    your report, September 18, 2013, at least as far as you

6    were concerned, your role was --- was done and that you

7    were prepared to go testify in court about what you did,

8    but beyond that you were done?

9             And that if Sergeant Kief had any continuing

10   interest in Ellen Ballock and her problems, that you were

11   leaving it with him?

12       A.   Once --- once he had been charged and it had

13   been forwarded to the Prosecutor's Office, I looked it as

14   my role as being finished in that regard, until there was

15   trial preparation or court date.

16       Q.   Okay.

17            I kind of take that as a yes.  You were

18   prepared to go testify about what ---

19       A.   Yes.

20       Q.   --- you did.  But you had no ongoing role nor

21   interest.

22       A.   Right.

23       Q.   And if Sergeant Kief wanted to talk to this

24   woman and try to help her, that was up to him.

62

```
 1        A.    He was higher ranked than me.

 2        Q.    Yeah, above your pay grade?

 3        A.    Right.

 4        Q.    Okay.

 5              Well, and there were a couple of occasions that

 6   Lieutenant Kief told us about yesterday in deposition,

 7   where representatives from the FBI came to the barracks.

 8              Were you present for either or both of those?

 9        A.    Both, I believe.

10        Q.    Okay.

11              Let's just take them in order then.

12              The first one, what do you remember?

13        A.    That was Special Agent John Hambrick.

14        Q.    Yeah.

15        A.    He's retired now.  At the time he was in charge

16   of the Clarksburg Field Office.  It's a branch of the

17   Pittsburgh Office.

18        Q.    Right.

19              You knew him because from time to time the

20   State Police and the FBI interact.

21              Right?

22        A.    I worked with him quite a bit when we were

23   working the Skylar Neese investigation.

24        Q.    Okay.
```

63

1    A.   So he, I believe, was instructed by his

2  supervisors in Pittsburgh to meet with us to go over the

3  case, what we had.  And he was interested in seeing the

4  content that was on the disk.

5    Q.   Okay.

6    A.   We checked with Ms. Scott, if that would be

7  okay if he could look at that.  And she did not object.

8        Then he started going through the different

9  types of e-mails on the disk.

10   Q.   Did he make copies or take ---- take anything

11 with him?

12   A.   She --- she --- Ms. Scott was fine if he had a

13 copy of the disk.  So he did have a disk when he left.

14   Q.   All right.

15        Conversation, you know, what conversation did

16 you either have or bear witness to during the time that

17 Agent Hamrick was in the detachment looking at the

18 investigation file?

19   A.   I don't recall exactly what all was said.  I

20 don't think he was allowed to discuss with us what was

21 happening internally with the FBI, so ---.

22   Q.   Okay.

23   A.   But I don't recall exactly what all was said or

24 who said what.

64

1      Q.   All right.

2           Now, in order to try and get some idea of when

3    this happened, let me ask you, did the investigation file

4    include all of this Tom Ballock website material at that

5    point?  Or was it pretty much limited to what you

6    addressed in your report of September 18, 2013?

7      A.   I believe Agent Hambrick was made aware of that

8    website, I believe.

9      Q.   Okay.

10          I appreciate that answer, but ---

11     A.   I don't know if it was ---.

12     Q.   Do you know if any of this same stuff that

13   we're looking at here right now related to the website

14   --- I mean, there's probably more stuff in here about the

15   website than there is about the original --- the original

16   e-mails.

17          Right?

18     A.   I think it was more of what was on the disk,

19   the content that she provided us.

20     Q.   All right.  That would be the disk that her

21   lawyer made?

22     A.   Correct.

23     Q.   That disk that the divorce lawyer provided,

24   that was the primary focus of Agent Hambrick's interest?

65

1      A.    Correct.

2      Q.    Hambrick, that's H-A-M-R-I-C-K (sic)?

3      A.    H-A-M-B-R-I-C-K.

4      Q.    B-R.  Okay.  H-A-M-B-R-I-C-K.  Okay.

5            So did Sergeant --- pardon me.

6            Did Agent Hambrick make any comment to you or

7      in your presence during that first visit as to the

8      respect to the probable impact all this would have on

9      Scott Ballock's employment with the FBI?

10     A.    To the best of my recollection, it wasn't for

11     him to decide.  And the final outcome --- he had to

12     report to his supervisor in Pittsburgh.  And I think they

13     had to report their findings to the main office in D.C.

14           So he didn't really elaborate a lot on FBI's

15     internal investigations or what the outcome of that would

16     be, because he had no say-so in that.  He couldn't

17     speculate.

18     Q.    Okay.

19           I see at Troopers' 402 a document, dated

20     April 11, 2016, addressed to SSRA James Herman, FBI,

21     Clarksburg, from Sergeant MA Kief, transmitting the next

22     four pages which would be Troopers' 403 through Troopers'

23     405, I guess.

24           I'm guessing the transmission --- the cover

66

1    pages counted as one of the pages.  It says so, yeah,

2    four pages including cover page.

3              So the cover page is 402 and then the

4    accompanying document is 403 through 405.  And I'll just

5    proffer into the record that Troopers' 403 through 405

6    would be a copy of the motion made by Marcia Ashdown on

7    April 7, 2016 in Magistrate Court to dismiss charges with

8    prejudice in both of the criminal cases brought against

9    Scott Ballock.  There's also a two-page attachment to the

10   motion.

11             I think it's clear enough that this was

12   Sergeant Kief advising the FBI, through James Herman, as

13   to the fact that the criminal case against Scott Ballock

14   had been dropped.

15             Can you tell me if you were present in court

16   the day the Prosecutor dropped those charges?

17        A.   I was.

18        Q.   Okay.

19             Did you know that she was going to do that?

20        A.   Not until the day of.

21        Q.   Okay.

22             So in the days leading up to the hearing, I'm

23   advised that there were communications between the

24   Prosecutor's Office and Scott Ballock's attorney, Mike

67

1    Benninger.

2         Did the --- anybody at the Prosecutor's Office

3    brief either you or Sergeant Kief about what they were

4    talking about?

5         A.   No, I --- I was just --- assumption we were

6    preparing for trial.  But they didn't tell me exactly

7    what was communicated between Marcia and Mr. Benninger.

8         Q.   Okay.

9         So you went to court on April 7, 2016

10   anticipating that you were going to testify?

11        A.   Correct.

12        Q.   You had reviewed your report and everything you

13   had done and were prepared to be the witness?

14        A.   Correct.

15        Q.   All right.

16        Only to find out that they had a deal and that

17   they were going to drop the case.

18        A.   Yes.

19        Q.   How'd you feel about that?

20        A.   I would've rather it gone to trial.

21        Q.   Okay.

22        By the time the hearing occurred on April 7,

23   2016, Tom Ballock had been posting things on his website

24   for some long period of time.

68

1          True?

2     A.   I believe so.

3     Q.   All right.

4          You weren't monitoring it very closely when

5     Ellen Ballock sent it in to you and Sergeant Kief.  But

6     you at least were aware that she was sending a lot of

7     stuff in related to Tom Ballock's website.

8          Fair?

9     A.   Correct.

10    Q.   Okay.

11         I don't know, I probably haven't examined Tom

12    Ballock's website material as closely as I should.

13         But did you come in for a mention in any of his

14    stuff?

15    A.   The only time I think he mentioned me --- my

16    name was when it was announced Scott filed the lawsuit.

17    But I wasn't part of the cowboykief express website.

18    That was separate from what I --- or I don't know if he

19    had --- he just attached the lawsuit announcement onto

20    that website.

21         But that was the only time I believe I was

22    referenced by name was when it was --- the lawsuit was

23    announced.

24    Q.   All right.

69

1              And so the mention of your name was only the

2    fact that it was on the lawsuit.

3         A.    Correct.

4         Q.    Okay.  Okay.

5              Did you have any conversations with Marcia

6    Ashdown or anybody else in the Prosecutor's Office as to

7    what motivated them to drop the case against Scott

8    Ballock?

9                   ATTORNEY JEFFRIES:  Objection.  I'm going

10   to instruct the witness not to answer on grounds of

11   attorney-client privilege.

12   BY ATTORNEY CROOKS:

13        Q.    Were you present in any meetings with lawyers

14   from the Prosecutor's Office where Ellen Ballock was also

15   present?

16        A.    I don't believe so, no.

17        Q.    Okay.

18              Well, let me ask you this.  Did you know that

19   the case against Scott Ballock was going to be expunged?

20        A.    I did not know that day, the day of the court

21   hearing.  And I wasn't surprised when it was --- when our

22   office was notified it had to be expunged.

23        Q.    You were not surprised?

24        A.    No.

70

1       Q.    Explain to me why you weren't surprised.

2       A.    If I had a case of mine that was dismissed, I

3  would want to get the records expunged.

4       Q.    Okay.

5             You're an experienced law-enforcement officer.

6  You know what expungement's about.

7             Right?

8       A.    Correct.

9       Q.    Sure.

10            Scott Ballock probably isn't the first person

11  in your experience who had a case dismissed and then

12  sought to have it expunged, I guess?

13      A.    Our office had --- I can't give you the numbers

14  --- see a lot of expungement orders for different types

15  of cases.

16      Q.    Okay.

17            Let me ask you, in the course of your personal

18  experience as a State Police Officer, have you ever

19  investigated charges of this kind arising out of

20  communications made during a divorce proceeding, other

21  than Scott Ballock?

22      A.    You mean this --- like this kind of case?  Is

23  that what you're asking?

24      Q.    Sure.

71

1      A.    I can't --- I can't give you --- I can't recall

2    off the top of my head.   I know in a lot of

3    circumstances, especially when there's child-custody

4    proceedings, a lot of the parents will call us to make a

5    complaint against the husband or the wife in hopes that

6    they would get primary custody of the children by getting

7    us involved.

8            But with all the --- the communication and all

9    the content in this case, nothing to this scale.   But

10   there's been other calls that come into our office of

11   allegations during --- especially child custody.   I can't

12   say for certain for divorce.

13     Q.    Okay.   Right.

14           You're distinguishing between child-custody

15   disputes and divorces.

16     A.    Correct.

17     Q.    Sometimes --- sometimes people have been

18   divorced for a long time and they're still fighting about

19   custody years down the line.

20     A.    Right.

21     Q.    Okay.

22           I'm with you.

23           So I was listening as carefully as I'm able to

24   the answer you just gave me.   And it sounds like it's not

72

1    unusual to have people call the barracks and want to make

2    a complaint against either an estranged spouse or a

3    divorced spouse in order to try and gain some sort of

4    leverage in a custody dispute.

5             But how many of those result in open

6    investigations by the State Police?

7        A.    I have no idea, exactly.  I mean, if they

8    have ---.

9        Q.    I guess what I'm looking for is, do you usually

10   open investigations?  Do you occasionally or seldom?

11       A.    I mean, it happens.  I don't know how

12   frequently.

13       Q.    Okay.

14            Let me put it to you this way.  If you open an

15   investigation every time somebody called and said they

16   wanted to file a complaint against their estranged or

17   divorced spouse in relation to a custody dispute, would

18   you have time for anything other than investigating those

19   calls?

20       A.    If --- a lot of times if parents call in and

21   they make allegations against husband or wife involving

22   the children, we refer them to make a Child Protective

23   Services referral.

24            And then if the caseworkers assign and they can

73

1    substantiate the allegations, then they contact us for

2    further investigation.

3        Q.    Okay.

4              Why wasn't that done in this instance?

5        A.    For Scott and Ellen's children?

6        Q.    Uh-huh (yes).

7        A.    This --- the e-mails pertain to Ellen, between

8    Ellen and Scott.

9        Q.    Well, the e-mails also make a lot of references

10   to the children.

11             True?

12       A.    I recall reading several about the children.

13       Q.    Sure.

14             I mean, there were minor children of this

15   marriage, at the time this divorce was going on.

16             Right?

17       A.    Correct.

18       Q.    For a period of time during the divorce the

19   son, Tommy, lived with Scott.  And the daughter, Summer,

20   lived with Ellen.

21             That squares with your memory of events, I

22   trust?

23       A.    Sounds right.

24       Q.    So minor children were involved in this.  In

74

1    your report, you're reporting issues and events that were

2    described in these e-mails that, if true, could

3    potentially pose a risk for these children.

4         A.   Can you give an example?

5              ATTORNEY JEFFREIES:  Objection to the form

6    of the question.  Mischaracterizes the document.

7    BY ATTORNEY CROOKS:

8         Q.   Why don't you grab a hold there of Exhibit 11?

9              Let's look at some aspects of that.

10             So let's start on page two, first paragraph,

11   you describe an e-mail that Scott Ballock sent to Ellen.

12   You quote from it, quote, I will not go through your

13   attorneys for anything ever.  As long as you have custody

14   of Summer, I will make my requests directly to you.  That

15   is my privilege, see attached.

16             So apparently you attached a copy of that

17   quoted --- and I'm sure if we took the time to dig it out

18   of your production here that your lawyer made, that it

19   would be there.

20        A.   Yes.

21        Q.   Okay.

22             Yet the e-mails continued even after the

23   attorney's letter was forwarded to the accused, dated

24   May 3, 2013.  And that letter from Matthew Stout to Scott

75

1    Ballock, dated May 3, 2013, is part of the investigation

2    file identified as Troopers' 416.

3         A.   Right.

4         Q.   Okay.

5              So when --- when you saw this, did it occur to

6    you that maybe it would be a good idea to talk to Matthew

7    Stout and ask him --- did you guys go to the --- go to

8    the Family Court Judge about this?

9         A.   No.

10        Q.   No?

11             I mean, that's what they're threatening to do

12   in this letter.

13             Right?

14             We're going to take you to --- to the Judge.  I

15   mean, you want to see it?

16        A.   No.

17        Q.   Okay.

18        A.   I don't directly --- I don't directly go to a

19   family Judge.  I --- you know, if Mr. Stout wanted to

20   proceed with that, that was his call.

21        Q.   Sure.

22             I'm sorry.  I didn't mean to suggest that you

23   --- it was your place to go to the Family Court Judge.  I

24   didn't mean that.

76

1          A.    Okay.

2          Q.    What I was suggesting was that when you saw

3     this letter of May 3, 2013, from Matt Stout, Attorney, to

4     Scott Ballock, who I guess at the time was pro se --- my

5     question is, did it occur to you that, well, you know,

6     maybe I should find out if this went to the Family Court

7     Judge?

8               Because the Family Court Judge may have

9     conducted a hearing.  There might be testimony.  There

10    might be additional evidence related.

11              I mean, this guy may have gone to court and

12    admitted to criminal activity that I'm investigating.

13    Maybe I should find out.

14              Did you think that maybe you should call Matt

15    Stout and ask him questions along that line?  Did you

16    ever go to court?  Did Scott testify?

17         A.    No, I didn't consult with Mr. Stout about that.

18         Q.    In retrospect, don't you think that would've

19    been a useful thing to do?

20         A.    That was one of the reasons why, too, I met

21    with Ms. Scott, was to brief her on these allegations in

22    this letter.  Because I then --- I --- I was believe Ms.

23    Scott had dealt with Mr. Stout before in other court

24    proceedings and that was something that she could

77

1    communicate with him.

2        Q.    Oh, so you were going to rely on Cindy Scott to

3    do that part of the investigation?

4        A.    Well I wasn't going to --- I didn't assume she

5    was going to do it.  But I --- I made her aware of his

6    letter.  So however she wanted to interpret the

7    information or proceed, that was her call.

8            But I --- that that was me briefing her what we

9    had regarding the letter that I had.  I wasn't --- never

10   called them to consult with them about this note.

11       Q.    Take a quick look if you will at --- ouch, hit

12   my knee --- Exhibit 1, Deposition Exhibit 1.

13           And I will represent that this is the Policy

14   and Procedures that were produced last year by your

15   counsel, Troopers 844 through 868.

16           More particularly, have a look at Troopers 851.

17       A.    Okay.

18       Q.    The title is Criminal Investigation.  There's a

19   definition of what a criminal investigation is found in

20   3.01.  Then there's further elaboration on what the

21   proper --- I guess the word should be conduct instead of

22   conduction.  Proper conduct of a criminal investigation,

23   includes but it not necessarily limited to.

24           And then there are several things listed there.

78

1          Are you with me?

2     A.    Yes.

3     Q.    Okay.

4          What is this?  Is this a --- is this a --- the

5     set of expectations by the State Police?

6     A.    It's a ---.

7     Q.    It's --- it's under the caption Policy ---

8     Index of Policies and Procedures.

9     A.    Sure.  It's a --- it's a guideline for

10    conducting investigations.

11    Q.    What's the difference between a guideline and a

12    policy and procedure?

13    A.    Policy and procedures is part of our Policy and

14    Procedure Manual.  So it's kind of like a --- a guidance

15    rules, things like that, of that nature.  So I'll

16    probably use the words interchangeably.  But ---.

17    Q.    So it's a rule book?

18    A.    Rules and guides, correct.

19    Q.    Okay.

20         So these are rules you're supposed to follow in

21    the conduct of an investigation?

22    A.    Yes.

23    Q.    3.02, subparagraph (c) says you are to locate

24    and interview all persons who have or who are thought to

79

1    have any information concerning the crime under

2    investigation.

3           Did I read that accurately?

4    A.    Uh-huh (yes), you did.

5    Q.    Okay.

6           Well, that would certainly include Matthew

7    Stout.

8           True?

9    A.    I didn't feel the need to talk to him.

10   Q.    You didn't feel that he would have any

11   information concerning the crime under investigation?

12   A.    He provided us the disk of what Ellen alleged.

13   Q.    So he obviously had information related to the

14   crime you were investigating?

15   A.    That he provided, correct.

16   Q.    So your presumption was that he couldn't have

17   said anything to add to what he had already given you?

18   A.    I can't speak for Mr. Stout, but ---.

19   Q.    Well, you made a presumption.

20   A.    But ---.

21   Q.    And I'm trying to understand what the

22   presumption was.

23   A.    He --- he relayed to us the disk with the

24   content.

80

1      Q.    Right.

2      A.    So he ---.

3      Q.    He also wrote this letter that is found at

4  Troopers 416.  And threatened to take Scott to court.

5           So I mean, you --- you acknowledged that if

6  Scott had gone to court and made statements in open court

7  to the Family Court Judge, that would potentially have

8  been incriminating?

9           He could have incriminated himself in the crime

10  that you were investigating.

11          True?

12     A.    Well, I can't --- the disk that --- that was

13  provided to us, I believe spoke for itself, establishing

14  probable cause for the harassment arrest.

15     Q.    So once you saw the disk, then you thought, you

16  know, all I got to do is just summarize this disk into my

17  report and I'm done?

18     A.    After I met with the Prosecutor's Office.

19     Q.    Okay.

20          So the rule book be damned.

21          I mean, you're not going to worry about doing

22  any further investigation.  I got the goods on this guy

23  right here, is basically what you were thinking.

