IN THE FAMILY COURT OF Monongalia COUNTY, WEST VIRGINIA

IN RE THE MARRIAGE OF:

PETITIONER:                            and        RESPONDENT:

Ellen Ballock                                      Scott Ballock

CIVIL ACTION NUMBER:        12-D-529 (Minor)

### DIVORCE DECREE

This matter came on for hearing on May 9, 2014. Petitioner Ellen Ballock and Respondent Scott Ballock appeared for the hearing. Petitioner's counsel, Kevin T. Tipton, Respondent's counsel, Delby Pool, and the Guardian Ad Litem (GAL), Teresa Lyons, also appeared for the hearing.

WHEREUPON, based upon the Findings of Fact and Conclusions of Law indicated below and/or stated upon the record, this Court ADJUDGES, ORDERS AND DECREES as follows:

1.  **JURISDICTION AND VENUE**

    a.      This Court has subject matter jurisdiction, personal jurisdiction over the parties, and venue.

2.  **THE PARTIES' MARRIAGE, SEPARATION, AND GROUNDS FOR DIVORCE**

    a.      The parties were married on June 8, 1991, in Monroe County, Indiana.

    b.      The parties last lived and cohabited together as husband and wife on September 14, 2012, in Monongalia County, West Virginia.

    c.      The parties have filed a verified complaint and verified answer respectively alleging and admitting that irreconcilable differences have arisen and exist between the parties.

    d.      The parties are granted a divorce based upon the ground of irreconcilable differences.

3.  **RESTORATION OF THE WIFE'S FORMER NAME**

    a.      The Wife has requested she be restored to her former name of Ellen Ruth Costlow, and that request is hereby granted.

4.  **PERMANENT INJUNCTIVE RELIEF**

    a.      Neither party will abuse, threaten, or harass the other party. Neither party will contact any employer regarding the other party in any fashion whatsoever. Communication between the parties will be limited to matters involving the parties' children, and all such communication will be by text or email.

Exhibit 1

5.   **EQUITABLE DISTRIBUTION OF THE MARITAL ESTATE**

    a.    The parties have entered into a written agreement by which the parties' marital assets and debts are to be divided, and the same is hereby ratified and affirmed by this Court. The parties' agreement is fair, valid, enforceable, and is not the result of fraud, duress or other unconscionable conduct by either party. The parties' agreement has been made part of the record, it is attached hereto and incorporated herein by reference, and the same is fully operative and enforceable in every way and to the same extent as if fully contained within this Order.

    b.    Consistent with the parties' agreement, the Court Orders as follows:

        i.    The parties will retain all marital personal property currently within their respective possessions, except as otherwise provided herein.

        ii.    The Husband will be awarded the following property:

            (1)    The former marital home.

            (2)    His vehicle.

            (3)    His copies of the family photos and the electronic journal, as previously Ordered. The Wife's counsel will provide the same to the Husband's counsel by no later than June 15, 2014.

        iii.    The Wife will be awarded the following property:

            (1)    Her vehicle.

            (2)    The monies currently held in the IOLTA account of Delby Pool related to the Husband's purchase of the Wife's interest in the former marital home, less the Wife's portion of the remainder of the GAL's fee. Delby Pool will forward to the GAL the Wife's portion of the GAL's remaining fee.

        iv.    The Husband will be solely responsible for the marital debts listed below:

            (1)    The mortgage and all other debts associated with the former marital home. The parties will cooperate to absolve the Wife of all responsibility related to any such debt as soon as possible, but in no event later than January 1, 2015. Unless this occurs, the Husband will make arrangements to list and sell the property as soon as possible after January 1, 2015. In such event, the Husband shall be entitled to all net proceeds remaining after the sale of the property.

(2)      The Husband's share of the GAL's remaining fee.

v.      The parties will cooperate to file a joint Federal and State return for Tax Year 2013 as soon as possible, and the Husband will be entitled to any refund related to the returns.

vi.     The Wife is hereby awarded 50% of the marital portion of the other party's interest in his TSP and FERS retirement accounts.  The marital portion is defined as all Plan/Account benefits arising from contributions made from the date of the parties' marriage on June 8, 1991 through the date of the parties' separation on September 14, 2012, including subsequent gains or losses related to market performance.  THE WIFE WILL BE RESPONSIBLE FOR PREPARING QUALIFIED DOMESTIC RELATIONS ORDERS DIVIDING THE PLAN/ACCOUNT BENEFITS AS PROVIDED HEREIN.

c.      A party who retains property awarded to the other party at the time of entry of the divorce decree will relinquish such property to the other party forthwith, but in no event more than 30 days from entry of the divorce decree.  During such time as the property remains in the party's possession prior to relinquishment to the other party, that party will hold all such property in constructive trust until relinquishment to the other party.

d.      Both parties are under an obligation to complete any and all documents and take such other action as may be necessary to implement the distribution of assets provided in this divorce decree by no later than 30 days from the date of entry of the divorce decree, except that no party will be compelled to relinquish title to property so long as the party remains subject to liability for a debt secured by such property.

e.      Each party shall be solely responsible for any debt arising from the individual acts of that party subsequent to the date of the parties' separation, any debt secured by property awarded to the party, and any other debt assigned to the party pursuant to this divorce decree, and he or she shall indemnify and save harmless the other party with regard to all such debts.

6.   **SPOUSAL SUPPORT**

a.      The parties have agreed to waive any claim either may have to spousal support and to be forever barred from seeking the same.  The parties' agreement is fair, valid, enforceable, and is not the result of fraud, duress or other unconscionable conduct by either party.  The parties' agreement is ratified and affirmed by this Court and, accordingly, both parties are barred from seeking spousal

support from the other party in the future based upon the marriage herein dissolved.

b.   The provisions of the most recent Temporary Order entered previously by this Court with regard to temporary spousal support will be vacated effective at midnight on May 31, 2015.

7.   **MINOR CHILDREN**

a.   The parties are the parents of the following minor children:

i.      Thomas Scott Ballock, DOB January 22, 2001, SSN XXX-XX-9456.

ii.     Summer Scott Ballock, DOB May 1, 2003, SSN XXX-XX-8253.

8.   **PARENTING PLAN**

a.   The parties have been unable to agree on a parenting plan for the parties' minor children.  After considering the evidence, the Court hereby enters a parenting plan, dated May 9, 2014, which the Court believes to be in the best interests of the parties' children.

b.   The Father is designated as the party with primary custodial responsibility of the parties' children.

9.   **CHILD SUPPORT**

a.   The parties' respective incomes and allowable deductions are as indicated per the child support worksheet attached hereto and incorporated herein.

b.   Pursuant to the West Virginia Guidelines for Child Support Awards, the Mother shall have a child support obligation to the Father in the amount of $178.53 per month, effective August 1, 2014.

c.   The provisions of the most recent Temporary Order entered previously by this Court with regard to temporary child support will be vacated on the effective date of the child support obligation entered herein.

10.   **INCOME TAX FILINGS**

a.   As the party with primary custodial responsibility for the parties' children, the Father is granted the income tax dependency exemption for the children effective Tax Year 2015.

11.   **MEDICAL INSURANCE AND UNINSURED MEDICAL COSTS**

a.   Medical insurance coverage for the parties' minor children is reasonably available to the Father through that party's employer.

b.   the Father shall maintain or enroll forthwith, if not already enrolled, the parties' minor children in the medical insurance plan offered by that party's employer or union.

c.   Based upon the parties' respective incomes, all reasonable and necessary uninsured medical costs

for the parties' minor children over $250.00 per year per child shall be paid 90% by the Father and 10% by the Mother.  Uninsured medical costs below $250.00 per year per child will be the responsibility of the Father.

12.   **METHOD OF PAYMENT OF SUPPORT**

    a.   Support should be paid by income withholding through the Bureau for Child Support Enforcement (BCSE), and the same is hereby Ordered.  In order for the BCSE to begin the wage withholding process, one of the parties must apply for BCSE services by completing a BCSE Application for Services.  An Application for Services may be obtained at www.wvdhhr.org/bcse or by contacting the Monongalia County BCSE office at 304-285-3218, or 118 South High Street, Morgantown, WV 26501.  Until such time as the BCSE begins withholding wages for child support, the support obligor is obligated to pay child support directly to the BCSE.

13.   **GUARDIAN AD LITEM**

    a.   The GAL is released from further responsibility in this matter.

14.   **DOCUMENTS TO BE SEALED**

    a.   By agreement of the parties, the GAL report, the GAL's exhibits on disc, the report of Dr. Cooper-Lehki, and the transcript of the testimony of Dr. Cooper-Lehki shall be maintained in the Court file under seal, and shall not be released without Order of this Court.

15.   **ATTACHMENTS TO THIS ORDER**

    a.   The provisions of this Order are supplemented by the following documents, attached hereto and incorporated herein unless inconsistent with specific provisions contained in this Order:

        i.   Child Support Worksheet

        ii.   Appendix:  Child Support

        iii.   Parenting Plan dated May 9, 2014

        iv.   Parties' written settlement agreement dated May 9, 2014

16.   **NOTICE OF RIGHT TO APPEAL**

    a.   The parties have agreed in consideration of their settlement agreement that each party shall be contractually barred from appealing this Order and the entry of the Court's parenting plan adopted herein, and the same is hereby Ordered.

17.   **COPIES TO ALL INTERESTED PARTIES**

    a.   Upon the entry of this Order, the Clerk of this Court shall mail a certified copy of the same to:

        i.   Petitioner's counsel, Kevin T. Tipton, at 316 Merchant Street, Suite 100, Fairmont, WV 26554.

        ii.   Respondent's counsel, Delby Pool, at 230 Court Street, Clarksburg, WV 26301.

        iii.   GAL, Teresa Lyons, at 141 Walnut Street, Morgantown, WV 26505.

        iv.   The BCSE at 118 South High Street, Morgantown, WV 26501.

