UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK,**

       **Plaintiff,**

**v.**
                                         **CIVIL ACTION NO.:  1:17-CV-52**
                                         **Honorable Irene M. Keeley**

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M.**
**GASKINS, AND STATE TROOPER**
**CHRIS BERRY,**

       **Defendants.**

**MEMORANDUM IN SUPPORT OF DEFENDANTS**
**STATE TROOPER MICHAEL KIEF, STATE TROOPER RONNIE M. GASKINS, AND**
**STATE TROOPER CHRIS BERRY'S MOTION FOR SUMMARY JUDGMENT**

       Although Plaintiff Scott T. Ballock asserts eight causes of action under a variety of legal

theories against Defendants State Trooper Michael Kief, State Trooper Ronnie M. Gaskins, and

State Trooper Chris Berry (collectively, the "State Police Defendants"), a ruling on the State Police

Defendants' Motion for Summary Judgement requires the Court to resolve only two overarching

issues:

       1.      During the year following their separation, Scott Ballock sent Ellen Costlow more

than 3,000 texts and e-mails, despite her repeatedly asking him to stop. Seven different people—

including Mr. Ballock himself—have agreed that this conduct gave rise to at least probable cause

to believe he criminally harassed Ms. Costlow. Does Mr. Ballock have a cause of action under any

legal theory based upon his arrest by the State Police Defendants?

       2.      Mr. Ballock's former employer, the FBI, twice decided to discharge him based

upon its independent review of his communications with Ms. Costlow and other conduct. Not only

did the FBI not mention the State Police Defendants in its termination letters, in its latest decision,

the FBI expressly noted that it did *not* consider his arrest. Does Mr. Ballock have a claim against the State Police Defendants based upon his discharge from employment?

As set forth below, and as determined by the FBI, Mr. Ballock's legal problems and subsequent loss of employment arose from his own conduct, which he fails to acknowledge, and not from some far-fetched conspiracy between the State Police Defendants and Ms. Costlow, of which Mr. Ballock has no evidence.

## I.    STATEMENT OF UNDISPUTED FACTS

Plaintiff Scott Ballock was an FBI agent, who was previously married to Co-Defendant Ellen Ruth Costlow.   3d Am. Compl. ¶ 20 (ECF No. 49). Beginning in about 2003, around the time Mr. Ballock began working for the FBI, Ms. Costlow would solicit men on Craigslist for sex. Often, the sexual encounters were videotaped.  Ballock Dep. 17:21-18:10, 20:20-21, attached as "Exhibit 1." Mr. Ballock admits to watching videos of his wife having sex with other people. *Id.* at 20:24-21:4.

In August 2011, Mr. Ballock was assigned as a Supervisory Senior Resident Agent at the FBI's Criminal Justice Information Service ("CJIS") center in Clarksburg. *Id.* at 14:21-24. Approximately a year after the couple moved to West Virginia, in summer 2012, Ms. Costlow began seeing Kenny Ice, Jr. *Id.* at 21:8-18, 22:11-22. In September 2012, the Ballocks separated. Shortly thereafter, Ms. Costlow filed for divorce. *Id.* at 24:10-16.

In August 2013, Mr. Ballock's father, Tom Ballock, contacted Sgt. Kief to warn him that one of the troopers under him, Trooper Berry, was allegedly having an affair with Ms. Costlow, and Sgt. Kief might want to warn Trooper Berry that she contacted the wives of the men she was seeing and told them of the affairs. *Id.* at 123:4-12; Kief Dep. 51:4-11, attached as "Exhibit 2." However, Tom Ballock said that he did not want to file a formal complaint against Trooper Berry.

Ex. 2, Kief Dep. 51:19-23. Instead, Tom Ballock contacted Sgt. Kief in order to "protect" Trooper Berry from Ms. Costlow. Ex. 1, Ballock Dep. 123:4-12.

After being made aware of the concerns that Trooper Berry purportedly was having an affair with Ms. Costlow, Sgt. Kief met with Trooper Berry. Trooper Berry denied that he was involved with Ms. Costlow. Ex. 2, Kief Dep. 52:15-18; Berry Dep. 27:3-13, attached as "Exhibit 3." Sgt. Kief also reviewed the text messages and call log of Trooper Berry's personal cell phone. Sgt. Kief did not see anything on Trooper Berry's phone that raised concerns. Ex. 2, Kief Dep. 52:19-23, 55:10-19; Ex. 3, Berry Dep. 27:13-20.

The allegations against Trooper Berry arise from an investigation Trooper Berry was conducting in Mr. Ballock's and Ms. Costlow's neighborhood involving a series of larcenies or break-ins into cars. Ex. 3, Berry Dep. 10:16-11:2. Trooper Berry interviewed Ms. Costlow to see if she saw anything suspicious or had any knowledge of the break-ins. *Id.* at 11:14-12:11. He gave her his cell phone number and asked her to contact him if she learned of any information relevant to the investigation. *Id.* at 16:6-16.

Ms. Costlow's boyfriend, Kenny Ice, claimed to have seen text messages Ms. Costlow had exchanged with Trooper Berry and believed she was having an affair with him. Mr. Ice then contacted Mr. Ballock and informed him of his suspicions. Ex. 1, Ballock Dep.112:13-25, 115:8-11; Mr. Ballock admits that he never actually saw the purported text messages. Mr. Ballock could not provide a single detail from these supposed text messages about the alleged affair between Ms. Costlow and Trooper Berry. *Id.* at115:12-16, 116:10-22. Regardless, Mr. Ballock did not care if Trooper Berry was having sex with his estranged wife. *Id.* at 116:23-117:6

In the course of checking into Mr. Ballock's allegations, Sgt. Kief also contacted Ms. Costlow, who informed him that Mr. Ballock had been harassing her in the year since the couple

separated, including by sending e-mails and text messages. Ex. 2, Kief Dep. 60:21-61:16, 66:7-22. This revelation led to the State Police opening up an investigation into Mr. Ballock's alleged harassment of Ms. Costlow. *Id.* at 97:9-16; Invest. Rep. 1, attached as "Exhibit 4."Sgt. Kief assigned Cpl. Gaskins to lead the investigation. Ex. 4, Invest. Rep. 1.

Mr. Ballock sent his estranged wife over 3,000 e-mails and text messages over a period of approximately one year, between the time the couple separated and the time Ms. Costlow made a complaint to the State Police. *Id.* at 2. A "substantial amount" of the communications were pressuring Ms. Costlow to return to Mr. Ballock. *Id.*

Although Ms. Costlow informed Mr. Ballock that she considered his communications harassing, he denied that they were. For example, less than two months after the couple separated, Ms. Costlow, in response to Mr. Ballock's repeated e-mails, asked him to leave her alone and refrain from sending her harassing texts and e-mails. E-Mails between Ellen Ballock and Scott Ballock (Nov. 7, 2012), attached as "Exhibit 5." Mr. Ballock responded at 4:01 p.m., denying that he had harassed Ms. Costlow and insisting that all of his communications with her were "polite and respectful." *Id.*

Mr. Ballock's communications were far from polite and respectful. In his communications with his wife, Mr. Ballock made derogatory references to her sex life, referring to "those who stick their dick in you" and accusing her of "leaving the kids at home to go have sex with a dirty troll." E-mail from Scott Ballock to Ellen Ballock (Oct. 7, 2012, 11:16 a.m.), attached as "Exhibit 6." Mr. Ballock called Ms. Costlow "pure evil" and said that he would never forgive her. E-mail from Scott Ballock to Ellen Ballock (Nov. 22, 2012, 10:22 p.m.), attached as "Exhibit 7."

