# EXHIBIT 1

# In The Matter Of:

*Scott Ballock v.*
*Ellen Ruth Costlow, et al*

---

*Scott Ballock*
*April 19, 2019*

---

*Sapphire Court Reporting LLC*
*204 Oak Drive*
*Clarksburg, WV 26301*
*304-476-7553*
*www.SapphireCR.com*

Original File Scott T. Ballock.txt
Min-U-Script® with Word Index

14

1    counter-intelligence matters.

2        Q.    So, I want to make sure I understand.  You were

3    at the Ann Arbor resident agency, but that falls under

4    the Detroit field office?

5        A.    Correct.

6        Q.    So you didn't actually work physically at

7    Detroit; you were physically at Ann Arbor?

8        A.    My office was in Ann Arbor.

9        Q.    Okay.

10       A.    Yeah.

11       Q.    So, am I correct then that, basically, your job

12   duties as a special agent, speaking generally, were

13   investing crimes, apprehending suspects --

14       A.    Correct.

15       Q.    -- making arrests?

16       A.    Yes.

17       Q.    Anything else that I'm missing?  I mean, my

18   knowledge of the FBI comes from TV and movies.

19       A.    Developing informants, working with the CIA to

20   develop informants to work against terrorists overseas.

21       Q.    Where did you go after Ann Arbor?

22       A.    I was promoted to supervisory special agent at

23   CJIS in Clarksburg, West Virginia.  I started there in

24   August of 2011.

25       Q.    Was that your first supervisory position?

17

1   Jeff Lindsey went.  So, first him, and then Soo Barrow.

2   Yeah.

3        Q.   Did you work anywhere after that?

4        A.   No.

5        Q.   When were you and Ellen Costlow married?

6        A.   June of 1990 -- 1991?  1991.

7        Q.   Where were you married?

8        A.   Bloomington, Indiana.

9        Q.   Was that your first marriage?

10       A.   Yes.

11       Q.   Was it hers?

12       A.   Yes.

13       Q.   I believe you said you have two children;

14   correct?

15       A.   Yeah.

16       Q.   ███████ and ██████?

17       A.   Correct.

18       Q.   What are their ages?

19       A.   ██████ is now 15.  She'll be 16 in three weeks,

20   less than three weeks.  And ██████ is 18.

21       Q.   Now, I understand from reviewing the file here

22   that at some point in your marriage Ellen began seeing

23   other men; is that correct?

24       A.   Correct.

25       Q.   When did that begin?

18

1       A.    When we were assigned to Indianapolis division.

2       Q.    Do you know what year?

3       A.    2003.

4       Q.    Were you aware that she was seeing other men?

5       A.    Yes.

6       Q.    How did she meet these men?

7       A.    Online and in person.

8       Q.    When you say online, how did she meet them

9  online?

10      A.    Craigslist.

11      Q.    Any other methods or websites she used?

12      A.    Yeah.  Yes, that's the website she used.  I

13  don't know of any others.

14      Q.    Okay.  All right.  I'm sorry I wasn't clear

15  there.

16            You said she met them online and in person.

17  Would she first make contact with them through

18  Craigslist?

19      A.    Uh-huh.

20      Q.    I need a verbal answer.

21      A.    Oh, I'm sorry.  You're right.  Yes.

22      Q.    And then she would arrange an in-person

23  meeting; is that correct?

24      A.    Yes.

25      Q.    Okay.  Did you ever post ads on Craigslist for

1    something was up?

2        A.    Yeah.

3        Q.    Did you ask her are you seeing other men or did

4    you just ask her, you know, generally, what's up, why

5    are you so distant or --

6        A.    I don't recall specifically, but probably are

7    you seeing other men.

8        Q.    Okay.  And then she confessed to you that she

9    was soliciting men through Craigslist?

10       A.    Yes.

11       Q.    And you, at that point, did not divorce her;

12   correct?

13       A.    Correct.

14       Q.    And she continued to see men on Craigslist or

15   through Craigslist after you confronted her; correct?

