# In The Matter Of:

*Scott Ballock v.*
*Ellen Ruth Costlow, et al*

---

*Scott Ballock*
*April 19, 2019*

---

*Sapphire Court Reporting LLC*
*204 Oak Drive*
*Clarksburg, WV 26301*
*304-476-7553*
*www.SapphireCR.com*

Original File Scott T. Ballock.txt
Min-U-Script® with Word Index

```
                                                                    24
 1      Q.   So, September 2012, you and Ellen separate?
 2      A.   Uh-huh.
 3      Q.   She -- am I correct that she stayed in the
 4  house at 51 Summit Overlook?
 5      A.   Yes.
 6      Q.   And where did you live?
 7      A.   I moved to an apartment in downtown Morgantown.
 8      Q.   Do you know the address?
 9      A.   I do not.
10      Q.   Who filed for divorce?
11      A.   She filed for divorce.
12      Q.   Do you know when that was?
13      A.   Around September 2012.
14      Q.   So shortly after you separated?
15      A.   Yes, very shortly.  Maybe October 2012, but
16  shortly.
17      Q.   Approximation is good enough.
18      A.   Okay.
19              (Deposition Exhibit No. 1 was marked for
20              identification.)
21      Q.   Mr. Ballock, I've handed you what's been marked
22  as Exhibit 1.
23      A.   Yes.
24      Q.   I'll represent to you that we got this from the
25  -- we requested and received the prosecuting attorney's
```

**EXHIBIT 2**

1  file in the criminal prosecution that underlies this
2  matter.
3      A.   Uh-huh.
4      Q.   Did you create this timeline?
5      A.   I did.
6      Q.   Do you know when you did?
7      A.   I don't.  I should have dated it.
8      Q.   Was it -- it was created for the criminal --
9      A.   Correct.  Yes.
10     Q.   -- at some time during the criminal action?
11     A.   Yes.
12     Q.   Okay.  We'll have a number of exhibits today,
13 but I'd ask you to kind of set this one aside because
14 we'll be coming back and referring to it from time to
15 time.  It's, frankly, a pretty comprehensive
16 chronological listing of what went on.
17          We'll move on to Exhibit 2.
18             (Deposition Exhibit No. 2 was marked for
19             identification.)
20     Q.   Mr. Ballock, take a look at the bottom of the
21 first page there.  You'll see an email from
22 ScottBallock@yahoo.com, November 7th, 2012, to
23 EllenBallock@yahoo.com.  Do you see where I am?
24     A.   Yes.
25     Q.   If you flip it over to the next page you'll see

1  on September 26, 2012, the subject line, "Hatred
2  Exposed." So this would have been -- do you recall the
3  exact date that the two of you separated?
4      A.   September 14th.
5      Q.   Okay. This was sent September 26, so less than
6  two weeks later?
7      A.   Yes.
8      Q.   Was this about the divorce process or the
9  children?
10     A.   Everything was about the children.
11     Q.   So that's your position, that everything that
12 you spoke to her about was about the children?
13     A.   Everything that I did and all of my actions
14 were for the benefit of the children.
15     Q.   Okay. Where in this email are the children
16 mentioned?
17     A.   The children aren't mentioned in this email.
18     Q.   And how is it for the benefit of the children
19 for you to say that her hatred was exposed?
20     A.   My attempts at writing her were to reconcile.
21 The things that I wrote were done in an attempt to
22 reconcile with her because I was concerned about the
23 children's future and the children's welfare.
24     Q.   And saying that her hatred was exposed, was
25 that polite and respectful?

140

1  outside of the criminal proceedings?
2      A.   I don't know.  But I wouldn't be surprised if
3  Christi Cooper-Lehki received it as part of her
4  investigation.  I don't know.
5      Q.   Between the time that you were arrested in
6  September 2013 and the time that the charges against you
7  were dismissed in April 2016, you didn't have any
8  contact with Sergeant Kief, did you?
9      A.   No.
10     Q.   During that same timeframe, did you have any
11 contact with Sergeant Gaskins?
12     A.   No.
13     Q.   During that same timeframe between your arrest
14 and the dismissal of the charges, did you have any
15 contact with Trooper Berry?
16     A.   No.
17     Q.   Did any of the troopers, my clients, ever offer
18 to drop the criminal charges against you?
19     A.   Your clients?
20     Q.   Yes.
21     A.   No.
22     Q.   Did Ellen ever offer to drop the charges
23 against you?
24     A.   Through the assistant prosecutor.
25     Q.   Which assistant prosecutor?

