```
             IN THE UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT

                    OF WEST VIRGINIA

                    * * * * * * * *

SCOTT T. BALLOCK,         *

     Plaintiff            *    Case No.

     vs.                  *    1:17-CV-52

ELLEN RUTH COSTLOW,       *

STATE TROOPER MICHAEL     *

KIEF, STATE TROOPER       *

RONNIE M. GASKINS,        *

STATE TROOPER CHRIS       *

BERRY,                    *

     Defendants           *

                    * * * * * * * *


                       DEPOSITION OF

                       MICHAEL KIEF

                       May 28, 2019
```

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

Sargent's Court Reporting Service, Inc.
1-800-727-4349

```
                                                               59
```

1
2            ATTORNEY CROOKS:  We can go back on the
3    record.
4    BY ATTORNEY CROOKS:
5        Q.    Okay.
6              Just before we took our short break, we were
7    talking about a timeframe that we'll probably be able to
8    pin down more precisely by reference to the voluminous
9    document productions that have been made.
10             But doing the best we can from memory, it
11   sounds like you --- you heard from Tom Ballock, Senior by
12   his way of calling --- asking for the person in charge at
13   the barracks.  Got you.  He complained about Chris Berry.
14             And then you got in touch with Trooper Berry,
15   talked to him.  He denied the relationship with Ellen
16   Ruth Costlow.  You looked at his cell phone.  Can't
17   remember exactly what you found, but you're confident
18   that you certainly didn't find anything that prompted you
19   to act further on that particular inquiry.
20             Have I summed all that up correctly?
21       A.    Correct.  Yes, sir.
22       Q.    Okay.
23             Did you do anything else at that point to
24   investigate Tom Ballock, Senior's complaint about Trooper

                                                                   60

1    Berry?
2         A.    Yes, sir.
3         Q.    What did you do?
4         A.    Called Ms. Costlow.
5         Q.    All right.
6               How'd you --- how'd you know how to get in
7    touch with her?  Did Tom Ballock give you that
8    information, or ---?
9         A.    I don't remember how I found that out.  No,
10   sir, I don't remember that.
11        Q.    Didn't get it off Trooper Berry's phone, did
12   you?
13        A.    I doubt that, sir.  I don't remember how I got
14   her --- her phone information.
15        Q.    Okay.
16              Well, you can't say for sure that there wasn't
17   communication between Trooper Berry and Ellen Costlow, so
18   it's possible you did get it from his phone?
19        A.    Again, I don't know, sir.
20        Q.    All right.
21              So tell me about this.  Did you go to see her?
22   Did she come to see you?  Did you just talk over the
23   phone?  How did this go down?
24        A.    I --- I called her on the phone, had a

61

1 conversation with her on the phone.
2     Q.    Okay.
3         Walk me through what you remember about that.
4     A.    I told her why I was calling. She --- she got
5 upset and denied any affair with Trooper Berry. And she
6 made the comment --- a comment about --- and I don't know
7 exactly word for word, but she made the comment she was
8 being harassed.
9     Q.    By whom?
10     A.    I don't believe she even said that, sir. I
11 don't remember the whole gist of the conversation. Being
12 wronged, though.
13         She asked if she could come into the state
14 police barracks to talk to me. I said, well, sure if you
15 have a complaint you would like to make or --- or talk to
16 me, that's fine. So she came in.
17     Q.    Have you told me everything you can recall
18 about your first telephone discussion with her?
19     A.    No, sir. That's about the --- the vague ---
20 the vague memory I have of it.
21     Q.    Did you make notes of your conversation with
22 Tom Ballock, Senior, your discussion with Trooper Berry,
23 and your phone call with Ellen Ruth Costlow?
24     A.    I believe I jotted a few things down talking to

66

know, your best, honest recollection and testimony about all this stuff. And it's not --- you know, it's not a contest or ---

A.  Sure.

Q.  --- anything of that nature.

All right.

So Ellen Ruth Costlow comes in to see you the evening of the same day that you called her?

A.  I believe it was the same evening.

Q.  To the best of your memory?

A.  Yes, sir.

Q.  Tell me what you remember. What was your impression when --- when she came in to see you?

A.  She --- she came to the state police barracks. She sat down, and she --- well, I had a conversation about her and Trooper Berry, which she denied having an affair with Trooper Berry.

