```
           IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT

                   OF WEST VIRGINIA

                  * * * * * * * *

SCOTT T. BALLOCK,                         *

    Plaintiff                             *   Case No.

    vs.                                   *   1:17-CV-52

ELLEN RUTH COSTLOW                        *

STATE TROOPER MICHAEL KIEF,               *

STATE TROOPER RONNIE M. GASKINS,          *

STATE TROOPER CHRIS BERRY,                *

    Defendants                            *

                  * * * * * * * *

              TROOPER RONNIE M. GASKINS

                   May 29, 2019
```

Any reproduction of this transcript is prohibited without

        authorization by the certifying agency.

62

1    A.    He was higher ranked than me.
2    Q.    Yeah, above your pay grade?
3    A.    Right.
4    Q.    Okay.
5          Well, and there were a couple of occasions that
6    Lieutenant Kief told us about yesterday in deposition,
7    where representatives from the FBI came to the barracks.
8          Were you present for either or both of those?
9    A.    Both, I believe.
10   Q.    Okay.
11         Let's just take them in order then.
12         The first one, what do you remember?
13   A.    That was Special Agent John Hambrick.
14   Q.    Yeah.
15   A.    He's retired now.  At the time he was in charge
16   of the Clarksburg Field Office.  It's a branch of the
17   Pittsburgh Office.
18   Q.    Right.
19         You knew him because from time to time the
20   State Police and the FBI interact.
21         Right?
22   A.    I worked with him quite a bit when we were
23   working the Skylar Neese investigation.
24   Q.    Okay.

63

1   A.   So he, I believe, was instructed by his
2   supervisors in Pittsburgh to meet with us to go over the
3   case, what we had. And he was interested in seeing the
4   content that was on the disk.
5   Q.   Okay.
6   A.   We checked with Ms. Scott, if that would be
7   okay if he could look at that. And she did not object.
8       Then he started going through the different
9   types of e-mails on the disk.
10  Q.   Did he make copies or take ---- take anything
11  with him?
12  A.   She --- she --- Ms. Scott was fine if he had a
13  copy of the disk. So he did have a disk when he left.
14  Q.   All right.
15      Conversation, you know, what conversation did
16  you either have or bear witness to during the time that
17  Agent Hamrick was in the detachment looking at the
18  investigation file?
19  A.   I don't recall exactly what all was said. I
20  don't think he was allowed to discuss with us what was
21  happening internally with the FBI, so ---.
22  Q.   Okay.
23  A.   But I don't recall exactly what all was said or
24  who said what.

214

<pre>
 1              Just a few follow-ups.
 2                       ---
 3                  RE-EXAMINATION
 4                       ---
 5   BY ATTORNEY JEFFREIES:
 6       Q.   You will recall earlier today you answered some
 7   questions of Mr. Crooks discussing a meeting you had with
 8   FBI Agent John Hambrick, where you gave him the disks of
 9   all the e-mails and text messages sent by Mr. Scott and
10   Ellen Costlow.
11            Do you recall that testimony?
12       A.   Yes.
13       Q.   Do you recall when that meeting with John
14   Hambrick occurred?
15            I'm not asking you to give a specific date,
16   but, do you know ---?
17       A.   I believe it was post arrest, because we
18   checked with Ms. Scott, that that was okay to release
19   that, considering it was pending adjudication.
20       Q.   So --- and so what I was kind of getting at ---
21   you believe it's after he had been arrested?
22       A.   I believe it was post arrest.
23       Q.   Okay.
24            Do you recall approximately how long after his
</pre>

```
 1   arrest?  Like do you think it's a matter of a week or two
 2   weeks or months?
 3              I mean, this case went on for almost two years.
 4        A.    I think it was fairly quick, because he had to
 5   respond to his supervisor in Pittsburgh.
 6        Q.    So fairly soon after the arrest?
 7        A.    I believe it was soon.  Perhaps a matter of
 8   days.
 9        Q.    You also discussed some --- in other cases,
10   especially, when there's a child-custody dispute, one
11   parent will call the State Police, lodge a complaint.
12   Kind of gain a little leverage in the child-custody
13   dispute.
14              And --- and you said that in most instances
15   generally what you'll do is refer the complaint to Child
16   Protective Services.
17              Do you recall that testimony?
18        A.    I do.
19        Q.    Why would you refer them to Child Protective
20   Services for making a complaint?
21        A.    If there's allegations of the child visits may
22   be around paraphernalia, drugs, we would contact CPS.
23   They could do home visits, speak with the parents.
24              If --- if we get information that the child can
```