03/12/2018
Indianapolis, Indiana

I, Scott T. Ballock, having been duly sworn by Supervisory Special Agent (SSA) Jared J Garth, hereby make the following supplemental statement to SSA Jared J Garth and Assistant Special Agent-in-Charge (ASAC) Anthony Russo, whom I know to be SSAs of the Federal Bureau of Investigation (FBI), assigned to the Inspection Division and Indianapolis Division, respectively. My attorney in support of this matter, J. Cathryne Watson of the law firm Swick & Shapiro, P.C. in Washington D.C. participated in today's interview. In addition, my attorney Rick Juckniess, of the Juckniess Law firm in Ann Arbor Michigan, participated in today's interview by speaker phone. Mr. Juckniess represents me in a civil lawsuit I filed against members of the West Virginia State Police (WVSP) in the Federal District Court for the Northern District of West Virginia (Docket 17-CV-52).

I entered on duty (EOD) on 6/1/2003, as a Special Agent. My first assignment was to the Indianapolis Field Office. After approximately three years, I rotated to the Detroit Field Office, Ann Arbor RA. In August 2011, I transferred from the Detroit Field Office to the Criminal Justice Information Services (CJIS) Division where I served as a Supervisory Special Agent.

I understand this internal investigation was initiated on 09/26/2013. It was originally initiated after my arrest on 09/13/2013 by the WVSP and charged with the following misdemeanor counts:  1) Stalking-Harass/Credible Threat; and 2) Stalking-Harass/Credible Threat (4.8, Other Misdemeanors).

Page 1 of 15

**CONFIDENTIAL**

PL 00129

EXHIBIT 6

**03/12/2018**
**Indianapolis, Indiana**

After my arrest, CJIS management altered the scope of my official duties. They also had me surrender by FBI firearm.

I understand the Inspection Division concluded its investigation on or about 08/29/2016 and transferred the results of the investigation to the FBI Office of Professional Responsibility (OPR).

On or about 04/10/2017, OPR proposed dismissing me from the rolls of the FBI based in its finding that I: (1) harassed by former spouse Ellen Costlow by sending her unwelcomed emails and text messages in violation of FBI Offense Code 4.8 (Other Misdemeanors), and (2) OPR's supplemental finding that beyond a preponderance of the evidence, I lacked candor under oath in my Signed, Sworn, Statement (SSS) dated 07/13/2016 because I denied ever having physically abused Ellen Costlow.  This was adjudicated to be a violation of FBI Offense Code 2.6 (Lack of Candor/Lying- Under Oath).

On or about 09/21/2017, the Assistant Director of OPR issued a letter dismissing me from the rolls of the FBI.  On 09/26/2017, I was walked out of CJIS.

I understand today's interview is a result of the decision made on 01/19/2018 by the FBI's Office of Disciplinary Appeals (ODA) to remand  my case to the Inspection Division for additional investigation.  I also understand the focus on this second interview is OPR's post hoc determination that I lacked candor under oath.  I have been advised that the purpose of this interview is not to discuss the initial predication for the

**CONFIDENTIAL**

PL 00130

**03/12/2018**
**Indianapolis, Indiana**

internal investigation, which was the reason for my arrest on
September 13, 2013.


I have been further advised of my rights and
responsibilities in connection with this inquiry. **Should I
refuse to answer or fail to reply fully and truthfully during
this interview, I can expect to remain dismissed from the rolls
of the FBI.**

SSA Garth began the interview by asking me to outline the
history of my relationship with my former spouse, Ellen Costlow.
I met Ellen Costlow in approximately September 1986. This was
during my first week as a freshman in college at Indiana
University. Ellen was a sophomore at Indiana University. I was
eighteen (18) years old. She was nineteen (19). We started
dating and in 1992, we married.

Ellen and I began our marriage with the mutual
understanding neither of us wanted to have children. For me that
changed after my sister had children. Although Ellen was
reluctant to have children, she acquiesced to my plea to raise a
family. We had two children, ████ (now age 17) and ████ (now
age 14). They currently reside with me in Indianapolis. In
December 2017, my children and I moved to Indianapolis, and I
started a job as a manager for the Kroger grocery company.

