UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**

    Plaintiff,

v.

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

    Defendants.

Case No.: 1:17-CV-52

JURY TRIAL REQUESTED

### PLAINTIFF'S OPPOSITION TO TROOPER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Excerpts from the deposition of Corporal Ronnie Gaskins:

Pages 151-152 cited at page 4.
Page 114 cited at page 7, footnote 8.
Pages 85-87 and 113-114, cited at page 10.
Pages 115-116, cited at page 11.
Pages 88-89, cited at page 11.
Page 130, cited at page 11.
Pages 95-96, cited at page 11.
Pages 157-158, cited at page 12.
Page 21, cited at page 13, footnote 14.
Page 57, cited at page 13, footnote 14.
Page 22, cited at page 21.

Exhibit No. 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

OF WEST VIRGINIA

* * * * * * * *

| | |
|---|---|
| SCOTT T. BALLOCK, | * |
| Plaintiff | * Case No. |
| vs. | * 1:17-CV-52 |
| ELLEN RUTH COSTLOW | * |
| STATE TROOPER MICHAEL KIEF, | * |
| STATE TROOPER RONNIE M. GASKINS, | * |
| STATE TROOPER CHRIS BERRY, | * |
| Defendants | * |

* * * * * * * *

TROOPER RONNIE M. GASKINS

May 29, 2019

COPY

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

Page 150

1   --- communicate with Ellen from the son, and then there
2   were other e-mails that came from this account that were
3   --- that fell under the harassment.
4   Q. Okay.
5   So it was your understanding, going through the
6   catalog of e-mails that have been provided, that some of
7   them were from Ellen's son?
8   A. This one particular e-mail she recognized it as
9   his style of writing.
10  Q. She wasn't complaining that her son was
11  harassing her, was she?
12  A. No.
13  Q. Page five, firth paragraph, there's reference
14  to you asking her about pictures of Scott at Beck's
15  Chapel, B-E-C-K, Chapel?
16  A. Correct.
17  Q. She told you that she was disturbed by the
18  e-mail.
19  What was it that was disturbing?
20  A. There was a --- I think she did a written
21  statement the second time she came back. And she made
22  reference to that particular e-mail.
23  So I don't know if she elaborated more on this
24  particular e-mail in her written statement. But at the

Page 151

1   time I think it just --- it disturbed her. It bothered
2   her.
3   The message he was trying to --- the message he
4   was conveying to her about this --- him standing alone at
5   the church. That's the one that stood out from her. But
6   exactly what she said, I don't know. She might've had
7   more in her written statement about this.
8   Q. Okay.
9   The next paragraph talks about the meeting you
10  had with APA Scott on Wednesday, September 11, 2013?
11  A. Correct.
12  Q. I don't think I have any other questions I have
13  to ask you about that.
14  The third paragraph, page five, simply recites
15  that you went to Magistrate's Court, presented to
16  Magistrate Holepit your two Criminal Complaints.
17  She found there was probable cause and issued
18  warrants for arrest?
19  A. Yes.
20  Q. So that's just reportage of what happened?
21  A. Correct.
22  Q. Did you present any other evidence to
23  Magistrate Holepit, other than the Criminal Complaints
24  that we've already talked about?

Page 152

1   A. Just the complaints.
2   Q. Okay.
3   So Magistrate Holepit, did she have questions?
4   A. I don't believe she did.
5   Q. So what happened? You just went in and was the
6   Assistant Prosecutor there or were you on your own?
7   A. No. Took him up to Magistrate Court.
8   Q. Okay.
9   A. Presented to her.
10  Q. So you went up to Magistrate Court. I've never
11  been in --- on one of these kind of meetings, so I'm ---
12  just morbid curiosity probably as much as anything.
13  You tell the Magistrate that you are there to
14  apply for arrest warrants, or how's this go down? You
15  just tell the --- you tell the Assistant, and they go get
16  the Magistrate?
17  A. Normally we check in at the front desk, and
18  we'll tell --- we'll ask which Magistrate's on call or
19  the intake, and that we have a complaint that needs a
20  signature for a warrant. And they'll tell us which
21  Magistrate's available.
22  Q. Okay.
23  Is that what you did this time?
24  A. I did.

Page 153

1   Q. Were you in the courtroom or were you in a back
2   office some place?
3   A. I --- I think this was in the old building on
4   Spruce Street.
5   Q. Spruce Street.
6   A. And they --- they were on the, I think, second
7   floor.
8   Q. Yes.
9   A. So I don't remember if I had to go into one of
10  the courtrooms or the intake desk out in the main lobby.
11  I don't remember.
12  Q. Okay.
13  Sounds like this was a pretty informal process.
14  And did you have much in the way of interaction
15  with Magistrate Holepit?
16  A. No. Because she's --- I mean, they're very
17  busy up there. And so we just --- we --- we present to
18  them the paperwork that we need for a signature, and they
19  look over and they sign it. That's pretty much it.
20  Q. Okay.
21  So the fourth paragraph, page five. We see
22  reference here to the second interview with Ellen
23  Ballock.
24  True?

Page 114

1  Attorney Scott to any particular e-mails? Did you select
2  any that you thought were most indicative for her to
3  examine or do you just give her the disk and say, you
4  know, here I'm going to leave this you, you can look at
5  as much of it as you think you need to?
6  A. She put the disk in. She started going through
7  it herself.
8  Q. Okay.
9  A. And I pointed out some of the other e-mails,
10 too, that were on the disk, but --- but she was at her
11 own leisure going through some of the content.
12 Q. Uh-huh (yes).
13 In your report, as we've already addressed, you
14 did print off some of the e-mails and attached them. So
15 you know, you wouldn't go down through the stack of stuff
16 that was produced from the investigation and see which
17 ones those were, but did you --- did you show those to
18 APA Scott?
19 A. I don't believe I showed them all to her, but
20 that she --- but I did address a few of them to her.
21 Q. Uh-huh (yes).
22 Was it your view that if there was even one
23 e-mail from among the more than 3,000 that could be
24 fairly interpreted as threatening, then that's all you

Page 115

1  really needed?
2  A. Based on one e-mail?
3  Q. Yeah.
4  A. Are you asking if --- if there was one e-mail
5  that was threatening?
6  Q. No.
7  A. Or would I just assess it on based on one?
8  Q. I was asking if you had --- I was asking about
9  your criteria for assessing these communications as part
10 of your criminal investigation.
11 Was it your view that, you know, hey if I got
12 just one out of these more than 3,000 e-mails, that
13 leaves me satisfied that he was harassing and threatening
14 her, then that's all I need.
15 A. I --- I got more the harassment, I was
16 investigating it more on the harassment side than the
17 threats. I mean, I --- there were some --- I don't know,
18 I can't recite specific examples.
19 I remember there were some e-mails you could
20 probably look at as a threat, but it was more of the
21 harassment.
22 Q. Right.
23 There were no overt threats in any of those
24 3,000 e-mails. He never said, I'm going to kill you?

