UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


**SCOTT T. BALLOCK**                                    Case No.:      1:17-CV-52

     Plaintiff,

v.                                                      JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

     Defendants.

## PLAINTIFF'S OPPOSITION TO TROOPER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


Excerpts from the deposition of Michael A. Kief:


Pages 69-70, cited at page 8.
Page 100, cited at page 12.
Pages 100-101, cited at page 12.
Page 102, cited at page 12.
Page 108, cited at page 12.
Page 110, cited at page 12.
Pages 104-105, cited at page 13.
Pages 138-139, cited at page 16.
Page 140, cited at page 16.
Pages 147-148, cited at page 13.
Page 107, cited at page 15, footnote 17.

Pages 139-140, cited at page 16.
Pages 52-53, cited at page 17.
Page 55, cited at page 17.
Page 61, cited at page 17.
Pages 50-51, cited at page 17.
Page 43, cited at page 17.
Page 107, cited at page 20.
Page 107, cited at page 21.


Exhibit No. 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

OF WEST VIRGINIA

\* \* \* \* \* \* \* \*

SCOTT T. BALLOCK,                \*

    Plaintiff                \*   Case No.

    vs.                \*   1:17-CV-52

ELLEN RUTH COSTLOW,        \*

STATE TROOPER MICHAEL     \*

KIEF, STATE TROOPER        \*

RONNIE M. GASKINS,         \*

STATE TROOPER CHRIS        \*

BERRY,                     \*

    Defendants                \*

\* \* \* \* \* \* \* \*

COPY

DEPOSITION OF

MICHAEL KIEF

May 28, 2019

Any reproduction of this transcript is prohibited without

authorization by the certifying agency.

Page 66

1    know, your best, honest recollection and testimony about
2    all this stuff.  And it's not --- you know, it's not a
3    contest or —
4    A. Sure.
5    Q. --- anything of that nature.
6    All right.
7    So Ellen Ruth Costlow comes in to see you the
8    evening of the same day that you called her?
9    A. I believe it was the same evening.
10   Q. To the best of your memory?
11   A. Yes, sir.
12   Q. Tell me what you remember.  What was your
13   impression when --- when she came in to see you?
14   A. She --- she came to the state police barracks.
15   She sat down, and she --- well, I had a conversation
16   about her and Trooper Berry, which she denied having an
17   affair with Trooper Berry.
18   She then went on to say she was in the middle
19   of a divorce or in --- in the process of divorce and that
20   her soon to be ex-husband would not stop contacting her,
21   that she was being harassed daily with emails and text
22   messages.
23   Q. You say Ellen Ruth Costlow denied having a
24   romantic relationship with Christ Berry.  Did she deny

Page 67

1    knowing Trooper Berry?
2    A. No.  No, she --- I don't believe she did deny
3    knowing Trooper Berry.
4    Q. Okay.
5    Tell me what you remember in that direction.
6    A. I really don't remember a lot.  I remember
7    something to the effect that Trooper Berry was up in her
8    neighborhood conducting some sort of investigation.  But
9    I don't know the specifics of the --- I don't remember
10   the specifics of the investigation or why he was up in
11   that neighborhood doing that.
12   Q. We do have some documentation on that.  In
13   fact, I can show you documentation --- and this is from
14   2013 ---
15   A. Uh-huh (yes).
16   Q. --- when the 911 call was placed.
17   A. Okay.
18   Q. And the 911 call resulted in some state police
19   responding to the Costlow residence.  Maybe you reviewed
20   some of that evidence in preparation for the deposition
21   today?  No --- no bells going off?
22   A. No bells going off, sir.  I know --- I know the
23   state police at least went up there at least once, but
24   I ---.

Page 68

1    Q. Let me see if this might job your memory a
2    little.
3    A. Okay.
4    Q. And again, we can take the time necessary to
5    get into some of these documents.
6    A. Sure.
7    Q. And I am going to show you some documents in
8    the course of this, but you know, you're a
9    straightforward, attentive witness, and you have an
10   impressive memory.  So we're covering a lot of ground
11   without the time necessary for a lot of document work.
12   So I'm going to take advantage of that.
13   There came a time when my client, Scott
14   Ballock, called and talked to you and he asked about the
15   fact that state police went to his estranged wife's
16   residence.  And he questioned you as to why there was no
17   report of that police activity.
18   A. Yes, sir.
19   Q. And you were a bit --- affronted, I believe
20   would be a fair way to put it, by his questioning you
21   along that line.
22   A. I think that's a mischaracterization.
23   Q. Okay.
24   Well, let me just ask you personally, do you

Page 69

1    remember having a conversation with Scott?
2    A. I remember having a conversation with Scott.
3    Q. You do remember that?
4    A. Yes.
5    Q. Okay.
6    Good.  So tell me about his conversation that
7    you had with Scott Ballock.
8    A. From what I remember about the conversation, he
9    called in and asked about an incident that happened at
10   his house.  And I believe he wanted a report, if I
11   remember correctly.
12   Q. Uh-huh (yes).
13   A. And ---.
14   Q. I believe he did.
15   A. Okay.
16   Q. Yeah.
17   A. And I explained how to get that report.  Well,
18   he --- he asked me if there was a report filed.  I
19   checked.  There was not a report filed.  So he questioned
20   me on why there wasn't a report filed.
21   Q. Okay.
22   You presumably went on your computer system,
23   called up a database in some fashion or whatever, and
24   were able to determine that there was no report on file?

## Page 70

1  A. The CI log did not show a report on file.
2  Q. What log?
3  A. Criminal Investigation log.
4  Q. Okay.
5  So you told Scott Ballock that there was no
6  report prepared?
7  A. Correct.
8  Q. What else do you remember about the
9  conversation?
10  A. I believe he asked me why there wasn't a report
11  filed. And I explained to him, you know, based upon the
12  investigating officers or the responding officers'
13  observations, and you know, it's up to them to --- to
14  initiate a report if they feel that it needs to be
15  initiated. But, you know, if they --- if, you know, a
16  trooper goes on a call, and there's no substance to that
17  call, then a report probably isn't going to be filed.
18  Q. Okay.
19  What do you remember about the substance of the
20  call, that is to say --- I realize as I listen to my own
21  questioning that that's probably a confusing way to
22  phrase it. Scott Ballock called you, told you that state
23  police had been to his residence, and his estranged wife
24  was currently living there.

## Page 71

1  And he wanted a copy of the report. You looked
2  in the Criminal Investigation log on your computer and
3  told him there was no report. And he wanted to know why.
4  You told him that the trooper who responded must have
5  judged it unworthy of a report.
6  Is that ---?
7  A. Correct. Yes, sir.
8  Q. Okay.
9  Do you know anything about what happened when
10  that --- who that trooper was, or what he found?
11  A. From what I remember, it was a verbal
12  altercation at his house or his --- that residence.
13  Q. All right.
14  They were estranged. Do you --- do you guys in
15  the state police use that word, estranged?
16  A. We can.
17  Q. When --- when someone is married to another
18  person, but by order of the family court, usually,
19  they're not living together.
20  A. Correct.
21  Q. Then they are said to be estranged.
22  A. Yes, sir.
23  Q. That's the way we use that word in the law.
24  You guys use it that way, too?

## Page 72

1  A. We can. Yes, sir.
2  Q. Okay. All right.
3  So it is accurate to say that his wife lived
4  there, but he did not because they were going through a
5  divorce at the time. And that squares with your best
6  memory of what you learned about all of this ---
7  A. Yes. sir.
8  Q. --- at the time?
9  Who was the state police trooper who went to
10  the house?
11  A. I can't remember that. sir. I don't remember
12  that.
13  Q. All right.
14  A. I'd hate to speculate.
15  Q. All right.
16  Did you make any effort to find out at the time
17  who the trooper was?
18  A. I can't remember, sir.
19  Q. You don't' remember if you tried to find out?
20  A. No, sir. I can't remember that.
21  Q. How was Scott Ballock in his attitude and ---
22  A. I remember ---.
23  Q. --- in the course of this conversation?
24  A. I believe his discourse came from when I told

## Page 73

1  him there wasn't a police report filed. And he
2  continually questioned me upon that. And I really didn't
3  have another answer for him except for the fact that it
4  was what it was, a verbal altercation that the
5  investigating --- or the responding officer didn't feel
6  like a report needed to be filed.
7  Q. Okay.
8  A. But he kept pressing upon that issue.
9  Q. Was there any policy or practice in effect at
10  the state police at the time of this response to the
11  Ballock residence in Thistledown as to whether a report
12  should be filed if a child, minor child, was present?
13  A. No, sir.
14  Q. If Summer Ballock, a minor child at the time,
15  was present at the Ballock residence when her mother and
16  Kenny Ice, Junior were having an argument, and the state
17  police came to the house about it, there'd be no
18  expectation on the part of the state police that the
19  trooper should formalize what they did, what they found,
20  what they did, in order to safeguard the interests of
21  that minor child?
22  A. It depended on thee escalation of the --- of
23  the incident.
24  Q. Okay.

