

U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535-0001

September 21, 2017

PERSONAL

Mr. Scott T. Ballock
Federal Bureau of Investigation
Clarksburg, West Virginia

Dear Mr. Ballock:

    On April 10, 2017, the Office of Professional Responsibility (OPR) proposed dismissing you from the rolls of the FBI based on its finding that you: (1) harassed your then-wife by sending her unwelcome emails and texts despite her requests that you stop doing so, in violation of FBI Offense Code 4.8 (Other Misdemeanors); and (2) lacked candor under oath in your Signed Sworn Statement when you denied that you physically abused your wife, and when you asserted you ensured your emails and texts to her were "respectful and appropriate," in violation of FBI Offense Code 2.6 (Lack of Candor/Lying – Under Oath). As the deciding official in this matter, I have given full and impartial consideration to all documentation and evidence upon which your proposed dismissal was based, as well as your Written Response dated June 14, 2017 (117+ pages including exhibits and references), and your Supplement to Written Response dated September 14, 2017 (50 pages including exhibits).[1] Based on a preponderance of the evidence, I conclude the allegations are substantiated. Based on the circumstances of this case, for the efficiency of the service, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, I am dismissing you from the rolls of the FBI.

## FACTUAL BACKGROUND

    At the outset, it is helpful to provide some context for the harassment and candor allegations at issue. You and your Ex-Wife separated in 2012, and your divorce became final in May 2014. The divorce was highly contentious and included a child custody dispute.

    The investigative record contains evidence that during the course of your marriage, you and your wife repeatedly solicited strangers via the internet to come to your home to have sex with your wife, and that you videotaped some of these encounters. One SSA who reviewed the emails and texts at issue concluded they reveal an "atypical marriage and corresponding sex life

---

[1] You waived your scheduled oral hearing. No adverse inference has been drawn from this waiver. It is noted simply for the sake of a complete procedural history.

Mr. Scott T. Ballock

which if borne out to be true could provide embarrassing."[2] The "Custody Evaluation" (p. 4) attached to your Written Response as Exhibit 1 concluded that your Ex-Wife was not coerced to engage in these activities, but it discusses the texts, emails, and videos that confirm this activity took place. There is no evidence your Ex-Wife fabricated these activities or your role in them.

The allegations against you in this disciplinary inquiry do not directly concern these sexual activities, but the harassing communications at issue include insinuations that you intended to use this conduct against your wife in your child custody dispute. The SSA referenced above concluded you knew this conduct could prove "embarrassing" to your wife, and your emails suggested you intended "to leverage this embarrassment factor against [your] estranged wife in a custody battle." As discussed below, the Family Court Judge who presided in your child custody dispute stated: "In considering the parties' sexual behavior, the Court is not sanguine about the Father's role in that regard. At the very least, the Court finds the Father's apparent acquiescence in the Mother's sexual relations with other men to be a contributing factor." Again, it is important to emphasize that these sexual activities are not the subject of the misconduct allegations against you, but they provide context for understanding the harassment and candor allegations at issue.[3]

## I.   Harassment

On September 13, 2013, you were arrested at the Monongalia County courthouse on two misdemeanor counts of harassment and unwanted communications via computer. On April 7, 2016, the charges against you were dismissed pursuant to an agreement between you and the prosecuting attorney in which you: (1) acknowledged probable cause existed for your arrest; and (2) agreed not to contact your Ex-Wife for any reason, subject to narrow exceptions for any future hospitalization or foreign travel of your children.

### A. Your Emails, Texts, and Other Communications

After you and your wife separated in September 2012, you sent her thousands of e-mails and text messages. These contacts included numerous communications intended to convince her to reconcile with you, as well as emails that were demeaning, insulting, or critical of her behavior. *See* 1A2 (DVD containing two files, one with 1,495 items and one with 1,843 items, consisting of emails, text messages, and photos).

Many of your communications were unwelcome. Your Ex-Wife viewed them as harassment, and she told you to stop sending them. For example, on September 29, 2012 (9:00am), your Ex-Wife accused you of texting her for seven hours the previous day. She complained these texts were "over the top," and she asked you to stop. You agreed (9:01am), stating: "Yes. Let's start now. See you..." However, the very next day, September 30 at

---

[2] Serial 1 (9/14/2013 email from the SSA to IIS attaching "Review prepared by SSA [name, division, phone number deleted], summarizing a review of an estimated 60% or more of the communications provided to the State Police by your estranged wife).

[3] Because you are not being disciplined for engaging in these activities, it is unnecessary to make findings regarding their frequency or your precise role in arranging, viewing, or videotaping these encounters.

2

Mr. Scott T. Ballock

1:38am, you texted your Ex-Wife a derogatory message: "Black boots, Black coat, Black heart, Black soul."

On October 11, 2012, you emailed your Ex-Wife with the subject line "We broke our vows" and a photo of you standing alone at a church altar. Other emails contained in the file show close-up photos of you looking emotional, and perhaps crying.

On November 7, 2012, your Ex-Wife emailed you stating: "Scott, I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication." You responded the same day: "My correspondence has been polite and respectful. Calling it 'harassing' does not make it so. I am simply providing you with information and recommendations for the divorce process and the benefit of the children." As noted, however, the record shows that many of your communications went beyond "the divorce process and the benefit of the children."

