# In The Matter Of:

*Scott Ballock v.*
*Ellen Ruth Costlow, et al*

*Scott Ballock*
*April 19, 2019*

*Sapphire Court Reporting LLC*
*204 Oak Drive*
*Clarksburg, WV 26301*
*304-476-7553*
*www.SapphireCR.com*

Original File Scott T. Ballock.txt
Min-U-Script® with Word Index

**EXHIBIT 2**

1    A.    No.
2    Q.    So you sent her 12 more texts over the next 12
3  minutes.  And then at the bottom of the page, about four
4  lines up at 12:20, she again says, "Please stop texting
5  me."  And if you follow along, you'll see that you
6  responded by sending three more texts over the next two
7  minutes.
8         Then again, going to the third page, at 12:22
9  and 12:23, she again texts, "Stop texting me please."
10 At 12:23, "Please leave me alone now."  You then sent 23
11 more texts.  So between the time that she first asked
12 you to stop texting her at 12:02 and the end of the day,
13 you sent a total of 38 text messages after she asked you
14 to stop.  Why?
15   A.    Because I was emotionally distraught.
16   Q.    You would agree with me that you made contact
17 with her using a cell phone after she asked you to stop?
18   A.    Yes.
19   Q.    At 1:45, about midway down the third page, one
20 of the texts you sent her after she'd asked you
21 repeatedly to stop was, "But I see it spiraling out of
22 control.  I see the cliff fast approaching for us all
23 and I want to save us."
24   A.    Can you repeat that?
25   Q.    Sure.  1:45 p.m., about halfway down the page.

1 supposed to be an unbiased law enforcement officer who
2 represents citizens as a whole, not just one person, was
3 taking sides with the complainant and very
4 unprofessionally and improperly communicating with her
5 on his official government account about how happy he
6 was that I was humiliated and how happy he was that
7 potentially exculpatory evidence was going to be kept
8 out of my case.
9     Q.   Just so I'm clear. In the email from Kief to
10 Ellen he was describing the hearing where Gabe Mucciola
11 argues against releasing the Cooper-Lehki report?
12     A.   Yeah. That was what he was referring to, I bet
13 Scott walked out of that courtroom with his tail between
14 his legs. That's great news. I bet he was humiliated.
15     Q.   That was Ellen saying those --
16     A.   No. That was your Sergeant Kief saying those
17 statements, a law enforcement officer saying those
18 statements.
19     Q.   But you testified earlier --
20     A.   So he wasn't just -- so he wasn't just
21 concerned about the law or justice prevailing. He was
22 concerned and happy that someone was being humiliated
23 and that someone would not be able to use exculpatory
24 information to their benefit.
25     Q.   Where did you get that email? Was that

1    produced in discovery?
2         A.   From you.  From you.  You surely read it.
3         Q.   Anything else that you -- leads you to believe
4    that the troopers had a vested interest in assisting
5    Ellen?
6         A.   Yes.  Well, at the dismissal at which Sergeant
7    Kief at the time was there, Judge Mullins said that
8    Ellen shall not provide any disparaging information to
9    my employer.  That was a condition.  Ellen shall not
10   provide any disparaging information to my employer.
11   That was also a condition of divorce court.
12            Judge Minor said you shall not have any contact
13   with Scott's employer.  Any contact.  So now, two
14   different judges have told Ellen you shall not interfere
15   with Scott's employment.
16            One week after that dismissal at which Sergeant
17   Kief attended and I have reason to believe probably
18   helped craft that wording, Sergeant Kief contacted Ellen
19   and invited her -- the FBI at the time was going to
20   investigate me due to the internal administrative
21   inquiry.  And Sergeant Kief knew that Ellen wasn't
22   allowed to talk to the FBI.  He knew it.  He was there.
23   He heard the judge's instructions.  He's a law
24   enforcement officer.  And he wrote -- he contacted Ellen
25   and said the FBI is coming to talk to me, hey, let's get

1  interview more than just the complainant.  Everyone
2  knows that.
3         This is a good one.  The third paragraph, the
4  victim went on displaying that the accused would cut his
5  toenails short, to the point where they would bleed and
6  make a comment it was a relief.  She accused me of being
7  a cutter.  She told the -- I have no idea how she came
8  up with that.  That was pretty fantastical.  She told
9  the psychiatrist that I was a cutter and therefore I was
10 dangerous.
11        I was going through, obviously, the most
12 difficult time of my life, and she, in response to that,
13 had me roll up my pant legs and my sleeves to see that I
14 have no scars.  I'm not a cutter.  I don't know why she
15 -- she would have said those things.
16        Well, I do know why.  She was trying to make me
17 out to be a monster.  It fit within her narrative.
18 That's a lie.  But, again, as you say, he wrote, "The
19 victim."
20    Q.   So --
21    A.   But, again, that's why you talk to other
22 people.  You don't just talk to just the complainant
23 unless you're trying to accomplish an objective.
24    Q.   You would agree with me then that nearly
25 everything that you've characterized as a lie was

1  related to -- it even explicitly says in the report that
2  Ellen told Corporal Gaskins that.
3      A.   Correct.
4      Q.   Would you agree that on the two or three
5  occasions you pointed out where he did not actually say
6  -- you know, preface the statement with "the victim
7  advised," would you agree that if you read in context
8  he's just relaying what she told him?
9      A.   Yeah.
10     Q.   In Paragraph 216 of your complaint it says
11 "When he prepared the report, Gaskins knew or should
12 have known that the statements provided to him by
13 Costlow were false."  I'd like to break that down.  Why
14 do you think Corporal Gaskins actually knew the
15 statements were false?
16     A.   Because I believe that they worked in concert
17 with Ellen to affect my arrest at family court to
18 advantage Ellen and disadvantage me based upon all the
19 other evidence.  And, at minimum, he should have known
20 because he should have interviewed more than the
21 complainant, especially in a divorce case.  Everyone
22 knows that that's where false allegations are routinely
23 made.  It's unbelievable.
24     Q.   I don't want to interrupt you.  Are you done?
25     A.   I'm done.