**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**SCOTT T. BALLOCK**                                          Case No.: 1:17-CV-52 IMK

           Plaintiff,

v.                                                                      JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

           Defendants.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION**
**FOR PARTIAL SUMMARY JUDGMENT AGAINST MICHAEL A. KIEF**

The Plaintiff, Scott T. Ballock, moved for partial summary judgment against the Defendant, Michael A. Kief as to the duty and breach elements of Claim Ten (tortious interference with contract of employment), (Doc 122) and he has responded, (Doc 123). This reply memorandum is submitted in support of the motion for partial summary judgment.

**I.     TIMELINE OF RELEVANT EVENTS**

The opposition brief argues the Plaintiff's motion misstated evidence, confused the sequence of events and urged speculation and innuendo in support of the motion. (Doc 123 at p. 1) These are not meritorious contentions.

Defendant Kief's opposition sets out a series of unnumbered paragraphs, seeking to set the record straight. They will be addressed in order.

It is agreed that Tom Ballock, the Plaintiff's father, placed a call to Sgt. Kief on August 13, 2013, advising him there was reason to believe Ellen Costlow and Trooper Chris Berry were

having an affair. This call was placed the day after two Monongalia County Sheriff Deputies responded to the Ballock marital residence occupied by Ellen Costlow.[1] She had been interviewed that day by the court-appointed forensic psychiatrist, Dr. Christi Cooper-Lehki, as part of the custody evaluation. Afterward, Ellen Costlow went home and had a fight with Kenny Ice, Jr., in part because of Trooper Chris Berry.[2] See Costlow dep. at p. 196-197. Mr. Ice was wounded and a bloody knife was found.[3] Ellen Costlow denied attacking Mr. Ice but could not explain how he was cut. Costlow dep. at p. 199. The police record indicated Mr. Ice did not want to press charges. (Doc 124, Exhibit 5). Ellen Costlow likewise could not explain what it was about her texts with Chris Berry that caused Kenny Ice, Jr., to accuse her of an affair. Costlow dep. at pgs. 204-205.

Scott Ballock created a timeline for his defense of the criminal case and it wound up in the prosecutor's file that was produced in discovery. It was cited in the opposition brief and attached as an exhibit. This is welcome, as it details several instances affirming the Plaintiff's motion.

In an example pertinent to the current motion, there was a joint counseling session with Terry Laurita Sigley on November 22, 2013, about nine weeks after the arrest in family court. In that session, Ellen Costlow first denied, then admitted to a telephone conversation overhead by their son, discussing her plans to try and get Scott fired from the FBI. See Doc 123-1 at pgs. 15-16.[4] In that same counseling session, Ellen Costlow declared that she did not initiate the

---

[1]     The Monongalia County Sheriff's Office Call Summary Report is in the record. (Doc 124, Exhibit 5).
[2]     Cited excerpts from the deposition of Ellen Costlow are attached as Exhibit 1.
[3]     Kenny Ice, Jr. used his cellphone to audio record some of the incident, so a copy has been produced in discovery. Ellen Costlow can be heard to alternate between menacing dialogue and screaming. At one point she can be heard breaking dishes as Kenny Ice narrates the scene.
[4]     This is in addition to the text messaging recovered from the cell phone of Kenny R. Ice, Jr., submitted as Exhibit 4 to the Plaintiff's motion for partial summary judgment. (Doc 122-1 at pgs. 24-25).

criminal proceedings against Scott, claiming instead that the police sought her out because they were worried about her. Id.

In deposition, Ellen Costlow first admitted and then denied that she wrote her lawyers, Matthew Stout and Amber Sellaro, on May 29, 2013, some three-and-one-half months before Scott's arrest, and directed them to file harassment charges that day. See Costlow dep. at pgs. 121-125.[5] She also claimed in deposition that she told her divorce lawyers several times to go to Judge Minor about the emails and texts Scott sent her,[6] yet we know Judge Minor was dismayed to witness the arrest on September 13, 2013 and pointed out he was never told about harassing communications. See Doc 124-7, Exhibit 7 at p. 6. Indeed, Judge Minor was rightly dismayed as he had statutory jurisdiction to enjoin the communications that Ellen Costlow took to the West Virginia State Police.[7] See W.V. Code § 51-2A-2a (2015).

