UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**

  Plaintiff,

v.

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

  Defendants.

Case No.: 1:17-CV-52

JURY TRIAL REQUESTED

## **EXHIBIT NUMBER 1**

Costlow dep. at p. 196-197, cited at page 2.

Costlow dep. at p. 199, cited at page 2.

Costlow dep. at pgs. 204-205, cited at page 2.

Costlow dep. at pgs. 121-125.

Costlow dep. at 131-132, cited in footnote 5.

Costlow dep. at pgs. 61-62, cited in footnote 8.

Costlow dep. at pgs. 61-64.

Costlow dep. at p. 133.

```
00001
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT
 3                 OF WEST VIRGINIA
 4                   * * * * * * * *
 5   SCOTT T. BALLOCK,           *
 6     Plaintiff          * Case No.
 7     vs.                * 1:17-CV-52
 8   ELLEN RUTH COSTLOW, STATE *
 9   TROOPER MICHAEL KIEF,     *
10   STATE TROOPER RONNIE M.   *
11   GASKINS and STATE TROOPER *
12   CHRIS BERRY,              *
13     Defendants          *
14                   * * * * * * * *
15
16           VIDEOTAPED DEPOSITION OF
17              ELLEN RUTH COSTLOW
18                 June 13, 2019
19
20
21
22
23   Any reproduction of this transcript is prohibited without
24        authorization by the certifying agency.
00002
 1              VIDEOTAPED DEPOSITION
 2                     OF
 3   ELLEN RUTH COSTLOW, taken on behalf of the Plaintiff
 4   herein, pursuant to the Rules of Civil Procedure, taken
 5   before me, the undersigned, Cody Neff, a Court Reporter
 6   and Notary Public in and for the State of West Virginia,
 7   at the law offices of Steptoe and Johnson, 1085 Van
 8   Voorhis Road, Suite 400, Morgantown, West Virginia, on
 9   Wednesday, June 13, 2019 beginning at 12:33 p.m.
10
11
12
13
14
15
16
17
```

```
18
19
20
21
22
23
24
00003
 1                APPEARANCES
 2
 3  CHARLES J. CROOKS, ESQUIRE
 4  Crooks Law Firm, PLLC
 5  244 Pleasant Street
 6  Morgantown, WV  26505
 7     COUNSEL FOR PLAINTIFF
 8
 9  P. TODD PHILLIPS, ESQUIRE
10  Phillips Law
11  141 Walnut Street
12  Morgantown, WV  26505
13     COUNSEL FOR ELLEN COSTLOW
14
15  MARK JEFFRIES, ESQUIRE
16  Steptoe and Johnson, PLLC
17  400 White Oaks Boulevard
18  Bridgeport, WV  26330
19     COUNSEL FOR STATE TROOPERS
20
21
22
23
24
00004
 1                I N D E X
 2
 3  DISCUSSION AMONG PARTIES            7 - 9
 4  WITNESS: ELLEN RUTH COSTLOW
 5  DIRECT EXAMINATION
 6    By Attorney Crooks              9 - 207
 7  CROSS EXAMINATION
 8    By Attorney Jeffries          208 - 216
 9  CROSS EXAMINATION
10    By Attorney Phillips          217 - 223
```

9   Q.   Your computer that is.
10  A.   Yes.
11  Q.   Where'd you find it?
12  A.   In a briefcase. Oh, in a briefcase in a work
13 car of Kenny's.
14  Q.   Okay.
15       Why I don't believe Kenny ever turned any
16 laptop over to Scott. Do you have any evidence or reason
17 to suggest that he did?
18  A.   No.
19  Q.   I guess your --- your surmise from all of what
20 you told me is you intercepted it. You stopped him from
21 doing it. You discovered it was missing and you tracked
22 it down and got it back.
23  A.   I don't know. It was ---.
24  Q.   I mean you suggested that's what ---
00196
1   A.   It was ---.
2   Q.   --- what he ---.
3   A.   --- it was covered in mud. It had a muddy
4 fingerprint on it. Thumb print on it, something on it.
5 But it was covered in mud. It didn't work anymore.
6   Q.   Oh, the computer was dysfunctional? What
7 happened ---
8   A.   Yes.
9   Q.   --- was the battery dead or what?
10  A.   Too much water, too much dirt. I don't know.
11 But I will tell you what I don't know for certain what
12 happened after he took it. All I know is where I found
13 it and that was not in the dirt and not in the mud.
14  Q.   Sounds like he went rolling in the creek with
15 it. So you fought with Kenny on August 12 of 2013 about
16 that computer and about this allegation of a relationship
17 with Chris Berry.
18  A.   Right.
19  Q.   Okay.
20       So you did have Chris Berry's personal cell
21 phone number at that point. Yes?
22  A.   Yes.
23  Q.   You had exchanged text messages with Trooper
24 Berry.
00197
1   A.   Yes.

