## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**                                     Case No.:      1:17-CV-52

      Plaintiff,

v.                                                       JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

      Defendants.

## <u>EXHIBIT NUMBER 2</u>

Ballock dep. at 75, cited in footnote 5.

Ballock dep. at 167 and 299-303, cited in footnote 13.

Ballock dep. at pgs. 278-82 and 286, cited in footnote 16.

Ballock dep. at pgs. 92-97, cited at page 13.

Ballock dep. at pgs. 140-141, cited at page 14.

1

1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF WEST VIRGINIA
2

3
     * * * * * * * * * * * * * * * * * * * * * * * * *
4

5  SCOTT BALLOCK,

6       Plaintiff,

7  v.                      CIVIL ACTION
                           NO.: 1:17-CV-52
8  ELLEN RUTH COSTLOW,
    STATE TROOPER MICHAEL KIEF,
9  STATE TROOPER RONNIE M.
    GASKINS, AND STATE TROOPER
10  CHRIS BERRY,

11      Defendants.

12
     * * * * * * * * * * * * * * * * * * * * * * * * *
13

14       The videotaped deposition of SCOTT T. BALLOCK
    taken at the insistence of the Defendant herein,
15  pursuant to Notice as to time and place and pursuant to
    the statutes of the West Virginia Rules of Civil
16  Procedure, before Donna Watkins Pizzino, Court Reporter
    and Notary Public, at the offices of Steptoe & Johnson
17  PLLC, 1085 Van Voorhis Road, Morgantown, West Virginia,
    on the 19th day of April, 2019, commencing at the hour
18  of 9:00 a.m.

19

20

21

22          Sapphire Court Reporting LLC
         DONNA WATKINS PIZZINO, COURT REPORTER
23        204 Oak Drive - Clarksburg, WV 26301
                      304.476.7553
24              www.SapphireCR.com

25

2

1                 APPEARANCES

2

3     APPEARING FOR THE PLAINTIFF:

4          Charles J. Crooks, Esquire
         Crooks Law Firm PLLC
5          244 Pleasant Street
         Morgantown, West Virginia 26505
6

7
      APPEARING FOR THE DEFENDANTS:
8
           Mark G. Jeffries, Esquire
9          Steptoe & Johnson PLLC
           400 White Oaks Boulevard
10          Bridgeport, West Virginia 26330

11          Monte L. Williams, Esquire
         Steptoe & Johnson PLLC
12          Post Office Box 1616

|    |    |
|----|----|
|    | Morgantown, West Virginia 26507 |
| 13 |    |
|    | P. Todd Phillips, Esquire |
| 14 | Lyons Phillips Legal Group PLLC |
|    | 141 Walnut Street |
| 15 | Morgantown, West Virginia 26505 |
| 16 |    |
| 17 | ALSO PRESENT: |
| 18 | State Trooper Ronnie M. Gaskins |
|    | State Trooper Michael Kief |
| 19 | State Trooper Chris Berry |
| 20 |    |
| 21 |    |
| 22 |    |
| 23 |    |
| 24 |    |
| 25 |    |

3

1          EXAMINATION INDEX

2

3  Direct Examination by Mr. Jeffries        8

4  Cross-Examination by Mr. Phillips        230

5  Cross-Examination by Mr. Crooks          259

18  halfway through the paragraph, again, you're pleading

19  with her to reconcile and you state, "We can implode our

20  lives." And then in parentheses, "My attorney doesn't

21  pull punches. And after I shared with her what I need

22  to disclose now to defend myself against your claims she

23  said there is a very real risk we may both lose the

24  children."

25        What did you share with your attorney that made

75

1  her fear you could lose custody of your children?

2    A.  Ellen's sexual behaviors.

3    Q.  How could that cause you to lose custody? You

4  said that you may both lose custody?

5    A.  Because I didn't go to CPS. I didn't think

6  that Ellen's sexual behaviors with other men was a

7  threat to the children.

8        (Deposition Exhibit No. 27 was marked for

9        identification.)

