UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SCOTT T. BALLOCK**                                Case No.:   1:17-CV-52

    Plaintiff,

v.                                                  JURY TRIAL REQUESTED

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**STATE TROOPER RONNIE M. GASKINS,**
and
**STATE TROOPER CHRIS BERRY,**

    Defendants.

## EXHIBIT NUMBER 3

Sgt. Kief dep. at 103, cited in footnote 7.

Sgt. Kief dep. at 76, cited at p. 4.

Sgt. Kief dep. at pgs. 68-73, cited in footnote 9.

Sgt. Kief dep. at pgs. 155-162, cited in footnote 12.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

OF WEST VIRGINIA

* * * * * * * *

| | | |
|---|---|---|
| SCOTT T. BALLOCK, | * | |
| Plaintiff | * | Case No. |
| vs. | * | 1:17-CV-52 |
| ELLEN RUTH COSTLOW, | * | |
| STATE TROOPER MICHAEL | * | |
| KIEF, STATE TROOPER | * | |
| RONNIE M. GASKINS, | * | |
| STATE TROOPER CHRIS | * | |
| BERRY, | * | |
| Defendants | * | |

* * * * * * * *

DEPOSITION OF

MICHAEL KIEF

May 28, 2019

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

Page 2

```
 1                    DEPOSITION
 2                        OF
 3    MICHAEL KIEF, taken on behalf of the Plaintiff herein,
 4    pursuant to the Rules of Civil Procedure, taken before
 5    me, the undersigned, Guy Starrett, a Court Reporter and
 6    Notary Public in and for the State of West Virginia, at
 7    the offices of Steptoe and Johnson, PLLC, 1085 Van
 8    Voorhis Road, Suite 400, Morgantown, West Virginia, on
 9    Tuesday, May 28, 2019 beginning at 1:11 p.m.
```

Page 4

```
 1                         I N D E X
 2
 3    WITNESS: MICHAEL KIEF
 4    EXAMINATION
 5       By Attorney Crooks                         7 - 248
 6       By Attorney Phillips                     248 - 263
 7       By Attorney Jeffries                     264 - 267
 8    DISCUSSION AMONG PARTIES                          267
 9    CERTIFICATE                                       268
```

Page 3

```
 1                    A P P E A R A N C E S
 2
 3    CHARLES J. CROOKS, ESQUIRE
 4    Crooks Law Firm PLLC
 5    244 Pleasant Street
 6    Morgantown, WV 26505
 7        COUNSEL FOR PLAINTIFF
 8
 9    MARK JEFFRIES, ESQUIRE
10    Steptoe and Johnson, PLLC
11    400 White Oaks Boulevard
12    Bridgeport, WV 26330
13        COUNSEL FOR DEFENDANTS STATE TROOPER MICHAEL KIEF/
14        STATE TROOPER RONNIE M. GASKINS/STATE TROOPER CHRIS
15        BERRY
16
17    P. TODD PHILLIPS, ESQUIRE
18    Lyons Phillips Legal Group, PLLC
19    141 Walnut Street
20    Morgantown, WV 26505
21        COUNSEL FOR DEFENDANT ELLEN RUTH COSTLOW
```

Page 5

```
 1                       EXHIBIT PAGE
 2
 3    PAGE
 4    NUMBER      DESCRIPTION IDENTIFIED
 5    Exhibit 1   Policies and Procedures            79
 6    Exhibit 2   Call Summary Report                79
 7    Exhibit 3   8/22/13 Email                      98
 8    Exhibit 4   Memo from Captain
 9                Merrill                            98
10    Exhibit 5   Complaint Report                  137
11    Exhibit 6   Domestic Violence Report          169
12    Exhibit 7   FBI Documents                     190
13    Exhibit 8   Warrant for Arrest
14                - Harassment                      205
15    Exhibit 9   Warrant for Arrest
16                - Unwanted Communication          205
17    Exhibit 10  Motion to Dismiss
18                Charges                           213
19    Exhibit 11  Investigation Report              235
```

Page 6

OBJECTION PAGE

| ATTORNEY | PAGE |
|---|---|
| Jeffries | 17, 74, 94, 104, 130, 144, 148, 152, 186, 192, 208, 212, 230 |
| Phillips | 230 |

Page 7

STIPULATION

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing, sealing, certification and filing are not waived.)

