# In The Matter Of:
*Scott Ballock v.*
*Ellen Ruth Costlow, et al*

*Scott Ballock*
*April 19, 2019*

**Sapphire Court Reporting LLC**
*204 Oak Drive*
*Clarksburg, WV 26301*
*304-476-7553*
*www.SapphireCR.com*

Original File Scott T. Ballock.txt
Min-U-Script® with Word Index

1  on September 26, 2012, the subject line, "Hatred
2  Exposed." So this would have been -- do you recall the
3  exact date that the two of you separated?
4      A.   September 14th.
5      Q.   Okay. This was sent September 26, so less than
6  two weeks later?
7      A.   Yes.
8      Q.   Was this about the divorce process or the
9  children?
10     A.   Everything was about the children.
11     Q.   So that's your position, that everything that
12 you spoke to her about was about the children?
13     A.   Everything that I did and all of my actions
14 were for the benefit of the children.
15     Q.   Okay. Where in this email are the children
16 mentioned?
17     A.   The children aren't mentioned in this email.
18     Q.   And how is it for the benefit of the children
19 for you to say that her hatred was exposed?
20     A.   My attempts at writing her were to reconcile.
21 The things that I wrote were done in an attempt to
22 reconcile with her because I was concerned about the
23 children's future and the children's welfare.
24     Q.   And saying that her hatred was exposed, was
25 that polite and respectful?

1  false statement with your attorney's approval or --
2      A.   Upon my attorney's advice.
3      Q.   Advice. Okay. And that you lied to the Court
4  to benefit your kids; right?
5      A.   I signed the statement to benefit my kids.
6      Q.   A statement you knew was false?
7      A.   A statement I didn't agree with.
8      Q.   Okay. And then the -- I'll go to the next
9  paragraph. It states you acknowledge communicating via
10 email with Ellen Costlow after it is alleged that a
11 letter was sent to him asking him to stop such
12 communications to Ellen Costlow.
13     A.   That's factually correct.
14     Q.   Okay.
15     A.   I did not receive the letter, but it was sent
16 to me.
17     Q.   But, as we've gone over, you received any
18 number of emails or texts saying stop, don't call me,
19 something indicating that she didn't want you to contact
20 her?
21     A.   Correct, interspersed with her contacting me.
22     Q.   Contacting you in ways that we have no record
23 of?
24     A.   In some instances we have records of, yes. I
25 didn't think this would have been an issue. Otherwise,

1  I would have recorded it.
2  Q. And you weren't -- you weren't charged with
3  anything violent; right? The basis of the criminal
4  charges in the second paragraph is that you contacted
5  her after she told you not to?
6  A. Correct.
7  Q. And you acknowledge making all the contacts and
8  the emails that were -- at least you're not --
9  A. I'm not denying.
10 Q. You're not disputing the record of emails and
11 the text messages?
12 A. I am not disputing that.
13 Q. Okay. And you called the Cooper-Lehki report
14 exculpatory evidence?
15 A. I did.
16 Q. The Cooper-Lehki report doesn't change the fact
17 that you made the -- that you sent the texts and emails
18 to Ellen and doesn't change the fact that she asked you
19 not to; correct?
20 A. Correct.
21         MR. PHILLIPS: Okay. I was just told we
22 have to switch the tape soon. I was looking for
23 something that would -- that you can answer quickly.
24 BY MR. PHILLIPS:
25 Q. Okay. You -- I guess you stated that you

1  year and then consider whether to go ahead with the
2  divorce or to reconcile; is that a fair characterization
3  of where things stood?
4      A.  At least on one occasion she expressed that.
5      Q.  Okay. I mean, have you got her in writing
6  somewhere on that because these folks want to see
7  everything in writing?
8      A.  I know, and I don't. I don't.
9      Q.  Okay.
10     A.  And that was face to face.
11     Q.  Okay. Were you willing to act on that request?
12     A.  It excited me.
13     Q.  Why do you use the word excited?
14     A.  It gave me hope.
15     Q.  Okay. Were you still anxious and worried that
16 you could lose custody of your children to Ellen at that
17 point?
18     A.  Yes.
19     Q.  Was that your motivation for seeking
20 reconciliation?
21     A.  My primary motive, yes.
22     Q.  The arrest that happened, I guess it was Friday
23 the 13th --
24     A.  Uh-huh.
25     Q.  -- 2013, in September. Were you aware that

1   A. Yes.
2   Q. So there's medical records that we need to
3   supplement those.
4   A. Yes.
5            MR. CROOKS: We'd be happy to produce
6   that. But I do think it's important that we make it
7   clear. I mean, his testimony is that he's not getting
8   any clinical therapy. He's just -- medication.
9            MR. JEFFRIES: Whatever --
10           MR. CROOKS: Whatever it is is what you
11  want. I know.
12           THE WITNESS: Can we sign a release?
13           MR. CROOKS: Yeah, if they've got a
14  release on hand here today, we'll sign it while we're
15  here.
16           MR. JEFFRIES: We can discuss this off the
17  record, but we'll need the address.
18           MR. CROOKS: We'll provide that.
19           MR. JEFFRIES: That's all I have. Do you
20  have anything else, Tom.
21           MR. PHILLIPS: Just a couple.
22                 RECROSS EXAMINATION
23  BY MR. PHILLIPS:
24  Q. Just to follow up on what Mr. Jeffries was
25  asking about probable cause and proceedings in

327

1  Monongalia County Magistrate Court, did your attorney
2  file a motion to dismiss the case in magistrate court
3  for lack of probable cause for your arrest?
4       A.   I don't recall.
5       Q.   And did he file a writ of prohibition with
6  circuit court to not allow magistrate court to proceed
7  because there was no probable cause for the arrest?
8       A.   I don't recall.
9       Q.   I believe you acknowledged that your -- you
10 used the word voluminous to describe --
11      A.   Yes.
12      Q.   -- the emails -- the frequency of emails you
13 sent at some times?
14      A.   Yes.
15      Q.   And you acknowledged that Ms. Costlow indicated
16 many times they were not wanted, she did not want to
17 receive them?
18      A.   Yes.
19      Q.   You acknowledge that harassment could be based
20 on the frequency of unwanted communications, not
21 necessarily on the content of the communication?
22      A.   I don't agree with that.
23      Q.   You don't agree?
24      A.   No.
25      Q.   You don't agree that --

```
                                                            330
1       A.   No.
2       Q.   Okay.
3       A.   I assumed with Kenny in Fairmont.
4       Q.   In Fairmont. Okay. How is your anxiety now.
5    You seem -- seem to be, my impression, pretty calm
6    today?
7       A.   I'm a very mellow and relaxed person generally.
8       Q.   Yeah.
9       A.   But I can't sleep. I have stomach aches. I --
10   it weighs heavy on my mind. I'm depressed. Just --
11   I've just -- despite -- I mean, I'm just a soft-spoken
12   -- this is who I am always. Whether I'm stressed out or
13   feeling anxiety, this is my outward appearance.
14      Q.   How does your overall anxiety and emotional
15   health right now with your new job and new relationship
16   compare to the summer of 2013 when you were going
17   through a tumultuous divorce?
18      A.   Oh, certainly it's lessened.
19              MR. PHILLIPS: Okay. Nothing else.
20              MR. CROOKS: Nothing further. We're done.
21              MR. JEFFRIES: Mr. Ballock, you have the
22   right to have the court reporter send you a transcript
23   and read it --
24              MR. CROOKS: We'll exercise our rights.
25              MR. JEFFRIES: Okay.
```