# In The Matter Of:

*Scott T. Ballock v.*
*Ellen Ruth Costlow, et al.*

---

*Dr. Clifford B. Hawley*
*May 13, 2019*

---

**Sapphire Court Reporting LLC**
*204 Oak Drive*
*Clarksburg, WV 26301*
*304-476-7553*
*www.SapphireCR.com*

Original File Dr Clifford Hawley.TXT
Min-U-Script® with Word Index

**EXHIBIT 3**

14

1  here in earnings and benefits to date, but also going
2  forward.  I just based it on the tables that you've seen.
3       Q.   Okay.  Going back to Page 2 of your report, the
4  second sentence of the first full paragraph, "As an agent for
5  the FBI, Mr. Ballock received a 25 percent supplement to
6  compensate for being on call 24/7."
7       A.   Yes.
8       Q.   What is the basis for that figure of a 25 percent
9  supplement?
10      A.   I believe that was in -- it's certainly here
11 somewhere in the file.  But I think it is in the first --
12 what is it called?  Isn't it one of the discovery documents?
13 I think it may be Plaintiff's Responses to Troopers
14 Defendants' First Set of Interrogatories.
15      Q.   Where Mr. Ballock said that he got 25 percent above
16 the GS pay scale for being on call?
17      A.   Well, he said that basically FBI agents did.
18      Q.   Okay.  Are there any limitations under federal law
19 as to the amount?  I mean, I understand the percentage.  But
20 is there -- are there any limitations as to the dollar amount
21 of premium pay that Mr. Ballock could receive?
22      A.   None that I am aware of, sir.
23      Q.   As a senior supervisory agent at the Criminal
24 Justice Information Services Center there in Clarksburg, was

15

1  Mr. Ballock considered a criminal investigator for purposes
2  of his entitlement to availability pay?
3      A.  Was he considered a criminal investigator?
4      Q.  Yes.
5      A.  I always thought he was considered a special agent.
6  I don't know what --
7      Q.  You don't know if he was considered --
8      A.  I don't know what that -- you know, he's an FBI
9  agent.  I don't know what the actual term "criminal
10 investigator" means.
11     Q.  What was the annual average of unscheduled duty
12 hours that Mr. Ballock worked in excess of each of his
13 regular duty days in 2016?
14     A.  In 2016?
15     Q.  Yes.
16     A.  Well, I don't have the table that I think would
17 apply to what his 12-month salary would be.
18     Q.  No.  That's the -- the question is, what was the
19 annual actual of unscheduled duty hours that he worked in
20 excess of each of his regular duty days in 2016?
21     A.  Well, the way I would figure that out -- or try to
22 figure that out would be to look at what his -- what you
23 might call straight salary would be.  And then see if his W-2
24 earnings was higher than that.  And then you would see how

1  much that -- what the difference would be.  And then you
2  could maybe figure that out in terms of hours if I understand
3  your question correctly.
4       Q.   Well, the question is asking for hours, the number
5  of hours.  So you would figure out how much he got above the
6  GS pay scale and back it up?  Is that --
7       A.   Yeah.  I mean, if we figured out that he should
8  have had a salary of 150,000 if he had zero extra hours, and
9  then we looked at his W-2 and it said 153,000 instead of 150,
10 I think I would presume there was $3,000 of extra pay
11 somewhere.  And then to figure out what the hours are, I
12 guess I would ballpark it by thinking about what his hourly
13 rate might have been.
14      Q.   But I take it you did not actually do that for
15 2016?
16      A.   There's no place in my report where I increased
17 damages by any amount of extra hours.
18      Q.   Right.  Did you determine what was the annual
19 average of unscheduled duty hours that he was available to
20 work on each regular duty day in 2016?
21      A.   No.
22      Q.   In his last full year of employment with the FBI in
23 2016, was Mr. Ballock paid 125 percent of the applicable GS
24 pay scale?

