# In The Matter Of:
## Scott T. Ballock v.
## Ellen Ruth Costlow, et al.

---

## Dr. Clifford B. Hawley
## May 13, 2019

---

## Sapphire Court Reporting LLC
## 204 Oak Drive
## Clarksburg, WV 26301
## 304-476-7553
## www.SapphireCR.com

Original File Dr Clifford Hawley.TXT
**Min-U-Script® with Word Index**

**EXHIBIT 1**

1   Q.   Okay.  And so among the 29.8 percent then would be
2   included federal government contributions to the thrift
3   savings plan?
4   A.   Yes.  For example.
5   Q.   Let's go to Page 3 of your report.  In the second
6   paragraph under Section III, talking about the future
7   earnings and benefit losses, you state that, "After retiring
8   from federal employment, one may still work in the private
9   sector or find state or local public employment."  And then
10  you go on to state that in calculating the present value of
11  Mr. Ballock's future earnings and benefits, you assume that
12  he could find employment at the equivalent of $100,000 in
13  2019 dollars, along with a mark-up for benefits valued at 27
14  percent.  Is that --
15  A.   Yes.
16  Q.   Is Mr. Ballock making $100,000 now?
17  A.   No.
18  Q.   And why would you assume that he could make
19  $100,000 in the future?
20  A.   Well, this would be in the future, absent
21  termination.  Where he would retire as an FBI agent at age
22  57, absent termination.
23  Q.   So what --
24  A.   You know, he's not making that now because that's

1  with termination at Kroger.
2      Q.   So are you saying that the termination is the
3  difference?
4      A.   Well, no.  I'm saying retired FBI agents have
5  excellent opportunities.  And I think you'll find this either
6  in an e-mail or in that discovery document that I mentioned
7  where many of them retire and then work for contractors of
8  the federal government.
9      Q.   Doing what?
10     A.   I have no idea.  I imagine that they're in high
11 demand for a lot of different possibility of services.
12     Q.   Did you consider any specific position in arriving
13 at this $100,000 figure?
14     A.   No, sir.
15     Q.   Is this $100,000 figure based on an assumption that
16 Mr. Ballock would be employed in West Virginia or employed
17 somewhere else?
18     A.   There's no geographic assumption tied to it.
19     Q.   Is it a national average?
20     A.   No.  It's in the file here.
21     Q.   Okay.  You said that he might get post-retirement
22 employment either in the private sector or state or local
23 government.  Was the $100,000 based upon him getting
24 post-retirement work in the private sector?

1  A. Not specifically, no.
2  Q. Was it based on him getting post-retirement work in
3  the state government?
4  A. Not specifically, no.
5  Q. Local government?
6  A. No. Not specifically, no.
7  Q. Well, what is the average salary in the private
8  sector for a retired FBI agent with a master's degree in
9  criminal justice?
10 A. I don't know.
11 Q. Do you know the average salary in state or local
12 government for an FBI agent, or retired FBI agent with a
13 master's degree in criminal justice?
14 A. No, sir.
15 Q. You're not an expert in a vocational assessment,
16 correct?
17 A. Correct.
18 Q. Did you review a vocational assessment on
19 Mr. Ballock to determine this $100,000 post-retirement
20 figure?
21 A. No, sir.
22 Q. So is the basis for attributing $100,000 in
23 post-retirement income simply Mr. Ballock responded in
24 discovery that he thought he could get that?

34

1 report.
2 A. Yes, sir.
3 Q. At the bottom of Page 3, the very last sentence
4 there, to calculate the present value of his earnings and
5 benefits as opposed to his pension --
6 A. Yes.
7 Q. -- you used a discount rate of 3 percent?
8 A. Right.
9 Q. So that's the 3 percent that you referred to minus
10 the 2 percent for inflation?
11 A. Yes, sir.
12 Q. All right. So let's go -- you were at Table 5.
13 Let's take a look at that.
14 A. Yes.
15 Q. Okay. So Table 5 is a chart of the present value
16 of Mr. Ballock's pension had he not been terminated?
17 A. Yes, sir.
18 Q. Did you review the divorce decree between
19 Mr. Ballock and Ms. Costlow?
20 A. No. But he did mention in one of his e-mails that
21 perhaps she gets 50 percent. I'm not quite exactly -- but he
22 may not have sole ownership of this.
23 Q. Did you take that into account in --
24 A. No, sir.

36

1  the loss?
2     A.   Well, you're describing what the judgment says.
3  And that's a little bit different than I always think about
4  it.  If I think I ever divorce my wife -- which I'm not going
5  to.  I thought that the spouse would be entitled to
6  everything -- or maybe half of everything up to the time of
7  divorce.  Right?  And that any pension then that she would
8  get half of would be based on what the expected pension would
9  be given the years of service at the time of divorce.
10    Q.   Okay.  So I think I follow where you're going.  Let
11 me -- so let's say that a couple -- and just take Mr. Ballock
12 and Ms. Costlow out.
13    A.   Yeah.
14    Q.   A couple were married throughout the entirety of
15 the man's service with the federal government?
16    A.   Yes.
17    Q.   And right as he's getting ready to retire, they get
18 a divorce and the court awards her 50 percent.
19    A.   Yes.
20    Q.   You would agree in that case it's going to be an
21 even 50 percent split of what her --
22    A.   Yeah.  I think there's a calculation that needs to
23 be done.  And sometimes -- I've been hired to do that, many
24 years ago.  But, yes.

