UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

SCOTT T. BALLOCK,

      Plaintiff,

v.                                 **CIVIL ACTION NO.:  1:17-CV-52**
                                         **Honorable Irene M. Keeley**

ELLEN RUTH COSTLOW,
STATE TROOPER MICHAEL KIEF,
AND STATE TROOPER RONNIE M. GASKINS,

      Defendants.

## JOINT PRE-TRIAL ORDER

## 1. PRETRIAL DISCLOSURES

### a.      Plaintiff's Witness List

1. Expected: The Defendant, **Ellen Ruth Costlow**, 55 Panola Road Fairmont, WV 26554-5508. Her testimony will relate primarily to the liability and causation aspects of the claims against her. She will be examined as an adverse witness.

    The topic areas will include her animosity toward Scott Ballock and her efforts to harm him. Ellen Costlow and Michael Kief collaborated to achieve three goals: 1 prejudice Scott Ballock on the child custody issue; 2. cause trouble for Scott with his employer; and 3. intimidate Scott's father Tom Ballock into taking down his blogging websites that were used to attack both Ellen Ballock and Michael Kief.

    During the divorce, Ellen Ballock communicated with Scott Ballock and then used those communications to complain to the State Police, all for the purpose of trying to get Scott Ballock fired from his job with the FBI. She did this with the aid of Michael A. Kief, then a Sergeant of the West Virginia State Police.

    Examination will concern aspects of the communications with Scott Ballock. These communications were the sole basis on which State Police obtained arrest warrants. Costlow was not troubled by the emails. She admitted in deposition her divorce lawyers helped her rout Scott Ballock's emails to a sequestered folder so she would not have to read them. In truth, the emails were useful to her and she directed her counsel to pursue criminal charges against Scott Ballock based on them. They did threaten Scott that they would take the matter to the family court, but that never happened. Ellen Costlow wanted criminal charges, so her lawyers

withdrew from her representation rather than complicit in the effort. She then struck upon Michael Kief and enlisted his help.

Ellen Costlow will be examined as to her collaboration with Michael Kief to arrange for Scott Ballock's arrest on harassment and stalking charges at the family court hearing on child custody, and her on-going communications and collaboration with Kief to harm Scott Ballock. Examination will include the ultimate withdrawal of the criminal charges, her agreements to refrain from communicating with the FBI about Scott Ballock as well as her knowing violation of confidentiality orders entered by the magistrate and family courts in 2016. Ellen Costlow and Michael Kief collaborated on statements they gave to the FBI in April of that year. Not only were the communications with the FBI intended to prejudice Scott Ballock's employment, they were in some respects defamatory, for that matter the mere reporting of the criminal matters to the FBI was defamatory given the artifice by which they were procured and the misimpression they caused.

Ellen Costlow's behavior, especially with Kenny Ice, Jr. and Karl Vincent Taylor, a convicted pedophile, caused Scott Ballock great concern. He was very much afraid she would receive some measure of custody and this motivated his communications. She was violent toward the minor son and sexually inappropriate with the minor daughter and Scott learned of this when the children returned to him from visits. Ellen Costlow's conduct in this regard explains Scott Ballock's attempts to reconcile rather than risk a court order awarding even limited custody of the Ballocks' minor children.   Ellen Costlow has been untruthful in many instances in this regard and it was her dishonest portrayal of Scott Ballock that was communicated to the FBI to cost him his position. Likewise, Ellen Costlow and Michael Kief's disregard of the truth behind all this rendered the transmission of the emails to the FBI false and defamatory. Examination will demonstrate this.

Ellen Costlow was also motivated to harm Scott Ballock because his father, Tom Ballock, was posting unflattering items about her on websites he created, blogs. The posts mostly concerned Ellen Ballock's poor behavior, including her sexual adventures outside the marriage to Scott. Ellen Costlow utilized the criminal charges against Scott Ballock to try and intimidate Tom Ballock into taking down his blogs.

2. May call: **Kenny Ray Ice, Jr.** 55 Panola Road Fairmont, WV 26554-5508. Telephone: (304) 288-8296.

He provided his phone to Scott Ballock for forensic examination which uncovered evidence of Ellen Costlow's intent and efforts to harm Scott Ballock. He was interviewed by Scott Ballock as well as a private investigator, revealing Ellen Costlow's exposure of the minor daughter to a convicted pedophile, drug use by Ellen Costlow, exposing the minor daughter to sexually explicit materials,

2

Ellen Costlow's attempted suicide while the minor daughter was in the home, exposed the daughter to violent arguments between Ellen Costlow and Kenny Ice, Jr., she left the home at night with the children unattended.

Ice can also testify that he discovered Ellen Costlow was having an affair with Trooper Christopher Berry and when he, Kenny Ice, discovered it, there was a violent fight with Ellen Costlow during which Ice suffered a knife wound. He then reported this to Scott Ballock. Ice can likewise testify to Ellen Costlow trying to get Scott Ballock fired and how she was getting help from the State Police in the effort.

3. Expected: **Michael Andrew Kief** - Defendant, 1210 Chase Street Morgantown, WV 26508-6840. His examination will be adverse.

Sgt. Kief was the one who worked closely with Ellen Costlow to harm Scott Ballock, even so far as to defame Scott Ballock to his employer. He gave false information to the FBI regarding his investigation into Scott Ballock. For instance, he told the FBI that he investigated the reported sexual relationship between Ellen Costlow and Trooper Christopher Berry and found it never happened. In deposition, Kief admitted he did very little to investigate the reported affair and never came to any conclusion. This was a falsehood told to the FBI and was done without respect for or compliance with basis due process in the course of the investigation and prosecution of the charges against Scott Ballock. Likewise, Sgt. Kief facilitated the use of Scott's emails to prosecute him and defame him to his employer. This prosecution was also used to prejudice Scott before the family court and to pressure Tom Ballock to take down his blog sites. The pursuit of these purposes constituted abuse of process.

Sgt. Kief and Ellen Costlow collaborated on how to utilize the criminal prosecution to prejudice the family court on the issue of child custody, arresting Scott Ballock at the final custody hearing on September 13, 2013. Kief violated basic policy of the State Police to arrest Scott Ballock, correspondence between and Ellen Costlow reveals an unusually close and professionally unprofessional relationship.

Likewise, Sgt. Kief brazenly collaborated with Ellen Costlow in violation of confidentiality orders entered by the magistrate and family courts in 2016. He sat for an interview with the FBI after these orders were entered and in preparation, he emailed Ellen Costlow for suggestions on what he should say.

4. Expected: The Plaintiff, **Scott Thomas Ballock**, 315 North Odell Street, Brownsburg, Indiana 46112. Telephone: (734) 430-1410.

Scott Ballock's testimony will address all the topics so far identified in regard to the preceding witnesses and will support his case on damages as well.

Scott's actions in the divorce were motivated by his fear of Ellen Costlow gaining any measure of custody of the children. He had managed Ellen Costlow's behaviors concerning the children for years and he was prepared to have her back and continue humoring and distracting her until the children were older. To his surprise, the family court appointed a true expert in psychiatry to evaluate the children and both he and Ellen Costlow, Dr. Christi Cooper-Lehki. She spent many hours evaluating the family members and investigating the circumstances attending the matter of custody and her testimony saved the day, despite the fact Sgt. Kief arrested him at the end of the hearing.

Scott Ballock volunteered to give a statement to the prosecutor during his defense of the criminal charges that were pending for three years. His offer was declined. He tried to obtain Dr. Cooper-Lehki's report for use in his defense, but the prosecutor's office persuaded the family court to deny Scott's request. The prosecution was not interested in the truth of the matter and showed itself more concerned with protecting the State Police conduct that precipitated the charges, insisting Scott admit an untruth, that there was probable cause for the arrest before they would drop the charges and agree to expungement. Likewise, the prosecution sought to gain Tom Ballock's agreement to take down his websites in exchange for dropping charges against Scott, clearly evidencing an abuse of process.

Scott was an FBI agent and he used his skills to investigate the case against him. He learned much from a cooperative witness, Kenny R. Ice, Jr. He conducted interviews of Ice and examined the contents of the cell phone Ice volunteered to him. His efforts were unwelcomed at the prosecutor's office and garnered him only antipathy from Sgt. Kief who testified in deposition it would not be a good idea for he and Scott to be in the same place at the same time.

Scott was ultimately fired from the FBI based on the fact Sgt. Kief volunteered to them that Scott was to be arrested, followed by the production of the emails that were used to obtain the charges that were ultimately dropped and expunged. Scott has done all he could to defend himself in the administrative appeal of the firing decision. The Department of Justice Office of Professional Responsibility has shifted positions since the remand and further investigation. They are now relying on Ellen's false allegations of physical and sexual abuse. In her deposition Ellen recanted her claim of physical and sexual abuse, stating she had no idea why Dr. Cooper-Lehki reported that she had made such claims against Scott.

A decision is pending on the termination.

All this has had a serious financial and emotional toll that that Scott will explain. He cares for the children and has until recently worked as a store manager for the Kroger grocery chain. Kroger implemented chain-wide layoffs as part of a corporate restructuring. Scott was not sufficiently senior to survive the reduction in force, so he is presently unemployed. Of course, this has added to the

4

financial emotional strain of the loss of his position at the FBI. Scott advanced during his time with the FBI and was prepared to retire at 57 and utilize his training and experience to freelance in the private sector. The divorce was stress enough, then Sgt. Kief and Ellen Costlow took the substance of that case to the FBI and set in motion a termination that threatens Scott with the loss of roughly two million dollars of income and benefits.