24          Fair?

1          <u>ATTORNEY JEFFRIES:</u>  Objection.

2   Mischaracterizes his testimony.

3   <u>BY ATTORNEY CROOKS:</u>

4       Q.    Does it mischaracterize your testimony?

5       A.    Probable cause we felt was established, so we

6   proceeded with the arrest.

7       Q.    Oh, I know that, yeah.  And I mean, that's ---

8   that's an --- an established set of facts.

9             I guess what I'm trying to find out here is,

10  you know, why it was you concluded that you didn't need

11  to do anything further once you looked at that disk?

12            I mean, what did Captain Merrill say when you

13  --- did you show Captain Merrill the --- the disk with

14  all those e-mails on it?

15      A.    I --- I don't --- I don't believe he saw the

16  disk.

17      Q.    And let's remember, Captain Merrill wanted to

18  be kept advised of this, because, after all, you were

19  investigating an active FBI agent.

20            Right?

21      A.    Correct.

22      Q.    So you looked at that disk and felt that you

23  didn't even need to do any more investigation, just

24  capture the guts of this communications on this disk and

82

1    write your report and ---

2                    ATTORNEY JEFFRIES:  Objection.

3    BY ATTORNEY CROOKS:

4        Q.    --- you're done.

5                    ATTORNEY JEFFRIES:  Mischaracterizes his

6    testimony.  Mischaracterizes the report.

7    BY ATTORNEY CROOKS:

8        Q.    Well, you didn't bother to get in touch with

9    Matthew Stout, we know that.  And it --- it wasn't just a

10   matter of not bother, you have told me that he gave you

11   the disk and as far as you were concerned that was

12   --- that was all you needed.

13                   Is that --- am I being fair to you?

14       A.    That was the information he provided to us that

15   we felt was enough to start an investigation and consult

16   with the Prosecuting Attorney's Office.

17       Q.    Okay.  Yeah.

18                   And that's what you did.  You started an

19   investigation and you talked to the Prosecutor.

20   Prosecutor told you that you had enough probable cause to

21   proceed.

22                   So maybe I just misapprehend the point and ---

23   and the function of criminal investigation.

24                   Once you have probable cause, you're done

83

1   investigating?

2        A.   Well. once you have probable cause, that's

3   enough to --- to seek an arrest warrant.  And further

4   information, as developed later on, I mean that can be

5   supplemented into a report.

6        Q.   Right.

7             Troopers 851 3.02 subparagraph (f) reads,

8   quote, locating and questioning those persons suspected

9   of having committed the crime, closed quote.

10            What's that mean?

11       A.   It means what it says, locating and questioning

12  persons suspected of having committed the crime.

13       Q.   Who would that have been in the course of the

14  investigation that you and I are talking about here?

15       A.   Scott Ballock.

16       Q.   Did you attempt to locate and question Scott

17  Ballock about this?

18       A.   No.

19       Q.   Is there any reason that you could not have

20  reached out to Scott Ballock and said who you were and

21  that you wanted to talk to him about the communications

22  he was having with his wife?

23       A.   There was more evidence or more information

24  that we needed.  If it was more of the just she say, with

84

1    no documentation, that'd be followed up with an

2    interview.

3        Q.    Okay.

4              So what I hear you saying is that you felt the

5    --- the evidence on that disk was strong enough without

6    having to take with the suspect?

7        A.    Myself and the Prosecutor, correct.

8        Q.    Oh, so the --- you talked about whether to

9    interview the defendant or the suspect?

10             Oh, strike that.

11             You had a conversation with Cindy Scott about

12   whether you should try and interview the suspect, Scott

13   Ballock, before he was arrested?

14       A.    No, I --- she was informed he was not

15   interviewed.  I did ask her if --- if I should proceed

16   getting a search warrant on his phones and computers.

17             And she advised me not to do that.  Why, I

18   don't know.  I didn't argue with her.  So that was the

19   additional follow-up I wanted to do in that regard.

20       Q.    Did she make any comment to suggest that she

21   didn't want to be wiretapping an FBI agent's

22   communications?

23       A.    She never made that comment.

24       Q.    Was it in your mind that perhaps that could be

85

1    a politically-sensitive issue?  And by politically

2    sensitive, I mean could have ramifications for relations

3    between the State Police and the FBI?

4         A.   I don't --- you mean if, if --- if he was

5    wiretapped?

6         Q.   Yeah.

7         A.   It never entered my mind.

8         Q.   Never occurred to you that the FBI might take a

9    dim view of one of their agents being wire-tapped?

10                   ATTORNEY JEFFRIES:  Object.

11   Mischaracterizes the testimony.  I believe he testified

12   as to a search warrant not a wiretap.

13   BY ATTORNEY CROOKS:

14        Q.   Search warrant that would authorize a wiretap.

15             Right?

16        A.   No, secure his phones and computers.

17        Q.   Oh, just to get --- oh, to confiscate them?

18        A.   Get like a --- a digital download.

19        Q.   Okay.

20        A.   For analysis.

21                   ATTORNEY CROOKS:  I misunderstood what he

22   said.  Thank you, Mark.

23   BY ATTORNEY CROOKS:

24        Q.   And so what you were talking about was not

86

1    surveillance.  What you were talking about was a --- a

2    warrant to go and cease his property and have it

3    forensically examined?

4         A.   Correct.

5         Q.   That was my misunderstanding.  I'm sorry.

6              Okay.

7              So anyway, Cindy Scott told you that wasn't

8    going to happen and there really wasn't any further

9    discussion to explain what her thinking was?

10        A.   Correct.

11        Q.   Well, why would you suggest that Scott's phone

12   and computer be ceased and examined?  What were you ---

13   what were you thinking it might find?

14        A.   That was the --- the primary means of

15   communicating with Ms. Costlow.  So I didn't know if

16   additional content would --- would surface on the phones

17   that weren't on the disk, and that was something to

18   explore.

19        Q.   Let me ask you, with respect to the charges

20   that you were investigating, is it necessary that the

21   communication at issue be unwanted?

22        A.   Communication ---.

23              <u>ATTORNEY JEFFRIES:</u>  Objection.  Calls for

24   a legal conclusion.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

87

```
 1                    Go ahead.  Just ---.
 2                    THE WITNESS:  Communication between Ellen
 3    and Scott?
 4    BY ATTORNEY CROOKS:
 5         Q.    Uh-huh (yes).
 6         A.    I'm confused.
 7         Q.    Right.  Right.
 8         A.    Can you rephrase that, please?
 9         Q.    You were investigating communications between
10    Ellen and Scott?
11         A.    Correct.
12         Q.    Specifically, you were evaluating whether
13    communications originating on Scott's side directed to
14    Ellen were criminal in nature.
15               True?
16         A.    Well, with the --- the content on the disk, he
17    --- he was obviously establishing communication contact
18    with her.
19         Q.    Right.
20               The question was whether it's criminal?
21         A.    I thought it was, yes.
22         Q.    Okay.
23               And that's what I'm trying to address in my
24    questions.
```

88

1          What is it that made Scott's communications

2     criminal, in your assessment as the investigating

3     officer?

4          A.    The continued or the pattern --- the consistent

5     pattern of communication with her via e-mail, text

6     messages.

7          Q.    So it was consistent?

8          A.    It was consistent.  I believe on one of the

9     text messages --- and I can't recall the date --- but she

10    had asked him to stop.

11         He continued texting her.  The pictures of

12    e-mails he was sending to her, I believe he was like

13    crying.  The selfies of him crying.  The --- the picture

14    of him at the church alter.  Those things, the totality

15    of it, the consistent pattern of it.

16         Q.    Okay.

17         Would it be fair to say that as you went over

18    all these e-mails, that there was a consistent pattern on

19    Scott's part to try and reconcile with his wife?

20         A.    It appeared to me that he --- he definitely

21    wanted her back.

22         Q.    Yeah.

23         He professed love for her.

24         True?

1      A.    I know he sent pictures of rings, engagement

2  rings.  He wanted to remarry or renew their vows,

3  something to that effect.  So I took it as he wanted her

4  back in his life.

5      Q.    Were there any references in Scott's e-mails on

6  the subject of reconciliation that talked about the

7  interest of the children?  It'd be better for the kids if

8  we got back together?

9      A.    He might have but I --- I don't remember.  I

10 remember him e-mailing Ellen things that he did with the

11 children.  They went to the zoo or something, kept ---

12 kept her up-to-date on that.

13         But in terms of reconciling with the kids, I

14 --- I don't remember.

15     Q.    Uh-huh (yes).

16         Scott was telling Ellen that he was in pain as

17 a result of this.

18         Wasn't he?

19     A.    I can't remember.  I don't remember if he told

20 her that.

21     Q.    Well, you said there were pictures of him

22 crying.

23     A.    Yeah.

24     Q.    Pictures of him alone at the altar.

90

```
 1       A.    I thought you meant like physical pain.

 2       Q.    I'm sorry.  I didn't ---.

 3       A.    Emotional pain, yeah.

 4       Q.    Emotional pain.

 5             I --- didn't ask you, are you married?

 6       A.    I am.

 7       Q.    Have you ever been divorced?

 8       A.    No.

 9       Q.    Hope --- hope you never have to experience it.

10  But you've probably seen friends and other people, maybe

11  even in the course of your police work, people going

12  through divorce.  Typically, a painful experience.

13             Fair?

14       A.    It's hard on both parties, it seems --- seems

15  like in my experience.

16       Q.    Yeah.

17             In fact, it's not unusual for one of the

18  parties to a divorce to propose reconciliation.

19             Isn't it?

20       A.    I don't --- I mean, I don't --- I have seen one

21  party want --- wants to get back to another and the other

22  one doesn't want to get back to another party.  They want

23  to move on.

24       Q.    Right.
```

91

1     A.    So I'm sure it's not uncommon.

2     Q.    I mean, right.  That was pretty much what you

3  found as you went through the content of that disk that

4  Matthew Stout provided.

5          Right?

6     A.    That --- that he wanted to get back with her,

7  sure.

8     Q.    Right.

9          And it was Ellen's refusal to do it that, in

10 your mind, made it harassment.  She didn't want to

11 reconcile and she didn't want to hear anything more about

12 reconciliation from Scott.

13         True?

14    A.    She --- it appeared to me that she did not want

15 to reconcile the relationship.  She wanted him to leave

16 her alone.

17         She just wanted to get --- I guess, I think it

18 was --- she just wanted to be kept up-to-date about the

19 children, that was it.

20    Q.    Which Scott did?

21    A.    There was e-mails, I believe.  He did tell her

22 about trips to the zoo or something.

23    Q.    During part of the time addressed by the

24 e-mails you reviewed --- I mean these e-mails went back

92

1   into 2012.

2           Correct?

3       A.   They went back quite a ways.

4       Q.   Yeah.

5           During part of that time Summer Ballock, the

6   daughter, lived with Ellen, her mother?

7       A.   I believe that's right.

8       Q.   And during that --- some of that same time,

9   particularly I'm referring now to 2013, Ellen was having

10  a relationship with a man, Kenny Ice, Jr.

11          You saw reference to that in the e-mails?

12      A.   Right.

13      Q.   And you --- you reported it in your report that

14  is Exhibit 11.

15          Is that true?

16      A.   Right.

17      Q.   Okay.

18          Scott was concerned about the effect that this

19  relationship between Ellen and Kenny Ice, Jr. might have

20  on Scott and Ellen's daughter, Summer.  That came through

21  in the e-mails also, didn't it?

22      A.   I don't recall, but that --- that sounds right.

23      Q.   Uh-huh (yes).

24          Now, even --- well, strike that.

93

1          Ellen made it clear, and I think you've

2     testified to this effect, that communications about the

3     children would be something that she would tolerate.  She

4     would communication with Scott about the kids.

5          Fair?

6      A.    I have to read ---.  I can't remember what Mr.

7     Stout --- I think --- I believe Ellen wanted Scott to

8     communicate to her through Mr. Stout, I believe.  And I

9     --- I haven't read the letter in a while.

10     Q.    Take a quick look here at Troopers 416.

11                          ---

12    (WHEREUPON, WITNESS COMPLIES.)

13                          ---

14               ATTORNEY JEFFRIES:  Can we take a break

15    after this one, Charles?

16               ATTORNEY CROOKS:  Yeah.  Let's go ahead

17    and take a break right now.

18                          ---

19    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

20    BY ATTORNEY CROOKS:

21     Q.    Sergeant, you have there a copy of the letter

22    that Matthew Stout wrote to Scott Ballock in May of 2013.

23          It's part of the production that your counsel

24    made last year.  I think the page number is 416.

94

1          Now, the reason we're looking at this letter is

2     we're trying to remember what kind of boundaries were

3     being set down for direct communication between Scott

4     Ballock and Ellen Ballock.

5          The letter's not too terribly long, just two

6     paragraphs.  You've looked at it.

7          What was the boundary that Mr. Stout was trying

8     to impose on direct communication between Scott and

9     Ellen?

10     A.    I understand this letter as if --- if direct

11     communication's fine involving the children, but outside

12     of that it's to go through the attorney's office.

13     Q.    Okay.

14     A.    That's how I interpret it.

15     Q.    Right.  Okay.

16          And just so the record's clear about this, Mr.

17     Stout was writing directly to Scott Ballock.  I'll

18     represent to you that when someone's in litigation, if

19     they're represented by counsel, lawyers are ethically

20     obliged to communicate with the lawyer and not right ---

21     or otherwise communicate directly with the litigants.

22          So I think it's a fair surmise, then, that Mr.

23     Stout, being an ethical attorney, was writing directly to

24     Scott Ballock, because he didn't have a lawyer at that

95

1   point.

2       A.    I would assume.

3       Q.    Okay.  Okay.

4            So --- so you obtained, from Mr. Stout, the

5   magnetic disk that contained two --- essentially two

6   files of e-mail communication.  And we were talking about

7   that.  More particularly we were talking about it as you

8   wrote it up in your investigation report.

9            I'll take that back, if you don't mind, that

10  way I can keep it all together here.

11           Let's turn our attention back now I think to

12  Kief Deposition Exhibit 11, which is a copy of your

13  report, which we figured out was written September 18,

14  2013.

15           In the first paragraph, on page two, you quote

16  some of Scott Ballock's e-mail communication with Ellen.

17  And he says in there --- I --- I may have even read this

18  in before, so I won't do it again.  But he essentially

19  says there that, you know, I'm going to write directly to

20  you, as long as you have custody of our daughter.  He

21  refers to her by name, Summer.

22           So --- so it would appear that although Scott

23  Ballock is sounding something of a defined tone here,

24  nonetheless, I mean, he and Mr. Stout were --- were in

96

1    agreement back in May that there was going to be direct

2    communication as it related to Summer at any --- at any

3    rate.

4              True?

5      A.    That's what it seems.

6      Q.    Okay.

7              So --- so as you are reviewing all these

8    e-mails, and there are a lot of them, spanning a large

9    period of time, you were kind of bearing in mind that,

10   you know, not every communication, per se, was out of

11   bounds here.

12             That if related to the child, then Ellen's

13   lawyer was okay with that.

14             True?

15     A.    Yes.

16     Q.    Okay.

17             And in fact, there were a great many e-mails on

18   that disk that, you know, talked about not only the

19   daughter, Summer, but it also talked about their son,

20   Tommy.

21             Correct?

22     A.    Okay.

23     Q.    So that --- we know that at least part --- and

24   I don't know that there's even any point, really, to try

97

1    and to express it in percentage terms or anything, but

2    there was more than a few of these e-mails that were

3    permissible, as far as you understood the arrangement

4    that Mr. Stout and Scott Ballock communicated about.

5            Fair?

6    A.    About the children, yes.

7    Q.    Yeah.  Okay.

8            So in the second paragraph of your report on

9    page two, you itemized that there were 1,495 items in the

10   first file on the disk and 1,843 items in the second

11   file.

12           I trust that those numbers were totaled up for

13   you already.  All you needed to do was just pop the disk

14   in and --- and look on the computer and it would tell you

15   how many items were in the --- each file.

16   A.    It was.

17   Q.    Okay.

18           I mean, I got this image of you sitting there

19   trying to count 1,800 plus items.

20           So --- so at any rate, you say in your report,

21   second paragraph, page two, that a substantial amount of

22   e-mails appeared to be pressuring the victim, that would

23   be Ellen, to return to Scott.

24           Those are not your words, you're using the

98

1    words victim and accused, consistent with the policies

2    and procedures of your department.

3             You accurately recited that they were married,

4    but in the process of divorcing.  You accurately recited

5    that they had two children together, Tommy and Summer.

6    And that Summer was staying with Ellen.

7         A.   Correct.

8         Q.   And that custody of the children was in

9    dispute.

10        A.   Correct.

11        Q.   So --- so as far as I can make it out, you

12   accurately described the lay of the land as it related to

13   the posture of these people.

14        A.   Uh-huh (yes).  Yes.

15        Q.   And you go on, then, in your report to do some

16   substantive analysis of the content of the e-mail

17   communications.  You say, in the third paragraph, page

18   two, that the accused, that would be Scott, appears to

19   show an obsessive behavior in wanting the victim back.

20            And then you go on to bring Kenny Ice's name

21   into the picture.

22            You indicate in this third paragraph, second

23   page, that you printed off several of the e-mails and

24   showed them to Sergeant Kief.  And that you were

99

1    selecting e-mails and pictures that depicted Scott's

2    sadness and emotional suffering.  And that he was urging

3    this upon Ellen, in an effort to try and win her back.

4              Am I characterizing that fairly?

5        A.   The types of e-mails that I showed Sergeant

6    Kief?

7        Q.   Yes, sir.

8        A.   I think I was just showing that the --- the

9    pattern of harassment between him and her in that regard.

10       Q.   Okay.

11             ATTORNEY PHILLIPS:  Let me object to the

12   characters --- characterization of the --- the letter.

13   He doesn't state in the report that he's showing them to

14   Sergeant Kief.

15   BY ATTORNEY CROOKS:

16       Q.   Let me revisit what I was trying to

17   characterize.

18             Let's see.  Oh, I may have misinterpreted

19   something.

20             In your report, page two, third paragraph, you

21   indicate that you printed off several e-mails and

22   photographs from the disk, as well as e-mails from among

23   those that were forwarded to Sergeant Kief by Ellen

24   Ballock.

100

1      A.    Correct.

2      Q.    Okay.

3            Now, for the big question --- now, you didn't

4      print these off in order to show them to Sergeant Kief,

5      as I suggested in my question.

6            You printed them off to serve as examples.  And

7      you were trying to show examples of what --- of --- of

8      Scott's pain and suffering that he was trying to lay

9      before Ellen or --- or to demonstrate what, that he was

10     being threatening ---?

11           Which was it?

12     A.    More just to --- to show the pattern of him

13     communicating with her by harassing her.