Date:     May 9, 2014

Family Judge Randal Minor

STATE OF WEST VIRGINIA, SS:
I, Jean Friend, Clerk of the Circuit and Family Courts of
Monongalia County state aforesaid do hereby certify that
the ___ ___ ___ ___ ___ ___ copy of the original Order
made and entered by said court.

                                   Circuit Clerk

# Worksheet A: BASIC SHARED PARENTING

IN THE FAMILY COURT OF __Monongalia__          COUNTY, WEST VIRGINIA

CASE NO. 12-D-529

| | | | |
|---|---|---|---|
| Mother: Ellen        Ballock | SS No.: | Primary Custodial Parent? | No |
| Father: Scott        Ballock | SS No.: | Primary Custodial Parent? | Yes |

| Children | SSN | Date of Birth | Children | SSN | Date of Birth |
|---|---|---|---|---|---|
| Thomas | | | | | |
| Summer | | | | | |

| PART 1. CHILD SUPPORT ORDER | Mother | Father | Combined |
|---|---|---|---|
| 1.  MONTHLY GROSS INCOME (Exclusive of overtime compensation) | $1,257.00 | $11,083.00 | |
| a.  Minus preexisting child support payment | $0.00 | $0.00 | |
| b.  Minus maintenance paid | $0.00 | $0.00 | |
| c.  Plus overtime compensation, if not excluded, and not to exceed 50%, pursuant to W. Va. Code §48-1-228(b)(6) | $0.00 | $0.00 | |
| d.  Additional dependents deduction | $0.00 | $0.00 | |
| 2.  MONTHLY ADJUSTED GROSS INCOME | $1,257.00 | $11,083.00 | $12,340.00 |
| 3. PERCENTAGE SHARE OF INCOME (Each parent's income from line 2 divided by Combined Income) | 10.19% | 89.81% | 100% |
| 4. BASIC OBLIGATION (Use Line 2 combined to find amount from schedule) | | | $1,752.00 |
| 5. ADJUSTMENTS (Expenses paid directly by each parent) | | | |
| a. Work Related Child Care Costs Adjusted for Federal  Tax Credit (0.75 x actual work-related  child care costs) | $0.00 | $0.00 | |
| b. Extraordinary Medical Expenses (Uninsured only) and Children's Portion of Health Insurance Premium Costs | $0.00 | $0.00 | |
| c.  Extraordinary Expenses (Agreed to by parents or by order of the court) | $0.00 | $0.00 | |
| d.  Minus Extraordinary Adjustments (Agreed to by parents or by order of the court) | $0.00 | $0.00 | |
| e.  Total Adjustments (For each column, add 5a, 5b, and 5c.  Subtract Line 5d. Add the parent's totals together for Combined amount.) | $0.00 | $0.00 | $0.00 |
| 6. TOTAL SUPPORT OBLIGATION (Add Line 4 and Line 5e Combined) | | | $1,752.00 |
| 7. EACH PARENT'S SHARE OF THE TOTAL CHILD SUPPORT OBLIGATION  (Line 3 x line 6 for each parent.) | $178.53 | $1,573.47 | |
| 8. PAYOR PARENT ADJUSTMENT (Enter payor parent's line 5e) | $0.00 | $0.00 | |
| 9. RECOMMENDED CHILD SUPPORT ORDER (Subtract line 8 from line 7 for the payor parent only.  Leave payee column blank.) | $178.53 | $0.00 | |
| *  Adjustment for obligator's social security benefits sent directly to the child | $0.00 | $0.00 | |
| ** Net RECOMMENDED CHILD SUPPORT ORDER (Line 9 - Line 9*) | $178.53 | $0.00 | |
| **PART II.  ABILITY TO PAY CALCULATION** | | | |
| (Complete if noncustodial parent's adjusted monthly gross income is below $1,550) | | | |
| 10. Spendable Income (0.80 x line 2 for payor parent only) | $1,005.60 | $0.00 | |
| 11. Self Support Reserve | $500 | $500 | |
| 12. Income Available for Support (line 10-line 11. If less than $50, then $50) | $505.60 | $0.00 | |
| 13. Adjusted Child Support Order (Lessor of line 9** and line 12.) | $178.53 | $0.00 | |

Comments, calculations, or rebuttals to schedule or adjustments if payor parent directly pays extraordinary expenses.

| | |
|---|---|
| PREPARED BY: Judge Randal Minor | Date: 5-9-14 |

A  Monthly        Support would be  $ 178.53

CivilWare, Copyright 2006, LawTech LLC, (304) 842-0179

## APPENDIX: CHILD SUPPORT

The following provisions are incorporated by reference into this Court's orders addressing child support and medical support for minor children, **unless inconsistent with specific provisions contained within the order to which this Appendix is attached or other orders of this Court, including a duly entered Domestic Violence Protective Order.** This Order replaces the Court's previous administrative order and will apply to all orders entered July 29, 2009 and thereafter which reference and attach the Appendix.

### I. CHILD SUPPORT

A. Unless otherwise provided in the attached order, child support shall be paid in equal installments each pay period by automatic wage withholding through the Bureau for Child Support Enforcement (BCSE). The support obligor and/or the obligor's employer shall forward all current support payments and payments on any arrearage to the BCSE at PO Box 247, Charleston, WV 25321, identified by the names and social security numbers of the parties.

B. If the attached order does not require automatic wage withholding, such withholding will commence as provided in the foregoing paragraph without further action of this Court if support payments fall more than thirty (30) days in arrears, or if the custodial party begins to receive Temporary Assistance for Needy Families (TANF) or Medicaid for the child or children for whom child support is being paid, or if either party requests at any time after entry of the support order that wage withholding commence by filing an application for services with the BCSE.

C. Absent further order of this Court, the obligation to pay support shall continue on a year-round basis through periods of visitation and during any interims or gaps in employment, and shall continue beyond the date when the youngest child of the parties reaches the age of eighteen (18) years, so long as such child is unmarried, residing with a parent, and is enrolled as a full-time student in high school or an equivalent vocational education program and making substantial progress towards a diploma. Absent further order of this Court, such payments may not extend past the date that the youngest child of the parties reaches the age of twenty (20). After the youngest child of the parties reaches the age of eighteen (18), and any of the other foregoing conditions ceases to be true, child support shall terminate automatically.

### II. MEDICAL SUPPORT

A. A party required to provide medical insurance coverage shall, within thirty (30) days of the entry of the attached order, provide to the other party, if not already provided, written proof that insurance has been obtained or an application for insurance has been made. Such proof of insurance coverage shall consist of the name of the insurer, the policy number, an insurance card, the address to mail claims to, a description of any restrictions on usage such as prior approval for hospital admission, and the manner in which to obtain such approval, a description of all deductibles, and five (5) copies of claim forms.

B. Uninsured medical costs for each minor child of the parties shall be allocated between the parties as provided in the attached order. A party requesting payment or reimbursement from the other party for uninsured medical costs shall provide the other party with written receipts or other documentation of the costs incurred. Upon receipt of documentation of uninsured medical costs, a party shall make payment or reimbursement forthwith but in no event later than thirty (30) days from receipt of the documentation of the uninsured medical costs.

C. Uninsured medical costs shall include, but not be limited to, insurance co-payments and deductibles, reasonable and necessary uninsured costs related to medical, dental, optical, psychological, psychiatric, orthodontia, asthma treatments, physical therapy, vision therapy and eye care, any chronic health problem, or other healthcare services. Premiums paid to maintain medical insurance shall not be considered "uninsured medical costs" under this paragraph.

D. Each party, within ten (10) days of any change in availability, coverage, or cost of any medical insurance programs covering or which might cover one or more children of the parties, shall provide the other party with complete information about such change in writing. If support is paid through the BCSE, this information shall also be provided in writing to the local BCSE Office. This duty to inform shall continue until there is no child of the parties eligible for support and no support obligation is due and owing to either party.

E. The duty to provide medical support for a child shall continue so long as the child is eligible to receive child support.

### III. DEPENDENCY EXEMPTIONS AND EXCHANGE OF INCOME INFORMATION

A. The dependency exemption for each minor child of the parties shall be allocated as provided in the attached order. If the party entitled in a given year to the dependency exemption for a minor child of the parties derives no tax savings or other financial benefit from the use of the dependency exemption, then the other party will be entitled to use the dependency exemption. Any tax savings or other financial benefit related to the use of the dependency exemption by the other party will be disclosed to and shared equally with the parent with primary residential custodial responsibility for the child. The party with primary residential custodial responsibility for the child will execute such documents as may be required to enable the other party to use a dependency exemption as provided herein, but only after that other party provides the party with primary residential custodial responsibility with copies of his or her proposed State and Federal tax returns.

B. Each year, the parties shall exchange tax returns and proof of any and all income by February 15th or as soon thereafter as possible. Proof of income shall include copies of all W-2's, 1099's, Federal schedules "C", and any other documentation of income.

C. Each party shall provide the other party with written notice of any change of income or employment, including the name and address of the new employer and the new wage or salary rate, within ten (10) days of any such change. If support is paid through the BCSE, this information shall also be provided, in writing, to the local BCSE Office.

D. This duty to inform shall continue until there is no child of the parties eligible for support and no support obligation is due and owing to either party.

### IV. DUTY TO INFORM THE OTHER PARTY OF CHANGES OF RESIDENCE AND/OR MAILING ADDRESS

A. Each party shall advise the other party, in writing, of any change in residence and/or mailing address within ten (10) days after the change. This information shall also be provided in writing to the local BCSE Office within ten (10) days after the change even if support is not paid through the BCSE. But this requirement does not apply in cases in which a family court has allowed the withholding of identifying information.