Ms. Costlow unequivocally informed Mr. Ballock again on November 15, 2012 that she was not interested in reconciliation: "That will never happen. I have no interest in you. Not now,

not in a year, not in a decade, not for the remainder of your life." E-mail from Ellen Ballock to Scott Ballock (Nov. 15, 2012, 9:35 p.m.), attached as "Exhibit 8." Nevertheless, Mr. Ballock continued to harass Ms. Costlow, alternating between seeking reconciliation and insulting her.

Mr. Ballock used the couple's children to attack Ms. Costlow, threatening that tragedies would befall their children, and it would be her fault: "When your daughter gets pregnant in the back seat of a corvette by some ill spoken Fairmont hillbilly or when your troubled son kills himself because of the inner turmoil he feels, I will be there to remind you that you chose this path." E-mail from Scott Ballock to Ellen Ballock (Dec. 15, 2012, 9:28 a.m.), attached as "Exhibit 9." And he promised her that he would never relent from harassing her: "But I will never stop reminding you of the terrible, life-altering mistake you have made." *Id.*

Not only were Mr. Ballock's messages to Ms. Ballock hurtful and disrespectful, he also harassed her simply with the large number of e-mails and texts he sent. Ms. Costlow continued to inform Mr. Ballock that she did not welcome either the number or the tone of his communications: "As you beg for me to come back, you also wrote horrible, nasty things about me. . . . To continue to write me all day and into the wee hours of the morning (hundreds of texts and emails a day) when I have asked you to stop is not love." E-mail from Ellen Ballock to Scott Ballock (Oct. 15, 2012, 8:42 a.m.), attached as "Exhibit 10."

Nevertheless, he continued to harass her with the large numbers of e-mails and texts he sent. For example, on October 11, 2012, he sent Ms. Costlow a total of 40 e-mails between 7:30 a.m. and 9:42 p.m. E-mails between Scott Ballock and Ellen Costlow (Oct. 11, 2012), collectively attached as "Exhibit 11." On this date, Mr. Ballock continued to request that Ms. Costlow abandon the divorce and reconcile, despite his acknowledgement that she was not interested in reconciliation. He wrote her at 8:08 a.m.: "You have convinced me that you have moved way

beyond the p[o]int of any possible reconciliation." Ms. Costlow unequivocally asked Mr. Ballock to stop harassing her, telling him at 8:12 a.m.: "Stop. . . . Leave me alone now." His response, despite acknowledging six minutes earlier that Ms. Costlow was not interested in reconciliation, was to again pressure her to come back, writing at 8:14 a.m.: "We can work on our relationship." In fact, Mr. Ballock sent Ms. Costlow 26 more emails this day after she told him to leave her alone. *Id.*

On May 17, 2013 alone, Mr. Ballock sent Ms. Costlow 61 text messages over a 12-hour period, including 38 after she repeatedly asked him to stop texting her. E-mail from Ellen Ballock to Ronnie M. Gaskins (Sept. 16, 2013, 12:02 p.m.) (forwarding text messages between Scott Ballock and Ellen Ballock of May 17, 2013), attached as "Exhibit 12." After Mr. Ballock had sent Ms. Costlow 23 texts, she instructed him at 12:08 p.m.: "I need you to stop texting me now." Mr. Ballock's response was to send twelve more texts over the next twelve minutes.  At 12:20 p.m., Ms. Costlow again asked, "Please stop texting me." Mr. Ballock responded with three more texts over the next two minutes before she again asked at 12:22 and 12:23 for him to stop texting her. Mr. Ballock then sent 23 more texts. In all, Mr. Ballock sent a total of 38 text messages on this single day after Ms. Costlow asked him to stop. *Id.*

Mr. Ballock's messages to Ms. Costlow included veiled threats. For example, among the 61 texts he sent her on May 17, 2013, he said, "I see it spiraling out of control, I see the cliff fast approaching for us all." *Id.* Along with calling Ms. Costlow "pure evil" on November 22, 2012, he also included a poem with the lines, "We promised to the death/I promise yet again/This time you can believe/You don't know where I've been."  Ex. 7.

Mr. Ballock also threatened Ms. Costlow with both civil and criminal legal actions. In February 2013, he asked her to keep her attorney's fees from the divorce separate from any

attorney's fees and expenses that arose out of criminal or civil prosecutions he might file against her and Mr. Ice. E-mail from Scott Ballock to Ellen Ballock (Feb. 9, 2013, 3:58 p.m.), attached as "Exhibit 13." He used his position as an FBI agent to threaten Ms. Costlow with criminal prosecution over the alleged "theft" of government property that the FBI issued to him, which was left in the couple's home. E-mail from Scott Ballock to Ellen Ballock (May 28, 2013, 11:00 p.m.), attached as "Exhibit 14."

In May of 2013, Ms. Costlow again asked Mr. Ballock to cease harassing her and to go through her attorneys for any future communications. E-mails between Ellen Ballock and Scott Ballock (May 15, 2013), attached as "Exhibit 15." Mr. Ballock's response was: "I will not go through your attorneys for anything. Ever. As long as you have custody of [the couple's daughter], I will make my requests directly to you." *Id.* Indeed, in this e-mail exchange, Mr. Ballock again acknowledged that Ms. Costlow had not wanted to communicate with him since their separation: "You haven't wanted to talk to me for eight months now." *Id.* Mr. Ballock continued to insult Ms. Costlow, informing her that she was causing harm to their children and ridiculing her for not working: "It is your privilege to continue to ignore me even if it negatively impacts the children . . . to break up the family . . . and ruin our young children's lives. . . .When you actually work for your money, you will finally understand the value of it." *Id.*[1]

Cpl. Gaskins documented his investigation of Ms. Costlow's claims in a report. *See*, *generally*, Ex. 4. Mr. Ballock admits that every statement Cpl. Gaskins put in his investigation report is true. Ex. 1, Ballock Dep. 136:24-137:9.

---

[1] It is impossible in a 30-page brief to fully convey the nature and extent of Mr. Ballock's harassment of Ms. Costlow. The attached exhibits give a mere taste of his harassment, taken from the more than 3,000 e-mails Ms. Costlow provided to the State Police. Additional examples are referred to in the State Police investigation report and in the dismissal letters the FBI sent to Mr. Ballock.

On September 11, 2013, Cpl. Gaskins met with Monongalia County Assistant Prosecuting Attorney Cindy Scott to decide whether to press charges, and if so, with what to charge Mr. Ballock. Ex. 4 at 5; Gaskins Dep. 26:13-27:10; *see also* 113:24-114:11, attached as "Exhibit 16." APA Scott reviewed Mr. Ballock's communications herself. *Id*. She advised Cpl. Gaskins to charge Mr. Ballock with one count each of Stalking/Harassment, in violation of West Virginia Code § 61-2-9a, and Harassment by Electronic Communications Device, in violation of West Virginia Code § 61-3C-14a. *Id.* at ¶ 7; Ex. 16, Gaskins Dep. 27:1-10.

The next day, Cpl. Gaskins presented two criminal complaints to Magistrate Sandy Holepit, who found probable cause for both counts and issued arrest warrants, attached as "Exhibit 18." The day after that, on September 13, 2013, Sgt. Kief served Mr. Ballock with the arrest warrants during Mr. Ballock's divorce hearing at Monongalia County Family Court. 3d Am. Compl. ¶ 35.