16       A.    Correct.

17       Q.    Did you record any of her encounters with these

18   other men on video?

19       A.    No.

20       Q.    Did anyone record the encounters?

21       A.    She did.

22       Q.    Anyone else?

23       A.    Not that -- not that I'm aware of.

24       Q.    Did you watch videos of your wife having sex

25   with other men?

21

1     A.    Yes.

2     Q.    How often?

3     A.    Not very often, just to confirm that it was

4    happening.

5     Q.    Did you ever have sexual relations with anyone

6    else while you and Ellen were married?

7     A.    No.

8     Q.    So, kind of the crux of this matter, what led

9    to us being here today was after you two -- the four of

10   you moved here to Morgantown, the transfer to CJIS,

11   Ellen began seeing a man called Kenny Ice; correct?

12    A.    Kenny Ice, Jr; correct.

13    Q.    When did you become aware that Ellen was seeing

14   Kenny Ice?  And I'll just refer to him as Kenny Ice, but

15   you're correct there's Kenny Ice Junior and Senior, and

16   she was seeing the junior.  So when did you become aware

17   that she was seeing Kenny Ice?

18    A.    In the summer of 2011.

19    Q.    How did you learn that?

20    A.    She told me about it.

21    Q.    Why did she tell you?

22    A.    Because she said if we couldn't get things

23   straightened out that she was going to leave me for him.

24    Q.    So I take it you two were having some marital

25   problems at that point?

1     A.   Yes.

2     Q.   What kind of marital problems?

3     A.   She has mental disorders, and she was very

4 moody and violent and difficult.  It was like walking on

5 egg shells around her.  She -- for her part, I didn't

6 give her the attention that she wanted.  All my

7 attention was focused on the children.  Instead of

8 having date nights, I would insist that whatever we did

9 recreationally or vacation-wise was with the children.

10 I neglected her emotional needs.

11     Q.   Okay.  Now, so you said that you first became

12 aware that she was seeing Kenny Ice in the summer of

13 2011?

14     A.   Yes.

15     Q.   And you guys didn't separate until September

16 2012; is that correct?

17     A.   So then I need to make a correction.  She met

18 him in the summer of 2012, about June.  You're correct.

19 We moved to West Virginia in 2011.  A year -- almost a

20 year later, in June 2012, is when she met Kenny

21 Ice, Jr., and we were separated, that's correct, in

22 September of 2012.

23     Q.   Now, if she had been seeing other men since

24 2003 -- so at this point it would have been nine years

25 -- why was it an issue when she began seeing Kenny Ice?

24

```
 1        Q.   So, September 2012, you and Ellen separate?

 2        A.   Uh-huh.

 3        Q.   She -- am I correct that she stayed in the

 4   house at 51 Summit Overlook?

 5        A.   Yes.

 6        Q.   And where did you live?

 7        A.   I moved to an apartment in downtown Morgantown.

 8        Q.   Do you know the address?

 9        A.   I do not.

10        Q.   Who filed for divorce?

11        A.   She filed for divorce.

12        Q.   Do you know when that was?

13        A.   Around September 2012.

14        Q.   So shortly after you separated?

15        A.   Yes, very shortly.  Maybe October 2012, but

16   shortly.

17        Q.   Approximation is good enough.

18        A.   Okay.

19                  (Deposition Exhibit No. 1 was marked for

20                  identification.)

21        Q.   Mr. Ballock, I've handed you what's been marked

22   as Exhibit 1.

23        A.   Yes.

24        Q.   I'll represent to you that we got this from the

25   -- we requested and received the prosecuting attorney's
```

1    A.   No.

2    Q.   So you sent her 12 more texts over the next 12

3  minutes.  And then at the bottom of the page, about four

4  lines up at 12:20, she again says, "Please stop texting

5  me."  And if you follow along, you'll see that you

6  responded by sending three more texts over the next two

7  minutes.

8         Then again, going to the third page, at 12:22

9  and 12:23, she again texts, "Stop texting me please."