1  A.  No.
2  Q.  How do you believe this came about then?
3  A.  I believe that Sergeant Kief, when an
4  allegation was made against one of his troopers, he
5  circled the wagons and worked with Berry and Ellen to
6  figure out a way to hurt me.
7  Q.  What evidence do you have to support that
8  belief?
9  A.  An email message, for one, that Ellen sent to
10 Gaskins maybe five days before the custody hearing in
11 which she said the custody hearing is this coming
12 Friday.  I have no understanding why it would be
13 important for their investigation to know why the
14 custody hearing was coming up because -- ask the
15 question again.
16 Q.  What evidence do you have to support your
17 belief that the whole reason they initiated a criminal
18 investigation and brought charges against you was
19 because of Berry's relationship with Ellen?
20 A.  Because of the sequencing of events.
21 Q.  Can you explain that to me?
22 A.  Chris Berry has a relationship with her, we let
23 Kief know about it, very shortly thereafter they began
24 an investigation, violate all of their policies, and
25 have me arrested at a family court hearing when that was

1   brought you back to CJIS?
2       A.   Yes.
3       Q.   And you went back to work?
4       A.   Yeah.
5       Q.   Did they inform you at that time that they
6   would be conducting an investigation?
7       A.   No, because it wasn't them who conducted the
8   investigation.  The protocol is for OPR to conduct an
9   investigation.
10      Q.   Did they inform you at that time that OPR would
11  be conducting an investigation?
12      A.   I don't know that they informed me of that, but
13  it was understood.
14      Q.   Okay.  Now I understand that about a week and a
15  half later, on September 26th, 2013, the FBI began its
16  internal investigation?
17      A.   No.
18      Q.   No?
19      A.   The FBI delayed its internal investigation
20  until the resolution of the misdemeanor criminal charge.
21  I invited them to and I asked them to, but their policy
22  is to not begin until...
23      Q.   Regardless of when the FBI investigation began,
24  were you informed they were conducting an internal
25  investigation?

286

1  year and then consider whether to go ahead with the
2  divorce or to reconcile; is that a fair characterization
3  of where things stood?
4      A.   At least on one occasion she expressed that.
5      Q.   Okay.  I mean, have you got her in writing
6  somewhere on that because these folks want to see
7  everything in writing?
8      A.   I know, and I don't.  I don't.
9      Q.   Okay.
10     A.   And that was face to face.
11     Q.   Okay.  Were you willing to act on that request?
12     A.   It excited me.
13     Q.   Why do you use the word excited?
14     A.   It gave me hope.
15     Q.   Okay.  Were you still anxious and worried that
16 you could lose custody of your children to Ellen at that
17 point?
18     A.   Yes.
19     Q.   Was that your motivation for seeking
20 reconciliation?
21     A.   My primary motive, yes.
22     Q.   The arrest that happened, I guess it was Friday
23 the 13th --
24     A.   Uh-huh.
25     Q.   -- 2013, in September.  Were you aware that

287

1 this was going to happen, that you were going to be
2 arrested?
3    A.   No.
4    Q.   It sounds like the FBI was aware.
5    A.   Yes.
6    Q.   It sounds like there was an FBI agent present
7 to, I guess, just observe what happened?
8    A.   Yes.
9    Q.   Did you know that this person was an FBI agent
10 when they were present in the room?
11    A.   I had never met him, but he introduced himself
12 -- introduced himself as an FBI agent.
13    Q.   Really. All right. So you didn't know this
14 person prior to that?
15    A.   Correct.
16    Q.   And he said I'm an FBI agent. So I'm going to
17 guess you probably said, okay, nice to meet you, but why
18 are you here?
19    A.   I didn't even have to ask that. He very
20 quickly volunteered I'm here to make sure everything
21 goes okay for you.
22    Q.   What did you take him to mean by that?
23    A.   Just that he was there to observe and make sure
24 that -- be able to witness anything that happened.
25    Q.   Okay. So, at the point that you met this agent