She then went on to say she was in the middle of a divorce or in --- in the process of divorce and that her soon to be ex-husband would not stop contacting her, that she was being harassed daily with emails and text messages.

Q.  You say Ellen Ruth Costlow denied having a romantic relationship with Christ Berry. Did she deny

106

1  Gaskins of the Morgantown Detachment.
2      Q.   Okay.
3          And who's it from?
4      A.   Captain Merrill.
5      Q.   Okay.
6          And what was Captain Merrill instructing
7  Corporal --- then Corporal Gaskins?
8      A.   To open up an investigation.
9      Q.   So the fair implication here is that Exhibit 4
10 occurred because it was instigated by Exhibit 3?  In
11 other words, you asked Captain Merrill for authority and
12 he granted it.  And he personally directed Corporal
13 Gaskins to open the investigation?
14     A.   Correct.
15     Q.   All right.
16         And the reason this echelon of authority at the
17 state police was directly involved here is because there
18 was an FBI agent at issue.
19         True?
20     A.   Yes, sir.
21     Q.   Did you make any contact with the FBI in the
22 course of your investigating?
23     A.   During the course of the whole ---?
24     Q.   Prior to the time that my client was arrested

107

1  on September 13th, 2013, did you contact the FBI?
2      A.   I --- I do not know, sir. I cannot remember
3  who contacted the FBI.
4      Q.   All right.
5           I take it by your answer that you're satisfied
6  that there was somebody at the state police who contacted
7  the FBI about Scott Ballock prior to his arrest on
8  September 13, 2013?
9      A.   Correct.
10     Q.   What was the point of that contact?
11     A.   Twofold, to let the agency that he was hired
12 under know that there was a criminal investigation being
13 conducted, and two, professional courtesy.
14     Q.   Did you direct someone to make that contact?
15     A.   I do not remember that, sir.
16     Q.   Would corporal Gaskins have had the authority
17 to contact the FBI for the two purposes that you just
18 identified?
19     A.   Yes, sir.
20     Q.   Okay.
21          Who was in charge of the investigation,
22 Corporal Gaskins?
23     A.   He was the investigating officer, sir.
24     Q.   Okay.

```
                                                              122

1         Q.    Why wasn't it suggested by the state police?
2         A.    I don't know that, sir.  I --- I have no clue
3    about that, sir.
4         Q.    Isn't it true, in fact, the reason that was
5    never offered or suggested or discussed with the FBI was
6    in am effort to try and prejudice Scott Ballock in the
7    eyes of his employer, the FBI, and to prejudice him in
8    the eyes of the family court Judge, Judge Minor?
9         A.    No, sir, not at all.  That was not the intent.
10        Q.    Would you agree that that was certainly the
11   effect?
12        A.    No, sir.
13        Q.    You don't --- you don't think that there was
14   any prejudice to Scott Ballock in the eyes of his
15   employer, the FBI, to ---?
16        A.    If there was ---.
17        Q.    Rather than the state police contact them, and
18   say that they were worried that he might be violent, he
19   was going to have to be taken into custody?
20        A.    If we had any prejudice against Mr. Ballock
21   about his employer, we would have went to his place of
22   work and placed him under handcuffs and taken him out of
23   his workplace.
24        Q.    What did you understand the purpose of the
```

123

```
 1   presence of the FBI representative to be in court the
 2   date that you arrested Scott Ballock?
 3        A.   They wanted to be present, sir.  I don't know
 4   what their purpose was.
 5        Q.   They didn't explain?
 6        A.   No, sir.  Not that I can remember.
 7        Q.   Okay.
 8             Did Scott Ballock put up any resistance to
 9   being arrested?
10        A.   No, sir.
11        Q.   How did he handle the whole thing?
12        A.   I don't remember him, but I just --- he was
13   quite calm about it, I believe.  I don't think he said a
14   word, if I remember correctly.
15        Q.   So in fact, the concern about him possibly
16   being, you know, violent or even loud and obnoxious about
17   it, those worries and fears were not born out, were they?
18        A.   Of being obnoxious about it, sir?
19        Q.   Yeah.  I mean, he didn't raise his voice ---
20        A.   No, sir.  He did not raise his voice at all.
21        Q.   --- or say how dare you or ---?
22        A.   No, sir.
23        Q.   Nothing to that effect?
24        A.   No, sir.
```