In 2001, our son ████ was born. I believe shortly after
his birth, our marriage began to deteriorate. Nevertheless, I
tried to preserve our marriage.


**Page 3 of 15**

**CONFIDENTIAL**                                              PL 00131

**03/12/2018**
**Indianapolis, Indiana**

Shortly after my transfer from Ann Arbor, MI to CJIS in West Virginia, Ellen met an individual named Kenny Ice.  I believe it was in the summer of 2012 that she met Ice through the Craigslist dating site, "Women Seeking Men," or "Casual Encounters," or something to this effect.  In an ongoing attempt to hold our marriage together, I did not object to having an open marriage wherein Ellen dated other men.  Yet, after she met Kenny Ice, my relationship with Ellen deteriorated rapidly.  Notwithstanding my efforts to preserve our marriage, on September 14, 2012, Ellen ordered me to leave our home in Morgantown, West Virginia. I complied with her demand.

SSA Garth shared with me and my attorney Cathryne Watson, the text and e-mail messages Ellen Costlow provided the FBI Internal Investigations Section in May 2016.  From the data shared with me, it appears these electronic communications were transmitted during a period of approximately six (6) months between September 13, 2012 and February 24, 2013.  I acknowledge during this time, I missed Ellen and desperately wanted to reconcile with her.  At the time, I did not want our marriage to end.

SSA Garth asked me about specific e-mails during this time frame, which former FBI OPR Unit Chief Timothy J. Dowling cited in his 04/10/2017 letter.  In this letter former UC Dowling proposed dismissing me from the FBI for the added charge of lack of candor.  In particular, SSA Garth asked me about the e-mails Ellen and I exchanged on or about 09/29/2012, 10/02/2012, and 10/08/2012.  In these specific exchanges, Ellen alleged I

**CONFIDENTIAL**

**PL 00132**

03/12/2018
Indianapolis, Indiana

committed sexual, physical, and psychological abuse.  She claimed I touched her against her will, strangled her, and placed a gun to her head.  I deny having done any of these things.  Her allegations are completely false.

I had compelling reasons why, during this time frame, I did not contemporaneously respond to Ellen's e-mails with a denial.  Ellen has been formally diagnosed with Borderline Personality Disorder. I learned from counselors that had I immediately denied her aggressive and false accusations, doing so would have escalated our conflict.  I knew from the history of our relationship, denials to Ellen would routinely lead to escalations; she would feed off of our fight. During this same time period, while talking with her on the phone, Ellen would routinely and forcefully demand that I admit to abusing her. I always refused because I never abused Ellen. When I refused to admit to abusing Ellen, she would hang up the phone. Ellen would tell me that if I wanted to talk to her, which I desperately did, I would say aloud that I abused her. I never did even though it meant getting hung up on. I later learned that Ellen had been surreptitiously recording our phone conversations. I believe she hoped to use them in our divorce proceedings. Court-appointed forensic psychiatrist Dr. Christi Cooper-Lehki reviewed these phone conversations, as well as the text messages cited by OPR, and still stated that there is no evidence that Ellen was abused.

Prior to this interview, the FBI did not ask me about these text messages. Had they, they would have learned that when I

Page 5 of 15

CONFIDENTIAL                                              PL 00133

03/12/2018
Indianapolis, Indiana

wrote I would "stop again" I was referring to asking Ellen for a hug, not sexually abusing her. I never abused Ellen, sexually, physically, or psychologically.

When I wrote "You do not need to move on to anything else. I was wrong. I ask for forgiveness," I was not admitting to any abuse. I was purposely vague and did not admit to abuse. I simply said generally that I was wrong, hoping this would satisfy her need to blame me for her problems so we could move on in our discussion. Both she and I knew her accusations were false and I didn't want her to continue with that line of false attack. I also didn't want her anger and rage to escalate. Then and now I admit to contributing to the decline of our marriage, but not by abusing her, there was never any abuse, and so it was fair of me to say I was wrong and sorry. It was not an admission.