Page 116

1  A. I'm not aware of any.
2  Q. Right.
3  So you're thinking about this when you went to
4  see APA Scott. You --- you were thinking that getting a
5  warrant and seizing his phone and --- and laptop computer
6  would be fruitful of your investigation.
7  True?
8  A. I believed there could've been other materials
9  found outside of what we had.
10 Q. Sure.
11 Well, it's reason to suspect that, because
12 these e-mails came from somewhere. He had to use a
13 computer to send those e-mails.
14 Right?
15 A. That's correct.
16 Q. Sure.
17 And presumably if they came from his laptop
18 computer.
19 A. That or his phone.
20 Q. Okay.
21 And that's why you wanted to get the phone as
22 well as the computer?
23 A. Correct.
24 Q. Okay.

Page 117

1  Now, all of the stuff that you were given by
2  Matthew Stout, as well as the e-mails that were sent to
3  you and Sergeant Kief by Ellen Ballock, those were --- to
4  the extent that they were cold or selected, they were
5  selected by Ellen Ballock, weren't they?
6  A. There was a lot of e-mails that was just about
7  the kids and going to the zoo, nothing that was like a
8  harassing or threatening nature.
9  So she included all those e-mails.
10 Q. Yeah, but, I mean, it's quite possible that she
11 left out e-mail communications that she initiated.
12 A. It's always possible.
13 Q. Right.
14 Did you ask her about that?
15 A. I don't recall if that specific question came
16 up.
17 Q. Okay.
18 So then you had obtained a warrant and seized
19 Scott's computer and phone. And if, in fact, Ellen had
20 initiated communication to Scott, opened the door to
21 these e-mails he was sending her, getting a warrant and
22 seizing that phone and that laptop would've demonstrated
23 it.
24 Wouldn't it?

Page 82

1  write your report and ---
2  ATTORNEY JEFFRIES: Objection.
3  BY ATTORNEY CROOKS:
4  Q. --- you're done.
5  ATTORNEY JEFFRIES: Mischaracterizes his
6  testimony. Mischaracterizes the report.
7  BY ATTORNEY CROOKS:
8  Q. Well, you didn't bother to get in touch with
9  Matthew Stout, we know that. And it --- it wasn't just a
10  matter of not bother, you have told me that he gave you
11  the disk and as far as you were concerned that was
12  --- that was all you needed.
13  Is that --- am I being fair to you?
14  A. That was the information he provided to us that
15  we felt was enough to start an investigation and consult
16  with the Prosecuting Attorney's Office.
17  Q. Okay. Yeah.
18  And that's what you did. You started an
19  investigation and you talked to the Prosecutor.
20  Prosecutor told you that you had enough probable cause to
21  proceed.
22  So maybe I just misapprehend the point and ---
23  and the function of criminal investigation.
24  Once you have probable cause, you're done

Page 83

1  investigating?
2  A. Well. once you have probable cause, that's
3  enough to --- to seek an arrest warrant. And further
4  information, as developed later on, I mean that can be
5  supplemented into a report.
6  Q. Right.
7  Troopers 851 3.02 subparagraph (f) reads,
8  quote, locating and questioning those persons suspected
9  of having committed the crime, closed quote.
10  What's that mean?
11  A. It means what it says, locating and questioning
12  persons suspected of having committed the crime.
13  Q. Who would that have been in the course of the
14  investigation that you and I are talking about here?
15  A. Scott Ballock.
16  Q. Did you attempt to locate and question Scott
17  Ballock about this?
18  A. No.
19  Q. Is there any reason that you could not have
20  reached out to Scott Ballock and said who you were and
21  that you wanted to talk to him about the communications
22  he was having with his wife?
23  A. There was more evidence or more information
24  that we needed. If it was more of the just she say, with

Page 84

1  no documentation, that'd be followed up with an
2  interview.
3  Q. Okay.
4  So what I hear you saying is that you felt the
5  --- the evidence on that disk was strong enough without
6  having to take with the suspect?
7  A. Myself and the Prosecutor, correct.
8  Q. Oh, so the --- you talked about whether to
9  interview the defendant or the suspect?
10  Oh, strike that.
11  You had a conversation with Cindy Scott about
12  whether you should try and interview the suspect, Scott
13  Ballock, before he was arrested?
14  A. No, I --- she was informed he was not
15  interviewed. I did ask her if --- if I should proceed
16  getting a search warrant on his phones and computers.
17  And she advised me not to do that. Why, I
18  don't know. I didn't argue with her. So that was the
19  additional follow-up I wanted to do in that regard.
20  Q. Did she make any comment to suggest that she
21  didn't want to be wiretapping an FBI agent's
22  communications?
23  A. She never made that comment.
24  Q. Was it in your mind that perhaps that could be

Page 85

1  a politically-sensitive issue? And by politically
2  sensitive, I mean could have ramifications for relations
3  between the State Police and the FBI?
4  A. I don't --- you mean if, if --- if he was
5  wiretapped?
6  Q. Yeah.
7  A. It never entered my mind.
8  Q. Never occurred to you that the FBI might take a
9  dim view of one of their agents being wire-tapped?
10  ATTORNEY JEFFRIES: Object.
11  Mischaracterizes the testimony. I believe he testified
12  as to a search warrant not a wiretap.
13  BY ATTORNEY CROOKS:
14  Q. Search warrant that would authorize a wiretap.
15  Right?
16  A. No, secure his phones and computers.
17  Q. Oh, just to get --- oh, to confiscate them?
18  A. Get like a --- a digital download.
19  Q. Okay.
20  A. For analysis.
21  ATTORNEY CROOKS: I misunderstood what he
22  said. Thank you, Mark.
23  BY ATTORNEY CROOKS:
24  Q. And so what you were talking about was not

Page 86

1   surveillance. What you were talking about was a --- a
2   warrant to go and cease his property and have it
3   forensically examined?
4   A. Correct.
5   Q. That was my misunderstanding. I'm sorry.
6   Okay.
7   So anyway, Cindy Scott told you that wasn't
8   going to happen and there really wasn't any further
9   discussion to explain what her thinking was?
10  A. Correct.
11  Q. Well, why would you suggest that Scott's phone
12  and computer be ceased and examined? What were you ---
13  what were you thinking it might find?
14  A. That was the --- the primary means of
15  communicating with Ms. Costlow. So I didn't know if
16  additional content would --- would surface on the phones
17  that weren't on the disk, and that was something to
18  explore.
19  Q. Let me ask you, with respect to the charges
20  that you were investigating, is it necessary that the
21  communication at issue be unwanted?
22  A. Communication ---.
23  ATTORNEY JEFFRIES: Objection. Calls for
24  a legal conclusion.

Page 87

1   Go ahead. Just ---.
2   THE WITNESS: Communication between Ellen
3   and Scott?
4   BY ATTORNEY CROOKS:
5   Q. Uh-huh (yes).
6   A. I'm confused.
7   Q. Right. Right.
8   A. Can you rephrase that, please?
9   Q. You were investigating communications between
10  Ellen and Scott?
11  A. Correct.
12  Q. Specifically, you were evaluating whether
13  communications originating on Scott's side directed to
14  Ellen were criminal in nature.
15  True?
16  A. Well, with the --- the content on the disk, he
17  --- he was obviously establishing communication contact
18  with her.
19  Q. Right.
20  The question was whether it's criminal?
21  A. I thought it was, yes.
22  Q. Okay.
23  And that's what I'm trying to address in my
24  questions.