Page 98

1  Q. Okay.
2  A. Yes.
3  ATTORNEY CROOKS: Let's mark this Number
4  3.
5  ---
6  (Whereupon, Deposition Exhibit 3, 8/22/13
7  Email, was marked for identification.
8  ---
9  ATTORNEY CROOKS: And I don't know that I
10  have extra copies of this, so I'll indulge the time
11  necessary for your lawyer and Mr. Phillips both. I'll
12  let you start if you want, Mark.
13  ATTORNEY PHILLIPS: If you don't mind,
14  I'll just look over his shoulder.
15  ATTORNEY CROOKS: Sure.
16  And let me go ahead and ask the reporter
17  to mark the next one in sequence that I'm going to ask.
18  ---
19  (Whereupon, Deposition Exhibit 4, Memo
20  from Captain Merrill, was marked for
21  identification.)
22  ---
23  ATTORNEY CROOKS: Thank you.
24  I'll let the three of you fellows look at

Page 99

1  those documents real quick while I excuse myself for just
2  a moment. I'll be right back. Hopefully, both of us
3  will use our time wisely.
4  ---
5  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
6  ---
7  COURT REPORTER: Back on the record.
8  ATTORNEY JEFFRIES: He's got them.
9  ATTORNEY CROOKS: Yeah. I --- I got them
10  here just so I can ask a couple questions.
11  We're back on the record after a short
12  break.
13  BY ATTORNEY CROOKS:
14  Q. We've identified Kief Exhibit 3 and Kief
15  Exhibit 4. And I believe these documents will more or
16  less prove up the answer you've already given, which is
17  that you kicked it upstairs, I think you said was the ---
18  what you did. You asked your superior for permission to
19  open an investigation.
20  So let me show you Exhibit Number 3. Can you
21  tell us what that is?
22  A. That's an email to my captain, James Merrill,
23  at the time.
24  Q. Okay.

Page 100

1  Why were you emailing your Captain?
2  A. Anytime another police officer or public
3  official or whoever --- we have to get permission to
4  investigate them from Charleston, more or less.
5  Q. Why is that?
6  A. I guess they don't want us opening
7  investigations on other police officers or public
8  officials without them knowing it.
9  Q. Okay.
10  Have you ever known a time when you sent an
11  email of this kind, and the response was no you have no
12  authority to open an investigation into this individual?
13  A. No, sir.
14  Q. Can you think of any other time when you ever
15  had to write an email like this and ask for permission to
16  investigate another police officer?
17  A. No, sir.
18  Q. At the time of Kief Exhibit Number 3, which was
19  August 20, 2013, I think, --- am I right?
20  A. Yes, sir.
21  Q. Okay.
22  ATTORNEY JEFFRIES: Correction. August
23  22nd.
24  THE WITNESS: I'm sorry, 22nd; yes.

Page 101

1  BY ATTORNEY CROOKS:
2  Q. Okay.
3  A. Yes.
4  Q. Thank you.
5  Kief Exhibit Number 3 is your email of August
6  23 to your captain. It looks like there's a second page
7  to that, and I don't have it. Do you have any memory of
8  this document now that we've looked at it as much as we
9  have? You remember doing this?
10  A. I remember sending an email. I ---.
11  Q. Okay.
12  A. Yeah. Yeah. Yeah, just ---.
13  Q. Best of your recollection, this was the first
14  time you'd ever sent an email of this kind to the captain
15  asking for permission to open an investigation because it
16  concerned a high profile person or a member of the law
17  enforcement community.
18  True?
19  A. True.
20  Q. Okay.
21  I believe --- make a point a point of it to
22  suggest that that might be one of the reasons you have of
23  --- of doing this. You never had to do it before.
24  Did you have any conversations with the captain

Page 102

1  on the telephone?
2  A. Yes, sir.
3  Q. Okay.
4  Tell me what you remember.
5  A. I --- I just called him and explained the
6  merits of what was going on with the whole thing. And he
7  said, well, email --- put it in writing. Give me ---
8  give me an email about what --- opening an investigation.
9  Q. Okay.
10  Now, the reason you did this email to Captain
11  Merrill was because Ellen Costlow had come to see you,
12  and she offered to give you a collection of emails from
13  her attorney, Matt Stout?
14  A. Correct.
15  Q. Did you have those emails, and did you review
16  them before you asked for permission from Captain
17  Merrill?
18  A. No. sir.
19  Q. Okay.
20  So you were simply seeking permission to take
21  advantage of the offer that Ellen Costlow had made to you
22  that she would provide this evidence?
23  A. Correct.
24  Q. Okay.

Page 103

1  And can you tell me if you had any conversation
2  with Captain Merrill to the effect that there has been
3  some allegations made that there was a sexual
4  relationship between the Complainant, Ellen Costlow, and
5  one of your troopers, Chris Berry?
6  A. I can't remember that, sir.
7  Q. Don't you think that's the sort of thing you
8  --- would be on your mind as you were talking to your
9  captain?
10  A. Again, I can't remember the --- the specifics
11  of the conversation. I don't know if I gave that to him
12  or not. I don't know.
13  Q. Did your captain ask you, look, why do you ---
14  why do you want to get involved in investigating a case
15  that's in front of the family court judge? Why don't you
16  just send her to the family court judge?
17  A. Because we were investigating a criminal
18  complaint, not a civil complaint.
19  Q. You understand that the family court judge
20  would have authority to order restrictions on
21  communication between parties who are divorced?
22  A. Yeah.
23  Q. You've been through a divorce yourself.
24  Right?

Page 104

1  A. Right. We never came to that.
2  Q. That was never necessary in your case, but ---
3  A. No, sir.
4  Q. --- I don't surprise you at all to tell you
5  that a family court judge has that authority?
6  A. It wouldn't surprise me, sir.
7  Q. Did it occur to you that you might refer her to
8  the family court judge rather than open a criminal
9  investigation?
10  A. No, sir.
11  Q. After all, she had cut Kenny Ice in a domestic
12  dispute, and there was no reason to make an arrest or
13  open an investigation into --- into that. And the state
14  police had responded to her residence on at least one
15  occasion and didn't even deem it necessary to make a
16  report.
17  ATTORNEY JEFFRIES: Objection, suspects.
18  BY ATTORNEY CROOKS:
19  Q. In light of --- in light of what we know about
20  the broad discretion that the state police has, I mean,
21  you were under no obligation to open up an investigation
22  into this complaint that Ellen Costlow was making, were
23  you?
24  A. My obligation is to the victim.