In a January 12, 2013 email from your Ex-Wife to her attorneys, she requested a protective order against your excessive communications. She stated that in addition to your emails and texts, she received phone calls from you at all hours of the day and night. The email emphasized: "I'm tired of Scott's harassment, his control over my life through nearly constant communication . . . and these late night blocked calls. It's all outrageous because they cut into my ability to get the sleep I need. The late night blocked calls are almost always silent on the caller's end, but from time to time Scott will forget to block his number and that is why I am convinced he's the one behind the calls tonight. PLUS, you've read from other emails that he sleeps with his phone next to him at night, so it's easy for him to call six times in a row at 3 am." Although there is no evidence that your Ex-Wife's attorneys requested a protective order at that time, her January 12 email to her attorneys confirms the seriousness of her concerns.

By email dated April 26, 2013, your Ex-Wife again requested her attorneys to stop the harassing communications from you. This email references two internet accounts used by you and your Ex-Wife to invite men to have sex with her during your marriage while you videotaped the encounters.

> I consider Scott's actions harassment at this point. Please help me put a stop to his incessant emails where he's sending me excerpts taken from [the two internet accounts]. I have chosen to stop living a toxic marriage filled with physical, psychological, and sexual abuse. When Scott walked out Sept 14, I didn't let him come back home as I had in the past. I am seeking peace in my life from my abusive husband. I ask again for your help in stopping Scott's contact with me over this matter and any other matter unless it is of an emergen[cy] nature or deals strictly with decision-making with the children.

On May 1, 2013, your Ex-Wife sent you another email making clear your "harassing" texts and emails were unwelcome. She requested you to stop communicating with her unless it concerned the children, and she directed you to contact her attorneys about any other matter:

CONFIDENTIAL          PL 00034

Mr. Scott T. Ballock

> Scott,
>
> I have asked you many times to leave me alone. This is my last request. Please refrain from sending harassing emails and texts, as well as any other means of communication. I specifically told you on April 29, 2013, to stop contacting me unless it is about the children and you need my input as a parent. If you have a question or concern about anything else, my attorneys can help you.

Your Ex-Wife's email included the names and phone numbers for her attorneys. The next day, May 2, you sent an email agreeing to limit communications:

> I'm not trying to 'harass' you. I'm sorry you feel that way. I shared with you the email last night because it's so much like a TMLMTBGB play[4] and I hoped you would appreciate that.
>
> I'm sorry I missed your calls last night. I tried returning them this morning.
>
> I will, as you request, limit my conversations to discussion about the children. And I hope you will allow me to continue sending you regular updates about [our son].

Your Ex-Wife again requested her attorneys to send you a letter demanding that you cease all communications with her "not directly necessary for the care of [the] children." This request again reinforces the seriousness of her concerns. *See* 1A2. By letter dated May 3, 2013, your Ex-Wife's counsel advised you: "My client has informed me that you continue to send her harassing and threatening text messages and emails. Please be informed that you are to send to our office – and not Mrs. Ballock – all inquiries and/or communications not directly necessary for the care of your children. Any communications sent to Mrs. Ballock that we view as further harassment will be used in Court to substantiate her allegations of your continuing intentional infliction of emotional distress."[5]

Notwithstanding your Ex-Wife's repeated requests to you through May 1, as well as your repeated agreements to limit your communications to the care of the children, on May 3 at 8:29am, you emailed her in an effort to reconcile. Although the email references your son, it does not concern decision-making regarding your children, but instead uses your son as leverage in your unwelcome attempts to reconcile:

---

[4] TMLMTBGB appears to be a reference to a play called "Too Much Light Makes the Baby Go Blind."

[5] The investigative file does not contain the lawyer's letter to you, but the police report quotes from the letter. You have insinuated you never received it, but even if true, the emails and texts from your Ex-Wife herself make clear further communications from you were unwelcome unless they concerned decisions regarding your children.

4

**CONFIDENTIAL** PL 00035

Mr. Scott T. Ballock

On May 15, you advised your Ex-Wife you might not be able to take the children on a planned vacation. When your Ex-Wife responded she could take them if you paid for it, you responded with a sarcastic email offering to pay for a vacation for your Ex-Wife and her boyfriend. Also on May 15, you sent an email stating: "I will not go through your attorneys for anything. Ever. As long as you have custody of [our daughter], I will make my requests directly to you. That is my privilege."

On May 16 and again on May 17, you emailed your Ex-Wife inviting her to take an out-of-town trip with you. You stated you wanted to "apologize" and "make amends," but that your Ex-Wife is "so filled with hatred and rage and insists like treating [you] like an enemy." You advised you will keep the reservations "in case [your Ex-Wife] realize[s] what a mistake [she is] making . . . ."

Again on May 17, you emailed your Ex-Wife the lengthy lyrics to a song about a failed marriage.

On May 25, you emailed your Ex-Wife to accuse her of creating a "false narrative" and asking her to "please call" if she is "fearful for [your] children's future," saying you both "owe it to [the children] to try to work this out and the first simple step is talking."