The point is, Ellen Costlow contradicted her account on this and many issues, on different occasions, always depending on what she perceived at the time to be the most advantageous story to tell. Any suggestion that she is truthful, consistent or corroborative of Sgt. Kief's account is contradicted by the exhibits Sgt. Kief's counsel proffered as well as the deposition testimony the Defendant Costlow has given.

The defense proffer of Sgt. Kief's deposition testimony and the two exhibits concerning events between the call from Tom Ballock on August 13, 2013 and August 22, 2013, are faithful

---

[5]   A copy of Matthew Stout's letter dated May 3, 2013, addressed to Scott Ballock is in the record, but Scott Ballock did not receive it. See Ballock dep. at 75, Exhibit 2. That letter declared that any further direct communications with Ellen Costlow would result in notification to Judge Minor. Yet, there were further direct communications and nothing was reported to Judge Minor. Ellen Costlow opted for a criminal complaint in hopes it would not only persuade Judge Minor on child custody, but get Scott Ballock fired (a declared aim of Ellen Costlow) and perhaps intimidate Scott's father from posting about her in his internet blog.

[6]   See Costlow dep. at pgs. 131-132.

[7]   Sgt. Kief testified in deposition that he understood Judge Minor could order that such communications be stopped. Sgt. Kief dep. at p. 103. Cited excerpts of Sgt. Kief's deposition are attached as Exhibit 3.

recitals, as far as they go. However, there were significant omissions concerning the events of that time. Notably, the "investigation" Sgt. Kief conducted into the affair about which Tom Ballock had called. This preceded the investigation of Scott Ballock's communications with his estranged wife and is relevant to Sgt. Kief's motivation and conduct as well as that of Ellen Costlow.

The day after Ellen Costlow and Kenny Ice, Jr. quarreled at least in part about Trooper Chris Berry, Tom Ballock called and warned Sgt. Kief that Ellen had a history of revealing her trysts to the wives of her illicit sex partners.[8] Sgt. Kief then called and tipped off Trooper Berry that he would speak with him the next day about the alleged affair, granting Trooper Berry adequate notice and opportunity to delete evidence from his phone. See Doc 124 at p. 17, citing Sgt. Kief's deposition. There was a daily activity log that would show Trooper Berry's investigation in the Thistledown neighborhood, if that was why he was in that area. Sgt. Kief did not consult that. See Kief dep. at p. 76, attached as Exhibit 3.

Sgt. Kief and Ellen Costlow gave conflicting deposition testimony about their initial contact. See Doc 124 at p. 17. Sgt. Kief said Tom Ballock's call concerning Chris Berry was his reason for contacting her the same day and she was upset by it, but Ellen Costlow denied ever being asked by Sgt. Kief about the affair. Id. She maintained Sgt. Kief contacted her because he was concerned for her safety where Tom Ballock was concerned. Id.

The Plaintiff's timeline proffered into the record by the defense also details a telephone call Scott Ballock placed to Sgt. Kief on August 15, 2013. Scott Ballock was seeking a report of an incident that occurred on March 6, 2013, when Cpl. Gaskins and Trooper Horne responded to

---

[8]     The report authored by Dr. Cooper-Lehki confirms this behavior. A copy was obtained *in camera* by United States Magistrate Judge Michael J. Aloi. In her deposition, Ellen Costlow admitted to at least one such occurrence. Costlow dep. at pgs. 61-62.

the Ballock home where an altercation between Ellen Costlow and Kenny Ice, Jr. was happening. A spirited exchange ensued when Sgt. Kief declared that no report was prepared and it was none of Scott Ballock's business anyway. Scott countered it was his business as his daughter was living with Ellen and he was looking after her interest. (Doc 123-1 at p.12).