2      Q.      On more than one occasion.
3      A.      Yes.
4      Q.      Trooper Berry had been to the house to see you.
5      A.      We'll restate that. He had come to the house
6   to take a statement of what I considered to be something
7   that was gone awry in the neighborhood.
8      Q.      Okay.
9      A.      I didn't have a license plate number to give
10  but I just had a description of the car again.
11     Q.      What time of day was it when he came to see
12  you?
13     A.      I don't remember exactly.
14     Q.      Okay.
15             Well let me just put the question directly to
16  you. Have you ever had a romantic relationship with
17  Chris Berry?
18     A.      No.
19     Q.      I guess some people don't have sex without
20  romance. Have you ever had sex with Chris Berry, period?
21     A.      No.
22     Q.      Okay.
23     A.      No.
24     Q.      How about these other troopers who are in the
00198
1   case? Let's tick them off as well.
2      A.      No.
3      Q.      Sergeant Kief?
4      A.      No.
5      Q.      Ronnie Gaskins?
6      A.      No.
7      Q.      Did Kenny Ice live with you at 51 ---
8      A.      No.
9      Q.      --- Summit --- help me again. The name is real
10  long.
11     A.      51 Summit Overlook Drive.
12     Q.      Overlook Drive.
13     A.      Morgantown. No.
14     Q.      He never lived there. Did he ever stay the
15  night there?
16     A.      Yes.
17     Q.      More than one occasion?
18     A.      Yes.
19     Q.      Did you ever throw screwdrivers at Kenny in the

20  course of fighting with him?
21  A.      No.
22  Q.      Do you realize that he contends that you did?
23  A.      Yes.
24  Q.      As I'm looking back, I see during the March
00199
1   6th, 2013 incident when Troopers Gaskins and Horn went to
2   your resident in Thistledown.
3   A.      Uh-huh (yes).
4   Q.      It appeared that you and Kenny had been in a
5   struggle and he ended up with a cut on him, on his arm
6   and a bloody knife was found downstairs.
7           Is any of that true?
8   A.      I didn't do that.
9   Q.      How did it happen?
10  A.      I don't know.
11  Q.      Well you were the only two present in the house
12  at the time.
13          Am I right?
14  A.      I don't know how it happened. I did not do
15  that.
16  Q.      What were the two of you fighting about on that
17  occasion? March 6th, 2013.
18  A.      Well actually, respectfully you got your dates
19  wrong, so ---.
20  Q.      I know. I'm known to do it on occasion.
21  A.      It's okay.
22  Q.      I'm getting tired.
23  A.      I don't know. There was a time where ---.
24  Q.      I was on the understanding that it was March
00200
1   6th, 2013 when Troopers Gaskins and Horn was dispatched
2   to the residence.
3                   ATTORNEY PHILLIPS: Sounds right to me.
4                   THE WITNESS: It is.
5   BY ATTORNEY CROOKS:
6   Q.      It was?
7   A.      But that's not what ---
8   Q.      What did you fight about?
9   A.      --- for. Probably --- oh, who knows? Probably
10  something pertaining to just sheer frustration over the
11  whole divorce thing from me, not having peace. But I
12  don't quite remember all of it.

```
24   A.      In my neighborhood ---
00204
 1   Q.      Yes?
 2   A.      --- there aren't police cars or state trooper
 3   cars or county ---.
 4   Q.      Unusual to see the police?
 5   A.      Very, yes.
 6   Q.      Okay.
 7           So how many other times did you interact with
 8   Chris Berry?
 9   A.      There was a time when it was the Bridgeport
10   Duck Speed Board Race. And          had gone with Scott
11   and            That's what I was told. And I was told that
12   they would give me 45 minutes heads up to pick up or so.
13   Let me know when to meet to pick up. We would do drop
14   offs and pick up not through Scott. Through Patty and
15   Tom at the Sheetz in Saberton. And I got a text message
16   saying to meet --- where are you? We're here. I was too
17   far away. I was about 45 minutes away and so I said well
18   I will be there, I didn't know. Nobody had sent a text
19   to tell me when to meet.
20           Then I received a message saying we're taking
21   her with us for the remainder of the weekend. And I
22   wrote back, no you can't. I was afraid that something
23   might not go right. Everything went fine. They brought
24           back, I picked her up, everything was fine.
00205
 1   Q.      What involvement did Chris Berry have with any
 2   of that?
 3   A.      I called to see if he was working. It just
 4   happened to be someone that I knew from what was going on
 5   in the neighborhood.
 6   Q.      So did he come to a house?
 7   A.      No.
 8   Q.      Talk to him on the phone? Did you trade texts?
 9   What ---?
10   A.      I think it was texts or just to see if he was
11   working. I can't remember that. But there wasn't any
12   need.
13   Q.      We talked about the August 12, 2013 argument
14   that you had with Kenny. And we talked about the
15   computer and apparently Kenny was accusing you. Was he
16   looking at your phone? Did he see these texts that you
```