10   Q.  Mr. Ballock, I've handed you Exhibit 27.

11   Again, this came from the state police file so your name

12   has been expunged, but I believe you've seen this letter

13   before, haven't you?

14       A.   Yes.

15       Q.   Did you receive this letter -- just for the

16   record let me put it in context for the record.  This

17   Exhibit 27 is a letter dated May 3rd, 2013, from Ellen's

18   divorce attorney Matthew Stout to you directing you to

19   send all inquiries or communications not directly

20   necessary for the care of the children through the

21   attorney's office.  Did you receive this letter from

22   Mr. Stout?

23       A.   I did not, the same way I did not receive the

24   letter sent to me from Judge Aloi's office.  I didn't

25   receive this.  I wish I had.


76

1       Q.   Which letter from Judge Aloi's office?

2       A.   I don't know what it was, but he mentioned in

3   his ruling, I believe, that something he sent to me came

4   returned as undeliverable.

23    A.   Say it again.

24    Q.   You understood that this dismissal agreement,

25  Exhibit 30 that we discussed earlier today, was designed


167

1  -- was intended to preclude a malicious prosecution

2  count against the troopers?

3    A.   Yes.  I understood that was Marcia's reason for

4  including it.

5    Q.   So why are there malicious prosecution counts

6  under both state law and 42 U.S.C. Section 1983 and the

7  complaint in this matter?

8    A.   Because, although that was her intent, I still

9  believe that they violated that law.  If the judge

10  disagrees with me, so be it.

11    Q.   In Paragraph 225 of your complaint --

12    A.   Yes.

13    Q.   -- you allege shortly -- and you've alluded to

14  this earlier today, but this is your chance to talk

15  about it.

16    A.  Yeah.

17    Q.  "Shortly after attempting to serve the state

18  police defendants a uniformed representative with the

19  state police appeared at the Clarksburg Resident Agency

20  of the FBI to lodge a complaint with the Senior Resident

21  Agent about your filing of the civil action."  I'd like

22  to discuss that for a little bit.  How did you attempt

23  -- it says after attempting to serve my clients.  How

24  did you attempt to serve the troopers?

25    A.   I went to the Morgantown detachment, asked for


168

1  them.

2    Q.  Attempted to serve them personally?

3    A.  Yes.  I didn't know what the rules were for

4  service.

5    Q.  When you filed the original complaint pro se,

6  you received a copy of the notice of general guidelines

7  for proceeding pro se?

8    A.  Uh-huh.

9    Q.  Did you read them?

25  -- there's no agreement.  It was a motion.


299

1    Q.   What you initialed and signed is listed as

2  Attachment to Motion to Dismiss with Prejudice.

3    A.   Yes.

4    Q.   The words dismissal agreement, I couldn't find

5  those used anywhere in this attachment to the motion.

6          MR. JEFFRIES:  Look in your response to

7  our motion to dismiss.

8          MR. CROOKS:  I'm looking at the exhibit.

9  I'm looking at the exhibit, not your characterization in

10  this case.

11    Q.   So let me ask you some questions that pertain

12  to this motion that was submitted to Magistrate Mullins

13  and entered.  So was it your understanding that unless

14  you initialled and signed off on this attachment to the

15  motion that the prosecutor wasn't going to agree to

16  dismiss the charges against you?

17    A.   That's right.  She didn't need to put that in

18  there.  She didn't need to put any of that in there.

19  She could have just dismissed the case.  But she told

20  Benninger she was trying to protect her boys and she

21  insisted on that.

22      Q.   Okay.  Did you have any -- we already waived

23  attorney/client privilege with respect to this -- the

24  entry of this motion and the attachment to it.  Did you

25  talk with your lawyer, Mike Benninger, as to whether the

300

1  prosecutor was overreaching trying to get this included

2  in the motion?

3      A.   Yeah.  We thought it was ridiculous.  We

4  thought that she should have just dismissed the case.

5      Q.   In answering questions put to you by Mark

6  Jeffries today, you listed off some reasons why you

7  signed it nonetheless.  And one of them was your

8  anticipation that there was going to be an expungement?