PROCEEDINGS

MICHAEL KIEF,
CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

EXAMINATION

BY ATTORNEY CROOKS:
Q. Okay.
Let's start real easy. Full name and date of birth.
A. Lieutenant Michael Kief.
Q. Okay.
A. Date of birth is 11/25/1968.
Q. What's your middle name?
A. Andrew.

Page 8

Q. You wouldn't happen to be Junior or ---
A. No, sir.
Q. --- Michael Andrew Keith, III or anything of that sort?
A. No, sir.
Q. Okay.
A. There's about five of us, but no juniors or seniors.
Q. Okay.
Where were you born and raised?
A. Martinsburg.
Q. Martinsburg.
How long's it been since you lived in Berkeley County?
A. Nineteen (19) --- well, I went to college in '87, so back for summer. So probably '91, '92 somewhere.
Q. The college, where was that?
A. Fairmont State.
Q. Fairmont State.
A. And Marshall University.
Q. Did you graduate any programs at Fairmont?
A. Board of Regents. That was a four year.
Q. What degree did you obtain at Marshall?
A. Police Science.

Page 9

Q. Police science.
A. Two-year degree.
Q. Okay.
Police science --- well, let me back up to the program at Fairmont State. Sounds like that Board of Regents program was a --- a liberal arts education?
A. What happened was I --- my major was architectural engineering.
Q. Okay.
A. And then I went to the academy. Out of the academy, I was stationed over in Romney. So I still had a couple hours to finish for my degree. So I went back, and --- and just finished under the Board of Regents Degree.
Q. Okay.
A. Because they changed the catalogue. If you're out for two years, you can't go back in under the same major. You have to take different classes.
Q. Yeah.
Okay.
I appreciate that. And I'm sure I'll understand this in its sequence here in just a couple minutes. What year did you attend the police academy?
A. 1994. September of '94 to April of 1995.

Page 102

1  on the telephone?
2  A. Yes, sir.
3  Q. Okay.
4  Tell me what you remember.
5  A. I --- I just called him and explained the
6  merits of what was going on with the whole thing. And he
7  said, well, email --- put it in writing. Give me ---
8  give me an email about what --- opening an investigation.
9  Q. Okay.
10  Now, the reason you did this email to Captain
11  Merrill was because Ellen Costlow had come to see you,
12  and she offered to give you a collection of emails from
13  her attorney, Matt Stout?
14  A. Correct.
15  Q. Did you have those emails, and did you review
16  them before you asked for permission from Captain
17  Merrill?
18  A. No, sir.
19  Q. Okay.
20  So you were simply seeking permission to take
21  advantage of the offer that Ellen Costlow had made to you
22  that she would provide this evidence?
23  A. Correct.
24  Q. Okay.

Page 103

1  And can you tell me if you had any conversation
2  with Captain Merrill to the effect that there has been
3  some allegations made that there was a sexual
4  relationship between the Complainant, Ellen Costlow, and
5  one of your troopers, Chris Berry?
6  A. I can't remember that, sir.
7  Q. Don't you think that's the sort of thing you
8  --- would be on your mind as you were talking to your
9  captain?
10  A. Again, I can't remember the --- the specifics
11  of the conversation. I don't know if I gave that to him
12  or not. I don't know.
13  Q. Did your captain ask you, look, why do you ---
14  why do you want to get involved in investigating a case
15  that's in front of the family court judge? Why don't you
16  just send her to the family court judge?
17  A. Because we were investigating a criminal
18  complaint, not a civil complaint.
19  Q. You understand that the family court judge
20  would have authority to order restrictions on
21  communication between parties who are divorced?
22  A. Yeah.
23  Q. You've been through a divorce yourself.
24  Right?