1   A.   I looked at -- you said 2016 in particular?
2   Q.   Yes.  The last full year.  Did he get 125 percent
3 of the GS pay scale?
4   A.   I think he may have gotten more.
5   Q.   Do you know for sure?
6   A.   This is totally from memory.  But I think we could
7 look at the -- of his W-2 here for 2016, and have a pretty
8 good idea about whether it was higher or lower than what his
9 straight pay could be expected to be.
10   Q.   Did you check to see if he got 125 percent of the
11 GS pay scale for 2016?
12   A.   I don't recall doing that.
13   Q.   Let's go back to Page 2 of your reports.  In the
14 second full paragraph discussing calculation of loss of
15 benefits, you stated that one way to do these -- to calculate
16 the value of the lost benefits is to look at employer cost.
17 And you cite to a Congressional Budget Office Working Paper
18 that found that the average, I guess, amount of employer
19 costs for benefits was 29.8 percent of wages.  Is that right?
20   A.   Yes.
21   Q.   Okay.  And so if I understand that correctly -- and
22 I went to law school because I'm bad at math.  So let's say
23 $100,000 salary.  Then the value of benefits would be 29,800?
24   A.   Yes.

20

1   Q.   Okay.  And so among the 29.8 percent then would be
2   included federal government contributions to the thrift
3   savings plan?
4   A.   Yes.  For example.
5   Q.   Let's go to Page 3 of your report.  In the second
6   paragraph under Section III, talking about the future
7   earnings and benefit losses, you state that, "After retiring
8   from federal employment, one may still work in the private
9   sector or find state or local public employment."  And then
10  you go on to state that in calculating the present value of
11  Mr. Ballock's future earnings and benefits, you assume that
12  he could find employment at the equivalent of $100,000 in
13  2019 dollars, along with a mark-up for benefits valued at 27
14  percent.  Is that --
15  A.   Yes.
16  Q.   Is Mr. Ballock making $100,000 now?
17  A.   No.
18  Q.   And why would you assume that he could make
19  $100,000 in the future?
20  A.   Well, this would be in the future, absent
21  termination.  Where he would retire as an FBI agent at age
22  57, absent termination.
23  Q.   So what --
24  A.   You know, he's not making that now because that's

21

1  with termination at Kroger.
2       Q.   So are you saying that the termination is the
3  difference?
4       A.   Well, no. I'm saying retired FBI agents have
5  excellent opportunities. And I think you'll find this either
6  in an e-mail or in that discovery document that I mentioned
7  where many of them retire and then work for contractors of
8  the federal government.
9       Q.   Doing what?
10      A.   I have no idea. I imagine that they're in high
11 demand for a lot of different possibility of services.
12      Q.   Did you consider any specific position in arriving
13 at this $100,000 figure?
14      A.   No, sir.
15      Q.   Is this $100,000 figure based on an assumption that
16 Mr. Ballock would be employed in West Virginia or employed
17 somewhere else?
18      A.   There's no geographic assumption tied to it.
19      Q.   Is it a national average?
20      A.   No. It's in the file here.
21      Q.   Okay. You said that he might get post-retirement
22 employment either in the private sector or state or local
23 government. Was the $100,000 based upon him getting
24 post-retirement work in the private sector?

1  A.  Not specifically, no.
2  Q.  Was it based on him getting post-retirement work in
3  the state government?
4  A.  Not specifically, no.
5  Q.  Local government?
6  A.  No.  Not specifically, no.
7  Q.  Well, what is the average salary in the private
8  sector for a retired FBI agent with a master's degree in
9  criminal justice?
10 A.  I don't know.
11 Q.  Do you know the average salary in state or local
12 government for an FBI agent, or retired FBI agent with a
13 master's degree in criminal justice?
14 A.  No, sir.
15 Q.  You're not an expert in a vocational assessment,
16 correct?
17 A.  Correct.
18 Q.  Did you review a vocational assessment on
19 Mr. Ballock to determine this $100,000 post-retirement
20 figure?
21 A.  No, sir.
22 Q.  So is the basis for attributing $100,000 in
23 post-retirement income simply Mr. Ballock responded in
24 discovery that he thought he could get that?