1   Q.   And so now let's say that the husband worked for 30
2   years, and he and the wife were married for the first 20 and
3   then they got a divorce.  Then she would get 50 percent of
4   two-thirds of the --
5   A.   And it would be two-thirds -- it wouldn't be
6   two- thirds because those pensions are calculated
7   differently.  She would get half of what the pension would be
8   calculated as with 20 years of service if that's what you
9   said, yes.
10   Q.   Okay.  So regardless, if I understand you
11   correctly, you did not take into account in calculating Table
12   5 and Table 6 of the fact that Ms. Costlow was awarded some
13   portion of Mr. Ballock's pension in the divorce?
14   A.   Right.
15   Q.   And you said that you thought that would apply to
16   Table 6, the pension with termination?
17   A.   Well, here's what I'll say.  I'm not sure at what
18   point they got divorced.  But this Table 5 assumes that he'll
19   work till retirement, which is 31 years of service.  Well,
20   his actual pension is going to be based on 23 years of
21   service.
22   Q.   Right.
23   A.   Now, I don't know -- did they get divorced after
24   this or before this?  I don't remember.  So this is based on

```
                                                                    39
 1    --
 2              THE WITNESS:  What's the question?
 3    BY MR. JEFFRIES:
 4         Q.   What was the average of his last three full years
 5    of employment with the FBI?
 6         A.   Three or four years?  That's vague.
 7         Q.   No.  The last three full years.
 8         A.   Three full years.  Okay.
 9         Q.   '14, 15, and '16.
10         A.   Okay.  Let me answer that.  All right.  Okay.
11    2016, $141,998.96.
12         Q.   Okay.
13         A.   2015, $143,940.48.  And 2014, $142,221 even.
14         Q.   Okay.  Thank you.
15              MR. JEFFRIES:  We can take a break now, Charles.
16              MR. CROOKS:  I appreciate it.
17              (There was a brief break in the proceedings.)
18    BY MR. JEFFRIES:
19         Q.   All right.  Dr. Hawley, I'll represent to you that
20    while we were on the break, I took the three figures you gave
21    me and added them together, and divided by three.  And I came
22    up with an average of $142,720 and a few cents as
23    Mr. Ballock's average earnings the last three full years he
24    was employed by the FBI.  Does that sound -- I mean, I don't
```

40

1  expect you to calculate that in your head.  But does that
2  sound off base or wildly --
3       A.   What did you say, 142?
4       Q.   142,720.
5       A.   That sounds reasonable.
6       Q.   Okay.  Now, I noticed among the figures you gave
7  me, Mr. Ballock's earnings fluctuated during those three
8  years.  Do you know why?
9       A.   My only assumption is what we talked about earlier,
10 that it was, you know, additional pay of some kind.
11      Q.   And if the numbers that you gave me are correct,
12 between 2015 and 2016, his pay actually went down by about --
13 almost exactly $2,000 from --
14      A.   Yes.
15      Q.   Do you know why?
16      A.   No.
17      Q.   All right.  So I'm looking at your salary table
18 here in the appendix, the first page of the appendix.
19      A.   Yes.
20      Q.   So for 2017, you've attributed 147,890.  Isn't that
21 significantly more than the average of his last three years
22 with the FBI?
23      A.   Yes.
24      Q.   Do you know why?

```
 1       A.   That number comes from the rest of the US table,
 2   and then the 25 percent add-on.
 3       Q.   And not based upon what he actually was earning?
 4       A.   Correct.
 5       Q.   Okay.  Let's go back to Table 1 in the report.
 6       A.   Yes.
 7       Q.   For 2018, you attributed his earnings as being
 8   151,795.  Again, you arrived at that number by just taking
 9   the pay scale and adding 25 percent to it?
10       A.   Yes, sir.
11       Q.   All right.  On the salary table of the appendix,
12   again, am I correct that everything from 2026 on, as well as
13   one-fourth of -- or maybe not one-fourth.  But the last
14   quarter of 2025 is based on this theoretical post-retirement
15   contracting job making $100,000 a year?
16       A.   Yes.
17       Q.   Do you have any opinions regarding Mr. Ballock's
18   economic losses that are not disclosed in your report?
19       A.   No, sir.
20       Q.   Are you planning on offering any opinions that we
21   haven't discussed today?
22       A.   No, sir.
23       Q.   Go to your CV that's attached to your report.
24       A.   Yes.
```