5. Expected: **Thomas Scott Ballock**, 315 North Odell Street, Brownsburg, Indiana 46112. Telephone: (734) 717-3201.

He will testify to the mistreatment he received from his mother, Ellen Ruth Costlow. This included physical and verbal assault and emotional abuse. He will also testify that his mother was always motivated to hurt Scott. When Tommy refused to be coached on what to say about Scott, she had him wrongfully admitted to the psychiatric ward at Chestnut Ridge Hospital, falsely claiming he was threatening her with a hatchet. Dr. Cooper-Lehki worked at Chestnut Ridge and she will testify that she was appalled by the committal. She went into this with Tommy in the forensic evaluation and will explain that Ellen is a sociopath who manipulates people.

Tommy will also testify that he overhead his mother tell someone on the telephone that she would get Scott's gun taken away from him in order to get him fired.

He will testify that Scott has never been violent or abusive, he has been a good parent to him, and he has always tried his best to protect both children from their mother's worst tendencies. Dr. Cooper-Lehki will corroborate these points.

He will testify as to the toll all this has had on Scott, the stress and sadness of the circumstances that have followed Scott's loss of employment with the FBI.

6. Expected: **Summer Ballock**, 315 North Odell Street, Brownsburg, Indiana 46112. Telephone: (734) 652-2186.

She will testify to the mistreatment she received from her mother, Ellen Ruth Costlow. This included placing her in inappropriate circumstances and emotional manipulation, such as suggesting Summer was in danger from Scott. She will also testify that her mother was always motivated to hurt Scott and went so far as to repeatedly coach her to lie about Scott and to make her rehearse what she would say to her counselor the guardian ad litem and the forensic child psychiatrist, Dr. Cooper-Lehki. Dr. Cooper-Lehki will corroborate this.

She will testify that Scott has never been violent or abusive, he has been a good parent to her, and he has always tried his best to protect both children from their mother's worst tendencies.

5

She will testify as to the toll all this has had on Scott, the stress and sadness of the circumstances that have followed Scott's loss of employment with the FBI.

7. May call: **Ronnie M. Gaskins** – Defendant. West Virginia State Police 725 Jefferson Road, Charleston, WV 25309.

Cpl. Gaskins was dragooned by Sgt. Kief to serve as the pro forma investigator into the complaint Ellen Costlow and Sgt. Kief devised. His Sergeant got him appointed by the Captain and then he merely wrote up the case Sgt. Kief presented him. Cpl. Gaskins then presented the emails to APA Cindy Scott who approved the application for arrest warrants.

8. Expected: **Dr. Christi Cooper-Lehki**, WVU Chestnut Ridge Center 930 Chestnut Ridge Road Morgantown, WV 26506. Telephone: (304) 598-4214.

She is an expert in psychiatry with a specialty in Battered-Woman Syndrome. She was appointed by the family court judge to evaluate the Ballock family and report a recommendation as to the best interest of the children for custody purposes. She did an exhaustive investigation and came to clinical opinions on the psychological profile of Scott and Ellen Ballock. She found that Scott was showing the strain and suffered from codependent features, but he was remarkably restrained in view of all Ellen had been doing to Scott and the children.

As to Ellen Costlow, she will testify that Ellen is a borderline personality disorder and possibly a sociopath. Dr. Cooper-Lehki will also say that Ellen did not suffer from Battered-Woman Syndrome or emotional or sexual abuse, as Ellen claimed.  Ellen recanted on this in her deposition and Dr. Cooper-Lehki will contradict Ellen on other points. Those will include the diagnoses achieved and the sociopathic behaviors Ellen displayed, especially toward Scott and the children. She will affirm that one of Ellen's goals was to harm Scott any way she could.

Likewise, Dr. Cooper-Lehki will testify to the risk Ellen posed to the children and that Ellen was so manipulative and dangerous that Dr. Cooper-Lehki feared retribution from Ellen.

Dr. Cooper-Lehki will testify that this six-month investigation was the most comprehensive she ever performed and she recommended that Ellen only be allowed supervised visitation with her children.

9. Expected: **Clifford Hawley**, 213 Wagner Road, Morgantown, WV 26501. Telephone: (304)-292-0899.

Dr. Hawley was deposed and issued a report on Scott's financial damages. Scott has since lost his job at Kroger, so those damages are commensurately increased.

10. May call: **Diane Halbritter**. 235 High Street, Morgantown, WV 26506. Telephone: 304-376-0080.

She was counselor for both children. She collaborated closely with Dr. Cooper-Lehki, so this witness probably cannot add anything to what Dr. Cooper-Lehki has to say.

11. May call: **Tom Ballock**. Telephone: (304) 984-6422 805 Harvest Ridge Road, Avon, IN 46123. This witness is unlikely as his wife is suffering a serious illness of long duration and he cannot leave her to attend trial. If he testifies, it would address his call to Sgt. Kief about the affair between Ellen and Trooper Chris Berry as well as his long-running feud with Ellen and Sgt. Kief as evidenced by his blogging activity. Mike Benninger threw Tom Ballock out of his office when Tom refused to take down his web blogs in exchange for the prosecutor's dropping of the charges against Scott. Tom would also verify that Scott tried to persuade him to take down the websites and did nothing to encourage those.

12. May call: **Michael Benninger, Esq.** 157 Pleasant Street Morgantown, WV 26505. Telephone: (304) 241-1856.

Benninger represented Scott in the defense of the stalking and harassment charges. He can testify to the negotiations and discovery as well as the details of the dismissal and expungement. His testimony would largely duplicate Scott's. The unique aspects of the dismissal terms and negotiations are likely unnecessary as the Defendants made no defense of the probable cause concession and it should be excluded from the evidence.

13. May call: **Marcia L. Ashdown, Esq.** 23 Cedarwood Drive, Morgantown, WV 26505-3628. Telephone: (304) 599-6278.

The prosecutor is much the same as Mr. Benninger. She would have to admit the case was not worthy of trial, particularly since it derived from a divorce that was completed and there were never any further communications from Scott to Ellen. She would likely deny the incriminating statements she made to the effect that "her boys" had misbehaved and she was not about to retire with a scandal in the newspaper.

14. May call James Hermann, FBI Agent. J. Edgar Hoover Bldg. 935 Pennsylvania Avenue, N.W. Washington, D.C. 20535.

This witness would contradict Ellen and Kief. He would testify that Kief told him that he, Kief, investigated the allegations of an affair between Berry and

10555081

Costlow and found them to be untrue. Kief lied about this, either to Hermann or in his deposition. As to Ellen, she testified that she did not know why the FBI wanted to talk with her, for all she knew, they were going to arrest her in connection with her handling of Scott's ammunition. Hermann would testify that Ellen knew very well why she was going to speak with the FBI and the confidence with which she did so.

**b.**     **Plaintiff's Exhibit List**

1. Audio recording, transcript (by Scott Ballock) and accompanying text exchange of May 10, 2013, Ellen Ruth Costlow and Kenny Ice, Jr., recovered from Kenny Ice, Jr's cellphone.

2. Audio recording on March 6, 2013, recovered from Kenny Ice, Jr.'s cell phone.

3. Email dated September 24, 2012, from Ellen Costlow to Scott Ballock.

4. Email dated October 16, 2012 from Scott Ballock to Ellen Costlow.

5. Email exchange between Ellen Costlow and Scott Ballock dated January 31, 2013.

6. Second audio recording of March 6, 2013 recovered from Kenny Ice, Jr's cell phone.

7. Text messages dated April 23, 2013 recovered from Kenny Ice's cell phone.

8. Email dated April 26, 2013 from Scott Ballock to Ellen Costlow.

9. Texts dated May 1, 2013, recovered from Kenny Ice, Jr.'s cell phone.

10. Email dated May 9, 2013 from Scott Ballock to Ellen Costlow.

11. Email dated May 29, 2013 from Ellen Costlow to her divorce attorneys, shared with State Police, September 3, 2013.

12. Email dated June 1, 2013 email from Scott Ballock to Ellen Costlow.

13. Family court emergency order entered June 11, 2013.

14. June 13, 2013 affidavit executed by Eric J. Miller of Forensicon concerning his credentials and method of analysis utilized in the case of Kenny Ice's telephone.

15. A July 2, 2013 email from Scott Ballock to Ellen Costlow.

16. The Call Summary Report of August 12, 2013 obtained from the Monongalia County Sheriff's Office.

17. Audio recording from Kenny R. Ice, Jr.'s cell phone of August 12, 2013, when the Monongalia County Sheriff department responded to Ellen Costlow's residence.

18. An undated selfie photo of Ellen in a black jacket.

19. An undated photo of Ellen smiling and holding a power drill.

20. An email dated September 8, 2013, from Ellen Costlow to Cpl. Ronnie Gaskins.

21. The West Virginia State Police policy and procedures manual for investigative procedures.

22. Undated report of investigation (September 18, 2013, per deposition) authored by Cpl. Gaskins.

23. Family court order entered September 20, 2013.

24. Attorney Kevin Tipton's letter of September 20, 2013 to Family Judge Minor.

25. Dismissal and settlement documents executed and entered February 14, 2014 in the civil action filed by Ellen Costlow against Tom Ballock.

26. May 9, 2014 divorce decree, including exhibits.

27. Family court order entered July 25, 2014.

28. The undated report prepared by Dr. Cooper-Lehki concerning her investigation.

29. Emails exchanged by Ellen Costlow March 4, 2014 and Mike Kief March 7, 2014.

30. The April 7, 2016 dismissal motion and attachment, dropping the criminal charges against Scott Ballock.

31. Email dated April 14, 2016 from Ellen Costlow to Sgt. Michael Kief and his reply.

32. Email dated April 22, 2016 from Ellen Costlow to Sgt. Michael Kief.

33. The expungement order entered July 13, 2016.

10555081

34. The March 05, 2019 letter from the Department of Justice stating the latest position of the Office of Professional Responsibility on the termination of Scott Ballock.