14     Q.    Okay.

15           The --- we could look at the --- the warrants

16     that were issued, if we need to.  Happy to do it.

17           But the concept of harassment, where did you

18     look for definition ---?  In the course of your

19     investigation, where did you go to, you know, get help

20     with --- you know, what constitutes harassment?

21     A.    Well, I --- after --- this was stuff that came

22     up during my meeting with Ms. Scott.

23     Q.    So you relied on Counsel for that?

24     A.    I --- seeked her advice, correct.

101

1      Q.   Okay.

2                ATTORNEY CROOKS:  I would submit, by the

3      way, Mark, that reliance upon Counsel ---.

4                     All right.

5                          ---

6      (WHEREUPON, THERE WAS A BRIEF INTERRUPTION IN THE

7      PROCEEDINGS.)

8                          ---

9                ATTORNEY CROOKS:  Have I got your

10     attention now?  Okay.  So don't make me do that again.

11               I would submit to you that reliance upon

12     Counsel operates as a waiver for any attorney-client

13     privilege when the conduct is at issue, in --- in a

14     substantive matter in the claims and defenses of the

15     case.  So ---.

16               ATTORNEY JEFFRIES:  I --- I agree,

17     generally.  I'm not sure about --- about the waiver ---

18     but I'll separate it when you need to.

19               ATTORNEY CROOKS:  Well, you had --- you

20     had voiced that objection in response to a couple

21     previous questions.  And I --- I sense that we're

22     probably going back around to it again.

23               But I just would ask that you consider the

24     --- the body of law that pertains to that point.

102

1              Okay.

2              So --- and maybe --- maybe that's what we

3    ought to do is take a quick look at Exhibits 8 and 9.

4              These are the warrants for arrest in the

5    Criminal Complaint  Yeah, these are collector exhibits.

6    BY ATTORNEY CROOKS:

7       Q.    So there's not only warrants here, but Criminal

8    Complaints.

9              Your name appears on, I believe, both of these.

10      A.    Let me look.  Let me look.

11      Q.    And I see it on Number 8 on the complaint.

12      A.    Yeah.

13      Q.    Your name appears on the complaints attached to

14   both warrants.

15             Did you prepare these Criminal Complaints?

16      A.    I did.

17      Q.    Okay.

18             So you were citing the statute on harassment in

19   Exhibit Number 8.

20      A.    Yes.

21      Q.    The complaint form requires --- or calls for

22   you to state the statutory language of offense.  And so

23   what you put in here on Exhibit 8, the Criminal Complaint

24   of harassment, says any person who repeatedly harasses or

103

```
 1     repeatedly makes credible threats against another is
 2     guilty of a misdemeanor and shall be incarcerated for not
 3     more than six months or fined not more than $1,000 or
 4     both.
 5            So harassment is defined as harassment
 6     according to the language of the statute.  I guess we'll
 7     --- that serves to explain, perhaps, why you sought the
 8     advice of the Assistant Prosecutor as to, you know, at
 9     what point does a written communication constitute
10     harassment.
11            Fair?
12       A.   I think there's was a --- within the West
13     Virginia State Code, they define harassment.  And I don't
14     remember how exactly it's defined, but it's a repeated
15     pattern of --- of events.
16       Q.   Okay.  Okay.
17            Now, if communications were bilateral, meaning
18     to say this was not a case of simply Scott initiating a
19     long series of unwelcome communication, but instead was a
20     case of Scott participating in a dialog that was going
21     back and forth with Ellen Costlow ---?  Would that have
22     factored into your assessment of whether Scott was guilty
23     of criminal activity, as charged in this complaint?
24       A.   If he was guilty --- could you rephrase that?
```

104

1      Q.   Okay.

2      A.   I know what you're asking, but I want to make

3  sure.

4      Q.   It was long question.

5           If your investigation has suggested to you that

6  the communication flow between Scott Ballock and Ellen

7  Ballock was not one-sided, but it was instead reciprocal,

8  they were --- they were in a dialog, right ---?  So that

9  perhaps these e-mails were --- were invited by telephone

10  conversations, okay?

11          Let's go with that, per se.  Suppose, you know,

12  Ellen picks up the phone and --- and calls Scott and

13  talks to him on the phone for, you know, some meaningful

14  period of time.  And then that prompts Scott to, you

15  know, type out an e-mail to Ellen.  That would be more of

16  a dialog than a --- than a one-way bombardment of e-mails

17  coming from Scott to Ellen.

18          True?

19     A.   Well, I don't know how --- if --- if Ellen and

20  Scott if --- if those conversations took place on the

21  phone that invited him to send e-mails.

22     Q.   Okay.  I understand.

23          I take your point.  I'm not suggesting, at the

24  moment anyway.  I'm not suggesting factually that ---

105

1    that --- that's what happened.  I reserve the right to

2    come back around to suggest that it --- in due course.

3           But my question right now is, to you, as the

4    investigating officer, --- you were trained in this, I

5    mean, you're a professional.

6           Right?

7           If your investigation had suggested that this

8    communication flow was a dialog, it was bilateral.

9           Right?

10          Maybe Scott's in writing, but Ellen's on the

11   phone opening the door to this, would that have factored

12   into your assessment of whether it rose to the level of

13   criminal conduct on the part of Scott Ballock?

14      A.   I guess there's different ways to look at it.

15   I mean, if --- if they're talking about their kids, it's

16   one thing.

17          But she --- she was pretty specific on him

18   refraining from contacting her outside the children.  So

19   in that sense, he acknowledged that he received notice of

20   the letter, but he continued sending those messages.

21      Q.   Okay.  Okay.

22      A.   So that's the standpoint I look at it as.

23      Q.   All right.

24          Right.  When Ellen was in the barracks, you

106

1    know, talking to you guys, she was telling you

2    unequivocally that she didn't want any communication with

3    him except for about the children.

4         Did you ask her, have you had any --- have you

5    initiated any of this?  Have you talked to Scott either

6    on the phone or in person, opened the door to these

7    communications?

8         A.    I don't exactly recall what she did say.

9         Q.    Yeah.

10        A.    Primary means of communication was on the

11   phone, but it was if the children had to go to the

12   emergency room, she wanted to know, that type of

13   communication.

14        Q.    Okay.

15             You said something about the primary means of

16   communication being on the phone.

17        A.    I think --- yeah, I think they would use the

18   phone to call each other.

19        Q.    Okay.

20             So Ellen told you that she and Scott talked to

21   each other on the telephone?

22        A.    I --- I can't 100 percent say for sure, but

23   that's how I believe they were communicating.  Because if

24   --- if Summer or Tommy had to go to the hospital, she

107

1    wanted to know right then and there.  Then --- then I

2    would assume he would have to call her, ---

3         Q.    Uh-huh (yes).

4         A.    --- to relay that information.

5         Q.    Uh-huh (yes).  Okay.

6              So let me --- let me stick to my question for a

7    moment.

8              Did you try to discover in the course of your

9    investigation, by way of interviewing Ellen Ballock, the

10   Claimant, to determine whether she was initiating contact

11   with Scott?

12             In other words, was she inviting him to send at

13   least some of these written communications?

14        A.    When she made the allegations and produced the

15   letter and the content, at that point I was trying to

16   corroborate if all the harassment does it --- was she

17   being harassed?  Did I corroborate her statement?

18        Q.    That's --- and that's what I'm trying to work

19   on with you right now.  Is --- if the Complainant, Ellen

20   Ballock, opened the door to communications with Scott,

21   maybe called him on the telephone and said provocative

22   things to him, that prompted him to write some of these

23   e-mails ---?  Would that still rise to the level of

24   harassment, as you understood it, as the investigating

108

1      officer?

2          A.    That seems like a hypothetical?

3          Q.    It is a question, so it is.  You're a trained

4      professional investigator.  You were assigned to conduct

5      this investigation.

6          A.    I don't know about answering a hypothetical,

7      but I can --- or I can comment on what I do know.

8          Q.    That's fine.  My --- I'm going to stand by my

9      question.

10             If --- if you had discovered that

11     communications, which you were trying to evaluate for

12     purposes of charging under the harassment statute, were,

13     in fact, invited communications, wouldn't that factor

14     into your assessment of whether those communications

15     constituted harassment?

16         A.    If you're talking hypothetical, I mean, if

17     there's information that would support that, obviously,

18     that would have been well-documented in the report.  And

19     I would've --- I would've addressed that to Ms. Scott, to

20     make a --- a further determination.

21             If that answers your question.

22         Q.    I think it may partially.  You --- if you had

23     known of any information to suggest that Scott's

24     communications with Ellen were invited, you would've

109

1    deemed it noteworthy and put it in your report and

2    conferred with legal counsel about it?

3         A.   Sure.

4         Q.   Okay.

5              And that's because it could negate the criminal

6    character of the communications, potentially.

7              True?

8         A.   Negate them all?

9         Q.   Uh-huh (yes).

10             It would depend on how many of the

11   communications were invited.

12             Right?

13             It would all depend on what you found?

14        A.   I think it would just depend on what --- what

15   information was at hand.

16        Q.   Sure, sure.  Okay.

17             And that's my only point, is that that would be

18   potentially significant, perhaps even exculpatory

19   information.  Exculpatory information, when a police

20   officer is assigned to conduct an investigation, are ---

21   do you have any obligation to determine if there's

22   exculpatory explanations for what you're investigating?

23        A.   We have to try and corroborate the victim's

24   statement.  And if it can't be corroborated, there ---

110

1    there are times when there's evidence that would say

2    otherwise what the victim alleged.

3            So that's all that would --- that would be

4    documented.

5    Q.    Okay.

6            You're a careful witness and I appreciate that.

7    But my point, I think, is a little more precise.

8            Let me try this, you know, again, just to be

9    sure we understand each other.

10           Okay?

11           You went through the academy.  You studied

12   Criminal Science in college.  I mean, you know what

13   exculpatory evidence means.

14           Right?

15   A.    Uh-huh (yes), I do.

16   Q.    Okay.

17           Exculpatory evidence obviously means evidence

18   that would tend to negate the criminality of the

19   suspect's behavior, in this case.

20           True?

21   A.    Correct.

22   Q.    Okay.

23           So if there was a --- an explanation for at

24   least some of these communications, then you would be

111

1    going through a process of trying to identify which of

2    these communications, if any, were, in fact, criminal

3    harassment.

4               Right?

5        A.    There's a lot of content there.

6        Q.    Sure is.  It's a big job.  I know dispute that.

7               Okay.

8               So wouldn't it have been helpful to you to

9    follow the rules for criminal investigation found at

10   Troopers 8513.02 --- it's on paragraph F, and get in

11   touch with --- that is to say to use the language or the

12   rule to locate and question the person suspected of

13   having committed the crime?

14       A.    My ---.

15       Q.    He may have --- he may have had explanations

16   for, you know, some or all of these communications.

17       A.    You're talking 3,000 items.

18       Q.    Yes.

19       A.    That's a lot of material.  And I was talking to

20   Scott in the letter from her attorney's office, so there

21   was clearly harassment going on.  This wasn't something

22   she was inviting him to do.

23       Q.    Okay.  All right.

24               So far as the Complainant's concern --- excuse

112

1    me, you interviewed her twice.

2            Right?

3        A.    Correct.

4        Q.    Over 3,000 communications.  And you adequately

5    addressed the import of those communications through two

6    interviews with Ellen Ballock.

7        A.    The second time was because the recorder didn't

8    work.

9        Q.    Okay.

10       A.    We wanted to get her statement in writing this

11   time.

12       Q.    All right, then.

13            So you could have satisfied yourself on the

14   substitute import of more than 3,000 communications in

15   the span of just one interview with Ellen Ballock, had

16   the tape recorder that Sergeant Kief brought with him

17   functioned the way it should have.

18            True?

19       A.    Are you asking why she was in the office?

20       Q.    No.

21       A.    No.

22       Q.    No, I'm talking, if you were saying that

23   getting in touch with the suspect, as required by 3.02,

24   subparagraph F and then the Troopers 851, was not

113

1    practical because there were just too many

2    communications.

3            There were more than 3,000 of them.  That's

4    what I understood you to tell me.

5        A.   The content spoke for itself, correct.

6        Q.   Okay.

7            You felt that the --- just reading it on your

8    own gave you the --- the comfort and satisfaction that

9    this was, in fact, harassment and criminal conduct under

10   the Code, did not need to follow the rules and talk to

11   the suspect?

12       A.   It wouldn't work that way.  But that's why I

13   reached out to Mrs. Scott and presented to her what I did

14   have at that point.  And then we had the conversation

15   about the search warrant to seize his phones and

16   computers.

17       Q.   All right.

18       A.   But --- and I agreed with her honest decision,

19   she reviewed the content on the disk and --- not all of

20   them, of course.

21           And she was comfortable with --- that there was

22   probable cause for his arrest.

23       Q.   Okay.

24           Did you direct the Assistant Prosecuting

114

1    Attorney Scott to any particular e-mails?  Did you select

2    any that you thought were most indicative for her to

3    examine or do you just give her the disk and say, you

4    know, here I'm going to leave this you, you can look at

5    as much of it as you think you need to?

6         A.    She put the disk in.  She started going through

7    it herself.

8         Q.    Okay.

9         A.    And I pointed out some of the other e-mails,

10   too, that were on the disk, but --- but she was at her

11   own leisure going through some of the content.

12        Q.    Uh-huh (yes).

13              In your report, as we've already addressed, you

14   did print off some of the e-mails and attached them.  So

15   you know, you wouldn't go down through the stack of stuff

16   that was produced from the investigation and see which

17   ones those were, but did you --- did you show those to

18   APA Scott?

19        A.    I don't believe I showed them all to her, but

20   that she --- but I did address a few of them to her.

21        Q.    Uh-huh (yes).

22              Was it your view that if there was even one

23   e-mail from among the more than 3,000 that could be

24   fairly interpreted as threatening, then that's all you

115

1    really needed?

2         A.    Based on one e-mail?

3         Q.    Yeah.

4         A.    Are you asking if --- if there was one e-mail

5    that was threatening?

6         Q.    No.

7         A.    Or would I just assess it on based on one?

8         Q.    I was asking if you had --- I was asking about

9    your criteria for assessing these communications as part

10   of your criminal investigation.

11            Was it your view that, you know, hey if I got

12   just one out of these more than 3,000 e-mails, that

13   leaves me satisfied that he was harassing and threatening

14   her, then that's all I need.

15        A.    I --- I got more the harassment, I was

16   investigating it more on the harassment side than the

17   threats.  I mean, I --- there were some --- I don't know,

18   I can't recite specific examples.

19            I remember there were some e-mails you could

20   probably look at as a threat, but it was more of the

21   harassment.

22        Q.    Right.

23            There were no overt threats in any of those

24   3,000 e-mails.  He never said, I'm going to kill you?

116

1          A.    I'm not aware of any.

2          Q.    Right.

3                So you're thinking about this when you went to

4     see APA Scott.  You --- you were thinking that getting a

5     warrant and seizing his phone and --- and laptop computer

6     would be fruitful of your investigation.

7                True?

8          A.    I believed there could've been other materials

9     found outside of what we had.

10         Q.    Sure.

11               Well, it's reason to suspect that, because

12    these e-mails came from somewhere.  He had to use a

13    computer to send those e-mails.

14               Right?

15         A.    That's correct.

16         Q.    Sure.

17               And presumably if they came from his laptop

18    computer.

19         A.    That or his phone.

20         Q.    Okay.

21               And that's why you wanted to get the phone as

22    well as the computer?

23         A.    Correct.

24         Q.    Okay.

117

1          Now, all of the stuff that you were given by

2    Matthew Stout, as well as the e-mails that were sent to

3    you and Sergeant Kief by Ellen Ballock, those were --- to

4    the extent that they were cold or selected, they were

5    selected by Ellen Ballock, weren't they?

6        A.   There was a lot of e-mails that was just about

7    the kids and going to the zoo, nothing that was like a

8    harassing or threatening nature.

9          So she included all those e-mails.

10       Q.   Yeah, but, I mean, it's quite possible that she

11   left out e-mail communications that she initiated.

12       A.   It's always possible.

13       Q.   Right.

14         Did you ask her about that?

15       A.   I don't recall if that specific question came

16   up.

17       Q.   Okay.

18         So then you had obtained a warrant and seized

19   Scott's computer and phone.  And if, in fact, Ellen had

20   initiated communication to Scott, opened the door to

21   these e-mails he was sending her, getting a warrant and

22   seizing that phone and that laptop would've demonstrated

23   it.

24         Wouldn't it?

118

1      A.   Well, it's like ---.  No, I can't really answer

2  hypothetically, but who knows what would've been

3  uncovered.

4      Q.   Well, that's why you were interested in doing

5  it.

6           Fair?

7      A.   Well, to see if --- if --- if there was more

8  that he was --- outside of the scope of what we had the

9  disk, I mean, more harassing e-mails, text messages,

10  things like that.

11      Q.   And I suppose it is possible that, yes, the ---

12  the --- the weight of the activity against --- or the

13  evidence against Scott could have --- have grown, but it

14  also could've yielded the exculpatory evidence.

15           You were open to the potential for exculpatory

16  evidence in the course of your investigation, weren't

17  you?

18      A.   For?

19      Q.   I mean, you have to be.

20           Right?

21      A.   For?

22      Q.   You're --- you're a professional.  You're

23  trained in this.  And you recognize that as a law-

24  enforcement officer, if there is exculpatory evidence,

119

1    you got a duty to consider it.

2           Right?

3      A.   Sure.

4      Q.   In --- in fact in discovery, even if there's

5    still enough to charge in discovery, you're going to have

6    to turn over exculpatory evidence.

7           Right?

8      A.   Yes.

9      Q.   I mean, you've been in school long, this ---

10   this is --- this is stuff you've known since college

11   days.  That under our system of justice, you know, the

12   Prosecutor and the police, they're not just partisans.  I

13   mean, they're trying to pursue justice here.  So that's

14   why they have a responsibility to identify and produce

15   exculpatory evidence when it exists.

16          Am I right?

17     A.   Sure.

18     Q.   Okay.  Okay.

19          I'm sorry to be demanding about such an obvious

20   point, but it --- it's part of my case here, you know.

21          In the course of an investigation, even the

22   suspects got certain rights.

23     A.   Sure.

24     Q.   Right?

120

1          Okay.

2          So now after he was arrested and retained Mike

3  Benninger to represent him, Scott Ballock offered to come

4  in and --- and be interviewed.

5          True?

6     A.    I'm unaware of that.

7     Q.    Well, those communications were made to the

8  Prosecutor's Office.

9          Right?

10    A.    I'm not aware of that.  I don't --- I don't

11  recall that.

12    Q.    So the Prosecutors never told you that Mike

13  Benninger was offering to bring his client and come and

14  sit for an interview?