B. This duty to inform shall continue until there is no child of the parties eligible for support and no support obligation is due and owing to either party.

C. Service of any future notice of hearing in this action shall be considered legally sufficient if timely mailed to the last address provided by the served party to the serving party.

### V. MODIFICATION OF CHILD SUPPORT

A. The amount of the monthly child support Ordered can be modified as provided by law based upon a change in the financial or other circumstances of the parties if those circumstances are among those considered in the child support formula. In order to make the modification a party must file a motion to modify the child support amount. Unless a motion to modify is filed, the child support amount will continue to be due and cannot later be changed retroactively even though there has been a change of circumstances since the entry of the order. Self help forms for modification can be found at the Circuit Clerk's office or the website of the West Virginia Supreme Court of Appeals (http://www.state.wv.us/wvsca).

### VI. CONTEMPT

A. The failure by one party to perform any obligation imposed herein or by the attached order may give rise to the contempt powers of the Family Court and to such other powers as available to the Court, including the entry of judgment and the imposition of interest at up to the legal rate from the breach of any obligation, and the assessment of reasonable attorney's fees related to the enforcement of such obligation. An adjudication of contempt for failure to pay child support may result in incarceration in the Regional County Jail for up to 6 months.

ENTERED July 29, 2009
ORDER BOOK 1 PAGE 185

JEAN FRIEND, CLERK

DATE: July 29, 2009

Family Judge Randal Minor

IN THE FAMILY COURT OF Monongalia COUNTY, WEST VIRGINIA

IN RE THE CHILDREN OF:

| Petitioner: | Ellen Ballock | Respondent: | Scott Ballock |
|---|---|---|---|
| Civil Action Number: | 12-D-529 | Date: | May 9, 2014 |

### PARENTING PLAN

A parenting plan provides a framework for how decisions affecting children will be made, where children will live, and how children will interact with parents and other family members. Once approved and adopted by a family court judge, a parenting plan becomes a binding court order which must be obeyed. While the parties always may agree to deviate from the parenting plan as circumstances may warrant, absent agreement by <u>both parties</u>, the terms of the parenting plan control.

This parenting plan was prepared by the: ☐ Father   ☐ Mother   ☐ Parties Jointly   ☐ Court   ☐ Other: _____

This parenting plan applies to the following minor child(ren):

| NAME | DATE OF BIRTH | SOCIAL SECURITY NUMBER | PRIMARY RESIDENTIAL CUSTODIAN* |
|---|---|---|---|
| Thomas Scott Ballock | January 22, 2001 | XXX-XX-9456 | Father |
| Summer Scott Ballock | May 1, 2003 | XXX-XX-8253 | Father |

* The primary residential custodian is defined as the person with whom a child will physically resided for at least 6 months (ie. half or more of the time) out of the calendar year. The child will reside with the primary residential custodian except as otherwise provided by this parenting plan.

### DECISION-MAKING AND ACCESS TO INFORMATION

Both parties shall have full access to each child's educational, medical and juvenile court records. Both parties shall have the right to be informed of and participate in all educational, medical and juvenile court activities and decisions involving a child.

The party with whom a child is residing on any given day makes all day-to-day decisions about the care and control of the child.

Either party may make emergency decisions affecting the health or safety of a child at any time, regardless of the party with whom the child is residing at that time. A party will take all reasonable steps to inform the other party of any emergency as soon as possible.

With respect to major decisions involving a child, including decisions related to education, medical, dental, eye and other health care, religious matters, child care, the child's employment, motor vehicle use, school and after school activities, and sports **(check boxes and complete as applicable):**

☐   The parties will consult and share in the making of all major decisions involving a child.

☐   All major decisions will be made by the Father, but he will consult with and inform the Mother regarding all emergency and other significant medical care for the children, and any trips with the children outside the continental United States.

☐   The parties will consult and share in the making of all major decisions involving a child with the exception of the following (check box and indicate who will make the decision):

o   Education _____

o   Medical _____

o   Religious _____

o   Child Care _____

o   Employment _____

o   Vehicle _____

o   School Activities _____

o   Sports _____

o   Other: _____

## RESIDENTIAL SCHEDULES

This section provides how a child listed above will spend time with each party. The primary custodial parent will have custodial responsibility of the child(ren) except as otherwise provided by this parenting plan.

The parties may always agree to some other schedule than provided herein; however, in case of any conflict between the parties the schedule provided herein will control.

The Holiday and Other Special Days Schedule will control over the Summer Vacation and Weekly Residential schedules. The Summer Vacation Schedule will control over the Weekly Residential Schedule.

**Weekly Residential Schedule:**      The Weekly Residential Schedule provides the basic day to day schedule where a child will reside, except as otherwise provided by the Summer or Holiday Schedules.

☐   The Weekly Residential Schedule will be as indicated on Attachment A: Residential Schedule.

☒   None of the schedules provided with Attachment A are appropriate in this case and the following schedule will apply:

> The Mother may spend time with Summer the first Sunday of the month from 10:00 AM to 6:00 PM, and all remaining Sundays but the second Sunday of the month from 12:00 Noon to 4:00 PM. In June and July of 2014, the Mother's 6/15 visit will be exchanged for comparable time on 6/14, and the Mother's 7/6 visit will be exchanged for comparable time on 7/13. The parties are free to exchange other days to accommodate Summer's other activities so long as both agree and the Mother receives comparable make-up time for any days lost.
>
> The Mother may have other supervised visits as contemplated by the children's counselor at her discretion, and the parties will cooperate to facilitate that.
>
> If one or both parties relocate so that weekly visits are no longer practical, then the Mother will have one week with Summer in June, one week in August, and from December 26 to January 1, each year. Unless the parties agree otherwise the June and August visits will be from Friday at 6:00 PM until the next Friday at 6:00 PM. The Mother will notify the Father by no later than May 1 of when she proposes to exercise her June and August visits. In case of conflict between the parties regarding summer vacation plans, the Mother's wishes will control in even numbered years, and the Father's wishes will control in odd numbered years.
>
> Any visits between the Mother and Tommy will be at the child's discretion.

## TRANSPORTATION AND EXCHANGES

The party having custodial responsibility of a child immediately prior to or immediately after any school day or after school activity of the child will be responsible for arranging transportation for the child between the party's home and the school or activity. Such arrangements will be at the responsible party's discretion, and may include letting the child ride a school bus between the school and the party's home if that is an available option.

Otherwise, transportation and exchanges of a child will occur as follows (**check the box and complete as appropriate**):

☐   Transportation is a shared responsibility. The party receiving a child at the beginning of a period of custodial responsibility will do so at the other party's residence.

☒   Transportation is a shared responsibility. The parties will meet and exchange a child as follows:

> The parties will meet and exchange the child at the Pilot Station off the Goshen Road Exit of I-79 or some other point roughly equal distance and time between the parties' respective residences.

☐   The _____ will be solely responsible for providing all transportation for a child to and from the parties' homes.

A party who expects to be late in picking up or dropping off a child must provide as much advance notice to the other party as reasonably possible. Parties will always extend a 30 minute grace period to a party who is late in picking up or dropping off a child. A party who incurs childcare or other costs as a result of the other party being late in picking up or dropping a child off will be reimbursed for such costs by the late party.

A party will return all clothes and other belongings a child had when he or she arrived for a period of custodial responsibility to the other party at the conclusion of the period of custodial responsibility.

## TELEPHONE CONTACT

The party with whom a child is not residing needs to make special efforts to stay in touch with the child. The party with whom a child is residing needs to encourage the child to stay in touch with the other party.

A child may call the party with whom the child is not residing at any reasonable time and as often as the child wishes.

A party with whom a child is not residing may call the child at any reasonable time. If the parties are unable to agree on what would be a reasonable time for the other party to call a child, then no calls are to be made to the child between the hours of 8:00 PM and 8:00 AM. If the parties are unable to agree on what would constitute a reasonable number of successfully completed calls to a child in a 24 hour period, then no more than one (1) call may be made from a party to a child in a 24 hour period.

A party may call the other party at any reasonable time to discuss a child. If the parties are unable to agree on what would be a reasonable time for one party to call the other party, then no calls are to be made to the other party between the hours of 8:00 PM and 8:00 AM. If the parties are unable to agree on what would constitute a reasonable number of successfully completed calls by one party to the other party in a 24 hour period, then no more than one (1) call may be made from a party to the other party in a 24 hour period.

Neither party may use phone calls to repeatedly harass, threaten or otherwise abuse the other party, or to unreasonably interfere with

the other party's exercise of custodial responsibility.

No party may knowingly refuse to answer or return, or permit a third party to refuse to answer or return, a phone call from the other party to the child or to the party in reference to a child. A party who is made aware the other party is trying to reach a child by phone, will take all reasonable steps to ensure the child returns the phone call as soon as reasonably possible.

Long distance calls from the child to a party with whom the child is not residing will be paid for by the party with whom the child is residing at the time of the call.

Long distance calls from the party with whom a child is not residing to the child will be paid for by the party making the call.

## COMMUNICATION

Separated parties need to regularly communicate with each other to provide the best possible care for a minor child of the parties and to reduce the stress of the parties' separation on the child.

A party will never speak poorly or allow anyone else to speak poorly of the other party in the child's presence.

A party will never discuss litigation between the parties or the parties' financial matters in the child's presence.

## CHILDREN'S ACTIVITIES

A party will not schedule activities for a child during the other party's scheduled parenting time, unless the party with the parenting time agrees in advance.

The parties will cooperate to the extent reasonably possible to enable a child to participate in school, sports, and other scheduled activities so long as such activities do not unduly interfere with a party's exercise of custodial responsibility.

The parties will take all reasonable steps to ensure that both parties have timely advance notice of a child's school, sports, and other scheduled activities.

## CHANGES IN CUSTODIAL ARRANGEMENTS

If one party requests a non-emergency change in custodial arrangements, the party receiving the request will decide whether to permit the change.