The decision to arrest Mr. Ballock during the Family Court proceedings was due to officer safety concerns; as an FBI agent, Mr. Ballock carried a weapon, but it was presumed he would be unarmed during the court proceeding. Ex. 4, Invest. Rep. 5; Ex, 2, Kief Dep. 203:11-14; Ex. 16, Gaskins Dep. 156:17-157:1.

At the time the State Police began its criminal investigation of Mr. Ballock, but before he was arrested, either Sgt. Kief or Cpl. Gaskins contacted the FBI to let them know that one of their agents was under criminal investigation. Ex. 2, Kief Dep. 106:21-107:13. Sometime after Cpl. Gaskins began the State Police investigation, John Hambrick of the FBI met with Cpl. Gaskins to discuss the allegations against Mr. Ballock. Ex. 16, Gaskins Dep. 62:5-63:4, 214:6-215:8. At this meeting, Mr. Hambrick asked for a copy of the disk of Mr. Ballock's communications with Ms. Costlow. *Id.* at 63:1-4. After receiving approval from APA Scott, Cpl. Gaksins supplied the FBI with a copy of the disk. *Id.* at 63:6-13.

The State Police coordinated Mr. Ballock's arrest during the Family Court hearing with the FBI. Ex. 2, Kief Dep. 120:23-121:7. The FBI shared Sgt. Kief's concerns about safety and concurred with his plan to serve the arrest warrant on Mr. Ballock during the Family Court hearing. Letter from Asst. Dir. Candice M. Will to Scott T. Ballock (Sept. 21, 2017) at 10, attached as "Exhibit 18." The FBI also had an agent present during his arrest to witness the event. Ex. 1, Ballock Dep. 186:1-12.

Nearly two and one-half years after Mr. Ballock's arrest, on April 7, 2016, Monongalia Prosecuting Attorney Marcia Ashdown dismissed the charges against Mr. Ballock. 3d Am. Comp. ¶ 56. Neither Ms. Costlow, Sgt. Kief, nor Cpl. Gaskins sought to have the charges against Mr. Ballock dismissed. Costlow Dep. 214:19-24, attached as "Exhibit 19"; Ex. 2, Kief Dep. 210:23-211:7; Ex. 16, Gaskins Dep. 66:15-67:7. In fact, Ms. Costlow, Sgt. Kief, and Cpl. Gaskins were surprised to learn that the Prosecuting Attorney's Office had decided to dismiss the charges; prior to deciding to dismiss the charges against Mr. Ballock, Ms. Ashdown did not consult with any of them. Ex. 2, Kief Dep. 211:12-14; Ex. 16, Gaskins Dep. 67:9-18; Ex. 19, Costlow Dep. 214:19-24.

The State moved to dismiss after Mr. Ballock and Ms. Costlow entered into an agreement with the State, under which Mr. Ballock acknowledged that probable cause existed for the State Police to file for the issuance of the arrest warrants. Mot. to Dismiss, *State v. Ballock*, (Case Nos. 13-M31M-06741 and 13-M31M6739), Apr. 7, 2016, attached as "Exhibit 20." Mr. Ballock has since disavowed his acknowledgement that probable cause for his arrest existed. Ex. 1, Ballock Dep. 109:8-15. He admitted that he submitted a false, signed statement to the Magistrate Court in order to get the criminal charges dismissed. *Id.* at 109:16-19.

After the criminal charges against Mr. Ballock were dismissed, the FBI conducted an independent, internal investigation into the allegations that Mr. Ballock harassed Ms. Costlow. *Id.* at 155:14-156:11. The FBI reviewed Mr. Ballock's e-mails and texts. Letter from Timothy J. Dowling to Scott T. Ballock (Apr. 10, 2017) at 11, attached as "Exhibit 21." The FBI's Office of Professional Responsibility ("OPR") determined, by a preponderance of the evidence, that Mr. Ballock committed a misdemeanor offense under W. Va. Code § 61-3C-14a of harassing Ms. Costlow by computer or electronic device. *Id.* at 12. The FBI's Assistant Director of Human Resources, Candice Will, after conducting her own independent review of the record, including Mr. Ballock's written submissions as part of the FBI disciplinary process, agreed with OPR's recommendation and dismissed Mr. Ballock from the FBI. Ex. 18 at 1.

Mr. Ballock claims that shortly after he filed the initial pro se pleading in this matter, an unidentified, uniformed representative of the West Virginia State Police visited the FBI's Clarksburg Resident Agency and lodged a complaint with the Supervisory Senior Resident Agent about this lawsuit. 3d Am. Compl. ¶ 225. He cannot, however, identify who this "mystery trooper" was. Ex. 1, Ballock Dep. 168:20-22.

On April 10, 2017, after Mr. Ballock stopped by the Morgantown State Police detachment in an attempt to serve the State Police Defendants, Sgt. Kief spoke by telephone with the acting Supervisory Senior Resident Agent at that time, John Large. Ex. 2, Kief Dep. 167:3-21; e-mail from John D. Large to Raymond P. Duda (Apr. 10, 2017, 11:51 a.m.), attached as "Exhibit 22."[2] Sgt. Kief did not call Mr. Large to lodge a complaint about Mr. Ballock filing a civil action, but to report Mr. Ballock's harassment of the troopers. Ex. 2, Kief Dep. 196:9-22. Sgt. Kief told Mr.

---

[2] OPR's letter recommending Mr. Ballock's discharge was dated the same day that Sgt. Kief contacted Mr. Large. *Compare* Ex. 21 *with* Ex. 22.

Large that Mr. Ballock's demeanor was arrogant and he appeared to be "thumbing his nose" at the State Police. Ex. 22.

Mr. Ballock appealed his discharge through the FBI's internal administrative process. The FBI's Office of Disciplinary Appeals remanded the case back to the FBI Inspection Division to conduct additional investigation. Letter from Pei Ling Chen to Scott T. Ballock (Nov. 15, 2018) at 1, attached as "Exhibit 23."

After additional investigation, OPR again recommended Mr. Ballock's dismissal, albeit on slightly different grounds. The FBI found that Mr. Ballock committed three violations of its rules and policies: (1) misuse of weapon/safety violation (putting a handgun in Ms. Costlow's vagina during sex and in Mr. Ballock's own mouth while threatening suicide); (2) unprofessional conduct off-duty (which included, but went beyond, his harassment of Ms. Costlow); and (3) lack of candor/lying under oath (both by his denial of abusing Ms. Costlow and by characterizing his emails and texts as "respectful and appropriate" and not threatening). *Id.* at 18-23.

Acting Assistant Director Nancy McNamara approved OPR's recommendation and discharged Mr. Ballock again. Letter from Nancy McNamara to Scott T. Ballock (Mar. 5, 2019) at 24, attached as "Exhibit 24." The FBI concluded that each of the three grounds is an independent basis for his discharge. *Id.* Importantly, the FBI expressly stated in the latest discharge letter that it did not consider Mr. Ballock's arrest by the State Police in reaching its decision. *Id.* at 3.


## II.      STANDARD OF DECISION

"Summary judgment 'should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Cloaninger v. McDevitt*, 555 F.3d 324,

332 (4th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). In considering a motion for summary judgment, courts are to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion, but only if there is a "genuine" dispute as to those facts. *Id.* A mere "scintilla" of evidence, however, is not sufficient to create a genuine fact issue; there must be evidence on which a jury might rely. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984).

## III.    ARGUMENT

### A.    The State Police Defendants Are Entitled to Summary Judgment on Mr. Ballock's Malicious Prosecution Counts Because No Reasonable Jury Could Find That There Was Not Probable Cause to Charge Mr. Ballock.