10  At 12:23, "Please leave me alone now."  You then sent 23

11  more texts.  So between the time that she first asked

12  you to stop texting her at 12:02 and the end of the day,

13  you sent a total of 38 text messages after she asked you

14  to stop.  Why?

15    A.   Because I was emotionally distraught.

16    Q.   You would agree with me that you made contact

17  with her using a cell phone after she asked you to stop?

18    A.   Yes.

19    Q.   At 1:45, about midway down the third page, one

20  of the texts you sent her after she'd asked you

21  repeatedly to stop was, "But I see it spiraling out of

22  control.  I see the cliff fast approaching for us all

23  and I want to save us."

24    A.   Can you repeat that?

25    Q.   Sure.  1:45 p.m., about halfway down the page.

1      A.   Because of email correspondence between Kief

2  and Ellen and because of some circumstantial evidence

3  against Berry and because Kenny Ice told me that --

4  Kenny Ice, Jr., told me that Berry was having a sexual

5  relationship with Ellen.

6      Q.   I'll go to the allegations about Trooper Berry

7  and Kenny Ice later, but what email or emails between

8  Sergeant Kief or now Lieutenant Kief and Ellen led you

9  to believe that the troopers had a vested interest in

10  assisting her?

11      A.   For one, before my misdemeanor trial, I

12  approached the family court and asked for the unsealing

13  of Christi Cooper-Lehki's report and testimony for use

14  in my defense.  Gabrielle Mucciola, I believe her name

15  is, assistant prosecutor showed up and represented Ellen

16  at that hearing and argued against its release.

17           The judge ultimately decided that he wasn't

18  going to release it based upon her comments and because

19  he thought it would be too embarrassing to Ellen.  In

20  emails between Kief and Ellen, Kief writes Ellen

21  something to the effect of -- 'cause Ellen, obviously,

22  had shared with him this information.  And Kief writes

23  to Ellen, "Wow.  That's fantastic.  That's great.  I bet

24  Scott was humiliated and walked out of the courtroom

25  with his tail between his legs."  So Kief, who is

1   supposed to be an unbiased law enforcement officer who

2   represents citizens as a whole, not just one person, was

3   taking sides with the complainant and very

4   unprofessionally and improperly communicating with her

5   on his official government account about how happy he

6   was that I was humiliated and how happy he was that

7   potentially exculpatory evidence was going to be kept

8   out of my case.

9        Q.   Just so I'm clear.   In the email from Kief to

10  Ellen he was describing the hearing where Gabe Mucciola

11  argues against releasing the Cooper-Lehki report?

12       A.   Yeah.   That was what he was referring to, I bet

13  Scott walked out of that courtroom with his tail between

14  his legs.   That's great news.   I bet he was humiliated.

15       Q.   That was Ellen saying those --

16       A.   No.   That was your Sergeant Kief saying those

17  statements, a law enforcement officer saying those

18  statements.

19       Q.   But you testified earlier --

20       A.   So he wasn't just -- so he wasn't just

21  concerned about the law or justice prevailing.   He was

22  concerned and happy that someone was being humiliated

23  and that someone would not be able to use exculpatory

24  information to their benefit.

25       Q.   Where did you get that email?   Was that

1  correct?

2      A.   Yes.

3      Q.   Without going into any details about the actual

4  discussion that occurred, is it fair to say that you

5  discussed this agreement with your counsel before you

6  signed it?

7      A.   Yes.

8      Q.   Looking on the second page, the first paragraph

9  of the agreement.  "Scott Ballock acknowledges that

10  probable cause existed for West Virginia State Police to

11  file for the issuance of the warrants in this case

12  pursuant to West Virginia Code Section 61-3C-14a and

13  Section 61-2-9a."  Did Corporal Gaskins have probable

14  cause to charge you with those violations?

15      A.   I don't believe he did.

16      Q.   You signed at the bottom of this agreeing that

17  he did.  Did you submit a false statement to the

18  magistrate court?

19      A.   In that regard, yes.

20      Q.   Now, as an FBI agent investigating crimes, you

21  understood what probable cause meant; correct?