154

1  A.  Again, I probably did say that.  Or I did say
2  that.  But that was just in regard for --- to embellish
3  her to --- she finally won one, and I was just, you know,
4  happy about just garnering her ---.
5  Q.  Do you think that that was consistent with your
6  obligation under policy and procedure to maintain
7  impartiality with respect to a matter that wasn't even
8  part of your official duties?
9  A.  Impartiality concerning ---?
10  Q.  Yeah.  I mean, you weren't investigating
11  anything in connection with the family court case?
12  A.  Correct.
13  Q.  You were participating to some degree in the
14  criminal case against Scott.  And Scott was trying to get
15  evidence to defend himself against those charges, and you
16  were pretty happy that he failed in that effort, weren't
17  you?
18  A.  My disdain for Scott and his dad had come with
19  harassments and emails.  Not --- harassments and
20  websites.
21  Q.  Okay.
22      So you do harbor ill feeling toward my client?
23  A.  For --- yes, sir.  I do.
24  Q.  Likewise, you harbor a feeling toward Scott's

219

1  A.  No. It was just, of course, Mr. Ballock,
2  Senior had the websites.
3  Q.  When did you first learn of those websites?
4  A.  I don't know, sir. I don't know that. I don't
5  know that.
6  Q.  Okay.
7       So the websites really didn't have anything to
8  do with your discretionary judgment as to whether
9  something short of arrest and criminal prosecution was
10  necessary to get Scott Ballock to cease and desist any
11  further communication with Ellen?
12  A.  No, sir.
13  Q.  Did you answer? I'm sorry.
14  A.  I said no, sir. If I --- yeah.
15  Q.  Gabriella Mucciola, M-U-C-C-I-O-L-A. Did I
16  pronounce that accurately?
17  A.  Mucciola (corrects pronunciation).
18  Q.  Mucciola, sorry. My Italian is not what it
19  should be.
20       She's an assistant prosecutor at the Monongalia
21  County prosecutor's office?
22  A.  Correct.
23  Q.  Are you aware that she came to family court and
24  sat with Ellen Costlow and argued on Ms. Costlow's behalf

                                                                    265

1    Q.    So the Monongalia County's police is not the
2  same as the state polices'?
3    A.    Correct.
4    Q.    You testified earlier in response to some
5  questions form Mr. Crooks that you harbor ill feelings
6  against Scott Ballock and his father.  Do you recall that
7  testimony?
8    A.    Yes, sir.
9    Q.    Did you harbor ay ill feelings towards Scott
10 Ballock at the time that Ms. Costlow first contacted you?
11   A.    No, sir.
12   Q.    When did you start to --- to develop ill
13 feelings towards the Ballocks?
14   A.    When my --- their focus became to harass me on
15 the Internet.
16   Q.    And that was after the --- Mr. Ballock was
17 arrested?
18   A.    Yes, sir.  I believe so.
19   Q.    And how did they harass you on the Internet?
20   A.    Just putting certain things on the Internet
21 about my personal life, my pictures, calling me names,
22 slandering the investigation, slandering my role in the
23 investigation, pretty much stating that I had an affair
24 with Ms. Costlow, pretty much putting it out there that I

266

1    was a pretty --- I wasn't a very good police officer.
2        Q.    And so they were posting their --- I guess Tom
3    Ballock was posting stuff on the Internet about the
4    criminal investigations.  So I take it from that that the
5    websites didn't come up until after Mr. Ballock was
6    arrested?
7        A.    I believe so, yes.
8        Q.    You talked about after the charges were
9    dismissed, and the charges against Mr. Ballock were
10   dismissed.  You had some contact with the FBI.  Who
11   initiated that contact?
12       A.    After the charges were dismissed?
13       Q.    That's correct.
14       A.    That would be the FBI.
15       Q.    They contacted you and said they wanted to
16   talk?
17       A.    Correct.  Yes.
18       Q.    When you're conducting an investigation, do you
19   routinely contact the suspect and --- and give them a
20   warning that you're preparing to file charges, and that
21   if they don't stop the behavior, you will fire charges?
22       A.    No, sir.
23       Q.    That's not the rule of the police to issue
24   warnings, is it?