Similarly, when I wrote "You needn't [go on]" it was because I lived a lifetime of Ellen going on and on and on and on and on, about how I was to blame for her problems, about how she believed everyone else was to blame for her issues, and I didn't need or want to hear her meritless complaints yet again. Because her accusations were ridiculous and false, she didn't need to go on. This was not an admission of guilt. Again, I never physically abused Ellen, nor did I abuse her sexually or psychologically.

When I wrote, "I understand. Too much history" I was not admitting to physically abusing Ellen. I was simply saying that

**CONFIDENTIAL**                                    PL 00134

03/12/2018
Indianapolis, Indiana

I understood there was too much history between us. But that history never included any physical abuse on my part.

I have never once admitted to Ellen's false accusations. That's because they never happened. I was deflecting and de-escalating, techniques both taught to me and learned from a lifetime of having to communicate with an angry Borderline.

Prior to our separation, I attended individual counseling. During the summer of 2012, my counselor, Kathie Gieselmanat Phoenix Psychological and Counseling Associates, 4579 Buckhannon Pike, #101, Mt. Claire, WV, telephone number 304-622-6404 provided me with various techniques for communicating with Ellen. This included a system having the acronym JADE. This stands for the notion that when dealing with a Borderline who is making false accusations, one should never Justify, Argue, Defend, or Explain in an effort to resolve conflict.  I used this approach during our telephone, email, and text message exchanges in the months following our separation.  My choice not to contemporaneously deny Ellen's false accusations was an attempt to abide by our marriage counselor's recommended strategy and to avoid escalating an argument with Ellen. I have provided email messages in which I adamantly denied Ellen's false accusations.  **Exhibit 3**

About nine (9) months after I separated from Ellen, Kenny Ice contacted me by telephone. Kenny Ice's telephone number is 304-288-8296. I believe he resides with Ellen at 55 Panola, Fairmont, WV.  Ice first contacted me in May 2013. I agreed to meet with him in person.  He shared with me all sorts of

**Page 7 of 15**

**CONFIDENTIAL**

**03/12/2018**
**Indianapolis, Indiana**

horrific details about Ellen. Most concerning was Ice's claim
that Ellen had been socializing our 9-year old daughter with a
convicted and registered child molester. Kenny also informed
that he and Ellen routinely fought in front of my daughter, that
Ellen was leaving our children at home unattended overnight,
that Ellen was abusing narcotics, and that Ellen had attempted
suicide with our daughter in the house. I believe I met Kenny
Ice on six different occasions between May and August 2013. We
also spoke on the phone on a few occasions.

   I am including this information in my statement because I
believe it corroborates my assertions regarding Ellen's behavior
and lack of credibility she exhibited during the months after
our separation. Because I had information that Ice was a low-
level drug dealer and I was not certain of his motives for
contacting me, I undertook actions to independently corroborate
his statements. Ice voluntarily surrendered his personal cell
phone to me so that I could hire a private company to
forensically examine it. The company was able to retrieve
several months' worth of information. Recovered text messages
and email messages between Ice and Ellen, as well as photos and
videos of Ellen that Ice surreptitiously recorded, corroborated
most of the information he told me. To prevent Ellen from saying
Kenny's testimony was coerced, I hired a private investigator to
interview Kenny separately from me. Despite this, and despite
the fact that Kenny reached out to me, Ellen still said that I
threatened to arrest Kenny if he didn't say these things. I have
provided copies of both interviews for OPR, as well as my notes

**Page 8 of 15**

**CONFIDENTIAL**

03/12/2018
Indianapolis, Indiana

from speaking with Ice's father, Kenny Ray Ice, Sr.  I've also
included notes I took after conversations with Ice.  These are
**Exhibit 4**.

SSA Garth advised me the Internal Investigations Section
obtained a transcript of Dr. Christi Cooper-Lehki's testimony on
September 13, 2013 before the Monongalia County, West Virginia
family court.  I understand the Honorable Randal Minor released
a copy of the transcript to the FBI in support of this internal
investigation, and the court imposed a strict protective order
precluding me from obtaining a copy. I have also not been
permitted to review the transcript.