Page 88

1   What is it that made Scott's communications
2   criminal, in your assessment as the investigating
3   officer?
4   A. The continued or the pattern --- the consistent
5   pattern of communication with her via e-mail, text
6   messages.
7   Q. So it was consistent?
8   A. It was consistent. I believe on one of the
9   text messages --- and I can't recall the date --- but she
10  had asked him to stop.
11  He continued texting her. The pictures of
12  e-mails he was sending to her, I believe he was like
13  crying. The selfies of him crying. The --- the picture
14  of him at the church alter. Those things, the totality
15  of it, the consistent pattern of it.
16  Q. Okay.
17  Would it be fair to say that as you went over
18  all these e-mails, that there was a consistent pattern on
19  Scott's part to try and reconcile with his wife?
20  A. It appeared to me that he --- he definitely
21  wanted her back.
22  Q. Yeah.
23  He professed love for her.
24  True?

Page 89

1   A. I know he sent pictures of rings, engagement
2   rings. He wanted to remarry or renew their vows,
3   something to that effect. So I took it as he wanted her
4   back in his life.
5   Q. Were there any references in Scott's e-mails on
6   the subject of reconciliation that talked about the
7   interest of the children? It'd be better for the kids if
8   we got back together?
9   A. He might have but I --- I don't remember. I
10  remember him e-mailing Ellen things that he did with the
11  children. They went to the zoo or something, kept ---
12  kept her up-to-date on that.
13  But in terms of reconciling with the kids, I
14  --- I don't remember.
15  Q. Uh-huh (yes).
16  Scott was telling Ellen that he was in pain as
17  a result of this.
18  Wasn't he?
19  A. I can't remember. I don't remember if he told
20  her that.
21  Q. Well, you said there were pictures of him
22  crying.
23  A. Yeah.
24  Q. Pictures of him alone at the altar.

23 (Pages 86 to 89)

Page 110

1  there are times when there's evidence that would say
2  otherwise what the victim alleged.
3  So that's all that would --- that would be
4  documented.
5  Q. Okay.
6  You're a careful witness and I appreciate that.
7  But my point, I think, is a little more precise.
8  Let me try this, you know, again, just to be
9  sure we understand each other.
10 Okay?
11 You went through the academy. You studied
12 Criminal Science in college. I mean, you know what
13 exculpatory evidence means.
14 Right?
15 A. Uh-huh (yes), I do.
16 Q. Okay.
17 Exculpatory evidence obviously means evidence
18 that would tend to negate the criminality of the
19 suspect's behavior, in this case.
20 True?
21 A. Correct.
22 Q. Okay.
23 So if there was a --- an explanation for at
24 least some of these communications, then you would be

Page 111

1  going through a process of trying to identify which of
2  these communications, if any, were, in fact, criminal
3  harassment.
4  Right?
5  A. There's a lot of content there.
6  Q. Sure is. It's a big job. I know dispute that.
7  Okay.
8  So wouldn't it have been helpful to you to
9  follow the rules for criminal investigation found at
10 Troopers 8513.02 --- it's on paragraph F, and get in
11 touch with --- that is to say to use the language or the
12 rule to locate and question the person suspected of
13 having committed the crime?
14 A. My ---.
15 Q. He may have --- he may have had explanations
16 for, you know, some or all of these communications.
17 A. You're talking 3,000 items.
18 Q. Yes.
19 A. That's a lot of material. And I was talking to
20 Scott in the letter from her attorney's office, so there
21 was clearly harassment going on. This wasn't something
22 she was inviting him to do.
23 Q. Okay. All right.
24 So far as the Complainant's concern --- excuse

Page 112

1  me, you interviewed her twice.
2  Right?
3  A. Correct.
4  Q. Over 3,000 communications. And you adequately
5  addressed the import of those communications through two
6  interviews with Ellen Ballock.
7  A. The second time was because the recorder didn't
8  work.
9  Q. Okay.
10 A. We wanted to get her statement in writing this
11 time.
12 Q. All right, then.
13 So you could have satisfied yourself on the
14 substitute import of more than 3,000 communications in
15 the span of just one interview with Ellen Ballock, had
16 the tape recorder that Sergeant Kief brought with him
17 functioned the way it should have.
18 True?
19 A. Are you asking why she was in the office?
20 Q. No.
21 A. No.
22 Q. No, I'm talking, if you were saying that
23 getting in touch with the suspect, as required by 3.02,
24 subparagraph F and then the Troopers 851, was not

Page 113

1  practical because there were just too many
2  communications.
3  There were more than 3,000 of them. That's
4  what I understood you to tell me.
5  A. The content spoke for itself, correct.
6  Q. Okay.
7  You felt that the --- just reading it on your
8  own gave you the --- the comfort and satisfaction that
9  this was, in fact, harassment and criminal conduct under
10 the Code, did not need to follow the rules and talk to
11 the suspect?
12 A. It wouldn't work that way. But that's why I
13 reached out to Mrs. Scott and presented to her what I did
14 have at that point. And then we had the conversation
15 about the search warrant to seize his phones and
16 computers.
17 Q. All right.
18 A. But --- and I agreed with her honest decision,
19 she reviewed the content on the disk and --- not all of
20 them, of course.
21 And she was comfortable with --- that there was
22 probable cause for his arrest.
23 Q. Okay.
24 Did you direct the Assistant Prosecuting

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 114

1  Attorney Scott to any particular e-mails? Did you select
2  any that you thought were most indicative for her to
3  examine or do you just give her the disk and say, you
4  know, here I'm going to leave this you, you can look at
5  as much of it as you think you need to?
6  A. She put the disk in. She started going through
7     it herself.
8  Q. Okay.
9  A. And I pointed out some of the other e-mails,
10    too, that were on the disk, but --- but she was at her
11    own leisure going through some of the content.
12 Q. Uh-huh (yes).
13    In your report, as we've already addressed, you
14    did print off some of the e-mails and attached them. So
15    you know, you wouldn't go down through the stack of stuff
16    that was produced from the investigation and see which
17    ones those were, but did you --- did you show those to
18    APA Scott?
19 A. I don't believe I showed them all to her, but
20    that she --- but I did address a few of them to her.
21 Q. Uh-huh (yes).
22    Was it your view that if there was even one
23    e-mail from among the more than 3,000 that could be
24    fairly interpreted as threatening, then that's all you

Page 115

1  really needed?
2  A. Based on one e-mail?
3  Q. Yeah.
4  A. Are you asking if --- if there was one e-mail
5     that was threatening?
6  Q. No.
7  A. Or would I just assess it on based on one?
8  Q. I was asking if you had --- I was asking about
9     your criteria for assessing these communications as part
10    of your criminal investigation.
11    Was it your view that, you know, hey if I got
12    just one out of these more than 3,000 e-mails, that
13    leaves me satisfied that he was harassing and threatening
14    her, then that's all I need.
15 A. I --- I got more the harassment, I was
16    investigating it more on the harassment side than the
17    threats. I mean, I --- there were some --- I don't know,
18    I can't recite specific examples.
19    I remember there were some e-mails you could
20    probably look at as a threat, but it was more of the
21    harassment.
22 Q. Right.
23    There were no overt threats in any of those
24    3,000 e-mails. He never said, I'm going to kill you?