Page 105

1  Q. So you felt obliged to Ellen Costlow?
2  A. If there was a criminal infraction, yes.
3  Q. At what point in time did you come to the
4  conclusion that there was enough evidence to seek the
5  criminal warrant for the arrest of Scott Ballock?
6  A. It wasn't mine. I had nothing to do with that,
7  sir.
8  Q. Okay.
9  Were you consulted on it?
10  A. I was being updated on the progress of the
11  investigation.
12  Q. All right.
13  According to Exhibit 3, Captain Merrill wanted
14  to be kept in the loop. He wanted email reports on this.
15  Did you keep him advised?
16  A. That was --- that is not --- that email is not
17  --- I'm sorry. The memo is not sent to me, sir.
18  Q. Pardon me. I --- I'm misspeaking it. I
19  apologize. I'm just trying to move along her, and I'm
20  getting a little ahead of myself.
21  A. That's all right.
22  Q. Let me show you Exhibit Number 4. What is
23  that?
24  A. That is a Troop 1 Memorandum to Corporal

Page 106

1    Gaskins of the Morgantown Detachment.
2    Q. Okay.
3    And who's it from?
4    A. Captain Merrill.
5    Q. Okay.
6    And what was Captain Merrill instructing
7    Corporal --- then Corporal Gaskins?
8    A. To open up an investigation.
9    Q. So the fair implication here is that Exhibit 4
10   occurred because it was instigated by Exhibit 3? In
11   other words, you asked Captain Merrill for authority and
12   he granted it. And he personally directed Corporal
13   Gaskins to open the investigation?
14   A. Correct.
15   Q. All right.
16   And the reason this echelon of authority at the
17   state police was directly involved here is because there
18   was an FBI agent at issue.
19   True?
20   A. Yes, sir.
21   Q. Did you make any contact with the FBI in the
22   course of your investigating?
23   A. During the course of the whole ---?
24   Q. Prior to the time that my client was arrested

Page 107

1    on September 13th, 2013, did you contact the FBI?
2    A. I --- I do not know, sir. I cannot remember
3    who contacted the FBI.
4    Q. All right.
5    I take it by your answer that you're satisfied
6    that there was somebody at the state police who contacted
7    the FBI about Scott Ballock prior to his arrest on
8    September 13, 2013?
9    A. Correct.
10   Q. What was the point of that contact?
11   A. Twofold, to let the agency that he was hired
12   under know that there was a criminal investigation being
13   conducted, and two, professional courtesy.
14   Q. Did you direct someone to make that contact?
15   A. I do not remember that, sir.
16   Q. Would corporal Gaskins have had the authority
17   to contact the FBI for the two purposes that you just
18   identified?
19   A. Yes, sir.
20   Q. Okay.
21   Who was in charge of the investigation,
22   Corporal Gaskins?
23   A. He was the investigating officer, sir.
24   Q. Okay.

Page 108

1    All right. I appreciate your answering me.
2    Does that mean he was in charge of it?
3    A. Yes, sir.
4    Q. Okay.
5    The reason I'm asking you is Captain Merrill
6    wanted to be kept advised. He wanted to know what was
7    happing with all of this.
8    Right?
9    A. Yes, sir.
10   Q. And presumably, based on what you told me up to
11   this point, Captain Merrill wanted to be kept in the loop
12   because the person under investigation here was a Federal
13   Bureau of Investigation agent?
14   A. Correct.
15   Q. Do you know if Corporal Gaskins, in fact, kept
16   Captain Merrill advised by email? Were you copied on his
17   emails?
18   A. I don't remember. I don't know that, sir. I
19   don't remember being copied on emails.
20   Q. Okay.
21   Captain Merrill in Exhibit number, what is it,
22   4?
23   A. Yes, sir.
24   Q. Did he copy you?

Page 109

1    A. On?
2    Q. Did he copy you on his email to --- or his memo
3    to Corporal Gaskins?
4    A. I don't remember that, sir.
5    Q. Does it say?
6    A. No, sir.
7    Q. Well, I only have the one copy, and I'm not
8    looking at it so ---.
9    A. No, sir. It does not.
10   Q. No matter how many times I've been down through
11   this stack, and I've tried to memorize everything, but I
12   guess I'm getting too old to be able to do that.
13   So you have a memory as to whether you were
14   kept advised of the investigation into Ellen Costlow's
15   complaint against Scott Ballock prior to Scott's arrest
16   on September 13, 2013.
17   A. I didn't say that, sir.
18   Q. I'm asking.
19   A. Yes, sir. But you made a statement, and I'm
20   --- that's not correct.
21   Q. Sounded like a statement, but it was intended
22   to be a question. Let me put it a little more clearly
23   for you. Were you kept advised of the investigation into
24   Ellen Costlow's criminal complaints against Scott Ballock

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 110

1    prior to the day of his arrest?
2    A. Yes, sir.
3    Q. How were you kept advised?
4    A. I was Corporal Gaskins' supervisor.  So he
5    would, you know, periodically talk to me about what's
6    going with the cases, his investigation.
7    Q. Okay.
8    What sort of things would he tell you?
9    A. Just an update on the investigation, what was
10   going on, what he found.
11   Q. Okay.
12   Based on those periodic briefings, what did you
13   understand to be the course of the investigation?  How
14   did it go down?  How did --- how was it done?  Was it
15   done in compliance of the protocols laid out in Kief
16   Exhibit Number 1?
17   A. I --- I do not know that, sir.
18   Q. Would it have been your responsibility to see
19   to it that Corporal Gaskins complied with the
20   requirements laid out in Kief Exhibit Number 1?
21   A. Explain that.
22   Q. You're his supervisor?
23   A. I am his --- was his supervisor, yes, sir.
24   Q. He was doing an investigation under your

Page 111

1    supervision.
2    A. Yes.
3    Q. And the captain was being kept in the loop on
4    how the investigation proceeded?
5    A. Correct.
6    Q. Did you, in fact, make a point to see to it
7    that the policies and procedures laid out in Kief Exhibit
8    Number 1 were followed in the investigation of Ruth Ellen
9    --- Ellen Ruth Costlow's criminal complaint against Scott
10   Ballock?
11   A. It's my opinion that Corporal Gaskins was
12   following all criminal --- the procedures, yes, sir.
13   Q. Do you know if Captain Merrill was told that
14   the decision had been made to seek an arrest warrant for
15   Scott Ballock?
16   A. That's something ---.
17   Q. Before he was --- let me --- let me restate the
18   question.  It's been two years.  I can almost read the
19   transcript.  Let me articulate the question.
20   Do you know if Captain Merrill was told
21   beforehand that the decision had been made to obtain an
22   arrest warrant for Scott Ballock?
23   A. That would've been done, sir.
24   Q. Why?

Page 112

1    A. Because before we arrested any police officer
2    or any official, we would've told that to our superiors.
3    Q. Do you know if Captain Merrill provided express
4    authority to proceed?
5    A. I do not know that, sir.
6    Q. Do you know if Captain Merrill ever had any
7    contact with the FBI?
8    A. I do not know that, sir.
9    Q. Now, there was an FBI agent present at the
10   family court proceeding on September 13, 2013 when my
11   client Scott Ballock was arrested.
12   Are you aware of that?
13   A. Repeat the question, sir.
14   Q. Sure.  The day my client was arrested ---
15   A. Yes, sir.
16   Q. --- in family court on the count, there was a
17   representative from the FBI present?
18   A. Correct.  Yes, sir.
19   Q. You know that?
20   A. Yes, sir.
21   Q. And in fact, one of the reasons you know that
22   is because the state police advised the FBI that we're
23   going to execute an arrest warrant for one of your agents
24   at the family court proceeding?

Page 113

1    A. Correct.
2    Q. Were you the one who notified the FBI of that
3    fact for the representative to be there?
4    A. I do not remember that, sir.
5    Q. And who actually the arrest warrant?
6    A. I was there.  There was another trooper there
7    when we went upstairs to the magistrate's office to get
8    --- to have Mr. Ballock arraigned.  I don't remember
9    whose signature is on the arrest warrant.
10   Q. I think it was yours.
11   A. Okay.
12   I --- I can't remember that, sir.
13   Q. I can show it to you here if we need to.
14   So did you interview Scott Ballock before you
15   arrested him?
16   A. No, sir.
17   Q. Did you reach out to make contact with Scott
18   Ballock prior to making the decision to arrest him to let
19   him know that you were investigating his communications
20   with his wife?
21   A. I didn't make that decision, sir.
22   Q. Who did?
23   A. That'd be the investigating officer and the
24   prosecuting attorney.

Page 102

1    on the telephone?
2    A. Yes, sir.
3    Q. Okay.
4    Tell me what you remember.
5    A. I --- I just called him and explained the
6    merits of what was going on with the whole thing. And he
7    said, well, email --- put it in writing. Give me ---
8    give me an email about what --- opening an investigation.
9    Q. Okay.
10   Now, the reason you did this email to Captain
11   Merrill was because Ellen Costlow had come to see you,
12   and she offered to give you a collection of emails from
13   her attorney, Matt Stout?
14   A. Correct.
15   Q. Did you have those emails, and did you review
16   them before you asked for permission from Captain
17   Merrill?
18   A. No, sir.
19   Q. Okay.
20   So you were simply seeking permission to take
21   advantage of the offer that Ellen Costlow had made to you
22   that she would provide this evidence?
23   A. Correct.
24   Q. Okay.