On May 28, you wrote your Ex-Wife accusing her of violating 18 U.S.C. 641 by stealing FBI property, including ammunition and other items. You assert your accusation is based on statements made by your Ex-Wife's ex-boyfriend.[6] Regardless of the legitimacy of the accusation, your email clearly violated your Ex-Wife's instruction to stop communicating with her. You emphasized: "Theft of government property is a matter we will be addressing immediately." Given the contentious nature of your divorce, and her repeated instructions to you not to contact her, the better course would have been for you to request that someone else in the FBI address the stolen property allegation. Your personal involvement in this matter, including your derogatory tone, undoubtedly exacerbated the pre-existing acrimony. If you had advised your chain of command of her repeated allegations of harassment and her repeated requests that you not contact her, the Division likely would have advised you not to become personally involved in addressing the stolen property allegation, and likely would have assigned someone else to the matter if necessary.

On May 28, in an especially hostile and acrimonious communication, you criticized your Ex-Wife for giving a lamp that belonged to your son to a "fuck buddy," calling her actions "disgraceful":

---

[6] The Division recently provided OPR your June 21, 2017 Security Incident Reporting System (SIRS) Active Incident Report (Serial 34), in which you assert that the ex-boyfriend advised you that: (1) your Ex-Wife gave him stolen FBI property; (2) the most expensive piece of FBI property he received was a megaphone; and (3) he was turning the property over to the local police.

6

**CONFIDENTIAL**　　　　**PL 00036**

Mr. Scott T. Ballock

> For all that you have done, for all the hurt and suffering you have caused, I was struck by your selfish decision to give your own son's cherished bowling ball lamp to a fuck buddy. I will let you explain to [our son] why you thought it would be ok to give away one of his prized possessions. [Our son] is all about family memories and his little treasures. For you to dishonor him is disgraceful.

Regardless of whether your allegation against her in this email is true, it plainly contravenes her repeated requests, and your repeated agreements, not to send her unwelcome emails and texts. This email was especially derogatory and demeaning, notwithstanding whether your underlying allegation was true.

On May 29, you sent your Ex-Wife an email accusing her of secretly videotaping a mutual acquaintance while the acquaintance was showering, and then showing the video to your Ex-Wife's boyfriend. You chastised your Ex-Wife for having a "sex addiction," asserting "[t]his keeps getting uglier and uglier." Even if true, the email again violates your Ex-Wife's instruction not to communicate with her about such matters. That same day, your Ex-Wife sent an email to her attorneys requesting them to bring harassment charges against you because your "constant threats, insults, and other abusive tactics are intolerable."

On June 19, you sent your Ex-Wife a particularly sharp email, asserting: "What are you and/or your idiot friends up to this time? Committing a felony by stealing from the FBI wasn't enough for you?"

The file contains more examples of unwelcome communications from you to your Ex-Wife despite her instruction to limit communications to decisions involving the children.

### B. The Criminal Investigation

On September 2, 2013, your Ex-Wife filed a formal complaint with the State Police against you for "harassing communications by cell phones and electronic communications devices." Her attorney provided the police a CD of approximately 3,000 e-mails and texts. A Corporal assigned to the matter stated he reviewed thousands of emails and text messages provided by your Ex-Wife's attorney and identified various communications as "harassment."[7]

FBI investigators interviewed the Corporal. According to the FD-302 (Serial 20), after his extensive review of your communications, the Corporal concluded you engaged in harassment, stalking, and threatening behavior:

> During the investigation, Corporal [ ] reviewed numerous texts and emails between SA BALLOCK and [EX-WIFE] that were identified as harassment and stalking. Some communications included threats. A written statement was obtained from [EX-WIFE]. According to [EX-WIFE], she was seeking a divorce

---

[7] See the Corporal's FD-302, dated 04/14/2016 and Incident Report (Serial 1A5). The Corporal's Incident Report is incorporated into OPR's Report of Investigation in its entirety.

7

**CONFIDENTIAL**  **PL 00037**

Mr. Scott T. Ballock

> from SA BALLOCK. When she left her husband, SA BALLOCK began continually following her and sending her communications via text and email containing threats.
>
> According to reports from [EX-WIFE], SA BALLOCK placed ads on Craigslist for men to have sex with [EX-WIFE] at their home under [a fictitious] name [ ]. SA BALLOCK placed the ads and videotaped the sexual encounter. This type of activity originated when they lived in Indianapolis. [EX-WIFE] advised that safety was not a concern because SA BALLOCK "screened" the men before they arrived at the house.[8]
>
> Corporal [ ] took the complaint and evidence to Assistant Prosecutor [ ] who agreed to file misdemeanor charges of Stalking and Harassment against SA BALLOCK. As a result, SA BALLOCK was arrested after a Family Court Hearing where Corporal [ ] knew he would be unarmed. SA Ballock was arraigned, processed, and released after his arrest. As a condition of his bond, SA BALLOCK ceased email and text communication with [EX-WIFE].
>
> After SA BALLOCK'S arrest, [BALLOCK'S FATHER] created various websites and posted nude photos of [EX-WIFE] and began to post statements and pictures alleging the [] State Police falsely arrested his son. The postings occurred on the various websites [BALLOCK'S FATHER] created . . . .

The police report prepared by the Corporal concluded that a substantial number of emails appear to be pressuring your Ex-Wife to reconcile with you, and reflect "obsessive behavior in wanting the victim back." The report provides numerous examples of your "obsessive behavior" designed to persuade your Ex-Wife to reconcile.

The local Monongalia County Assistant Prosecutor reviewed the evidence from the Corporal's investigation and agreed to file misdemeanor charges in the Magistrate Court of Monongalia County, West Virginia, against you for harassment and unwanted communications by computer, in violation of West Virginia Code §§ 61-2-9a and 61-3C-14a(a)(2). In the Criminal Complaint signed by the Magistrate, the Corporal swore or affirmed to the Magistrate that you harassed your Ex-Wife via email and text notwithstanding repeated written communications to you by her and her attorney to stop contact.