For his part, Sgt. Kief remembered a phone conversation with Scott Ballock.[9] Scott Ballock wanted a report of police activity at his house. The Criminal Investigative Log showed no report was done. Scott questioned why no report was filed and Sgt. Kief explained that troopers use discretion to decide whether to prepare a report of a call response. In this case there was a verbal argument and the trooper judged it unworthy of a report. Sgt. Kief did not recall who the trooper was. He said there was no policy or procedure in effect at the time as to whether a report should be filed, but allowed that the presence of a minor child at the scene of a police dispatch would be a factor in deciding whether to file a report. Sgt. Kief recalled Scott Ballock was not satisfied with his explanation of why no report was on file.

True, a week after dealing with the barrack's affair, being challenged by Scott Ballock, and meeting with Ellen Costlow, Sgt. Kief sought permission to investigate Scott on August 22, 2013. (Doc 123 at p. 2) He did so because, according to Sgt. Kief, Charleston headquarters wanted to know anytime an investigation into another police officer or public official was to be undertaken. See Doc 124 at p. 12. However, Sgt. Kief's written request to proceed[10] made no mention of his precipitating "investigation" into the affair, or how Sgt. Kief put the issue away without any written record or finding.[11] Likewise, Sgt. Kief did not explain to his superiors that

---

9      Sgt. Kief's deposition testimony summarized in this paragraph appeared at pages 68 through 73. See Exhibit 3.

10     A copy of Sgt. Kief's written request for authority to proceed is attached as Exhibit 4.

11     Sgt. Kief did not know whether he believed Trooper Berry had an affair with Ellen Costlow. (Doc 124 at p. 17), citing Sgt. Kief's dep. at p. 43.

the estranged spouses he referenced in his request were before the family court. Omitting all this from the opposition brief misrepresents the whole matter as just another day at the office.

The opposition brief also obfuscates the record on who contacted the FBI to advise them that the State Police would be arresting one of their agents. Cpl. Gaskins denied having done so and Sgt. Kief equivocated. <u>See</u> Doc 124 at pgs. 20-21, <u>citing</u> depositions. Sgt. Kief apparently did it, but the testimony somewhat conflicts. The Plaintiff is satisfied to try the issue, but the current motion still warrants partial summary judgment.

True, a copy of the disc obtained from Ellen Costlow's divorce counsel, just before they withdrew from her representation, was turned over to the FBI within days of having invited the FBI to witness Scott Ballock's arrest. (Doc 123 at p. 2). The opposition brief apparently seeks to distance Sgt. Kief from this initial meeting by omitting mention of him, "... Agent John Hambrick of the FBI's Clarksburg Resident Agency met with Cpl. Gaskins to discuss the allegations against Mr. Ballock and to obtain a copy of the dic of harassing communications Mr. Ballock sent to Ms. Costlow." (Doc 123 at p. 2). This is another misleading omission.

The deposition of Sgt. Kief established he was twice interviewed by the FBI.[12] The first was when Agent John Hambrick came to the barracks, met with Sgt. Kief and Cpl. Gaskins, and reviewed the emails and texts obtained from Mr. Stout. According to Sgt. Kief, Agent Hambrick asked no questions and stated that unless Scott Ballock was convicted, he would keep his job. Sgt. Kief and Cpl. Gaskins were the only two troopers present when Agent Hambrick came to the barracks. Sgt. Kief recalled providing Agent Hambrick with a copy of the disc and the emails he had received from Ellen Costlow. The second contact Kief had with the FBI was April 14,

---

[12]    Sgt. Kief's deposition testimony at pages 155-162 covers all the points summarized on this issue.

2016, a week after the prosecuting attorney moved to dismiss the criminal charges on April 7, 2016 and agreed to expunge the arrest.

The Plaintiff's motion for partial summary judgment proceeds against Sgt. Kief. The opposition brief omitted his role in the initial meeting with FBI Agent Hambrick. That also should have been addressed.