17 had exchanged with Chris Berry? What --- what was it
18 that got Kenny so convinced that you were having an
19 affair with Chris Berry?
20   A.   I'm not sure what precipitated that.
21   Q.   Okay.
22   A.   But yes, he looked at my phone. Nothing to
23 hide but I'm not sure what precipitated that.
24   Q.   Okay.
00206
1        Well we know the computer issue was going on.
2   A.   Right.
3   Q.   I don't see where it would necessarily prompt
4 him to look at your phone either. I'm not with you
5 there.
6   A.   I don't know. I really don't know.
7   Q.   Like I said, we also know that that was one of
8 the day you met with Christi Cooper-Lehki. Was there any
9 connection there?
10  A.   No. That surprises me. You've said that a
11 couple of time now. No.
12  Q.   Okay.
13  A.   There wasn't.
14  Q.   You can tell me coincidence but lawyers are ---
15  A.   I understand.
16  Q.   --- keen about those sorts of things.
17  A.   I understand.
18  Q.   All right.
19       So I guess that's just where we'll have to
20 leave it. We don't know what prompted Kenny to look at
21 your phone?
22  A.   No.
23  Q.   And we look --- what kind of --- is this the
24 very first time he had ever heard of Chris Berry?
00207
1   A.   I think so.
2   Q.   As far as you know?
3   A.   I think so.
4   Q.   You got something else?
5   A.   Well, do you remember the woman at Walmart who
6 lost her life during a drop off and pick up of her child?
7 And the father-in-law, I believe, shot her?
8   Q.   I do seem to have some --- some memory of that.
9 Why does that come to mind?