9      A.   Yes.

10      Q.   My notes indicate that, number 1, your lawyer

11  said, look, you may as well sign this, it's the only way

12  we're going to get it dismissed?

13     A.   That's right.

14     Q.   Two, you were worried about your children?

15     A.   Yes.

16     Q.   Custody.  Three, the prosecutor agreed to

17  expunge the record?

18     A.   Yes.

19     Q.   And four, the prosecutor didn't want her boys

20  to face a civil suit?

21     A.   Correct.

22     Q.   Now, expungement, what did that mean to you at

23  that point?  What did you understand that was going to

24  mean?

25     A.   I was told that expungement meant that it never

301

1  happened, nothing ever happened, and that all the

2  records would be deleted, gotten rid of, and if somebody

3  ever contacted the court or state police and asked about

4  it they would say we have no records about it.

5    Q.  Okay.

6    A.  In essence, it meant that nothing -- that it

7  never happened.

8    Q.  All right.  Would that have included the motion

9  to dismiss as well as the attachment to it?

10    A.  All of it.  Nothing happened.

11    Q.  So, you know, why not go ahead and sign off if

12  it's going to be expunged anyway, is that what you meant

13  when you included expungement in your answer earlier?

14    A.  Exactly.  Benninger said Marcia already agreed

15  to the expungement.  It's going to happen.  We've got to

16  wait 60 days, I think it was, and then we'll get rid of

17  it.  And then it will be like nothing ever happened.

18    Q.  When the motion was presented was there a

19  hearing?

20    A.  The expungement?

21    Q.  No.  I'm sorry.  I wasn't explicit in my

22  question.  The motion to dismiss, which is Deposition

23  Exhibit 30 and the attachment to it --

24    A.  Yes.

25    Q.  -- when it was presented, was there a hearing?

302

1    A.  Yes.

2    Q.  Okay.  Was that in front of Magistrate Mullins?

3    A.  Yes.

4    Q.  Were there ever any pleas entered that day?

5    A.  No.  It was not a plea.  It was not a pleading.

6    Q.  Okay.  Were you put under oath and asked any

7  questions that day?

8    A.  No.

9    Q.  Did you --

10    A.  I didn't say one word that day.

11    Q.  That was going to be my follow-up question.

12  Did you have anything to say?

13    A.  I said not one word.

14    Q.  Was there any discussion between Magistrate

15  Mullins and the lawyers, Mike Benninger and -- who was

16  it for the prosecution that day?

17    A.  Marcia Ashdown.

18    Q.  So the prosecuting attorney came to magistrate

19  court on this agreed motion; is that what happened?

20    A.  That's right.

21    Q.  I see.  Was there any discussion in open court

22  with respect to the terms that were contained in this

23  attachment that was initialed by you, your lawyer,

24  Marcia, and Ellen?

25    A.  Certainly the acknowledgment of them.  I don't

303

1  remember if he read them off verbatim.  I just don't

2  remember.  But, yeah, it was an integral part of the

3  hearing.  Maybe Marcia read it.  Maybe Benninger read

4  it.  I don't remember.

5    Q.  So how long did that hearing take?

6    A.  It was relatively short, maybe 20 minutes.

7    Q.  Okay.  Did the paperwork for the expungement go

8  through as you anticipated based on what your lawyer

9  told you was likely to happen?

10    A.  Yes.  Without a hitch, it was expunged.

11    Q.  Okay.  Was the FBI advised that expungement had

12  occurred?

13    A.  Yes.

14    Q.   Did you develop a file on each man Ellen met on

15 Craigslist?

16    A.   No.

17    Q.   There was some mention of Ellen's father dying.

18 I guess that was -- let's see.  That was part of

19 Deposition Exhibit 33, which was the undated report

20 prepared by Gaskins.

21    A.   Correct.

22    Q.   Page 4 of that report mentioned Ellen's father

23 passing away.

24    A.   Correct.

25    Q.   I thought I heard you say the man was still

304

1 alive?

2    A.   Yes.  I still get invited to Thanksgiving and

3 Ellen doesn't.

4    Q.   What's the context of that?  Why is that even

5 in the report?  What was Ellen saying about her father

6 dying?