Page 104

1  A. Right. We never came to that.
2  Q. That was never necessary in your case, but ---
3  A. No, sir.
4  Q. --- I don't surprise you at all to tell you
5  that a family court judge has that authority?
6  A. It wouldn't surprise me, sir.
7  Q. Did it occur to you that you might refer her to
8  the family court judge rather than open a criminal
9  investigation?
10  A. No, sir.
11  Q. After all, she had cut Kenny Ice in a domestic
12  dispute, and there was no reason to make an arrest or
13  open an investigation into --- into that. And the state
14  police had responded to her residence on at least one
15  occasion and didn't even deem it necessary to make a
16  report.
17  ATTORNEY JEFFRIES: Objection, suspects.
18  BY ATTORNEY CROOKS:
19  Q. In light of --- in light of what we know about
20  the broad discretion that the state police has, I mean,
21  you were under no obligation to open up an investigation
22  into this complaint that Ellen Costlow was making, were
23  you?
24  A. My obligation is to the victim.

Page 105

1  Q. So you felt obliged to Ellen Costlow?
2  A. If there was a criminal infraction, yes.
3  Q. At what point in time did you come to the
4  conclusion that there was enough evidence to seek the
5  criminal warrant for the arrest of Scott Ballock?
6  A. It wasn't mine. I had nothing to do with that,
7  sir.
8  Q. Okay.
9  Were you consulted on it?
10  A. I was being updated on the progress of the
11  investigation.
12  Q. All right.
13  According to Exhibit 3, Captain Merrill wanted
14  to be kept in the loop. He wanted email reports on this.
15  Did you keep him advised?
16  A. That was --- that is not --- that email is not
17  --- I'm sorry. The memo is not sent to me, sir.
18  Q. Pardon me. I --- I'm misspeaking it. I
19  apologize. I'm just trying to move along her, and I'm
20  getting a little ahead of myself.
21  A. That's all right.
22  Q. Let me show you Exhibit Number 4. What is
23  that?
24  A. That is a Troop 1 Memorandum to Corporal

Page 74

1  So I mean, we don't know who the trooper was,
2     but it wasn't you.
3  A. It was not me.
4  Q. So but --- but you are supervisory. You're a
5     lieutenant, and you supervisor troopers, so you're in a
6     position to know. If a trooper went to the residence,
7     there was no violence going on at the time, and upon
8     inquiring, it seemed that violence was not likely, then
9     it would be an acceptable policy and procedure for the
10    trooper to, you know, tell the people at the residence,
11    look, you know, if I have to come back here, it's going
12    to be a problem? And then go back, get in the car, you
13    know, let the station know that everything's ---
14    everything's okay, and that, you know, you're back onto
15    the next thing.
16 A. If ---.
17 ATTORNEY JEFFRIES: Object to the form.
18    I'm not sure if there was a question, and if there was,
19    I'm not sure what it was.
20 BY ATTORNEY CROOKS:
21 Q. That would be --- that would be an acceptable
22    approach to take on the part of whoever that trooper was?
23 A. If there wasn't anything going on. If there's
24    no criminal offense, yes, sir.

Page 75

1  Q. When you show up, and there's physical violence
2     in flagrante right there in front of you, you know, then
3     that's a different story altogether. But if it's just a
4     verbal argument, and everybody's cool, then a trooper
5     doesn't have to fill out a report even if there was a
6     minor child present?
7  A. Correct.
8  Q. What do you know about Chris Berry
9     investigating in the Thistledown neighborhood?
10 A. Just from general recollection, there was
11    something about car break-ins.
12 Q. Okay.
13 A. But that's about all I know. I don't know if
14    he was following up on something. I have no --- that was
15    --- that's my general recollection.
16 Q. Ellen Costlow told you that she knew Chris
17    Berry, and it was because he'd been in the neighborhood
18    investigating car break-ins.
19    True?
20 A. That I do not remember. I don't remember that
21    --- that specific with her.
22 Q. Okay.
23    So you may have garnered your information about
24    Chris Berry's investigative activity in the Thistledown

Page 76

1     neighborhood from some source other than Ellen Costlow?
2  A. From Chris or --- yeah. I don't remember that,
3     sir.
4  Q. Okay.
5     If Chris Berry was investigating car break-ins
6     in the Thistledown neighborhood, would that be something
7     that he would be obliged by the policy and procedure of
8     the state policy to document?
9  A. Sir?
10 Q. If Chris Berry was in the Thistledown
11    neighborhood investigating reports of car break-ins,
12    would that be the sort of investigative effort that would
13    --- you'd expect to be written? Put in writing? Kept on
14    file?
15 A. There would be --- that would be on his daily
16    activity sheet, his general activity of what happened
17    during that day.
18 Q. What if he went up and did that investigation
19    on his own time? Would there be ---?
20 A. On his own time?
21 Q. Would there be any record of it?
22 A. I --- I'm not too sure I know the question,
23    sir.
24 Q. All right.