1  A.   That -- not necessarily he thought he could get it,
2  that current -- I mean, I assumed that he could get it.  But
3  it's a statement that current FBI agents retiring often get
4  six-figure salaries -- I think that's the phrase he used --
5  from contractors and others.  And, obviously, I used the
6  lowest six-figure number you could get.
7  Q.   So that -- the $100,000 of post-retirement
8  employment came from Mr. Ballock?
9  A.   Yes.
10 Q.   So let's go to Table 3 of your report for a minute.
11 A.   Okay.
12 Q.   So in the first column, "Earnings Absent
13 Termination."  I believe earlier in the report, you assume
14 that he would retire in September of 2025.  Does that sound
15 right?  Yeah.  Here it is.
16 A.   As an FBI agent.
17 Q.   As an FBI agent.
18 A.   Yes.
19 Q.   So am I correct that in this first column, all the
20 earnings from 2026 on are assuming -- are based on the
21 assumption that he would get $100,000-a-year job as a
22 contractor?
23 A.   That starts in I think October of 2025.
24 Q.   Since the last quarter of 2025, and then all of

34

1 report.
2     A.   Yes, sir.
3     Q.   At the bottom of Page 3, the very last sentence
4 there, to calculate the present value of his earnings and
5 benefits as opposed to his pension --
6     A.   Yes.
7     Q.   -- you used a discount rate of 3 percent?
8     A.   Right.
9     Q.   So that's the 3 percent that you referred to minus
10 the 2 percent for inflation?
11     A.   Yes, sir.
12     Q.   All right. So let's go -- you were at Table 5.
13 Let's take a look at that.
14     A.   Yes.
15     Q.   Okay. So Table 5 is a chart of the present value
16 of Mr. Ballock's pension had he not been terminated?
17     A.   Yes, sir.
18     Q.   Did you review the divorce decree between
19 Mr. Ballock and Ms. Costlow?
20     A.   No. But he did mention in one of his e-mails that
21 perhaps she gets 50 percent. I'm not quite exactly -- but he
22 may not have sole ownership of this.
23     Q.   Did you take that into account in --
24     A.   No, sir.

38

```
 1  23 years of service.
 2       Q.    But it's not based on her getting any portion of
 3  the pension at all?
 4       A.    That's correct.
 5       Q.    Okay.  Now let's go to the appendix of your report.
 6       A.    Yes.
 7       Q.    Okay.  So the first appendix is the salary
 8  calculations that you used?
 9       A.    Yes.
10       Q.    What were Mr. Ballock's actual earnings for the
11  last three full years that he was employed by the FBI?  That
12  is 2014, '15, and '16.
13       A.    I have that information here if you want to know
14  that.
15       Q.    I do.
16             MR. CROOKS:  How about we take a short break?  I
17  just want to -- for my personal comfort, if nothing else.
18  And perhaps you might want to look at his file while we do
19  that.
20             MR. JEFFRIES:  Well, I've got a question pending.
21  Can I -- I normally don't like to break with a question.
22             THE WITNESS:  What's the question?
23             MR. CROOKS:  I don't either.  Except if we're going
24  to start rummaging through the file in pursuit of an answer
```

1  --
2         THE WITNESS:  What's the question?
3  BY MR. JEFFRIES:
4     Q.   What was the average of his last three full years
5  of employment with the FBI?
6     A.   Three or four years?  That's vague.
7     Q.   No.  The last three full years.
8     A.   Three full years.  Okay.
9     Q.   '14, 15, and '16.
10    A.   Okay.  Let me answer that.  All right.  Okay.
11 2016, $141,998.96.
12    Q.   Okay.
13    A.   2015, $143,940.48.  And 2014, $142,221 even.
14    Q.   Okay.  Thank you.
15         MR. JEFFRIES:  We can take a break now, Charles.
16         MR. CROOKS:  I appreciate it.
17         (There was a brief break in the proceedings.)
18 BY MR. JEFFRIES:
19    Q.   All right.  Dr. Hawley, I'll represent to you that
20 while we were on the break, I took the three figures you gave
21 me and added them together, and divided by three.  And I came
22 up with an average of $142,720 and a few cents as
23 Mr. Ballock's average earnings the last three full years he
24 was employed by the FBI.  Does that sound -- I mean, I don't