35. June 17, 2019 letter from Scott Ballock addressed to the Office Professional Responsibility.

**c.     Defendant Costlow's Witness List**

1.   WV State Trooper Michael Kief (address previously provided);

2.   WV State Trooper Ronnie M. Gaskins (address previously provided);

3.   Former Monongalia County Assistant Prosecuting Attorney Cindy Scott;

WVU Division of Diversity, Equity and Inclusion
1085 Van Voorhis Road, Suite 250
Morgantown, WV 26506-6423
(304) 293-5600

4.   Ellen Ruth Costlow;

5.   May call: Trooper Chris Berry (address previously provided).

**d.     Defendant Costlow's Exhibit List**

1.   Investigation Report of Trooper Ronnie M. Gaskins;

2.   Email from Plaintiff to Ms. Costlow (October 7, 2012 11:16 a.m.);

3.   Emails between the Plaintiff and Ms. Costlow (October 20, 2012 7:06 p.m., 7:10 p.m.);

4.   Email from Plaintiff to Ms. Costlow (November 22, 2012 10:22 p.m.);

5.   Email from Plaintiff to Ms. Costlow (May 28, 2013 11:00 p.m.);

6.   Email from Plaintiff to Ms. Costlow (September 30, 2012 1:38 a.m.);

7.   Emails between Plaintiff and Ms. Costlow, (November 7, 2012 3:31 p.m., 4:01 p.m.);

8.   Texts messages between Plaintiff and Ms. Costlow (May 17, 2013 8:24 a.m.-8:48 p.m.);

9.   Email from Plaintiff to Ms. Costlow (May 3, 2013 9:00 p.m.);

10. Email from Plaintiff to Ms. Costlow (May 15, 2013 10:29 p.m.);

11. Letter from Matthew Stout to Plaintiff (May 3, 2013);

12. Texts messages between Plaintiff and Ms. Costlow (May 17, 2013 8:24 a.m.-8:48 p.m.);

13. Email from Plaintiff to Ms. Costlow (December 15, 2012 9:28 a.m.);

14. Letter from FBI Office of Professional Responsibility to Plaintiff, March 5, 2019;

15. W. Va. Code § 61-2-9;

16. W. Va. Code § 61-3C-14;

17. Warrants for Plaintiff's arrest issued by the Magistrate Court of Monongalia County (September 12, 2013);

18. Criminal Complaints against Plaintiff issued by the Magistrate Court of Monongalia County (September 12, 2013);

19. Letter from FBI Office of Professional Responsibility to Plaintiff, September 21, 2017;

20. Motion with Attachment, Magistrate Court of Monongalia County, April 7, 2016.

**e.      Defendant Kief's Witness List**

1. Expected: Lt. Michael Kief (address previously provided);

Lt. Kief will testify regarding his discussions with Tom Ballock and Scott Ballock, the criminal investigation of Scott Ballock, and his discussions with FBI officials.

2. Expected: Sgt. Ronnie Gaskins (address previously provided);

Sgt. Gaskins will testify regarding the criminal investigation of Scott Ballock and his discussions with FBI officials.

3. Expected: Trooper Chris Berry (address previously provided);

Trooper Berry will testify regarding his contact with Ms. Costlow as part of his investigation into car break-ins in her neighborhood, and he will deny any sexual or romantic relationship with Ms. Costlow.

4. Expected: Ellen Ruth Costlow (address previously provided);

11

Besides any testimony that may be elicited from her counsel or Plaintiff's counsel, Ms. Costlow is expected to testify regarding the harassment she experienced from Scott Ballock and her conversations with Lt. Kief and Sgt. Gaskins.

     5.   Expected: Cindy Scott, Esq.
WVU Division of Diversity, Equity and Inclusion
1085 Van Voorhis Road, Suite 250
Morgantown, WV 26506-6423
(304) 293-5600

Ms. Scott is expected to testify regarding her review of Scott Ballock's communications with Ms. Costlow, her decision to criminally charge Mr. Ballock, and discussions she had with Sgt. Gaskins about the criminal investigation of Mr. Ballock.

     6.   May call:  Scott T. Ballock;

Mr. Ballock may be called, if necessary, as an adverse witness. He is expected to testify about his communications with Ms. Costlow, his communications with Lt. Kief, the FBI's internal investigation of his actions and its subsequent decision to discharge him, and his damages.

     7.   May call:  John Hambrick
80 Boeing Lane
Davis, WV  26260
(304) 266-7771;

If called, Mr. Hambrick is expected to testify regarding his role in the FBI's internal investigation of Mr. Ballock, his discussions with Lt. Kief and Sgt. Gaskins about the criminal investigation of Mr. Ballock, and the decision to serve Mr. Ballock with the arrest warrants during the Family Court proceeding and what he witnessed during that event.

     8.   May call:  Plaintiff's treating physicians and healthcare providers and employees and staff of Plaintiff's healthcare providers.

If called, Mr. Ballock's treating physicians and healthcare providers are expected to testify regarding Mr. Ballock's alleged emotional distress and claimed psychological disorders.

     9.   May call: Any witness necessary for authentication or foundation purposes;

Lt. Kief may call witnesses as necessary to authenticate evidence or lay foundation for evidence.

     10. May call: Any other witnesses designated by or called by other parties or identified in discovery conducted in this matter.

Lt. Kief may call witnesses identified by the other parties or otherwise identified in discovery to testify as necessary.

**f.      Defendant Kief's Exhibit List**

1. Investigation report, Incident No. 1210-43774;

2. Criminal Complaints filed in the Magistrate Court of Monongalia County, WV; Case Nos. 13-M31M-06739 and 13-M13M-06741;

3. Arrest warrants, Case Nos. 13-M31M-06739 and 13-M13M-06741;

4. Monongalia County Magistrate Court Dismissal Order and attached agreement, Case Nos. 13-M31M-06739 and 13-M13M-06741;

5. Timothy J. Dowling (Office of Professional Responsibility) letter to Scott Ballock dated April 10, 2017 re: proposed dismissal from rolls of the FBI;

6. Candice M. Will (Office of Professional Responsibility) letter to Scott Ballock dated September 21, 2017 dismissing Ballock from rolls of the FBI;

7. Pei Ling Chen (Office of Professional Responsibility) letter to Scott Ballock dated November 15, 2018 recommending dismissal from the FBI;

8. Nancy McNamara (Office of Professional Responsibility) letter to Scott Ballock dated March 5, 2019 dismissing Ballock from the rolls of the FBI;

9. Email from Ellen Ballock to Ronnie M. Gaskins dated September 16, 2013, 12:02 p.m. forwarding text messages between Scott Ballock and Ellen Ballock on May 17, 2013;

10. Email from Scott Ballock to Ellen Ballock dated May 28, 2013, 11:00 p.m. re: Theft of Government Property;

11. Emails between Ellen Ballock and Scott Ballock dated May 15, 2013 re: Disney World

12. Numerous emails from Scott Ballock to Ellen Ballock dated February 18, 2013 (pp. 13-16);

13. Email from Scott Ballock to Ellen Ballock dated February 9, 2013, 3:58 p.m. re: Attorney Fees (p. 39);

14. Email from Scott Ballock to Ellen Ballock dated January 28, 2013 9:58 p.m. re: Things received for Thomas (pp. 68-69)

15. Email from Scott Ballock to Ellen Ballock dated January 18, 2013, 8:31 a.m. re:

10555081

CJIS (p. 111);

16. Email from Scott Ballock to Ellen Ballock dated January 15, 2013, 10:55 a.m. re: Family Day (p. 114);

17. Email from Scott Ballock to Ellen Ballock dated January 6, 2013, 12:57 a.m. re: Why (p. 129);

18. Numerous emails from Scott Ballock to Ellen Ballock dated January 5, 2013 (pp. 129-151);

19. Numerous emails from Scott Ballock to Ellen Ballock dated January 2, 2013 (pp. 164-171);

20. Numerous emails from Scott Ballock to Ellen Ballock dated January 1, 2013 (pp. 171-174);

21. Numerous emails from Scott Ballock to Ellen Ballock dated December 16, 2012 (pp. 214-243);

22. Numerous emails from Scott Ballock to Ellen Ballock dated December 15, 2012 (pp. 243-303);

23. Numerous emails from Scott Ballock to Ellen Ballock dated December 10, 2012 (pp. 344-354);

24. Email from Scott Ballock to Ellen Ballock dated December 9, 2012, 1:40 a.m. re: This weekend (pp. 360-361);

25. Email from Scott Ballock to Ellen Ballock dated December 8, 2012, 10:55 p.m. re: You (pp. 363-365);

26. Email from Scott Ballock to Ellen Ballock dated December 7, 2012, 10:03 am re: She Has to Cry at Night (pp. 373-374)

27. Email from Scott Ballock to Ellen Ballock dated December 7, 2012, 4:08 p.m. re: Two years later, Morenci mom holds out hope that 3 boys are still alive (p. 375);

28. Emails from Scott Ballock to Ellen Ballock dated November 22, 2012, re: How Could You? (pp. 386-387);

29. Email from Scott Ballock to Ellen Ballock dated November 22, 2012, 5:58 p.m. re: Morgantown (p. 388)

30. Email from Ellen Ballock to Scott Ballock dated November 16, 2012, 8:36 a.m. re: I do not deny the kids visiting you (p. 404);