15    A.    I --- I don't ever recall that.

16    Q.    Would that have been significant to you, as the

17  investigating officer?

18    A.    I'm not sure.  I mean, once the arrest was

19  made. it was going to the --- the process.  I can't

20  recall a --- a circumstance where that did happen.

21    Q.    No, I don't think it did happen.  I don't --- I

22  don't think the Prosecutor ever took up Mike's offer and

23  conducted an interview.

24          Let me ask you.  We know, based on what you've

121

1    told us, as well as what you put in your report, that you

2    were open to the --- potential for doing a supplemental

3    report, if additional information baring on the merits of

4    this case came to hand.  And it could necessitate a

5    supplemental report.

6            That's what you were referring to at the finish

7    of this report.

8            Right?

9        A.   Yeah, with all the cases, if more information's

10   developed, we can supplement that.

11       Q.   Right.

12           I mean, you're always open to the possibility

13   of a supplemental report, if additional information comes

14   to hand.

15       A.   Sure.

16       Q.   Okay.

17           I'm sure in the course of your experience there

18   have been times, after arrest and arraignment, when the

19   defendant has submitted to interview.

20           Can you look back on your experience and tell

21   me if you can think of ---?

22       A.   Are you talking about post arrest?

23       Q.   Yeah, post arrest.

24       A.   I can recall maybe one case, it was a --- it

122

1    was a shooting down in Lewis County and the --- the

2    suspect that we had detained would not provide a

3    statement without an attorney present.

4         Q.   Okay.

5         A.   And once he retained counsel, we Mirandize him

6    and interviewed him at the jail.

7         Q.   Okay.

8         A.   Under his counsel's advice, he did interview

9    with us.

10        Q.   Uh-huh (yes).

11             So what I take from your answer, since you

12   pointed out that it --- it was only once instance that

13   you can think of in the course of your personal

14   experiences as a policeman, that it's --- it's rather

15   unusual for the defendant to submit to an interview, post

16   arrest, post arraignment?

17        A.   I don't do a lot of them.  And I can't recall

18   any other examples.

19        Q.   Okay.

20             So if an Associate --- or let me get this

21   right.  She's an Assistant Prosecuting Attorney, APA

22   Scott called you and said, Mike Benninger represents

23   Scott Ballock.  He says that they're willing to come in

24   for an interview, you know, we want --- want you to come

123

1    over and we're going to get together with them and

2    conduct an interview on this.

3           You would have been available and --- and up

4    for doing that.

5           Right?

6    A.    No, I --- I wouldn't have told her no.

7    Q.    Yeah.

8           Now, I don't think that's a good idea.

9    A.    No.

10   Q.    Okay.

11          So you would have done it and you would have

12   done a supplemental report?

13   A.    Sure.

14   Q.    Okay.

15          So if Mike Benninger offered that on behalf of

16   Scott Ballock, and APA Scott exercised her discretion and

17   didn't tell you so, you would never have had that

18   opportunity.

19          True?

20   A.    Are you asking if --- if I --- I was aware that

21   they requested an interview?

22   Q.    No, I'm --- I'm asking, just suppose that ---

23   that if Mike Benninger had offered to bring his client

24   and submit to interview, and Cindy Scott chose to decline

124

1    that and she didn't bother to tell you about, then there

2    was no opportunity for supplementing your investigation

3    to that effect?

4         A.   Well, I don't want to answer for Ms. Scott.

5    But I --- I'm not aware of that conversation ever

6    happening.

7         Q.   Okay.

8              ATTORNEY CROOKS:  Let me take a short

9    break.

10                        ---

11   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

12                        ---

13             ATTORNEY CROOKS:  Okay.

14             I'm going to try and pick up our tempo

15   just a little bit here, so we can get this done.

16   BY ATTORNEY CROOKS:

17        Q.   Let's --- let's have a look again at --- at

18   your report.

19        A.   Okay.

20        Q.   Last paragraph, page two, you say that it

21   appears Scott wanted to show --- Scott had an obsessive

22   behavior in wanting Ellen back.  And then you go on to

23   talk about pictures that he had sent.

24             Were the --- the pictures evidence of

125

1    harassment?

2         A.   I considered it harassment, yes.

3         Q.   Okay.

4              What was it about the picture that you are

5    talking about in this paragraph that were harassing?

6         A.   Can you cite exactly where you're at on this

7    third --- are --- are you in the third paragraph of page

8    two?

9         Q.   Yes, sir.

10             It says in the second sentence --- maybe I can

11   help you --- due to the quantity of e-mails, the

12   undersigned officer printed out various e-mails and ---

13        A.   Okay.

14        Q.   --- and to show examples of the kind of e-mails

15   the victim received.

16             So you were looking for exemplars, examples.

17   Close-up pictures of the accused crime.

18        A.   Okay.

19        Q.   And was that evidence of harassment?

20        A.   I considered it, yes.

21        Q.   Okay.

22             You cited an e-mail, dated October 11, 2012,

23   the previous year.  We broke our vows.  Life will never

24   be the same without you by my side.

126

1           Did you consider that to be harassing?

2     A.    I did.

3     Q.    Okay.

4           How about the fact that that e-mail, well,

5     actually all the e-mails that you cited by date in this

6     paragraph (indicating), they all predated the letter from

7     Matthew Stout.

8           Didn't they?

9     A.    Yes.

10    Q.    And yet you --- you judged them to be

11    harassing?

12    A.    Yes, that --- Ellen was prompted to --- to

13    reach out to Mr. Stout, to have that letter issued to

14    Scott.

15    Q.    You see where you quote from Scott's e-mail

16    November 7, 2012?

17    A.    Okay.

18    Q.    You say --- you quote him as saying, quote, you

19    directed me to send all correspondence to you about the

20    divorce via e-mail.  That is what I have done.

21          My correspondence has been polite and

22    respectful.  Calling it harassing does not make it so.

23    I'm simply providing you with information and

24    recommendations for the divorce process in the benefit of

1    the children, closed quote.

2            Why did you quote that?

3      A.    I don't remember exactly why I specifically

4    quoted that one.  And probably, too, he --- he makes a

5    reference to harassing.

6            So at some point she was telling him to not

7    contact her because he was harassing her.  So at some

8    point he --- he knew that he --- that she felt that he

9    was --- she was being harassed by him.

10     Q.    Okay.

11            He appreciated that she was viewing it that

12   way.  But he disagreed with her, according to the passage

13   that you quoted?

14     A.    Correct.

15     Q.    Okay.

16            So there was an interpretation --- a

17   disagreement of interpretation going on between the ---

18   the two people?

19     A.    That's it.

20     Q.    Right.

21     A.    It would seem.

22     Q.    Okay.

23            And so you had to make a decision and you

24   decided to agree with Ellen Ballock's interpretation.

128

1          Is that what happened?

2     A.   Well, at this point I'm trying to establish, is

3 there a pattern of harassment that is going on between

4 them two?

5     Q.   A pattern.  So in looking for a pattern, you

6 have to start somewhere.

7          Is this where you started, these e-mails that

8 you're quoting here?

9     A.   What was --- what contained within the disk.

10    Q.   Sure.

11         It was either on the disk or among the e-mails

12 forwarded to you by Ellen Ballock.  Those are the only

13 two sources of evidence you had at that point.

14         True?

15    A.   Right.  You're correct.  Primarily the disk.

16    Q.   So yeah, yeah.  I'm going to stand by my

17 question.  They disagreed over whether the communication

18 that you were citing constituted harassment.  And you ---

19 you decided to weigh in on Ellen Ballock's side of that

20 interpretive dispute.

21         True?

22    A.   I --- I'm looking at more as the fact that he

23 --- it's at one point she's communicated to him that he's

24 harassing her.  And he's acknowledged that she has ---

129

1      Q.    At some ---.

2      A.    --- at some point told him that, that --- that

3    he was harassing her.  So he's acknowledged that.

4      Q.    Okay.

5            He also confirmed her directive to him that he

6    put everything about the divorce in e-mail.

7            Right?

8      A.    I --- I don't know for sure.  I guess.

9      Q.    Well, that's what he said.

10     A.    Okay.  Yeah.

11     Q.    That's what you quoted him as saying.

12     A.    That's what he says.

13     Q.    Right.

14           So I mean, if --- if she wanted him to put it

15   in writing, presumably so that she could have a record of

16   it, he was complying with her request.

17           Wasn't he?

18     A.    If you go outside the --- the context of the

19   divorce, that he's --- and the children that he's talking

20   about, there are other e-mails that don't really apply to

21   the divorce, only the children.

22     Q.    What do they apply to?

23     A.    I don't know.  He was --- seemed to sending it

24   to her.

130

1      Q.   First paragraph, page three, you mentioned that

2  back in November of 2012, six and a half, seven months

3  before Matthew Stout wrote his cease and desist letter,

4  in May of 2013, Scott sent Ellen some poems.

5      A.   I see it.

6      Q.   Okay.

7           And you also mention in this paragraph that in

8  October of 2012 he wrote her and said that he could not

9  wait to put a wedding ring on her finger and show the

10 world that they were back together.

11          Why --- why would you quote all of that?

12     A.   This one (indicating) where it says to let the

13 whole world know you are mine again, ---

14     Q.   Uh-huh (yes).

15     A.   --- pretty possessive.  It's just his pattern

16 of harassing her by means of wanting to get back to her.

17     Q.   Okay.

18          Well, won't you be mine, that's --- that's on

19 just about every grade school valentine I ever gave or

20 received.

21          I mean, it's --- it's rather common in this

22 culture to talk about having somebody as your own when

23 --- when you're in love with them.

24          True?

131

         1       A.    I don't know if Ellen interpreted ---

         2   interpreted this as love.

         3       Q.    So you were trying to discern how Ellen Ballock

         4   felt about these communications, how she received them

         5   and what she thought about them?

         6       A.    Try and get a feel for how he's relaying the

         7   information, the context of it and how she's interpreting

         8   that.

         9       Q.    Okay.

        10             So you're trying to get a feel for what he's

        11   trying to convey, as well as, what --- how she's

        12   receiving it?

        13       A.    You could say that.

        14       Q.    When you --- you interviewed her, to brace up

        15   your interpretation of how she was receiving it.

        16             Right?

        17             To make sure you accurately understood how she

        18   received it?

        19       A.    She --- well, you --- you can talk to Ms.

        20   Ballock.  She talks a lot.

        21             Sometimes it's not about what you're wanting to

        22   talk about.  She kind of goes off course.  You've got to

        23   bring her back.

        24             But try to get her to --- to talk about, you

132

1    know, the --- the --- the back story of their marriage.

2    You know, him --- how he was communicating to her, what

3    was bothering her, what was --- how was it --- how was

4    she understanding it to be harassment?

5            Like the --- the types of e-mails and the text

6    messages and how was that harassing to her and --- and

7    had her cite the specific examples of what bothered her

8    the most.

9        Q.   So she was a difficult interview?

10       A.   She talks a lot.  So you just --- you --- you

11   have to try to keep her on, on --- on this --- on --- on

12   one page at a time.

13       Q.   Right.

14           You've encountered people like that in the

15   course of your career.

16           Right?

17       A.   Sure.

18       Q.   Okay.

19           And you had a lot of experience at interviewing

20   people.

21           Right.

22       A.   I've interviewed people, sure.

23       Q.   Yeah.

24           So you've told me that you were trying to

133

1    understand what he meant and how she received it.  And

2    you've told me that you interviewed her.

3            But again, I --- I put the question to you.

4    Why didn't you act on the rules for investigation and

5    interview Scott Ballock about what he was intending by

6    these communications?

7        A.   Because looking at the context, at the --- the

8    number of e-mails, the pattern where he wouldn't stop.

9    He continued and continued.  That's ultimately that was

10   looked at.

11       Q.   Well, his marriage was at stake.  His children

12   were involved.

13       A.   Sure.

14       Q.   And do you have children?

15       A.   No.

16       Q.   No.

17            You're married?

18       A.   Right.

19       Q.   So you know how deep and sincere a man's

20   affection for his wife can be.

21            Right?

22       A.   Sure.

23       Q.   Okay.

24            So I mean, loving your wife and wanting to

134

1    reconcile with her, that is not illegal, is it?

2         A.   In general, no.

3         Q.   Okay.

4              So what we're really getting down to is how he

5    was expressing his feelings of love and his desire for

6    reconciliation, and whether it constituted a --- a

7    criminal act.

8         A.   If you look at the totality and the context of

9    everything that was provided, I don't agree with how he

10   was trying to reconcile.

11        Q.   Okay.

12             So you had made a judgement on ---

13        A.   I felt that there was ---

14        Q.   --- his ---?

15        A.   --- a course of harassment.

16        Q.   Okay.

17             I'm sorry.  I --- I didn't mean to speak over

18   you.

19        A.   Okay.

20        Q.   You can go ahead and repeat your answer if you

21   want to.

22             Go ahead.

23        A.   No, I was confident that there was a --- a

24   consistent pattern of the --- the harassment that she

135

1    alleged.

2        Q.   So consistently telling her that he loved her

3    and he wanted to reconcile with her was harassment,

4    because of the consistency of it and ---?

5        A.   Well, I'm talking about the whole context of

6    everything, the totality of everything, not just the, I

7    love you stuff, and you --- you have to look at the whole

8    context of it.

9        Q.   The second paragraph of page three, you

10   indicate that Ellen received various e-mails from

11   anonymous sources.  And that these came after the cease

12   and desist letter from Matthew Stout.

13       A.   Correct.

14       Q.   Okay.

15            You --- did you ever come to any judgement as

16   to who wrote the e-mails that you're quoting here in the

17   second paragraph of page three of your report?

18       A.   The one from West Coast Twiggs or the West ---

19   yeah, West Coast Twiggs?

20       Q.   Yeah.

21       A.   I think --- I think I made a mention later on

22   in the report that it appeared that it was an account

23   maintained by Scott or --- or maybe his son, Tommy, had

24   access to it.  Because there's an e-mail dated November

136

1    9th of 2012 from that West --- westcoastTwiggs@yahoo.com.

2        Q.    Yeah.

3              That's the third paragraph ---

4        A.    Right.

5        Q.    --- on page three.

6        A.    Where --- where Tommy's talking to Ellen, his

7    mom, and the dad is asleep.

8        Q.    Right.

9              There's nothing harassing about the content

10   addressed in the third paragraph of page three of your

11   report, is there?

12       A.    No.

13       Q.    Now ,this second paragraph of page three, I'm a

14   little bit foggy on what you're saying in the second

15   sentence.  One e-mail in particular from West Coast

16   Twiggs to Ellen's e-mail account and Kenny Ice's e-mail

17   account from July of 2013.

18       A.    I think, if I --- if I understand this, if I'm

19   reading this right, West Coast Twiggs sent correspondence

20   or an e-mail to Ellen's account and to Kenny Ice's

21   account, which was davedew13@gmail.com.

22             So Ellen and Kenny Ice are receiving an e-mail

23   from West Coast Twiggs.

24       Q.    The other.

137

1           It makes reference here (indicating) to an

2     account that apparently Ellen wrote to someone named

3     Shawn.

4           A.    Shawn?   Where --- where are you at, Charles?

5                 I'm sorry.

6           Q.    Yeah, that's okay.   I'm a little more than

7     halfway into the second paragraph on page three, where it

8     says, she wrote this to Shawn one night, about a horse at

9     our family camp.

10                And then there's a quote here (indicating).

11    But I won't ---.

12          A.    About the horse.

13          Q.    Yeah.

14                I won't read that into the ---.

15          A.    Okay.

16                What's your question with that?

17          Q.    Yeah.

18                My question is, you know, who is Shawn?

19          A.    I don't remember at the time if Ellen told us

20    who Shawn was.   But apparently that was Shawn Matthews,

21    Scott's FBI alias name, when he was communicating to her.

22          Q.    Oh, okay.

23          A.    Shawn Matthews.

24          Q.    Yeah.

138

 1            I remember Scott talking about that in his

 2    deposition.

 3            Okay.

 4            So all right.  So someone using the

 5    westcoastTwiggs@yahoo account wrote to Ellen and to her

 6    boyfriend, Kenny Ice, and shared what Ellen had written

 7    on a previous occasion and posted it to Shawn Matthews.

 8    That's the way I'm ---

 9        A.   I ---.

10        Q.   --- understanding this.

11        A.   I --- I believe so.

12        Q.   Okay.

13            Well, let me ask you, what was the point of

14    citing and quoting this information into your report?

15    What --- what were you establishing in the report here?

16        A.    It seemed kind of like a --- to me it's a

17    bizarre e-mail.

18        Q.   Okay.

19        A.    And like it's information that was shared

20    between two people is now being spread out to everybody

21    else, like another form of --- of harassment.  You're

22    sharing information that you shared with somebody

23    else, ---.

24        Q.   Okay.

139

```
 1        A.    --- especially with the boyfriend.

 2        Q.    All right.

 3              Who do you think wrote this?

 4              You said it was anonymous.  Or did you come to

 5   any judgement as to --- I'm going to presume that you

 6   thought it was Scott, because you're putting it in this

 7   report.

 8              And it's Scott who you are investigating.  I

 9   could be wrong about that.

10        A.    The e-mail about the horse?

11        Q.    Yeah.

12        A.    I don't --- I don't know if Ellen did tell us

13   who Shawn was or who she suspected it was.

14        Q.    But she never --- she didn't deny writing this

15   story about the white horse.

16              Did she?

17        A.    I don't think she ever denied it.  I'm not a

18   hundred percent sure on that.

19        Q.    Okay.

20              And you put it in your report, so I'm going to

21   presume that you asked Ellen about it?

22        A.    I probably did, if that's why it was in there.

23        Q.    Yeah.

24              I agree with you.  This is a rather bizarre
```

140

1    communication.

2          Did --- did you ask Ellen if she understood

3    that Shawn Matthews was actually her husband?

4       A.   I don't think she knew.  She might have.  I

5    don't remember her saying --- I don't remember her

6    telling this.

7       Q.   Okay.

8       A.   She might've suspected it, or she --- she knew

9    for certain.  I don't know.  But Scott in his deposition

10    made it sound like she didn't know who it was.  It was

11    somebody she was --- somebody else outside of ---.

12       Q.   Sure.

13       A.   --- the marriage.

14       Q.   She came to understand that at some point,

15    but ---?

16       A.   Probably.

17       Q.   --- you're not able to say from your

18    investigation as to when that happened?

19       A.   Correct.

20       Q.   Okay.

21          The third paragraph, page three, we talked

22    about.

23          Bottom of page three you indicate that on

24    September 6 this was, I don't know, a week before Scott

141

1    was arrested, Ellen came to the detachment, and she spoke

2    with Sergeant Kief and you.

3         So was this the first or the second interview?

4    A.    That was ---.

5    Q.    I'm thinking it's the first one.

6    A.    I think it's the first one.  You're right.

7    Q.    I didn't necessarily want to lead you on that,

8    but I think that's the first one.