If a change in custodial arrangements is required because of an emergency, the party with custodial responsibility at the time of the emergency does not require advance agreement of the other party to make the change but must notify the other party of the emergency as soon as possible.

A party receiving a request for a change will never use a request for a change as a bargaining chip, or as a way to punish the party making the request.

A party making a request for a non-emergency change will make the request as soon as reasonably possible. A party receiving a request for a change will respond to the request as soon as reasonably possible.

A party making a change without request and agreement as provided herein will be responsible for any additional child care or other costs caused by the change.

## SETTLING DISAGREEMENTS

The parties will make all reasonable efforts to resolve disagreements with respect to their child or children informally.

In the event the parties are unable to resolve a dispute informally, either party may file an appropriate motion with the Court seeking resolution of the dispute.

In the event the Court finds that either party has acted unreasonably in addressing any dispute between the parties, including the filing of frivolous litigation, the Court may award the other party his or her costs associated with resolving the dispute, including reasonable attorney fees.

## RELOCATION OF EITHER PARTY

A party who has custodial responsibility under a parenting plan or court order who intends to change his or her residence for more than ninety days must give a minimum of **sixty (60) days advance notice**, or the most notice practicable under the circumstances, to the other party. Notice shall include the relocation date, the address of the intended new residence, the specific reasons for the proposed relocation, a proposal for how custodial responsibility should be modified in light of the intended move, and information for the other party as to how he or she may respond to the proposed relocation or modification of custodial responsibility.

## DUTY TO INFORM THE OTHER PARTY OF RESIDENCE, MAILING ADDRESS, AND PHONE NUMBERS

The parties will always let each other know their current residence addresses, mailing addresses, home, work, cell, and emergency telephone numbers, and will notify each other within 24 hours of any changes in these matters. **But this requirement does not apply in cases in which a family court has allowed the withholding of identifying information.**

This duty to inform shall continue until there is no child of the parties under the age of eighteen (18) years.

Service of any future filing or notice of hearing in this action shall be considered legally sufficient if timely made to the last address provided by the served party to the serving party.

## ENFORCEMENT OF PARENTING PLANS

Once the Family Court accepts and adopts a parenting plan proposed by the parties jointly or individually by one party, the plan becomes a court order. While parties may always agree to alternative arrangements, absent such agreement by **both** parties, the parties must obey all terms and conditions of the parenting plan. A party has no right to violate a parenting plan even if the other party has violated the plan previously.

If, upon a party's complaint, the Court finds the other party intentionally and without good cause violated a provision of the court-ordered parenting plan, it shall enforce the remedy specified in the plan or, if no remedies are specified or they are clearly inadequate, it shall find the plan has been violated and order an appropriate remedy.

If a party interferes with the other party's right to exercise custodial responsibility for a child, the Court can order make-up time to compensate for time missed with the child.

If a party misses planned time with a child or causes the other party to miss time with a child, the Court can award monetary compensation for the missed time, and/or award child care costs

and other expenses in connection with the missed time.

If a party violates the parenting plan, the Court can modify the plan in favor of the party who did not violate the plan. The Court can change custodial responsibility to favor the non-violating party, or the Court can grant exclusive custodial responsibility to the non-violating party.

The Court can order a party violating the plan to submit to counseling.

The Court can order a party violating the plan to pay a civil penalty up to $100.00 for a first violation, up to 500.00 for a second violation, or up to $1000.00 for a third or subsequent violation.

The Court can order a party violating the parenting plan to pay the other party's court costs, attorney's fees, and any other expenses that the party incurred to enforce the parenting plan.

## CONTEMPT

The failure by one party to perform any obligation imposed herein or by the attached order may give rise to the contempt powers of the Family Court and to such other powers as available to the Court, including the entry of judgment and the imposition of interest at up to the legal rate from the breach of any obligation, and the assessment of reasonable attorney's fees related to the enforcement of such obligation.

## RESTRICTIONS

The Family Court can restrict a parent's interaction with a child if that parent has engaged in past conduct harmful to children. Such conduct can include: abuse or neglect of a child; sexual abuse of a child; domestic violence; repeated interference with the other parent's access to a child; and repeated false allegations of domestic violence, abuse or neglect of a child by the other parent. Restrictions may also be necessary if a child is very young and/or a parent has had limited contact with the child in the past. If restrictions are necessary in this case, a separate sheet is attached for purposes of choosing what restrictions are appropriate in this case.

☐  Restrictions related to one or both parties' exercise of custodial responsibility are appropriate as indicated on Attachment C: Restrictions.

## ADDITIONAL TERMS AND CONDITIONS

The following additional terms and conditions should apply to this parenting plan:

Neither party shall expose a child to any adult sexual behavior between the party and another partner(s).

Neither party shall allow a child to be exposed to any pornographic material, including any videos or other material in which a party appears.

Neither party shall have a child spend the night in the home of the parent's significant other or have the significant other spend the night in the parent's home while the child is present.

Neither party shall engage in any type of communication with or behavior toward the children or in the presence of the children that provides them with information about

this litigation or related matters, including but not limited to, the parties' sexual activities. The parties shall also prohibit any third party from engaging in these communications or behaviors with the children.

Each party shall take all reasonable steps to avoid exposing the children in any way to a registered sex offender. Further, the children shall not be within 200 feet of Karl Vincent Taylor, a known sex offender, nor shall they have any contact whatsoever with him.

Neither parent shall encourage a child to conceal information or lie to the other parent. Neither parent shall question a child with the intent of obtaining information about the other party.

Should any violation of the parenting plan arise during a period of visitation the parent has an obligation to notify the other parent of the occurrence.

Neither party shall leave a child unattended during the late evening or the night.

One or both children will continue in counseling until the counselor deems that no longer necessary. If the Father relocates he will arrange for the children to begin counseling as soon as possible in his new location, as contemplated by this parenting plan.

Communication between the parties will be limited to matters involving the children, and such communication will be by text or email.

Neither party will discuss or otherwise mention the other party on any social media or otherwise on the Internet, nor will they encourage any third party to do so.

Each party will notify the other party of any emergency medical issues involving the children as soon as reasonably possible.

**PLEASE SIGN BELOW BEFORE A NOTARY PUBLIC.**

_____          _____
Ellen Ballock                                                          Date


_____          _____
Scott Ballock                                                          Date



State of West Virginia

County of _____

   This Parenting Plan was affirmed before me by one or both parents as evidenced by the foregoing signature(s) on

_____.


                                                    _____
                                                    Notary Public

My commission expires _____.


+--------------------------------------+
| For the Court's Use:                 |
|                                      |
| ____  Accepted as Proposed           |
|                                      |
| ____  Accepted as Modified           |
|                                      |
| ____  Not Accepted                   |
+--------------------------------------+


                              DATE:      May 9, 2014

                              Family Judge Randal Minor

May 9. 2014

CS— Custody as per Judge's order — Nonappeal
~~JOLTA~~ to ~~ETI~~ Ellen less personal/gal fee
QDRO TSP + FERS   (R.T does orders)
Each keep all assets in his name / her name now
Sherianne SS + so does her
Pictures of children + Journals/Kids by June 15  R.t. will get them
They file Qt Return — Discord to R.T & he send back — SB Reps
all refund

Mutual No Contact order
She is not to communicate with SB's Employer FBI, ever
He ~~sir~~ is not to contact/communicate EB's employer, ever, percent-o-future
Email + Text only as to/kids
         Nothing will be posted on the internet by SB or TB
JRB
05/09/14
EB
05/09/14        Jan = Balbo
                05/09/2014
                                                        counsel for Ellen Ballock

        Ellen M Ballock
        05/09/2014                          Gregory B. Pool  counsel for
                                               Scott Ballock

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

SCOTT THOMAS BALLOCK,

          PETITIONER,

V.

                              PETITION No. ___16-P-233___
                              Case No.: 13-M31M-06739
                              Bond Id.: 13-PR31-1122
                              Case No.: 13-M31M-06741
                              Bond Id.: 13-PR31-1121

STATE OF WEST VIRGINIA,

          RESPONDENT.

## AGREED EXPUNGEMENT ORDER

    On this day came the State of West Virginia by Gabrielle E. Mucciola, Prosecuting Attorney, and came Petitioner, by counsel, J. Michael Benninger, and presented to the Court, Petitioner's *PETITION FOR EXPUNGEMENT OF CRIMINAL RECORD*, filed pursuant to *West Virginia Code* § 61-11-25. Upon a review of the Petition, the Court finds, and the parties agree and stipulate, that the facts in this case are not in dispute and that the only issues are of a legal nature.

    The Court **FINDS** the following:

1.    On or about September 13, 2013, Petitioner was arrested and charged with one count of stalking; harassment; penalties; and definitions, allegedly in violation of *West Virginia Code* § 61-02-09A(a).

Exhibit 2

2.  On or about September 13, 2013, Petitioner was arrested and charged with one count of unwanted communications by computer, allegedly in violation of *West Virginia Code* § 61-03C-14a(a)(2).

3.  Criminal complaints were filed in Monongalia County Magistrate Court by Corporal R. M. Gaskins, of the West Virginia State Police, Morgantown Detachment, on September 12, 2013, and assigned the following case numbers: **13-M31M-06739** and **13-M31M-06741**.

4.  Magistrate Mullins signed the CRIMINAL JUDGMENT ORDER on April 13, 2016, dismissing Petitioner's charges of one count – stalking; harassment; penalties; definitions, and one count – unwanted communications by computer, in violation of *West Virginia Code* §§ 61-02-09A(a) and 61-03C-14a(a)(2), in the following case numbers: **13-M31M-06739** and **13-M31M-06741**, Bond Id. Numbers: **13-PR31-1121** and **13-PR31-1122**.