Mr. Ballock's counts of malicious prosecution under § 1983 and state law both fail because he was arrested based upon probable cause that he committed the offenses for which he was charged, as found by seven different people. In fact, Mr. Ballock admitted during his deposition to conduct that was in violation of one of the statutes under which he was charged.

"A malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (internal quotation and citation omitted). The elements of a § 1983 "malicious prosecution" claim are that a "defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Id.* Similarly, under West Virginia law, the elements of a malicious prosecution claim are: "(1) that the prosecution was set on foot and conducted to its termination, resulting in plaintiff's discharge; (2) that it was caused or procured by defendant; (3) that it was without probable cause; and (4) that it was malicious." Syl. Pt. 2, in part, *Norfolk S. Ry. Co. v. Higgenbotham*, 228 W. Va. 522, 721 S.E.2d 541 (2011). Because the absence of probable cause is an essential element of a malicious prosecution claim, "[p]robable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for .

. . malicious prosecution. This is so even where the defendant officers allegedly acted upon a malicious motive." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006).

Here, no reasonable jury could find that Cpl. Gaskins lacked probable cause for charging Mr. Ballock with harassment under West Virginia Code § 61-2-9a(b) or harassing communications by electronic communication device under § 61-3C-14a(a)(2).[3] Indeed, seven people, including Mr. Ballock himself, agreed that there was probable cause—or more—to believe Mr. Ballock had committed these offenses.

First, APA Cindy Scott, after discussing the matter with Cpl. Gaskins and perusing Mr. Ballock's communications herself, agreed that there was probable cause. Exhibit 16 at 26:13-27:10; *see also* 113:24-114:11. Consequently, she instructed Cpl. Gaskins on which offenses to charge Mr. Ballock. *Id.* Acts of independent decision-makers in the criminal justice system, such as a prosecuting attorney, insulate a police officer from liability under a § 1983 malicious prosecution claim. *Evans*, 703 F.3d at 647. The same rule applies under state law malicious prosecution claims. *Pote v. Jarrell*, 186 W. Va. 369, 374, 412 S.E.2d 770, 775 (1991) ("[A]cting on the advice of counsel can be an absolute defense in an action for malicious prosecution[.]")

After Cpl. Gaskins met with APA Scott, he prepared criminal complaints and presented them to Magistrate Holepit, who also found probable cause to believe Mr. Ballock committed both offenses. Ex. 18. For qualified immunity purposes, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as

---

[3] Section 61-2-9a(b) provides, in relevant part, "Any person who repeatedly harasses . . . another is guilty of a misdemeanor[.]" Section 61-3C-14a(a)(2) provides, in relevant part, "It is unlawful for any person, with the intent to harass or abuse another person, to use a computer, mobile phone, personal digital assistant or other electronic communication device to . . . [m]ake contact with a person after being requested by the person to desist from contacting them[.]" For purposes of § 61-2-9a, "harasses" is defined as "willful conduct directed at a specific person . . . which would cause a reasonable person mental injury or emotional distress." W. Va. Code § 61-2-9a(f)(3).

we have sometimes put it, in 'objectively good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922-23 (1984)); *McKinney v. Richland Cty. Sheriff's Dept.*, 431 F.3d 415, 418 (4th Cir. 2005) (concluding that plaintiff suffered no violation of constitutional rights when arrested pursuant to warrant based on probable cause).[4]

Four separate FBI officials investigating Mr. Ballock's conduct found more than probable cause. Based upon each official's independent review of the evidence, including Mr. Ballock's submissions in his defense, he or she found by a preponderance of the evidence that Mr. Ballock harassed Ms. Costlow through his e-mails and text messages. Ex. 21 at 12; Ex. 18 at 14; Ex. 23 at 2-3; Ex. 24 at 2-3. The FBI determined that Mr. Ballock engaged in "skillful, intrusive, and pervasive" harassment of Ms. Costlow. Ex. 24 at 3.

Finally, in a signed agreement he submitted to the Magistrate Court in order to get the charges dismissed, Mr. Ballock himself agreed that the State Police had probable cause to charge him. Ex. 20. Mr. Ballock has since disavowed his statement, admitting that he submitted a false, signed statement to the Magistrate Court in order to get the criminal charges against him dismissed. Ex. 1, Ballock Dep. 109:8-19. Mr. Ballock's efforts, however, are "nothing more than an

---

[4] Because a § 1983 claim requires a violation of a right protected by the Constitution or federal law, and the qualified immunity analysis also looks to whether there was a violation of clearly established law, the availability of qualified immunity overlaps substantially with the merits of a constitutional claim. *O'Bar v. Pinion*, 953 F.2d 74, 80 (4th Cir. 1991). The State Police Defendants primarily argue that Mr. Ballock has no evidence to establish the elements of his claims. In the alternative, however, the State Police Defendants are entitled to qualified immunity from all of Mr. Ballock's claims under both § 1983 and state law because he cannot identify any clearly established law that the State Police Defendants violated by charging him based upon at least arguable probable cause. *See Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 396 (4th Cir. 2015) (In order to be entitled to qualified immunity, a defendant must either show (1) that no constitutional violation occurred; or (2) that the right violated was not clearly established at the time it was violated); Syl. Pt. 11, *W. Va. Reg'l Jail & Corr. Fac. Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014) (holding that a state employee charged with negligence in carrying out discretionary functions is entitled to qualified immunity if the alleged acts or omissions do not violate a clearly established law of which a reasonable official would be aware).

intentional attempt to mislead the [magistrate] court and this [C]ourt to gain unfair advantage in this action." *See Lowery v. Stovall*, 92 F.3d 219, 225 (4th Cir. 1996).

Regardless, not only did Mr. Ballock agree that the State Police had probable cause to charge him, he admits to conduct that is in violation of § 61-3C-14a. Regarding his 61 text messages to Ms. Costlow on May 17, 2013, including 38 texts after Ms. Costlow asked him to stop texting her, Mr. Ballock concedes that he used an electronic communication device to contact her after she requested that he desist from doing so. Ex. 1, Ballock Dep. 65:8-18.[5]

In sum, despite Mr. Ballock's efforts to discredit Ms. Costlow and to minimize his own actions, as the FBI found, the "independent record evidence, including [his] own communications," conclusively establish that there was at least probable cause for Cpl. Gaskins to charge him with violations of §§ 61-2-9a(b) and 61-3C-14a(a)(2). Ex. 18 at 17. No reasonable jury could find otherwise. Therefore, Mr. Ballock cannot establish an essential element of his malicious prosecution counts. For this reason, the Court should grant the State Police Defendants summary judgment on Counts Two and Five.

**B.    The State Police Defendants Are Entitled to Summary Judgment on Mr. Ballock's Abuse of Process Counts Because He Has No Evidence the State Police Defendants Used the Criminal Process for an Improper Purpose.**

Mr. Ballock's abuse of process counts under both § 1983 and state law fail as a matter of law because he has no evidence that the State Police Defendants used the criminal process for an improper purpose after charges were filed against him. Instead, Mr. Ballock takes issue with the State Police Defendants' issuance and prosecution of the criminal charges. This is not an abuse of process claim.