22      A.   Yes.  It's a very low standard.

23      Q.   And when you would investigate cases, you would

24  gather the evidence and present it to a U.S. Attorney;

25  correct?

112

1    get me that she didn't want to see her boys face a civil

2    suit, and she believed that this would preclude me from

3    filing a civil suit.

4        Q.    Any other reasons why you knowingly submitted a

5    false statement to the magistrate?

6        A.    No.   Everybody knew that probable cause didn't

7    exist.   Marcia did.   My attorney did.   I believe Ellen

8    did.

9        Q.    And you would agree with me that the magistrate

10   found probable cause and issued a warrant for your

11   arrest; correct?

12       A.    Yeah.   Sure.   That's pretty easy.

13       Q.    Let's refer back to your timeline for a minute.

14   Page 8 on your entry for May 21st, 2013, "Kenny Ice

15   interviews begin."

16       A.    Yes.

17       Q.    That's the day you first spoke to Kenny Ice?

18       A.    I think so.

19       Q.    It says here in your timeline that Mr. Ice

20   revealed that Ellen was having a sexual affair with West

21   Virginia State Police Trooper Chris Berry, that Ellen

22   and Berry were working to have you arrested so that you

23   would lose your job and so that Ellen would win custody

24   of the children and lifetime alimony payments.

25       A.    Yes.

1   Berry and that he was going to arrest me, I was

2   unconcerned because I didn't think I was doing anything

3   wrong.

4        I didn't document it.  I didn't document a lot

5   of things that he told me.  I had a busy life.  I was a

6   single parent.  I was raising my two children.  I work.

7   I didn't document everything he told me.

8       Q.   As I understand it, you allege that there were

9   some text messages between Trooper Berry and Ellen; is

10  that correct?

11      A.   According to Kenny Ice, Jr.

12      Q.   Did you see the text messages?

13      A.   I did not.  Kenny Ice, Jr. said they were of a

14  personal nature, highly inappropriate messages between a

15  law enforcement officer and Ellen, someone that was

16  already in a relationship with him.

17        There was one message along the lines of what

18  should I bring over for lunch.  This caused a fight --

19  or maybe what should I get for lunch.  I don't know

20  which one sent it.  It caused a fight between Ellen and

21  Kenny which resulted in deputies being called out to the

22  house.

23      Q.   But you did not actually see those text

24  messages?

25      A.   I did not.  They were sent at a time when Berry

116

1   was apparently off duty.

2        Q.    Okay.  And so what exactly did Mr. Ice tell you

3   about Trooper Berry and Ellen?

4        A.    That they were having a relationship.

5        Q.    Sexual relationship?

6        A.    Sexual relationship, yes, and that it was clear

7   from the email -- from the text messages.

8        Q.    It was clear to him?

9        A.    Yeah, clear to him.

10       Q.    When did he say this affair began or this

11  relationship began?

12       A.    I didn't -- I don't think I asked that and I

13  don't know he told me.

14       Q.    How long did the relationship last?

15       A.    I don't know the answer to that.

16       Q.    How did Trooper Berry and Ellen meet?

17       A.    I don't know the answer to that.

18       Q.    Where would they meet to have sex?

19       A.    I don't have the answer to that.

20       Q.    Kenny Ice didn't provide you with any of this

21  information?

22       A.    No.

23       Q.    What I can't understand, Mr. Ballock, Ellen had

24  been seeing other men with your knowledge since

25  approximately 2003.  So, at this point, for ten years.

117

1    The two of you were separated and in the process of

2    getting a divorce.  She was dating Kenny Ice, had been

3    dating him for a year at this point.  If she was having

4    an affair with Trooper Berry, why would you care?

5        A.   I didn't care.  I couldn't care less.  The

6    reason he told me was because it's what started a fight.

7        Q.   Between him and --

8        A.   Between them.  I cared only in that he also

9    said they were trying to find a way to arrest me.