I was present for Dr. Christi Cooper-Lehki's testimony on
September 13, 2012 in Judge Minor's courtroom.  This was the
same day the West Virginia State Police (WVSP) executed a
warrant for my arrest.  During that family court hearing, the
court advised those present in the courtroom that the WVSP
intended to execute the warrant at the conclusion of the day's
hearing.  I was therefore somewhat distracted by my impending
arrest, which was a total surprise, at the time.  Nevertheless,
I do believe that I recall much of Dr. Christi Cooper-Lehki's
testimony, which the court relied on in part, to award me sole
custody of our children.

SSA Garth referred to my original signed, sworn, statement
(SSS) dated 07/13/2016.  In that SSS, I stated Dr. Cooper-Lehki
testified that Ellen was not abused and that she was not a
battered woman.  I agree a more accurate characterization of Dr.
Cooper-Lehki's testimony is that, in response to the court's

**Page 9 of 15**

**CONFIDENTIAL**                                              PL 00137

03/12/2018
Indianapolis, Indiana

inquiry, she found no evidence that I physically abused Ellen Costlow. Dr. Cooper-Lehki did not provide all of her significant findings about Ellen to the Family Court, and I encourage OPR to contact her to learn why Cooper-Lehki does not believe Ellen was an abused woman. Again, there exists absolutely no evidence that Ellen was physically abused, but lots of evidence that she is a manipulative liar intent on hurting me.

SSA Garth asked me whether I recall testimony regarding my use of a handgun during sex with Ellen Costlow. I do not recall stating I used my FBI issued Glock to penetrate Ellen's vagina during sex. I do recall discussing with Dr. Cooper-Lehki that I did, at Ellen's insistence, use a handgun to penetrate Ellen's vagina during sex. I did not, however, use my FBI issued weapon. This was not an instance of sexual or physical abuse. This was done not only with Ellen's consent, but at her request and insistence. This illustrates another one of my attempts to appease Ellen. Nevertheless, I believe it is possible Ellen may have convinced herself that her desire for this kind of intimacy was indicative of my having abused her.

When we lived together, I locked my FBI weapon in a safe we maintained in our home. I did own a personal weapon, which was a Glock 27. I kept this weapon under my bed. And I still own it. On one occasion, I recall Ellen asking me to use the weapon in order to arouse her. The weapon was not loaded with ammunition. Ellen had been diagnosed with a sex disorder. Although I recall I initially tried to persuade her not to use

**CONFIDENTIAL**                                    PL 00138

03/12/2018
**Indianapolis, Indiana**

the weapon in this manner, I ultimately complied with her request in my ongoing effort to appease and satisfy her.

I recall having a discussion with Dr. Cooper-Lehki sometime after she testified on September 13, 2013. Approximately nine (9) months after the September 13, 2013 hearing, the court awarded me full custody of our two children. Prior to the court's decision, Dr. Cooper-Lehki had expected to testify a second time. Yet, the court did not require her to do so.

During our conversation Dr. Cooper-Lehki described how sick Ellen had become. Dr. Cooper-Lehki told me she had worked with many violent individuals during the course of her career, but Ellen was the worst patient she had ever met and attempted to treat, specifically because Ellen was so malicious and manipulative. Dr. Cooper-Lehki told me Ellen never showed any remorse for her actions, constantly tried to manipulate people, and purposely hurt people. Dr. Cooper-Lehki told me she believes Ellen may be a sociopath.

Over the course of several years, Ellen met with four or five different counselors. She switched counselors so often because none could ever "fix" her. Ellen struggled with many demons. She suffered from major depression, could not maintain personal relationships, and had difficulty even functioning most days. She began counseling when we lived in Ann Arbor. Michigan. Finally, she met a counselor in Morgantown, West Virginia who told Ellen something she wanted to hear. The counselor persuaded her to believe that she felt threatened and trapped by me... I recall the day Ellen had that counseling

**Page 11 of 15**

**CONFIDENTIAL**                                             PL 00139

**03/12/2018**
**Indianapolis, Indiana**

session.  She came home and was giddy.  She happily announced to me that she was an abused woman.  She said something like, "I finally have an answer." Ellen believed she finally had the answer for all of her problems, and it was me.