Page 116

1  A. I'm not aware of any.
2  Q. Right.
3     So you're thinking about this when you went to
4     see APA Scott. You --- you were thinking that getting a
5     warrant and seizing his phone and --- and laptop computer
6     would be fruitful of your investigation.
7     True?
8  A. I believed there could've been other materials
9     found outside of what we had.
10 Q. Sure.
11    Well, it's reason to suspect that, because
12    these e-mails came from somewhere. He had to use a
13    computer to send those e-mails.
14    Right?
15 A. That's correct.
16 Q. Sure.
17    And presumably if they came from his laptop
18    computer.
19 A. That or his phone.
20 Q. Okay.
21    And that's why you wanted to get the phone as
22    well as the computer?
23 A. Correct.
24 Q. Okay.

Page 117

1  Now, all of the stuff that you were given by
2     Matthew Stout, as well as the e-mails that were sent to
3     you and Sergeant Kief by Ellen Ballock, those were --- to
4     the extent that they were cold or selected, they were
5     selected by Ellen Ballock, weren't they?
6  A. There was a lot of e-mails that was just about
7     the kids and going to the zoo, nothing that was like a
8     harassing or threatening nature.
9     So she included all those e-mails.
10 Q. Yeah, but, I mean, it's quite possible that she
11    left out e-mail communications that she initiated.
12 A. It's always possible.
13 Q. Right.
14    Did you ask her about that?
15 A. I don't recall if that specific question came
16    up.
17 Q. Okay.
18    So then you had obtained a warrant and seized
19    Scott's computer and phone. And if, in fact, Ellen had
20    initiated communication to Scott, opened the door to
21    these e-mails he was sending her, getting a warrant and
22    seizing that phone and that laptop would've demonstrated
23    it.
24    Wouldn't it?

## Page 114

1  Attorney Scott to any particular e-mails? Did you select
2  any that you thought were most indicative for her to
3  examine or do you just give her the disk and say, you
4  know, here I'm going to leave this you, you can look at
5  as much of it as you think you need to?
6  A. She put the disk in. She started going through
7     it herself.
8  Q. Okay.
9  A. And I pointed out some of the other e-mails,
10   too, that were on the disk, but --- but she was at her
11   own leisure going through some of the content.
12 Q. Uh-huh (yes).
13   In your report, as we've already addressed, you
14   did print off some of the e-mails and attached them. So
15   you know, you wouldn't go down through the stack of stuff
16   that was produced from the investigation and see which
17   ones those were, but did you --- did you show those to
18   APA Scott?
19 A. I don't believe I showed them all to her, but
20   that she --- but I did address a few of them to her.
21 Q. Uh-huh (yes).
22   Was it your view that if there was even one
23   e-mail from among the more than 3,000 that could be
24   fairly interpreted as threatening, then that's all you

## Page 115

1  really needed?
2  A. Based on one e-mail?
3  Q. Yeah.
4  A. Are you asking if --- if there was one e-mail
5    that was threatening?
6  Q. No.
7  A. Or would I just assess it on based on one?
8  Q. I was asking if you had --- I was asking about
9    your criteria for assessing these communications as part
10   of your criminal investigation.
11   Was it your view that, you know, hey if I got
12   just one out of these more than 3,000 e-mails, that
13   leaves me satisfied that he was harassing and threatening
14   her, then that's all I need.
15 A. I --- I got more the harassment, I was
16   investigating it more on the harassment side than the
17   threats. I mean, I --- there were some --- I don't know,
18   I can't recite specific examples.
19   I remember there were some e-mails you could
20   probably look at as a threat, but it was more of the
21   harassment.
22 Q. Right.
23   There were no overt threats in any of those
24   3,000 e-mails. He never said, I'm going to kill you?

## Page 116

1  A. I'm not aware of any.
2  Q. Right.
3    So you're thinking about this when you went to
4    see APA Scott. You --- you were thinking that getting a
5    warrant and seizing his phone and --- and laptop computer
6    would be fruitful of your investigation.
7    True?
8  A. I believed there could've been other materials
9    found outside of what we had.
10 Q. Sure.
11   Well, it's reason to suspect that, because
12   these e-mails came from somewhere. He had to use a
13   computer to send those e-mails.
14   Right?
15 A. That's correct.
16 Q. Sure.
17   And presumably if they came from his laptop
18   computer.
19 A. That or his phone.
20 Q. Okay.
21   And that's why you wanted to get the phone as
22   well as the computer?
23 A. Correct.
24 Q. Okay.

## Page 117

1  Now, all of the stuff that you were given by
2    Matthew Stout, as well as the e-mails that were sent to
3    you and Sergeant Kief by Ellen Ballock, those were --- to
4    the extent that they were cold or selected, they were
5    selected by Ellen Ballock, weren't they?
6  A. There was a lot of e-mails that was just about
7    the kids and going to the zoo, nothing that was like a
8    harassing or threatening nature.
9    So she included all those e-mails.
10 Q. Yeah, but, I mean, it's quite possible that she
11   left out e-mail communications that she initiated.
12 A. It's always possible.
13 Q. Right.
14   Did you ask her about that?
15 A. I don't recall if that specific question came
16   up.
17 Q. Okay.
18   So then you had obtained a warrant and seized
19   Scott's computer and phone. And if, in fact, Ellen had
20   initiated communication to Scott, opened the door to
21   these e-mails he was sending her, getting a warrant and
22   seizing that phone and that laptop would've demonstrated
23   it.
24   Wouldn't it?

Page 86

1 surveillance. What you were talking about was a --- a
2 warrant to go and cease his property and have it
3 forensically examined?
4 A. Correct.
5 Q. That was my misunderstanding. I'm sorry.
6 Okay.
7 So anyway, Cindy Scott told you that wasn't
8 going to happen and there really wasn't any further
9 discussion to explain what her thinking was?
10 A. Correct.
11 Q. Well, why would you suggest that Scott's phone
12 and computer be ceased and examined? What were you ---
13 what were you thinking it might find?
14 A. That was the --- the primary means of
15 communicating with Ms. Costlow. So I didn't know if
16 additional content would --- would surface on the phones
17 that weren't on the disk, and that was something to
18 explore.
19 Q. Let me ask you, with respect to the charges
20 that you were investigating, is it necessary that the
21 communication at issue be unwanted?
22 A. Communication ---.
23 ATTORNEY JEFFRIES: Objection. Calls for
24 a legal conclusion.

Page 87

1 Go ahead. Just ---.
2 THE WITNESS: Communication between Ellen
3 and Scott?
4 BY ATTORNEY CROOKS:
5 Q. Uh-huh (yes).
6 A. I'm confused.
7 Q. Right. Right.
8 A. Can you rephrase that, please?
9 Q. You were investigating communications between
10 Ellen and Scott?
11 A. Correct.
12 Q. Specifically, you were evaluating whether
13 communications originating on Scott's side directed to
14 Ellen were criminal in nature.
15 True?
16 A. Well, with the --- the content on the disk, he
17 --- he was obviously establishing communication contact
18 with her.
19 Q. Right.
20 The question was whether it's criminal?
21 A. I thought it was, yes.
22 Q. Okay.
23 And that's what I'm trying to address in my
24 questions.