Page 103

1    And can you tell me if you had any conversation
2    with Captain Merrill to the effect that there has been
3    some allegations made that there was a sexual
4    relationship between the Complainant, Ellen Costlow, and
5    one of your troopers, Chris Berry?
6    A. I can't remember that, sir.
7    Q. Don't you think that's the sort of thing you
8    --- would be on your mind as you were talking to your
9    captain?
10   A. Again, I can't remember the --- the specifics
11   of the conversation. I don't know if I gave that to him
12   or not. I don't know.
13   Q. Did your captain ask you, look, why do you ---
14   why do you want to get involved in investigating a case
15   that's in front of the family court judge? Why don't you
16   just send her to the family court judge?
17   A. Because we were investigating a criminal
18   complaint, not a civil complaint.
19   Q. You understand that the family court judge
20   would have authority to order restrictions on
21   communication between parties who are divorced?
22   A. Yeah.
23   Q. You've been through a divorce yourself.
24   Right?

Page 104

1    A. Right. We never came to that.
2    Q. That was never necessary in your case, but ---
3    A. No, sir.
4    Q. --- I don't surprise you at all to tell you
5    that a family court judge has that authority?
6    A. It wouldn't surprise me, sir.
7    Q. Did it occur to you that you might refer her to
8    the family court judge rather than open a criminal
9    investigation?
10   A. No, sir.
11   Q. After all, she had cut Kenny Ice in a domestic
12   dispute, and there was no reason to make an arrest or
13   open an investigation into --- into that. And the state
14   police had responded to her residence on at least one
15   occasion and didn't even deem it necessary to make a
16   report.
17   ATTORNEY JEFFRIES: Objection, suspects.
18   BY ATTORNEY CROOKS:
19   Q. In light of --- in light of what we know about
20   the broad discretion that the state police has, I mean,
21   you were under no obligation to open up an investigation
22   into this complaint that Ellen Costlow was making, were
23   you?
24   A. My obligation is to the victim.

Page 105

1    Q. So you felt obliged to Ellen Costlow?
2    A. If there was a criminal infraction, yes.
3    Q. At what point in time did you come to the
4    conclusion that there was enough evidence to seek the
5    criminal warrant for the arrest of Scott Ballock?
6    A. It wasn't mine. I had nothing to do with that,
7    sir.
8    Q. Okay.
9    Were you consulted on it?
10   A. I was being updated on the progress of the
11   investigation.
12   Q. All right.
13   According to Exhibit 3, Captain Merrill wanted
14   to be kept in the loop. He wanted email reports on this.
15   Did you keep him advised?
16   A. That was --- that is not --- that email is not
17   --- I'm sorry. The memo is not sent to me, sir.
18   Q. Pardon me. I --- I'm misspeaking it. I
19   apologize. I'm just trying to move along her, and I'm
20   getting a little ahead of myself.
21   A. That's all right.
22   Q. Let me show you Exhibit Number 4. What is
23   that?
24   A. That is a Troop 1 Memorandum to Corporal

Page 138

1   produced to us in discovery and marked as Kief Exhibit
2   Number 1 in todays' deposition.
3   A. Okay.
4   Q. Am I right?
5   A. Yes, sir.
6   Q. All right.
7   Take a look at page 853 of Deposition Exhibit
8   Number 1 for a second, would you?
9   A. I'm sorry. Got one.
10  Q. I'm looking at 3.02. Proper conduct of a
11  criminal investigation includes, but is not necessarily
12  limited to.
13  ATTORNEY JEFFRIES: Charles, I believe
14  you're on page 851.
15  ATTORNEY CROOKS: Am I?
16  All right.
17  BY ATTORNEY CROOKS:
18  Q. I apologize. Didn't mean to mislead you.
19  Thank you for the ---.
20  A. All right sir.
21  Q. Thank you for bracing me on that. Let me take
22  a fresh line of questioning. We've looking at page 851
23  of Kief Exhibit Number 1. I'm looking specifically at
24  3.02. Proper conduct of a criminal investigation

Page 139

1   includes, but is not necessarily limited to --- are you
2   with me so far?
3   A. Yes, sir. Uh-huh (yes).
4   Q. I'm going to skip past some stuff that doesn't
5   pertain, and focus on parts that I believe do for
6   purposes of my question.
7   A. Uh-huh (yes).
8   Q. Sub-part (c) says locating and interviewing all
9   persons who have or who are thought to have any
10  information concerning the crime under investigation?
11  A. Yes, sir.
12  Q. Well, all persons who have information would
13  certainly include the person who's accused of sending the
14  harassing emails and texts ---
15  A. Yes. sir.
16  Q. --- wouldn't it?
17  A. Uh-huh (yes).
18  Q. So that means to say this policy and procedure
19  called for interviewing Scott Ballock.
20  A. Okay.
21  Q. True?
22  A. As it --- as it is written, yes, sir.
23  Q. So if Scott Ballock was offering to come in and
24  --- and sit for an interview by the state police and/or

Page 140

1   the prosecutor's office, and they turned him down, then
2   they would have been operating in contradiction to this
3   directive in state police policy and procedure?
4   A. Yes, sir.
5   Q. Sub-paragraph (f) says that proper conduct of a
6   criminal investigation also includes, but is not
7   necessarily limited to, locating and questioning those
8   persons suspected of having committed the crime. I mean,
9   that's --- that's saying explicitly that Scott Ballock
10  should've been interviewed if the opportunity presented
11  itself, isn't it?
12  A. Yes, sir.
13  Q. And so if the state police and the person,
14  Corporal Gaskins, whether acting of his own accord or
15  under the direction of Cindy Scott, turned Scott down
16  when he volunteered to come in and give a statement, that
17  wouldn't be fair treatment to Scott, would it?
18  A. I don't know if I would characterize it as
19  that, sir. These are guidelines that we go by, not --- I
20  mean, it's policy and procedure. But the --- we have a
21  lot of leeway about how we conduct a criminal
22  investigation. It's certainly not something that they
23  would be written up or anything like that.
24  Q. A lot of the communications that were at issue

Page 141

1   in the criminal charge for which Scott was arrested,
2   which was later withdrawn by the prosecuting attorney's
3   office, had to do with interactions that Ellen and Kenny
4   Ice, Junior were having. You've looked at those emails
5   enough to --- to know that I'm right about that?
6   Correct?
7   Kenny Ice comes up a lot.
8   A. I'm thinking that's a --- yes. Kenny Ice comes
9   up a lot, yes, sir.
10  Q. And so he would've been somebody who had
11  information concerning the crime under investigation.
12  True?
13  A. He would have knowledge of it, yes, sir.
14  Q. Do you know if Kenny Ice was contacted and
15  interviewed by Corporal Gaskins as part of the ---?
16  A. I do not know that, sir. I don't believe he
17  was.
18  Q. In fact, a lot of the claims hat Ellen Costlow
19  made against Scott and many of the subjects addressed by
20  Scott Ballock in his texts and emails to Ellen could've
21  been either corroborated or refuted by Kenny Ice if ---
22  if all the mentions of Kenny Ice are to be taken as
23  credible in those emails.
24  True?

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 146

1  Q. ---- I don't want to --- yeah.  I don't want to
2  misrepresent what ---.
3  A. Yeah.  There's two different things there.
4  Q. Yeah.  Your --- just another case of your
5  careful attention to my questions.  Thank you.
6  You interviewed Ellen Costlow at the detachment
7  in Morgantown the night before you executed the warrants
8  and arrested Scott?
9  A. I interviewed her, sir?
10  Q. Yeah.
11  A. Okay.
12  I don't remember that.
13  Q. You don't remember doing that?
14  A. No, sir.
15  Q. You don't remember having a discussion with her
16  saying look, you know, we got these warrants.  I'm going
17  to execute them tomorrow.  What time is your hearing?
18  What time do I need to be there?  How did you know?
19  A. I don't believe Ms. Costlow knew we were going
20  to serve those warrants on him that day.  It's my
21  recollection we did not tell her.
22  Q. You did not tell her?
23  A. Correct.
24  Q. Okay.