As noted, on September 13, 2013, you were arrested at the Monongalia County courthouse immediately following your child custody hearing on the two misdemeanor counts of harassment and unwanted communications by computer.

More than two years later, on April 7, 2016, you entered into an agreement with the local prosecutor to dismiss the charges. You were represented by counsel when you agreed to the

---

[8] I note your Ex-Wife told FBI investigators that you did not screen the men. This discrepancy does not significantly affect the analysis.

Mr. Scott T. Ballock

terms of the agreement.[9] In the agreement, you admitted, among other things, that probable cause existed to arrest you for harassing your Ex-Wife. The agreement, signed by you and your counsel, contains the following provisions:[10]

> 1. SCOTT BALLOCK acknowledges that probable cause existed for West Virginia State Police to file for the issuance of the warrants in this case pursuant to W.VA. Code 61-3C-14a and 61-2-9a.

\* \* \*

> 3. SCOTT BALLOCK agrees to cease, and not to initiate or reinitiate, if applicable, efforts to affect [EX-WIFE'S] personal reputation, employment, professional status or workplace relationships, and he agrees to discourage any other person purporting to act on his behalf to similarly cease, or not to reinitiate any disparagement of [EX-WIFE] on social media or other platforms of public communications. SCOTT BALLOCK also agrees to assist in removing any remains of disparaging social media postings by taking reasonable steps within his control to remove these postings, links or other social media communications.

\* \* \*

> 6. SCOTT BALLOCK agrees not to contact [EX-WIFE] by any means or for any reason other than to notify her by email of hospitalization of either child, or regarding either child traveling outside of the country.

You accused a State Trooper of having a romantic relationship with your Ex-Wife, which allegedly motivated the Trooper to arrest you in order to assist your Ex-Wife with her alimony and custody claims. You stated you based this accusation on information provided to you by your Ex-Wife's boyfriend, whom you elsewhere describe as a violent, low-level drug dealer. In other words, the purported source of this inflammatory allegation is a violent criminal whose veracity is obviously subject to serious question. The Trooper denied your allegation. The State Police investigated the accusation of the affair and determined it is untrue.

You also accuse the State Police and your wife of conspiring to have you arrested after a Family Court hearing as part of a plot to influence the outcome of that hearing. However, the record shows the State Police coordinated with the FBI regarding the arrest and advised the FBI it selected this time and location to ensure you would be unarmed to minimize the risk of violence. An internal FBI email dated September 13, 2013 states: "These are the representations of the [State Police] – as we discussed – they are concerned about the fact that he is [law enforcement] / the duress of the situation and the stress it will put him under / which is why they want to utilize the courtroom environment, away from work, unarmed, to effect the arrest" (1A5). These concerns were legitimate, as evidenced by an FBI email dated September 13, 2013 and a September 16, 2013 EC from your Assistant Director stating that pursuant to discussions

---

[9] See Serial 1A5, Motion.

[10] See FD-302, West Virginia State Police Corporal.

9

Mr. Scott F. Ballock

with the FBI Deputy Director, your law enforcement privileges would be suspended. In its referral FC to the Inspection Division, CJIS observed that your arrest and related developments were of "notable concern" to CJIS and had been the subject of discussion and coordination with the FBI's Deputy Director and the AD, HRD.

Your Written Response (p.4.) notes the Family Court Judge expressed concern that your arrest was executed for "strategic" reasons related to the custody dispute. You fail to note, however, the judge was unaware that both the State police and the FBI had legitimate concerns regarding how you might react, and the State Police and the FBI coordinated on the arrest to ensure you would be unarmed. You are pursuing a civil suit against the State Police, and your Written Response includes a copy of your Amended Complaint against three State Troopers and your Ex-Wife. Although you have had an opportunity to review the file, which (along with OPR's proposal letter) shows the State Troopers coordinated with the FBI regarding the arrest, your filings in the civil suit fail to disclose the efforts by the State Police to coordinate the arrest with the FBI, and the legitimate concerns shared by the State Police and the FBI regarding the need to ensure you were unarmed when arrested to reduce the risk of violence.

### C. Your Ex-Wife's Allegations

According to her FD-302 (Serial 21), your Ex-Wife told FBI investigators during this disciplinary inquiry that she endured years of threats, intimidation, and abuse from you.[11] I am not making a specific finding regarding the veracity of each allegation she made, but the FD-302 provides relevant background and context.

Specifically, your Ex-Wife also described how you both arranged for men found on the internet to come to your home and have sex with her while you videotaped the encounters. These liaisons often made your Ex-Wife fearful for her small children. She also stated you would become angry if you were not satisfied with the video:

> [EX-WIFE] confirmed that throughout their marriage she and SA BALLOCK arranged for men to come to their home and engage in sexual acts with her. The men were recruited from Craigslist. The encounters were videotaped and maintained by both [EX-WIFE] and SA BALLOCK. [EX-WIFE] advised that she often was fearful of the encounters because her children were sometimes present in the home. The children stayed in their bedroom upstairs. SA BALLOCK stood outside their door to ensure the children were not exposed to the encounter. [EX-WIFE] confirmed that the men were not "screened" in any way before they arrived. [EX-WIFE] advised that she would try to look up real names and phone numbers on Google if they provided that information. She confirmed that SA BALLOCK did not screen the men before the encounter.[12] She explained that SA BALLOCK would become angry if the video did not

---

[11] The FD-302 references other serious allegations against you that need not be recited here.