It is agreed the FBI deferred active investigation until after the criminal charges were dismissed. (Doc 123 at p. 3). By that time, the family court's permanent injunction had been in effect for nearly two years; it was entered May 9, 2014 and the criminal charges were dismissed April 7, 2016. (Doc 123 at p. 3).[13] The Defendants' failure to acknowledge or attempt to carry their Rumery burden forecloses their use of the statement attached to the prosecutor's motion to dismiss the charges. (Doc 124 at pgs. 2-7).

It is agreed that on April 14, 2016, Sgt. Kief gave an interview to the FBI. (Doc 123 at p. 3) This was after he collaborated by email with Ellen Costlow about what he should say, in violation of the family court permanent injunction as well as the agreement Ellen Costlow signed the previous week, on April 7, 2016. See Doc 122 at p. 7, citing Exhibits 5 and 7.

It is agreed that FBI investigators interviewed Ellen Costlow on May 12, 2016. (Doc 123 at p. 3). This was also a direct violation of the same injunction and agreement. See Doc 122 at pgs. 7-8, citing Exhibits 8 and 9.

It is agreed that Judge Susan B. Tucker of the Circuit Court of Monongalia County, West Virginia entered an agreed expungement order on July 13, 2016. (Doc 123 at p. 3). This was

---

[13]     Scott Ballock's deposition testimony established that everyone involved knew there was no probable cause for the arrest and he signed rather than risk his career and possibly custody of his children. Ballock dep. at pgs. 167 and 299-303.

co-sponsored by the Prosecuting Attorney, Marcia Ashdown and was binding on the West Virginia State Police. See Doc 122-1.

It is agreed the FBI's first proposed termination decision was issued on April 10, 2017 by Timothy J. Dowling. (Doc 123 at p. 4). It is also agreed that Asst. Dir. Candice M. Will issued a termination letter dated September 21, 2017. (Doc 123 at p. 4). Finally, it is agreed that a second termination letter, superseding the first of September 21, 2017, was issued on March 5, 2019, following remand and further investigation. (Doc 123 at p. 4).

## II. STANDARD OF DECISION

The standard for deciding Rule 56 motions is well known to this Court.

## III. ARGUMENT

Although Sgt. Kief and Ellen Costlow could not tell the same story about the circumstances of their meeting, once they got together, their actions were clear enough. They quickly arranged an investigation of sorts and arrested Scott Ballock, setting in train the damages at issue.

Subjective intent has been discovered. In her deposition Ellen Costlow admitted that on at least one occasion she went to the spouse of one of her paramours and supplied evidence of his adultery with her. Costlow dep. at pgs. 61-64.[14] In her report, held *in camera* by the Court, Dr. Christi Cooper-Lehki reported there was more than one such instance. She also addressed the disordered personality that motivated Ellen Costlow.

---

[14]    The Court's attention is invited to Doc 123-1 at p. 9, submitted by the defense. Kenny R. Ice, Jr. turned over his cellphone to Scott Ballock on May 28, 2013. Two days before, Ice had texted his friends, warning them that Ellen threatened to have sex with them and then go to the hospital and report it as sexual assault. A copy of the cited text can be supplied if necessary.

Sgt. Kief still cannot say under oath whether he believes Trooper Berry and Ellen Costlow had an affair. Having been warned by Tom Ballock, not knowing whether to believe Chris Berry, perhaps even threatened by Ellen Costlow, Sgt. Kief elected to cover for Chris Berry and give Ellen Costlow what she had been wanting, criminal charges against Scott Ballock. No doubt, having been chastened by Scott Ballock the previous week made this decision easier.

For her part, Ellen Costlow admitted in deposition that she well understood that making criminal complaints against Scott Ballock could cause him trouble with his employer. Costlow dep. at p.133. The Court has now seen her text messages to Kenny Ice, Jr. declaring such an intention, the statement to the same effect as witnessesd by her son, the text message Kenny Ice sent his friends warning them of Ellen Costlow's threat to frame them for sexual assault and of course, the *in camera* copy of Dr. Christi Cooper-Lehki's report addressing this *modus operandi*.