17  A.      I said I'm bragging.
18  Q.      Well he said --- he --- he was incredulous
19  according to what I heard. He thought it was a true
20  story. And he pointed out that you cried all day long.
21  And you said so you would believe me. So maybe --- maybe
22  you weren't bragging. Maybe you were being honest and
23  humble about it. I don't know. But the fact is that's
24  --- that's what was said, you cried all day long to sell
00120
1  Kenny Ice, Junior on a story that you just made up.
2  A.      That's what I said. I cried all day long.
3  That's what was said.
4  Q.      All right.
5           So I went through the documents that were
6  produced to us by the state police and as you no double
7  understand, a lot of those documents came from you. That
8  is to say you provided the state police with most of the
9  documents that are in the file that they produced to us.
10  A.      I have to see it first. I'm sorry. Because
11  that may or may not be correct. May I just see the top
12  of one? Or what you're speaking of the majority of?
13  Q.      Let me put it to you this way. Let me show you
14  this. Here's a letter that is dated March 21, 2018.
15  This is from my honorable colleague Mark ---.
16  A.      Oh.
17  Q.      Yes? Mark Jeffries.
18  A.      Yes.
19  Q.      Sending me this on a disc. Right? Your lawyer
20  was provided the same thing. You can see that it was
21  addressed --- the letter was addressed to not only me but
22  my co-counsel at the time ---
23  A.      Uh-huh (yes).
24  Q.      --- and to your lawyer. And it was a disc
00121
1  containing everything you see printed off here in this
2  stack in front of me. 882 pages.
3  A.      And your question was?
4  Q.      Well my question was to ask you to affirm that
5  you provided the bulk of the material that constituted
6  the state police investigation file into the harassment
7  charges that you initiated against my client, Scott
8  Ballock.
9  A.      My attorney provided it.

```
10   Q.      Well, at your direction.
11   A.      Okay.
12   Q.      You did something through your attorney that
13   you didn't necessarily have to do yourself?
14   A.      They contacted him. They asked me if I had an
15   attorney. I think that was ---.
16   Q.      I think we're working too hard on this
17   particular question.
18   A.      Okay.
19   Q.      I'm looking at Troopers 31 and I'm sorry I'm
20   not sitting here at the ready with four copies of the 800
21   plus pages of production but it's just too much of it.
22   Page 31 from the Trooper production is an email from you.
23   And I'll just show you here.
24   A.      Okay.
00122
1    Q.      An email from you ---.
2    A.      Let me grab my glasses. I need my glasses.
3    Q.      Right. Date Wednesday, May 29th, 2013 at 4:43
4    a.m. And this was an email that you sent at that day at
5    that time to ---
6    A.      Oh, yes.
7    Q.      --- your lawyers. Amber Salero, Matthew Stout.
8    A.      Yes.
9    Q.      The salutation reads Amber and Matt.
10   Highlighted in the first sentence.
11   A.      Sure.
12   Q.      I need to file harassment charges against and
13   it's expunged. But everywhere you see expunged, the word
14   --- the name Scott ---
15   A.      Right.
16   Q.      --- should appear.
17   A.      Uh-huh (yes).
18   Q.      This file --- this is what is called an
19   expunged file in the sense that somebody at the state
20   police in accordance with an order entered by the Circuit
21   Court here in Monongalia County, went through their
22   record and blanked out ---
23   A.      Okay.
24   Q.      --- everywhere Scott's name appeared. Okay?
00123
1    A.      Uh-huh (yes).
2    Q.      So I need to file harassment charges against
```

```
 3   Scott today.
 4   A.      Uh-huh (yes).
 5   Q.      And I would appreciate your help in this
 6   matter.
 7   A.      Uh-huh (yes).
 8   Q.      And then you go on to talk about ---.
 9   A.      I'm losing sleep at night.
10   Q.      Yeah.
11   A.      Thinking about what he'll do next, the threats,
12   the insults, and other abusive tactics.  Sure.
13   Q.      Sure.  All the same stuff that you ultimately
14   said to the --- directly to the state police some five
15   months later in the month of August the same year 2013.
16   All right?  So ---
17   A.      I guess.
18   Q.      --- all I'm asking you to do at the present is
19   just affirm what I'm showing you.
20   A.      That is an email I wrote to Amber and Matt.
21   Q.      Yes.
22   A.      And that is what it says.  That is all that it
23   says.
24   Q.      You're instructing your lawyers May the 29th of
00124
 1   2013 to commence harassment charges against Scott.  Now
 2   by harassment charges ---
 3   A.      Well that's not ---
 4   Q.      --- What did you mean?
 5   A.      --- a directive to them.  When I needed
 6   something done I didn't write like that.
 7   Q.      I need to file harassment charges against Scott
 8   today and I would appreciate your help in this matter.
 9   A.      I guess semantically, no.  Well, it didn't ---.
10   Q.      It didn't happen.  Did it?
11   A.      Well semantically, we can talk about needing
12   but that's --- when I would write a directive it was
13   different.  That was my feeling of need and over losing
14   sleep.  This is all correspondence from him.  Right?
15   That was submitted as evidence
16   Q.      My question is you wanted your lawyers to help
17   you institute harassment charges against Scott as of May
18   29, 2013.  Yes or no?
19   A.      Was this is after he received the letter from
20   my attorneys telling him to stop?
```