11    A.  Yeah.

12    Q.  It's been a long day.

13    A.  I moved out of the house on September 14th and

14  Kenny moved in.

15    Q.  Okay.  All right.  So we're clear then, Kenny

16  came to you and shared all this information after you

17  had moved out and he moved in?

18    A.  Came out of the blue.  I had -- I was shocked.

19  I got a text message from Kenny Ice.

20    Q.  Okay.  Did you ask him for that iPhone he gave

21  you?

22    A.  He -- when he was telling me all of his

23  stories, he would say and I took pictures of it or I

24  would audio-record her screaming and yelling, I've got

25  text messages.  And he volunteered.  He said if you can

278

1  get that off of there, you can borrow my phone.

2    Q.  Okay.

3    A.  So he volunteered.

4    Q.   What did you do in that direction?

5    A.   I accepted his offer, and I found a company out

6 of Chicago called Forensicon that, for $1,500, extracted

7 videos, pictures, text messages, email messages.  They

8 said they did their best to extract -- recover deleted

9 items as well.

10    Q.   Is that all the material that was turned over

11 to --

12    A.   Yeah.

13    Q.   -- Mark so he could put it on that file-sharing

14 site?

15    A.   Yes.

16    Q.   Is there any of that stuff that was held back?

17    A.   No.

18    Q.   All the texts and emails that Mark reviewed

19 with you during his examination, Deposition Exhibit 2

20 through -- well, the biggest part of 50 deposition

21 exhibits --

22    A.   Yeah.

23    Q.   Where were you emotionally in your

24 relationship, emotionally with Ellen at the point when

25 you were writing these texts and emails?  How did you

279

1  feel about this relationship?  Did you want it over?

2  Did you want to save it?  Did you blow hot and cold?

3     A.  I blew hot and cold.

4     Q.  All right.  Did Ellen have any hand in your

5  change of mind from time to time on that topic?

6     A.  Yes, because she would give me hope that it

7  might work out.

8     Q.  In the time that you have known Ellen, going

9  all the way back to when you first met in college, would

10  it be fair to say she can be a seductive person when she

11  wants to be?

12     A.  She is -- yes.  She has feminine wiles.

13     Q.  Okay.  You're being polite and civilized I

14  think.  Why don't you be a little more explicit in what

15  you're saying?  What do you mean?

16     A.  She's very attractive.  She's very well-spoken

17  and educated.  She's very manipulative and she uses her

18  looks and her sex -- sexuality to get what she wants out

19 of people.

20    Q.  Has she ever used those influences on you?

21    A.  Sure.

22    Q.  Would it be true to say that she used those

23 capacities on you during the time that these emails and

24 texts that were the subject of the charges for stalking

25 and harassment took place?

280

1    A.  The main reason I tried to hold it together --

2 I didn't want to see my kids subjected to her crazy, to

3 the violence.  And I didn't want to see my kids --

4 there's so many things that happened, and it was just --

5 it was occurring with such regularity, fights at the

6 home between her and Kenny, her not taking :            · to

7 school.

8        The reality is that, even if it meant going

9 back to a -- to a distant relationship where we still

10 lived separate lives, essentially, I wanted that.  I

11 wanted to be able to be there for the kids to protect

12 them and to raise them.  I didn't want to see them every

13  other weekend and only on Wednesdays.

14    Q.  The divorce is final now, isn't it?

15    A.  Yes.

16    Q.  Were you awarded custody of your children?

17    A.  I have full custody of the children.

18    Q.  Did that come as any surprise to you when it

19  happened that way?

20    A.  No.  I warned her that that was going to

21  happen.  I knew that -- I knew in my heart that the

22  psychiatrist was going to get to the bottom of things.

23    Q.  Was the psychiatrist Dr. Christi Cooper-Lehki

24  -- was her involvement in the case the turning point in

25  your anticipation for how the child custody matter was

281

1  going to get resolved?  Is that where you began to have

2  some hope that you would prevail on that issue?