Page 77

1     Kind of an odd question, isn't it? I'm
2     suggesting that a state trooper would go up to
3     Thistledown neighborhood on his own time, off the clock,
4     and conduct an investigation to car break-ins in the
5     neighborhood. That --- that would sound very irregular,
6     wouldn't it?
7  A. In uniform or ---?
8  Q. I don't know if he was wearing his uniform at
9     the time.
10 A. I --- it would be very unlikely some trooper
11    would be investigating a crime on their off-duty hours.
12 Q. That would be very irregular, wouldn't it?
13 A. Yes, sir. It would be irregular.
14 Q. In your review of the discovery in this case,
15    have you seen the Monongalia County sheriff's report
16    indicating that deputies went to the Ballock household in
17    Thistledown neighborhood in 2013 in response to an
18    argument between Ellen Costlow and Kenny Ice, Junior?
19 A. In preparations for this case, sir?
20 Q. At any point during the course of this case.
21 A. I might have seen it during the investigation,
22    but I don't have any ---.
23 Q. You have a general memory of ---
24 A. I remember ---.

20 (Pages 74 to 77)

Page 66

1 know, your best, honest recollection and testimony about
2 all this stuff. And it's not --- you know, it's not a
3 contest or ---
4 A. Sure.
5 Q. --- anything of that nature.
6 All right.
7 So Ellen Ruth Costlow comes in to see you the
8 evening of the same day that you called her?
9 A. I believe it was the same evening.
10 Q. To the best of your memory?
11 A. Yes, sir.
12 Q. Tell me what you remember. What was your
13 impression when --- when she came in to see you?
14 A. She --- she came to the state police barracks.
15 She sat down, and she --- well, I had a conversation
16 about her and Trooper Berry, which she denied having an
17 affair with Trooper Berry.
18 She then went on to say she was in the middle
19 of a divorce or in --- in the process of divorce and that
20 her soon to be ex-husband would not stop contacting her,
21 that she was being harassed daily with emails and text
22 messages.
23 Q. You say Ellen Ruth Costlow denied having a
24 romantic relationship with Christ Berry. Did she deny

Page 67

1 knowing Trooper Berry?
2 A. No. No, she --- I don't believe she did deny
3 knowing Trooper Berry.
4 Q. Okay.
5 Tell me what you remember in that direction.
6 A. I really don't remember a lot. I remember
7 something to the effect that Trooper Berry was up in her
8 neighborhood conducting some sort of investigation. But
9 I don't know the specifics of the --- I don't remember
10 the specifics of the investigation or why he was up in
11 that neighborhood doing that.
12 Q. We do have some documentation on that. In
13 fact, I can show you documentation --- and this is from
14 2013 ---
15 A. Uh-huh (yes).
16 Q. --- when the 911 call was placed.
17 A. Okay.
18 Q. And the 911 call resulted in some state police
19 responding to the Costlow residence. Maybe you reviewed
20 some of that evidence in preparation for the deposition
21 today? No --- no bells going off?
22 A. No bells going off, sir. I know --- I know the
23 state police at least went up there at least once, but
24 I ---.