40

1   expect you to calculate that in your head. But does that
2   sound off base or wildly --
3       A.   What did you say, 142?
4       Q.   142,720.
5       A.   That sounds reasonable.
6       Q.   Okay. Now, I noticed among the figures you gave
7   me, Mr. Ballock's earnings fluctuated during those three
8   years. Do you know why?
9       A.   My only assumption is what we talked about earlier,
10  that it was, you know, additional pay of some kind.
11      Q.   And if the numbers that you gave me are correct,
12  between 2015 and 2016, his pay actually went down by about --
13  almost exactly $2,000 from --
14      A.   Yes.
15      Q.   Do you know why?
16      A.   No.
17      Q.   All right. So I'm looking at your salary table
18  here in the appendix, the first page of the appendix.
19      A.   Yes.
20      Q.   So for 2017, you've attributed 147,890. Isn't that
21  significantly more than the average of his last three years
22  with the FBI?
23      A.   Yes.
24      Q.   Do you know why?

```
 1        A.    That number comes from the rest of the US table,
 2   and then the 25 percent add-on.
 3        Q.    And not based upon what he actually was earning?
 4        A.    Correct.
 5        Q.    Okay.  Let's go back to Table 1 in the report.
 6        A.    Yes.
 7        Q.    For 2018, you attributed his earnings as being
 8   151,795.  Again, you arrived at that number by just taking
 9   the pay scale and adding 25 percent to it?
10        A.    Yes, sir.
11        Q.    All right.  On the salary table of the appendix,
12   again, am I correct that everything from 2026 on, as well as
13   one-fourth of -- or maybe not one-fourth.  But the last
14   quarter of 2025 is based on this theoretical post-retirement
15   contracting job making $100,000 a year?
16        A.    Yes.
17        Q.    Do you have any opinions regarding Mr. Ballock's
18   economic losses that are not disclosed in your report?
19        A.    No, sir.
20        Q.    Are you planning on offering any opinions that we
21   haven't discussed today?
22        A.    No, sir.
23        Q.    Go to your CV that's attached to your report.
24        A.    Yes.
```

```
                                                                    49

 1         A.    And I see -- I think there's another page here,
 2   right?
 3         Q.    There is.
 4         A.    Okay.
 5         Q.    This is part of a longer e-mail string.  And all I
 6   want was this last e-mail here, the --
 7         A.    Well, all I want to say is that my e-mail that
 8   comes right after that discusses this.
 9         Q.    Okay.  I don't think that we actually got a copy of
10   the form itself.
11         A.    I know.  I would be happy to provide that.
12         Q.    Okay.  If you wouldn't mind giving it to Charles.
13               MR. CROOKS:  I didn't give it to you?  I meant to.
14               MR. JEFFRIES:  We got all of these e-mails, but I
15   never actually saw like a questionnaire.
16               THE WITNESS:  I sent it to you the very first time.
17               MR. CROOKS:  Yeah.
18               THE WITNESS:  And I'm sure you sent it to Scott.
19               MR. CROOKS:  I'll try to send it to you while we're
20   sitting here.
21               MR. JEFFRIES:  Okay.
22               THE WITNESS:  Yeah.
23   BY MR. JEFFRIES:
24         Q.    Okay.  So on Page 3 at the very top of the e-mail,
```

50

1   Mr. Ballock explains, "In addition to base salary, agents are
2   automatically given authorized overtime, essentially a 25
3   percent bonus in exchange for being on call 24/7 and not
4   earning hourly overtime.  All agents receive this AUO
5   regardless of assignment.  Retirement benefits are calculated
6   based upon this higher figure."
7          Is that where you came up with the 25 percent, I
8   guess, mark-up for want of a better word --
9       A.   Yes, sir.
10      Q.   -- to the GS schedule?
11      A.   Yes, sir.
12      Q.   And then two more pages back, I guess the fifth
13  page.  The third paragraph down, "Ballock was also denied the
14  ability to secure one of numerous contractor positions at
15  CJIS which agents routinely accept for a low six-figure
16  salary when they turn 57 and retire from the bureau."
17          Is that where you got the post-retirement $100,000
18  figure?
19      A.   Yes, sir.
20      Q.   Did you rely on anything else to come up with that
21  $100,000 post-retirement figure?
22      A.   No, sir.
23          MR. JEFFRIES:  All right.  That's all I have,
24  Charles.