31. Email from Scott Ballock to Ellen Ballock dated November 16, 2012, 12:04 a.m.

14

re: You're right (p. 407);

32. Email from Ellen Ballock to Scott Ballock dated November 15, 2012, 9:35 p.m. re: You fantasize like a child (p. 410);

33. Email from Scott Ballock to Ellen Ballock dated November 11, 2012, 8:50 p.m. re: Employment (p. 426);

34. Email from Ellen Ballock to Scott Ballock dated November 11, 2012, 8:02 p.m. re: To repeat my answers (p. 428);

35. Email from Ellen Ballock to Scott Ballock dates November 11, 2012, 11:07 a.m. re: Stop (p. 430);

36. Emails between Scott Ballock to Ellen Ballock dated November 9, 2012 re: Leave me alone (p. 443);

37. Multiple emails from Scott Ballock to Ellen Ballock dated November 7, 2012 (pp. 449-455);

38. Email from Ellen Ballock to Scott Ballock dated November 5, 2012, 8:54 p.m. re: No. Not hysterical (p. 460);

39. Email from Scott Ballock to Ellen Ballock dated November 4, 2012, 10:58 p.m. re: Stop calling me a sociopath (p. 470)

40. Email from Ellen Ballock to Scott Ballock dated October 22, 2012, 5:27 p.m. re: You contend (pp. 482-483);

41. Email from Scott Ballock to Ellen Ballock dated October 21, 2012, 2:35 a.m. re: You are something else (p. 495);

42. Emails between Scott Ballock and Ellen Ballock dated October 20, 2012, 7:06 p.m. re: you are not street smart (p. 534);

43. Numerous emails (approx. 40) from Scott Ballock to Ellen Ballock dated October 15, 2012 (pp. 563-575);

44. Numerous emails between Scott Ballock and Ellen Ballock dated October 11, 2012 (pp. 582-595);

45. Email from Scott Ballock to Ellen Ballock dated October 9, 2012, 8:56 a.m. re: The End (p. 600-601);

46. Email from Ellen Ballock to Scott Ballock dated October 8, 2012, 5:36 p.m. re: "It was unreal" (p. 637);

47. Emails between Scott Ballock and Ellen Ballock dated October 8, 2012, (p. 638);

48. Email from Scott Ballock to Ellen Ballock dated October 7, 2012, 11:16 a.m. re: Choices (p. 655);

49. Email from Scott Ballock to Ellen Ballock dated October 2, 2012, 10:45 p.m. re: I'm sorry (pp. 666-667);

50. Emails between Ellen Ballock and Scott Ballock dated October 2, 2012, (pp. 670-672);

51. Email from Scott Ballock to Ellen Ballock dated October 1, 2012, 6:38 a.m. re: Morning (p. 681);

52. Email from Scott Ballock to Ellen Ballock dated September 30, 2012, 1:38 a.m. re: Final Poem (p. 683);

53. Emails between Scott Ballock and Ellen Ballock dated September 29, 2012 re: Whatever works (p. 683);

54. Emails between Scott Ballock and Ellen Ballock dated September 29, 2012 (p. 686);

55. Email from Scott Ballock to Ellen Ballock dated September 27, 2012, 6:23 a.m. re: Hold My Hand (p. 703);

56. Email from Scott Ballock to Ellen Ballock dated September 27, 2012, 12:16 a.m. re: Goodbye (p. 713).

Per Paragraph 9 of the Second Amended Scheduling Order (ECF No. 88), any objections to the parties' witness and exhibit lists are due to be filed on December 9, 2019.

## 2.  CONTESTED ISSUES OF LAW REQUIRING A RULING BEFORE TRIAL

a.      Are the Defendants entitled to summary judgment?

Federal Rule of Civil Procedure 56; *Cloaninger v. McDevitt*, 555 F.3d 324, 32 (4th Cir. 2009); *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984).

## 3.  PLAINTIFFS' STATEMENT OF CLAIMS AND DAMAGES

### Plaintiffs' Claims.

10555081

1.      Abuse of process, against all Defendants, in violation of 42 U.S.C. § 1983 (Claim 1). Abuse of process requires a willful and intentional abuse or misuse of process for the accomplishment of a wrongful object; some collateral advantage not properly involved in the proceeding. Preiser v. McQueen, 177 W.Va. 273, 279, 352 S.E.2d 22, 28 (1985).

The distinctive nature of an action for abuse of process, as compared with the actions for malicious prosecution and false imprisonment, is that it lies for the improper use of a regularly issued process, not for maliciously causing process to issue, or for an unlawful detention of the person. . . . The authorities are practically unanimous in holding that to maintain the action [for abuse of process] there must be proof of a willful and intentional abuse or misuse of the process for the accomplishment of some wrongful object—an intentional and willful perversion of it to the unlawful injury of another.

Preiser, 177 W.Va. at 279, 352 S.E.2d at 28, (quoting Glidewell v. Murray-Lacy and Company, 124 Va. 563, 569, 571, 98 S.E. 665, 667, 668 (1919)). See Preiser v. MacQueen, 177 W.Va. 273, 279 n. 8, 352 S.E.2d 22, 28 n. 8 (1985), (evidence that a collateral advantage has been obtained is relevant in demonstrating that lawfully issued process has been used for an improper purpose).

2.   Malicious prosecution elements, federal: (1) the Defendants caused; (2) a criminal prosecution of Scott Ballock by legal process unsupported by probable cause; that (3) terminated in his favor, dismissal and expungement. See Evans v. Chalmers, 703 F.3d 636 (4th Cir. 2012), (North Carolina case).

The elements of state law malicious prosecution claims: ""To maintain an action for malicious prosecution it is essential to prove (1) that the prosecution was malicious, (2)

that it was without reasonable or probable cause, and (3) that it terminated favorably to plaintiff." <u>Norfolk S. Ry. Co. v. Higgenbotham</u>, 228 W.Va. 522, 721 S.E.2d 541 (2011).

3. Elements of civil conspiracy: Under West Virginia law, a civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff. <u>Doe v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints</u>, 239 W. Va. 428, 801 S.E.2d 443 (2017).

Ellen Costlow and Michael Kief conspired to abuse legal process to prejudice Scott Ballock in the family court; interfere with Scott Ballock's employment; and intimidate Scott Ballock's father who was posting internet blogs that were unflattering to Ellen Costlow and Michael Kief. As to Ellen Costlow's liability for Kief's actions see also, <u>Brice v Nkaru</u>, 220 F.3d 233 (4th Cir. 2017).

4. Intentional infliction of emotional distress elements (1) Defendants' conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) the defendants acted with intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result; (3) that the actions of the Defendants caused the Plaintiff to suffer emotional distress; and (4) that the emotional distress suffered by the Plaintiff was so severe that no reasonable person could be expected to endure it. <u>Travis v. Alcon Labs, Inc.</u>, 202 W.Va. 369, 504 S.E.2d 419 (1998).

5. Defamation elements: (1) defamatory statements; (2) non-privileged communication to a third party; (3) falsity; (4) reference to the Plaintiff; (5) at least negligence on the part of the Defendants; and (6) resulting injury. Crump v. Beckley Newspapers, Inc., 173 W.Va. 699, 320 S.E.2d 70 (1984).

6. Breach of contract against Costlow, elements: Costlow agreed as part of the dismissal motion in the criminal case and as part of the divorce decree that she would have no contact with the FBI. She violated these agreements with the aid of Michael Kief.

7. Slander against Costlow. This is spoken defamation, established when Ellen Costlow falsely complained to the State Police and to the FBI about the Plaintiff.

8. Interference with contract of employment claim elements: (1) the existence of an employment relationship (FBI special agent); (2) an intentional act or interference by an outside party (Costlow and Kief notified the FBI of the investigation and arrest when there was no need and the investigation and arrest were unjustified); (3) that the interference caused harm (termination is under appeal, but harm has occurred in the interim); (4) damages (special damages and general damages have been discovered). Hatfield v. Health Mgmt. Assocs. Of W.Va., 223 W.Va. 259, 672 S.E.2d 395 (2008).

**Plaintiffs' Damages.**

Plaintiff's expert witness, Professor Clifford Hawley will explain the calculation of the Plaintiff's special damages, income and benefits, as detailed in his report and deposition.

1. Losses to date: $238,690.

2. Present value of future losses exclusive of pension benefit losses, $1,057,349 to $1,200,449.

3. Estimated pension loss: $655,353.

4. Statutory interest from the time of termination on September 26, 2019.

Plaintiff is entitled to general damages for his emotional pain and suffering caused by the wrongful acts of the Defendants. Those damages are to be established by the jury.

## 4. DEFENDANTS' STATEMENT OF DEFENSES

In order to prevail on a claim of civil rights violations under 42 U.S.C. § 1983, a plaintiff must show (1) that the defendant was acting under color of state law; and (2) that the defendant's actions deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988). Thus, "[i]f there is no violation of a federal right, there is no basis for a section 1983 action[.]" *Id.*

As to Ms. Costlow, Plaintiff has no evidence that she was acting under color of state law. In addition to the elements Plaintiff would have to prove to establish liability and damages on his § 1983 claims against the State Police Defendants, he would have to prove that Ms. Costlow engaged in wrongful conduct with a sufficiently close nexus to the actions of the State Police Defendants in arresting Plaintiff that her actions could be treated as those of the State. *Rossigold v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003), *Jackson v. Metro Edison Co.*, 419 U.S. 345 (1974), *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999). Plaintiff can produce no evidence that Ms. Costlow played any role in consultation with the Monongalia County Prosecuting Attorney's office, drafting of criminal complaints, obtaining warrants or arresting the Plaintiff. Ms. Costlow's actions in being interviewed by the Troopers cannot be seen as anything other than the actions of a private individual. Charges against the Plaintiff were based entirely upon emails and

text messages delivered by Ms. Costlow's Family Court attorney, which the Plaintiff does not dispute sending.