9    A.    I believe it is.

10   Q.    Okay.

11        So this was the interview that was conducted

12   with the faulty recording device?

13   A.    I believe so.  It was.

14   Q.    Okay.

15        So what notes or other memoranda came out of

16   that interview, any?

17        If you thought it was being recorded, you may

18   not have taken many notes.

19   A.    I don't believe I did.

20   Q.    Okay.

21        If you think it's being recorded, you --- you

22   might leave the pen down and just sit there and listen

23   carefully?

24   A.    Right.  Because I would've attached the disk to

142

1    the report.

2         Q.   So, you know, how much of what's in this report

3    really serves to memorialize what was established in that

4    first interview, any?

5         A.   Well, I try to get as --- as much as I could in

6    the report.  But again, when you --- let's talk to Ellen.

7    She kind of goes all over the place.

8         Q.   She can ramble.

9         A.   She does, so you have to try to get as much as

10   you can from her.

11        Q.   Uh-huh (yes).  Okay.

12             Well, the first paragraph, page four, is where

13   you recite that Ellen told you and Sergeant Kief,

14   apparently, that she used a pseudonym of her own, Ashlee

15   Leeson?

16        A.   Correct.

17        Q.   Now, in this paragraph you recite her account,

18   which was to the effect that she and her husband, Scott,

19   collaborated to use Craigslist to arrange liaisons with

20   strange men for sex?

21        A.   Correct.

22        Q.   And apparently she says that she would have sex

23   with these men and that Scott would record it?

24        A.   Correct.

143

1      Q.    You attended Scott's deposition on April 19th?

2      A.    I did.

3      Q.    You heard him deny the truth of this

4  allegation?

5      A.    He did not confirm what Ellen is saying in

6  terms of him hooking up guys for her.

7      Q.    He denied that?

8      A.    But he did acknowledge there was meetings with

9  other men on Craigslist, I believe.  I believe.

10     Q.    Okay.

11           He'd found out about it.  Yes.

12           So what's your --- what's your judgement on

13  this?

14           I mean, you're the investigating officer.

15           Who's the --- who'd the credible person here?

16  Is it Ellen or is it Scott?

17           I mean, one of them has to be telling a

18  falsehood here.

19     A.    What do I think?  Who's telling the truth?

20     Q.    Yeah.

21     A.    I mean, in terms of hooking up with men on

22  Craigslist, you have her word against his word.

23     Q.    That's --- that's right.

24     A.    So it ---.

144

1     Q.    Yeah.

2     A.    I can't side with Ellen, just --- Scott denies

3  it.  She says it happened, but I can't decide just on

4  that alone.

5     Q.    Okay.

6           So --- so this was a jump ball.  I mean, you

7  didn't know who was telling the truth.

8           Well, at the point that you've made this

9  report, all you had was Ellen's side of it.

10          True?

11    A.    From the information she --- her and her

12 attorney provided, yes.

13    Q.    So even though you don't know whether to

14 believe it now, you believe it at the time you put it in

15 this report?

16          Is that why it's in here?

17    A.    No.  That --- that --- that was just her ---

18 her --- her allegations as it relates to the Craigslist.

19 That was her allegation.

20    Q.    Well, the content of the first paragraph on

21 page four, I mean, does it characterize any criminal

22 activity that you know of?

23    A.    Not in terms of the harassment itself, no.  I

24 think that --- because there was so many different e-mail

145

1   accounts within the content of the --- the disk.  So I

2   think we're trying to establish kind of who's who and

3   what's the purpose of the Ashlee Leeson gmail dot com

4   account, because you do see that, I believe, quite a bit

5   in the e-mails.

6        Q.    I see.

7              So you were simply trying to put this in the

8   report, so that it would make some of the Ashlee Leeson

9   e-mail account that is seen in several places on the disk

10  that you were given?

11       A.    Sure.

12       Q.    Okay.

13             I mean, this really --- it --- it explains that

14  contextually, but it really doesn't add anything to the

15  criminal investigation for harassment.

16             And it doesn't constitute any evidence of

17  criminal activity on the part of Scott Ballock?

18       A.    No.  Because I believe that --- Ashlee Leeson

19  was an account, I think, she maintained.

20       Q.    Right.  Right.

21             Likewise, the next paragraph, where Ellen told

22  you that Scott would use his iPad and government-issued

23  cellphone and send her e-mail and text messages.  I mean,

24  you put this in here so as to try and make some sense of

146

1    where all the communications were originating.  So that

2    if --- if it became relevant in the litigation of the

3    charges, then there would be sources of evidence that

4    could be located?

5        A.    Sure.

6        Q.    I mean, it is --- I'm --- I'm kind of

7    anticipating what you were thinking.

8              But am I getting it right?

9        A.    Right.  Because she was establishing to us how

10   he was sending that to her.

11       Q.    Okay.  Okay.

12             The next paragraph, the West Coast Twiggs

13   account.  Just more context there.

14             True?

15       A.    Sure.

16       Q.    Okay.

17             Next paragraph, which --- what is it?

18             It's one, two, three, fourth paragraph on page

19   four, Ellen explained to you that she did write that

20   story about the white horse, but that this was her

21   erotic, fictional writing?

22       A.    Correct.

23       Q.    What'd you make of that?

24             Did you tell her that sounded bizarre?

147

1       A.   I didn't --- I don't think I told her that, but

2   I --- the whole thing to me was bizarre.

3       Q.   Okay.

4            So you've got a complaining witness here who

5   engages in some pretty bizarre composition work in her

6   e-mail account.

7            Now she's complaining that she's getting

8   harassing e-mails from her estranged husband, who,

9   according to her, participated in her bizarre sexual

10  life.

11           True?

12      A.   I think that was just her providing to us a ---

13  I don't know if she was keeping all this together for

14  divorce hearing purposes or she just simply provided to

15  us everything she accumulated and saved.

16      Q.   Fifth paragraph on page four.  You recite in

17  here that Ellen told you --- so I presume this came

18  through the interview process?

19      A.   Correct.

20      Q.   That Scott would send her e-mails on

21  significant dates, including when her father passed away?

22      A.   Correct.

23      Q.   That's the first sentence.

24           Right?

148

1          A.    Correct.

2          Q.    So she told you that her father was dead?

3          A.    Well, I must've understood her, because, as I

4     understand know, her father is alive.  It's her mother

5     that passed away.

6                That's a misunderstanding on my part.

7          Q.    Okay.

8                Then you go on to recite that she has received

9     various e-mails from Scott's dad, Tom Ballock?

10         A.    Yes.

11         Q.    You recite in this paragraph that Tom Ballock

12    would post photographs and listings about her on websites

13    he created, including Ellen Ballock dot com?

14         A.    Yes.

15         Q.    So this serves to document the first notice

16    that you had of who Tom Ballock was and what he was doing

17    with his websites?

18         A.    I believe so.

19         Q.    And you accurately record here that the DVD-R

20    that you received from Matthew Stout included e-mails

21    originating from Tom Ballock?

22         A.    Yes.

23         Q.    So why didn't --- why didn't --- or let me put

24    it this way.

149

1          Did you have any conversations with Ellen

2   Ballock to the effect that, you know, you could file a

3   Criminal Complaint against Tom Ballock for harassing

4   e-mails?

5       A.   I don't know if that conversation came up or if

6   she --- or why she didn't pursue anything with Tom.

7          I'm not sure.  I don't remember.

8       Q.   She never did file any such Criminal Complaint

9   against him.

10         Did she?

11      A.   Not that I'm aware of.

12      Q.   Not that I'm aware of either.  There's another

13  reference here to the West Coast Twiggs e-mail from her

14  son, Tom.

15         Any particular reason you made mention of that

16  again?

17      A.   I --- I think because there was a lot of

18  mention or a lot of documents that had West Coast Twiggs

19  on the e-mails --- the accounts, ---

20      Q.   So we know that ---.

21      A.   --- so ---.

22      Q.   Oh, I'm sorry.  I'm interrupting.

23         Go ahead.

24      A.   I'm just saying that account was --- was the

150

1    --- communicate with Ellen from the son, and then there

2    were other e-mails that came from this account that were

3    --- that fell under the harassment.

4         Q.    Okay.

5              So it was your understanding, going through the

6    catalog of e-mails that have been provided, that some of

7    them were from Ellen's son?

8         A.    This one particular e-mail she recognized it as

9    his style of writing.

10        Q.    She wasn't complaining that her son was

11   harassing her, was she?

12        A.    No.

13        Q.    Page five, firth paragraph, there's reference

14   to you asking her about pictures of Scott at Beck's

15   Chapel, B-E-C-K, Chapel?

16        A.    Correct.

17        Q.    She told you that she was disturbed by the

18   e-mail.

19              What was it that was disturbing?

20        A.    There was a --- I think she did a written

21   statement the second time she came back.  And she made

22   reference to that particular e-mail.

23              So I don't know if she elaborated more on this

24   particular e-mail in her written statement.  But at the

151

1    time I think it just --- it disturbed her.  It bothered

2    her.

3            The message he was trying to --- the message he

4    was conveying to her about this --- him standing alone at

5    the church.  That's the one that stood out from her.  But

6    exactly what she said, I don't know.  She might've had

7    more in her written statement about this.

8        Q.    Okay.

9            The next paragraph talks about the meeting you

10   had with APA Scott on Wednesday, September 11, 2013?

11       A.    Correct.

12       Q.    I don't think I have any other questions I have

13   to ask you about that.

14           The third paragraph, page five, simply recites

15   that you went to Magistrate's Court, presented to

16   Magistrate Holepit your two Criminal Complaints.

17           She found there was probable cause and issued

18   warrants for arrest?

19       A.    Yes.

20       Q.    So that's just reportage of what happened?

21       A.    Correct.

22       Q.    Did you present any other evidence to

23   Magistrate Holepit, other than the Criminal Complaints

24   that we've already talked about?

152

1      A.    Just the complaints.

2      Q.    Okay.

3            So Magistrate Holepit, did she have questions?

4      A.    I don't believe she did.

5      Q.    So what happened?  You just went in and was the

6      Assistant Prosecutor there or were you on your own?

7      A.    No.  Took him up to Magistrate Court.

8      Q.    Okay.

9      A.    Presented to her.

10     Q.    So you went up to Magistrate Court.  I've never

11     been in --- on one of these kind of meetings, so I'm ---

12     just morbid curiosity probably as much as anything.

13           You tell the Magistrate that you are there to

14     apply for arrest warrants, or how's this go down?  You

15     just tell the --- you tell the Assistant, and they go get

16     the Magistrate?

17     A.    Normally we check in at the front desk, and

18     we'll tell --- we'll ask which Magistrate's on call or

19     the intake, and that we have a complaint that needs a

20     signature for a warrant.  And they'll tell us which

21     Magistrate's available.

22     Q.    Okay.

23           Is that what you did this time?

24     A.    I did.

153

1      Q.   Were you in the courtroom or were you in a back

2  office some place?

3      A.   I --- I think this was in the old building on

4  Spruce Street.

5      Q.   Spruce Street.

6      A.   And they --- they were on the, I think, second

7  floor.

8      Q.   Yes.

9      A.   So I don't remember if I had to go into one of

10  the courtrooms or the intake desk out in the main lobby.

11  I don't remember.

12      Q.   Okay.

13           Sounds like this was a pretty informal process.

14           And did you have much in the way of interaction

15  with Magistrate Holepit?

16      A.   No.  Because she's --- I mean, they're very

17  busy up there.  And so we just --- we --- we present to

18  them the paperwork that we need for a signature, and they

19  look over and they sign it.  That's pretty much it.

20      Q.   Okay.

21           So the fourth paragraph, page five.  We see

22  reference here to the second interview with Ellen

23  Ballock.

24           True?

154

 1       A.    Correct.

 2       Q.    Was that one recorded?

 3       A.    This was the --- I think this was the

 4  handwritten statement one, where she provided a

 5  handwritten statement.

 6       Q.    Okay.

 7             So she shows up.  She hands you a copy of her

 8  handwritten statement, which is part of the investigation

 9  file produced to us last year.

10             There was no recorded interview conducted?

11       A.    Not this one.

12       Q.    Okay.

13             So as it played out, there never was any

14  recorded interview with Ellen Ballock in support of this

15  investigation?

16       A.    Had the recorder worked, there would've been,

17  yes.

18       Q.    Okay.

19             So apparently it was in this second meeting

20  with Ellen Ballock that she made reference to this

21  picture of Scott at Beck's Chapel, and that it was very

22  disturbing to her?

23       A.    Yes.

24       Q.    Now, I see at the end of this paragraph a

155

```
1    sentence that says that Sergeant Kief recorded the

2    interview, but due to technical difficulties it did not

3    record.

4            Could it be that you were mistaken about this?

5    That it was the faulty recorder that happened during the

6    first interview?

7            Maybe the first interview you fellows didn't

8    even try to record it.  So I don't know.  Maybe --- maybe

9    this is accurate information, what you're saying right

10   here.

11      A.   I don't know if I'm trying to convey that

12   that's why we called her in the second time.  I --- I ---

13   I'm --- I'm pretty sure the first time it didn't record.

14           The second time we had her come in and do a

15   written statement.  And --- maybe that's why I had that

16   in there, why we called her in for the second time,

17   because his recorder didn't work.

18      Q.   Okay.

19           So Thursday, September 12 you get the arrest

20   warrants from Magistrate Holepit in the afternoon ---

21   well, late morning, 1130 hours.

22           At 615 hours, Ellen Ballock comes in, sees you

23   and Sergeant Kief.  Apparently she must've told you at

24   that time that, look, we've got a hearing tomorrow.  He's
```

156

1    going to be in Family Court.  And that's when the plan

2    was laid to execute on these arrest warrants.

3            Fair?

4        A.   I believe she informed at the time Sergeant

5    Kief about that coming hearing.  So I believe I found out

6    from him.

7        Q.   I'm looking at the content of paragraph --- the

8    fifth paragraph on page five of your report.

9            Due to officer safety reasons, the arrest

10   warrants were served at the Monongalia County Magistrate

11   Court.  The accused is a federal law-enforcement officer

12   and carries an issued firearm.

13           Okay.

14           So I see what's recorded here.

15           Okay?

16           I can read it.

17           When you say, due to officer safety reasons,

18   was there something specific about Scott that left you

19   and Sergeant Kief concerned about your safety, or was it

20   just the general fact that Scott was law enforcement and

21   he carried a weapon?

22       A.   He was a concern how his --- and me looking at

23   the e-mails, and I wasn't sure of his mental state.  So

24   there was concerns of how he would respond, knowing he

157

1    was going to be arrested.

2        Q.    What did Ellen tell you to expect?

3        A.    I don't know.  I think --- I don't think she

4    even elaborated on that.  Or if she did, I don't

5    remember.

6        Q.    Okay.

7              So she wasn't sitting there with you and

8    Sergeant Kief saying, you watch out for this guy?

9        A.    I --- I don't remember her saying anything like

10   that.  Like I can't recall, at least.

11       Q.    Was she telling you that she was afraid of

12   Scott?

13       A.    That he might hurt her?  In that sense?  Is

14   that what you're talking about?

15       Q.    Yeah.

16       A.    Don't recall.

17       Q.    Okay.

18             So you don't recall Ellen ever saying, you

19   know, I'm afraid of Scott, I'm afraid what he might do to

20   me, he might hurt me?

21       A.    I don't think she ever conveyed that like there

22   would be a physical harm.  I don't think so.

23       Q.    Well, she never told you that he acted out in

24   violence against her.

158

1          Right?

2     A.    Well, she mentioned there was an incident that

3  happened in Indiana involving the firearm in her private

4  area.  She mentioned that, but ---.

5     Q.    That was the incident where the pistol was used

6  as a sexual aid?

7     A.    She mentioned that.  That was the only thing I

8  can recall that happened to her physically.

9     Q.    Now, that incident that she told you about,

10  that was years before she came to see you about these

11  e-mails.

12          True?

13     A.    Yeah.  I don't know how long ago that happened.

14     Q.    Okay.

15          In fact, that was an episode of sex play that

16  went too far, as she explained it to you.

17          True?

18     A.    I don't think she was talking about sex play.

19     Q.    I'm just saying that she and Scott were having

20  sex, and the way she told the story, it went too far.

21     A.    At that --- I didn't know what they were doing

22  in the bedroom and I really didn't care.  That wasn't my

23  place to go.

24     Q.    Right.

159

1          You had come to the conclusion long before you

2    heard that account that this was a --- a bizarre

3    relationship?

4          A.    It's different.

5          Q.    Okay.

6          The unusual --- well, bizarre is your word,

7    nature of the relationship between these two people, did

8    it undermine your sense that Scott was guilty of criminal

9    behavior?

10         A.    I don't know if I use the word guilty, but

11   reasonable belief that he, in fact, did commit a crime.

12         Q.    Okay.

13         You're --- you're --- you're parsing some of my

14   terms here, because you're being careful.  I'm not

15   criticizing you for it.

16         But what you're saying is --- you're rephrasing

17   my question, essentially.

18         Did --- did the bizarre character of the

19   relationship between Ellen and Scott cause you any doubt

20   about whether Scott was probably guilty of criminal

21   behavior?

22         A.    With the sex stuff?

23         Q.    Yeah.

24         A.    I --- I didn't really want to dive into that.

160

1    Just kind of.

2        Q.    It was just unsavory, and you didn't --- didn't

3    want to think about it or talk about it with her?

4        A.    Pretty much.

5        Q.    Okay.

6              Well, pardon me to insist, but it could --- it

7    could bear upon the object of your investigation,

8    actually.

9              Don't you think?

10       A.    From what I --- I'm trying to go on memory.

11   It's been six years or so.

12       Q.    Yeah.

13       A.    From what I understood, a lot of this happened

14   in Indiana, so I really didn't care what happened in

15   Indiana.

16       Q.    Okay.  Okay.

17             So the next paragraph just recites that Scott

18   was arrested, arraigned and released on bond?

19       A.    Correct.

20       Q.    You were --- you participated in the arrest?

21       A.    I was not there when he was arrested.

22       Q.    Okay.

23             So you don't know anything about what happened

24   at the Family Court proceeding when Scott was arrested?

161

1      A.   No.

2      Q.   Okay.

3           Apparently the day after the arrest, a

4  Saturday, you reviewed the DVD again, and you looked at

5  e-mails dated April 25 and 26 of 2013.  In the subsequent

6  paragraph, on page six, you talk about an e-mail from

7  April 26, 2013.

8           Why were you going back and making this review

9  at this point?

10     A.   There was so much content within that disk, I

11 think I just wanted to go back and try to pull --- try to

12 pull as much information as I could.  That's what I think

13 I did.

14     Q.   Okay.

15          Well, something prompted you to it.

16          I mean, what --- can you tell me what it was?

17          He had been arrested the day before, so ---.

18     A.   I cannot recall what exactly prompted me to

19 that.