5.  Petitioner has not been previously convicted of any felony offense.

6.  There are no current charges or proceedings pending in any Court concerning the matters for which Petitioner is seeking Expungement.

7.  There is no evidence contained in the record to indicate that the State initiated further proceedings against

2

Petitioner    concerning    the    charge    for    which    this
Expungement is sought.

8.    This Expungement Petition has been filed at least sixty
(60 days since the disposition of the aforementioned
criminal charges.)

Based on the above findings, the Court finds that this is
an appropriate case for the Expungement of records under *West
Virginia Code* § 61-11-25, and is of the opinion to grant the
relief requested herein.

It is therefore, **ORDERED** that:

1.    All records relating to the arrest, charges or other
matters arising out of the arrest or charges of
Petitioner, Scott Thomas Ballock, Date of Birth:
September 3, 1968, Social Security No.: XXX-XX-4494,
for the charges of one count - stalking; harassment;
penalties; definitions, and one count - unwanted
communications by computer, allegedly in violation of
*West Virginia Code* §§ 61-02-09A(a) and 61-03C-
14a(a)(2), Magistrate Court Case Numbers **13-M31M-06739**
and **13-M31M-06741**, Bond Id. Numbers. **13-PR31-1121** and
**13-PR31-1122** shall be **EXPUNGED**.

2.    The term "records" as used in this Order includes, but
is not limited to, arrest records, fingerprints,
photographs, index references or other data whether in

3

documentary or electronic form, relating to the arrest, charge or other matters arising out of the arrest or charges.

3. Expungement of the records in satisfaction of this Order is accomplished when:

   a. All records in custody of the Court and/or Clerk of the Court are sealed, and

   b. All records in the custody of any other agency or official, including law enforcement records, are **EXPUNGED**, meaning, destroyed. However, records maintained by the West Virginia Division of Motor Vehicles are not subject to Expungement or destruction.

4. Every agency with records relating to the arrest, charges or other matters arising out of the arrest or charges that are herein ordered to **EXPUNGE** records, shall certify to this Court, within sixty (60) days of the entry of this *AGREED EXPUNGEMENT ORDER,* that the required Expungement has been completed. Certification shall be complete upon filing the same with the office of the Circuit Clerk.

5. The Clerk of this Court shall seal this Order of Expungement.

4

6.   Upon Expungement, the proceedings in this matter shall be deemed to never have occurred. All courts and other agencies, except the Division of Motor Vehicles, shall reply to any inquiry that no record exists on the matter.

7.   The Petitioner shall not have to disclose the fact of the record or any matter relating thereto on an application for employment, credit or other type of application.

8.   Inspection of the sealed records in the Court's possession may be permitted only by Order of this Court under the circumstances prescribed in *West Virginia Code* § 61-11-25(f).

The Clerk of this Court shall provide a copy of this Order via fax and U.S. Mail to the following:

A. Monongalia County Prosecutor's Office, 243 High Street, Room 323, Morgantown, WV 26505 (F)-(304) 291-7250;

B. Clerk of the Magistrate Court of City of Morgantown, 75 High Street, Suite 22, Morgantown, WV 26505 (F)-(304) 291-7213;

C. Counsel for Petitioner at Benninger Law, P.O. Box 623, Morgantown, WV 26505 (F)-(304)241-1857;

5

D. Petitioner, 51 Summit Overlook Drive, Morgantown, Monongalia County, West Virginia 26508. (U.S. Mail only); and

E. Superintendent, West Virginia State Police, 725 Jefferson Road, Charleston, WV 26309 (F)-(304)746-2246;

ENTER: *July 13, 2016*

*Susan B. Tucker*

JUDGE

Prepared by:

J. Michael Benninger
WV Bar # 312
Benninger Law PROFESSIONAL LIMITED LIABILITY COMPANY
P. O. Box 623
Morgantown, WV 26507
(304) 241-1856
mike@benningerlaw.com

*Counsel for Petitioner*

Approved by:

*Marcia Ashdown*

Marcia L. Ashdown, P.A.
WV Bar # 174
Monongalia County Prosecutor's Office
243 High Street, Room 323
Morgantown, WV 26505
(304) 291-7250

*Prosecuting Attorney for State of West Virginia*

STATE OF WEST VIRGINIA, SS:

I, Jean Friend, Clerk of the Circuit/Family Court of Monongalia County State aforesaid do hereby certify the attached ORDER is a true copy of the original Order made and entered by said Court.

Jean _____ Circuit Clerk

ENTERED: July 13, 2016
DOCKET LINE ___ ___, Jean Friend, Clerk

Case 1:17-cv-00099-IMK-MJA Document 117-1 Filed 07/09/19 Page 21 of 38 PageID #: 2698

IN THE MAGISTRATE COURT OF _____ COUNTY, WEST VIRGINIA

## STATE OF WEST VIRGINIA

v.

*Scott Ballock*

Case No. *13-M31M-06741*
*13-M31M-6739*

## MOTION

The
- ☐ Plaintiff
- ☐ Defendant
- ☒ State of West Virginia

in the above-styled case hereby moves or requests that this court:

- ☐ remove this case to circuit court (*if civil*)
- ☐ continue the case from the currently scheduled date of _____
- ☐ other (*specify*): *to dismiss charges with prejudice.*

This motion is based upon the following grounds: *The State and the defendant have entered into an agreement for dismissal w/ prejudice of the charges, pursuant to conditions and understandings as set forth in the attachment, which has been signed by the Prosecuting Attorney, counsel for the defendant, the defendant and the complaining witness.*

*Marcia Ashdown, Prosecuting Attorney*                *April 7, 2016*

Signature of party filing motion/attorney for the party prosecutor          Date

**NOTICE TO PARTY FILING MOTION:** One copy of this motion must be filed with the court and one copy must be mailed or delivered by hand to the attorneys for all other parties or to the parties themselves if they are not represented by attorneys.

## CERTIFICATE OF SERVICE

I, *Marcia Ashdown* _____, hereby certify that I have served a copy of the above motion on the attorneys for all parties or, if such parties are not represented by attorneys, to the parties themselves on the _*7th*_ day of _*April, 2016*_, ☒ by hand ☐ by first-class mail to:

Name and address of attorneys or parties served:

*J. Michael Benninger*          *Marcia Ashdown*          *April 7, 2016*

                                    Signature                    Date

**NOTICE TO PARTY RECEIVING MOTION:** Contact the magistrate court to see whether the requested action has been granted, denied or set for hearing.

## RULING

As a result of the hearing on _____, the motion is

- ☐ Denied
- ☒ Granted as requested
- ☐ Granted in the following manner: _____

_*4-7-16*_                    *Hershel L. Mullen*
Date                                              Magistrate

W. Va. Code § 50-4-8; Mag. Civ. Rules 8, 9, 12; Mag. Crim. Rules 12, 13

Exhibit 3

WHITE - Court file
GREEN - Opposing counsel or party

## ATTACHMENT TO MOTION TO DISMISS WITH PREJUDICE

To effectuate the resolution of Case No. 13-M31M-06741, State v. Scott Ballock, by dismissal of the charges the defendant and the complainant mutually agree as follows:

1. Scott Ballock acknowledges that probable cause existed for West Virginia State Police to file for the issuance of the warrants in this case pursuant to W.Va. Code §61-3C-14a and §61-2-9a.

2. Scott Ballock acknowledges communicating via email with Ellen (Ballock) Costlow after it is alleged that a letter was sent to him asking him to stop such communications to Ellen Costlow.

3. Scott Ballock agrees to cease, and to not initiate or reinitiate, if applicable, efforts to affect Ellen Costlow's personal reputation, employment, professional status or workplace relationships, and he agrees to discourage any other person purporting to act on his behalf to similarly cease, or not reinitiate any disparagement of Ellen Costlow on social media or other platforms of public communications. Scott Ballock also agrees to assist in removing any remaining remnants of disparaging social media postings by taking reasonable steps within his control to remove these postings, links or other social media communications.

4. Ellen Costlow agrees that she will not communicate any disparaging information or commentary to Scott Ballock's employer or place of employment, or on social media or any other platforms of public communications.

5. Scott Ballock and Ellen Costlow agree that the Family Court, in which they were engaged in litigation when the communications giving rise to the misdemeanor charges in this case occurred, will retain jurisdiction over any lawful matters involving family issues that may

arise between the parties in the future.  Scott Ballock, who has sole custody of the children, agrees to inform Ellen Costlow by email of any changes of the children's address.

6. Scott Ballock agrees not to contact Ellen Costlow by any means or for any reason other than to notify her by email of hospitalization of either child, or regarding either child traveling outside of the country.