---

[5] "The derogatory and insulting nature" of Mr. Ballock's texts "reflect an intent to harass or abuse." *See* Ex. 18 at 13. So, too, do the multiple texts (38) after Ms. Costlow asked him to stop texting her. *Id.*

The essential elements of the tort of abuse of process are (1) an ulterior purpose, and (2) a "willful act in the use of the process not proper in the regular conduct of the proceeding." *Rahmi v. Sovereign Bank N.A.*, Civil Action No. 3:12-CV-87, 2013 WL 412623, at *2 (N.D.W. Va. Feb. 1, 2013). The improper use usually takes the form of coercion to obtain a collateral advantage that is not part of the proceeding itself; it is this form of extortion, rather than the issuance or formal use of the process, that constitutes the tort. *Id.* Thus, merely filing a complaint does not give rise to an abuse of process claim, and failure to allege willful abuse of process *after its issuance* is fatal to a claim. *S. States Coop., Inc. v. I.S.P. Co., Inc.*, 198 F. Supp. 2d 807, 816 (N.D.W. Va. 2002).

Mr. Ballock has no evidence that the State Police Defendants took any action after filing the criminal complaint against him that was not a proper use of the criminal process.[6] Mr. Ballock alleges that the State Police Defendants "abused the judicial process by encouraging and *causing the criminal charges and prosecution to be brought*" and that they "*initiated and continued their efforts* even after it was apparent that Plaintiff was innocent." 3d Am. Compl. ¶¶ 159-60, 182-83 (emphasis added). These allegations relate to the issuance and prosecution of the criminal charges against him. Yet, "there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Preiser v. MacQueen*,

---

[6] If a § 1983 abuse of process claim is recognized in the Fourth Circuit, Mr. Ballock's claim is time barred, in addition to failing on the merits. Because the civil rights statutes do not provide for a statute of limitations, courts look to the state statute of limitations to determine if such claims are time-barred. *McCausland v. Mason Cty. Bd. of Educ.*, 649 F.2d 278, 279 (4th Cir. 1981). "In West Virginia, § 1983 actions are considered personal injury actions and utilize the two year statute of limitations." *Orum v. Haines*, 68 F. Supp. 2d 726, 730 (N.D.W. Va. 1999) (citing W. Va. Code § 55-2-12(b)). Yet, the *time of accrual* of a Section 1983 action is a matter of federal law, by analogy to the most common law tort cause of action. *Denmark v. Starcher*, Civil Action No. 1:14CV58, 2014 WL 7272789, at *3 (N.D.W. Va. Dec. 18, 2014). Under federal law, when abuse of process provides the most analogous cause of action, the limitations period runs from the date the plaintiff was arrested. *Id.* at *5. Thus, the limitations period on Mr. Ballock's § 1983 abuse of process claim began to run on his arrest on September 13, 2013 and expired two years later.

177 W. Va. 273, 279, 352 S.E.2d 22, 28 n. 8 (1985) (quoting W. Prosser, *Handbook of the Law of Torts* § 121 (1971)).

An abuse of process claim against a police officer based upon his arrest of the plaintiff requires more than merely showing that the officer charged the plaintiff and participated in the prosecution of those charges. Regardless of whether the initial decision to file a criminal complaint is proper, the prosecution of that complaint by an officer is a proper use of the legal process. Order Granting in Part Def. Walker's Mot. to Dismiss 2d Am. Compl., *Hamstead v. Walker*, Civil Action No. 3:18-CV-79, slip op. at 8-9 (N.D.W. Va. May 7, 2019) (dismissing abuse of process claim against arresting officer because plaintiff made no allegations officer used criminal charges for improper purpose after initiation, but merely carried the criminal process to its authorized conclusion); *see also Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 261 (N.D.N.Y. 2014) (granting summary judgment in abuse of process claim against officers when plaintiff presented no evidence that officers issued criminal complaints against plaintiff to obtain a collateral objective outside the legitimate ends of the process); *Grande v. Keansburg Borough*, Civil Action No. 12-1968 (JAP), 2013 WL 2933794, at *14 (D.N.J. June 13, 2013).

Mr. Ballock fails to state an abuse of process claim, much less offer evidence in support of it. Therefore, the Court should grant the Trooper Defendants summary judgment on Counts One and Four.

        **C.**     **The State Police Defendants Are Entitled to Summary Judgment on Mr. Ballock's Tortious Interference With Contract Count Both Because There Is No Evidence the State Police Defendants Made an Unprivileged Communication to Mr. Ballock's Employer and Because Mr. Ballock Was Also Discharged for Conduct Unrelated to the Criminal Charges.**

The State Police Defendants are entitled to summary judgment on Mr. Ballock's Tortious Interference with Contract claim for two reasons. First, Mr. Ballock cannot show that the State Police Defendants interfered with his employment; to the contrary, the evidence shows that Sgt.

Kief and Cpl. Gaskins merely gave truthful information about the criminal investigation to the FBI in response to the FBI's request. Second, Mr. Ballock cannot establish that anything the State Police Defendants are alleged to have done is the cause of his injury, both because the FBI did not rely on any statement by the State Police Defendants and because the FBI also discharged him based upon his conduct that was entirely independent of the underlying criminal investigation.

In order to establish a claim of tortious interference with contract, a plaintiff must show: (1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by an outside party; (3) that the interference caused harm; and (4) damages. Syl. Pt. 5, *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 223 W. Va. 259, 672 S.E.2d 395 (2008). Defendants in such cases have a variety of defenses, including the giving of truthful requested advice. *Id.* at 267, 672 S.E.2d at 403. Here, Mr. Ballock cannot establish either the second or third elements, and the State Police Defendants' communications with the FBI are privileged.

Mr. Ballock has no evidence that any of the State Police Defendants intentionally interfered with his employment. As an initial matter, Mr. Ballock bases this claim on the allegation that after he filed the initial Complaint in this action, an unidentified "uniformed representative with the West Virginia State Police" appeared at the FBI's Clarksburg Resident Agency to lodge a complaint about his filing of this action. 3d Am. Compl. ¶ 225. Yet, Mr. Ballock cannot identify who this "mystery trooper" was, much less that he acted on behalf of, or even with the knowledge of, any of the State Police Defendants. Ex. 1, Ballock Dep. 168:20-22.

Nonetheless, the State Police Defendants concede to communications with the FBI. It is undisputed that after Mr. Ballock showed up at the Morgantown State Police detachment in a purported attempt to serve the original pleading in this matter, Sgt. Kief called John Large, the Supervisory Senior Resident Agent of the Clarksburg Resident Agency, not to lodge a complaint

about Mr. Ballock filing this action, but to report Mr. Ballock harassing and "thumbing his nose" at the State Police Defendants. Ex. 2, Kief Dep. 196:9-22; Ex. 22. It is also undisputed that around the time of Mr. Ballock's arrest and again after the dismissal of the criminal charges against him, FBI officials asked to interview Sgt. Kief and Cpl. Gaskins. Ex. 2, Kief Dep. 155:7-156:10, 161:18-162:13; Ex. 16, Gaskins Dep. 62:5-63:13.

These communications between Sgt. Kief and Cpl. Gaskins and FBI officials are privileged. Giving "truthful information is an absolute bar to a claim of tortious interference 'whether or not the information is requested.'" *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W. Va. 135, 150, 506 S.E.2d 578, 593 (1998) (quoting *Restatement (Second) of Contracts* § 722(a) cmt. b (1981)). Here, Sgt. Kief and Cpl. Gaskins responded to a request by the FBI, giving its officials truthful information about the investigation, arrest, and prosecution of Mr. Ballock. Similarly, Sgt. Kief provided truthful information to Mr. Large: that Mr. Ballock stopped by the Morgantown detachment, supposedly in an attempt to serve process on the State Police Defendants, and Sgt. Kief felt like Mr. Ballock was being arrogant and "thumbing his nose" at the State Police. These communications are not actionable.