10       Q.   What specifically did he tell you about that?

11       A.   Just that they were trying to find a way to

12   arrest me.

13       Q.   Did he tell you why he believed that?

14       A.   So that I would lose my job.

15       Q.   But, I mean, why did he believe that they were

16   trying to find a way to arrest you?

17       A.   I don't know.  He was -- he was coy in a lot of

18   things.  He, again, would parse out information,

19   increasingly damaging information.  In fact, he once

20   told me I have one thing that I'm not even telling you

21   that would send Ellen to jail and she'd never see her

22   kids again, but I'm waiting to see how you treat me

23   through all this.

24       Q.   That's what Kenny Ice told you?

25       A.   Yeah.

123

1    immediately after it happened.  But then I wanted to

2    write this up some time later and said remember that,

3    tell me again what happened.

4        Q.   Okay.  Why did your father contact Sergeant

5    Kief about allegations that his

6    soon-to-be-ex-daughter-in-law was seeing a state

7    trooper?

8        A.   My dad said that he did that to protect Trooper

9    Berry, actually, because Ellen had sexual relations with

10   men and would then go tell their wives about the

11   relationship.  And he said that he was trying to help

12   Berry avoid the same fate.

13       Q.   Now, there's no mention in here that your

14   father asked Sergeant Kief to file a formal complaint

15   against Trooper Berry, is there?

16       A.   No.

17       Q.   Did your father tell you that he asked Sergeant

18   Kief to file -- that he wanted to file a formal

19   complaint against Trooper Berry?

20       A.   I don't think he did.  I think, again, I think

21   he was calling just to give a heads-up.

22       Q.   Let's go back to your timeline.

23            MR. WILLIAMS:  Take a break?

24            MR. JEFFRIES:  Let me finish this up.

25       Q.   Let's go to page 12.  Are you there?

136

1   interview more than just the complainant.  Everyone

2   knows that.

3           This is a good one.  The third paragraph, the

4   victim went on displaying that the accused would cut his

5   toenails short, to the point where they would bleed and

6   make a comment it was a relief.  She accused me of being

7   a cutter.  She told the -- I have no idea how she came

8   up with that.  That was pretty fantastical.  She told

9   the psychiatrist that I was a cutter and therefore I was

10  dangerous.

11          I was going through, obviously, the most

12  difficult time of my life, and she, in response to that,

13  had me roll up my pant legs and my sleeves to see that I

14  have no scars.  I'm not a cutter.  I don't know why she

15  -- she would have said those things.

16          Well, I do know why.  She was trying to make me

17  out to be a monster.  It fit within her narrative.

18  That's a lie.  But, again, as you say, he wrote, "The

19  victim."

20      Q.   So --

21      A.   But, again, that's why you talk to other

22  people.  You don't just talk to just the complainant

23  unless you're trying to accomplish an objective.

24      Q.   You would agree with me then that nearly

25  everything that you've characterized as a lie was

1   related to -- it even explicitly says in the report that

2   Ellen told Corporal Gaskins that.

3       A.   Correct.

4       Q.   Would you agree that on the two or three

5   occasions you pointed out where he did not actually say

6   -- you know, preface the statement with "the victim

7   advised," would you agree that if you read in context

8   he's just relaying what she told him?

9       A.   Yeah.

10      Q.   In Paragraph 216 of your complaint it says

11  "When he prepared the report, Gaskins knew or should

12  have known that the statements provided to him by

13  Costlow were false."  I'd like to break that down.  Why

14  do you think Corporal Gaskins actually knew the

15  statements were false?

16      A.   Because I believe that they worked in concert

17  with Ellen to affect my arrest at family court to

18  advantage Ellen and disadvantage me based upon all the

19  other evidence.  And, at minimum, he should have known

20  because he should have interviewed more than the

21  complainant, especially in a divorce case.  Everyone

22  knows that that's where false allegations are routinely

23  made.  It's unbelievable.