I believe she had the goal of seeing me fired from my job as a Special Agent with the FBI because she wanted to hurt me.  I believe she wanted to see the FBI take my weapon away.  My son ██████ heard Ellen say that she was going to get my gun taken away from me so that I would be fired.  In a court-ordered joint counseling session with counselor Terry Laurita-Sigley, Ellen admitted to making this statement in front of my son.  In a recovered text message, Ellen wrote to Kenny that she has the upper hand in ruining my career.

Both of my children feared Ellen because she would have frequent violent outbursts.  When the Monongalia Family Court awarded me full custody of our children, it also ordered Ellen's visits be supervised.  As a consequence, my son ██████ has not seen his mother in almost five (5) years, and my daughter ██████ in almost three (3) years.  Indeed, Ellen violated two separate court orders in speaking with the FBI.  That is how motivated she is in trying to hurt me.  This mentally disordered person believes I, not she, am responsible for the loss of her

**CONFIDENTIAL**                                    PL 00140

**03/12/2018**
**Indianapolis, Indiana**

children, as well as every other problem she has, and she wants
to punish me for it.

SSA Garth asked me about the e-mails and texts messages I
referenced at the bottom of page two (2) of my July 13, 2016
SSS. In my SSS, I stated, "I possess e-mails which demonstrate
Ellen, despite her allegation that my communications were
unwanted, actually wanted to commute with me. These e-mails are
now attached to this current SSS as **Exhibit 1.**

In my July 13, 2016 SSS, I also referenced electronic
communications Kenny Ice provided to me. I recall I offered to
include them in support of my July 13, 2016 SSS, but the
interviewing agents did not want to accept a copy of them. I
recall they said that if they needed them, they would ask for
them at a later date. These electronic communications are now
attached to this current SSS as **Exhibit 2.**

SSA Garth asked me one more time to clarify whether I was
ever physically abusive toward my former wife Ellen Costlow. I
was not. I was never physically abusive toward Ellen. Never.
The fact that I did not immediately respond to the
claims she made in e-mails to me in late September and early
October 2012 is not a basis to conclude I lacked candor in my
July 13, 2016 SSS.

I understand ODA has offered me the opportunity to take a
voluntarily polygraph examination concerning the truthfulness of
the information contained in this signed, sworn, statement, and

**Page 13 of 15**

**CONFIDENTIAL**                                      **PL 00141**

**03/12/2018**
**Indianapolis, Indiana**

in particular, on the question of whether I ever physically
abuse Ellen Costlow.  I also have been advised and understand
that should I chose not to take a polygraph, no negative
inference may be drawn from that personal decision.  Upon advice
of counsel, I am declining to take a polygraph examination.

I have no other pertinent information regarding the
aforementioned allegations.  I have been advised that I should
submit any additional information of which I may become aware,
regarding this inquiry, to the Internal Investigations Section
(IIS)/Inspection Division (INSD) or to the Office of
Professional Responsibility (OPR).

I have been given the opportunity to review this statement
and make any changes prior to signing it.

I was instructed on 03/12/2018 not to discuss this matter
with anyone other than the person(s) conducting this interview,
representatives from IIS/INSD, OPR, the FBI Ombudsman, and/or an
FBI Employee Assistance Program (EAP) Counselor.  I have been
told that should I decide to discuss this matter with anyone
else, I must first obtain authorization from the interviewer(s).

**Page 14 of 15**

**CONFIDENTIAL**                                    **PL 00142**

**03/12/2018**
**Indianapolis, Indiana**

I have read this statement, consisting of this and fourteen (14) other pages and it is true and correct.

_____
Scott T. Ballock

Sworn to and subscribed before me on the _____ day of April, 2018, in Indianapolis, Indiana.

_____
SSA Anthony Russo

Witness:

_____
SSA Meredith A. Burke

CONFIDENTIAL                              PL 00143