Page 88

1 What is it that made Scott's communications
2 criminal, in your assessment as the investigating
3 officer?
4 A. The continued or the pattern --- the consistent
5 pattern of communication with her via e-mail, text
6 messages.
7 Q. So it was consistent?
8 A. It was consistent. I believe on one of the
9 text messages --- and I can't recall the date --- but she
10 had asked him to stop.
11 He continued texting her. The pictures of
12 e-mails he was sending to her, I believe he was like
13 crying. The selfies of him crying. The --- the picture
14 of him at the church alter. Those things, the totality
15 of it, the consistent pattern of it.
16 Q. Okay.
17 Would it be fair to say that as you went over
18 all these e-mails, that there was a consistent pattern on
19 Scott's part to try and reconcile with his wife?
20 A. It appeared to me that he --- he definitely
21 wanted her back.
22 Q. Yeah.
23 He professed love for her.
24 True?

Page 89

1 A. I know he sent pictures of rings, engagement
2 rings. He wanted to remarry or renew their vows,
3 something to that effect. So I took it as he wanted her
4 back in his life.
5 Q. Were there any references in Scott's e-mails on
6 the subject of reconciliation that talked about the
7 interest of the children? It'd be better for the kids if
8 we got back together?
9 A. He might have but I --- I don't remember. I
10 remember him e-mailing Ellen things that he did with the
11 children. They went to the zoo or something, kept ---
12 kept her up-to-date on that.
13 But in terms of reconciling with the kids, I
14 --- I don't remember.
15 Q. Uh-huh (yes).
16 Scott was telling Ellen that he was in pain as
17 a result of this.
18 Wasn't he?
19 A. I can't remember. I don't remember if he told
20 her that.
21 Q. Well, you said there were pictures of him
22 crying.
23 A. Yeah.
24 Q. Pictures of him alone at the altar.

Page 130

1  Q. First paragraph, page three, you mentioned that
2     back in November of 2012, six and a half, seven months
3     before Matthew Stout wrote his cease and desist letter,
4     in May of 2013, Scott sent Ellen some poems.
5  A. I see it.
6  Q. Okay.
7     And you also mention in this paragraph that in
8     October of 2012 he wrote her and said that he could not
9     wait to put a wedding ring on her finger and show the
10    world that they were back together.
11    Why --- why would you quote all of that?
12 A. This one (indicating) where it says to let the
13    whole world know you are mine again, ---
14 Q. Uh-huh (yes).
15 A. --- pretty possessive. It's just his pattern
16    of harassing her by means of wanting to get back to her.
17 Q. Okay.
18    Well, won't you be mine, that's --- that's on
19    just about every grade school valentine I ever gave or
20    received.
21    I mean, it's --- it's rather common in this
22    culture to talk about having somebody as your own when
23    --- when you're in love with them.
24    True?

Page 131

1  A. I don't know if Ellen interpreted ---
2     interpreted this as love.
3  Q. So you were trying to discern how Ellen Ballock
4     felt about these communications, how she received them
5     and what she thought about them?
6  A. Try and get a feel for how he's relaying the
7     information, the context of it and how she's interpreting
8     that.
9  Q. Okay.
10    So you're trying to get a feel for what he's
11    trying to convey, as well as, what --- how she's
12    receiving it?
13 A. You could say that.
14 Q. When you --- you interviewed her, to brace up
15    your interpretation of how she was receiving it.
16    Right?
17    To make sure you accurately understood how she
18    received it?
19 A. She --- well, you --- you can talk to Ms.
20    Ballock. She talks a lot.
21    Sometimes it's not about what you're wanting to
22    talk about. She kind of goes off course. You've got to
23    bring her back.
24    But try to get her to --- to talk about, you

Page 132

1     know, the --- the --- the back story of their marriage.
2     You know, him --- how he was communicating to her, what
3     was bothering her, what was --- how was it --- how was
4     she understanding it to be harassment?
5     Like the --- the types of e-mails and the text
6     messages and how was that harassing to her and --- and
7     had her cite the specific examples of what bothered her
8     the most.
9  Q. So she was a difficult interview?
10 A. She talks a lot. So you just --- you --- you
11    have to try to keep her on, on --- on this --- on --- on
12    one page at a time.
13 Q. Right.
14    You've encountered people like that in the
15    course of your career.
16    Right?
17 A. Sure.
18 Q. Okay.
19    And you had a lot of experience at interviewing
20    people.
21    Right.
22 A. I've interviewed people, sure.
23 Q. Yeah.
24    So you've told me that you were trying to

Page 133

1     understand what he meant and how she received it. And
2     you've told me that you interviewed her.
3     But again, I --- I put the question to you.
4     Why didn't you act on the rules for investigation and
5     interview Scott Ballock about what he was intending by
6     these communications?
7  A. Because looking at the context, at the --- the
8     number of e-mails, the pattern where he wouldn't stop.
9     He continued and continued. That's ultimately that was
10    looked at.
11 Q. Well, his marriage was at stake. His children
12    were involved.
13 A. Sure.
14 Q. And do you have children?
15 A. No.
16 Q. No.
17    You're married?
18 A. Right.
19 Q. So you know how deep and sincere a man's
20    affection for his wife can be.
21    Right?
22 A. Sure.
23 Q. Okay.
24    So I mean, loving your wife and wanting to

Page 94

1  Now, the reason we're looking at this letter is
2  we're trying to remember what kind of boundaries were
3  being set down for direct communication between Scott
4  Ballock and Ellen Ballock.
5  The letter's not too terribly long, just two
6  paragraphs. You've looked at it.
7  What was the boundary that Mr. Stout was trying
8  to impose on direct communication between Scott and
9  Ellen?
10 A. I understand this letter as if --- if direct
11 communication's fine involving the children, but outside
12 of that it's to go through the attorney's office.
13 Q. Okay.
14 A. That's how I interpret it.
15 Q. Right. Okay.
16 And just so the record's clear about this, Mr.
17 Stout was writing directly to Scott Ballock. I'll
18 represent to you that when someone's in litigation, if
19 they're represented by counsel, lawyers are ethically
20 obliged to communicate with the lawyer and not right ---
21 or otherwise communicate directly with the litigants.
22 So I think it's a fair surmise, then, that Mr.
23 Stout, being an ethical attorney, was writing directly to
24 Scott Ballock, because he didn't have a lawyer at that