Page 147

1  A. We knew that there was a hearing the next day.
2  Q. How did you know that?
3  A. I can't remember how we found out the
4  conversation of how we knew that there was going to be a
5  court hearing the next day.
6  Q. Did you assign Corporal Gaskins, or was that
7  Captain Merrill?
8  A. We discussed having Corporal Gaskins do the
9  investigation.
10  Q. Did you ever interview Ellen Costlow without
11  Corporal Gaskins being present?
12  A. The first time I met Ms. Costlow, the night
13  --- the first night of her asking about the affair.  I
14  don't remember having another interview with her.  I
15  can't --- I can't recall, sir.  I do not know.
16  Q. Did you ever make any recordings of interviews
17  that you conducted with Ellen Costlow?
18  A. I don't remember any, sir, no.
19  Q. Have you ever done that sort of thing in the
20  course of criminal investigations?
21  A. Sure.
22  Q. How about criminal investigations where another
23  member of law enforcement is at issue?  Don't you think
24  making a recording of interviews with the complaining

Page 148

1  witness would help in keeping Captain Merrill advised?
2  A. I don't know if I've interviewed a complaining
3  victim, sir.  I don't know if I've ever done that before.
4  I've done suspects, but not victims.
5  Q. If Scott Ballock had been interviewed as he
6  offered, and he waived his Fifth Amendment privilege,
7  answered questions, he could have potentially put the
8  rope around his own neck and admitted to criminal
9  activity.
10  True?
11  A. He could have, yes, sir.
12  Q. Wouldn't that have been a good reason to
13  interview him?  Doesn't that argue that he would be a
14  credible witness worthy of interviewing in the course of
15  the investigation?
16  ATTORNEY JEFFRIES:  Objection.  Scott is
17  not with us.
18  BY ATTORNEY CROOKS:
19  Q. If the man is willing to risk his career, and
20  --- and go on to jail to answer questions, doesn't that
21  argue in favor of bringing him and interviewing him?
22  A. Corporal Gaskins did not feel like he needed to
23  interview Mr. Ballock for a reason.  I do not know that
24  reason.

Page 149

1  Q. Did you ever indicate that you had tried to
2  tape record an interview with Ellen Costlow, but that the
3  recording machine malfunctioned?
4  A. I remember that on a website someplace.  I
5  don't recall what that circumstance was.  But I remember
6  reading that on one of his websites.  But I don't recall
7  the circumstances.
8  Q. You received quite a few emails directly from
9  Ellen Costlow during the course of this investigation.
10  True?
11  A. True.
12  Q. And that was even after Corporal Gaskins had
13  been appointed as the investigating officer?
14  A. True.
15  Q. Did you ever tell Ellen Costlow, look, I'm not
16  the chief investigating officer on this?  You should be
17  communicating with Corporal Gaskins?
18  A. No, sir.
19  Q. Why not?
20  A. Couple different things.
21  Q. Why would you have back channel communication
22  with the complainant when somebody else is investigating?
23  A. They're really --- Ms. Costlow was --- her
24  emails are, basically, somebody that wants somebody to

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 106

1    Gaskins of the Morgantown Detachment.
2    Q. Okay.
3    And who's it from?
4    A. Captain Merrill.
5    Q. Okay.
6    And what was Captain Merrill instructing
7    Corporal --- then Corporal Gaskins?
8    A. To open up an investigation.
9    Q. So the fair implication here is that Exhibit 4
10   occurred because it was instigated by Exhibit 3? In
11   other words, you asked Captain Merrill for authority and
12   he granted it. And he personally directed Corporal
13   Gaskins to open the investigation?
14   A. Correct.
15   Q. All right.
16   And the reason this echelon of authority at the
17   state police was directly involved here is because there
18   was an FBI agent at issue.
19   True?
20   A. Yes, sir.
21   Q. Did you make any contact with the FBI in the
22   course of your investigating?
23   A. During the course of the whole ---?
24   Q. Prior to the time that my client was arrested

Page 107

1    on September 13th, 2013, did you contact the FBI?
2    A. I --- I do not know, sir. I cannot remember
3    who contacted the FBI.
4    Q. All right.
5    I take it by your answer that you're satisfied
6    that there was somebody at the state police who contacted
7    the FBI about Scott Ballock prior to his arrest on
8    September 13, 2013?
9    A. Correct.
10   Q. What was the point of that contact?
11   A. Twofold, to let the agency that he was hired
12   under know that there was a criminal investigation being
13   conducted, and two, professional courtesy.
14   Q. Did you direct someone to make that contact?
15   A. I do not remember that, sir.
16   Q. Would corporal Gaskins have had the authority
17   to contact the FBI for the two purposes that you just
18   identified?
19   A. Yes, sir.
20   Q. Okay.
21   Who was in charge of the investigation,
22   Corporal Gaskins?
23   A. He was the investigating officer, sir.
24   Q. Okay.

Page 108

1    All right. I appreciate your answering me.
2    Does that mean he was in charge of it?
3    A. Yes, sir.
4    Q. Okay.
5    The reason I'm asking you is Captain Merrill
6    wanted to be kept advised. He wanted to know what was
7    happing with all of this.
8    Right?
9    A. Yes, sir.
10   Q. And presumably, based on what you told me up to
11   this point, Captain Merrill wanted to be kept in the loop
12   because the person under investigation here was a Federal
13   Bureau of Investigation agent?
14   A. Correct.
15   Q. Do you know if Corporal Gaskins, in fact, kept
16   Captain Merrill advised by email? Were you copied on his
17   emails?
18   A. I don't remember. I don't know that, sir. I
19   don't remember being copied on emails.
20   Q. Okay.
21   Captain Merrill in Exhibit number, what is it,
22   4?
23   A. Yes, sir.
24   Q. Did he copy you?

Page 109

1    A. On?
2    Q. Did he copy you on his email to --- or his memo
3    to Corporal Gaskins?
4    A. I don't remember that, sir.
5    Q. Does it say?
6    A. No, sir.
7    Q. Well, I only have the one copy, and I'm not
8    looking at it so ---.
9    A. No, sir. It does not.
10   Q. No matter how many times I've been down through
11   this stack, and I've tried to memorize everything, but I
12   guess I'm getting too old to be able to do that.
13   So you have a memory as to whether you were
14   kept advised of the investigation into Ellen Costlow's
15   complaint against Scott Ballock prior to Scott's arrest
16   on September 13, 2013.
17   A. I didn't say that, sir.
18   Q. I'm asking.
19   A. Yes, sir. But you made a statement, and I'm
20   --- that's not correct.
21   Q. Sounded like a statement, but it was intended
22   to be a question. Let me put it a little more clearly
23   for you. Were you kept advised of the investigation into
24   Ellen Costlow's criminal complaints against Scott Ballock

28 (Pages 106 to 109)

Page 138

1   produced to us in discovery and marked as Kief Exhibit
2   Number 1 in todays' deposition.
3   A. Okay.
4   Q. Am I right?
5   A. Yes, sir.
6   Q. All right.
7   Take a look at page 853 of Deposition Exhibit
8   Number 1 for a second, would you?
9   A. I'm sorry. Got one.
10  Q. I'm looking at 3.02. Proper conduct of a
11  criminal investigation includes, but is not necessarily
12  limited to.
13  ATTORNEY JEFFRIES: Charles, I believe
14  you're on page 851.
15  ATTORNEY CROOKS: Am I?
16  All right.
17  BY ATTORNEY CROOKS:
18  Q. I apologize. Didn't mean to mislead you.
19  Thank you for the ---.
20  A. All right sir.
21  Q. Thank you for bracing me on that. Let me take
22  a fresh line of questioning. We've looking at page 851
23  of Kief Exhibit Number 1. I'm looking specifically at
24  3.02. Proper conduct of a criminal investigation

Page 139

1   includes, but is not necessarily limited to --- are you
2   with me so far?
3   A. Yes, sir. Uh-huh (yes).
4   Q. I'm going to skip past some stuff that doesn't
5   pertain, and focus on parts that I believe do for
6   purposes of my question.
7   A. Uh-huh (yes).
8   Q. Sub-part (c) says locating and interviewing all
9   persons who have or who are thought to have any
10  information concerning the crime under investigation?
11  A. Yes, sir.
12  Q. Well, all persons who have information would
13  certainly include the person who's accused of sending the
14  harassing emails and texts ---
15  A. Yes. sir.
16  Q. --- wouldn't it?
17  A. Uh-huh (yes).
18  Q. So that means to say this policy and procedure
19  called for interviewing Scott Ballock.
20  A. Okay.
21  Q. True?
22  A. As it --- as it is written, yes, sir.
23  Q. So if Scott Ballock was offering to come in and
24  --- and sit for an interview by the state police and/or