[12] I note that in contrast, your Ex-Wife told police the men were screened by you. This discrepancy does not affect the analysis of the allegations at issue.

10

Mr. Scott T. Ballock

capture the "shot" correctly or [EX-WIFE] was not "loud" enough during the activity.

Your Ex-Wife stated that after years of threatening behavior, she separated from you, which resulted in a "strained" relationship not only with you, but also your father, who then posted nude pictures of her on various websites. Your Ex-Wife also described harassing emails and texts she received from you after the separation:

> In addition to the information placed on the websites, SA BALLOCK sent [EX-WIFE] several thousand emails and more than 10,000 texts she described as harassing. Additionally, [EX-WIFE] has over 45 audio recordings in her possession of conversations between she and BALLOCK which contain various threats.[13] SA BALLOCK obtained a cell phone she used and had a private company conduct a forensic examination of the phone. She claimed that SA BALLOCK engaged in these types of activities to control and harass her. He also followed her around. She contacted an attorney and subsequently the West Virginia State Police regarding the harassment. [EX-WIFE] advised that there was an accusation that she was having an affair with [a State Police Officer] which she denies. [EX-WIFE] provided the emails and texts to the [State Police] investigator who eventually contacted the prosecutor and filed charges. SA BALLOCK was arrested. After his arrest, SA BALLOCK stopped sending [EX-WIFE] texts and emails. [BALLOCK'S FATHER], however, continued to post pictures and derogatory information about [EX-WIFE] on more than 10 websites. According to [EX-WIFE], this was in violation of their divorce and criminal agreements. [EX-WIFE] acknowledged that she may pursue criminal/civil action against [BALLOCK'S FATHER].

The FBI investigators specifically recommended review of the original notes located in the IAs. In addition to apprising FBI investigators of this information during this inquiry, your Ex-Wife recounted many of these accusations to the State Police during its criminal investigation of you, and they are set forth in the State Police report discussed above.

### D. Your Response

You assert in your Signed Sworn Statement (SSS) (Serial 22) that your communications with your Ex-Wife were always "appropriate and respectful," and never "harassing":

> During our separation and divorce, I specifically requested and engaged in "written" forms of communication with [Ex-Wife] to ensure our conversations were documented - precisely so that my communications with her could not be misconstrued or misrepresented. Specifically because we were in the middle of contentious divorce proceedings, *I ensured that nothing I sent to [Ex-Wife] could be construed as anything but appropriate and respectful.* Most of these communications referenced issues or concerns with our minor children [ ]. I

---

[13] The file does not contain copies of these audio recordings.

11

**CONFIDENTIAL**  PL 00041

Mr. Scott T. Ballock

> received calls from [Ex-Wife] and I told her she needed to email or text me concerning the nature of her communication. I possess emails which demonstrate [Ex-Wife], despite her allegation that my communications were unwanted, actually wanted to communicate with me. [Ex-Wife] repeatedly initiated contact with me. Among other reasons, [Ex-Wife] contacted me to request that I help her secure employment with the FBI, to discuss issues with the children, and to discuss the possibility of reuniting and saving our marriage. I once woke in the middle of the night to [Ex-Wife] standing directly above me in my apartment; she had let herself in to talk to me. On another occasion, [Ex-Wife] called me in the early morning hours and asked that I meet her "at the mailbox" in front of her home to talk (I declined). I have printouts of her communications with me via FaceTime and as well as photos of herself she sent me during this time period. On at least one occasion, she initiated contact with me posing as our son [ ]. I did initiate communications, but usually referencing our children. *None of my communications were threatening or harassing.* (Emphasis added).

You assert that your Ex-Wife is mentally unbalanced and that during your separation, she abused prescription drugs; attempted suicide; exposed your daughter to a known child molester; mistreated the children in other ways; and planned to destroy your reputation and get you fired from the FBI in order to "gain lifetime alimony and full custody of the children."

You also cite the findings of a court-appointed psychiatrist that your Ex-Wife suffers from severe mental illness. You stated the psychiatrist concluded your Ex-Wife is an "unfit" and "abusive" mother, actively attempted to alienate the children from you, might be a sociopath, and "does not perceive reality correctly." You assert you were awarded full custody of the children, and your Ex-Wife's visitation rights have been revoked.

As noted, the Family Court Judge expressed significant concerns regarding your Ex-Wife's sexual behavior during the marriage and separation, but he also criticized your conduct as a "contributing factor" (9/20/13 Temporary Modification Order, at 3-4):

> In considering the parties' sexual behavior, the Court is not sanguine about the Father's role in that regard. At the very least, the Court finds the Father's apparent acquiescence in the Mother's sexual relations with other men to be a contributing factor. The Mother alleges her behavior was coerced by the Father. The Court questions that. The Court notes many if not most of the Mother's encounters occurred outside the presence of the Father though most admittedly with his knowledge and apparent consent.

## ANALYSIS

### A. Misdemeanor/Harassment

According to FBI Offense Code 4.8, employees are prohibited from "[e]ngaging in an act, other than one which has been specifically delineated in another offense code, which is considered a misdemeanor in the jurisdiction in which the act occurred."