### A. Elements.

The motion (Doc 122) for partial summary judgment was a more focused on the facts and the legal invocation got a bit cursory. The use of the terms duty and breach are derived of torts, as the cause of action is tortious. Their use can be easily applied to the <u>Hatfield</u> criteria.

Duty. What duty did Sgt. Kief owe Scott Ballock? He owed him due process. Sgt. Kief invoked the powers of the West Virginia State Police without probable cause, knowing the likely severe consequences for Scott Ballock's employment as an FBI agent. This was at least part of the reason he had to seek authority from his superiors, something he never had occasion to do before Scott Ballock.

Breach. Notifying the FBI that Scott Ballock would be arrested was not courteous or necessary, it was malign. By the time of the FBI interview on April 14, 2016, Sgt. Kief's conduct

rose to the level of a knowing violation of an injunctive order of nearly two years duration and it was done in coordination with Ellen Costlow. Sgt. Kief's April 14, 2016 interview was done only a week after the expungement process was agreed at the time the charges were dropped on April 7, 2016.

**B. Tortious character of Sgt. Kief's conduct and causation.**

In the opposition brief, Sgt. Kief argues there is no evidence that his conduct was tortious. Obviously, there is such evidence. It need not be repeated.

As to causation, much interpretation is offered of the administrative case that is currently on appeal. The first termination decision, dated September 21, 2017, was superseded and the second, March 5, 2019, sought to discount Scott's arrest as well as Sgt. Kief's untrustworthy investigation. While this is actually damning of Sgt. Kief's actions, the defense argues this as absolution. However, as the fully-adopted Report and Recommendation (Doc 48 at p. 24) observed, the mere fact of notifying the FBI about the whole affair was enough, it is not necessary that the FBI's Office of Disciplinary Responsibility (ODR) expressly relied on Sgt. Kief and Ellen Costlow's contributions. Moreover, the current administrative appeal is *de novo*, so the false and defamatory information communicated by Sgt. Kief and Ellen Costlow is still in play.

**C.     Scott Ballock's arguments are evidence based, relevant and accurate.**

**1.   The last item in the State Police investigation file.**

We come to the best argument in the opposition brief. It pertains to the website data that concludes the "investigation file" obtained in discovery. (Doc 123, at 8-9). The web content was indeed provided by Ms. Costlow on November 4, 2016. It is agreed the item was errantly

identified as a product of Sgt. Kief's efforts on February 14, 2018. Ellen Costlow provided it, Sgt. Kief filed it, then produced it in discovery. It is agreed the reference to it was inaccurate and not material to the current motion.

### 2. Scott Ballock's co-dependency and his communications with his estranged wife.

On Ellen Costlow's motion a forensic psychiatrist was appointed by the family court to do a custodial evaluation. The report is being held *in camera* by this Court. It details the evidentiary basis for the argument the defense now seeks to disparage. Dr. Christi Cooper-Lehki is a careful and informative lecturer and certain to be an instructive trial witness. She will affirm her report and that is important to understanding the role Scott Ballock's codependent features played.

People who struggle with mood disorders and sub-diagnostic features of mood disorders typically lack the ability to see it in themselves. In the case of codependency, the sufferer is too emotionally invested. Sometimes, long-term therapy is needed to unpack and appreciate it. The attack on Scott Ballock back in 2013, and even more so today with the benefit of hindsight, demonstrates a fundamental failure on the part of the defense to comprehend that this was part of what was happening.

At one point, Plaintiff's counsel was preparing to depose Dr. Cooper-Lehki about all this, but those arrangements were canceled. It would have helped educate defense counsel along this line, but the expense and inevitable motion practice[15] argued against it. Dr. Cooper-Lehki's deposition was not necessary to the summary judgment motions and it will be much more efficient to adduce the evidence in the presence of the Court.