21   Q.      Your lawyer Matthew Stout wrote a letter dated
22   May 3.
23   A.      Uh-huh (yes).
24   Q.      So the answer to your question is ---.
00125
1    A.      Where Scott was told to stop contacting me.
2    Q.      All right.
3            My question to you is ---.
4    A.      No, that doesn't tell them to go do it.
5    Q.      All right.
6            I'm not going to parse the terms with you.
7    A.      Okay.
8    Q.      You wrote to them, you said you need to go get
9    this done, you wanted it done that day. My question is
10   why wasn't anything done that day? If not that day,
11   pretty soon after that email was sent. Why'd it take
12   them until the third week of August, same year before
13   anything got done?
14   A.      I got a call from Marion County Sheriff
15   Department.
16   Q.      Uh-huh (yes).
17   A.      It must have been --- it must have been August
18   of 2013 or late July of 2013 --- it was late summer ---
19   asking me if I knew Thomas Ballock. And they were
20   concerned, telling me we need to let you know that he's
21   been coming in asking lots of questions about you and
22   asking for records under for you. A couple of days later
23   I got a phone call from West Virginia State Police asking
24   me to come in. They had concerns about Tom Ballock in
00126
1    --- as it pertains to --- as it pertained to my safety.
2    Q.      Now I took the deposition of Michael Kief in
3    this case. Are you aware of that?
4    A.      Yes, I'm aware.
5    Q.      That deposition was aided by certain documents
6    from this police investigation file. And nearest we can
7    figure it that exchange you just characterized happened
8    in August 2013. Okay?
9    A.      Okay.
10   Q.      I just showed you a May 29 email that you sent
11   your lawyers, saying that you need something done today.
12   And my question was, why didn't anything happen until
13   August. Did your lawyers ---?

```
00130
 1  the mother had raised the issue at any time.  Close
 2  quotes.
 3           So, now I read that what --- to my reading,
 4  looks like a little bit of frustration, perhaps
 5  exasperation on the part of the family court judge that
 6  you went to the police and the police came and arrested
 7  Scott, in front of the court ---.
 8  A.    Let's rephrase that.
 9  Q.    I'm just telling you how I read that.
10  A.    I didn't go to the police.
11  Q.    You need to let me finish my questions.
12  A.    Sure.
13  Q.    All right?
14           So this prompts me to ask you, did you discuss
15  with your lawyers the options of going to family court,
16  talking to Judge Minor and getting an injunction?
17  A.    Yes.  And we had gone in about websites that
18  had been put up about me.  What I remember a lot of is,
19  Ellen, we're just going to get you divorced.  We're going
20  to get you divorced.  They just want to move on.  We will
21  get you divorced.  We were hoping --- all of us were
22  hoping that the letter sent to Scott would work, would
23  make it stop.  But he was sending me code about any
24  mission.
00131
 1  Q.    Federal code.
 2  A.    He was calling me to tell me remember if you
 3  lie to the FBI like Martha Stewart did, you'll end up in
 4  prison.  These weren't correspondences from him about the
 5  health and welfare of the children.  That's not his ---
 6  that was not the intent of any of the correspondence in
 7  especially May, so ---.
 8  Q.    Now you ---.
 9  A.    Also respectfully, you're an attorney, you have
10  clients.  I'm a teacher, I have students.  If they need
11  me to do something, it depends on if the timing is good
12  for what we're doing.  You know, you can't go to recess
13  if we haven't had lunch yet.  There are decisions that
14  have to be made by as professional.  I'm not going to
15  question the decisions that they made.  But I will tell
16  you when I read that, that was real hard to --- that was
17  hard to take because we had been to court for other
```