3    A.  Yes, because instead of Ellen getting to turn

4  on the waterworks and be a cute little girl in front of

5  the judge and share her false narrative, I knew that

6  somebody was going to actually look into things.

7    Q.  And yet -- well, I caught myself about to

8  misstate something.

9        By the time Dr. Cooper-Lehki became involved

10  had all these texts and emails happened yet, the ones

11  that you --

12    A.  Oh, the vast majority of them, yes.  The texts

13  and emails declined significantly right before -- right

14  before the September 13th.  They were voluminous before

15  then.  And, yes, she said that she reviewed every text,

16  every email, every recorded conversation that Ellen

17  provided her because, unbeknownst to me, Ellen was

18  recording some of our conversations.

19    Q.  You mean some of your telephone conversations?

20    A.  Yes.

21    Q.  Okay.  How did you come to find out about her

22  recording it?

23    A.  Through Cooper-Lehki.

24    Q.  Dr. Cooper-Lehki got involved when, Scott?

25    A.  Spring of -- early spring of 2013.

282

1    Q.   Okay.  In all these emails and texts between

2  you and Ellen that were reviewed today, would it be fair

3  to say that they all predated the appointment of

4  Dr. Cooper-Lehki to look into this?

5    A.   No.  No.

6    Q.   No?

7    A.   Most of them, the vast majority of them.

8    Q.   Okay.  Well, I think I may follow your -- take

9  your meaning there.  Deposition Exhibit Number 23

10  appears to be some texting that happened in September of

11  2013.  That would have been well after Dr. Cooper-Lehki

12  was involved; true?

13    A.   Yeah.  That was after my arrest.  September?

14    Q.   I'm just looking at the date on -- let's see.

15  My apologies.  This is a text messages in Deposition

16  Exhibit Number 23 between Ellen and Ronnie M. Gaskins at

17  his state police account.

18    A.   Yeah.  No.  I stopped all communication with

19  Ellen after September 13th.  But one week later, there

20  was an event at my children's private school at which

21  Ellen came up to me and grabbed my hand and walked me

22  around to show me the artwork of the kids and gave my

23  mom a hug and a big kiss and told her I love you.

24        So a week after I was arrested and she feigned

25  surprise about the arrest.  She was like, I had no idea


283

1  they were going to do that, I am so sorry that happened

2  to you, I want you to know I had nothing to do with

3  that.

4    Q.  Okay.  Did you take her as truthful?

5    A.  No.

6    Q.  You knew she was lying?

7    A.  Of course.

8    Q.  Kimberley Compliment.

9    A.  Yes.

10   Q.  Her name came up today.

11   A.  Yes.

12   Q.  Am I right in understanding she was a

13  colleague?

14   A.  No.  She was just a friend of ours in

23  happens?

24     A.   Yeah.

25     Q.   So she wanted to be separate and apart for a

286

1  year and then consider whether to go ahead with the

2  divorce or to reconcile; is that a fair characterization

3  of where things stood?

4     A.   At least on one occasion she expressed that.

5     Q.   Okay.  I mean, have you got her in writing

6  somewhere on that because these folks want to see

7  everything in writing?

8     A.   I know, and I don't.  I don't.

9     Q.   Okay.

10     A.   And that was face to face.

11     Q.   Okay.  Were you willing to act on that request?

12     A.   It excited me.

13     Q.   Why do you use the word excited?

14     A.   It gave me hope.

15     Q.   Okay.  Were you still anxious and worried that

16  you could lose custody of your children to Ellen at that

17  point?

18     A.   Yes.

19     Q.   Was that your motivation for seeking

20  reconciliation?

21     A.   My primary motive, yes.

22     Q.   The arrest that happened, I guess it was Friday

23  the 13th --

24     A.   Uh-huh.

25     Q.   -- 2013, in September.  Were you aware that

287

1  this was going to happen, that you were going to be

2  arrested?

3     A.   No.

4     Q.   It sounds like the FBI was aware.

5     A.   Yes.

6     Q.   It sounds like there was an FBI agent present

7  to, I guess, just observe what happened?