Page 68

1 Q. Let me see if this might job your memory a
2 little.
3 A. Okay.
4 Q. And again, we can take the time necessary to
5 get into some of these documents.
6 A. Sure.
7 Q. And I am going to show you some documents in
8 the course of this, but you know, you're a
9 straightforward, attentive witness, and you have an
10 impressive memory. So we're covering a lot of ground
11 without the time necessary for a lot of document work.
12 So I'm going to take advantage of that.
13 There came a time when my client, Scott
14 Ballock, called and talked to you and he asked about the
15 fact that state police went to his estranged wife's
16 residence. And he questioned you as to why there was no
17 report of that police activity.
18 A. Yes, sir.
19 Q. And you were a bit --- affronted, I believe
20 would be a fair way to put it, by his questioning you
21 along that line.
22 A. I think that's a mischaracterization.
23 Q. Okay.
24 Well, let me just ask you personally, do you

Page 69

1 remember having a conversation with Scott?
2 A. I remember having a conversation with Scott.
3 Q. You do remember that?
4 A. Yes.
5 Q. Okay.
6 Good. So tell me about his conversation that
7 you had with Scott Ballock.
8 A. From what I remember about the conversation, he
9 called in and asked about an incident that happened at
10 his house. And I believe he wanted a report, if I
11 remember correctly.
12 Q. Uh-huh (yes).
13 A. And ---.
14 Q. I believe he did.
15 A. Okay.
16 Q. Yeah.
17 A. And I explained how to get that report. Well,
18 he --- he asked me if there was a report filed. I
19 checked. There was not a report filed. So he questioned
20 me on why there wasn't a report filed.
21 Q. Okay.
22 You presumably went on your computer system,
23 called up a database in some fashion or whatever, and
24 were able to determine that there was no report on file?

Page 70

1  A. The CI log did not show a report on file.
2  Q. What log?
3  A. Criminal Investigation log.
4  Q. Okay.
5  So you told Scott Ballock that there was no
6  report prepared?
7  A. Correct.
8  Q. What else do you remember about the
9  conversation?
10 A. I believe he asked me why there wasn't a report
11 filed. And I explained to him, you know, based upon the
12 investigating officers or the responding officers'
13 observations, and you know, it's up to them to --- to
14 initiate a report if they feel that it needs to be
15 initiated. But, you know, if they --- if, you know, a
16 trooper goes on a call, and there's no substance to that
17 call, then a report probably isn't going to be filed.
18 Q. Okay.
19 What do you remember about the substance of the
20 call, that is to say --- I realize as I listen to my own
21 questioning that that's probably a confusing way to
22 phrase it. Scott Ballock called you, told you that state
23 police had been to his residence, and his estranged wife
24 was currently living there.

Page 71

1  And he wanted a copy of the report. You looked
2  in the Criminal Investigation log on your computer and
3  told him there was no report. And he wanted to know why.
4  You told him that the trooper who responded must have
5  judged it unworthy of a report.
6  Is that ---?
7  A. Correct. Yes, sir.
8  Q. Okay.
9  Do you know anything about what happened when
10 that --- who that trooper was, or what he found?
11 A. From what I remember, it was a verbal
12 altercation at his house or his --- that residence.
13 Q. All right.
14 They were estranged. Do you --- do you guys in
15 the state police use that word, estranged?
16 A. We can.
17 Q. When --- when someone is married to another
18 person, but by order of the family court, usually,
19 they're not living together.
20 A. Correct.
21 Q. Then they are said to be estranged.
22 A. Yes, sir.
23 Q. That's the way we sue that word in the law.
24 You guys use it that way, too?

Page 72

1  A. We can. Yes, sir.
2  Q. Okay. All right.
3  So it is accurate to say that his wife lived
4  there, but he did not because they were going through a
5  divorce at the time. And that squares with your best
6  memory of what you learned about all of this ---
7  A. Yes, sir.
8  Q. --- at the time?
9  Who was the state police trooper who went to
10 the house?
11 A. I can't remember that, sir. I don't remember
12 that.
13 Q. All right.
14 A. I'd hate to speculate.
15 Q. All right.
16 Did you make any effort to find out at the time
17 who the trooper was?
18 A. I can't remember, sir.
19 Q. You don't' remember if you tried to find out?
20 A. No, sir. I can't remember that.
21 Q. How was Scott Ballock in his attitude and ---
22 A. I remember ---.
23 Q. --- in the course of this conversation?
24 A. I believe his discourse came from when I told