Defendants' chief defense is that Plaintiff will not be able to establish all the essential elements of any of his federal claims or their related state law counterparts.

In order to establish the essential elements of his Section 1983 malicious prosecution claim (as well as the related state law claim), Plaintiff must prove that he was arrested without probable cause. *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (establishing lack of probable cause as an essential element of a Section 1983 "malicious prosecution" claim); Syl. Pt. 2, *Norfolk S. Ry. Co. v. Higgenbotham*, 228 W. Va. 522, 721 S.E.2d 541 (2011) (establishing lack of probable cause as essential element of state law malicious prosecution claim). Additionally, acts of independent decision-makers in the criminal justice system, such as a prosecuting attorney, insulate a police officer from liability from malicious prosecution claims under both Section 1983 and state law. *Evans*, 703 F.3d at 647; *Pote v. Jarrell*, 186 W. Va. 369, 374, 412 S.E.2d 770, 775 (1991). Also, there is no violation of constitutional rights when an individual is arrested pursuant to arrest warrants signed by a magistrate, who also found probable cause. *McKinney v. Richland Cty. Sheriff's Dept.*, 431 F.3d 415, 418 (4th Cir. 2005).

Presuming that a Section 1983 abuse of process cause of action exists, or considering only the state law tort, Plaintiff must prove that Defendants used the criminal process for an improper purpose after it was issued. *See Rahmi v. Sovereign Bank N.A.*, Civil Action No. 3:12-CV-87, 2013 WL 412623, at *2 (N.D.W. Va. Feb. 1, 2013) (setting forth elements of abuse of process claim). Yet, "there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Preiser v.*

*MacQueen*, 177 W. Va. 273, 279, 352 S.E.2d 22, 28 n. 8 (1985) (internal quotation and citation omitted).   Merely filing a complaint does not give rise to an abuse of process claim, and failure to allege willful abuse of process *after its issuance* is fatal to a claim. *S. States Coop., Inc. v. I.S.P. Co., Inc.*, 198 F. Supp. 2d 807, 816 (N.D.W. Va. 2002).

Plaintiff brings of defamation under both Section 1983 and state law against Cpl. Gaskins and Ms. Costlow. Under state common law, "[t]he essential elements for a successful defamation action . . . are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70 (1984). A Section 1983 defamation claim requires a plaintiff to prove additional elements. A plaintiff alleging defamation in violation of § 1983 "must demonstrate that his reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status'" in order to prevail. *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314-15 (4th Cir. 2012) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)). A law enforcement officer's publication of defamatory allegations within the confines of a criminal investigation is widely recognized as privileged. *See Restatement (Second) of Torts* § 598A (1975). Similarly, a publication is privileged if it is reasonable to believe that there is information that affects an important interest of the third person, and the recipient is one to whom the publication is within the generally accepted standards of decent conduct. *Restatement (Second) of Torts* § 595.

To establish a claim of civil conspiracy under Section 1983, a plaintiff must present evidence (1) that the defendants acted jointly in concert and (2) that some over act was done in furtherance of the conspiracy (3) that resulted in the deprivation of the plaintiff's constitutional

rights. *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir. 1996).[1] An individual alleging a conspiracy must also produce evidence that each member of the alleged conspiracy shared the same conspiratorial objective. *Id.*

Plaintiff also has three counts that are brought solely under state law—tortious interference with contract, intentional infliction of emotional distress, and breach of contract. The breach of contract count is brought only against Ms. Costlow.

In order to establish a claim of tortious interference with contract, a plaintiff must show: (1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by an outside party; (3) that the interference caused harm; and (4) damages. Syl. Pt. 5, *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 223 W. Va. 259, 672 S.E.2d 395 (2008). Defendants in such cases have a variety of defenses, including the giving of truthful requested advice. *Id.* at 267, 672 S.E.2d at 403. Providing truthful information is an absolute bar to a tortious interference claim, regardless of whether the information is requested. *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W. Va. 135, 150, 506 S.E.2d 578, 593 (1998). Moreover, communications are privileged if they involve a matter that is of sufficient importance to the recipient, and the recipient is one to whom the communication is within the generally accepted standards of conduct. *Restatement (Second) of Torts* § 595.

A plaintiff must prove four elements in order to prevail in an outrage claim:

It must be shown:  (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional

---

[1] Plaintiff's counsel clarified during the October 9, 2019 status hearing that Plaintiff's civil conspiracy claim is brought under Section 1983.

10555081

> distress; and, (4) that the emotional distress suffered by the
> plaintiff was so severe that no reasonable person could be expected
> to endure it.

Syl. Pt. 3, *Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 374, 504 S.E.2d 419, 425 (1998). "It is

difficult to overstate the high burden of proof required to sustain a tort claim for intentional

infliction of emotional distress/outrage." *Pegg v. Herrnberger*, 845 F.3d 112, 122 (4th Cir.

2017). In fact, "the elements to establish a malicious prosecution case are less severe than an

action for outrageous conduct". *Hines v. Hills Dep't Stores, Inc.*, 193 W. Va. 91, 96, 454 S.E.2d

385, 390 (1994).

In addition to the Plaintiff's inability to establish damages, his breach of contract claim

against Ms. Costlow, based upon the attachment to the Motion to Dismiss criminal charges

against Plaintiff, is not viable based upon the Plaintiff's breach of the agreement, in which he

acknowledged the existence of probable cause for his arrest. *Kanawha-Gauley Coal & Coke Co.*

*v. Pittston Minerals Group, Inc.*, 2011 U.S. Dist. Lexis 80411 *29, 2011 WL 3022239 (S.D. W.

Va. Charleston July 22, 2011)*, citing, *Exec. Risk, Inc. v. Charleston Area Med. Ctr., Inc.,* 681 F.

Supp. 2d 694, 714 (S.D. W. Va. 2009). Plaintiff's attempt to base this claim upon a "breach" of a

Family Court order also fails, as the order did not create a "contract" between Ms. Costlow and

the Plaintiff, enforceable in a suit for damages in another forum. *McCormick v. Hamilton Bus.*

*Sys.*, 175 W. Va. 222, 322 S.E.2d 234 (1985); Syl. pt. 1, *First National Bank v. Marietta Mfg.*

*Co.*, 151 W. Va. 636, 153 S.E.2d 172 (1967); *Fulton v. Messenger*, 61 W. Va. 477, 56 S.E. 830,

832 (1906). Furthermore, no breach occurred where the FBI contacted Ms. Costlow. None of

Plaintiff's claims are viable, of course, based upon the fact that Plaintiff was fired for conduct,

which he acknowledges committing, occurring prior to the first tortious act he alleges and prior

to the formation of any "contract" he seeks to enforce, and for lying to FBI investigators during the course of the investigation of Plaintiff's conduct.

The State Police Defendants also have asserted qualified immunity to Plaintiff's claims. In order to be entitled to qualified immunity from claims under Section 1983, a defendant must either show (1) that no constitutional violation occurred; or (2) that the right violated was not clearly established at the time it was violated.  *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 396 (4th Cir. 2015). A right is "clearly established" if the contours of the right are sufficiently clear so that a reasonable officer would understand that what he is doing violates the right. The right at issue, however, is not defined as a broad general proposition, but rather, in light of the specific context of the case. *Cox v. Quinn*, 828 F.2d 227, 238 (4th Cir. 2016). Because a Section 1983 claim requires a violation of a right protected by the Constitution or federal law, and the qualified immunity analysis also looks to whether there was a violation of clearly established law, the availability of qualified immunity overlaps substantially with the merits of a constitutional claim. *O'Bar v. Pinion*, 953 F.2d 74, 80 (4th Cir. 1991). Similarly, under West Virginia law, a state employee charged with negligence in carrying out discretionary functions is entitled to qualified immunity if the alleged acts or omissions do not violate a clearly established law of which a reasonable official would be aware. Syl. Pt. 11, *W. Va. Reg'l Jail & Corr. Fac. Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

## 5.  SUMMARY OF MATERIAL FACTS/THEORIES OF LIABILITY OR DEFENSE

### I.  Plaintiff's Summary of Material Facts and Theories of Liability.

Scott Ballock and Ellen Costlow were married in June of 1991. They had two children, born in 2001 and 2003. Ellen Costlow filed for divorce from Scott Ballock in October of 2012.

The divorce was litigated in the family court of Monongalia County, West Virginia until May 14, 2014.

Ellen Costlow left Scott Ballock for another man, Kenny Ray Ice, Jr. Her relationship with Mr. Ice was tempestuous, resulting in more than one police intervention during violent arguments, the first on March 6, 2013 when the State Police were called by Mr. Ice to the residence. Ellen Costlow would act out in front of her daughter and expose her to dangerous situations, so Scott Ballock feared for the safety of his daughter and whether the court might award Ellen Costlow some measure of custody. After Ellen Costlow introduced and socialized her daughter to a convicted pedophile, Scott Ballock was awarded primary custody on June 11, 2013 and Ellen Costlow was obliged to supervised visitation.