20     Q.   Okay.

21          Well, it looks like in the next paragraph ---

22 I'm looking at the second paragraph on page six.  It

23 looks like Sergeant Kief is acting here in furtherance of

24 the investigation.

162

1          He called Ellen to talk with her about the

2     e-mail she sent to her lawyer April 26, 2013.

3          A.    Uh-huh (yes).  Talks about ---- was asked about

4     physical abuse as mentioned --- as mentioned in the

5     e-mail.  And then that's when she talked about incident

6     --- alleged incident that happened in Indiana.

7          We weren't sure --- if --- I think at the time

8     we were thinking was it something that happened here that

9     was physical?  Then it was mentioned it happened in

10    Indiana.

11         Q.    Okay.

12         So the fact that this was dated information,

13    something that happened in another state, did that factor

14    into your decision on whether additional charges were

15    necessary?

16         A.    Not for stuff that happened in Indiana.

17         Q.    Had it happened here in West Virginia, then you

18    might've considered additional charges is the surmise I

19    make from --- from reading this.

20         A.    Or I would have to look into allegations of

21    domestic violence.

22         Q.    Okay.

23         So it looks like in the next couple of

24    paragraphs you're citing Ellen's account of some

163

1    instances of arguments between her and --- and Scott.   In

2    the third paragraph, page six, there's reference to

3    Christmas 2011 episode with shouting going on, screaming.

4         A.    I see it.

5         Q.    Then the next paragraph, which would be the

6    four paragraph, page six, there's reference to the use of

7    the pistol in the course of sex.  And that's dated back

8    to 2005.

9              So you're putting these things in the report to

10   reflect the fact that she shared it with you.  But

11   consistent with what I think you've said already, the

12   fact that it happened so long ago and the fact that it

13   happened in another state meant that you were --- you

14   would record it for the report, but you weren't going to

15   recommended any further charges on it?

16        A.    Yeah.  I think it was documenting the physical

17   abuse that she mentioned in the e-mail to Matthew Stout.

18        Q.    Yeah.

19        A.    And all ---.

20        Q.    The e-mail to Matthew Stout is what prompted

21   this discussion with her.

22        A.    Right, reading this.

23        Q.    Okay.

24              Well, and I may have misstated something about

Sargent's Court Reporting Service, Inc.
1-800-727-4349

164

1    that --- the handgun issue in 2005.  It looks here like

2    the fourth paragraph on page six is reciting an episode

3    shared by Ellen to the effect that Scott threatened to

4    shoot himself.

5         A.    I see it.

6         Q.    So --- and then the next paragraph, the fifth

7    paragraph, she goes on to tell you about the handgun

8    being used in the course of sex, 2007, 2008.

9             Have I got that right?

10        A.    I see it.

11        Q.    Okay.

12            Sixth paragraph, page six, she also told you

13   and Sergeant Kief that Scott put her in a headlock

14   because she accused him of having an affair?

15        A.    That's what she alleged.

16        Q.    Okay.

17            Did you believe her when she shared these

18   pieces of history?

19        A.    I didn't take her word for gold, because, you

20   know, if she had made the allegations of domestic abuse

21   --- of this stuff happening here in West Virginia, you

22   know, this --- this would require further follow-up, of

23   course.

24            But I'm just citing what she alleged that

165

1    happened in Indiana.  So just because I wrote it doesn't

2    necessarily mean it's gospel truth.  It's just what she

3    alleged happened in Indiana.

4         Q.    Uh-huh (yes).  Okay.

5              By the time you got done with this report,

6    having talked with her, what --- if I'm getting this

7    right now, it looks like three times, twice before the

8    arrest and once after ---.

9              First of all, let me --- let me make that point

10   for the record.

11             It does look as though you talked with her

12   twice before Scott was arrested and once after?

13        A.    It would seem.  Correct.

14        Q.    Okay.

15             Did it seem to you, as the investigating

16   officer, that she was going to be a problematic witness?

17        A.    In a sense of how problematic?

18        Q.    Couldn't stay on topic.  Couldn't answer a

19   question directly.  Told a lot of bizarre-sounding

20   stories.

21        A.    No.  I don't know if she would be able to

22   actually perform in court, testify in front of Scott.  I

23   think she --- I don't know if she was scared of that

24   process or --- that's how I took it.

166

1      Q.   In the last paragraph on page six you talk
2   about e-mails between Ashlee Leeson and Chris Ellis.
3           Why do you get into that in this report?
4      A.   It looks like we were --- Ashlee Leeson and
5   Chris Elliss were names that surfaced multiple times ---
6      Q.   Okay.
7      A.   --- in the e-mails.  And I think it was just
8   curiosity who these people were.
9      Q.   Right.
10          You and Sergeant Kief had been looking at the
11  content of that disk, and you saw references to Chris
12  Ellis.
13          And you wanted to know who it was?
14     A.   That's what it looks like.
15     Q.   Come to find out he was the Red Roof Inn
16  bicycle bandit?
17     A.   That's what it sounds like.
18     Q.   Scott Kirby is the --- the name that Ellen
19  Ballock shared with you?
20     A.   Yes.
21     Q.   Was that the name of any petty criminal that
22  you'd ever heard of ---?
23     A.   I don't think ---.
24     Q.   --- already?

167

1      A.    I don't think I had any dealings with a Scott
2  Kirby.
3      Q.    Okay.
4             Ellen told you that Scott Kirby robbed the Red
5  Roof Inn in Fairmont, West Virginia and rode off on a
6  bicycle?
7      A.    That's what she claimed.
8      Q.    You would stand by your use of the word
9  bizarre?
10     A.    In what context?  The --- like the e-mail or
11 the ---?
12     Q.    Yeah.  The whole thing.  I mean, Craigslist,
13 meeting Scott Kirby and ---.
14     A.    The whole thing's different.  I mean, it's
15 tough.
16            I don't engage in --- so looking at it from the
17 outside it's ---.
18     Q.    Far from ---
19     A.    --- bizarre.
20     Q.    --- normal behavior.
21            Isn't it?
22     A.    Right.
23     Q.    I'm over on page seven.
24     A.    Okay.

168

1      Q.    You reference in the first full paragraph to

2   Sue Lucas.

3      A.    Page seven?

4      Q.    Yeah.

5      A.    Second paragraph?

6      Q.    Yeah.

7      A.    Okay.

8      Q.    Actually, I'm saying it's the first full

9   paragraph, because I guess the preceding paragraph kind

10  of lapses over from page six.  That's why I ---.

11     A.    Okay.

12     Q.    --- described it that way.

13           Anyway, there's some reference here to Sue

14  Lucas.

15           Apparently she was an FBI agent out in Ann

16  Arbor Michigan, colleague of Scott's?

17     A.    Yeah.  She claimed that.  And I don't think

18  it's in here, but I believe --- I believe Agent John

19  Hambrick confirmed that.

20     Q.    And in this paragraph it says the victim,

21  that's Ellen, alleged that her boyfriend, Kenny Ice, took

22  her cellphone and handed it over to the accused, Scott.

23     A.    Right.

24     Q.    Apparently then Scott and Sue Lucas spent over

169

1    40 hours looking at the phone?

2         A.    That's what she's alleging.

3         Q.    Okay.

4               Have you come to learn that, in fact, Kenny Ice

5    went to see Scott Ballock in the course of this civil

6    litigation ---?

7               Well, actually, no.  I take that back.

8               He went to see Scott in 2013.

9         A.    I --- I believe she had made reference to Kenny

10   Ice and Scott communicating back and forth, because we

11   were like, ---.

12        Q.    Why'd he do that?

13        A.    --- why're you staying with Kenny?  Why's this

14   --- this ---?

15        Q.    Yeah.

16        A.    We were just curious.

17        Q.    Exactly.

18              Well, I --- I would submit, Sergeant, that you

19   might have been even more than a little curious.  You

20   might've begun to really wonder about this complainant,

21   if what she's telling you here was accurate information.

22              And her live-in boyfriend went to see Scott

23   Ballock and turned over his phone to him.  Now, she

24   describes it here as her phone, but I would submit to you

170

1    the reason she did that was because she paid the bill.

2    It was actually Kenny's phone that ---.

3         A.    I later found out.

4         Q.    Yeah.  You understand it that way, too.

5               Don't you?

6         A.    I think Scott brought that up in his

7    deposition.

8         Q.    Right.

9               You --- this is --- this is surpassing strange.

10              Isn't it?

11        A.    Well, I mean, if you look at what she's

12   alleging is --- the whole thing's bizarre.  But if you

13   put that aside and focus on the context of the e-mails

14   and what was provided to us.

15              I mean, that's in writing. It's there.  This

16   --- these are just, simply, her --- her allegations.

17        Q.    Okay.

18              So what I hear you saying is, is that this

19   conversation with her, which happened the day after Scott

20   was arrested, it didn't serve to undermine your

21   confidence in --- in this criminal case?

22        A.    No.

23        Q.    You thought the whole thing was bizarre, but

24   you were still satisfied, based on the --- your own

171

1    interpretation of the e-mails on that disk that this was

2    a case that should go forward?

3         A.   The e-mails about animals and things like that,

4    that's --- I mean, that stuff sticks out to me as

5    bizarre.

6         Q.   I guess in the next paragraph, depending on how

7    you count, it's the third or maybe second full paragraph

8    on page seven, talks about Ellen saying that Scott cut

9    himself?

10        A.   I see it.

11        Q.   Do you recall Scott being asked about that in

12   his deposition?

13        A.   He denied it.

14        Q.   He did deny it.

15             So why would that be worthy of including in

16   this report, how he trimmed his toenails?

17        A.   I think I was just trying to --- all the

18   allegations she was making was for documentation

19   purposes.  I mean, this --- this alone wouldn't sway my

20   decision about ---.

21        Q.   Right.

22        A.   --- Scott or anybody like that.

23        Q.   Hard to believe that the court would have any

24   interest in how Scott trimmed his toenails in the trial

172

1    of charges upon which he was arrested?

2         A.    No.

3         Q.    It looks like, in the next paragraph, on

4    Monday, September 15, now we're two days after Scott had

5    been arrested and arraigned, you called Ellen and told

6    her that the DVD did not contain the interview between

7    her and Sergeant Kief.

8              Explain to me what you were doing there.

9         A.    I think --- my memory on events, it's been so

10   long, but I think this was --- this was me asking her for

11   --- for her to prepare a written statement at our office.

12        Q.    So this is the written statement that you told

13   me a few minutes ago she already brought into you the

14   night before you guys had the arrest warrants executed?

15        A.    Well, if I said it, I was wrong.  But this is

16   --- this is the date that she was contacted to bring in a

17   written statement.

18        Q.    Okay.

19             So her written statement, then, was not

20   obtained until after the warrants were obtained and

21   executed?

22        A.    Correct.

23        Q.    What was the latest date when Scott Ballock

24   communicated directly with Ellen, according to your

173

1    investigation?

2         A.    I'm not exactly sure when, honestly.

3         Q.    Okay.

4         A.    I don't recall or I don't remember.

5         Q.    I guess I'm over at page eight.  There's

6    reference here --- in fact, there's quoting from a text

7    message.  I can't figure out from the way this is

8    written, you know, when the quoted text was transmitted.

9               Are you able to --- it says there was an

10   attachment, so maybe that tell them?

11        A.    I says the attachment, it probably covers that.

12        Q.    Okay.  Okay.

13        A.    Because and then I ended it refer to the DVD-R.

14        Q.    So again, you know, why's --- why is it

15   pertinent to include this in the report?

16        A.    The --- the --- the message where it says it's

17   only going to get worse?

18        Q.    Uh-huh (yes).

19        A.    That is an e-mail that she --- reading this

20   report, she sent to me.  So I felt she sent it to me, so

21   I'd make it as part --- part of the report and the

22   investigation.

23        Q.    Okay.

24              But this was received after the warrants were

174

1    executed?

2        A.    Correct.

3        Q.    So the case was already underway?

4        A.    Right.  It --- this wasn't going to play into

5    getting more warrants.  It was just adding onto what was

6    already known.

7        Q.    Okay.

8              I don't know.  I kind of --- based on this

9    discussion we've had, I suspect that you were probably

10   happy to see the close of this investigation and write

11   your report and move on.

12       A.    Well, ---.

13       Q.    Right?

14       A.    --- this case was not the top of my priority,

15   because, you know, I worked in Morgantown.  There's a lot

16   going on.

17             There are a lot of high-profile --- a lot of

18   felony cases I had to attend to.  So this is --- is there

19   anything I do perfect?  No.  But this is the best work

20   that I felt I was doing at the time.

21             So --- no, it wasn't the top of my priority

22   list, but it was important to get done.

23       Q.    I might be done, but I want to take a break to

24   think about it, and ---.

175

```
 1                              ---
 2      (WHEREUPON, A SHORT BREAK WAS TAKEN.)
 3                              ---
 4      BY ATTORNEY CROOKS:
 5          Q.   We've gone over the report.  We've talked about
 6      the aspects of your investigation.
 7              Has that careful review caused you to remember
 8      anything that we haven't touched on in this review of
 9      your report?  Was there other investigative effort made
10      that we haven't discussed up to this point?
11          A.   As to my knowledge, that's everything.
12          Q.   Okay.
13              Going all the way back to the beginning of this
14      thing, did Ellen Ballock initiate contact with the State
15      Police about Scott or did the State Police reach out to
16      her about Scott?
17          A.   I think it was something else unrelated.  Ellen
18      was talking to Sergeant Kief, and I think that led into,
19      hey, by the way, I got my --- this husband here that's
20      been harassing me.
21              Then she wanted to make a complaint. So I think
22      that's how that started.
23          Q.   Okay.
24              Lieutenant Kief would be the better person to
```

176

1   really explore that with.

2        Right?

3   A.   Yes.

4   Q.   Okay.

5        We've talked about Tom Ballock in the course of

6   our deposition session.

7        Are you aware that Tom Ballock had a

8   conversation with then Sergeant Kief, in which --- during

9   which Tom Ballock said he was calling to complain that

10  one of the Troopers in the detachment, Chris Berry, was

11  having a romantic relationship with Ellen Ballock?

12  A.   He did make reference to allegations of an

13  affair.  And I think he talked to both Tom and Scott, but

14  I'm not sure.  But I think he did talk --- I think he did

15  mention Tom in particular.

16  Q.   Uh-huh (yes).  Right.

17       Tom Ballock?

18  A.   Tom Ballock.

19  Q.   And he also talked with Chris Berry.

20       Are you aware of that?

21  A.   He did make reference to that.

22  Q.   Okay.

23       And he likewise talked with Ellen?

24  A.   Yes.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

177

1      Q.    And then it was in the conversation with Ellen

2  about the Tom Ballock complaint that the whole idea that

3  she might make a complaint against Scott for harassment

4  came out.

5           Does that square with the way you remember the

6  whole thing coming together?

7      A.    I wasn't there for that conversation, but I

8  think that's how it led into the computer harassment

9  part.

10     Q.    Uh-huh (yes).

11          So there was a point in time when Sergeant Kief

12 talked to you and told you about this complaint phone

13 call from Tom Ballock?

14     A.    He did.

15     Q.    Did this complaint by Tom Ballock and the

16 inquiries that Kief made about them strike you as being

17 pertinent to your investigation of these harassing

18 communications?

19     A.    Did the affair seem --- the alleged affair seem

20 pertinent?

21     Q.    Yes.

22     A.    I don't think so.

23     Q.    Did you ever have any discussion with Chris

24 Berry, Trooper Chris Berry, about that issue?

178

1      A.    I've asked him before if he --- if he did have

2   an affair with Ellen.

3      Q.    You asked him that?

4      A.    I did.

5      Q.    Okay.

6            Was this just idle interest on your part or was

7   it something a little more official than that?

8      A.    More general conversation, within the office.

9      Q.    Just the sort of thing you would ask in ---?

10     A.    Just is this true that this happened.

11     Q.    Right.

12           So what did he tell you?

13     A.    He said --- he said nothing happened.

14     Q.    Okay.

15           Do you know anything else about that particular

16  issue?  Tom Ballock's accusation that is.

17     A.    Just the alleged affair.

18     Q.    Uh-huh (yes).

19     A.    Anything else, I'm not sure of.

20     Q.    Have you ever responded to the Ballock

21  residence on dispatch?

22     A.    Once before.

23     Q.    You did?

24     A.    I did.

179

1      Q.    Okay.

2            When was that?

3            How about March 6th, 2013?

4      A.    It was definitely 2013.  That sounds right.

5      Q.    Okay.

6            We know, because we have the recording of the

7      911 call, that State Police appeared at the Ballock

8      residence on March 6th, 2013.  I asked Lieutenant Kief,

9      who was Sergeant Kief in those days, which of his

10     Troopers it might've been.  He didn't know.

11           So your recollection is that you were the

12     Trooper who happened to be dispatched there that time?

13     A.    I don't believe I was the primary call-taker.

14     Q.    Okay.

15     A.    That was, at the time Trooper Horne and I was

16     responding as a backup.

17     Q.    You were backing up Trooper Horne?

18     A.    Correct.

19     Q.    I don't know Trooper Horne.  What's --- what's

20     his or her full name?

21     A.    Matthew Horn, he's a Sergeant now in Fairmont,

22     Q.    Okay.

23           How do you spell Horne?

24     A.    H-O-R-N-E.

180

1     Q.   Okay.

2          All right.

3          Well, tell me what you remember about that

4     call.

5     A.   I just remember calling dispatch for a

6     domestic.  I believe Trooper Horne had been to the

7     residence before, because he made reference on a radio

8     about that guy --- agent that lived there.

9          So in my mind I'm thinking we're going to a

10    domestic involving the caller and that guy.  You know, it

11    wasn't the case, Scott wasn't even there.  It was Ellen

12    and Kenny.

13    Q.   Okay.

14    A.   And I stayed and ---.

15    Q.   Did you get there first or second?

16    A.   I got there at the same time, because ---

17    because Trooper Horne knew, I believe exactly where the

18    house was.  I think he's been there before.

19         So we might've went up --- went up together, I

20    don't remember.

21    Q.   All right.

22         The best you can recall, then, you and Trooper

23    Horne arrive about the same time.

24         You know, if you can just tell me what you

181

1    remember in --- sequentially, if possible.

2         A.    What was exactly said, I don't remember.  I ---

3    I remember just talking --- talking with Kenny Ice.

4         Q.    Yeah.

5         A.    Parties got reseparated.  Trooper Horne talked

6    to Ellen off to the side.  I don't remember what he

7    alleged or what he said happened.  I think it was just

8    stuff that was verbal in nature.

9         Q.    Meaning to say that Ellen and Kenny were having

10   an argument?