_____  04/07/2016        _____
Scott Ballock, Defendant                    Ellen Costlow, Complainant

_____  4/7/16             _____
Counsel for Defendant                       Prosecuting Attorney's Office

| ID | Type/Sender | Recipient | Message | Hash | Timestamp |
|---|---|---|---|---|---|
| 6523 | iMessage:+13042827230 | +16812129511 Ellen Ballock | You used to want to make me smile. | 41395.61333 | 5/1/2013 2:43:12 PM(UTC+0) |
| 6524 | iMessage:+13042827230 | +13042827230 | 202E72CC-D6B8-414 | 41395.61333 | 5/1/2013 2:43:12 PM(UTC+0) |
| 3402 | iMessage:+13042827230 | +16812129511 Ellen Ballock | That will help. | 41395.61664 | 5/1/2013 2:47:58 PM(UTC+0) |
| 3403 | iMessage:+13042827230 | +13042827230 | He respd(U-◆ )U | 41395.61664 | 5/1/2013 2:47:58 PM(UTC+0) |
| 3401 | iMessage:+13042827230 | +13042827230 | That days u meet fir dinner and fucked | 41395.6175 | 5/1/2013 2:49:12 PM(UTC+0) |
| 6517 | iMessage:+13042827230 | +13042827230 | Read what I sent u | 41395.61759 | 5/1/2013 2:49:20 PM(UTC+0) |
| 6516 | iMessage:+13042827230 | +16812129511 Ellen Ballock | Must be Scott responding to make me look bad. | 41395.61772 | 5/1/2013 2:49:31 PM(UTC+0) |
| 6515 | iMessage:+13042827230 | +16812129511 Ellen Ballock | I'm very hated aren't I? I have the upper hand with possible ruining Acotts career so they're going all out. | 41395.61907 | 5/1/2013 2:51:28 PM(UTC+0) |
| 6514 | iMessage:+13042827230 | +13042827230 | Yep | 41395.62027 | 5/1/2013 2:53:11 PM(UTC+0) |
| 6511 | iMessage:+13042827230 | +16812129511 Ellen Ballock | I haven't looked at what you sent yet. I'm doing 90 | 41395.62041 | 5/1/2013 2:53:23 PM(UTC+0) |
| 6513 | iMessage:+13042827230 | +13042827230 | I left hmw without money. Had to use my stash cash from my cell◆1(Us◆P)U  E1A1722F-4C12-4 | 41395.62041 | 5/1/2013 2:53:23 PM(UTC+0) |
| 6512 | iMessage:+13042827230 | +16812129511 Ellen Ballock | I'll look in about 5 minutes. | 41395.62071 | 5/1/2013 2:53:49 PM(UTC+0) |
| 3616 | iMessage:+13042827230 | +16812129511 Ellen Ballock | I can't get into email. | 41395.13299 | 5/1/2013 3:11:30 AM(UTC+0) |
| 3617 | iMessage:+13042827230 | +13042827230 | I thought you changed it. | 41395.13309 | 5/1/2013 3:11:39 AM(UTC+0) |
| 4318 | iMessage:+13042827230 | +13042827230 | Read texts | 41395.63471 | 5/1/2013 3:13:59 PM(UTC+0) |
| 3400 | iMessage:+13042827230 | +13042827230 | Yep | 41395.63889 | 5/1/2013 3:20:00 PM(UTC+0) |
| 3437 | iMessage:+13042827230 | +13042827230 | Ok | 41395.15478 | 5/1/2013 3:42:53 AM(UTC+0) |
| 3438 | iMessage:+13042827230 | | U◆NJU   37B6FDFD-C2C5-447B-A677-B | 41395.15478 | 5/1/2013 3:42:53 AM(UTC+0) |
| 3435 | iMessage:+13042827230 | +16812129511 Ellen Ballock | You need to clean up that mouse poop before it makes you sick. | 41395.15848 | 5/1/2013 3:48:13 AM(UTC+0) |
| 3436 | iMessage:+13042827230 | +13046984941 | 7B235DAF-D9F3-4D85-A70D-0FC24CACO0CCOYou need to cle | 41395.15848 | 5/1/2013 3:48:13 AM(UTC+0) |

Exhibit 4

| ID | From | Message | Value | Timestamp |
|---|---|---|---|---|
| 3434 | iMessage: +16812129511 Ellen Ballock / iMessage: +13042827230 | And wash the dishes so you don't get gnats and drain flies. | 41395.15852 | 5/1/2013 3:48:16 AM(UTC+0) |
| 1061 | iMessage: +16812129511 Ellen Ballock / iMessage: +13042827230 | What is it please? | 41395.16296 | 5/1/2013 3:54:40 AM(UTC+0) |
| 1062 | iMessage: +13042827230 | Pok | 41395.16659 | 5/1/2013 3:59:53 AM(UTC+0) |
| 1063 | iMessage: +13042827230 | Ok | 41395.16661 | 5/1/2013 3:59:55 AM(UTC+0) |
| 201 | iMessage: +16812129511 Ellen Ballock / iMessage: +13042827230 | I'm going to move forward filing harassment charges against Scott. | 41395.67081 | 5/1/2013 4:05:58 PM(UTC+0) |
| 1057 | iMessage: +16812129511 Ellen Ballock / iMessage: +13042827230 | Tell me the password | 41395.17185 | 5/1/2013 4:07:28 AM(UTC+0) |
| 1058 | iMessage: +13042827230 | Ok | 41395.17196 | 5/1/2013 4:07:37 AM(UTC+0) |
| 1060 | iMessage: +13042033089 | 49A8F04F-B3AF-4EF1-BDAD-D8470DC4BA2D | 41395.17196 | 5/1/2013 4:07:37 AM(UTC+0) |
| 1059 | iMessage: +13042827230 | Ok | 41395.17201 | 5/1/2013 4:07:42 AM(UTC+0) |
| 1543 | iMessage: +16812129511 Ellen Ballock / iMessage: +13042827230 | You want food delivered to you around 2:00? | 41395.67547 | 5/1/2013 4:12:41 PM(UTC+0) |
| 4139 | iMessage: +16812129511 Ellen Ballock / iMessage: +13042827230 | Me, silly | 41395.67556 | 5/1/2013 4:12:48 PM(UTC+0) |
| 1542 | iMessage: +13042827230 | By who lol | 41395.67598 | 5/1/2013 4:13:25 PM(UTC+0) |
| 3431 | iMessage: +16812129511 Ellen Ballock / iMessage: +13042827230 | You have nothing more I ever want b | 41395.17616 | 5/1/2013 4:13:40 AM(UTC+0) |
| 3432 | iMessage: +13042827230 | ThTs the problem my dick was never as good as everyone else's from wv that u called� ((US | 41395.17616 | 5/1/2013 4:13:40 AM(UTC+0) |
| 3433 | iMessage: +13042827230 | E7594E9C-BB8C-4E2F-A4A4 | 41395.17616 | 5/1/2013 4:13:40 AM(UTC+0) |
| 3430 | iMessage: +13042827230 | Ok | 41395.17618 | 5/1/2013 4:13:42 AM(UTC+0) |
| 4138 | iMessage: +13042827230 | Lol | 41395.6769 | 5/1/2013 4:14:44 PM(UTC+0) |
| 4137 | iMessage: +13042827230 | Ok then | 41395.67692 | 5/1/2013 4:14:46 PM(UTC+0) |
| 6563 | iMessage: +13042827230 | Ok | 41395.17811 | 5/1/2013 4:16:29 AM(UTC+0) |
| 6562 | iMessage: +13042827230 | What u tell summer | 41395.17887 | 5/1/2013 4:17:34 AM(UTC+0) |

Page 1 of 1

| | |
|---|---|
| **From:** | Ellen Ballock <ellenballock@yahoo.com> |
| **To:** | Sgt Michael Kief <michael.a.kief@wvsp.gov> |
| **Date:** | 08/11/2014 05:18 PM |
| **Subject:** | Libel |

At what point are Tom Ballock's actions unlawful?  What about libel?

Every day and all night long he updates his website. He knows I'm watching it because I'm worried more naked photos are going to be posted. What woman wouldn't watch a website that held that potential? Judge Minor chastised Scott for his father's behaviors and said he'd be detained if anything from the GAL or forensic psychiatrists report ever were published, but that is all.

I signed an agreement to not contact the FBI just as Scott agreed to not contact my current or future employers or to let his dad post about me on the internet. Unfortunately, I don't know what else to do but contact Scott's superiors at this point. I don't want to be held in contempt of court, but I don't like what's happening to my reputation. Scott knows what his dad is doing and has known since Dec 2012. He and his dad have lived under the same roof since Dec 2012. I even have proof of a bill Tom Ballock pays for one of the websites and it's addressed to him at 51 Summit Overlook Drive in Morgantown. I wonder what evil plans Tom Ballock has ready to go online if things don't go Scott's way in court when the criminal trial happens..... There will be more damaging information and photos and videos posted.  It's just a matter of time.

This is certainly behavior unbecoming of a Supervisory Special Agent for the FBI.

~Ellen

*Exhibit 5*

**Troopers 00524**

Page 2 of 3

On Mar 7, 2016, at 9:09 AM, Kief Michael A <michael.a.kief@wvsp.gov> wrote:

That is great news!! I'm sure he has tucked his tail between his legs and was humiliated.  The next target for Scott and Tom will be Judge Minor, I am sure.  I am so glad he shot Scott down on everything.  One thing, did Scott have his attorney at the hearing or did Scott speak for himself?  Didn't know how that went down.

-----Original Message-----
From: Ellen Costlow <ellencostlow@gmail.com>
To: Gaskins Ronnie M <ronnie.m.gaskins@wvsp.gov>, Sgt Michael Kief <michael.a.kief@wvsp.gov>
Date: Fri, 4 Mar 2016 15:26:06 -0500
Subject: 3-4-16 update

Good afternoon.  All went well for me today at the hearing. I really like Gabriel. She's on top of this case and was well prepared today when she met me in Family Court.

Judge Minor was going to allow divorce documents to be unsealed until he listen to my reasons for leaving them sealed, Scott's reasons to use the documents against me to help himself, and most of all after he listened to Gabriel's legal facts and professional opinion. She read the codes of law Scott was charged with breaking, then addressed both Judge Minor and Scott about the charges against Scott in more plain terms. Judge Minor agreed with Gabriel the documents are not relevant to the criminal case.  He also agreed the documents should not be out there in the public domain. He said all documents are to remain sealed to preserve my privacy.  Scott hated hearing that and spoke up about his civil right to due process.  Judge Minor told Scott he could file motions in civil court or magistrate court to see if those judges will allow them to be unsealed.

The criminal case is to be heard in Magistrate Court sometime at the end of this month, but could now be postponed if motions are filed elsewhere for divorce documents to be unsealed.