Moreover, Mr. Ballock has no evidence that any communication by anyone from the State Police played a role in the FBI's decision to discharge him. The four letters from the FBI detailing its reasons for his discharge scarcely mention any of the State Police Defendants and certainly do not indicate that the FBI's decision was influenced by them. Instead, the FBI's investigation properly focused on Mr. Ballock's conduct. The FBI based its discharge decisions on its "full and impartial consideration [of] all documentation and evidence," including Mr. Ballock's own submissions in his defense. Ex. 24 at 2. In fact, the FBI expressly disclaimed that it considered Mr. Ballock's arrest by the State Police when deciding to discharge him. *Id.* at 3.

In addition, Mr. Ballock cannot make a causal connection between any act of the State Police Defendants and his discharge because the FBI discharged him not only for his harassment of Ms. Costlow, but also for weapons safety violations and for lack of candor and lying under oath. *Id.* at 20-22. Neither of these other offenses was related to the State Police investigation of Mr. Ballock. Moreover, the FBI concluded that *each* of the three violations it found warranted Mr. Ballock's dismissal. *Id.* at 24. Thus, even if the FBI had not considered Mr. Ballock's harassment of Ms. Costlow, it would nonetheless have discharged him.

Mr. Ballock cannot show that the State Police Defendants tortiously interfered with his employment. The communications Sgt. Kief and Cpl. Gaskins made to the FBI were true, and therefore act as an absolute bar to this count. Additionally, Mr. Ballock cannot make a causal link between any communications by the State Police Defendants and the FBI's decision—after conducting its own independent review of the evidence—to discharge him, which was on the basis of three different offenses, each of which warranted discharge. Therefore, the Court should grant the State Police Defendants summary judgment on Count Ten.

> **D.    Cpl. Gaskins Is Entitled to Summary Judgment on Mr. Ballock's Defamation Counts Because Mr. Ballock Has No Evidence Either That Cpl. Gaskins Made an Untruthful Statement or That Cpl. Gaskins Made a Non-privileged Communication of a Defamatory Statement to a Third Person.**

Cpl. Gaskins is entitled to summary judgment on the two defamation counts against him because Mr. Ballock cannot prove two essential elements of the claim: (1) that anything Cpl. Gaskins put in his investigation report was false and (2) that Cpl. Gaskins made a non-privileged communication of defamatory information contained in the report.

Mr. Ballock brings defamation counts against Cpl. Gaskins under both § 1983 and state law.[7] The essential elements of these counts are similar, but not identical.

Under state common law, "The essential elements for a successful defamation action . . . are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70 (1984). The existence of a qualifiedly privileged occasion, in the absence of a factual controversy, is a question of law. *Id.* at Syl. Pt. 8, *Belcher v. Wal-Mart Stores, Inc.*, 211 W. Va. 712, 568 S.E.2d 19 (2002).

"[T]he Supreme Court has required plaintiffs in cases involving allegedly defamatory statements by the government to show more than reputational injury in order to prevail on a constitutional claim." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314-15 (4th Cir. 2012). Therefore, a plaintiff alleging defamation in violation of § 1983 "must demonstrate that his reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status" in order to prevail. *Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)). This doctrine is sometimes referred to as the "stigma plus" test. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 n.16 (4th Cir. 2006).[8]

---

[7] Mr. Ballock styles his state law claim as "slander." Under West Virginia law, slander is simply defamation through oral means. *Butts v. Royal Vendors, Inc.*, 202 W. Va. 448, 453, 504 S.E.2d 911, 916 (1998).

[8] Thus, Mr. Ballock's § 1983 defamation claim fails for the additional reason that he cannot show that Cpl. Gaskins deprived him of his liberty or property interest in employment with the FBI. Rather, it was the FBI that discharged him. The absence of any state action by Cpl. Gaskins in depriving Mr. Ballock of a liberty interest without due process is fatal to this count. *See Shirvinski*, 673 F.3d at 317 (finding plaintiff did not state § 1983 claim based on allegedly defamatory statement by Coast Guard because the Coast Guard did not deprive him of a liberty interest without due process; instead, one government contractor instructed its subcontractor that the plaintiff should be terminated).

Mr. Ballock bases his defamation counts upon statements Cpl. Gaskins included in the report of the criminal investigation of Mr. Ballock. 3d Am. Compl. ¶¶ 205-06, 214-15. Yet, Mr. Ballock admits that Ms. Costlow did, in fact, relay to Cpl. Gaskins every statement that is contained in the report, even if Mr. Ballock disputes the veracity of the statements themselves. Ex. 1, Ballock Dep. 136:24-137:9. Thus, Cpl. Gaskins made no false statements, and Mr. Ballock cannot meet an essential element of the cause of action.

In addition, the publication of Ms. Costlow's allegations in the report of the criminal investigation is privileged, and Mr. Ballock has no evidence either that Cpl. Gaskins published the report to a third person outside the privilege or that he abused the privilege. Mr. Ballock does not know to whom Cpl. Gaskins published the report. *Id.* at 139:14-140:4. Nevertheless, Cpl. Gaskins prepared the report as part of the criminal proceeding against Mr. Ballock, and the FBI received a copy of the report as part of its investigation. *See* Ex. 18 at 7 n.7.

A law enforcement officer's publication of defamatory allegations within the confines of a criminal investigation is widely recognized as privileged. *See Restatement (Second) of Torts* § 598A (1975); *Hopkins v. O'Connor*, 925 A.2d 1030, 1043-44 (Conn. 2007) (concluding that, but for statutory language providing otherwise, a police officer's preparation of a report required under police department procedures that allegedly contained defamatory statements would be subject to absolute immunity); *Lightfoot v. Floyd*, 667 So. 2d 56, 69-70 (Ala. 1995) (noting that communications in an investigator's incident report would likely be privileged because making reports is usually a discretionary function within the scope of a police officer's authority).

Similarly, Cpl. Gaskins's sharing of the report with FBI officials is also privileged. A publication is privileged if it is reasonable to believe that there is information that affects an important interest of the third person and the recipient is one to whom the publication is within the

generally accepted standards of decent conduct. *Restatement (Second) of Torts* § 595. When deciding whether a publication is within the generally accepted standards of good conduct, it is an important factor that "the publication is made in response to a request rather than volunteered by the publisher." *Id.* It is certainly reasonable to believe that information regarding criminal accusations made against a supervisory FBI agent affect a substantially important interest of the FBI. The fact that the FBI requested the report and incorporated it into the agency's own findings is a clear indication that the FBI deemed the information in the report to be important enough to justify Cpl. Gaskins publishing it in response to a request.

Mr. Ballock cannot introduce evidence to support two essential elements of a defamation claim. Accordingly, the Court should grant Cpl. Gaskins summary judgment as to Counts Seven and Eight.

> ### E. The State Police Defendants Are Entitled to Summary Judgment on Mr. Ballock's Outrage Count Because Mr. Ballock Has No Evidence the State Police Defendants Engaged in Outrageous Conduct.

Mr. Ballock cannot prevail on his intentional infliction of emotional distress count because he has no evidence that the State Police Defendants engaged in any conduct that reasonably could be considered outrageous. Because proof of such conduct is an essential element of this claim, the State Police Defendants are entitled to summary judgment.