24      Q.   I don't want to interrupt you.  Are you done?

25      A.   I'm done.

139

1      A.    I did not.

2      Q.    You stated in the complaint, specifically in

3   Paragraphs 139 and 140, that Ellen is a, quote,

4   "skillful liar."  Why should Corporal Gaskins have known

5   that her statements were false especially when she had

6   your own emails to back a lot of them up?

7      A.    Because had he done his job properly and

8   professionally, he would have -- and had he not been

9   trying to serve another objective, he would have

10  interviewed more than the complainant.

11     Q.    So you just believe he didn't conduct an

12  adequate investigation?

13     A.    On purpose.

14     Q.    Who was this report provided to?

15     A.    Which report?

16     Q.    The incident report?

17     A.    Who was it provided to?

18     Q.    Yes.

19     A.    I don't understand the question.  They created

20  it for their --

21     Q.    Do you know who read this report?

22     A.    Who read it?

23     Q.    Yes.

24     A.    I have no idea who all read it.

25     Q.    Do you know if it was provided to anyone

140

1    outside of the criminal proceedings?

2        A.   I don't know.  But I wouldn't be surprised if

3    Christi Cooper-Lehki received it as part of her

4    investigation.  I don't know.

5        Q.   Between the time that you were arrested in

6    September 2013 and the time that the charges against you

7    were dismissed in April 2016, you didn't have any

8    contact with Sergeant Kief, did you?

9        A.   No.

10       Q.   During that same timeframe, did you have any

11   contact with Sergeant Gaskins?

12       A.   No.

13       Q.   During that same timeframe between your arrest

14   and the dismissal of the charges, did you have any

15   contact with Trooper Berry?

16       A.   No.

17       Q.   Did any of the troopers, my clients, ever offer

18   to drop the criminal charges against you?

19       A.   Your clients?

20       Q.   Yes.

21       A.   No.

22       Q.   Did Ellen ever offer to drop the charges

23   against you?

24       A.   Through the assistant prosecutor.

25       Q.   Which assistant prosecutor?

142

1    my father remove a website that he had created which had

2    Ellen on it.   Benninger --

3        Q.    Which one?

4        A.    I don't know what it is.   Benninger called my

5    dad into his office and me, told us of Cindy Scott's

6    proposal.   And my dad refused, so Benninger threw him

7    out of the office.

8        Q.    You don't know the name of the website that

9    Cindy Scott wanted removed?

10       A.    No.

11       Q.    So Ellen continued to prosecute the case until

12   it was eventually dismissed?

13       A.    Yes.

14       Q.    Was Trooper Berry involved in your criminal

15   prosecution at all?

16       A.    I don't know.

17       Q.    Did he ever appear at any of the hearings

18   related to the criminal charges?

19       A.    Not that I'm aware.

20       Q.    How did my clients, Lieutenant Kief, Sergeant

21   Gaskins, and Trooper Berry, how did they abuse the

22   criminal process?

23       A.    By working with Ellen to have me arrested at

24   family court to advantage her and disadvantage me.

25       Q.    And --

146

1    completely unnecessary.

2        Q.    Any other evidence?

3        A.    Not that I can think of right now.

4        Q.    Do you have any evidence that -- strike that.

5              What outrageous acts did Sergeant Kief commit?

6        A.    I've explained some of them.  Shall I explain

7    them again?

8        Q.    Yes.  If you could -- I mean, if you've already

9    referred to them, just point me back to earlier

10   testimony.  But what specifically did he do that you

11   believe is outrageous?

12       A.    Specifically he invited Ellen to circumvent the

13   judge's order.  And, through him, provide the FBI with

14   disparaging information.  He thought he was being pretty

15   clever there.

16             He obviously wanted harm to come to me because

17   he gave Ellen suggested topics to include, has Scott

18   ever abused his position of authority which was well

19   outside of the scope of the bureau's internal

20   investigation into me seven days after the order was

21   issued at which Kief was sitting next to Ellen.  The

22   email where he says that's great news that the

23   exculpatory information is being denied Scott.  He

24   didn't use the term exculpatory information, but that's

25   what it was.  Great news.