Page 95

1  point.
2  A. I would assume.
3  Q. Okay. Okay.
4  So --- so you obtained, from Mr. Stout, the
5  magnetic disk that contained two --- essentially two
6  files of e-mail communication. And we were talking about
7  that. More particularly we were talking about it as you
8  wrote it up in your investigation report.
9  I'll take that back, if you don't mind, that
10 way I can keep it all together here.
11 Let's turn our attention back now I think to
12 Kief Deposition Exhibit 11, which is a copy of your
13 report, which we figured out was written September 18,
14 2013.
15 In the first paragraph, on page two, you quote
16 some of Scott Ballock's e-mail communication with Ellen.
17 And he says in there --- I --- I may have even read this
18 in before, so I won't do it again. But he essentially
19 says there that, you know, I'm going to write directly to
20 you, as long as you have custody of our daughter. He
21 refers to her by name, Summer.
22 So --- so it would appear that although Scott
23 Ballock is sounding something of a defined tone here,
24 nonetheless, I mean, he and Mr. Stout were --- were in

Page 96

1  agreement back in May that there was going to be direct
2  communication as it related to Summer at any --- at any
3  rate.
4  True?
5  A. That's what it seems.
6  Q. Okay.
7  So --- so as you are reviewing all these
8  e-mails, and there are a lot of them, spanning a large
9  period of time, you were kind of bearing in mind that,
10 you know, not every communication, per se, was out of
11 bounds here.
12 That if related to the child, then Ellen's
13 lawyer was okay with that.
14 True?
15 A. Yes.
16 Q. Okay.
17 And in fact, there were a great many e-mails on
18 that disk that, you know, talked about not only the
19 daughter, Summer, but it also talked about their son,
20 Tommy.
21 Correct?
22 A. Okay.
23 Q. So that --- we know that at least part --- and
24 I don't know that there's even any point, really, to try

Page 97

1  and to express it in percentage terms or anything, but
2  there was more than a few of these e-mails that were
3  permissible, as far as you understood the arrangement
4  that Mr. Stout and Scott Ballock communicated about.
5  Fair?
6  A. About the children, yes.
7  Q. Yeah. Okay.
8  So in the second paragraph of your report on
9  page two, you itemized that there were 1,495 items in the
10 first file on the disk and 1,843 items in the second
11 file.
12 I trust that those numbers were totaled up for
13 you already. All you needed to do was just pop the disk
14 in and --- and look on the computer and it would tell you
15 how many items were in the --- each file.
16 A. It was.
17 Q. Okay.
18 I mean, I got this image of you sitting there
19 trying to count 1,800 plus items.
20 So --- so at any rate, you say in your report,
21 second paragraph, page two, that a substantial amount of
22 e-mails appeared to be pressuring the victim, that would
23 be Ellen, to return to Scott.
24 Those are not your words, you're using the

Page 154

1  A. Correct.
2  Q. Was that one recorded?
3  A. This was the --- I think this was the
4     handwritten statement one, where she provided a
5     handwritten statement.
6  Q. Okay.
7     So she shows up. She hands you a copy of her
8     handwritten statement, which is part of the investigation
9     file produced to us last year.
10    There was no recorded interview conducted?
11 A. Not this one.
12 Q. Okay.
13    So as it played out, there never was any
14    recorded interview with Ellen Ballock in support of this
15    investigation?
16 A. Had the recorder worked, there would've been,
17    yes.
18 Q. Okay.
19    So apparently it was in this second meeting
20    with Ellen Ballock that she made reference to this
21    picture of Scott at Beck's Chapel, and that it was very
22    disturbing to her?
23 A. Yes.
24 Q. Now, I see at the end of this paragraph a

Page 155

1     sentence that says that Sergeant Kief recorded the
2     interview, but due to technical difficulties it did not
3     record.
4     Could it be that you were mistaken about this?
5     That it was the faulty recorder that happened during the
6     first interview?
7     Maybe the first interview you fellows didn't
8     even try to record it. So I don't know. Maybe --- maybe
9     this is accurate information, what you're saying right
10    here.
11 A. I don't know if I'm trying to convey that
12    that's why we called her in the second time. I --- I ---
13    I'm --- I'm pretty sure the first time it didn't record.
14    The second time we had her come in and do a
15    written statement. And --- maybe that's why I had that
16    in there, why we called her in for the second time,
17    because his recorder didn't work.
18 Q. Okay.
19    So Thursday, September 12 you get the arrest
20    warrants from Magistrate Holepit in the afternoon ---
21    well, late morning, 1130 hours.
22    At 615 hours, Ellen Ballock comes in, sees you
23    and Sergeant Kief. Apparently she must've told you at
24    that time that, look, we've got a hearing tomorrow. He's

Page 156

1     going to be in Family Court. And that's when the plan
2     was laid to execute on these arrest warrants.
3     Fair?
4  A. I believe she informed at the time Sergeant
5     Kief about that coming hearing. So I believe I found out
6     from him.
7  Q. I'm looking at the content of paragraph --- the
8     fifth paragraph on page five of your report.
9     Due to officer safety reasons, the arrest
10    warrants were served at the Monongalia County Magistrate
11    Court. The accused is a federal law-enforcement officer
12    and carries an issued firearm.
13    Okay.
14    So I see what's recorded here.
15    Okay?
16    I can read it.
17    When you say, due to officer safety reasons,
18    was there something specific about Scott that left you
19    and Sergeant Kief concerned about your safety, or was it
20    just the general fact that Scott was law enforcement and
21    he carried a weapon?
22 A. He was a concern how his --- and me looking at
23    the e-mails, and I wasn't sure of his mental state. So
24    there was concerns of how he would respond, knowing he

Page 157

1     was going to be arrested.
2  Q. What did Ellen tell you to expect?
3  A. I don't know. I think --- I don't think she
4     even elaborated on that. Or if she did, I don't
5     remember.
6  Q. Okay.
7     So she wasn't sitting there with you and
8     Sergeant Kief saying, you watch out for this guy?
9  A. I --- I don't remember her saying anything like
10    that. Like I can't recall, at least.
11 Q. Was she telling you that she was afraid of
12    Scott?
13 A. That he might hurt her? In that sense? Is
14    that what you're talking about?
15 Q. Yeah.
16 A. Don't recall.
17 Q. Okay.
18    So you don't recall Ellen ever saying, you
19    know, I'm afraid of Scott, I'm afraid what he might do to
20    me, he might hurt me?
21 A. I don't think she ever conveyed that like there
22    would be a physical harm. I don't think so.
23 Q. Well, she never told you that he acted out in
24    violence against her.

Page 158

1  Right?
2  A. Well, she mentioned there was an incident that
3     happened in Indiana involving the firearm in her private
4     area. She mentioned that, but ---.
5  Q. That was the incident where the pistol was used
6     as a sexual aid?
7  A. She mentioned that. That was the only thing I
8     can recall that happened to her physically.
9  Q. Now, that incident that she told you about,
10    that was years before she came to see you about these
11    e-mails.
12    True?
13 A. Yeah. I don't know how long ago that happened.
14 Q. Okay.
15    In fact, that was an episode of sex play that
16    went too far, as she explained it to you.
17    True?
18 A. I don't think she was talking about sex play.
19 Q. I'm just saying that she and Scott were having
20    sex, and the way she told the story, it went too far.
21 A. At that --- I didn't know what they were doing
22    in the bedroom and I really didn't care. That wasn't my
23    place to go.
24 Q. Right.