Page 140

1   the prosecutor's office, and they turned him down, then
2   they would have been operating in contradiction to this
3   directive in state police policy and procedure?
4   A. Yes, sir.
5   Q. Sub-paragraph (f) says that proper conduct of a
6   criminal investigation also includes, but is not
7   necessarily limited to, locating and questioning those
8   persons suspected of having committed the crime. I mean,
9   that's --- that's saying explicitly that Scott Ballock
10  should've been interviewed if the opportunity presented
11  itself, isn't it?
12  A. Yes, sir.
13  Q. And so if the state police and the person,
14  Corporal Gaskins, whether acting of his own accord or
15  under the direction of Cindy Scott, turned Scott down
16  when he volunteered to come in and give a statement, that
17  wouldn't be fair treatment to Scott, would it?
18  A. I don't know if I would characterize it as
19  that, sir. These are guidelines that we go by, not --- I
20  mean, it's policy and procedure. But the --- we have a
21  lot of leeway about how we conduct a criminal
22  investigation. It's certainly not something that they
23  would be written up or anything like that.
24  Q. A lot of the communications that were at issue

Page 141

1   in the criminal charge for which Scott was arrested,
2   which was later withdrawn by the prosecuting attorney's
3   office, had to do with interactions that Ellen and Kenny
4   Ice, Junior were having. You've looked at those emails
5   enough to --- to know that I'm right about that?
6   Correct?
7   Kenny Ice comes up a lot.
8   A. I'm thinking that's a --- yes. Kenny Ice comes
9   up a lot, yes, sir.
10  Q. And so he would've been somebody who had
11  information concerning the crime under investigation.
12  True?
13  A. He would have knowledge of it, yes, sir.
14  Q. Do you know if Kenny Ice was contacted and
15  interviewed by Corporal Gaskins as part of the ---?
16  A. I do not know that, sir. I don't believe he
17  was.
18  Q. In fact, a lot of the claims hat Ellen Costlow
19  made against Scott and many of the subjects addressed by
20  Scott Ballock in his texts and emails to Ellen could've
21  been either corroborated or refuted by Kenny Ice if ---
22  if all the mentions of Kenny Ice are to be taken as
23  credible in those emails.
24  True?

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 50

1  aware of that?
2  A. I --- I'm sorry. I'm misconstruing your
3  question. She did not initiate ---.
4  Q. I may have confused you without intending to.
5  You worked in the Morgantown Detachment ---
6  A. Yes, sir.
7  Q. --- of the state police between 2012 and 2015?
8  A. Yes, sir.
9  Q. You were a sergeant?
10 A. Yes, sir.
11 Q. And my question has to do with some of the
12 merits that we're litigating in this civil action.
13 A. Sure. Yes, sir.
14 Q. Okay.
15 I'm asking you do you remember, generally, that
16 Ellen Ruth Costlow initiated at least one criminal
17 complaint against my client, Scott Ballock, during that
18 time.
19 A. That was not her intent when she came into the
20 state police detachment.
21 Q. Okay.
22 What was her intent, as far as you were able to
23 discern?
24 A. A complaint against Trooper Berry.

Page 51

1  Q. Against Trooper Berry?
2  A. Yes, sir.
3  Q. All right.
4  Tell me about that. When was it, first of all?
5  A. It was my first contact with Tom Ballock,
6  Senior. He had called in to the state police barracks to
7  let us know, or let me know --- he asked for a supervisor
8  --- to let me know that Chris Berry was having an affair
9  with his daughter-in-law or soon to be daughter-in-law.
10 That conversation was short. There was a
11 couple of questions that I had that he answered.
12 Q. What were those?
13 A. I asked him what his relationship was to Ms.
14 Costlow. He said he was the father-in-law. I asked him
15 why he was making the complaint instead of her husband.
16 I don't remember how he responded to that, if he did. I
17 asked him if he wanted to make a formal complaint, and he
18 declined to do so.
19 Q. So you offered to facilitate the filing of a
20 formal complaint?
21 A. Yes.
22 Q. And your recollection is that Tom, Senior ---?
23 A. He said he didn't want to do that.
24 Q. Did he explain why?

Page 52

1  A. No, sir, he did not.
2  Q. Is that the end of your contact with Tom,
3  Senior?
4  A. Yes, sir. I believe so.
5  Q. When was that?
6  A. That was --- I do not know that, sir, not
7  without looking at --- it was the first time that I knew
8  of Mr. Ballock and knew of the situation.
9  Q. Okay.
10 So Ellen Ruth Costlow ---
11 A. Yes, sir.
12 Q. --- comes in the picture next.
13 A. Trooper Berry did first, yes.
14 Q. All right.
15 Trooper Berry. Go ahead. Tell me what you
16 remember.
17 A. I called Trooper Berry, and told him about the
18 allegation. He denied it. I asked him to come in and
19 speak to me. He did. He --- he came in. He did --- I
20 looked at his cell phone. He let me see his cell phone,
21 and there wasn't anything on there that --- that gave me
22 concern or no --- no proving or disproving of a --- of a
23 relationship.
24 Q. Were there any communications on Trooper

Page 53

1  Berry's cell phone ---?
2  A. I don't remember that. I'm sorry. Go ahead.
3  Q. You're cooperating with me, and I appreciate
4  it, but we're --- we're kind of getting comfortable with
5  each other so you're kind of anticipating my question and
6  overrunning it a little bit. That's not disrespectful.
7  It's just how it works with humans. So let me, without
8  being rude to you, suggest that you need to let me finish
9  the question.
10 A. Absolutely.
11 Q. Okay.
12 That way the transcript will --- will read a
13 lot better.
14 A. Got you.
15 Q. You examined Christopher Berry's cell phone as
16 part of your inquiry into, this informal complaint we'll
17 call it, ---
18 A. Right.
19 Q. --- that Tom Ballock, Senior had phoned in to
20 you?
21 A. Correct.
22 Q. All right.
23 In those days, there in Morgantown Detachment,
24 were troopers using an official West Virginia State

Page 54

1  Police phone, and then maintaining a --- a separate
2  personal phone?
3  A. No, sir.
4  Q. Okay. All right.
5  So if a state police trooper like Christopher
6  Berry had to conduct state police business on the
7  telephone as opposed to over the radio, he would just use
8  his own personal phone?
9  A. Yes, sir.
10  Q. Okay.
11  Likewise, if Trooper Berry wanted to use his
12  cell phone for his own personal, private own business,
13  it'd be that same phone?
14  A. True. Yes, sir.
15  Q. Okay.
16  So you weren't --- you weren't trying to, you
17  know, examine some official phone versus ---
18  A. No, sir.
19  Q. --- his personal phone?
20  A. No, sir.
21  Q. All right.
22  That's all. That's the only point I'm trying
23  to make clear here. Sources of evidence, you know.
24  So you looked at his phone. Did you find that

Page 55

1  Christopher Berry had communicated directly with Ellen
2  Ruth Costlow using his cell phone?
3  A. I don't remember that, sir. I do not remember
4  if there was any communications between him and her on
5  there. I remember that there wasn't anything --- there
6  wasn't anything proving an allegation on his cell phone.
7  I don't remember specific conversation between him and
8  her on the cell phone. It's been so many years. I --- I
9  don't remember that point.
10  Q. When you say you examined his phone, what did
11  you look at, specifically as you can tell me?
12  A. Text messages.
13  Q. So you looked at text messages?
14  A. Yes.
15  Q. Did you look at the call history?
16  A. Yes, sir.
17  Q. All right.
18  Anything else?
19  A. No, sir. No, sir.
20  Q. These cell phones, you can do all kinds of
21  things?
22  A. Yes. Yes. Yes.
23  Q. I use mine for email.
24  A. Yes.