12

Mr. Scott T. Ballock

The West Virginia Code, Section 61-3C-14a (Obscene, anonymous, harassing and threatening communications by computer, cell phones and electronic communication devices; penalty.) states: "It is unlawful for any person, with the intent to harass or abuse another person, to use a computer, mobile phone, personal digital assistant or other electronic communication device to: ... (2) Make contact with a person after being requested by the person to desist from contacting them .... Any person who violates a provision of this section is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $500 or confined in jail not more than six months, or both fined and confined."[14]

The evidence shows that, after having received numerous unwelcome electronic communications from you, your Ex-Wife repeatedly demanded that you stop contacting her unless necessary to address child-rearing issues. She repeatedly told you that your communications were unwelcome, with the narrow exception of communications about matters requiring her input regarding a parenting decision. You refused to comply with your Ex-Wife's repeated demands and continued to harass her via electronic communications. After enduring many more unwelcome communications, your Ex-Wife sought help from law enforcement. A State Police Corporal reviewed over 3,000 emails provided by your Ex-Wife's attorney and determined that many of the electronic communications were "harassment and stalking" in nature. A local prosecutor then reviewed the evidence and she determined there was enough evidence to charge you with two misdemeanor counts of harassment/stalking and unwanted communications by computer. My independent review of the emails, summarized above, confirms they were unwelcome and constituted harassment.

You claim you have emails from your Ex-Wife showing she welcomed your texts and emails, but you have provided no evidence that any such communications post-date her May 2013 instruction to you to stop sending her unwanted texts and emails. You also state you have emails from your Ex-Wife concerning your children, but these would not be especially probative given that your Ex-Wife made clear that communications about decisions involving the children were necessary, and not harassing or unwelcome. The very few communications you cite that occurred after May 2013 are relatively innocuous[15] and, more importantly, in no way rescind her instruction to you to stop your unwelcome, harassing communications.

You seem to take the position that an email is not harassment unless it threatens physical violence or is otherwise malicious on its face. In fact, multiple *unwelcome* emails constitute harassment where, as here, they contravene repeated instructions to stop sending them. The derogatory and insulting nature of many of your emails reflect an intent to harass or abuse.

The Division's *Douglas* Factors EC (pp. 8, 10) asserts the investigation "exonerates" you from the harassment allegations, but this conclusion is premised on the false assumption that

---

[14] In addition to WVC § 61-3C-14a (Obscene, anonymous, harassing and threatening communications by computer, cell phones and electronic communication devices; penalty), you were arrested for violating WVC § 61-2-9a (Stalking and harassment). I believe WVC § 61-3C-14a is more applicable to the facts presented.

[15] For example, you assert that on July 2, 2013, she told you to send her love to your mother and the children. Regarding certain purported communications, you provide no evidence whatsoever.

CONFIDENTIAL                                                                PL 00043

Mr. Scott T. Ballock

of this you try to hide from me. I don't know how you got that those things would not cause long-lasting damage. *Shall I move on to the physical abuse? The psychological abuse? How about the sexual abuse?*" (Emphasis added).

You to Ex-Wife (3:20 PM): "You do not need to move on to anything else. *I was wrong. I ask forgiveness.* I ask to move forward with you. Because, despite your anger and hatred right now, there is part of you that lives in me. There were magical times and a closeness." (Emphasis added).

Your Ex-Wife then wrote to you that you threatened her life and she would need "a long time to heal." You did not deny that you threatened her life, but instead responded you understood what she was saying:

Ex-Wife to You (3:37 PM): "Scott, There is too much history of hurtful actions. I changed the day you threatened my life. The next times you did it I became someone not like myself. I became a lonely, rejected, uncared for survivor. It's going to take me a long time to heal."

You to Ex-Wife (3:42 PM): "Ok. Thank you. I understand. Too much history. I am moving on then. Tonight, without you. If you begin to think of me and wish to end your date and come over, call me and I will come back to town."

Your Ex-wife's references to your having threatened her life were not an incidental comment, but instead her core message, as reflected in the assertion: "I changed the day you threatened my life." Your response -- "Ok. Thank you. I understand. Too much history." – is a clear acknowledgement that you did so.

On October 8, 2012, your Ex-Wife asserted you repeatedly strangled her and touched her in a sexual manner against her will. You did not deny her assertions but instead stated you were sorry, you "messed up," and you "drove [her] away":

**10/08/2012,** Ex-Wife to You (5:31 PM): "What is wrong is you fondling me at your apartment and in the emergency room. What's wrong is expecting to the point of nearly demanding I hug you when we drop off or pick up the kids."

You to Ex-Wife (5:34 PM): "Ok, I will stop again.[16] Please understand how difficult this is for me. To experience, to believe. It's unreal to me. It really is."

Ex-Wife to You (5:36 PM): "*It was unreal the first time you strangled me.* It was unreal when you didn't spend my 37th birthday with me and the kids at a campground [made] sad because you wanted to see KC. It was unreal when you told me you didn't want to be married as everything was loaded onto a moving truck (twice). *Need I go on?*" (Emphasis added).

---

[16] I note that your reply, that you will stop "again," shows this was not the first time you sexually harassed your Ex-Wife through unwelcome fondling. Your response is an unequivocal admission.