---

[15]   Plaintiff's counsel well remembers being admonished in a hearing that we will not be retrying the divorce action.

Of course, the defense had an equal chance to depose the mental health professionals who have been identified as potential trial witnesses since the case started. They chose not to do it.

The Cooper-Lehki report speaks in part to Scott Ballock's condition, the codependent features he was experiencing at the time the emails and texts were occuring. He was denied the chance to use that exculpatory evidence and now he is challenged again for trying to use it.

The criminal case against Scott Ballock was dropped and the record of his arrest was expunged so the codependent features have yet to be heard outside of family court. Once the elected prosecuting attorney got up to speed on all that had happened, she dropped the charges and agreed to expungement of the arrest. That process of review likely included the Cooper-Lehki report. The Court will recall, one of the Assistant Prosecuting Attorneys successfully persuaded Judge Minor against Scott Ballock's use of that report approximately one month before the criminal trial. That could not be done without reading the report.

The defense citations to Scott Ballock's deposition testimony (Doc 123 at pgs. 9-10) actually support Dr. Cooper-Lehki's clinical impression that Scott Ballock was displaying codependent features. He was desperately trying to protect his children by regaining the marital relationship he had worked to manage up to the time his wife took up with Kenny R. Ice, Jr. In this way, he sought to protect his children when the police and the court was reluctant to do so.[16]

Scott is currently managing a Kroger store and his budget is tight, but if he recovers in this action he will be able to afford the therapy Dr. Cooper-Lehki recommended, the help he needs to emotionally process all this. The report Dr. Cooper-Lehki wrote is instructive. The defense lawyers need to study it before trial.

---

[16]    See Scott Ballock's deposition testimony at pgs. 278-282 and 286, attached as Exhibit 2.

### 3. Tom Ballock's websites.

Tom Ballock's website blogging runs throughout the litigation. The record before the Court shows it was addressed by the family court, but Tom Ballock was not a party to that proceeding. It was the subject of a civil action filed by Ellen Costlow, but that was dropped when a counterclaim was filed and discovery was at hand. Most significantly, it runs throughout the emails Ellen Costlow sent to Sgt. Kief. This current round of briefing established that the last item in the investigation file was Tom Ballock's website content pulled down by Ellen Costlow and forwarded via email to Sgt. Kief.

Ellen Costlow was desperate to stop Tom Ballock's blogging activities, she frequently brought it into her deposition testimony and claims the State Police sought her out to protect her from Tom Ballock. In his deposition, Scott Ballock itemized the reasons he believed Sgt. Kief was motivated against him in connection with his father's websites; the testimony ran to five pages. See Ballock dep. at pgs. 92-97, attached as Exhibit 4.

Tom was the problem yet it was Scott Ballock who was charged, arrested and prosecuted. At one point, APA Cindy Scott offered to drop the charges if only Tom Ballock would relent:

```
 1   A.   Cindy Scott.  Cindy Scott, at my initial
 2   hearing, before it began, Benninger and Scott approached
 3   the bench and Benninger explained to the judge what this
 4   was all about in reality and it belonged in family
 5   court.  Cindy Scott held up a West Virginia statute book
 6   and said these are all the ways you can arrest someone
 7   in West Virginia, if you want to find a way to arrest
 8   someone, you can.  The West Virginia State Police dumped
 9   this in my lap.  The judge looked at her and said and
10   now you're dumping it in my lap.  And she shrugged.
11        My attorney told me that Cindy Scott did not
12   want to pursue these charges against me but that Ellen
13   was threatening her that if she didn't she would make a
14   big stink about it.  He said -- and this was before she
```

15 announced.  He said that Cindy Scott was going to run to
16 be a judge, and she didn't want the victim of a domestic
17 to be able to say that she didn't take care of her.  So
18 she was threatening Cindy Scott.
19        And, in fact, Cindy Scott believed that Ellen
20 once surreptitiously recorded a conversation with her.
21 So, again, Cindy Scott didn't want to prosecute me
22 according to Mike Benninger.  But she said Ellen is
23 forcing me to.
24        And Cindy Scott, though, worked with Ellen and
25 offered to dismiss the case if -- on the condition that

1 my father remove a website that he had created which had
2 Ellen on it.  Benninger --
3    Q.  Which one?
4    A.  I don't know what it is.  Benninger called my
5 dad into his office and me, told us of Cindy Scott's
6 proposal.  And my dad refused, so Benninger threw him
7 out of the office.