18  things. I asked each time.
19  Q.    You asked each time for what?
20  A.    That we would walk in, please bring up
21  something about all of these emails, please bring up
22  something about all of these text messages. They were
23  all being filtered into a box within my email. So I
24  wouldn't have to go through reading them all. I just
00132
1   came to see if anything was about Tommy or Summer.
2         So there were steps that they had taken to try
3   to alleviate the --- the effect it was having.
4   Q.    So let me ask you, when you were meeting with
5   the state police, specifically with Sergeant Kief, he's a
6   lieutenant now but he was Sergeant at the time. You met
7   with him the night before the hearing.
8   A.    That happened to be --- was that the day or the
9   day before that had been called? That was coincidence.
10  Q.    So arresting Scott in front of the family court
11  judge was just mere coincidence.
12  A.    That's not my decision. What was asked was do
13  I know when he works. Work hours. I said something
14  about, you know, home with the children not good because
15  --- otherwise he's here. But I wasn't certain of his
16  hours or anything like that. I said all I know for
17  certain is he will be at family court. We have a hearing
18  tomorrow.
19  Q.    You said --- oh, I'm sorry.
20  A.    No I was just -- that's all. That's all.
21  Q.    Okay.
22  A.    There was no advantage I was trying to gain by
23  this for myself, for any court proceeding. And ---.
24  Q.    You know a representative from the FBI was
00133
1   present.
2   A.    I didn't know that until that day.
3   Q.    So if wasn't you who notified the FBI that
4   Scott was going to be arrested in family court?
5   A.    No.
6   Q.    That would have been somebody at the state
7   police.
8   A.    I guess so.
9   Q.    Now you said earlier in the deposition that you
10  didn't want to cause trouble for Scott's employment with

12   A.      I suppose she did.
13   Q.      You suppose she did?
14   A.      There was a lot done during this time.
15   Q.      Yes. Dr. Cooper-Lehki itemized an extensive
16  investigation including 14 hours of interviews with you.
17  You took an MMPI ---
18   A.      Yes.
19   Q.      --- inventory.
20   A.      I did which showed that I'm normal. I don't
21  know how --- it showed that I was fine. Levels of
22  anxiety, not uncommon to a woman going through a divorce.
23   Q.      Uh-huh (yes).
24          Well according to the report that Dr. Cooper-
00060
1  Lehki submitted to the family court she said, quote ---
2  and I'm looking here on page three of the report, quote,
3  Ellen Ballock suffers from borderline personality
4  disorder which is a pervasive pattern of instability of
5  interpersonal relationships, self-image, and effects and
6  marked impulsivity that begins by early adulthood and is
7  present in a variety of contexts, closed quote. Although
8  the report does go on. You read this. Right? You ---.
9   A.      Well like I said, I read some of this but ---.
10   Q.      Have you ever looked up on the internet or
11  otherwise borderline personality disorder to see what Dr.
12  Cooper-Lehki was saying about you?
13   A.      This is what she chose to say, this is what she
14  believes she found.
15   Q.      That's right.
16   A.      So, it's ---
17   Q.      Did you look it up so that you could understand
18  what she was trying to say?
19   A.      It says it right here.
20   Q.      Well it does. It explains it. She
21  explains ---.
22   A.      How about this? I didn't have to look it up.
23  Tom Ballock had plastered it all over the internet. I
24  didn't have to look it up because it was already
00061
1  something that had been suggested by Tom Ballock even to
2  Teresa Lyons and emails he wrote.
3   Q.      Uh-huh (yes).
4          Teresa Lyons was the guardian ad litem during