8     A.   Yes.

9     Q.   Did you know that this person was an FBI agent

15    Q.  Anything else?

16    A.  I would have to refresh my memory by looking at

17 it.

18    Q.  That's all you can recall right now off the top

19 of your head?

20    A.  Correct.

21    Q.  Why do you think that Corporal Gaskins and

22 Sergeant Kief knew that this information was false?

23    A.  Because I believe that for some reason they had

24 a personal vested interest in assisting Ellen.

25    Q.  Why do you believe that?


92

1    A.  Because of email correspondence between Kief

2 and Ellen and because of some circumstantial evidence

3 against Berry and because Kenny Ice told me that --

4 Kenny Ice, Jr., told me that Berry was having a sexual

5 relationship with Ellen.

6    Q.  I'll go to the allegations about Trooper Berry

7 and Kenny Ice later, but what email or emails between

8 Sergeant Kief or now Lieutenant Kief and Ellen led you

9 to believe that the troopers had a vested interest in

10 assisting her?

11     A.  For one, before my misdemeanor trial, I

12 approached the family court and asked for the unsealing

13 of Christi Cooper-Lehki's report and testimony for use

14 in my defense.  Gabrielle Mucciola, I believe her name

15 is, assistant prosecutor showed up and represented Ellen

16 at that hearing and argued against its release.

17       The judge ultimately decided that he wasn't

18 going to release it based upon her comments and because

19 he thought it would be too embarrassing to Ellen.  In

20 emails between Kief and Ellen, Kief writes Ellen

21 something to the effect of -- 'cause Ellen, obviously,

22 had shared with him this information.  And Kief writes

23 to Ellen, "Wow.  That's fantastic.  That's great.  I bet

24 Scott was humiliated and walked out of the courtroom

25 with his tail between his legs."  So Kief, who is

93

1 supposed to be an unbiased law enforcement officer who

2  represents citizens as a whole, not just one person, was

3  taking sides with the complainant and very

4  unprofessionally and improperly communicating with her

5  on his official government account about how happy he

6  was that I was humiliated and how happy he was that

7  potentially exculpatory evidence was going to be kept

8  out of my case.

9     Q.  Just so I'm clear.  In the email from Kief to

10  Ellen he was describing the hearing where Gabe Mucciola

11  argues against releasing the Cooper-Lehki report?

12     A.  Yeah.  That was what he was referring to, I bet

13  Scott walked out of that courtroom with his tail between

14  his legs.  That's great news.  I bet he was humiliated.

15     Q.  That was Ellen saying those --

16     A.  No.  That was your Sergeant Kief saying those

17  statements, a law enforcement officer saying those

18  statements.

19     Q.  But you testified earlier --

20     A.  So he wasn't just -- so he wasn't just

21  concerned about the law or justice prevailing.  He was

22  concerned and happy that someone was being humiliated

23  and that someone would not be able to use exculpatory

24  information to their benefit.

25      Q.  Where did you get that email?  Was that

94

1  produced in discovery?

2      A.  From you.  From you.  You surely read it.

3      Q.  Anything else that you -- leads you to believe

4  that the troopers had a vested interest in assisting

5  Ellen?

6      A.  Yes.  Well, at the dismissal at which Sergeant

7  Kief at the time was there, Judge Mullins said that

8  Ellen shall not provide any disparaging information to

9  my employer.  That was a condition.  Ellen shall not

10  provide any disparaging information to my employer.

11  That was also a condition of divorce court.

12         Judge Minor said you shall not have any contact

13  with Scott's employer.  Any contact.  So now, two

14  different judges have told Ellen you shall not interfere

15  with Scott's employment.

16         One week after that dismissal at which Sergeant

17  Kief attended and I have reason to believe probably

18  helped craft that wording, Sergeant Kief contacted Ellen

19  and invited her -- the FBI at the time was going to

20  investigate me due to the internal administrative

21  inquiry.  And Sergeant Kief knew that Ellen wasn't

22  allowed to talk to the FBI.  He knew it.  He was there.