Page 73

1  him there wasn't a police report filed. And he
2  continually questioned me upon that. And I really didn't
3  have another answer for him except for the fact that it
4  was what it was, a verbal altercation that the
5  investigating --- or the responding officer didn't feel
6  like a report needed to be filed.
7  Q. Okay.
8  A. But he kept pressing upon that issue.
9  Q. Was there any policy or practice in effect at
10 the state police at the time of this response to the
11 Ballock residence in Thistledown as to whether a report
12 should be filed if a child, minor child, was present?
13 A. No, sir.
14 Q. If Summer Ballock, a minor child at the time,
15 was present at the Ballock residence when her mother and
16 Kenny Ice, Junior were having an argument, and the state
17 police came to the house about it, there'd be no
18 expectation on the part of the state police that the
19 trooper should formalize what they did, what they found,
20 what they did, in order to safeguard the interests of
21 that minor child?
22 A. It depended on thee escalation of the --- of
23 the incident.
24 Q. Okay.

19 (Pages 70 to 73)

Page 154

1  A. Again, I probably did say that. Or I did say
2  that. But that was just in regard for --- to embellish
3  her to --- she finally won one, and I was just, you know,
4  happy about just garnering her ---.
5  Q. Do you think that that was consistent with your
6  obligation under policy and procedure to maintain
7  impartiality with respect to a matter that wasn't even
8  part of your official duties?
9  A. Impartiality concerning ---?
10 Q. Yeah. I mean, you weren't investigating
11 anything in connection with the family court case?
12 A. Correct.
13 Q. You were participating to some degree in the
14 criminal case against Scott. And Scott was trying to get
15 evidence to defend himself against those charges, and you
16 were pretty happy that he failed in that effort, weren't
17 you?
18 A. My disdain for Scott and his dad had come with
19 harassments and emails. Not --- harassments and
20 websites.
21 Q. Okay.
22 So you do harbor ill feeling toward my client?
23 A. For --- yes, sir. I do.
24 Q. Likewise, you harbor a feeling toward Scott's

Page 155

1  father?
2  A. Correct.
3  Q. And that ill feeling is borne of things that
4  Scott's father was posting on the website about the case
5  against his son, including references to you personally?
6  A. Correct.
7  Q. Just want to make sure I understand.
8  Now, you were interviewed by the FBI.
9  A. There was a meeting with the FBI, sir.
10 Q. Okay.
11 You had a meeting?
12 A. Yes, sir.
13 Q. All right.
14 Well, I ---
15 A. An interview.
16 Q. --- appreciate your sense of caution in
17 answering my question, but the fact is, you had a
18 communication, face-to-face communication with somebody
19 form the FBI?
20 A. Correct.
21 Q. Okay.
22 When was that?
23 A. Which one?
24 Q. Well, okay. Maybe that's a more appropriate

Page 156

1  question. How many different times?
2  A. I remember two specifically.
3  Q. Okay.
4  A. Once when the FBI came to review the emails and
5  text messages.
6  Q. Okay.
7  Those would be the emails and text messages
8  that the state police obtained from Matt Stout, one of
9  the lawyers represented Ellen Ruth Costlow?
10 A. Correct.
11 Q. Okay.
12 Did you have any other emails other than the
13 ones you obtained from Mr. Stout?
14 A. I don't know that, sir. I can't remember if I
15 did or not. If we did ---.
16 Q. Well, Ellen Costlow shared a lot of stuff with
17 you, right?
18 A. I can't --- I remember the disc --- yes. Yes,
19 sir. Yes, sir. Yes. Yes, sir.
20 Q. So, you know, your collection of evidence came
21 from the magnetic disc that Mr. Stout provided as well as
22 a series of emails forwarded to you by Ellen Costlow?
23 A. I don't know if they forwarded to us or if she
24 had them printed out. I can't remember that.

Page 157

1  Q. Well, ---
2  A. I can't ---.
3  Q. --- I don't know that the difference ---
4  A. True.
5  Q. --- comes to that much. But those are the two
6  sources that you were operating with?
7  A. Yes, sir.
8  Q. So when the FBI came, that's what you shared
9  with them?
10 A. They looked at the --- the content of the ---
11 of the text and emails.
12 Q. Did they talk to you about the investigation?
13 A. No, not really, sir.
14 Q. Did they ask you any questions?
15 A. Not that I can recall. I --- I remember him
16 coming and looking at the discs, and having the emails.
17 But I --- as far as talking to us about what happened or
18 what was going on, or with the case, no. The only thing
19 we knew that they --- they told us was if, unless Mr.
20 Ballock was found guilty in court, that he would keep his
21 job.
22 Q. Okay.
23 How many people were present there from the
24 FBI?