In March of 2013, Ellen Costlow, arguing that she was suffering from Battered-Woman Syndrome moved the family court to appoint a forensic psychiatrist with expertise in that diagnosis, Dr. Christie Cooper-Lehki. Dr. Cooper-Lehki's investigation lasted more than six months and resulted in a psychiatric profile for each member of the family that was relied upon by the family court to award Scott Ballock full custody. Ellen Costlow was not diagnosed as suffering from Battered Woman Syndrome as she claimed but was diagnosed as suffering from Borderline Personality Disorder with many attending sociopathic features that posed a risk to the children and Scott Ballock. The sociopathic features included lying, manipulation, the desire to hurt others, and a lack of conscience or remorse for harming others.

Dr. Cooper-Lehki could find no evidence of abuse suffered by Ellen Costlow, instead she found that Ms. Costlow fabricated her complaints of abuse. Dr. Cooper-Lehki found that Scott

Ballock's relationship with the children was loving and supportive, while Ellen Costlow was an unfit and abusive mother who coached the daughter on what to tell the counselor, the guardian ad litem and Dr. Cooper-Lehki. The children's counselor and the guardian ad litem concurred with Dr. Cooper-Lehki's conclusions.

Kenny Ice, Jr. experienced violence at the hands of Ellen Costlow, witnessed on several occasions by the Ballocks' minor daughter. In May of 2013, Mr. Ice called Scott Ballock and volunteered information including his cell phone that contained text messages and audio recordings of conversations and arguments with Ellen Costlow. For instance, in a text on May 1, 2013, Ellen Costlow told Kenny Ice, Jr. that, "I have the upper hand with possible ruining Scott's career so they're going all out." "I'm going to move forward with the harassment charges against Scott." Dr. Cooper-Lehki considered this evidence and interviewed Mr. Ice.

On August 12, 2013, Mr. Ice suffered a knife wound at the hand of Ellen Costlow. Mr. Ice had moments earlier discovered inappropriate personal messages between Trooper Christopher Berry and Ellen Costlow. Mr. Ice called Scott Ballock the next day and advised that Ellen Costlow was in a sexual relationship with Trooper Berry. Later that day, Tom Ballock, Scott Ballock's father, called Sgt. Kief to warn him that Ellen Costlow was having an affair with State Trooper Berry and that Ms. Costlow would likely reveal this to Trooper Berry's wife, as she had done with other paramours.

Ellen Costlow was interviewed multiple times by Dr. Cooper-Lehki between March and September of 2013. Ellen Costlow anticipated the doctor's testimony and report would stand against her, so she contrived to file criminal charges against Scott Ballock, hoping to prejudice

10555081

him before the family court and get him fired from his job as a supervisory special agent of the FBI. In an email to Sgt. Kief, contained in the State Police investigation file, Ellen Costlow explained that if Scott Ballock lost his job she would get custody.

Over the first eleven months of the divorce the estranged couple exchanged communications via telephone, texts and emails. As she had during their marriage, Ellen Costlow would sometimes initiate, instigate and retaliate in these communications, swinging from affectionate and even open to reconciliation, to angry and vengeful. More than once she told her husband to stop communications only to reopen them when her mood or motives changed. She took these communications to the State Police after she was contacted by Sgt. Michael Kief.

Sgt. Kief claimed in deposition that he called Ellen Costlow to inquire about the call he received from Tom Ballock, concerning her and Trooper Berry. Seeing an opportunity to finally gain the advantage in family court, Ellen Costlow gave the 11 months of electronic communications to Sgt. Kief. He then arranged arrest warrants against Scott Ballock for stalking and harassment. Ellen Costlow claimed in deposition she told Sgt. Kief she was traumatized by the communications, yet in deposition she admitted they were automatically routed to a dump folder and she was not even inconvenienced by them. She perused them at her leisure from time to time.

Sgt. Kief admitted in deposition he failed to follow State Police policy and procedure in his inquiries into Tom Ballock's telephone call or Ellen Costlow's complaint of stalking and harassment. In an expedited and result-oriented approach, Sgt. Kief utilized Cpl. Gaskins as a perfunctory and ran the operation himself in collaboration with Ellen Costlow. Sgt. Kief first

28

notified the FBI and then personally executed the arrest of Scott Ballock on September 13, 2013, the day of the final custody hearing in family court. This was within three weeks of Ellen Costlow and Sgt. Kief's first meeting.

Judge Minor commented on the arrest in his order of September 20, 2013, observing it was done to influence his decision. He noted that Ellen Costlow never brought the communications at issue to his attention, otherwise he would have dealt with it.

In her deposition, Ellen Costlow testified she did not know she could bring criminal charges for email and text harassment until she spoke to Sgt. Kief in August 2013. Yet an email dated May 29, 2013, produced in discovery by the State Police, Ellen Costlow stated to her divorce attorneys, "I need to file harassment charges against Scott today and I would appreciate your help in this matter." It was her divorce attorneys who helped Ellen Costlow set up the email dump file. They withdrew as her counsel when she instructed them to send her electronic communications to the State Police on a computer disc. That was the disc that was copied and given to the FBI.

The May 29 email to Ellen Costlow's divorce counsel occurred one day after Scott Ballock emailed Costlow. Scott Ballock had learned from Kenny Ice, Jr. that Ellen Costlow had stolen FBI property and either sold or gave it away. This included 40 boxes of FBI pistol ammunition valued at over $2,000. Also, on May 28, 2013, Scott Ballock notified Ellen Costlow that he just discovered she withdrew $127,000 from the joint savings account, taking it to a zero balance. Kenny Ice, Jr. told Scott Ballock she was spending the money on him and illicit drugs.

10555081

Scott Ballock was obliged to report the loss of FBI property. The FBI Security Division ordered Scott Ballock to try and retrieve that property. Ellen Costlow told the State Police that Scott Ballock was threatening her regarding the FBI property, a falsehood.

Thanks to Sgt. Kief, the FBI had an agent present to witness Scott Ballock's arrest. Sgt. Kief gave the FBI the communications at issue and three years later gave a statement to the FBI, intended to defame Scott Ballock. According to the State Police investigation file, from before the arrest on September 13, 2013, until well after Sgt. Kief spoke to the FBI in April 2016, he and Ellen Costlow carried on an unusually close and unprofessional collaboration, including plans to violate court orders by giving information to the FBI. Sgt. Kief solicited Ellen Costlow to violate the court orders, suggesting she should tell him what he should say. He suggested she broaden the scope of the FBI investigation by sharing information unrelated to the stalking and harassment charges.

Sgt. Kief told the FBI Scott Ballock was arrested in family court out of concern over his potential for gun violence, yet Scott Ballock was later allowed access to the State Police barracks later that same day, bearing his loaded firearm. Similarly, Sgt. Kief falsely told the FBI that he, Sgt. Kief, investigated the report of Ellen Costlow's affair with a married trooper and found it to be untrue. In deposition, he admitted he called the trooper the day before meeting with him, shared the allegation, and said he wanted to see the phone the next day; there were no messages on it. Ellen Costlow testified she was never asked by Sgt. Kief about the affair. Sgt. Kief never spoke with Kenny Ice, Jr. about the matter. When asked in deposition whether he thought there

had been an affair, he testified he did not know, but he kept Trooper Berry out of the investigation of Scott Ballock because such an affair would be disqualifying.

The stalking and harassment charges were withdrawn on April 7, 2016, nearly three years after the arrest. The elected prosecutor, Marcia Ashdown, negotiated the terms and appeared in magistrate court to dismiss the case. She admitted to Ballock's counsel in negotiations that "her boys had been misbehaving." The dismissal motion included an agreement by Ellen Costlow not to contact Scott Ballock's employer. This followed the divorce decree of May 14, 2014, which included an injunction against contacting each other's employer and an agreement signed by Ellen Costlow, not to contact the FBI, ever.

Scott Ballock's father, Tom Ballock, established several websites and posted a series of narratives critical of Ellen Costlow. She sued him in civil court in early 2013 and dropped the case with prejudice before Ellen Costlow started working with Sgt. Kief in late August of that year.

Tom Ballock began criticizing Sgt. Kief immediately after Scott Ballock was arrested on September 13, 2013. The State Police investigation file revealed that Sgt. Kief investigated Tom Ballock's websites for possible criminal violations. Tom Ballock found out and stepped up his attacks against Sgt. Kief, calling him, "Cowboy Kief." Sgt. Kief testified in deposition that this greatly upset him. It apparently motivated Sgt. Kief. He could not find anything with which to charge Tom Ballock, so he took it out on Scott Ballock by encouraging Ellen Costlow to violate the confidentiality agreements and injunctive order and by his own false statements to the FBI, defaming Scott Ballock.

31

10555081

During the FBI's administrative investigation, the FBI agents who interviewed Scott Ballock told him there was nothing to worry about, but the Office of Disciplinary Responsibility (ODR) overruled those recommendations and adopted Sgt. Kief and Ellen Costlow's false narratives. The OPR's first decision to terminate Scott Ballock was for abusing Ellen Costlow and being arrested. Candace Will, Esquire, of the OPR cited Sgt. Kief's false statement about his investigation of Trooper Berry as aggravation in terminating Scott Ballock. This position was then abandoned after Scott Ballock pointed out to the Disciplinary Review Board the falsity of Sgt. Kief's statement and the DRB remanded the matter for further investigation.

The second termination decision shifted position to rely on sex play with a firearm, Ellen Costlow's false narrative of abuse and a supposed lack of candor in respect to Ellen Costlow's false accusations of abuse. The second decision is on appeal to the DRB.

## II. Defendants' Summary of Material Facts and Theories of Defense.

Plaintiff Scott Ballock was an FBI agent, who was previously married to Ms. Costlow. In August 2011, Mr. Ballock was assigned as a Supervisory Senior Resident Agent at the FBI's Criminal Justice Information Service ("CJIS") center in Clarksburg. Approximately a year after the couple moved to West Virginia, in September 2012, the Ballocks separated. Shortly thereafter, Ms. Costlow filed for divorce.