11        A.    I think that was the context of it.

12        Q.    Were they outside or inside?

13        A.    We were all inside.

14        Q.    Okay.

15        A.    And at some point Trooper Horne came back from

16   speaking with Ellen.  And I believe we had Kenny leave

17   the house.

18              I believe he --- we asked him to leave and he

19   said sure and he left.

20        Q.    That's fine.

21        A.    I'm assuming he drove off in his own car, if I

22   remember.

23        Q.    Okay.

24              Well, was the house in disarray?  I mean, were

182

1    things thrown around?

2         Did it look like there might've been violence

3    going on?

4         A.   I was only in maybe one room in the house.   And

5    I don't recall --- I don't recall anything in disarray.

6         Q.   Did you see any children?

7         A.   I don't think I saw any children. I don't

8    remember seeing any children.

9         Q.   What time of day was this?

10        A.   It was daytime, early afternoon.

11        Q.   So I'll represent to you that at that point in

12   time Summer was living with her mom at that address.

13        A.   She may have been in school.

14        Q.   March 6th is ---

15        A.   Possibly.

16        Q.   --- that's still during the school year.

17        A.   Possibly.

18        Q.   Okay.

19             So Trooper Horne spoke with Ellen and you spoke

20   with Kenny?

21        A.   Correct.

22        Q.   Okay.

23             And what did Kenny tell you?

24        A.   I don't remember what he said exactly.   Going

183

1    through my mind, it was something that --- something

2    verbal --- it was something --- an argument that they had

3    or something.

4           But exactly about what, I don't remember.  It's

5    been a while.

6       Q.   Okay.

7           Any sign or indication that Kenny or Ellen or

8    both of them had been drinking?

9       A.   No.

10      Q.   Okay.

11          Thus you had no concern about Kenny getting in

12   his vehicle and driving away?

13      A.   I didn't --- I mean, I didn't smell anything.

14   I don't recall smelling anything on his breath or he

15   didn't act like he was intoxicated.

16      Q.   If you thought he'd been drinking, you wouldn't

17   suggest to get in his car ---

18      A.   No.

19      Q.   --- and drive away?

20          Okay.

21      A.   Would've made other arrangements.

22      Q.   Right.

23          Okay.

24          So did Ellen make any request that you --- that

184

1    you and Trooper Horne not document the call?

2        A.    I don't believe so.

3        Q.    Okay.

4              Then Sergeant Kief, was he made aware of this

5    call, for any reason?

6        A.    He --- he knew about it, but I don't --- I

7    don't remember how he found out.

8        Q.    Okay.

9        A.    It might've come up in conversation during the

10   investigation.

11       Q.    During the investigation of ---?

12       A.    The harassment.

13       Q.    Of the harassment?

14       A.    Yeah.

15       Q.    Okay.

16             So --- okay.

17             I rather suspected that might've been the case.

18             So in the course of your investigation, these

19   harassing indications that were --- at least alleged to

20   be harassing, did you remember, you know, oh, I've been

21   to their house?

22       A.    When I heard that she was wanting to make a

23   complaint on her husband, who is an FBI agent, then it

24   clicked with me, that's probably the house I went to.

185

1      Q.    And then likewise, the name Kenny Ice.  You may

2  have recognized that name?

3      A.    Right, it was through the e-mails ---

4      Q.    Right.

5      A.    --- that I'm --- Ellen talked about Kenny Ice.

6  At the time talking to him, I --- I initially thought it

7  was Scott, but he identified himself as Kenny.  So ---.

8      Q.    Okay.

9            All right.

10           No recollection as to what the argument was

11  about?

12     A.    I'm sorry, I don't remember.

13     Q.    Okay.

14           The fact that there was no report prepared,

15  help me with that.  I mean, there was a dispatch in

16  response to a 911 call.

17           Right?

18     A.    Correct.

19     Q.    And that was --- that was the reason that you

20  and Trooper Horne went to the residence was because

21  somebody picked up the phone at the house and called 911.

22     A.    Correct.

23     Q.    And so ultimately there was no --- there was

24  nothing documented about this.

186

1          Why is that?

2     A.    I can say my --- through my career I respond to

3     many domestics, whether it was a third-party call or

4     someone in the house that just wanted somebody to leave.

5     A lot of times there's no crime committed, it's just

6     verbal.

7          And our job at that point is to ensure the

8     safety of everyone.  So if that means getting one party

9     to leave the house and separate them for the night, it's

10    what we do.

11         If there's evidence of domestic violence, then

12    we would do a report.  And in this particular case there

13    was no --- there was no evidence of a domestic violence,

14    it was just a verbal argument.

15    Q.    Okay.

16         So what I hear you saying is --- is that at

17    least in respect to domestic calls, in the absence of

18    violence, a report's not expected under the --- the way

19    the State Police operate?

20    A.    Right.  And as long as we notify them about

21    getting a protective order through Magisterial Court. we

22    give them those options if they ever need one where to

23    get one.

24    Q.    That reminds me in this case one of the

187

1    documents that we provided was a domestic violence order.

2    I think it's one of the exhibits.

3         A.    It's 6.

4         Q.    Yeah, Exhibit-6.

5               Did you provide that to Ellen?

6         A.    I did.

7         Q.    Okay.

8               Apparently she never received it.

9         A.    What this --- we try to explain it, ---

10        Q.    Right.

11        A.    --- without confusing you.  So like on Exhibit

12   5 --- and our new reports still have similar questions.

13   It's for FBI reporting purposes.

14              That creates --- it's a stat that they keep on

15   the types of crimes we respond to or investigate.

16              For instance, it asks relationship of victim to

17   suspect.  So if it --- it can be a crime, a theft, or

18   joyriding, whatever.  If the victim and the suspect are

19   married or it's a parent, et cetera, and we have to ---

20   for reporting purposes, we have to fill out what's called

21   this 195 domestic violence report.

22              It doesn't necessarily mean that there was a

23   domestic violence that occurred.  It's just we had to

24   fill this out for reporting purposes.

188

1          If --- if the victim and suspect are married or

2     they're ---

3          Q.    Kinship.

4          A.    --- kinship essentially yes, household member.

5     That's why we had to fill it out.

6               So that's why this was done.  There was --- it

7     wasn't a copy of the domestic violence, because the

8     computer harassment complaint Scott being the husband ---

9          Q.    Right.

10         A.    --- Ellen the wife, it's domestic ---.

11         Q.    It needs to go into the database?

12         A.    Right.

13         Q.    Okay.

14              Okay.

15              Thank you, thank you.  I feel like I understand

16    that now.

17              All right.

18              I appreciate the chance to cover all of this

19    with you the way we have.  You get to meet a lot of nice

20    people in litigations.  Sometimes it's not under the best

21    of circumstance.

22                   ATTORNEY JEFFRIES:  We'll go for lunch.

23                   ATTORNEY CROOKS:  Yeah.

24    BY ATTORNEY CROOKS:

189

1     Q.   I appreciate --- appreciate your careful

2     attention to my questions.

3                    ATTORNEY CROOKS:  Pass the witness.

4                              ---

5                         EXAMINATION

6                              ---

7     BY ATTORNEY PHILLIPS:

8     Q.   All right.

9          First I want to get just kind of the heart of

10    this, I will --- what --- what constitutes harassment ---

11    criminal harassment under West Virginia law?

12         As I take it, it can be based on the frequency

13    of unwanted communication, or the --- or the --- the

14    content --- what's said in the communications.

15         Do they both play a role?

16    A.   Without seeing the definition of how it's

17    defined in the Code, but it --- I remember it involving a

18    --- a --- a pattern ---

19    Q.   Okay.

20    A.   --- of acts.

21    Q.   And --- and I guess the fact that it's unwanted

22    contact, it plays a big role in --- in that ---

23    A.   Sure.

24    Q.   --- determining it's harassing?

190

1        And --- and a pattern --- I think --- I think
2   you said it does not have to be a --- a threat, but I
3   guess nothing needs to even be said.

4        Repeated hang-up phone calls could constitute
5   harassment.

6        A.    There is in harassing phone calls, where if you
7   constantly call someone, ---

8        Q.    Uh-huh (yes).

9        A.    --- they can file under that charge.

10       Q.    Okay.

11       Or --- or it could --- it it's unwanted, it
12  could say something on the surface that looks nice, I
13  have someone that just kept calling or saying, you know,
14  I love you, hang up, I love you, hang up.

15       And the person made clear, don't do this, and
16  they keep doing it repeatedly thousands of times, that
17  could be harassment?

18       A.    Sure.

19       Q.    Yeah.

20       Okay.

21       And this --- that's largely what you found to
22  establish criminal harassment in the communications Scott
23  sent to Ellen?

24       A.    Right.  Form of e-mails, text messages,

191

1    correct.

2         Q.    Yeah, the --- I guess she in --- and you ---

3    you look at these as a whole to establish a pattern.

4              Correct?

5         A.    Sure.

6         Q.    In --- in looking at --- you didn't --- you

7    didn't pick out one particular e-mail or text message to

8    say that that makes or doesn't make the whole string of

9    messages harassing?

10        A.    One of the things that --- that was looked at,

11   especially in our messages with Ms. Scott, was the letter

12   that was from Mr. Stout to Scott.

13        Q.    Uh-huh (yes).

14        A.    And how they continued to have a --- the

15   messages continued after that letter.  It's one of the

16   things that she did look at.

17        Q.    Okay.

18              And that --- and that came up before even the

19   May 3rd letter, and was part of the pattern, was it not,

20   where Ellen would say stop, quit communicating, and Scott

21   would keep communicating.

22              Is that part of the pattern?

23        A.    Can you rephrase that?  I'm sorry.

24        Q.    Okay.

192

1          Wanted to see if in your investigation

2    reviewing these communications you saw a pattern where

3    Mrs. --- Ms. Costlow would let Mr. Ballock know that she

4    didn't want any more communications, tell him to stop.

5          It would be clear that he understood that she

6    wanted him to stop and he would keep doing the same thing

7    anyway.

8          A.   Sure.

9          Q.   Isn't that --- you saw a pattern in that?

10          A.   Especially there was a series of text messages,

11    I believe, that one time she ---

12          Q.   Uh-huh (yes).

13          A.   --- told him to stop and he continued.  And

14    then --- so yeah.

15          Q.   And in fact, from the one message that's

16    included in your report, it's clear that she had told him

17    that --- that she felt he was harassing her.

18          I believe it's page --- let's see.

19          Okay.

20          Yeah, the bottom of --- the last paragraph on

21    page two, like, my correspondence has been polite and

22    respectful.  Calling it harassing does not make it so.

23          So I guess from that you concluded that she had

24    indicated that she felt this was harassing and --- and

193

 1    his response was, it would be fair to characterize that,

 2    well, I don't think it's harassing, so I'm going to do it

 3    anyway, even if you think it's harassing?

 4        A.    Yes, at one point she told him what he's doing

 5    is harassing her.  So he --- he was aware that --- that

 6    --- he made reference to the harassing.

 7        Q.    Uh-huh (yes).

 8              And --- and Mr. Ballock's attorney asked you a

 9    lot of questions about e-mails, where Mr. Ballock

10    indicated that he wanted to renew a relationship with Ms.

11    Costlow.

12              Correct?

13        A.    Yes.

14        Q.    And she indicated many times she didn't want to

15    receive these.

16              Correct?

17        A.    Right, she had no interest.

18        Q.    And --- and the --- in the whole stack, the

19    whole chain of text messages and e-mails, and I believe

20    stated in there over more than 1,400 e-mails and 20,000

21    text messages?

22        A.    Yeah, I don't remember the exact count, but it

23    was --- it was a large file ---

24        Q.    Yeah.

194

1        A.    --- on tab.

2        Q.    In that, did --- was there ever any --- did Ms.

3    Costlow give any indication, in that whole chain, that

4    she wanted to get back with Mr. Ballock, drop the

5    divorce, anything like that?

6        A.    I --- I don't recall ---

7        Q.    Yeah.

8        A.    --- seeing anything like that.

9        Q.    And --- and probably --- probably would've

10   noticed that in --- in with everything else that would've

11   stood out, do you think, something like that coming from

12   Ms. Costlow?

13       A.    Sure, I mean, if I saw something like that,

14   sure.

15       Q.    Okay.

16             And --- and then some of the --- some of the

17   e-mails, it would be fair to ---- and text messages it

18   would be fair to say are unwanted and also more ugly or

19   demeaning or vicious in content.

20             Would you agree?

21       A.    The --- the --- are you asking the content of

22   the e-mails?

23       Q.    Yes, some of them, you know, the --- being

24   questioned by Mr. Ballock's attorney.  He was emphasizing

195

1    a lot of them are about, I love you, let's get back

2    together.

3            Some of them are more critical, hateful, saying

4    negative things about Ms. Costlow?

5        A.   I --- just a lot of e-mails.  Like he wanted to

6    get back with her.

7        Q.   Uh-huh (yes).

8        A.   And it was --- and it was just a lot of

9    pictures, too, of himself.

10       Q.   Yeah.

11       A.   So it wasn't --- it was always --- it was words

12   as well as pictures of himself that he would send to her.

13       Q.   Uh-huh (yes).

14           And after she said she didn't want to receive

15   them.

16           Correct?

17       A.   Yeah.

18       Q.   And then --- and then other times he --- he

19   tells her she's cruel.

20           Do you remember coming across the e-mail saying

21   that?

22       A.   I --- I can't recall exactly, but I think I do.

23       Q.   Okay.

24           What about her --- saying she's pure evil.

196

1          Do you remember ---?

2     A.   Is that what he said that ---?

3     Q.   Yeah.

4     A.   I can't exactly recalled that one.

5     Q.   All right.

6          I'll represent to you that is in there ---

7     A.   Okay.

8     Q.   --- and other --- and then other e-mails that

9  --- where he indicates, I'm not going to stop.  Or he

10  indicates that he understands she's communicated to him

11  that she wants him to stop.  And he says I'm not going

12  to.

13          Do you recall reading e-mails like that?

14     A.   I believe so, and --- and the --- but the

15  attorney's letter is the one that stands out to me, too.

16     Q.   Okay.

17          And I'll represent the one in particular, this

18  number 17 --- Exhibit 17 to Kief --- or to Scott Ballock

19  deposition.

20          It includes, I will never stop reminding you of

21  the terrible life-altering mistake you have made.

22               ATTORNEY CROOKS:  Todd, just give him ---

23  just a date and ---.

24               ATTORNEY PHILLIPS:  Yeah, sure.

197

1          <u>ATTORNEY CROOKS:</u>  This was Exhibit 17?

2          <u>ATTORNEY PHILLIPS:</u>  Seventeen (17).

3          Right.

<u>BY ATTORNEY PHILLIPS:</u>

5     Q.   Okay.

6          And would you agree that that kind of statement

7     and tone is not isolated?  That he in other --- basically

8     in another parts indicates, I'm going to keep doing this

9     whether you like it or not?

10     A.   That's what it sound likes --- sounds like.

11     Q.   Yeah.

12          And I think you --- you indicated that you and

13     other Troopers get complaints of a domestic nature,

14     particularly in custody proceedings.  And you mentioned,

15     I guess, some --- I don't want to go into these, but some

16     involve one parent accusing the other parent of abusing

17     children that the parties have together.

18          Correct?

19     A.   That and sometimes so-and-so's got drugs at the

20     house, ---

21     Q.   Okay.

22     A.   --- things like that.

23     Q.   Okay.

24          I wanted to set those aside and I just wanted

198

1    to focus on any kind of complaints that are more --- that

2    are similar to what Mr. Ballock did and was charged with,

3    with harassing e-mails or texts.

4             You have seen other cases like that?

5        A.    As far as harassment?  I mean, there's stuff

6    that I've seen that people harass with Facebook, ---

7        Q.    Uh-huh (yes).

8        A.    --- social media and things like that.

9        Q.    Okay.

10            And would what we've kind of looked at with the

11   pattern here, was he --- let me know if you think it's

12   typical or atypical, from your experience, where they

13   establish --- their e-mails and different tones.

14            Where he says he wants to get back together and

15   then he says, you're evil or whatever.  And --- and

16   continues, after being told to stop, would that be ---

17   would you find that to be a typical or atypical pattern

18   in other harassment investigations you've had or are

19   aware of other Troopers having?

20       A.    I mean, it's in the sense of computers and ---

21   and phones, I mean you see it quite often.

22       Q.    Uh-huh (yes).

23       A.    And people will call in the office.  Most of

24   the cases that I've seen and dealt with involve mostly

199

1    Facebook.

2         Q.    Okay.

3         A.    People make threats to somebody else in a

4    comments section.  And somebody else sees that comment

5    and they tell so-and-so, hey, I heard this about you

6    and ---

7         Q.    Okay.

8         A.    --- things like that.

9         Q.    Okay.

10             The --- more often than not, is it parties who

11   are romantically involved of the sort or not necessarily?

12        A.    A lot of the cases, some of them are between

13   juveniles still young and in school or husband and wife

14   got separated.  They might make allegations against one

15   parent online.

16        Q.    Okay.

17        A.    I mean, there --- there's all kinds of

18   different ---.

19        Q.    Okay.

20             I just wanted to --- I just wanted to see how

21   this --- the --- the --- kind of the dynamic of this

22   harassment investigation, compared to others.

23             Because it was --- you testified earlier you

24   --- when you said you had not seen it on this scale ---.

200

1     A.   In terms of the quantity and the amount of

2   documents provided to us, it's different than others.

3     Q.   Okay.

4        Is this the most unwanted communications you've

5   ever seen?

6     A.   It's quite significant.

7     Q.   Yeah.

8        Is it a lot more than anything you'd ever seen?

9     A.   More than I'm used to seeing.

10    Q.   Yeah.

11       Okay.

12       I wanted --- I wanted to get the --- get that

13  established.  And --- and how --- I believe you said you

14  talked to Ms. Costlow about how this made her feel.

15       How --- how did these unwanted e-mails you

16  received from Scott Ballock make her feel?

17    A.   I think ultimately she was -- she just wanted

18  to be left alone.

19    Q.   Uh-huh (yes).

20    A.   She wanted him to stop altogether.  She just

21  wanted to hear from him only if it was about the kids.

22  And if there's an emergency or something like that, but I

23  think she just ultimately wanted them to stop.

24    Q.   And he wouldn't?

201

1       A.    Correct.

2       Q.    And we established that he said he wouldn't.

3             Right?

4       A.    Correct.

5       Q.    And in fact, he seemed to indicate that nothing

6    would make him stop.

7       A.    It didn't like he was going to.

8       Q.    Yeah.  And I sort of --- I couldn't --- don't

9    remember if anything in the follow-up questions from Mr.

10   Ballock's attorney ---.  I can't remember if Trooper

11   Berry was mentioned in that.

12            But I remember going on break, I was struck at

13   least up until then I --- I don't think you -- do you

14   recall mentioning Trooper Berry in any of your testimony

15   today?