When Scott became an FBI agent 13 years ago, he let it define him. Now he doesn't know what to do as he sees being charged with these crimes will cost him his title. He's feeling wronged and humiliated and continues to say he was only trying to help me by sending all the letters and texts, that I was just out to take his job from him, and that I was having an affair with a State Police Officer to get favors like having him arrested.
I think Scott has lied to himself so much he now believes himself. In his mind he thinks no one would ever help me unless sex is

**Troopers 00623**

Exhibit 6

involved. He's sick. He sees no value in me what-so-ever as a human being because I serve no purpose for him now.

I will be watching myself as I go about my daily life.  I know I say this from time to time, but I am still concerned Scott or Tom will physically come after me as a way to seek final control over me.

Also, Scott took court time to tell Judge Minor I'm a danger to children and the parents at my school should be told. Judge Minor told Scott he disagrees that I'm a danger and added that Dr. Cooper-Lehki has a burden to reveal findings (or something like that) just like he does if she believes I am a danger.  Scott quickly said she can't alert parents if the divorce documents remain unsealed. Judge Minor was not concerned about that in the slightest and shook his head in disgust toward Scott.  So who knows what angle Scott will come up with next to try to rob me of earning a living.

Scott and Tom just can't seem to resign themselves to being happy having my kids full-time and the big house, because they haven't yet managed to destroy my life. Remember Tom's quote at the end of one of his websites?  "While seeking revenge, dig two graves - one for yourself." I pray he never means that literally.

Sincerely,
Ellen Costlow

Troopers 00624

**From:**   Ellen Costlow <ellencostlow@gmail.com>
**To:**   Sgt Michael Kief <michael.a.kief@wvsp.gov>,Gaskins Ronnie M <ronnie.m.gaskins@wvsp.gov>
**Date:**   04/14/2016 02:50 AM
**Subject:** The past....

I didn't know where to begin when asked if there is anything really important I'd like you to be sure to share at your 10am meeting. I think the sheer number of emails and texts from Scott showing his calculated and cruel threats followed by his wanting to invent a "time-machine" to go back in time to reunite, followed by more threats that things are going to get worse, then invitations to go to Alexandria and Washington, D.C., which when turned down resulted in more vile actions to cause harm to me.....all of which span over the course of nearly 10 months (Sept/Oct 2012-July/August 2013) is the most important to share.
But, I know you will share all of that along with the facts that concerned you the most. Your ability to decipher and explain what happened during my marriage and divorce and to reveal patterns of behavior will be extremely helpful.

....but since you asked....
Scott told me in the Spring of 2012 his idea of retiring at 50 was to spend his days enjoying watching (secretly videotaping) me with a different man every day of the week.  So I vowed to myself the next time he walked out it would be the last. I wasn't sure I could make it on my own, but I knew I wouldn't survive being married to him. That need of his coupled with his physical fits of shoving and throwing objects at me was too much and to think it would be ramped up at age 50 was unbearable.

Scott walked out on me nearly every month when we lived in Ann Arbor from 2006-2011. It was his way to control me. He would say he was spending the night at his office and would follow me and the kids around town before returning home to us. While living in Ann Arbor he also pretended to be someone else and wrote on an email account he later commandeered to use against me in our divorce.  You know all about that....

The craigslist ad perusing was done by Scott and he would write men as if he were me and set up "play" times. Then he'd write those men again to try to get them to return or cut me down (you're fat, ugly, saggy bag if wrinkles, not good enough in bed) if the men didn't return for more.  Sometimes he'd email me the ad and tell me to write the men. I believe I provided some of those sent from his email address to mine. Thus Scott's "I'll make you look like the biggest whore" text threat in October 2012 was very real to me, and that's exactly what he proceeded to do on his own and through the help of his father. He is a cruel, cruel man who never truly loved me, rather he just used me.

**Troopers 00669**

Exhibit 7

Scott walked out on me twice in WV. The first time was Dec 2011. The second was Sept 2012. At that point I locked the door and never let him back into my life. I even changed the locks on the house.

I felt horribly blackmailed by Scott throughout my divorce.  The number of texts and email along with their content was emotionally distressing. He had and still has absolutely no respect for me as the mother of his children. He sees no need for me in their lives even though my son is 15 and my daughter is turning 13 next month.

Oh, before I forget, the sex acts Scott wanted done for him were what I wanted to escape from most of all.  If you need evidence of his voice on audio after a "taping session," I think I can produce that. I really don't want to have to find it, but I have kept it only in the event he decides to say I'm lying.

Also, I'd like it known that Scott purposely involved his father from the start of our separation full-well knowing how vindictive and vicious his father can be on the Internet to businesses he's disgruntled with. As a result, Scott deliberately shared with his Dad everything that was said in Family Court all along the way to include personal details, such as where I attend church and what medicines I take. I can prove that evidence as well if needed. Scott shared many lies with his dad, twisted truths, and placed blamed on me for things he'd done. Together the two of them kept the waters muddied to the point no one knew who to believe. They played the judge, attorneys, children's counselor, forensic psychologist, and many other people to their advantage by presenting me as a person with borderline personality disorder. To prove my innocence to anyone was nearly impossible. Scott is cunning and charismatic. I was a frightened mess from all his threats that "it  (the divorce and 'mudslinging') is just going to get worse" texts and emails.

Did Scott abuse his power as an agent?  He certainly used the family court system though he blamed me for that. At every turn he'd set me up to look culpable for wrongdoings I had not done, such as abusing my son or putting the family dog to sleep. The family dog was alive and well. I never ever have hurt my son. Scott harassed me so badly, blamed me for many atrocities he'd done, and got away with it for so long I was convinced no one would ever believe me.  I felt trapped. After all, Scott's threatening words to me throughout our marriage and divorce were "No one will ever believe anything you say. You're a stay-at-home mom and former teacher. I (Scott) am a Special Agent for the FBI."  And you know what? He was right. Even the forensic psychiatrist said in court "Why would he lie?  He's a Special Agent for the FBI."  So as the harassment escalated, he went so far as to tell me me if the FBI questioned me about ammunition or a thumb-drive, I'd have to tell the truth or end up in jail like Martha Stewart. But I had not done anything wrong. (I have that voice

**Troopers 00670**

recording if you need it.)

In the fall of 2012, Scott told me his Special Agent friend Sue Lucas from Ann Arbor was researching the guy I was dating (Kenny) and said he was a "bad guy" meaning a drug dealing criminal. Scott also told me he could get me a job at CJIS then wrote about a half hour later that he'd talked to his supervisor and they couldn't hire me because of Kenny. Is that abuse of power, too, or just plain cruel?

The more Scott realized I wasn't going to reunite with him, the more steps he took to try to ruin me.

I am willing to answer any questions anyone has as long as they respect what I have endured. I have voice recordings of Scott because my first attorney Bader Giggenbach told me to record him, and that is the only reason.

In the present, just as recent as April 13, 2016, it's unbelievably distressing to read what Scott's dad posts on the Internet. It's disturbing to know what great lengths Scott and his Dad have gone in an effort to try to ruin my life.  Scott would like to see me friendless, without family, jobless, homeless, penniless, .... actually, he would like for me to die. (I have that statement on a voice recording, too.)

Please reiterate to whomever you meet with tomorrow I am not who Scott and Tom say I am. I am not vindictive. I'm not mentally ill. I'm a mother, a teacher, a Christian, and stronger than I ever imagined. I'm a survivor and have spent a great deal of time, effort, and money meeting with professionals who have helped me repair the damage to my sense of self-worth and move forward productively in life with as much grace as possible.

I miss my children terribly. Those 5 words can bring on a flood of tears....  I don't want Scott to know how much my heart aches without them as that would give him great satisfaction.  But I have to say he purposely made it impossible to see my children without causing one sort of problem or another. My son grew angry and violent toward me. I chose to suspend visitation with him Dec. 2013 when he slapped my face and said "Freedom of speech, bitch!" over the idea Scott had planted in his mind that I wasn't going to return the family dog. In all actuality, I couldn't get Scott to take the family dog, but he made it look like I was the bad guy. A few months later, he told my daughter (July 2014) that he had a private detective follow the two of us one Saturday when she was with me. We had been together, alone, but he told her we had been with Kenny and he had proof. She knew the truth and couldn't convince him otherwise. She feared somehow it was all meant to harm me. He wouldn't let up and she was beside herself over it the next time I

**Troopers 00671**

saw her. At that point I knew I had to suspend visitation. She was being psychologically damaged and the only one who could stop it was me by suspending visitation.

I want so very much to spend time with my children and share custody, but in essence Scott's behavior and false accusations about me prohibit it. That was his plan.... I believe my daughter is afraid to write me because of Scott. She doesn't respond to my email. My son was angry about the divorce, told to lie that I used to hurt him (that's psychologically damaging), and his confusion turned into anger toward me. My son's hatred of me is fed by Tom and Scott. In the end I want what's best for my kids and I decided they should be raised together and not have to endure the stress of visitation given the way Scott behaves. I just pray every day Scott is good to them and Tom has little influence on them.

I have not slept much since the court hearing. The court document meant nothing to Scott and Tom. They still believe they are justified in action and above the law. The websites are horribly cruel. There is no peace for me, no freedom from uncivil, vindictive retribution, and no end to the madness of it all.

Please do not let anyone be duped into believing Scott didn't know how far his dad would take steps to deliberately try to ruin my reputation. Scott willingly gave his father ammunition and permission to ruin me very early on in our separation. Scott knew exactly what he was doing when he enlisted the help of his dad. He knew how incredibly vicious and "slick" the websites would be.

If you need to know financial information of money I spent flying his mom to visit, hotel rooms from time to time, or how I bought gifts for her to give my children because she didn't have enough money to buy them herself, let me know. The FBI should have all the financial documents from 2003-2012 that reflect exact amounts of money I inherited between 2009-2011 and the purchase price, mortgage, and selling price of each home and car we owned.