The tort of intentional infliction of emotional distress, sometimes referred to as the tort of outrage, is recognized in West Virginia. *Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 374, 504 S.E.2d 419, 425 (1998). A plaintiff must prove four elements in order to prevail in an outrage claim:

> It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his

conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Id.* at Syl. Pt. 3. The trial court's role is to first determine, as a matter of law, whether the defendant's conduct may reasonably be considered extreme and outrageous. *Id.* at Syl. Pt. 4.

"It is difficult to overstate the high burden of proof required to sustain a tort claim for intentional infliction of emotional distress/outrage." *Pegg v. Herrnberger*, 845 F.3d 112, 122 (4th Cir. 2017). "Indeed, few courts have found that a plaintiff has met the 'extreme and outrageous' standard under West Virginia law." *Garrett v. Viacom, Inc.*, No. Civ.A. 1:03CV22, 2003 WL 22740917, at *4 (N.D.W. Va. Aug. 27, 2003) (citing cases).

Here, there is no evidence that the State Police Defendants engaged in any outrageous conduct. To the contrary, the evidence shows that Sgt. Kief and Cpl. Gaskins did exactly what West Virginia's taxpayers expect them to do: investigate a complaint of criminal activity and make an arrest based upon probable cause.[9] As there is not sufficient evidence to support the malicious prosecution counts, the same conduct necessarily cannot support an outrage claim. *Hines v. Hills Dep't Stores, Inc.*, 193 W. Va. 91, 96, 454 S.E.2d 385, 390 (1994) ("[T]he elements to establish a malicious prosecution case are less severe than an action for outrageous conduct").

Besides investigating and arresting Mr. Ballock, Sgt. Kief and Cpl. Gaskins spoke to FBI officials—at the officials' request—about the criminal investigation. As discussed above, such communications were privileged, not outrageous.

---

[9] It is undisputed that Trooper Berry played no role in the investigation, arrest, or prosecution of Mr. Ballock. Ex. 2, Kief Dep. 257:2-10; Ex. 16, Gaskins Dep. 201:22-24; Ex. 3, Berry Dep. 30:6-9. Indeed, Mr. Ballock admits that he never saw Trooper Berry in any of the hearings in the criminal matter. Ex. 1, Ballock Dep. 142:14-19. Thus, the only alleged act by Trooper Berry mentioned in the Third Amended Complaint that has any possible relevance is that Trooper Berry and Ms. Costlow were sexually involved. 3d. Am. Compl. ¶ 25. Mr. Ballock testified, however, that he did not care if Ms. Costlow and Trooper Berry were involved with each other. Ex. 1, Ballock Dep. 116:23-117:6.

Doing the very job for which they were hired and making privileged communications to the FBI cannot, as a matter of law, be reasonably considered to be sufficiently outrageous to meet the high bar required to support an intentional infliction of emotional distress claim. Consequently, the Court should grant the State Police Defendants summary judgment as to Count Nine.

### F.   The State Police Defendants Are Entitled to Summary Judgment on Mr. Ballock's Civil Conspiracy Count Because Mr. Ballock Has No Evidence of a Common Plan Among Defendants.

Mr. Ballock has no evidence that Defendants shared any objective or came to any mutual agreement to either undertake an unlawful act or to accomplish a lawful purpose by unlawful means. For this reason, the State Police Defendants are entitled to summary judgment on Mr. Ballock's conspiracy claim.

It is not clear whether Mr. Ballock brings his conspiracy claim under state law, § 1983, or both. Nevertheless, the elements are similar under either legal theory.

Under West Virginia law, "[a] civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means."  Syl. pt. 8, in part, *Dunn v. Rockwell*, 225 W. Va. 43, 689 S.E.2d 255 (2009).  Civil conspiracy is not a stand-alone cause of action; instead, it is merely a legal doctrine by which liability for a tort may be imposed on those who did not actually commit a tort themselves, but who shared a common plan for its commission with the actual perpetrator.  *Id.* at Syl. Pt. 9. Because a common plan is essential to a civil conspiracy claim, a plaintiff must produce evidence "that each member of the alleged conspiracy shared the same conspiratorial objective and mutual agreement." *Ash v. Allstate Ins. Co.*, No. 12-1533, 2013 WL 567774, at *5 (W. Va. Oct. 18, 2013).

Similarly, to prove a civil conspiracy claim under § 1983, a plaintiff must present evidence that the defendants "acted jointly in concert and that some overt act was done in furtherance of the

conspiracy" that resulted in a deprivation of the plaintiff's constitutional rights. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). To prevail, a party alleging a conspiracy must come forward with evidence that "each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* Plaintiffs alleging a civil rights conspiracy carry a "heavy burden." *Id.* Thus, in order to survive summary judgment, Mr. Ballock must produce evidence that, at least, reasonably leads to the inference that Defendants "positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.*

Mr. Ballock has no evidence that Defendants shared the same conspiratorial objective or that they came to a mutual agreement to either accomplish an unlawful goal or to accomplish a lawful goal by unlawful means.

Mr. Ballock attempts to make much of an e-mail Ms. Costlow sent to Cpl. Gaskins five days before Mr. Ballock was arrested, in which she mentioned, "The custody hearing is this Friday at 8:30 am in Judge Minor's chambers. Custody of my daughter is what is at stake. . . ." 3d Am. Compl. ¶¶ 82-83; a copy of the complete e-mail is attached as "Exhibit 25." Read in context, however, the e-mail is simply Ms. Costlow relaying information that may be relevant in the criminal investigation, such as important information her boyfriend found on the internet, letters Mr. Ballock's father sent to the Family Court Judge, and information that her daughter had seen file folder icons on Mr. Ballock's computer labeled "Ellen" and "Kinny" (the derogatory way Mr. Ballock spelled Kenny Ice, Jr.'s name). Ex. 25. Ms. Costlow provided Cpl. Gaskins with the date and time of the Family Court hearing because there had been discussions about when and where would be the best time to serve Mr. Ballock with the arrest warrant. Ex. 19, Costlow Dep. 132:10-18. No one wished to arrest Mr. Ballock at his home in front of his children. *Id.*; Ex. 2, Kief Dep. 258:10-21.

The undisputed evidence, however, is that Sgt. Kief arrested Mr. Ballock during the Family Court hearing, not to assist Ms. Costlow in the divorce proceedings, but out of concerns for officer safety. Ex. 2, Kief Dep. 258:10-14; Ex. 16, Gaskins Dep. 156:7-157:1. Furthermore, Sgt. Kief coordinated this plan of action with FBI officials. Ex. 2, Kief Dep. 120:23-121:7; Ex. 18 at 10. The FBI shared Sgt. Kief's "legitimate concerns" about the need to ensure Mr. Ballock was unarmed at the time of his arrest in order to reduce the risk of violence and concurred in this plan. Ex. 18 at 10.

Mr. Ballock points out that Family Court Judge Minor stated in an order that he was concerned that the timing of the arrest was an attempt by Ms. Costlow to gain an advantage in the divorce. 3d. Am. Compl. ¶ 91. As the FBI noted, however, Judge Minor was unaware that the State Police and the FBI shared legitimate concerns about how Mr. Ballock might act when arrested and coordinated his arrest to ensure he was unarmed. Ex. 18 at 10. Nevertheless, even if Ms. Costlow hoped to gain advantage in the divorce proceedings by having Mr. Ballock arrested, there is no evidence that the State Police Defendants shared this objective or came to a mutual agreement with her to accomplish it.