1    brought you back to CJIS?

2        A.    Yes.

3        Q.    And you went back to work?

4        A.    Yeah.

5        Q.    Did they inform you at that time that they

6    would be conducting an investigation?

7        A.    No, because it wasn't them who conducted the

8    investigation.   The protocol is for OPR to conduct an

9    investigation.

10       Q.    Did they inform you at that time that OPR would

11   be conducting an investigation?

12       A.    I don't know that they informed me of that, but

13   it was understood.

14       Q.    Okay.   Now I understand that about a week and a

15   half later, on September 26th, 2013, the FBI began its

16   internal investigation?

17       A.    No.

18       Q.    No?

19       A.    The FBI delayed its internal investigation

20   until the resolution of the misdemeanor criminal charge.

21   I invited them to and I asked them to, but their policy

22   is to not begin until...

23       Q.    Regardless of when the FBI investigation began,

24   were you informed they were conducting an internal

25   investigation?

156

1        A.     Yes.

2        Q.     Who informed you?

3        A.     It may have been via letter.   I don't know

4    precisely who informed me.

5        Q.     That leads to my next question.   After the

6    charges were dismissed in the Mon County Magistrate

7    Court in April of 2016, what then happened at the FBI?

8        A.     Then two agents came out to interview me.   This

9    may have been the first time I was official and formally

10   notified of the investigation.   Although, I knew it was

11   coming.   And interviewed me about what happened.

12       Q.     Were you still -- I take it you weren't put

13   back into your old position?

14       A.     Correct.

15       Q.     You weren't given your gun or badge?

16       A.     Correct.

17       Q.     That kind of leads to my next exhibit.

18              (Deposition Exhibit No. NO 34 was marked

19              for identification.)

20       Q.     Mr. Ballock, Exhibit 34 is your signed sworn

21   statement that you gave to the FBI on June 29th, 2016.

22       A.     Yeah.

23       Q.     This is what you were just referring to?

24       A.     Yeah.

25       Q.     Actually, I do have a question.   At the top

168

1    them.

2        Q.    Attempted to serve them personally?

3        A.    Yes.  I didn't know what the rules were for

4    service.

5        Q.    When you filed the original complaint pro se,

6    you received a copy of the notice of general guidelines

7    for proceeding pro se?

8        A.    Uh-huh.

9        Q.    Did you read them?

10       A.    Yes.

11       Q.    So you were informed that, even though you were

12   proceeding pro se, you were bound by the Federal Rules

13   of Civil Procedure.

14       A.    Yes.

15       Q.    Were you aware that Rule 4 provides that as a

16   party to the action you are not permitted to conduct

17   service?

18       A.    No.  I only attended law school for three

19   weeks.

20       Q.    So who was the uniformed representative who

21   appeared at the resident agency?

22       A.    I don't know.  I wish you guys would tell me.

23       Q.    To make sure that I'm clear, the resident

24   agency is a different physical location and different --

25   I guess within the organization chart, it's a completely

186

1    Again, you have alluded to this before, but in the top

2    paragraph there it talks about Agent Hamrick attended

3    the arrest proceeding.  So he was there at family court

4    when you came out?

5         A.    Uh-huh.

6         Q.    Verbal answer.

7         A.    Yes.  Sorry.  Yes.

8         Q.    Did he accompany you to magistrate court?

9         A.    I don't know.

10        Q.    He was just there on behalf of the agency to

11   observe?

12        A.    Yes.

13        Q.    There on the -- just under Item 5, under the

14   bold heading it says, Special Agent -- "Senior

15   Supervisory Agent Ballock was rated at the excellent

16   level from 2012 to 2015."  So this would include after

17   your arrest in 2013 and while the charges were pending

18   in 2014 and '15?

19        A.    Yes.

20        Q.    I'm sorry?

21        A.    Yes.

22        Q.    And it goes on to say, "and he has earned two

23   cash awards."  What is the basis for a cash award?

24        A.    It varies, doing a special assignment, going

25   above and beyond, getting -- starting new projects.