Page 159

1  You had come to the conclusion long before you
2  heard that account that this was a --- a bizarre
3  relationship?
4  A. It's different.
5  Q. Okay.
6  The unusual --- well, bizarre is your word,
7  nature of the relationship between these two people, did
8  it undermine your sense that Scott was guilty of criminal
9  behavior?
10 A. I don't know if I use the word guilty, but
11    reasonable belief that he, in fact, did commit a crime.
12 Q. Okay.
13 You're --- you're --- you're parsing some of my
14    terms here, because you're being careful. I'm not
15    criticizing you for it.
16 But what you're saying is --- you're rephrasing
17    my question, essentially.
18 Did --- did the bizarre character of the
19    relationship between Ellen and Scott cause you any doubt
20    about whether Scott was probably guilty of criminal
21    behavior?
22 A. With the sex stuff?
23 Q. Yeah.
24 A. I --- I didn't really want to dive into that.

Page 160

1     Just kind of.
2  Q. It was just unsavory, and you didn't --- didn't
3     want to think about it or talk about it with her?
4  A. Pretty much.
5  Q. Okay.
6     Well, pardon me to insist, but it could --- it
7     could bear upon the object of your investigation,
8     actually.
9     Don't you think?
10 A. From what I --- I'm trying to go on memory.
11    It's been six years or so.
12 Q. Yeah.
13 A. From what I understood, a lot of this happened
14    in Indiana, so I really didn't care what happened in
15    Indiana.
16 Q. Okay. Okay.
17    So the next paragraph just recites that Scott
18    was arrested, arraigned and released on bond?
19 A. Correct.
20 Q. You were --- you participated in the arrest?
21 A. I was not there when he was arrested.
22 Q. Okay.
23    So you don't know anything about what happened
24    at the Family Court proceeding when Scott was arrested?

Page 161

1  A. No.
2  Q. Okay.
3     Apparently the day after the arrest, a
4     Saturday, you reviewed the DVD again, and you looked at
5     e-mails dated April 25 and 26 of 2013. In the subsequent
6     paragraph, on page six, you talk about an e-mail from
7     April 26, 2013.
8     Why were you going back and making this review
9     at this point?
10 A. There was so much content within that disk, I
11    think I just wanted to go back and try to pull --- try to
12    pull as much information as I could. That's what I think
13    I did.
14 Q. Okay.
15    Well, something prompted you to it.
16    I mean, what --- can you tell me what it was?
17    He had been arrested the day before, so ---.
18 A. I cannot recall what exactly prompted me to
19    that.
20 Q. Okay.
21    Well, it looks like in the next paragraph ---
22    I'm looking at the second paragraph on page six. It
23    looks like Sergeant Kief is acting here in furtherance of
24    the investigation.

Page 18

1  Q. And you were copied on it.
2  A. Okay.
3  Q. It's dated August 22, 2013. And it says it is
4     a request to open an investigation into Scott Thomas
5     Ballock, Supervisory Special Agent FBI, CJIS.
6     Would this be the communication that you
7     referenced a few minutes ago about Sergeant Kief seeking
8     authority from Captain Merrill, who opened the
9     investigation?
10 A. Let me glance over this real quick.
11 Q. Sure.
12      ----
13      (WHEREUPON, WITNESS REVIEWS DOCUMENT.)
14      ----
15      THE WITNESS: Yeah, I think --- it looks
16      like he's just briefing the Captain on --- on the early
17      stages of the complaint.
18      BY ATTORNEY CROOKS:
19 Q. Okay.
20    Now, Exhibit 4 kind of goes along with Exhibit
21    3.
22    I'll let you look at it.
23      ----
24      (WHEREUPON, WITNESS REVIEWS DOCUMENT.)

Page 19

1      ----
2      THE WITNESS: Okay.
3      BY ATTORNEY CROOKS:
4  Q. So I take it this Exhibit 4 is Captain Merrill
5     advising you that he was authorizing you and assigning
6     you --- or at least affirming Sergeant Kief's assignment
7     of you as the investigating officer for the Ballock
8     investigation?
9  A. Yes.
10 Q. Okay.
11    In bold type Exhibit 4 says, you are to report
12    your findings to Troop 1 headquarters by written
13    memorandum no later than October 22, 2013.
14    Do you have any idea what drove that particular
15    date?
16 A. I have no idea.
17 Q. Okay.
18    And it's roughly 60 days. So it could be
19    nothing more than just Captain Merrill saying, you know,
20    I want to know something within 60 days.
21    Correct?
22 A. Yeah, it's possible.
23 Q. Okay.
24    It says that you were also to notify Captain

Page 20

1     Merrill regularly via e-mail of the progress of the
2     investigation as it unfolds.
3     So you know, let's stick with that for a
4     second. You were assigned as of that date. You had
5     already received the e-mails and text from Ellen's
6     lawyer.
7     What did you do next at that point?
8  A. Once I received the disk, is that what you're
9     asking?
10 Q. Yeah, once --- once all of this was in place.
11    You had the --- you had the communications that were at
12    issue.
13    Right?
14    I mean, the charge was unwelcome communications
15    via computer and harassing e-mails.
16    Right?
17 A. Uh-huh (yes).
18 Q. So you had the written communications that are
19    --- that were going to be at issue. You had talked with
20    Sergeant Kief.
21    By August 22, you were assigned by --- well,
22    actually you'd already been assigned by the Sergeant and
23    the Captain affirmed it on August 22.
24    So okay, you're the --- you're the lead

Page 21

1     investigating officer. Had you talked to Ellen Costlow
2     by that point?
3  A. I don't remember the exact date, but she was
4     called in early on in the investigation for a statement.
5  Q. Okay.
6     All right. She was called in.
7     The way you put that kind of made me think that
8     maybe somebody other than you called her in.
9  A. I don't recall. I believe I reached out to
10    her. Or it could have been Sergeant Kief, I don't
11    remember.
12 Q. Okay.
13    What residual role did Sergeant Kief have in
14    the investigation, any? Or was this just assigned to you
15    solely?
16 A. You mean like a hands-on ---?
17 Q. Yeah.
18 A. No, I was the primary investigator. But he was
19    my immediate supervisor, so I would keep him up-to-date
20    on what was happening.
21 Q. Okay.
22    Did you comply with Captain Merrill's directive
23    and keep him advised in e-mail format?
24 A. I don't remember if I was e-mailing him as I

## Page 54

1  trust.
2  A. Right.
3  Q. Okay.
4  All right. Did you ever talk to Tom Ballock?
5  A. No.
6  Q. You never met the man, never talked to him?
7  A. I've seen him in court.
8  Q. Okay.
9  A. But I've never talked to him.
10 Q. Okay.
11 When did you first even hear about Tom Ballock
12 and his website?
13 A. I think I heard it from --- at the time
14 Sergeant Kief.
15 Q. Sergeant Kief told you?
16 A. About the Cowboykief website and all that.
17 Q. Okay.
18 Let's take another look into the production
19 that your lawyer gave me in March of last year. I land
20 on Trooper's 387 here.
21 There's an e-mail from Ellen Ballock addressed
22 to Sergeant Michael Kief, Ronnie M. Gaskins. And it's
23 dated June 11, 2014.
24 So this is, you know --- what is that? That's