Page 56

1  Q. Did you look at Christopher Berry's email
2  account?
3  A. No, sir. I did not.
4  Q. Okay.
5  A. He was letting me look at his cell phone, his
6  personal cell phone so ---.
7  Q. Well, you had legitimate reason to do so.
8  Right?
9  A. Right.
10  Q. All right.
11  You were the sergeant for the detachment?
12  A. One of the sergeants, yes, sir.
13  Q. Okay.
14  I take it was within your scope of
15  responsibilities as a sergeant in the detachment to make
16  the inquiry of Christopher Berry that you made?
17  A. Yes, sir.
18  Q. Okay.
19  Did you consider this to be an investigation
20  that would be reported to the ---?
21  A. Professional Standards Unit?
22  Q. Professional Standards Unit, yeah.
23  A. Depending on what I found.
24  Q. Explain that answer to me with a little more

Page 57

1  detail.
2  A. If he was conducting a relationship or --- or
3  activities on duty that --- that weren't --- if he was
4  doing something extracurricular on duty, then that would
5  be a problem.
6  Q. Okay.
7  Was Chris Berry married at that time?
8  A. I do not know his married status.
9  Q. Okay.
10  I think we've already established that there's
11  nothing, per se, inappropriate about state police
12  officers, troopers, having personal relationships with
13  civilians?
14  A. Correct.
15  Q. That in and of itself is perfectly fine?
16  A. Yes, sir.
17  Q. Likewise, if Chris Berry was having a
18  relationship with Ellen Ruth Costlow at that time,
19  whenever it was that Tom Ballock called and
20  complained, ---
21  A. Yes, sir.
22  Q. --- that was not necessarily a problem to your
23  way of thinking unless it was taking up company time?
24  A. Correct.

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 58

1    Q. After looking Trooper Berry's cell phone, you
2      were satisfied that there was --- there was nothing that
3      you could see in the text app or the call history to
4      suggest that he was, in fact, having a relationship with
5      Ellen Ruth Costlow. Is that ---
6    A. Correct.
7    Q. --- to the best of your memory?
8    A. Yes, sir.
9    Q. But you're not able to recall whether there
10     might've been evidence of direct communication between
11     Chris Berry and Ellen Ruth Costlow on his cell phone?
12   A. Correct.
13   Q. There may be very --- there may very well have
14     been communication between Chris Berry and Ellen Ruth
15     Costlow on Chris Berry's cell phone?
16   A. Yes, sir. That point, I cannot remember.
17   Q. Okay.
18   ATTORNEY JEFFRIES: Are we at a breaking
19     point, Charles? Break wanted.
20   What time is it?
21   COURT REPORTER: 2:10, and we can go off
22     the record.
23            ---
24   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

Page 59

1            ---
2    ATTORNEY CROOKS: We can go back on the
3      record.
4    BY ATTORNEY CROOKS:
5    Q. Okay.
6    Just before we took our short break, we were
7      talking about a timeframe that we'll probably be able to
8      pin down more precisely by reference to the voluminous
9      document productions that have been made.
10   But doing the best we can from memory, it
11     sounds like you --- you heard from Tom Ballock, Senior by
12     his way of calling --- asking for the person in charge at
13     the barracks. Got you. He complained about Chris Berry.
14   And then you got in touch with Trooper Berry,
15     talked to him. He denied the relationship with Ellen
16     Ruth Costlow. You looked at his cell phone. Can't
17     remember exactly what you found, but you're confident
18     that you certainly didn't find anything that prompted you
19     to act further on that particular inquiry.
20   Have I summed all that up correctly?
21   A. Correct. Yes, sir.
22   Q. Okay.
23   Did you do anything else at that point to
24     investigate Tom Ballock, Senior's complaint about Trooper

Page 60

1      Berry?
2    A. Yes, sir.
3    Q. What did you do?
4    A. Called Ms. Costlow.
5    Q. All right.
6    How'd you --- how'd you know how to get in
7      touch with her? Did Tom Ballock give you that
8      information, or ---?
9    A. I don't remember how I found that out. No,
10     sir, I don't remember that.
11   Q. Didn't get it off Trooper Berry's phone, did
12     you?
13   A. I doubt that, sir. I don't remember how I got
14     her --- her phone information.
15   Q. Okay.
16   Well, you can't say for sure that there wasn't
17     communication between Trooper Berry and Ellen Costlow, so
18     it's possible you did get it from his phone?
19   A. Again, I don't know, sir.
20   Q. All right.
21   So tell me about this. Did you go to see her?
22   Did she come to see you? Did you just talk over the
23   phone? How did this go down?
24   A. I --- I called her on the phone, had a

Page 61

1      conversation with her on the phone.
2    Q. Okay.
3    Walk me through what you remember about that.
4    A. I told her why I was calling. She --- she got
5      upset and denied any affair with Trooper Berry. And she
6      made the comment --- a comment about --- and I don't know
7      exactly word for word, but she made the comment she was
8      being harassed.
9    Q. By whom?
10   A. I don't believe she even said that, sir. I
11     don't remember the whole gist of the conversation. Being
12     wronged, though.
13   She asked if she could come into the state
14     police barracks to talk to me. I said, well, sure if you
15     have a complaint you would like to make or --- or talk to
16     me, that's fine. So she came in.
17   Q. Have you told me everything you can recall
18     about your first telephone discussion with her?
19   A. No, sir. That's about the --- the vague ---
20     the vague memory I have of it.
21   Q. Did you make notes of your conversation with
22     Tom Ballock, Senior, your discussion with Trooper Berry,
23     and your phone call with Ellen Ruth Costlow?
24   A. I believe I jotted a few things down talking to

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 50

1    aware of that?

2    A. I --- I'm sorry. I'm misconstruing your

3    question. She did not initiate ---.

4    Q. I may have confused you without intending to.

5    You worked in the Morgantown Detachment ---

6    A. Yes, sir.

7    Q. --- of the state police between 2012 and 2015?

8    A. Yes, sir.

9    Q. You were a sergeant?

10    A. Yes, sir.

11    Q. And my question has to do with some of the

12    merits that we're litigating in this civil action.

13    A. Sure. Yes, sir.

14    Q. Okay.

15    I'm asking you do you remember, generally, that

16    Ellen Ruth Costlow initiated at least one criminal

17    complaint against my client, Scott Ballock, during that

18    time.

19    A. That was not her intent when she came into the

20    state police detachment.

21    Q. Okay.

22    What was her intent, as far as you were able to

23    discern?

24    A. A complaint against Trooper Berry.

Page 51

1    Q. Against Trooper Berry?

2    A. Yes, sir.

3    Q. All right.

4    Tell me about that. When was it, first of all?

5    A. It was my first contact with Tom Ballock,

6    Senior. He had called in to the state police barracks to

7    let us know, or let me know --- he asked for a supervisor

8    --- to let me know that Chris Berry was having an affair

9    with his daughter-in-law or soon to be daughter-in-law.

10    That conversation was short. There was a

11    couple of questions that I had that he answered.

12    Q. What were those?

13    A. I asked him what his relationship was to Ms.

14    Costlow. He said he was the father-in-law. I asked him

15    why he was making the complaint instead of her husband.

16    I don't remember how he responded to that, if he did. I

17    asked him if he wanted to make a formal complaint, and he

18    declined to do so.

19    Q. So you offered to facilitate the filing of a

20    formal complaint?

21    A. Yes.

22    Q. And your recollection is that Tom, Senior ---?

23    A. He said he didn't want to do that.

24    Q. Did he explain why?

Page 52

1    A. No, sir, he did not.

2    Q. Is that the end of your contact with Tom,

3    Senior?

4    A. Yes, sir. I believe so.

5    Q. When was that?

6    A. That was --- I do not know that, sir, not

7    without looking at --- it was the first time that I knew

8    of Mr. Ballock and knew of the situation.

9    Q. Okay.

10    So Ellen Ruth Costlow ---

11    A. Yes, sir.

12    Q. --- comes in the picture next.

13    A. Trooper Berry did first, yes.

14    Q. All right.

15    Trooper Berry. Go ahead. Tell me what you

16    remember.

17    A. I called Trooper Berry, and told him about the

18    allegation. He denied it. I asked him to come in and

19    speak to me. He did. He --- he came in. He did --- I

20    looked at his cell phone. He let me see his cell phone,

21    and there wasn't anything on there that --- that gave me

22    concern or no --- no proving or disproving of a --- of a

23    relationship.