15

Mr. Scott T. Ballock

> You to Ex-Wife (5:38 PM): "*You needn't.*" (Emphasis added).
>
> You to Ex-Wife (10:45 PM): Subject: *I'm sorry*: "*I know how much I messed up. But I'm sitting here in my cozy apartment, knowing where you are and what you're doing and I'm surprisingly at peace with it. Because I know I drove you away. Because I know I am responsible for tonight* . . . ." (Emphasis added).

In other words, in response to a clear and pointed assertion that you strangled your Ex-wife, you did not question or deny it, but instead apologized that same day by saying: "I'm sorry."; "I know how much I messed up."; and "I know I drove you away."

In short, although you stated under oath that the allegation you physically abused your Ex-Wife is "false," the evidence establishes you likely physically abused your Ex-Wife and threatened her life. This finding does not turn on a credibility assessment of your Ex-Wife, but instead on your own admissions, apologies, and acquiescence in your communications about the abuse.[17] You had a clear motive for lying in your SSS, given the potential disciplinary consequences, and it is reasonable to assume you forgot that you had admitted to the abuse in your communications with your Ex-Wife.

Your Written Response (p. 5) asserts your apologies and other communications were simply a "coping mechanism" you adopted to minimize your Ex-Wife's "destructive reactions" in view of her mental unbalance. This is demonstrably false. Your communications were filled with attacks and insults that were in no way designed to assuage her. For example, you described her by saying: "Black boots, Black coat, Black heart, Black soul." You told her "For you to dishonor [your son] is disgraceful." You said she was "filled with hatred and rage" and referred to "all the hurt and suffering [she] caused." You stressed "the ugliness you have brought into all of our lives, the futures you have doomed us all to, through your self-centered choices." You repeatedly stated you both could lose custody of the children, and you blamed her "demons" for your plight, including tearing the family apart and the "resentment, anger, and sadness the children will feel for the rest of their lives." And on and on. In view of these highly derogatory and insulting communications, it is unpersuasive for you to explain your apologies as part of an overall strategy to mollify her due to her mental instability.

### 2. The Nature of Your Emails and Texts

In your SSS (p. 2), you stated that after you separated from your Ex-Wife in September 2012, you ensured your emails and texts to her were respectful and appropriate:

> During our separation and divorce, I specifically requested and engaged in 'written' forms of communication with [my Ex-Wife] to ensure our conversations were documented – precisely so that my communications with her could not be misconstrued or misrepresented. Specifically because we were in the middle of

---

[17] The record contains other evidence of physical abuse provided by your Ex-Wife to the police and FBI investigators, but it is unnecessary to address that evidence because the strongest evidence comes not from your Ex-Wife, but from your own emails and texts.

16

**CONFIDENTIAL** **PL 00045**

Mr. Scott T. Ballock

contentious divorce proceedings, I ensured that nothing I sent to [my Ex-Wife] could be construed as anything but appropriate and respectful.

As shown above, however, during your separation you sent your Ex-Wife emails and texts that were disrespectful, sarcastic, and malicious. They included, among other things, derogatory references to your Ex-Wife and her "fuck buddy," highly charged accusations of criminal misconduct, and hostile characterizations of your Ex-Wife's actions. Your tone was often angry and acrimonious. Given the allegations in this inquiry, you had a strong motive to mischaracterize your texts and emails. Regardless whether any of your specific allegations against her were true, it is clear those communications were not "appropriate and respectful."

### 3. Your Written Response

The vast bulk of your Written Response is devoted to an attempt to show your Ex-Wife is mentally unbalanced and lacks credibility. The Written Response (p. 1) asserts she is the "sole source" of the allegations against you. This is incorrect. Nothing in my findings depends on her credibility. The findings in OPR's proposal letter and this final letter are based on independent record evidence, including your own communications, that in no way turn on her credibility. I am not "taking sides" in your contentious divorce, and in no way do I condone her behavior. The issue is not her behavior or whether her accusations are, as you put it, "unworthy of credence." Rather, the issue is whether you have engaged in misconduct. For the reasons set forth herein, the records shows you have.

Your written response (p. 9) also argues that others have described you as calm and low key, but these descriptions do not accurately describe your texts and emails to your Ex-Wife. The harassing nature of your communications does not involve a mere "difference of opinion" as you suggest, but is overwhelmingly shown by the communications themselves.

### 4. Conclusion

In sum, the record shows you failed to be fully forthright in your SSS regarding: (1) your physical abuse; and (2) the nature of your communications with your Ex-Wife. Based on a preponderance of the evidence, I conclude that you violated Offense Code 2.6.

## PENALTY DETERMINATION

When determining an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

### A. Harassment

The investigation establishes you violated FBI Offense Code 4.8 (Other Misdemeanors). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

17

Mr. Scott T. Ballock

In mitigation, you have a positive service record and no prior disciplinary history, and your Division thinks well of you. You were under stress during your separation and divorce. The file also reflects other mitigators, which I have considered.

Notwithstanding the relevant mitigating factors, I find that severe aggravation is appropriate for several reasons. First, as a Supervisory Special Agent, you are held to a higher standard. The Bureau trusts its supervisors to represent the FBI professionally at all times, and to serve as an example for those they supervise. The FBI Offense Codes and Penalty Guidelines specifically cite "supervisory or high-grade status" as an aggravating factor.

Second, your arrest was reported by several local and national online media outlets, thereby harming the Bureau's reputation. The FBI Offense Codes and Penalty Guidelines cite "actual or potential harm to the FBI's reputation" as an aggravating factor.