Ballock dep. at pgs. 140-141. Ellen Costlow intersected with local politics and again displayed a

willingness to intimidate. Dr. Cooper-Lehki can explain the sociopathic capacities of Borderline

Personality Disorder.

The fact is, once the elected prosecuting attorney looked at the whole affair she did the

ethical thing and dropped it, all to the surprise and disappointment of Ellen Costlow and Sgt.

Kief, though she did overreach in the process to try and protect "her boys." In that last respect,

the Rumery factors were known to the defense; it is a burden-shifting doctrine. The defense

needs a record in order to use the statement coerced from Scott Ballock. Presumably, they spoke

with the prosecutor. Whether or no, they did not depose her.

Meaningful discovery has been done in this case and it has connected up the motivations,

events and consequences of this sad story. The defense bemoans the result and appears to claim

surprise, but they have had a fair opportunity, they participated. They only now appreciate the

results because they were besotted with their own perspective. There is no unfair surprise at work.

## IV.    CONCLUSION

Whatever tussle there is left in the story for the jury to decide, it is undisputed that Sgt. Kief and Ellen Costlow initiated the criminal process and the communications to the FBI that have so-far cost Scott Ballock his career. The first two Hatfield criteria are established for summary judgment purposes. Hatfield v. Health Mgmt. Assocs. of W.Va., 223 W.Va. 259, 672 S.E.2d 395 (2008). Scott Ballock was an FBI agent when the Defendants went into action. Their intentional communications to the FBI set in motion the administrative process that is still pending. Indeed, if Scott Ballock prevails in his administrative appeal, he has suffered actionable harm; the FBI cannot redress all the damages he suffered. The result of the administrative appeal will simply further define the measure of damages. Thus, the third and fourth Hatfield criteria await events at the FBI and a jury trial in this action.

This reply brief is respectfully submitted this 12th day of August, 2019.

*/S/ Charles J. Crooks, Esq.*
Charles J. Crooks, Esq.
WVSB # 4633
Crooks Law Firm PLLC
244 Pleasant Street
Morgantown, WV 26505
charles@crookslawfirm.org
(304) 282-1039
***Counsel for Plaintiff,***
***Scott T. Ballock***

15

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**                                    Case No.:      1:17-CV-52

     Plaintiff,

v.                                                       JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY**,

     Defendants.

## <u>CERTIFICATE OF SERVICE</u>

I, Charles J. Crooks, Esq., local counsel for the Plaintiff, Scott T. Ballock, hereby certify that on the 12th day of August, 2019, I filed the foregoing **"PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST MICHAEL A. KIEF"** with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to the following:

P. Todd Phillips, Esq.
P. Todd Phillips & Associates
235 High Street
Suite 322
Morgantown, WV 26505
ToddPhillips.Law@gmail.com
**Counsel for Defendant,**
**Ellen Ruth Costlow**

And

*/S/ Charles J. Crooks, Esq.*

Mark G. Jeffries (WV Bar No. 11618)
Steptoe & Johnson PLLC
400 White Oaks Blvd.
Bridgeport, WV 26330-4500
Mark.jeffries@steptoe-johnson.com

Monté L. Williams (WV Bar No. 9526)
Steptoe & Johnson PLLC
P.O. Box 1616
Morgantown, WV 26507-1616
(304) 598-8000
Monte.williams@steptoe-johnson.com
**Co-counsel for Defendants State Trooper**
**Michael Kief, State Trooper Ronnie M.**
**Gaskins and State Trooper Chris Berry**