5  your divorce?
6  A.  Yes. So looking this up occurred before any of
7  this happened because my thought was what is this?
8  Q.  Dr. Cooper-Lehki, page four of her report, top
9  paragraph says that many of your harmful behaviors such
10 as giving videos, pictures, and documented details of
11 your sexual relations to the wives of your lovers
12 supports the presence of personality disorder. In fact,
13 you did provide evidence in photographic form to women,
14 that is to say the wives of some of the men with whom
15 you've had sex.
16     Didn't you?
17 A.  I took information to Scott Kirby's wife
18 because he would not stop coming to the house.
19 Q.  Uh-huh (yes).
20 A.  He wouldn't stop.
21 Q.  What was he coming to your house for?
22 A.  He was saying he wanted to know what was going
23 on as if somebody was doing something to him. I wanted
24 nothing to do with him.
00062
1  Q.  As if someone was doing something to him.
2  A.  Some sort of threat. I don't know. I can't
3  tell you exactly what kind of a threat he was talking
4  about. I just didn't want him coming to the house
5  anymore at all.
6  Q.  This was ---.
7  A.  To be left alone and I made that clear.
8  Q.  All right.
9       VIDEOGRAPHER: Excuse me, Counsel. Two
10 minutes until change.
11      ATTORNEY CROOKS: Let's go off the record
12 for you to change that.
13      VIDEOGRAPHER: Going off the record at
14 2:08 p.m.
15 OFF VIDEO
16      ---
17 (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)
18      ---
19 ON VIDEO
20      VIDEOGRAPHER:
21      We're back on the record at 2:20 p.m.
22 BY ATTORNEY CROOKS:

23   Q.      We were addressing ourselves to the content of
24  Dr. Christi Cooper-Lehki's report entitled custody
00063
1   evaluation which she submitted to Judge Randal,
2   R-A-N-D-A-L, Minor, M-I-N-O-R.
3           Partly because we took a break and partly
4   because things just tend to work this way, I'll probably
5   jump around just a little bit on some topics. As always,
6   if you're not sure where I am and where I'm looking at
7   just let me know and I'll get you oriented to a document
8   or rephrase my question.
9   A.      Okay.
10  Q.      One of the things we talked about was your
11  contact with wives of men with whom you had sexual
12  relations. We talked about Scott Kirby's wife, her name
13  was Belynda, B-E-L-Y-N-D-A, Belynda Kirby. Do you recall
14  getting in touch with Belynda Kirby at a public PTA
15  meeting and providing her photographs and correspondence
16  demonstrating Scott's affair with you?
17  A.      Yes.
18  Q.      Okay.
19          Why'd you do that?
20  A.      It was the only way I can think of to keep him
21  from coming to the house.
22  Q.      Did it work?
23  A.      Yes.
24  Q.      In fact, Belynda Kirby instituted a divorce
00064
1   case against Scott. Are you aware of that?
2   A.      That could also be due to the fact that he
3   robbed the Ramada Inn in Marion County and tried to get
4   away on a bicycle.
5   Q.      He was the bicycle bandit. I forgot. Was he
6   apprehended in the attempted escape?
7   A.      I don't know.
8   Q.      How'd you know about it?
9   A.      It was on the news.
10  Q.      Was it? How could I miss that? Now there was
11  another wife Michelle Nickelson. And according to Dr.
12  Cooper-Lehki, you provided correspondence and photographs
13  of your affair with her husband as well.
14  A.      I didn't do that.
15  Q.      You didn't do that? Who did?

```
16   A.     I don't know.
17   Q.     When Dr. Cooper-Lehki got in touch with
18   Michelle Nickelson, she was told that included in the
19   correspondence and photographs documenting your affair
20   with her husband that someone had put one of Scott's
21   business cards in the package. Were you aware of that?
22   A.     I wasn't aware of that.
23                  ATTORNEY PHILLIPS: Charles is that ---?
24   Are you in the report? Which report?
00065
1                   ATTORNEY CROOKS: No.
2                   ATTORNEY PHILLIPS: Is this information in
3    the record?
4                   ATTORNEY CROOKS: I don't --- I think it
5    may have been disclosed in court.
6                   ATTORNEY PHILLIPS: Okay.
7    BY ATTORNEY CROOKS:
8    Q.     Now you were sure to tell Dr. Cooper-Lehki and
9    here I am referring to Dr. Cooper-Lehki's report, page
10   four, second paragraph, you were sure to tell Dr. Cooper-
11   Lehki that Scott insisted and forced you and coerced you
12   and groomed you, here I'm just using words from the
13   report of what you told her.
14   A.     Can you point to that please?
15   Q.     Second paragraph, all right. Looks to me like
16   we're working on fourth sentence, I think.
17   A.     Oh, I see that.
18   Q.     She chooses --- now Dr. Cooper-Lehki is
19   referring to you. She chooses to blame Scott Ballock for
20   her sexual acts insisting that he forced her, coerced
21   her, and groomed her to perform sexual acts with other
22   men and with dogs for his pleasure. You see where I read
23   that?
24   A.     I do.
00066
1    Q.     Did I read it accurately?
2    A.     You read what Dr. Cooper-Lehki wrote.
3    Q.     Okay.
4           Now this is in fact what you told her.
5           True?
6    A.     This is not --- these are her words.
7    Q.     I understand that.
8    A.     Okay.
```