23  He heard the judge's instructions.  He's a law

24  enforcement officer.  And he wrote -- he contacted Ellen

25  and said the FBI is coming to talk to me, hey, let's get

95

1  around that, you tell me what you want me to tell the

2  FBI.

3          Ostensibly, the investigation -- the FBI's

4  investigation -- that was a week later.  Ostensibly, the

5  FBI's investigation was to have been about these emails.

6  That's it.  But Sergeant Kief told Ellen let's broaden

7  the scope, let me know if you know any way that he has

8  abused his power.

9          So Sergeant Kief is messing with my job.  He

10  wants me fired.  He doesn't want to administer justice.

11  He doesn't want to just do what's right.  He doesn't

12  want to be a neutral and impartial law enforcement

13  officer.  He wants to screw me, and I don't know why.

14      Q.   I'd like to break down what you just said a

15  little bit.  You said that you have reason to believe

16  that Sergeant Kief helped craft the language in the

17  dismissal agreement that your wife shall not provide

18  disparaging information to your employer; is that

19  correct?

20      A.   I wouldn't be surprised if he did.  He was part

21  of that is my understanding.  But he was -- in any

22  event, he was at the hearing where that was agreed upon.

23  He was sitting with Ellen.

24      Q.   All right.  You testified you have reason to

25  believe that he helped craft it.  Why do you have reason

96

1  to believe that?

2      A.   My attorney.

3      Q.   What did your attorney tell you?

4    A.   That he worked with the prosecutor's office who

5  was working with the state police in crafting that

6  agreement.

7    Q.   And your attorney being Mike Benninger?

8    A.   Yeah.  My attorney was Mike Benninger.

9    Q.   So Mike told you that Sergeant Kief worked with

10  the prosecuting attorney to craft this language?

11    A.   Yes.

12    Q.   Okay.

13    A.   He somehow had very close relations with the

14  prosecutor's office.  And he shared with me things that

15  were going on.  He said that --

16    Q.   Let me interrupt just for a second.

17    A.   I'm finishing that question.

18    Q.   I'm not clear.  You said he had close relations

19  with the prosecutor's office --

20    A.   Yes.

21    Q.   You're talking --

22    A.   Benninger.  I'm sorry.  Benninger.

23    Q.   Okay.  Go ahead and finish.

24    A.   So he knew a lot that was going on.  So,

25  another reason that I believe he -- that I believe he

97

1  was being unprofessional is, again, this dismissal

2  agreement.  One of the conditions is that I was supposed

3  to encourage my father to take down his website.

4        The email correspondence between Kief and Ellen

5  which you provided me during discovery shows that Kief

6  was actively trying to arrest me for violating that

7  agreement.  He -- Ellen was encouraging him to.  She was

8  asking him where he was in his investigation.  She was

9  giving him investigative advice.  She was asking him if

10  he was keeping records, things of that nature.  So he

11  clearly knew about the conditions because he was trying

12  to bust me for one of them, but he was helping Ellen

13  violate it.

14        Mike Benninger also told me -- he called me one

15  day and he said, hey, make sure -- I know you -- I know

16  you have nothing to do with your father's website, but

17  you better make sure you don't because Kief is upset

18  that he didn't get you.  He's coming after you.  West

19  Virginia State Police have employed a forensic --

20  computer forensics expert.  They are going -- the are

21  going gangbuster for you.  He wants to get you.  And I

22  was unfazed and unconcerned because I had no connection

23  to my father's website.

24       Mike Kief -- and I've never heard of this in

25  law enforcement.  Mike Kief reached out to someone at a

98

1  school board and someone -- a school principal on

2  Ellen's behalf to be a character reference for her.  I

3  have never heard of a law enforcement officer doing that

4  for a complainant.  It's highly unprofessional and

5  smacks me of improper relationship between Kief and

6  Ellen.

7       Chris Berry was allegedly having a sexual

8  relationship with Ellen.  I wouldn't be surprised if

9  Mike Kief was having a sexual relationship with Ellen or

10  had.  I don't know why he was taking sides in an

11  investigation.

25     Q.   Do you know if it was provided to anyone

                                    140

1   outside of the criminal proceedings?