40 (Pages 154 to 157)

Page 158

1  A. I believe just one.
2  Q. Just one?
3  A. That ---.
4  Q. Do you remember the name?
5  A. I believe it was John Hamrick.
6  Q. John Hamrick?
7  A. Yes, sir.
8  Q. Okay.
9     I know that name.
10    So Mr. Hamrick --- well, strike that.
11    Agent Hamrick told you that, you know, unless
12    Scott was found guilty in the criminal case, he would
13    keep his job?
14 A. Sure.
15 Q. All right.
16    That statement was apropos of what? Did ---
17    did you ask him?
18 A. I don't know how that conversation came about.
19    It's been a long time ago. I'm sure we don't know the
20    relationship between state charges and the federal
21    government, and how that worked. I don't know how that
22    conversation came about, sir.
23 Q. Was anybody from your state police headquarters
24    present when Agent Hamrick was present the first time to

Page 159

1  look at the emails?
2  A. No, sir. I believe it was just --- no, sir.
3     Uh-uh (no). No.
4  Q. Are you the person in the highest authority
5     from the West Virginia State Police present when Agent
6     Hamrick came and looked at the evidence that was part of
7     the state police investigation into Scott Ballock's
8     communications with Ellen Costlow?
9  A. I believe so, sir.
10 Q. Okay.
11    Was anyone from the Monongalia County
12    prosecuting attorney's office present at that time?
13 A. Not that I can remember.
14 Q. So the members of the West Virginia State
15    Police present when Agent Hamrick came would've been you
16    and Corporal Gaskins?
17 A. Yes, sir.
18 Q. Anyone else?
19 A. I don't believe so, sir.
20 Q. Did you provide copies of any investigative
21    product to Agent Hamrick?
22 A. I believe he took a copy of the disc.
23 Q. All right.
24    So a copy of the disc was turned over?

Page 160

1  A. I believe so. Yes, sir.
2  Q. Okay.
3     Well, we've established that there was also
4     some other email that you'd receive in either printed-off
5     form or via email from Ellen Costlow. How about that
6     stuff? Was any of that given to Agent Hamrick?
7  A. I would believe it would have been, sir. I
8     don't specifically remember that, but I believe it would
9     have been.
10 Q. Okay.
11    Was Agent Hamrick at all interested in the
12    website that Tom Ballock was ---
13 A. I can't remember that, sir.
14 Q. --- operating?
15    Okay.
16    You don't think --- you don't remember?
17 A. I don't remember that, sir. I don't.
18 Q. Do you remember having any discussion with him
19    about it?
20 A. No, sir. I do not remember.
21 Q. So you don't remember what it was that prompted
22    Agent Hamrick to tell you that, look, you know, unless
23    Scott gets convicted of this, he's not going to lose his
24    job?

Page 161

1  A. Correct. Right.
2  Q. How did you take that? Were you surprised?
3  A. No, sir. I wouldn't say I was surprised if it
4     was --- I wasn't surprised or --- it was --- I don't know
5     how they operate. So that was --- I don't know their
6     thoughts behind that. I don't know.
7  Q. This was an internal FBI matter, and you had no
8     information or expectation as to what his answer to that
9     question was going to be?
10 A. Correct. Yes, sir. Yes, sir. I don't know.
11 Q. Was --- was your disdain for Scott Ballock such
12    by that point that you were disappointed to hear that he
13    would keep his job unless he got convicted of these cases
14    that you were investigating against him?
15 A. No, sir. I'm not even so sure if the website
16    were up at that time. This was pretty early in the
17    investigation.
18 Q. There was a second time that you communicated
19    with the FBI?
20 A. Yes, sir.
21 Q. Okay.
22    Tell me about that.
23 A. After the investigation was over with, after
24    the court was over with, they contacted and wanted to