In August 2013, Mr. Ballock's father, Tom Ballock, contacted Sgt. Kief to warn him that one of the troopers under him, former Defendant Trooper Chris Berry, was allegedly having an affair with Ms. Costlow, and Sgt. Kief might want to warn Trooper Berry that she contacted the

wives of the men she was seeing and told them of the affairs. However, Tom Ballock said that he did not want to file a formal complaint against Trooper Berry.

After being made aware of the concerns that Trooper Berry purportedly was having an affair with Ms. Costlow, Sgt. Kief met with Trooper Berry. Trooper Berry denied that he was involved with Ms. Costlow. Sgt. Kief also reviewed the text messages and call log of Trooper Berry's personal cell phone and did not see anything on the phone that raised concerns.

The allegations against Trooper Berry arose from an investigation Trooper Berry was conducting in Mr. Ballock's and Ms. Costlow's neighborhood involving a series of larcenies or break-ins into cars. Trooper Berry interviewed Ms. Costlow to see if she saw anything suspicious or had any knowledge of the break-ins. He gave her his cell phone number and asked her to contact him if she learned of any information relevant to the investigation.

Ms. Costlow's boyfriend, Kenny Ice, claimed to have seen text messages Ms. Costlow had exchanged with Trooper Berry and believed she was having an affair with him. Mr. Ice then contacted Mr. Ballock and informed him of his suspicions.

In the course of checking into Tom Ballock's allegations, Sgt. Kief also contacted Ms. Costlow, who informed him that Mr. Ballock had been harassing her in the year since the couple separated, including by sending e-mails and text messages. This revelation led to the State Police opening up an investigation into Mr. Ballock's alleged harassment of Ms. Costlow.

Mr. Ballock sent his estranged wife over 3,000 e-mails and text messages over a period of approximately one year, between the time the couple separated and the time Ms. Costlow made a complaint to the State Police. A "substantial amount" of the communications were pressuring Ms. Costlow to return to Mr. Ballock. Although Ms. Costlow informed Mr. Ballock

33

that she considered his communications harassing, he denied that he had harassed Ms. Costlow and insisted that all of his communications with her were "polite and respectful."

Mr. Ballock's communications were far from polite and respectful. In his communications with his wife, Mr. Ballock made derogatory references to her sex life, called her "pure evil" and said that he would never forgive her. Despite Ms. Costlow unequivocally informing Mr. Ballock that she was not interested in reconciliation, he continued to harass her, alternating between seeking reconciliation and insulting her. Mr. Ballock used the couple's children to attack Ms. Costlow, threatening that tragedies would befall their children, and it would be her fault. And he promised her that he would never relent from harassing her.

Not only were Mr. Ballock's messages to Ms. Ballock hurtful and disrespectful, he also harassed her simply with the large number of e-mails and texts he sent. Mr. Ballock also threatened Ms. Costlow with both civil and criminal legal actions.

In May of 2013, Ms. Costlow again asked Mr. Ballock to cease harassing her and to go through her attorneys for any future communications. Mr. Ballock responded that he would never go through Ms. Costlow's attorneys for anything, ever.

Cpl. Gaskins documented his investigation of Ms. Costlow's claims in a report. Mr. Ballock has admitted that every statement Cpl. Gaskins put in his investigation report is true.

On September 11, 2013, Cpl. Gaskins met with Monongalia County Assistant Prosecuting Attorney Cindy Scott to decide whether to press charges, and if so, with what to charge Mr. Ballock. APA Scott reviewed Mr. Ballock's communications herself. She advised Cpl. Gaskins to charge Mr. Ballock with one count each of Stalking/Harassment, in violation of

West Virginia Code § 61-2-9a, and Harassment by Electronic Communications Device, in violation of West Virginia Code § 61-3C-14a.

The next day, Cpl. Gaskins presented two criminal complaints to Magistrate Sandy Holepit, who found probable cause for both counts and issued arrest warrants.The day after that, on September 13, 2013, Sgt. Kief served Mr. Ballock with the arrest warrants during Mr. Ballock's divorce hearing at Monongalia County Family Court.

The decision to arrest Mr. Ballock during the Family Court proceedings was due to officer safety concerns; as an FBI agent, Mr. Ballock carried a weapon, but it was presumed he would be unarmed during the court proceeding. The State Police coordinated Mr. Ballock's arrest during the Family Court hearing with the FBI, which shared Sgt. Kief's concerns about safety and concurred with his plan to serve the arrest warrant on Mr. Ballock during the Family Court hearing. The FBI also had an agent present during his arrest to witness the event.

The FBI became involved in Mr. Ballock's arrest because when the State Police began its criminal investigation of Mr. Ballock, but before he was arrested, either Sgt. Kief or Cpl. Gaskins contacted the FBI to let them know that one of their agents was under criminal investigation. Additionally, sometime after Cpl. Gaskins began the State Police investigation, John Hambrick of the FBI met with Cpl. Gaskins to discuss the allegations against Mr. Ballock. At this meeting, Mr. Hambrick asked for a copy of the disk of Mr. Ballock's communications with Ms. Costlow. After receiving approval from APA Scott, Cpl. Gaksins supplied the FBI with a copy of the disk.

Nearly two and one-half years after Mr. Ballock's arrest, on April 7, 2016, Monongalia Prosecuting Attorney Marcia Ashdown dismissed the charges against Mr. Ballock. Neither Ms.

Costlow, Sgt. Kief, nor Cpl. Gaskins sought to have the charges against Mr. Ballock dismissed. In fact, Ms. Costlow, Sgt. Kief, and Cpl. Gaskins were surprised to learn that the Prosecuting Attorney's Office had decided to dismiss the charges; prior to deciding to dismiss the charges against Mr. Ballock, Ms. Ashdown did not consult with any of them. The State moved to dismiss after Mr. Ballock and Ms. Costlow entered into an agreement with the State, under which Mr. Ballock acknowledged that probable cause existed for the State Police to file for the issuance of the arrest warrants.

After the criminal charges against Mr. Ballock were dismissed, the FBI conducted an independent, internal investigation into the allegations that Mr. Ballock harassed Ms. Costlow. The FBI reviewed Mr. Ballock's e-mails and texts. The FBI's Office of Professional Responsibility ("OPR") determined, by a preponderance of the evidence, that Mr. Ballock committed a misdemeanor offense under W. Va. Code § 61-3C-14a of harassing Ms. Costlow by computer or electronic device. The FBI's Assistant Director of Human Resources, Candice Will, after conducting her own independent review of the record, including Mr. Ballock's written submissions as part of the FBI disciplinary process, agreed with OPR's recommendation and dismissed Mr. Ballock from the FBI.

Mr. Ballock claims that shortly after he filed the initial pro se pleading in this matter, an unidentified, uniformed representative of the West Virginia State Police visited the FBI's Clarksburg Resident Agency and lodged a complaint with the Supervisory Senior Resident Agent about this lawsuit. He cannot, however, identify who this "mystery trooper" was.

On April 10, 2017, after Mr. Ballock stopped by the Morgantown State Police detachment in an attempt to serve the State Police Defendants, Sgt. Kief spoke by telephone with

the acting Supervisory Senior Resident Agent at that time, John Large. Sgt. Kief did not call Mr. Large to lodge a complaint about Mr. Ballock filing a civil action, but to report Mr. Ballock's harassment of the troopers. Sgt. Kief told Mr. Large that Mr. Ballock's demeanor was arrogant and he appeared to be "thumbing his nose" at the State Police.

Mr. Ballock appealed his discharge through the FBI's internal administrative process. The FBI's Office of Disciplinary Appeals remanded the case back to the FBI Inspection Division to conduct additional investigation.

After additional investigation, OPR again recommended Mr. Ballock's dismissal, albeit on slightly different grounds. The FBI found that Mr. Ballock committed three violations of its rules and policies: (1) misuse of weapon/safety violation (putting a handgun in Ms. Costlow's vagina during sex and in Mr. Ballock's own mouth while threatening suicide); (2) unprofessional conduct off-duty (which included, but went beyond, his harassment of Ms. Costlow); and (3) lack of candor/lying under oath (both by his denial of abusing Ms. Costlow and by characterizing his emails and texts as "respectful and appropriate" and not threatening). Acting Assistant Director Nancy McNamara approved OPR's recommendation and discharged Mr. Ballock again. The FBI concluded that each of the three grounds is an independent basis for his discharge. Importantly, the FBI expressly stated in the latest discharge letter that it did not consider Mr. Ballock's arrest by the State Police in reaching its decision.

Defendants' theory of defense is that Mr. Ballock cannot prove the essential elements of any cause of action he asserts. The numerous e-mails and text messages he sent Ms. Costlow, both by their volume and insulting nature, and despite her repeated requests that he cease contacting her, establish that there was probable cause for his arrest. In addition, APA Scott

instructed Cpl. Gaskins to charge Mr. Ballock with the two counts with which he was charged, thereby acting as an intervening cause and insulating Defendants from liability. Finally, Mr. Ballock was arrested pursuant to a warrant signed by a magistrate. Not only is the arrest warrant proof of probable cause, but there is simply no constitutional violation when one is arrested pursuant to a valid arrest warrant. The existence of probable cause negates Mr. Ballock's malicious prosecution claims under both Section 1983 and state law.