16      A.    No, just --- just the alleged affair.

17      Q.    Okay.

18            Because --- because I believe the complaint

19   puts you and Trooper Berry and Lieutenant Kief all

20   together in investigating Mr. Ballock, arresting him,

21   continuing the prosecution after.

22            As far as the investigation, arrest,

23   prosecution, did Trooper Berry play any role at all?

24      A.    No.

202

1        Q.    We had --- we had a discussion for about kind

2   of about bizarre things.  And you know, the --- that may

3   have been done by Mr. Ballock or Ms. Costlow in the

4   investigation report.

5             Do you find it bizarre that --- that Trooper

6   Berry is alleged to have played a role in investigating

7   Mr. Ballock, arresting him, prosecuting him?

8        A.    If I understand your question right, I don't

9   think Trooper Berry investigated Scott Ballock ---

10       Q.    Yeah.

11       A.    --- or, I mean, as it pertains to this, I

12  don't ---.

13       Q.    Right.

14       A.    If I understand you right.

15       Q.    Yeah, I was --- I was just saying, is it

16  bizarre to think that he played a role?  Does that ---

17  does that strike you as bizarre or strange or ---?

18       A.    When you say play a role, what role are you

19  talking about?

20       Q.    Any role.  What I'm saying is ---.

21       A.    I just want to make sure I understand.

22       Q.    Oh, okay.

23             Well, let me --- let me just rephrase it.  I

24  mean, if you investigated the --- you're the lead

1    investigator on the case, and you assigned --- obtained

2    the warrants for Mr. Ballock's arrest.

3            Right?

4        A.   Correct.

5        Q.   So --- so Mr. Ballock, especially being in law

6    enforcement, he --- he would know that you were involved

7    in his investigation and arrest.

8            Think that's fair to say?

9        A.   My name was assigned on the complaint.

10       Q.   Yeah.

11           Okay.

12           And then Trooper or Lieutenant Kief arrested

13   him?

14       A.   He served the warrant, correct.

15       Q.   Yeah.  So clearly he was involved in the

16   process.

17           But Trooper Berry isn't anywhere to be found in

18   the ---.

19           You --- you then arrest him, he's --- he's not

20   --- didn't obtain the warrant, didn't --- he didn't do

21   anything involved in the investigation.

22           Did he?

23       A.   No.

24       Q.   So I'm just saying as --- what does that

204

1     indicate --- and then --- But Mr. Ballock alleged in here

2     that he was in with you and Kief and this whole

3     investigation, arrest and his prosecution.

4              Does that strike as you kind of --- kind of

5     bizarre, to think that, that he could --- that Trooper

6     Berry could be involved in the investigation and arrest

7     at all?

8        A.    Do I think it's bizarre?

9        Q.    Yeah.

10       A.    Certainly.

11       Q.    For Scott to think that ---.

12       A.    Conspiracy to all --- us three.

13       Q.    Yeah.

14       A.    I mean, to look at from my standpoint, it

15    sounds crazy.

16       Q.    Uh-huh (yes).

17             Okay.

18             Yeah, I just wanted to --- I wanted to ---.   I

19    wanted to know what you thought about that.

20             And there were questions asked about the

21    credibility, you know, because there's a lot of he said,

22    she said stuff.  And about sexual activity that was

23    reported to you, that, you know, you had no other ---

24    would have no other evidence of.

205

 1          But what would --- would that affect how

 2    credible you would see today Mr. Ballock, if he thinks

 3    that Trooper Berry played a role in his investigation and

 4    arrest?

 5          What would --- someone who could --- with

 6    someone who could think that be --- given all the

 7    evidence here be credible to you?

 8          A.   Who's credible to me?

 9          Q.   Mr. --- Mr. Ballock, I want to --- I want to

10    know, how does his idea that --- that Trooper Berry was

11    involved in this affect his credibility?

12          A.   Scott's credibility?

13          Q.   Yeah, Scott's credibility.

14          A.   I mean, it depends what perspective you look

15    at.  If you're Scott, you --- you're going to think these

16    guys conspired against me.  And of course you're --- he's

17    going to think he's going to think his credibility got

18    ruined, but ---.

19          Q.   Uh-huh (yes).

20          A.   But from my standpoint, to think that he

21    thought we conspired is crazy.

22          Q.   Uh-huh (yes).

23          And not only conspired he --- he alleges you

24    did this to help Ms. Costlow in her divorce.

206

1      A.    I could care any less the outcome of that

2   divorce.

3      Q.    You never --- you never sat down with Trooper

4   Berry and said, how can we help Ellen Costlow's divorce?

5      A.    No.

6      Q.    You never had a conversation like that with

7   Lieutenant Kief?

8      A.    No.

9      Q.    What about --- what about Ellen Costlow?  Did

10   you ever --- did you ever say, how can we help you in

11   your divorce?

12      A.    No.  Strictly collecting information from her,

13   document it on the report.

14      Q.    And --- and --- and of course, also, you know,

15   alleged not only to help with the divorce, but Mr.

16   Ballock seemed to believe that you had --- you know, that

17   you knew there was no probable cause to arrest him, but

18   you did this for unconstitutional purpose.

19          Did you --- did you wake up one day and say, I

20   want to --- I want to do something unconstitutional today

21   and I'll do it against Mr. Ballock?

22          Did that ---?

23      A.    No.  No, nothing like that.

24      Q.    Okay.

207

1          And I guess --- and he also says you wanted to

2     punish him.  Is --- when you started your investigation

3     or at any --- at any time, did you conclude there was no

4     probable cause, but you continued because you really

5     wanted to punish Scott Ballock?

6          A.   I have no reason to want to deliberately punish

7     Scott Ballock.  He was an FBI agent.

8          I work with a lot of FBI agents in my career,

9     especially on the Skylar Neese ---.  I became really good

10    friends with some of those guys.

11         It was uncomfortable, because he was an FBI

12    agent.  I got along with a lot of them, ---

13         Q.   Uh-huh (yes).

14         A.   --- but I --- I have --- I have no vendetta

15    against Scott Ballock.

16         Q.   And you --- fair to say this went where the

17    evidence led?

18         A.   Right.

19         Q.   And there's nothing personal?

20         A.   No.

21         Q.   And certainly whatever was going on in the

22    Family Court case with Ms. Costlow and Mr. Ballock didn't

23    --- wasn't a consideration on whether --- whether or not

24    to file charges against Mr. Ballock?

208

1    A.    I said I had zero interest in the outcome of

2  that.

3    Q.    And would you --- do you think someone who

4  believes that --- that you pursued a case without

5  probable cause to help Ms. Costlow in Family Court and to

6  punish Mr. Ballock --- would you say someone that

7  believes that is a little bit out of touch with reality?

8    A.    To Scott Ballock's perspective, that makes

9  sense to him.  And it makes it pretty clear that he

10  believes that's what happened.

11        But outside of that, looking through my

12  perspective, it's crazy to think that.  I mean, it's ---.

13    Q.    Okay.

14        And --- and did you get together with one or

15  all of the other Defendants, Lieutenant Kief, Trooper

16  Berry and Ellen Costlow and enlist the services of

17  another State Trooper to lodge a complaint with the FBI

18  Senior Supervisor --- Supervisory Resident Agent after an

19  initial complaint was filed?

20    A.    I don't know who made this complaint that Scott

21  referred to.  I have no knowledge of that.

22    Q.    Did ---?

23    A.    The only complaint that I know of is when Scott

24  tried to serve some papers at our office.  That's the

209

1    only complaint that I'm aware of that Lieutenant Kief

2    called the FBI.

3        Q.    All right.

4        A.    But outside of that I'm not aware of anything

5    like that.

6        Q.    Okay.

7              You --- okay, you didn't have --- fair to say

8    you didn't have any discussions with any of the other

9    Defendants in this case on, we can intimidate Mr. Ballock

10   by having another Trooper go talk to his Supervisory

11   Resident Agent?

12       A.    No.

13       Q.    Okay.

14             Does --- does that allegation seem at all

15   bizarre to you?

16       A.    It's crazy to think that.

17       Q.    Okay.

18             Couple other questions.

19             Just a small point with Captain Merrill and

20   being kept up on the case.  Do you --- compared with

21   other cases you've had, did you find that Captain Merrill

22   wanted more information about this investigation, about

23   less, about the same?

24       A.    Captain Merrill was very active in a lot of

210

1    cases we worked.

2        Q.    Uh-huh (yes).

3        A.    So I wasn't surprised --- this wasn't going ---

4    he was very active in my bank robbery case, Skylar Neese

5    case.  He was very active on other cases that I've seen

6    outside of Monongalia County, since I was.

7        Q.    Yeah.

8        A.    So I mean, it wasn't anything out of the

9    ordinary to me.

10       Q.    Okay.

11             Yeah, just wanted to confirm that.

12             And --- oh, and then there was some --- there's

13   some question early about the possibility that --- that

14   Ms. Costlow could communicated Mr. Ballock that she

15   wanted to receive messages from him, something

16   established that she had ---.

17             A lot of the time she says you know don't

18   contact me.  It keeps going.  But the possibility was

19   raised that, yeah, maybe she said something contrary to

20   what appears in the --- in the volume of e-mails and text

21   messages you compiled.

22             Do you recall those questions from her

23   attorney?

24       A.    I do.

211

1      Q.    Okay.

2            On --- well, first off, looking at the e-mails

3      and texts that were delivered on DVD to you, did it ---

4      did it look like there were any communications on her

5      part that had been removed to interrupt the chain?

6      A.    Not that I'm aware of.

7      Q.    Yeah.

8            And you were, I guess --- see the trial in this

9      matter I believe was scheduled for April 7th, 2016.

10           Does that sound ---?

11     A.    March, April, somewhere around there.

12     Q.    Okay.

13           And up until the morning of, you were --- you

14     thought there was going to be a trial and you were

15     prepared to testify?

16     A.    Yes.

17     Q.    I imagine you were --- you were going to be a

18     key, if not the key witness for the State?

19     A.    Sure.

20     Q.    And I'm sure you're aware in --- in preparing

21     for trials, both sides have to share with the other the

22     documents they're going to use, any like e-mails or

23     photographs or anything like that.

24           Right?

212

1      A.   I understand there's discovery ---

2      Q.   Yeah.

3      A.   --- involved.

4      Q.   And typically you have --- I mean, have you had

5  occasions where the Prosecutor gives you say something

6  they're going to --- they produce these documents,

7  they're going to ask you about them.

8           Does that situation come up?

9      A.   I mean, if something's going to trial, the

10  Prosecutor would --- does meet with us to go over with us

11  the evidence in the case.

12      Q.   Did in this case, did --- did Ms. Scott give

13  you any documents that their side was going to use, that

14  Mr. Ballock was going to use, to show that Ms. Costlow

15  had communicated with him, encouraging him to communicate

16  communications that didn't show up in what --- what the

17  State was going to present their --- what's been

18  presented in this case?

19      A.   I'm not aware of any communication of that ---

20      Q.   Yeah.

21      A.   --- nature.

22      Q.   And you think you, in discovery, would share

23  that they had --- that they had an e-mail where Ellen

24  says to Scott, send me some more e-mails or something

213

1    like that, that probably would have been shared with you?

2        A.    Sure.  I mean, if she's going to prosecute the

3    case this --- she would come and brief me on that.

4        Q.    Okay.

5        A.    She wasn't --- she --- she didn't leave.  I

6    think Marcia took over later on, towards the end of it.

7        Q.    Okay.

8        A.    And I wasn't aware of anything.

9        Q.    Marcia was going to --- it's your understanding

10   if there would have been a trial, Marcia would have

11   represented the State?

12       A.    Sure.

13       Q.    Okay.

14             I guess, just to conclude, you're --- you're

15   not aware of --- nothing's ever been produced to you ---

16   communications from Ellen to Mr. Ballock, where she

17   indicates that she wants to receive the volume of

18   communications she received?

19       A.    I'm not aware of it.  And if Scott had those, I

20   think he would have already presented them.

21       Q.    Right.

22                     ATTORNEY PHILLIPS:

23                     Nothing more.

24                     ATTORNEY CROOKS:

214

1                         Just a few follow-ups.

2                                ---

3                          RE-EXAMINATION

4                                ---

5    BY ATTORNEY JEFFREIES:

6         Q.    You will recall earlier today you answered some

7    questions of Mr. Crooks discussing a meeting you had with

8    FBI Agent John Hambrick, where you gave him the disks of

9    all the e-mails and text messages sent by Mr. Scott and

10   Ellen Costlow.

11              Do you recall that testimony?

12        A.    Yes.

13        Q.    Do you recall when that meeting with John

14   Hambrick occurred?

15              I'm not asking you to give a specific date,

16   but, do you know ---?

17        A.    I believe it was post arrest, because we

18   checked with Ms. Scott, that that was okay to release

19   that, considering it was pending adjudication.

20        Q.    So --- and so what I was kind of getting at ---

21   you believe it's after he had been arrested?

22        A.    I believe it was post arrest.

23        Q.    Okay.

24              Do you recall approximately how long after his

215

1    arrest?  Like do you think it's a matter of a week or two

2    weeks or months?

3             I mean, this case went on for almost two years.

4        A.    I think it was fairly quick, because he had to

5    respond to his supervisor in Pittsburgh.

6        Q.    So fairly soon after the arrest?

7        A.    I believe it was soon.  Perhaps a matter of

8    days.

9        Q.    You also discussed some --- in other cases,

10   especially, when there's a child-custody dispute, one

11   parent will call the State Police, lodge a complaint.

12   Kind of gain a little leverage in the child-custody

13   dispute.

14            And --- and you said that in most instances

15   generally what you'll do is refer the complaint to Child

16   Protective Services.

17            Do you recall that testimony?

18       A.    I do.

19       Q.    Why would you refer them to Child Protective

20   Services for making a complaint?

21       A.    If there's allegations of the child visits may

22   be around paraphernalia, drugs, we would contact CPS.

23   They could do home visits, speak with the parents.

24            If --- if we get information that the child can

216

1    be in danger, something like that, we can do a welfare

2    check on the child.

3         Q.   Okay.

4              Ms. Costlow's allegations that she made about

5    Mr. Ballock, were there any allegations that he was

6    abusing or neglecting their children?

7         A.   No.

8         Q.   But to bring you back to Exhibit 1 in your

9    report --- and specifically I'd like to go to page two of

10   the report.

11             Now, Mr. Crooks mentioned --- in this bottom

12   paragraph, on page two, he cites e-mails from November of

13   2012, February 2013, October 2012 and November 2012

14   again.

15             And Mr. Crooks mentioned that these were ---

16   all preceded the letter from Matthew Stout to Mr.

17   Ballock, asking him to direct any communications through

18   Mr. Stout.

19             The very last sentence of this paragraph, the

20   fourth line from the bottom begins, the victim had

21   written the accused an e-mail on the same date and read

22   as follows.  Quote, Scott, I've asked you many times to

23   leave me alone.  This is my last request.  Please refrain

24   from sending harassing e-mails and texts, as well as any

217

1    other means of communication.

2         Then it says on the same date, that's referring

3    to the previous e-mails of November 7, 2012 as ---.

4    A.   I believe so --- it was.

5    Q.   And so the fact that with Ms. Costlow had asked

6    Mr. Ballock directly, please refrain from sending

7    harassing e-mails and texts, did that play into your

8    decision to find Mr. --- the third time he calls Ms.

9    Ballock (sic) and harassed her ---?

10   A.   If it's established that she had told him in

11   writing to stop harassing her, to leave her alone.

12   Q.   And that was before the attorney sent a letter.

13        Correct?

14   A.   Correct.

15   Q.   Let's go to page three.  There's a middle

16   paragraph, there's a discussion about West Coast Twiggs

17   at yahoo dot com.

18        You attended Mr. Ballock's deposition a few

19   weeks ago.

20        Didn't you?

21   A.   I did.

22   Q.   Do you recall hearing in the deposition of Mr.

23   Ballock admitted that the e-mails from West Coast Twiggs

24   were from him?

218

1      A.   Yes.

2      Q.   Okay.

3           Let's go to page four of this report.

4           Right at the top paragraph, there's some

5   discussion about who would solicit people on Craigslist

6   to who --- put --- record videos of Ms. Costlow having

7   sex with him.

8           And Mr. Crooks brought up that the attorney ---

9   Mr. Stout said that he denied pretty much everything that

10  Ms. Costlow lists in this paragraph here.

11          Are you following that?

12     A.   Yes, not denying that.

13     Q.   And does it matter who was telling the truth as

14  to who videoed, whether it was Mr. Ballock videoed or Ms.

15  Costlow videoed or a third person videoed?  Does that

16  make any difference in the allegations of harassment?

17     A.   No.  This was --- I think this was us just

18  trying to establish who this was.

19     Q.   And you testified that the sexual allegations

20  brought forth in these e-mails reflect what you consider

21  an unusual lifestyle.

22          Would that be a fair characterization of it?

23     A.   Sure.

24     Q.   And I believe you said that despite this

219

1   bizarre sexual lifestyle --- you testified to Mr. Crooks'

2   question that it didn't undermine your confidence in the

3   criminal case.

4           Do you recall that testimony?

5       A.   I do.

6       Q.   Is it okay to harass someone just because they

7   engage in sexually-deviant behavior?

8       A.   It's not okay to harass.

9       Q.   But there's no exception under the law for

10  that?

11      A.   Not that I'm aware of, no.

12                  ATTORNEY JEFFRIES:

13              That's all I've got.

14              * * * * * * * *

15          DEPOSITION CONCLUDED AT 4:03 P.M.

16              * * * * * * * *

17

18

19

20

21

22

23

24

220

1    STATE OF WEST VIRGINIA   )

2

3                            CERTIFICATE

4          I, Guy Starrett, a Notary Public in and for the

5    State of West Virginia, do hereby certify:

6          That the witness whose testimony appears in the

7    foregoing deposition, was duly sworn by me on said date,

8    and that the transcribed deposition of said witness is a

9    true record of the testimony given by said witness;

10         That the proceeding is herein recorded fully and

11   accurately;

12         That I am neither attorney nor counsel for, nor

13   related to any of the parties to the action in which these

14   depositions were taken, and further that I am not a

15   relative of any attorney or counsel employed by the

16   parties hereto, or financially interested in this action.

17

18         I certify that the attached transcript meets the

19   requirements set forth within article twenty-seven,

20   chapter forty-seven of the West Virginia Code.

21

22        OFFICIAL SEAL
          STATE OF WEST VIRGINIA
          NOTARY PUBLIC
          GUY STARRETT                     _____
23        The Peoples Bldg., Suite 617     Court Reporter
          179 Summers St.
          Charleston, WV 25301
          My commission expires July 17, 2023
24

Sargent's Court Reporting Service, Inc.
1-800-727-4349