Had it not been for your intervention and his arrest, I fear I wouldn't have had the chance to begin to heal and move forward in life. He would have kept writing and texting, throwing his triumphs and my failures in my face, ridiculing and taunting me, threatening me, then asking me to reunite and so on.

I could go on for hours peeling away the layers of lies Scott presented as truths to protect himself and control me. The list of people he contacted to lie on his behalf or to provide personal information about my life apart from him is lengthy. Every way he could think of to hurt me or control me, he did.

All that said, I must have faith that things will end up ok for me.

**Troopers 00672**

*Sometimes God allows us to go through difficult times, even as a result of the wicked actions of others.  Yet whatever we have to endure, no matter how unfair or unjust, we can be sure that God will use it for good.*
Romans 8:28

Sincerely,
Ellen Costlow

**Attachments:**

the servants of the God of your father." And Joseph wept when they spoke to him.

[18]Then his brothers also came and fell down before him and said, "Behold, we are your servants."

[19]But Joseph said to them, "Do not be afraid, for am I in God's place?

[20]"As for you, you meant evil against me, *but* God meant it for good in order to bring about this present result, to preserve many people alive.

## Life Lessons

**50:20 — *"As for you, you meant evil against me, but God meant it for good in order to bring about this present result, to preserve many people alive."***

Sometimes God allows us to go

https://mail.wvsp.gov/WorldClient.dll?Session=N71CQTT010BNH&View=Message&Pri...   2/14/2018

**Troopers 00673**

File: image1.png    Size: 150k    Content Type: image/png

Sometimes God allows us to go through difficult times, even as a result of the wicked actions of others. Yet whatever we have to endure, no matter how unfair or unjust, we can be sure that God will use it for good (Rom. 8:28).

123 hrs 42 mins left in book                               5%

Troopers 00674

Page 1 of 1

| **From:** | Ellen Costlow <ellencostlow@gmail.com> |
| **To:** | First Sgt Michael Kief <michael.a.kief@wvsp.gov>,Gaskins Ronnie M <ronnie.m.gaskins@wvsp.gov> |
| **Date:** | 04/22/2016 01:02 PM |
| **Subject:** | Jim Herman 04-26-16 |

I will be meeting with Jim Herman and (if I heard her name
correctly) Marie Golden who is assisting in the internal
investigation of Scott. I will sit down with them Tuesday the 26th
at 4:30 at the FBI office on Pike Street in Clarksburg.

Mr. Herman told me he had some specific, pointed questions to ask me
and volunteered that he doesn't want to put me through having to
relive everything. I thanked him for that and asked if what I say
will be of public record because of Scott's father posting all he
can on the Internet.

Now that I have time to think about the short conversation with Jim
I see that you both did an excellent job providing what evidence you
had and must have conveyed the emotional distress I feel revisiting
all that happened. Thank you.

Mr. Herman said the outcome of the investigation will not be told to
me unless Scott decides to tell me. That said, I am hopeful Mr.
Herman will at least tell one of you just so I will know one way or
the other. I still have concerns about Tom trying to take my life.
I also have concerns Scott will hire someone to cause bodily harm to
me or kill me.

Let me know your thoughts about any of this, please.

Sincerely,
Ellen Costlow
304-276-4740

**Troopers 00698**

Exhibit 8

Page 1 of 6

| From: | Ellen Costlow <ellencostlow@gmail.com> |
|---|---|
| To: | Kief Michael A <michael.a.kief@wvsp.gov> |
| Date: | 05/12/2016 06:27 PM |
| Subject: | Re: Marcia, Tom, and Barbara Fleischauer |

Tom will not be able to hold back much longer. I'm sure he's consulting with online attorneys and professors from Harvard and Yale about Freedom of Speech violations he believes he's suffered.

...I do believe Scott is in trouble at work and very little has to do with me in the end. Probably, wouldn't you say, that if a Special Agent is a rested it starts an investigation and they go over everything with a fine tooth comb. And he's had to follow rules and instructions for the last almost 3 years. I gave them a lot of information about what I knew that went on in Indianapolis Indiana in Ann Arbor Michigan. They took lots of notes. All of that information I had not supplied to West Virginia state police or my attorneys. I think that's why they wrote down so much.

Interestingly, they asked if I had shared the audio from my recording device with West Virginia State Police or my attorneys. I told him there were a few audios that the police may have and one of my attorneys had listened to a few, but nothing was ever played in court. They asked me if Scott knew he was being recorded.  I told them "no of course he didn't know" and that I had just tell the recorder up to my cell phone as I talk on speakerphone and the only people talking were me and Scott.

After giving it some thought, I do think they're interested in the audio. Is there a way I can get that to someone in the form that it is in now to be opened up and to listen to and submitted? Many of the recordings are disturbing. And Scott confesses to all kinds of abuse and he also spells out what's going up on the Internet. All of the "blackmail" tactic to get me back is there.

Maybe they are just curious. I don't know, what do you think? I told him that I would leave the recorder with them even though it wasn't working properly but I was certain somebody could get it working again. Battery acid seemed to be the culprit after all.

Scott always thought that he was above the law. He never thought that he would get caught doing anything wrong. Honest. He's pretty good about lying his way out of things, too, and getting others to do his dirty work. But I imagine the investigation that has gone on has uncovered many things he cannot lie about or deny.

I really don't aim to write you so much this evening. I'm just clearing my head.

**Troopers 00733**

Exhibit 9

I think I will go home and take a toothbrush and a little bit of maybe baking soda paste to the battery connection of the recorder. If I can get it working, could I give it to you?  Or would Corporal Gaskins want to listen to everything? I thought Matthew Stout had given these audios to everybody, apparently he didn't.

Oh, by the way, I was questioned about Officer Berry. Do you know how much that bothers me that anyone would think I would have an affair with the a police officer for sexual favors or that a WV State Trooper would put his job on the line for a woman?  I told them in no I told them nothing at all happened and it's very hurtful that Scott has his dad write as if I did have an affair on all the websites. I reminded them that the court documents say he's supposed to help take down his dad's websites and they said I'd have to find an attorney for that.  (Of course that's the answer. It doesn't matter that Tom is a lunatic causing me harm because this investigation is larger than "bad behavior" stemming from a divorce).

They did say "Well, at least that's all in the past and you're safe now. " I told them I had escaped the abuse from Scott. But I told him what his father dishes out is still present. I also told them that his father would like to see me dead and has said that much to others in the family.  I stop talking and let them think that over for just a minute. I told them the same thing that I tell you, and my father, and Kenny: if Tom Ballock ever decides to take his own life, he's going to take mine first.

I closed the interview by telling them I am concerned for the affect all of the Internet writing will have on my children. I didn't mention any concern for their welfare should Scott lose his job. That's not my concern. I will take my children back with strict rules about his contact with me should he not be able to support 2 kids. You'd think earning $12,000/mo take-home pay would have given him the chance to save something. After all, he's known he was under investigation for nearly 3 years. Right?

-Ellen

On May 12, 2016, at 9:35 AM, Kief Michael A <michael.a.kief@wvsp.gov> wrote:

Troopers 00734

Looking at Tom's "Vote for Yank" website, he says his "freedom of speech" was infringed upon due to the Ethics Commission making him take down his websites. Also at the bottom of the website, it mentioned his son's "ex wife", (not by name) causing problems for Scott at work. Scott must be having problems with the FBI. Don't know about this, just what is saying on the website. Tom's websites are up, but not like I expected them to be. Does not name me by name or you by name as of yet. Don't know if he is waiting to see what happens with the FBI investigation or what. I have a hard time believing he is behaving according to the court order Scott signed. We will see what happens. Good luck with Mr. Herman today.

-----Original Message-----
From: Ellen Costlow <ellencostlow@gmail.com>
To: Kief Michael A <michael.a.kief@wvsp.gov>
Date: Thu, 12 May 2016 00:42:20 -0400
Subject: Re: Marcia, Tom, and Barbara Fleischauer

Thank you.

I'm nearly ready for my meeting. I cannot sleep of course. Too many thoughts running through my head.

I printed as much as I could until I ran out of ink. Then I decided to house documents on my computer under a different log in to show everything as a slide-show type presentation. Don't know why I didn't think of that earlier.

I also found almost all the emails and texts that show Scott's "abuse of power" against me using his FBI connections. I cannot help but question the integrity of the FBI should they choose to keep him on board. It's not my decision. I'm just saying I'd hope they seriously consider the gravity of his actions toward me not just as his ex-wife, but as a citizen. I have stayed completely out of Scott's life for years now. The same cannot be said of him. The FBI's "Gentlemen's Code of Conduct" has got to mean something to someone, don't you think?

Sincerely,
Ellen Costlow


On May 11, 2016, at 8:31 PM, Kief Michael A <michael.a.kief@wvsp.gov> wrote:

Oh my. From reading this email, it seems that Marcia and Gabe are under the impression that Tom lives in Marion County. I don't why they would say this.....anyway, I will call Gabe tomorrow (Thursday) and get her thoughts on things. Put this out of your mind for now and concentrate on your meeting with Mr. Herman. I'll let you know what I find out from Gabe.

-----Original Message-----
From: Ellen Costlow <ellencostlow@gmail.com>
To: First Sgt Michael Kief <michael.a.kief@wvsp.gov>
Date: Wed, 11 May 2016 15:17:29 -0400
Subject: Fwd: Marcia, Tom, and Barbara Fleischauer


Please read what Gabe wrote. I cannot stop crying. I have been left out to be eaten by wolves for the past 3 and a half years and am still not finding any peace. I have been lied to over and over by attorneys. I have been told things will stop and I will be helped and then I'm dismissed.

Marcia said she'd help me and would put me in contact with those who could help me if she couldn't. I trusted her. You know how much I trusted her against my own better judgment of the entire situation.

**Troopers 00735**