Mr. Ballock also attempts to make much of an e-mail from Sgt. Kief to Ms. Costlow in which, after Ms. Costlow informed Sgt. Kief that the Family Court refused to release a forensic psychological evaluation of Mr. Ballock and Ms. Costlow for Mr. Ballock's use in the criminal proceedings, Sgt. Kief responded, "That is great news! I'm sure he has his tail tucked between his legs and was humiliated." E-mail from Michael A. Kief to Ellen Costlow (Mar. 7, 2016, 9:09 a.m.), attached as "Exhibit 26." Mr. Ballock characterizes this exchange as showing Sgt. Kief was happy that exculpatory evidence had been withheld. Ex. 1, Ballock Dep. 92:6-93:14. Nothing could be

further from the truth. Sgt. Kief was merely offering encouragement to Ms. Costlow, the victim in the criminal matter. Ex. 2, Kief Dep. 153:9-154:4.

Moreover, the records requested were not "exculpatory evidence." As Mr. Ballock acknowledged during his deposition, Assistant Prosecuting Attorney Gabrielle Mucciola argued on behalf of the State that the report should not be released. Ex. 1, Ballock Dep. 92:14-16. What Mr. Ballock failed to acknowledge was that Judge Minor refused to release the report, not simply because its contents would be embarrassing to Ms. Costlow, but because he was concerned that Mr. Ballock's father would publish the report on the internet and because, after reviewing the statutes under which Mr. Ballock was charged, he concluded that "the records in question would have minimal if any relevance to Mr. Ballock's criminal case" because "it [was] not obvious . . . that Ms. Costlow's actions or evaluations referenced in the records would operate as a defense to the matters charged." Order at 2-3, *In re: Ballock and Costlow* (Mar. 4, 2016) (Civil Action No. 15-D-529), attached as "Exhibit 27."[10] The e-mail exchange between Sgt. Kief and Ms. Costlow is not evidence of a shared objective or mutual agreement to engage in unlawful conduct.

Finally, Mr. Ballock attempts to show that Sgt. Kief conspired with Ms. Costlow to cause him to lose his job by pointing to another e-mail exchange in which Ms. Costlow responded to Sgt. Kief's question "if there [was] anything really important" she wanted him to be sure to share when he met with FBI officials following the dismissal of the criminal charges. E-mail from Ellen Ballock to Michael Kief (Apr. 14, 2016, 2:50 a.m.), attached as "Exhibit 28." Sgt. Kief explained that he was merely asking Ms. Costlow to refresh his memory about an investigation that had begun nearly three years earlier. Ex. 2, Kief Dep. 168:12-169:1. Mr. Ballock, however, paints this exchange as Sgt. Kief attempting to help Ms. Costlow circumvent court orders that forbid her from

---

[10] The FBI, however, did review the records at issue as part of Mr. Ballock's administrative appeal of his discharge. Ex. 24 at 2 n.2. The FBI did not find the report exonerated Mr. Ballock.

communicating with Mr. Ballock's employer. Ex. 1, Ballock Dep. 146:8-15. Even accepting Mr. Ballock's characterization of the communication does not support his civil conspiracy claim because Sgt. Kief and Ms. Costlow's communications with the FBI were privileged. *Restatement (Second) of Torts* § 595. Thus, there is no evidence of a shared goal of accomplishing an unlawful objective.

Additionally, there is no causal link between these communications and Mr. Ballock's loss of employment. Sgt. Kief and Cpl. Gaskins spoke with FBI officials and provided them with the disc of Mr. Ballock's communications shortly after his arrest. Ex. 2, Kief Dep. 155:7-156:10; Ex. 16, Gaskins Dep. 62:5-63:13. Therefore, there is no causal link between Ms. Costlow's purported violation of court orders and Mr. Ballock's loss of employment. As the FBI repeatedly explained to Mr. Ballock, his misconduct—including not only his harassment of Ms. Costlow, but also his contributions to his father's websites about Ms. Costlow, his relationship with Kenny Ice, his abuse of his position as an FBI agent in gaining information about Ms. Costlow, his admitted misuse of a weapon, and his lying under oath—was the basis for its decision to discharge him. Ex. 24 at 19. Indeed, Mr. Ballock's attempts to defend his actions by producing alleged e-mails he exchanged with Ms. Costlow under an alias, data he obtained from Mr. Ice's cell phone, and call summary reports he obtained from law enforcement agencies about arguments between Ms. Costlow and Mr. Ice all simply served as "further evidence of the disturbing extent of [his] intrusion into [Ms. Costlow's] life and complete invasion of her privacy." *Id.* at 19-20.

Mr. Ballock has no evidence that the State Police Defendants shared a conspiratorial objective with Ms. Costlow to accomplish an unlawful plan. Therefore, the Court should grant the State Police Defendants summary judgment on Count Six.

## IV.    CONCLUSION

As the FBI found, Mr. Ballock's harassment of Ms. Costlow was "skillful and far reaching." He managed to avoid criminal liability and get the charges dismissed only by submitting a false statement to the Magistrate Court. Rather than focusing on his own misconduct, he continues his harassment of Ms. Costlow through this lawsuit, and he included the State Police Defendants in an attempt to get revenge on them. The source of Mr. Ballock's troubles, however, is Mr. Ballock. He has no evidence to support his varied causes of action against the State Police Defendants.

WHEREFORE, for the foregoing reasons, Defendants State Trooper Michael Kief, State Trooper Ronnie M. Gaskins, and State Trooper Chris Berry respectfully request that the Court GRANT their Motion and enter summary judgment in their favor and grant them any and all other relief the Court finds appropriate.

Dated this 18th day of July 2019.

Respectfully submitted,

*/s/ Mark G. Jeffries*
Mark G. Jeffries (WV Bar No. 11618)
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8000
mark.jeffries@steptoe-johnson.com

Montè L. Williams (WV Bar No. 9526)
STEPTOE & JOHNSON PLLC
P.O. Box 1616
Morgantown, WV  26507-1616
(304) 598-8000
monte.williams@steptoe-johnson.com

*Counsel for Defendants State Trooper Michael Kief, State Trooper Ronnie M. Gaskins, and State Trooper Chris Berry*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK,**

   **Plaintiff,**

**v.**             **CIVIL ACTION NO.: 1:17-CV-52**
                **Honorable Irene M. Keeley**

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M.**
**GASKINS, AND STATE TROOPER**
**CHRIS BERRY,**

   **Defendants.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of July 2019, I electronically filed the foregoing

"Memorandum in Support of Defendants State Trooper Michael Kief, State Trooper Ronnie M.

Gaskins, and State Trooper Chris Berry's Motion for Summary Judgment" with the Clerk of the

Court using CM/ECF system, which will send notification of such filing to the following:

      Charles J. Crooks, Esquire
      Crooks Law Firm PLLC
      244 Pleasant Street
      Morgantown, WV 26505
      *Counsel for Plaintiff*

      P. Todd Philips, Esquire
      Lyons Phillips Legal Group PLLC
      141 Walnut Street
      Morgantown, WV 26505
      *Counsel for Defendant Ellen Ruth Costlow*

      *s/ Mark G. Jeffries*
      Mark G. Jeffries (WV Bar No. 11618)
      STEPTOE & JOHNSON PLLC
      400 White Oaks Boulevard
      Bridgeport, WV 26330
      (304) 933-8000
      mark.jeffries@steptoe-johnson.com

8464606

Montè L. Williams (WV Bar No. 9526)
STEPTOE & JOHNSON PLLC
P.O. Box 1616
Morgantown, WV  26507-1616
(304) 598-8000
monte.williams@steptoe-johnson.com

*Counsel for Defendants State Trooper Michael Kief, State Trooper Ronnie M. Gaskins, and State Trooper Chris Berry*

8464606