## Page 55

1  like eight or nine months after you closed your report.
2  A. Uh-huh (yes).
3  Q. She writes an e-mail to the both of you
4  gentlemen, saying, Tom --- referring to Tom Ballock,
5  Scott's father --- is putting both my names on the
6  internet and linking them to the Ashlee Leeson pseudonym
7  because he will want anyone who Googles me a Costlow or
8  Ballock to be linked directly to a nude pic or video of
9  me once he launches those onto the web.
10 How can I get him stopped before he puts naked
11 photos of me on the internet? He's trying to do it and
12 say Kenny is doing or possible frame another person. I
13 know that will not be the case. It will be Tom who does
14 it, just like it wasn't Kenny harassing me with
15 misspelled anonymous e-mails. It was Tom posing as
16 Kenny, when Tom quit posing as Kenny and just sent
17 anonymous e-mail himself.
18 Sergeant, you know, what is it --- what's the
19 point of this? Your investigation was done eight months
20 prior. Ellen Ballock was still ---. As of --- as of
21 June 2014, she was still a litigant in Family Court.
22 She, in fact, had a civil case filed against
23 Tom Ballock.
24 You're aware of that?

## Page 56

1  A. I wasn't sure if I was aware of that at the
2  time, ---
3  Q. Okay.
4  A. --- like a civil suit.
5  Q. Yeah, sued him.
6  A. Oh, I believe so.
7  Q. Okay.
8  A. I remember.
9  Q. All right. Yeah.
10 A. I think I might have heard that.
11 Q. Yeah, sometimes it's difficult to remember the
12 precise sequence of events. But you knew --- at some
13 point you realized and appreciated the fact that she sued
14 Tom Ballock about this website he was maintaining.
15 I mean, why is she writing to you and Sergeant
16 Kief in June of 2014, some eight months plus after you
17 closed your investigation? What are you guys --- are you
18 inviting her to continue reporting to you on all this ---
19 all this stuff?
20 A. I don't know why she was e-mailing me. I
21 honestly had no interest in communicating with her at
22 that point.
23 Q. Okay.
24 Did you ever e-mail her or --- or call her or

## Page 57

1  talk to her personally and explain to her, look, you
2  know, my part in this is done, you know?
3  A. I don't remember in what capacity, but I would
4  refer her to Cindy Scott. Because at that point it was
5  in the hands of adjudication.
6  So I had no interest in maintaining a dialogue
7  with her.
8  Q. Okay.
9  So after September 18, 2013, anything in this
10 production that was made last year postdating
11 September 18, 2013, as far as you were concerned, was ---
12 had nothing to do with you.
13 You weren't looking at it. You weren't
14 investigating it. You weren't taking any action on it.
15 It may as well have never been sent to you.
16 Fair?
17 A. I had no interest in looking into it anymore.
18 Now, if Ms. Scott felt there should have been a follow-up
19 to this, I would've done a supplemental. But at that
20 point I was done actively looking into it.
21 Q. Okay.
22 I'm unaware of any evidence in this production
23 to suggest that Cindy Scott or anybody else at the
24 Prosecutor's Office suggested or directed that additional

15 (Pages 54 to 57)

Page 22

1  should. I do know that he would --- he was very active
2  with the guys in Morgantown.
3  So he would often show up at our office and he
4  would talk to us about our cases. So he could have been
5  apprised verbally.
6  But I can't --- I don't remember communicating
7  with him as much on e-mail. I had a lot of interaction
8  with him directly.
9  Q. Did Captain Merrill, to your recollection,
10  maintain an abiding interest in what was going on with
11  this investigation?
12  A. He wanted to keep posted on what was going on,
13  because he --- we had a good working relationship with
14  the FBI. So I think he wanted --- wanted to be kept up-
15  to-date as the case progressed.
16  Q. Was there any discussion among you, Sergeant
17  Kief and Captain Merrill as to whether the FBI should be
18  contacted, let them know we're investigating one of your
19  agents?
20  A. I don't remember having that kind of
21  conversation. I don't know if Sergeant Kief and Captain
22  Merrill did.
23  Because I don't --- I don't believe I reached
24  out to the FBI. I believe it was Sergeant Kief.

Page 23

1  So I don't know if he was directed to do that
2  or if that was something he self-initiated. I don't
3  know.
4  Q. Okay.
5  What do you know about Sergeant Kief's contact
6  with the FBI, in that respect?
7  A. I just know that he reached out to him. And I
8  --- I don't believe I heard any conversations he had with
9  him like on the phone or anything, but --- that he
10  informed the --- I think it was the Clarksburg field
11  office that there was an investigation involving an agent
12  at the CG center.
13  Q. And you know this because Sergeant Kief told
14  you that he reached out to the FBI?
15  A. Yes.
16  Q. Now, what did --- what was your understanding
17  at that point with respect to the relationship between
18  Ellen Costlow --- actually at that point her name was
19  Ellen Ballock ---? She had yet to be divorced. I'm
20  probably going to struggle with that, honestly.
21  It won't be any effort on my part to confuse
22  you, I'll just --- I probably will struggle with that.
23  But her name is Ellen Costlow now.
24  A. Uh-huh (yes).

Page 24

1  Q. And that's the name she sails under now. And
2  that's the name that is on the lawsuit. So that's the
3  name that's stuck in my head.
4  But what was your understanding as of the
5  commencement of your investigation concerning the
6  relationship between Ellen Ballock and her husband,
7  Scott?
8  Where did matters stand between them? What was
9  going on?
10  A. The only thing I knew is they were in the
11  process of going through a divorce.
12  Q. Okay.
13  So you --- you knew that you were investigating
14  communications between an estranged husband and his wife
15  that occurred in the midst of a divorce.
16  Did you have any concern about whether this was
17  fit subject matter for a criminal investigation? That
18  maybe it was something that was better left to the Family
19  Court system, perhaps?
20  A. No, because as Sergeant Kief cited, the West
21  Virginia Code 61.29(a), harassment, both with the e-mails
22  and the text messages that was investigated as a computer
23  harassment/Criminal Code violation. So it was separate
24  from what they were doing in court for the divorce

Page 25

1  proceedings.
2  Q. So I take it, then, there was never any
3  discussion between you and Sergeant Kief or perhaps
4  Captain Merrill, when he was stopping in to check on
5  things, that, you know, in view of the fact that this is
6  an FBI agent, particularly, maybe we're better off if we,
7  you know, recommend Ms. Costlow --- or Ms. Ballock have
8  her lawyer go see the Family Court Judge about this.
9  Nothing to that effect?
10  A. I don't believe so.
11  Q. Okay.
12  I mean, you followed the point of my question
13  here. The Captain wanted to know what you were doing
14  about this investigation.
15  And the way I'm understanding your testimony,
16  he wanted to know, because there was an FBI agent at
17  issue here. And you know, the Captain didn't want to
18  spoil or do anything that would spoil the cordial
19  relations between the State Police and the FBI.
20  So my question then becomes, as you go through
21  all of these e-mails and you see that it's --- it's all,
22  you know, related to their domestic situation, I want to
23  know, I mean, was there any thought given ---
24  consideration given to simply taking a pass on a criminal

7 (Pages 22 to 25)