24    Q. Were there any communications on Trooper

Page 53

1    Berry's cell phone ---?

2    A. I don't remember that. I'm sorry. Go ahead.

3    Q. You're cooperating with me, and I appreciate

4    it, but we're --- we're kind of getting comfortable with

5    each other so you're kind of anticipating my question and

6    overrunning it a little bit. That's not disrespectful.

7    It's just how it works with humans. So let me, without

8    being rude to you, suggest that you need to let me finish

9    the question.

10    A. Absolutely.

11    Q. Okay.

12    That way the transcript will --- will read a

13    lot better.

14    A. Got you.

15    Q. You examined Christopher Berry's cell phone as

16    part of your inquiry into, this informal complaint we'll

17    call it, ---

18    A. Right.

19    Q. --- that Tom Ballock, Senior had phoned in to

20    you?

21    A. Correct.

22    Q. All right.

23    In those days, there in Morgantown Detachment,

24    were troopers using an official West Virginia State

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 42

1  investigation?
2  A. Yes, sir.
3  Q. If a state police officer, trooper, had a
4  romantic relationship --- and by that, I mean a
5  relationship that included sexual relations --- with a
6  member of the public, would it be considered unethical
7  for that trooper to investigate a complaint filed by that
8  person?
9  A. I don't understand your question.
10  Q. Sure.
11  A. Is it unethical for a trooper to have a sexual
12  relation with another person or ---?
13  Q. I presume it's not unethical for troopers to
14  have sexual relationships. My question has to do with
15  the propriety of a state trooper having a sexual
16  relationship with a member of the public, and then acting
17  in an official capacity to investigate a complaint made
18  by the person with whom they have a sexual relationship.
19  Would that be considered appropriate conduct on the part
20  of the state trooper?
21  A. I --- I guess it would be --- it would be
22  determined by what that investigation was. There's all
23  different forms of investigations. I don't know. It's
24  kind of a broad question.

Page 43

1  Q. Do you know if Christopher Berry, Trooper
2  Christopher Berry, ever had a sexual relationship with
3  Ellen Ruth Costlow?
4  A. I do not know that. No, sir.
5  Q. If Christopher Berry had a personal
6  relationship with Ellen Ruth Costlow, and she wanted to
7  file a complaint against her estranged husband at the
8  time, my client, ---
9  A. Right.
10  Q. --- Scott Ballock, ---
11  A. Yes, sir.
12  Q. --- would it have been appropriate for Chris
13  Berry to participate in any way in the investigation of
14  that complaint?
15  A. If a trooper was having a sexual relationship
16  with a person, and for him to be personally involved with
17  making a complaint against her ex-husband or --- or a
18  family member would be improper.
19  Q. Why?
20  A. He wouldn't be a non-biased person.
21  Q. Why would that be a problem?
22  A. Because he would have emotional connection with
23  the person he's making a complaint about.
24  Q. That would explain his impartiality, wouldn't

Page 44

1  it?
2  A. Impartiality to ---?
3  Q. His lack of impartiality when he received that.
4  If a trooper is having a sexual relationship with a
5  member of the public, that by itself is not a problem?
6  A. No, sir. Unless it's on duty.
7  Q. Unless it's during ---
8  A. Right.
9  Q. --- work hours.
10  Okay.
11  I understand that. I don't know if my
12  information is that precise.
13  The point that I'm touching on currently here
14  has to do with if a trooper --- in this case we're
15  talking about Christopher Berry ---
16  A. Yes, sir.
17  Q. --- having a sexual relationship with a member
18  of the public. And we're talking about Ellen Ruth
19  Costlow?
20  A. Yes, sir.
21  Q. And she wanted to make a criminal complaint
22  against her then estranged husband, Scott Ballock, ---
23  A. Yes, sir.
24  Q. --- my client, ---

Page 45

1  A. Yes, sir.
2  Q. --- it would be inappropriate for Christopher
3  Berry to either participate directly or to try and
4  influence his colleagues at the state police in the
5  investigation of the complaint that Ellen Ruth Costlow
6  might have made against my client?
7  A. Yes, sir.
8  Q. One of the reasons ---.
9  A. I'm not avoiding your question. I'm just
10  trying to make sure we --- we're clear.
11  Q. I appreciate that.
12  A. Okay.
13  Q. I appreciate your careful attention to my
14  questions because these are lawyerly questions. There's
15  a lot of stuff in it, and I can tell you're paying close
16  attention.
17  A. Okay.
18  Q. I appreciate it.
19  Thank you.
20  I'll try to be clearer with you. I don't -- I
21  don't have any problem with your asking for
22  clarification. I want to make sure we understand one
23  another.
24  A. Yes. sir.

12  (Pages 42 to 45)

Page 106

1    Gaskins of the Morgantown Detachment.
2    Q. Okay.
3    And who's it from?
4    A. Captain Merrill.
5    Q. Okay.
6    And what was Captain Merrill instructing
7    Corporal --- then Corporal Gaskins?
8    A. To open up an investigation.
9    Q. So the fair implication here is that Exhibit 4
10   occurred because it was instigated by Exhibit 3? In
11   other words, you asked Captain Merrill for authority and
12   he granted it. And he personally directed Corporal
13   Gaskins to open the investigation?
14   A. Correct.
15   Q. All right.
16   And the reason this echelon of authority at the
17   state police was directly involved here is because there
18   was an FBI agent at issue.
19   True?
20   A. Yes, sir.
21   Q. Did you make any contact with the FBI in the
22   course of your investigating?
23   A. During the course of the whole ---?
24   Q. Prior to the time that my client was arrested

Page 107

1    on September 13th, 2013, did you contact the FBI?
2    A. I --- I do not know, sir. I cannot remember
3    who contacted the FBI.
4    Q. All right.
5    I take it by your answer that you're satisfied
6    that there was somebody at the state police who contacted
7    the FBI about Scott Ballock prior to his arrest on
8    September 13, 2013?
9    A. Correct.
10   Q. What was the point of that contact?
11   A. Twofold, to let the agency that he was hired
12   under know that there was a criminal investigation being
13   conducted, and two, professional courtesy.
14   Q. Did you direct someone to make that contact?
15   A. I do not remember that, sir.
16   Q. Would corporal Gaskins have had the authority
17   to contact the FBI for the two purposes that you just
18   identified?
19   A. Yes, sir.
20   Q. Okay.
21   Who was in charge of the investigation,
22   Corporal Gaskins?
23   A. He was the investigating officer, sir.
24   Q. Okay.

Page 108

1    All right. I appreciate your answering me.
2    Does that mean he was in charge of it?
3    A. Yes, sir.
4    Q. Okay.
5    The reason I'm asking you is Captain Merrill
6    wanted to be kept advised. He wanted to know what was
7    happing with all of this.
8    Right?
9    A. Yes, sir.
10   Q. And presumably, based on what you told me up to
11   this point, Captain Merrill wanted to be kept in the loop
12   because the person under investigation here was a Federal
13   Bureau of Investigation agent?
14   A. Correct.
15   Q. Do you know if Corporal Gaskins, in fact, kept
16   Captain Merrill advised by email? Were you copied on his
17   emails?
18   A. I don't remember. I don't know that, sir. I
19   don't remember being copied on emails.
20   Q. Okay.
21   Captain Merrill in Exhibit number, what is it,
22   4?
23   A. Yes, sir.
24   Q. Did he copy you?

Page 109

1    A. On?
2    Q. Did he copy you on his email to --- or his memo
3    to Corporal Gaskins?
4    A. I don't remember that, sir.
5    Q. Does it say?
6    A. No, sir.
7    Q. Well, I only have the one copy, and I'm not
8    looking at it so ---.
9    A. No, sir. It does not.
10   Q. No matter how many times I've been down through
11   this stack, and I've tried to memorize everything, but I
12   guess I'm getting too old to be able to do that.
13   So you have a memory as to whether you were
14   kept advised of the investigation into Ellen Costlow's
15   complaint against Scott Ballock prior to Scott's arrest
16   on September 13, 2013.
17   A. I didn't say that, sir.
18   Q. I'm asking.
19   A. Yes, sir. But you made a statement, and I'm
20   --- that's not correct.
21   Q. Sounded like a statement, but it was intended
22   to be a question. Let me put it a little more clearly
23   for you. Were you kept advised of the investigation into
24   Ellen Costlow's criminal complaints against Scott Ballock

28  (Pages 106 to 109)