Third, and most importantly, the harassment followed serious prior misconduct, including physical abuse and death threats against your Ex-Wife. By email dated July 29, 2015 to OPR and copied to the FBI's appellate authorities, the Director made clear: (1) he cares deeply about the issue of domestic violence; (2) OPR's penalties for domestic violence must "strongly promote both specific and general deterrence"; and (3) he fully supports dismissal for domestic violence where appropriate. He recognized victims frequently fail to seek relief because they fear additional abuse or the financial consequences if the abuser goes to jail or loses employment.

In sum, the record shows you do not possess the integrity, judgment, and self-control required to be an FBI Special Agent. Based on the circumstances of this case, I am dismissing you for your 4.8 offense.[18]

### B. Lack of Candor

The investigation further establishes you violated FBI Offense Code 2.6 (Lack of Candor/Lying – Under Oath). The standard penalty is dismissal. Offense Code 2.6 does not include a mitigated or aggravated range.

Based on the circumstances of this case, I am dismissing you for your 2.6 offense.

---

[18] The record contains evidence that in late-May 2013, you ordered a Bureau contractor to perform a database search of your estranged wife's boyfriend. The matter was handled as a performance issue. You dispute the allegation and contend the contractor misused the database to satisfy his own curiosity because he knew the boyfriend. You assert the contractor was your "subordinate" and you admonished him for misusing the database. Due to these conflicting accounts, I have not considered this incident in assessing a penalty.

18

Mr. Scott T. Ballock

## CONCLUSION

In sum, a preponderance of the evidence substantiates that you violated Offense Codes 4.8 and 2.6. Your conduct, as set forth herein, represents a willful and intentional violation of Bureau rules and regulations. As a result, I am dismissing you from the rolls of the FBI. This action is necessary and warranted to promote the efficiency of the FBI.[19]

## APPEAL RIGHTS

If you wish to appeal, **within ten (10) calendar days following notification of OPR's *final* decision, you must forward a brief statement that you intend to appeal** to the Executive Assistant Director, Human Resources Branch, Federal Bureau of Investigation, J. Edgar Hoover Building, 935 Pennsylvania Avenue, Northwest, Washington, D.C. 20535-0001. You may also fax your notice of appeal to HRB's Office of Disciplinary Appeals at 202-324-9312. You will then be provided an opportunity to review the file and submit a brief based on a deadline set by HRB. Your division head must be notified at the time you file an appeal. If an appeal is filed for any action other than a dismissal, the OPR disciplinary penalty will be held in abeyance pending the appellate decision.

If you are appealing a suspension of fourteen (14) calendar days or less, the EAD, HRB, will decide the appeal. If you are appealing a suspension of more than fourteen (14) calendar days, demotion, or dismissal, the Disciplinary Review Board (DRB) will decide the appeal. The standard of review on appeal in examining OPR's factual findings and penalty is the substantial evidence standard of review. The penalty set by OPR cannot be increased on appeal by either the EAD, HRB, or the DRB. In the rare instance that the EAD, HRB, or the DRB identifies factors that require additional investigation and/or adjudication, the case will be remanded to the Inspection Division and/or OPR for additional action.

Should you wish to retain an attorney to assist you in your appeal, you must ensure that the enclosed forms are completed prior to disclosing any Bureau information to the attorney handling your appeal. If you and the attorney who will assist you have already completed and provided these disclosure forms to the Bureau in connection with this case, you do not have to re-submit them. You are referred to Corporate Policy Directive 0915D (Disciplinary Appeals Process) for additional details pertaining to appeals.

---

[19] You are admonished not to discuss this matter with anyone other than the Inspection Division's Internal Investigations Section (IIS), OPR, the Human Resources Branch's Office of Disciplinary Appeals (ODA), the Security Division, the FBI's Employee Assistance Program, the FBI's Ombudsman, or an attorney who has signed the appropriate Nondisclosure Agreement. Neither you, your attorney, nor anyone acting on your behalf should contact any witness or potential witness about this inquiry without first obtaining approval from IIS, OPR, or ODA. In addition, you are admonished that any redacted materials or other FBI documents you review in connection with this inquiry are the property of the FBI, and you are prohibited from photocopying or removing such documents from FBI space. You may take notes concerning the content of such material, but those notes may be used only to facilitate your participation in this disciplinary inquiry and for no other purpose.

19

**CONFIDENTIAL** PL 00048

Mr. Scott T. Ballock

## REFERRAL TO OTHER DIVISIONS

In accordance with established policy, the results of this administrative inquiry will be shared with other divisions, as appropriate. Thus, a copy of this communication is being provided to the Security Division as it may be relevant to your retention of a Top Secret security clearance.

## NOTICE TO SEPARATED EMPLOYEE REGARDING FEDERAL EMPLOYEES HEALTH BENEFITS COVERAGE

Your Federal Employees Health Benefit (FEHB) coverage will automatically continue at no cost to you for 31 days after your separation. At that point, you may elect to enroll in OPM's Temporary Continuation of Coverage (TCC) in the Federal Employees Health Benefits program at your own expense. The website www.opm.gov contains additional information and rates for TCC.

Sincerely yours,

*[signature: Candice M. Will]*

Candice M. Will
Assistant Director
Office of Professional Responsibility

Enclosures

20

**CONFIDENTIAL**                                                **PL 00049**