18  things. I asked each time.
19  Q.     You asked each time for what?
20  A.     That we would walk in, please bring up
21  something about all of these emails, please bring up
22  something about all of these text messages. They were
23  all being filtered into a box within my email. So I
24  wouldn't have to go through reading them all. I just
00132
1  came to see if anything was about Tommy or Summer.
2         So there were steps that they had taken to try
3  to alleviate the --- the effect it was having.
4  Q.     So let me ask you, when you were meeting with
5  the state police, specifically with Sergeant Kief, he's a
6  lieutenant now but he was Sergeant at the time. You met
7  with him the night before the hearing.
8  A.     That happened to be --- was that the day or the
9  day before that had been called? That was coincidence.
10 Q.     So arresting Scott in front of the family court
11 judge was just mere coincidence.
12 A.     That's not my decision. What was asked was do
13 I know when he works. Work hours. I said something
14 about, you know, home with the children not good because
15 --- otherwise he's here. But I wasn't certain of his
16 hours or anything like that. I said all I know for
17 certain is he will be at family court. We have a hearing
18 tomorrow.
19 Q.     You said --- oh, I'm sorry.
20 A.     No I was just -- that's all. That's all.
21 Q.     Okay.
22 A.     There was no advantage I was trying to gain by
23 this for myself, for any court proceeding. And ---.
24 Q.     You know a representative from the FBI was
00133
1  present.
2  A.     I didn't know that until that day.
3  Q.     So if wasn't you who notified the FBI that
4  Scott was going to be arrested in family court?
5  A.     No.
6  Q.     That would have been somebody at the state
7  police.
8  A.     I guess so.
9  Q.     Now you said earlier in the deposition that you
10 didn't want to cause trouble for Scott's employment with

```
11  the Bureau.
12   A.    No.
13   Q.    You didn't say that?
14   A.    I did say that, yes. I agree. That was ---
15  sorry.
16   Q.    Okay.
17   A.    That's true.
18   Q.    All right.
19   A.    That's true.
20   Q.    So did it occur to you that going so far as to
21  swear out criminal complaints against Scott, having him
22  arrested, charged with harassment could cause him trouble
23  in his employment with the FBI?
24   A.    Yes.
00134
1    Q.    Okay.
2    A.    I did.
3    Q.    Did that not cause you to reconsider and
4   perhaps look for some other resolution to the problem of
5   these emails?
6    A.    I did consider it heavily.
7    Q.    Uh-huh (yes). Tell me about that.
8    A.    I weighed it back and forth in my mind. A
9   letter from my attorney didn't stop what was going on.
10  There were the threats, the constant contact, it wasn't
11  stopping. And the sheer number of emails you're aware
12  of. Yes?
13   Q.    I know how many.
14   A.    Thousands. Within eight months. Are you aware
15  of the number of text messages?
16   Q.    Again, we're here for your deposition today.
17   A.    Okay. Okay. So that was --- I weighed
18  everything in my mind.
19   Q.    When was the first time you talked with --- oh,
20  I'm sorry.
21   A.    Oh, I just didn't --- it could have. That's
22  all that I could decide that it could have.
23   Q.    Yeah.
24   A.    I'm not in --- I'm not in the position to make
00135
1   those decisions.
2    Q.    Uh-huh (yes). The FBI.
3    A.    Uh-huh (yes).
```