2     A.   I don't know.  But I wouldn't be surprised if

3   Christi Cooper-Lehki received it as part of her

4   investigation.  I don't know.

5     Q.   Between the time that you were arrested in

6   September 2013 and the time that the charges against you

7   were dismissed in April 2016, you didn't have any

8   contact with Sergeant Kief, did you?

9     A.   No.

10     Q.   During that same timeframe, did you have any

11   contact with Sergeant Gaskins?

12     A.   No.

13     Q.   During that same timeframe between your arrest

14   and the dismissal of the charges, did you have any

15   contact with Trooper Berry?

16     A.   No.

17     Q.   Did any of the troopers, my clients, ever offer

18   to drop the criminal charges against you?

19     A.   Your clients?

20    Q.   Yes.

21    A.   No.

22    Q.   Did Ellen ever offer to drop the charges

23  against you?

24    A.   Through the assistant prosecutor.

25    Q.   Which assistant prosecutor?


141

1     A.   Cindy Scott.  Cindy Scott, at my initial

2  hearing, before it began, Benninger and Scott approached

3  the bench and Benninger explained to the judge what this

4  was all about in reality and it belonged in family

5  court.  Cindy Scott held up a West Virginia statute book

6  and said these are all the ways you can arrest someone

7  in West Virginia, if you want to find a way to arrest

8  someone, you can.  The West Virginia State Police dumped

9  this in my lap.  The judge looked at her and said and

10  now you're dumping it in my lap.  And she shrugged.

11        My attorney told me that Cindy Scott did not

12  want to pursue these charges against me but that Ellen

13  was threatening her that if she didn't she would make a

14  big stink about it.  He said -- and this was before she

15  announced.  He said that Cindy Scott was going to run to

16  be a judge, and she didn't want the victim of a domestic

17  to be able to say that she didn't take care of her.  So

18  she was threatening Cindy Scott.

19        And, in fact, Cindy Scott believed that Ellen

20  once surreptitiously recorded a conversation with her.

21  So, again, Cindy Scott didn't want to prosecute me

22  according to Mike Benninger.  But she said Ellen is

23  forcing me to.

24        And Cindy Scott, though, worked with Ellen and

25  offered to dismiss the case if -- on the condition that

142

1  my father remove a website that he had created which had

2  Ellen on it.  Benninger --

3     Q.  Which one?

4     A.  I don't know what it is.  Benninger called my

5  dad into his office and me, told us of Cindy Scott's

6  proposal.  And my dad refused, so Benninger threw him

7  out of the office.

8      Q.   You don't know the name of the website that

9  Cindy Scott wanted removed?

10     A.   No.

11     Q.   So Ellen continued to prosecute the case until

12  it was eventually dismissed?

13     A.   Yes.

14     Q.   Was Trooper Berry involved in your criminal

15  prosecution at all?

16     A.   I don't know.

17     Q.   Did he ever appear at any of the hearings

18  related to the criminal charges?

19     A.   Not that I'm aware.

20     Q.   How did my clients, Lieutenant Kief, Sergeant

21  Gaskins, and Trooper Berry, how did they abuse the

22  criminal process?

23     A.   By working with Ellen to have me arrested at

24  family court to advantage her and disadvantage me.

25     Q.   And --

143

1    A.   By forming an inappropriately close

2   relationship with a complainant, by violating and

3   inviting someone else, Ellen, to violate a judge's

4   order, and by giving her suggestions as to how to

5   violate it, by --

6    Q.   Let me pause you there.  When you're talking

7   about violation of the order, that's what you testified

8   to earlier about talking to the FBI?

9    A.   Uh-huh.

10    Q.   And that was after the charges had been

11   dismissed; correct?

12    A.   Correct.  But he's still a part of the criminal

13   justice system and he's abusing his position to try and

14   get me fired, clearly, because it was more to him.

15    Q.   Any other ways that they abused the criminal

16   process?

17    A.   By not following their policy manual in

18   conducting the investigation.

19    Q.   In Paragraph 183 of the current complaint you

20   allege that the state police defendants continued their

21   efforts even after it was apparent the plaintiff was