41 (Pages 158 to 161)

Page 162

1    have a meeting.
2    **Q. Okay.**
3    **Was it Hamrick again?**
4    A. I didn't --- no. I believe he was retired by
5    that time.
6    **Q. Okay.**
7    **Who was it?**
8    A. It was another John. I'm sure I'll remember
9    his name here shortly.
10   **Q. Large?**
11   A. No. It's --- could've been. Could've been
12   John Large. Could've been. There was another --- I
13   can't remember.
14   **Q. Okay. All right.**
15   **So just one or two people? Do you know?**
16   A. I can't remember that, sir.
17   **Q. Where did the interaction take place?**
18   A. I believe it was up in the state police
19   barracks up in the conference room.
20   **Q. Same place where Hamrick was shown**
21   **investigative material?**
22   A. No. We were down in the sergeants' room at
23   that point.
24   **Q. Okay.**

Page 163

1    A. I remember being in that room, yes, sir.
2    **Q. Okay.**
3    **So you met upstairs in the conference room with**
4    **an FBI agent on the second occasion. This was after the**
5    **prosecutor had withdrawn the charges against my client?**
6    A. Yes, sir.
7    **Q. You've already told me that you were**
8    **disappointed that the prosecutor dropped the charges**
9    **against Scott. Did you ask the FBI agent who you met**
10   **with in the conference room what was going to happen with**
11   **Scott's job?**
12   A. No, sir.
13   **Q. You were already satisfied after talking to**
14   **Hamrick on the first occasion that he was probably going**
15   **to keep his job?**
16   A. That's what we were told, sir.
17   **Q. So what --- what did you tell the agent in the**
18   **conference room meeting?**
19   A. He had questions on some of the stuff that we
20   uncovered during the investigation or that Corporal
21   Gaskins uncovered during the investigation.
22   **Q. Like what?**
23   A. Certain instances, what had happened during
24   different times of their going through emails. I can't

Page 164

1    remember specifically what the --- what the content was,
2    but he asked us questions of --- I believe the ammunition
3    came up in that conversation, about what we found as far
4    as details about what Ms. Costlow had said, certain
5    things to that nature.
6    **Q. Were you surprised that the FBI was still**
7    **asking questions? After all, Hamrick told you that if he**
8    **didn't get convicted, he wasn't going to lose his job.**
9    A. I don't know if it was a surprise. It was just
10   we didn't know what they wanted in the meeting.
11   **Q. Okay.**
12   **Well, certainly, by the time of your second**
13   **meeting with the FBI, after the criminal case against**
14   **Scott had been dropped, Tom Ballock had been posting**
15   **things on the Internet for quite some time?**
16   A. Correct.
17   **Q. I take it then that your disdain for my client**
18   **and his father was running pretty high, particularly**
19   **after the criminal case had been dropped against him.**
20   **True?**
21   A. I had disdain for --- for both of them, yes.
22   **Q. And seeing the criminal case withdrawn probably**
23   **made it somewhat worse?**
24   A. I don't think that's --- I've had those ---

Page 165

1    after 25 years, if the prosecutor wants to do something
2    then, you know, we --- there's not a lot we can say about
3    it.
4    **Q. Were you encouraged that perhaps there might**
5    **yet be some risk for Scott's employment with the FBI?**
6    **After all, you were having this second meeting with the**
7    **FBI, and they were asking a lot of questions.**
8    A. Yeah. I didn't know what the meeting was
9    about, sir. I really didn't. They were asking questions
10   about, you know, things that, again, found in the
11   investigation.
12   **Q. Did you ask them why are you here? What --- I**
13   **thought this was all over?**
14   A. I don't think we came out specifically and
15   asked them. I mean, that's --- it's a meeting they ---
16   they asked for. And it's been my experience with ---
17   with the FBI that they'll tell you about as much as you
18   want to know --- they'll tell you about as much as they
19   want you to know. I'm sorry.
20   **Q. Okay.**
21   A. My bad. You looked at me kind of strange, and
22   I was like --- yeah.
23   **Q. There's a --- I would assume.**
24   A. As much as they want you to know.

42 (Pages 162 to 165)