Mr. Ballock has no evidence that Defendants used the criminal process for an improper purpose after criminal charges were initiated against him. Rather, his abuse of process claims under both Section 1983 and state law relate to simply the initiation and prosecution of the criminal charges. His allegations fail to state an abuse of process claim. In addition, although a Section 1983 abuse of process claim has not been recognized in the Fourth Circuit, presuming such a claim is viable, Mr. Ballock's claim is time-barred because he filed the action more than two years after his arrest.

Mr. Ballock has admitted that everything in Cpl. Gaskins's investigation report—which forms the basis of his defamation claims under Section 1983 and state law—is true. Furthermore, he has no evidence that Cpl. Gaskins or Ms. Costlow made an unprivileged communication of the allegedly defamatory statements contained therein. Also, he cannot show that any harm he suffered was proximately caused by any statement contained within the report. Additionally, any communication to FBI officials was privileged because the communications at issue—regarding criminal charges of harassment of Mr. Ballock's estranged wife—affected a sufficiently important interest of the FBI and were within the generally accepted standards of decent conduct. Finally, as to the Section 1983 defamation claim, Mr. Ballock cannot show that any reputational

injury he suffered as a result of the investigation report was accompanied by state action that distinctly altered or extinguished any legal status he had.

Mr. Ballock's claims also fail because he cannot show that his discharge from the FBI was caused by Defendants. The FBI set forth in extensive detail its reasons for discharging Mr. Ballock. Contrary to Mr. Ballock's theory, the FBI did not base its discharge decision on any statements by Defendants, but upon Mr. Ballock's own conduct, as evidenced by the e-mails and texts at issue. To the extent that Mr. Ballock argues that Defendants "set in motion" the FBI investigation, Sgt. Kief did so by informing the FBI that the State Police was conducting a criminal investigation of one of its agents. This information was true, and under West Virginia law, supplying truthful information is an absolute defense to a claim of tortious interference with contract, whether the information was requested or not. Moreover, communication to FBI officials that one of the agency's senior supervisory agents was under criminal investigation for harassing his estranged wife is a privileged communication of information that affects a sufficiently important interest of the FBI and is within generally accepted standards of decent conduct.

Mr. Ballock cannot establish an intentional infliction of emotional distress claim because he has no evidence that Defendants engaged in any outrageous conduct. To the contrary, the evidence is that Ms. Costlow made a complaint to the State Police that Mr. Ballock was criminally harassing her, and Sgt. Kief and Cpl. Gaskins investigated her complaint and initiated criminal charges against Mr. Ballock based upon probable cause.

10555081

Finally, because the remaining claims fail, Mr. Ballock cannot establish a Section 1983 civil conspiracy claim. That is, Mr. Ballock has no evidence that Defendants conspired to deprive him of a federally protected right.

Besides Mr. Ballock's lack of evidence to establish the essential elements of his claims, the State Police Defendants alternatively argue that they are entitled to qualified immunity. Mr. Ballock cannot show that the State Police Defendants violated any clearly established law, either by arresting him based upon at least arguable probable cause or by communicating with another law enforcement agency about a criminal investigation of one of its supervisory agents.

While Ms. Costlow is not entitled to qualified immunity, Mr. Ballock's Section 1983 claims against her fail because there is no evidence she acted under color of law to deprive him of a federally-protected right. Furthermore, Mr. Ballock's breach of contract claim against Ms. Costlow fails for a number of reasons:  (1) The divorce decree between the parties does not create an enforceable contract; (2) Mr. Ballock breached the agreement attached to the Magistrate Court dismissal order prior to any alleged breach by Ms. Costlow when he falsely stated that he agreed there was probable cause for his arrest; (3) Ms. Costlow did not breach any enforceable agreement when the FBI contacted her; and (4) Mr. Ballock cannot establish that any damages he suffered were proximately caused by Ms. Costlow's purported breach of contract because he was discharged for his own conduct.

## 6. CONTESTED ISSUES OF FACT AND LAW

### I. FACTS

    a. Whether Sgt. Kief acted in conjunction with Ms. Costlow to bring criminal charges against Mr. Ballock for the purpose of assisting her in the divorce proceeding.

    b. Whether there was probable cause to charge and arrest Mr. Ballock.

10555081

    c.   Whether Defendants' actions caused the FBI to terminate Mr. Ballock's employment.

## II. LAW

See heading number 2 "Contested Issues of Law Requiring a Ruling Before Trial"

## 7. STIPULATIONS

    a.   Tom Ballock contacted Sgt. Kief on or about August 13, 2013 to advise that Trooper Berry was alleged to be having an affair with Ellen Costlow. Sgt. Kief investigated this but could not substantiate the allegations.

    b.   Sgt. Kief served Mr. Ballock with arrest warrants on September 13, 2013 during a break in a Family Court hearing.

    c.   Cpl. Gaskins met with John Hambrick of the FBI shortly after Scott Ballock's arrest and provided Agent Hambrick with the disk of Mr. Ballock's e-mails to Ms. Costlow.

    d.   The FBI initiated its internal investigation of Mr. Ballock on September 26, 2013, but held an active investigation in abeyance until after the criminal charges against Mr. Ballock were dismissed.

    e.   The criminal charges against Scott Ballock were dismissed on April 7, 2016.

    f.   On May 9, 2014, a decree of divorce was entered, including an injunction that "[n]either party will contact any employer regarding the other party in any fashion whatsoever." A signed handwritten agreement to the decree stated, "She is not to communicate with SB's Employer FBI, ever."

    g.   Sgt. Kief spoke with FBI investigators on or about April 14, 2016.

    h.   Ms. Costlow spoke with FBI investigators on or about May 12, 2016.

    i.   The order expunging the arrest and prosecution of Scott Ballock was entered on July 13, 2016.

    j.   The FBI first proposed Mr. Ballock's discharge on April 10, 2017.

    k.   Scott Ballock challenged the proposed termination on June 14, 2017.

    l.   The Office of Professional Responsibility (OPR) decided on September 21, 2017 to adopt the proposed dismissal.

    m.   Scott Ballock appealed the decision on October 3, 2017 and supplemented his appeal on December 22, 2017.

10555081

n.  On January 19, 2018, the Office of Disciplinary Appeals (ODA) remanded for further investigation and re-adjudication by the OPR.

o.  On November 15, 2018, the OPR concluded that Scott Ballock violated three offense codes, two of which merited dismissal.

p.  On March 5, 2019, the OPR, Nancy McNamara, Acting Assistant Director Office of Professional Responsibility, issued its second termination decision.

q.  The OPR's second termination decision, dated March 5, 2019, is currently on appeal, pending a decision by the Disciplinary Review Board (DRB).

r.  Without waiving the right to object to their *admissibility*, the parties stipulate to the *authenticity* of the e-mails and text messages between Mr. Ballock and Ms. Costlow that were provided by Ms. Costlow's divorce attorneys to the State Police, as well as the court filings in the Ballock divorce and the underlying criminal proceedings.

## 8.  SUGGESTIONS FOR AVOIDANCE OF UNNECESSARY PROOF AND CUMULATIVE EVIDENCE

The Court's decisions on the pending motions for summary judgment and motions *in limine*.

## 9.  SUGGESTIONS FOR SPECIAL PROCEDURES

None.

## 10.  PLAINTIFFS' STATEMENT OF DAMAGES CLAIMED

See Section 3 above.

## 11.  ESTIMATED NUMBER OF TRIAL DAYS

a.  Plaintiff estimates 5 days.

b.  Defendants estimate 3 days.

Respectfully submitted this 6th day of December, 2019.

10555081

**/s/ *Charles J. Crooks***
Charles J. Crooks (WV Bar No. 4633)
CROOKS LAW FIRM PLLC
244 Pleasant Street
Morgantown, WV 26505
(304) 282-1039
Charles@crookslawfirm.org
*Counsel for Plaintiff*


**/s/ *P. Todd Phillips* (email consent 12/6/19)**
P. Todd Phillips (WV Bar No. 9499)
LYONS PHILLIPS LEGAL GROUP PLLC
141 Walnut Street
Morgantown, WV 26505
(304) 296-3200 or (304) 296-0123
toddphillips.law@gmail.com
*Counsel for Defendant Ellen Ruth Costlow*

**/s/ *Mark G. Jeffries***
Mark G. Jeffries (WV Bar No. 11618)
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000
mark.jeffries@steptoe-johnson.com

Montè L. Williams (WV Bar No. 9526)
STEPTOE & JOHNSON PLLC
P.O. Box 1616
Morgantown, WV  26507-1616
(304) 598-8000
monte.williams@steptoe-johnson.com
*Counsel for Defendant State Trooper Michael Kief*

10555081

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

**SCOTT T. BALLOCK,**

      **Plaintiff,**

**v.**                                        **CIVIL ACTION NO.:  1:17-CV-52**
                                                **Honorable Irene M. Keeley**

**ELLEN RUTH COSTLOW,**
**STATE TROOPER MICHAEL KIEF,**
**AND STATE TROOPER RONNIE M. GASKINS,**

      **Defendants.**

### CERTIFICATE OF SERVICE

        I hereby certify that on the 6th day of December 2019, I electronically filed the

foregoing "Joint Pre-trial Order" with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to the following:

P. Todd Philips, Esquire
Lyons Phillips Legal Group PLLC
141 Walnut Street
Morgantown, WV 26505
*Counsel for Defendant Ellen Ruth Costlow*

Mark G. Jeffries (WV Bar No. 11618)
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8000
mark.jeffries@steptoe-johnson.com

Montè L. Williams (WV Bar No. 9526)
STEPTOE & JOHNSON PLLC
P.O. Box 1616

10555081

Morgantown, WV  26507-1616
(304) 598-8000
monte.williams@steptoe-johnson.com

*Counsel for Defendant*
*State Trooper Michael Kief*

10555081